Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN CRESS,<br><br>                    Plaintiff,<br><br>          v.<br><br>NEXO FINANCIAL LLC, NEXO FINANCIAL SERVICES LTD., NEXO SERVICES OU, NEXO AG, NEXO CAPITAL INC., and ANTONI TRENCHEV<br><br>                    Defendant. | Case No. 3:23-cv-00882<br><br>**DEMAND FOR JURY TRIAL**<br><br>**COMPLAINT** |

COMPLAINT

Plaintiff John Cress ("Plaintiff" or "Cress") alleges the following against Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo Services OU, Nexo AG, and Nexo Capital, Inc. (collectively "Nexo"), and Antoni Trenchev (together with Nexo, "Defendants") based on personal knowledge, the investigation of counsel, and information and belief.  Plaintiff believes that reasonable discovery will identify additional evidence for the allegations set forth herein.

**INTRODUCTION**

1.      Plaintiff brings this action against international crypto-lender Nexo to seek redress for the harm resulting from Nexo's fraudulent inducement of him to take out loans collateralized by millions of dollars in digital assets, which were ultimately sold ("liquidated") by Nexo.

2.      On September 26, 2022, the California Commissioner of Financial Protection and Innovation (the "Commissioner") found that Defendant Nexo Capital Inc., as well as the wider Nexo Group of corporate entities, had made unregistered securities offerings in the form of accounts through which Nexo customers earn interest on their deposited digital assets ("Earn Account Securities"), in violation of California law, and ordered Nexo to cease and desist from offering such accounts.[1] Specifically, the Commissioner found that as of July 31, 2022, over 18,000 California residents have accounts with Nexo that earn interest, which collectively hold investments totaling at least $174,800,000.

3.      Plaintiff is one of those California residents who had a Nexo interest-bearing account. Indeed, Plaintiff moved his substantial digital assets to Nexo so that he could passively earn interest. But Nexo also provides a related service—allowing customers to borrow cash against their deposited digital assets, which it then liquidates if the loan-to-value ratio ("LTV") of the customer's account becomes too high.

4.      To induce Plaintiff to borrow against his deposited digital assets and invest in its own complex financial products rather than just earn interest on his own digital assets, Nexo made false

---

[1] State of California, Business, Consumer Services and Housing Agency, Department of Financial Protection and Innovation, DESIST AND REFRAIN ORDER, (Sept. 26, 2022), https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/09/D-R-Nexo-Group.pdf.

promises to Plaintiff regarding its services to "VIP" customers, which Plaintiff relied upon in deciding to borrow against, and thus put at risk of liquidation, his substantial digital asset holdings.  Plaintiff ultimately suffered millions of dollars in losses because of those misrepresentations when he was liquidated of substantially all his digital assets.

5.      Further, finance lenders such as Nexo must be licensed to make loans under California law.  On information and belief, Nexo made these loans to Plaintiff while it was unlicensed, in violation of California law.

6.      On January 19, 2023, Nexo consented to the entry of a Cease and Desist Order by the U.S. Securities and Exchange Commission ("SEC").  Like the California Commissioner, the SEC concluded that Nexo had made unregistered securities offerings in the form of Earn Account Securities through which Nexo customers earn interest on their deposited digital assets, in violation of the Securities Act of 1933 ("Securities Act"), and ordered Nexo to cease and desist from offering such accounts.

7.      Nexo has had legal troubles outside of the United States too.  In January 2023, Bulgarian prosecutors launched an investigation into Nexo's alleged illegal activities, raiding more than 15 sites in the Capital Sofia in an operation involving over 300 law enforcement officers. Although Trenchev was elected to the Bulgarian parliament in 2014, the Bulgarian government has since launched "a pre-trial investigation aimed at neutralizing [] illegal criminal activity of crypto lender Nexo."[2]  The investigation is targeting Nexo for organized crime, tax crimes, money laundering, banking activity without a license, and computer fraud.

## PARTIES

8.      Plaintiff John Cress is a resident of San Francisco, California.

---

[2] Reuters, *Bulgaria launches probe of crypto lender Nexo, raids sites*, REUTERS, (Jan. 12, 2023, 3:59 AM) https://www.reuters.com/business/finance/bulgaria-launches-probe-crypto-lender-nexo-raids-sites-2023-01-12/;    Jamie Crawley, *Crypto Lender Nexo Targeted in Bulgaria Probe Into Alleged Money Laundering, Tax Violations*, COINDESK, Jan. 12, 2023, 1:16 PM), (https://www.coindesk.com/business/2023/01/12/nexo-subject-to-investigation-in-bulgaria-over-alleged-money-laundering-tax-offenses/.

9.      Defendant Nexo Financial LLC ("Nexo Financial") was incorporated in Delaware in June 2018 and maintains the registered agency address of 251 Little Falls Drive, Wilmington Delaware.  Nexo Financial is registered with the U.S. Financial Crimes Enforcement Network as a money services business ("MSB") for activity in all fifty states and operates through branches in at least twenty-four states, including California.

10.      Defendant Nexo Financial Services Ltd. ("Nexo Financial Services") is based in London, England, at 1 Canada Square Floor 39, Canary Wharf, and since May 2020 has supported Nexo Services OU in offering and maintaining the "Nexo" services advertised and available on the Nexo website and through the Nexo website platform.

11.      Defendant Nexo Services OU ("Nexo Services") is incorporated in Estonia and holds a crypto exchange license and the crypto wallet license required for a company to control a client's virtual assets under the European Anti-Money Laundering Directive 5 ("AMLD5").  Nexo Services has operations in both Estonia and Bulgaria, but neither country has authorized Nexo Services to conduct business there.

12.      Defendant Nexo AG is incorporated in Switzerland with the listed address of c/o Sibla Services AG, Grafenaustrasse 15, Zug, ZUG, 6300. Nexo AG's board members and authorized signatories include Nexo co-founders Kosta Kantchev and Antoni Trenchev.

13.      Defendant Nexo Capital Inc. ("Nexo Capital") is a Cayman Islands corporation, with the address Two Artillery, 161 Shedden Road, 2nd Floor, George Town, P.O. Box 799, Grand Cayman KY KY1-1103, that has its principal place of business and headquarters in London, England.  Nexo Capital operates Nexo's website.  On information and belief, Nexo Capital is the Nexo entity that issued credit to Plaintiff.

