EVERSHEDS SUTHERLAND (US) LLP
Ian S. Shelton (SBN 264863)
ianshelton@eversheds-sutherland.com
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone:    (916) 844-2965
Facsimile:    (916) 241-0501

*Attorneys for Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo AG, Nexo Capital Inc., and Antoni Trenchev*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CRESS,<br><br>        Plaintiff,<br><br>    vs.<br><br>NEXO FINANCIAL LLC, NEXO FINANCIAL SERVICES LTD., NEXO AG, NEXO CAPITAL INC., and ANTONI TRENCHEV,<br><br>        Defendants. | CASE NO. 3:23-CV-00882-TSH<br><br>The Honorable Thomas S. Hixson<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)**<br><br>Hearing Date:  September 7, 2023<br>Hearing Time:  10:00 a.m.<br><br>Courtroom:    San Francisco Courthouse<br>            Courtroom E – 15th Floor<br>            450 Golden Gate Avenue<br>            San Francisco, CA 94102 |

MOTION TO DISMISS

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on Thursday, September 7, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard in the above-entitled Court, located at San Francisco Courthouse, Courtroom E – 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo AG, Nexo Capital Inc., and Antoni Trenchev ("Defendants") will move this Court to dismiss the Complaint filed by Plaintiff John Cress pursuant Federal Rule of Civil Procedure 12(b). In particular, Defendants seek the following relief:

1. Defendants seek dismissal of Antoni Trenchev, Nexo Financial LLC, Nexo Financial Services Ltd., and Nexo AG for lack of personal jurisdiction.

2. Defendants seek dismissal of the fraudulent inducement of contract claim (Count One) because Plaintiff fails to plead with the requisite particularity that the Defendants made an actionable misrepresentation, that Defendants made the alleged misrepresentations with the requisite knowledge of falsity (scienter), or that Plaintiff reasonably or justifiably relied on any such alleged misrepresentation.

3. Defendants seek dismissal of the equitable UCL claim (Count Two) because Plaintiff pleads he has adequate remedies at law, because the UCL does not apply to securities transactions, and because Plaintiff fails to adequately plead predicate acts.

4. Defendants seek dismissal of Plaintiff's California claim for the unregistered offer and sale of securities (Count Three) because this claim is preempted by federal law, Plaintiff did not purchase unregistered securities, Plaintiff was not in privity with certain Defendants, and Plaintiff fails to plead that he suffered any harm from the purchase of unregistered securities.

5. Defendants seek dismissal of Plaintiff's California claim for fraud in the offer and sale of securities (Count Five) because Plaintiff fails to plead with the requisite particularity that the Defendants made an actionable misrepresentation or that Plaintiff reasonably relied on any such alleged misrepresentation, Plaintiff was not in privity with certain

-ii-
MOTION TO DISMISS

Defendants, and Plaintiff fails to plead that he suffered any harm from the alleged fraud.

6.   Defendants seek dismissal of Plaintiff's securities claims against Defendant Trenchev individually (Counts Four and Five) because there are no viable predicate securities violations and because Plaintiff fails to plead with the requisite particularity that Trenchev personally and materially aided the alleged fraud.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities; the pleadings and other papers on file in this action; and such other declarations, evidence and argument as may be presented before or at the hearing.

DATED:   May 15, 2023                    EVERSHEDS SUTHERLAND (US) LLP


                                         By: */s/ Ian S. Shelton*
                                             Ian S. Shelton

                                             *Attorneys for Defendants Nexo Financial LLC,*
                                             *Nexo Financial Services Ltd., Nexo AG, Nexo*
                                             *Capital Inc., and Antoni Trenchev*

MOTION TO DISMISS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

    A.    Cress deposits his cryptocurrency on the Nexo platform to earn interest................ 3

    B.    Cress takes out credit lines secured by his cryptocurrency deposits. ...................... 3

    C.    The price of Bitcoin collapses and Cress's cryptocurrency collateral is liquidated as his bad bets unwind. ........................................................................... 5

    D.    Years later, Nexo settles with securities regulators regarding the Earn Interest Product that was highly profitable for Cress, and Cress concocts this "securities" lawsuit to recover his unrelated bad bets on Bitcoin and Ether............. 6

ARGUMENT ....................................................................................................................... 6

    I.    THE COURT SHOULD DISMISS ALL DEFENDANTS EXCEPT FOR NEXO CAPITAL INC. FOR LACK OF PERSONAL JURISDICTION. ............... 6

        A.    Cress fails to adequately plead general or specific jurisdiction.................... 7

            1.    The Court does not have general jurisdiction.................................. 7

            2.    The Court does not have specific jurisdiction. ............................... 8

        B.    Cress fails to plausibly plead "single-enterprise" liability. ........................ 9

            1.    There is no unity of interest.............................................................. 9

            2.    There is no inequitable result. ....................................................... 10

    II.    THE COURT SHOULD DISMISS THE FRAUDULENT INDUCEMENT CLAIM. ....................................................................................................... 11

        A.    Nexo's alleged misrepresentations are not actionable. ............................ 11

        B.    Cress fails to plead Nexo knew the statements were false when it made them.................................................................................................... 14

        C.    Cress fails to plead he actually and justifiably relied on Nexo's statements. ................................................................................................. 15

    III.    THE COURT SHOULD DISMISS THE UCL CLAIM....................................... 17

        A.    The UCL claim fails because Cress pleads adequate remedies at law........ 17

        B.    The UCL Claim fails because Cress pleads that his entire Nexo account and every transaction within it were securities. ........................... 17

        C.    The UCL claim fails because Cress inadequately pleads the predicate acts........................................................................................... 18

MOTION TO DISMISS

IV.  THE COURT SHOULD DISMISS THE CALIFORNIA SECURITIES CLAIMS. ............................................................................................... 19

A.  Cress fails to state a claim for the unregistered sale of securities. .............. 19

1.  Cress does not plead damages from the "Earn Account Securities." .................................................................................. 19

2.  The claim relating to the NEXO Token is preempted by NSMIA. .................................................................................... 20

3.  The so-called "Leveraged Investment Instrument" is not a security. ....................................................................................... 21

4.  The non-issuer defendants should be dismissed for lack of privity. ........................................................................................ 23

B.  Cress fails to state a claim for securities fraud. ........................................ 23

1.  The California securities claim suffers from threshold defects. ........................................................................................ 23

2.  The alleged misrepresentations are not actionable. ........................ 24

C.  Cress fails to state securities claims against Trenchev individually. .......... 25

CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AM Tr. v. UBS AG*,
   681 F. App'x 587 (9th Cir. 2017) ......................................................................... 7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................... 9, 10

*Aton Ctr., Inc. v. Regence Blue Shield of Washingto*n,
   2021 WL 615049 (S.D. Cal. Feb. 16, 2021) ........................................................ 15

*In re Bae,*
   645 B.R. 272 (Bankr. N.D. Cal. 2022) ............................................................... 23

*Boland, Inc. v. Rolf C. Hagen (USA) Corp.*,
   685 F. Supp. 2d 1094 (E.D. Cal. 2010) .............................................................. 19

*In re Boon Global Ltd.*,
   923 F.3d 643 (9th Cir. 2019) ............................................................................. 8

*Bowen v. Ziasun Techs., Inc.*,
   116 Cal. App. 4th 777 (2004) ........................................................................... 17

*Brodt v. Bache & Co., Inc.*,
   595 F.2d 459 (9th Cir. 1978) ........................................................................... 22

*Brown v. Earthboard Sports USA, Inc.*,
   481 F.3d 901 (6th Cir. 2007) ........................................................................... 21

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
   2021 WL 1176645 (N.D. Cal. Mar. 29, 2021) ..................................................... 17

*Carmel v. Mizuho Bank, Ltd.*
   2019 WL 10186488 (C.D. Cal., Nov. 14, 2019) ................................................... 19

*Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*,
   911 F.2d 242 (9th Cir. 1990) ........................................................................... 11

*Copart, Inc. v. Sparta Consulting, Inc.*,
   277 F. Supp. 3d 1127 (E.D. Cal. 2017) .............................................................. 11

*Doe v. Unocal Corp*,
   248 F.3d 915 (9th Cir. 2001) ........................................................................... 10

*Edwards v. FCA US LLC*,
   2022 WL 1814144 (N.D. Cal. June 2, 2022) ....................................................... 11

MOTION TO DISMISS

*Elias v. Hewlett-Packard Co.*,
  950 F. Supp. 2d 1123 (N.D. Cal. 2013) ................................................................. 13

*Ford Motor Co. v. Montana Eighth Judicial Dist. Court*,
  141 S. Ct. 1017 (2021) ............................................................................................ 7

*Gerritsen v. Warner Bros. Ent. Inc.*,
  116 F. Supp. 3d 1104 (C.D. Cal. 2015)................................................................. 10

*Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*,
  614 F. Supp. 2d 1080 (C.D. Cal. 2009).................................................................. 9

*Harris Rutsky & Co. Ins. Servs. Inc. v. Bell & Clements Ltd.*,
  328 F.3d 1122 (9th Cir. 2003) ................................................................................ 7

*Hill v. Wrather*,
  158 Cal. App. 2d 818 (1958) ................................................................................ 20

*Hocking v. Dubois*,
  839 F.2d 560 (9th Cir. 1988) ................................................................................ 22

*Hoffman v. 162 North Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014) ............................................................................. 15

*Jackson v. Fischer*,
  931 F. Supp. 2d 1049 (N.D. Cal. 2013) ............................................................... 25

*Jeong v. Nexo Financial LLC*,
  2022 WL 174236 (N.D. Cal. Jan. 19, 2022)..............................................6, 7, 10, 11

*Julian v. TTE Tech., Inc.*,
  2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ..................................................... 17

*Kalin v. Semper Midas Fund, Ltd.*,
  2022 WL 16935782 (N.D. Cal. Oct. 12, 2022) ................................................ 8, 25

*Lopez v. Dean Witter Reynolds, Inc.*,
  805 F.2d 880 (9th Cir. 1986) ................................................................................ 22

*Lubin v. Sybedon Corp.*,
  688 F. Supp. 1425 (S.D. Cal. 1988)...................................................................... 23

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) .................................................................................. 4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .............................................................................. 25

*Microsoft Corp. v. Hon Hai Precision Indus. Co.*,
  2020 WL 5128629 (N.D. Cal. Aug. 31, 2020) ..................................................... 15

MOTION TO DISMISS

*Mohebbi v. Khazen,*
    50 F. Supp. 3d 1234 (N.D. Cal. 2014) ................................................................. 20

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.,*
    774 F.3d 598 (9th Cir. 2014) ............................................................................... 23

*Ortolivo v. Precision Dynamics Int'l, LLC,*
    2022 WL 16823693 (N.D. Cal. Nov. 8, 2022) ....................................................... 8

*Ranza v. Nike, Inc.,*
    793 F.3d 1059 (9th Cir. 2015) ............................................................................... 9

*Resolution Trust Co. v. Rowe,*
    1993 WL 165303 (N.D. Cal. May 7, 1993) ........................................................... 16

*Reynolds v. Finance Holdings Ltd.,*
    481 F. Supp. 3d 997 (N.D. Cal. 2020) .................................................................... 9

*SEC v. R.G. Reynolds Enterprises, Inc.,*
    952 F.2d 1125 (9th Cir. 1991) ............................................................................... 22

*Sharma v. Volkswagen AG,*
    2021 WL 912271 (N.D. Cal. Mar. 9, 2021) ........................................................... 17

*Siegal v. Gamble,*
    2016 WL 3648503 (N.D. Cal. July 7, 2016) ....................................................24, 26

*Smith v. Allstate Ins. Co.,*
    160 F. Supp. 2d 1150 (S.D. Cal. 2001) .................................................................. 11

*Sonner v. Premier Nutrition Corp.,*
    971 F.3d 834 (9th Cir. 2020) ................................................................................. 17

*Stemcell Techs. Canada Inc. v. StemExpress, LLC,*
    2022 WL 509673 (N.D. Cal. Feb. 21, 2022) ........................................................... 8

*Sterling Cross Def. Sys., Inc. v. Dolarian Capital, Inc.,*
    2014 WL 2767401 (E.D. Cal. June 18, 2014) ......................................................... 25

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.,*
    117 F. Supp. 3d 1092 (C.D. Cal. 2015) .................................................................. 15

*Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.,*
    99 Cal. App. 4th 228 (2002) ................................................................................. 10

*Wallack v. Idexx Laboratories, Inc.,*
    2013 WL 1562523 (S.D. Cal. Apr. 11, 2013) ......................................................... 25

*Warfield v. Alaniz,*
    569 F.3d 1015 (9th Cir. 2009) ............................................................................... 22

MOTION TO DISMISS

*Zakinov v. Ripple Labs, Inc.*,
    2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ................................................................................17, 23

*Ziegler v. Indian River Cty.*,
    64 F.3d 470 (9th Cir. 1995) ................................................................................................... 7

**Statutes**

15 U.S.C. § 77r ....................................................................................................................... 20

15 U.S.C. § 77r(b)(4)(D) ........................................................................................................ 21

**Regulations**

17 C.F.R. § 230.500 ................................................................................................................ 21

17 C.F.R. § 230.501(a)(5) ........................................................................................................ 1

17 C.F.R. § 230.506(c) ............................................................................................................ 21

MOTION TO DISMISS

**INTRODUCTION**

John Cress is a sophisticated and accredited investor who amassed over $13 million worth of cryptocurrency as of early 2021.[1] As Bitcoin ("BTC") and Ether ("ETH") prices were nearing all-time-highs in March and April 2021, Cress transferred his cryptocurrency to the Nexo platform, which earned cryptocurrency "interest" through Nexo's Earn Interest Product ("EIP"). Cress then decided to take out secured credit lines from Nexo in an attempt to earn even greater returns. In order to obtain those credit lines at single-digit interest rates, Cress pledged his cryptocurrency as collateral and bought NEXO Tokens worth approximately 10% of his total portfolio value. Cress's strategy was very aggressive. He "maxed out" his credit lines (which Nexo caps at a 50% loan-to-value ("LTV") ratio when BTC or ETH is used as collateral) by obtaining nearly $14 million in credit secured against $30 million in cryptocurrency held in his Nexo account. Cress then made a series of speculative bets—purchasing more cryptocurrency with the credit line proceeds in the hope that prices would continue to rise. Unfortunately, when the prices of BTC and ETH plummeted by nearly 50% in May 2021, Cress was upside-down on his credit lines and his collateral was liquidated per the terms and conditions ("Crypto Credit Terms"). Upset with his own risky investment decisions, Cress now seeks to cast blame elsewhere, asserting novel claims based on the theory that he keeps his gains while Nexo insures his losses. Cress's claims should be dismissed.

*First*, Cress's claims against Nexo Financial LLC, Nexo Financial Services Ltd., Nexo AG, and Antoni Trenchev should be dismissed because the Court lacks personal jurisdiction over them. Cress concedes that Nexo Capital Inc., which does not contest personal jurisdiction, is the only "Nexo entity that issued credit to Plaintiff." Dkt. 1 ¶ 13. Cress relies solely on the "single enterprise" theory of personal jurisdiction to sue the other Nexo affiliates, but pleads no specific facts plausibly satisfying that notoriously difficult standard. In a separate case raising similar issues, Judge Freeman dismissed Nexo Financial LLC, Nexo Financial Services Ltd., and Nexo AG for lack of personal

---

[1] An "accredited investor" includes "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000," subject to certain inapplicable exclusions. 17 C.F.R. § 230.501(a)(5). Cress pleads that Nexo recognized him as an accredited investor and that he deposited and/or purchased over $16 million in cryptocurrency on the Nexo platform, net of any credit lines, well over the $1 million threshold. Dkt. 1 ¶ 77.

MOTION TO DISMISS

jurisdiction and denied leave to conduct jurisdictional discovery. This Court should do the same.

*Second*, Cress has framed this case as a securities lawsuit, but the alleged security he focuses on—the EIP—has nothing to do with Cress's liquidation losses. Cress's lawsuit was filed on the heels of Nexo's recent settlement with the SEC and state securities regulators, in which Nexo—without admitting fault—agreed to withdraw its EIP (or, as Cress calls it, the "Earn Account Securities") from the U.S. market. However, Cress paid nothing for the alleged EIP security, and he received over $300,000 worth of cryptocurrency interest over the life of his account. To be clear, ***none of Cress's claimed damages arose from the EIP***. In fact, in Paragraph 100 of his Complaint, he asserts that he *wishes he had kept his cryptocurrency in Nexo's Earn Interest Product, because he was making money in the product, instead of depositing it as collateral in Nexo's Credit Line Wallet.* Cress pleads that he *withdrew* his cryptocurrency from the Earn Interest Product and transferred it to a *different* product—Nexo's Credit Line Wallet—where he staked it as collateral to get credit lines from Nexo. Cress then used those credit lines to trade highly volatile commodities. Cress concedes he only lost money in Nexo's Credit Line Product, not in the Earn Interest Product.

Cress then turns to two other items he claims to be unlawful securities— the NEXO Token and the so-called "Leveraged Investment Instrument." But Cress pleads that the NEXO Token is registered with the SEC as an exempt security and that Nexo only sold it to accredited investors. State claims premised on registration of a "covered security" are preempted by the federal National Securities Markets Improvement Act ("NSMIA"). As for the "Leveraged Investment Instrument," it is simply a term that Cress made-up as a euphemism to refer to Cress's entire Nexo account. For decades, courts have recognized that non-discretionary trading accounts under the control of the customer are not "securities." In short, Cress is trying to recover his bad bets on BTC and ETH by re-characterizing his Nexo account and all credit lines within it as securities.

