1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    JOHN CRESS,                             Case No.  23-cv-00882-TSH

8                    Plaintiff,

9        v.                                  **ORDER RE: MOTION TO DISMISS**

10   NEXO FINANCIAL LLC, et al.,             Re: Dkt. No. 19

11                   Defendants.

12

13                            **I.    INTRODUCTION**

14           Pending before the Court is Defendants Nexo AG, Nexo Capital Inc., Nexo Financial LLC,

15   Nexo Financial Services Ltd., and Antoni Trenchev's Motion to Dismiss pursuant to Federal Rule

16   of Civil Procedure ("Rule") 12(b)(2) and Rule12(b)(6).  ECF No. 19.  Plaintiff John Cress filed an

17   Opposition (ECF No. 23) and Defendants filed a Reply (ECF No. 24).  For the reasons stated

18   below, the Court **GRANTS IN PART AND DENIES IN PART** the motion.[1]

19                            **II.    BACKGROUND**

20           Plaintiff John Cress brings this action against Nexo Financial LLC, Nexo Financial

21   Services Ltd., Nexo AG, and Nexo Capital, Inc. (collectively "Nexo"), as well as Antoni

22   Trenchev.[2]  ECF No. 1.

23           Plaintiff John Cress is a resident of San Francisco, California.  *Id.* ¶ 8.

24           Defendant Nexo Financial LLC is a Delaware corporation with a registered agency address

25   in Delaware.  *Id.* ¶ 9.  Defendant Nexo Financial Services Ltd. is based in London, England.  *Id.* ¶

26

27   _____
     [1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 6,
     16.
28   [2]  Nexo Services OU was originally a defendant, but was dismissed without prejudice on April 24,
     2023.  ECF No. 15.

United States District Court
Northern District of California

10.  Defendant Nexo AG is a Switzerland corporation with a listed address in Switzerland.  *Id.* ¶ 12.  Defendant Nexo Capital Inc. ("Nexo Capital") is a Cayman Islands corporation with its principal place of business in London, England.  *Id.* ¶ 13.  Nexo Capital operates Nexo's website.  *Id.*  Nexo Capital is the Nexo entity that issued credit to Cress.  *Id.*

Defendant Antoni Trenchev is the Co-Founder, Managing Partner, and Chief Executive Officer of Nexo.  *Id.* ¶ 14.  Trenchev is a resident of the United Kingdom.  *Id.*  Trenchev signed a Cryptocurrency Purchase Agreement pursuant to which Nexo sold Plaintiff digital assets.  *Id.*

Since April 2018, Nexo has maintained a website through which customers can use their digital assets as collateral, held in their "Credit Line Wallet," to borrow fiat currency, such as U.S. Dollars.  *Id.* ¶ 31.  Beginning in October 2020, Nexo also offered customers interest-bearing accounts on deposited digital assets through a "Savings Wallet," which serves as back-up collateral.  *Id.*

A customer can borrow as much cash as they want if they maintain a particular loan-to-value ("LTV") ratio – the ratio between the amount of cash they have borrowed and the value of the collateral in their Credit Line Wallet.  *Id.* ¶ 32.  The value of the collateral fluctuates with the price of the digital assets held as collateral.  *Id.*  If a customer's LTV ratio rises above a certain threshold, to bring the LTV ratio back in line Nexo will transfer assets from the Savings Wallet to the Credit Line Wallet and/or automatically sell ("liquidate") the collateral.  *Id.* ¶ 33.  Customers may also use their borrowed fiat currency to purchase additional digital assets, which in turn provide additional collateral for the loan.  *Id.* ¶ 34.

In March 2021, Cress decided to transfer Bitcoin and Ether he had accumulated on Coinbase, a cryptocurrency exchange, to his Nexo Savings Wallet in order to earn passive returns through Nexo's interest-bearing Earn Account.  *Id.* ¶ 37.

On March 15, 2021, Nexo employee Hristiyan Hristov emailed Cress and told him that he was eligible for Nexo's "VIP Relationship Program."  *Id.* ¶ 39.  Hristov emailed Cress on March 17, 2021, attaching a brochure advertising the benefits of the VIP Relationship Program.  *Id.* ¶ 40.  In the brochure, Nexo stated that participants in the VIP Relationship Program: 1) "get a response from the support team in 2 hours, 24/7," receive a "dedicated relationship manager," "direct phone

number availability"; and 2) could utilize certain "OTC services," which included Nexo's "Liquidation Relief Program," described as a "service in the event of a market crash to recover your liquidated assets . . . ." *Id.* ¶ 42.

Cress emailed Hristov asking how much interest the Bitcoin he posted as collateral would "be earning and if all the interest was applied to the monthly loan payment, how short would the payments be and is that ok?" Hristov responded: "You will be earning 5% annually on the Bitcoin which you used as collateral. Keep in mind that the interest rate will be paid out daily in BTC [Bitcoin], so you will benefit from the potential upside in the Bitcoin price." *Id.* ¶ 44.

On March 26, 2021, Cress took out an approximately $5.4 million loan collateralized by his digital assets. *Id.* ¶ 48. Cress then borrowed $7.45 million more through loans in March and April 2021. *Id.*

In taking out the collateralized loans, Cress relied upon Nexo's representations regarding its responsiveness and Liquidation Relief Program because the digital asset market is highly volatile and he believed these benefits reduced the risk of losing his digital assets to liquidation. *Id.* ¶ 45. Cress also relied upon Nexo's representation that his collateral would earn interest because it helped to offset any interest he would pay on his loans. *Id.* ¶ 46.

Cress also emailed Hristov to request options for purchasing additional Bitcoin with a Nexo loan secured by digital assets. *Id.* ¶ 52. In order to receive more favorable interest rates on borrowing as well as the Earn Account, Nexo requires customers to purchase "NEXO Tokens" and maintain 10% of their portfolio balance in NEXO Token securities. *Id.* ¶ 50. Hristov sent Cress options for purchasing Bitcoin. *Id.* ¶ 52. These options all included that Cress purchase NEXO Tokens, but did not reflect the cost of the NEXO Tokens in the LTV ratio and liquidation numbers provided by Hristov. *Id.* By not accounting for the NEXO Tokens, Hristov understated the riskiness of the potential loans. *Id.* Hristov also represented to Cress that "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors." *Id.* ¶ 55.

Cress's purchase of NEXO Tokens dramatically increased the likelihood that Cress's assets would be liquidated as NEXO Tokens are far more volatile than Bitcoin. *Id.* ¶ 60. As a

result, when the crypto market experienced downside volatility, the value of Cress's collateral decreased more sharply than it would have if he had only been holding Bitcoin. *Id.* This, in turn, increased Cress's LTV more rapidly, resulting in the liquidation of his assets. *Id.*

In essence, Nexo sold Plaintiff a complex and highly risky leveraged loan of a bundle of digital assets, including NEXO Token security (the "Leveraged Investment Instrument"). *Id.* ¶ 62.

By May 23, 2021, the price of NEXO Tokens sank, causing the partial liquidation of Cress's digital assets. *Id.* ¶ 66. Nexo's Terms explicitly state that it will provide customers notice and opportunity to furnish additional collateral prior to liquidating the assets, but Nexo provided Cress no warnings. *Id.* ¶ 79. On June 21 and 22, 2021, the price of NEXO Tokens plunged, resulting in the liquidation of nearly all of Cress's digital assets. *Id.* ¶ 66. Nexo again failed to warn Cress prior to beginning the liquidation of his assets. *Id.* ¶ 81.

Cress emailed Hristov on June 22, 2021 regarding the Liquidation Relief Program. *Id.* ¶ 87. Nexo informed him under the Program he could take out a new loan from Nexo to repurchase his liquidated assets from Nexo. *Id.*

On February 27, 2023, Cress filed a Complaint with the following causes of action: 1) Fraudulent Inducement of Contract (against all Nexo Defendants); 2) California Unfair Competition Law ("UCL") (against all Nexo Defendants); 3) Unregistered Offer and Sale of Securities (against all Defendants); 4) Unregistered Offer and Sale of Securities (against Trenchev); and 5) Fraud in the Offer and Sale of Securities (against all Defendants). *Id.*

On May 15, 2023, Defendants filed the instant Motion to Dismiss pursuant to Rule 12(b)(2) and Rule 12(b)(6). ECF No. 19. On July 14, 2023, Cress filed an Opposition. ECF No. 23. On August 14, 2023, Defendants filed a Reply. ECF No. 24.

### III.   LEGAL STANDARD

#### A.   Rule 12(b)(2)

Rule 12(b)(2) governs motions to dismiss for lack of personal jurisdiction. The plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). However, this demonstration requires that the plaintiff "make only a prima facie showing of jurisdictional facts" to withstand the motion to

dismiss. *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010). To make this showing, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "Uncontroverted allegations in the complaint must be taken as true, and conflicts over statements contained in affidavits must be resolved in [plaintiff's] favor." *Love*, 611 F.3d at 608.

