December 13, 2024

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:   *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
      JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S INTERROGATORY # 3

Dear Judge Hixson:

Pursuant to the Court's Discovery Standing Order, Plaintiff John Cress ("Plaintiff") and Defendant Nexo Capital, Inc. ("Defendant") submit this joint letter regarding the following discovery dispute.

## Issue

Whether Defendant should be required to respond to Plaintiff's Interrogatory No. 3.

## Attestation

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below. Efforts to resolve the dispute without the Court's assistance were unavailing.

Dated: December 13, 2024          TAYLOR-COPELAND LAW

                                  By: /s/ James Taylor-Copeland

                                  Attorneys for Plaintiff

Date: December 13, 2024           BAKER & MCKENZIE LLP

                                  By: /s/ Ian S. Shelton

                                  Attorneys for Defendant

0

**Plaintiff's Position**

**Factual Background.**  In 2021 Nexo reached out to Plaintiff advertising its VIP lending program.  Nexo promised Plaintiff would have access to its exclusive "VIP" services, including a liquidation relief program ("LRP") to recover his assets in the event of a liquidation and prompt customer support. In order to get favorable interest rates, Nexo required Plaintiff to exchange at least 10% of his portfolio on the Nexo platform into its own NEXO Token. Nexo assured Plaintiff that the NEXO Token was "registered with the SEC as [a] security." Plaintiff subsequently took out a loan from Nexo collateralized by digital assets, presently worth over $25 million.

All of these representations turned out to be completely false.  During a period of critical market turmoil, Nexo ignored Plaintiff for weeks as Plaintiff desperately sought Nexo's help in shoring up his loan.  After Plaintiff was liquidated, Nexo informed him for the first time that its LRP would not, in fact, allow him to recover his assets.  Nexo's representations regarding the NEXO Token—which collateralized his substantial loan and underpinned his liquidation threshold—were also false.  Nexo never registered its NEXO Token with the SEC.[1]  Rather, it sold Plaintiff and thousands of others an unregistered security.

**Interrogatory No. 3** thus asked Nexo to provide information regarding "each sale of NEXO" made by Nexo. Nexo initially refused to answer this Interrogatory entirely, but now proposes that it "produce documents or information sufficient to show direct sales of the NEXO Token in the United States."[2] There is no basis for Nexo's refusal to provide any information regarding its international sales of the NEXO Token as all of Nexo's sales of the NEXO Token are highly relevant to one of the key issues of this case: whether Nexo's offers and sales of the NEXO Token constituted securities transactions. Cal Corp. Code § 25019 ("Security" includes "any note . . . membership in an incorporated or unincorporated associations . . . certificate interest or participation in any profit-sharing agreement . . . investment contract . . .").[3]

Nexo's argument that the *Howey* test is subjective (focusing on the purchaser), rather than objective (focusing on the seller), simply does not square with Ninth Circuit law. *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Howey*, courts conduct an objective inquiry into the transaction offered based on what the purchasers were 'led to expect.'").  The Ninth Circuit has also held that "mass communications to potential investors through social media posts and online videos" can constitute an offer or sale of a security. *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1260 (9th Cir. 2022).  Indeed, Plaintiff's allegations in his FAC track this line of 9th Circuit cases—rather than the inapposite circumstances in *Binance*.  ECF No. 29 ¶¶ 102-114, 137 (citing Nexo's website and social media posts as allegations to establish Nexo sold investment contracts).[4]

---

[1] Nexo's contention that searching for documents regarding the NEXO Token would be burdensome is a red herring. Plaintiff has repeatedly proposed searches that would not merely catch the name of the company (i.e. including only NEXO in all capitals or "NEXO Token").

[2] Unable to articulate a defense of its position, the vast majority of Nexo's briefing is an improper attempt to skirt the pages limits imposed by this Court's rules and interpose additional argument regarding Plaintiff's RFPs, which the parties agreed to address through a separate Joint Letter.

