December 13, 2024

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:    *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
       JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S RFPs

Dear Judge Hixson:

Pursuant to the Court's Discovery Standing Order, Plaintiff John Cress ("Plaintiff") and Defendant Nexo Capital, Inc. ("Defendant") submit this joint letter regarding the following discovery dispute. The parties have met and conferred in good faith prior to filing this letter, including by Zoom meeting and the exchange of multiple letters and emails. Given the nature of the dispute, the parties would welcome a telephonic or Zoom hearing and/or additional guidance from the Court. Given the page limitations of the present joint discovery letter, the parties would also be happy to submit more formal briefing if it would be helpful to the Court.

## Issue

Whether Defendant should be required to search for and produce documents responsive to Plaintiff's Requests for Production of Documents ("RFP") 2, 4, 5, 6, 7, 9, 11, 14, 17, 18, 25, 26, 27, 28, 29, 31, 33, 34, 36, 37, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 51, 52, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 68, 69, 70, 72, 73, 74, 77, and 78.

## Attestation

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below. Efforts to resolve the dispute without the Court's assistance were unavailing.

| | |
|---|---|
| Dated: December 13, 2024 | TAYLOR-COPELAND LAW |
| | By: /s/ James Taylor-Copeland |
| | Attorneys for Plaintiff |
| Date: December 13, 2024 | BAKER & MCKENZIE LLP |
| | By: /s/ Ian S. Shelton |
| | Attorneys for Defendant |

0

**Plaintiff's Position**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering [a] the importance of the issues at stake in the action, [b] the amount in controversy, [c] the parties' relative access to relevant information, [d] the parties' resources, [e] the importance of the discovery in resolving the issues, and [f] whether the burden or expense of the proposed discovery outweighs its likely benefit." F.R.C.P. 26(b)(1).

Here Plaintiff lost digital assets currently worth well over $25 million[1] as a result of Nexo's fraudulent representations regarding its responsiveness, the liquidation relief program ("LRP"), whether Plaintiff's collateral would earn interest, and the calculation of Plaintiff's liquidation threshold (the "Fraudulent Statements"). Nexo also falsely represented that the NEXO Token was registered with the SEC, when in fact Nexo failed to properly register NEXO.  This case involves the resolution of significant issues and a large amount in controversy. *State Farm Mut. Auto Ins. Co. v. Pointe Physical Therapy, LLC*, 255 F.Supp.3d 700, 708 (E.D. Mich. 2017) (plaintiff "has articulated support for the proportionality factors" where resolution of fraud claim was an important issue and "the potential for a multi-million dollar verdict" demonstrated a substantial amount in controversy); *SEC v. SBB Rsch. Grp., LLC*, 2023 U.S. Dist. LEXIS 110448, at *23 (N.D. Il. June 27, 2023) ("the importance of the issues" favors additional discovery in securities action).

As is typical in fraud cases, Nexo is in sole possession of internal documents and communications regarding the Fraudulent Statements. Nexo is also in sole possession of many documents and communications regarding its offers and sales of the NEXO Token. *Hill v. Goodfellow Top Grade*, 2019 U.S. Dist. LEXIS 70220, at *4 (N.D. Cal. Apr. 25, 2019) (discovery "is proportional to the needs of the case, because, as Plaintiff argues, Defendant alone has access to this information.").  Nexo, a company with hundreds of employees and billions of dollars of assets under management, has substantially greater resources than Plaintiff, an individual who lost ninety percent of his savings as a result of the acts at issue in this case.

Plaintiff served RFPs targeted at obtaining information relevant to (1) Plaintiff's fraudulent inducement claim (including falsity, knowledge of falsity, intent, and Plaintiff's reasonable reliance) and (2) Plaintiff's securities claims. Nexo initially objected to 76 of Plaintiff's 78 Requests,[2] and even after Plaintiff agreed to table 15 Requests and significantly narrow many others, Nexo still maintains objections to 51 Requests.  Nexo's objections are devoid of merit.  Plaintiff's requests seek relevant information that is critical to resolving key issues in this case. *See HotSpot Therapeutics, Inc. v. Nurix Therapeutics, Inc.*, 2024 U.S. Dist. LEXIS 11324, at *3 (N.D. Cal. Jan. 8, 2024) (Hixson, J.) (broad discovery is both "relevant and proportional" into issues likely to be highly disputed at trial).[3]

