March 14, 2025

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:     *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
        SUPPLEMENTAL JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S RFPs (ECF
        54) AND THE COURT'S DISCOVERY ORDER (ECF 55)

Dear Judge Hixson:

The parties submit this joint letter setting forth each side's view as to whether a final order regarding Plaintiff's RFPs identified in ECF 54 is warranted at this juncture. The parties have met and conferred in good faith prior to filing this letter, including by Zoom meeting and the exchange of letters and emails.

**Attestation**

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below.

Dated: March 14, 2025                    TAYLOR-COPELAND LAW

                                         By: /s/ James Taylor-Copeland

                                         Attorneys for Plaintiff


Date: March 14, 2025                     BAKER & MCKENZIE LLP

                                         By: /s/ Ian S. Shelton

                                         Attorneys for Defendant

0

**PLAINTIFF'S POSITION**. On December 13, 2024, the parties submitted a dispute regarding 51 of Plaintiff's RFPs ("the RFPs"). ECF No. 54.[1] These RFPs targeted information relevant to (1) Plaintiff's fraud, UCL, and securities claims.[2] On January 10, 2025, the Court found many RFPs relevant but sought to mitigate burden on Nexo by restricting searches to specific sources. ECF No. 55.

In light of the Court's indication that it views many of the RFPs at issue as relevant, Plaintiff asked Nexo if it would produce documents responsive to **any** of the RFPs at issue. Nexo unequivocally refused, stating that it "must stand on our RFP positions in ECF 54-1." Despite the Court's clear direction, Nexo has refused to amend a single RFP response, demonstrating that it will not produce **any** responsive documents absent a Court order. Accordingly, Plaintiff requested that the parties jointly contact the Court to seek further guidance on ECF 54 and the Court's subsequent order (ECF 55) to obtain a final ruling. Nexo refused and instead insisted that the parties submit this Supplemental Letter Brief.[3] Nexo then ambushed Plaintiff by submitting extensive argument regarding search terms and date limiters which it never raised during meet and confer discussions.[4] Unlike the RFP dispute, this manufactured issue is not ripe for adjudication. Plaintiff respectfully requests that the Court order Nexo to produce the RFPs, enabling a meaningful meet and confer on search terms.

**Nexo's Inconsistent and Unreasonable Position on the RFPs and Search Terms.** Nexo argues a ruling on RFPs served in July 2024 is premature, despite previously agreeing the dispute was ripe when the parties submitted it to the Court in December 2024. Nexo contends that the RFPs cannot be addressed until the parties agree on search terms. This directly contradicts Nexo's prior stance. From October 2024 through February 2025, Nexo maintained that discussion of search terms was premature until the parties reached agreement or obtained a Court ruling on which RFPs required responses. In October Nexo refused to search nearly all terms proposed by Plaintiff, stating that its "position is that this issue will be addressed through reference to the specific RFPs for which Nexo agrees to produce responsive documents . . . searches for other documents not related to Cress should be targeted to the collection of specific documents identified in specific RFPs." Nexo reiterated this same position on January 23, 2025, stating that "[o]ur proposal to search 18 custodians is based on the assumption that **the search terms are reasonable and tailored to the RFPs agreed by the parties or ordered by the Court**."

Now, Nexo has reversed course, arguing that the parties must agree on search terms before the Court can address the RFPs. This baseless reversal contradicts common-sense precedent recognizing that defining responsive documents should precede negotiating search terms. *See In re Stubhub Refund Litig.*, 2022 U.S. Dist. LEXIS 92941, at *4-10 (N.D. Cal. May 19, 2022) (granting motion to compel RFPs before the parties "exchanged custodians and search terms."); *Lambda Labs v. Lambda, Inc.*, 2020 U.S. Dist. LEXIS 127900 (N.D. Cal. July 17, 2020) (granting motion to compel RFPs before "express[ing any] view on the appropriate search terms.").

Nexo's direct contradiction of its earlier position lays bare its true intention, to delay and obfuscate. Nexo has been unable to explain how any disputes regarding the RFPs will be narrowed or mooted.

