April 14, 2025

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

*Re:*    *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
        JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S INTERROGATORY
        NOS. 2, 3, and 5

Dear Judge Hixson:

Pursuant to the Court's Discovery Standing Order, Plaintiff John Cress ("Plaintiff") and Defendant Nexo Capital, Inc. ("Defendant") submit this joint letter regarding the following discovery dispute.

**Issue**

Whether Defendant should be required to respond to Plaintiff's Interrogatories Nos. 2, 3, and 5.

**Attestation**

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below. Efforts to resolve the dispute without the Court's assistance were unavailing.

| | |
|---|---|
| Dated: April 14, 2025 | TAYLOR-COPELAND LAW |
| | By: /s/ James Taylor-Copeland |
| | Attorneys for Plaintiff |
| Date: April 14, 2025 | BAKER & MCKENZIE LLP |
| | By: /s/ Ian S. Shelton |
| | Attorneys for Defendant |

**PLAINTIFF'S POSITION**

Plaintiff served his Interrogatories on Nexo in July 2024. Nexo initially refused to answer Rogs 3 and 5 entirely. After substantial meet and confer, Nexo agreed to supplement its responses on November 15, 2024.[1] However, when Nexo finally served those amended responses on February 14, 2025, it substantially rewrote the interrogatories and responded to entirely different questions. Nexo's response to Rog 2 also redacts highly relevant information regarding parties it claims it has provided the Liquidation Relief Program ("LRP") and Rog 3 redacts U.S. counterparties to its NEXO sales, even though this Court recognized this information is relevant. Plaintiff respectfully asks that the Court order Nexo to respond to the Rogs as written, and provide unredacted responses.

**Rog 2** asked Nexo to describe the terms of the LRP. Nexo responded that the LRP is "a service that certain Nexo customers could use," and that if "the customer decided to use the service, the customer would enter a written contract with Nexo, which were titled Liquidation Relief Agreements ('LRAs') . . ." Nexo states that "[t]he terms of the LRAs executed by Nexo's U.S. customers are reflected in the LRAs produced as NEXO-0002719–NEXO-0002973."[2] However, Nexo has redacted the identities of all 47 of these U.S. customers. The identities of these customers are highly relevant to whether Nexo provided liquidation relief, and who it provided it to.

Nexo argues that the GDPR bars discovery into the identities of these U.S. witnesses. Not so. The GDPR "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence." *Finjan, Inc. v. Zscaler, Inc.*, 2019 U.S. Dist. LEXIS 24570, at *4-5 (N.D. Cal. Feb. 14, 2019) (ordering unredacted disclosure of UK citizen's emails). Nexo's own caselaw merely analyzes the GDPR as it applies to European citizens. *Kashef v. BNP Paribas S.A.*, 2022 U.S. Dist. LEXIS 92427, at *11 (S.D.N.Y. May 23, 2022); *Id*. Dkt. 317 at 12-13, 331 at 9 (parties conceding US entities not at issue). Nexo does not cite, and Plaintiff has been unable to identify, a single case in which a court has held GDPR provides a basis for withholding discovery regarding U.S. citizens. To the contrary, Courts routinely recognize that a protective order, like the one here, is sufficient to address privacy concerns—even where the data of Europeans is implicated. *Finjan,* 2019 U.S. Dist. LEXIS 24570, at *11. Nexo should produce the unredacted LRAs.

**Rog 3** asked Nexo to provide information regarding "each sale of NEXO…" On November 15, 2024, Nexo agreed to produce "direct sales of the NEXO Token in the United States." The parties submitted a dispute regarding whether this Rog should be limited to Nexo's sales within the United States. The Court recognized that sales outside of the U.S. could be relevant to Nexo's preemption defense and that evidence regarding the NEXO Tokens "could be relevant to the *Howey* inquiry no matter where the sales took place, but held that the "transactional-level information" sought by Plaintiff's Rog 3 was not proportional to the needs of the case and thus denied Plaintiff's motion to compel non-U.S. sales in Rog 3. ECF 63 at 4.

