September 19, 2025

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:   *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
      JOINT DISCOVERY LETTER REGARDING PLAINTIFF'S INTERROGATORIES
      NO. 5 AND 12.

Dear Judge Hixson:

The parties submit this joint letter setting forth each side's view as to whether the Court should order Nexo to answer Interrogatories 5 and 12 as written. The parties have met and conferred in good faith prior to filing this letter, including by Zoom meeting and the exchange of letters and emails.

## Attestation

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below.


Dated: September 19, 2025         TAYLOR-COPELAND LAW

                                  By: /s/ James Taylor-Copeland

                                  Attorneys for Plaintiff


Date: September 19, 2025          BAKER & MCKENZIE LLP

                                  By: /s/ Ian S. Shelton

                                  Attorneys for Defendant

## PLAINTIFF'S POSITION

**Plaintiff's Interrogatory No. 5** asks: *"For each year from 2018 to the present, please state the percentage of Your total revenue that comes from (a) sales of NEXO and (b) liquidation of borrowing customers."*[1] The Court unequivocally ordered Nexo to answer Rog 5 as written—i.e., for worldwide sales, 2018 through the present—in its April 17, 2025 discovery order. ECF No. 69. Yet Nexo still refuses to fully respond despite being under a direct Court order to do so.

Nexo initially agreed in a November 15, 2024 meet and confer letter[2] to provide a full response to Rog 5, but when it served its response Nexo reneged on that agreement. Instead, Nexo improperly limited its answer to U.S. sales during an arbitrary portion of 2021. Plaintiff was forced to move to compel a proper response, and on April 17, 2025 the Court granted that relief and ordered Nexo to "answer this rog for worldwide sales." *See* ECF No. 69. It has now been four months since that Order, yet Nexo still has not complied.

Rather than comply with the Court's clear mandate, Nexo continues to provide information only for the self-selected 2021 time frame. However, Rog 5 plainly requests information "[f]or each year from 2018 to present," meaning Nexo has already been ordered to answer for 2018, 2019, 2020, 2021, 2022, 2023, 2024, and 2025 on a worldwide basis.

Nexo's blatant disregard for the Court's Order is sanctionable under Rule 37(b). *See G-K Props. v. Redevelopment Agency of San Jose*, 409 F. Supp. 955 (N.D. Cal. 1976); *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 391–92 (N.D. Cal. 2012) (citing Fed. R. Civ. P. 37(b)(2)(A)). Plaintiff requests that the Court affirm its prior Order (ECF No. 69) and warn Nexo that it will be sanctioned if it further disregards this Court's Orders, unnecessarily burdening both Plaintiff and the Court.

**Plaintiff's Interrogatory No. 12:** Rog 12 asks Nexo to *"Identify all cryptocurrency exchanges on which You sold the NEXO token, including approximate amounts, date first sold, and date last sold."* This request seeks narrow but crucial information about **where** Nexo sold its NEXO tokens and to **whom**—specifically, whether Nexo sold tokens on exchanges accessible to U.S. purchasers. Without this information, Plaintiff cannot fully understand the scope of Nexo's token sales to the public, nor test the veracity of Nexo's claim that it complied with U.S. securities laws by limiting sales only to accredited U.S. investors. Nexo's sales on U.S.-based or U.S.-accessible exchanges are directly relevant both to Nexo's defenses in this case and to the application of the *Howey* test. In addition, where and how Nexo marketed and sold its NEXO tokens bears on every element of the *Howey* analysis. *See, e.g., In re Ripple Labs Inc. Litig.*, 2024 U.S. Dist. LEXIS 109252 (N.D. Cal. June 20, 2024); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023).

