James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |
|---|---|
| | Case No. 3:23-cv-00882-TSH |
| JOHN CRESS, | **MOTION FOR LEAVE TO AMEND FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| v. | Date: November 6, 2025<br>Time: 10:00 AM |
| NEXO CAPITAL INC. | Judge: Hon. Thomas S. Hixson |
| Defendant. | Courtroom:   San Francisco Courthouse<br>Courtroom E – 15th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

NOTICE OF MOTION ........................................................................................1

MEMORANDUM OF POINTS & AUTHORITIES .............................................1

    I.     ISSUES TO BE DECIDED ......................................................................1

    II.    INTRODUCTION ....................................................................................1

    III.   FACTUAL BASIS OF MOTION.............................................................2

        A.    Plaintiff's Operative Complaint................................................2

        B.    Procedural Background...............................................................3

        C.    Nexo's August and September 2025 Document Productions.....................4

            1.    Nexo's Systematic Fraud in OTC Transactions and Liquidations ...........................................................4

            2.    Nexo Knew That it Had Not Registered the NEXO Token with the SEC ........................................................7

        D.    Plaintiff Promptly Informs Nexo Regarding His Intention to Amend.............................................................8

    IV.   LEGAL STANDARD..............................................................................9

    V.    ARGUMENT ........................................................................................10

        A.    Good Cause Exists to Relieve Plaintiff from any Deadline to Amend the Pleadings ...............................................10

        B.    Nexo will Not be Prejudiced by the Amendment .....................11

        C.    Nexo Cannot Make a Strong Showing Any of the Other *Foman* Factors are Present .........................................13

            1.    Undue Delay ................................................................13

            2.    Bad Faith or Dilatory Motive.......................................14

            3.    Repeated Failure to Cure Deficiencies .........................14

            4.    Futility..........................................................................14

               a)    Common Law Fraud Regarding NEXO Token (Fifth COA)........................................15

b)    Fraudulent Inducement Based on Zero Fees (First COA)................................................................................16

c)    Fraudulent Omission (Ninth COA)..................................17

d)    Civil Theft (Sixth COA) ..................................................19

e)    Civil RICO (Seventh and Eighth COAs)..........................20

f)    Breach of Contract (Tenth COA)......................................21

g)    Plaintiff's Claims are Timely............................................23

CONCLUSION..................................................................................................24

MOTION FOR LEAVE TO AMEND FAC
Case No. 3:23-cv-00882-TSH

# TABLE OF AUTHORITIES

**Cases**

*ASARCO, LLC v. Union Pacific Railroad Co.*, 765 F.3d 999 (9th Cir. 2014). ................................. 23

*Baystar Capital Mgmt. LLC v. Core Pac. Yamaichi Int'l H.K. Ltd.*, 2007 U.S. Dist. LEXIS 105322 (C.D. Cal. 2007) ............................................................................................................................... 18

*Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276  (Cal. Ct. App. 2017) ............................................ 18

*Bowles v. Reade*, 198 F.3d 752  (9th Cir. 1999). ............................................................................... 14

*Brees v. Jefferson Cnty.*, 2007 WL 3308432  (W.D. Wash. Nov. 6, 2007) ........................................ 13

*C.F. v. Capistrano Unified Sch. Dist.*, 656 F. Supp. 2d 1190  (C.D. Cal. 2009) ............................... 11

*Carranza v. City of San Pablo*, 2022 WL 110647 (N.D. Cal. Jan. 12, 2022) .................................... 13

*Citimortgage, Inc. v. Wright*, 2017 U.S. Dist. LEXIS 224294 (C.D. Cal. Sep. 19, 2017). ............... 24

*Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127 (E.D. Cal. 2017) .............................. 15

*DCD Programs, Ltd. v. Leighton*, 833 F. 2d 183 (9th Cir. 1987) ...................................... 12, 13, 15

*Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) ............................................. 9

*Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 973–74 (1997), as modified (July 30, 1997) ............................................................................................................................................... 15

*Esquivel v. Prudential Life Ins. Co.*, 2018 U.S. Dist. LEXIS 122844 (C.D. Cal. July 23, 2018) ....... 14

*Fishon v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 58655 (N.D. Cal. Mar. 30, 2022) ......... 14

*Foman v. Davis*, 371 U.S. 178 (1962) ................................................................................................. 9

*Fragale v. Faulkner*, 110 Cal.App.4th 229 (2003) .......................................................................... 18

*Fuks v. Vanetik*, 2024 U.S. App. LEXIS 566, No. 22-55794, 2024 U.S. App. LEXIS 566 (9th Cir. Jan. 9, 2024). ................................................................................................................................. 21

*Google LLC v. Sonos, Inc.*, 2021 WL 4061718 (N.D. Cal. Sept. 7, 2021) ........................................ 11

*Griggs v. Pace Am. Grp., Inc.*, 160 F.3d 877 (9th Cir. 1999) ..................................................... 9, 14

*Grimmet v. Brown*, 75 F.3d 506 (9th Cir. 1996) .............................................................................. 20

*Hueso v. Select Portfolio Servicing, Inc.*, 527 F.Supp.3d 1210 (C.D. Cal. 2021). ............................ 19

*In re Tracht Gut, LLC*, 836 F.3d 1146 (9th Cir. 2016) ..................................................................... 13

*In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716 (9th Cir. 2013) ...................... 10

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992) ................................................ 10

*Kamal v. Eden Creamery, LLC*, 88 F.4th 1268 (9th Cir. 2023) ............................................................ 10

*Kinect Renewable Sols. Ltd. Liab. Co. v. United Am. Transp.*, 2025 U.S. Dist. LEXIS 101318 (C.D. Cal. May 28, 2025) ............................................................................................................................... 19

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999) .................... 13, 14

*Martell v. Trilogy, Ltd.*, 872 F.2d 322 (9th Cir. 1989) ........................................................................ 24

*McEvoy v. ChanceLight Educ.*, 2024 WL 3957207 (N.D. Cal. Aug. 27, 2024) ................................ 13

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) ............................................................ 12

*Morand-Doxzon v. Del. N. Cos. Sportservice, Inc.*, 2021 WL 831263 (S.D. Cal. Mar. 4, 2021) ...... 15

*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074 (9th Cir. 1990) ...................................... 13

*Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708 (9th Cir. 2001) .......................................... 9

*Payroll Res. Group v. HealthEquity, Inc.*, 2024 WL 2974150 (N.D. Cal. June 13, 2024) ................... 9

*Regents of Univ. of Cal. v. Affymetrix, Inc.*, 2018 WL 4053318 (S.D. Cal. Aug. 24, 2018) .............. 11

*Rodarte v. Alameda Cnty.*, 2015 WL 5440788 (N.D. Cal. Sept. 15, 2015) ........................................ 10

*Salahutdin v. Valley of California, Inc.*, 24 Cal.App.4th 555 (1994) .................................................. 18

*See Norton v. LVNV Funding LLC*, 2020 WL 2557003 (N.D. Cal. May 19, 2020) ........................... 11

*Skillz Platform Inc. v. AviaGames Inc.*, 2023 WL 7308385 (N.D. Cal. Nov. 6, 2023) ...................... 14

*Srigley v. Monterey Peninsula Yacht Club, Inc.*, 748 F. Supp. 3d 801 (N.D. Cal. Sept. 11, 2024) 9, 10, 13

*Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128 (N.D. Cal. 2010) .............................. 12

