October 23, 2025

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:    *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
       DISCOVERY LETTER REGARDING PLAINTIFF'S REQUESTS FOR
       PRODUCTION SETS THREE AND FOUR

Dear Judge Hixson:

The Parties submit this letter setting forth their view as to whether the Court should order Nexo to answer produce documents in response to Plaintiff's RFPs 112-113, 176-178,184-186, 192, 201-203, 219, 230, 238-239, 247, and 250. The parties have met and conferred in good faith prior to filing this letter, including by Zoom meeting and the exchange of letters and emails.

**Attestation**

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below.


Dated: October 23, 2025                     TAYLOR-COPELAND LAW

                                            By: /s/ James Taylor-Copeland

                                            Attorneys for Plaintiff


Date: October 23, 2025                      BAKER & MCKENZIE LLP

                                            By: /s/ Ian S. Shelton

                                            Attorneys for Defendant


1

**PLAINTIFF'S POSITION**. Cress served RFPs Sets Three and Four on Nexo on April 15 and June 5, 2025. Nexo objected to producing documents in response to RFPs 112-113, 176-178, 184-186, 192, 201-203, 219, 230, 238-239, 247, and 250.[1] For most RFPs at issue, Nexo either objected entirely or stated that "no further documents will be produced," even though at the time it served these objections it had not produced a single document from any Court-ordered custodians. Nexo's objections rest almost entirely on relevance and proportionality and rely on the Court's prior Discovery Order (ECF 69) to justify withholding responsive materials.

After months of failed meet-and-confer efforts and Nexo's refusal to produce documents, Plaintiff sent its Joint Letter Brief insert on August 22, 2025. Despite promising to provide a response within seven days, Nexo responded belatedly on September 26 with limited and unhelpful compromises, followed by inconsistent and shifting positions on October 10, 20, and 21—often rescinding prior agreements and misrepresenting that it had produced documents when it had not. These tactics reflect bad faith, and Plaintiff respectfully requests that the Court compel production of responsive materials.

Nexo's claim that it need not provide highly relevant material because it has produced over 50,000 documents has no relation to the legal standard and also glosses over Nexo's failure to adhere to the Court's prior orders. The Court ordered, and Nexo agreed, to make a "substantially complete" production by August 31, 2025 (Dkt. 70 ¶11). Nexo missed that deadline and produced numerous critical communications in September. More significantly, Nexo continues to withhold key materials it has been ordered to produce. While those failures are not the subject of this Motion, Nexo cannot and should not be rewarded for its ongoing disregard of the discovery process.

**1. Exchange-Related RFPs**. Cress's RFPs seek information about Nexo's public sales of NEXO tokens relating to U.S. purchasers and on U.S. exchanges. RFPs 112-113 (documents and communications regarding sales to U.S. purchasers), 176-177 (documents and communications regarding Nexo's understanding of where exchanges and its customers are located), 178 (documents sufficient to show the exchanges NEXO is listed on), 192 (Nexo's policies and procedures for its exchange-partner Changelly), 201 (documents identifying the locations of counterparties), 202-203, 247 (documents identifying the exchanges Nexo sold NEXO on).

Nexo objected to this exchange-related information as irrelevant, overbroad, and not proportional, relying on this Court's ECF 69 Order denying broader requests for production. However, this Court's recent ECF 73 Discovery Order overruled Nexo's objections to refusing to produce discovery simply on the basis that it requested exchange-related information. ECF 73. Cress now seeks a set of narrow documents relating to Nexo's sales to U.S. purchasers, and documents sufficient to identify the contours of Nexo's public token sale.

Nexo's public token sales (particularly to U.S. exchanges or to U.S. purchasers) are directly relevant to the *Howey* analysis. *In re Ripple Labs Inc. Litig.*, 2024 U.S. Dist. LEXIS 109252, at *13, *23 (N.D. Cal. June 20, 2024) (exchange listings and exchange purchasers are relevant to elements of *Howey*); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 197-198 (S.D.N.Y. 2023) (direct and exchange sales are both relevant to *Howey* analysis of whether NEXO tokens are securities). Cress has uncovered evidence that Nexo sold NEXO on other exchanges that permit U.S. users—including Mercatox, Uniswap, Bitstamp, Hotbit, and Binance. Whether Nexo in fact

---

[1] The full text of the RFPs, Nexo's objections and responses, Nexo's final proposed compromises, and Plaintiff's final proposed compromises are attached as Plaintiff's **Exhibit 1**.

sold NEXO tokens to U.S. purchasers (through those exchanges or otherwise) is a critically relevant fact that goes to the heart of Nexo's defenses that its NEXO securities offering was compliant with Regulation D.

