Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN CRESS,<br><br>                     Plaintiff,<br><br>          v.<br><br>NEXO CAPITAL INC.,<br><br>                     Defendant. | Case No. 3:23-cv-00882-TSH<br><br>**DEMAND FOR JURY TRIAL**<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff John Cress ("Plaintiff" or "Cress") alleges the following against Defendant Nexo Capital, Inc. ("Defendant" or "Nexo"), based on personal knowledge, the investigation of counsel, and information and belief.  Plaintiff believes that reasonable discovery will identify additional evidence for the allegations set forth herein.

## INTRODUCTION

1.      Plaintiff brings this action against international crypto-lender Nexo to seek redress for the harm resulting from Nexo's fraudulent inducement of him to take out loans collateralized by millions of dollars in digital assets, which were ultimately sold ("liquidated") by Nexo.

2.      On September 26, 2022, the California Commissioner of Financial Protection and Innovation (the "Commissioner") found that Defendant Nexo Capital Inc., as well as the wider Nexo Group of corporate entities, had made unregistered securities offerings in the form of accounts through which Nexo customers earn interest on their deposited digital assets ("Earn Account Securities"), in violation of California law, and ordered Nexo to cease and desist from offering such accounts.[1] Specifically, the Commissioner found that as of July 31, 2022, over 18,000 California residents have accounts with Nexo that earn interest, which collectively hold investments totaling at least $174,800,000.

3.      Plaintiff is one of those California residents who had a Nexo interest-bearing account. Indeed, Plaintiff moved his substantial digital assets to Nexo so that he could passively earn interest. But Nexo also provides a related service—allowing customers to borrow cash against their deposited digital assets, which it then liquidates if the loan-to-value ratio ("LTV") of the customer's account becomes too high.

4.      To induce Plaintiff to borrow against his deposited digital assets and invest in its own complex financial products rather than just earn interest on his own digital assets, Nexo made false promises to Plaintiff regarding its services to "VIP" customers, which Plaintiff relied upon in deciding

---

[1] State of California, Business, Consumer Services and Housing Agency, Department of Financial Protection and Innovation, DESIST AND REFRAIN ORDER, (Sept. 26, 2022), https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/09/D-R-Nexo-Group.pdf.

SECOND AMENDED COMPLAINT

to borrow against, and thus put at risk of liquidation, his substantial digital asset holdings.  Plaintiff ultimately suffered millions of dollars in losses because of those misrepresentations when he was liquidated of substantially all his digital assets.

5.    Further, finance lenders such as Nexo must be licensed to make loans under California law.  On information and belief, Nexo made these loans to Plaintiff while it was unlicensed, in violation of California law.

6.    On January 19, 2023, Nexo consented to the entry of a Cease and Desist Order by the U.S. Securities and Exchange Commission ("SEC").  Like the California Commissioner, the SEC concluded that Nexo had made unregistered securities offerings in the form of Earn Account Securities through which Nexo customers earn interest on their deposited digital assets, in violation of the Securities Act of 1933 ("Securities Act"), and ordered Nexo to cease and desist from offering such accounts.

7.    Nexo has had legal troubles outside of the United States too.  In January 2023, Bulgarian prosecutors launched an investigation into Nexo's alleged illegal activities, raiding more than 15 sites in the Capital Sofia in an operation involving over 300 law enforcement officers. Although Trenchev was elected to the Bulgarian parliament in 2014, the Bulgarian government has since launched "a pre-trial investigation aimed at neutralizing [] illegal criminal activity of crypto lender Nexo."[2]  The investigation is targeting Nexo for organized crime, tax crimes, money laundering, banking activity without a license, and computer fraud.

**PARTIES**

8.    Plaintiff John Cress is a resident of San Francisco, California.

9.    Defendant Nexo Capital Inc. ("Nexo Capital") is a Cayman Islands corporation, with the address Two Artillery, 161 Shedden Road, 2nd Floor, George Town, P.O. Box 799, Grand Cayman

---

[2] Reuters, *Bulgaria launches probe of crypto lender Nexo, raids sites*, REUTERS, (Jan. 12, 2023, 3:59 AM) https://www.reuters.com/business/finance/bulgaria-launches-probe-crypto-lender-nexo-raids-sites-2023-01-12/; Jamie Crawley, *Crypto Lender Nexo Targeted in Bulgaria Probe Into Alleged Money Laundering, Tax Violations*, COINDESK, Jan. 12, 2023, 1:16 PM), (https://www.coindesk.com/business/2023/01/12/nexo-subject-to-investigation-in-bulgaria-over-alleged-money-laundering-tax-offenses/.

KY KY1-1103, that has its principal place of business and headquarters in London, England. Nexo Capital operates Nexo's website. On information and belief, Nexo Capital is the Nexo entity that issued credit to Plaintiff.

**JURISDICTION AND VENUE**

10. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiff and Defendant are citizens of different states or countries.

11. This Court has personal jurisdiction over Defendant, because for purposes of inducing Plaintiff to take out loans, Defendant solicited Plaintiff through substantial contacts with California; and because Plaintiff's claims arise out of the business that Defendant conducted in California, and the substantial contacts they maintained with California.

12. But for Nexo's advertising made available in California, Plaintiff would not have used Nexo's services and would not have suffered the losses he did. Plaintiff's use of Nexo's services did not and do not result from Nexo's random, fortuitous, or attenuated contacts with the state, or from his unilateral activity.

13. Defendant signed a "Cryptocurrency Purchase Agreement" with Plaintiff. The Agreement was sent to Plaintiff in California for signature through DocuSign.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because, as explained above, a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

**FACTUAL ALLEGATIONS**

**A.    Background**

**1.    Nexo And Crypto-Lending**

15. Since April 2018, Nexo has maintained and operated a website through which customers can use their digital assets as collateral, held in their "Credit Line Wallet," to borrow fiat currency, such as US Dollars. Beginning in October 2020, Nexo also offered customers interest-bearing accounts paying interest rates as high as 16% on deposited digital assets through a "Savings

Wallet," which also serves as back up collateral. Nexo describes itself as "the world's largest and most trusted crypto lender."

16.    A customer can borrow as much cash as they want from Nexo as long as they maintain a particular LTV ratio—*i.e.* the ratio between the amount of cash borrowed and the value of the collateral held in the customer's Credit Line Wallet. The value of that collateral fluctuates with the price of the digital assets held as collateral.

17.    Accordingly, a customer sometimes must stake more digital assets or pay back on its loan to maintain the requisite LTV ratio. If a customer's LTV ratio rises above a certain threshold, to bring the LTV ratio back in line Nexo will (1) transfer assets from the Savings Wallet to the Credit Line Wallet and/or (2) automatically sell ("liquidate") the collateral. These sales may result in the liquidation of all a customer's digital assets held in the Credit Line Wallet and Savings Wallet.

18.    Nexo also allows customers to use that borrowed fiat currency to purchase additional digital assets, which in turn provide additional collateral for the loan. Through this mechanism, Nexo is in actuality selling customers a complex leveraged long on their basket of digital assets.

19.    Leveraged trading, which is also known as margin trading, allows customers to use borrowed capital to make trades and thus provides them with additional exposure to the digital assets comprising their position. For example, a customer trading with 10x leverage could take on a $10,000 position using only $1,000 as collateral. Leveraged trading can be extremely high risk, particularly in the volatile crypto market. Generally, the higher the leverage, the higher the risks of getting liquidated.

### 2.    Plaintiff's Investment in Digital Assets

20.    Plaintiff began purchasing Bitcoin ("BTC") in 2014 on Coinbase—a prominent U.S.-based crypto-currency exchange. Plaintiff began purchasing Ether ("ETH") in 2017—also on Coinbase.

21.    In March 2021, Plaintiff decided to transfer his accumulated BTC and ETH to Nexo to earn passive returns on his assets through Nexo's interest-bearing Earn Account Securities. Specifically, on March 3, 2021, Plaintiff began a series of deposits to his Nexo Savings Wallet of 250.33 BTC and 250 ETH, to earn interest on his digital assets.

SECOND AMENDED COMPLAINT

22.    At the time, Plaintiff also considered engaging in borrowing using those assets as collateral, but was undecided about whether to risk his assets through borrowing, given the possibility of a "flash crash" scenario in which the value of his crypto-collateral would drop so far that he would be liquidated.

**B.    Nexo Solicited Plaintiff to Borrow Against his Digital Assets**

23.    On March 15, 2021, Nexo employee Hristiyan Hristov ("Hristov") contacted Plaintiff and stated that Plaintiff's account had grown to the point that he was eligible for Nexo's "VIP Relationship Program." Hristov also informed Plaintiff that he would be Plaintiff's "dedicated relationship manager." At that point, Plaintiff had not borrowed on Nexo's platform or decided to pursue borrowing on Nexo's platform, and he did not respond to Hristov.

24.    On March 17, however, Hristov again reached out to Plaintiff, advertising the benefits of the VIP Program and attaching a brochure produced by Nexo describing the program to, as Hristov put it, "spark your interest."

25.    Plaintiff responded that he was feeling "less comfortable borrowing" and "more nervous borrowing" given the high prices of BTC, which he explained to Hristov increased the likelihood of a large enough drop in BTC price such that he could be liquidated of his holdings.

26.    But Plaintiff's fears were allayed by the VIP brochure that Nexo had sent him. Nexo promised that as a participant in the VIP Program, Plaintiff (1) would "get a response from the support team in 2 hours, 24/7," receive a "dedicated relationship manager," "direct phone number availability," and (2) could utilize certain "OTC services," which included, among other things, Nexo's "[l]iquidation relief program," which Nexo specifically represented was a "service in the event of a market crash to recover your liquidated assets . . . ." Plaintiff reasonably understood that these representations to mean that, as a VIP, (1) he would receive prompt responses from a dedicated relationship manager, at any time, and (2) in the event of a market crash that his digital assets would receive protection from liquidation.

27.    On March 23, Plaintiff requested that Hristov send him documentation of the terms of the loan he would be taking out. Hristov did not send any documentation.

28.     In that same e-mail exchange, Plaintiff also asked how much interest the Bitcoin he posted as collateral would "be earning and if all the interest was applied to the monthly loan payment, how short would the payments be and is that ok?"  Hristov responded: "You will be earning 5% annually on the Bitcoin which you used as collateral.  Keep in mind that the interest rate will be paid out daily in BTC, so you will benefit from the potential upside in the Bitcoin price."  Thus, Hristov represented that Plaintiff would continue earning interest on his digital assets, as he had been before, even after posting those assets as collateral for his loan.

