James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN CRESS,<br><br>            Plaintiff,<br><br>v.<br><br>NEXO CAPITAL INC.<br><br>            Defendant. | Case No. 3:23-cv-00882-TSH<br><br>**PLAINTIFF CRESS'**<br>**OPPOSITION TO DEFENDANT**<br>**NEXO'S MOTION TO DISMISS**<br>**SECOND AMENDED**<br>**COMPLAINT**<br><br>Date: January 29, 2026<br>Time: 10:00 AM<br><br>Judge: Hon. Thomas S. Hixson<br><br>Courtroom:    San Francisco Courthouse<br>               Courtroom E – 15th Floor<br>               450 Golden Gate Avenue<br>               San Francisco, CA 94102 |

1

## <u>TABLE OF CONTENTS</u>

2   TABLE OF AUTHORITIES ................................................................................ iii

3      I.     FACTUAL BACKGROUND ............................................................... 1

4            A.     Nexo's Systematic Fraud in OTC Transactions and Liquidations .............. 1

5            B.     Nexo Knowingly Misrepresented That It Had Registered the NEXO Token ............................................................................ 5

6      II.    ARGUMENT ................................................................................ 5

7            A.     Fraudulent Inducement and UCL Based on Zero Fee Representations (COA 1, 2) ............................................................ 6

9            B.     Civil Theft in Violation of California Penal Code §496 (COA 6) ............ 11

10           C.     Fraudulent Omission Based on Concealment of Hidden Fees (COA 9) ......................................................................... 12

11           D.     Common Law Fraud Misrepresentation of NEXO's SEC Registration (COA 5) ................................................................. 14

13           E.     Civil RICO (COA 7) ............................................................... 16

14           F.     Breach of Cryptocurrency Purchase Agreement (COA 10) ..................... 24

15      III.    CONCLUSION ........................................................................ 25

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

## <u>TABLE OF AUTHORITIES</u>

3

**Cases**

4

*3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317 (9th Cir. 2020) .............................. 25

5

*Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297 (M.D. Fla. 2017) ......... 17

6

*Acree v General Motors Acceptance Corp.*, 92 Cal.App.4th 385 (2001).......................................... 25

7

*Albergo v. Immunosyn Corp.*, 2012 U.S. Dist. LEXIS 197659 (S.D. Cal. June 19, 2012) ............... 15

8

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) ...................................................................... 23

9

*Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) .......................... 7

10

*Anderson v. Apple Inc.*, 500 F.Supp.3d 993 (N.D. Cal. 2020)........................................................... 13

11

*Baystar Capital Mgmt. LLC v. Core Pac. Yamaichi Int'l H.K. Ltd.*, 2007 U.S. Dist. LEXIS 105322
(C.D. Cal. 2007)............................................................................................................................ 13

12

*Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276 ( 2017) .................................................................. 13

13

*California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir.
1987) ............................................................................................................................................. 23

14

*Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) .......................................................................... 6

15

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445  (1998)..... 13

16

*City Sols. v. Clear Channel Communs., Inc.*, 365 F.3d 835 (9th Cir. 2004)...................................... 15

17

*Coronavirus Rep. v. Apple Inc.*, 2024 U.S. Dist. LEXIS 239334 (N.D. Cal. Oct. 28, 2024). .............. 1

18

*Eclectic Props. E., Ltd. Liab. Co. v. Marcus & Millichap Co.*, 2012 U.S. Dist. LEXIS 28865 (N.D.
Cal. Mar. 5, 2012)......................................................................................................................... 22

19

*Ehret v. Uber Techs., Inc.*, 68 F.Supp.3d 1121 (N.D. Cal. 2014)........................................................ 9

20

*Elizabeth Arden, Inc. v. Merch. of Tennis, Inc.*, 2011 U.S. Dist. LEXIS 164879, (C.D. Cal. July 25,
2011) ............................................................................................................................................. 20

21
22

*Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089 (9th Cir. 2015)........................................................ 23

23

*Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013) ..................................... 19

24

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189 (2d Cir. 2003) ............... 16

25

*Gebhart v. SEC*, 595 F.3d 1034  (9th Cir. 2010) ............................................................................... 15

26

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989).................................................................. 21, 23

27
28

iii

*Hanson v. Nexo Cap. Inc.*, No. 2:24-cv-10466-MAR, Dkt. 31, at 26 (C.D. Cal. June 30, 2025) ...... 13

*Hernandez v. Balakian*, 480 F. Supp. 2d 1198 (E.D. Cal. 2007) ......................................................... 24

*In re 5-Hour ENERGY Mktg. & Sales Practices Litig.*, 2015 WL 12734796 (C.D. Cal. Jan. 22, 2015) ................................................................................................................................................ 8

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ............................................................ 16

*In re Sumitomo Copper Litig.*, 995 F. Supp. 451 (S.D.N.Y.1998) .................................................... 22

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ................................................................................... 9

*Jeong v. Nexo Financial LLC*, No. 21-cv-02392-BLF, 2022 U.S. Dist. LEXIS 150413 (N.D. Cal. Aug. 22, 2022) .............................................................................................................................. 10

*Kabbash v. Jewelry Channel, Inc.*, 2015 U.S. Dist. LEXIS 150675, at *9 (C.D. Cal. Nov. 2, 2015).. 7

*Kagan v. Gibraltar Sav. & Loan Assn.*, 35 Cal. 3d 582 (1984) ..................................................... 9, 10

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ................................................................. 8

*Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447 (S.D.N.Y. 2009) .............................................. 18

*Lair v. Bank of Am.*, N.A., 2024 U.S. Dist. LEXIS 41588 (C.D. Cal. Jan. 26, 2024) ....................... 25

*Life Bliss Found. v. Sun TV Network Ltd.*, 2014 WL 12589657 (C.D. Cal. Sept. 17, 2014) .............. 24

*LiMandri v. Judkins*, 52 Cal. App. 4th 326  (1997) .......................................................................... 13

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005) ..................... 20

*Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656 (2001) .................................................................. 16

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603 (1992) .............................. 13

*Matthews v. Apple, Inc.*, 769 F. Supp. 3d 999 (N.D. Cal. 2024) ....................................................... 11

*Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076 (N.D. Ill. 2016) ........................................... 18

*Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235 (2009) ............................................. 9

*Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) .......................................... 6

*Naranjo v. Doctors Med. Ctr. of Modesto, Inc.*, 111 Cal. App. 5th 408 (2025) ............................... 25

*Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 679-80 (N.D. Cal. 2002) ......... 7

*Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, (N.D. Cal. 2015) ......................................................... 9

*Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783 (6th Cir. 2012) ........................................ 17

*People v. Ashley*, 42 Cal. 2d 246 (1954) ............................................................................................ 12

*Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026 (1992)................... 25

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866  (9th Cir. 2010)...................... 16, 17

*RJR Nabisco Inc. v. European Cmty.*, 579 U.S. 325 (2016) ................................................................ 24

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010) ................................................................ 9

*Sakai v. Merrill Lynch Life Ins. Co*., 2008 U.S. Dist. LEXIS 69420 (N.D. Cal. Sep. 10, 2008)........ 13

*Shinde v. Nithyananda Foundation*, 2015 WL 12732434 (C.D. Cal. Feb. 23, 2015)........................ 21

*Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333 (2022) ......................................................... 11, 12

*Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134 (9th Cir. 1997)............................................ 6

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007)........................................................................ 18

*Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230 (2013)................... 25

*Trachsel v. Buchholz*, 2009 U.S. Dist. LEXIS 4219 (N.D. Cal. Jan. 6, 2009) ................................. 16

*United States v. Dowling*, 739 F.2d 1445 (9th Cir. 1984) ................................................................. 22

*United States v. Jenkins*, 633 F.3d 788  (9th Cir. 2011) .................................................................... 15

*United States v. Shields*, 844 F.3d 819 (9th Cir. 2016)..................................................................... 22

*Weissich v. County of Marin*, 224 Cal. App. 3d 1069  (1990) .......................................................... 16

*Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902 (N.D. Cal. 2012) ........................................................ 15

*Williams v. Gerber Prods. Co*., 552 F.3d 934 (9th Cir. 2008)............................................................. 9

*Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117 (C.D. Cal. 2010)............................................... 9

**Statutes**

18 U.S.C. § 1341 .............................................................................................................................. 22

18 U.S.C. § 1343 .............................................................................................................................. 22

18 U.S.C. § 1962............................................................................................................................. 20, 21

18 U.S.C. § 1964(c) .......................................................................................................................... 16

Cal. Civ. Code § 3343(a) .................................................................................................................. 16

Cal. Penal Code § 496 ..................................................................................................................... 11, 12

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................................... 1, 16

Fed. R. Civ. P. 8 .................................................................................................................. 17

Fed. R. Civ. P. 9(b) ..................................................................................................... passim

N.D. Cal. Civ. Local R. 7-2 ................................................................................................. 1

Nexo's Motion rests on a simple but untenable premise: that it may market itself as "#ZeroFees," promise "no hidden fees," and tout "institutional rates" for "exclusive OTC services with some of the best rates on the market" while simultaneously extracting hidden fees and liquidation "taxes" and then concealing them through fraudulent trade confirmations. Cress pleads far more than generalized grievances. He alleges contemporaneous, unqualified representations made on Nexo's platform and by Nexo's CEO at the very time he transacted, plus internal documents acknowledging Nexo tells customers it does not charge commissions "while in fact [it] do[es]," and instructing personnel never to disclose the "liquidation tax."

Nexo's effort to reframe this case as a routine contractual "fee dispute" is equally misplaced. Cress does not allege merely that Nexo's pricing was too high; he alleges Nexo promised no fees and market-leading execution rates, then knowingly took undisclosed fees it had no right to collect, and hid those takings through deceptive records and communications. Those allegations plausibly state claims for fraudulent inducement, fraudulent omission, fraud, civil theft, RICO, and breach of contract.

Finally, Nexo's Motion[1] repeatedly asks this Court to decide fact-intensive questions—reasonable consumer meaning, reliance, causation, and damages scope—on a Rule 12(b)(6) record. That is not how pleading works. Cress alleges a coherent causal chain: Nexo's misrepresentations induced him to transact on Nexo's platform and structure his positions as Nexo urged; Nexo's concealed fees and predatory liquidation practices increased his exposure; and those practices caused substantial losses. Whether Nexo can rebut those allegations is a merits question for discovery and, if necessary, expert proof—not a basis to dismiss well-pled claims at the threshold. For these reasons, this Court should deny Nexo's Motion to Dismiss Cress' Second Amended Complaint in its entirety.

I.    **FACTUAL BACKGROUND**

    **A.    Nexo's Systematic Fraud in OTC Transactions and Liquidations**

---

[1] Nexo's 28-page Motion, which contains a two-page Notice of Motion and a 26-page Memorandum of Points and Authorities, also fails to comply with Civil Local Rule 7-2 which requires that a Motion must be "one filed document not exceeding 25 pages in length." N.D. Cal. Civ. Local R. 7-2(b); *Coronavirus Rep. v. Apple Inc.*, 2024 U.S. Dist. LEXIS 239334, at *3-4 (N.D. Cal. Oct. 28, 2024).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    Nexo's #ZeroFees Misrepresentations

Cress' SAC adds claims based on Nexo taking substantial undisclosed fees on both Cress' OTC purchases and liquidations, despite Nexo publicly advertising that it had a "#ZeroFees policy," "no hidden fees," no "credit line [or] exchange fees," and "no additional costs associated with our services" SAC ¶¶ 53-55. In order to conceal this systematic fraud from Cress and its other customers, Nexo provided false transaction confirmations that omitted these massive fees. SAC ¶¶ 80-93.

Nexo mischaracterizes the SAC and its own evidence, arguing that Cress' new claims are based on "generic advertising" that was "not contemporaneous" and "did not address the fees on the OTC transactions or liquidations at issue." Nexo ignores its CEO Trenchev's statement on the very day Cress made his first OTC purchase that "**there is no concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make**." SAC ¶ 55. Nexo also attempts to dodge Cress' allegation that the customer account page shown to him in March 2021 advertised no hidden fees, ¶ 53(d), by arguing that Cress "has not attached a copy of the alleged advertisement to support this claim." But there is no requirement that Cress attach copies of all fraudulent statements to the SAC. Cress nevertheless attaches a copy of this document to this Opposition, produced to Nexo in discovery on January 30, 2025. Declaration of Max Ambrose, Ex. 1.

Nexo concedes it advertised its "no hidden fees" policy to all customers from the outset of its existence in 2018 until well after it liquidated Cress in 2021. For example, Nexo acknowledges that its 2018 Whitepaper advertised "'no hidden fees' for Nexo's Credit Line Product" and its later 2020 and 2021 blog posts advertised "no fees" for the Credit Line Product. But Nexo argues its advertisements did not discuss fees associated with OTC purchases or liquidations because they are unrelated to its Credit Line Product. Mot at 13-14. This directly contradicts Nexo's previous representations to Cress and this Court. For example, Nexo's VIP Relationship Manager, Hristiyan Hristov, represented to Cress that Nexo's OTC desk was "purchasing Bitcoin **through Nexo's Credit Line,**" and that Cress' Credit Line scenarios also included his "LTV and liquidation threshold." SAC ¶ 36. Nexo similarly took this exact position in its first Motion to Dismiss. Dkt. 19 at 22 ("Cress requested **information on credit lines** from Nexo. The next day, Hristov sent Cress **three scenarios**

1    **for purchasing Bitcoin**…**through [the] Nexo Credit line**."); Dkt. 19 at 12 (Nexo's Credit Line

2    product "include[ed] the risk of liquidation spelled out in the Crypto Credit Terms."). Nexo now seeks

3    to erase its previous representations to mislead this Court into dismissing Cress' valid claims.

4        Moreover, it is simply untrue that Nexo's Whitepaper and other advertisements are limited to

5    its Credit Line Product. Nexo has—for years—represented most of its entire platform had no fees.[2]

6    Nexo's whitepaper represents "**Nexo has no fees whatsoever**, apart from a very competitive annual

7    interest rate…"[3] Mot. Ex. 1 at 32 (emphasis added). The Whitepaper also specifically represents Nexo

8    charges no "Hidden Fees,", no "Additional Fees,", and no "Exchange Fees." Dkt. 94-2 at 30-32.

9        Nexo's attempts to distort its other fee-related advertisements fare no better. Nexo

10   acknowledges that its March 15, 2020 blog post "advertised no fees for Nexo's Credit Line Product."

11   Mot. At 14. Once again, liquidations and any liquidation fees are a part of that same Credit Line

12   Product. But contrary to Nexo's contention, this advertisement is not limited to its Credit Line Product.

13   Rather it states: "**No Fees.** Banks also tend to charge all sorts of fees for their services, whereas Nexo

14   **adheres to a #ZeroFees policy**. There are **no additional costs associated with our services**." Mot.

15   Ex. 2. (emphasis in original).

16       Nexo argues that its June 24, 2020 blog post was limited to its Earn Interest Product, but that

17   blog post advertises "No minimum contribution requirements and **all transactions at #ZeroFees**."

18   SAC ¶ 53(b) (emphasis added). Nexo's February 19, 2021, blog post advertised: "Under our

19   #ZeroFees policy . . . Nexo does not charge any **credit line**, origination, forex, **and exchange fees**."

20   SAC ¶ 53(c) (emphasis added). On March 17, 2021, Nexo also sent Cress a VIP Brochure promising

21   that, as a VIP, he would get "OTC services with some of the best rates on the market", including

22

23   [2] Tellingly, Nexo is unable to point to a single instance in the entire 2018 to 2022 period where it
     affirmatively stated that it charged any upfront fee for any of the products or services Cress used.

24   [3] Nexo mischaracterizes Cress' allegations by arguing Nexo would "earn no profits on the multi-
     million-dollar OTC cryptocurrency purchases that he made through Nexo's OTC trading desk." Mot.

25   at 13. This is false. The OTC transactions increased Cress' loan value by millions of dollars which
     would allow Nexo to earn millions of dollars a year in interest payments. https://nexo.com/blog/why-

26   liquidations-are-needed-and-how-they-protect-us-all ("Nexo's revenues and NEXO Token holders'
     dividends* are generated by the interest our clients pay on their loans, therefore liquidations go against

27   the very essence of our business and token models as they shrink the loan book and reduce revenue.").

28

"institutional rates for amounts larger than $100,000." SAC ¶ 117. Nexo's "#ZeroFees" and "no hidden fees" policies were not simply "generic advertising," that never reached Cress. It was a major hook of Nexo's entire platform that was critical to Cress' understanding of how Nexo worked.

**2.    Nexo Conceals That its OTC Desk is a Sham**

Nexo's own internal memos recognized that: "We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do." It noted that the "problems with the set up" include that (a) "[o]ften, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" and (b) "[s]ince the pricing of the deal is not transparently communicated in advance to the customer, the [Account Manager]s waste a significant amount of time post the execution timing when to report the deal to the customer so we can justify the commission we add up . . ." SAC ¶ 80. Nexo's OTC sales of NEXO tokens are priced "3-5% over the spot price," and BTC and ETH sales are priced "1-3% over the spot price." *Id.* ¶ 81. Nexo's Relationship Managers also frequently misled customers about the nature of OTC Desk transactions, telling them Nexo "is not a participant in the trade, we act as a middle man of the deal." SAC ¶ 83. In fact, as in Cress' case, Nexo often sold its own digital assets to its customers. *Id.*

Nexo concealed both its secret profits and the fact that it was selling from its own inventory to Cress by providing him with fabricated trade confirmations. For example, on March 27, 2021, Nexo told Cress it had "purchased" BTC and NEXO tokens for him at specific market rates. SAC ¶ 66. However, Nexo actually acquired the assets at lower prices and pocketed the difference— approximately $86,000 (or 1.5657 BTC). *Id.* ¶ 64. In addition to the profits retained by the OTC Desk, Nexo sold Cress the NEXO Token from its own inventory at a 134.3% markup and took an additional $680,627 profit on the transaction. *Id.* ¶ 65.

Nexo took similar undisclosed profits on Cress' second, third, and fourth OTC transactions, and in those transactions involving the NEXO Token, it sold him the Token out of its own inventory taking markups of well over 100%. SAC ¶¶ 68-83.

**3.    Nexo Conceals Its "Liquidation Tax"**

Nexo also took substantial undisclosed fees on each of Cress' liquidations and was engaged in

1  a systematic scheme to conceal these secret fees from its customers, including Cress. For example, an

2  internal memo states, "WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION

3  THERE IS A LIQUIDATION TAX." The same document then provides instructions to "convince

4  [customers] there is no mistake," which include withholding information on the "tax which we

5  SHOULD NEVER mention. That's why, we should also not mention the sell price . . ." SAC ¶ 92.

6        While Nexo has previously represented to its customers, Cress, and this Court that "Nexo does

7  not view liquidations as a revenue-generating activity," Dkt. 68-1, it has generated tens of millions of

8  dollars in liquidation fees since 2019—a "significant source of revenue to Nexo." SAC ¶ 223.

9        **B.    Nexo Knowingly Misrepresented That It Had Registered the NEXO Token**

10        Nexo's document production also laid bare that, Hristov's representation to Cress that "the

11  NEXO token is registered with the SEC as a security" was not a one-off mistake by a VIP Relationship

12  Manager. Rather, it was standard language provided to dozens of VIP Program customers to induce

13  them to purchase NEXO Tokens. SAC ¶ 107. But Nexo was well aware that filing a Form D Notice

14  in 2018 did not constitute registration with the SEC. Its own Terms of Token Sale stated that "the offer

15  and sale of this security instrument has not been registered under the U.S. Securities Act of 1933 . . ."

16  SAC ¶ 108. These Terms were never provided to Cress. *Id.*

17        In 2020 the "SEC brought to Nexo's attention the fact that" Nexo's marketing materials falsely

18  stated that it was "SEC-compliant." SAC ¶ 110.  Nexo represented to the SEC that it had "since unified

19  all the language across the various platforms and communication channels to ensure that no inaccurate

20  depictions of the facts are present." *Id*. In 2021, the SEC responded to an inquiry from a Nexo customer

21  by stating that "Nexo is not registered with the SEC." *Id*. ¶ 109. This customer forwarded this

22  correspondence to Nexo's support and legal departments with the subject "Nexo falsely stated on it's

23  website it is SEC Compliant." *Id.*

24        Nexo was on notice—from the SEC itself—both of the falsity and importance of its

25  representations regarding registration of its token with the SEC. Nexo, nevertheless, used this false

26  representation to sell tens of millions of dollars of NEXO tokens to U.S. investors, including Cress.

27  **II.    ARGUMENT**

28

**A.      Fraudulent Inducement and UCL Based on Zero Fee Representations (COA 1, 2)**

Cress alleges that Nexo made a litany of specific false statements to him regarding the lack of fees on its platform. Nexo first argues that a single out of context and misquoted representation— "some of the best rates on the market"—is puffery. It is not. Nexo further argues that Cress' allegations—that "Nexo misrepresented its fees about OTC transactions and liquidations"—fail to satisfy Rule 9(b). They do not. The SAC identifies specific false statements, including some made as part of Nexo's years-long #ZeroFees marketing campaign.

**Nexo's Representations Are Not Puffery.** Nexo's representation that Cress would receive "exclusive OTC services" with "some of the best rates on the market" constitutes an actionable misrepresentation of fact because it asserts a specific, measurable attribute of the service: its price. Under Ninth Circuit precedent, a statement cannot be dismissed as puffery if it makes a claim that can be empirically verified. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). The term "rates" refers to a specific numerical value (a percentage or fee) that can be objectively tested.

It is well established that puffery must be analyzed in context. *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (The "Court may not assess the statements listed in the FAC in a vacuum, plucking statements out of their context . . .  but rather will examine the entire statement and its circumstances to determine if it is actionable.") Nexo nevertheless asks the Court to ignore context entirely. Nexo did not promise Plaintiff "some of the best rates on the market" in a vacuum. Rather, Nexo broadly advertised #ZeroFees and "no hidden fees", and represented to Cress that, as a Nexo VIP, he would have access to "**exclusive OTC services**" promising "some of the **best rates on the market**," including "**institutional rates** on amounts over $100,000." SAC ¶¶ 52, 117 (emphasis added).

Nexo's representations are not vague assurance that its rates are "good." It is a comparative pricing representation tethered to an external benchmark—"the market"—and reinforced by the promise of "institutional rates." Nexo is telling customers that (i) its OTC desk delivers pricing at or near prevailing market levels and (ii) that pricing is among the most favorable available. That is the

opposite of inactionable "corporate optimism": it is a claim that is capable of verification by comparing Nexo's execution prices to contemporaneous market prices. When a statement supplies a benchmark for testing truth or falsity, it is a statement of fact, not puffery. *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004).

The SAC plausibly pleads falsity on exactly that verifiable basis. Because Nexo's OTC desk took 1-5% fees above spot prices on each transaction, Nexo's pricing was materially worse than what Cress could have obtained through ordinary retail execution, let alone "institutional" pricing. SAC ¶¶ 67, 80–82.

Nor does Nexo's attempt to recast the claim as subjective opinion withstand scrutiny. Nexo marketed "exclusive OTC services" promising "institutional rates" for large purchases—language that anchors the representation in quantifiable price terms and invites objective comparison. Courts reject puffery defenses where the seller's language ties the claim to an ascertainable pricing benchmark. *See Kabbash v. Jewelry Channel, Inc.*, 2015 U.S. Dist. LEXIS 150675, at *9 (C.D. Cal. Nov. 2, 2015) (use of the term "estimated retail value" is "anchored in fact by a quantifiable retail price"). The same logic applies here: "market" and "institutional rates" are not free-floating accolades; they refer to ascertainable reference points that can be tested against market data.

Nexo also fails to address Cress' allegations that its own internal documents confirm that it was well aware it was not providing its customers with some of the best rates on the market. SAC ¶ 80 ("Often, when the customer sees the result of the trade he feels misled in regards to what costs he is facing" because while, "[w]e tell customers Nexo does not charge commission . . . in fact we do."). If Nexo "either did not believe in the alleged statements or it was aware of undisclosed fact that tended to undermine the accuracy of its statements," the statements are actionable—not puffery. *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 679-80 (N.D. Cal. 2002).

**Cress Satisfies Rule 9(b).** Nexo argues that Cress fails to plead the time, place, or content of the false representations regarding fees, or that the ads cited were "generic" and "old." Mot. at 13, 27. This is demonstrably false. The SAC identifies specific, unqualified statements—made on Nexo's website, in marketing materials, and by Nexo's CEO—during the precise period Cress used Nexo's

OTC desk and took out his loans. These allegations more than satisfy Rule 9(b).

The SAC identifies Nexo's categorical "ZeroFees" and "no hidden fees" messaging, which by its plain meaning promises that Nexo will charge "zero fees" for its services and will not conceal any fees. SAC ¶¶ 53-55. Nexo claims some of the ads cited "pre-dated Cress's involvement." Mot. at 14. Yet, on March 26, 2021—the exact day Cress executed a $5.4 million transaction—when specifically asked about exchange fees, Nexo CEO Antoni Trenchev stated in a public AMA: "There is no concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make . . . There is no hidden fee like, you know, percentage wise. If we're going to implement one we're going to do an announcement well ahead of time so that people don't see some random transactions in their transaction history which they're without an explanation." SAC ¶ 55; Ambrose Decl. Ex. 2, Ex. 3.[4] The brief video recording of that exchange is particularly probative. It reflects a contemporaneous, unqualified assurance by the company's highest executive, made in real time and without limitation, at the precise moment Cress was induced to transact. The Court may wish to view the recording itself, which captures the full context of the statement in a way a quotation cannot. Ambrose    Decl.    Ex.    2    from    11:48    to    14:40    (also    available    at    https://www.youtube.com/live/fz_oyZo7Jxg?si=HoF9VRh_qhLaPjLV&t=708)

Nexo's reliance on *Kearns v. Ford Motor Co.* and similar cases is misplaced. In *Kearns*, the plaintiff vaguely alleged exposure to a marketing campaign, but failed to identify what the ads said, when he saw them, or "which ones he found material." 567 F.3d 1120, 1126 (9th Cir. 2009). Similarly, the plaintiffs in *In re 5-Hour ENERGY Mktg. & Sales Practices Litig.* vaguely alleged seeing "numerous advertisements" without identifying a particular statement. 2015 WL 12734796, at *7 (C.D. Cal. Jan. 22, 2015). By contrast, Cress pleads exactly what *Kearns* requires: the exact words ("#ZeroFees," "no hidden fees," "no exchange fees," etc.); the speaker (Trenchev, Hristov, Nexo's platform communications); the places (VIP materials, website/blog, public AMA); and specific dates. SAC ¶¶ 24, 53-55, 117.  And unlike in *Yumul v. Smart Balance, Inc.*, Cress *does* allege that Nexo's

---

[4] NEXO, *Monthly AMA March 2021*, (YouTube, Mar. 26, 2021), https://www.youtube.com/live/fz_oyZo7Jxg?si=HoF9VRh_qhLaPjLV&t=708 from 11:48 to 14:40.

1  "ZeroFees" and "no hidden fee" advertising remained consistent. 733 F. Supp. 2d 1117, 1124 (C.D.

2  Cal. 2010); SAC ¶¶ 53-56, 62-66.

3        Setting aside that Cress pleads his fraudulent inducement claim with extreme specificity,

4  Courts routinely hold that "where, as here, a plaintiff alleges exposure to a long-term advertising

5  campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff

6  relied on particular advertisements or statements." *Ehret v. Uber Techs., Inc.*, 68 F.Supp.3d 1121,

7  1129 (N.D. Cal. 2014) citing *In re Tobacco II Cases,* 46 Cal. 4th 298, 328 (2009). The SAC alleges

8  both a years-long #ZeroFees/no hidden fees campaign continuing through the period of Cress's

9  transactions, SAC ¶¶ 53–56 and reliance on specific statements in deciding to obtain loans and transact

10 through Nexo's OTC desk. SAC ¶¶ 54, 140–145. Either is more than enough under Rule 9(b). *See also*

11 *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 977-78 (N.D. Cal. 2015) (campaign exposure sufficient;

12 no need to plead reliance on a single advertisement) *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal.

13 App. 4th 1235, 1262 (2009) (Fraud claims based on misleading advertisements do not need to allege

14 "the specific advertisements the individual plaintiffs relied upon.").

15       Nexo's argument that its unqualified advertisements of "#ZeroFees" and "no exchange fees"

16 should be narrowly read to exclude OTC transactions and liquidations is also foreclosed by controlling

17 case law. Ninth Circuit precedent rejects the notion that consumers must hunt for hidden carve-outs to

18 broad "no fee" claims. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (reasonable

19 consumers need not "look beyond misleading representations" to discover limitations); *Rubio v.*

20 *Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) (consumers may rely on the "plain meaning"

21 of unqualified advertising claims). The California Supreme Court similarly rejected semantic fee

22 distinctions where the advertisement promised "no management fees" but the defendant later imposed

23 a "trustee fee." *Kagan v. Gibraltar Sav. & Loan Assn.*, 35 Cal. 3d 582, 588, 597 (1984). So too here.

24 Nexo cannot advertise "#ZeroFees," "no exchange fees", no "credit line" fees, and "no hidden fees,"

25 then later argue that these unqualified statements exclude OTC or liquidation-related charges. *Id.* (a

26 reasonable consumer would interpret the unqualified promise of "no fees" to mean the account was

27 entirely free of charges).

28

1    In *Jeong v. Nexo Financial LLC*, No. 21-cv-02392-BLF, 2022 U.S. Dist. LEXIS 150413 (N.D.

2  Cal. Aug. 22, 2022), a court in this District denied Nexo's motion to dismiss UCL claims based on the

3  same "#ZeroFees" representations at issue here, where "Plaintiff alleges that he was charged fees when

4  Nexo liquidated his [] collateral." *Id.* at *11. Nexo cannot plausibly claim its slogan is too "generic"

5  to be actionable when a court in this District has already held materially similar allegations sufficient.

6    Just as the bank in *Kagan* could not hide behind the distinction between a "management" fee

7  and a "trustee" fee, Nexo cannot hide behind the distinction between an "Exchange" fee and an "OTC"

8  fee to evade liability for its unqualified promises. *See Kagan*, 35 Cal. 3d at 597. Nexo's OTC Desk is

9  a mechanism for exchanging digital assets; it is simply the venue Nexo provides for executing high-

10  value exchanges. Furthermore, Nexo's argument implies the nonsensical conclusion that it promised

11  "no fees" to its general retail customers while reserving the right to secretly gouge its high-value "VIP"

12  clients with hidden markups. This interpretation is directly contradicted by Nexo's simultaneous

13  representation that VIP clients using the OTC Desk would receive "some of the best rates on the

14  market." SAC ¶ 117. It strains credulity to suggest that a service marketed as a premium benefit with

15  "best rates" would carry hidden fees that the standard, "zero-fee" service did not.

16    Beyond marketing, the SAC alleges deceptive trade confirmations and pricing

17  communications. Most significantly, on March 26, 2021, Hristov informed Cress that Nexo had

18  purchased BTC and NEXO at specific prices, but Nexo's internal records show Nexo acquired more

19  assets at lower prices, pocketed the difference, and sold NEXO from inventory. SAC ¶¶ 80-83. These

20  transaction-specific allegations, which Nexo does not address, are quintessential Rule 9(b) detail.

21    Finally, Nexo's assertion that Cress "does not point to any specific statement" concerning

22  liquidation-related fees is false. The SAC alleges Nexo emailed Cress that the "Nexo Oracle may

23  initiate small partial loan repayments automatically (**without any penalty or added fees**)." SAC ¶

24  116 (emphasis added). That is a concrete representation about fees associated with liquidation

25  mechanics. Moreover, each of Nexo's advertisements regarding its Credit Line Product necessarily

26  involved Cress' OTC transactions and liquidations, because as Hristov specifically represented, Cress'

27  OTC purchases were made "through Nexo's Credit line" which impacted Cress' "LTV and liquidation

28

10

numbers." *See supra*, Section I.A.1; SAC ¶ 36.

In short, the SAC pleads who made the statements, what was said, when and where it was said, and how it misled Cress—supported by specific contemporaneous assurances, a consistent marketing campaign through the relevant period, and transaction-level misrepresentations.

**B.    Civil Theft in Violation of California Penal Code §496 (COA 6)**

Nexo contends that the civil theft claim fails because: (1) the claim fails to meet Rule 9(b); and (2) a "dispute about fees" in a contractual setting cannot constitute theft. Not so.

First, to the extent the civil theft claim relies on fraudulent misrepresentations, Cress has incorporated the same detailed allegations discussed above in Section II.A (fraudulent inducement). The SAC further describes how Nexo's theft was executed and concealed by sending fraudulent trade confirmations omitting any mention of fees, thus duping Cress into believing he paid fair market price, when in fact Nexo siphoned off a portion. SAC ¶¶ 52-93, 111-116.

The second objection—that this is merely a contract dispute over fees, not "theft"—misrepresents the SAC. This is not a "run-of-the-mill fee dispute"; it is theft by false pretenses. The SAC does not allege merely that Nexo charged "too much." It alleges that Nexo affirmatively represented it charged no fees ("#ZeroFees," "no hidden fees") and then secretly took fees it knew it had not disclosed and had no right to collect. SAC ¶¶ 52–83, 195–202. That is classic theft by false pretenses—the consensual but fraudulent acquisition of property. The California Supreme Court recently confirmed that § 496(c) applies to business misconduct involving "theft by false pretense." *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 351 (2022).

Nexo's attempt to characterize *Siry* as a caution against fee disputes is backwards. *Siry* rejected a categorical carve-out for commercial misconduct and emphasized that § 496(c) reaches conduct that is "not innocently or inadvertently" undertaken but reflects "careful planning and deliberation" and the requisite criminal intent. *Id.* at 362. That is exactly what Cress alleges here. Courts have recognized that pre-*Siry* decisions, like those cited by Nexo, which prohibit civil theft in business disputes are "no longer good law." *Matthews v. Apple, Inc.*, 769 F. Supp. 3d 999, 1012 (N.D. Cal. 2024) (decisions like *Grouse River* are "no longer good law").

Nor is Nexo aided by cases dismissing § 496(c) claims where defendants plausibly believed they were entitled to the property. *See Siry*, 13 Cal. 5th at 369. Cress alleges the opposite: Nexo's internal documents and communications reflect its awareness that it was secretly profiting from OTC transactions and liquidations, misrepresenting pricing, and affirmatively concealing fees and "taxes" from customers. SAC ¶¶ 64–93, 111–116, 196–198 ("We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do."). This aligns with the paradigm the Supreme Court identified as actionable theft by trick or false pretenses. *See People v. Ashley*, 42 Cal. 2d 246, 267 (1954) (obtaining loans from victims by making "false promises of security for their loans" constitutes theft by false pretenses).

Finally, Nexo's "contract dispute" framing is especially untenable because Cress alleges, and Nexo concedes, there was no contractual authorization for these takings. The CPA did not disclose any OTC fees and Nexo did not otherwise disclose the commissions in advance. SAC ¶ 61; *see also* Mot. at 30 (conceding Nexo did not disclose OTC fees in advance). Where, as here, Cress alleges Nexo intentionally induced payment through a concealed, unauthorized taking, courts sustain § 496(c) claims notwithstanding the commercial context. *Siry*, 13 Cal. 5th at 351.

In short, Cress pleads far more than a pricing disagreement. He alleges Nexo's deliberate scheme to obtain his property through false pretenses, then conceal the taking through misleading confirmations and nondisclosure. Nexo's internal documents demonstrate its specific intent to deprive Cress and its other customers of their property. Nexo knew it had no rightful claim to those funds. Nor is Nexo able to point to any agreement entitling it to those funds. SAC ¶¶ 80, 92, 111-116. Cress thus states a plausible claim under § 496(c).

## C.    Fraudulent Omission Based on Concealment of Hidden Fees (COA 9)

Nexo's attack on Cress' fraudulent omission claim focuses on challenging its duty to disclose. Nexo focuses on a single source of that duty—fiduciary duty. However, Cress need only allege one of the four independent bases for a duty to disclose to satisfy the pleading requirement of fraudulent

omission. *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal. App. 4th 603, 613 (1992).[5] Thus, (1) exclusive knowledge of material facts not known to plaintiff, (2) active concealment, or (3) partial representations are all sufficient to plead fraudulent concealment. *See Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 310–11 (2017); *Baystar Capital Mgmt. LLC v. Core Pac. Yamaichi Int'l H.K. Ltd.*, 2007 U.S. Dist. LEXIS 105322, at *13 (C.D. Cal. 2007). Cress pleads them all. SAC ¶¶ 240-249.

Nexo does not contest that it "had exclusive knowledge of material facts that were not known" to Cress regarding its fees (i.e., Nexo knew the hidden fee rates, but Cress did not) or that it "actively concealed" those fees and profits from Cress by sending him fraudulent trade confirmations. SAC ¶¶ 64-83, 111-116, 242-244. Thus, Nexo makes no argument that Cress failed to allege a pure omission. *Anderson v. Apple Inc.*, 500 F.Supp.3d 993, 1014 (N.D. Cal. 2020) (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997)). The Court's enquiry may end there.

Nexo's reliance on *Hanson v. Nexo Cap. Inc.*, No. 2:24-cv-10466-MAR, Dkt. 31, at 26 (C.D. Cal. June 30, 2025) is also inapposite. Nexo's relationship to its VIP clients went far beyond a simple lender-borrower relationship. Cress alleges that Nexo was essentially acting as his financial advisor and broker, providing detailed financial advice. *Sakai v. Merrill Lynch Life Ins. Co.*, 2008 U.S. Dist. LEXIS 69420, at *7-8 (N.D. Cal. Sep. 10, 2008); *See also City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal.App.4th 445, 484 (1998) (encouraging a client to undertake overly risky "highly leveraged interest-bearing instruments" stated a claim for breach of fiduciary duty).

Nexo does not dispute that Cress has adequately alleged he would have acted differently had he been aware of Nexo's OTC fees, but without any analysis asserts that, "[w]ith regard to liquidation fees, Cress has not, and cannot, articulate how knowledge of these fees would have changed his actions." Mot. at 28. This is incorrect. Cress specifically alleges that he "would not have utilized Nexo's OTC desk to make purchases and would not have taken out loans to purchase digital assets using its OTC desk had these secret fees been disclosed." SAC ¶ 244. The undisclosed liquidation fees

---

[5] Nexo's reliance on *Marketing West* cuts against them, because in *Marketing West*, the Court never analyzed any fiduciary duty and ultimately held "respondent's duty to disclose in this case is fact dependent and a question for the trier of fact, not a question of law." *Id*. at 614-15. So too here.

1    materially changed the risk of Cress' investments by leaving his account more susceptible to further

2    liquidations and thus total loss. SAC ¶ 87. This is why Nexo actively sought to conceal these fees from

3    Cress and its other customers. SAC ¶ 92 ("WE SHOULD NEVER, UNDER ANY

4    CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX.").

5        **D.    Common Law Fraud Misrepresentation of NEXO's SEC Registration (COA 5)**

6        Cress' Fifth COA asserts a common-law fraud claim based on Nexo's false statement that the

7    NEXO token was "registered with the SEC as a security"—a statement that Nexo's representative

8    (Hristov) made to Cress to induce him to purchase NEXO Tokens in 2021. SAC ¶ 107. As Nexo

9    acknowledges, this claim is "based on the same factual predicate as his old securities fraud claim."

10   Mot. at 31, which this Court has allowed to proceed. Dkt 26. Nexo nevertheless argues that Cress fails

11   to plausibly allege scienter, reliance, and causation.

12       **Scienter.** Nexo's scienter and intent to defraud is laid bare by Cress' allegations that Nexo's

13   false statements were "standard language provided to VIP Program customers to induce them to

14   purchase NEXO Tokens," and that "Nexo Relationship Managers sent this identical misrepresentation

15   to dozens of VIP customers." SAC ¶¶ 106-107. In addition, Nexo's own Token Sale Terms and

16   Conditions, and Nexo's communications with the SEC and its customers, show that Nexo knew its

17   NEXO Token offering was not "registered with the SEC as a security." SAC ¶¶ 108-110.

18       Nexo seeks to relitigate this Court's ruling that its statement regarding SEC registration was

19   "literally false," Dkt. 26 at 32, by arguing the context of the statement's context demonstrates it was

20   not made with an intent to deceive. Not so. Cress' SAC ¶¶ 34-39, 106-110 lays out the context of the

21   misrepresentation in detail: In early 2021, as Cress was considering whether to invest in NEXO

22   Tokens, Nexo told him, "the NEXO token is registered with the SEC as a security, therefore we are

23   only allowed to facilitate deals for American citizens who are also certified, accredited investors."

24   SAC ¶ 106. Nexo seizes on the latter half of that sentence to claim the statement was somehow true

25   or innocently qualified. But telling Cress the token was *"registered with the SEC as a security"* was

26   flatly false. Nexo had never registered the NEXO token offering with the SEC. The only thing Nexo

27   had done was file a Form D notice in 2018, indicating it was engaging in an unregistered securities

28
                                            14

offering (claiming an exemption). This Court has already rejected Nexo's argument that a Form D is a "registration" with the SEC. Dkt. 26 at 32-33 ("The Form D is not a 'registration statement…'").

Nexo knew this. As discussed in Section I.2.B, Nexo's own Terms and Conditions of Token Sale, which were never provided to Cress, stated the NEXO token sale was not registered. SAC ¶ 108. And in 2020, the SEC told Nexo its marketing materials falsely stated that it was "SEC-compliant." SAC ¶¶ 109-110. Nexo told the SEC it corrected the language, but nevertheless continued to represent to its customers that "the NEXO token is registered with the SEC as a security." *Id.* ¶¶ 107, 110. In 2021, a Nexo customer sent Nexo an email that "Nexo falsely stated on it's website it is SEC Compliant" and forwarded SEC correspondence to Nexo discussing that "Nexo is not registered with the SEC." SAC ¶ 110. Yet even then Nexo continued to falsely represent that its token was "registered with the SEC as a security." This is more than sufficient to establish scienter at the pleading stage. *Albergo v. Immunosyn Corp.*, 2012 U.S. Dist. LEXIS 197659, at *14 (S.D. Cal. June 19, 2012) (Scienter met where defendant's representations are "contradicted by [defendant]'s own SEC filings."); *Gebhart v. SEC*, 595 F.3d 1034, 1043 (9th Cir. 2010) (Scienter met where defendant makes "no effort" to ensure their representations were true).

**Reliance.** "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *City Sols. v. Clear Channel Communs., Inc.*, 365 F.3d 835, 840 (9th Cir. 2004) (citation omitted). Here, the Court has already ruled that Nexo's statement that the NEXO Token was registered with the SEC was material. Dkt. 26 at 32-33. "A statement is material if 'a reasonable investor would have considered it useful or significant.'" *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 913 (N.D. Cal. 2012) (*quoting United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011)). And Cress specifically alleges that he did rely on the assurance of SEC registration; that it allayed his concerns; and led him to purchase a large quantity of NEXO Tokens. SAC ¶ 37, 106.

**Causation.** Nexo argues Cress has not plausibly pled causation because he seeks liquidation losses allegedly "untethered" to the misrepresentation that the NEXO Token was SEC-registered. That argument improperly seeks a merits determination on causation and the scope of recoverable damages.

California law permits recovery of both out-of-pocket and consequential damages proximately caused by fraud. Cal. Civ. Code § 3343(a); SAC ¶¶ 189–90. At the pleading stage, Cress need only allege a plausible causal link to some injury. The extent of damages and the precise causal chain are factual issues not resolved on a motion to dismiss. *See Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 666 (2001) ("Causation generally a question of fact for the jury"); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (loss causation is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").

The SAC plausibly pleads that Nexo's SEC-registration misrepresentation induced Cress to purchase and hold NEXO, and that NEXO's poor performance materially reduced his collateral value and contributed to liquidation of his assets on the platform. SAC ¶ 49; SAC ¶ 187. There is nothing "facially implausible" about that clear chain. *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1057; SAC ¶ 187. Nexo's effort to confine damages to token-only losses is therefore premature: proximate cause and the recoverability of consequential liquidation losses are fact questions, likely informed by expert testimony, not a Rule 12(b)(6) issue. *See Weissich v. County of Marin*, 224 Cal. App. 3d 1069, 1084 (1990) (proximate cause generally cannot be decided from the complaint's allegations).

### E.    Civil RICO (COA 7)

#### 1.    The PSLRA Does Not Bar Cress's RICO Claim

Nexo argues that the PSLRA bars Cress' RICO claim because it supposedly arises from securities fraud. Mot. at 15-16. That is incorrect. The PSLRA "amended RICO to state . . . that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010) (quoting 18 U.S.C. § 1964(c)). Nexo drastically overstates the scope of the PSLRA amendment. The amendment bars a plaintiff from re-casting securities-fraud conduct as a RICO predicate. *See Trachsel v. Buchholz*, 2009 U.S. Dist. LEXIS 4219, at *9 (N.D. Cal. Jan. 6, 2009). It does not immunize a defendant from RICO liability for a separate fraudulent scheme simply because

1   some other aspect of the overall relationship involved a security. *Absolute Activist Value Master Fund*

2   *Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1321-22 (M.D. Fla. 2017) (holding that PSLRA does not bar

3   RICO claims based on a distinct post-investment scheme, even if the broader relationship involved

4   securities fraud).  Indeed, the PSLRA does not bar a civil RICO claim where the alleged pattern targets

5   non-securities misconduct (e.g., a tax or fee scheme) and any securities transaction is merely incidental

6   rather than integral to, or "in connection with," the racketeering conduct. *Ouwinga v. Benistar 419*

7   *Plan Servs., Inc.*, 694 F.3d 783, 790 (6th Cir. 2012).

8       In *Rezner*, the Ninth Circuit held the bar did not apply where municipal bonds were pledged

9   as collateral but were not themselves misrepresented and did not drive the alleged injury; the fraud

10  instead arose from misrepresentations about the tax treatment of a loan, which made the securities

11  component peripheral rather than integral. 630 F.3d at 872. In *Absolute Activist*, the District Court

12  similarly rejected a PSLRA defense where the underlying securities fraud was complete and the RICO

13  claim targeted a separate scheme involving concealment and laundering of proceeds that occurred after

14  any securities transaction and could not itself be pled as securities fraud. 233 F. Supp. 3d at 1322-23.

15      Here, the RICO claim does not depend on Nexo's alleged misrepresentation concerning the

16  NEXO Token.[6]  It targets a separate scheme: Nexo's systematic extraction of undisclosed fees through

17  its OTC trading desk and liquidation fees. Nexo has already persuaded this Court of that those are not

18  securities transactions. In its original motion to dismiss, Nexo affirmatively argued that Cress' credit

19  lines, collateralized loans, and OTC BTC and ETH trades were not securities transactions. *See* Dkt.

20  19. The Court agreed. Dkt. 26 at 28–31.

21      Nexo now attempts to reverse course by collapsing the entire case into a securities theory in

22  order to invoke the PSLRA's RICO bar, asserting that Cress' RICO allegations "cannot be separated"

23  from his securities allegations. Mot. at 16. But Cress' only actionable securities-fraud allegation—the

24

25  [6] While Cress' RICO claims are not predicated upon Nexo's misrepresentation that its NEXO Token
    was registered with the SEC as a security, even if they were, Cress is expressly entitled to plead these
26  theories in the alternative under FRCP 8(d). Because Nexo maintains that it did not offer the NEXO
    Token as a security, that remains a contested factual issue. Rule 8(d)(3) allows a party to state as many
27  separate claims as he has, "regardless of consistency."

28

false representation that the NEXO Token was "registered with the SEC"—is pled as a standalone claim, not a RICO predicate act. SAC ¶ 204. The alleged racketeering activity arises entirely from Nexo's hidden fee scheme in connection with Cress' OTC purchases and liquidations. Cress' OTC purchases included BTC, ETH, stablecoins, and NEXO. And Nexo's liquidations were limited to his BTC, ETH, and stablecoins. The securities-fraud claim and the RICO claim, thus, address distinct misconduct, distinct transactions, and distinct harms.

Courts applying the PSLRA consistently focus on whether the alleged RICO predicates themselves would be actionable as securities fraud—not whether securities appear somewhere in the broader factual background. *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 457, n.9 (S.D.N.Y. 2009) (holding PSLRA did not preclude a RICO claim where securities transactions were used to generate artificial tax losses in an unlawful tax shelter because the fraud lay in the design and promotion of the scheme rather than in misrepresentations about securities themselves); *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1116 (N.D. Ill. 2016) ("PSLRA exception does not bar RICO claims" if the "scheme at issue only incidentally involved the underlying securities or securities transactions."). Where, as here, the challenged conduct involves non-securities transactions and causes harm independent of any securities misrepresentation, the PSLRA does not apply.

Nexo's reliance on *Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007), is misplaced. *See* Mot. at 17. In *Swartz*, the alleged fraud depended on a securities sale to work. 476 F.3d at 761. The Ninth Circuit treated the Microsoft stock sale as the "lynchpin" of the scheme: without selling the stock (with an inflated basis), there was no tax loss and no injury mechanism. *Id.* It does not address a situation where the challenged conduct is affirmatively non-securities conduct, and the alleged racketeering harm is fully realized without any securities transaction. *See id.*

Cress alleges two different wrongs: a securities misrepresentation concerning the NEXO Token, and a racketeering scheme built on concealed fees and predatory liquidation practices involving all assets on the Nexo platform, including assets such as BTC and ETH which are undisputedly not securities. The PSLRA prevents bootstrapping the former into RICO; it does not immunize the latter simply because both occurred within the same commercial relationship.

18

### 2.  Cress Alleges the Existence of a RICO Enterprise

Cress pleads a RICO enterprise: an association-in-fact made up of multiple, separately identifiable actors who operated together over time for a common fraudulent purpose.

### a.  The SAC alleges a real enterprise with identified members and roles

Nexo is wrong that the SAC defines the "Nexo Enterprise" as Nexo acting alone, or as a vague cloud of "affiliates." Cress alleges "an ongoing, continuing group or unit of persons and entities associated together for the common purpose of maximizing profits by fraudulently concealing" fees in customer transactions. SAC ¶ 210. Cress then identifies specific enterprise members and their roles beyond Nexo including (i) specific named corporate affiliates (e.g., Nexo Inc., Nexo Financial LLC, Nexo AG, etc.) that together (with Nexo) operate the platform and customer-facing operations, (ii) NDS EOOD—a separate entity used to supply personnel who interacted with customers and carried out the fraud, and (iii) Nexo's owners/managers Trenchev and Kantchev, who set policy and directed execution of the scheme. *Id.* ¶¶ 207–214.

Cress also pleads how the enterprise functioned: executives established and enforced the policies and procedures that made the concealed-fee scheme possible; NDS EOOD communicated the misrepresentations to customers; and the Nexo platform and its systems initiated the transactions and generated deceptive confirmations/records that masked the true economics of OTC pricing and liquidations. *Id.* ¶¶ 207–214. That is more than a label. Cress pleads structure (relationships, division of labor) and continuity (ongoing, repeated conduct) aimed at a shared objective.

For that reason, Nexo's reliance on *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013), is misplaced. *Ellis* rejected an enterprise theory based on unspecified corporate groupings with no identification of the enterprise members or their roles. *Id.* at 1088–89. Here, by contrast, Cress identifies specific corporate entities and individual actors and describes the distinct functions each performed in carrying out and concealing the fee-extraction scheme. SAC ¶¶ 207–214. The enterprise allegations are based on coordinated conduct among identifiable actors, not on bare corporate labels or internal corporate structure.

### b.  The SAC satisfies RICO distinctness

1   As the Motion notes, distinctness is lacking only when the alleged "enterprise" is merely the

2   defendant "person" under another name. Mot. at 17-18. That is not the case here. The SAC alleges

3   that Nexo (the RICO "person") conducted the affairs of an enterprise that includes other, legally

4   distinct entities and individuals, including NDS EOOD and principals Trenchev and Kantchev. SAC

5   ¶¶ 210–14. Nexo's assertion that "the only non-Nexo entity mentioned is Credissimo" is incorrect.

6   The SAC expressly identifies NDS EOOD and individual owners/managers Trenchev and Kantchev

7   as enterprise members, each legally distinct from Nexo Capital and from one another. SAC ¶ 211;

8   *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 362 (9th Cir. 2005) ("a corporate

9   officer can be a person distinct from the corporate enterprise."). And to the extent Nexo attempts to

10  recharacterize these actors as alter egos to defeat distinctness, that argument does not warrant dismissal

11  at the pleading stage. *See Elizabeth Arden, Inc. v. Merch. of Tennis, Inc.*, 2011 U.S. Dist. LEXIS

12  164879, at *18–20 (C.D. Cal. July 25, 2011).

13                      **c. Nexo's position conflicts with its prior claims of corporate separateness.**

14  Nexo's position also conflicts with its own prior representations to this Court. In its first motion

15  to dismiss, Nexo emphasized that the European Nexo entities and Nexo Financial maintain

16  independent corporate structures, are distinct business entities, provide different services, and observe

17  corporate formalities. Dkt. 19 at 10. Now, to avoid RICO liability, Nexo reverses course and argues

18  that those same entities and individuals are functionally indistinguishable from Nexo Capital and

19  therefore cannot form an enterprise. Nexo cannot have it both ways. If the entities are distinct, as Nexo

20  previously insisted, then the SAC's allegations of a coordinated association-in-fact readily satisfy

21  RICO's enterprise and distinctness requirements; if Nexo now claims they are effectively the same,

22  that presents a factual dispute inappropriate for resolution on a motion to dismiss and does not negate

23  the SAC's detailed allegations of coordinated, multi-actor misconduct.

24                      **3. Cress alleges a valid pattern of racketeering activity**

25  A plaintiff must plead a "pattern of racketeering activity," 18 U.S.C. § 1962, which requires

26  that predicate acts be "related" and "continuous." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239

27  (1989). "Continuity" may be closed-ended, repeated conduct over a substantial period, or open-ended,

28

conduct that poses a threat of repetition or constitutes a regular way of doing business. *Id.* at 241–42.

In *Shinde v. Nithyananda Foundation*, No. EDCV 13-363, 2015 WL 12732434 (C.D. Cal. Feb. 23, 2015), plaintiffs alleged repeated mail and wire fraud over several years in connection with a unified scheme to solicit donations through systematic misrepresentations. *Id.* at *10–11. Like Nexo, defendants argued the scheme had ended and posed no ongoing threat. The court rejected that argument, holding that closed-ended continuity does not require allegations of current or future misconduct. *Id.* The court found a pattern because the predicates were not isolated but part of a long-term scheme with a common purpose and method spanning multiple years. *Id.*

Here, the SAC likewise pleads a pattern under section 1962(c) by alleging repeated, related acts of mail and wire fraud carried out over many years as part of Nexo's regular course of business.

### a. Cress alleges predicate acts

First, the SAC pleads multiple predicate acts of mail fraud and wire fraud based on Nexo's repeated use of interstate wires and mails to misrepresent and conceal pricing and fees in OTC trades and liquidations. Cress alleges that Nexo transmitted false trade confirmations, misleading account records, and deceptive pricing information to Cress through emails, web-based dashboards, and other electronic communications, which were essential to inducing transactions, executing them, and concealing undisclosed spreads and commissions. SAC ¶¶ 215–234. Cress also alleges that Nexo used public-facing internet communications, including blog posts, promotional materials, and AMA statements distributed via interstate wires, to falsely assure customers that no hidden fees were charged, thereby reinforcing the scheme. *Id.* ¶ 221. These acts were not isolated; Cress alleges hundreds or thousands of such transmissions affecting numerous customers beyond Cress since at least 2018 through at least 2022. *Id.* ¶ 222.

Nexo's contention that Rule 9(b) requires Cress to plead the precise date, sender, and content of every individual mailing or wire transmission misstates the law. Where a complaint pleads a detailed fraudulent scheme and explains how the mails or wires were used to further it, Rule 9(b) is satisfied even without itemizing each communication. *Eclectic Props. E., Ltd. Liab. Co. v. Marcus & Millichap Co.*, No. C-09-00511 RMW, 2012 U.S. Dist. LEXIS 28865, at *40-44 (N.D. Cal. Mar. 5, 2012)

(holding Rule 9(b) was satisfied where plaintiffs alleged a detailed fraudulent scheme and described the course of communications, even without specifying the date or contents of every individual transmission); *see also In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y.1998) ("a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications[ ] is sufficient to satisfy Rule 9(b)"). Nevertheless, the SAC does identify specific fraudulent communications in addition to those targeted at Cress personally. SAC ¶¶ 223-224 (identifying dates, contents, senders, and medium of various misrepresentations regarding fees).

Nexo's assertion that Cress' RICO claim fails because "non-disclosure is not a racketeering activity" mischaracterizes well-settled law and ignores Cress' allegations. Mot. at 22. *United States v. Dowling*, 739 F.2d 1445, 1448 (9th Cir. 1984) ("A nondisclosure or concealment **may serve as a basis for the fraudulent [RICO] scheme**.") (emphasis added). The RICO claim is not based on silence alone, but on affirmative misrepresentations and misleading communications that concealed undisclosed OTC markups and liquidation taxes. SAC ¶¶ 217-224. Those communications constitute deceptive statements sufficient to establish a scheme to defraud under sections 1341 and 1343.

Nor does *United States v. Dowling*, 739 F.2d 1445 (9th Cir. 1984) help Nexo. Rather, *Dowling* recognizes that it is well "settled in this Circuit that a scheme to defraud need not be an active misrepresentation. A nondisclosure or concealment may serve as a basis for the fraudulent scheme." *Id.* at 1448. While nondisclosure requires breach of an independent duty, *see id.* at 1449–50, the SAC pleads such a duty. It alleges that Nexo affirmatively assumed a fiduciary and trust-based relationship through its VIP Relationship Program, assignment of a dedicated relationship manager, discretionary control over Plaintiff's collateral and liquidations, and superior, nonpublic knowledge of pricing and execution practices. SAC ¶¶ 62-83, 218-224, 242.

"The existence of a fiduciary duty is a fact-based determination that must ultimately be determined by a jury." *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016). In the RICO context, "the term 'fiduciary' is a broad one…encompassing 'informal,' 'trusting relationships in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." 844 F.3d 819, 823 (9th Cir. 2016) (cleaned up). Cress pleads both an

informal and a formal fiduciary duty. SAC ¶¶ 218-224 (Nexo "lull[ed] customers into a sense of trust" to "prevent them from discovering Nexo's fees" by stating that it did not charge any fees or commissions, providing its customer false and fraudulent transaction records, and misrepresenting it acted as a middleman); SAC ¶¶ 62-83 (Hristov and Dinca advised Cress into buying millions of dollars of digital assets while Nexo took secret fees and provided false records); SAC ¶ 242 (alleging a formal fiduciary duty).

Finally, Nexo's reliance on *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089 (9th Cir. 2015), and *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987), is misplaced. *Eller* involved an arm's-length transaction with full contractual disclosure and no fiduciary or discretionary relationship, and *California Architectural* was decided on a summary-judgment record lacking evidence of fraudulent intent or an independent duty to disclose. Neither case resembles the fiduciary, discretionary, and concealment-based scheme alleged here.

### b. Cress alleges continuity

Cress adequately pleads both closed-ended and open-ended continuity.

For closed-ended continuity, Cress alleges repeated, related acts of fraud spanning multiple years, from at least 2019 through 2022, not a "four-month period" as Nexo suggests—and directed at numerous customers rather than a single isolated transaction. SAC ¶¶ 222, 231. Allegations of repeated fraud over a multi-year period are sufficient at the pleading stage to establish closed-ended continuity. *H.J. Inc.*, 492 U.S. at 242; *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995).

Cress also pleads open-ended continuity by alleging that the fraudulent conduct was systematic and embedded in Nexo's ordinary business practices, including how it priced OTC trades and liquidations and how those prices were communicated to customers. SAC ¶¶ 215, 219, 232. Where predicate acts constitute a defendant's "regular way of doing business," continuity is satisfied. *H.J. Inc.*, 492 U.S. at 242. Cress further alleges that absent intervention, Nexo's deceptive pricing practices would continue indefinitely. SAC ¶ 232.

Nexo's assertion that RICO does not apply to "extra-territorial conduct" misframes the claim. *See* Mot. at 24. Cress seeks recovery for a domestic injury caused by U.S.-directed conduct—

specifically, a fee-and-markup scheme implemented through interstate wires into the U.S. and resulting in concrete losses to Cress here. *RJR Nabisco Inc. v. European Cmty.*, 579 U.S. 325 (2016), and *Life Bliss Found. v. Sun TV Network Ltd.*, 2014 WL 12589657 (C.D. Cal. Sept. 17, 2014), bar recovery for foreign injuries; they do not preclude civil RICO claims alleging domestic injury arising from domestic racketeering activity. *See RJR Nabisco*, 579 U.S. at 354.

### 4.    Cress Pleads a RICO Conspiracy Claim (COA 8)

Nexo's contention that the RICO conspiracy claim "falls with" the substantive RICO claim or rests on conclusory allegations is incorrect. *See* Mot. at 24. Cress pleads a coordinated agreement among Nexo, its specific affiliated entities, and senior executives to implement and carry out a uniform scheme to conceal OTC and liquidation fees. SAC ¶¶ 237–38. These allegations plausibly establish assent to a common plan and knowing participation by each conspirator. *Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1212 (E.D. Cal. 2007) (a conspiracy may be "inferred from the words, actions, or interdependence of activities and persons involved.").

### F.    Breach of Cryptocurrency Purchase Agreement (COA 10)

Nexo argues that Cress has not identified specific terms of the CPA that Nexo breached. Not so. Cress alleges that Nexo breached the CPA governing Cress' OTC trades by: (1) failing to timely execute Cress' purchase orders within the required "Review Period" (10 minutes); (2) charging hidden fees; and (3) liquidating the assets sold to Cress even though the contract promised to deliver them free of liens. SAC ¶¶ 257-260. Despite Nexo's insistence that Cress does not specify the terms, he does. SAC ¶¶ 58-61 (alleging the specific terms Nexo breached).

**Timely execution breach:** The CPA provided that when Cress submitted a Purchase Order, Nexo had ten minutes to confirm the order, after which the order was deemed rejected if not confirmed. Cress alleges Nexo did not abide by this term. Contrary to Nexo's assertion that Cress "does not plead any specifics about the confirmation of his OTC transactions," Cress alleges how his OTC orders were not executed or confirmed until days later at prices significantly higher than on retail exchanges or through time-weighted average pricing. SAC ¶¶ 57-79. Effectively, Nexo let the 10-minute window lapse but still went ahead and executed at a later time, presumably when market conditions suited it.

1  If proven, that is a clear breach of the express timing clause of the CPA.

2      **Unauthorized fees (breach of implied covenant):** While the CPA does not explicitly say

3  "Nexo will charge no fees," it also does not say Nexo may add any extra charge or mark up prices and

4  secretly pocket the difference. SAC ¶ 61. The CPA defines the "Purchase Price" as the price set forth

5  in the Purchase Order and promises to deliver the purchased assets upon payment of that price. SAC

6  ¶¶ 59-60. There is no term permitting Nexo to inflate that price with a secret fee. By surreptitiously

7  doing so, Nexo violated the spirit and reasonable expectations of the contract.

8      Moreover, under California law, a "breach of a specific provision of the contract is not

9  necessary to a claim for breach of the implied covenant of good faith and fair dealing." *Thrifty Payless,*

10  *Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (cleaned up). "Rather, the

11  question is whether the party's conduct, 'while not technically transgressing the express covenants ...

12  frustrates the other party's rights to the benefits of the contract.'" *3500 Sepulveda, LLC v. Macy's W.*

13  *Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020) (*quoting Racine & Laramie, Ltd. v. Dep't of Parks*

14  *& Recreation*, 11 Cal. App. 4th 1026, 1032 (1992)). "Allegations that a party to the contract has

15  charged another contracting party more than is allowed under the contract may form the basis of a

16  breach of contract claim." *Naranjo v. Doctors Med. Ctr. of Modesto, Inc.*, 111 Cal. App. 5th 408, 430

17  (2025); *Acree v General Motors Acceptance Corp.*, 92 Cal.App.4th 385, 396 (2001) ("overcharging

18  violated the covenant of good faith and fair dealing implied in the sales agreement"). That is just what

19  Cress alleges here. SAC ¶¶ 258-59. And it is well established that charging fees not specified in a

20  contract can breach the implied covenant of good faith and fair dealing. *Lair v. Bank of Am.*, N.A.,

21  2024 U.S. Dist. LEXIS 41588, at *8-9 (C.D. Cal. Jan. 26, 2024).

22      **"Free of liens" breach:** The CPA also promised that Cress would receive title to the

23  assets "free and clear of any and all liens." SAC ¶ 255. Yet, after these purchases, Nexo quickly used

24  the purchased assets as collateral for Cress' loan. Nexo's Motion does not address this breach at all.

25      In sum, the breach of contract claim is based on concrete contractual provisions and duties.

26  **III.    CONCLUSION**

27      Cress respectfully requests that the Court deny Nexo's Motion in its entirety.

28

Dated: January 2, 2026

Respectfully submitted,


/s/ *Max Ambrose*
James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

OPPOSITION TO NEXO'S MOTION TO DISMISS - Case No. 3:23-cv-00882-TSH