1  Ian S. Shelton (SBN 264863)
   BAKER & MCKENZIE LLP
2  ian.shelton@bakermckenzie.com
   10250 Constellation Boulevard, Suite 1850
3  Los Angeles, California 90067
4  Phone: (310) 299-8535
   Fax:   (310) 201-4721
5
   Matthew C. Rawlinson (admitted *pro hac vice*)
6  BAKER & MCKENZIE LLP
   matthew.rawlinson@bakermckenzie.com
7  800 Capitol Street, Suite 2100
   Houston, Texas 77002
8  Phone: (713) 427-5000
   Fax:   (713) 427-5099
9
10 *Attorneys for Defendant Nexo Capital Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CRESS,<br><br>    Plaintiff,<br><br>    vs.<br><br>NEXO CAPITAL INC.,<br><br>    Defendant. | CASE NO. 3:23-CV-00882-TSH<br><br>The Honorable Thomas S. Hixson<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT (DKT. 88)**<br><br>Hearing Date: January 29, 2026<br>Hearing Time: 10:00 a.m.<br><br>Courtroom: Courtroom E – 15th Floor<br>Federal Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

# **TABLE OF CONTENTS**

Table of Contents ........................................................................................................................ II

Table of Authorities ................................................................................................................... iii

Introduction ................................................................................................................................. 1

Argument ..................................................................................................................................... 3

    I.    The Fraudulent Inducement and UCL Claims Fail Because They Are Non-Actionable Puffing and Cress Does Not Identify Any Statement Promising No Fees on OTC Cryptocurrency Purchases or Liquidations ..................................... 3

    II.    The Civil Theft Claim Fails Based on the Existence of a Contractual Relationship and Lack of Intent to Steal ..................................................................... 6

    III.    The Fraudulent Omission Claim Fails Because There Is No Fiduciary Relationship ................................................................................................................. 7

    IV.    The Common Law Fraud Claim Fails For Lack of Scienter, Causation, and Reliance .............................................................................................................. 9

    V.    The RICO Claim Fails on Multiple Grounds ................................................... 11

        A.    The PSLRA Bars Cress's RICO Claims ............................................ 11

        B.    The SAC Does Not Allege an Enterprise .......................................... 13

        C.    The SAC Does Not Allege a Pattern of Racketeering Activity ......... 14

    VI.    The Breach of Contract Claim Fails Because Cress Does Not Identify Breach of Any Terms ............................................................................................... 15

Conclusion ................................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Devine*,
  233 F. Supp. 3d 1297 (M.D. Fla. 2017)...........................................................................11, 12

*Albergo v. Immunosyn Corp.*,
  2012 U.S. Dist. LEXIS 197659 (S.D. Cal. June 19, 2012)..........................................................10

*Alvarez v. Adtalem Educ. Grp., Inc.*,
  2019 WL 13065378 (N.D. Cal. Dec. 16, 2019) ...........................................................................6

*BSA Framing, Inc. v. Applied Underwriters, Inc.*,
  2018 WL 11462083 (C.D. Cal. Feb. 27, 2018).........................................................................13

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
  637 F.3d 1047 (9th Cir. 2011) .....................................................................................................3

*California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
  818 F.2d 1466 (9th Cir. 1987) ...................................................................................................14

*Chow v. Johnson*,
  No. C-07-4478 CW, 2008 WL 11396738 (N.D. Cal. Feb. 5, 2008)..........................................14

*City Sols., Inc. v. Clear Channel Commc'ns*,
  365 F.3d 835 (9th Cir. 2004) .....................................................................................................10

*Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc.*,
  911 F.2d 242 (9th Cir. 1990) .......................................................................................................3

*Core Focus Consulting 2, LLC v. RenewAge Energy Sols., Inc.*,
  2024 WL 3403115 (C.D. Cal. July 12, 2024) .............................................................................7

*Davies v. GetFugu, Inc.*,
  No. CV 09-8724-GHK (RCX), 2010 WL 11597458 (C.D. Cal. Aug. 26, 2010) .....................12

*Ehret v. Uber Technologies, Inc.*,
  68 F. Supp. 3d 1121 (N.D.Cal. 2014) .........................................................................................5

*Ellis v. J.P. Morgan Chase & Co.*,
  950 F. Supp. 2d 1062 (N.D. Cal. 2013) ....................................................................................13

*Gebhart v. SEC*,
  595 F.3d 1034 (9th Cir. 2010) ...................................................................................................10

*GEC US 1 LLC v. Frontier Renewables, LLC*,
  2016 WL 4677585 (N.D. Cal. Sept. 7, 2016) .............................................................................6

*Hanson v. Nexo Cap. Inc.*,
  No. 2:24-cv-10466-MAR, Dkt. 31 (C.D. Cal. June 30, 2025)................................................8, 9

*Jeong v. Nexo Capital Inc.*,
  No. 21-cv-02392-BLF, 2022 U.S. Dist. LEXIS 150413 (N.D. Cal. Aug. 22,
  2022) ..........................................................................................................................................5

*Kagan v. Gibraltar Sav. & Loan Assn.*,
    35 Cal. 3d 588 (1984) .................................................................................................. 5, 6
*McKnight v. Torres*,
    563 F.3d 890 (9th Cir. 2009) .............................................................................................. 15
*Morgan v. AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (2009) ............................................................................................ 5
*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ............................................................................... 4, 5
*Pette v. Int'l Union of Operating Eng'rs*,
    No. CV 12-09324 DDP PJWX, 2013 WL 5573043 (C.D. Cal. Oct. 9, 2013) ..................... 14
*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
    630 F.3d 866 (9th Cir. 2010) ....................................................................................... 12, 13
*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) .............................................................................................. 5
*Sedima v. Imrex Co.*,
    473 U.S. 479 (1985) ............................................................................................................ 14
*Shahangian v. Bank of Am. Nat'l Ass'n*,
    No. CV15-1919 DMG, 2015 WL 12696038 (C.D. Cal. Dec. 1, 2015) ............................... 11
*Shinde v. Nithyananda Foundation*,
    No. EDCV 13-363, 2015 WL 12732434 (C.D. Cal. Feb. 23, 2015) ................................... 14
*Siry Inv., L.P. v. Farkhondehpour*,
    13 Cal. 5th 333 (2022) .......................................................................................................... 6
*Stanwood v. Mary Kay, Inc.*,
    941 F. Supp. 2d 1212 (C.D. Cal. 2012) ................................................................................ 4
*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) .............................................................................................. 12
*Tecnogruas v. Int'l Transportation Serv., LLC*,
    No. 2:24-CV-05984-AB-PVC, 2025 WL 3049589 (C.D. Cal. Aug. 18, 2025) .................... 6
*In re Tobacco II Cases*,
    46 Cal.4th 298 (2009) ........................................................................................................... 4
*United States v. Dowling*,
    739 F.2d 1445 (9th Cir. 1984), rev'd, 473 U.S. 207 (1985) .............................................. 14
*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Circ. 2008) .............................................................................................. 5

**Statutes**

18 U.S.C. § 1964(c) ........................................................................................................... *passim*
CA Penal Code § 496(a) ............................................................................................................ 6
CA Penal Code § 496(c) ............................................................................................................ 6

**Other Authorities**

Fed. R. Civ. P. 8(a) ....................................................................................................................... 10

Fed. R. Civ. P. 9(b) .................................................................................................................*passim*

**INTRODUCTION**

Cress's opposition claims that Nexo made a blanket promise to never charge fees on any product or service, including bespoke OTC cryptocurrency purchases and liquidations. Nexo never said that. Cress points to zero ads where Nexo told him it would not charge fees on OTC cryptocurrency purchases or liquidations. Instead, Cress relies upon ads for *different* products and services. Cress's opposition continues his pattern of citing out-of-context snippets of ads or interviews about fees that do not relate to OTC cryptocurrency purchases or liquidations.

Cress is a sophisticated and accredited investor who amassed over $13 million worth of cryptocurrency as of early 2021. In March 2021, Cress opened a Nexo account and transferred his cryptocurrency to the Nexo platform to earn cryptocurrency "interest" through Nexo's Earn Interest Product. Dkt. 88 ¶ 21. Cress then decided to take out secured credit lines from Nexo in an attempt to earn even greater returns. *Id.* ¶¶ 40-41. In order to obtain those multi-million-dollar credit lines at low interest rates, and without a credit check, Cress pledged his cryptocurrency as collateral and bought NEXO Tokens worth approximately 10% of his total portfolio value. *Id.* Cress also joined Nexo's VIP Relationship Program offered to high-net-worth customers, which offered "OTC services." *Id.* ¶ 26. Cress knew that, as stated in Nexo's Crypto Credit General Terms and Conditions ("Credit Terms"), that if his loan-to-value became too high, his digital assets could be liquidated. *Id.* ¶¶ 17, 25. Cress ultimately "maxed out" his credit lines by obtaining nearly $14 million in credit lines secured against $30 million in cryptocurrency held in his Nexo account. *Id.* ¶ 32.

Cress's multi-million-dollar cryptocurrency purchases were through the OTC trading desk offered by the VIP Program—*i.e.*, custom purchase transactions individually negotiated and manually processed. Yet Cress cites advertising about totally different products—such as fees on originating credit lines, the EIP, other products offered to non-OTC retail customers, or other perks of the platform like crypto withdrawals. The ads Cress references do not pertain to the specific services at issue in this case. Nowhere in Cress's SAC, or his opposition, does Cress identify a single statement that Nexo would not charge him fees on OTC cryptocurrency purchases or forced liquidations. The below table shows the promotional materials that Cress cites in his SAC and

identifies what products the promotional materials are actually about. Cress does not even dispute that these promotional materials did not address OTC or liquidation fees:

| | Alleged Advertisement | Product Advertised |
|---|---|---|
| 1. | 2018 Nexo White Paper discussing "no hidden fees." Dkt. 88 ¶ 53(e); Dkt. 94-2. | Credit Line Product[1] |
| 2. | March 15, 2020 Blog Post advertising no fees. Dkt. 88 ¶ 53(a); Dkt. 94-3. | Credit Line Product[2] |
| 3. | June 24, 2020 Blog Post advertising zero fees. Dkt. 88 ¶ 53(b); Dkt. 94-4. | Earn Interest Product[3] |
| 4. | February 19, 2021 Blog Post promoting free crypto withdrawals. Dkt. 88 ¶ 53(c); Dkt. 94-5. | Loyalty Program |
| 5. | Cress's Account Page, Dkt. 95-2 stating "No Hidden Fees." Dkt. 88 ¶ 53(d); Dkt. 95-2. | Credit Line Product |

Stating in advertising that Nexo would not charge fees for originating credit lines, or for earning crypto interest through the EIP, or for various loyalty perks, is not the same as saying that Nexo would charge no fees for anything, or that Nexo would charge no fees for multi-million-dollar cryptocurrency purchases through the OTC desk. Yet Cress simply cites hashtags for ads associated with other products, which were not even directed to Cress or related to the OTC Program, and claim that Nexo committed fraud. Additionally, in his opposition, Cress attaches the transcript of a March 26, 2021 Ask Me Anything ("AMA") with Nexo's CEO Trenchev. Dkt. 88 ¶ 55; Dkt. 95-2. Cress fails to allege that he ever saw the AMA. Dkt. 88 ¶¶ 55, 57. Like the other promotional materials, the AMA is not about OTC or liquidation fees, but rather another product, the retail "Nexo Exchange" that Cress admittedly did *not* use for the OTC purchases at issue. Dkt. 95-3 at 2; Dkt. 95-4 at 3. Finally, Cress does not claim to have personally seen, heard, or relied upon any of these ads. Instead, he alleges that other customers were exposed to such materials. These vague and generalized allegations, which are more characteristic of class-action complaints, fail to establish concrete, specific claims tied to Cress personally. For these reasons, as well as those further detailed below, all of his claims should be dismissed.

---

[1] The cited Whitepaper was issued three years before the events at issue and before Nexo was operational.
[2] The cited blog post predated Cress's involvement with Nexo by a year.
[3] The cited blog post pre-dated Cress's involvement with Nexo by a year.

**ARGUMENT**

**I. THE FRAUDULENT INDUCEMENT AND UCL CLAIMS FAIL BECAUSE THEY ARE NON-ACTIONABLE PUFFING AND CRESS DOES NOT IDENTIFY ANY STATEMENT PROMISING NO FEES ON OTC CRYPTOCURRENCY PURCHASES OR LIQUIDATIONS**

Cress's claims for fraudulent inducement and breach of the false advertising prong of the UCL are based on allegations that Nexo advertised "some of the best rates" and OTC cryptocurrency purchase fees. These claims, however, fail because "**some of** the **best** rates on the **market**" (Dkt. 88 ¶¶ 52, 82, 117) (emphasis added) is non-actionable puffery, and further, these allegations fail to meet the heightened pleading standard of Rule 9(b). To meet Rule 9(b), the complaint must identify the "who, what, when, where, and how" of the fraudulent conduct, "as well as what is false or misleading about" it and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). Cress misleadingly cites to cases involving UCL standing to conflate the distinct standards for pleading under Rule 9(b) and standing, but upon scrutiny, his pleadings fall short of Rule 9(b)'s requirements.

Nexo's ads touting "exclusive OTC services" with "some of the best rates on the market" exemplify classic puffery. Courts within the Ninth Circuit have held that similar statements are non-actionable. In *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service Inc.*, the Ninth Circuit held that ads that imply "lower rates" and "better services" "than those of a competitor" are "exaggerated claim[s]," and "it is beyond the realm of reason to assert, as plaintiffs do, that a reasonable consumer would interpret this as a factual claim upon which he or she could rely." 911 F.2d 242, 246 (9th Cir. 1990). The *Cook* decision undermines Cress's argument that ads about "rates" are categorically verifiable. Rather, *Cook* shows that terms like "rates," in conjunction with "best," or "lower" in promotional materials is non-actionable opinion or "puffing," and reliance upon them is not justified. Cress's assertions to the contrary, which tellingly include minimal cites to case law, are simply wrong. He argues that the mention of some amorphous "market" provides a benchmark, but that does not transform non-actionable "puffing" into a verifiable and objective assertion. Likewise, promising "institutional" rates, whatever that means, is also not a verifiable

benchmark. Statements like those attributed to Nexo are ubiquitous in marketing, especially in the world of hashtags and short, concise, punchy, slogans.

Cress also fails to satisfy the heightened pleading requirements of Rule 9(b) because he relies solely on generic ads and does not identify which specific misrepresentations he viewed, heard, or read—or that he relied upon them at all when transacting with Nexo. In his opposition, Cress argues that Nexo engaged in a long-standing advertising campaign, and such a campaign relieves him of the need to plead with specificity or show actual reliance. Cress fails to mention that this standard is actually about standing, not 9(b)'s requirements, which many courts deem as separate and distinct issues. *See Stanwood v. Mary Kay, Inc.*, 941 F. Supp. 2d 1212, 1220 (C.D. Cal. 2012) ("While it may be true that for purposes of standing a plaintiff need not plead with an unrealistic degree of specificity that she relied on particular ads, *see In re Tobacco II Cases*, 46 Cal.4th 298, 306 (2009), that issue is separate from whether Rule 9(b)'s requirements are met."). For instance, Cress relies on *Opperman*, but in it, that court collected cases showing the weight of cases in favor of keeping the requirements of 9(b) and standing distinct. *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 977 (N.D. Cal. 2015). The *Stanwood* court exemplifies this distinction in practice. It held that:

> [T]he plaintiff's claims are based on several alleged misrepresentations. The first is that she was 'exposed' to Mary Kay's 'extensive and long term marketing and advertising campaign touting the company and its business operations as not testing any of its products on animals.' Under Rule 9(b), it is not sufficient to simply allege exposure to a long-term advertising campaign. . . . Therefore, [plaintiff's] claims for fraud based on her exposure to Mary Kay's advertising campaign must adequately plead the 'who, what, when, where, and how' of the underlying misrepresentations, which she has failed to do.

*Stanwood*, 941 F. Supp. 2d at 1219-1220 (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (cleaned up). Here, Cress fails to plead the who, what, when, where, and how, instead relying upon the inapplicable relaxed pleading standard for long-standing marketing campaigns.

Moreover, Cress continues to press vague, class-action like allegations about what other customers—not Cress—hypothetically viewed, heard, or read. For example, rather than focusing on what Cress heard, his allegations focus on "public-facing internet communications, including blog posts, promotional materials, and AMA statements distributed via interstate wires, to falsely assure customers" and that these ads "affect[ed] numerous customers beyond Cress since at least 2018."

Opp. at 27. The public AMA is a prime example of Cress citing to generalized allegations which are not relevant to Cress's individual claim. Notably, despite attaching the transcript as an exhibit and inviting the Court to listen to it—nowhere in the SAC, does Cress say that he heard it, nor that reliance upon it caused him to transact with Nexo. Nor could he—as he signed the Cryptocurrency Purchase Agreement ("CPA") two days before the alleged public AMA. SAC ¶¶ 55, 57.

Cress's additional cases do not salvage his position. Like *Opperman*, *Morgan v. AT&T Wireless Servs., Inc.*, is about standing, not Rule 9(b). 177 Cal. App. 4th 1235 (2009). Further, unlike *Ehret v. Uber Technologies, Inc.*, Nexo has not requested "the precise web pages viewed and the precise date [plaintiff] viewed the representation," rather Nexo has merely requested that Cress specify the ads that he relied upon that actually pertain to the specific services he used, and are at issue in this case. 68 F. Supp. 3d 1121, 1129 (N.D. Cal. 2014). Cress has not done so.

The remaining cases that Cress cites are irrelevant and taken out of context. *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) does not include the quoted language and is about whether a credit card solicitation violated the Truth in Lending Act's ("TILA") disclosure requirements; by properly alleging a TILA violation, the court found that the plaintiff also alleged a claim under the UCL reasonable customer standard. Opp. at 15-16. The *Jeong* case did not involve fees on OTC cryptocurrency purchases, and it did not analyze whether the alleged hashtag was attached to an ad that actually referred to liquidation fees. *Jeong v. Nexo Capital Inc.*, No. 21-cv-02392-BLF, 2022 U.S. Dist. LEXIS 150413, at *11 (N.D. Cal. Aug. 22, 2022). In *Williams v. Gerber Prods. Co.*, Gerber's packaging for its fruit juice snack product contained pictures of a number of different fruits, potentially suggesting that those fruits or their juices were contained in the product. 552 F.3d 934, 939 (9th Cir. 2008). The Court held that under the UCL reasonable customer standard, a plaintiff "should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." *Id.* It is unclear how that even remotely pertains to the present case. In *Kagan*, the defendant "conceded" that "its promotional brochure might have contributed to the confusion" where it advertised no fee is charged for management but then charged a trustee fee to a third-party for "operation and administration of the Plan, including management." *Kagan v. Gibraltar Sav. & Loan Assn.*, 35 Cal. 3d 588, 597 (1984).

REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

None of these cases are relevant—let alone persuasive here.

## II. THE CIVIL THEFT CLAIM FAILS BASED ON THE EXISTENCE OF A CONTRACTUAL RELATIONSHIP AND LACK OF INTENT TO STEAL

In its opening brief, Nexo argued that Penal Code § 496(a) does not apply here, as there is no "theft." Mot. at 25. Despite hesitation given § 496's legislative history (as detailed in Nexo's opening brief citing *Grouse River Outfitters Ltd v. NetSuite, Inc.*, No. 16- CV-02954-LB, 2016 WL 5930273, at *14 (N.D. Cal. Oct. 12, 2016)), in *Siry Inv., L.P. v. Farkhondehpour*, the California Supreme Court held that § 496(c) can apply in the business context. *Siry* was decided on default judgment posture, so that "defendants [we]re deemed to have admitted all material allegations, including the allegation that defendants committed theft." 13 Cal. 5th 333, 361 (2022). Regardless, the California Supreme Court cautioned "not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft." *Id.* To prove theft, a plaintiff must establish criminal intent on the part of the defendant beyond mere proof of nonperformance or actual falsity." *Id.* at 361-62. Courts have emphasized the importance of establishing criminal intent under *Siry*, defined as "intent to steal [ ] without a good faith claim of right," *Tecnogruas v. Int'l Transportation Serv., LLC*, No. 2:24-CV-05984-AB-PVC, 2025 WL 3049589, at *11 (C.D. Cal. Aug. 18, 2025) (*quoting People v. Davis*, 19 Cal. 4th 301, 305 (1998)) and cautioning that "[o]ne cannot intend to steal property which he believes to be his own," (*id.* quoting *People v. Kaufman*, 17 Cal. App. 5th 370, 388 (2017) (dismissing a contract dispute where defendant had a "colorable" claim to the funds at issue).

Nexo maintains that Cress fails to plausibly allege an intent to steal in this run-of-the-mill pricing dispute. *See GEC US 1 LLC v. Frontier Renewables, LLC*, 2016 WL 4677585, at *9 (N.D. Cal. Sept. 7, 2016) (civil theft requires "a specific intent to steal, and cannot be established if a defendant has a good faith claim of right to possession"). (internal quotation marks and citations omitted). "A cause of action for civil theft cannot lie where a plaintiff receives legitimate services based on mutual agreement to pay for those services." *Alvarez v. Adtalem Educ. Grp., Inc.*, 2019 WL 13065378, at *5 (N.D. Cal. Dec. 16, 2019).

The deficiency in Cress's civil theft claim is even more apparent in the context of his non-

disclosure theory of liability. Cress does not allege facts sufficient to demonstrate that Nexo's alleged failure to disclose certain fees was accompanied by the specific criminal intent required for a theft claim. Nor do the allegations within the SAC plausibly suggest that Nexo acted with the requisite intent to steal, as opposed to mere nonperformance or omission. Cress insists that the non-disclosure theory of liability is not his only theory, but the generic advertising referenced in the SAC do not relate to the OTC and liquidation fees that are at issue in this dispute. For instance, Cress fails to allege that he received any specific communication from Nexo promising no fees on OTC transactions or liquidations. Instead, the complaint relies on references to general ads concerning other products, which were directed to other customers and span timeframes ranging from years prior to Cress's engagements with Nexo to days after he had already begun transacting. These allegations do not support the assertion that Nexo intentionally concealed material information with the criminal intent necessary for a theft claim.

Like his other fraud-based claims, here Cress also fails to plead to the degree of specificity required by Rule 9. *See Core Focus Consulting 2, LLC v. RenewAge Energy Sols., Inc.*, 2024 WL 3403115, at *4 (C.D. Cal. July 12, 2024) (where a civil theft claim relies on a "false representation" to fraudulently obtain property, plaintiff must "state the time, place, and specific content of the false representations" and "the identities of the parties to the misrepresentation"). Here, Cress's pleadings are insufficient and do not support a plausible inference of intentional wrongdoing by Nexo.

### III. THE FRAUDULENT OMISSION CLAIM FAILS BECAUSE THERE IS NO FIDUCIARY RELATIONSHIP

In its opening brief, Nexo put forward multiple grounds for dismissing Cress's fraudulent omission claim: (i) the SAC fails to plausibly allege that Nexo concealed or suppressed any material fact; (ii) the SAC does not establish that Nexo had a duty to disclose any such information to Cress; and (iii) with regard to liquidation fees, Cress has not, and cannot, articulate how knowledge of these fees would have changed his actions. Mot. at 19. Although Cress nods to certain allegations that he claims refutes these arguments in his opposition, these allegations are conclusory, lack plausibility, and Cress has failed to meaningfully oppose Nexo's arguments. Instead Cress cites documents that purportedly show Nexo intended to defraud him. Allegations about Nexo's state of mind are

irrelevant here, because they do not implicate the issue raised in the motion to dismiss—Nexo never made a false representation to Cress about fees on OTC cryptocurrency purchases or forced liquidations.

As detailed in Nexo's opening brief, the SAC does not plausibly allege that Nexo concealed or suppressed any material fact. While Nexo advertised no fees for select services, the ads cited by Cress do not pertain to the specific services he used, nor are they at issue in this case—these ads all relate to non-OTC transactions or services.

In his opposition brief, Cress insists that he is not relying solely on a fiduciary duty relationship as the basis of his fraudulent omission claim. The SAC has a passing reference to alternative theories of agency, but both the SAC and Cress's opposition make it clear that the only well-pled basis for Cress's claim is fiduciary duty. The Court should not give weight to Cress's brief and unsupported nods to other agency theories, and his fiduciary duty argument does not withstand scrutiny. Repeatedly, both the SAC and the opposition brief cite fiduciary duty as central to Cress's claim. *See* Opp. at 28 ("[The SAC] alleges that Nexo affirmatively assumed a fiduciary and trust-based relationship through its VIP Relationship Program, assignment of a dedicated relationship manager, discretionary control over Plaintiff's collateral and liquidations, and superior, nonpublic knowledge of pricing and execution practices." (citing SAC ¶¶ 62-83, 218-224, 242)); *see id.* at 28-29 ("Cress pleads both an informal and a formal fiduciary duty." (citing SAC ¶¶ 218-224)). Whereas, Cress's sole reference to other sources of duty is encapsulated in a single conclusory passing paragraph. SAC ¶ 242.

Cress's claim of a fiduciary relationship is implausible. In his opposition, Cress argues that unlike *Hanson v. Nexo Cap. Inc.*, "Nexo's relationship to its VIP clients went far beyond a simple lender-borrower relationship," and that "Nexo was essentially acting as his financial advisor and broker, providing detailed financial advice." Opp. at 19; No. 2:24-cv-10466-MAR, Dkt. 31, at 26 (C.D. Cal. June 30, 2025). Allegations sufficient to establish a fiduciary relationship between Nexo and Cress, and to overcome the express disclaimer of such a relationship in the operative contract, are absent from the SAC. This case is just like *Hanson*, where a court in the Central District of California found that "it does not appear that a fiduciary relationship ever existed between [Nexo]

-8-
REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

and Plaintiff." *Hanson v. Nexo Cap. Inc.*, No. 2:24-cv-10466-MAR, Dkt. 31, at 26 (C.D. Cal. June 30, 2025). The court in *Hanson* made this finding based on the parties' contract and California law—both of which are applicable here. *Id.* Any fiduciary relationship was expressly disclaimed by the contract to which Cress and Nexo agreed. This disclaimer is reinforced by the fact that Cress admits to being a sophisticated, accredited investor. The CPA under which Cress bases his OTC allegations states unambiguously that Cress understands that "Nexo is not providing and will not provide any fiduciary . . . services with respect to" Cress "or any transaction subject to this Agreement." Dkt. 80-8 at 37. Nor does Cress identify any federal or state law that created a fiduciary relationship.

### IV. THE COMMON LAW FRAUD CLAIM FAILS FOR LACK OF SCIENTER, CAUSATION, AND RELIANCE

Cress's common law fraud claim rests on a single allegation, based only on a selectively partial quote—that Nexo misrepresented that it was "registered with the SEC as a security." Opp. at 20 (citing SAC ¶ 107). When this same statement is quoted in full, it renders Cress's common law fraud claim implausible. Specifically, a Nexo representative told Cress: "Additionally, please note that the NEXO token is registered with the SEC as a security, **therefore we are only allowed to facilitate deals for American citizens who are also certified, accredited investors.**" Dkt. 88 ¶ 39 (emphasis added). The Court's prior ruling on Nexo's earlier motion to dismiss addressed only falsity and materiality, not scienter, causation, or reliance. Dkt. 26 at 32-33.

In his opposition, Cress ignores that the statement that he only selectively and partially quotes by the Nexo representative was not made with the intent to deceive Cress. Rather, because Nexo had previously filed a Form D with the SEC in 2018, the representative told Cress in an abundance of caution that he had to be an accredited investor to purchase the NEXO Token from Nexo. Contemporaneously, this was understood by Cress, because he did exactly as intended, submitting proof of his accredited investor status to Nexo. *See* Dkt. 80-8 at 40. Nexo made the statement about registration with the SEC to explain why it needed an accredited investor certificate, not as inducement to purchase the NEXO Token.

Cress asserts that his allegations that Nexo's statements were "standard language provided to VIP Program customers to induce them to purchase NEXO Tokens," and that "Nexo Relationship

-9-
REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

1  Managers sent this identical misrepresentation to dozens of VIP customers" show scienter.
2  Opp. at 20 (quoting SAC ¶¶ 106-107). He is silent as to how statements directed at other customers,
3  non-plaintiffs, support a showing of scienter directed at Cress. This is insufficient to make a showing
4  under Rule 8(a). The cases Cress cites do not alter this outcome. *Albergo v. Immunosyn Corp.*,
5  involved violation of the exchange act on a motion for summary judgment, whereby defendants,
6  amongst other things, "quoted to Plaintiffs as $10 per share and other buyers as $1 per share," and
7  pled the fifth amendment privilege, which the court held was sufficient to support a reasonable
8  inference of knowledge or recklessness. 2012 U.S. Dist. LEXIS 197659, at *11 (S.D. Cal. June 19,
9  2012). Likewise, *Gebhart v. SEC*, was a district court review of a securities fraud case that had been
10 fully adjudicated before the National Association of Securities Dealers and the SEC. 595 F.3d 1034,
11 1043 (9th Cir. 2010). These cases' records are nothing like the present case.

12    Cress's cases in opposition to reliance fare no better. In *City Sols., Inc. v. Clear Channel
13 Commc'ns*, a case cited by Cress (Opp. at 21), the Ninth Circuit acknowledged that "whether a
14 party's reliance was justified may be decided as a matter of law if reasonable minds can come to
15 only one conclusion based on the facts." 365 F.3d 835, 841 (9th Cir. 2004). Citing as support
16 SAC ¶¶ 37, 106, Cress argues that the SAC shows that "he did rely on the assurance of SEC
17 registration; that it allayed his concerns; and led him to purchase a large quantity of NEXO Tokens."
18 Opp. at 21. SAC ¶ 37 states that Cress had never previously considered purchasing NEXO Tokens,
19 but SAC ¶ 40 explains that Cress did so to "obtain favorable borrowing rates." SAC ¶ 106 merely
20 quotes the statement at issue. SAC ¶ 40 admits that Cress purchased the NEXO Tokens to get a large
21 interest rate discount on his multi-million dollar credit lines—a huge economic incentive. Nexo's
22 explanation for why it needed an accredited investor certificate to sell those tokens was an
23 afterthought. Particularly given the full text of the statement, the contention that the registration
24 statement was the inducement for purchasing the NEXO Tokens is not plausible.

25    With regards to causation, Cress attempts to radically expand his damages beyond the NEXO
26 Token that is the basis of the alleged false representation. Yet he relies on the exact same
27 representation to support his NEXO Token securities fraud claim. The Court has previously held
28 that the only plausible alleged security is the NEXO token, and the only plausible damages

associated with those securities claims are the losses on that particular token. Dkt. 26 at 28-31; Dkt. 37 at 9-10. Nonetheless, Cress attempts to claim more damages—based on the same facts—by contending that it is sufficient to "allege a plausible causal link to some injury." Opp. at 22. This understates his obligation. As this Court previously held, any purported damages would be limited to losses associated with the NEXO token. A complaint "must plead facts suggesting that the damages in question were the direct result of the misrepresentation in question." *Shahangian v. Bank of Am. Nat'l Ass'n*, No. CV15-1919 DMG (MRWX), 2015 WL 12696038, at *4 (C.D. Cal. Dec. 1, 2015). The only direct losses associated with Cress's purchase of NEXO Tokens were the losses on those tokens, not his *separate* losses on *other* cryptocurrencies caused by the *liquidations*. None of Cress's NEXO Tokens were liquidated, yet Cress wants a purported false statement about those NEXO Tokens to provide the predicate for recovery of millions in liquidated BTC and ETH.

## V.     THE RICO CLAIM FAILS ON MULTIPLE GROUNDS

Cress dedicates significant space to defending his RICO claims; however, the substantive allegations in the SAC remain exceptionally thin. His attempt to disclaim that his securities fraud claims underlie his RICO claim in the SAC is all but a single sentence (*see* Dkt. 88 ¶ 204), which is plainly inadequate. While Cress asserts that he identified distinct corporate entities and individuals, as well as racketeering activity, that is not so. For instance, his reference to NDS EOOD in the SAC merely describes its contractual relationship with Nexo, including the provision of employees, without offering any factual basis for an enterprise as required under RICO. Allegations related to Trenchev and Kantchev likewise echo the shortcomings this Court previously found. Additionally, in the SAC, Cress relies on broad, class-action style allegations of racketeering activity that lack particularity and connection to his own claims and experience. If such minimal assertions were found sufficient, any business engaged in routine business dealings would be swept into RICO liability, which is not the law. Accordingly, these deficiencies underscore the absence of a plausible RICO claim and reinforce the need for dismissal.

### A.     The PSLRA Bars Cress's RICO Claims

The Private Securities Litigation Reform Act ("PSLRA") precludes Cress's RICO claims. This is not a close question; in fact, Cress's own cited authorities confirm this conclusion. In

*Absolute Activist Value Master Fund Ltd. v. Devine*, albeit a non-binding case from the Middle District of Florida that Cress relies upon, that court explained that "[C]ourts have applied the RICO bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim." 233 F. Supp. 3d 1297, 1321 (M.D. Fla. 2017). Similarly, in *Rezner*, another case cited by Cress, the Ninth Circuit explained that the threshold for application of the PSLRA bar is not high. It bars any action where "fraud 'touches' the sale" or where fraud is committed "in connection with" a securities transaction. *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010). This finding is consistent with the PSLRA's purpose: "not simply to eliminate securities fraud as a predicate offense in a civil RICO action, but also to prevent a plaintiff from pleading other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Davies v. GetFugu, Inc.*, No. CV 09-8724-GHK (RCX), 2010 WL 11597458, at *2 (C.D. Cal. Aug. 26, 2010) (internal quotation marks and citations omitted). As explained in Nexo's opening brief, "Courts have construed the PSLRA bar in Section 1964(c) to prohibit the dissection of said claims into their offending and non-offending components, so long as some component may legitimately be characterized as in furtherance of, or in connection with, actionable securities fraud." *Id.* at *3.

Cress's cited cases are distinguishable from the present matter. In *Absolute Activist*, the court held that the "gravamen" of the complaint was a money laundering scheme to "conceal and preserve the proceeds of the successful securities fraud scheme . . . . [that] took place <u>after</u> the purchase or sale of securities." *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1321-22 (M.D. Fla. 2017) (emphasis in original). Likewise, *Rezner* involved a financial scheme designed to avoid the payment of federal income taxes, where the court found the "connection here between the pledge of securities and the fraud . . . tenuous." *Rezner*, 630 F.3d at 871. While the tax evasion scheme involved the pledge of some municipal bonds, the alleged injury was not related to this pledge. Rather, the "alleged loss resulted from [] misrepresentations to the United States regarding the tax treatment of the [] loan." *Id.* Here, in contrast, the OTC cryptocurrency purchases that are the basis of the RICO claim are based on same NEXO Token purchases that are the predicate for the

securities claims. This case is more akin to *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007), where the alleged security was the "lynchpin of the []scheme" and the fraud and security were directly connected. *Rezner*, 630 F.3d at 872 (analyzing *Swartz*). Here, the sale of alleged securities is the gravamen of both the SAC and alleged injury.

### B.  The SAC Does Not Allege an Enterprise

Cress insists that he "identifie[d] specific corporate entities and individual actors and describe[d] the distinct functions each performed in carrying out and concealing the fee-extraction scheme." Opp. at 25 (citing SAC ¶¶ 207–214). However, this assertion is not supported by the actual allegations in the SAC. For example, although Cress's opposition brief amplifies allegations regarding NDS EOOD, the only substantive statement in the SAC concerning NDS EOOD is that "Nexo contracts with NDS EOOD to provide employees from its operation. NDS EOOD provides these employees, including Hristov and other employees that are responsible for relaying the fraudulent statements alleged herein to Nexo's customers, including Plaintiff." SAC ¶ 212. Similarly, the allegations about Trenchev and Kantchev are the same as when this Court dismissed Trenchev from this action for lack of personal jurisdiction because Cress could not point to any personal involvement in the facts giving rise to the lawsuit. Dkt. 26 at 10-13. For Trenchev, the Court added that Cress had not pleaded more than "conclusory allegations that Trenchev exercised control over Nexo. . . ." *Id*. at 13. With regards to Trenchev in the SAC, it merely alleges that he conducted a 2021 Ask Me Anything (SAC ¶ 55), signed Nexo's Form D (SAC ¶ 125), and includes a conclusory allegation that he was a co-founder "responsible for such oversight for each of the entities." SAC ¶¶ 207–208. These perfunctory allegations do not satisfy the requirements for pleading a RICO enterprise. If such minimal assertions were sufficient to allege an enterprise, then any business that engages in routine business activities could be a RICO defendant, and any corporate officer that conducted press events or signed forms in his corporate capacity could be the same. As the court in *BSA Framing* noted, "[t]hat theory would ensnare almost every corporation facing a run-of-the-mill fraud claim in RICO litigation and is, unsurprisingly, not the law." 2018 WL 11462083, at *8 (C.D. Cal. Feb. 27, 2018). The defects in Cress's pleadings mirror those found in *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1088-89 (N.D. Cal. 2013). Cress has only "vaguely alleged that

unidentified subsidiaries, affiliated companies, and/or intercompany divisions" engage in some conduct, without "specific factual allegations explain[ing] how this occurs." The same is true here: Cress's allegations fail to demonstrate the required attributes of a RICO enterprise, including that the constituent entities and actors are actually separate and distinct.

### C. The SAC Does Not Allege A Pattern of Racketeering Activity

Cress attempts to overcome the SAC's shortfalls in alleging a racketeering activity, including relatedness and continuity, by alleging vague predicate acts that resemble class-action style predicate acts that are insufficient in an individual plaintiff case. In an individual plaintiff case, the predicate acts must be specific to the plaintiff—in this case, Cress, "not numerous customers beyond Cress." Opp. at 27; *see Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985) (A plaintiff in a civil RICO action "can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."). Here, the predicate acts alleged pertain chiefly to other non-party customers, not Cress, and thus, these allegations must be disregarded. *See Chow v. Johnson*, No. C-07-4478 CW, 2008 WL 11396738, at *3 (N.D. Cal. Feb. 5, 2008) (holding that the plaintiffs failed to allege valid racketeering acts because the predicate acts did not proximately cause their injury, but rather other non-plaintiff's injuries.); *Pette v. Int'l Union of Operating Eng'rs*, No. CV 12-09324 DDP PJWX, 2013 WL 5573043, at *4 (C.D. Cal. Oct. 9, 2013) ("The various racketeering acts alleged in the SAC harmed Local 501 and its benefit funds, not Plaintiffs. . . .").[4]

Moreover, the few allegations that relate specifically to Cress are inadequately pled. Rule 9(b) requires particularity, which is absent here. Cress's claims are further defective because, rather than alleging affirmative acts, he relies on a non-disclosure theory of liability, and "a non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). Cress fails to adequately allege any such duty. As correctly stated in *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics,*

---

[4] The present case is unlike the case Cress cites, *Shinde v. Nithyananda Foundation*, where the court found that the defendants "made a great many affirmative misrepresentations **to Plaintiffs** over a course of years." No. EDCV 13-363, 2015 WL 12732434, at *9 (C.D. Cal. Feb. 23, 2015) (emphasis added).

*Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987) in rejecting a similar RICO claim: "No such duty existed and, hence, no fraud." Cress's conspiracy claim fails with his primary RICO claim.

### VI. THE BREACH OF CONTRACT CLAIM FAILS BECAUSE CRESS DOES NOT IDENTIFY BREACH OF ANY TERMS

Cress alleges that Nexo breached the parties' CPA by "allowing the Review Period to lapse without timely execution or confirmation." Opp. at 30. Nothing in the CPA guarantees execution of such manual purchase orders—those that Cress took advantage of using the OTC desk— in a specific amount of time.

Next, Cress alleges that charging fees was a breach of the implied covenant of good faith and fair dealing. *Id.* Here, Cress is attempting to do precisely what the Ninth Circuit and numerous district courts have held is impermissible. The covenant of good faith and fair dealing "is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract." *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009). Nothing in the CPA prevents Nexo from charging fees on its OTC transactions.

Finally, Cress argues that Nexo breached the CPA by liquidating the digital assets it sold to Cress despite its promise to deliver them free from "any and all Liens." Opp. at 31. This position is absurd; Cress appears to contend that once cryptocurrency is purchased free and clear through the OTC desk, that status somehow attaches to the cryptocurrency and prevents it from serving as collateral in *separate* transactions *after* the purchase. The CPA simply states that cryptocurrency purchased through the OTC desk will be free and clear of liens when purchased. However, that cryptocurrency can obviously serve as collateral if pledged as such in separate credit line transactions governed by a separate contract—the Credit Terms.

### CONCLUSION

Nexo respectfully requests that the Court grant this motion and dismiss.

DATED: January 15, 2026                    BAKER & MCKENZIE LLP

By: */s/ Ian S. Shelton*
Ian S. Shelton

*Attorneys for Defendant Nexo Capital Inc.*

-15-
REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT