April 22, 2026

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:     *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH - JOINT DISCOVERY
        LETTER REGARDING NEXO'S 30(B)(6) WITNESS KNOWLEDGE AND PREPARATION

Dear Judge Hixson:

The parties submit this joint letter setting forth each side's view as to the sufficiency of Nexo's knowledge and preparation of its 30(b)(6) witnesses on Topics 1(1)–(4) (VIP Program and Liquidation Relief Program), 3(15)–(16) (Nexo's NEXO Token sales), 4(18)–(19) (Liquidation Mechanics and Systems), and 8(33)–(39) (Data retention).  The parties have met and conferred in good faith prior to filing this letter, including by Zoom meeting and the exchange of letters and emails.

**Attestation**

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred telephonically and in good faith to resolve the disputes set forth below.


Dated: April 22, 2026           TAYLOR-COPELAND LAW

                                By: /s/ James Taylor-Copeland

                                Attorneys for Plaintiff


Date: April 22, 2026            BAKER & MCKENZIE LLP

                                By: /s/ Ian S. Shelton

                                Attorneys for Defendant


0

**PLAINITFF'S POSITION.** Plaintiff Cress moves for Nexo to produce properly prepared Rule 30(b)(6) witnesses on Topics 1(1)–(4) (VIP Program and Liquidation Relief Program), 3(15)–(16) (Nexo's NEXO Token sales), 4(18)–(19) (Liquidation Mechanics and Systems), and 8(33)–(39) (Data retention). Nexo designated Octavian Dinca and co-founder/Managing Partner Antoni Trenchev as its 30(b)(6) witnesses, and produced them with demonstrable gaps in their knowledge and preparation on issues central to the case—Nexo's fees-related representations, OTC desk and liquidation mechanics, NEXO Token Sales, and Nexo's document preservation. Plaintiff requests 2.5 additional hours for a remote re-deposition, at Nexo's expense, on the topics identified below.

**PROCEDURAL BACKGROUND.** Plaintiff served a Rule 30(b)(6) notice identifying topics in eight categories (VIP Program, Fee Representations, NEXO Token Sales, Liquidations/Oracle, Regulatory/Licensing, Entity Relationships, Related-Persons Communications, and Document Preservation). Dinca was ultimately designated on topics 1(1)–(6), 2(8), 2(10) (in part), 4(17)–(19), 5(22), 5(26), 8(48);[1] Trenchev on 2(7), 2(9), 3(11)–(16), 4(20), 5(21), 5(23)–(25), 5(27)–(28), 6(29)–(30), 7(32), 8(33)–(39), 8(49)(a). Dinca was deposed March 27, 2026. Trenchev on April 1–2, 2026. Nexo's Objections and Designations are attached as **Exhibit A**. Excerpts of Nexo's deposition witness testimony are attached as **Exhibit B** (Trenchev) and **Exhibit C** (Dinca).

**LEGAL STANDARD.** Rule 30(b)(6) "implicitly requires [the witness] to review all matters known or reasonably available to it in preparation." *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C.). That duty extends to "subjective beliefs and opinions" and the "interpretation of documents and events." *Id.* If the witness cannot answer, the company has "a duty to substitute another person." *Marker v. Union Fid. Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C. 1989). Failure of preparation may result in an order compelling a further deposition, cost-shifting, and Rule 37 sanctions. Fed. R. Civ. P. 37(a)(4), (b).

The person designated on a 30(b)(6) topic "must testify about information known or reasonably available to the organization." Fed. R. Civ. Proc. 30(b)(6); *Hotspot Therapeutics, Inc. v. Nurix Therapeutics, Inc.*, 2024 U.S. Dist. LEXIS 44364, at *2-3 (N.D. Cal. Feb. 13, 2024). A "witness's ignorance on [designated] topics [is] unacceptable." *Id.* at *5. "The Court does expect that a prepared witness could authenticate [] documents and explain them, and – independent of documents – would have at least a high-level understanding of" the topics they are designated on. *HotSpot Therapeutics, Inc. v. Nurix Therapeutics, Inc.*, 2024 U.S. Dist. LEXIS 11324, at *5 (N.D. Cal. Jan. 8, 2024); *Cordova v. Lake Cty.*, 2023 U.S. Dist. LEXIS 213448, at *7 (N.D. Cal. Nov. 30, 2023) (lack of knowledge shows inadequate preparation).

**THE TOPICS ON WHICH NEXO'S DESIGNEES WERE UNPREPARED**

**A. Document Preservation and Spoliation (Topics 8(33)–(39)).** Trenchev was designated to testify on "Nexo's data retention policies, document preservation, litigation holds, [and] ESI collection" (Trenchev Vol. I Dep. 12:24-13:11). However, Trenchev did not even know "what ESI stands for," and exhibited a complete lack of knowledge or preparation throughout the deposition. (*id.* 85:4-9).

Trenchev did not know—or at least claimed not to know—who implemented Nexo's document retention policies or why (*id.* 86:6-87:12), whether Nexo's 30-day email auto-deletion policy applied to Kantchev and his own email accounts affected sent or archived mail (*id.* 93:4–94:22), whether it applied retroactively (*id.* 95:17-96:13), why retention settings were implemented on December 7, 2022 (*id.* 113:1–114:22), who authorized Nexo's Slack retention policies (*id.*), who implemented retention settings deleting all emails to and from his and Mr. Kantchev's personal email addresses on March 9, 2023—days after this litigation was filed (*id.* 135:17-136:25), whether Google Vault was used (*id.* 129:17-22), or whether Nexo attempted to recover deleted emails (*id.* 108:4–109:7). Nor did Trenchev know who implemented Nexo's Slack document retention/deletion policies days after this case was filed,

---

[1] Nexo also withdrew a third designee, Edoard Tonkov, *approximately 22 hours before his deposition*, substituting Dinca.

1

why Nexo's Slack document retention/deletion policies were adopted, who at Nexo knows why Nexo deleted its Slack messages, (*id*. 111:7-112:4, 113:1–114:22), why Nexo's Slack retention policy differed for direct messages versus channels (*id*. 114:4–7), or how Nexo conducted its preservation of Slack documents relating to Cress's case (*id*. 44:18-45:4).

Trenchev also did not know why Nexo changed retention settings to automatically delete all of Kalin Metodiev's emails—including emails to or from custodians such as Hristov and Dinca—in January 2024, while this litigation was ongoing (*id*. 162:13-163:1). **Metodiev directly oversaw Nexo's OTC Desk which sold Cress his assets, and the VIP program at the heart of this dispute—yet Nexo deleted his emails during this litigation and could not explain *why* or *who* did it.** Nexo's deletions of Trenchev's Kantchev's and Metodiev's emails during this litigation is not trivial. It was done in a way that deleted them from *all* Nexo employees' inboxes—thus purging them from every custodial inbox.[2]

Many of the questions Trenchev was unable to answer come from (1) a spreadsheet reflecting Nexo's implementation of document retention/deletion settings in Google, and (2) a letter sent by Nexo's counsel to Plaintiff on 1/30/26 describing changes reflected in Nexo's spreadsheet. The spreadsheet is one of six documents Nexo produced from a "Doc Retention Collection" filepath on March 13 in response to Plaintiff's discovery targeting Nexo's data retention policies. Nexo's insistence that a witness designated to testify about its "data retention policies, document preservation…[and] ESI collection," need not familiarize themselves with this spreadsheet or the implementation of the data retention settings identified therein is absurd. Trenchev Tr. 129:17-22 ("I have not" "seen this spreadsheet before.").

Given Nexo's admission that it has deleted nearly all emails to or from Kantchev, Trenchev, and Metodiev, as well as nearly all Slack messages, a prepared witness on these topics is essential so that Plaintiff and the Court can properly assess Nexo's intent in implementing these deletions—either following receipt of a demand letter, or in many cases during this litigation, and even after this Court had ordered Nexo to search custodial files and/or produce documents

**B. VIP Relationship Program (Topics 1(1)–(4)).** Dinca was designated on the structure, benefits, and operation of the VIP Relationship Program—the program through which Hristov induced Plaintiff to take out millions in loans. He could not identify any written policies or procedures governing the program. Dinca Dep. 68:14–69:9. Asked whether Nexo had policies or procedures for the VIP program in 2021, he testified, "*I can't recall exactly*. But I imagine it is possible there were . . ." *Id.* 69:6–7. Asked to describe those policies, he responded, "I don't understand the question." *Id.* 69:17–21. He could not remember any specific documents describing Nexo's VIP program policies. *Id.* 70:4-76:25. Dinca did not know if Nexo's VIP relationship program had any "guidance, policies, procedures, practices, anything that would explain how a VIP manager would do their job in March 2021." *Id*. 72:8-12.

**C. Liquidation Fees and Mechanics (Topics 2(10), 4(18)–(19)).** Dinca testified he "can't speak on liquidations, the mechanics of the liquidations," and does not know how to answer whether Nexo could verify it was liquidating customers at or above the 83.33% LTV threshold. *Id*. 301:17-302:9). Dinca did not know who at Nexo set the 83.33% LTV threshold (*id*. 295:7-10), does not know whether Nexo ever recorded LTV threshold data (*id*. 297:21-298:2), what Nexo does to ensure its liquidation systems work as intended, or who knows whether Nexo's liquidation systems work as intended. *Id*. 307:8-308:19). Dinca did not know the reason why Nexo took liquidation fees from Cress or if Nexo ever disclosed those fees to Cress. *Id*. 335:14-336:16).

Dinca was also designated on the authorship and circulation of Nexo's internal document instructing employees that "WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES[,] MENTION THERE IS

---

[2] Plaintiff has provided Nexo with an expert report confirming as much and will submit it to the Court should it be helpful.

A LIQUIDATION TAX." Yet Dinca testified, he had never seen the document before, who created, and that "I don't know what this is." Dinca Dep. 405:22-406:13. He could not say why Nexo adopted its June 2021 liquidation-fee policy (*id.* 347:3–11) or whether Nexo's LTV calculations using NEXO Tokens were accurate. *Id.* 414:21–15). These are the facts underpinning Cress' fraud claims, civil-theft claim and the RICO predicate acts.

**D. NEXO Token Sales to U.S. Persons (Topics 3(15)–(16)) — Trenchev.** Nexo's exemption defense requires it establish that it did not sell the NEXO Token to unaccredited US purchasers. Whether the NEXO Token was generally available to U.S. purchasers on its own Exchange is thus a key fact. Yet its Managing Partner could not answer: "Q. Was there a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange? A. I don't know. Q. You don't know? A. I don't know." Trenchev Tr. 211:4-212:19; *see also id.* 245:5-7 ("you don't know if you sold to U.S. clients on the retail exchange; correct? A. Correct."). While it beggars' belief that Nexo's Managing Partner is ignorant of its Token sales on its own Exchange, Nexo clearly knows whether it has offered the NEXO Token to U.S. purchasers on its Exchange. It must provide a witness prepared to testify about these facts.

**RELIEF REQUESTED**. Plaintiff respectfully requests that the Court order Nexo, within 30 days, to: (1) designate and produce one or more properly prepared Rule 30(b)(6) witness(es) on the Topics described above; and (2) provide to Plaintiff, at least seven days in advance, a written identification of the person(s) designated and the steps taken to prepare them, including the documents and custodians reviewed. Plaintiff reserves the right to seek further Rule 37 sanctions.

**NEXO'S POSITION.** Cress's request for more 30(b)(6) deposition testimony should be denied. Nexo prepared and presented 30(b)(6) designees on 46 topics, and Cress questioned the two relevant designees. Nexo produced—Octavian Dinca and Antoni Trenchev—for ten hours each, and twenty hours total. Those individuals testified in their individual and corporate capacities. Cress cherry-picks responses to create a narrative that the witnesses were not prepared. The record shows otherwise—the two witnesses testified extensively and substantively concerning the subjects that Cress complains about.

As an initial matter, Nexo objected that Cress's sweeping topics were overbroad, vague, unduly burdensome, or disproportionate, and in several respects swept in privileged material. **Exhibit A**. [3] Nexo then responded to Cress's meet and confer letter, refusing to withdraw its objections to the topics. *See* **Exhibit D**. Cress declined to challenge Nexo's Rule 30(b)(6) objections before the depositions. Cress never sought Court intervention, never moved to compel a different scope, and never asked the Court to require testimony beyond Nexo's designations. Cress instead proceeded with the depositions and cannot now use an "unpreparedness" narrative to backdoor relief it declined to pursue before the depositions.

Rule 30(b)(6) requires a designee to testify to matters known or reasonably available to the organization after a reasonable inquiry; it does not demand that a witness possess perfect recall of every operational detail, identify every individual who made decisions years earlier, or supply facts that are not known or knowable despite reasonable efforts. Courts have "repeatedly emphasized the practical constraints on

---

[3] With respect to the VIP Relationship Program and Liquidation Relief Program topics (Topics 1(1)–(4)), Nexo objected that the requests were overbroad/vague and (in particular, Topics 1(2)–(4)) impermissibly sought corporate "knowledge" and "intent" at a historical moment and across multiple departments. With respect to liquidation mechanics and liquidation-related charges (Topics 4(18)–(19) and Topic 2(10) (in part)), Nexo objected that these topics swept together broad technical systems, transaction-by-transaction questions about Plaintiff's individual liquidations, and interpretations of internal communications, in a manner that was overbroad, unduly burdensome, and implicated privilege. With respect to data retention and preservation (Topics 8(33)–(39)), Nexo objected that the topics sought sweeping, company-wide retention and litigation-response processes (including counsel-directed preservation decisions and search methodologies) beyond what is proportional. With respect to NEXO Token sales (Topics 3(15)–(16)), Nexo objected that the topics bundled distinct issues (including accredited-investor procedures, alleged sales through different channels, purported referrals to third-party exchanges, and interrogatory-compilation processes), were not reasonably particularized, and included privileged aspects.

the scope of a 30(b)(6) deposition" in that it is not feasible for "a Rule 30(b)(6) witness to know the intimate details of everything." *United States v. HVI Cat Canyon, Inc.*, No. CV 11-5097 FMO, 2016 WL 11683593, at *7-8 (C.D. Cal. Oct. 26, 2016).

**A. Document retention and preservation (Topics 8(33)–(39)).** Before Mr. Trenchev's deposition, the Court denied Cress's motion to compel and limited the scope of document retention and preservation discovery, based largely on relevance, proportionality, and privilege concerns. *See* Dkt. 107. The present letter brief seeks an oral version of the same discovery, now characterizing it as "unpreparedness."

The transcripts show substantial testimony on retention practices, the historical change in retention settings, and the Nexo's preservation steps in response to litigation. Mr. Trenchev testified that, before any formal retention policy, the default practice was to retain emails indefinitely (A. Trenchev Depo Pt.1., **Exhibit E**, Tr. 34:5–9) (highlighting testimony on document retention) and that early Slack retention followed default settings associated with the subscription level (Tr. 34:16–35:15). He further testified that the company formalized retention policies (Tr. 35:12–15). Nexo has produced those retention policies. Whatever adjustments may have been made to Mr. Metodiev's email retention settings in 2024 do not affect the merits of Cress's request here: the communications relevant to Cress from the 2021 time period were preserved and produced, and Cress offers no evidence—beyond speculation—to suggest otherwise.[4] Mr. Trenchev explained there was an established procedure to gather, copy, and safeguard relevant materials in response to litigation (Tr. 39:17–40:34), and he understood that communications between Cress and his account manager were collected (Tr. 42:20–43:18). Cress's insistence that Mr. Trenchev should memorize the specific administrators who implemented retention settings years ago does not justify a second deposition; the relevant facts reasonably available—what was done, when, and the general purpose—were addressed, and Nexo produced documents concerning these issues.[5] Cress also points to questions about specific tools or technical mechanics (e.g., administrative access and the mechanics of searches) as proof of inadequate preparation. But Mr. Trenchev testified to the Company's structure for those functions—namely, that "super admin" access generally resides with information security administrators (Tr. 86:6–11), and that search terms were used to filter relevant materials (Tr. 44:2–4). A senior business executive can testify to the Company's processes and decision framework without becoming the Company's e-discovery vendor.[6]

**B. VIP Relationship Program (Topics 1(1)–(4)).** Cress claims Mr. Dinca could not describe the VIP Relationship Program, but his testimony shows the opposite. (O. Dinca Depo., **Exhibit F**, Tr. 58:19–23) (collecting testimony on VIP Relationship Program Topics and Liquidations). Mr. Dinca described the

---

[4] While Cress now argues that Mr. Metodiev possesses information going to the "heart of this dispute," Cress did not identify or designate him as a custodian, reference him in any 30(b)(6) topics, identify any communications between Mr. Metodiev or Cress (there are none), or otherwise identify him as relevant to any matter until this letter brief. Mr. Trenchev cannot be faulted for not testifying about the "why or who" of a discrete 2024 retention policy change specific to Mr. Metodiev that Cress did not even mention in his topics, and concerning an individual Cress never claimed to be relevant until now. Cress's reference to questions about "a spreadsheet reflecting Nexo's implementation of document retention/deletion settings in Google" referred to a technical spreadsheet containing hundreds of rows of data, including a 2024 entry about Mr. Metodiev. **Exhibit B** at 162. As for Cress's reference to a January 30 meet and confer letter describing retention changes, Trenchev agreed that he had no reason to believe the information in it was inaccurate. *Id.* at 85-86.

[5] Cress's reference to "Nexo's deletions" of Mr. Trenchev's and Mr. Kantchev's emails refers to retention policy changes on their email accounts in December 2022, months before this lawsuit was filed in late February 2023. The Court later found that Mr. Trenchev's connection to this lawsuit was so attenuated that he was dismissed as a party for lack of personal jurisdiction. Mr. Trenchev and Mr. Kantchev were not designated as custodians, over Nexo's objection, until 2025. Cress's purported description of the operation of Google's document retention system, including allegedly "purging them from every custodial inbox," is based on an April 20, 2026 expert report that Nexo has not had the opportunity to adequately review, rebut, or depose the purported expert about. The purpose of discovery letter briefs is to address discovery disputes (here, whether 30(b)(6) testimony on a few topics was insufficient), not to make contested merits or sanctions arguments.

[6] Trenchev asked Cress's counsel to confirm the meaning of the acronym "ESI" in a letter, which he did. **Exhibit B** at 85.

4

day-to-day services provided to VIP clients, including communications, customer support, and OTC services (Tr. 67:1–5). He testified that the VIP Relationship Program was available to certain users and offered benefits and services (Tr. 71:13–23), and explained the meaning of a "VIP relationship manager" as managing relationships with the Company's largest clients (Tr. 185:13–17), including that Cress fell within that category (Tr. 185:18–20). He also authenticated and explained the VIP Relationship Program brochure, identified it as a written description used with VIP clients (Tr. 72:21–23; Tr. 200:9–19), and described the brochure's purpose and exclusivity (Tr. 203:7–13), including core benefits (dedicated relationship manager; OTC services; priority support) (Tr. 202:6–14).[7]

**C. Liquidation mechanics and liquidation-related charges (Topics 4(18)–(19), 2(10) (in part)).** Cress contends Mr. Dinca "can't speak on liquidations," but Cress mischaracterizes the record. Mr. Dinca explained the process of liquidations and the triggering event (Tr. 301:12-305:25). He also confirmed Nexo's interrogatory responses on the same issues Cress complains about (*Id.*). Further, Mr. Dinca testified that he reviewed documents regarding liquidations in preparation (Tr. 21--23) and investigated internally with technical teams to understand the liquidation process and how the system worked at the relevant time (Tr. 19:14–17; Tr. 295:21–296:10). He explained the document reflected the crypto liquidation order when Cress experienced liquidations (Tr. 19:3–5), that liquidations were automated (Tr. 295:21–296:10), and that liquidation could be triggered at a loan-to-value of 83.3% (Tr. 294:1–6). He further testified that liquidation involves selling client assets and applying proceeds to repay the credit line (Tr. 296:22–25), and he confirmed the platform sold assets at 83.3% LTV "and above" (Tr. 296:11–14), including that Cress's liquidations were above that threshold (*Id.*). Mr. Dinca also addressed liquidation-related charges, confirming the platform assessed a fee (Tr. 318:16–25) and explaining that fee treatment was part of the credit-line service (Tr. 319:9–14), with fee logic implemented as preset logic in the system (Tr. 334:1–5). Cress also fixates on a single internal document discussing a "liquidation tax." The document was shown to Mr. Dinca, who testified he had not previously seen it. Nexo does not know who drafted that document, and additional deposition time will not change that answer. Rule 30(b)(6) does not require Nexo to speculate or manufacture an author, and Mr. Dinca already testified about liquidation fees (*Id.*)

**D. NEXO Token sales (Topics 3(15)–(16)).** Cress argues Nexo's designee was unable to testify about NEXO Token sales to U.S. persons. But Mr. Trenchev testified Nexo conducted a token sale in 2018 (Trenchev Deposition Pt. II, **Exhibit G** Tr. 236:11–16) (highlighting testimony on sales of NEXO token) and that "five" investors in that sale were from the United States, and he testified those U.S. investors, along with all U.S. based NEXO purchasers were accredited investors (Tr. 214:25–215:12). He also testified that it was Nexo's policy to sell the token exclusively to U.S. accredited investors (*Id.)*. He further testified that Nexo made direct sales to certain U.S. customers in 2021-2022 via the OTC desk (who were vetted as accredited investors) (Tr. 243:9–17). Trenchev also testified that their filing of a Form D was done because of the uncertainty of the regulatory treatment of tokens in 2018 and that they only sold to accredited investors in 2021-2022 in an abundance of caution (Tr. 239:1-240:24).

Cress has not shown that further 30(b)(6) testimony is warranted. Nor has Cress identified any authority supporting his extraordinary demand that Nexo must provide "at least seven days in advance, a written identification of the person(s) designated and the steps taken to prepare them, including the documents and custodians reviewed." This demand for a "roadmap" of 30(b)(6) preparation steps invades the attorney client privilege and work product protection and is not supported by the text of Rule 30(b)(6) or any other authority. The 42 hours of deposition testimony that Cress obtained from Nexo's witnesses in London, including the 20 hours from Trenchev and Dinca, is sufficient.

---

[7] Again trying to create the appearance of impropriety where none exists, Cress observes that Nexo had Mr. Dinca cover some topics that were previously assigned to Mr. Tonkov. It's irrelevant. It was Nexo's prerogative to select its designee.