# Exhibit B

# Exhibit B

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# ANTONI ANTONIEV TRENCHEV

# CONFIDENTIAL



Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - -

IN THE MATTER OF:

JOHN CRESS,

Plaintiff,

NEXO CAPITAL INC.

Defendant.

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME I

Wednesday, April 1, 2026

AT:  1:04 p.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Plaintiff John Cress:

      JAMES TAYLOR-COPELAND (in person)
      MAX AMBROSE (remotely)
      TAYLOR-COPELAND LAW
      501 W. Broadway, Suite 800
      San Diego, CA 92101
      Tel: (619) 734-8770
      james@taylorcopelandlaw.com


Appearing for the Defendant Nexo Capital and the witness:

      IAN S. SHELTON (in person)
      KIRSTEN DOOLEY (in person)
      BAKER & MCKENZIE LLP
      10250 Constellation Boulevard, Suite 1850
      Los Angeles, CA 90067
      Tel: (310) 299-8535
      ianshelton@bakermckenzie.com


Appearing remotely:

JOHN CRESS (Plaintiff)

VIDEOGRAPHER:

      Simon Rutson

A.   I am.

Q.   Do you also understand that you've been designated to testify as Nexo's corporate representative on Nexo's licensing and regulatory status in California, including whether Nexo held a California finance lender's license, Nexo's relationship with Nexo Financial LLC, communications with California regulators, and Nexo's representations regarding whether it was a licensed lender?

A.   I understand that.

Q.   Okay.  And are you prepared to provide testimony on that subject today?

A.   I am.

Q.   Do you understand that you've been designated to testify on the authorship and circulation of certain documents?

A.   I am.

Q.   And are those the documents identified in this exhibit 100?

A.   Yes.

Q.   And are you prepared to testify about those matters today?

A.   I am.

Q.   Do you also understand that you've been designated to testify on Nexo's data retention policies,

document preservation, litigation holds, ESI collection and search practices and compliance with the court's discovery orders?

A.   Yes.

Q.   And are you crept to testify about that topic today?

A.   I am.

Q.   Did you talk to anybody at Nexo outside the presence of counsel to prepare to testify on that topic that we just discussed?

A.   I have not.

Q.   Do you also understand that you've been designated as Nexo's corporate representative to testify on the factual basis for Nexo's interrogatory responses?

A.   I do.

Q.   And are you prepared to provide that testimony today?

A.   I am.

Q.   So other than the conversation you had with Yassen, did you have any other conversations with anybody at Nexo outside the presence of counsel to prepare for any of those 30(b)(6) topics?

A.   Sorry which are the 30(b)(6) topics?

Q.   The topics on which you've been designated as Nexo's corporate representative.

that level.

A.    Thank you.   It would be my understanding that they would use search words, search terms, to filter out what is relevant and what is not.

BY MR. TAYLOR-COPELAND:

Q.    To run that search would they have to involve IT?

A.    I do not know that.

Q.    Do you know if Google enabled Nexo to search for specific terms across all email addresses?

A.    Make sure that I understand the question, whether it can -- whether there's a functionality, you type in the search term and then it searches through all addresses of -- corporate addresses?

Q.    Correct.

A.    I am unaware of such a feature.  It might or might not exist.

Q.    And do you know if Slack had functionality to allow search through all Nexo's Slack messages regardless of user?

A.    I do not know the inner working of the Slack platform.

Q.    So do you know how Nexo ran these searches with the search terms?

A.    I don't have the details on that.

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026

CONFIDENTIAL

JOB NO. 2571483

Q.   Do you know if there are any records of that happening?

A.   I don't know whether this was a recorded activity or how it was conducted.

Q.   I am about to introduce another exhibit. do you guys want to keep going or --

A.   Should we take five to ten minutes?

MR. SHELTON:   Let's take a 10 minute break.

A.   Thank you.

THE VIDEOGRAPHER:   Going off the record at 2:15. end of media 1.

(2:15 p.m.)

(Break taken.)

(2:28 p.m.)

THE VIDEOGRAPHER:   This is the beginning of media 2 in the deposition of Antoni Trenchev.  Back on the record at 2:28.

BY MR. TAYLOR-COPELAND:

Q.   I'm going to introduce exhibit 102.

(Exhibit 102 marked for identification)

A.   Okay.  It's two so ...

MR. TAYLOR-COPELAND:   Yes.  My questions are just going to be about this at a very high level.  So it's a document entitled "Nexo Financial LLC, Complaint Policy".

immediately to your questions?

Q.    I don't believe so.

A.    Okay.

Q.    Other than seeing it's a letter from your attorneys to Mr. Cress's attorneys.

A.    Sure.  Can I know what ESI stands for?

Q.    I believe it's electronically stored information.

A.    Thank you.

Okay, I skimmed through the rest of the section, I think the more important parts were in the beginning, but I reserve my right to revisit that statement.

Q.    Of course.

So you see on page 5 under "Trenchev and Kanchev" heading, it says:

"We confirmed that Trenchev and Kanchev had a 30-day retention policy period effective December 4, 2022 ..."

Do you see that?

A.    I do.

Q.    Okay, is it true that a 30-day retention policy was placed on your emails on December 4, 2022?

A.    I see no reason why anything our external legal counsel should -- is telling you should not be

true.  So I would answer that in the affirmative.

Q.   So you have no reason to believe that that's not true; right?

A.   Right.

Q.   Okay.

Do you know who placed the retention policy on your emails?

A.   I do not specifically.  I understand that in the Google operating systems there is super admins.  This would normally be people at Infosec that can access the settings of the Google suite of services.  So -- but I do not have a particular name for you.

Q.   Okay.

So you didn't personally go into Google and set this retention policy; is that right?

A.   I did not.

Q.   Okay.

Did you direct somebody to implement this retention policy?

A.   I don't recall having done that.

Q.   So you can't say one way or the other?

A.   Unless I'm entirely mistaken, I have not ordered anyone to do that.

Q.   Do you know if Mr. Kanchev ordered anybody to do that?

A.   I --

MR. SHELTON:  Objection, calls for speculation.

A.   -- I cannot know that.

BY MR. TAYLOR-COPELAND:

Q.   Sorry, could you repeat that?

A.   I cannot know that.

Q.   So does Nexo know whether Mr. Kanchev ordered the implementation of this 30-day retention policy?

A.   I cannot confirm that with certainty.

Q.   You don't know one way or the other?

A.   I do not know one way or the other.

Q.   You spoke to Yassen to prepare for today?

A.   I spoke to Yassen on a particular topic.

Q.   Did you ask Yassen whether Mr. Kanchev asked him to implement a retention policy?

A.   I have not.

Q.   So is it fair to say the only people who would know whether Mr. Kanchev asked Yassen to implement the retention policy would be Mr. Kanchev and Yassen?

A.   I'm not sure that is an accurate statement. Because that presupposes that it is Yassen who made the changes.  I am not certain whether he was the only one with access to the settings of the Google services on December 2022.

A.    I do not.

Q.    And would the rationale for placing both of your emails on that retention period have been the same?

A.    Yes.

Q.    As a practical matter, did the implementation of this retention policy mean that emails older than 30 days were automatically deleted?

MR. SHELTON:  Objection, calls for an expert opinion.

A.    I do not know.

BY MR. TAYLOR-COPELAND:

Q.    You don't know?

A.    I don't know.

Q.    Did you ask Yassen about that in preparing for today?

A.    I did not.

Q.    How do you access your email?

A.    I access my email from my computer and my mobile phone, which is a working phone.

Q.    Do you use the -- do you use an application to do that?

A.    I use the native Google app.

Q.    Okay.

And then on your desktop?

A.    I would use the browser to log in to -- to the

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                      CONFIDENTIAL

Gmail.

Q.   Okay.  Do you have your phone with you?

A.   Not my working phone.  I have my personal phone.

Q.   Are you able to access -- in preparing for today did you check if you are able to access emails more than 30 days old?

A.   I have not.

Q.   Did you speak to Mr. Kanchev at all in preparing for today?

A.   No.

Q.   So you don't have any idea whether he's able to access emails more than 30 days old?

A.   I have not.

Q.   Did this retention policy impact sent emails?

MR. SHELTON:  Objection, calls for an expert opinion.

A.   I don't know.

BY MR. TAYLOR-COPELAND:

Q.   Did it include archived emails?

MR. SHELTON:  Same objection.

A.   Same answer by me, I do not know.

BY MR. TAYLOR-COPELAND:

Q.   When Nexo implemented this policy was it aware it would result in the permanent deletion of emails

older than 30 days?

MR. SHELTON:  Objection, assumes facts.

A.   Again, as with your previous two questions I don't know exactly what unfolds one -- that mechanism is set in place, especially not in lieu of already existing emails.

BY MR. TAYLOR-COPELAND:

Q.   So the purpose of implementing this policy was to reduce the risk of older emails being compromised by hackers, right?

MR. SHELTON:  Objection.  Misstates testimony.

A.   Well, I -- what I stated is that it was a de-risking exercise, and I stated the threat of hackers as one of the threats that the blockchain space and companies as ours were facing at the time.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  And how did Nexo understand that implementing this retention policy would reduce risk?

A.   Well, less data would be retained on third party services going forward.

Q.   So that data would be unavailable on third party services going forward, correct?

A.   I did not say that.  I said -- and by the way to this day I'm not clear when this retention policy is set, whether all existing emails are -- stop being

available or going forward once you receive an email, let's say 40 days pass, that email becomes unavailable. I'm not entirely sure on the technicalities and inner workings of those settings.

Q. So you don't know one way or the other whether it would apply retroactively or not?

MR. SHELTON: Objection, vague. Calls for an expert opinion.

A. Erm, I am not an expert on this and I do not know exactly what unfolds, and we've had results yield -- searches yield results of certain emails older than 30 days popping up, so it is somewhat confusing to me what exactly happens.

BY MR. TAYLOR-COPELAND:

Q. How do you know searches have yielded some emails older than 30 days?

MR. SHELTON: Mr. Trenchev, I'm going to object on privilege grounds. I don't want you to testify to any discussions you have had with your attorneys, but if you can respond outside of that scope, you can respond.

A. I don't know, I just remember somebody saying that they found an email that is much older in their inbox, but I don't have a great many details around that.

A.   I have used it with many different people in departments.

Q.   Okay.

Do you know if there is a backup copy of any emails that may have been deleted as part of this retention policy?

MR. SHELTON:  Objection, calls for speculation, calls for an expert opinion.

A.   I -- I don't know that, no.

BY MR. TAYLOR-COPELAND:

Q.   Does Nexo know?

MR. SHELTON:  Same objections.

A.   Erm, I -- on my email address?

BY MR. TAYLOR-COPELAND:

Q.   Correct.

A.   I don't believe there are copies on my email address unless somebody went rogue and copied it without my knowledge.

Q.   Okay.

So before the retention policy was implemented you didn't download or try to save your existing messages anywhere?

A.   No.

Q.   Do you know if Mr. Kanchev did that?

MR. SHELTON:  Objection, calls for

speculation.

A.   I -- I don't know for sure but I know that he was also using the browser as opposed to a third party provider such as Outlook, which would then store it locally.  So I would assume the same as me but again I don't -- cannot with full certainty speak on his behalf.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if any emails deleted as part of this retention policy are permanently lost?

MR. SHELTON:  Objection.  Calls for speculation, calls for an expert opinion.

A.   I -- erm ... again, you are suggesting proactive deletion of emails which I don't think is an accurate depiction of the events that took place, certainly why the retention policy was put in place, and I don't know about the -- or the reversibility of deleted messages and what exactly happens when an email is deleted on the interface, what happens behind scenes on the Google servers, whether it can be recovered, is beyond my area of expertize and knowledge.

Q.   Is Nexo aware of any way to recover any emails deleted as a result of these retention policies?

MR. SHELTON:  Same objection, calls for speculation, calls for an expert opinion.  You can

too short a time.

Q.   And -- so the -- December 4 is the same day the emails retention policy was implemented; right?

A.   I mean, if these are American dates, Baker McKenzie being the U.S. law firm, we would assume that, it would be, yes, December 4 and the same date.

Q.   Okay.  Do you recall if these Slack retention -- this Slack retention policy was adopted as part of that same rationale that you discussed to reduce risk?

A.   I don't recall that, no.

Q.   So does -- does Nexo know who implemented the Slack retention policy?

A.   I don't -- I'm not entirely sure what the situation was in 2022, to be honest.

Q.   Did you -- in preparing for today did you ask anybody at Nexo who implemented these Slack retention policies?

A.   I don't think that anyone at Nexo would have been able to confirm what happened four years ago, exactly, and I think that direct messages, these are usually between several people, certainly less than a handful, because then it would make sense to create a channel rather than direct messages and they -- did not tend to include data and exchanges that are or

corporate significance.  It was usually people talking amongst themselves, also about non-Nexo related stuff.

That would be my understanding of what the direct messages usually constitute.

MR. SHELTON:  James, can we take a break pretty soon?  I need to use the rest room.

MR. TAYLOR-COPELAND:  Sure that's fine.  We can take a break now.

THE VIDEOGRAPHER:  Going off the record at 4:40, this the end of media 3.

(4:40 p.m.)

(Break taken.)

(4:56 p.m.)

THE VIDEOGRAPHER:  This the beginning of media 4, back on the record at 4:56.

BY MR. TAYLOR-COPELAND:

Q.   Mr. Trenchev, when you sent voice notes using Slack was it primarily in public and private chats or primarily in direct messages?

A.   I'm not prepared to make that dis-- distinction.

Q.   It could've been in both?

A.   I don't know how to list a quantity in either one category.

Q.   Okay.

Does Nexo have a business reason that it implemented a four-day retention policy on Slack direct messages on December 4, 2022?

A.   As stated before, I think the four-day policy was a mistake by whoever put that into the system, and hence that's why it was promptly changed after the discovery two days later.

Q.   Okay, so on December 7 it was changed to 30 days; right?

A.   This is what the document says, yes.

Q.   Okay.  And was there a business reason for having a 30-day retention policy for Slack direct messages?

A.   What would the definition of a business reason be?

Q.   Do you know why Nexo implemented a 30-day retention policy for its Slack direct messages on December 7, 2022?

A.   Well, there must have been a reason why we thought that is a good idea.  I just cannot reverse engineer that four years later.

Q.   So you don't know?

A.   I do not know.

Q.   Okay.

Do you know why Nexo implemented a retention

policy on direct messages but didn't implement any retention policy for public and private channels until a few months later?

A.   Other than that distinction I made before the break, I don't think there is more I can add, different type of information on the different type of channels.

Q.   So you don't know why one retention policy was deposited for direct messages and a different one was adopted for public and private channels?

A.   I do not know.

Q.   Does Nexo know who authorized the change -- any of these changes in the Slack DM retention policy?

A.   DM being direct messages?

Q.   Correct.

A.   I don't think Nexo can reverse engineer that several years later what the exact approval process for that change was.

Q.   Okay.

Does Nexo know who authorized the changes to public and private channels retention policies on March 1, 2023?

A.   Same -- same answer.

Q.   Is Nexo aware of any way to recover any Slack messages deleted pursuant to these retention policies?

MR. SHELTON:  Objection, calls for an expert

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    CONFIDENTIAL

snapshots do not exist."

Nexo's response is:

"Subject to and without waiving the foregoing objections, including the General Objections, Nexo has no documents to produce in response to this Request."

My question is whether you are aware of any documents or communications regarding efforts to recover, restore or retrieve deleted emails, Slack messages or other data from yourself or Mr. Kanchev?

A.    I have not.

Q.    Okay.

You can set that to the side then.

I am going to introduce exhibit 106, which is a spreadsheet which I'll put up here, and so you can let me know how to get it to you later.

(Exhibit 106 marked for identification)

My first question is whether you have seen this spreadsheet before?

A.    I have not.

Q.    Are you familiar with Google Vault and its function within Nexo's Google Workspace environment?

A.    I am not.

Q.    What is Yassen's full name and job title?

A.    If we're talking about Yassen Damyanov, as I answered earlier today, in the early days of -- is

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                        CONFIDENTIAL

Q.   Is that one of Kosta Kanchev's emails?

A.   It is a very old legacy one from 2017.  How it relates to the present is not clear to me.

Q.   Okay.  And Antoni@NexoBank.com, was that also one of your earlier emails?

A.   Same.  Same.

Q.   And Antoni@Nexo.io, that's your current email at Nexo, correct?

A.   Well, my current email -- it's -- the domain was Nexo.io and we moved to Nexo.com and somehow one is the alias of the other but how exactly it is I don't know but it appears that this is the source and that's why it appears to this day.

Q.   So that was your email at least at some point in time, right?

A.   Indeed.

Q.   Okay.  And then Kosta@Nexo.io would have been Mr. Kanchev's email at some point in time as well; right?

A.   Correct.

Q.   And is Kosta.kk@gmail.com Mr. Kanchev's personal email address?

MR. SHELTON:  Objection, calls for speculation.

A.   Well, it would appear to be his personal

email.  I certainly have seen that email address.

BY MR. TAYLOR-COPELAND:

Q.   And above it, in row 438, column H, is Antoni@trenchev.com; do you see that?

A.   I do.

Q.   Is that your personal email address?

A.   Yes.

Q.   Do you have a similar retention policy for your personal email address?

A.   I generally do not tend to use email a lot so I do not know what my current retention policy on my personal email is.

Q.   Did you search this Antoni@trenchev.com email address as part of this case?

A.   I don't believe I did because that's my personal email.

Q.   Okay.

Do you know who implemented the changes in Nexo's retention policy to reference you and Mr. Kanchev's personal email addresses?

A.   I don't know.

Q.   Was it you?

A.   It was not me.

Q.   Was it Mr. Kanchev?

A.   I don't know.

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 2, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## ANTONI ANTONIEV TRENCHEV - VOL. II

## CONFIDENTIAL

**CERTIFIED COPY**

Reported by:
GEORGIA GOULD



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - -
IN THE MATTER OF:

JOHN CRESS,

Plaintiff,
NEXO CAPITAL INC.
Defendant.
- - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME II

Thursday, April 2, 2026

AT:  9:01 a.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Plaintiff John Cress:

       JAMES TAYLOR-COPELAND (in person)
       MAX AMBROSE (remotely)
       TAYLOR-COPELAND LAW
       501 W. Broadway, Suite 800
       San Diego, CA 92101
       Tel: (619) 734-8770
       james@taylorcopelandlaw.com


Appearing for the Defendant Nexo Capital and the witness:

       IAN S. SHELTON (in person)
       KIRSTEN DOOLEY (in person)
       BAKER & MCKENZIE LLP
       10250 Constellation Boulevard, Suite 1850
       Los Angeles, CA 90067
       Tel: (310) 299-8535
       ianshelton@bakermckenzie.com


Appearing remotely:

JOHN CRESS (Plaintiff)

VIDEOGRAPHER:

       Simon Rutson

Q.    What inquiries or subpoenas did Nexo preserve documents in response to?

A.    Well, there have been many inquiries, and requests, so I couldn't pinpoint specific instances. But this is standing policy at Nexo.

Q.    Do you know for sure that Nexo did anything to preserve documents or communications in response to any inquiries or subpoenas from regulators?

A.    I believe I have memories of us doing that.

Q.    Just briefly we're going to go back to exhibit 106 which I'll put up on the screen here.

A.    Ah, right.

Q.    So in row 354, column H, do you see it says, "terms from Kalin@Nexo.io," and then above it it says "terms to Kalin@Nexo.io," is Kalin@Nexo.io Kalin Metodiev?

A.    Yes.

Q.    Do you know why Nexo would change retention settings for Mr. Metodiev's email in January of 2024?

A.    I do not know that, no.

Q.    Mr. Metodiev was the one who oversaw Nexo's OTC desk.  Correct?

A.    Correct.

Q.    Did he also oversee Nexo's VIP relationship program?

A.   I think so.

Q.   So I'd like to direct your attention to row 177, column H, and there is an entry that says "subject Shane-Nexo tokens proposition".  Do you know what that was, Shane-Nexo tokens proposition?

A.   Not specifically.  I presume Shane refers to a client of ours.  I don't -- I don't have the context of that, no.

Q.   Okay.  Thank you.  We'll put that aside.

And if I could direct your attention back to exhibit 108 which we were looking at toward the end of the day yesterday.  It's the consent order.

A.   Yes.

Q.   And if you could please turn to page 3.

A.   Yes.

Q.   And the last sentence of paragraph 10 says:

"Nexo Capital did not generally evaluate the borrower's debt-to-income ratio."

Is that true?

A.   I believe so.

Q.   Did Nexo evaluate Mr. Cress's debt to income ratio before extending him a loan?

MR. SHELTON:  Objection, calls for speculation.

A.   While I'm not entirely sure, it is the nature

services.

So to which of the two is your question?

BY MR. TAYLOR-COPELAND:

Q.   That's fair enough.  Right now I'm talking about the retail exchange.  Was there a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange?

A.   I don't know.

Q.   You don't know?

A.   I don't know.

Q.   Are you 100 percent sure about that?

A.   I don't know.

Q.   Who would know?

A.   I couldn't give you a name of a person who would know for sure right now.

Q.   So you're Nexo's corporate representative on this topic; right?

A.   I'm not sure that's a topic.  You were asking me about functionality of the Nexo retail exchange.  Am I a designated corporate representative for Nexo retail exchange?

MR. SHELTON:  So he'll give you a document if he wants to ask you a question.

BY MR. TAYLOR-COPELAND:

Q.   So you're the designated corporate

ANTONI ANTONIEV TRENCHEV - VOL. II                                    JOB NO. 2496606
APRIL 02, 2026                        CONFIDENTIAL

representative on topic 315, which is Nexo's sale of the Nexo Token on exchanges, and topic 316, which is Nexo's sale of the Nexo Token to U.S. persons.  And so --

A.   Okay.

Q.   -- I'll repeat my question, which is whether there was a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange?

A.   There was a period of time when the Nexo Token was sold to accredited investors.

Q.   On the retail exchange?

A.   I cannot confirm whether that flow was through the retail exchange or the OTC service.

Q.   Okay.  So let's set aside accreditation for a second.

A.   Okay.

Q.   Was there a period of time during which the Nexo Token was available to U.S. purchasers on Nexo's retail exchange?

A.   I don't remember.

Q.   Did you do anything to try to determine that in preparing for today?

A.   I did some preparation with regards to the Nexo Token and its sales to American, U.S. customers. However, the exact flow, whether it went through the retail exchange or the OTC desk, is something that I do

A.   I don't remember what I particularly said. I said that I'm certain that we sold to U.S. clients via the OTC desk for sure.

BY MR. TAYLOR-COPELAND:

Q.   Right.  And you don't know if you sold to U.S. clients on the retail exchange; correct?

A.   Correct.

Q.   Okay.

So my question is whether you know if Nexo included any transact -- or any relevant transactions on the retail exchange in these interrogatory responses?

A.   I don't know whether those sales of the Nexo Token occurred on the OTC, through the OTC desk, or through the retail platform exchange.

Q.   Okay.

But to the extent Nexo have sales on its exchange where the counterparty is a U.S. purchaser, those are direct sales and should be included in this response; correct?

MR. SHELTON:  Objection, vague, misstates testimony.  Calls for a legal opinion.

Could you repeat that question again?  I had trouble.

MR. TAYLOR-COPELAND:  Yeah.  To the extent Nexo has sales on its exchange where the counterparty is