EXHIBIT E

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH
Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## Antoni Antoniev Trenchev

## Confidential



Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - - -

IN THE MATTER OF:

JOHN CRESS,

                                   Plaintiff,

NEXO CAPITAL INC.
                                   Defendant.

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME I

Wednesday, April 1, 2026

AT:  1:04 p.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

                    A P P E A R A N C E S

  Appearing for the Plaintiff John Cress:

            JAMES TAYLOR-COPELAND (in person)
            MAX AMBROSE (remotely)
            TAYLOR-COPELAND LAW
            501 W. Broadway, Suite 800
            San Diego, CA 92101
            Tel: (619) 734-8770
            james@taylorcopelandlaw.com


  Appearing for the Defendant Nexo Capital and the witness:

            IAN S. SHELTON (in person)
            KIRSTEN DOOLEY (in person)
            BAKER & MCKENZIE LLP
            10250 Constellation Boulevard, Suite 1850
            Los Angeles, CA 90067
            Tel: (310) 299-8535
            ianshelton@bakermckenzie.com


  Appearing remotely:

  JOHN CRESS (Plaintiff)

  VIDEOGRAPHER:

            Simon Rutson

That would be the -- the main driver behind our decision -- but obviously smaller ones like lifestyle choices, partner preferences, stuff like that.

Q.   Was there a criminal investigation of Nexo in Bulgaria in 2022?

A.   No.

Q.   Did you at some point become aware that there was a criminal investigation of Nexo in Bulgaria?

A.   I did.

Q.   When was that?

A.   In early 2023.

Q.   Do you recall exactly when in 2023?

A.   I think it was around January 13th, which was a Friday.

Q.   So January 13th 2023?

A.   Is when we became aware, yes.

Q.   Do you know what the resolution of that investigation was?

A.   I do.

Q.   And what was it?

A.   After about nine months of investigating the Bulgarian prosecutor's office dropped all charges against us.  The procedure in Bulgaria is such that when the prosecutor drops charges, so that those cannot later be reinstated against you, you appeal that decision

before a court, the court then rules, and their ruling, in our case, was that Nexo as a group of companies and its owners, directors and officers, have not committed any crimes.

Q.    Did Nexo have any formal document retention policy in 2018?

A.    I do not believe that we had formalized that in a set of documents.  I think the default setting was that everything is pretty much kept indefinitely.

Q.    Was --

A.    Again, talking about 2018.

Q.    Okay.  Did -- and was that the same in 2019?

A.    I am not entirely sure when we issued our first formal retention policy but I would believe it was later than 2020.

Q.    So before the time that you issued a formal written policy, was the informal policy to retain emails indefinitely?

A.    It was whatever the default settings of the email provider was, which was Google.  I think that is where early days of a start-up and we had not pondered upon the retention policy and had no reason to at that time.

Q.    And before having a formal retention policy, is the same true of Slack, that you just used whatever

the default setting was?

A.    I think that over time we've had different subscription models to Slack.  So early on there would have been the free version which obviously keeping messages for a -- like many messages for extended periods of time is costly to them so they kept it at whatever default duration that was.  At some point we upgraded to a paid service which had more options to modify policies, but the exact nuances and what -- when -- what happened, I couldn't now on the top of my head reverse engineer.

Q.    Who was responsible for creating the first written retention policy?

A.    Well, that would have been within the purview of the legal department.

Q.    As a lawyer did you sometimes get involved in activities like that with the legal department?

A.    I am not a lawyer.  I have never been qualified as a lawyer.  I went to university studying law.  But my interests were elsewhere.

Q.    Fair enough.

Do you know in Bulgaria to be a lawyer do you have to be qualified?

MR. SHELTON:  Objection, calls for a legal opinion.

A.   I am not familiar with how the Bulgarian professional guild of lawyers is governed, of structure.

BY MR. TAYLOR-COPELAND:

Q.   Were you at all involved personally in creating the first written retention policy?

A.   I do not recall being involved in that personally.

Q.   Do you know who at the legal department would've been involved?

A.   Certainly the head of legal, Bianca, would have been involved in that.  Who else, I couldn't cite.

Q.   So I'm gonna ask this first for you personally.  At some point did you learn that Mr. Cress had sent a demand letter to Nexo?

A.   At some point I became aware of Mr. Cress as a former client at that time, and I understood that he is unhappy with certain aspects of the services he received from Nexo.

Q.   Do you know when Nexo first learned about Mr. Cress's demand letter?

A.   Well, I do not have the exact date but it should have been around early 23, something like that. I don't know exactly.

Q.   I want to introduce exhibit 101.

        (Exhibit 101 marked for identification)

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    Confidential

A.   Thank you.

Did I just say 2023 or 2022?

Q.   I believe you said 2023.

A.   I meant to say 22.  If that could be reflected.

(Record Read.)

BY MR. TAYLOR-COPELAND:

Q.   Have you seen this letter before?

A.   I do not recall seeing that letter, no.

Q.   Okay.

And it's a letter from Roche Freedman to Michael Bahar.  Correct?

A.   Looks like it, yes.

Q.   At Eversheds Sutherland?

A.   Indeed.

Q.   And was Eversheds Sutherland Nexo's attorney in 2021?

A.   We had commissioned Eversheds Sutherland with some work.

Q.   Were they working on the Jeong v Nexo case at that time?

A.   I couldn't say.

Q.   Do you have any reason to believe that this letter wasn't forwarded to you or to Nexo?

A.   I don't know.

that Mr. Cress had some complaints, what did you understand those complaints to be?

A.   I understood that, unfortunately, Mr. Cress had suffered financial loss, which is something I -- on a personal level, understand how painful it can be and I sympathize with that.  I understood that he thought that there was something around the liquidation or the functioning of the Nexo credit facility that was improper, but I do not believe that to have been the case.

Q.   Did you understand him to be threatening litigation if his demands weren't met?

A.   I mean, looking at the document I think it explicitly says that if the list of demand is not met and an amicable resolution is found he has the intention to pursue other means of achieving his goals.

Q.   Was Nexo aware that once litigation is threatened an obligation arises to preserve relevant documents?

A.   By that time I don't think this was the first time that we received a letter of demands and there was an established procedure for the legal department to follow after such a letter was received.

Q.   And what was that procedure?

A.   Well, it would be to gather, copy and

safeguard the relevant materials to the case that the complaint pertains to.

Q.   Do you know what steps, if any, were taken to preserve documents or communications in response to receiving this letter?

A.   I became aware of the complaint after the -- this letter was received.  And when it was brought to my attention, the legal team at the time had told me that they had gathered all the relevant documentation, and should this advance procedurally in -- in a direction -- or legal action would be filed against us, we would be able to produce the relevant documentation that are related to this case.

Q.   Do you know specifically what those documents and communications that were collected by the legal department were?

A.   I believe that the communications between Mr. Cress and his account manager had been duly copied and stored.  I believe from what I understand from the legal team that we were able to produce documents around the transactions and the interactions in discovery, so there is nothing that leads me to believe that the procedures around receiving demand letters and what the team should do after that have not been followed.

Q.   Was the procedures to be followed in the event

of receiving a demand letter, is that a written document?

A.   I do not know whether they were formalized but when this was brought to my attention they already said we have gathered the information that will be needed in the future.

Q.   Were you told not to delete any of your emails?

MR. SHELTON:  Objection, vague.

A.   I mean, any of your emails is a rather broad term.  What exactly do you mean by that?

BY MR. TAYLOR-COPELAND:

Q.   Were you told not to delete relevant emails?

A.   I don't believe that I was told to not delete relevant document -- emails because I had no relevant documents to this case.  I had not heard of Mr. Cress at that point.  I had not interacted with him and it was not part of my job description to be a customer-facing agent of the company.

Q.   So before receiving the demand letter you had never heard of Mr. Cress?

A.   I don't -- I don't believe I had, no.

Q.   As managing director would you receive reports about the clients with the most assets on the Nexo platform?

A.   Well, at the time we were three managing partners, and each of us would have their area of expertize, and departments he would oversee.  So the trading department, the OTC desk, none of that was under me, so I would not -- like the OTC desk or the -- or the trading department, they would not report to me directly.

Q.   Would they report to Kalin Metodiev?

A.   Yes.

Q.   Do you know if Mr. Metodiev received reports about the, you know, VIP clients with the most assets on the platform?

MR. SHELTON:  Objection, calls for speculation.

A.   I couldn't verify that.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo issue a litigation hold in response to this October 2021 demand letter?

A.   Can you define litigation hold for me?

Q.   Yes.  Did it send out instructions to retain relevant documents?

A.   I remember when this was brought to my attention, asking that question or something similar to it, and the answer by legal department is we did better than that, we went about, all the relevant parties and

custodians around Mr. Cress as a client, and we made sure that all the relevant information is copied and would be available in the future.

Q.    Do you know did that relevant information include all emails involving Mr. Cress?

MR. SHELTON:   Objection, vague.

A.    They confirmed to me that they had gathered all relevant information regarding the case and that would include email.  Further than that, I don't know what all emails would mean.

BY MR. TAYLOR-COPELAND:

Q.    Do you know if they collected Slack messages?

A.    I do not recall particular discussions singling out Slack.  What I understand is that during discovery we have produced Slack messages with relevance to Mr. Cress, so that leads me to deduce that we collected Slack messages that we deemed relevant to the case at this earlier stage.

Q.    And how did Nexo decide what was relevant to the case at that stage?

MR. SHELTON:   I am gonna object on privilege grounds.  Mr. Trenchev, I don't want you to disclose the substance of communications with Nexo's attorneys, but if you can give a response at a more general level as a corporate representative, you can testify on that at

that level.

A.    Thank you.   It would be my understanding that they would use search words, search terms, to filter out what is relevant and what is not.

BY MR. TAYLOR-COPELAND:

Q.    To run that search would they have to involve IT?

A.    I do not know that.

Q.    Do you know if Google enabled Nexo to search for specific terms across all email addresses?

A.    Make sure that I understand the question, whether it can -- whether there's a functionality, you type in the search term and then it searches through all addresses of -- corporate addresses?

Q.    Correct.

A.    I am unaware of such a feature.  It might or might not exist.

Q.    And do you know if Slack had functionality to allow search through all Nexo's Slack messages regardless of user?

A.    I do not know the inner working of the Slack platform.

Q.    So do you know how Nexo ran these searches with the search terms?

A.    I don't have the details on that.

Q.   Do you know if there are any records of that happening?

A.   I don't know whether this was a recorded activity or how it was conducted.

Q.   I am about to introduce another exhibit. do you guys want to keep going or --

A.   Should we take five to ten minutes?

MR. SHELTON:  Let's take a 10 minute break.

A.   Thank you.

THE VIDEOGRAPHER:  Going off the record at 2:15. end of media 1.

(2:15 p.m.)

(Break taken.)

(2:28 p.m.)

THE VIDEOGRAPHER:  This is the beginning of media 2 in the deposition of Antoni Trenchev.  Back on the record at 2:28.

BY MR. TAYLOR-COPELAND:

Q.   I'm going to introduce exhibit 102.

(Exhibit 102 marked for identification)

A.   Okay.  It's two so ...

MR. TAYLOR-COPELAND:  Yes.  My questions are just going to be about this at a very high level.  So it's a document entitled "Nexo Financial LLC, Complaint Policy".

A.   I don't believe so.  This is very early in the history of Nexo Financial LLC.  It was a U.S. entity that was incorporated with the idea that it will go about getting licensed by the various state regulators in the U.S., August 2020 would appear from my memory to be a very early stage of the existence of this company. So I don't believe it was operational.

Q.   Do you know why it would need a complaint policy if it wasn't operational?

A.   I believe that the creation of such and presenting it to the Regulator was part of the licensing process and that you had to lay out at least a draft of what you intend your policy to be once you become operational.

Q.   Do you know if Nexo Capital would've had its own complaint policy at this time, August of 2020?

A.   I do not know that, no.

Q.   Do you know if a customer sent a demand to Nexo generally if it would be processed under this policy, Nexo Capital's own policy or no policy at all?

A.   There was a way of handling customer complaints wherever they would originate, there would be forwarded and sent to Nexo's legal team and they would operate within the policy of handling those demands, requests, inquiries, whatever the form might have been.

Q.   And is Nexo's legal team -- is employed by NDSEOD?

A.   Yes.

Q.   And so would they then handle all legal complaints sent to any of the Nexo companies?

A.   Yes.

Q.   You can set that document aside.

In 2020 was Nexo aware of any investigations into the company by U.S. regulators?

MR. SHELTON:  Objection, vague.

A.   I don't believe we were under investigation by any regulator in 2020.

BY MR. TAYLOR-COPELAND:

Q.   In 2021 was Nexo aware of any investigations by U.S. state or federal regulators?

MR. SHELTON:  Same objection.

A.   I don't believe we have been under investigation by any state or federal regulator.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo receive subpoenas from state or federal regulators in 2020?

A.   Erm, I am not sure whether we have received subpoenas and whether that was in 2020, or later, but we have received inquiries by regulators over the years. It would be hard for me to pinpoint exact dates on top

being very polite, very cordial, very professional, and

they were gathering information around Nexo, what types

of services we were offering.  But this was not

an investigation, it was information gathering.

Q.   What information was the SEC requesting from

you?

MR. SHELTON:  Objection, vague.

A.   I don't recall exactly what they requested.
I think they asked whether U.S. persons would have been

participating in our token sale which had taken some

three years earlier.  There might have been, if I recall

correctly, some discussion about characterizations of

our custodian at the time.  This is what I remember.

BY MR. TAYLOR-COPELAND:

Q.   Do you recall any correspondence about whether

the Nexo Token was SEC compliant?

A.   I don't particularly recall such questions and

discussions right now.

Q.   In 2022 did Nexo come to understand that it

was under investigation by U.S. state or federal

regulators?

MR. SHELTON:  Objection, vague.

A.   We -- I think towards mid-2022 we were in

contact with regards to an inquiry, not

an investigation, from the SEC.  But this, in difference

initially we were dealing with the SEC.

Q.   Was Nexo aware that once a regulatory investigation was pending there was an obligation to preserve relevant documents?

MR. SHELTON:  Objection, vague, calls for a legal opinion.

A.   I do not know what I knew on that topic in 22.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo do anything to preserve relevant documents in response to inquiries or subpoenas from regulators?

MR. SHELTON:  Same objection.

A.   I believe that we produced a lot of documents. And there never was an issue raised by either federal or state regulators that our documents are inadequate or incomplete, which leads me to conclude the opposite, that they found our document producing efforts to be adequate and complete.

BY MR. TAYLOR-COPELAND:

Q.   Did anybody tell you not to delete documents related to any of the subpoenas or investigations?

A.   I do not recall that.

MR. SHELTON:  I am gonna put in the record objection on privileged grounds as to communications that Mr. Trenchev might or might not have had with his

Q.   Do you know if Nexo suspended any retention policies in response to those government inquiries or subpoenas?

A.   I don't remember that.

Q.   Who would have been responsible for making that sort of decision?

A.   Presumably legal would have suggested it to us or go ahead and do it.  I am not sure what the ... what the status quo was in 2022.  What I do remember is that we had hired external counsel, so -- you know, even though I do not remember it specifically it might have been that they have provided us with advice and guidance on the matter.  I just don't remember that.

Q.   When did Nexo first learn that Mr. Cress had filed a lawsuit against Nexo?

A.   Well, can we define of who we understand Nexo to be?  Because there's different individual departments.  So what do you mean by -- when you say when did Nexo?

Q.   When did Nexo Capital learn that a plaintiff had filed a lawsuit against it?

A.   Well, since Nexo Capital is a legal entity it would have to be its representatives, me and Mr. Kanchev.  I could not tell you when he would have learned.  I think I personally got aware at some point,

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                        Confidential

in 2022, but I'm not entirely sure.

Q.   Did Nexo implement any preservation measures after learning of the filing of Mr. Cress's lawsuit?

MR. SHELTON:  Objection, asked and answered.

A.   I believe I answered that question already.

BY MR. TAYLOR-COPELAND:

Q.   Maybe I am missing something but can you -- could you repeat your answer?

A.   I will try.

I believe that when the issue -- issues around Mr. Cress were brought to my attention, I asked the same or similar question as you, what did we do to preserve relevant documentation and correspondence, rather did we send out a notice to do so and they told me that we had actually done better, we had gone about to collect relevant information as per our understanding and procedures and -- and because of that we didn't need to send out notices because the work had already been done.

Q.   So Nexo didn't send out any preservation notice in response to Mr. Cress's lawsuit; correct?

MR. SHELTON:  Objection, misstates testimony.

A.   I said that we -- the team, the legal team, had informed me they have gone beyond asking our team members and representatives to preserve, and that above and beyond is the actual collection of relevant data and

information.

BY MR. TAYLOR-COPELAND:

Q.   Okay, my question is whether Nexo sent out any preservation notice in response to Mr. Cress's lawsuit.

A.   And my answer is that we did a step that went beyond asking somebody to keep the information and that step was to actually get the information and keep it.

Q.   Were you aware that you were named as a defendant in Mr. Cress's lawsuit?

A.   I -- from the documents, exhibit 101, which is the initial letter that was sent, I did not see -- I did not see me mentioning at all.  Certainly not as a defendant -- a defendant you said?  Or counterparty or person of relevance.  So I -- I cannot be aware of something that has not --

Q.   Were you ever --

A.   -- happened.

Q.   Were you ever made aware that Mr. Cress had named you personally as a defendant?

MR. SHELTON:  Objection, vague as to the document you're referring to.

A.   Could we narrow down the question a little bit?  So that I can answer it better?

BY MR. TAYLOR-COPELAND:

Q.   Sure.  Did you ever have an understanding that

Mr. Cress was suing you personally?

A. I became aware that I was drawn in as a party to the complaint, but from my recollection that was years later.

Q. And when you were -- became aware that you we're drawn in as a party, what did you do to preserve your own documents?

A. Well, first of all I was very surprised by that fact because I had no interactions with Mr. Cress, and I think it was maybe around that time that I heard of the case or at least got more aware of this being an unresolved issue, and I went through my mind what if anything of relevance I would have as documentation, correspondence, and I came to conclusion that that would be not at all since I had not communicated or interacted with Mr. Cress at any time. And neither was it part of my job description to do that.

Q. So you decided that because you hadn't communicated with Mr. Cress there was no need for you to do anything to preserve your own documents or communications is that right?

MR. SHELTON: Objection, misstates testimony.

A. I said that I did not see what communication or documentation I would have to preserve as there was no documentation or correspondence of relevance to this

case in my accounts.

BY MR. TAYLOR-COPELAND:

Q.   So you didn't do anything to preserve any communications after learning of the lawsuit; correct?

MR. SHELTON:   Objection, vague, misstates testimony.

A.   I -- this is a rather broad statement that I did not preserve any communication.  Certainly I preserved lot of communication.  I just did not see anything relevant to the case that I should specifically focus on keeping.

BY MR. TAYLOR-COPELAND:

Q.   Can you identify one thing you did to preserve your documents after learning of Mr. Cress's litigation?

A.   I'm not sure I understand the question.  There is proactive disposal of documents and then there is keeping documents as they are.  I did -- I did not take a specific proactive action to do anything because I had no communication or documents with relevance to the case.

Q.   So you didn't suspend any auto-deletion functions on your email?

A.   I do not have auto-deletion functions on my email in 2022 and did not go about deleting anything.

Q.   At any point did you suspend automatic

policy of my email address, but I think it is much later than the period that you are alluding to.

Q.    Okay.

What is the difference between automatic deletion and this 30-day retention policy?

A.    Well, deletion is -- is all encompassing, so if you set a mechanism to auto-delete it indiscriminately deletes everything.  Whereas a retention policy, my understanding of the technicalities is that you can have a retention policy that after let's say whatever number of days, it's no longer kept, but if you flag a certain email, a start or put a label on it, that might survive the retention policy.

So there is a -- there is a difference if I manage to paint that out.

Q.    But unless one of these specific tags is applied the emails that are subject to the retention policy are deleted at the time the retention policy lapses; correct?

MR. SHELTON:  Objection, calls for an expert opinion.

A.    I don't understand that entirely.  However, deletion is like -- how do I phrase this? -- it's a proactive act and it -- the retention policy, unless

you deem a document worthy or important, it's just --
ceases to be.  There is not a deliberate deletion of the
file.

BY MR. TAYLOR-COPELAND:

Q.    But the implementation of the policy to begin
with is a deliberate act; correct?

MR. SHELTON:  Objection, vague.

A.    The creation of a policy is a deliberate act,
philosophically speaking, perhaps you're right, but we
have to narrow down what -- how that relates to the
discussion here.

BY MR. TAYLOR-COPELAND:

Q.    I'll introduce exhibit 103.

(Exhibit 103 marked for identification)

A.    Okay.

Q.    Have you seen this document before?

A.    Well, I might have, I don't immediately
recognize it.

Q.    Do you understand that you've been designated
as Nexo's corporate representative to discuss this
document?

A.    I do.

Q.    And it's a document titled "Data Retention and
Disposal, March 27, 2023"; correct?

A.    Correct.

Q.   And are you aware that this was in your files?

A.   I would take your word for it.

Q.   So no reason to believe it wasn't found in your files?

A.   No reason to believe it was not found in my files.

Q.   And if you turn to page 3 of 6, at the top, it says "Data Retention and Disposal".

A.   Data retention -- uh-huh, yes.

Q.   And it says, "Nexo Business Unit, All", and, "Nexo Entity, All".

Does that mean that this applied to all Nexo corporate entities?

A.   Well, it could have been phrased a little bit more accurately, but it's hard for me to say what the author exactly intended, but you're not entirely unreasonable -- unreasonable in assuming so.

Q.   Okay.

And then Document Control Information, it says, "Approver, Milan Velev".  Do you know who that is?

A.   I do.

Q.   And who is that?

A.   He is an employee of Nexo and he is in charge of Infosec department, which is information security.

Q.   Did he report to you?

A.   No.

Q.   Who did he report to?

A.   I'm not entirely sure.  I believe that would be the CTO but I could be mistaken.

Q.   And who is the CTO?

A.   Vasil Petrov.

Q.   Then you see it says, "Approved date 2023-1-11"?

A.   I do.

Q.   Is that January 1, 2023 or January 11, 2023?

A.   Might have been November 1, 2023.  I could not confirm that.

Q.   So you don't know one way or the other whether this was approved in November 2023 or January 2023?

A.   Well, if we look at the first page and it says March 27, 2023.  I think it's unlikely that it's in November 2023.  But rather, it would be January, but consistency in spelling out the months might have helped us figure that out, definitively.

Q.   So you can't say for sure, but based on the context of the document it appears more likely it's January 2023 than November 2023; right?

A.   Correct.

Q.   Then do you see where it says "Purpose":

     "The purpose of this policy is to mitigate

MR. SHELTON:  Objection, vague.

A.   I have no reason to believe it did not.

BY MR. TAYLOR-COPELAND:

Q.   Then do you see it says, right underneath that, it's "Emails - internal and external", it says "Indefinite"?

A.   I do.

Q.   Is there any difference to you between permanent and indefinite?

A.   There is.

Q.   What's the difference?

A.   They would appear to be antonyms.

Q.   So to you indefinite means there's no retention policy at all?

A.   I mean, indefinite means the retention policy is to keep them indefinitely.

Q.   Okay.  And how is that different from keeping them permanently?

A.   Oh sorry, I -- I ... I confused the words.  To me "permanent" and "indefinite" would be very similar concepts.

Q.   Then it says:

"Electronic Documents, Depending on the subject matter, at least 5 years."

Right?

A.    It does say that.

Q.    Okay.  Do you believe that Nexo adhered to that policy?

A.    I believe that the wording here is vague, and not precise, would make it hard to comply with such a vague and imprecise wording of a policy.

Q.    And then:

"Transaction records, At least 5 years after termination."

What does that mean?

A.    It means that transaction records should normally be kept for at least five years after the termination of presumably client relationship even though it's not spelled out and I could not accurately guess the intent of the author of this document.

Q.    Would transaction records include a client's LTV at the time of liquidation?

MR. SHELTON:  Objection, vague.

A.    I do not know.

BY MR. TAYLOR-COPELAND:

Q.    Then 4.3, "Retention of Customer Data", it says:

"All active Customer Data shall be retained for as long as the Customer continues to be an active Customer of Nexo unless that Customer has requested

deletion of the data."

Do you see that?

A.    I do.

Q.    Okay.

Does Nexo have customer data in Slack chats?

MR. SHELTON:  Objection, vague.

A.    I mean, Slack data is a very broad term so I am unsure how to answer that question.

BY MR. TAYLOR-COPELAND:

Q.    So you don't know one way or the other whether Nexo communicated customer data through Slack?

MR. SHELTON:  Same objection.  Asked and answered.

A.    I would say that customer data, there is a retention policy of that data, and that it can be kept in a number of locations and I don't see how and why that should be Slack.

BY MR. TAYLOR-COPELAND:

Q.    Do you see 6 says:

"Suspension of Disposal in the Event of Litigation or Claims."

And it says:

"In the event Nexo is served with any subpoena or request for documents or any employee becomes aware of a governmental investigation or audit concerning Nexo

or the commencement of any litigation against or

concerning Nexo, such employee shall inform Management.

Any further disposal of documents shall be suspended

until Management with the advice of counsel determines

otherwise.  Management shall take such steps as is

necessary to promptly inform all staff of any suspension

and further data disposal."

       Do you see that?

  A.  I do.

  Q.  Is your experience that this policy was

adhered to at Nexo?

  A.  I have no reason to believe it has not been

adhered to.

  Q.  And as management were you informed when Nexo

was served with a subpoena?

       MR. SHELTON:  Objection, vague.

  A.  I'm looking -- I am looking at the definition

of management.  Unfortunately, in 2.1, there is no

definition of management, and I am not sure whether

management would include what your question implies,

senior management, such as me, Mr. Kanchev, or

Mr. Metodiev, at that time.  Or it would include also

other managers at the company, such as if we were

talking about, I don't know, a customer, a consumer,

customer support agent, whether him reporting to his

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    Confidential

Q.   What do you mean by "the seriousness of the case"?

A.   I mean that sometimes we've had people who had lost a thousand dollars claiming that we should give them 100 million because they were so distressed over the loss of a thousand dollars.  This would be an example of a -- of a complaint that on the monetary value claims $100, but if you look a little bit closer in the facts it might not need be taken that serious.

Q.   And so is that like a reflection of whether the claim has some level of merit or not?

MR. SHELTON:  Objection, vague, asked and answered.

A.   You asked me like the initial filter of what will be brought to my attention and whether the monetary amount is a determining factor, and I'm answering a long way in saying that monetary amounts in and of itself do not -- does not constitute the grounds for this being escalated to management or not.

BY MR. TAYLOR-COPELAND:

Q.   Following receipt of -- sorry, let me rephrase that.

Once Nexo became aware of Mr. Cress's lawsuit, did it suspend any disposal of documents?

MR. SHELTON:  Objection.  Asked and answered.

A.   Yes, I do feel like we discussed this, but again this point, when it was ultimately brought to my attention and I asked my colleagues at the legal department what did we do, did we send the preservation notice, they told me we had gone above and beyond on this and already collected the data that would be relevant to the case.

BY MR. TAYLOR-COPELAND:

Q.   Did you suspend the retention policy in effect for any of your email addresses upon learning of the case?

A.   Well, for the given period, I don't believe there was a retention policy on my email.  We're discussing data retention document of March, late March 2023 and I think the events of this coming to my attention precede that document.

Q.   At any point did you suspend the disposal of documents under the retention policy for your email addresses?

A.   Which time period are we talking?  This is a very general question of -- of operations of a company that stretch to over eight years.

Q.   Do you recall when you -- when Nexo implemented the 30-day retention policy with respect to some of your email addresses?

A.   I know it happened.  I do not have the specific dates.  If you can help me refresh my memory, perhaps I could be more useful to you.

Q.   Well, we'll get there in a second.

A.   Sure.

Q.   So did Nexo suspend the disposal of documents in response to learning of an SEC in -- inquiry or subpoena at any time between 2021 or 2023?

MR. SHELTON:  So I'm gonna object.  It's beyond the scope of his 30(b)(6) designation.  If you are able to testify in your personal capacity as to document preservation steps taken in connection with any SEC investigation, then you can answer.

A.   I do not have a particular memory of how exactly the events then unfolded.  What I know to be true is that we produced a lot of documents during the inquiries and the investigations.  In that time period that you indicated and given the communications with the various regulators who were conducting those invest -- inquiries, I have no reason to believe that our documents production exercise had been inadequate or insufficient and judging by the results of those inquiries, and the amicable resolution that ended them, I believe the opposite, that they were adequate and sufficient.

Q.   Well, let's go to -- back to section 4.1,
"Emails - internal and external, Retention Period,
indefinite."

A.   Yes.

Q.   Did you follow that policy?

MR. SHELTON:  Objection, vague.

A.   Emails, internal and external, were
indefinite.  I have, at certain times at my tenure at
Nexo, had my email retention policy set to indefinite,
yes.

BY MR. TAYLOR-COPELAND:

Q.   And at other times it has been set to 30 days;
right?

A.   At other times it has been set at different
settings, so it would be period-specific.

Q.   Okay, I want to introduce exhibit 104.

(Exhibit 104 marked for identification)

A.   Thank you.

Q.   My questions here, I am just showing this to
you to refresh your recollection, my questions are gonna
be on page 5 where there is a heading labeled "Trenchev,
Kanchev, Individual Custodial Emails".  So if you want
to take your time to read that section and then I'll
have some questions.

A.   And the other sections will not be relevant

immediately to your questions?

Q.   I don't believe so.

A.   Okay.

Q.   Other than seeing it's a letter from your attorneys to Mr. Cress's attorneys.

A.   Sure.  Can I know what ESI stands for?

Q.   I believe it's electronically stored information.

A.   Thank you.

Okay, I skimmed through the rest of the section, I think the more important parts were in the beginning, but I reserve my right to revisit that statement.

Q.   Of course.

So you see on page 5 under "Trenchev and Kanchev" heading, it says:

"We confirmed that Trenchev and Kanchev had a 30-day retention policy period effective December 4, 2022 ..."

Do you see that?

A.   I do.

Q.   Okay, is it true that a 30-day retention policy was placed on your emails on December 4, 2022?

A.   I see no reason why anything our external legal counsel should -- is telling you should not be

true.  So I would answer that in the affirmative.

Q.   So you have no reason to believe that that's not true; right?

A.   Right.

Q.   Okay.

Do you know who placed the retention policy on your emails?

A.   I do not specifically.  I understand that in the Google operating systems there is super admins. This would normally be people at Infosec that can access the settings of the Google suite of services.  So -- but I do not have a particular name for you.

Q.   Okay.

So you didn't personally go into Google and set this retention policy; is that right?

A.   I did not.

Q.   Okay.

Did you direct somebody to implement this retention policy?

A.   I don't recall having done that.

Q.   So you can't say one way or the other?

A.   Unless I'm entirely mistaken, I have not ordered anyone to do that.

Q.   Do you know if Mr. Kanchev ordered anybody to do that?

A.    I --

MR. SHELTON:  Objection, calls for speculation.

A.    -- I cannot know that.

BY MR. TAYLOR-COPELAND:

Q.    Sorry, could you repeat that?

A.    I cannot know that.

Q.    So does Nexo know whether Mr. Kanchev ordered the implementation of this 30-day retention policy?

A.    I cannot confirm that with certainty.

Q.    You don't know one way or the other?

A.    I do not know one way or the other.

Q.    You spoke to Yassen to prepare for today?

A.    I spoke to Yassen on a particular topic.

Q.    Did you ask Yassen whether Mr. Kanchev asked him to implement a retention policy?

A.    I have not.

Q.    So is it fair to say the only people who would know whether Mr. Kanchev asked Yassen to implement the retention policy would be Mr. Kanchev and Yassen?

A.    I'm not sure that is an accurate statement. Because that presupposes that it is Yassen who made the changes.  I am not certain whether he was the only one with access to the settings of the Google services on December 2022.

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                           Confidential                           JOB NO. 2571483

the reason why all the emails on some occasions have been still on the servers after that time constraint has elapsed.

Q.   To store things in Google, would that be something that you would personally do or -- like a button you would press or is that something that a system admin would have to do?

A.   No, no, I said "star" not "store".  It was like next to the email and the subject there was a star. Which like you press, turns into yellow and I think it's stored beyond the retention.

Q.   Okay.

A.   All this.

Q.   So if you flag something, as I think you hit that star button, then it would be -- wouldn't be subject to the retention policy?

A.   I think so.

Q.   Okay.

So at some point you became aware there was a retention policy; right?

A.   Yes, but I do recall that there were several amendments to that retention policy.  So it might have been that -- I don't know, maybe Kosta, if this was only for me and him, it's either me or him I don't recall, but I don't remember having a problem finding my emails.

It might have been him where he said, well, maybe that's too short and we expanded it.  I don't believe that currently the retention policy period is 30 days, I think it's much longer.  Not entirely sure.

But I -- what I do remember is several changes to the retention policy, certainly more than one.

Q.   What makes you think the current retention policy is much longer?

A.   I just have this objective feeling of having seen something to that accord.

Q.   Why did Nexo implement the 30 day retention policy?

A.   Well, I think that December 2022 was after a period of particularly challenging times for the industry as a whole and specifically, for businesses, such as ours, many of our competitors did not survive.  FTX had just imploded.  And there was a lot of hacking attacks at the time.  Various black hacking groups that were becoming even more targeted in their attempts towards crypto companies, and I think the thinking was around de-risking us with Kosta, as custodians of -- custodians of especially sensitive data which might or might not obviously in our opinion not have had to be retained going forward.

To put it shortly, it was a de-risking

activity, an initiative.

Q. Whose decision was that?

A. Erm, whose decision was what? The retention period?

Q. To implement that retention policy.

A. I remember like general discussions around de-risking the amount of information that we had between me and him. But who specifically pulled the trigger, I couldn't -- I couldn't say. I don't believe it was me.

Q. So you and Mr. Kanchev had discussions about implementing this retention policy to reduce risk; right?

A. Yes.

Q. Okay.

Before you implemented that policy, did you check with legal and compliance?

A. I don't specifically recall discussions with legal and compliance. So I couldn't tell you other -- either way.

Q. And you're aware that -- well, let me ask it differently.

Do you have any reason to dispute that Mr. Kanchev's email was also placed on a 30-day retention period on December 4, 2022?

ANTONI ANTONIEV TRENCHEV                                          JOB NO. 2571483
APRIL 01, 2026                         Confidential

A.   I do not.

Q.   And would the rationale for placing both of your emails on that retention period have been the same?

A.   Yes.

Q.   As a practical matter, did the implementation of this retention policy mean that emails older than 30 days were automatically deleted?

MR. SHELTON:   Objection, calls for an expert opinion.

A.   I do not know.

BY MR. TAYLOR-COPELAND:

Q.   You don't know?

A.   I don't know.

Q.   Did you ask Yassen about that in preparing for today?

A.   I did not.

Q.   How do you access your email?

A.   I access my email from my computer and my mobile phone, which is a working phone.

Q.   Do you use the -- do you use an application to do that?

A.   I use the native Google app.

Q.   Okay.

And then on your desktop?

A.   I would use the browser to log in to -- to the

Gmail.

Q.   Okay.  Do you have your phone with you?

A.   Not my working phone.  I have my personal phone.

Q.   Are you able to access -- in preparing for today did you check if you are able to access emails more than 30 days old?

A.   I have not.

Q.   Did you speak to Mr. Kanchev at all in preparing for today?

A.   No.

Q.   So you don't have any idea whether he's able to access emails more than 30 days old?

A.   I have not.

Q.   Did this retention policy impact sent emails?

MR. SHELTON:  Objection, calls for an expert opinion.

A.   I don't know.

BY MR. TAYLOR-COPELAND:

Q.   Did it include archived emails?

MR. SHELTON:  Same objection.

A.   Same answer by me, I do not know.

BY MR. TAYLOR-COPELAND:

Q.   When Nexo implemented this policy was it aware it would result in the permanent deletion of emails

older than 30 days?

MR. SHELTON:  Objection, assumes facts.

A.   Again, as with your previous two questions I don't know exactly what unfolds one -- that mechanism is set in place, especially not in lieu of already existing emails.

BY MR. TAYLOR-COPELAND:

Q.   So the purpose of implementing this policy was to reduce the risk of older emails being compromised by hackers, right?

MR. SHELTON:  Objection.  Misstates testimony.

A.   Well, I -- what I stated is that it was a de-risking exercise, and I stated the threat of hackers as one of the threats that the blockchain space and companies as ours were facing at the time.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  And how did Nexo understand that implementing this retention policy would reduce risk?

A.   Well, less data would be retained on third party services going forward.

Q.   So that data would be unavailable on third party services going forward, correct?

A.    I did not say that.  I said -- and by the way to this day I'm not clear when this retention policy is set, whether all existing emails are -- stop being

available or going forward once you receive an email, let's say 40 days pass, that email becomes unavailable. I'm not entirely sure on the technicalities and inner workings of those settings.

Q. So you don't know one way or the other whether it would apply retroactively or not?

MR. SHELTON: Objection, vague. Calls for an expert opinion.

A. Erm, I am not an expert on this and I do not know exactly what unfolds, and we've had results yield -- searches yield results of certain emails older than 30 days popping up, so it is somewhat confusing to me what exactly happens.

BY MR. TAYLOR-COPELAND:

Q. How do you know searches have yielded some emails older than 30 days?

MR. SHELTON: Mr. Trenchev, I'm going to object on privilege grounds. I don't want you to testify to any discussions you have had with your attorneys, but if you can respond outside of that scope, you can respond.

A. I don't know, I just remember somebody saying that they found an email that is much older in their inbox, but I don't have a great many details around that.

it's important in its own right.  I did not comment whether discussions with the SEC, particularly this one, had any relevance to the case at hand.

BY MR. TAYLOR-COPELAND:

Q.   How would it be important in its own right?

MR. SHELTON:  Objection, vague.

A.   I mean, this was the first outreach by the SEC to us, so I remember that being a lot of excitement, slight worry.  Just a natural reaction of young people running a start-up when they receive an inquiry by -- by a federal regulator.  So it was significant and important.

BY MR. TAYLOR-COPELAND:

Q.   Do you recall whether you manually deleted emails that you sent to the SEC?

A.   I am not in the habit of manually deleting emails generally, unless it's obvious spam or what would be a very obvious phishing attack.

Q.   So I take it then that you don't have a specific recollection of manually deleting any emails that you sent to the SEC?

A.   I would confirm that with a fair amount of certainty that I did not manually delete emails that I sent to the SEC.

Q.   Do you know if Nexo had any retention policy

in effect for your emails prior to December of 2022?

A.   Unless I'm mistaken, I would presume they were at the default setting, and that would be indefinite. There might -- the only limitation might have been actual gigabyte storage.  So a set retention policy by Nexo, I don't believe we had prior to that for my email address.

Q.   Okay.  And is the same true of Mr. Kanchev's email address?

A.   Without knowing for sure, I would assume that this would be a safe assumption.

Q.   In December of 2022 was the email account of anyone other than you or Mr. Kanchev put on a 30-day retention policy?

A.   I don't believe so.

Q.   Did you discuss including Mr. Metodiev at that point in time as one of the managing partners --

A.   I don't remember.  Sorry, did you finish?

Q.   You can go ahead.

MR. SHELTON:  I am gonna object on privileged grounds, to the extent you spoke with legal counsel about the retention policy, and I instruct you not to answer.  But if you had discussions with non-legal personnel in Nexo, you can answer.

A.   Well, I don't remember there being discussions

around Mr. Metodiev's email.

BY MR. TAYLOR-COPELAND:

Q.   Did you or Mr. Kanchev analyze Nexo's preservation obligations with respect to any litigation or investigation before implementing the 30-day retention policy?

MR. SHELTON:  Objection, vague, and I object on privileged grounds.  So I'll instruct you not to answer any discussions you had with -- to your attorneys about preservation obligations in connection with litigation.  But you can answer if those discussions involved discussions not with counsel.

A.   Well, I think the thinking at the time was that me and Mr. Kanchev not being customer-facing, not interacting with -- with clients, would have little to no relevant documents and communication on our email servers, on our email inboxes.  So -- because we had already seen a few complaints and demands, and they tended to cluster around execution, communications with account managers, customer support, so those were the important custo -- custodians of information and documents in our mind.

And that is also the reason why exclusively our inboxes had a specific retention policy, while for the rest of the employees I think we were sticking to

the indefinite retention setting then and now.

BY MR. TAYLOR-COPELAND:

Q.   Did either you or Mr. Kanchev consult outside counsel regarding the implementation of the 30-day retention policy before implementing the policy?

MR. SHELTON:  Mr. Trenchev, I'm gonna object on privileged grounds.  I don't want you to disclose the substance of any communications you had with counsel regarding the retention policies.  If you can answer, otherwise you can.

A.   I don't think I can answer otherwise.

BY MR. TAYLOR-COPELAND:

Q.   So my question isn't what the communications were, my question is whether or not you consulted outside counsel regarding the implementation of the policy before implementing the policy, either yes or no. I don't believe that's privileged.

A.   Well, I -- I have a hard time reconciling his objection, and the instruction he just gave me with answering the question even as you just rephrased it. I think it still would go in that territory.

MR. TAYLOR-COPELAND:  Are you instructing him not to answer that question?

MR. SHELTON:  Yes.

BY MR. TAYLOR-COPELAND:

Q.   Are you gonna follow that instruction?

A.   I'm gonna follow that instruction.

Q.   Okay, we'll take that to the court as well.

Do you know if you currently have access to any of your emails from 2018?

MR. SHELTON:  Objection, vague.

A.   I do not know that.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if you currently have access to any emails from 2019?

MR. SHELTON:  Same objection.

A.   Well, I mean I -- during the -- today and yesterday's preparation, for today's hearing, and deposition with you, I was presented a -- a few documents, and I believe one of them was an email from around that period. So I'm not sure where it originated, but I'm just thinking that if we have that document how would I answer your question, do I have access?  I mean, obviously so -- if my memory's correct, and that was indeed an email from that period, I then would have some sort of access even if it's not necessarily through my inbox.

BY MR. TAYLOR-COPELAND:

Q.   So my question is really just limited to through your inbox.

A.   Okay.

Q.   Do you have access to any emails from 2018 to 2021 in your inbox?

MR. SHELTON:  Objection, vague.

A.   I do not know how to answer that.  I do not know.

BY MR. TAYLOR-COPELAND:

Q.   Did you ever email anybody about Nexo's VIP customers?

A.   I don't believe I have.

Q.   Did you ever email anybody about OTC transactions?

A.   The only instance where I could think of it is if I was describing Nexo's business and I would have mentioned the OTC service as such but I don't think I have discussed any transactions related to the OTC service.

Q.   Did you ever email anybody about Nexo's VIP program?

A.   I don't believe I have.

Q.   Have you ever emailed anybody about Nexo's Liquidation Relief Program?

A.   I don't believe I have.

Q.   Have you ever emailed anybody about Nexo's fees?

speculation.

A.   I -- I don't know for sure but I know that he was also using the browser as opposed to a third party provider such as Outlook, which would then store it locally.  So I would assume the same as me but again I don't -- cannot with full certainty speak on his behalf.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if any emails deleted as part of this retention policy are permanently lost?

MR. SHELTON:  Objection.  Calls for speculation, calls for an expert opinion.

A.   I -- erm ... again, you are suggesting proactive deletion of emails which I don't think is an accurate depiction of the events that took place, certainly why the retention policy was put in place, and I don't know about the -- or the reversibility of deleted messages and what exactly happens when an email is deleted on the interface, what happens behind scenes on the Google servers, whether it can be recovered, is beyond my area of expertize and knowledge.

Q.   Is Nexo aware of any way to recover any emails deleted as a result of these retention policies?

MR. SHELTON:  Same objection, calls for speculation, calls for an expert opinion.  You can

answer, if you know.

A.   I don't think that Nexo has the knowledge of that.  This is too technical and dependent on the functionality of its email service provider, in this case Google.

BY MR. TAYLOR-COPELAND:

Q.   But you didn't ask anybody at Nexo about that; right?

A.   I personally have not asked anyone at Nexo about that.

Q.   Then looking back on page 5, "Slack Production" -- let's start with, actually, below -- there's "Public and Private Channels" and then there's "Direct Messages".  And it says the direct messages were placed on a four-day retention policy on 12/04/2022.  Do you see that?

A.   I do.

Q.   Okay.  Do you know who implemented that policy?

A.   I do not.  What I remember is that four days was a mistake, was -- I think somebody might have wanted to type in 40 and they missed a zero because four days is clearly a very, very short time period, and I think that's why it was discovered and corrected when it was discovered and maybe somebody complained about it being

too short a time.

Q.   And -- so the -- December 4 is the same day the emails retention policy was implemented; right?

A.   I mean, if these are American dates, Baker McKenzie being the U.S. law firm, we would assume that, it would be, yes, December 4 and the same date.

Q.   Okay.  Do you recall if these Slack retention -- this Slack retention policy was adopted as part of that same rationale that you discussed to reduce risk?

A.   I don't recall that, no.

Q.   So does -- does Nexo know who implemented the Slack retention policy?

A.   I don't -- I'm not entirely sure what the situation was in 2022, to be honest.

Q.   Did you -- in preparing for today did you ask anybody at Nexo who implemented these Slack retention policies?

A.   I don't think that anyone at Nexo would have been able to confirm what happened four years ago, exactly, and I think that direct messages, these are usually between several people, certainly less than a handful, because then it would make sense to create a channel rather than direct messages and they -- did not tend to include data and exchanges that are or

corporate significance.  It was usually people talking amongst themselves, also about non-Nexo related stuff.  That would be my understanding of what the direct messages usually constitute.

MR. SHELTON:  James, can we take a break pretty soon?  I need to use the rest room.

MR. TAYLOR-COPELAND:  Sure that's fine.  We can take a break now.

THE VIDEOGRAPHER:  Going off the record at 4:40, this the end of media 3.

(4:40 p.m.)

(Break taken.)

(4:56 p.m.)

THE VIDEOGRAPHER:  This the beginning of media 4, back on the record at 4:56.

BY MR. TAYLOR-COPELAND:

Q.   Mr. Trenchev, when you sent voice notes using Slack was it primarily in public and private chats or primarily in direct messages?

A.   I'm not prepared to make that dis-- distinction.

Q.   It could've been in both?

A.   I don't know how to list a quantity in either one category.

Q.   Okay.

Does Nexo have a business reason that it implemented a four-day retention policy on Slack direct messages on December 4, 2022?

A.   As stated before, I think the four-day policy was a mistake by whoever put that into the system, and hence that's why it was promptly changed after the discovery two days later.

Q.   Okay, so on December 7 it was changed to 30 days; right?

A.   This is what the document says, yes.

Q.   Okay.  And was there a business reason for having a 30-day retention policy for Slack direct messages?

A.   What would the definition of a business reason be?

Q.   Do you know why Nexo implemented a 30-day retention policy for its Slack direct messages on December 7, 2022?

A.   Well, there must have been a reason why we thought that is a good idea.  I just cannot reverse engineer that four years later.

Q.   So you don't know?

A.   I do not know.

Q.   Okay.

Do you know why Nexo implemented a retention

policy on direct messages but didn't implement any retention policy for public and private channels until a few months later?

A.   Other than that distinction I made before the break, I don't think there is more I can add, different type of information on the different type of channels.

Q.   So you don't know why one retention policy was deposited for direct messages and a different one was adopted for public and private channels?

A.   I do not know.

Q.   Does Nexo know who authorized the change -- any of these changes in the Slack DM retention policy?

A.   DM being direct messages?

Q.   Correct.

A.   I don't think Nexo can reverse engineer that several years later what the exact approval process for that change was.

Q.   Okay.

Does Nexo know who authorized the changes to public and private channels retention policies on March 1, 2023?

A.   Same -- same answer.

Q.   Is Nexo aware of any way to recover any Slack messages deleted pursuant to these retention policies?

MR. SHELTON:  Objection, calls for an expert

opinion.

A.   I don't think Nexo can have knowledge as to inner workings of a third party service provider such as Google -- or Slack in this case, sorry.

BY MR. TAYLOR-COPELAND:

Q.   Do you know whether Nexo has any audit logs related to its -- the implementation of Slack retention policies?

MR. SHELTON:  Objection, vague as to the term audit log.

A.   I do not know that.

BY MR. TAYLOR-COPELAND:

Q.   Has Nexo made any effort to recover deleted Slack messages?

MR. SHELTON:  Objection, vague.

A.   Which time period for what purposes?  Narrow down the question, please.

BY MR. TAYLOR-COPELAND:

Q.   As part of its response to this litigation has Nexo made any efforts to recover deleted Slack messages?

A.   As discussed already, when the demand letter in exhibit 101 was handed over, as later discovered by me, the team went about securing copies of the relevant messages.  So I don't see how they would go -- or would need to go about trying to recover messages if all the

relevant messages were already secured by the team for future use.

Q. So is the answer then that Nexo has not done anything in this litigation to recover deleted Slack messages?

MR. SHELTON: Objection. Misstates testimony.

A. This is not what I said. The answer to that question is that Nexo went above and beyond in securing all relevant communications, whether on Slack or elsewhere in order to be helpful to the proceedings in which we currently find ourselves.

BY MR. TAYLOR-COPELAND:

Q. So has Nexo made any effort to recover any messages deleted as -- any deleted Slack messages, in this litigation?

A. Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.

Q. And what did Nexo do to secure Slack messages much earlier?

A. Well, this is within the duties of the legal department. They have a procedure by which they make copies of the relevant information, and to my understanding that procedure has been followed and

I believe that we have submitted some Slack messages that are relevant to the case, which is testimony of the fact that they did indeed preserve that information communication and messages.

Q.   Do you know how they selected which Slack communications to retain?

MR. SHELTON:  All right, so I'm gonna object on privileged grounds.  I think that Mr. Trenchev has gone all the way to the limit of being able to testify on this topic without invading the privilege by describing the process.  I believe now the question is getting into the mechanics which, as I previously stated, we objected to and we do believe implicate the privilege.  So the specifics of the collection process I do believe are privileged and we objected to them.

So I won't object to the questioning up until now, but that question I do object to on privilege grounds.

MR. TAYLOR-COPELAND:  So it was the legal team that was responsible for collection of relevant documents; is that correct?

A.   Yes.  That was the policy.

Q.   Was that policy followed in Mr. Cress's case?

A.   I have no reason to believe it was not.

Q.   Do you know one way or the other?