14.      Defendant Antoni Trenchev is the Co-Founder, Managing Partner, and Chief Executive Officer of Nexo.  Trenchev is a resident of the United Kingdom.  Trenchev exercised control over Nexo and directed and/or authorized, directly or indirectly, the sale of Nexo Tokens to Plaintiff. Trenchev signed the Cryptocurrency Purchase Agreement pursuant to which Nexo sold Plaintiff digital assets, including the NEXO Token securities.

15.     Nexo Financial, Nexo Financial Services, Nexo Services, Nexo AG, and Nexo Capital, collectively operating and maintaining the Nexo website and offering the Nexo services advertised on that website and through the Nexo whitepaper, are subject to single-enterprise liability.

16.     There is such a unity of interest and ownership among these entities that any separate corporate personalities are merged, such that one corporation is a mere adjunct of another and they form a single enterprise.  On information and belief, for example:

    a.    Nexo was founded and is, in Nexo's words, "powered" by Credissimo, a European Financial/Technological (or "FinTech") Group based in Bulgaria, and the majority shareholders and founders of Credissimo—Kosta Kantchev, Georgi Shulev, and Antoni Trenchev—are the majority shareholders and founders of Nexo.

    b.    Nexo co-founders Kantchev, Shulev, and Trenchev identify themselves, and are publicly identified, as "co-founders" and "managing partners" of "Nexo," without distinguishing among the Nexo corporate entities.

    c.    These Nexo entities commingle funds and assets, failing to segregate funds among the separate entities. These entities thus treat the ostensible funds and assets of one entity as the funds and assets of the other.

    d.    These Nexo entities do not maintain distinct minutes or corporate records, instead confusing the records of these entities.

    e.    These Nexo entities share similar if not effectively identical equitable ownership, in that Nexo co-founders Kantchev, Shulev, and Trenchev collectively hold most of the equity in each entity.

    f.    These Nexo entities share similar if not effectively identical supervision and management, in that some combination of Kantchev, Shulev, and Trenchev is responsible for such oversight for each of the entities.

g.      One or more of Nexo Financial, Nexo Financial Services, and Nexo AG may serve as a mere shell, instrumentality, or conduit for the Nexo Services business based and operating in Bulgaria and Estonia.

h.      These Nexo entities do not honor corporate formalities, do not maintain arm's length relationships, and treat the employees of any particular entity as working for "Nexo" as a whole.

17.     Underscoring the single-enterprise nature of Nexo, Plaintiff entered into a "Cryptocurrency Purchase Agreement" with "Nexo (any holding companies, subsidiaries or related entities which are hereinafter referred to as 'Nexo')," which was signed by Trenchev on behalf of all Nexo entities.  Throughout its relationship with Plaintiff, Nexo always presented itself as a single enterprise, never suggesting that certain products were offered by distinct Nexo entities.  For example, Nexo never suggested that Plaintiff was purchasing digital assets from a different entity than he was borrowing from.

18.     Nexo co-founder Trenchev further underscored the single-enterprise character of the Nexo corporate entities in an interview with Bloomberg on February 6, 2021, responding to a question concerning who "regulates" Nexo: "We are a global enterprise.  We are regulated as a financial institution in Estonia, we have various consumer lending licenses in the US, we are pending authorization by the FCA in London.  So it really depends on the jurisdiction and where you are based. In Switzerland we are part of a self-regulatory organization, so its quite an endeavor on that front, but the team is great and we have had quite some successes."

19.     In an August 2018 interview with Crypto Rand, Trenchev made similar comments underlining the unity of the Nexo entities, stating that "it is important to know that Nexo is SEC-compliant and adheres to all relevant European legislation" and citing the "great talent over at the helm of Nexo—Kosta has terrific analytical abilities to see the bigger trends and sharp business acumen to respond to them in the most efficient manner; Georgi is perhaps the most methodological and diligent person I know when it comes to finishing a mission and he is a real 'Excel' wizard."

20. Nexo's recently granted license to operate as a finance lender in California, and Nexo's announcement of that event, further underscore the single-enterprise character of the Nexo corporate entities. The licensee is Nexo Financial (the Delaware entity), but the listed address of Nexo Financial is the London address of both Nexo Financial Services (the U.K. entity) and Nexo Capital (the Cayman Islands entity).

21. In its press release announcing that this license had been granted, Nexo further highlighted its single enterprise character. For example:

    a. Nexo refers to itself in the collective: "Nexo, the leading regulated financial institution for digital assets with over $5 billion in assets under management, today announced it has obtained a California Finance Lender (CFL) License, applicable to lenders and brokers of commercial loans in the United States from the California Department of Business Oversight (DBO)."

    b. Nexo co-founder Trenchev is quoted describing Nexo as a collective, "global" entity: "The CFL License is a significant milestone in serving both our expanding client base and the next generation of crypto adopters within California's State regulatory framework. Our latest lender's license in the U.S., it further showcases our commitment to building a fully complaint and sustainable business globally and sets the bar high for the industry.'"

22. In addition, notwithstanding that this California finance lender license specifies Nexo Financial as the Nexo lending entity, Nexo Capital is the Nexo entity that recently brought suit in the United States against a customer for allegedly defaming "Nexo" in criticizing Nexo's online lending platform and overall operations."

23. Second, inequitable results would follow if the misconduct and acts in question in this action were treated as those of any one corporate entity alone. For example,

    a. If these entities were to claim distinctly to oversee and operate different aspects of the Nexo Crypto Credit, VIP, and OTC services made available to Plaintiff on the Nexo

website, Plaintiff may have to bring different suits in different jurisdictions to establish liability.

b.  If Nexo's actions were treated as only the actions of certain Nexo entities, then Plaintiff may be forced to litigate his claims in Estonia or the United Kingdom which would be inequitable given the substantial presence and activities of Nexo in the United States and Nexo's direct solicitation of Plaintiff's investments.

24.   This result would be particularly unfair as Nexo advertises itself as a single entity.  A Nexo blog post from November 2022, which states that it "would like to shed some light on Nexo's business model and how it might differ from that of others," states that Nexo's "core services complement each other and make the enterprise profitable."

25.   Nexo identifies these core services as "Crypto-backed loans, margin lending and institutional OTC loans made on a collateralized basis, Earn interest products and staking, [and] Trading services (spot, futures, options, otc, etc.)."  This post does not make any effort to differentiate between the various Nexo entities and Nexo's product offerings.  Rather, Nexo highlights the interconnected nature of its borrowing, trading, and earn products.

**JURISDICTION AND VENUE**

26.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff and Defendants are citizens of different states or countries.

27.   This Court has personal jurisdiction over Defendants, because for purposes of inducing Plaintiff to take out loans, Defendants solicited Plaintiff through substantial contacts with California; and because Plaintiff's claims arise out of the business that Defendants conducted in California, and the substantial contacts they maintained with California.

28.   But for Nexo's advertising made available in California, Plaintiff would not have used Nexo's services and would not have suffered the losses he did.  Plaintiff's use of Nexo's services did not and do not result from Nexo's random, fortuitous, or attenuated contacts with the state, or from his unilateral activity.

29.     Defendant Trenchev signed a "Cryptocurrency Purchase Agreement" with Plaintiff on behalf of "Nexo (any holding companies, subsidiaries or related entities which are hereinafter referred to as 'Nexo')."  The Agreement was sent to Plaintiff in California for signature through DocuSign.

30.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because, as explained above, a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.     Background

#### 1.     Nexo And Crypto-Lending

31.     Since April 2018, Nexo has maintained and operated a website through which customers can use their digital assets as collateral, held in their "Credit Line Wallet," to borrow fiat currency, such as US Dollars.  Beginning in October 2020, Nexo also offered customers interest-bearing accounts paying interest rates as high as 16% on deposited digital assets through a "Savings Wallet," which also serves as back up collateral.  Nexo describes itself as "the world's largest and most trusted crypto lender."

32.     A customer can borrow as much cash as they want from Nexo as long as they maintain a particular LTV ratio—*i.e.* the ratio between the amount of cash borrowed and the value of the collateral held in the customer's Credit Line Wallet. The value of that collateral fluctuates with the price of the digital assets held as collateral.

33.     Accordingly, a customer sometimes must stake more digital assets or pay back on its loan to maintain the requisite LTV ratio.  If a customer's LTV ratio rises above a certain threshold, to bring the LTV ratio back in line Nexo will (1) transfer assets from the Savings Wallet to the Credit Line Wallet and/or (2) automatically sell ("liquidate") the collateral.  These sales may result in the liquidation of all a customer's digital assets held in the Credit Line Wallet and Savings Wallet.

34.     Nexo also allows customers to use that borrowed fiat currency to purchase additional digital assets, which in turn provide additional collateral for the loan.  Through this mechanism, Nexo is in actuality selling customers a complex leveraged long on their basket of digital assets.

35.     Leveraged trading, which is also known as margin trading, allows customers to use borrowed capital to make trades and thus provides them with additional exposure to the digital assets comprising their position.  For example, a customer trading with 10x leverage could take on a $10,000 position using only $1,000 as collateral.  Leveraged trading is extremely high risk, particularly in the volatile crypto market.  The higher the leverage, the higher the risks of getting liquidated.

### 2.     Plaintiff's Investment in Digital Assets

36.     Plaintiff began purchasing Bitcoin ("BTC") in 2014 on Coinbase—a prominent U.S.-based crypto-currency exchange.   Plaintiff began purchasing Ether ("ETH") in 2017—also on Coinbase.

37.     In March 2021, Plaintiff decided to transfer his accumulated BTC and ETH to Nexo to earn passive returns on his assets through Nexo's interest-bearing Earn Account Securities. Specifically, on March 3, 2021, Plaintiff began a series of deposits to his Nexo Savings Wallet of 250.33 BTC and 250 ETH, to earn interest on his digital assets.

38.     At the time, Plaintiff also considered engaging in borrowing using those assets as collateral, but was undecided about whether to risk his assets through borrowing, given the possibility of a "flash crash" scenario in which the value of his crypto-collateral would drop so far that he would be liquidated.

### B.     Nexo Solicited Plaintiff to Borrow Against his Digital Assets

39.     On March 15, 2021, Nexo employee Hristiyan Hristov ("Hristov") contacted Plaintiff and stated that Plaintiff's account had grown to the point that he was eligible for Nexo's "VIP Relationship Program." Hristov also informed Plaintiff that he would be Plaintiff's "dedicated relationship manager." At that point, Plaintiff had not borrowed on Nexo's platform or decided to pursue borrowing on Nexo's platform, and he did not respond to Hristov.

40.     On March 17, however, Hristov again reached out to Plaintiff, advertising the benefits of the VIP Program and attaching a brochure produced by Nexo describing the program to, as Hristov put it, "spark your interest."

COMPLAINT

41.     Plaintiff responded that he was feeling "less comfortable borrowing" and "more nervous borrowing" given the high prices of BTC, which he explained to Hristov increased the likelihood of a large enough drop in BTC price such that he could be liquidated of his holdings.

42.     But Plaintiff's fears were allayed by the VIP brochure that Nexo had sent him.  Nexo promised that as a participant in the VIP Program, Plaintiff (1) would "get a response from the support team in 2 hours, 24/7," receive a "dedicated relationship manager," "direct phone number availability," and (2) could utilize certain "OTC services," which included, among other things, Nexo's "[l]iquidation relief program," which Nexo specifically represented was a "service in the event of a market crash to recover your liquidated assets . . . ."  Plaintiff reasonably understood that these representations to mean that, as a VIP, (1) he would receive prompt responses from a dedicated relationship manager, at any time, and (2) in the event of a market crash that his digital assets would receive protection from liquidation.

43.     On March 23, Plaintiff requested that Hristov send him documentation of the terms of the loan he would be taking out.  Hristov did not send any documentation.

44.     In that same e-mail exchange, Plaintiff also asked how much interest the Bitcoin he posted as collateral would "be earning and if all the interest was applied to the monthly loan payment, how short would the payments be and is that ok?"  Hristov responded: "You will be earning 5% annually on the Bitcoin which you used as collateral.  Keep in mind that the interest rate will be paid out daily in BTC, so you will benefit from the potential upside in the Bitcoin price."  Thus, Hristov represented that Plaintiff would continue earning interest on his digital assets, as he had been before, even after posting those assets as collateral for his loan.

**C.     Plaintiff Relied on Nexo's Representations in Borrowing Against his Digital Assets**

45.     Plaintiff relied upon Nexo's representations about its responsiveness and the Liquidation Relief Program in deciding whether to take out collateralized loans from Nexo because the digital asset market is highly volatile, and a loan collateralized by such volatile assets entails substantial risk.  Both the responsiveness of customer service to trading requests, for example, and

protection from liquidation in the event of sudden volatility in the market were critical to Plaintiff's decision to take out collateralized loans, because the existence of those two benefits would eliminate the risk of losing his digital assets to liquidation in a "flash crash" scenario.

46.    Plaintiff also relied upon Nexo's representation that his collateral would continue earning interest, because it altered the economic cost of borrowing.   The economic benefit of continuing to earn interest on his collateral, for example, would offset any interest that he would pay on his loans, which Plaintiff understood to be a substantial benefit.   Indeed, without these assurances and representations by Hristov, Plaintiff would not have borrowed from Nexo.

47.    Plaintiff's reliance was justified. *First*, Nexo's "VIP" and Liquidation Relief programs were not publicly advertised at the time, and information regarding their terms was uniquely within the possession of Nexo.  *Second*, Nexo concealed the true nature of the Liquidation Relief Program from Plaintiff.  For example, on May 23, 2021, Plaintiff emailed Hristov seeking an explanation of exactly how the Liquidation Relief Program would operate to protect his assets in a "[f]lash crash scenario." Plaintiff received no response. *Third*, Plaintiff asked for Nexo to send him loan terms so that he could verify relevant information, including interest rates on his collateral and loans.  But those terms were not forthcoming.

48.    As Hristov had predicted, and Nexo intended, Nexo's VIP Program brochure and Hristov's other representations *did* "spark" Plaintiff's interest in borrowing, and on March 26, in reliance on Nexo's representations regarding the VIP Program and its borrowing services, Plaintiff took out an approximately $5.4 million loan collateralized by his digital assets.  Plaintiff then borrowed approximately $7.45 million more through loans on March 30, April 14, and April 30.  As a result of this borrowing that Nexo had induced, Plaintiff proceeded to suffer the loss of substantially all of the digital assets he deposited onto Nexo's platform.

### D.    Nexo's Unlicensed Lending Activity

49.    Nexo Capital operates in California as a finance lender, including with respect to Plaintiff.  Nexo Capital does not hold, and has never held, a license in California, from the California

Department of Business Oversight, to operate as a finance lender within the state. Nexo's lending, including with respect to Plaintiff, was accordingly unlawful.

**E.      Nexo Requires Plaintiff to Purchase its Highly Volatile NEXO Token**

50.      Nexo advertises borrowing interest rates as low as zero percent. However, in order to get more favorable interest rates on both borrowing and Earn Account Securities, Nexo requires customers, including Plaintiff, to purchase its NEXO Tokens—which Nexo concedes are securities under U.S. law—and maintain ten percent of their portfolio balance in NEXO Token securities.

51.      The difference in rates is substantial. If a Nexo customer does not acquire any NEXO Tokens their borrowing rate is 13.9%. However, if a customer maintains 10% of their portfolio balance in NEXO Tokens, their borrowing rate is less than half that at 5.9%.

52.      When Plaintiff asked Hristov to lay out various possibilities for purchasing additional Bitcoin with a Nexo loan secured by his digital assets, Hristov responded by stating "I have prepared three scenarios of purchasing Bitcoin through Nexo's Credit line. In all of them, I have added the amount of NEXO Tokens (in BTC value) you would need for the Platinum membership." Each of the scenarios called for Plaintiff to purchase 25 Bitcoin worth of NEXO Tokens to obtain NEXO Platinum and thus qualify for Nexo's lower 5.9% borrowing rates. However, despite requiring Plaintiff to purchase 25 Bitcoin worth of NEXO Tokens, the additional cost of the NEXO Tokens was not reflected in the LTV and liquidation numbers provided by Hristov, thus understating the riskiness of the loans and obscuring from Plaintiff that both the LTV and liquidation threshold would be dependent on the price of NEXO Tokens as well as the price of BTC.

53.      Plaintiff had never previously considered purchasing NEXO Tokens and instead made clear that he was seeking to use Nexo's lending solely to increase his BTC holdings, indicating to Hristov that he would like to move forward with a purchase of 100 Bitcoin for a 40% LTV ratio.

54.      However, Hristov responded by once again directing Plaintiff to purchase NEXO Tokens, stating, "[a]t the moment, without the additional collateral, you can withdraw up to $4M loan which will enable you to purchase ~ 50 BTC and 25 BTC worth of NEXO Tokens." Simply put,

rather than allowing Plaintiff to purchase Bitcoin as he planned, Nexo would require Plaintiff to purchase a significant amount of NEXO tokens in order to obtain its advertised interest rates.

55.     Hristov allayed Plaintiff's concerns by representing that "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors."  This statement was untrue as Nexo has never registered the NEXO Token with the SEC.  While Nexo Capital did file a Form D Notice of Exempt Offering of Securities with the SEC in 2018, that Notice indicated that its token offering would be complete within a year, and in any event does not constitute registration with the SEC.

56.     Based on this representation and Nexo's requirement that Plaintiff purchase the NEXO Tokens to obtain favorable borrowing rates, Plaintiff proceeded to borrow $5.4 million to purchase 75 Bitcoin and 25 Bitcoin worth of NEXO Tokens, whereas Plaintiff had initially intended to use the full loan amount to purchase 100 Bitcoin.

57.     On or about March 30, 2021, Plaintiff emailed Hristov indicating that he would like to use Nexo's "credit line to purchase 50 or 75 more bitcoins."  Hristov responded that he would "be happy to help you facilitate a new deal. I am proposing the following parameters: 1. Buy 50 BTC @ $58,000 = ~$2,900,000 executed again in the next 24 hours; 2. Buy 20 BTC = ~$1,165,000 worth of NEXO Tokens to get to the Platinum tier (10% of total portfolio after the new purchases)."

58.     Stated otherwise, in order to continue receiving a favorable borrowing rate from Nexo, Plaintiff would have to convert not only 10% of the assets he deposited on Nexo to the NEXO Token, but also 10% of all assets purchased with loans obtained from Nexo.

59.     This fact had not been disclosed to Plaintiff previously and contradicted Hristov's initial recommendation that Plaintiff purchase NEXO Tokens with 10% of Plaintiff's deposited collateral (25 of 250 Bitcoin).  However, as Plaintiff's assets were already tied up as collateral on the platform, he had little choice but to accept Nexo's requirement that he purchase even more NEXO Tokens in order to continue receiving a favorable interest rate.

60.     By forcing Plaintiff to convert a significant amount of his holdings to its own highly volatile security token, Nexo dramatically increased the likelihood that Plaintiff would be liquidated.

Rather than Plaintiff's position being secured by just Bitcoin—which is significantly less volatile than the NEXO Token—Plaintiff's position was secured by a basket of Bitcoin and the NEXO Token security. As a result, when the crypto market experienced downside volatility, the value of Plaintiff's collateral decreased more sharply than it would have if he had been holding only Bitcoin. This in turn increased Plaintiff's LTV more rapidly, resulting in the liquidation of Plaintiff's assets.

61. Nexo compounded this effect by choosing to liquidate Plaintiff's most stable assets (USDC and Bitcoin) first when his LTV rose above Nexo's liquidation threshold. The result of each liquidation was to make Nexo's own security token a larger and larger portion of Plaintiff's holdings thus further increasing the volatility of his collateral's value and greatly increasing the likelihood of future liquidations.

62. The economic reality of these related transactions is that Nexo was selling Plaintiff a complex and highly risky leveraged long of a bundle of digital assets, including its NEXO Token security (the "Leveraged Investment Instrument"). If the value of the bundle of assets underlying the Leveraged Investment Instrument increased, so too would the value of the Leveraged Investment Instrument. However, if the value of those assets decreased, the value of the Leveraged Investment Instrument would decrease sharply.

63. The success or failure of the Leveraged Investment Instrument was thus dependent in large part on the performance of the underlying NEXO Token security. In fact, Nexo acknowledged that Plaintiff's "liquidation price . . . would depend on the movement of the different assets in your account."

64. Due to its dependence on the success of the NEXO Token security the whole Leveraged Investment Instrument offered and sold by Nexo to Plaintiff itself constituted a security under U.S. and California law.

65. Ultimately, the poor performance of the NEXO Token contributed substantially to the decrease in the value of Plaintiff's collateral and thus to the liquidation of Plaintiff's digital assets. The losses Plaintiff sustained as a result of the poor performance of the NEXO Token security were

thus not limited to the diminishment of the value of the NEXO Token itself, but rather included the entirety of Plaintiff's digital assets held on Nexo.

66.     Plaintiff purchased the NEXO Token security from Nexo at prices between $2.51 and $3.87 per token.  By May 23, 2021, the price of the NEXO Token securities sank to $1.47 causing the first partial liquidation of Plaintiff's digital assets. They then recovered somewhat before plunging once again on June 21 and 22 to $1.16, resulting in the liquidation of nearly all of Plaintiff's remaining digital assets.

67.     The true nature of Nexo's Leveraged Investment Instrument was laid bare only after Nexo liquidated all of Plaintiff's other digital assets, leaving Plaintiff holding only the NEXO Token securities after liquidating millions of dollars' worth of Plaintiff's more stable USDC, BTC, and ETH holdings.

**F.     Nexo's "OTC Trading Team" Is a Mirage**

68.     To add insult to injury, Nexo's "exclusive OTC services" which promised "some of the best rates on the market" also appears to have been illusory.  Each time Plaintiff sought to execute the purchase of substantial amounts of Bitcoin or Ether, Nexo took days to do so and provided Plaintiff execution prices far higher than those available at the time Plaintiff placed the orders.  These poor execution prices increased Plaintiff's LTV and thus contributed to the eventual liquidation of Plaintiff's holdings as described in Section G below.

69.     On or about March 24, 2021, Plaintiff and Nexo executed a Cryptocurrency Purchase Agreement, which provided that Plaintiff could "submit a Purchase Order to Nexo" and Nexo "shall have ten minutes (the 'Review Period') to confirm such Purchase Order via email after which Review Period such Purchase Order shall be deemed to be rejected and expired."

70.     On or about March 26, 2021, Plaintiff emailed Hristiyan, "I signed the purchase agreement and most of my BTC is on Nexo now.  All my bitcoin will be there less than two hours from now.  Can you call me now?  We can go through any final steps and start purchasing bitcoin now at prices below $54,000 and I want to buy Nexo fast before it keeps rebounding."

71.     Despite Plaintiff's clear instructions, Nexo apparently did not execute his orders until the following day, when Hristov emailed Plaintiff stating that the "OTC team did a great job and purchased the assets as it follows: 1. 74.441 BTC @$55,289.81 [and] 2. 481,878 NEXO Tokens @ $2.66." Nexo's "OTC team" thus purchased these assets at a significantly higher price than Plaintiff could have acquired them himself using a retail exchange.

72.     Similarly, on or about March 30, 2021, Plaintiff sent $4,300,000 to Nexo's OTC desk to purchase 50 Bitcoin and 20 Bitcoin worth of NEXO Tokens. Plaintiff sent a contemporaneous confirmation email regarding this purchase.

73.     However, Plaintiff had not received any confirmation from Nexo by the next day. He thus followed up, writing, "I was expecting an email from you this morning with an update on the OTC desk order execution confirmation. A whole day has gone by now gone by. Also the price of bitcoin just rose from 57,400 to 59,400 now, so I'm expecting the order fulfilled yesterday close to $57,400. I don't have any emails from you or any from Nexo in general. If you look at my transactions history, I sent $4,300,000 to the address you gave me, but I haven't heard back with any confirmation or any update and it's been 24 hours and bitcoin has moved higher by $2,000. This is not good."

74.     Hristov did not respond for another 12 hours, and when he did he "confirm[ed] that we have received the funds and executing the Bitcoin purchase as we agreed – Time waited average execution – 24 hours. Approximately six hours later Hristov stated that the "OTC has executed the deal with the following parameters: 1. 530,190 NEXO Tokens @ $2.829 [and] 2. 47.3227 BTC @ $59,197." Once again, these prices were significantly higher than those at which Plaintiff could have acquired these assets on a retail exchange. In addition, despite Hristov's claim that the Bitcoin execution price was based on a time weighted average during the 24 hours following Plaintiff's order, the $59,197 per Bitcoin price was significantly higher than the time weighted average price during that time.

75.     When Plaintiff made an additional Bitcoin purchase on April 14 and an Ethereum purchase on May 1, Nexo once again provided execution prices that were significantly higher than the time weighted average price during the 24 hours following Plaintiff's order.

76.     Plaintiff is informed and believes and based thereon alleges that Nexo's OTC desk was nothing more than a sham and that Nexo intentionally provided Plaintiff with poor execution prices in order to retain the difference between the prices quoted to Plaintiff and its actual execution prices.

**G.     Nexo Liquidates Plaintiff's Holdings Without Providing Notice**

77.     As of May 10, 2021, Plaintiff held digital assets worth over $30 million on Nexo, including over $4 million in NEXO Tokens, collateralizing a total loan amount of approximately $13,924,318.67.

78.     However, over the next several weeks the value of those digital assets decreased rapidly.  The fall in the price of the NEXO Tokens was particularly dramatic, losing 70 percent of its value and decreasing from $3.70 on May 10 to a low of $1.05 on May 23.  This caused Plaintiff's LTV to rise, placing his assets at risk of liquidation.

79.     Although Nexo's Terms explicitly state that it will provide its customers with notice and an opportunity to furnish additional collateral prior to liquidating their assets, it provided Plaintiff with no such warnings on May 23, 2021.  Plaintiff was thus deprived of the opportunity to provide additional collateral to protect his investment.

80.     Nexo nevertheless proceeded to liquidate a substantial portion of Plaintiff's digital assets when his LTV rose above .833, first liquidating over $1,000,000 in USDC (a USD stable coin).  Nexo then proceeded to liquidate 31.52 BTC despite the fact that the first liquidation appears to have brought Plaintiff's LTV to below the .833 threshold which Nexo represents as the liquidation threshold.  Nexo did not liquidate any of the NEXO Token held by Plaintiff, thus increasing the security token's weight in the basket of crypto assets used to collateralize his long position.

81.     While the value of Plaintiff's digital assets recovered somewhat following this initial liquidation, their value declined again on June 21 and 22.  Nexo once again failed to provide Plaintiff with any warnings prior to beginning the liquidation of his assets.  While Nexo did send warning texts and emails to Plaintiff, those texts and emails did not arrive until *after* Nexo had begun to liquidate Plaintiff's digital assets.  Nexo thus once again deprived Plaintiff of the opportunity to provide additional collateral to protect his investment.

82.     Nexo also appears to have once again liquidated more of Plaintiff's collateral than was necessary to maintain an LTV below .833.  Nexo also once again liquidated Plaintiff's relatively stable BTC assets, with each liquidation resulting in the Nexo Token security comprising an ever-larger portion of Plaintiff's shrinking collateral.

83.     Almost immediately following the liquidation of substantially all of Plaintiff's digital assets, the market began to recover.  Within months both Bitcoin and Ethereum would reach new all-time highs.

### H.     Nexo's Misrepresentations

84.     Nexo's VIP Program brochure, and Hristov's communications regarding that program, contained multiple false and misleading representations and omissions that, in violation of California law, fraudulently induced Plaintiff into borrowing against his digital assets.  Indeed, the Nexo VIP Program was an unlawful scheme to steer customers with large accounts, such as Plaintiff, into loans and programs that were lucrative to Nexo with the promise of special benefits, when in fact Nexo provided sub-standard service and a false sense of security conveyed by its advertising that increased the likelihood of customer liquidations, and did not provide the benefits Nexo represented that Plaintiff would receive. Specifically, Nexo's representations regarding (1) its Liquidation Relief program, (2) its responsiveness, and (3) the ability to earn interest on collateral were false and misleading.

### 1.     Nexo Misrepresented its Liquidation Relief Program

85.     Nexo represented to Plaintiff that as a participant in its VIP Program he would be able to "recover [his] liquidated assets" through its Liquidation Relief Program.

86.     As discussed above, Nexo liquidated Plaintiff's assets over the course of May and June 2021.  On June 21 and 22, 2021, Plaintiff was substantially liquidated of his remaining BTC and paid off his loan.

87.     On June 22, 2021, Plaintiff wrote to Hristov that Nexo had instructed him to utilize Liquidation Relief.  The same day, Nexo informed Plaintiff that under its Liquidation Relief Program it would allow him to take out a new *loan from Nexo* to repurchase his liquidated assets *from Nexo*, subject to his ability to provide millions of dollars' worth of additional collateral.

88.     Plaintiff did not, and a reasonable consumer would not, understand the "Liquidation Relief" program to simply mean that Nexo would provide a new collateralized loan to purchase back assets that Nexo itself had liquidated.  The VIP Brochure's language regarding Nexo's Liquidation Relief Program was accordingly misleading, because it was likely to deceive reasonable customers, and in fact did deceive Plaintiff, into concluding that posted collateral would be protected in the event of a liquidation.

### 2.     Nexo Misrepresented its Responsiveness

89.     Nexo represented that VIP customers would receive a response from its support team "in 2 hours, 24/7," a "dedicated relationship manager," and "direct phone number availability." Contrary to Nexo's representations about its responsiveness to VIP customers, Plaintiff in fact had to wait days, even weeks, to receive responses regarding his inquiries about Nexo's services and his account at critical periods in the market.

90.     Contrary to Nexo's representations about access to customer service, although Hristov was assigned as Plaintiff's relationship manager, he was frequently unavailable, and Plaintiff did not receive a direct phone line to Hristov.

91.     For example, on May 28, 2021, Plaintiff initiated a customer service ticket requesting that Nexo work with him to protect his collateral in times of market volatility.  Nexo responded the next day that his request had been referred to Plaintiff's "account manager." On June 10, almost *two weeks* after he had initiated contact, Plaintiff wrote to Hristov that despite "trying very hard to reach someone at Nexo for help protecting my assets," he had been waiting 12 days for a response.  Plaintiff emphasized that "[t]his is a very serious situation and I am doing everything possible to think about ways to protect my assets. I need Nexo to respond immediately today to help me carry out the moves that need to happen." Hristov responded, but only to provide more misleading information regarding a collateral swap program, which Plaintiff noted "is not at all what it sounds like."

92.     Nexo's lack of responsiveness injured Plaintiff because it impacted his ability to make decisions about how to protect his assets from the liquidation that he ultimately suffered.  As a result of Nexo's delays in responding to Plaintiff, for example, he could not timely determine whether he

should maintain his loan-to-value ratio to avoid liquidation by attempting to sell assets outside of Nexo and posting additional collateral, whether Nexo would accept pledges of other assets not listed on its website as collateral, or whether Nexo would allow him to engage in swaps on the terms he had proposed to Hristov.

93.     Nexo compounded this misrepresentation by failing to provide Plaintiff with notice and an opportunity to provide additional collateral before liquidating Plaintiff's assets.  Simply put, Nexo left Plaintiff in an information vacuum.

### 3.     Nexo Misrepresented That Collateral Would Continue to Bear Interest

94.     When Hristov *was* available, he misled Plaintiff regarding Nexo's financial products. Specifically, on March 23, 2021 Hristov told Plaintiff: "You will be earning 5% annually on the Bitcoin which you used as collateral." This was false—Plaintiff did not earn interest on digital assets posted as collateral for his loans.

95.     Not only did this false representation induce Plaintiff to take out loans collateralized by his digital assets by substantially altering the benefits and risks of such borrowing, but it also contributed directly to the eventual liquidation of Plaintiff's assets.  Without receiving interest on his digital assets as promised, Plaintiff was left with nothing to offset the substantial interest due on his crypto loans.  As a result, the amount of his loans increased relative to the value of his digital assets, thereby increasing his LTV ratio and thus leaving his assets at increased risk of liquidation.

### <u>FIRST CAUSE OF ACTION</u>

### **Fraudulent Inducement of Contract**

### **(Against Nexo Defendants)**

96.     Plaintiff realleges the allegations above.

97.     Nexo represented that it would provide Plaintiff, as a member of its VIP Program, (1) a Liquidation Relief Program that would protect his assets in the event of a liquidation, (2) prompt responsiveness, and (3) interest on his posted collateral.

98.     On information and belief, Nexo had no intention of honoring these false promises when it made them, but rather that they were provided to Plaintiff with the purpose of convincing him to take out loans that put his collateral at risk of liquidation and for Nexo's benefit.

99.     On information and belief, Nexo deliberately made the false promises regarding its (1) Liquidation Relief Program, (2) responsiveness, and (3) interest on Plaintiff's posted collateral to induce Plaintiff to take out loans from Nexo.

100.     Plaintiff relied to his detriment on Nexo's false promises by taking out loans from Nexo.  Plaintiff would have behaved differently if he had known the promises were false in that Plaintiff would not have taken out loans at all, but instead only earned interest on his digital asset deposits.

101.     Plaintiff's reliance on Nexo's false promises was justified in that Plaintiff had no reason to doubt the truthfulness of Nexo's promises about its (1) Liquidation Relief Program, (2) responsiveness, and (3) interest on his posted collateral.  Further, Plaintiff investigated the truth of Nexo's promises by asking for explanations, which were not delivered, resulting in the concealment of the falsity of those promises by Nexo.

102.     Nexo's false and misleading promises, inducing Plaintiff's reliance thereon, were the direct and proximate cause of Plaintiff's loss, which Plaintiff would not have sustained but for Nexo's fraud.

103.     As a result of Nexo's fraud, Plaintiff is entitled to restitution in the amount of the value of the digital assets he lost.  Plaintiff is also entitled to any interest he would have earned on those assets, had Nexo not induced him to post those assets as collateral, thereby causing his losses.

104.     Additionally, Plaintiff is entitled to punitive damages as a result of Nexo's fraudulent conduct.

## SECOND CAUSE OF ACTION

### California Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### (Against Nexo Defendants)

105.    Plaintiff incorporates the allegations above.

106.    Nexo is a "person" and since December 23, 2020, has engaged in "unlawful," "unfair," "misleading," and "deceptive" business acts under California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, as alleged herein.

107.    The UCL prohibits "induc[ing] the public to enter into any obligation" through any "untrue or misleading" statement. Nexo has engaged in "deceptive" and "misleading" advertising under the UCL.

108.    *First,* Nexo engaged in "deceptive" and "misleading" advertising by using language in its VIP Program Brochure likely to deceive reasonable customers into concluding that Program would provide: (1) a Liquidation Relief Program that would protect the customers' collateral in the event of a liquidation and (2) prompt responses from a dedicated relationship manager to whom the customer would have direct access. Further, Nexo represented to Plaintiff that he would earn interest on his posted collateral to induce Plaintiff to take out loans from Nexo, which was also false. Nexo also falsely represented to Plaintiff that he would receive notice and an opportunity to provide additional collateral before liquidation of his assets.  Nexo further misrepresented the true cost of borrowing from Nexo by advertising interest rates that were only available to customers holding ten percent of their assets in the NEXO Token.  Nexo obscured the impact of holding the NEXO Token on Plaintiff's LTV and liquidation threshold. Nexo's misleading and deceptive advertisement induced Plaintiff into borrowing from Nexo.

109.    *Second*, Nexo's conduct in failing to honor its promises to Plaintiff were "unfair" because any reasons, justifications, and motives for its conduct do not counterbalance its substantial financial impact on Plaintiff.  Nexo's failure to protect Plaintiff's collateral in a market crash, its lack of responsiveness, and its failure to pay interest on Plaintiff's collateral, were injurious to Plaintiff and unscrupulous, and Nexo failed to comply with those promises in bad faith, for its own financial benefit, at the expense of Plaintiff, without any justified excuse.

110.    *Third*, Nexo's conduct has also been "unlawful," because it was in violation of the California Finance Law, §§ 22100 et seq. prohibiting engaging in the business of a finance lender or

broker without obtaining a license.  Under the California Finance Law, a "finance lender" includes "any person who is engaged in the business of making consumer loans or making commercial loans." Cal. Fin. Code § 222009.  "The business of making consumer loans or commercial loans may include lending money" in exchange for a security interest involving the forfeiture of rights in or to personal property.  *Id.*  Nexo's conduct in obscuring the true cost of borrowing—including the required NEXO Token purchases—was also unlawful.

111.    Nexo is a finance lender because it engages in the business of making consumer and/or commercial loans, which includes lending money and taking as security for the loan an obligation involving the forfeiture of rights in or to personal property.

112.    Specifically, Nexo made loans of money to Plaintiff in which Nexo received a security interest in Plaintiff's digital assets involving the forfeiture of certain rights therein.  Nexo made those loans without obtaining a finance lending license.

113.    The statutorily defined purpose of California's Finance Lender License is to "protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).  Plaintiff was harmed by Nexo's unlawful lending practices in violation of the UCL, because he would not have suffered losses caused by Nexo were it not for Nexo's unlicensed and unfair lending practices.

### THIRD CAUSE OF ACTION

**Unregistered Offer and Sale of Securities**

**Cal. Corp. Code §§ 25110 and 25503, *et seq.***

**(Against All Defendants)**

114.    Plaintiff incorporates the allegations above.

115.    NEXO Tokens and Nexo Earn Accounts are securities within the meaning of the California Corporations Code.

116.    Nexo concedes that the NEXO Token is a security.

117.    Both the California Commissioner of Financial Protection and Innovation and the S.E.C. have determined that Nexo Earn Accounts are securities.

118.    The practical reality of Defendants' practices—including the requirement that customers maintain ten percent of their portfolio in NEXO Token to obtain better lending rates—is to sell retail investors, including Plaintiff, the Leveraged Investment Instrument, a leveraged long on a basket of digital assets which includes the NEXO Token security as well as Nexo Earn Account securities.

119.    This risky Leveraged Investment Instrument financial product is itself a security within the meaning of the California Corporations Code as its performance is inextricably intertwined with the performance of the NEXO Token securities and Nexo Earn Account securities included in the basket of digital assets.  In fact, Defendants acknowledged that Plaintiff's "liquidation price . . . would depend on the movement of the different assets in your account."

120.    By engaging in the conduct described above within California, Defendants sold and offered to sell securities to Plaintiff.

121.    Plaintiff purchased NEXO Token securities, Nexo Earn Account Securities, and Leveraged Investment Instrument securities from Defendants.

122.    No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

123.    By reason of the foregoing, Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

124.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff has suffered damages in connection with his purchase of NEXO Token securities.

125.    Defendants assumed a fiduciary relation to Plaintiff in connection with their sale of unregistered NEXO Token securities to Plaintiff.  But Defendants nevertheless falsely claimed that the NEXO Tokens sold to Plaintiff had been registered with the SEC.

126.    As a result, this cause of action did not accrue until Plaintiff learned in early 2023 that the NEXO Tokens had not been registered with the SEC.

**FOURTH CAUSE OF ACTION**

**Unregistered Offer and Sale of Securities**

**Cal. Corp. Code §§ 25110 and 25504, *et seq.***

**(Against the Control Person Defendant Trenchev)**

127.    Plaintiff incorporates the allegations above.

128.    This Count is asserted against Defendant Antoni Trenchev for violation of Section 25504 of the California Corporations Code.

129.    Trenchev, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts was, at the time of the wrongs alleged herein, and as set forth herein, a controlling person within the meaning of Section 25504 of the California Corporations Code. Trenchev had the power and influence and exercised the same to cause the unlawful offer and sale of NEXO tokens, Nexo Earn Account securities, and Leveraged Investment Instruments as described herein in violation of Section 25110 of the California Corporations Code.

130.    As the Co-Founder, Managing Partner, and Chief Executive Officer of Nexo, Trenchev possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of Nexo, through ownership of voting securities, by contract, subscription agreement, or otherwise.  Trenchev also has the power to direct or cause the direction of the management and policies of Nexo.

131.    Trenchev has sufficient influence to have caused Nexo to submit a registration or qualification statement.

132.    Trenchev jointly participated in, and/or aided and abetted, Nexo's failure to register the NEXO Token, Nexo Earn Account securities, and Leveraged Investment Instruments in violation of Section 25110.

133.    By virtue of the conduct alleged herein, Trenchev is liable for the wrongful conduct complained of herein and is liable to Plaintiff for recission and/or damages suffered.

**FIFTH CAUSE OF ACTION**

**Fraud in the Offer and Sale of Securities**

**Cal. Corp. Code §§ 25401 and 25504.1, *et seq.***

**(Against All Defendants)**

134.   Plaintiff incorporates the allegations above.

135.   This Count is asserted against Defendants for violation of Section 25401 of the California Corporations Code.

136.   This Count is asserted against Defendant Trenchev because he materially assisted, and/or aided and abetted, in the violation of Section 25401, with intent to deceive or defraud, pursuant to Section 25504.1.

137.   California Corporations Code Section 25401 makes it illegal to "offer or sell a security in this state . . . by means of any written or oral communications which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made . . . not misleading."

138.   Defendants were, at the times of the wrongs alleged herein, and as set forth herein, "persons" within the meaning of Section 25401 of the California Corporations Code.

139.   Defendants, separately or together, directly or indirectly, caused a false statement or omission to be made in connection with the offers or sale of a security, including the statements detailed in paragraphs 44-47, 51-58, 79, 84-88, 93-95 that:

    a.   "The NEXO token is registered with the SEC as a security";

    b.   The Liquidation Relief Program that would protect the customers' collateral in the event of a liquidation;

    c.   Plaintiff would earn interest on his posted collateral to induce Plaintiff to take out loans from Nexo;

    d.   Plaintiff would receive notice and an opportunity to provide additional collateral before liquidation of his assets; and

e.   Described the "scenarios" provided to Plaintiff by Hristov which obscured the impact of holding the NEXO Token on Plaintiff's LTV and liquidation threshold.

140.   Defendants, separately or together, sold and offered to sell NEXO Tokens, Nexo Earn Accounts, and the Leveraged Investment Instrument, securities, to Plaintiff in the state of California.

141.   Defendants, separately or together, had knowledge of the falsity or misleading nature of a statement or omission made in connection with their offer or sale of NEXO Tokens and Leveraged Investment Instruments to Plaintiff.  Alternatively, Defendants, separately or together, were negligent in failing to investigate and discover the falsity of the statement or omission.

142.   Defendants, separately or together, were aware that a fact being misrepresented or omitted was material to the buyer's decision to purchase NEXO Tokens and/or Leveraged Investment Instruments, including Plaintiff's decision to purchase NEXO Tokens and Leveraged Investment Instruments.

143.   By virtue of the conduct alleged herein, the Defendants are liable, jointly or severally, for the wrongful conduct complained of herein and are liable to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendants as follows:

(a) Damages and/or restitution in an amount to be determined according to proof at trial;

(b) Punitive damages in an amount to be determined by the Court according to proof;

(c) An award of pre and post-judgment interest for the maximum amount allowed by law;

(d) An award of costs;

(e) An award of reasonable attorneys' fees; and

(f) Any and all other relief the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Dated: February 27, 2023

Respectfully submitted,

/s/ *Max Ambrose*
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

COMPLAINT