*Third*, Cress's common law fraud and securities fraud claims fail because Cress does not plead the alleged fraud with particularity, including identification of the false statement, explanation of falsity, reliance, and damages. Pleading fraud under Rule 9(b) is a high bar, and Cress falls short.

*Finally,* Cress's UCL claim must be dismissed because Cress seeks damages and pleads adequate remedies at law. In addition, the UCL is inapplicable to securities claims, which is

precisely how Cress has chosen to posture his claims. And, Cress has no viable predicate UCL violations. Cress engaged in leveraged and ill-timed price speculation on volatile crypto assets and is asking the Court to make Nexo the insurer of his losses.  All his claims should be dismissed.

## FACTUAL BACKGROUND

### A.    Cress deposits his cryptocurrency on the Nexo platform to earn interest.

John Cress was a cryptocurrency multi-millionaire and accredited investor. *See* Ex. 3; Trenchev Decl. ¶ 6. He began accumulating cryptocurrency in 2014. Dkt. 1 ¶ 36. By March 2021, Bitcoin was nearing all-time highs and Cress's digital wealth had ballooned to about $13 million. Dkt. 1 ¶ 37.  In March 2021, Cress opened a Nexo account to earn interest on his cryptocurrency. *See* Dkt. 1 ¶¶ 3, 6, 37. Cress pleads that he was initially interested in Nexo's "Earn Interest Product" or, as Cress labels it, the "Earn Account Securities."[2] Dkt. 1 ¶ 37.

### B.    Cress takes out credit lines secured by his cryptocurrency deposits.

Shortly after opening his Nexo account and starting to earn interest through the EIP, Cress was contacted by Nexo to discuss Nexo's VIP Relationship Program offered to high-net-worth customers. Dkt. 1 ¶ 39. At the time, Cress was considering credit lines secured by his cryptocurrency collateral, and Nexo sent him a brochure about the program. Dkt. 1 ¶¶ 40–42.  Even before borrowing, Cress admits he knew that "[l]everaged trading is extremely high risk, particularly in the volatile crypto market." Dkt. 1 ¶¶ 35, 38. He also knew that if he made bad bets on BTC and ETH prices, his collateral could be liquidated. Dkt. 1 ¶¶ 35, 41. There is no dispute that Cress understood the risks of his decisions, including the risk of liquidation spelled out in the Crypto Credit Terms.

Importantly, Nexo does *not* offer credit lines through its EIP. Dkt. 1 ¶¶ 31–33. Instead, Nexo has a separate product, Nexo's Credit Line Wallet, where customers can stake digital assets as collateral and receive credit lines. Dkt. 1 ¶¶ 33–34. The distinction is critical because Cress's securities claims hinge on Nexo's alleged wrongdoing with respect to the EIP. Nexo withdrew that product from the U.S. market in its settlement with regulators. However, Cress only alleges losses

---

[2] Without conceding Cress's terminology, Nexo uses Cress's term "Earn Account Securities" to refer to its Earn Interest Product, which is the term that Cress uses in his Complaint.

MOTION TO DISMISS

from activity in his Credit Line Wallet. Dkt. 1 ¶ 100. Cress does not (and cannot) plead any losses from the Earn Account Securities because he earned profits in excess of $300,000 from the EIP. Nexo's Credit Line Wallet was not implicated in Nexo's recent settlement with regulators.

Cress alleges that Nexo's short brochure on the VIP Relationship Program allayed his concerns about liquidation because the brochure represented that Cress would receive responsive customer service and would have access to a "Liquidation Relief Program," even though Cress later admits he did not know was the program was. Dkt. 1 ¶ 42; Ex. 5 at 21. The brochure contained no description of the program beyond stating that a customer could "use the service in the event of a market crash to recover your liquidated assets." *See* Ex. 2 at 4, 10 (VIP Brochure).[3] The brochure was a very high-level advertisement for the VIP Relationship Program:



A week after Nexo sent Cress the brochure, Cress executed a Cryptocurrency Purchase Agreement (the "CPA") on March 24, 2021. Dkt. 1 ¶¶ 69–70; Ex. 4 (CPA).[4] The CPA stated that Cress was "solely responsible for any decision to enter into a transaction . . . including the evaluation of any and all risks related to any such transaction" and that Cress had "not relied on any statement or other representation of Nexo" other than those in the CPA. Ex. 4, § 3.2(g). After executing the CPA, Cress began taking out credit lines, but he was required to maintain a specific ratio between his credit line and the value of his collateral. Dkt. 1 ¶ 32. As stated in the Crypto Credit Terms,

---

[3] The brochure, although not attached to the Complaint, may be considered by the Court because the Complaint refers to the document, it is central to his claim, and its authenticity should be undisputed. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see* Trenchev Decl. ¶ 5.

[4] The CPA, although not attached to the Complaint, may be considered by the Court for the reasons noted in n.3, *supra*. *See* Trenchev Decl. ¶ 7.

liquidations would occur if his credit line balance exceeded 83.3% of the value of his collateral (the LTV ratio). Dkt. 1 ¶ 80. Cress began using his credit line proceeds to purchase *additional* Bitcoin at (historically high) prices between $54,000 and $60,000. Dkt. 1 ¶¶ 57, 70–71, 73–74. In turn, Cress leveraged his newly purchased Bitcoin as further collateral—a decision that Cress admits was, "extremely high risk, particularly in the volatile crypto market." Dkt. 1 ¶ 35.

By May 10, 2021, Cress's crypto assets had ballooned to over $30 million, against which he had taken out almost $14 million in credit lines. Dkt. 1 ¶¶ 48, 77. Cress had "maxed out" his available credit lines from Nexo. Dkt. 1 ¶ 77. Cress went "all-in" on a knife-edge, leveraged bet that BTC and ETH prices would continue to rise beyond their near all-time-highs, which he admits was "highly risky." Dkt. 1 ¶ 62. And he plainly understood that his decisions "put at risk of liquidation, his substantial digital asset holdings." Dkt. 1 ¶ 4.

**C.**    **The price of Bitcoin collapses and Cress's cryptocurrency collateral is liquidated as his bad bets unwind.**

In May and June 2021, Bitcoin prices fell sharply, and Cress's highly-leveraged bets began to unwind.[5] Dkt. 1 ¶ 78.



Cress's $30 million balancing act left him with virtually no room for error. Cress was unable to maintain the requisite LTV and his collateral was liquidated as prices fell. Dkt. 1 ¶¶ 80–82. Cress

---

[5] The historical price of a traded commodity like Bitcoin is publicly-available from many sources. Nexo requests that the Court take judicial notice of above chart, which is available at https://www.barchart.com/crypto/quotes/%5EBTCUSD/interactive-chart.

-5-

attempts to blame NEXO Token volatility for his liquidation, but he admits that the Nexo Token was only approximately 10% of his holdings, Dkt. 1 ¶ 78, while BTC, ETH, and two "stablecoins" pegged to the U.S. dollar (USDC and USDT) comprised the other 90%. During a few weeks in May and June 2021, BTH collapsed from over $60,000 to nearly $30,000, and ETH collapsed from over $4,000 to about $2,000, causing the liquidations to occur.

**D.    Years later, Nexo settles with securities regulators regarding the Earn Interest Product that was highly profitable for Cress, and Cress concocts this "securities" lawsuit to recover his unrelated bad bets on Bitcoin and Ether.**

Like many others, Cress rode the boom-bust crypto cycle based on his decisions to buy BTC and ETH at the top-of-the-market and with leverage, hoping prices would rise indefinitely. Cress's collateral liquidations were consistent with the Crypto Credit Terms. Earlier this year—almost two years after Cress first opened his Nexo account—Nexo reach an agreement with the SEC regarding its "Earn Account Securities," *i.e.,* the Earn Interest Product ("EIP"). Dkt. 1 ¶ 6. Without admitting or denying the SEC's findings, Nexo was charged with failing to register the EIP as a security with the SEC.[6] Nexo agreed to pay a fine and withdraw the EIP from the U.S. market.

Cress spied his chance. Barely a month after Nexo's settlement with the SEC, Cress filed this lawsuit against Nexo, carefully pleading securities violations as the gravamen of all his claims, even though he pleads no losses associated with EIP because he earned over $300,000 in interest. Of course, Cress intends to keep all these profits, while demanding that Nexo cover his losses.

## ARGUMENT

**I.    THE COURT SHOULD DISMISS ALL DEFENDANTS EXCEPT FOR NEXO CAPITAL INC. FOR LACK OF PERSONAL JURISDICTION.**

Nexo Financial Services Ltd. and Nexo AG (collectively, the "European Nexo Entities"), along with Nexo Financial LLC ("Nexo Financial") and Antoni Trenchev, but not Nexo Capital, Inc., move to dismiss Cress's claims against them for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). Nearly identical jurisdictional arguments were made and rejected last year in *Jeong v. Nexo Financial LLC*, 2022 WL 174236, at *11–15 (N.D. Cal. Jan. 19, 2022) (Freeman, J.). Nexo

---

[6] The SEC's release is available here: https://www.sec.gov/news/press-release/2023-11.

Financial and the European Nexo Entities are not subject to general jurisdiction in California. *See* Trenchev Decl. ¶¶ 13–14, 18. Nor is there any basis for specific jurisdiction: the European Nexo Entities have no California connection and did not issue the credit lines to Cress. *Id.* at ¶ 17. Cress also makes no allegations about Nexo Financial's conduct, and admits (correctly) that Nexo Capital Inc. is the entity that issued him the credit lines. Dkt. 1 ¶ 13. Trenchev's sole connection to Cress is signing the CPA on behalf of Nexo, but this is insufficient to subject him to personal jurisdiction in his individual capacity in California. Instead, Cress attempts a jurisdictional short-cut by adding "single enterprise" allegations to the Complaint. These allegations are legally insufficient to establish specific jurisdiction, and are so bare and conclusory that they do not support jurisdictional discovery either, as Judge Freeman previously found. *See Jeong*, 2022 WL 174236, at \*16.

### A.    Cress fails to adequately plead general or specific jurisdiction.

Cress has the burden to establish jurisdiction over all defendants. *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995) (citation omitted). The Court must assess each defendant's contacts separately to determine whether personal jurisdiction exists. *Harris Rutsky & Co. Ins. Servs. Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1130 (9th Cir. 2003).

### 1.    The Court does not have general jurisdiction.

Corporate defendants are subject to general jurisdiction in their place of incorporation and where their principal place of business is located. *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021). Nexo Financial and the European Nexo Entities are not incorporated in California and do not have their principal place of business in California. *See* Trenchev Decl. ¶¶ 13–14, 18. Trenchev is not a California resident. *Id.* at ¶ 24.

Nexo Financial obtained a California Financing Law ("CFL") license in February 2021. *Id.* at ¶ 20. Nexo Financial was not involved in any of the disputed transactions, and it has no connection to California other than holding that license. *Id.* at ¶ 19. Even if the license were relevant to Cress's allegation, it would still be insufficient to confer general jurisdiction over Nexo Financial. *See AM Tr. v. UBS AG*, 681 F. App'x 587, 588-89 (9th Cir. 2017) ("California does not require corporations to consent to general personal jurisdiction . . . when they . . . register to do business).

-7-

MOTION TO DISMISS

### 2.    The Court does not have specific jurisdiction.

***Specific Jurisdiction for the Corporate Entities.*** Specific jurisdiction requires that the plaintiff's claims arise out of or relate to the defendant's contacts with the forum. *See Ford*, 141 S. Ct. at 1025. However, Cress has not pled any specific facts connecting the European Nexo Entities to California or even to his claims at all. Nexo Financial was not involved in any of the transactions disputed by Cress in his Complaint, and it has no connection to California other than holding the CFL license. *See* Trenchev Decl. ¶ 19.

***Specific Jurisdiction for Trenchev.*** Cress asserts securities fraud and "control person" claims against Trenchev, but the Court must still have jurisdiction over the control person. *See Kalin v. Semper Midas Fund, Ltd.*, 2022 WL 16935782, at *2 (N.D. Cal. Oct. 12, 2022) ("Director and control liability is not to be conflated with jurisdiction."). Trenchev still must have sufficient contacts with the forum in order for personal jurisdiction to exist.

Trenchev signed the CPA in his corporate capacity on behalf of Nexo, *see* Trenchev Decl. ¶ 25, but this is insufficient to establish jurisdiction over him. *See Kalin,* 2022 WL 16935782, at *2 (the conclusory allegation that the control person was "necessarily…aware of the false misleading statement in the offering memorandum and of the fact that the offering memorandum was being used to induce purchases by persons in California" insufficient to establish personal jurisdiction); *see also In re Boon Global Ltd.*, 923 F.3d 643, 651 (9th Cir. 2019) (holding that a corporate officer who signs a contract in a corporate capacity is not automatically subject to personal jurisdiction); *Stemcell Techs. Canada Inc. v. StemExpress, LLC*, 2022 WL 509673, at *3 (N.D. Cal. Feb. 21, 2022) (where a defendant signed contracts "in his official capacity as CEO," they "do not count towards [his] contacts with California."). Furthermore, Cress has not sued Trenchev or any Nexo entities for a breach of the CPA, discounting the CPA's weight even further.

For torts, California courts use a "purposeful direction analysis," considering whether the individual "committed an intentional act, expressly aimed at California, which caused harm that he knew would be suffered in California." *Ortolivo v. Precision Dynamics Int'l, LLC,* 2022 WL 16823693, at *3 (N.D. Cal. Nov. 8, 2022). Trenchev had no way to know that Cress lived in California. Trenchev never spoke to or met with Cress, never emailed Cress, and never sent Cress

mail to California. *See* Trenchev Decl. ¶ 24. Cress offers no allegations that Trenchev committed any intentional act directed against Cress or aimed at California.

**B.      Cress fails to plausibly plead "single-enterprise" liability.**

Under the single-enterprise theory, personal jurisdiction may be extended over foreign affiliate companies under very limited circumstances. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1072 (9th Cir. 2015). Cress must establish (1) a unity of interest and ownership that the separate corporate personalities are merged, **and** (2) an inequitable result. *Hamilton Beach Brands, Inc. v. Metric & Inch Tools, Inc.*, 614 F. Supp. 2d 1080, 1083 (C.D. Cal. 2009). This test envisions *pervasive* control over corporate affiliates, such as when a corporation "dictates every facet" of the affiliate's business—"from broad policy decisions to routine matters of day-to-day operation." *Ranza*, 793 F.3d at 1071 (citations and quotations omitted).

Cress alleges that Nexo Financial holds a CFL license and that all the Nexo entities should be treated as a single, unified entity. *See* Dkt. 1 ¶¶ 15, 20.  However, as noted above, Nexo Financial has no connection to the lawsuit. Cress alleges personal jurisdiction over the European Nexo Entities based on the bare allegation that all the Nexo entities have "such a unity of interest and ownership . . . that any separate corporate personalities are merged, such that one corporation is a mere adjunct of another and they form a single enterprise." *See* Dkt. 1 ¶ 16.  These allegations are insufficient to establish either prong of the single-enterprise theory in this case.

**1.      There is no unity of interest.**

First, Cress fails to plead that the European Nexo Entities and Nexo Financial enjoy "such a unity of interest and ownership…that the separate corporate personalities are merged, such that one corporation is a mere adjunct of another and they form a single enterprise." *See* Dkt. 1 ¶ 16.  This entails a corporate veil-piercing analysis, which requires more than mere labels and conclusions. *Reynolds v. Finance Holdings Ltd.*, 481 F. Supp. 3d 997 (N.D. Cal. 2020).

Cress makes a series of conclusory allegations in an effort to establish single-enterprise jurisdiction. *See* Dkt. 1 ¶ 16. The allegation in paragraph 16(a) regarding *Credissimo* has no apparent connection to Cress's single-enterprise theory. The allegations in paragraph 16(b)–(h) are conclusory and boilerplate allegations that need not be accepted by this Court. *See Ashcroft v. Iqbal*,

-9-

MOTION TO DISMISS

556 U.S. 662, 680 (2009). The allegations in paragraphs 18, 19, and 21, in which Cress relies on media quotes and press releases to establish his single-enterprise theory, are immaterial to the Court's analysis. *See Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002) (media quotes and press releases not listed among factors considered by California courts).

Cress's single-enterprise allegations are far less compelling than those in *Ranza*, which held that Nike and its wholly-owned subsidiary, NEON, were not alter egos, despite the fact that "Nike [was] heavily involved in NEON's operations," exercised control over NEON's overall budget and policies, operated a general information tracking system for all subsidiaries, and ensured the Nike brand was marketed consistently throughout the world.  793 F.3d at 1074.

Here, the European Nexo Entities and Nexo Financial maintain their own independent corporate structures. *See* Trenchev Decl. ¶¶ 16, 22. They are distinct business entities from Nexo Capital Inc., provide different types of services in different geographical regions, have maintained corporate formalities, have been adequately capitalized to meet their ongoing operational and financial obligations, have maintained separate bank accounts, have not commingled assets or funds with the assets or funds of Nexo Capital Inc., have maintained separate books and records, and have paid their own taxes if owed. *See id.* Each maintains different officers, committees, and boards to direct their operation (although some may overlap). *See id.* These sworn facts plainly controvert Cress's boilerplate assertions. The Court should dismiss the European Nexo Entities and Nexo Financial for lack of personal jurisdiction, and reject Plaintiff's unity of interest argument, as it did in *Jeong*.  *See* 2022 WL 174236, at *12.

### 2.    There is no inequitable result.

Cress does not plausibly allege that an "injustice" would occur if this Court does not exercise single-enterprise jurisdiction over the European Nexo Entities. *Doe v. Unocal*, 248 F.3d 915, 926 (9th Cir. 2001). Cress alleges that, if the foreign entities were not held to be a single enterprise with Nexo Capital, Cress might have to bring suits in different jurisdictions. *See* Dkt. 1 ¶ 23. However, this allegation is insufficient. *See Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1144 (C.D. Cal. 2015) (difficulty collecting a judgment not an inequitable result).

In any event, Nexo Capital Inc., the entity which operates the Nexo platform and extended

-10-

MOTION TO DISMISS

the credit lines to Cress, is not challenging personal jurisdiction. The presence of Nexo Capital Inc. eliminates any concerns about an "inequitable result" and precludes single-enterprise jurisdiction over its affiliates. The Court should dismiss the European Nexo Entities and Nexo Financial for lack of personal jurisdiction and deny jurisdictional discovery. *See Jeong,* 2022 WL 174236, at *15.

## II.     THE COURT SHOULD DISMISS THE FRAUDULENT INDUCEMENT CLAIM.

Cress fails to plead his fraudulent inducement claim to Rule 9(b)'s exacting standard. *Edwards v. FCA US LLC*, 2022 WL 1814144, at *2 (N.D. Cal. June 2, 2022) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Under Rule 9(b) a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Id.*

### A.     Nexo's alleged misrepresentations are not actionable.

Cress claims he was induced into the transactions based on two Nexo representations in a VIP Program Brochure: (1) a "Liquidation Relief Program" where he could "use the service in the event of a market crash to recover your liquidated assets," and (2) prompt responsiveness. Dkt. 1 ¶¶ 97–99. Cress also complains that he was misled by a statement in an email about interest accruing on his cryptocurrency collateral. Dkt. 1 ¶¶ 94. These three statements are not actionable.

"Under any theory of deceit, a misrepresentation is actionable only if it is a representation of fact rather than opinion." *Copart, Inc. v. Sparta Consulting, Inc*., 277 F. Supp. 3d 1127, 1149 (E.D. Cal. 2017); *see also Smith v. Allstate Ins. Co.*, 160 F. Supp. 2d 1150, 1154 (S.D. Cal. 2001) ("Representations of opinion are ordinarily not actionable for fraud because they contain judgments of quality, value, authenticity, or other matters of judgment."). Only factual, specific representations in advertisements that can be measured against an objective standard are actionable. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.,* 911 F.2d 242 (9th Cir. 1990).

***Liquidation Relief Program.*** Cress pleads that the VIP Program Brochure stated that Nexo offered a "service in the event of a market crash to recover [his] liquidated assets." Dkt. 1 ¶¶ 42, 85. Cress claims that he subjectively understood this to mean his assets would ***not*** be liquidated—and would "receive protection"—in the event of a market crash. Dkt. 1 ¶¶ 42, 88. After he was liquidated, Cress admits that, at his request, Nexo offered him a new credit line service "to recover"

-11-
MOTION TO DISMISS

his "liquidated assets," but he was unsatisfied with the terms. Dkt. 1 ¶ 87. Cress does not plead that he reviewed the terms of the Liquidation Relief Program, or that Nexo made any representations regarding the specific terms of that program, prior to the liquidations at issue.

This is not actionable because Cress pleads no misrepresentation. Cress alleges that Nexo generally advertised that Nexo's Liquidation Relief Program was a way "*to recover*" his "*liquidated assets*" in a market crash. Dkt. 1 ¶¶ 42, 85. Cress then alleges that Nexo offered him a service to do just that. Dkt. 1 ¶ 87. Cress claims that *he believed* that the Liquidation Relief Program meant that his collateral *would never be liquidated at all*. Dkt. 1 ¶ 88. But nothing in Nexo's VIP Program Brochure (or other communications quoted by Cress) remotely support that unreasonable and subjective inference. Cress describes the Liquidation Relief Program as an option to recover liquidated collateral. Dkt. 1 ¶¶ 42, 85. The word "recover" unambiguously contemplates that the customer has been separated from his or her collateral, as does the word "liquidated." In fact, a reasonable consumer would understand that the Liquidation Relief Program is not a way to obtain *secured* credit lines *without security*, and that a service "to recover" liquidated collateral means that the collateral would never be liquidated despite clear contractual language in the Crypto Credit Terms to the contrary. Cress himself did not even believe this, as evidenced by his communications with Nexo (cited in his own complaint) repeatedly referencing the "liquidation price" for the various investment scenarios that Cress considered. Ex. 5 at 6, 8, 9, 13, 14, 15, 16, 20.

***Responsiveness.*** Cress's claims about Nexo's prompt responsiveness advertised in the VIP Program Brochure are not actionable. Cress admits he was assigned a dedicated relationship manager at Nexo. Dkt. 1 ¶ 39. Cress claims that he "did not receive a direct phone line" to his dedicated relationship manager, Dkt. 1 ¶ 90, but this is belied by the fact that in Hristov's many emails to Cress, Hristov's direct line was prominently featured in his email signature block.[7]



---

[7] The Cress-Hristov emails, although not attached to the Complaint, may be considered by the Court for the reasons noted in n.3, *supra*. *See* Trenchev Decl. ¶ 8; Ex. 5.

Ex. 5 at 1.  Cress's own emails discuss his phone calls with Hristov. Ex. 5 at 35. In any event, these are non-specific, general claims of availability, are not quantifiable promises, and are not actionable.

Similarly, the promise of an email reply was plainly limited to "business hours" and that the customer could "expect" a response within "a matter of hours." This is generalized puffery regarding responsive customer support that nearly every other business makes. It cannot form the basis for a fraud claim. *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1133 (N.D. Cal. 2013). Nexo's responsiveness statements are not actionable as a matter of law.

*Interest on Collateral*. As to collateral, Cress conflates Nexo's two different products and misrepresents his communications with Nexo. Collateral can be stored in either the Credit Line Wallet or the Savings Wallet. Dkt. 1 ¶¶ 31, 33. Collateral stored in a Savings Wallet can earn interest through Nexo's Earn Interest Product, but no such option is available for collateral stored in the Credit Line Wallet (except for NEXO Tokens that earn interest in both wallets). Dkt. 1 ¶ 31.

On March 22, 2021, Cress requested information on credit lines from Nexo. The next day, Hristov sent Cress three scenarios for purchasing Bitcoin:

| Total BTC | BTC Earn interest and protect Collateral | BTC Collateral | Purchased BTC through Nexo Credit line | Amount of BTC for NEXO Platinum | LTV | BTC Liq price @ BTC $54,000 | Interest rate | Yearly interest |
|---|---|---|---|---|---|---|---|---|
| 250 | 166 | 84 | 50 | 25 | 20.00% | $13,000 | 5.9% | ~$160,000 |
| 250 | 125 | 125 | 75 | 25 | 30.00% | $19,500 | 5.9% | ~$239,000 |
| 250 | 82 | 168 | 100 | 25 | 40.00% | $25,930 | 5.9% | ~$318,600 |

Ex. 5 at 3. The "*BTC Earn Interest and Protect Collateral*" column represents the number of BTC that Cress would deposit in the Earn Interest Product or Savings Wallet. The "*BTC Collateral*" Column represents the number of BTC that Cress would deposit in his Credit Line Wallet.

Cress responded the same day and expressed interest in the third scenario (in the red box above) and asked how much interest he would earn on "collateral reserves" in his Savings Wallet:

> I think the scenario for 40% LTV to purchase 100 BTC is reasonable.  How much interest would the 82 BTC be earning and if all the interest was applied to the monthly loan payment, how short would the payments be and is that ok?  I need to decide whether to use the earned interest to serve as more collateral reserves or to make loan payments etc.

Ex. 5 at 3. The same day Hristov responded to Cress's question about the 82 Bitcoin in Cress's

MOTION TO DISMISS

Savings Wallet and explained (accurately) that it would earn 5% interest:

> You will be earning 5% annually on the Bitcoin which is you used as collateral. Keep in mind that the interest rate will be paid out daily in BTC, so you will benefit from a potential upside on the Bitcoin price.

Ex. 5 at 4. In sum, Cress asked how much he would earn on the 82 Bitcoin in his Savings Wallet. He received an accurate response. Cress *never* asked how much interest he would earn on the 168 Bitcoin in his Credit Line Wallet. There is no misrepresentation *at all*. Cress never complained about this during his credit line transactions with Nexo because he understood that collateral in his Credit Line Wallet would not earn interest, while the "collateral reserves" in his Savings Wallet would.

Not only was Hristov's statement accurate (that interest would accrue on BTC in Cress's Savings Wallet), Cress's communications with Nexo's customer support—which he repeatedly references in his complaint—establish that Cress *knew* interest did not accrue on assets in his Credit Line Wallet, and Nexo (again) confirmed his fact. On June 11, 2021, Cress stated:

> (05:19:55 PM) John Cress: Ok, good. Would you recommend swapping these to USDC or USDT?
> (05:20:30 PM) John Cress: Neither one will earn interest right?
> (05:21:37 PM) Beyhan: I'm so sorry, John - I'm unable to make such recommendations.
>
> Yes, if they are on the Credit Line wallet, they will not earn interest.

Ex. 6 at 2.[8] Despite complaining about Nexo customer support's responsiveness, Cress omits that the same support team *confirmed Cress's own subjective understanding* that collateral in his Credit Line Wallet does not earn interest.[9]

**B.    Cress fails to plead Nexo knew the statements were false when it made them.**

Cress repeatedly alleges Nexo made ***false promises*** with the purpose of convincing him to take out credit lines that put his collateral at risk of liquidation. Dkt. 1 ¶98. However, Cress fails to plead with specificity how (or even if) Nexo had an intent not to perform its promises with respect

---

[8] This chat, although not attached to the Complaint, may be considered by the Court for the reasons noted in n.3, *supra*. *See* Trenchev Decl. ¶ 9.

[9] Nexo also prominently and repeatedly discloses the same information on its Nexo support webpages. *Available here*: https://support.nexo.com/s/article/why-did-i-not-receive-interest-on-my-savings; https://support.nexo.com/s/article/earn-high-yielding-annual-interest-on-crypto-assets-explained. *See* Trenchev Decl. ¶ 10; Ex. 7.

-14-
MOTION TO DISMISS

to offering the Liquidation Relief Program.[10] Cress must allege facts to demonstrate that Nexo **harbored an intention not to be bound** at the time the representation was made. *See UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1109-10 (C.D. Cal. 2015).

Here, Cress merely alleges "Nexo had no intention of honoring these false promises when it made them, but rather that they were provided to Plaintiff with the purpose of convincing him to take out credit lines that put his collateral at risk of liquidation and for Nexo's benefit." Dkt. 1 ¶ 98. Not only were none of the allegations false, such conclusory allegations are insufficient to show Nexo's intent not to perform its promises. *See Aton Ctr., Inc. v. Regence Blue Shield of Washingto*n, 2021 WL 615049, at *9–10 (S.D. Cal. Feb. 16, 2021) (evidence of fraudulent intent consisting of only nonperformance of an oral promise is insufficient to support a finding of intentional misrepresentation). Cress fails to connect the dots between Nexo's allegedly unfulfilled promises to him and Nexo's knowledge of falsity (scienter).

### C.    Cress fails to plead he actually and justifiably relied on Nexo's statements.

Cress must plead that his reliance was "actual and justifiable." *See Microsoft Corp. v. Hon Hai Precision Indus. Co.*, 2020 WL 5128629, at *10 (N.D. Cal. Aug. 31, 2020). Reliance must also be reasonable in "that (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act; and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." *Id.* (quoting *Hoffman v. 162 North Wolfe LLC*, 228 Cal. App. 4th 1178, 1194 (2014)).

*First*, Cress could not have relied on Nexo's alleged misrepresentation of the Liquidation Relief Program because, despite the VIP Program Brochure, he was not aware of the program or its terms until *after* he was liquidated. Cress claims that he was directed to the Liquidation Relief Program on June 22, 2021, after he was liquidated. Dkt. 1 ¶¶ 85–87. But when directed to the Liquidation Relief Program, Cress stated that **he had no idea what the program even was:**

---

[10] Indeed, offering the Liquidation Relief Program is in Nexo's interest since it would provide an avenue for customers to rejoin the platform. Nexo is not liable to Cress for fraud because the program did not have terms that Cress subjectively imagined after liquidation.

> **John**                                                    22 JUN
>
> Someone from support told me I should be using the "liquidation relief program", but I don't know know what the liquidation relief program is.  It feels very late to be discussing it, but I should know everything about it and every way it could possibly be used to help me

Ex. 5 at 21. Cress could not have relied on the Liquidation Relief Program if he was unaware of it prior to liquidation. Cress does not and cannot plausibly plead reliance in this circumstance.

*Second*, Cress's reliance was not reasonably justifiable. He is an accredited investor who entered into a financial transaction with an aggregate value of over $30 million based on Nexo's advertised response times, the belief that his collateral would be immune from liquidation in perpetuity, and that he would earn interest on his Credit Line collateral (even though he only asked about—and only received information on—interest on his Savings Wallet collateral). Cress has not adequately pled that it would be reasonable for an accredited investor to justifiably rely on (generalized) advertising about response times, a (misinterpreted) phrase in a brochure, and a (truthful) statement from customer support to enter into a series of transactions worth $30 million.

Importantly, Cress failed to plead justifiable reliance because in the CPA he expressly accepted the risk of his transactions, disclaimed reliance on any prior statements from Nexo, and entered an integrated agreement. The CPA provides that Cress was "solely responsible for any decision to enter into a transaction . . . including the evaluation of any and all risks related to any such transaction" and that Cress had "not relied on any statement or other representation of Nexo" other than those in the CPA. Ex. 4, § 3.2(g). The CPA contained a merger clause, noting that the CPA and each future purchase order "supersede[d] all prior agreements and understandings, written or oral, among the Parties with respect thereto." Ex. 4, § 4.7. The Crypto Credit Terms also contain an "at your own risk" disclosure, warning customers to "carefully consider" whether credit lines are "suitable for you in light of your circumstances and financial resources." Ex. 1, § XI.5. Taken together with the size of Cress's transactions and his sophistication as an accredited investor, these multiple disclosures preclude a finding of reasonable reliance. *See Resolution Trust Co. v. Rowe*, 1993 WL 165303, at *3 (N.D. Cal. May 7, 1993) ("Given the amount of the loan, the sophistication of the lender, and the disclaimers contained in the compilation report, the court finds that no rational lender could have relied upon the report in making its loan decision.").

MOTION TO DISMISS

### III.   THE COURT SHOULD DISMISS THE UCL CLAIM.

#### A.   The UCL claim fails because Cress pleads adequate remedies at law.

Cress's UCL claim is not viable because he admits his losses are purely monetary and seeks damages remedies at law for fraudulent inducement and alleged securities violations. Thus, his UCL claim must be dismissed pursuant to *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020). Cress "must establish that [he] lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL[.]" *Id.* at 844. Cress may not plead equitable restitution as alternative relief under the UCL. *See In re California Gasoline Spot Mkt. Antitrust Litig.*, 2021 WL 1176645, at *8 (N.D. Cal. Mar. 29, 2021); *Sharma v. Volkswagen AG*, 2021 WL 912271, at *8 (N.D. Cal. Mar. 9, 2021). Cress must establish in his pleading how UCL restitution could be different from damages. *Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at *4 (N.D. Cal. Nov. 17, 2020).

The only equitable remedy Cress's Complaint references is "restitution," which is mentioned twice. *See* Dkt. 1 ¶ 103, Prayer for Relief. Cress's characterization of the restitution he seeks is dispositive of this issue: "Plaintiff is entitled to ***restitution in the amount of the value*** of the digital assets he lost. Dkt. 1 ¶ 103; Prayer for Relief at (a). Cress alleges losses in monetary terms: the value of his liquidated collateral, Dkt. 1 ¶¶ 46, 65, 81, price discrepancies in Bitcoin purchase executions, Dkt. 1 ¶¶ 73–76, and lost interest on his collateral, Dkt. 1 ¶¶ 94–95. These are classic formulations for legal damages. Cress has pled no facts tending to establish the inadequacy of legal remedies. His claim can be remedied by monetary award. Therefore, his UCL claim for equitable relief fails.

#### B.   The UCL Claim fails because Cress pleads that his entire Nexo account and every transaction within it were securities transactions.

The UCL does not apply to "securities-related" transactions. *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 788 (2004); *Zakinov v. Ripple Labs, Inc.*, 2020 WL 922815, at *21 (N.D. Cal. Feb. 26, 2020). As pleaded, Cress's UCL claim is based solely on damages from alleged securities violations, so it should be dismissed.

In *Zakinov*, the plaintiff, like Cress, alleged that the underlying cryptocurrency, XRP, was an unregistered security. *Zakinov* concluded that "*Bowen* bars plaintiff's § 17200 claim to the extent plaintiff premises that claim on the theory that XRP is a security." *Id.* at *22. Cress is the master of

his complaint, and he alleges that his damages arise from three types of securities transactions involving the Earn Account Securities, the NEXO Token, and the Leveraged Investment Instrument. Cress pleads unequivocally (and not in the alternative) that each is a security, and indeed that *his entire Nexo account (including credit lines) is a security* (*i.e.,* the "Leveraged Investment Instrument"). Dkt. 1 ¶¶ 62, 115, 116. Having elected to plead his securities claims as broadly as possible, Cress cannot bring a UCL claim in these circumstances. This conclusion is reinforced by the fact that Cress's securities fraud claim (Count Five) is based on the same "false advertising" allegations as the UCL claim (Count Two). *Id.* ¶¶ 108, 139. As for the unlicensed lender allegations supporting his UCL claim, Cress has pleaded that his credit lines were securities transactions within an account that he characterizes as a security—not loans subject to the CFL—and he does not seek any UCL "restitution" distinct from his alleged securities claims.

**C.    The UCL claim fails because Cress inadequately pleads the predicate acts.**

Cress also fails to plead the predicate acts supporting his UCL claim. As to the false advertising allegations, Cress inadequately pleads the allegations related to (1) the Liquidation Relief Program, (2) prompt responses from customer service, and (3) interest on collateral for the reasons explained above. Cress's claim that Nexo "misrepresented the true cost of borrowing from Nexo by advertising interest rates that were only available to customers holding ten percent of their assets in the NEXO Token" is not plausible or pleaded with particularity. Cress specifically pleads that Nexo informed him that different interest rates apply depending on the percentage of NEXO Tokens held in the account. Dkt. 1 ¶ 50-51. Cress's claim that "Nexo obscured the impact of holding the NEXO Token on Plaintiff's LTV and liquidation threshold" is also not plausible or pleaded with particularity. Holding the Nexo Token lowered the interest rate on the credit line; it did not change the LTV and liquidation threshold. *Id.* ¶ 51. Finally, as to the alleged failure to provide notice of liquidation, this is an alleged contract breach of the Crypto Credit Terms, *see* Ex. 1 § VI[11] ("Margin Calls Liquidation"), and the UCL cannot be used as a substitute for a breach of contract action. *See*

---

[11] The Crypto Credit Terms, although not attached to the Complaint, may be considered by the Court for the reasons noted in n.3, *supra*. *See* Trenchev Decl. ¶ 4.

-18-
MOTION TO DISMISS

*Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1110 (E.D. Cal. 2010) ("A breach of contract . . . is not itself an unlawful act for purposes of the UCL.").

## IV.     THE COURT SHOULD DISMISS THE CALIFORNIA SECURITIES CLAIMS.

### A.     Cress fails to state a claim for the unregistered sale of securities.

Cress claims the Earn Account Securities, the NEXO Token, and the Leveraged Investment Instrument are unregistered securities in violation of Sections 25110 and 25503. However, Cress cannot maintain a claim under these sections because he was not damaged by the Earn Account Securities, the NEXO Token is an exempt security registered with the SEC, and the Leveraged Investment Instrument (*i.e.*, his entire Nexo account) is not a security. [12]

#### 1.     Cress does not plead damages from the "Earn Account Securities."

Cress fixates on Nexo's Earn Account Securities because Nexo entered into a settlement with the SEC and the California Commissioner of Financial Protection and Innovation regarding allegations that the EIP was an unregistered security. [13] *See* Dkt. 1 ¶¶ 2, 6, 117.  ***But the EIP has nothing to do with Cress's claim***. Cress paid nothing for the EIP, and he pleads no losses associated with it. Nor could he, in light of the fact that he earned over $300,000 in cryptocurrency interest over the life of his account. Cress sought the guaranteed interest that the EIP yielded on the deposits. Dkt. 1 ¶ 37. Cress then moved his funds into a different Nexo product, the Nexo Credit Line, where he staked it as collateral and used it purchase more cryptocurrency. Cress never alleges any losses associated with the Earn Account Securities. He withdrew from that product and began trading BTC and ETH on credit lines provided by Nexo (where he lost his money). Cress even admits that he wishes he would have ***kept*** his funds in the Earn Account Securities and not moved them to the Nexo Credit Line as collateral:

> Plaintiff relied to his detriment on Nexo's false promises by taking out loans from Nexo. Plaintiff would have behaved differently if he had known the promises were false in that **Plaintiff would not have**

---

[12] BTC, which comprised the vast majority of Cress's portfolio, is not a security. *See Carmel v. Mizuho Bank, Ltd.,* 2019 WL 10186488, at *13 (C.D. Cal., Nov. 14, 2019) ("Bitcoin itself is a commodity, not a security."). The same is true of ETH.

[13] Nexo did not admit fault in the settlement.

MOTION TO DISMISS

**taken out loans at all, but instead only earned interest on his digital asset deposits**.

*See* Dkt. 1 ¶ 100 (emphasis added).

Cress's admission makes sense: his damages arise from bad, leveraged bets buying BTC and ETH with his credit lines. With the power of hindsight, Cress wishes he would have *kept* his money in the Earn Account Securities product because it was profitable—indeed, he earned over $300,000 from it over the life of his account. But Section 25503, which creates a private cause of action for the sale of an unregistered security, requires damages:

> [a plaintiff] may sue . . . for damages, if they no longer own the security . . . Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.

Cal. Corp. Code § 25503; *accord Hill v. Wrather*, 158 Cal. App. 2d 818, 825 (1958) (in the securities context, "fraud without damage or injury is not remediable"). The Court must dismiss the Section 25503 claim because Cress fails to plead any damages associated with the Earn Account Securities product consistent with the requirements of the statute.

### 2. The claim relating to the NEXO Token is preempted by NSMIA.

Cress's claim that the NEXO Token is an unregistered security under Sections 25110 and 25503 is preempted by federal law. Cress's pleading with respect to the NEXO Token is convoluted and misinformed—he not only fails to plead that the NEXO Token is **not** a covered security, but he has affirmatively pled that it is a "covered security." He has no claim.

Federal laws and regulations preempt state-level Blue Sky laws for "covered securities" like the NEXO Token. In 1996, in response to the growing patchwork of state regulatory requirements, Congress passed the National Securities Markets Improvement Act ("NSMIA") which preempts state regulation of a "covered security." 15 U.S.C. § 77r. A "covered security"—including an exempt security—is not subject to state registration and review. *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1249 (N.D. Cal. 2014). Cress has the burden to plead facts demonstrating that the NEXO

-20-
MOTION TO DISMISS

Token is not a covered security. *See id.* (granting dismissal on NSMIA preemption because plaintiff failed to plead "sufficient facts to support his conclusion that the securities are not 'covered securities' that were subject to registration requirements or exemptions under the Securities Act.").

Importantly, a "covered security" is defined to include, among other things, a security in a transaction that is ***exempt*** from registration under SEC rules or regulations. 15 U.S.C. § 77r(b)(4)(D); *see Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 910–12 (6th Cir. 2007) ("[Offerings that] actually qualify for a federal securities registration exemption . . . enjoy NSMIA preemption."). Relevant here is the Form D exemption, which applies to the NEXO Token. Securities Act 17 C.F.R. §§ 230.500 *et seq.* Specifically, 17 C.F.R. § 230.506(c) (known as the "Rule 506(c) Exemption") allows an exemption if the purchasers of securities are accredited investors, and the company takes reasonable steps to verify that the investors are accredited investors. 17 C.F.R. § 230.506(c). Here, Nexo verified that Cress was an accredited investor.

Not only does Cress fail to plead that NEXO is not a "covered security," but he admits that the NEXO Token is registered with the SEC as an exempt security under Rule 506(c). Dkt. 1 ¶ 55. Nexo filed a Form D with the SEC. Ex. 8 (Form D).[14] Nexo accurately explained to Cress that "the NEXO Token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors." Dkt. 1 ¶ 55. Nexo verified that Cress was an accredited investor, which allowed him to purchase NEXO Token. Dkt. 1 ¶ 55; Ex. 3 (Accredited Investor Certificate).[15] Thus, the NEXO Token is registered with the SEC as an exempt security. As such, on the face of Cress's complaint, NSMIA preempts the application of California law. Cress's NEXO Token claims under Sections 25110 and 25503 should be dismissed.

**3.      The so-called "Leveraged Investment Instrument" is not a security.**

Cress next argues that his *entire Nexo account*—which he refers to as the "Leveraged

---

[14] Nexo requests that the Court take judicial notice of its Form D filing with the SEC, which is attached as Exhibit 8 (*see* Trenchev Decl. ¶ 27) and is available on the SEC's website here: https://www.sec.gov/Archives/edgar/data/1732097/000173209718000002/xslFormDX01/primary_doc.xml.

[15] Cress's accredited investor certificate, Ex. 3, although not attached to the Complaint, may be considered by the Court for the reasons noted in n.3, *supra*. *See* Trenchev Decl. ¶ 7.

-21-

Investment Instrument"—is a security because "its performance is inextricably intertwined with the performance of the NEXO Token securities and Nexo Earn Account securities included in the basket of digital assets." Dkt. 1 ¶ 119. This argument was rejected decades ago by the Ninth Circuit.

**Howey Test.** Under the seminal *Howey* test, a security is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946)). A common enterprise exists where the investment scheme involves "strict vertical commonality." *Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir. 1988). Vertical commonality may be established "by showing that the ***fortunes of the investors are linked with those of the promoters***." *SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991) (internal quotation marks and citation omitted) (emphasis added).

Cress describes the Leveraged Investment Instrument as the aggregate value of the assets in his account (including his credit lines), which fluctuate based on his own cryptocurrency transactions. Dkt. 1 ¶ 119. His account—and his account's fluctuations in value—are unique to him. If Cress's account loses value, the losses are Cress's, not Nexo's. Because of this, the rule in the Ninth Circuit has been clear for decades—non-discretionary trading accounts controlled by an individual are *not* a security. *Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 462 (9th Cir. 1978) (describing an investment account as a "solitary" enterprise where the profits are not shared and whether his "investment flourished or perished" did not directly affect the financial position of the broker); *see also Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 885 (9th Cir. 1986) (same).

The Leveraged Investment Instrument also fails the *Howey* test because Cress's profits were the product of his own efforts, and not of anyone else. *See Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009). Here, the efforts to profit were entirely Cress's—he was taking out credit lines from Nexo and orchestrating BTC and ETH trades (neither of which are securities) in hopes that their prices would rise.

**Risk-Capital Test.** Under this test, a sale of securities occurs when there is "an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the

-22-

MOTION TO DISMISS

investor; and the conduct of the enterprise by the issuer with other people's money." *In re Bae*, 645 B.R. 272, 290 (Bankr. N.D. Cal. 2022). However, an investor who retains control over the "success of the enterprise" has not "risked capital." *Id*. The Leveraged Investment Instrument fails this test, too, because Cress does not allege that Nexo's credit lines were part of an effort to raise funds for a business enterprise; he does not allege he was merely a passive participant; and he does not allege that Nexo conducted the trading without his input for its own profit. Cress received credit lines by pledging his own collateral; the credit lines were not in furtherance of a business enterprise with Nexo. Cress's Nexo account was not a security under any standard.

**4.      The non-issuer defendants should be dismissed for lack of privity.**

Cress must allege privity with the issuing Nexo entity. *Zakinov,* 2020 WL 922815, at *15. Cress's Complaint has made no allegations of the requisite privity—he simply lumps all Nexo entities together. Here, the only covered security at issue is the NEXO Token, which was issued by Nexo Capital, Inc. Cress makes no allegations that Trenchev, Nexo Financial Services Ltd., Nexo AG, or Nexo Financial LLC issued the Earn Account Securities or the Leveraged Investment Instrument. Trenchev and these Nexo entities should be dismissed for this independent reason.

**B.      Cress fails to state a claim for securities fraud.**

Cress fails to plead securities fraud claims to Rule 9(b)'s "exacting pleading standards." *See Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Before even reaching the actual statements, Cress has three threshold problems with these claims.

**1.      The California securities claim suffers from threshold defects.**

*First*, Cress's securities claims fail for similar reasons that his Section 25110 and 25503 claims should be dismissed—Cress pled no damages on the Earn Account Securities and the Leveraged Investment Instrument is not a security.

*Second*, a violation of section 25401 requires "strict privity" between the seller of a secured instrument and a purchaser. *See Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1453 (S.D. Cal. 1988). Cress has not pled how Trenchev or any Nexo entities, other than Nexo Capital, Inc. (which issued the NEXO Token and credit lines to Cress), were involved in issuing the alleged securities to him.

-23-

MOTION TO DISMISS

*Third*, Cress's Complaint is bereft of any facts about Trenchev's alleged "aiding and abetting." Cress makes the conclusory allegation that Trenchev "materially assisted" and had the "intent to deceive" Cress. Trenchev and Cress never met, communicated, or interacted in any way. Rule 9(b) requires Cress to plead when, how, and where Trenchev was involved in aiding and abetting the fraud, but his Complaint has no facts on this point. Trenchev only signed the CPA on behalf of Nexo. He has failed to plead a viable securities fraud claim against Trenchev individually.

### 2.    The alleged misrepresentations are not actionable.

The statements Cress relies on to show securities fraud do not satisfy Rule 9(b). *See Siegal v. Gamble*, 2016 WL 3648503, at *4–5 (N.D. Cal. July 7, 2016).

***The NEXO Token is Registered with the SEC as a Security.*** The NEXO Token is registered with the SEC as an exempt security. *See* Ex. 8; Dkt. 1 ¶ 55. This is not a misrepresentation.

***The Liquidation Relief Program.*** Cress could not have relied on statements about the Liquidation Relief Program to purchase any alleged securities from Nexo because he was unaware of the Liquidation Relief Program until after he was liquidated. Ex. 5 at 21. Further, Cress does not plead that Nexo ever represented that his collateral would be *shielded* from liquidation and that the Crypto Credit Terms authorizing such liquidation would not apply to him. Dkt. 1 ¶¶ 42, 85. Cress admits he was offered a service to recover his cryptocurrency. *Id.* ¶ 87. He just did not like the terms.

***Earning Interest on Collateral.*** Cress inquired about earning interest on collateral in his Savings Wallet, and received an accurate answer that the collateral would earn interest. Nexo never represented that assets in his Credit Line Wallet would earn interest. Ex. 5 at 3–4; Ex. 6 at 2.

***Notice before Liquidation.*** Cress claims that Nexo's Crypto Credit Terms state that it will provide notice of an impending liquidation to allow for an opportunity to stake additional collateral. Dkt. 1 ¶ 79; *see* Ex. 1 § VI. Cress claims that he did not get this notice, or the notice was late. Dkt. 1 ¶¶ 81, 93. This is an alleged breach of contract, not fraud. Cress does not allege that Nexo made this representation in the Crypto Credit Terms with no intention of complying. As such, the securities fraud claim is barred by the economic loss rule because the complaint only alleges a contractual breach. *Sterling Cross Def. Sys., Inc. v. Dolarian Capital, Inc.*, 2014 WL 2767401, at *3 (E.D. Cal. June 18, 2014). Nor does Cress plead that Nexo's representation about notice of

MOTION TO DISMISS

liquidation induced him to make the purchase. *See Wallack v. Idexx Laboratories, Inc.*, 2013 WL 1562523, at \*10 (S.D. Cal. Apr. 11, 2013) (Explaining that Section 25401 "makes it unlawful to sell or offer to sell a security by means of a false statement of material fact, or an omission of material fact necessary to make the statement not misleading.")

**The "Obscured Scenarios."** Cress claims that Nexo provided him with "scenarios" that obscured the impact of the small fraction of NEXO Tokens in his account. Dkt. 1 ¶ 52, 56, 139(e). But he fails to plead what exactly was hidden from him, and how the obscured facts induced him into transactions. These vague contentions fail to state a securities fraud claim. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (holding that "vague claims about what statements were false or misleading, how they were false, and why we can infer intent to mislead" are not sufficient to satisfy Rule 9(b)."). Cress admits he was aware of the risks (Dkt. 1 ¶¶ 38, 47), chose to proceed, and lacks any actionable claim. *Kalin*, 2022 WL 16935782, at \*5.

### C. Cress fails to state securities claims against Trenchev individually.

The Court should dismiss Cress's Section 25504 claim against Trenchev individually. First, the Court lacks personal jurisdiction since Trenchev did not commit tortious acts purposefully aimed at California. *See Kalin*, 2022 WL 16935782, at \*2. Second, there is no control person liability if there is no primary liability. *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1064 (N.D. Cal. 2013). Third, Cress does not allege that Trenchev knew or had reason to know of the alleged violations. *Abdo v. Fitzsimmons*, 2021 WL 616324, at \*23 (N.D. Cal. Feb. 17, 2021) (Hixson, J.). Cress only pleads allegations about Trenchev's "influence," but none about his knowledge of the specific conduct and representations at issue.

### CONCLUSION

The Court should dismiss Antoni Trenchev, Nexo Financial Services Ltd., Nexo AG, and Nexo Financial LLC for lack of personal jurisdiction under Rule 12(b)(2) and dismiss Cress's claims for failure to state a claim under Rule 12(b)(6).

DATED: May 15, 2023                      EVERSHEDS SUTHERLAND (US) LLP


                                    By: */s/ Ian S. Shelton*
                                         Ian S. Shelton

                                         *Attorneys for Defendants Nexo Financial LLC,*
                                         *Nexo Financial Services Ltd., Nexo AG, Nexo*
                                         *Capital Inc., and Antoni Trenchev*

MOTION TO DISMISS