Courts properly exercise personal jurisdiction over a defendant "if it is permitted by a long-arm statute and if the exercise of jurisdiction does not violate federal due process." *Pebble Beach Co.*, 453 F.3d at 1154. "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Because "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution," a court's inquiry centers on whether exercising jurisdiction comports with due process. *Id.*; *see* Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."). Due process requires that nonresident defendants have "minimum contacts" with the forum state such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted).

A court may exercise either general or specific jurisdiction over a nonresident defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). General jurisdiction exists where a defendant has "continuous and systematic" contacts with the forum. *Id.* at 415. If general jurisdiction exists, the forum has jurisdiction over the defendant regardless of where the events giving rise to the litigation occurred. *Id.*

If a defendant's contacts with the forum are not sufficient to establish general jurisdiction, specific jurisdiction may still be shown. The Court may assert specific jurisdiction over a nonresident defendant if three requirements are met:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

United States District Court
Northern District of California

1

        (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

2

3

        (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

4

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citation omitted).

5

The plaintiff bears the burden of demonstrating the first two prongs. *CollegeSource, Inc. v.*

6

*AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011). If the plaintiff satisfies the first two parts

7

of the test, the burden shifts to the defendant to "to set forth a 'compelling case' that the exercise

8

of jurisdiction would not be reasonable." *Id.* (quoting *Burger King v. Rudzewicz*, 471 U.S. 462,

9

476-78 (1985)). While all three requirements must be met, in considering the first two prongs,

10

"[a] strong showing on one axis will permit a lesser showing on the other." *Yahoo! Inc. v. La*

11

*Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (en banc).

12

**B.     Rule 12(b)(6)**

13

        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

14

sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff

15

can prove no set of facts in support of his claim which would entitle him to relief." *Cook v.*

16

*Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (citation and quotation marks omitted). Rule 8

17

provides that a complaint must contain a "short and plain statement of the claim showing that the

18

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, a complaint must plead "enough facts

19

to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

20

570 (2007). Plausibility does not mean probability, but it requires "more than a sheer possibility

21

that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009). A complaint

22

must therefore provide a defendant with "fair notice" of the claims against it and the grounds for

23

relief. *Twombly*, 550 U.S. at 555 (quotations and citation omitted).

24

        In considering a motion to dismiss, the court accepts factual allegations in the complaint as

25

true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v.*

26

*St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Erickson v. Pardus*, 551

27

U.S. 89, 93–94 (2007). However, "the tenet that a court must accept a complaint's allegations as

28

true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere

United States District Court
Northern District of California

6

1   conclusory statements." *Iqbal*, 556 U.S. at 678.

2          If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

3   request to amend the pleading was made, unless it determines that the pleading could not possibly

4   be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

5   banc) (citations and quotations omitted).  A court "may exercise its discretion to deny leave to

6   amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to

7   cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . .,

8   [and] futility of amendment.'"  *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th

9   Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

10  **C.     Rule 9(b)**

11          Where a plaintiff asserts a claim sounding in fraud, the plaintiff must "state with

12  particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b).  A claim sounds

13  in fraud if the plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that

14  course of conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103

15  (9th Cir. 2003).  The context surrounding the fraud must "be 'specific enough to give defendants

16  notice of the particular misconduct . . . so that they can defend against the charge and not just deny

17  that they have done anything wrong.'"  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir.

18  2009) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  Thus,

19  "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the

20  misconduct charged." *Vess*, 317 F.3d at 1106 (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th

21  Cir. 1997)).

22                                  **IV.   DISCUSSION**

23  **A.     Rule 12(b)(2) – Personal Jurisdiction**

24          Nexo moves under Rule 12(b)(2) to dismiss claims against all Defendants except Nexo

25  Capital Inc.  ECF No. 19 at 6-11.  Nexo argues that Cress has not shown personal jurisdiction over

26  these Defendants because Cress does not establish general jurisdiction or specific jurisdiction.

27  ECF No. 19 at 6-11.  Cress argues there is specific jurisdiction over all Defendants, including

28  based on a theory of single enterprise.  ECF No. 23 at 3-9.  Cress also argues alternatively that the

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | Court should grant leave to conduct jurisdictional discovery. *Id.* at 9.

2 |       **1.**      **Specific Jurisdiction Over Corporate Defendants**

To establish specific jurisdiction, Cress must show Defendants purposefully directed activities toward the forum, the claim must be one which arises out of the forum or forum-related activities, and the exercise of jurisdiction must be reasonable. *See Schwarzenegger*, 374 F.3d at 802. A plaintiff may satisfy the first prong "by showing either purposeful availment or purposeful direction, which are two distinct concepts." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (citing *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012)). Purposeful availment generally operates for claims sounding in contract, and purposeful direction is generally a better approach for analyzing claims in tort. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020). "At bottom, both purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.'" *Id.* ( quoting *Burger King*, 471 U.S. at 474–75).

Cress argues that Nexo companies purposefully directed their activities at California by collectively operating the Nexo website and offering the Nexo services advertised through the website. ECF No. 23 at 3-4. "[P]ersonal jurisdiction may be appropriate where the defendant operates an interactive website, depending on the 'level of interactivity and commercial nature of the exchange of information that occurs on the Web site.'" *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-04000 SC, 2013 WL 57861, at *3 (N.D. Cal. Jan. 3, 2013) (quoting *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997)). As Nexo correctly counters, the Complaint actually states that it is Nexo Capital that operates the website. *See* ECF No. 1 ¶ 13 ("Nexo Capital operates Nexo's website").

Paragraph 15 of the Complaint goes on to allege: "Nexo Financial, Nexo Financial Services, Nexo Services, Nexo AG, and Nexo Capital, collectively operating and maintaining the Nexo website and offering the Nexo services advertised on that website and through the Nexo

whitepaper, are subject to single-enterprise liability."  Below the Court addresses Cress's single enterprise theory of personal jurisdiction.  *Cf. Jeong v. Nexo Fin. LLC*, No. 21-CV-02392-BLF, 2022 WL 174236, at *10 (N.D. Cal. Jan. 19, 2022) ("Plaintiff's conclusory allegations regarding the fact that Defendants 'collectively operat[e] and maintain[ ] the Nexo website' are insufficient to overcome Nexo's evidence.").  Here, the Court merely observes that the allegation of collective operation of the website is presented in the Complaint solely as part of the single enterprise allegation.  Outside of the single enterprise allegation, the Complaint specifically alleges that Nexo Capital – the Defendant not contesting personal jurisdiction – operates Nexo's website.  Cress thus fails to show purposeful availment where he alleges that Nexo Capital is the entity maintaining the website.  *See id.* (finding same).

### 2.    Specific Jurisdiction Based on Single Enterprise

Cress also argues that there is jurisdiction over the Nexo entities based on an alter ego or single enterprise theory.  ECF No. 23 at 5-8.

The veil separating affiliated corporations may "be pierced to exercise personal jurisdiction over a foreign defendant in certain limited circumstances."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015).  One of these circumstances is based on application of "the alter ego test," under which general jurisdiction may be imputed where companies are "'not really separate entities,' such that one entity's contacts with the forum state can be fairly attributed to the other." *Id*.  For personal jurisdiction to be applied on this basis, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'"  *Id.* at 1073 (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001)).  "Disregarding the corporate entity is recognized as an 'extreme remedy,' and courts will only pierce the corporate veil in 'exceptional circumstances.'"  *Jeong*, 2022 WL 174236, at *11 (quoting *Gonzalez v. Drew Indus. Inc.*, No. CV 06–08233 DDP (JWJx), 2008 WL 11338569, at *1 (C.D. Cal. Apr. 1, 2008)).

"The 'unity of interest and ownership' prong of this test requires 'a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the

former.'" *Ranza*, 793 F.3d at 1073 (quoting *Unocal*, 248 F.3d at 926). "This test envisions pervasive control over the subsidiary, such as when a parent corporation 'dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation.'" *Id.* (quoting *Unocal*, 248 F.3d at 926). "Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Id.* (citing *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003)). Factors indicating a unity of interest and ownership include:

> (1) inadequate capitalization, (2) commingling of funds and other assets, (3) disregard of corporate formalities and failure to maintain an arm's length relationship, (4) holding out by one entity that is liable to the debts of the other, (5) identical equitable ownership, (6) use of the same offices and employees, (7) lack of segregation of corporate records, (8) manipulating assets between entities so as to concentrate the assets in one and the liabilities in another, and (9) identical directors and officers.

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (citing *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017)).

Cress points to multiple Complaint allegations to argue these factors favor unity of interest. ECF No. 23 at 5-7. For one, Kosta Kantchev, Georgi Shulev, and Antoni Trenchev identify themselves as "co-founders" and "managing partners" of "Nexo," without distinguishing between the corporate entities. ECF No. 1 ¶ 16(b). Nexo entities also share similar supervision and management, in that some combination of Kantchev, Shulev, and Trenchev are responsible for oversight of each of the entities. *Id.* ¶ 16(f). Kantchev, Shulev, and Trenchev collectively hold most of the equity in each entity. *Id.* ¶ 16(e). Nexo Capital and Nexo Financial Services Ltd. are both based in London, UK. *Id.* ¶¶ 10, 13. Finally, the Nexo entities treat the employees of any particular entity as working for "Nexo" as a whole. *Id.* ¶ 16(h). However, Judge Freeman already analyzed these allegations and found them insufficient for unity of interest in *Jeong v. Nexo Financial LLC*. 2022 WL 174236, at *13-15; *see* ECF No. 23 at 6-7. As Nexo points out, the Complaint allegations regarding single enterprise jurisdiction are nearly identical to those detailed in *Jeong*, *compare* ECF No. 1 ¶¶ 16(a)-(h), *with Jeong*, 2022 WL 174236, at *12 (paragraph detailing allegations), and Defendants similarly introduce evidence here controverting Cress's

United States District Court
Northern District of California

1    conclusory allegations.  ECF No. 19-1 ¶¶ 16, 22 (Trenchev Decl.).  This Court finds Judge

2    Freeman's analysis applying the *Daewoo* factors to these allegations and evidence persuasive and

3    adopts her reasoning.  *See Jeong*, 2022 WL 174236, at \*13.

4         Cress argues that he has added additional allegations here from those in *Jeong*.  ECF No.

5    23 at 6.  Specifically, Cress alleges that he entered into a "Cryptocurrency Purchase Agreement"

6    with "Nexo (any holding companies, subsidiaries or related entities which are hereinafter referred

7    to as 'Nexo')."  *See id.*; *see also* ECF No. 1 ¶ 17.  He also alleges that Nexo presented itself as a

8    single enterprise in its relationship with him.  ECF No. 23 at 6-7.  The Court does not find that

9    these additional allegations tip the scales, however.  The majority of the *Daewoo* factors weighed

10   against finding a unity of interest in *Jeong* and the new allegations do not provide sufficiently

11   pertinent facts to change that analysis.  The language cited by Cress in the Cryptocurrency

12   Purchase Agreement actually indicates that there are, in fact, separate companies and subsidiaries,

13   as opposed to stating that there is only one singular Nexo.  *Cf. 21st Century Fin. Servs., LLC v.*

14   *Manchester Fin. Bank*, 255 F. Supp. 3d 1012, 1023 (S.D. Cal. 2017) (finding ambiguity in

15   references to affiliated entities as one entity in some documents was clarified in other documents

16   such that there was not a unity of interest).  Further, Cress is not alleging a cause of action based

17   on breach of the Cryptocurrency Purchase Agreement.

18        Cress also points to public statements by Nexo and its co-founders referring to "Nexo" as

19   opposed to specifying the individual companies.  ECF No. 23 at 6-7.  These public statements do

20   provide "some evidence" of the Defendants' relationship.  *Seiko Epson Corp. v. Print-Rite*

21   *Holdings, Ltd.*, No. CV 01-500-BR, 2002 WL 32513403, at \*15 (D. Or. Apr. 30, 2002) ("Group's

22   public image offers some evidence of the parties' true relationships with one another . . . .").

23   However, as again noted by Judge Freeman, this kind of evidence "provide[s] only marginal

24   support for unity of interest between entities."  *Jeong*, 2022 WL 174236, at \*14 (collecting cases).

25   Further, none of the public statements provided by Cress provide particularly germane evidence of

26   the Defendants' unity of interest, but rather generally indicate "Nexo" served at times as a

27   shorthand for the companies.  *See id.* ( "[T]he statements generally hinge on shorthand references

28   to 'Nexo' as if it were a single entity, as opposed to any specific statements about how the various

United States District Court
Northern District of California

11

entities are managed or organized.  The Court adopts the shorthand 'Nexo' to refer to Defendants throughout this order, but that does not have any bearing on the details of Defendants' relationship.").

Accordingly, in light of the compelling reasoning of *Jeong* and the failure of Cress to point to sufficiently distinguishing allegations or evidence, the Court finds Cress has failed to meet his *prima facie* regarding single enterprise jurisdiction.  In sum, Cress has failed to adequately plead that this Court has general or specific personal jurisdiction over Nexo Financial LLC, Nexo Financial Services Ltd., and Nexo AG.

The Court hereby **GRANTS** Defendants' Rule 12(b)(2) Motion to Dismiss as to Nexo Financial LLC, Nexo Financial Services Ltd., and Nexo AG.

### 3.      Specific Jurisdiction Over Antoni Trenchev

Defendants also argue that Cress has failed to adequately plead specific jurisdiction over individual Defendant Antoni Trenchev, because there are insufficient allegations that he purposefully directed action at California.  ECF No. 19 at 8-9.  Cress argues that there is jurisdiction because Trenchev's conduct was tortious.  ECF No. 23 at 8-9.

"In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'"  *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 264 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  For specific jurisdiction over a non-resident defendant, "[t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws."  *Yahoo! Inc.*, 433 F.3d at 1205-06.

The parties do not dispute that Trenchev is a non-resident of California.  Cress argues that Trenchev solicited Cress's securities investment with knowledge that Cress lived in California.  ECF No. 23 at 8-9.  However, Cress does not point to any evidence of solicitation by Trenchev other than his signing of the Cryptocurrency Purchase Agreement.  ECF No. 1 ¶ 14.  Trenchev's

signing of this agreement in his corporate capacity does not count toward his contacts with California.  *See In re Boon Glob. Ltd.*, 923 F.3d 643, 651 (9th Cir. 2019) ("[A] corporate officer does not become a party to the contract simply 'by signing it in the officer's representative capacity.'") (quoting Restatement (Third) of Agency § 6.01 (Am. Law Inst. 2003)); *see also Stemcell Techs. Canada Inc. v. StemExpress, LLC*, No. 21-CV-01594-VC, 2022 WL 509673, at *3 (N.D. Cal. Feb. 21, 2022) (finding contracts signed by defendant as representative of corporation were insufficient for minimum contacts).  Cress's allegations that Trenchev "knew" that Cress lived in California imputes Nexo's knowledge to Trenchev without any factual basis.  Further, Trenchev's knowledge without additional allegations is insufficient to establish minimum contacts.  *See Ortolivo v. Precision Dynamics Int'l, LLC*, No. 22-CV-01812-JSW, 2022 WL 16823693, at *3 (N.D. Cal. Nov. 8, 2022) ("Long alleges that he conducts his duties in Tennessee, and the fact that he knew Ortolivo resided in California is not sufficient under *Walden*."); *Walden v. Fiore*, 571 U.S. 277, 289 (2014) ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections.").

Cress's only other allegations that Trenchev was involved in the Cress-Nexo relationship are conclusory allegations that Trenchev exercised control over Nexo and directed and/or authorized the sale of NEXO Tokens to Cress.  ECF No. 1 ¶ 14.  These allegations are insufficient.  *See Stemcell Techs.*, 2022 WL 509673, at *3 (allegations that individual defendant "planned, schemed and conspired" with corporate entity were insufficient to establish jurisdiction); *Kalin v. Semper Midas Fund, Ltd.*, No. 4:21-CV-01062-YGR, 2021 WL 5906053, at *3 (N.D. Cal. Dec. 14, 2021) (Complaint "merely alleges in a conclusory fashion that the defendants had control over" corporate entity).

Accordingly, Cress has failed to adequately plead that this Court has personal jurisdiction over Trenchev.  The Court hereby **GRANTS** Defendants' Rule 12(b)(2) Motion to Dismiss as to Trenchev.

### 4.   Jurisdictional Discovery

Cress requests in the alternative that the Court grant leave to conduct jurisdictional

1    discovery.  ECF No. 23 at 9.

2         "A district court is vested with broad discretion to permit or deny discovery, and a decision

3    to deny discovery will not be disturbed except upon the clearest showing that the denial of

4    discovery results in actual and substantial prejudice to the complaining litigant."  *Laub v. U.S.*

5    *Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quotation marks and citation omitted).

6    The Ninth Circuit has stated that jurisdictional discovery "should ordinarily be granted where

7    pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory

8    showing of the facts is necessary."  *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d

9    535, 540 (9th Cir. 1986) (quotation marks and citation omitted).  "In order to obtain discovery on

10   jurisdictional facts, the plaintiff must at least make a 'colorable' showing that the Court can

11   exercise personal jurisdiction over the defendant."  *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1119

12   (C.D. Cal. 2007).  This "colorable showing" suggests "something less than a prima facie showing,

13   and could be equated as requiring the plaintiff to come forward with 'some evidence' tending to

14   establish personal jurisdiction over the defendant."  *Id*.  Where a plaintiff's claim "of personal

15   jurisdiction appears to be both attenuated and based on bare allegations in the face of specific

16   denials made by defendants, the Court need not permit even limited discovery."  *Terracom v.*

17   *Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (citations omitted).

18        Trenchev specifically disputes many of Cress's claims related to alter ego jurisdiction.  *See*

19   Trenchev Decl., ECF No. 19-1 ¶¶ 16, 22 (stating the Nexo entities have their own directors,

20   maintain corporate formalities, have been adequately capitalized, maintain separate bank accounts,

21   have not commingled assets, etc.).  Cress's barebones allegations contradicting these statements,

22   such as that the Nexo entities commingle funds and assets and do not maintain corporate

23   formalities, do not sufficiently create controverted facts meriting jurisdictional discovery.  *See*

24   *Jeong*, 2022 WL 174236, at *16.  The Court also, again, agrees with Judge Freeman's analysis

25   based on nearly identical facts, in which she found the plaintiff "only alleged minimal facts

26   supporting a small fraction of the factors relevant to single-enterprise liability, which is far

27   removed from the 'exceptional circumstances' necessary to invoke this 'extreme remedy.'"  *Id.*

28   (quoting *Gonzalez*, 2008 WL 11338569, at *1).  As to Trenchev, Cress makes no arguments at all

United States District Court
Northern District of California

1    regarding a colorable basis and the Court does not find any.

2            Accordingly, Cress's request for jurisdictional discovery is **DENIED**.

3    **B.      Fraudulent Inducement of Contract Claims**

4            Cress's first cause of action alleges that he was fraudulently induced to take out risky loans

5    based on misrepresentations made by Nexo.  ECF No. 1 ¶¶ 96-104.  "Fraud in the inducement . . .

6    occurs when '"the promisor knows what he is signing but his consent is induced by fraud, mutual

7    assent is present and a contract is formed, which, by reason of the fraud, is voidable.  In order to

8    escape from its obligations the aggrieved party must rescind."'"  *Najarro v. Superior Ct.*, 70 Cal.

9    App. 5th 871, 889 (2021), *as modified* (Oct. 22, 2021) (quoting *Rosenthal v. Great W. Fin. Sec.

10   Corp.*, 14 Cal. 4th 394, 416 (1996)).  "In California, the elements of fraud and deceit are (1)

11   'misrepresentation (false representation, concealment, or nondisclosure)'; (2) 'knowledge of

12   falsity (or "scienter")'; (3) 'intent to defraud, i.e., to induce reliance'; (4) 'justifiable reliance'; and

13   (5) 'resulting damage.'"  *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1148 (E.D.

14   Cal. 2017) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 973–74 (1997), *as

15   modified* (July 30, 1997)).

16       **1.      Misrepresentation**

17           Cress alleges that he was fraudulently induced based on three misrepresentations made by

18   Nexo: 1) Nexo represented to Plaintiff that as a participant in its VIP Program he would be able to

19   "recover [his] liquidated assets" through its Liquidation Relief Program; 2) Nexo represented that

20   VIP customers would receive a response from its support team "in 2 hours, 24/7," as well as a

21   "dedicated relationship manager," and "direct phone number availability"; and 3) Nexo told Cress:

22   "You will be earning 5% annually on the Bitcoin which you used as collateral."  ECF No. 1 ¶¶ 85,

23   89, 94.  Nexo argues that the cause of action must be dismissed because none of these statements

24   can be characterized as actionable misrepresentations.  ECF No. 19 at 11-14.

25           "Under any theory of deceit, a misrepresentation is actionable only if it is a representation

26   of fact rather than opinion."  *Copart, Inc.*, 277 F. Supp. 3d at 1149.  "Language considered non-

27   actionable puffery cannot form the basis for fraudulent inducement . . . claims because these

28   'vague, exaggerated, generalized or highly subjective statements regarding a product or business'

United States District Court
Northern District of California

are 'extremely unlikely to induce consumer reliance.'" *MegaFon PJSC v. Hewlett Packard Enter. Co.*, No. 18-CV-06463-NC, 2019 WL 1130481, at *5 (N.D. Cal. Mar. 12, 2019) (quoting *Cnty. of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1039 (N.D. Cal. 2011)). "Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus., Inc. v. Ikon Office Sols.*, 513 F.3d 1038, 1053 (9th Cir. 2008).

Cress first alleges that Nexo represented that as a VIP Program participant he would be able to "recover [his] liquidated assets" through its Liquidation Relief Program. ECF No. 1 ¶ 85. While the parties debate what it means to "recover" liquidated assets, the Court understands Cress to allege that Nexo advertised to him that as a VIP he would be able to participate in a Liquidated Relief Program which would permit him at least some measure of protection from liquidation. According to Cress, there effectively was no Liquidation Relief Program at all, and when he sought to utilize the program it became clear that he was in the same position he would have been without being a VIP. *See Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1167 (2018) (noting in the reasonable consumer context that "there is no protection for literal falseness."). As such, the Court finds this statement to be a plausible misrepresentation.

Cress next alleges that Nexo represented that VIP customers would receive a response from its support team "in 2 hours, 24/7," as well as a "dedicated relationship manager," and "direct phone number availability." ECF No. 1 ¶ 89. Nexo argues that these representations are not actionable because Cress was, in fact, provided direct phone number availability and the promise of an email reply was plainly limited to business hours. ECF No. 19 at 12-13. Nexo produces emails between Nexo employee Hristiyan Hristov and Cress and points to Hristov's signature block containing a phone number, as well as the fact that Hristov and Cress spoke on the phone multiple times. *See* ECF No. 19 at 12-13. The Court declines to make a factual determination that the phone number provided in Hristov's signature block was a direct line as opposed to a general company number. Nor is it dispositive that Hristov and Cress spoke on the phone. These emails submitted by Nexo are not properly considered in a motion to dismiss. Additionally, the Court does not consider the representation that a support team would respond within "2 hours 24/7" to be generalized puffery, as it is quantifiable and specific, and runs counter

1    to Cress's additional allegation that he did not receive a timely response.  *See Newcal Indus., Inc.*,

2    513 F.3d at 1053 ("Ultimately, the difference between a statement of fact and mere puffery rests in

3    the specificity or generality of the claim.").  The Court finds Cress alleges a plausible

4    misrepresentation.

5           Finally, Cress alleges that on "on March 23, 2021 Hristov told Plaintiff: 'You will be

6    earning 5% annually on the Bitcoin which you used as collateral.'  This was false—Plaintiff did

7    not earn interest on digital assets posted as collateral for his loans."  ECF No. 1 ¶ 94.  Nexo

8    provides the email containing the statement as well as the surrounding conversation and argues

9    that it was clearly responsive to Cress's inquiry regarding Bitcoin in his Savings Wallet and thus

10   was factually true and not misleading in relation to the Bitcoin in Cress's Credit Line Wallet. [3]

11   ECF No. 19 at 13-14.  Cress counters that, on its face, the statement is inaccurate as it is not

12   specifically limited to his Savings Wallet and it is premature to resolve the statement's meaning.

13   ECF No. 23 at 13-14.  Although a close call, the Court finds that Cress has plausibly alleged a

14   misrepresentation.  "A representation need not be a *direct falsehood* to constitute fraud.  It may be

15   a deceptive answer or other indirect but misleading language."  *Brady v. Carman*, 179 Cal. App.

16   2d 63, 68 (1960).  Whether it is ultimately reasonable for Cress to have understood the statement

17   to apply more broadly to the Bitcoin in his Credit Line Wallet and Savings Wallet the Court does

18   not decide.  The Court merely finds plausible on its face that Hristov's answer speaking in such

19   broad terms could be misleading or deceptive.

20

21

22   _____

[3]  The Court considers the emails provided by Nexo dated March 23, 2021 to be appropriate for
23   consideration under the incorporation-by-reference doctrine because the Complaint "necessarily
     relies" on the exchange as a misrepresentation and the authenticity of the emails is uncontested.
24   ECF No. 19-6 at 4-5; *see Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010);
     *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Nexo also produces an alleged
25   conversation between Cress and a representative at Nexo dated June 11, 2021, where Cress
     indicates he is aware that the Bitcoin in the Credit Line Wallet will not earn interest.  *See* ECF No.
26   19 at 14; ECF No. 19-7.  The Court agrees with Cress that this conversation is not relied upon or
     referred to in the Complaint, and reliance upon these alleged facts would permit Nexo to "insert
27   their own version of events into the complaint to defeat otherwise cognizable claims."  *Khoja v.
     Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  Further, the conversation post-
28   dates Cress's decision to take out loans with Nexo and thus does not necessarily defeat his
     allegations regarding what he knew at the time he decided to take out the loans.

United States District Court
Northern District of California

**2.      Knowledge of Falsity**

Nexo also argues that Cress's claim specifically based on the Liquidation Relief Program is inadequately pled because Cress does not allege facts suggesting that Nexo had an intent not to perform at the time that it promised Cress could recover under the Program.  ECF No. 19 at 14-15.

"'Promissory fraud' is a subspecies of fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  [Citations.] An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Engalla*, 15 Cal. 4th at 973–74 (quoting *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996)).  "Although intent can be averred generally under Rule 9(b), a plaintiff must point to facts which show that defendant harbored an intention not to be bound by terms of the contract at formation." *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1109-10 (C.D. Cal. 2015) (quoting *Mat–Van, Inc. v. Sheldon Good & Co. Auctions, LLC*, No. CV 07–CV–912 IEG–BLM, 2007 WL 2206946, at *6 (S.D. Cal. July 27, 2007)).

Cress alleges that "[o]n information and belief, Nexo had no intention of honoring these false promises when it made them, but rather that they were provided to Plaintiff with the purpose of convincing him to take out loans that put his collateral at risk of liquidation and for Nexo's benefit."  ECF No. 1 ¶ 98.  The Court finds these allegations, namely that Nexo had no intention of honoring the promises when it made them coupled with straightforward allegations regarding Nexo's motivations in making the promises to induce him to take out risky loans with Nexo sufficient for a motion to dismiss.  *See Lucas v. Int'l Bus. Machines Corp.*, No. 20-CV-00141-JCS, 2020 WL 2494562, at *8 (N.D. Cal. May 14, 2020) ("The Court finds IBM's straightforward motivation to induce its sales representatives to sell additional products, as well as its alleged failure to follow through on the promise, sufficient at the pleading stage to satisfy *Iqbal*'s plausibility standard for the conclusion that IBM did not intend to honor that promise when it was made.").  The Court considers this conclusion particularly apt where facts related to Nexo's intent are uniquely within its possession.  *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged

18

1   upon information and belief where the facts are peculiarly within the possession and control of the

2   defendant . . .") (internal quotations and citation omitted).

3       **3.    Reliance**

4       Nexo also argues that Cress could not have actually and justifiably relied upon Nexo's

5   representations related to the Liquidation Relief Program because Cress did not become fully

6   aware of the program until after he had taken out the loans.  ECF No. 19 at 15-16.  Further, as to

7   all misrepresentations, Nexo contends that Cress's reliance was not reasonable as he is an

8   accredited investor, and he agreed in the Cryptocurrency Purchase Agreement that he had not

9   relied upon any statement or other representation of Nexo in entering into the transactions.  *Id*.

10  Cress argues that the reasonableness of his reliance is a question of fact.  ECF No. 23 at 14-18.

11      "A plaintiff asserting fraud by misrepresentation is obliged to plead and prove actual

12  reliance, that is, to 'establish a complete causal relationship' between the alleged

13  misrepresentations and the harm claimed to have resulted therefrom."  *OCM Principal*

14  *Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 864 (2007), *as*

15  *modified* (Dec. 26, 2007) (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1092 (1993)).  Reliance

16  on the representations need not be the "sole or even predominant or decisive factor in influencing

17  his conduct . . . .  It is enough that representation has played a substantial part" in influencing the

18  decision.  *Engalla*, 15 Cal. 4th at 977.  A plaintiff must also plead justifiable reliance "i.e.,

19  circumstances were such to make it *reasonable* for the plaintiff to accept the defendant's

20  statements without an independent inquiry or investigation.'"  *Microsoft Corp. v. Hon Hai*

21  *Precision Indus. Co.*, No. 19-CV-01279-LHK, 2020 WL 5128629, at *11 (N.D. Cal. Aug. 31,

22  2020) (quoting *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 794 (2013))

23  (quotation marks and internal alterations omitted) (emphasis in original).  Justifiable reliance

24  extends "beyond the plaintiff's *subjective* reliance to an *objective* requirement that a reasonable

25  person in the plaintiff's shoes would have been justified in relying on the misrepresentation."  *Dix*

26  *v. Nova Benefit Plans, LLC*, No. CV1408678ABFFMX, 2015 WL 12859221, at *5 (C.D. Cal.

27  Apr. 28, 2015) (citing *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1066-67 (2012)).  "The

28  reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and

United States District Court
Northern District of California

experience." *West*, 214 Cal. App. 4th at 794 (quotation marks omitted). "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *Id*.

The Court finds that dismissal based on reliance is not warranted. Nexo relies upon a June 22, 2021 email exchange to argue Cress was not aware of the Liquidation Relief Program and could not have relied upon it, but the Complaint alleges that on March 17, 2021, Hristov emailed Cress a brochure about Nexo's VIP Program that referred to the Liquidation Relief Program. ECF No. 1 ¶¶ 40, 42. Paragraph 42 of the Complaint alleges that after receiving this brochure on March 17, "Plaintiff reasonably understood . . . that, as a VIP . . . in the event of a market crash that his digital assets would receive protection from liquidation," and paragraph 45 alleges that he relied on Nexo's representations about the Liquidation Relief Program in deciding whether to take out loans. Drawing all inferences in Cress's favor, the Court finds that he plausibly alleges awareness of the Liquidation Relief Program such that he could plausibly rely upon it.

The Court also finds that the Cryptocurrency Purchasing Agreement's terms do not merit the conclusion that reliance on statements prior to the agreement was per se unreasonable. "Reliance on pre-contract statements when contract language contradicts them is only per se unreasonable when the content of the conflicting statements is specific and the contradiction is direct." *MegaFon PJSC*, 2019 WL 1130481, at *7 (citing *Applied Elastometrics, Inc. v. Z-Man Fishing Prods.*, Case No. 06-cv-2469-CW, 2006 WL 3251732, at *6 (N.D. Cal. Nov. 8, 2006)). The Court does not find that the agreement, wherein Cress allegedly agreed that he had "not relied on any statement or representations of Nexo" other than those in the agreement itself, to be directly contradictory of the alleged pre-contract misrepresentations.

Finally, the Court does not conclude that Cress's status as an "accredited investor" renders undisputed that reliance on the alleged misrepresentations was unreasonable. In *Microsoft Corp. v. Hon Hai Precision Indus. Co.*, the case cited by Nexo, the court did consider that plaintiff was a sophisticated corporation in the electronics industry in finding reliance was unreasonable, but the court's interpretation of the party as sophisticated placed much more emphasis on the undisputed fact that the plaintiff was represented by counsel in negotiations. No. 19-CV-01279-LHK, 2020

20

WL 836712, at *12 (N.D. Cal. Feb. 20, 2020) ("Finally, Hon Hai's reliance on Microsoft's alleged misrepresentations was unjustified because courts have consistently held that '[w]here a party is represented by counsel, or where the alleged misrepresentation was made by an adversary during the course of negotiations, . . . reliance is unjustifiable.'") (quoting *Borg v. Principal Life Ins. Co*., No. C 07-03149 JW, 2008 WL 11453724, at *3 (N.D. Cal. July 24, 2008)).  There are no allegations of attorney representation here, nor are there the depth of factors at play in *Microsoft Corp.*

Accordingly, the Court **DENIES** Nexo's Motion to Dismiss Cress's fraudulent inducement of contract claim.

## C.     UCL Claim

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof. Code §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.* § 17200. The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotations and citation omitted).  Cress brings his cause of action under all three prongs – based on unlawful, unfair, and fraudulent or deceptive and misleading action.  ECF No. 1 ¶¶ 105-113.

### 1.     Adequate Remedy at Law

"The UCL provides only equitable remedies." *Mish v. TForce Freight, Inc.*, No. 21-CV-04094-EMC, 2021 WL 4592124, at *5 (N.D. Cal. Oct. 6, 2021) (citing *Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 292 (2020)).  "The only monetary remedy available in a private action under the unfair competition law is restitution." *Clark v. Superior Ct.*, 50 Cal. 4th 605, 613 (2010).  Cress's prayer for relief seeks restitution in an amount to be determined according to proof at trial, although he does not specifically tie the remedy to his UCL claim. ECF No. 1 at 27.  In *Sonner v. Premier Nutrition Corp.*, the Ninth Circuit held that a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for

past harm under the UCL . . . ."  971 F.3d 834, 844 (9th Cir. 2020).  Nexo argues that Cress's

UCL claim fails because he has not pled that there is an inadequate remedy at law pursuant to

*Sonner*.  ECF No. 19 at 17.

As noted in *Jeong v. Nexo Fin. LLC*, the applicability of *Sonner* at the pleading stage is

unresolved.  2022 WL 174236, at *27 (collecting cases and finding courts in the Ninth Circuit are

divided on "how exacting a standard *Sonner* imposes on plaintiffs who plead claims for equitable

and legal remedies at the pleading stage.").  Some courts have found that a plaintiff may plead

UCL claims in the alternative.  *See, e.g.*, *Jeong*, 2022 WL 174236, at *27 ("[G]iven the general

liberal policy courts have toward pleading in the alternative, this Court finds that Plaintiff may

proceed with his equitable restitution claim at this stage even though he is also seeking contract

damages."); *Sinatro v. Barilla Am., Inc*., 635 F. Supp. 3d 858, 882 (N.D. Cal. 2022) (citing *Jeong*

and allowing a UCL claim as an alternative form of relief); *Leventhal v. Streamlabs LLC*, No. 22-

CV-01330-LB, 2022 WL 17905111, at *8 (N.D. Cal. Dec. 23, 2022) (citing *Jeong* and permitting

a UCL claim for equitable restitution as an alternative form of relief); *but see, e.g.*, *In re MacBook

Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020)

(requiring plaintiff plead an inadequate remedy at law); *Mish*, 2021 WL 4592124, at *6 ("[I]n

order for Mish to state a claim under the UCL for equitable remedies (including disgorgement and

injunctive relief), she must sufficiently plead that she lacks an adequate remedy at law.").

Cress argues not only that he may plead his UCL claims in the alternative but also that his

UCL claim is not wholly duplicative of his other claims as it relies upon Nexo obscuring the true

cost of borrowing by advertising rates only available to customers holding 10% of their assets in

NEXO Token.  *See* ECF No. 23 at 18-19; *see also* ECF No. 1 ¶ 108; *cf. Nacarino v. KSF

Acquisition Corp*., 642 F. Supp. 3d 1074, 1082-83 (N.D. Cal. 2022) (finding claims for damages

were based on precisely the same conduct as equitable claims for restitution and dismissing based

on availability of equitable remedies).  Given the liberal policy of pleading in the alternative, the

lack of binding precedent on the issue, and Cress's differentiation between his damages claims and

UCL claim, the Court permits Cress's UCL claim to move forward at the pleading stage.  *See*

*Sinatro*, 635 F. Supp. 3d at 882 (finding plaintiff could move forward with UCL claim based on

United States District Court
Northern District of California

1   pleading in the alternative and plaintiff's explanation that the remedy at law may be inadequate).

2   The Court may reassess the issue of available remedies at a later stage of the case.

3           **2.        Securities-Related Transactions**

4           Nexo next argues that Cress's UCL claim fails because the UCL does not apply to

5   securities-related transactions.  ECF No. 19 at 17-18.

6           In *Bowen v. Ziasun Techs., Inc.*, the California Court of Appeal in the Fourth District

7   concluded that "section 17200 does not apply to securities transactions." 116 Cal. App. 4th 777,

8   788 (2004), *as modified on denial of reh'g* (Apr. 7, 2004).  This holding has since been somewhat

9   narrowed.  First, it is interpreted to be a bar on "lawsuits based on deceptive conduct in the sale

10  and purchase of securities."  *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th

11  688, 715 (2007).  Second, courts "have allowed Section 17200 claims to proceed where the claims

12  were tangentially related to securities transactions."  *Betz v. Trainer Wortham & Co.*, 829 F. Supp.

13  2d 860, 866 (N.D. Cal. 2011).  "No court, however, has allowed Section 17200 claims to proceed

14  where . . . the predicate acts are securities transactions."  *Id.*

15          This Court finds that, to the extent that Cress's UCL claims are based on Nexo's deceptive

16  conduct in the sale of NEXO Tokens and his Earn Account, these claims are barred under *Bowen*.

17  As to allegations related to borrowing from Nexo, the Court finds that these claims may proceed.

18  Nexo argues that because Cress has alleged that essentially all of his assets with Nexo were

19  securities that he is barred from proceeding with the UCL claim regardless of whether they are

20  determined to be securities or not.  ECF No. 25 at 11.  Nexo cites to no caselaw in support of this

21  proposition, and the Court finds that Cress could proceed with a UCL claim in the alternative to

22  the security fraud claims based on the "Leveraged Investment Instrument."  *See Zakinov v. Ripple*

23  *Labs, Inc.*, No. 18-CV-06753-PJH, 2020 WL 922815, at *23 (N.D. Cal. Feb. 26, 2020) ("In the

24  event XRP were factually determined ***not*** to be a security (like any other non-security good

25  subject to California consumer protection statutes) and plaintiff alleged the above referenced

26  misstatements with requisite Rule 9(b) specificity, those statements may still be actionable under §

27  17200 or § 17500 under, for example, a theory of false advertising.") (emphasis in original).

28  Further, as described below, the Court does not find at the moment that Cress has adequately pled

that his "Leveraged Investment Instrument" is a security and thus he currently has no claim related to securities transactions in borrowing with Nexo.  In the event he amends his Complaint to allege that the Leveraged Investment Instrument is a security, he may also allege his UCL claim related to the sale and purchase of the Leveraged Investment Instrument in the alternative.  *See id.*

Accordingly, the Court **GRANTS** Defendant's Motion to Dismiss the UCL claim to the extent it is based on Nexo's deceptive conduct in the sale of NEXO Tokens and his Earn Account.

### 3.    Predicate Acts

Finally, Nexo argues that Cress's UCL claim fails because he inadequately pleads the requisite predicate acts.  ECF No. 19 at 18-19.  Nexo argues first that the false advertising claim fails because the three representations discussed above in the fraudulent inducement claim regarding the Liquidation Relief Program, responsiveness, and interest rates on collateral are not actionable.  *Id.*  As detailed above, the Court disagrees and thus finds these claims may proceed. Nexo also argues that Cress's claim that Nexo misrepresented the true cost of borrowing is implausible and not pled with specificity.  ECF No. 19 at 18-19.  A UCL claim based on false advertising must comply with Rule 9(b).  *See In re Apple & AT & T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1075 (N.D. Cal. 2011) (Rule 9(b)'s heightened pleading standard applies to UCL causes of actions that "are 'grounded in fraud' or 'sound in fraud.'") (quoting *Kearns*, 567 F.3d at 1125).  The Court finds that the Complaint's allegations related to the statements by Hristov failing to account for the impact of the NEXO Token on Cress's LTV and liquidation threshold are sufficiently specific to satisfy Rule 9(b).  ECF No. 1 ¶ 52.  However, the Court agrees with Nexo that the allegations that Nexo advertises interest rates available only to customers holding 10% of their assets in NEXO Token does not provide the "'the who, what, when, where, and how' of the misconduct charged," nor specify "what is false or misleading about a statement, and why it is false" and thus is properly dismissed under Rule 9(b).  *Vess*, 317 F.3d at 1106; *see* ECF No. 1 ¶¶ 50, 51.  Accordingly, the Court dismisses Cress's UCL claim to the extent it is based on the advertised interest rates being available only to customers who maintain 10% of their portfolio balance in NEXO Token.

The Court also dismisses Cress's claim under the unlawful prong of the UCL to the extent

1    he alleges that Nexo failed to provide him notice before liquidating his assets.  Nexo argues that

2    this claim was premised on breach of a contract term, and that a breach of contract claim is not

3    itself an unlawful act under the UCL.  *See* ECF No. 19 at 18-19 (citing *Boland, Inc. v. Rolf C.*

4    *Hagen (USA) Corp*., 685 F. Supp. 2d 1094, 1110 (E.D. Cal. 2010)).  Cress's opposition does not

5    respond to Nexo's argument and thus concedes it.  *See Linder v. Golden Gate Bridge, Highway &*

6    *Transportation Dist.*, No. 4:14-CV-03861 SC, 2015 WL 4623710, at *4 (N.D. Cal. Aug. 3, 2015)

7    ("[F]ailure to respond in an opposition brief to an argument put forward in an opening brief

8    constitutes waiver or abandonment . . . .") (quoting *Stichting Pensioenfonds ABP v. Countrywide*

9    *Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011)).

10          Accordingly, the Court also **GRANTS** Nexo's Motion to Dismiss Cress's UCL claim

11   under the unlawful prong to the extent it is based on Nexo's advertised interest rates being

12   available only to customers who maintain 10% of their portfolio balance in NEXO Token or on

13   Nexo's failure to provide Cress notice before liquidating his assets.

**D.      California Securities Claims under Section 25110 and 25503**

15          Cress brings a cause of action pursuant to Cal. Corp Code § 25110.  ECF No. 1 ¶¶ 114-

16   125.  Under the statute, "[i]t is unlawful for any person to offer or sell in this state any security in

17   an issuer transaction (other than in a transaction subject to Section 25120)" unless the sale meets

18   certain qualifications.  Cal. Corp. Code § 25110.  Cress alleges that Nexo failed to file

19   registrations regarding three securities: 1) NEXO Tokens; 2) the Nexo Earn Accounts, also known

20   as Cress's Savings Wallet, an account through which Cress earned interest on his deposited digital

21   assets; and 3) the "Leveraged Investment Instrument," which Cress describes as a complex and

22   highly risky leveraged loan of a bundle of digital assets.  ECF No. 1 ¶¶ 2, 6, 37, 62, 114-126.

23          Nexo argues that Cress's claim fails related to all three alleged securities because: 1) Cress

24   does not allege he incurred damages related to the Nexo Earn Account; 2) a claim related to the

25   NEXO Token is preempted by the National Securities Markets Improvement Act; and 3) the

26   "Leveraged Investment Instrument" is not a security.  ECF No. 19 at 19-23.

**1.      Earn Account Securities**

28          Pursuant to Cal. Corp Code § 25110 and Cal. Corp. Code § 25503, a plaintiff alleging

United States District Court
Northern District of California

failure to register securities may sue "for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned.  Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff."  Cal. Corp. Code § 25503.  Nexo argues that Cress has not alleged losses such that he can seek the relief statutorily available to him pursuant to Cal. Corp. Code § 25110 and § 25503 where the value of the Earn Account was actually higher at the time of liquidation and Cress benefitted financially from interest while he possessed it.  ECF No. 19 at 19-20.  Cress argues that he has been harmed because his Earn Account was liquidated, which caused him to lose millions of dollars.  ECF No. 23 at 20-21.  The Court agrees with Nexo that this is not a harm or loss for which there is a remedy available under Cal. Corp. Code § 25503.  Cress fails to allege that he suffered damages within the meaning of § 25503 concerning the value of the Earn Account, and paragraph 100 of the Complaint basically alleges the opposite.  Cal. Corp. Code § 25503 and § 25110 do not appear to provide a remedy for this type of loss, and Cress does not argue or allege loss within the parameters of the statutory remedy.

### 2.      NEXO Token

Nexo also argues that a claim based on the NEXO Token pursuant to Cal. Corp. Code § 25110 is preempted by federal law because the NEXO Token is a "covered security."  ECF No. 19 at 20-21.  Cress argues that the NEXO Token is not a "covered security" because it does not meet the Rule 506(c) exemption requirements.  ECF No. 23 at 21-22.

"Federal preemption is an affirmative defense that a defendant must plead and prove.  Unless the complaint itself establishes the applicability of a federal-preemption defense—in which case the issue may properly be the subject of a Rule 12(b)(6) motion."  *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012).  Nexo here argues preemption based on the National Securities Markets Improvement Act of 1996 ("NSMIA") which prohibits states from requiring the registration or qualification of a "covered security," as defined by federal law.  15 U.S.C. § 77r.  A "covered security" includes a security in a transaction that is exempt from registration under

1   Security and Exchange Commission ("SEC") rules or regulations.  15 U.S.C. § 77r(b)(4)(D).

2   Federal law exempts from registration a transaction not involving any public offering, and Rule

3   506 of Securities Act Regulation D specifies the circumstances for this private offering

4   registration exemption.  15 U.S.C. § 77d(a)(2); 17 C.F.R. § 230.506.  Pursuant to Securities Act

5   Regulation D, Rule 506(c) when all purchasers are "accredited investors" and the issuer takes

6   reasonable measures to verify that the purchaser is an accredited investor, the security offering is

7   exempt from the registration requirement.  *See* 17 C.F.R. § 230.506(c); *Esebag v. Whaley*, No.

8   LACV1808446JAKRAOX, 2020 WL 7414734, at *10 (C.D. Cal. Sept. 8, 2020).

9        Cress argues that, while he has pled that Nexo filed a Form D Notice of Exempt Offering

10  of Securities with the SEC in 2018 related to the NEXO Token, the NEXO Token is not properly

11  exempt from registration because it fails to meet the exemption requirements.  ECF No. 23 at 21-

12  22.  Specifically, Cress argues that Nexo's sale to Cress violated that requirement that no offer or

13  sales may be made more than 30 days after an offering.  *Id.*  This argument appears premised in 17

14  C.F.R. § 230.152, which provides no integration analysis is required if an offer is made more than

15  30 calendar days after the termination or completion of any other offering.  This language is

16  intended to guide a determination of when multiple offers or sales constitute essentially one

17  transaction, as in when they are integrated, such that the transaction must meet the exemption

18  requirements as a whole.  *See S.E.C. v. Melchior*, No. 90-C-1024J, 1993 WL 89141, at *9 (D.

19  Utah Jan. 14, 1993) (citing the prior version of 17 C.F.R. § 230.502(a) and noting "[t]he

20  integration doctrine is a method used to combine two or more otherwise exempt securities sales

21  into a single offering: It serves as a means of ensuring investor protection by preventing issuers

22  from circumventing the registration requirements by claiming a combination of exemptions for a

23  series of transactions that would otherwise comprise a single offering requiring registration.")

24  (quoting *Walker v. Montclaire Hous. Partners,* 736 F. Supp. 1358, 1364 (M.D.N.C. 1990)).  Cress

25  argues that Nexo's failure to sell the NEXO Token within the timeline it indicated in its Form D

26  filing renders the sale to Cress ineligible for exemption.  ECF No. 23 at 21-22.  Cress does not cite

27  to any regulatory requirements or caselaw indicating that failure to sell a security within the

28  timeline provided in the Form D filing is failure to comply with 17 C.F.R. § 230.506.  Even if

27

United States District Court
Northern District of California

1 ultimately Nexo's exemption filing is insufficient to establish exemption, as the Court in *Brown v.*
2 *Earthboard Sports USA, Inc.*, 481 F.3d 901, 914 (6th Cir. 2007) found, Cress has not plausibly
3 alleged a cause of action under Cal. Corp. Code § 25110, as his pleadings currently suggest on
4 their face federal preemption without additional facts otherwise.  *See Mohebbi v. Khazen*, 50 F.
5 Supp. 3d 1234, 1249 (N.D. Cal. 2014) ("Plaintiff has not pled sufficient facts to support his
6 conclusion that the securities are not 'covered securities' that were subject to registration
7 requirements or exemptions under the Securities Act.").

8       Cress also argues that his claim regarding NEXO Token is not preempted because Nexo
9 engaged in fraud when selling the NEXO Token.  ECF No. 23 at 21-22.  "Although Congress has
10 prohibited the states from regulating the registration of certain classes of securities, states may
11 continue to regulate the sale of securities through statutory and common-law causes of action for
12 securities fraud."  *Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1144 (S.D. Cal. 2008).  The Court
13 finds that Cress's claim based on failure to register would still be preempted, as it is not a claim
14 based on fraud, but that a cause of action for securities fraud would not be preempted.  *See Lillard*
15 *v. Stockton*, 267 F. Supp. 2d 1081 (N.D. Okla. 2003) (finding that state law registration claims
16 were preempted, but not addressing state claims for fraud); *Flaxel*, 541 F. Supp. 2d at 1144
17 (permitting private plaintiffs' claims for violations of state-law securities fraud statutes); *compare*
18 *Janvey v. Willis of Colorado Inc.*, No. 3:13-CV-3980-N, 2014 WL 12670763, at *11 (N.D. Tex.
19 Dec. 5, 2014)*, amended sub nom. Off. Stanford Invs. Comm. v. Willis of Colorado, Inc.*, No. 3:13-
20 CV-3980-N, 2015 WL 13742125 (N.D. Tex. Feb. 4, 2015) ("Class Plaintiffs allege
21 noncompliance of the Stanford CDs with Regulation D.  For instance, Class Plaintiffs allege that
22 tens of thousands of investors purchased SIBL CDs, which is inconsistent with the Regulation D
23 requirement that no more than 35 purchasers take part in any offering from the issuer.
24 Accordingly, taking Class Plaintiffs' well-pled facts as true, it is inappropriate to hold at this stage
25 that Class Plaintiffs' TSA registration claims are preempted by the NSMIA.").  Thus, Cress's
26 fraud allegations do not save his claim under Cal. Corp. Code § 25110.

27     **3.**    **Leveraged Investment Instrument**
28       Nexo argues that the "Leveraged Investment Instrument" characterized by Cress is not a

"security" within the meaning of California Corporations Code § 25019 and specifically that it fails under both tests related to investment contracts.  ECF No. 19 at 21-22.  Cress argues that it is a derivative security because it derives value from the NEXO Token and Earn Account securities and that it meets the *Howey* test because it is an integrated investment package.  ECF No. 23 at 22-23.

California Corporations Code § 25019 broadly defines a "security" as "any note; stock; . . . bond; . . . evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; . . . investment contract; . . . or, in general, any interest or instrument commonly known as a 'security . . . .'"  "[T]he 'critical question' . . . is whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition."  *People v. Black*, 8 Cal. App. 5th 889, 900 (2017) (quoting *People v. Figueroa*, 41 Cal. 3d 714, 719 (1986)).  "[T]he general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon."  *Figueroa*, 41 Cal. 3d at 736 (quoting *People v. Syde*, 37 Cal. 2d 765, 768 (1951)).

As best the Court understands Cress's identification of a "Leveraged Investment Instrument," and it appears likely Cress intended as broad a definition as possible, it encompasses all of the assets Cress leveraged as collateral and potential collateral in order to receive credit from Nexo for investing.  *See* ECF No. 1 ¶ 62 ("Nexo was selling Plaintiff a complex and highly risky leverage long of a bundle of digital assets, including its NEXO Token security (the 'Leveraged Investment Instrument')").  As such, it includes the NEXO Tokens, as well as the Bitcoin and Ether that Cress invested in his Credit Wallet to serve as collateral for his borrowing.  It also includes any NEXO Tokens and Bitcoin and Ether that Cress deposited in his Earn Account, as those assets served as back-up collateral for his borrowing.

The parties do not dispute that Bitcoin and Ether are not securities, nor do they dispute (at the pleading stage) that the NEXO Tokens and Earn Account are securities.  Cress's argument to consider all of his assets with Nexo collectively as a security rests primarily on the fact that the Leveraged Investment Instrument includes some securities, namely NEXO Tokens and his Earn

United States District Court
Northern District of California

1    Account, and thus the Leveraged Investment Instrument as a whole constitutes a derivative

2    security.  ECF No. 23 at 22-23.  Derivative securities are 'financial instruments that derive their

3    value (hence the name) from an underlying security or index.'"  *Analytical Survs., Inc. v. Tonga*

4    *Partners, L.P.*, 684 F.3d 36, 48 (2d Cir. 2012), *as amended* (July 13, 2012) (quoting *Magma*

5    *Power Co. v. Dow Chem. Co*., 136 F.3d 316, 321 (2d Cir. 1998)).  Cress points to no caselaw, and

6    the Court could not locate any, where an instrument constitutes a "derivative security" simply

7    because it is comprised of some securities as well as some non-securities.  The cases cited by

8    Cress address options to purchase securities, or swaps of securities; they do not address

9    instruments comprised of both securities and commodities.  *See Elliott Assocs. v. Porsche*

10   *Automobil Holding SE*, 759 F. Supp. 2d 469, 475 (S.D.N.Y. 2010)*, aff'd sub nom. Parkcentral*

11   *Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014) (swaps of securities);

12   *Roth ex rel. Leap Wireless Int'l, Inc. v. Goldman Sachs Grp., Inc.*, 873 F. Supp. 2d 524, 531

13   (S.D.N.Y. 2012), *aff'd sub nom. Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865 (2d Cir. 2014)

14   (option to purchase securities).  Without any applicable caselaw, the Court declines to take such an

15   expansive view of derivative securities and apply it broadly to collateral which draws value from

16   both securities and commodities.

17        Cress also argues that the Leveraged Investment Instrument is an investment contract.

18   ECF No. 23 at 22-23.  An investment contract constitutes "a contract or scheme for 'the placing of

19   capital or laying out of money in a way intended to secure income or profit from its

20   employment.'"  *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) (quoting *State v. Gopher Tire*

21   *& Rubber Co.*, 146 Minn. 52, 56 (1920)).  California courts rely on two tests to determine the

22   existence of an investment contract: the risk capital test and the federal or *Howey* test.  *See Black*,

23   8 Cal. App. 5th at 900.  Cress asserts that the Leveraged Investment Instrument meets both tests,

24   but does not provide further details or analysis.  ECF No. 23 at 22.  Instead, Cress relies upon

25   *Safeway Portland Employees' Fed. Credit Union v. C. H. Wagner & Co.*, to argue that the

26   Leveraged Investment Instrument is a security.  501 F.2d 1120, 1123 (9th Cir. 1974); *see* ECF No.

27   23 at 23.  In *Safeway*, the Ninth Circuit determined that even if a certificate of deposit ("CD")

28   issued by a bank was not itself a security, that did not preclude the court from considering it

United States District Court
Northern District of California

collectively with the defendant's packaging of it as an "integrated investment package" to determine whether the entire package constituted an investment contract. 501 F.2d at 1123. According to Cress, because the Leveraged Investment Instrument includes securities, and because under *Safeway* "all elements of an investment contract do not have to be securities in order for the entire package to so qualify" the Leveraged Investment Instrument is therefore a security. *See* ECF No. 23 at 23. However, even assuming the Leveraged Investment Instrument constitutes an "integrated investment package," that only means that it "must be viewed in its entirety in determining whether it is" a security. 501 F.2d at 1123 (assessing the nature of the economic inducement as well as expectations of profits and other *Howey* factors as to the "package"). Cress provides virtually no argument as to how the instrument as a whole is an investment contract other than to point to the presence of NEXO Tokens. Given the vagueness of the parties' relationship to the Leveraged Investment Instrument and Cress's theory as to why it is an investment contract, the Court is more persuaded by Nexo's argument – that there is no vertical commonality between Nexo and Cress as required under *Howey* because there is no indication that Nexo and Cress's fortunes were linked by the Leveraged Investment Instrument. *See* ECF No. 19 at 22 (citing *S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991)).

Accordingly, as the Court finds Cress has not plausibly alleged the existence of a non-exempt, unregistered security, the Court **GRANTS** Nexo's Motion to Dismiss Cress's claim pursuant to Cal. Corp. Code §§ 25110 and 25503.

**E.      Fraud in the Offer and Sale of Securities Pursuant to Cal. Corp. Code §§ 25401 and 25504.1 Claims**

Cress brings a claim based on securities fraud pursuant to Cal. Corp. Code §§ 25401 and 25504.1. ECF No. 1 ¶¶ 134-143. Nexo argues that this claim should be dismissed because Cress pleads no damages for the Earn Account and the Leveraged Investment Instrument is not a security. ECF No. 19 at 23. The Court agrees with Nexo on both counts. As to the Earn Account, under Cal. Corp. Code § 25501 damages due to a purchaser for violation of Cal. Corp. Code § 25401 "shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at

1  the time it was disposed of by the plaintiff plus the amount of any income received on the security

2  by the plaintiff."  Cal. Corp. Code § 25501.[4]  Similar to the Court's discussion of Cress's claim

3  under Cal. Corp Code § 25110, Cress does not plead a harm under Cal. Corp. Code § 25401 that

4  may be remedied by statute based on his theory of losses regarding the Earn Account.  As such, he

5  has not adequately pled a securities fraud claim based on the Earn Account.  In relation to the

6  Leveraged Investment Instrument, as detailed above, he has not adequately pled that the

7  instrument is a security, and thus he cannot make out a claim based on those allegations.

8     Additionally, Nexo argues that the statements relied upon for Cress's securities fraud claim

9  do not comport with Rule 9(b) pleading requirements.  ECF No. 19 at 24-25.  The Court addresses

10  only those statements which related to a claim based on sale of the NEXO Tokens, as that is the

11  only security adequately pled.  Cress's claim related to NEXO Tokens appears limited to Hristov's

12  representation that "the NEXO token is registered with the SEC as a security therefore we are only

13  allowed to facilitate deals with American citizens who are also certified, accredited investors."

14  ECF No. 1 ¶¶ 55, 56 (pleading Cress bought the NEXO Tokens based on this statement) ¶ 139(a).

15     Under the statute, "[i]t is unlawful for any person to offer or sell a security . . . by means of

16  any written or oral communication that includes an untrue statement of a material fact or omits to

17  state a material fact necessary to make the statements made, in the light of the circumstances under

18  which the statements were made, not misleading."  Cal. Corp. Code § 25401.  "Under both state

19  and federal securities law, "'[a] fact is material if there is a substantial likelihood that, under all the

20  circumstances, a reasonable investor would consider it important in reaching an investment

21  decision.'"  *People v. Butler*, 212 Cal. App. 4th 404, 421 (2012) (quoting *Insurance Underwriters

22  Clearing House, Inc. v. Natomas Co.* 184 Cal. App. 3d 1520, 1526 (1986)).

23     Cress argues that the statement that "the NEXO token is registered with the SEC as a

24  security . . ." is literally false and thus that his claim may proceed.  ECF No. 23 at 24 (citing

25  *Flaxel*, 541 F. Supp. 2d at 1143 ("The Form D is not a 'registration statement,' but, instead, a form

26

27  _____
[4] Cress does not seek recission, so the Court does not address the availability of such a remedy.
28  *See* Cal. Corp. Code § 25501 (plaintiff may sue under § 25401 "either for rescission or for damages.").

that exempts a company from registering its securities.")).  In addition, he alleges facts showing that this misrepresentation was material.  Cress alleges that he "had never previously considered purchasing NEXO Tokens and instead made clear that he was seeking to use Nexo's lending solely to increase his BTC holdings."  ECF No. 1 ¶ 53.  However, Hristov stated that in order to obtain the advertised interest rates, Cress needed to purchase a significant amount of NEXO Tokens.  *Id.* ¶ 54. Cress alleges that Hristov allayed Cress's concerns by representing that the NEXO Token was registered with the SEC.  *Id.* ¶ 55.  This is sufficient to allege materiality.

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Cress's claim pursuant to Cal. Corp. Code §§ 25401 and 25504.1, except **DENIES** the motion as to the alleged misrepresentation that the NEXO Token was registered with the SEC as a security.

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss as follows:  1) The Court **GRANTS** dismissal of all claims as against Nexo Financial LLC, Nexo Financial Services Ltd., and Nexo AG, and Trenchev; 2) The Court **DENIES** dismissal of Cress's fraudulent inducement of contract claim; 3) The Court **GRANTS IN PART AND DENIES IN PART** dismissal of Cress's UCL, as stated above; 4) The Court **GRANTS** dismissal of claims pursuant to Cal. Corp. Code §§ 25110 and 25503; and 5) The Court **GRANTS IN PART AND DENIES IN PART** dismissal of claims pursuant to Cal. Corp. Code §§ 25401 and 25504.1, as stated above.  The Court **GRANTS** Cress leave to amend.  Cress may file a First Amended Complaint within 30 days of the date of this order.

**IT IS SO ORDERED.**

Dated:  October 10, 2023

THOMAS S. HIXSON
United States Magistrate Judge

*United States District Court*
*Northern District of California*