[3] Desperate to avoid discovery, Nexo now claims that NEXO is a "utility token," despite having marketed it publicly as a security token for years, e.g., publicly describing its NEXO token sale in 2018 as an "11x Oversubscribed Security Token Sale" where Nexo raised $52,500,000.

[4] Indeed, the *Binance* court distinguished the case before it from those cases where, as here, Plaintiff's Complaint contains "allegations concerning outreach to retail buyers by [Defendant]," and thus transactions involving secondary investors are indeed relevant to the investment contract inquiry. *See Binance*, 2024 U.S. Dist. LEXIS 114924, at *61, n.16 ("The court denied a defense motion for summary judgment on a claim involving secondary investors because in that case, it declined to conclude, as a matter of law, that Ripple's conduct would not have led a reasonable retail investor to have an expectation of profit due to the efforts of others.") (citing *In re Ripple Labs, Inc. Litig.*, No. 18-cv-06753-PJH, 2024 WL 3074379, at *9-10 (N.D. Cal. June 20, 2024)).

1

The information sought in Rog 3 is also highly relevant to Nexo's defenses, including its assertion that Plaintiff's unregistered securities claim is preempted because its sales of the NEXO Token were subject to an exemption. The Rule 506(c) exemption which Nexo claims, is available only when "all purchasers are 'accredited investors' and the issuer takes reasonable measures to verify that the purchaser is an accredited investor." ECF No. 37 at 12-13 ("paragraphs 95-114 and 142-43 plausibly allege that Nexo sold the NEXO Token to non-accredited investors, failed to take reasonable measures to verify that the purchasers were accredited investors, and failed to take reasonable care to assure that the purchasers were not statutory underwriters."). The terms of all of Nexo's sales, including Nexo's counterparties, are critical to adjudication of this defense.

Nexo's argument, which it previously raised in its futile attempt to dismiss Plaintiff's unregistered securities claim, is that it is irrelevant that it sold NEXO to unaccredited investors outside of the United States because *Morrison v. Nat'l Autralia Bank Ltd.* limits the extraterritorial application of the Exchange Act. *See* ECF No. 32 at 10 (Nexo Motion to Dismiss). But Nexo's reliance on *Morrison* is inapposite. It is not Plaintiff that seeks the protections of the federal securities laws (much less their extraterritorial application). Rather, it is Nexo that seeks to use federal preemption as a shield to liability under California law.

In essence, Nexo argues that there are two distinct sets of transaction at issue in this case, U.S. sales which are subject to the securities laws and non-U.S. sales that are not.[5] But Courts have repeatedly held that purchases—including purchases by non-U.S. investors—and expected resales into the secondary market are viewed as one scheme under *Howey. SEC v. Telegram Grp. Inc.*, 448 F.Supp.3d 352, 367 (S.D.N.Y. 2020). Moreover, "securities do not come to rest with investors who intend a further distribution." *Id.* "One requirement of Rule 506(c) exemption is that the issuer 'exercise reasonable care to assure that the purchasers of the securities are not underwriters' . . . which in turns requires a '[r]easonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons.'" *Id.* (quoting § 230.502(d)). Nexo's non-U.S. sales are just as relevant to this determination as its sales to U.S. persons.[6]

Even if certain sales to unaccredited investors outside the United States were not relevant to the Rule 506(c) analysis, the Court will still ultimately need to determine whether all or some of those transactions are integrated with Nexo's U.S. sales. "All sales that are part of the same Regulation D offering must meet all of the terms and conditions of Regulation D." 17 C.F.R. § 230.502(a). Thus, even if Nexo's sale to Plaintiff was made pursuant to Regulation D, if it was part of the same offering with any sales that did not comply with Regulation D, it would "not qualify for an exemption under Regulation D." *SEC v. Kik Interactive, Inc.*, 492 F.Supp.3d 169, 181-82 (S.D.N.Y. 2020). In determining whether sales should be integrated for purposes of Regulation D, the Court considers: (a) whether the sales are part of a single plan of financing; (b) whether the sales involve issuance of the same class of securities; (c) whether the sales have been made at or about the same time; (d) whether the same type of consideration is being received; and (e) whether the sales are made for the same general purpose. 17 C.F.R. § 230.502(a) note.

"Not all of these factors need be established to justify a finding that transactions claimed to be separate

---

[5] Even if this were correct, and it is not, Plaintiff would still be entitled to obtain discovery regarding all of Nexo's sales to test whether Nexo's claims that certain transactions are non-U.S. transactions under *Morrison* is accurate. "[D]etermination of where liability attached could involve a genuine factual dispute." *See In re Stoyas*, 2024 U.S. Dist. LEXIS 116170, at *13 (C.D. Cal. May 16, 2024) (Disputes about "where certain aspects of the transaction took place, who participated in the transaction, or where those participants were located" are "questions of fact" that "could be submitted to a jury.").

[6] The nature and extent of both Nexo's U.S. and non-U.S. sales also informs whether those sales constituted part of a plan or scheme to evade registration provisions. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d at 915 (quoting 17 C.F.R. §§ 230.501-230.508, Preliminary Notes, n. 6 (2005)) ("'[R]egulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with these rules, is part of a plan or scheme to evade the registration provisions of the Act.'").

were in fact one integrated transaction." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 364 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). This analysis necessarily requires information regarding both Nexo's foreign and domestic sales of the NEXO Token. *See Kik* at 181-82 (finding that exempt presale was integrated with public offering and thus "constituted an unregistered offering of securities that did not qualify for exemption under Rule 506(c).").

The Court should overrule Nexo's relevancy objections and order them to provide full responses to Plaintiff's Interrogatory No. 3, because the information sought in Interrogatory No. 3 is plainly relevant to both Plaintiff's claims and Nexo's defenses. *Black Mt. Equities, Inc.*, 2020 U.S. Dist. LEXIS 77468, at *10-11, 14-18 ) (granting Plaintiff's motion to compel interrogatories relating to defendant's securities-related defenses).

### Defendants' Position

**Relevant Context.** Nexo has agreed to produce every document related to Cress, including his account and transactions, as well as targeted discovery regarding matters unrelated to Cress. But Cress is insatiable, demanding oppressive and burdensome discovery regarding nearly every aspect of Nexo's business and transactions. Some factual background is necessary for context.

In 2021, Nexo Capital Inc. was providing cryptocurrency services in the U.S. through the Nexo website and mobile app, including the ability to earn interest (in the form of additional cryptocurrency) on cryptocurrency deposited on the Nexo platform, and the ability to obtain secured credit lines at low interest rates by pledging cryptocurrency collateral. The only reason Nexo customers like Cress could get multi-million dollar credit lines—at single-digit interest rates and without any credit check—was because those credit lines were fully collateralized. The Terms and Conditions (T&Cs) governing the Nexo platform clearly stated that Nexo could *liquidate* the collateral in a market downturn to pay off the outstanding credit lines.

John Cress was a cryptocurrency multi-millionaire and accredited investor who—during a four-month period in 2021—gambled big with leverage and lost. By March 2021, Bitcoin and other cryptocurrencies were approaching all-time-highs. Cress alleges that he initially deposited approximately 238 BTC and 250 ETH on the Nexo platform. Unsatisfied with the returns available through Nexo's "interest product," Cress hoped to earn gargantuan returns through the "credit line product"—which would allow him to buy large quantities of additional Bitcoin using leverage. In order for Cress's investment strategy to work, however, and offset the cost of the credit line, the prices of cryptocurrencies would need to continue appreciating beyond those 2021 all-time-highs. Cress "maxed out" his credit lines, buying cryptocurrency on Nexo's platform in March and April 2021. Cress also devoted about 10% of his portfolio to the Nexo Token in order to obtain the lowest interest rates on his credit lines. Unfortunately, Cress mis-timed the market, buying $14 million in various cryptocurrencies using leverage at the market peak. According to Cress, by May 10, 2021, his total assets on the Nexo platform had grown to over $30 million, including $4 million in Nexo Tokens, collateralizing a credit line of approximately $14 million (Dkt. 1 ¶ 77).[7] In May and June 2021, the cryptocurrency market dropped by at least 50%. This rapid decrease in the value of Cress's collateral activated Nexo's automatic liquidation feature, as provided by Nexo's T&Cs. The proceeds of those liquidations were used to pay off Cress's outstanding credit lines—his liquidated cryptocurrency no longer exists in Nexo's possession. Those contractually authorized liquidations are the losses Cress seeks to

---

[7] Assuming a collateral-to-credit-line ratio of 50%, as Cress alleges, a 50% drop in the market would completely wipe him out because the value of the collateral ($30 million) would crash towards the value of the outstanding credit line ($14 million).

recover in this lawsuit. Cress does not assert a breach of contract claim—showing he does not contest Nexo's contractual right to liquidate his collateral.

The purpose of Cress's lawsuit is to shift all risk to Nexo, making Nexo the insurer of Cress's investment losses. While Cress asserts various claims, they can be divided into two general categories—the common law fraud / fraudulent inducement (CLF) theory and the securities theory.[8] Regarding the CLF theory, Cress argues that he was fraudulently induced to take out credit lines based primarily on certain statements in a Nexo brochure. The CLF theory will require, among other things, Cress to convince the fact-finder that Nexo promised he would never be liquidated and that he could borrow millions from Nexo at no risk. On the other hand, the securities theory addresses whether the specific Nexo Token transactions at issue were securities transactions and seeks losses associated with those liquidated Nexo Tokens—which comprised only about 10% of Cress's account. Nexo contends that the value of Cress's securities claims are less than $2 million, and certainly less than $3 million based on Cress's own allegations (Dkt. 1 ¶¶ 77-78), using the price paid minus value received statutory formula. The amount in controversy related to the securities claims is relevant to the discovery proportionality inquiry before the Court.

Two aspects of Cress's conduct between March and June 2021—the narrow window in which the relevant events occurred—are relevant to the scope of appropriate discovery. First, despite knowing the risk of liquidation and the increasing volatility of the crypto market going into summer 2021, Cress did nothing to mitigate that risk, like adding more crypto assets to lower the leverage in his account, paying down his credit lines, or liquidating his positions and accepting a partial (rather than complete) loss. He simply maintained a super-leveraged position, and waited *months* before getting liquidated on May 23 and *again* on June 21-22, 2021. Second, the facts of the CLF theory are unique to Cress's transactions and state of mind. The centerpiece of that theory is his contention that he was fraudulently induced to pursue the credit lines based a one-sentence statement in a Nexo brochure that described a "Liquidation relief program" (LRP)—which he claims was a promise that he would never be liquidated despite express language in the T&Cs to the contrary.[9] However, Cress admitted in writing on June 22, after he was liquidated, that "I don't know know (*sic*) what the liquidation relief program is." Thus, Cress contends he was induced to take out millions in credit lines by a program he knew nothing about. Nexo's communications with other customers are irrelevant to the fact-specific CLF claims.

**Discovery.** Cress's litigation strategy has focused on attempting to leverage a pre-trial settlement by bombarding Nexo with the broadest and most oppressive discovery requests possible. These requests smack of class-action-type discovery and have nothing to do with Cress specifically.

Specifically, although Cress's securities claims have the lowest economic value (approximately $2-3 million as described above), they have taken center-stage in discovery because Cress claims that "all documents relating to" nearly every element of Nexo's historical business have some "relevance" to the *Howey* test. Indeed, Cress argues that Nexo must produce all documents and communications regarding every Nexo Token transaction it has ever engaged in since the company started in 2017. The discovery burden associated with such a request is staggering—particularly given the fact that the Nexo Token is the native utility token of the Nexo platform and contains the name of the company itself.

---

[8] Cress asserts two securities claims—claiming that the Nexo Token is an unregistered security and that Nexo committed securities fraud when selling the Nexo Token to Cress. While the securities theory has a fraud element, it is not particularly relevant here because the securities claims seek the same losses associated with the Nexo Token.

[9] Nexo has agreed to produce dozens of executed LRP contracts with other customers, redacted to protect third-party personal identifying information ("PII"). These executed contracts show that the LRP was real. The fact that Cress did not like the terms of the LRP and chose not to sign up *after* he was liquidated does not mean the statement in the brochure was fraudulent.

As to the fraud claims based on the brochure, Cress claims that Nexo must produce "all documents relating to" its VIP Program and LRP interactions with *every customer*, not just Cress. But as shown above, the fraud theory implicates Nexo's interactions with Cress specifically. The Court should reject Cress's efforts to require Nexo to produce these documents and communications which are irrelevant, oppressive and harassing, unduly burdensome, disproportional to the amount in controversy and needs of the case.

**Cress Interrogatory 3.** Rog 3 demands NEXO identify ***all*** sales of the NEXO Token to ***all*** customers ***anywhere in the world*** from ***2017 to the Present***. It seeks detailed information concerning each of those sales including: (a) the date and time of the sale; (b) the quantity of the NEXO Token sold; (c) the sale price; (d) the place where the transaction was authorized; (e) the order number of the sale (if any); (f) the exchange on which the sale occurred (if any); (g) the counterparty (if know); (h) and (by Bates number) the contract pursuant to which the NEXO token was sold (if any).

Most of this information is irrelevant to the securities claims, unduly burdensome, and not proportional to the needs of the case or the value of the claims. Only *direct* and *domestic* Nexo Token transactions between Nexo and U.S. customers—where the counter-parties actually know each other's identity—are arguably relevant to "investment contract" status or Nexo's accredited investor / preemption defense.[10] *Morrison v. Nat'l Australia Bank Ltd.*, 561 U. S. 247, 261 (2010) (no extraterritorial application of U.S. securities laws). The Court should reject Cress's efforts to seek overbroad discovery regarding sales to foreigners who are not subject to U.S. securities laws.[11] Nexo Token transactions that do not involve Cress, particularly those outside of the U.S., are not relevant to the "investment contract" inquiry at all because "it is the economic reality of the particular transaction, based on the entire set of contracts, expectations, and understandings of the parties, that controls." *Binance*, 2024 U.S. Dist. LEXIS 114924, at *56. Nexo has agreed to produce documents or information sufficient to show direct sales of the Nexo Token in the U.S. and to produce accredited investor certificates (anonymized to remove customer information) for U.S. customers who purchased the Nexo Token from Nexo.  This is all that is necessary to assess the viability of any accredited investor / preemption defense. The cases cited by Cress, above, which arise primarily in the context of SEC enforcement actions, do not warrant a different conclusion nor stand for the novel proposition Cress advocates, which would result in extra=territorial application of US securities laws under all circumstances. Notwithstanding, even if foreign transactions were relevant the burden in compiling this information, and all of the ancillary information related to those sales that Cress seeks, is not proportional to the needs of the case.

The Court should also deny the request to compel because Rog 3 is compound, implicating eight different data points about an untold number of transactions—in the U.S. and abroad—over a multi-year period. Finally, to the extent the Court compels any response, Nexo should be allowed to respond by producing business records under FRCP 33(d).

---

[10] In *SEC v. Binance Holdings Ltd.*, No. 23-1599 (ABJ), 2024 U.S. Dist. LEXIS 114924, at *62 (D.D.C. June 28, 2024), the Court held that the SEC had not plausibly alleged that any particular secondary sale of BNB satisfies the *Howey* test for an investment contract. Binance recently filed a 45-page brief arguing that those non-security secondary sales include "blind sales" of tokens by their developers on exchanges, including "initial exchange offerings," and blind resales of any tokens by sellers who did not develop those tokens. Dkt. 285 at 2 (No. 23-1599). Only direct, domestic sales of the Nexo Token are arguably relevant because the buyer of crypto from an anonymous seller has no reason to think that the money flowed to the developer to generate profits for a common enterprise.

[11] The request for foreign transaction information and counterparties presents serious privacy and confidentiality concerns given the strict privacy regimes in Europe and the UK.