While Nexo complains that these RFPs are not reasonably tailored, Nexo has made it impossible for Plaintiff to narrow RFPs to specific custodian or groups by refusing to provide basic information necessary to identify key witnesses, such as an organizational chart (RFP 2) or list of persons holding equity in Nexo (RFP 43). *Unilin Beheer B.V. v. NSL Trading Corp.*, 2015 U.S. Dist. LEXIS 192143, at *20 (C.D. Cal. Feb. 27, 2015) ("organizational structure may provide relevant information about how decisions are made . . . and may also be essential for the discovery of potential witnesses . . .").

---

[1] This is not intended to set forth a complete recitation of Plaintiff's damages.

[2] In stark contrast, Plaintiff agreed to search for and produce documents responsive to 92 of Nexo's 100 Requests.

[3] Because of the number of frivolous objections, Plaintiff addresses them by general subject matter in this letter. A chart of the requests, Nexo's responses, and the parties' proposed compromises, is attached as Appendix 1.

**Fraudulent Inducement.** Plaintiff's Requests sought documents regarding Nexo's VIP Program and the representations made therein;[4] whether Nexo has previously made good on those representations;[5] the compensation structure for Plaintiff's Relationship Manager Hristov (RFP 9); and Nexo's liquidation of Plaintiff's assets and revenue or profits derived therefrom.[6]

Nexo either refused to respond to these Requests in their entirety or has agreed to produce only communications directly with Plaintiff. There is no basis for this position, as internal documents and communications, as well as communications with third parties regarding the VIP Relationship Program and the representations made therein are relevant to nearly every element of Plaintiff's fraudulent inducement claim (including falsity, knowledge of the falsity, intent, and Plaintiff's reasonable reliance). *Lambda Labs v. Lambda, Inc.*, 2020 U.S. Dist. LEXIS 127900, at *4-8 (N.D. Cal. July 17, 2020) (documents and communications relating to complaints about a school and the school's misrepresentations are relevant and proportional); *Price v. Synapse Grp., Inc.*, 2018 U.S. Dist. LEXIS 155637, at *22-23 (S.D. Cal. Sep. 12, 2018) ("Persisting in an allegedly deceptive business practice after receiving customer complaints could be evidence of intent to defraud...").

**Securities Claims.** Plaintiff seeks documents and communications concerning the genesis of the NEXO Token (RFP 51 and 52); the benefits of holding the NEXO Token (RFP 14); registering the NEXO Token with the SEC (RFP 17); the Form Ds filed by Nexo in 2018 (RFP 46); communications with regulators (RFP 45); bonus compensation paid to executives (RFP 11); listing the NEXO Token on exchanges (RFP 34 and 41); Nexo's marketing of the Token;[7] Nexo's sales of the NEXO Token;[8] and Nexo's use of the proceeds of those sales.[9]

This information is critical to adjudication of whether Nexo's offers and sales of the NEXO Token constituted securities transactions. *SEC v. Life Partners*, 912 F.Supp.4, at *7-13 (D.D.C. Jan. 22, 1996) (granting motion to compel discovery into whether defendant complied with securities laws); *SEC v. Payward, Inc.*, 2024 U.S. Dist. LEXIS 209340, at *6 (N.D. Cal. Nov. 18, 2024) ("[O]nly discovery will establish whether the sales, trades, and exchanges on Kraken truly met all the *Howey* elements."). The terms of every one of Nexo's sales, as well as the counterparty to each transaction, are also highly relevant to Nexo's affirmative defenses, including its assertion that Plaintiff's securities claim is preempted because Nexo's offer and sale of the NEXO Token was subject to an exemption. The Rule 506(c) exemption which Nexo claims, is available only when "all purchasers are 'accredited investors' and the issuer takes reasonable measures to verify that the purchaser is an accredited investor." ECF No. 37 at 12-13.

**The Relevant Period.** Plaintiff's Requests sought documents from January 1, 2017, through the present.

---

[4] RFP 4 (VIP Relationship Program), 5 (VIP Relationship Program Brochure), 6 (LRP), 11 (compensation relating to the VIP Relationship Program)10 (public statements re VIP Relationship Program), 31 (support response time); 60 (social media posts re the LRP); 70 (statements by CEO re LRP), 73-74 (communications by employees re LRP), 72 (removal of representations re LRP).

[5] RFP 7; 59-61 (communications with journalists and social media posts).

[6] RFP 25-26 (revenue received), 27 (expenses incurred), 28 (profit realized), 29 (profitability of lending business).

[7] RFP 37 (marketing or investor communications), 39 (archived or saved Nexo.com and Nexo.io webpages), 40 (analytics from Nexo.com and Nexo.io); (communications shared with journalists); 60 (social media and chat room posts); 61 (payments to third parties for public statements/advertising); 62 (use of click farms to artificially increase exposure); 68 (recordings or transcripts of public statements); 69 (nonpublic statements made to purchasers); 70 (statements made by CEO).

[8] RFP 33; 42 (invoices and transactional history); 47 and 63 (contracts); 48-49 (wallets controlled by Nexo); 64 (sales on cryptocurrency exchanges); 65 (direct sales); 77 (use of market makers); 78 (Nexo's holdings of NEXO).

[9] RFP 36 (business plans); 56 (planned uses for proceeds); 57 (use of proceeds); 58 (conversion of proceeds).

2

Nexo refused entirely to search for documents outside of January 1, 2021, to July 2021. There is no basis for Nexo's extreme narrowing of the Relevant Period. Nexo filed Form Ds indicating that its offering of the NEXO Token began in February 2018. Documents relating to this offering and the filing of the Form Ds themselves directly inform the *Howey* analysis as well as Nexo's claimed preemption/exemption defense. Many of these documents and communications (i.e. communications with investors, promotional materials, internal token launch plans) will necessarily pre-date the beginning of the offering in February 2018. Documents regarding the VIP Relationship Program and the fraudulent representations made therein are likewise relevant regardless of when they were created.

**Defendants' Position**

Nexo disputes Cress's characterizations of his claims in this actions, Nexo's alleged actions, and Nexo's responses to Cress's RFPs.  Nexo incorporates by reference the "Relevant Context" and "Discovery" sections of its letter addressing Cress's Interrogatory 3, which more fully set forth the relevant factual and discovery background. This is an individual action concerning discrete transactions engaged in by Cress over a period of four months in 2021.  Nexo has agreed to produce every document related to Cress, including his account and transactions, as well as targeted discovery regarding matters unrelated to Cress. The 51 RFPs[10] that Cress seeks to compel are not related to Cress and are breathtakingly overbroad, unduly burdensome and harassing, and not proportional to the needs of the case. Cress's demand for production tries to appear reasonable by speaking in generalities, without addressing the actual scope, burden, and cost associated with these 51 requests.[11]

With the exception of 3 requests, Cress seeks "**all documents and communications relating to**" expansive categories that are not limited to Cress, and extend to all other customers and counterparties. For example, Cress's requests all documents about LRP Program including communications with all other customers (4, 6, 72), all documents about VIP Relationship Program including communications with all other customers (5), liquidation compensation to any customer (7), employment and bonus comp for all executives (9, 11), Nexo Token volatility (14), all communications with regulators (17, 45, 46), profitability of collateralized lending (29), availability of customer support (31), and every transaction detail, contract, and communication regarding every Nexo Token transaction between Nexo and anyone in the world (33, 42, 63, 64, 65, 69). Cress also seeks production of other expansive categories that are overbroad and oppressive.[12]

---

[10] RFPs 2, 4, 5, 6, 7, 9, 11, 14, 17, 18, 25, 26, 27, 28, 29, 31, 33, 34, 36, 37, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 51, 52, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 68, 69, 70, 72, 73, 74, 76, 77, and 78.

[11] Nexo believes that Cress's efforts to compel are meritless, but is prepared to provide additional briefing on any request and/or issues raised in this letter if it would be helpful to the Court.

[12] All communications about a contract (18), all revenue from liquidation generally (25), revenue from Cress (26), expenses associated with Cress (27), profit from Cress (28), all documents and communications concerning listing of the Nexo Token on any exchange (34), all business plans, development costs, financial projections, budgets, balance sheets, audits, inventories, internal investigations or complaints, and due diligence or pricing of the Nexo Token (36), all marketing or investor communications (37), all archived pages of the Nexo website without limit (39), all website analytics without limit (40), all communications with exchanges regarding the Nexo Token (41), all contracts regarding the Nexo Token (47), the "genesis" of the Nexo Token (51), allocation of Nexo corporate ownership (52), all use of Nexo Token proceeds (56, 57, 58), all advertising and communications with journalists and third parties (59), all social media and chat room posts (60), all social media payments (61), click farms and bots (62), all public statements about the Nexo Token (68), all statements made by certain individuals regarding the Nexo Token or LRP (70, 73, 74), utility of Nexo Token (76), market makers (77), and Nexo's own holdings of the Nexo Token (78). Cress also asks for all org charts as part of a fishing expedition to expand the scope of discovery even further (2) and documents sufficient to identify all equity holders in Nexo (43) and all ETH addresses owned by Nexo (49).

3

The common theme of these RFPs is they are not limited to Cress, his transactions, or the four-month time period at issue, and are not otherwise tailored in any way. Rather, Cress seeks discovery **since 2017**, for **all Nexo customers**, and directed to "all documents and communications" concerning a broad swath of Nexo's business and transactions. The Parties have diligently worked to reach compromises concerning Cress's RFPs, but disputes remain with respect to these 51 requests, which Cress will not narrow or which the parties otherwise cannot reach a compromise.[13]   Given Cress's failure to reasonably narrow these requests[14], Nexo requests cost shifting under Rule 26(c)(1)(B) if the Court considers compelling them in their current overbroad form. *E.g., Lawson v. Spirit Aerosystems*, No. 18-1100-EFM-ADM, 2020 WL 3288058, 2020 U.S. Dist. LEXIS 106817, at \*70 (D. Kan. June 18, 2020) ("The court long ago warned Lawson that it would allocate ESI costs if he continued to pursue needlessly overbroad discovery.").

**Cress's Requests Concerning the NEXO Token (RFPs 14, 17, 33, 34, 36, 37, 41-43, 45-47, 51, 52, 56-58, 60, 61, 63 – 65, 68-70, 76, 78 and 79).** Most of Cress's disputed RFPs relate to Cress's claim that the Nexo Token was an unregistered security.  But the Nexo Token comprised only 10% of Cress's account, and is Cress's smallest claim, worth perhaps as little as $2 million.  Yet he uses it to request "all" documents concerning broad aspects of Nexo's operations unrelated to the token.  For example, RFP 37 seeks "All marketing or investor communications, presentations, videos (include videos posted to youtube.com), scripts, talking points, blog posts and itineraries."

Even requests limited to the Nexo Token seek information concerning sales to purchasers all over the world, which is irrelevant to the "investment contract" status of the particular token transactions at issue, and/or any accredited investor / preemption defense Nexo may assert. *See e.g.*, RFPs 33, 42, 47, 64, 65. As explained in the letter regarding Cress's interrogatory 3, only *direct* and *domestic* Nexo Token transactions between Nexo and U.S. customers—where the counter-parties actually know each other's identity—are arguably relevant to "investment contract" status or Nexo's accredited investor / preemption defense. *SEC v. Binance Holdings Ltd.*, No. 23-1599 (ABJ), 2024 U.S. Dist. LEXIS 114924, at \*62 (D.D.C. June 28, 2024) (addressing secondary sales). Nexo has agreed to provide information on U.S. purchasers of the Nexo token but Cress wants detailed information on all global purchasers.  Other requests seek "[a]ll documents and communications" concerning vast categories of documents like social media posts (RFP 61), "non-public statements … made to any purchaser or potential purchaser" of the Nexo Token (RFP 69) and sales on third-party cryptocurrency exchanges (RFPs 41, 64) that are not specifically tailored to the matters at issue.

Cress justifies these broad requests as seeking information relevant to the securities test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  However, despite multiple meet and confers, Cress has not articulated any specific prong of the *Howey* test to which these requests are relevant.  Moreover, even if relevant to some aspect of the *Howey* test, the broad formulation of these requests, which would necessitate Nexo to collect, review and produce potentially hundreds of thousands of documents, is not proportional to the needs of the case.

**Cress's Requests Concerning Nexo's VIP Relationship and Liquidation Relief Programs (RFPs 4, 5, 6, 7, 29, 31, 60, 61, 72, 73 and 74).** Cress—not on behalf of any class—seeks, without limitation,

---

[13] Because of the number of requests at issue, Nexo has grouped them by general subject matter.  A chart of the requests and Nexo's responses, including proposed compromises,  are attached as Appendix 1.

[14] Nexo proposed compromises with respect to RFPs 2, 9, 25, 26, 27, 28, 33, 65, 70, 72, 73, 74 and 76, but Cress rejected these proposals and appears to insist on full production of documents as reflected in Appendix 1.

essentially all documents and communications regarding Nexo's VIP Relationship Program and all "representations" in the VIP Program Brochure, even though his claims only revolve around a few purported representations made specifically to him in March 2021.  *See* RFPs 4, 5, 31 and 72. Contrary to the Cress's suggestion, above, Cress's requests are not tailored to the pursuit of documents relevant to specific elements of his fraud claims or issues underlying those claims.  Rather, Cress seeks every communication and scrap of paper surrounding the program, even as to aspects of the program he did not rely and does not claim were misleading.  Cress does not articulate a valid reason why documents or communications concerning every aspect of the VIP Relationship Program with every customer, who are not parties to this action, are relevant to this lawsuit.

Cress also seeks all documents and communications concerning Nexo's Liquidation Relief Program including communications with customers other than Cress and/or any relief provided to those customers under the Program, and social media posts concerning the program. *See* RFPs  6, 7, 60-61, 72, 73 and 74.  Nexo has agreed to produce communications between Nexo and Cress concerning the Liquidation Relief Program, and liquidation relief contracts entered into between Nexo and other customers (anonymized to remove identifying information), which reflect the terms of the program and the relief provided to those customers.  Cress does not establish how communications with customers *other* than Cress or documents outside of those that Nexo has agreed to produce are relevant or proportional.

**Cress's Requests Concerning His Nexo Activity (RFPs 18, 25, 26, 27 and 28).** Cress seeks documents and communications concerning the Cryptocurrency Purchase Agreement ("CPA") with Nexo, and financial metrics associated with Cress's activity on the Nexo platform. *See* RFPs 18, 25, 26, 27, 28. Nexo has agreed to produce a copy of the CPA and any communications between Nexo and Cress concerning the CPA.  Nexo has also agreed to produce a copy of Cress's transaction history on the Nexo platform and any internal financial metrics that Nexo collected in the regular course of business regarding Cress's account.  Nexo has also otherwise agreed, in response to other requests, to produce all communications between Nexo and Cress, and all internal communications about Cress.   No further documents are relevant or proportional.

**Cress's Remaining Requests (2, 9, 11, 39, 40, 48, 49).** The remaining requests in dispute seek documents on a variety of topics with little to no relevance to the issues in this litigation and appear to be nothing more than an attempt to leverage a pre-trial settlement through oppressive and unreasonable discovery.   For example, RFP 2 seeks an organizational chart for Nexo across a multi-year span identifying all employees and roles—a fishing expedition that will allow Cress to expand the scope of discovery even further. This would include employees and departments that have no connection to Cress's account or the narrow issues in this litigation.  Similarly, RFP 11 seeks "all documents and communications" concerning employment and bonus compensation provided to all Nexo executives. Nexo has offered to produce the employment contract and incentive structure of the relationship manager with responsibility over Cress's account.  Requests 39 and 40 seek archived versions of Nexo's website and analytics related to the website.  Cress, however, does not claim he reviewed or relied on any materials on Nexo's website, and, in any event, these requests are not limited to the matters at issue. Finally, Cress seeks documents reflecting any Ethereum and other cryptocurrency wallet addresses Nexo controls.  *See* RFPs 39 and 40.  It is unclear how these materials are relevant to any of Cress's claims.