---

[1] The full text of each RFP as well as each parties' final proposed compromise was attached as Appendix 1 (ECF 54-1). A revised Appendix 1 is attached hereto as **Exhibit 1**, which adjusts Plaintiff's Proposed Compromise position to be consistent with the Court's Orders on custodians and eliminates RFP 2, which the Court addressed in its previous Orders by ordering Nexo to produce organizational charts.

[2] Nexo initially objected to 76 of Plaintiff's 78 RFPs, and even after Plaintiff agreed to table 15 RFPs and significantly narrow many others, Nexo still maintained objections to 51 of the remaining 63 RFPs. In stark contrast, Plaintiff ultimately agreed to search for and produce documents responsive to 96 of Nexo's 100 RFPs.

[3] ECF 54 sets forth the parties' substantive arguments regarding the RFPs. Plaintiff does not seek to restate those arguments fully here and objects to Nexo's attempts to submit additional argument without invitation from the Court. However, if the Court feels that additional briefing would be helpful, Plaintiff is happy to provide it.

[4] A copy of the parties' meet and confer correspondence is attached hereto as **Exhibit 2**.

1

Plaintiff asked Nexo to identify (1) any RFPs it would now agree to respond to in light of the Court's guidance in ECF 55 and (2) any specific RFPs which it believes the parties could meet and confer about further in connection with a discussion about search terms. Nexo was unable to identify a single RFP.

**Nexo Seeks to Relitigate the RFPs by Manufacturing a Dispute Regarding Search Terms.** Recognizing that the Court agrees that "many of the RFPs . . . are relevant," Nexo seeks to use the parties' ongoing discussion regarding search terms to manufacture a new burden argument. But the Court has already mitigated any burden by limiting the number of sources Nexo must search.

Moreover, any burden associated with specific search terms can be addressed separately, *after* it is clear which RFPs Nexo must respond to. While Plaintiff has proposed reasonable terms, Nexo has raised objections to 49 of the 95 proposed terms—including 17 that Nexo itself proposed Plaintiff run.[5] The parties agreed to discuss these terms further once Nexo provides a hit count report. Initially, Nexo stated it could produce this report by March 7, 2025, but has since refused to do so or provide an estimated timeline.[6] Nexo now submits argument regarding the burden and cost of even running those terms despite never raising this issue previously.

Nexo's shifting positions and refusal to engage in meaningful discussions have unnecessarily delayed discovery. Plaintiff should not endure indefinite delays due to speculative claims that further negotiations may narrow disputes—when Nexo has failed to identify a single RFP where this applies. Plaintiff thus respectfully seeks a Court order compelling Nexo's compliance.

**Nexo's Extreme Limitation of the Relevant Period.** Plaintiff requested documents from January 1, 2017, through the present. Nexo refused entirely to search for documents outside of January 1, 2021, to July 2021. There is no basis for Nexo's extreme narrowing of the Relevant Period. Nexo's own Form D filings show the NEXO Token offering began in February 2018, and relevant documents such as communications with investors, promotional materials, internal token launch plans necessarily predate this. These documents inform the *Howey* analysis and Nexo's claimed preemption/exemption defense.

Documents regarding the VIP Relationship Program and the fraudulent representations made therein are likewise relevant regardless of when they were created. While Plaintiff does not yet know with certainty when Nexo created its VIP Program and began advertising the Liquidation Relief Program ("LRP"), there are a number of posts about the LRP in Nexo's Telegram community beginning in March 2020.

The burden associated with searching and producing these documents is also minimal. Only two custodians (Trenchev and Kantchev) were employed by Nexo in 2017. Eleven of the fourteen custodians began their employment in either 2020 or 2021.

With respect to documents after 2021, Nexo acknowledges making millions of dollars in NEXO sales to US investors during 2022 and also responded to numerous investigations by securities regulators, including the SEC, during the 2022-2023 time period. Nexo advertised these investigations as reaching a "Landmark Resolution with U.S. Regulators" involving "multi-year-long inquiries into Nexo, looking at various aspects of the business."[7] Moreover, Nexo's own documents show that it entered into dozens of "Liquidation Relief Agreements" from at least early 2021 through at least December 2022. These

---

[5] Nexo criticizes the inclusion of "recover," "relief," and "direct phone," despite asking Plaintiff to run the same terms.

[6] Despite having total clarity regarding the sources to be searched since at least February 19, 2024 (*see* ECF 62 and 64), on March 7, Nexo's counsel indicated that it had not yet even collected the data from these sources as ordered by the Court, much less began to run searches.

[7] Nexo Reaches Landmark Resolution with U.S. Regulators, Jan. 19, 2023, https://nexo.com/blog/nexo-reaches-landmark-resolution-with-us-regulators.

documents are highly relevant, and the Court should order Nexo to produce them.[8]

Plaintiff nevertheless agreed to impose limiters on the time frame and requested information from Nexo to evaluate whether additional limiters on specific sources are warranted. Rather than provide that information so the parties can meet and confer, Nexo ambushed Plaintiff with its instant complaint that the potential cost of searching the 4.8 TB of data without any limiters will exceed $350,000—far exceeding Plaintiff's $5,000 cost for searching 751 GB (.751 TB). It is not unreasonable for a corporate defendant with hundreds of millions of dollars in annual revenue to perform a search of about five times more data than an individual Plaintiff in a case involving more than $20m in damages. Nexo's exaggerated burden claim, based on an inflated review cost ($75,000/TB vs. $7,500/TB), does not justify withholding relevant discovery.

**Nexo's Misinterpretation of the Court's Ruling on Rog. 3 (ECF 63).**  This Court recognized that sales outside of the US could be relevant to Nexo's preemption defense because "the whole of Nexo's offering around the world could be evidence of its offering in the United States," and that evidence regarding the NEXO Tokens "could be relevant to the *Howey* inquiry no matter where the sales took place."  ECF 63 at 3. While the Court did determine that the "transactional-level information" sought by Plaintiff's Rog 3 was not proportional to the needs of the case, those proportionality and burden concerns are simply not present with respect to RFPs. Information regarding U.S. and international sales is likely to be intertwined in Nexo's records. Filtering out non-U.S. transactions actually adds unnecessary burden, especially since Nexo's own classification of sales as "domestic" is disputed. For example, Nexo appears to maintain that sales on exchanges headquartered outside of the U.S. are not U.S. transactions. However, Courts have held otherwise. *Williams v. Binance,* 96 F.4th 129, 137 (2d Cir. 2024).

**NEXO'S POSITION.** Cress misstates Nexo's position in order to justify revisiting the RFPs, which were resolved by the Court's ruling on ECF 54. *See* ECF 55. Nexo understood that the Court expected the parties to meet and confer on the scope of Cress's RFPs in light of the custodian ruling. Nexo's position on discovery has been consistent and reasonable—it must be proportional to the needs of the case. The Court's prior order limiting custodians to 14 individuals and 9 non-custodial email accounts (23 total sources) recognized the relevance, burden, and proportionality considerations that must be taken into account when adjudicating the proper scope of discovery. Unfortunately, Cress and his counsel will not respect these limits and negotiate reasonable compromises regarding the scope of discovery unless compelled to do so by this Court. Cress's position is always the same—more.

Cress selectively quotes from Nexo's January 23, 2025 letter alleging Nexo has switched positions. That is not the case. The full quote demonstrates Nexo's consistency. Nexo stated in its letter: "The proportionality inquiry is necessarily driven by the number of custodians, the search time period, and the breadth of the terms. Our proposal to search 18 custodians is based on the assumption that the search terms are reasonable and tailored to the RFPs agreed by the parties or ordered by the Court. If any search terms result in an excessive number of hits, Nexo will meet and confer with Plaintiff in an attempt to get the document review universe to a manageable level." Nexo was stating that search terms must produce a reasonable number of hits; it was not agreeing that Cress's search terms were reasonable or proportional.

Thus, the parties have continuing disputes as to the search time period and the terms. Cress wants to skip to his incredibly overbroad RFPs without resolution of the time period and without the knowledge of the number of hits, which will drive the relevance and proportionality inquiry. The date ranges will determine total data volume. The search terms will determine hits subject to review. The parties and the

---

[8] Since the outset of this case, Plaintiff has asked Nexo to reproduce the documents provided to these regulators (RFP 45) to see if he can narrow additional discovery regarding the securities claims. Despite the fact that there is no burden associated with reproducing documents that have already been produced elsewhere, Nexo has refused to do so.

Court need to know this information, and resolve ranges and terms, in order to assess the cost and burden of the RFPs.

## I.    The Facts of the Case and Amount In Controversy Drive the Proportionality Inquiry

Cress is litigating this matter as if it were a class action or billion-dollar controversy, and as if Cress's relationship with Nexo spanned the inception of Nexo in 2018 to the present. The reality is starkly different. Cress deposited approximately 250 BTC and 250 ETH on the Nexo platform in March 2021, and he was liquidated in May and June 2021. Those four months are the relevant time period. He claims to have lost approximately 238 BTC and 250 ETH through those liquidations. The amount in controversy at March 2021 crypto prices was around $14 million. Cress's common law fraud claims are based on the contention that Nexo is responsible for Cress's investment losses based on certain generic statements in a VIP Relationship Brochure—such as a one-sentence reference to a Liquidation Relief Program (LRP)—that Cress did not ask about until *after* he was liquidated.

The most oppressive RFPs, however, relate to Cress's state law securities claims, and boil down to the contention that almost any type of financial or business information is potentially relevant to the securities status of the NEXO Token. Cress has used his smallest claims as the biggest sources of leverage in discovery. Cress bought the NEXO Token so that he could get Platinum Status and Nexo platform perks like a lower interest rate on his credit lines. In order to keep that status, he maintained about 10% of his portfolio in the NEXO Token. According to Cress's own interrogatory response, he bought NEXO Tokens for $3.1 million, and sold some but not all of them for $1.7 million, resulting in a loss of no more than **$1.3 million**. But this $1.3 million securities claim is Cress's justification to demand that Nexo spend potentially multiples of the claim value to review millions of documents that Cress claims has some tangential relevance to securities status. This is not reasonable or proportional.

## II.    Cress's RFPs are Grossly Overbroad, Unduly Burdensome, and Not Proportional

On December 13, 2024, the parties submitted their Joint Discovery Letter regarding Cress's RFPs. ECF 54. The parties also submitted an Appendix identifying their position on the 48 RFPs that remain in dispute: 4, 5, 6, 7, 9, 11, 14, 17, 18, 25-27, 29, 31, 33, 34, 36, 37, 39-43, 45-49, 51, 52, 56-65, 68-70, 72-74, 77, and 78. *See* Appendix 1 & ECF 54-1. Cress's RFPs are facially overbroad, unduly burdensome, and not proportional to the needs of the case; his only concession is to limit review to the 23 sources.

The most obvious overbreadth is that Cress demands production of every document relating to every NEXO Token transaction *anywhere in the world* (RFPs 33, 42, 47, 63, 65, 68, 69, 70, 77, 78). He also appears to request all financial and business documents related to the NEXO Token (14, 36, 51). The Court has already ruled that non-US sales are not discoverable. ECF 63. Further, these requests are irrelevant to the "investment contract" status of Cress's particular NEXO Token transactions, which is based on the facts and circumstances of those specific transactions, and/or Nexo's accredited investor/preemption defense, which are based on Nexo's US sales. Many of Cress's RFPs consist of a demand that Nexo produce *every* document about the VIP Relationship Program, LRP, or any request for reimbursement associated with a liquidation, with *any* customer at *any* time (4, 5, 6, 7, 31, 60, 70, 72, 73, 74). But fraud must be predicated on statements made to Cress.

Cress asks for all communications with regulators or law enforcement globally (45), but the SEC and companion state investigations in the US related to the Earn Interest Product (EIP) that is *not* at issue in this litigation. Foreign interactions with regulators or law enforcement by definition are irrelevant to US securities laws, and Cress has not identified any domestic interaction that focused on the securities status of the NEXO Token. Cress's blanket demand for all global interactions with regulators or law enforcement regarding its core business lines (EIP and credit) are irrelevant to securities claims based on the token.

Cress wants all documents related to the listing or sale of the NEXO Token on any third-party cryptocurrency exchange in the world (34, 41, 64), but this request is incredibly burdensome and not limited to the US or Cress's NEXO Token purchases. Cress wants all documents related to the 2018 ICO (46, 52, 56, 57, 58), but he did not participate in that offering and did not join the Nexo platform until March 2021. Cress then demands broad and highly sensitive categories of "all documents" that touch upon Nexo's core business functions—executive compensation (9, 11), financial performance and crypto holdings (25, 26, 27, 29, 48, 49, 78), marketing and advertising (37, 59, 60, 61, 62), webpages and analytics (39, 40), and company ownership information (43, 52). For example, Cress requests "[a]ll marketing . . . communications" without limit (37).

Nexo requests that the Court order the parties to meet and confer on the scope of the RFPs, subject to the following guidelines: (1) Discovery should be limited to NEXO Token sales *in the US*, and communications *with Cress* about the VIP Program or LRP; (2) the Court should deny discovery as to foreign regulators or law enforcement, or domestic investigations unrelated to the US securities status of the NEXO Token; (3) the Court should limit discovery regarding third-party cryptocurrency exchanges to information with a connection to Cress's NEXO Token transactions; and (4) as to the overbroad financial, marketing, advertising, website, and ownership RFPs, rather than requesting broad categories of "all documents," the Court should instruct Cress to tailor the requests to Cress's specific allegations.

### III.    Cress Refuses to Agree to Reasonable Date Limits and Search Terms

**Date Limits.** Cress's RFPs define the relevant time period as January 1, 2017 to the present—over eight years. Without date limiters, the total universe of data from the 23 sources exceeds **9.4 million documents**, consisting of over **4.8 terabytes (TB) of data**. The cost of loading and hosting such a huge amount of data, which is necessary to generate a hit count report, will cost hundreds of thousands of dollars. Nexo is able to implement date limiters on the initial export from its systems to limit the cost of ingestion, but only if the parties agree or the Court imposes reasonable date limits on the front end. Cress has offered minimal limits—only excluding communications after July 25, 2024 (the date of service of the RFPs) for the individual custodians and February 27, 2023 (the date of the Complaint) for the non-custodial email accounts, while reserving the right to demand search of that data in the future. Given this situation, Nexo requests that the Court limit the collection date range from January 1, 2021 to December 31, 2022. On December 5, 2022, Nexo announced its departure from the US market, which was substantially completed during the first quarter of 2023. On February 27, 2023, Cress filed his Complaint. Cress is likely to argue that this time period is not broad enough to address his securities claims. Recently, the Court ordered that two Nexo executives—Antoni Trenchev and Kosta Kantchev— be included as custodians in this case. ECF 65. Nexo is amenable to discovery relating to these two individuals only from 2017 to 2022. If the Court declines to impose date limits, Nexo requests that the Court order the parties to meet and confer on date ranges that reduce collection from the 23 sources to less than 1 TB (or 1,000 gigabytes) of data.

**Search Terms.** The overbreadth of the RFPs is driving Cress's demand for over 100 search terms. Cress's latest version of overbroad search terms is attached as Exhibit 3. Nexo marked in yellow various terms that it believed could be better addressed through direct document searches (e.g., financial statements) rather than through an overbroad search. Cress refused. Nexo also marked in red various terms that are hopelessly overbroad, such as "recover," "relief," or even "direct phone." Again, Cress refused. Finally, Cress demands searches that include the term "NEXO" with ineffective limiters, marked in blue. Given this situation, Nexo requests that the Court order the parties to meet and confer on search terms that reduce total hit count to below 100,000 documents.