Following this Order, Nexo responded to Rog 3, but unilaterally limited its response to "[1] direct sales of the NEXO Token [2] to customers [3] in the United States" (4) during 2021-2022. Thus, in addition to the geographic limitation imposed by the Court, Nexo limited its response to "direct sales" to its own "customers" during a two-year period. Nexo also ignored this Court's ruling that

---

[1] Rogs 2, 3, 5 and Nexo's responses to those Rogs are attached here as **Exhibit 1**.
[2] Plaintiff separately requested these LRAs in RFPD 6 which sought documents regarding Nexo's LRP.

"[t]he counterparty for U.S. sales would be relevant to determining if they were all accredited investors" and redacted the identities of **all** its known counterparties. Nexo's additional limitations are without merit. It should be compelled to respond as to all U.S. sales.

Nexo concedes that "[s]ales on third-party exchanges were not included in the response" because they "do not involve known counterparties and the exchanges are not based in the U.S." But it is just these exchange transactions that often evidence a public offering. Nexo asks Plaintiff and the Court to accept as a matter of faith that all its exchange sales were made to non-U.S. persons on non-U.S. exchanges, without even identifying those exchanges. But this claim is farcical.

Unaccredited U.S. investors have purchased the NEXO Token directly through the Nexo Platform, as well as through other exchanges. A May 2021 YouTube video shows U.S. investors how to buy the Token directly on the Nexo Platform by clicking a button labeled "Buy NEXO Tokens 🚀 ."[3] Nexo's "official Telegram Group" has also repeatedly directed individuals to exchanges where they can buy NEXO without any reference to their nationality or accredited investor status. These are U.S. sales, as "a domestic transaction occurs when either the seller or the buyer is present in the United States." *United States SEC v. Balina*, 2024 U.S. Dist. LEXIS 197717, at *7 (W.D. Tex. Aug. 16, 2024) citing *Williams v. Binance,* 96 F.4th 129, 137 (2d Cir. 2024).

Nexo's exchange sales directly inform whether Nexo sold the NEXO Token to unaccredited investors, failed to verify that the purchasers were accredited investors, and failed to assure that purchasers were not statutory underwriters. Nexo tries to sidestep this relevance by relying on a single out-of-district ruling to argue that its sales on these exchanges cannot be investment contracts. *See SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328-330 (S.D.N.Y. 2023). But this decision has been widely criticized and rejected. *In re Ripple Labs, Inc. Litig.*, U.S. Dist. LEXIS 109252 (N.D. Cal. June 20, 2024) (rejecting *SEC v. Ripple* and holding question of fact as to whether Ripple's sales on exchanges were investment contracts); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023) ("the Court rejects the approach recently adopted" in *SEC v. Ripple*); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 711 (N.D. Cal. 2024) (relying on *SEC v. Terraform*); *SEC v. Payward, Inc.*, 2024 U.S. Dist. LEXIS 189611 (N.D. Cal. Aug. 23, 2024) ("Secondary Market Transactions on [exchanges] are Subject to the *Howey* Test."). Moreover, the NEXO token is not only an investment contract, but also a "certificate of interest or participation in any profit-sharing agreement." *Hayes v. Scherer*, 2023 U.S. Dist. LEXIS 138436 (C.D. Cal. July 3, 2023). NEXO's payment of dividends based on its profits to holders is a quintessential "profit-sharing agreement." Finally, Nexo *told* purchasers that NEXO was a security that was registered with the SEC.

Nexo also improperly limits its sales to its own "customers," But Nexo's sales to U.S. investors are relevant regardless of whether or not those investors were active users of the Nexo platform. From at least 2019-2021, Nexo received millions of dollars in stablecoin payments from U.S. market makers such as Galaxy Digital and Genesis Trading, strongly suggesting that it engaged them to sell NEXO tokens as its agent or underwriter. NEXO Tokens were also widely traded on Decentralized Exchanges ("DEXs"), and public records suggest Nexo sold significant quantities of NEXO Tokens on DEXs. The majority of this DEX infrastructure is located in the U.S., thus purchases by investors on these DEXs are domestic transactions. *Williams*, 96 F.4th at 137.

---

[3] *How to Buy NEXO Tokens | STEP BY STEP GUIDE*, YouTube, May 12, 2021, https://www.youtube.com/watch?v=6GrqFaHniFM at 2:52-10:30.

Nexo's restriction of its response to 2020 and 2021 is also without merit. Nexo has publicly disclosed that it sold NEXO Tokens to U.S. investors in its initial coin offering in 2018.[4] Nexo argues that its sale of NEXO Tokens to Plaintiff was a separate offering from its 2018 sales. But this directly conflicts with the position Nexo took in its MTD, where it argued that Plaintiff's claims were preempted because "Nexo filed a Form D with the SEC" in 2018. ECF No. 19 at 21. Even if Nexo could disclaim that position, whether its 2021 sales were integrated with its earlier offerings will at minimum require an analysis of the counterparties to those earlier sales.

Nexo argues that disclosing exchange sales to U.S. investors is unduly burdensome, but it is Nexo that has placed these sales at issue by asserting a half-baked preemption defense. Nexo relies on a defense which requires it to have the identities and locations of its purchasers, yet refuses to produce any of it, despite its previous agreement to do so. It should not be overly burdensome to provide that information.

**Rog 5** asked "For each year from 2018 to the present, please state the percentage of Your total revenue that comes from (a) sales of NEXO . . ." Nexo agreed to respond to this Interrogatory on November 15, 2024.[5] However, Nexo later served a response stating that "The percentage of total global revenue . . . **that came from direct sales of the NEXO Token to U.S. customers** was 2.05% for the time period reflected in the chart contained in Rog 3." The percentage of revenue Nexo derives from its sales is relevant to the *Howey* adjudication regardless of where those sales take place, e.g., whether they are "direct" or made on an exchange. *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 360, 371 (S.D.N.Y. 2020) (Telegram's sale of grams comprising over 90 percent of revenue is relevant to the *Howey* analysis). Once again, Nexo relies on the Court's ECF 63 Order to justify backtracking on its agreement to respond fully. But the Court's burden concerns regarding transactional data are simply not present here, where this Rog asks Nexo to merely provide a simple calculation based on readily available financial data.

## NEXO'S POSITION

**Rog 2.** In response to Cress's Rog 2 requesting that Nexo describe the "terms of the Liquidation Relief Program," Nexo described the Liquidation Relief Agreements executed by 47 of its U.S. customers and stated that "[t]he terms of the LRAs executed by Nexo's U.S. customers are reflected in the LRAs produced as NEXO-0002719–NEXO-0002973." Nexo's identification by Bates number of 47 copies of LRAs with its U.S. customers was the appropriate method of identifying the "terms" of those agreements, consistent with Rule 33(d).

Cress does not object to Nexo's invocation of Rule 33(d), but he argues that Nexo should produce all LRAs including those Nexo entered with "non-U.S. customers," citing his RFP 6. The Court should deny Cress's request to compel production of non-U.S. LRAs because foreign LRAs are irrelevant, overbroad, and not proportional to the needs of the case. The 47 domestic LRAs that Nexo has produced are already at the outer edge of relevance and implicate the sensitive personal identifiable information (PII) of Nexo's other customers; by producing agreements with 47 of its U.S. customers, Nexo has shown that Cress's argument that the LRP program was "fraudulent" is false. It was a real program that scores of U.S customers used. By seeking the identities and

---

[4] *How to Earn With Bitcoin & Crypto | Live AMA with Nexo's Antoni Trenchev*, YouTube, Apr. 16, 2021, https://www.youtube.com/watch?v=OJC_D6_lM0M at 46:00-47:00.

[5] November 15, 2024, Meet and Confer Letter from I Shelton, attached hereto as **Exhibit 2**.

3

transactional information of Nexo's U.S. customers, Cress is already attempting to transform this matter into **47 mini-trials** concerning Nexo's course of dealing with domestic customers. Adding an unknown number of foreign customers (and more mini-trials) would be a bridge too far, particularly since Cress's LRP-based common law fraud claims require actual reliance *by Cress*, not non-party foreign customers. *Russell v. Maman,* No. 18-cv-06691-RS, 2020 WL 10964919, 2020 U.S. Dist. LEXIS 258215, at *15 (N.D. Cal. Apr. 10, 2020)*. Nexo's LRP discussions with its other U.S. customers are not relevant to Cress's reliance, and its discussion with its foreign customers certainly is not. When denying Cress's motion to compel foreign transaction information as to NEXO Token sales (Dkt. 63), the Court recognized that a fishing expedition as to foreign transactions would be overbroad and not proportional to the needs of the case. The same is true of foreign LRA agreements. The Court should limit production to domestic LRAs only, particularly given the third-party data privacy concerns addressed below. To avoid 47 mini-trials, the Court should limit production to the domestic LRAs themselves and not require production of every communication with 47 non-parties concerning that subject matter.

In order to protect the PII of its non-party customers, Nexo redacted that information from its U.S. LRAs and used pseudonyms (consisting of the initials of its U.S. customers). While Cress demands that the redactions be removed, he fails to explain why the redacted PII of other U.S. customers is necessary for him to prosecute his claims. There is no need for Plaintiff to possess this information, even with a protective order in place. The identities and personal information of Nexo's customers (name, address, ID numbers) is not relevant to Plaintiff's claims. Nexo's business operations are primarily based in Europe. Particularly given the tangential relevance of other customer's personal information to this case, Nexo is precluded by European data privacy laws, including the GDPR, from disclosing the personal data of its customers, and certainly those customers based outside the U.S. Courts have approved pseudonymization in these circumstances. *See Kashef v. BNP Paribas S.A.*, No. 16-CV-3228 (AKH) (JW), 2022 WL 1617489, 2022 U.S. Dist. LEXIS 92427, at *11 (S.D.N.Y. May 23, 2022) (denying motion to compel depseudonymization of personal information and noting that "the GDPR requires further consideration of *necessity* along with the two concepts already contemplated in the Federal Rules") (emphasis in original). To the extent that Cress argues the GDPR does not protect the data of Nexo's U.S. customers, this court and others have allowed redactions for third-party confidentiality concerns despite the existence of a protective order.[6] Nexo's pseudonymization (by placing its U.S. customer initials over the redactions) allows Cress to distinguish between the LRAs. Cress does not need the PII of Nexo's U.S. customers—including full names, addresses, and ID numbers—to prosecute his claims. *See Moore v. Battelle Energy All., LLC*, No. 4:21-cv-00230-CRK, 2023 U.S. Dist. LEXIS 19434, at *15 (D. Idaho Feb. 3, 2023) ("The parties may mark nonparty names Confidential and replace nonparty names with initials.").

**Rog 3.** Consistent with the Court's prior order regarding Rog 3, Nexo produced transaction information showing its direct sales of the NEXO Token in the United States. While Cress argues that Nexo improperly limited information to sales to (1) U.S. customers, and (2) between 2021-2022, the response was not limited in that matter. It just so happens that the information in Nexo's possession reflects that the identified U.S. sales were to U.S. customers (who were vetted as

---

[6] *See Epic Games, Inc. v. Apple Inc*., No. 20-cv-05640-YGR (TSH), 2021 U.S. Dist. LEXIS 70755, at *9 (N.D. Cal. Apr. 9, 2021) (redactions for third-party confidentiality concerns despite existence of protective order); *Hanson-Poulsen v. DOD*, No. 2:16-cv-05786-DMG-AFMx, 2020 U.S. Dist. LEXIS 76699, at *12 (C.D. Cal. Mar. 3, 2020) (allowing redaction of "highly sensitive personal identifying information" despite existence of protective order).

accredited investors) and occurred during that time period. Nexo is not presently aware of sales of the NEXO Token to U.S. persons who were not customers outside that time period. Nexo also redacted the PII in its NEXO Token transaction sale information and used pseudonyms. This pseudonymization was appropriate for the same reasons explained in connection with the LRAs.

Cress argues that Nexo should supplement its NEXO Token transaction list with sales on *foreign* cryptocurrency exchanges and DEXs, even if Nexo did not operate the exchange and is not aware of the identity of the counterparty due to the blind nature of exchange transactions. This demand for foreign transaction information seeks reconsideration of the Court's prior ruling holding that foreign NEXO Token transaction information is not proportional to the needs of the case (Dkt. 63). Cress argues that "[u]naccredited U.S. investors have purchased the NEXO Token directly through the Nexo Platform, as well as through other exchanges." However, Nexo did not sell NEXO Tokens to U.S. customers through its own exchange; it only so only through its Over-The-Counter (OTC) accredited investor transactions disclosed in Rog 3. In support of this argument, Cress cites social media posts and YouTube videos allegedly explaining that the NEXO Token could be purchased on *third-party, foreign* exchanges (Cress does not identify any U.S.-based exchange). Separate from the extraterritoriality issue previously addressed by the Court (Dkt. 63), which independently bars the discovery, to the extent Cress claims that a U.S. customer might have purchased the NEXO Token on a foreign exchange not operated by Nexo, blind sales on third-party exchanges (even sales by the issuer) do not constitute the offer and sale of investment contracts as a matter of law because, among other things, they were "blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to [Nexo], or any other seller of [the NEXO Token]." *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328-330 (S.D.N.Y. 2023). While Cress asks this Court not to follow *Ripple*, its programmatic sales holding was correct and persuasively reasoned. Not one of Cress's cited cases address or support his unprecedented position that Nexo's alleged blind sale of one or more NEXO Tokens on a third-party, foreign exchange defeats its accredited investor defense as to sales in the U.S. to individuals like Cress who admit to being accredited investors. Such a ruling would turn this Court's extraterritoriality holding on its head. To the extent Cress's cited authority holds that a secondary sale on an exchange can be a securities transaction under *Howey* (Nexo disputes that position), that issue is irrelevant because every court agrees the test is transaction specific. The facts and circumstances of Nexo's alleged extraterritorial sales of the NEXO Token on foreign exchanges is irrelevant to whether Nexo's direct OTC sale of the token *to Cress* is a securities transaction. In addition to being incredibly burdensome and not proportional, discovery regarding foreign exchange transactions is irrelevant to the securities status of Cress's specific NEXO Token transactions, and irrelevant to Nexo's accredited investor defense for sales in the U.S.

**Rog 5.** In response to Rog 5, Nexo provided the percentage of its total revenue that came from its sales of the NEXO Token to U.S. customers. In response, Cress demands that Nexo provide "the amount of its revenue from the sale of NEXO divided by its total revenues." However, foreign direct sales of the NEXO Token and foreign exchange transactions are irrelevant, overbroad, and not proportional to the needs of the case. While Cress claims that "the Court's burden concerns [as to Rog 3] regarding transactional data are simply not present here," the total revenue calculation would require Nexo to crunch the same numbers associated with the original overbroad version of Rog 3. If foreign NEXO Token sales do not fall within the scope of U.S. securities laws (Dkt. 63 at 2), then the revenue associated with those foreign sales is not relevant to *Howey* either.