Nexo objected to Rog 12 as "irrelevant and beyond the scope of discovery as ordered by the Court." Not so. This Court has repeatedly confirmed that Nexo's exchange-related sales are within the scope of relevant discovery. Most recently, in its July 3, 2025 discovery order, the Court **overruled** Nexo's objection to including exchange transactions in discovery. *See* ECF No. 73 ("the Court

---

[1] Plaintiff's Interrogatory Nos. 5 and 12 and Nexo's full Responses are attached as **Exhibit 1**.
[2] Nexo's November 15, 2025 Meet and Confer Letter is attached as **Exhibit 2**. Nexo's agreement to respond to Interrogatory 5 is highlighted in green at pages 9-10.

**OVERRULES** Nexo's objection to including exchange transactions."). Likewise, in an earlier order the Court noted that evidence of what the NEXO tokens **were** could be relevant to the *Howey* inquiry "no matter where the sales took place." *See* ECF No. 63. Thus, information about Nexo's exchange sales is clearly relevant both to determining whether Nexo in fact sold NEXO tokens to U.S. purchasers on those exchanges, and to assessing whether Nexo's exchange sales—effectively a public offering of the tokens—constitute the sale of investment contracts under the *Howey* test. Despite Nexo's persistent arguments to the contrary, this Court has consistently and correctly held that Nexo's exchange offerings are relevant to this case.

Nexo's attempt to equate Rog 12 with Rog 3 misstates what Rog 12 actually seeks and this Court's prior ruling. In ECF 63, the Court declined to compel "transaction-level information" for "each particular sale," expressly identifying the kind of granular fields that it deemed disproportionate: "the date and time, price, quantity, order number, and so on."

Rog 12 asks for none of that. It does not request per-trade data, timestamps, prices, counterparties, wallet addresses, order numbers, or any other line-item fields. Instead, to minimize any burden on Nexo, Plaintiff through Rog 12 requests only high-level identification of the exchanges on which Nexo sold NEXO, the timeframes of those sales (date of first and last sale), and the approximate aggregate amounts by exchange. That is summary-level venue and period information—far narrower and far less burdensome than the transaction-by-transaction details sought by Rog 3.

Nexo's attempt to rely on this Court's April 17, 2025 Order (ECF No. 69) to avoid exchange-related discovery is misplaced and contrary to the spirit and letter of the Court's discovery orders. While Nexo points out that the Court denied certain NEXO token document requests in ECF 69, that same order also **affirmatively recognized the relevance** of Nexo's exchange sales. In ECF 69, the Court held that Cress's RFP 58 for "documents and communications concerning the sale, exchange or conversion of the NEXO proceeds into other digital currency [or] fiat currency" were relevant and proportional to the needs of the case—which necessarily encompasses documents and information about proceeds from Nexo's exchange sales. *See* ECF No. 69; ECF No. 66-1 at 10. Indeed, ECF 69 went on to compel Nexo to produce a broad range of documents concerning its NEXO token sales to the public. *See* ECF No. 69 (ordering production for RFPs 52, 56, 57, 58, 59, 60, 63, 68, 69, 70); ECF No. 66-1. By now refusing to answer Rog 12, Nexo is attempting to conceal the very information that would show where its token sale proceeds came from (i.e. which exchanges and where its buyers are located). Such gamesmanship should not be tolerated.

Nexo's contention that Plaintiff is not entitled to an answer to Rog 12 because "sales outside the U.S. are beyond the scope of discovery" is internally inconsistent. Nexo itself argues that *Morrison* analysis is governed not by the location of the buyer, but only by whether the exchange is a foreign or domestic exchange. Not so. Under *Morrison* "a domestic transaction occurs when either the seller or the buyer is present in the United States." *United States SEC v. Balina*, 2024 U.S. Dist. LEXIS 197717, at *7 (W.D. Tex. Aug. 16, 2024) *citing Williams v. Binance*, 96 F.4th 129, 137 (2d Cir. 2024). But even if Nexo were right, how can Plaintiff and the Court assess whether Nexo's sales occurred on domestic exchanges while it refuses to even identify which exchanges it sold on?

In fact, Nexo seeks to conceal this information because it knows that many of the exchanges it sold on are domestic exchanges. For example, evidence uncovered by Plaintiff indicates that Nexo sold

NEXO Tokens on Uniswap, which is based in New York and allows U.S. purchasers. *See In re Ethereummax Inv'r Litig.*, No. CV 22-00163-MWF (SKx), 2023 U.S. Dist. LEXIS 186489, at *40-41 (C.D. Cal. June 6, 2023) (holding that a token issuer's sales through Uniswap place the issuer in privity with purchasers on the exchange, effectively making those transactions direct sales to the public). Cress has also uncovered evidence that Nexo's token was offered to U.S. purchasers via other exchanges such as Changelly, Hotbit, and Binance. *Williams*, 96 F.4th at 137 (holding that sales to U.S. purchasers on Binance are domestic transactions). In sum, Nexo's exchange-based sales are central to proving Cress's claims and refuting Nexo's defenses. Whether Nexo in fact sold NEXO tokens to U.S. purchasers (through those exchanges or otherwise) is a critically relevant fact that goes to the heart of Nexo's defenses.

Nexo's exchange sales are also relevant to *Howey*. Courts have recognized that a cryptocurrency issuer's push "to be listed on more exchanges" was evidence of selling securities to the public. *In re Ripple Labs Inc. Litig.*, 2024 U.S. Dist. LEXIS 109252, at *13 (N.D. Cal. June 20, 2024). Similarly, the presence of "exchange-based purchasers" is relevant to determining whether a token satisfies the horizontal commonality prong of *Howey*. *Id.* at *23. In short, it is not only Mr. Cress's direct purchase of NEXO that is relevant to whether the token is an investment contract, but also **where** Nexo sold its tokens, **to whom** they were sold, and **how** those sales were conducted.

This Court's prior orders (ECF Nos. 63, 69, 73) have already rejected Nexo's position and confirmed the relevance of exchange sales. Producing a short table of exchanges and date ranges—information Nexo can readily pull from its own listing files and ledgers—is proportional to the needs of the case and directly probative of whether Nexo engaged in public, exchange-based sales inconsistent with its claimed Rule 506(c) compliance. Plaintiff therefore respectfully asks that the Court order Nexo to provide a full and direct response to Interrogatory No. 12.

## NEXO'S POSITION

**Plaintiff's Interrogatory 5** (*see* full text above) requests the percentage of Nexo's total revenue that comes from sales of NEXO and liquidation of collateral **for each year from 2018 through the present**. The Court ordered Nexo "to answer this rog for worldwide sales." ECF 69 at 2. That is what Nexo did. In its February 14, 2025 Amended Responses—before the Court's Order in ECF 69—Nexo stated that "[t]he percentage of total global revenue of Nexo Capital Inc. that came **from direct sales of the NEXO Token to U.S. customers** was [X]% for the time period reflected in the chart contained in Interrogatory No. 3." (emphasis added; percentage redacted). Then, in its May 30, 2025 Second Amended Responses, Nexo stated that "[t]he percentage of total global revenue of Nexo Capital Inc. that came **from worldwide sales** of the NEXO Token was [Y]% for the time period reflected in the chart contained in Interogatory No. 3." (emphasis added; percentage redacted).[3] Nexo complied with the Court's Order and provided updated percentage information regarding worldwide sales.

Plaintiff claims that Nexo stated in a meet and confer letter that it would provide a "full response" to Rog 5, but the letter simply stated that Nexo would supplement its response, which Nexo did. Nor did Nexo, as Plaintiff alleges, improperly limit its response to ROG 5. When it previously moved to compel a response to ROG 5, Plaintiff did not seek to compel information beyond "the

---

[3] Because the actual revenue percentages are designated confidential under the Protective Order and are unnecessary for the resolution of this discovery dispute, the parties have redacted the percentages from the letter brief and exhibits.

time period reflected in the chart contained in Interrogatory No. 3," which listed Nexo's direct sales of the NEXO Token to U.S. customers in 2021 and 2022. Because Plaintiffs did not raise that argument, the Court did not order Nexo to answer the Interrogatory for additional time periods. Nor should it. Nexo's ROG 3 discloses that it directly sold the NEXO Token to U.S. customers only in 2021 and 2022, so the time period in ROG 5 is appropriately limited for the same reason that the time period in ROG 3 is limited.

Nexo complied with the Court's Order, and it reasonably limited the time period to 2021-2022, because providing information for 2018-2020, and 2023-2025, would include non-U.S. sales and irrelevant time periods beyond the alleged U.S. offering, and the Court has ruled that only sales of the NEXO Token in the United States are discoverable. ECF 63. In answering ROG 5, Nexo limited its response to direct sales of the NEXO Token to U.S. customers, which occurred during the period of 2021-2022. Plaintiff's demand that Nexo produce worldwide percentages for 2018, 2019, 2020, 2023, 2024, and 2025 is irrelevant, overbroad, unduly burdensome, and not proportional to the needs of the case because all foreign NEXO Token transactions are beyond the scope of U.S. securities laws, and any domestic transactions are limited by the SEC integration rule to the 2021-2022 time period when Nexo was making direct sales to U.S. customers. 17 C.F.R. § 2309.152. Plaintiff's liquidations occurred in 2021. Plaintiff provides no authority supporting the position that NEXO Token worldwide sales—years before and after his liquidations in 2021— are relevant to the securities status of his transactions that occurred during an alleged domestic offering in 2021-2022.

**Plaintiff's Interrogatory 12** (*see* full text above) requests that Nexo identify all crypto exchanges on which it has ever sold the NEXO Token (without distinguishing between U.S. or foreign exchanges), as well as granular transactional information regarding the amounts sold and dates of first and last sale. Nexo properly objected to ROG 12 as "irrelevant and beyond the scope of discovery as ordered by the Court"—specifically the Court's prior orders in ECF 63 and 69.

Plaintiff relies on ECF 73 addressing less burdensome requests for admission. In that order, the Court "overrule[d] Nexo's objection to including exchange transactions" (emphasis removed). But in doing so, the Court did not overrule its previous ruling in ECF 63 denying a motion to compel an interrogatory response to Plaintiff's ROG 3, which originally asked for "transaction-level information" concerning "each sale of NEXO," including "**[t]he exchange** on which the sale occurred (if any)." ECF 63 at 4 (emphasis added). ROG 12 seeks information that overlaps with ROG 3, which was already the subject of ECF 63. By asking Nexo to "[i]dentify all cryptocurrency exchanges on which You sold the NEXO token, including approximate amounts, date first sold, and date last sold," Plaintiff is persisting in seeking granular and burdensome transaction-level discovery regarding foreign exchange sales that are not subject to U.S. securities laws.

If the Court's order in ECF 63 left any doubt as to whether Plaintiff is entitled to burdensome, foreign crypto exchange discovery, it was eliminated by the Court's subsequent order in ECF 69, which denied Plaintiff's motion to compel the cryptocurrency exchange RFPs that overlap with the information sought in ROG 12, including RFP 64 seeking "[a]ll documents and communications regarding Your sales of NEXO on Cryptocurrency Exchanges." The Court also denied Plaintiff's motion to compel several other RFPs that requested NEXO Token transaction information related to any "Cryptocurrency Exchange," including RFPs 33, 34, 41, 42, 65, and 78.

In denying Plaintiff's motion to compel production of these crypto exchange RFPs, the Court either upheld Nexo's objections entirely, or upheld Nexo's compromise to produce a much more limited

subset of documents.[4] *See* ECF 66-1 (listing requests and the parties' positions); ECF 69 (adopting Plaitniff's position as to certain RFPs in ECF 66-1 but not others). ROG 12 is much more simlar to ROG 3 that the Court refused to compel in ECF 63, and the exchange RFPs that the Court refused to compel in ECF 69, than the exchange RFAs that it did compel in ECF 73. Plaintiff cannot bypass the Court's orders in ECF 63 and 69 by seeking substantially the same information in ROG 12. In addition to denying Plaintiffs' motion to compel crypto exchange RFPs, the Court's order in ECF 69 also confirmed that Nexo's response to ROG 3 was appropriately limited to direct sales of the NEXO token in the U.S. ECF 69 at 2. Notably, ROG 12 is not limited to NEXO Token sales on domestic crypto exchanges, but instead seeks information regarding any sale of the NEXO Token on any crypto exchange anywhere in the world. When addressing Plaintiff's RFAs, the Court stated explicitly that it "sustain[ed] Nexo's objection to including sales outside the United States," and it did so "[l]argely for the reasons discussed in ECF No. 63." ECF 73. The same reasoning applies here.

The Court correctly ruled that NEXO Token sales on non-Nexo crypto exchanges are beyond the scope of discovery. *See* ECF 69 (denying motion to compel RFP 64). Moreover, the Court correctly ruled that sales outside the U.S. are beyond the scope of discovery. *See* ECF 63 (denying motion to compel "evidence of non-U.S. sales" with respect to ROG 3); ECF 69 (same for RFP 33). The same reasoning supports denial of the motion to compel ROG 12.

The Court should deny the motion to compel ROG 12 because it seeks substantively and temporally irrelevant information, and it is burdensome and not proportional. ROG 12 is not limited to sales of the NEXO Token on domestic crypto exchanges. Many courts, including courts in this circuit, have held that alleged securities sales on foreign exchanges, even when the purchaser resides in the U.S., are not subject to U.S. securities laws.[5] ROG 12 also seeks temporally irrelevant information because any alleged "offering" of the NEXO Token to U.S. customers occurred in 2021-2022 as reflected in ROG 3, and the SEC integration rule bars integration of "[a]ny [domestic] offering made more than 30 calendar days before the commencement of any other offering, or more than 30 calendar days after the termination or completion of any other offering." 17 C.F.R. § 2309.152(b)(1). The fact that NEXO Token sales might have occurred on foreign crypto exchanges months or years before or after the alleged "offering" of the NEXO Token to U.S. customers in 2021-2022 does not change the Court's prior extraterritoriality analysis in ECF 63. The Court should deny Plaintiff's motion to compel ROG 12.

---

[4] Plaintiff argues that the Court compelled production of RFP 58 concerning "NEXO Proceeds," but that RFP was limited to the NEXO Token ICO in 2018. As reflected above, the Court denied the motion to compel crypto exchange RFPs 33, 34, 41, 42, 64, 65 and 78 with a broader scope and transactional focus akin to ROG 12. Indeed, the RFPs that the Court compelled and Plaintiff relies upon—52, 56, 57, 58, 59, 60, 63, 68, 69, and 70—do not reference crypto exchanges and instead relate to "NEXO Proceeds," public statements, advertising, or other discrete topics concerning the NEXO Token. None of the RFPs cited by Plaintiff is remotely similar in scope to ROG 12.

[5] *See Baylor v. Honda Motor Co., Ltd...*, No. 2:23-cv-00794-WLH-AGR, 2024 U.S. Dist. LEXIS 28082, at *12 (C.D. Cal. Jan. 19, 2024) ("a number of lower courts 'have rejected the argument that a transaction qualifies as a 'domestic transaction' under *Morrison* **whenever the purchaser or seller resides in the United States**, even if the transaction itself takes place entirely over a foreign exchange.'") (emphasis added); *In re UBS Sec. Litig.*, 2011 U.S. Dist. LEXIS 106274, at *25 (S.D.N.Y. Sep. 13, 2011) (holding that "foreign-squared claims" asserted by "United States investors who purchased stock on a foreign exchange" were barred by *Morrison*); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (same); *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010) (holding that § 10(b) of the Securities Exchange Act applies only to "transactions in securities listed on **domestic exchanges**, and **domestic transactions** in other securities.") (emphasis added). Plaintiff's contention that he is entitled to discovery regarding foreign "U.S.-accessible exchanges" is contrary to *Morrison*.