*Sweaney v. Ada County*, 119 F.3d 1385 (9th Cir. 1997) .................................................................... 14

*Thao v. Swarthout*, 2024 WL 3904874 (E.D. Cal. Aug. 22, 2024) .................................................... 11

*TrustLabs, Inc. v. Jaiyong*, 2024 WL 1354486 (N.D. Cal. Mar. 30, 2024) ........................................ 13

*Tyco Thermal Controls LLC v. Redwood Indus.*, 2009 WL 4907512 (N.D. Cal. Dec. 14, 2009)...... 13

*VLSI Tech. LLC v. Intel Corp.*, 2024 WL 664804 (N.D. Cal. Feb. 16, 2024) .................................... 10

*Wagner v. S. Cal. Edison Co.*, 2017 WL 10543557 (C.D. Cal. July 28, 2017) .................................. 11

*Wynes v. Kaiser Permanente Hosps.*, 2012 WL 2339245 (E.D. Cal. June 19, 2012) ........................ 11

*Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080 (9th Cir. 2002)............................................................ 10

**Rules**

Fed. R. Civ. P. 15....................................................................................................................... 1, 2, 10

Fed. R. Civ. P. 15(a) ...................................................................................................................... 9, 12

Fed. R. Civ. P. 15(a)(2) .................................................................................................................... 1, 9

Fed. R. Civ. P. 15(c) ......................................................................................................................... 24

Fed. R. Civ. P. 15(c)(1)(B) ............................................................................................................... 23

Fed. R. Civ. P. 16....................................................................................................................... 1, 2

Fed. R. Civ. P. 16(b)(4) .................................................................................................................... 10

Fed. R. Civ. P. 26................................................................................................................................ 3

MOTION FOR LEAVE TO AMEND FAC
Case No. 3:23-cv-00882-TSH

**NOTICE OF MOTION**

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE, that on November 6, 2025, at 10:00 AM, or as soon thereafter as may be heard, Plaintiff will move the Court, the Honorable Thomas S. Hixson presiding, for an Order pursuant to Fed. R. Civ. P. 15(a)(2) granting his leave to amend his Complaint. This Motion is based on this Notice of Motion; the below Memorandum; the concurrently-filed Declaration of James Taylor-Copeland ("Taylor-Copeland Decl.") and all exhibits thereto; all prior proceedings in the action; and all further argument and evidence presented.

**MEMORANDUM OF POINTS & AUTHORITIES**

**I.    ISSUES TO BE DECIDED**

The issues to be decided are (1) whether Plaintiff has shown good cause to amend the scheduling order under Rule 16, and (2) whether Plaintiff has shown that his proposed amendment to the Complaint is proper under Rule 15.

**II.    INTRODUCTION**

Plaintiff John Cress respectfully moves this Court for leave to file a Second Amended Complaint ("SAC") to add claims based on newly discovered evidence produced by Nexo only within the last month. Despite Plaintiff's diligence in pursuing discovery since July 2024, Nexo withheld critical documents until recent August and September productions. These productions revealed, for the first time, that Nexo systematically engaged in a fraudulent scheme to extract undisclosed fees from Plaintiff and other customers in connection with over-the-counter ("OTC") transactions and loan liquidations, while actively concealing those fees through fabricated confirmations and misleading statements. The productions further established that Nexo knowingly misrepresented to Plaintiff and numerous other investors that the NEXO Token was "registered with the SEC as a security," despite being on notice from the SEC itself that this representation was false.

Armed with this new evidence, Plaintiff promptly informed Nexo of his intent to amend and now seeks leave to add additional misrepresentations as the basis for his fraudulent inducement claim,

1
**MOTION FOR LEAVE TO AMEND FAC**
Case No. 3:23-cv-00882-TSH

and add causes of action for fraudulent omission, common law fraud, civil theft, civil RICO, and breach of contract. These claims are directly tied to the same nucleus of operative facts already pled in the case—Defendants' fraudulent representations and deceptive conduct in soliciting Plaintiff's investments and managing his Nexo account. The proposed amendments do not alter the scope of the litigation in any fundamental way, nor do they require adjustments to the Court's scheduling order. Rather, they ensure that the operative pleading accurately reflects the full extent of Nexo's unlawful conduct.

Good cause exists under Rule 16 to permit amendment of the scheduling order, as Plaintiff could not reasonably have asserted these claims earlier given Nexo's delay and obstruction in discovery. Rule 15's liberal standard is likewise satisfied, as there has been no undue delay, bad faith, or prejudice to Nexo. To the contrary, allowing amendment now will promote the interests of justice and judicial efficiency by permitting resolution of all related claims in a single proceeding. Plaintiff has acted diligently and in good faith, and the proposed amendments are not futile. Accordingly, Plaintiff respectfully requests that the Court grant leave to file the Second Amended Complaint.

## III.    FACTUAL BASIS OF MOTION

### A.    Plaintiff's Operative Complaint

In 2021 Nexo reached out to Plaintiff advertising its VIP lending program. First Amended Complaint ("FAC") ¶¶ 38-43. Nexo promised Plaintiff would have access to its exclusive "VIP" services, including a liquidation relief program ("LRP") to recover his assets in the event of a liquidation and prompt customer support. FAC ¶¶ 49-51. In order to get favorable interest rates, Nexo required Plaintiff to exchange at least ten percent of his portfolio on the Nexo platform into its own NEXO Token. FAC ¶ 41. Nexo assured Plaintiff that the NEXO Token was "registered with the SEC as [a] security."  FAC ¶ 54. Plaintiff subsequently took out loans from Nexo collateralized by digital assets, and used what Nexo advertised as its "exclusive OTC services," which promised "some of the best rates on the market," to purchase millions of dollars worth of BTC, ETH, and NEXO.  These

transactions were recommended and facilitated by Nexo, through Plaintiff's VIP Relationship Manager, Hristiyan Hristov. FAC ¶¶ 51-75.

The thrust of Plaintiff's FAC is that Nexo's representations regarding its VIP Program and NEXO Token were false. Plaintiff's FAC asserts claims for fraudulent inducement and violation of the UCL, largely based on Nexo's misrepresentations regarding its VIP Program. FAC ¶¶ 115-132. Plaintiff also asserts that Nexo failed to properly register the NEXO Token and committed securities fraud in representing that the Token "was registered with the SEC as a security." FAC ¶¶ 133-164.

**B.    Procedural Background**

Plaintiff served his First Set of Requests for Production of Documents ("RFPs") nearly as early as the Federal Rules allow, on July 25, 2024, six days after the parties' Rule 26 conference. Taylor-Copeland Decl. ¶ 20. Nexo asked for, and was given a month extension to respond, only to object to 76 of Plaintiff's 78 Requests, forcing Plaintiff to file a Motion to Compel in December 2024. *Id*. From January 2025 to April 2025, this Court issued six discovery orders defining the metes and bounds of permissible discovery. Dkt. 55, 62, 63, 65, 69, 72.

On August 13, 2024, the Court entered an initial Case Management Order, which set a deadline of August 29, 2025, for close of fact discovery. Dkt. 51. The Case Management Order also set a December 12, 2024, deadline to seek leave to amend pleadings. *Id.*

On May 7, 2025, the Court approved a joint stipulation extending the close of fact discovery by approximately six months, to February 27, 2026. Dkt. 71. In the May 7 Stipulation and Order, Nexo acknowledged that it had not yet begun its review of documents collected from court ordered custodians, but that it "has agreed to begin review of a large set of documents . . . no later than May 30, 2025 and make rolling productions throughout the review process." *Id*. at 2. Nexo agreed that it would "substantially complete document production by August 31, 2025." The May 7 Stipulation and Order is silent regarding any deadline to seek leave to amend pleadings.

After the Court's April 17, 2025 Discovery Order (Dkt. 69), Nexo initially made three limited productions on May 23, July 9, and July 21, 2025. These productions consisted primarily of redacted

Liquidation Relief Agreements (that Nexo was later ordered to reproduce as unredacted), and incomplete sets of Nexo's public social media posts and blog articles. They did not include any documents collected from the court ordered individual custodians (i.e. emails, chats, memos) or non-custodial sources (e.g., customer support, salesforce, etc.). *Id.* Indeed, Nexo did not produce any such records until August 31, 2025, when it produced 45,990 documents to Plaintiff. Despite promising to substantially complete its production by August 31, there were major deficiencies in this production, including that it contained no emails to or from Nexo's executives Kantchev and Trenchev, almost no emails to or from many of Nexo's other custodians, missing communications and sales data regarding Plaintiff, and almost no internal communications made via email, Slack or other internal communication rails. Plaintiff sent Nexo a meet and confer letter identifying a total of seventeen critical deficiencies with its production on September 9, 2025. Nexo has yet to provide any response to this letter, but on September 12, 2025 it made an additional production containing some of its communications with regulators regarding the NEXO Token. Plaintiff sent an additional meet and confer letter regarding this production on September 15, 2025. Nexo has not yet responded to either letter.

**C.    Nexo's August and September 2025 Document Productions**

Nexo's August 31 and September 12 document productions revealed for the first time that: (1) Nexo was taking secret fees on its customers' OTC purchases and liquidations, and engaged in a systematic scheme to conceal these fees; and (2) was well aware that its representation that the "Nexo token is registered with the SEC as a security" was false, but nevertheless made this representation as a matter of course to hundreds of its VIP clients over years. Taylor-Copeland Decl. ¶¶ 3-19, Exs. 1-17.

**1.    Nexo's Systematic Fraud in OTC Transactions and Liquidations**

MOTION FOR LEAVE TO AMEND FAC
Case No. 3:23-cv-00882-TSH

Nexo's productions contained internal memos, spreadsheets, and emails[1] revealing for the first time that Nexo took substantial undisclosed fees on both Plaintiff's OTC purchases and liquidations, and was engaged in systematic fraud to conceal these secret fees stolen from its customers. Taylor-Copeland Decl. ¶¶ 3-19, Exs. 1-17.

Nexo produced an internal memo, which recognized that its OTC Desk was nothing more than a sham designed to defraud Plaintiff and its other customers. Nexo noted that: "We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do." It noted that the "problems with the set up" include that (a) "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" and (b) "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant amount of time post the execution timing when to report the deal to the customer so we can justify the commission we add up . . ." Taylor-Copeland Decl. ¶ 4, Ex. 2. Nexo's OTC sales of NEXO tokens are priced "3-5% over the spot price," and BTC and ETH sales are priced "1-3% over the spot price." *Id.* ¶ 5, Ex. 3.

Nexo's VIP Relationship Managers, including Hristov, also frequently misled customers about the nature of the OTC Desk and transactions, telling them Nexo "is not a participant in the trade, we act as a middle man of the deal." Taylor-Copeland Decl. ¶ 6, Ex. 4. In fact, as in Plaintiff's case, Nexo was often selling its own digital assets to its customers. Taylor-Copeland Decl. ¶¶ 7, 10, Exs. 5, 8.

Nexo concealed both its secret profits and the fact that it was selling digital assets from its own inventory to Plaintiff by providing him with fabricated trade confirmations. For example, on March 27, 2021, Hristov emailed Plaintiff regarding his first OTC transactions, stating that the "OTC team did a great job and purchased the assets as it follows: 1. 74.441 BTC @$55,289.81 [and] 2.

---

[1] Nexo has still not produced many critical emails or slack communications regarding Plaintiff's OTC transactions, or any records reflecting Nexo's purchase of BTC or ETH on Plaintiff's behalf, or Nexo's sale of Plaintiff's BTC or ETH when it claims to have "liquidated" Plaintiff's assets. Taylor-Copeland Decl. ¶ 21.

481,878 NEXO Tokens @ $2.66." However, an internal email to Nexo's payments team, shows this was untrue:

> We bought 75 BTC @ $54,878.23 = $4,115,867
>
> We are crediting the client with 74.441 BTC @ $55,289.81
>
> Profit for the OTC Desk - 0.55 BTC
>
> We are selling 481,878 NEXO tokens @ $2.55
>
> We are crediting the client with 481,878 NEXO tokens @ $2.66
>
> Profit for the OTC Desk - 1.007 BTC
>
> Hedge -  22.3875 BTC @ $54,887
>
> Total profit = 1.5657 BTC ≈ $86,000

Taylor-Copeland Decl. ¶ 7, Ex. 5. In addition to the profits retained by the OTC Desk, Nexo's records reflect that it sold Plaintiff the NEXO Token at a 134.3% markup and took an additional $680,627 profit on the transaction. *Id.* ¶ 8, Ex. 6.

Similarly, Nexo's records reveal that on Plaintiff's second OTC transaction, Nexo sold Plaintiff its own NEXO Token at an astronomical 134.4% markup, taking an undisclosed profit of $817,243. *Id.* ¶ 8, Ex. 6.

On April 16, Hristov emailed Plaintiff regarding his third OTC purchase, stating "I have some great news. The team has finished with the execution last night. We purchased the following assets: 28.3780 BTC @ $63,426; [and] 91,715 NEXO Tokens @ $3.816. This was a lie. SAC ¶ 78. Nexo's records show that it acquired the NEXO Token for $1.27 and resold it to Plaintiff at a 184.1% markup, taking an undisclosed $214,508 profit. Taylor-Copeland Decl. *Id.* ¶ 8, Ex. 6. But Nexo did not stop there. Seeking to further take advantage of Plaintiff, Nexo took an additional $102,125 undisclosed "portfolio booster" profit on this transaction. *Id.* ¶ 9, Ex. 7.

Nexo's internal emails show that the OTC desk took a profit of 8,000 USDT and .7513 ETH on Plaintiff's final OTC purchase. The internal email from Octavian Dinca reflects that Nexo

MOTION FOR LEAVE TO AMEND FAC
Case No. 3:23-cv-00882-TSH

purchased the ETH for $3,171.57, but provided it to the "customer" at $3,203.60. *Id.* ¶ 10, Ex. 8. Nexo provided a fabricated confirmation regarding this purchase as well.

Nexo's production also revealed that it took substantial undisclosed fees on each of Plaintiff's liquidations and was engaged in a systematic scheme to conceal these secret fees from its customers, including Plaintiff. For example an internal memo states, "WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX. Most of you have probably worked on cases, in which the customer is disputing the amount received as part of the liquidation, claiming it is smaller than it should be." The same document then provides instructions to "convince them there is no mistake," which include withholding information on the "tax which we SHOULD NEVER mention. That's why, we should also not mention the sell price . . ." Taylor-Copeland Decl. ¶ 11, Ex. 9.

While Nexo has previously represented to its customers, Plaintiff, and this Court that "Nexo does not view liquidations as a revenue-generating activity," Dkt. 68-1, its production reveals that it has generated at least $46 million in liquidation fees since 2019. Taylor-Copeland Decl. ¶ 12, Ex. 10. And in communicating with the SEC and several state regulatory agencies in 2021 and 2022, Nexo acknowledged that it applies "a liquidation fee of 5.0%" and that liquidation fees are a "significant source of revenue to Nexo." Taylor-Copeland Decl. ¶¶ 13-14, Exs. 11, 12.

### 2. Nexo Knew That it Had Not Registered the NEXO Token with the SEC

Nexo's document production also laid bare that, Hristov's representation to Plaintiff that "the NEXO token is registered with the SEC as a security" was not a one-off mistake by a VIP Relationship Manager. Rather, it was standard language provided to VIP Program customers to induce them to purchase NEXO Tokens. Taylor-Copeland Decl. ¶ 15, Ex. 13. Nexo Relationship Managers sent this identical misrepresentation to dozens of VIP customers.

But Nexo was well aware that filing a Form D Notice of Exempt Offering of Securities with the SEC in 2018, did not constitute registration with the SEC. Its own Terms and Conditions of Token Sale stated that "the offer and sale of this security instrument has not been registered under the U.S.

Securities Act of 1933 . . . or under the securities laws of certain states." Taylor-Copeland Decl. ¶ 16, Ex. 14. These Terms were never provided to Plaintiff.

Nexo's production also revealed that a Nexo customer contacted the SEC and asked whether Nexo was registered with the SEC. Taylor-Copeland Decl. ¶ 17, Ex. 15. The SEC responded by stating that "Nexo is not registered with the SEC." *Id.* This customer forwarded this correspondence to Nexo's support and legal departments with the subject "Nexo falsely stated on it's website it is SEC Compliant." *Id.*

In fact, the SEC contacted Nexo regarding the NEXO Token in 2020. Taylor-Copeland ¶ 18, Ex. 16.[2] The "SEC brought to Nexo's attention the fact that" Nexo's marketing materials falsely stated that it was "SEC-compliant." *Id* ¶ 19, Ex. 17. Nexo represented to the SEC that it had "since unified all the language across the various platforms and communication channels to ensure that no inaccurate depictions of the facts are present." Nexo's most recent production thus reveals that it was on notice— from the SEC itself—both of the falsity and importance of its representations regarding registration of its token with the SEC. Nexo, nevertheless, used this false representation to sell tens of millions of dollars of NEXO tokens to U.S. investors, including Plaintiff.

### D.    Plaintiff Promptly Informs Nexo Regarding His Intention to Amend

Based on the foregoing new information it became clear to Plaintiff that amendment of his Complaint was necessary. Plaintiff informed Nexo of his intent to amend on September 22 and planned to file the instant motion on September 26 if Nexo was unwilling to stipulate to amendment. At Nexo's request, Plaintiff agreed to hold off on filing the motion to allow the parties additional time to meet and confer. Nexo informed Plaintiff on September 29, 2025 that it would not stipulate to amendment, and that no further meet and confer efforts were necessary. *Id.*

Plaintiff's proposed amendments are based on the newly discovered information set forth above. *See generally* Taylor-Copeland Decl. Plaintiff seeks leave to add fraudulent inducement (First

---

[2] Nexo has still not produced hardly any documents regarding this early SEC investigation or provided any explanation regarding why it has not done so.

COA), civil theft (Sixth COA), civil RICO (Seventh and Eighth COAs), fraudulent omission (Ninth COA), and breach of contract (Tenth COA) claims based upon Nexo's misrepresentations and active concealment of its OTC and liquidation fees. Plaintiff also seeks leave to add a common law fraud claim based upon Nexo's false representation that the Nexo Token was registered with the SEC as a security (Fifth COA).

## IV.    LEGAL STANDARD

Other than amending as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave," which "[t]he court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy 'is to be applied with extreme liberality.'" *Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003 (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) ); *accord Payroll Res. Group v. HealthEquity, Inc.*, 2024 WL 2974150, at *2 (N.D. Cal. June 13, 2024 ("Generally, a court should determine whether to grant leave indulging 'all inferences in favor of granting the motion.'" (quoting *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999)).

In deciding whether to grant leave to amend, courts consider the factors set forth by the Supreme Court in *Foman v. Davis*, namely (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, and (5) futility of amendment. *See* 371 U.S. 178, 182 (1962); *Eminence Capital LLC*, 316 F.3d at 1051-52. However, "[n]ot all of the factors merit equal weight," and "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital LLC*, 316 F.3d at 1052 (citation omitted). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* (citation omitted); *cf. Srigley v. Monterey Peninsula Yacht Club, Inc.*, 748 F. Supp. 3d 801, 804 (N.D. Cal. Sept. 11, 2024) (Even "an unreasonable delay with an improper motive is insufficient to deny leave to amend absent a showing of prejudice." (citing *Owens*, 244 F.3d at 712)).

1    When a motion for leave to amend is brought after the amendment deadline in the scheduling

2    order has passed, a party must first have "good cause and . . . the judge's consent," *see* Fed. R. Civ.

3    P. 16(b)(4); *Srigley*, 2024 WL 4143590, at *1; *see also VLSI Tech. LLC v. Intel Corp.*, 2024 WL

4    664804, at *2 (N.D. Cal. Feb. 16, 2024) ("If the moving party establishes 'good cause' to modify

5    the scheduling order," under Rule 16(b), "'it must then demonstrate that its motion is also proper

6    under Rule 15.'" (quoting *Rodarte v. Alameda Cnty.*, 2015 WL 5440788, at *2 (N.D. Cal. Sept. 15,

7    2015))). "The good cause standard 'primarily considers the diligence of the party seeking the

8    amendment.'" *Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1277 (9th Cir. 2023) (quoting *In re W.*

9    *States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013)).

10   **V.    ARGUMENT**

11       **A.    Good Cause Exists to Relieve Plaintiff from any Deadline to Amend the Pleadings**

12       Nexo's August 31 and September 12 document productions contain the documents and

13   information forming the basis of Plaintiff's additional asserted claims. Taylor-Copeland Decl. ¶¶ 3-

14   19, Exs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 (Claims 1, 5, 6, 7, 8, 9, 10).

15       Since Nexo did not produce the information underlying these additional claims until August

16   31, 2024 or September 12, 2024, more than eight months after the initial December 12, 2024 deadline

17   to amend pleadings, Plaintiff "cannot reasonably [have] met" the deadline "despite [his] diligence,"

18   *see Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) (quoting *Johnson v. Mammoth*

19   *Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)).[3]

20       Plaintiff has exercised diligence in seeking relief, providing Nexo notice of his intent to amend

21   within three weeks of Nexo's production containing the additional information, and filing the present

22   motion less than a month after discovery of the information, shortly after having the materials needed

23   for the motion. Taylor-Copeland Decl. ¶¶ 3-21; *See Thao v. Swarthout*, 2024 WL 3904874, at *3 (E.D.

---

[3] While the current scheduling Order is silent regarding any deadline to seek leave to amend pleadings, even if the earlier December 2024 deadline remains in effect, good cause exists to relieve Plaintiff of this deadline. At a minimum, the approximately six month extension to all deadlines provided by the May 7 Scheduling Stipulation and Order ensures there will be no prejudice to Nexo as a result of amendment. Dkt. 71.

Cal. Aug. 22, 2024) ("plaintiffs filed this motion within two months of discovering the evidence that supports the motion, which the court finds demonstrates diligence" (citing *Wynes v. Kaiser Permanente Hosps.*, 2012 WL 2339245, at *1 (E.D. Cal. June 19, 2012) (finding diligence where plaintiff sought leave to amend two months after documents with pertinent information were produced); *Regents of Univ. of Cal. v. Affymetrix, Inc.*, 2018 WL 4053318, at *3 (S.D. Cal. Aug. 24, 2018) ("The less than two months period between the time Defendants discovered the references at issue and the time Defendants gave Plaintiffs notice of their intent to amend their invalidity contentions is reasonable and establishes Defendants' diligence in seeking leave to amend." (citations omitted)); *Wagner v. S. Cal. Edison Co.*, 2017 WL 10543557, at *2 (C.D. Cal. July 28, 2017) (party was "reasonably diligent" where "there was relatively little delay—only two months—between" the discovery of new facts and party's motion to amend); *Google LLC v. Sonos, Inc.*, 2021 WL 4061718, at *5 (N.D. Cal. Sept. 7, 2021) (party "diligently sought leave to amend once it discovered the basis for the requested amendments" by providing notice to opposing party "within two months").

As a result, there is good cause to modify the Case Management Order to allow Plaintiff to amend his pleading, particularly where doing so would not, on the present schedule, interfere with "the [C]ourt's efficient adjudication of [the] case." *See Norton v. LVNV Funding LLC*, 2020 WL 2557003, at *3 (N.D. Cal. May 19, 2020) (citing *C.F. v. Capistrano Unified Sch. Dist.*, 656 F. Supp. 2d 1190, 1197 (C.D. Cal. 2009), *aff'd sub nom. C.F. ex. Rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975 (9th Cir. 2011)). In *Norton*, the movant had "not sought to change the deadlines for discovery, dispositive motions, or the pretrial conference, nor d[id] extensions of those deadlines appear necessary." *Id.* So too here. Plaintiff does not seek to move the deadlines for discovery, summary judgment, or trial and amendment will not require extension of those deadlines.[4]

**B.    Nexo will Not be Prejudiced by the Amendment**

---

[4] While the parties are presently meeting and conferring regarding a number of discovery issues, these issues will need to be resolved regardless of whether the Court grants Plaintiff leave to amend his complaint.

The only effect of Plaintiff's proposed amendment is to add claims related to Nexo's misrepresentations regarding (1) its OTC and liquidation fees, and (2) the NEXO Token. These claims are closely related to Plaintiff's first claim (fraudulent inducement relating to Plaintiff's purchase of digital assets through Nexo's OTC desk and subsequent liquidation) second claim (UCL claims relating to Nexo's deceptive and misleading advertising in Nexo's VIP Brochure), and third through fifth claims (Nexo's sales of unregistered NEXO token securities and fraud in the offer and sale of NEXO token securities). Plaintiff is not seeking any changes to the case schedule or any deadlines as a result of amending. Moreover, Plaintiff has already served discovery requests regarding his OTC purchases and his purchases of the NEXO Token. Nexo has already agreed to produce or has been ordered to produce many documents regarding Plaintiff's purchase of NEXO tokens from Nexo. While Nexo has thus far failed to produce many of these critical records, it must do so whether the Court grants Plaintiff leave to amend his complaint or not.

Plaintiff does not currently see a need to serve additional discovery requests as a result of the amendment, nor anticipate any additional significant discovery as a result of amending. *Cf. McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809 (9th Cir. 1988) (prejudice where new claims would "require[] additional discovery on a wide range of new issues," as well as "new depositions").[5]

"The party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F. 2d 183, 187 (9th Cir. 1987) (citation omitted); *see also id.* at 187-88 (timing of proposed amendment was not prejudicial where case was still at discovery stage). "To overcome Rule 15(a)'s liberal policy with respect to the amendment of pleadings a showing of prejudice must be substantial." *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1158 (N.D. Cal. 2010) (citation omitted). "Neither delay resulting from the proposed amendment nor the prospect of additional discovery needed by the non-moving party in itself constitutes a sufficient showing of prejudice." *Tyco Thermal Controls LLC v. Redwood Indus.*, 2009 WL 4907512, at *3 (N.D. Cal. Dec.

---

[5] There are a number of existing disputes regarding Plaintiff's discovery requests and Nexo's production. But these disputes will need to be resolved regardless of whether Plaintiff amends his Complaint. In addition, no depositions have yet been noticed or taken in this case.

14, 2009). Similarly, "the burden of having to defend against a claim on its merits does not constitute undue prejudice." *Carranza v. City of San Pablo*, 2022 WL 110647, at *6 (N.D. Cal. Jan. 12, 2022) (citing *DCD Programs, Ltd.*, 833 F.2d at 186). "Likewise, 'mere inconvenience or a general opposition to amendment is not grounds to deny a motion to amend.'" *Id.* (quoting *Brees v. Jefferson Cnty.*, 2007 WL 3308432, at *2 (W.D. Wash. Nov. 6, 2007)).

Although prejudice might exist "where allowing amendment would 'reopen discovery and therefore delay the proceedings,'" *Srigley*, 2024 WL 4143590, at *3 (quoting *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999)), or "in the face of new theories," *see TrustLabs, Inc. v. Jaiyong*, 2024 WL 1354486, at *7 (N.D. Cal. Mar. 30, 2024) (citation omitted), that is not the case here. Rather, "[t]he essence of the case remains what is has been from the beginning:" Nexo's fraudulent and illicit conduct in the handling of Plaintiff's Nexo account, including in Plaintiff's purchases of BTC, ETH, and NEXO tokens from Nexo's OTC Desk, and in the handling of the liquidations of Plaintiff's assets. *See McEvoy v. ChanceLight Educ.*, 2024 WL 3957207, at *1 (N.D. Cal. Aug. 27, 2024) (noting "there is a low risk of prejudice as . . . fact discovery remains open"); *cf. Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (prejudice may exist where adding new claims would "greatly alter[] the nature of the litigation" and require the non-moving party to take an "entirely new course of defense"). "Because allowing leave to amend will not interfere with discovery, delay the proceedings, or otherwise improperly prejudice [Nexo], the Court [should] not deny leave to amend on this ground." *See Srigley*, 2024 WL 4143590, at *3.

## C. Nexo Cannot Make a Strong Showing Any of the Other *Foman* Factors are Present

### 1. Undue Delay

As described above, Plaintiff moved with due diligence upon learning that Nexo's OTC sales of Nexo Tokens were fraudulent. In any event, "undue delay alone cannot serve as a basis for the denial of leave to amend." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1155 n.4 (9th Cir. 2016) (citing

*Lockheed Martin Corp.*, 194 F.3d at 986 ("[D]elay is not a dispositive factor in the amendment analysis.")); *see also Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999).

### 2. Bad Faith or Dilatory Motive

Plaintiff has no bad faith or dilatory motive. He "does not seek to add parties or prolong the litigation." *See Skillz Platform Inc. v. AviaGames Inc.*, 2023 WL 7308385, at *2 (N.D. Cal. Nov. 6, 2023) (granting leave to amend). Rather, Plaintiff did not uncover the information underpinning the additional claims until he was able to review Nexo's August and September 2025 productions. Taylor-Copeland Decl. ¶¶ 20-23. It is Nexo that delayed Plaintiff's discovery of this information through its obstructive approach to discovery—refusing to even begin its document search until May 2025, and first producing the documents underlying the basis for this motion on August 31, 2025, more than a year after they were first requested on July 25, 2024. Taylor-Copeland Decl. ¶ 20.

### 3. Repeated Failure to Cure Deficiencies

Because Plaintiff is not amending his complaint to cure a deficiency, but rather to slightly expand the scope of the case, this factor is not present. In any event, "as for repeated amendments, Plaintiff has only amended the complaint once before." *See Fishon v. Premier Nutrition Corp.*, 2022 U.S. Dist. LEXIS 58655, at *6 (N.D. Cal. Mar. 30, 2022). It is not uncommon for a Plaintiff to seek leave to file a Second Amended Complaint, and these motions are treated "with extreme liberality," and "a presumption that leave to amend should be granted." *Esquivel v. Prudential Life Ins. Co.,* 2018 U.S. Dist. LEXIS 122844, at *6-7 (C.D. Cal. July 23, 2018) *citing Griggs v. Pace Am. Grp., Inc.*, 160 F.3d 877, 889 (9th Cir. 1999).

### 4. Futility

"[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Sweaney v. Ada County*, 119 F.3d 1385, 1393 (9th Cir. 1997) (quotation omitted). Because the Court found Plaintiff's claims with respect to Nexo's fraudulent handling of Plaintiff's Nexo account and illicit sales of NEXO token securities well-plead, and because Plaintiff's additional claims are relevant to Nexo's fraudulent

handling of Plaintiff's Nexo account and sales of NEXO tokens to Plaintiff, Plaintiff's proposed amendment would not be futile. *See Morand-Doxzon v. Del. N. Cos. Sportservice, Inc.*, 2021 WL 831263, at *4 (S.D. Cal. Mar. 4, 2021) ("[W]here there is a colorable claim, courts must grant leave to amend." (citing *DCD Programs*, 833 F.2d at 188)).

### a)    Common Law Fraud Regarding NEXO Token (Fifth COA)

With respect to Plaintiff's common law fraud claim based on Nexo's representation that "the NEXO token is registered with the SEC as a security," the Court has already held that Plaintiff may pursue a securities fraud claim under Cal. Corp. Code §25401 based on this same statement. Dkt. 26 at 32-33. The Court recognized that Plaintiff properly alleged that the statement is literally false and was material:

> Cress alleges that he "had never previously considered purchasing NEXO Tokens and instead made clear that he was seeking to use Nexo's lending solely to increase his BTC holdings." ECF No. 1 ¶ 53. However, Hristov stated that in order to obtain the advertised interest rates, Cress needed to purchase a significant amount of NEXO Tokens. Id. ¶ 54. Cress alleges that Hristov allayed Cress's concerns by representing that the NEXO Token was registered with the SEC. Id. ¶ 55. This is sufficient to allege materiality.

*Id.* In order to maintain a common law fraud claim based on this statement, Plaintiff must show that this (1) misrepresentation;  was made with (2) "'knowledge of falsity (or "scienter")'; (3) 'intent to defraud, i.e., to induce reliance'; (4) 'justifiable reliance'; and (5) 'resulting damage.'" *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1148 (E.D. Cal. 2017) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 973–74 (1997), as modified (July 30, 1997)).

As discussed in Section IV.C.2, Plaintiff learned that this statement was made with knowledge of falsity and intent to defraud through Nexo's recent productions. Specifically, Nexo's own Terms and Conditions of Token Sale, which were never provided to Plaintiff, stated that "the offer and sale of this security instrument has not been registered under the U.S. Securities Act of 1933 . . . or under the securities laws of certain states." SAC ¶ 108.  Moreover, in 2020, the SEC "brought to Nexo's attention the fact that" Nexo's marketing materials falsely stated that it was "SEC-compliant." *Id.* ¶¶

109-110. Nexo represented to the SEC that it had "since unified all the language across the various platforms and communication channels to ensure that no inaccurate depictions of the facts are present." Nexo was thus on notice—from the SEC itself—both of the falsity and importance of its representations regarding registration of its token with the SEC. Nexo, nevertheless, used the identical misrepresentation that the NEXO Token was registered with the SEC as a security, to sell tens of millions of dollars of NEXO tokens to U.S. investors, including Plaintiff.  The SAC's allegations more than sufficiently set forth the additional knowledge and intent allegations necessary to sustain a common law fraud claim based on this statement. SAC ¶ 53.

### b)    Fraudulent Inducement Based on Zero Fees (First COA)

Similarly, there can be little doubt that Plaintiff adequately pleads a fraud claim based on Nexo taking undisclosed profits at Plaintiff's expense in each OTC transaction and liquidation. Nexo advertised that, as a VIP, Plaintiff would receive access to "exclusive OTC services" including some of the best rates in the market. SAC ¶¶ 52, 117. This was simply false. Nexo also advertised that it did not charge any fees in connection with digital asset transactions, or any other hidden fees. *Id.* ¶ 53. For example, in March 2021, Nexo's customer account page advertised "no hidden fees." SAC ¶ 53(d). Nexo's Whitepaper also advertised "No Hidden Fees." *Id.* at 53(e). And in an AMA, Nexo's CEO Trenchev assured a suspicious customer that "There is no concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all the fees we make." *Id.* ¶ 55. Plaintiff relied on Nexo's representations regarding its OTC Desk and its Zero Fee policy. SAC ¶ 54.

However, internally Nexo acknowledged that its OTC Desk was nothing more than a sham designed to defraud Plaintiff and its other customers. Nexo noted that: "We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do." It noted that the "problems with the set up" include that (a) "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" and (b) "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant amount of time post the execution timing when to report the deal to the customer so we can justify the commission

we add up . . ." SAC ¶¶ 80, 115. Nexo's OTC sales of NEXO tokens are priced "3-5% over the spot price," and BTC and ETH sales are priced "1-3% over the spot price." SAC ¶¶ 80-83.

Nexo also internally recognized its scheme to conceal liquidation fees, stating, "WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX. Most of you have probably worked on cases, in which the customer is disputing the amount received as part of the liquidation, claiming it is smaller than it should be." The same document then provides instructions to "convince them there is no mistake," which include withholding information on the "tax which we SHOULD NEVER mention. That's why, we should also not mention the sell price . . ." SAC ¶¶ 92, 220. While Nexo has previously represented to its customers, Plaintiff, and this Court that "Nexo does not view liquidations as a revenue-generating activity," Dkt. 68-1, its production reveals that it has generated at least $46 million in liquidation fees, since 2019. And in communicating with the SEC and several state regulatory agencies in 2021 and 2022, Nexo acknowledged that it applies "a liquidation fee of 5.0%" and that liquidation fees are a "significant source of revenue to Nexo." SAC ¶¶ 92, 220.

Nexo's records reveal that it did in fact take substantial undisclosed fees on all of Plaintiff's OTC transactions and liquidations. SAC ¶¶ 52-93. Nexo sought to conceal these profits by providing Plaintiff with fabricated and fraudulent transaction confirmations. SAC ¶¶ 64-79. The SAC's allegations are more than sufficient to properly set forth a fraudulent inducement claim based upon Nexo's misrepresentations regarding its fees.

### c) Fraudulent Omission (Ninth COA)

Moreover, even if these statements were not actionable, and they are, Nexo's concealment of its secret profits would still be. California courts have recognized four circumstances in which non-disclosure or concealment constitutes actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff, (2) when the defendant had exclusive knowledge of material facts that were not known to the plaintiff, (3) when the defendant actively conceals a material fact from the plaintiff, and (4) when the defendant makes partial representations but also suppresses certain material

facts. *See Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 310–11 (Cal. Ct. App. 2017); *Baystar Capital Mgmt. LLC v. Core Pac. Yamaichi Int'l H.K. Ltd.*, 2007 U.S. Dist. LEXIS 105322, at *13 (C.D. Cal. 2007).

While any one of these circumstances would permit Plaintiff to pursue a fraud claim based on Nexo's concealment of profits at Plaintiff's expense, each one is present here.

*First*, Nexo was acting as Plaintiff's agent, and thus his fiduciary, in acquiring digital assets on his behalf. Under California law, an "agent is a fiduciary." *Fragale v. Faulkner*, 110 Cal.App.4th 229, 239, n.9 (2003); SAC ¶ 242. "Most acts by an agent in breach of his fiduciary duties constitute constructive fraud. The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud. Also, a careless misstatement may constitute constructive fraud *even though there is no fraudulent intent*." *Salahutdin v. Valley of California, Inc.*, 24 Cal.App.4th 555, 562 (1994) (emphasis in original).

*Second*, Nexo had exclusive knowledge of material facts that were not known to Plaintiff. Nexo knew that it was taking significant fees on each transaction at Plaintiff's expense and did not inform him that it was taking any fees at all until *after* he made his final OTC purchase, when it stated that it had taken a 0.5% fee on his purchase of ETH. SAC ¶¶ 78-79. However, even this representation was untrue. Nexo's recent document production confirms that it took a fee of over one percent on his purchase and had taken substantially higher fees on his earlier transactions. SAC ¶¶ 78-83.

*Third*, Nexo actively concealed that it was taking secret profits at Plaintiff's expense. For example, on March 27, Hristov sent an internal email to Nexo's payments team stating the prices at which they acquired assets for Plaintiff and the profits they took on those transactions:

> We bought 75 BTC @ $54,878.23 = $4,115,867
>
> We are crediting the client with 74.441 BTC @ $55,289.81
>
> Profit for the OTC Desk - 0.55 BTC
>
> We are selling 481,878 NEXO tokens @ $2.55

We are crediting the client with 481,878 NEXO tokens @ $2.66

Profit for the OTC Desk - 1.007 BTC

Hedge - 22.3875 BTC @ $54,887

Total profit = 1.5657 BTC ≈ $86,000

SAC ¶ 64. Later that same day, Hristov emailed Plaintiff stating that the "OTC team did a great job and purchased the assets as it follows: 1. 74.441 BTC @$55,289.81 [and] 2. 481,878 NEXO Tokens @ $2.66." In order to conceal Nexo's secret profits on these transactions, Hristov lied to Plaintiff regarding the price at which it acquired BTC and NEXO. Hristov also lied to Plaintiff in representing that the OTC team had purchased NEXO Tokens when in fact it was selling those tokens and taking a massive undisclosed profit. SAC ¶¶ 65-67.

*Fourth*, these same emails from Hristov to Plaintiff also constitute partial representations that suppresses certain material facts: namely Nexo's secret profits.

### d)    Civil Theft (Sixth COA)

Plaintiff has also adequately pled a civil theft claim. To state a violation of California's statute prohibiting theft of property, the following three elements are required: (1) the property was stolen; (2) the defendant was in possession of it; (3) knowing it was stolen. *Kinect Renewable Sols. Ltd. Liab. Co. v. United Am. Transp.,* 2025 U.S. Dist. LEXIS 101318, at *9-10 (C.D. Cal. May 28, 2025) (citing *Hueso v. Select Portfolio Servicing, Inc.*, 527 F.Supp.3d 1210, 1229 (C.D. Cal. 2021).

Nexo induced Plaintiff to deposit his BTC and ETH into Nexo's Credit Line, and subsequently transfer millions of dollars' worth of digital assets to Nexo's OTC Desk based on Nexo's representations that it did not charge fees and would provide Plaintiff with OTC services "with some of the best rates on the market" and "institutional rates for amounts larger than $100,000." SAC ¶¶ 32, 52-93. Nexo thus induced Plaintiff into sending Nexo his property based on its false representations.

Nexo also took possession by theft, knowing it was stealing Plaintiff's property. For example, as discussed in more detail in section 4(b), Nexo advertised to Plaintiff that it did not charge any fees

for any services on its platform, including its OTC transactions or liquidation fees on Plaintiff's assets. SAC ¶¶ 52-83, 84-93. However, as discussed in Section 4(c), Nexo internally acknowledged that it lied to customers (including Plaintiff) about charging secret OTC fees and commissions and secretly charging above spot prices, while misleading customers into believing they were purchasing from third parties at better than market rates, while they were buying assets directly from Nexo at highly marked-up prices. SAC ¶¶ 80-83. Nexo additionally knew it would steal liquidation fees from its customers (including Plaintiff) by representing there were no hidden fees, or liquidation fees, when in fact, there were. SAC ¶¶ 83-94.

Nexo concealed the theft of Plaintiff's property by providing him false transaction confirmations which misrepresented the price at which Nexo acquired BTC and NEXO, and where those digital assets came from. SAC ¶¶ 64-79. And Nexo concealed the liquidation fees it took from Plaintiff as each subsequent liquidation left Plaintiff with less collateral than he would have had under Nexo's represented No-Fees policy, without ever telling Plaintiff these fees were charged. SAC ¶¶ 87-93. Nexo's thefts thus ultimately caused Plaintiff to lose millions of dollars' worth of digital assets through Nexo's inflated execution prices, undisclosed liquidation fees, and cascading liquidations. SAC ¶ 199.

### e)    Civil RICO (Seventh and Eighth COAs)

Nexo's conduct similarly violates the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(C)) ("RICO"). The elements of a civil RICO claim are: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's business or property. *Grimmet v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996).

Nexo regularly conducts business within a group of associated entities, founded and managed by Kantchev and Trenchev, and owned almost exclusively by Kantchev, for the purpose of maximizing profits by fraudulently concealing commissions, fees, and profits that it takes from its customers in digital asset transactions and customer loan liquidations. SAC ¶¶ 207-208(a-e) (defining Nexo, along with more than 20 persons, including Kantchev and Trenchev, as the Nexo Enterprise).

The Nexo Enterprise is systematically linked, and the entities within the Nexo Enterprise coordinate operations between them. SAC ¶¶ 210-211. For example, Nexo contracts with NDS EOOD to provide employees from its operation, including Hristiyan Hristov, who made fraudulent statements regarding OTC fees and liquidations to Nexo's customers, including Plaintiff. SAC ¶¶ 23-25, 94-118, 212.

As described in Section 4(a-d), Nexo has engaged in a pattern of racketeering activity, i.e., predicate acts. These predicate acts include the Nexo Enterprise's systematic scheme to fraudulently charge and conceal substantial fees facilitated by the use of U.S. Mail and wire. Through these means, the Nexo Enterprise advertised that it did not charge any hidden fees or commissions, including for OTC purchase, loans, and liquidations, when in truth, the Nexo Enterprise has secretly extracted at least tens of millions of dollars in secret fees from its customers from at least 2019 through at least 2022. SAC ¶¶ 52-93, 111-118, 218-222. Plaintiff is one of these customers that the Nexo Enterprise advertised its "ZeroFees" policy to, and subsequently extracted secret fees from, both in connection with the Nexo Enterprise's hidden OTC fees and hidden liquidation fees. *Id*.

Nexo's pattern of racketeering activity remains ongoing and open-ended, and threatens to continue indefinitely. Numerous schemes have also been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition. As a direct and proximate result of the Nexo Enterprise's pattern of racketeering activity, Plaintiff has suffered substantial damages.

### f)      Breach of Contract (Tenth COA)

In addition Nexo's frauds, thefts, and racketeering activity, Nexo has also breached its Cryptocurrency Purchase Agreement with Plaintiff. The elements for breach of contract are (1) the existence of the contract, (2) Plaintiff's performance or excuse for nonperformance, (3) Defendant's breach, and (4) the resulting damages to the Plaintiff. *Fuks v. Vanetik*, 2024 U.S. App. LEXIS 566, No. 22-55794, 2024 U.S. App. LEXIS 566, at *2 (9th Cir. Jan. 9, 2024).

On or about March 24, 2021, Plaintiff and Nexo entered into a written Cryptocurrency Purchase Agreement ("CPA"). SAC ¶¶ 13, 57, 251. The CPA provided, among other terms, that

Plaintiff could submit purchase orders for cryptocurrency to Nexo, and upon receiving the Purchase Order, Nexo "shall have ten minutes (the 'Review Period') to confirm such Purchase Order via email after which Review Period such Purchase Order shall be deemed to be rejected and expired." SAC ¶¶ 57-59, 252. The CPA also provided that Nexo was required to deliver the purchased cryptocurrencies to Plaintiff "by transfer of immediately available cryptocurrencies on the applicable Cryptocurrency Network." SAC ¶¶ 60, 253.

The CPA does not state that Nexo will charge any fees or take any profits in connection with fulfilling the Purchase Orders under the CPA. Nor did Nexo inform Plaintiff that it would charge any fees or take any profits from the purchases of digital assets. The CPA further provides that "upon the consummation of [the] purchase, [Plaintiff] will be vested with good and valid title such Counterparty Purchased Cryptocurrency free and clear of any and all Liens." SAC ¶ 255.

At all relevant times, Plaintiff performed his obligations under the CPA, including tendering the required funds and complying with all applicable terms and conditions for cryptocurrency purchases, or his conduct was excused by Nexo's conduct. For example, Plaintiff signed the CPA and subsequently provided millions of dollars of digital assets in exchange for BTC and NEXO tokens with instructions for each Purchase Order. SAC ¶¶ 57-79.

However, Nexo materially breached the express terms of the CPA by failing to timely execute Plaintiff's Purchase Orders by executing the orders days later, depriving Plaintiff of his benefit of the bargain. SAC ¶¶ 57-79, 257. Nexo further breached the CPA by charging Plaintiff undisclosed fees in the execution of the CPA. As discussed in Section 4(b-c), Plaintiff's Purchase Orders were fulfilled by Nexo with hidden mark-ups or spreads above the prevailing market price, imposing additional fees on each transaction without disclosure to Plaintiff. These additional charges were not authorized by, nor apparent from the terms of the CPA, and Nexo's imposition of those fees without transparency or agreement constituted a material breach of the CPA. Nexo further breached the CPA by liquidating the digital assets it sold to Plaintiff despite its promise to deliver them free from "any and all Liens."

As a direct and proximate result of Nexo's breaches of the CPA, Plaintiff has sustained significant damages. Nexo's undisclosed fees and untimely executions caused Plaintiff to receive less cryptocurrency than he should have obtained for the funds expended, and to miss opportunities to acquire assets at intended or favorable prices. This in turn diminished Plaintiff's available collateral on the Nexo Platform and increased his loan-to-value (LTV) ratio, heightening the risk of his loan account and ultimately leading to Plaintiff's liquidations in May and June 2021. Plaintiff suffered direct monetary losses resulting from Nexo's breaches.

Nexo additionally breached the implied covenant of good faith and fair dealing in the CPA. Nexo's conduct described above was arbitrary, dishonest, and bad-faith in its performance of the contract. Nexo's conduct thus deprived Plaintiff of the fruits of his bargain and violated the spirit of the CPA.

### g) Plaintiff's Claims are Timely

The additional claims asserted Plaintiff's SAC are timely because (1) they relate back to the filing of Plaintiff's original Complaint on February 27, 2023 and (2) are subject to the discovery rule.

**First,** under Rule 15(c)(1)(B), an amended pleading "relates back" to the date of the original complaint when it asserts a claim that arose out of "the conduct, transaction, or occurrence" set forth in the original pleading. The "relation back doctrine is to be liberally applied," and an amendment that "share[s] a common core of operative facts" with the original complaint will relate back. *ASARCO, LLC v. Union Pacific Railroad Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

Here, the new causes of action in the proposed SAC unquestionably arise from the same nucleus of facts alleged in the original Complaint. The proposed amendment does not introduce a "whole new transaction" or surprise attack; it merely amplifies Nexo's liability for the very conduct Plaintiff originally challenged. For example, one set of new claims concerns Nexo's undisclosed fees and secret profits on Plaintiff's OTC trades and liquidations—transactions that formed part of the original lawsuit and which Nexo was aware were in dispute. Likewise, Plaintiff seeks to add a fraud claim based on Nexo's false representation that its Token was "registered with the SEC," a statement

which already forms the basis for Plaintiff's securities fraud claim. Because the amendment targets the same dealings between Plaintiff and Nexo previously pled, Nexo has long been on notice of the core factual matters underlying the new claims.

The focus is on whether the defendant was alerted to the basic factual scenario, not whether the precise legal label or remedy was previously asserted. *Martell v. Trilogy, Ltd.*, 872 F.2d 322, 326 n.8 (9th Cir. 1989). Thus, where an initial complaint has put the defendant on notice of the transactions and wrongful conduct at issue, amendments expanding the plaintiff's legal theories or adding related claims will relate back under Rule 15(c). *Id.*

Here, Rule 15(c)(1)(B) is satisfied: the new causes of action arise out of the same "conduct, transaction, or occurrence" set out in the original Complaint. The amendment therefore relates back to the original filing date, rendering the new claims timely as a matter of law.

***Second,*** independently of relation back, the newly asserted claims are timely under the discovery rule. The "discovery rule" postpones a claim's accrual until the plaintiff actually discovers, or reasonably should have discovered, the facts giving rise to the claim. *Citimortgage, Inc. v. Wright*, 2017 U.S. Dist. LEXIS 224294, at *3-4 (C.D. Cal. Sep. 19, 2017). Here, the gravamen of the new claims is that Nexo defrauded Plaintiff by charging secret fees and actively concealed those fees from Plaintiff at the time of the transactions. The very nature of these claims demonstrates why Plaintiff did not discover them earlier: Nexo went to great lengths to hide the truth. Plaintiff thus discovered the factual basis for these new claims only recently, as a result of Nexo's court-ordered document productions in late August and September 2025.

## **CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that the Court grant leave to file the Second Amended Complaint.

Dated:  September 30, 2025

Respectfully submitted,


/s/ *Max Ambrose*

James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

MOTION FOR LEAVE TO AMEND FAC
Case No. 3:23-cv-00882-TSH