**2. Liquidation Relief Program-Related RFPs**. RFPs 184-186, 219, and 239 request narrow sets of documents and communications relating to Nexo's Liquidation Relief Program ("LRP"), which forms the basis for Cress's fraudulent inducement claim. FAC ¶¶ 115-123. RFPs 184 (communications regarding LRAs already produced by Nexo), 185 (communications regarding the LRAs Nexo provided to customers), 186 (documents and communications regarding Nexo's transfer of assets to customers pursuant to its LRP), 219 (documents sufficient to show the type and amount of assets recovered by LRP customers), and 239 (documents and communications regarding LRP complaints from 2020-2022).

Nexo refuses to produce any of these LRP related documents for non-U.S. customers. However, Nexo has no basis for refusing to produce information about whether it provided liquidation relief to non-U.S. customers. While this Court has ruled that some discovery relating to Nexo's securities offering be limited to U.S. purchasers, Cress's fraudulent inducement claim is a common law fraud claim. Whether non-U.S. customers had complaints regarding the LRP bears on the falsity of that representation, Nexo's knowledge of falsity, and Nexo's intent just as much as complaints from U.S. customers. *Price v. Synapse Grp., Inc.*, 2018 U.S. Dist. LEXIS 155637, at *22-23 (S.D. Cal. Sep. 12, 2018) ("Persisting in an allegedly deceptive business practice after receiving customer complaints could be evidence of intent to defraud...").

Moreover, it is not clear that Nexo can accurately differentiate between its U.S. and non-U.S. customers. Following its 2022 "exit" from the U.S. market, Nexo encouraged U.S. customers to self-identify as foreign nationals and its VIP Relationship Managers may have intentionally misidentified the nationality of its customers to allow them to continue doing business with them. For example, Nexo's records frequently and falsely list Mr. Cress as a resident of Iceland, although he has always solely been a resident of the U.S.

**3. Nexo's Liquidation Calculations.** RFPs 230 and 238 seek code and information about how Nexo performed its purportedly "automatic" liquidations of Cress's millions of dollars of digital assets. Nexo claims it liquidated Cress's funds using its automated EXCHANGER program. The code for this EXCHANGER is critical for understanding (a) whether this representation is accurate and (b) the calculation of Plaintiff's damages (i.e. whether Plaintiff would have been liquidated at all, but for Nexo's unlawful conduct).

Despite Nexo being ordered to produce documents and communications regarding all revenues and expenses associated with Plaintiff's orders and asset liquidations (RFPs 26, 27), and Nexo agreeing to produce "any internal financial metrics that Nexo collected in the regular course of business regarding Cress's account specifically" (in response to RFPs 28 and 29 seeking information about Cress's OTC transactions and liquidations), Nexo has not yet produced **any** records demonstrating it sold Plaintiff's collateral as Nexo claims (i.e., exchange or OTC transaction confirmations). Moreover, Nexo's internal records strongly suggest that it did not sell all of Plaintiff's assets as claimed. While some of its purported liquidations of Plaintiff's assets identify the sell vendor as "nexo_liquidator" others identify it as "nexo_fake." Nexo's proposed compromise would not allow Plaintiff to investigate the veracity of its contentions regarding the liquidation of Plaintiff's assets or analyze the propriety of those liquidations using Nexo's own system.

**4. Nexo's Efforts to Ensure NEXO Purchasers Were Not Underwriters**. RFP 250 requests documents and communications regarding Nexo's "efforts to verify that purchasers of NEXO Tokens were not statutory underwriters, including for the purchasers disclosed in Your response to Plaintiff's Interrogatory No. 3." (Nexo's Rog 3 response disclosed some of Nexo's direct sales to known U.S. counterparties). Nexo has limited its response to "sales of the NEXO Token in the United States." However, Nexo still maintains an obligation not to sell to underwriters outside the United States, where those underwriters then sell securities to U.S. purchasers without restriction. Thus, **all** of Nexo's sales to underwriters are relevant, regardless of whether they were to U.S. or non-U.S. underwriters. *See* 15 U.S.C.S. § 80a-2(a)(40) (defining an underwriter as "any person…" whether foreign or domestic); *SEC v. Telegram Grp.*, 448 F. Supp. 3d 352, 380-381 (S.D.N.Y. 2020) (finding Telegram failed to use reasonable care to ensure that the Initial Purchasers were not Underwriters when the initial purchasers bought Grams from Telegram, the issuer, with an intent to resell them for profit in the secondary market soon after launch of the TON blockchain); *SEC v. Platforms Wireless Int'l Corp.*, Nos. 07-56542, 09-55039, 2010 U.S. App. LEXIS 15328, at *18 (9th Cir. July 27, 2010) ("The definition of 'underwriter' in the Securities Act is expansive." It applies to "any person" in connection with the distribution of "any security."). Cress thus respectfully requests this Court order Nexo to produce documents and communications regarding Nexo's efforts to verify that NEXO purchasers were not statutory underwriters.

**NEXO'S POSITION.** Plaintiff's position ignores Nexo's substantial efforts to produce documents, the parties' prior agreement regarding search terms, and the asymmetrical nature of document production in this matter. At incredible burden and expense, Nexo has, to date, produced 53,593 documents consisting of over 231,564 pages. Consistent with the document production schedule in the parties' stipulation to modify the scheduling order (Dkt. 71), Nexo's August 29, 2025 production alone was 45,990 documents consisting of over 205,256 pages. In contrast, Cress has produced a paltry 844 documents in total, and he still refuses to produce the documents that are the subject of Nexo's pending letter brief regarding its own RFPs (Dkt. 77).

The parties engaged in lengthy negotiations to arrive at mutually acceptable (but still incredibly burdensome) search terms for Nexo's document review, applied to the 23 custodians and non-custodial sources. Cress explicitly approved each and every one of those search terms, with the parties not reaching agreement on all search terms until July 1, 2025. Nexo's document review and production over the summer was based on reviewing the documents that hit on the search terms that Cress selected. After the document hits on the review population were segregated, Nexo reviewed and produced responsive documents.

After initially receiving Cress's draft letter brief regarding his RFPs on August 22, Nexo attempted to moot or at least narrow the issues in dispute by producing over 45,000 more documents. After making that substantial production, Nexo attempted to engage with Cress to address his remaining concerns by providing explanations or proposed compromises in response to the evolving iterations of his letter brief. The parties were able to reach some compromises and eliminate certain RFPs. Despite those efforts, Cress's "final proposed compromise" as to the remaining RFPs is no compromise at all—he simply agrees to limit the RFPs to the 23 custodial and non-custodial sources previously ordered by the Court. The Court should adopt Nexo's final proposed compromises set forth in **Exhibit 1**. Cress's allegations of "bad faith" tactics are untrue and distract from the actual merits of this discovery dispute—the RFPs that remain in dispute are overbroad, unduly burdensome, and not proportional to the needs of the case.

**Sales of the NEXO Token to U.S. Purchasers (RFPs 112 and 113).** RFPs 112 and 113 broadly seek all documents concerning the offering or sale of the NEXO Token to U.S. purchasers. As set forth in **Exhibit 1**, Nexo has already produced responsive documents using Cress's agreed search terms applied to the agreed custodians. For those U.S. customers who directly purchased NEXO Tokens from Nexo, and who are identified in Nexo's interrogatory response, Nexo additionally proposes to produce documents sufficient to show the NEXO Token transactions associated with those customers. The Court should adopt Nexo's proposed compromise.

**Exchange-Related RFPs (RFPs 176-78, 192, 201-03, 247).** These RFPs address NEXO Token sales on crypto exchanges. The first group seeks all documents concerning Nexo's understanding of where crypto exchanges (RFP 176) and their customers (RFP 177) are located, identification of all crypto exchanges were the NEXO Token has been listed (regardless of whether Nexo sold on the exchange) (RFP 178), and the third-party exchange Changelly (RFP 192). Nexo stands on its objections to these RFPs as overbroad, unduly burdensome, and not proportional. In response to other RFPs, Nexo has already produced documents or articles regarding purchases of the NEXO Token on Changelly and the listing of the NEXO Token on other third-party exchanges. The Court should not compel further responses because it would ignore the parties' prior agreement on search terms and create a burdensome supplemental review that is not proportional.

The second group of exchange-related RFPs are incredibly overbroad. They seek documents sufficient to identify the domicile of the counterparty for any sale of the NEXO Token made by Nexo (RFP 201), the crypto exchange for any sale of the NEXO Token made by Nexo (RFP 202), and the crypto exchange for any provision of liquidity for NEXO Tokens (RFP 203). Nexo objected to these crypto exchange RFPs for the same reasons explained in its letter brief regarding Cress's crypto exchange Rog 12 (Dkt. 74). Nexo proposed tabling these RFPs until the Court provided guidance on Rog 12, but Cress refused. Consequently, Nexo proposes in **Exhibit 1** to produce documents responsive to RFP 247 (documents sufficient to show the crypto exchanges on which Nexo sold the NEXO Token from 2021-2022, which will address whether they are foreign) and stands on its objections to RFPs 201, 202, and 203, which are overbroad, unduly burdensome, and not proportional. For the reasons explained in the joint letter brief regarding Cress's Rog 12, any NEXO Token sales on foreign exchanges are not subject to U.S. securities laws, as this Court previously recognized (Dkt. 63 and 73), and any NEXO Token sales on exchanges before 2021 or after 2022 could not be part of the same "offering."

Alleged securities sales on foreign crypto exchanges, even when the purchaser resides in the U.S., are not subject to U.S. securities laws.[2] Additionally, any alleged "offering" of the NEXO Token to U.S. customers (including Cress) occurred in 2021-2022, and the SEC integration rule bars integration of "[a]ny [domestic] offering made more than 30 calendar days before the commencement of any other offering, or more than 30 calendar days after the termination or completion of any other offering." 17 C.F.R. § 2309.152(b)(1). The contention that NEXO Token sales might have occurred on any crypto exchanges before or after the alleged "offering" of the NEXO Token to U.S. customers in 2021-2022 is irrelevant to the Rule 501 safe harbor.

---

[2] *See Baylor v. Honda Motor Co., Ltd..*, No. 2:23-cv-00794-WLH-AGR, 2024 U.S. Dist. LEXIS 28082, at *12 (C.D. Cal. Jan. 19, 2024) ("a number of lower courts 'have rejected the argument that a transaction qualifies as a 'domestic transaction' under *Morrison* whenever the purchaser or seller resides in the United States, even if the transaction itself takes place entirely over a foreign exchange.'") (emphasis added); *In re UBS Sec. Litig.*, 2011 U.S. Dist. LEXIS 106274, at *25 (S.D.N.Y. Sep. 13, 2011) (holding that "foreign-squared claims" asserted by "United States investors who purchased stock on a foreign exchange" were barred by *Morrison*).

On their face, RFPs 201-203 seek granular, transaction-level information for the sale of the NEXO Token on any exchange in the world, and not limited in time. By limiting its production to documents sufficient to show the crypto exchanges on which Nexo sold the NEXO Token from 2021-2022, Nexo can demonstrate that the sales were on foreign exchanges and thus not subject to U.S. securities laws. Compelling production of RFPs 201-203 would contradict the Court's prior orders regarding extraterritorial transactions. Dkt. 63, 73.

**Liquidation Relief Program-Related RFPs**. RFPs 184-186, 219, and 239 are incredibly broad, seeking every document related to every Liquidation Relief Agreement ("LRA") that Nexo executed anywhere in the world, including with its non-U.S. customers. Cress first seeks all documents concerning LRAs with its U.S. customers identified by Nexo (RFP 184), which standing alone is unduly burdensome because it would call for production of transactional-level information for scores of non-party U.S. customers. But then Cress goes a step further, seeking all documents concerning LRAs with any customers in the world (RFP 185), all documents concerning transfers of assets pursuant to LRAs with any customers in the world (RFP 186), all documents concerning assets recovered pursuant to LRAs for any customers in the world (RFP 219), and all complaints about the LRP for any customers in the world (RFP 239). The breadth of these requests smacks of class action discovery. Nexo has already produced the LRAs executed by its U.S. customers. Cress is not entitled to granular transactional-level information regarding every LRA executed by every U.S. customer, and certainly not for every foreign customer. Nexo has also produced a large volume of LRA/LRP documents that hit on the agreed search terms applied to the agreed custodians. The fact that scores of other U.S. customers executed LRAs with Nexo is sufficient to rebut Cress's false contention that the program was "fraudulent." These RFPs seek mini-trials on Nexo's relationship and transactions with scores of non-party customers. Nexo stands on its objections to RFPs 185, 186, 219 and 239 as overbroad, unduly burdensome, and not proportional. The Court should adopt Nexo's proposed compromises for RFPs 184 and 239.

**Nexo's Liquidation Calculations.** RFP 230 demands production of Nexo's **source code** for its oracle / automatic liquidation programming. The Court should not compel production of Nexo's most sensitive trade secret; this is not a patent or copyright infringement case. Nexo's Crypto Credit General Terms and Conditions authorized the liquidation of Cress's collateral if he breached the required Loan-to-Value Ratio, which was set at 83.3%. Nexo has produced articles regarding its liquidation procedures. The parties can calculate whether the LTV was breached, and whether the 2021 liquidations were proper, based on Cress's already produced transaction history and publicly available market price data for the liquidated cryptocurrency. It is not proportional to order the production of highly-sensitive source code when the disputed issue (here, breach of the LTV ratio) can be addressed by other evidence. RFP 238 seeks "[a]ll Documents and Communications Concerning how You calculated LTV for Your customers in 2021." Nexo's proposed compromise is the following: "Nexo will not produce source code. Nexo will produce documents sufficient to substantiate Nexo's response to Interrogatory No. 7 regarding how LTV was calculated." Nexo's compromise position is reasonable and proportional.

**Nexo's Efforts to Ensure NEXO Purchasers Were Not Underwriters**. RFP 250 requests "[a]ll Documents and Communications Concerning Your efforts to verify that purchasers of NEXO Tokens were not statutory underwriters," which is a back-door method of obtaining discovery regarding Nexo's foreign sales of the NEXO Token. Nexo's proposed compromise is that "Nexo will produce documents sufficient to show Nexo's efforts to verify that the U.S. customers to whom it directly sold NEXO Tokens were not statutory underwriters." That is a proper limitation.