**C.     Plaintiff Relied on Nexo's Representations in Borrowing Against his Digital Assets**

29.     Plaintiff relied upon Nexo's representations about its responsiveness and the Liquidation Relief Program in deciding whether to take out collateralized loans from Nexo because the digital asset market is highly volatile, and a loan collateralized by such volatile assets entails substantial risk.  Both the responsiveness of customer service to trading requests, for example, and protection from liquidation in the event of sudden volatility in the market were critical to Plaintiff's decision to take out collateralized loans, because the existence of those two benefits would eliminate the risk of losing his digital assets to liquidation in a "flash crash" scenario.

30.     Plaintiff also relied upon Nexo's representation that his collateral would continue earning interest, because it altered the economic cost of borrowing.  The economic benefit of continuing to earn interest on his collateral, for example, would offset any interest that he would pay on his loans, which Plaintiff understood to be a substantial benefit.  Indeed, without these assurances and representations by Hristov, Plaintiff would not have borrowed from Nexo.

31.     Plaintiff's reliance was justified.  *First*, Nexo's "VIP" and Liquidation Relief programs were not publicly advertised at the time, and information regarding their terms was uniquely within the possession of Nexo.  *Second*, Nexo concealed the true nature of the Liquidation Relief Program from Plaintiff.  For example, on May 23, 2021, Plaintiff emailed Hristov seeking an explanation of exactly how the Liquidation Relief Program would operate to protect his assets in a "[f]lash crash scenario." Plaintiff received no response.  *Third*, Plaintiff asked for Nexo to send him loan terms so

that he could verify relevant information, including interest rates on his collateral and loans. But those terms were not forthcoming.

32. As Hristov had predicted, and Nexo intended, Nexo's VIP Program brochure and Hristov's other representations *did* "spark" Plaintiff's interest in borrowing, and on March 26, in reliance on Nexo's representations regarding the VIP Program and its borrowing services, Plaintiff took out an approximately $5.4 million loan collateralized by his digital assets. Plaintiff then borrowed approximately $7.45 million more through loans on March 30, April 14, and April 30. As a result of this borrowing that Nexo had induced, Plaintiff proceeded to suffer the loss of substantially all of the digital assets he deposited onto Nexo's platform.

**D.    Nexo's Unlicensed Lending Activity**

33. Nexo Capital operates in California as a finance lender, including with respect to Plaintiff. Nexo Capital does not hold, and has never held, a license in California, from the California Department of Business Oversight, to operate as a finance lender within the state. Nexo's lending, including with respect to Plaintiff, was accordingly unlawful.

**E.    Nexo Requires Plaintiff to Purchase its Highly Volatile NEXO Token**

34. Nexo advertises borrowing interest rates as low as zero percent. However, in order to get more favorable interest rates on both borrowing and Earn Account Securities, Nexo requires customers, including Plaintiff, to purchase its NEXO Tokens—which Nexo concedes are securities under U.S. law—and maintain ten percent of their portfolio balance in NEXO Token securities.

35. The difference in rates is substantial. If a Nexo customer does not acquire any NEXO Tokens their borrowing rate is 13.9%. However, if a customer maintains 10% of their portfolio balance in NEXO Tokens, their borrowing rate is less than half that at 5.9%.

36. When Plaintiff asked Hristov to lay out various possibilities for purchasing additional Bitcoin with a Nexo loan secured by his digital assets, Hristov responded by stating "I have prepared three scenarios of purchasing Bitcoin through Nexo's Credit line. In all of them, I have added the amount of NEXO Tokens (in BTC value) you would need for the Platinum membership." Each of the scenarios called for Plaintiff to purchase 25 Bitcoin worth of NEXO Tokens to obtain NEXO Platinum

and thus qualify for Nexo's lower 5.9% borrowing rates.  However, despite requiring Plaintiff to purchase 25 Bitcoin worth of NEXO Tokens, the additional cost of the NEXO Tokens was not reflected in the LTV and liquidation numbers provided by Hristov, thus understating the riskiness of the loans and obscuring from Plaintiff that both the LTV and liquidation threshold would be dependent on the price of NEXO Tokens as well as the price of BTC.

37.    Plaintiff had never previously considered purchasing NEXO Tokens and instead made clear that he was seeking to use Nexo's lending solely to increase his BTC holdings, indicating to Hristov that he would like to move forward with a purchase of 100 Bitcoin for a 40% LTV ratio.

38.    However, Hristov responded by once again directing Plaintiff to purchase NEXO Tokens, stating, "[a]t the moment, without the additional collateral, you can withdraw up to $4M loan which will enable you to purchase ~ 50 BTC and 25 BTC worth of NEXO Tokens."  Simply put, rather than allowing Plaintiff to purchase Bitcoin as he planned, Nexo would require Plaintiff to purchase a significant amount of NEXO tokens in order to obtain its advertised interest rates.

39.    Hristov allayed Plaintiff's concerns by representing that "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors."  This statement was untrue as Nexo has never registered the NEXO Token with the SEC.  While Nexo Capital did file a Form D Notice of Exempt Offering of Securities with the SEC in 2018, that Notice indicated that its token offering would be complete within a year, and in any event does not constitute registration with the SEC. As detailed in Section H.4, Nexo knew that the Token was not registered with the SEC, but nevertheless marketed it as a registered security to induce Plaintiff and other investors to buy the Token.  In addition, as detailed in Section I, Nexo's offer and sale of the NEXO Token to Plaintiff did not qualify for any exemption to registration.

40.    Based on this representation and Nexo's requirement that Plaintiff purchase the NEXO Tokens to obtain favorable borrowing rates, Plaintiff proceeded to borrow $5.4 million to purchase 75 Bitcoin and 25 Bitcoin worth of NEXO Tokens, whereas Plaintiff had initially intended to use the full loan amount to purchase 100 Bitcoin.

41.     On or about March 30, 2021, Plaintiff emailed Hristov indicating that he would like to use Nexo's "credit line to purchase 50 or 75 more bitcoins."  Hristov responded that he would "be happy to help you facilitate a new deal. I am proposing the following parameters: 1. Buy 50 BTC @ $58,000 = ~$2,900,000 executed again in the next 24 hours; 2. Buy 20 BTC = ~$1,165,000 worth of NEXO Tokens to get to the Platinum tier (10% of total portfolio after the new purchases)."

42.     Stated otherwise, in order to continue receiving a favorable borrowing rate from Nexo, Plaintiff would have to convert not only 10% of the assets he deposited on Nexo to the NEXO Token, but also 10% of all assets purchased with loans obtained from Nexo.

43.     This fact had not been disclosed to Plaintiff previously and contradicted Hristov's initial recommendation that Plaintiff purchase NEXO Tokens with 10% of Plaintiff's deposited collateral (25 of 250 Bitcoin).  However, as Plaintiff's assets were already tied up as collateral on the platform, he had little choice but to accept Nexo's requirement that he purchase even more NEXO Tokens in order to continue receiving a favorable interest rate.

44.     By forcing Plaintiff to convert a significant amount of his holdings to its own highly volatile security token, Nexo dramatically increased the likelihood that Plaintiff would be liquidated. Rather than Plaintiff's position being secured by just Bitcoin—which is significantly less volatile than the NEXO Token—Plaintiff's position was secured by a basket of Bitcoin and the NEXO Token security.  As a result, when the crypto market experienced downside volatility, the value of Plaintiff's collateral decreased more sharply than it would have if he had been holding only Bitcoin.  This in turn increased Plaintiff's LTV more rapidly, resulting in the liquidation of Plaintiff's assets.

45.     Nexo compounded this effect by choosing to liquidate Plaintiff's most stable assets (USDC and Bitcoin) first when his LTV rose above Nexo's liquidation threshold.  The result of each liquidation was to make Nexo's own security token a larger and larger portion of Plaintiff's holdings thus further increasing the volatility of his collateral's value and greatly increasing the likelihood of future liquidations.

46.     The economic reality of these related transactions is that Nexo was selling Plaintiff a complex and highly risky leveraged long of a bundle of digital assets, including its NEXO Token

security (the "Leveraged Investment Instrument").  If the value of the bundle of assets underlying the Leveraged Investment Instrument increased, so too would the value of the Leveraged Investment Instrument.  However, if the value of those assets decreased, the value of the Leveraged Investment Instrument would decrease sharply.

47.    The success or failure of the Leveraged Investment Instrument was thus dependent in large part on the performance of the underlying NEXO Token security.  In fact, Nexo acknowledged that Plaintiff's "liquidation price . . . would depend on the movement of the different assets in your account."

48.    Due to its dependence on the success of the NEXO Token security the whole Leveraged Investment Instrument offered and sold by Nexo to Plaintiff itself constituted a security under U.S. and California law.

49.    Ultimately, the poor performance of the NEXO Token contributed substantially to the decrease in the value of Plaintiff's collateral and thus to the liquidation of Plaintiff's digital assets. The losses Plaintiff sustained as a result of the poor performance of the NEXO Token security were thus not limited to the diminishment of the value of the NEXO Token itself, but rather included the entirety of Plaintiff's digital assets held on Nexo.

50.    Plaintiff purchased the NEXO Token security from Nexo at prices between $2.51 and $3.87 per token.  By May 23, 2021, the price of the NEXO Token securities sank to $1.47 causing the first partial liquidation of Plaintiff's digital assets. They then recovered somewhat before plunging once again on June 21 and 22 to $1.16, resulting in the liquidation of nearly all of Plaintiff's remaining digital assets.

51.    The true nature of Nexo's Leveraged Investment Instrument was laid bare only after Nexo liquidated all of Plaintiff's other digital assets, leaving Plaintiff holding only the NEXO Token securities after liquidating millions of dollars' worth of Plaintiff's more stable USDC, BTC, and ETH holdings.

1

**F.    Nexo's "OTC Trading Team" Is a Mirage**

2      52.    To add insult to injury, Nexo's "exclusive OTC services" which promised "some of the

3    best rates on the market" was illusory.  Each time Plaintiff sought to execute the purchase of substantial

4    amounts of Bitcoin or Ether, Nexo took days to do so and provided Plaintiff execution prices far higher

5    than those available at the time Plaintiff placed the orders. These poor execution prices increased

6    Plaintiff's LTV and thus contributed to the eventual liquidation of Plaintiff's holdings as described in

7    Section G below, which Nexo also profited from.

8      53.    Throughout 2020 and early 2021, Nexo publicly advertised that it did not charge any

9    fees for any services on its platform, including transactions. For example,

10          a.    On or about March 15, 2020, Nexo posted on its blog: "No fees: Banks also tend to

11                charge all sorts of fees for their services, whereas Nexo adheres to a #ZeroFees policy.

12                There are no additional costs associated with our services."

13          b.    On or about June 24, 2020, Nexo posted on its blog: "No minimum contribution

14                requirements and transactions at #ZeroFees."

15          c.    On or about February 19, 2021, Nexo posted on its blog: "Under our #ZeroFees policy

16                you can make unlimited free-of-charge fiat withdrawals, crypto and fiat transfers into

17                your Nexo Wallet, and credit line withdrawals. Nexo does not charge any credit line,

18                origination, forex, and exchange fees."

19          d.    In March 2021, Nexo's customer account page advertised "no hidden fees."

20          e.    Nexo's Whitepaper also advertises "No Hidden Fees."

21      54.    Plaintiff relied upon Nexo's representations regarding its OTC Desk and its zero-fee

22    policy in choosing to utilize Nexo's OTC Desk to purchase millions of dollars in digital assets

23    collateralized by Plaintiff's BTC and ETH.

24      55.    In a March 26, 2021 Ask Me Anything with Nexo's CEO Trenchev, a suspicious

25    customer asked Trenchev, "[w]hy does the Nexo Exchange work with a hidden fee rather than being

26    open about it and will this change in the future?" Trenchev doubled down replying: "There is no

27

28

concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make."

56.     However, Nexo's representations that it did not charge fees in connection with cryptocurrency transactions was also false.

57.     On or about March 24, 2021, Plaintiff and Nexo executed a Cryptocurrency Purchase Agreement ("CPA"), which provided that Plaintiff could "submit a Purchase Order to Nexo" and Nexo "shall have ten minutes (the 'Review Period') to confirm such Purchase Order via email after which Review Period such Purchase Order shall be deemed to be rejected and expired."

58.     The CPA provided that: "Promptly following confirmation of each Purchase Order in accordance with Section 1.1 (i) if Counterparty [Cress] is purchasing Counterparty Purchased Cryptocurrency from Nexo,  then Counterparty shall deliver . . . the Counterparty Purchase Price  to Nexo by transfer of immediately available funds or cryptocurrencies . . ." *Id.* at Section 1.2(b).

59.     Under the CPA, "Counterparty Purchased Cryptocurrency " shall mean the number and type of cryptocurrency Counterparty is obligated to purchase from Nexo pursuant to a Purchase Order." And "Counterparty Purchase Price" shall mean the price per applicable cryptocurrency set forth in a Purchase Order multiplied by the number of Counterparty Purchased Cryptocurrency set forth in such Purchase Order.

60.     The CPA further provides that: "Promptly following payment of the Counterparty Purchase Price . . . , then Nexo shall deliver . . . the Counterparty Purchased Cryptocurrency to Counterparty by transfer of immediately available cryptocurrencies on the applicable Cryptocurrency Network . . ." *Id.* at Section 1.2(c).

61.     The CPA does not state that Nexo will charge any fees or take any profits in connection with fulfilling Purchase Orders under the CPA. Nor did Nexo inform Plaintiff that it would charge any fees or take any profits from his purchases of digital assets.

62.     On March 26, 2021 at 4:52 UTC, Plaintiff emailed Hristiyan, "I signed the purchase agreement and most of my BTC is on Nexo now.  All my bitcoin will be there less than two hours

from now. Can you call me now? We can go through any final steps and start purchasing bitcoin now at prices below $54,000 and I want to buy Nexo fast before it keeps rebounding."

63.     Hristov responded that he was "finalizing some internal stuff regarding [Plaintiff's] loan and OTC deal," and would call him. At 19:46 UTC, Hristov emailed Cress: "Please send the $5,400,000 USDT for the purchase of 75 BTC and the rest in NEXO Tokens to Nexo's OTC desk wallet - 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7. At 20:09 UTC, Cress transferred $5,400,000 USDT to the wallet identified by Hristov.

64.     Despite Plaintiff's clear instructions, Nexo apparently did not execute his orders until the following day. Late on March 27, Hristov sent an internal email to Nexo's payments team stating:

> We bought 75 BTC @ $54,878.23 = $4,115,867
>
> We are crediting the client with 74.441 BTC @ $55,289.81
>
> Profit for the OTC Desk - 0.55 BTC
>
> We are selling 481,878 NEXO tokens @ $2.55
>
> We are crediting the client with 481,878 NEXO tokens @ $2.66
>
> Profit for the OTC Desk - 1.007 BTC
>
> Hedge - 22.3875 BTC @ $54,887
>
> Total profit = 1.5657 BTC ≈ $86,000

65.     In addition to the profits retained by the OTC Desk, Nexo's records reflect that it sold him the NEXO Token at a 134.3% markup and took an additional $680,627 profit on the transaction.

66.     Nexo had never disclosed to Plaintiff that it would take these substantial profits on his asset purchases. Later that same day, Hristov emailed Plaintiff stating that the "OTC team did a great job and purchased the assets as it follows: 1. 74.441 BTC @$55,289.81 [and] 2. 481,878 NEXO Tokens @ $2.66." In order to conceal Nexo's secret profits on these transactions, Hristov lied to Plaintiff regarding the price at which it acquired BTC and NEXO. Hristov also lied to Plaintiff in representing that the OTC team had purchased NEXO Tokens when in fact it was selling those tokens itself and taking a massive undisclosed profit.

67.    Nexo's "OTC team" both provided these assets to Cress at a significantly higher price than Plaintiff could have acquired them himself using a retail exchange and took substantial undisclosed profits on these transactions at Plaintiff's expense.

68.    Similarly on March 30, 2021, at 18:25 UTC, Plaintiff sent $4,300,000 USDT to Nexo's OTC desk to purchase 50 Bitcoin and 20 Bitcoin worth of NEXO Tokens.

69.    Plaintiff sent a contemporaneous confirmation email regarding this purchase.

70.    However, Plaintiff had not received any confirmation from Nexo by the next day.  He thus followed up, writing, "I was expecting an email from you this morning with an update on the OTC desk order execution confirmation.  A whole day has gone by now gone by.  Also the price of bitcoin just rose from 57,400 to 59,400 now, so I'm expecting the order fulfilled yesterday close to $57,400.  I don't have any emails from you or any from Nexo in general.  If you look at my transactions history, I sent $4,300,000 to the address you gave me, but I haven't heard back with any confirmation or any update and it's been 24 hours and bitcoin has moved higher by $2,000.  This is not good."

71.    Hristov did not respond for another 12 hours, and when he did he "confirm[ed] that we have received the funds and executing the Bitcoin purchase as we agreed – Time waited average execution – 24 hours.  Approximately six hours later Hristov stated that the "OTC has executed the deal with the following parameters: 1. 530,190 NEXO Tokens @ $2.829 [and] 2. 47.3227 BTC @ $59,197."  Once again, these prices were significantly higher than those at which Plaintiff could have acquired these assets on a retail exchange.  In addition, despite Hristov's claim that the Bitcoin execution price was based on a time weighted average during the 24 hours following Plaintiff's order, the $59,197 per Bitcoin price was significantly higher than the time weighted average price during that time. Hristov's representation that the OTC desk was purchasing these assets from third parties using a time weighted average execution over 24 hours was simply false.

72.    Once again, Nexo sold Plaintiff its own NEXO Token at an astronomical 134.4% markup, taking an undisclosed profit of $817,243.

73.     When Plaintiff made an additional Bitcoin purchase on April 14 and an Ethereum purchase on May 1, Nexo once again provided execution prices that were significantly higher than the time weighted average price during the 24 hours following Plaintiff's order.

74.     On April 14, 2021 at 16:36 UTC, Plaintiff sent $2,150,000 USDT to Nexo's OTC desk to purchase Bitcoin and bring his total BTC holdings to 400.  At 18:38 UTC, Hristov confirmed receipt of the funds and stated that Nexo would proceed to purchase $350,000 worth of NEXO Tokens immediately and start a 24-hour TWAP purchase of $1,800,000 worth of BTC.

75.     Two days later, on April 16, Hristov emailed Plaintiff stating "I have some great news. The team has finished with the execution last night. We purchased the following assets: 28.3780 BTC @ $63,426; [and] 91,715 NEXO Tokens @ $3.816. This was a lie. Nexo's records show that it acquired the NEXO Token for $1.27 and resold it to Plaintiff at a 184.1% markup, taking an undisclosed $214,508 profit.

76.     But Nexo did not stop there. Seeking to further take advantage of Plaintiff, Nexo took an additional $102,125 undisclosed "portfolio booster" profit on the April 14 transaction. Nexo generally marketed portfolio boosters to its customers as a way for customers to use their existing collateral to increase their leverage and "boost" their portfolio while taking on additional risk of liquidation, thus raising the customer's LTV. After Plaintiff took out his loans with Nexo, Plaintiff never once discussed a portfolio booster with Nexo, let alone assented to one. However, Nexo's internal records show that on April 14, 2021, Nexo unilaterally took $102,125 from what should have been deposited as Plaintiff's loan collateral as part of his April 14 OTC transaction. Nexo thus stole $102,125 of Plaintiff's collateral as part of the April 14 transaction, increasing the riskiness of his loan, and increasing the chance his loans are liquidated—without ever telling him—all while extracting more than one hundred thousand dollars of undisclosed profits from Plaintiff in the process.

77.     On May 2, 2021 at 5:57 UTC, Plaintiff sent $1,000,000 USDT to Nexo's OTC desk to purchase ETH. On May 3, Nexo stated that the execution took place and 312.14868 ETH would be added to Plaintiff's account. Plaintiff asked Nexo to detail the total amount that was spent and the price per token because "[i]f I'm calculating correctly, I sent $1,000,000 and if that only purchased

312 ETH, that means the price was $3,205 . . . Those numbers seem impossible because ETH never reached a price of $3,205. I can't be paying more than a price where ETH ever traded."

78.    Nexo responded and informed Plaintiff that the OTC purchase took place around 11:30 UTC on May 3, and that 312.1487 ETH were bought at 3203.6 USDT per unit. Nexo states that this cost included "the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC desk charged for the transaction which is estimated around ~0.5% as well." Nexo had never previously informed Plaintiff of any fees associated with purchases through the OTC desk. Moreover, even this admission still understated Nexo's fees and falsely represented that some fees were charged by another OTC desk.

79.    In fact, Nexo's internal emails state that the OTC desk took a profit of 8,000 USDT and .7513 ETH. The internal email from Octavian Dinca reflects that Nexo purchased the ETH for $3,171.57, but provided it to the "customer" at $3,203.60.

80.    Nexo internally recognized that its OTC Desk was nothing more than a sham designed to defraud Plaintiff and its other customers. In an internal memo, Nexo noted that: "We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do." It noted that the "problems with the set up" include that (a) "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" and (b) "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant amount of time post the execution timing when to report the deal to the customer so we can justify the commission we add up . . ."

81.    Internal memos state that Nexo's OTC sales of NEXO tokens are priced "3-5% over the spot price," and BTC and ETH sales are priced "1-3% over the spot price."

82.    Nexo's internal records confirm it followed this deceitful policy, selling NEXO to Plaintiff from its own inventory, and knowingly selling NEXO, BTC, and ETH to Plaintiff well above spot market prices, despite falsely promising him the "some of best rates on the market."

83.    Nexo's VIP Relationship Managers, including Hristov, also frequently misled customers about the nature of the OTC Desk and transactions, telling them Nexo "is not a participant

in the trade, we act as a middle man of the deal." In fact, as in Plaintiff's case, Nexo was often selling its own digital assets to its customers.

### G.   Nexo Profits By Liquidating Plaintiff's Holdings

84.   As of May 10, 2021, Plaintiff held digital assets worth over $30 million on Nexo, including over $4 million in NEXO Tokens, collateralizing a total loan amount of approximately $13,924,318.67.

85.   However, over the next several weeks the value of those digital assets decreased rapidly.  The fall in the price of the NEXO Tokens was particularly dramatic, losing 70 percent of its value and decreasing from $3.70 on May 10 to a low of $1.05 on May 23.  This caused Plaintiff's LTV to rise, placing his assets at risk of liquidation.

86.   Nexo proceeded to liquidate a substantial portion of Plaintiff's digital assets when it contends his LTV rose above .833, first liquidating over $1,000,000 in USDC (a USD stable coin). Nexo then proceeded to liquidate 31.52 BTC despite the fact that the first liquidation appears to have brought Plaintiff's LTV to below the .833 threshold which Nexo represents as the liquidation threshold.  Nexo did not liquidate any of the NEXO Token held by Plaintiff, thus increasing the security token's weight in the basket of crypto assets used to collateralize his long position.

87.   Nexo profited from these liquidations, taking a substantial fee on each liquidation— thus leaving Plaintiff's account more susceptible to further liquidations. These liquidation fees were not disclosed to Plaintiff. Moreover, Nexo credited Plaintiff thousands of dollars less per BTC liquidated than the prevailing market price on reputable exchanges.

88.   While the value of Plaintiff's digital assets recovered somewhat following this initial liquidation, their value declined again on June 21 and 22, 2021.

89.   Nexo appears to have liquidated more of Plaintiff's collateral than was necessary to maintain an LTV below .833.  Nexo also liquidated Plaintiff's relatively stable BTC assets, with each liquidation resulting in the NEXO Token security comprising an ever-larger portion of Plaintiff's shrinking collateral.

90.     Nexo also profited from these liquidations, once again, taking a substantial undisclosed fee on each liquidation. Moreover, Nexo credited Plaintiff thousands of dollars less per BTC liquidated than the prevailing market price on reputable exchanges.

91.     Almost immediately following the liquidation of substantially all of Plaintiff's digital assets, the market began to recover.  Within months both Bitcoin and Ethereum would reach new all-time highs.

92.     Nexo's internal documents reveal that it actively sought to conceal these liquidation fees from Plaintiff and its other customers, stating "WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX. Most of you have probably worked on cases, in which the customer is disputing the amount received as part of the liquidation, claiming it is smaller than it should be." The same document then provides instructions to "convince them there is no mistake," which include withholding information on the "tax which we SHOULD NEVER mention. That's why, we should also not mention the sell price . . ."

93.     Nexo has not provided any records or evidence showing that it actually sold any of the digital assets it claims to have "liquidated," much less the sale price received for those assets.

**H.    Nexo's Misrepresentations**

94.     Nexo's advertising, the VIP Program brochure, and Hristov's communications regarding that program, contained multiple false and misleading representations and omissions that, in violation of California law, fraudulently induced Plaintiff into borrowing against his digital assets. Indeed, the Nexo VIP Program was an unlawful scheme to steer customers with large accounts, such as Plaintiff, into loans and programs that were lucrative to Nexo with the promise of special benefits, when in fact Nexo provided sub-standard service and a false sense of security conveyed by its advertising that increased the likelihood of customer liquidations, and did not provide the benefits Nexo represented that Plaintiff would receive. Specifically, Nexo's representations regarding (1) its Liquidation Relief program, (2) its responsiveness, (3) the ability to earn interest on collateral (4) its registration of the NEXO Token with the SEC, (5) its zero-fee policy, and (6) its OTC desk were false and misleading.

### 1.     Nexo Misrepresented its Liquidation Relief Program

95.     Nexo represented to Plaintiff that as a participant in its VIP Program he would be able to "recover [his] liquidated assets" through its Liquidation Relief Program.

96.     As discussed above, Nexo liquidated Plaintiff's assets over the course of May and June 2021.  On June 21 and 22, 2021, Plaintiff was substantially liquidated of his remaining BTC and paid off the vast majority of his loan.

97.     On June 22, 2021, Plaintiff wrote to Hristov that Nexo had instructed him to utilize Liquidation Relief.  The same day, Nexo informed Plaintiff that under its Liquidation Relief Program it would allow him to take out a new *loan from Nexo* to repurchase his liquidated assets *from Nexo*, subject to his ability to provide millions of dollars' worth of additional collateral.

98.     Plaintiff did not, and a reasonable consumer would not, understand the "Liquidation Relief" program to simply mean that Nexo would provide a new collateralized loan to purchase back assets that Nexo itself had liquidated. The VIP Brochure's language regarding Nexo's Liquidation Relief Program was accordingly misleading, because it was likely to deceive reasonable customers, and in fact did deceive Plaintiff, into concluding that posted collateral would be protected in the event of a liquidation.

### 2.     Nexo Misrepresented its Responsiveness

99.     Nexo represented that VIP customers would receive a response from its support team "in 2 hours, 24/7," a "dedicated relationship manager" that would reply to their emails "in a matter of hours, no more than 24h," and "direct phone number availability." Contrary to Nexo's representations about its responsiveness to VIP customers, Plaintiff in fact had to wait days, even weeks, to receive responses regarding his inquiries about Nexo's services and his account at critical periods in the market.

100.     Contrary to Nexo's representations about access to customer service, although Hristov was assigned as Plaintiff's relationship manager, he was frequently unavailable, and Plaintiff did not receive a direct phone line to Hristov.

101.    For example, on May 28, 2021, Plaintiff initiated a customer service ticket requesting that Nexo work with him to protect his collateral in times of market volatility.  Nexo responded the next day that his request had been referred to Plaintiff's "account manager." On June 10, almost *two weeks* after he had initiated contact, Plaintiff wrote to Hristov that despite "trying very hard to reach someone at Nexo for help protecting my assets," he had been waiting 12 days for a response.  Plaintiff emphasized that "[t]his is a very serious situation and I am doing everything possible to think about ways to protect my assets. I need Nexo to respond immediately today to help me carry out the moves that need to happen." Hristov responded, but only to provide more misleading information regarding a collateral swap program, which Plaintiff noted "is not at all what it sounds like."

102.    Nexo's lack of responsiveness injured Plaintiff because it impacted his ability to make decisions about how to protect his assets from the liquidation that he ultimately suffered.  As a result of Nexo's delays in responding to Plaintiff, for example, he could not timely determine whether he should maintain his loan-to-value ratio to avoid liquidation by attempting to sell assets outside of Nexo and posting additional collateral, whether Nexo would accept pledges of other assets not listed on its website as collateral, or whether Nexo would allow him to engage in swaps on the terms he had proposed to Hristov.

103.    Simply put, Nexo left Plaintiff in an information vacuum.

### 3.    Nexo Misrepresented That Collateral Would Continue to Bear Interest

104.    When Hristov *was* available, he misled Plaintiff regarding Nexo's financial products. Specifically, on March 23, 2021 Hristov told Plaintiff: "You will be earning 5% annually on the Bitcoin which you used as collateral." This was false—Plaintiff did not earn interest on digital assets posted as collateral for his loans.

105.    Not only did this false representation induce Plaintiff to take out loans collateralized by his digital assets by substantially altering the benefits and risks of such borrowing, but it also contributed directly to the eventual liquidation of Plaintiff's assets.  Without receiving interest on his digital assets as promised, Plaintiff was left with nothing to offset the substantial interest due on his

crypto loans.  As a result, the amount of his loans increased relative to the value of his digital assets, thereby increasing his LTV ratio and thus leaving his assets at increased risk of liquidation.

### 4.    Nexo Misrepresented That the NEXO Token Was Registered with the SEC as a Security

106.    Nexo also lied to Plaintiff to induce him to purchase its own NEXO Token. On March 23, Hristov allayed Plaintiff's concerns regarding the NEXO Token by representing that "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors."  This statement was untrue as Nexo has never registered the NEXO Token with the SEC.

107.    Hristov's representation that "the NEXO token is registered with the SEC as a security" was not a one-off mistake by a VIP Relationship Manager. Rather, it was standard language provided to VIP Program customers to induce them to purchase NEXO Tokens. Nexo Relationship Managers sent this identical misrepresentation to dozens of VIP customers.

108.    But Nexo was well aware that filing a Form D Notice of Exempt Offering of Securities with the SEC in 2018, did not constitute registration with the SEC. In fact, its own Terms and Conditions of Token Sale stated that "the offer and sale of this security instrument has not been registered under the U.S. Securities Act of 1933 . . . or under the securities laws of certain states." These Terms were never provided to Plaintiff.

109.    In April 2021, a Nexo customer contacted the SEC and asked whether Nexo was registered with the SEC. The SEC responded by stating that "Nexo is not registered with the SEC." This customer forwarded this correspondence to Nexo's support and legal departments with the subject "Nexo falsely stated on it's website it is SEC Compliant."

110.    In fact, the SEC contacted Nexo regarding the NEXO Token in 2020. The "SEC brought to Nexo's attention the fact that" Nexo's marketing materials falsely stated that it was "SEC-compliant." Nexo represented to the SEC that it had "since unified all the language across the various platforms and communication channels to ensure that no inaccurate depictions of the facts are present." Nexo was thus on notice—from the SEC itself—both of

the falsity and importance of its representations regarding registration of its token with the SEC. Nevertheless, Nexo used these false representations to sell tens of millions of dollars of NEXO tokens to U.S. investors, including Plaintiff.

**5.    Nexo Misrepresented to Plaintiff That it Did Not Charge Fees on Transactions When It Took Secret Profits on Both Purchases and Liquidations**

111.    Nexo also misrepresented to Plaintiff and its other customers that it did not charge fees on cryptocurrency transactions or liquidations. As set forth in paragraphs 52-93 above, Nexo extensively marketed its #ZeroFees policy. It advertised that it had "no hidden fees" including in connection with exchanges and liquidations.

112.    However, as set forth in paragraphs 52-93 above, Nexo took substantial profits on Plaintiff's OTC purchases, liquidations, and undisclosed "sales" of its portfolio booster product to Plaintiff.

113.    Not only were these profits not disclosed to Plaintiff, but Nexo also sought to actively conceal these profits by sending Plaintiff fraudulent trade confirmations which omitted any reference to its own profits, and by hiding the fact that Nexo took $102,125 of Plaintiff's collateral as an undisclosed profit for a "portfolio booster" without his knowledge as part of his April 14 OTC purchase.

114.    Nexo also took undisclosed profits when it liquidated Plaintiff's digital assets. At no point did Nexo inform Plaintiff that there would be any fee associated with the liquidations. Rather, they consistently represented that there were no fees associated with liquidations.

115.    Nexo acknowledged this systematic fraud internally, noting that: "We tell customers Nexo does not charge commission on the transaction[s], while in fact we do." It noted that the "problems with the set up" include that (a) "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" and (b) "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant

amount of time post the execution timing when to report the deal to the customer so we can justify the commission we add up . . ."

116.  Even the automated emails Nexo sent Plaintiff around the time of his liquidation concealed that Nexo profited based on those liquidations, stating only "[p]lease be informed that if the Loan-to-Value ratio increases to 83.33%, the Nexo Oracle may initiate small partial loan repayments automatically (without any penalty or added fees)."

### 6.    Nexo Misrepresented That Plaintiff Would Receive The Best OTC Rates on the Market

117.  Nexo also misrepresented that as a VIP, Plaintiff would receive "OTC services with some of the best rates on the market." The VIP Brochure further promised that Plaintiff for "Purchases of large quantities of cryptocurrency," Plaintiff would "get institutional rates for amounts larger than $100,000.

118.  This was false. Rather, as set forth in paragraphs 52-83 above, Nexo knowingly and intentionally gave Plaintiff rates far worse than the prevailing market rate on reputable exchanges.

### I.    Nexo's Sale of the NEXO Token Did Not Qualify for Any Exemption to Registration

119.  A distribution by issuers and/or underwriters is not exempt under Section 4 of the Securities Act and requires registration unless some other exemption or safe harbor applies.  The party claiming that a distribution is entitled to an exemption bears the burden of claiming the exemption.

120.  Nexo's 2018 Form D filings claimed that its offering of NEXO Tokens was exempt from the requirement to be registered under the securities laws, pursuant to the exemption for sales to accredited investors under SEC Rule 506(c).  However, the offering did not qualify for the exemption, among other reasons, because the underlying assets being sold – the NEXO Tokens – were offered as part of one larger non-exempt offering of securities to the general public.  Moreover, Nexo's sale of NEXO Tokens to Plaintiff in 2021 were not made pursuant to SEC Rule 506(c), but rather were part of Nexo's non-exempt public offering of the NEXO Token.

121.    Furthermore, all of Nexo's sales of the NEXO Token should be treated as one offering, because Nexo sold the NEXO as part of a single plan of financing, for the same general purpose, and without creating different classes of NEXO.

122.    Nexo filed an initial Form D on February 20, 2018.  The initial Form D claimed that its offering of NEXO Tokens was exempt from the requirement to be registered under the securities laws, pursuant to the exemption for sales to accredited investors under SEC Rule 506(c).  It stated that the date of first sale was February 14, 2018, and that the offering was not intended to "last more than one year."  The Form D further stated that the total offering amount was $50,000,000 and that $7,250,000 had been sold.

123.    Nexo filed an Amended Form D on March 13, 2018, changing the size of the total offering amount to $52,500,000 and indicating that $46,270,000 had been sold and that $6,230,000 remained to be sold.

124.    Nexo filed a second and final Amended Form D on May 5, 2018, indicating that all $52,500,000 of the total offering amount offering amount had been sold to a total of 129 investors and that the total remaining to be sold was $0.  Plaintiff was not one of those 129 investors—and could not have been—because Plaintiff first purchased his NEXO Tokens beginning in March 2021.  Like the earlier Form D filings, the second Amended Form D indicated that Nexo did not intend for the offering to last more than one year.  Nexo has not subsequently filed any additional Form Ds.  Nexo's own Form D filings thus show that Nexo's purported offering under SEC Rule 506(c) concluded on May 18, 2018—nearly three years before Plaintiff purchased the NEXO Token from Nexo.

125.    Each of Nexo's Form D filings was signed by Antoni Trenchev.

126.    In June 2023, the SEC filed a Complaint against the digital asset exchange Coinbase, alleging that Coinbase violated the securities laws by allowing its users to purchase the NEXO Tokens through the Coinbase Wallet.  *Securities and Exchange Commission v. Coinbase, Inc. et al.*, 23 Civ. 4738 (S.D.N.Y.).

127.    As alleged by the SEC: "From February through May 2018, Nexo conducted a public offering of NEXO and sold NEXO to 129 investors globally in exchange for bitcoin and ETH, raising

approximately $52.5 million.  Nexo's self-described "Token Sale" consisted of an initial airdrop distribution in February 2018, an ICO "pre-sale" in March 2018, and ICO from April to May 2018. In 2018, Nexo filed forms with the SEC claiming that its offers and sales of NEXO were offers and sales of securities exempt from the federal securities' laws registration requirements."

128.    However, since at least March 2019, NEXO has been available for buying, selling, and trading on digital asset trading platforms, including on Nexo's own exchange.  In fact, Nexo publicly advertises that "You can acquire NEXO Tokens through the Nexo Exchange inside our platform (recommended) or through a third-party exchange."

129.    On information and belief, Nexo has offered and sold the NEXO Token to tens of thousands of investors, including tens of thousands of non-accredited investors.  The NEXO Token contract on the Ethereum blockchain shows that there are 78,975 holders of the NEXO Token.  This number likely significantly understates the true number of NEXO Token holders as digital asset exchanges often hold tokens belonging to many, or sometimes even all, customers in one account.

130.    The publicly available information disseminated by Nexo, as well as the economic incentives that Nexo has offered with respect to NEXO led investors to reasonably view NEXO as an investment and to expect profits from Nexo's efforts to develop its lending business and grow the Nexo platform, which in turn would increase the demand for and the price of the NEXO Token.

131.    For example, Nexo took and touted steps to make NEXO available for trading on digital asset trading platforms.  In a July 7, 2021 blog post on its website, Nexo—in announcing NEXO's listing on the Bitfinex crypto asset trading platform—stated: "[o]ne of the Nexo community's repeated requests has been that we list our native asset [NEXO] on more and more bigger exchanges.  Our team wasted no time addressing these requests."  In a May 29, 2022 blog post Nexo made similar statements with respect to NEXO's listing on the crypto asset trading platform Bitstamp. Both of these blog posts emphasized that the relevant listings had the potential to augment NEXO token usage and boost its price.

132.    In addition, Nexo's website has stated that Nexo pools and uses the proceeds from NEXO sales to fund and develop Nexo's lending and investment activities to generate Nexo profits,

which in turn are used to make "interest rate payments" (which Nexo described at the time if its initial Token Sale as "dividends) to NEXO investors on a *pro rata* basis.  Similarly in a post on its Medium blog on or around November 23, 2018, Nexo touted that it had "raised funds in a token offering and [had] been able to develop a user-friendly crypto lending wallet and a profitable business model in less than 6 months."

133.    In the NEXO whitepaper, Nexo stated that "52.50% of NEXO tokens will be distributed to investors from the Nexo Token Sale" and "25% of NEXO tokens will be allocated towards the growth of the loan portfolio." In addition, as disclosed in the whitepaper, 11.25% of NEXO tokens were distributed to Nexo's founders and the team with a vesting structure to "ensure that the team's interests are aligned with those of the investors and that the team's efforts will be channeled to towards the creation of a profitable and sustainable business"—with an additional 5.25% for Nexo's advisors. An additional 6% of NEXO was retained by Nexo to use for "community building and Airdrops" to "promote the Nexo loan services by engaging the crypto community, thus ensuring the long-term success of the Nexo enterprise."  In its 2018 Interim Report, Nexo further highlighted the alignment between NEXO purchasers and Nexo's management team, stating: "[n]one of Nexo's managers has sold a single NEXO token; rather, everyone is motivated to deliver the strongest possible performance and pursue long-term higher returns in accordance with successful company growth."

134.    In public statements on its website and social media pages, Nexo specified its expertise and described the efforts it has made and will continue to make to develop its lending business and the Nexo platform and to attract customers and users, for example:

    a.    the NEXO whitepaper statement touting Nexo's "experienced", "award-winning", and "[s]uccessful FinTech Team serving millions of people for over 10 years under strict European Banking and Financial Services Supervision" and that "the team's efforts will be channeled towards the creation of a profitable and sustainable business";

b. Nexo website's "About Us" page, which highlighted the expertise of its team and described Nexo as "[l]everaging the best of the team's years of experience in FinTech along with the power of blockchain"; and

c. Nexo's statement in its 2018 Interim Report that "[g]iven the executive management's institutional background, Nexo is always assessing new and constructive partnerships" and that Nexo is "keen to pursue further productive collaborations, which would facilitate Nexo's continuous loan portfolio growth and platform functionalities."

135.   Further, Nexo explicitly promised returns to investors in public statements on its website and social media pages. For example, in the NEXO whitepaper and on its Medium blog, Nexo told NEXO holders that it would provide them with dividends of 30% of Nexo's profits generated from loan interest paid by Nexo customers, among other business lines.  Specifically, as Nexo explained in a Medium blog post on or around November 23, 2018, a "base dividend" is "paid out to all eligible token holders proportionally to their NEXO Token holdings" and, in addition, at least one-third of the total dividend amount goes towards a "loyalty dividend" that is "paid out individually for each NEXO Token based on how long it has been in the Nexo Wallet from one ex-dividend date to the next."

136.   In addition, Nexo's website touts the special economic incentives and benefits Nexo provides to NEXO holders, including daily "interest payments" (returns) and lower interest rates on loans. Specifically, as marketed on Nexo's website, NEXO "[h]olders receive up to 12% interest per annum on the NEXO Tokens held in both the Savings and Credit Line wallets of their Nexo accounts." Nexo's website has also told investors that "holding NEXO Tokens automatically makes you a part of Nexo's Loyalty Program which gives you: [u]p to 50% higher yields with our Earn on Crypto suite", "[u]p to 0.5% back in crypto rewards on purchases or swaps via the Nexo Exchange", "[b]orrowing rates starting from just 0% APR", and "[u]p to 5 free crypto withdrawals."

137.   Moreover, the Nexo website tells investors they can use NEXO to "[s]wap any asset for NEXO with zero fees and fixed-price execution"; "[b]orrow instantly" ("from 0% APR"); "[s]pend

the value of your NEXO Token without selling it"; and "[k]eep more NEXO in your portfolio to get higher yields, lower borrower rates, and more crypto rewards."

138.    Finally, beginning in December 2020—just months before it sold the NEXO Token to Plaintiff—Nexo conducted multiple NEXO token "buyback" programs, pursuant to which Nexo repurchased from investors over $150 million worth of NEXO. As Nexo explained on its website, these buybacks were designed to "boost [NEXO] token liquidity, thus reducing price volatility" and to "give token holders additional security that the token's value will continue to rise."

## FIRST CAUSE OF ACTION

## FRAUDULENT INDUCEMENT

139.    Plaintiff realleges the allegations above.

140.    Nexo represented that it would provide Plaintiff, as a member of its VIP Program: (1) a Liquidation Relief Program that would protect his assets in the event of a liquidation, (2) prompt responsiveness, (3) interest on his posted collateral, and (4) the best rates on his OTC purchases. Nexo also advertised that it (5) did not charge any fees on digital asset purchases or any other hidden fees.

141.    Nexo had no intention of honoring these false promises when it made them, but rather that they were provided to Plaintiff with the purpose of convincing him to take out loans that put his collateral at risk of liquidation and for Nexo's benefit.

142.    Nexo deliberately made the false promises regarding its (1) Liquidation Relief Program, (2) responsiveness, (3) interest on Plaintiff's posted collateral, (4) its OTC rates, and (5) its fees to induce Plaintiff to take out loans from Nexo and utilize its OTC trading desk to purchase digital assets.

143.    Plaintiff relied to his detriment on Nexo's false promises by taking out loans from Nexo and purchasing digital assets using Nexo's OTC trading desk.    Plaintiff would have behaved differently if he had known the promises were false in that Plaintiff would not have taken out loans at all, but instead only earned interest on his digital asset deposits.

144.    Plaintiff's reliance on Nexo's false promises was justified in that Plaintiff had no reason to doubt the truthfulness of Nexo's promises about its (1) Liquidation Relief Program, (2)

responsiveness, (3) interest on his posted collateral, (4) its OTC rates, and (5) fees.  Further, Plaintiff investigated the truth of Nexo's promises by asking for explanations, which were not delivered, resulting in the concealment of the falsity of those promises by Nexo.

145.    Nexo's false and misleading promises, inducing Plaintiff's reliance thereon, were the direct and proximate cause of Plaintiff's loss, which Plaintiff would not have sustained but for Nexo's fraud.

146.    As a result of Nexo's fraud, Plaintiff is entitled to restitution in the amount of the value of the digital assets he lost.  Plaintiff is also entitled to any interest he would have earned on those assets, had Nexo not induced him to post those assets as collateral, thereby causing his losses.

147.    Additionally, Plaintiff is entitled to punitive damages as a result of Nexo's fraudulent conduct.

148.    With respect to Nexo's statements regarding its OTC rates and its fees, Plaintiff did not discover, nor could he have reasonably discovered, all facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of the material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

## SECOND CAUSE OF ACTION

## CALIFORNIA UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

149.    Plaintiff incorporates the allegations above.

150.    Nexo is a "person" and since December 23, 2020, has engaged in "unlawful," "unfair," "misleading," and "deceptive" business acts under California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, as alleged herein.

151.    The UCL prohibits "induc[ing] the public to enter into any obligation" through any "untrue or misleading" statement. Nexo has engaged in "deceptive" and "misleading" advertising under the UCL.

152.    *First,* Nexo engaged in "deceptive" and "misleading" advertising by using language in its VIP Program Brochure likely to deceive reasonable customers into concluding that Program would provide: (1) a Liquidation Relief Program that would protect the customers' collateral in the event of a liquidation and (2) prompt responses from a dedicated relationship manager to whom the customer would have direct access. Further, Nexo represented to Plaintiff that he would earn interest on his posted collateral to induce Plaintiff to take out loans from Nexo, which was also false. Nexo also falsely represented to Plaintiff that he would receive notice and an opportunity to provide additional collateral before liquidation of his assets.  Nexo obscured the impact of holding the NEXO Token on Plaintiff's LTV and liquidation threshold. Nexo's misleading and deceptive advertisement induced Plaintiff into borrowing from Nexo.

153.    Nexo also advertised that it did not charge any fees in connection with transactions on its platform and that it would provide Plaintiff, as a VIP, the best rates on his OTC purchases.

154.    *Second*, Nexo's conduct in failing to honor its promises to Plaintiff were "unfair" because any reasons, justifications, and motives for its conduct do not counterbalance its substantial financial impact on Plaintiff.  Nexo's failure to protect Plaintiff's collateral in a market crash, its lack of responsiveness, its secret fees on Plaintiff's purchases and liquidations, and its failure to pay interest on Plaintiff's collateral, were injurious to Plaintiff and unscrupulous, and Nexo failed to comply with those promises in bad faith, for its own financial benefit, at the expense of Plaintiff, without any justified excuse.

155.    *Third*, Nexo's conduct has also been "unlawful," because it was in violation of the California Finance Law, §§ 22100 et seq. prohibiting engaging in the business of a finance lender or broker without obtaining a license.  Under the California Finance Law, a "finance lender" includes "any person who is engaged in the business of making consumer loans or making commercial loans." Cal. Fin. Code § 222009.  "The business of making consumer loans or commercial loans may include

lending money" in exchange for a security interest involving the forfeiture of rights in or to personal property. *Id.* Nexo's conduct in obscuring the true cost of borrowing—including the required NEXO Token purchases—was also unlawful.

156.   Nexo is a finance lender because it engages in the business of making consumer and/or commercial loans, which includes lending money and taking as security for the loan an obligation involving the forfeiture of rights in or to personal property.

157.   Specifically, Nexo made loans of money to Plaintiff in which Nexo received a security interest in Plaintiff's digital assets involving the forfeiture of certain rights therein.  Nexo made those loans without obtaining a finance lending license.

158.   The statutorily defined purpose of California's Finance Lender License is to "protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders." Cal. Fin. Code § 22001(a)(4).  Plaintiff was harmed by Nexo's unlawful lending practices in violation of the UCL, because he would not have suffered losses caused by Nexo were it not for Nexo's unlicensed and unfair lending practices.

## THIRD CAUSE OF ACTION

### UNREGISTERED OFFER AND SALE OF SECURITIES

#### Cal. Corp. Code §§ 25110 and 25503, *et seq.*

159.   Plaintiff incorporates the allegations above.

160.   NEXO Tokens and Nexo Earn Accounts are securities within the meaning of the California Corporations Code.

161.   Nexo concedes that the NEXO Token is a security.

162.   Both the California Commissioner of Financial Protection and Innovation and the SEC have determined that Nexo Earn Accounts are securities.

163.   The practical reality of Defendant's practices—including the requirement that customers maintain ten percent of their portfolio in NEXO Token to obtain better lending rates—is to sell retail investors, including Plaintiff, the Leveraged Investment Instrument, a leveraged long on a

basket of digital assets which includes the NEXO Token security as well as Nexo Earn Account securities.

164.    By engaging in the conduct described above within California, Defendant sold and offered to sell securities to Plaintiff.

165.    Plaintiff purchased NEXO Token securities from Defendant.

166.    No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

167.    Nexo's sale of the NEXO Token to Plaintiff did not qualify for any exemption to registration from the federal or state securities laws.  Nexo's sale of NEXO Tokens to Plaintiff did not involve the sale of a "covered security" because, as detailed in Section I, it was not exempt from registration under the federal securities laws or SEC rules or regulations.

168.    Nexo filed three Form Ds with the SEC with respect to NEXO Tokens offered and sold in 2018; however, Nexo's sale to Plaintiff in 2021 were not noticed in those Form Ds.  The federal securities laws require the notice to be filed by companies that have sold securities without registration under the Securities Act of 1933 in an offering made under Rule 504 or 506 of Regulation D or Section 4(a)(5) of the Securities Act.  Moreover, even Nexo's 2018 offers and sales were not exempt from registration under Regulation D because they were part of a single offering of NEXO to the general public.  In addition, Nexo did not exercise reasonable care to assure that the purchasers of NEXO via its purported Regulation D offering were not statutory underwriters of NEXO within the meaning of Section 2(a)(11) of the Securities Act.

169.    By reason of the foregoing, Nexo has violated Sections 25110 and 25503 of the California Corporations Code.

170.    As a direct and proximate result of Defendant's unregistered sale of securities, Plaintiff has suffered damages in connection with his purchase of NEXO Token securities.

171.    Defendant assumed a fiduciary relation to Plaintiff in connection with its sale of unregistered NEXO Token securities to Plaintiff.  But Defendant nevertheless falsely claimed that the NEXO Tokens sold to Plaintiff had been registered with the SEC.

1    172.    As a result, this cause of action did not accrue until Plaintiff learned in early 2023 that

2  the NEXO Tokens had not been registered with the SEC.

**FOURTH CAUSE OF ACTION**

**FRAUD IN THE OFFER AND SALE OF SECURITIES**

**Cal. Corp. Code §§ 25401**

6    173.    Plaintiff incorporates the allegations above.

7    174.    This Count is asserted against Defendant for violation of Section 25401 of the

8  California Corporations Code.

9    175.    California Corporations Code Section 25401 makes it illegal to "offer or sell a security

10  in this state . . . by means of any written or oral communications which includes an untrue statement

11  of material fact or omits to state a material fact necessary in order to make the statements made . . .

12  not misleading."

13    176.    Defendant was, at the times of the wrongs alleged herein, and as set forth herein, a

14  "person" within the meaning of Section 25401 of the California Corporations Code.

15    177.    Defendant caused a false statement or omission to be made in connection with the

16  offers or sale of a security, including the statements detailed in paragraphs 36-41, 106-110 that:

17        a.   "The NEXO token is registered with the SEC as a security"

18    178.    Defendant sold and offered to sell NEXO Token securities, to Plaintiff in the state of

19  California.

20    179.    Defendant had knowledge of the falsity or misleading nature of a statement or omission

21  made in connection with its offer or sale of NEXO Tokens to Plaintiff.  Alternatively, Defendant, was

22  negligent in failing to investigate and discover the falsity of the statement or omission.

23    180.    Defendant, was aware that a fact being misrepresented or omitted was material to the

24  buyer's decision to purchase NEXO Tokens and/or Leveraged Investment Instruments, including

25  Plaintiff's decision to purchase NEXO Tokens and Leveraged Investment Instruments.

26    181.    By virtue of the conduct alleged herein, the Defendant is liable for the wrongful conduct

27  complained of herein and are liable to Plaintiff.

28

1

**FIFTH CAUSE OF ACTION**

2

**FRAUD**

3

182.    Plaintiff incorporates the allegations above.

4

183.    Nexo represented that "The NEXO token is registered with the SEC as a security."

5

184.    This statement was untrue as Nexo has never registered the NEXO Token with the

6

SEC.

7

185.    Nexo knew this statement was false at the time, and made the statement to Plaintiff

8

with the purpose of convincing him to purchase the NEXO Token, thereby directly benefiting Nexo.

9

186.    Nexo deliberately made this false statement to induce Plaintiff to purchase the NEXO

10

Token with loans collateralized by Plaintiff's BTC.

11

187.    Plaintiff relied to his detriment on Nexo's false representation that the NEXO Token is

12

registered with the SEC by purchasing the NEXO Token with loans from Nexo secured by his BTC.

13

Plaintiff would have behaved differently if he had known the statement was false in that Plaintiff

14

would not have purchased the NEXO Token at all.

15

188.    Plaintiff's reliance on Nexo's false representation was justified in that Plaintiff had no

16

reason to doubt the truthfulness of Nexo's statement that "The NEXO token is registered with the SEC

17

as a security."

18

189.    Nexo's false and misleading statement, inducing Plaintiff's reliance thereon, was the

19

direct and proximate cause of Plaintiff's loss, which Plaintiff would not have sustained but for Nexo's

20

fraud regarding the NEXO Token.

21

190.    As a result of Nexo's fraud, Plaintiff is entitled to restitution of the digital assets he lost

22

as a result of this fraud.  Plaintiff's damages include out-of-pocket damages and consequential

23

damages.  Plaintiff is also entitled to any interest he would have earned on those assets, had Nexo not

24

induced him to purchase the NEXO Token, thereby causing his losses.

25

191.    Additionally, Plaintiff is entitled to punitive damages as a result of Nexo's fraudulent

26

conduct.

27

28

34

192.     Plaintiff did not discover, nor could he have reasonably discovered, all facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of some material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

<u>**SIXTH CAUSE OF ACTION**</u>

**CIVIL THEFT (PENAL CODE § 496(C))**

193.     Plaintiff incorporates the allegations above.

194.     Nexo knowingly received, withheld, concealed, and/or sold Plaintiff's property—namely his BTC and ETH—which Nexo obtained by false pretenses, embezzlement, and trick.

195.     Nexo induced Plaintiff to deposit his BTC and ETH into Nexo's Credit Line, and subsequently transfer millions of dollars' worth of digital assets to its "OTC Desk" based on its representations that it did not charge any fees and would provide Plaintiff with "OTC services with some of the best rates on the market" and "institutional rates for amounts larger than $100,000."

196.     Nexo knew this property was obtained by theft. Internal emails and memos confirm Nexo's awareness that it was (a) secretly profiting from OTC transactions, (b) misrepresenting pricing to Plaintiff and other customers, and (c) affirmatively concealing its commissions and profits.

197.     Nexo concealed this theft and deceit from Plaintiff by providing him false transaction confirmations which misrepresented both the price at which it acquired BTC and NEXO and where those digital assets came from. Nexo claims that it subsequently sold Plaintiff's BTC and ETH.

198.     Nexo also concealed from Plaintiff that it was taking a fee or "tax" on liquidations. Once again, it was Nexo's official policy to conceal these secret fees from its customers, including Plaintiff.

199.     Nexo's conduct directly caused Plaintiff to lose millions of dollars' worth of digital assets, both through inflated execution prices, undisclosed liquidation fees, and cascading liquidations caused by the negative impact of the poor execution prices and undisclosed fees on Plaintiff's LTV.

200.    Under Penal Code § 496(c), Plaintiff is entitled to recover three times his actual damages, together with costs of suit and reasonable attorneys' fees.

201.    Nexo acted fraudulently and oppressively in committing the above-alleged theft. Plaintiff is thus entitled to punitive damages.

202.    Plaintiff did not discover, nor could he have reasonably discovered, the facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of the material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

## SEVENTH CAUSE OF ACTION

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(C))

203.    Plaintiff incorporates the allegations above.

204.    This claim is not based upon any of Nexo's securities law violations.

205.    Plaintiff did not discover, nor could he have reasonably discovered, the facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of the material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

### THE ENTERPRISE

206.    Defendant Nexo is a "person" within the meaning of Title 18 United States Code section 1961(3).

207.    At all relevant times, in violation of Title 18 United States Code section 1962(c), Nexo, including its directors, employees, and agents, along with Nexo Services, LLC, Nexo Inc., Nexo Financial LLC, Nexo Services UAB, Nexo Global Investments LLC, Nexo MENA Holding Ltd.,

Nexo Services S.r.l., Nexo Payments Limited, Nexo Clearing and Custody Ltd., Nexo Finance Limited, AFS Holding Ltd., AFS Advance Financial Solutions Ltd., Nexo Markets Ltd., Nexo Bank Inc., NPEM Ltd., Nexo AG, NDS EOOD, MIRASTAR EOOD, Nexo Financial Services LTD, Nexo Trading Inc., Nexo Financial Services Inc., Nexo Services Ltd, Nexo Payments, Inc., Antoni Trenchev, and Kosta Kantchev (the "Related Persons") conducted the affairs of an associated-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Nexo Enterprise"). The affairs of the Nexo Enterprise affected interstate commerce through a pattern of racketeering activity.

208.    Nexo and the Related Persons collectively operate and maintain the Nexo website and offer the Nexo services advertised on that website and through the Nexo whitepaper.  On information and belief, for example:

a.    Nexo was founded and is, in Nexo's words, "powered" by Credissimo, a European Financial/Technological (or "FinTech") Group based in Bulgaria.

b.    Nexo co-founders Kantchev, Shulev, and Trenchev identify themselves, and are publicly identified, as "co-founders" and "managing partners" of "Nexo," without distinguishing among the Nexo corporate entities.

c.    These Nexo entities commingle funds and assets, failing to segregate funds among the separate entities. These entities thus treat the ostensible funds and assets of one entity as the funds and assets of the other.

d.    These Nexo entities share similar if not effectively identical equitable ownership, in that Kantchev holds nearly all equity in each entity.

e.    These Nexo entities share similar if not effectively identical supervision and management, in that some combination of Kantchev and Trenchev are responsible for such oversight for each of the entities.

209.    These Nexo entities do not honor corporate formalities, do not maintain arm's length relationships, and treat the employees of any particular entity as working for the Nexo Enterprise.

210.    The Nexo Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of maximizing profits by fraudulently concealing commissions, fees, and profits that it takes from its customers in digital asset trades and transactions and the "liquidation" of its customers' digital assets. While the Nexo Enterprise contends that it does not want its customers to be liquidated, it is in fact a hyper-predatory scheme to artificially increase its customers' likelihood of liquidation by taking secret profits on customer transactions, leaving its customers with less digital assets and a higher LTV (and consequentially, higher risk) than they would otherwise have. When its customers are inevitably liquidated it takes additional profits on those transactions.

211.    While the members of the Nexo Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The Nexo Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Nexo and the Related Persons that operate the Nexo platform and related digital asset borrowing, transactions, and support.

212.    Operating the Nexo Enterprise according to policies and procedures developed and established by its executives, Nexo controls and directs the affairs of the Nexo Enterprise and uses the other members of the Nexo Enterprise as instrumentalities to carry out Nexo's fraudulent scheme. For example, Nexo contracts with NDS EOOD to provide employees from its operation. NDS EOOD provides these employees, including Hristov and other employees that are responsible for relaying the fraudulent statements alleged herein to Nexo's customers, including Plaintiff.

213.    These policies and procedures established by Nexo's executives include: publicly advertising zero-fees and no hidden fees; secretly charging its customers substantial fees in connection with both purchases and liquidations; concealing those fees by providing fabricated transactional records to customers; and affirmatively lying to customers regarding its fees and even the source of the assets it is selling them.

214.    By developing and implementing policies and procedures leading to the repeated, and unlawful, assessment of undisclosed fees and commissions in connection with both customer asset

purchases and liquidations, Nexo engaged in the conduct of the Nexo Enterprise distinct from Nexo's own affairs as the operator of a digital asset savings and loan platform.

## THE PREDICATE ACTS

215. The Nexo Enterprise's systematic scheme to fraudulently charge and conceal substantial fees, as described above, was facilitated by the use of the United States Mail and wire. The Nexo Enterprise's scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

216. In violation of Title 18 United States Code sections 1341 and 1343, the Nexo Enterprise utilized the mail and wire in furtherance of their scheme to defraud its customers by obtaining money from them using false or fraudulent pretenses.

217. Through the mail and wire, the Nexo Enterprise advertised that it did not charge any hidden fees or commissions, including in connection with OTC purchases, loans and liquidations. Nexo also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

218. Furthermore, to lull customers into a sense of trust and prevent them from discovering Nexo's fees, Nexo concealed their scheme from its customers by affirmatively stating that it did not charge any fees or commissions and providing its customers false and fraudulent transactional records.

219. Nexo acknowledged this systematic fraud internally, noting that: "We tell customers Nexo does not charge commission on the transaction[s], while in fact we do." It noted that the "problems with the set up" include that (a) "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" and (b) "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant amount of time post the execution timing when to report the deal to the customer so we can justify the commission we add up . . ."

220. Nexo's internal documents also show that it actively sought to conceal liquidation fees from Plaintiff and its other customers, stating "WE SHOULD NEVER, UNDER ANY

CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX. Most of you have probably worked on cases, in which the customer is disputing the amount received as part of the liquidation, claiming it is smaller than it should be." The same document then provides instructions to "convince them there is no mistake," which include withholding information on the "tax which we SHOULD NEVER mention. That's why, we should also not mention the sell price . . ."

221.    As laid out in Sections F, G, and H, Nexo repeatedly provided fraudulent trade confirmations to Plaintiff in order to hide its secret fees. It also misrepresented to Plaintiff that it was acting as a middleman in the transaction, when it was often selling Plaintiff its own digital assets at a substantial markup.

222.    This was not an isolated incident. The Nexo Enterprise has been engaged in widespread fraud regarding its fees since at least 2019 and through at least 2022. During this time Nexo affirmatively misrepresented its fees via widespread email marketing communications with customers, direct email communications with its customers, customer support chats, and in marketing communications to the media.

223.    For example, in a March 27, 2020 email to a Nexo customer discussing the customer's liquidations, Hristiyan Hristov lied to a customer that "Nexo's business model is not generating profits from liquidations." In an October 6, 2021 customer support chat, Nexo customer support lied to a customer via email that Nexo has a #ZeroFees policy, and that Nexo does not charge any credit line origination, forex, and exchange fees. Nexo has generated tens of millions of dollars in fees, including liquidation fees, since 2019. And in communicating with the SEC and several state regulatory agencies in 2021 and 2022, Nexo acknowledged that it applies "a liquidation fee of 5.0%" and that liquidation fees are a "significant source of revenue to Nexo."

224.    Nexo made similar false representations to its customers regarding its OTC fees. For example, in a March 1, 2021, email to a Nexo customer discussing OTC prices, Hristov lied that "Nexo is not a participant in the trade, we act as a middle man of the deal," and that Nexo "push[es large token holders] to get the best price of execution, without us charging an additional spread." Hristov's statements are false, because as discussed in Section F, Nexo sold its own cryptocurrencies to its

customers, marked up above the spot price. Moreover, the trade confirmations provided to these customers contained fabricated pricing information designed to conceal the fees Nexo was charging its customers.

225.    Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

226.    The fraudulent concealment was material to Plaintiff. Had the Nexo Enterprise disclosed the true nature of the fees for default-related services, Plaintiff would have been aware of the substantial hidden costs and Nexo's predatory business model and would have refrained from taking loans from Nexo or using its OTC Desk to purchase assets.

227.    Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to Plaintiff and other customers, to pursue and achieve their fraudulent scheme, the Nexo Enterprise engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

228.    The Nexo Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact that they actively concealed the fees in their communications with customers.

229.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which the Nexo Enterprise have engaged under Title 18 United States Code section 1962(c).

230.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Nexo Enterprise racketeering enterprise. The racketeering acts committed by the Nexo Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on Plaintiff.

231.    Because there are hundreds if not thousands of acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiff to plead all of the details of the scheme with particularity. Plaintiff cannot plead the precise dates of all of the Nexo Enterprise's uses of the mail and wire.

232.     The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

233.     Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

234.     As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiff has suffered substantial damages. Members of the Nexo Enterprise are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

## EIGHTH CAUSE OF ACTION

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, CONSPIRACY TO VIOLATE 1962(C) (18 U.S.C. § 1962(D))

235.     Plaintiff incorporates the allegations above.

236.     Plaintiff did not discover, nor could he have reasonably discovered, the facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of the material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

237.     As set forth above, in violation of Title 18 United States Code section 1962(d), Nexo conspired to violate the provisions of Title 18 United States Code section 1962(c).

238.     As set forth above, Nexo, having directed and controlled the affairs of the Nexo Enterprise, was aware of the nature and scope of the Enterprise's unlawful scheme, and they agreed to participate in it.

239.     As a direct and proximate result of these violations of Title 18 United States Code sections 1962(d), Plaintiff has suffered substantial damages. Members of the Nexo Enterprise are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

### NINTH CAUSE OF ACTION

### FRAUDULENT OMISSION

240.    Plaintiff incorporates the allegations above.

241.    Nexo failed to disclose to Plaintiff that it would take substantial fees and profits (a) on his OTC transactions and (b) for any liquidations of his assets.

242.    Nexo had a duty to disclose these facts to Plaintiff because:

    a.    Nexo was acting as Plaintiff's agent in his purchases of digital assets and thus owed him fiduciary duties;

    b.    Nexo had exclusive knowledge of material facts that were not known to the Plaintiff because it alone knew that it would take substantial profits on Plaintiff's digital asset purchases and liquidations;

    c.    Nexo actively concealed these fees and profits from Plaintiff by sending him fraudulent trade confirmations which omitted any reference to the profits Nexo took at Plaintiff's expense; and

    d.    Nexo made partial representations regarding its OTC purchases and liquidations, but suppressed all facts regarding its profits and fees.

243.    Nexo knew that this information was not available to Plaintiff at the time and deliberately withheld this information intending that Plaintiff would be induced into action by his ignorance of the truth. In particular, Nexo intended to induce Plaintiff to utilize its OTC trading desk to purchase digital assets and take loans secured by his digital assets by obscuring the true cost of both the digital asset purchases and any subsequent liquidations.

244.    Plaintiff relied to his detriment on Nexo's failure to disclose these secret profits and fees.  Plaintiff would have behaved differently if he had known the profits Nexo derived at his expense from these transactions in that he would not have utilized Nexo's OTC desk to make purchases and would not have taken out loans to purchase digital assets using its OTC desk. Moreover, if Plaintiff had known Nexo was sending him fraudulent trade confirmations he would have immediately ceased all further activity on the platform.

245.    Plaintiff's reliance was justified in that Plaintiff initially had no reason to doubt Nexo's truthfulness or suspect it would take undisclosed profits on (a) his OTC purchases or (b) any subsequent liquidations.

246.    Nexo's failure to disclose this material information, inducing Plaintiff's reliance thereon, was the direct and proximate cause of Plaintiff's loss, which Plaintiff would not have sustained but for Nexo's fraud.

247.    As a result of Nexo's fraud, Plaintiff is entitled to restitution of the digital assets he lost as a result of this fraud.  Plaintiff's damages include out-of-pocket damages and consequential damages.

248.    Additionally, Plaintiff is entitled to punitive damages as a result of Nexo's fraudulent conduct.

249.    Plaintiff did not discover, nor could he have reasonably discovered, the facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of the material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

## **TENTH CAUSE OF ACTION**

### **BREACH OF CRYPTOCURRENCY PURCHASE AGREEMENT**

250.    Plaintiff incorporates the allegations above.

251.    On or about March 24, 2021, Plaintiff and Nexo entered into a written Cryptocurrency Purchase Agreement (the "CPA").

252.    The CPA provided, among other terms, that Plaintiff could submit purchase orders for cryptocurrency to Nexo, and that upon receiving any such Purchase Order Nexo "shall have ten minutes (the 'Review Period') to confirm such Purchase Order via email after which Review Period such Purchase Order shall be deemed to be rejected and expired."

253.    The CPA provided that: "Promptly following confirmation of each Purchase Order in accordance with Section 1.1 (i) if Counterparty [Cress] is purchasing Counterparty Purchased Cryptocurrency from Nexo,  then Counterparty shall deliver . . . the Counterparty Purchase Price to Nexo by transfer of immediately available funds or cryptocurrencies . . ." *Id.* at Section 1.2(b). The CPA further provided that: "Promptly following payment of the Counterparty Purchase Price . . . , then Nexo shall deliver . . . the Counterparty Purchased Cryptocurrency to Counterparty by transfer of immediately available cryptocurrencies on the applicable Cryptocurrency Network . . ." *Id.* at Section 1.2(c).

254.    The CPA does not state that Nexo will charge any fees or take any profits in connection with fulfilling Purchase Orders under the CPA. Nor did Nexo inform Plaintiff that it would charge any fees or take any profits from his purchases of digital assets.

255.    The CPA further provides that "upon consummation of [the] purchase, [Cress] will be vested with good and valid title such Counterparty Purchased Cryptocurrency free and clear of any and all Liens."

256.    At all relevant times, Plaintiff performed all of his obligations under the CPA, including tendering the required funds and complying with all applicable terms and conditions for cryptocurrency purchases, or his performance was excused by Nexo's conduct.

257.    Nexo materially breached the express terms of the CPA by failing to timely execute Plaintiff's cryptocurrency purchase orders as required. In multiple instances in 2021, Plaintiff submitted Purchase Orders to Nexo pursuant to the Purchase Agreement, but Nexo did not execute those orders until days later. By allowing the Review Period to lapse without timely execution or confirmation, Nexo effectively rejected or delayed Plaintiff's orders in violation of the CPA's express requirements, thereby depriving Plaintiff of the benefit of his bargain.

258.    Nexo further breached the CPA by charging Plaintiff undisclosed fees in the execution of cryptocurrency purchases. Specifically, the prices at which Nexo fulfilled Plaintiff's purchase orders included hidden mark-ups or spreads above the prevailing market price, effectively imposing additional fees on each transaction without disclosure to Plaintiff.

259.    These extra charges were not authorized by, nor apparent from, the terms of the CPA, and Nexo's imposition of such fees without transparency or agreement from Plaintiff constituted a material breach of the CPA.

260.    Nexo further breached the terms of the CPA by liquidating the digital assets it sold to Cress despite its promise to deliver them free from "any and all Liens."

261.    As a direct and proximate result of Nexo's breaches of the CPA, Plaintiff has sustained significant damages. Nexo's failure to timely execute Plaintiff's orders and its imposition of undisclosed fees caused Plaintiff to receive less cryptocurrency than he should have obtained for the funds expended, and to miss opportunities to acquire assets at intended or favorable prices. This in turn diminished the total collateral in Plaintiff's account and increased his loan-to-value (LTV) ratio, thereby substantially heightening the risk that his loan account would be subjected to liquidations. Indeed, due to Nexo's breaches – which left Plaintiff with a smaller cushion of digital assets than he bargained for – Plaintiff's account became more vulnerable to downturns in the crypto market. When the market did experience significant declines in May and June 2021, Plaintiff's reduced collateral value caused his LTV to rise more rapidly, and Nexo proceeded to liquidate a substantial portion of Plaintiff's digital asset holdings.

262.    Plaintiff suffered direct monetary losses in the failed or delayed transactions as well as consequential losses from the forced liquidations of his assets.

263.    In committing the foregoing acts, Nexo also breached the implied covenant of good faith and fair dealing inherent in the CPA. Nexo's conduct – including but not limited to executing Plaintiff's trades at prices that disadvantaged Plaintiff relative to the market, failing to act in a transparent or commercially reasonable manner in carrying out Plaintiff's purchase orders, and otherwise acting in bad faith to retain economic value that should have accrued to Plaintiff – unfairly interfered with Plaintiff's right to receive the benefits and reasonable expectations of the CPA. By acting in an arbitrary, dishonest, and bad-faith manner in its performance of the contract, Nexo deprived Plaintiff of the fruits of his bargain and violated the spirit of the Agreement.

264.    Plaintiff did not discover, nor could he have reasonably discovered, the facts giving rise to this cause of action until at least August 31, 2025 through Nexo's recent document productions. Prior to that time, Plaintiff was genuinely ignorant of the material facts underlying this claim and, despite exercising reasonable diligence, was unable to uncover those facts any sooner. Upon discovering these pertinent facts, Plaintiff proceeded with reasonable promptness to file this cause of action, doing so without undue delay after discovery.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendant as follows:

(a) Damages and/or restitution in an amount to be determined according to proof at trial;

(b) Treble damages;

(c) Punitive damages in an amount to be determined by the Court according to proof;

(d) An award of pre and post-judgment interest for the maximum amount allowed by law;

(e) An award of costs;

(f) An award of reasonable attorneys' fees; and

(g) Any and all other relief the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

1    Dated: October 30, 2025

2

3                                              Respectfully submitted,

4

5                                              /s/ *Max Ambrose*

6                                              Max Ambrose (320964)
                                               maxambrose@taylorcopelandlaw.com
7                                              James Taylor-Copeland (284743)
                                               james@taylorcopelandlaw.com
8                                              TAYLOR-COPELAND LAW
                                               501 W. Broadway, Suite 800
9                                              San Diego, CA 92101
                                               Telephone: 619-734-8770
10                                             Facsimilie: 619-566-4341

11                                             *Counsel for Plaintiff John Cress*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT