EXHIBIT G

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 2, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# Antoni Antoniev Trenchev

## Confidential - VOL. II

Reported by:
GEORGIA GOULD



**CERTIFIED COPY**

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - -
IN THE MATTER OF:

JOHN CRESS,

                              Plaintiff,
NEXO CAPITAL INC.
                              Defendant.
- - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME II

Thursday, April 2, 2026

AT:  9:01 a.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2496606
APRIL 02, 2026                    Confidential - VOL. II

Nexo Capital Inc.

Q.    Okay, so it provides services to Nexo Capital.

Does Nexo Capital pay NDS EOOD for those services?

MR. SHELTON:  Objection, vague as to time period.

A.    Can we narrow down the time of this?

BY MR. TAYLOR-COPELAND:

Q.    Let's start in 2021.  Did Nexo Capital pay NDS EOOD for the services NDS EOOD provided in 2021?

A.    I would assume so.

Q.    Do you know one way or the other?

A.    I know that at some point there was a contract between Nexo Capital Inc. and NDS.  I just am not sure of the date of execution of that contract.

Q.    Did -- was NDS providing services to Nexo Capital before execution of that contract?

MR. SHELTON:  Objection, vague.

A.    I don't know.

BY MR. TAYLOR-COPELAND:

Q.    At present, does Nexo Capital pay NDS EOOD for the services it provides?

A.    I think so.

Q.    Does NDS EOOD provide services for any of the other companies on this organizational chart?

A.    I'm not sure.

Q.    When was the Nexo Token created?

A.    Can we define "created"?

Q.    When did Nexo come up with the idea of having a token sale?

A.    That would have been in late 2017.

Q.    And whose idea was that?

A.    We're talking exclusively about the Nexo Token?

Q.    The token sale.  Token and token sale, yes.

A.    I couldn't say.  It was early start-up days and a lot of ideas were buzzing around, and who particularly came up with the idea that we should have a token, I could not pinpoint a specific person.

Q.    Was it after the founding of the company?

A.    No, the incorp -- well, which company?

Q.    I will ask a different question.

How did you and Mr. Kanchev meet?

A.    We met in university.

Q.    What university is that?

A.    We were at different universities, but both of our universities were in London and we met socially at some point.

Q.    And when was that?

A.    Roughly around 2006.

Q.   And then prior to founding Nexo did you have any work or professional dealings with Mr. Kanchev?

MR. SHELTON:   Objection, vague.

A.   I don't believe so, no.

BY MR. TAYLOR-COPELAND:

Q.   And then how was it that you came to be involved in Nexo?  Did he come to you, did you approach him?

A.   He came to me with the idea and asked if I would be interested in joining.

Q.   And you said yes?

A.   I said yes.

Q.   How much did Nexo raise in its token sale?

A.   We sold all tokens that were designated for the sale, which were 52.5 million tokens.

Q.   Were any of those sold to Mr. Kanchev?

A.   No.

Q.   Were any sold to you?

A.   No.

Q.   Did you receive an allotment of Nexo Tokens?

MR. SHELTON:   Objection, vague.

A.   So -- I got the number wrong, it is not 52 million but 525 million.  The total number of Nexo Tokens is 1 billion.  Roughly half -- a little bit more than half of it went to the token sale.  And there was

a different distribution -- allocation of tokens.  There were some reserved for team members and founders.

Q.   So Nexo sold 525 million dollars of tokens in the --

A.   No.

Q.   -- initial sale?

MR. SHELTON:  Objection, misstates testimony.

A.   No.  We're talking about the number of tokens.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  So there's a billion tokens overall; correct?

A.   Correct.

Q.   What -- how many did Nexo sell in its initial token sale?

A.   525 million, so a little bit more than half of it.

Q.   So it sold 525 million tokens for approximately $52.5 million.

MR. SHELTON:  Objection.  Misstates testimony.

A.   The price of the token was around 10 cents, but there were discounts that were received for larger customers.

BY MR. TAYLOR-COPELAND:

Q.   So just doing the math there, if the price had been 10 cents per token, then the amount Nexo received

would've been about $52.5 million?

A. That is the maximum that would have been possible, but once you include the discounts that we granted to certain participants, the actual dollar amount is smaller.

Q. Okay.

And what -- what's the actual dollar amount?

A. I do not know that.

Q. Is it around 30 million?

A. I don't --

MR. SHELTON: Objection.

A. -- remember.

BY MR. TAYLOR-COPELAND:

Q. And were a certain percentage of tokens reserved for members of the team?

A. I answered that question affirmatively.

Q. Okay. And what percentage was that?

A. I don't remember the exact percentage.

Q. From 2018 to the present how many Nexo Tokens have you personally received?

MR. SHELTON: Objection, vague.

A. I'm not sure.

BY MR. TAYLOR-COPELAND:

Q. Is it over a million?

A. I don't -- I am not sure.

Q.   Could it be over 10 million?

MR. SHELTON:  Objection, asked and answered.

A.   Same answer.

BY MR. TAYLOR-COPELAND:

Q.   It could be over 100 million?

MR. SHELTON:  Same objection.

A.   I don't remember.

BY MR. TAYLOR-COPELAND:

Q.   There's only one billion tokens in existence; right?

A.   Correct.

Q.   So 100 million of them would be 10 percent of all tokens.  Can you say one way or the other whether you've received more than 100 million Nexo Tokens since 2018?

A.   I believe I answered that question already.

Q.   Which is that you don't know?

A.   I do not know.

Q.   Okay.

Do you know if Mr. Kanchev has received more than 100 million Nexo Tokens --

MR. SHELTON:  Objection, calls for speculation --

MR. TAYLOR-COPELAND:  -- from 2018 to the present?

MR. SHELTON:  Objection, calls for speculation.

A.    I don't know but highly unlikely.  Do you know at the time of the token sale, who owned all the tokens before the distribution began?

MR. SHELTON:  Objection, vague, calls for a legal opinion.

A.    I cannot comment on the legalese around ownership of a token, certainly not at that very early stage.

BY MR. TAYLOR-COPELAND:

Q.    Do you have an understanding of what a security is under U.S. law?

MR. SHELTON:  Objection, calls for a legal opinion.

A.    I would say I have a rudimentary understanding of it.

BY MR. TAYLOR-COPELAND:

Q.    And what's that understanding?

MR. SHELTON:  Same objection, also vague as to time.

A.    My understanding has changed over the years. When are we talking?

BY MR. TAYLOR-COPELAND:

Q.    Let's start with what your understanding is

right now.

MR. SHELTON:  Same objections.

A.  Well, I couldn't give you a clear definition but I would presume that a security is -- is sort of a financial instrument.

BY MR. TAYLOR-COPELAND:

Q.  What was your understanding in 2018?

A.  I cannot comment on my specific understanding eight years ago.

Q.  Did you have an understanding of what a security was in 2021?

MR. SHELTON:  Objection, calls for a legal opinion.

A.  Same answer.  It is very hard for me to transform back into my state of mind of five years ago.

BY MR. TAYLOR-COPELAND:

Q.  In 2018 did Nexo consider whether the Nexo Token was a security under U.S. law?

MR. SHELTON:  Objection, calls for a legal opinion.  Also privilege objection to the extent you're asking about conversations between Nexo and its attorneys regarding that issue.  But if you can otherwise respond, you can, Mr. Trenchev.

A.  Thank you.

In 2018 the entire industry was pondering as

to the classification of digital assets.  In terms of regulatory status we understood that different jurisdiction might take different approaches, obviously the United States as the world's largest economy was a topic of discussion.

So I remember there being debates on pretty much all digital assets, whether they could be security or a utility token, that was the distinction back then.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo engage U.S. counsel to analyze whether the token would be a security under U.S. law in 2018?  And I am looking for a yes or no answer to that question.

MR. SHELTON:  So I don't object if you can provide a "yes" or "no" answer but I can instruct you not to discuss the substance of your communications with counsel if you had them.

A.   I don't remember.

BY MR. TAYLOR-COPELAND:

Q.   In 2018 did Nexo market the Nexo Token as a security token?

MR. SHELTON:  Objection, vague.

A.   I don't remember whether we marketed the Nexo Token as a security token.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if Nexo have described the Nexo Token as a dividend-paying asset-backed security in 2018?

A.   It appears that you're reading that from somewhere which leads me to conclude that this is communication from Nexo?

Q.   Just -- I don't want you to guess --

A.   Right.

Q.   -- what I'm asking.  I'm just asking if you know or not.

A.   Can you restate the question please?

Q.   Yeah.

Did Nexo's materials describe the Nexo Token as a dividend-paying asset-backed security token?

A.   It might have.

Q.   Would that have been an accurate description of the Nexo Token?

MR. SHELTON:  Objection, vague as to time period.

A.   When would that be?

BY MR. TAYLOR-COPELAND:

Q.   In 2018, was that an accurate description of the Nexo Token?

MR. SHELTON:  Objection, calls for a legal opinion.

A.    I cannot comment on what the status of the Nexo Token would have been in 2018.

BY MR. TAYLOR-COPELAND:

Q.    Was the Nexo Token ever registered with the SEC as a security?

MR. SHELTON:  Objection, vague.

A.    The Nexo Token has been -- I don't know the definition of the term "registered", but a Reg D506 form was filed with the SEC, so to that extent the SEC must have been aware of the Nexo Token and its existence.

Q.    What is a Reg D506 form?

MR. SHELTON:  Objection -- objection, calls for a legal opinion.

A.    I'm not a lawyer, certainly not a securities lawyer in the United States, but in my limited understanding on the matter it is an exemption mechanism by virtue of which companies can raise funds in the United States from accredited investors.

BY MR. TAYLOR-COPELAND:

Q.    Exemption from what?

MR. SHELTON:  Objection, calls for a legal opinion.  Vague as to the term "exemption".

A.    Exemption from the usual routes of very difficult and complex fundraising in the United States.

BY MR. TAYLOR-COPELAND:

Q.   Right.  So it's an exemption from registration with the SEC; correct?

MR. SHELTON:  Objection, calls for a legal opinion.  Vague as to the term "registration".

A.   I cannot confirm this statement.

BY MR. TAYLOR-COPELAND:

Q.   Well, you said it's an exemption from the usual routes of very difficult and complex fundraising.

What do you understand those usual routes of difficult and complex fundraising to be?

MR. SHELTON:  Objection, calls for a legal opinion.

A.   Again --

MR. SHELTON:  Vague.

A.   Sorry?

MR. SHELTON:  Calls for a legal opinion and vague.

A.   Again, I am not a securities lawyer, and certainly was not one in 2018, which is the date around the events that we are discussing, but from what I understand, a complex fundraising would include something such as an IPO, which is an expensive and difficult process to go through, certainly for a start-up.

BY MR. TAYLOR-COPELAND:

Q.   Okay.

MR. SHELTON:   James, we've been going about an hour.   When you're ready for a break.

MR. TAYLOR-COPELAND:   That's fine.   We can take one now.

THE VIDEOGRAPHER:   Going off the record at 10.02.   End of media 1.

(10:02 a.m.)

                         (Break taken.)

(10:16 a.m.)

THE VIDEOGRAPHER:   This the beginning of media 2.   Back on the record, 10.21.

BY MR. TAYLOR-COPELAND:

Q.   Mr. Trenchev could you please take a look at exhibit 110 which is the org chart in front of you.

A.   Yes.

Q.   Were you ever a manager of NDSEOOD?

A.   I was a director at the company at some time.

Q.   When did you cease being a director of NDS EOOD?

A.   At some point in 22.

Q.   And was Mr. Kosta Kanchev also a manager or director of NDSEOOD at some point in time?

A.   He was.

Q.   When did he stop being a manager or director

A.   Yes.

MR. SHELTON:  Objection, vague.  Calls for a legal opinion.

BY MR. TAYLOR-COPELAND:

Q.   And what percentage of Nexo's profits were distributed as dividends during the time period when Nexo was distributing dividends to token holders?

MR. SHELTON:  Objection, vague.

A.   I do not recall that.

BY MR. TAYLOR-COPELAND:

Q.   Do you recall if it was approximately 30 percent?

A.   I do not recall that.

Q.   Did Nexo pay dividends to U.S. holders of the Nexo Token?

MR. SHELTON:  Objection, vague as to time period.

A.   Can we narrow down the time period?  Because I think there is a difference in time.

BY MR. TAYLOR-COPELAND:

Q.   Was there a time that Nexo did pay dividends to U.S. holders of the Nexo Token?

A.   Yes.

Q.   And what was that time period?

A.   I do not remember.

Q.   Do you have an estimate?

A.   I remember that at some point there was a governance vote to -- to discontinue the dividend component of the Nexo Token.  To answer your question about time period, I think that would have been the discontinuation 22 or 3.  I'm not entirely sure.

Q.   Okay.

So prior to the governance vote to discontinue the dividend, Nexo distributed dividends to both U.S. and non-U.S. holders of the token, right?

A.   Oh I don't think I can answer that question in that way.  Could we narrow it down a little bit? Because I feel like it's a bit general.

Q.   What part of the question is unclear?

A.   There have been several inter-- instances of distribution.  I believe that at the time we called it air drops, so I'm not sure all of them underwent -- under the same rules and principles.

Q.   Do you know if any if them excluded U.S. holders in particular?

A.   I have some memory of that but it's a little bit vague in my memory.

Q.   Did Nexo ever describe the Nexo Token as SEC-compliant?

A.   We might have.

Q.   What did that mean to Nexo?

A.   I'm the corporate representative on that topic, correct?

MR. SHELTON:   Correct.

A.   Yes.

Well, the understanding of Nexo at the time was that the regulatory framework lacked clarity, this being digital assets being a new innovative type of assets.  There were various school of thought that were debating to what extent the existing regulatory framework would encapsulate that asset class.

So our aim at Nexo has always been to be compliant, and even going above arguing existing rules do not apply, in an effort to -- as a precautionary measure, take steps to be on the safe side if it was then retroactively determined that those laws would have applied to our activity and the asset class as such.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo ever check with the SEC to ask whether it could describe its token as SEC-compliant?

MR. SHELTON:   Objection, vague.

A.   I don't recall.

BY MR. TAYLOR-COPELAND:

Q.   Did the SEC ever tell Nexo to stop using SEC compliant language?

A.   We touched upon my correspondence with the SEC yesterday.  I remember there being discussions during that time period with them about our custodian at the time, BitGo.  Them being SEC-compliant, the custodian, and I remember they wanted us to discontinue the use of that language.  Which we did.

But I don't remember particularly whether there were discussions around language surrounding the Nexo Token.

Q.   Did Nexo have an understanding of what limitations a rule 506(c) sale imposed on the sale of a Nexo Token?

MR. SHELTON:  So I'm gonna object on privilege grounds.  I instruct you not to answer as far as any substantive conversations that Nexo had with legal counsel, but if you can otherwise respond, you can.

A.   Could I have the question again please?

BY MR. TAYLOR-COPELAND:

Q.   Yes.  Did Nexo -- this is in 2018 -- did Nexo have an understanding of what limitations utilizing rule 506(c) imposed on its sale of the Nexo Token?

A.   I think in 2018 the most important distinction for us, if we were to go down the route of raising money through the Reg D exemption, was the fact that we could not sell to non-accredited investors.

So I remember that as being a very vivid point and where we focused our efforts to only sell to accredited investors.

Q.   Did Nexo place restrictions on the resale of tokens sold to accredited investors?

MR. SHELTON:  Objection, vague, calls for a legal opinion.

A.   Well, I don't know how we could have placed restrictions on what an owner of an asset can do with his or her asset.

BY MR. TAYLOR-COPELAND:

Q.   Were you aware that you could code lock-up periods into the token?

MR. SHELTON:  Objection, calls for an expert opinion.

A.   You're asking me whether I knew it's technologically possible to program a token in a certain way?

Q.   Correct.

A.   I had some rudimentary understanding of the capabilities around smart contracts.

Q.   Did Nexo include any transfer restrictions in its Nexo Token smart contract?

MR. SHELTON:  Objection, vague as to the tokens at issue.

A.    I don't think that we did that.

BY MR. TAYLOR-COPELAND:

Q.    Do you know how many U.S. investors purchased the Nexo Token in the initial rule 506(c) sale?

A.    If memory serves me well, I think it was five people.

Q.    Do you know if they were all accredited investors?

A.    They have been accredited investors.

Q.    And how did Nexo verify their accreditation?

A.    I think that accreditation status of investors can be verified in multiple ways.  So I believe that we presented several options to potential participants in the token sale.  This could have been a letter from an accountant, or -- or an attorney, or I remember that there was automated system that you could utilize, verify your accreditation or verify investor.com, something to that accord, which the client goes through, submits the necessary documentation and then receives a document certifying as to their accreditation status.

Q.    Who was responsible for verifying accreditation in 2018?

A.    I don't remember.

Q.    Do you know if Nexo used that automated service to verify accreditation in 2018?

A.   I don't remember exactly, but I do remember seeing the letterhead of the company, us having documents issued from that company.

Q.   Do you know if Nexo has records of the verification of the accredited investor status of the five investors in 2018?

A.   I think we do have that.

Q.   After the initial rule 506(c) offering, were Nexo Tokens traded on cryptocurrency exchanges?

A.   I think it's --

MR. SHELTON:   Objection, vague, calls for speculation.

A.   I think it's 506(d).  You said (c).

BY MR. TAYLOR-COPELAND:

Q.   Yes.

A.   So could you please rephrase the question?

Q.   Okay.

A.   Or ask it again.

Q.   That's fair enough.

After the initial token offering were Nexo Tokens traded on cryptocurrency exchanges?

MR. SHELTON:   Objection, vague as to the time period.

A.   When are we talking?

BY MR. TAYLOR-COPELAND:

Q.   Okay, so, after the token sale did Nexo itself take any steps to get the token listed on third party exchanges?

A.   I do not recall whether we initiated steps to list the Nexo Token.  What I do remember is that trading of tokens was an interesting business to many exchanges throughout the world and they would themselves proactively list tokens so that they have more options for their clients, and presumably more revenue.

Q.   And Nexo is aware that at some point the Nexo Tokens began trading on various cryptocurrency exchanges; right?

A.   Oh, I -- yes, it was aware that the Nexo Token was available on -- the reason I'm hesitating is that "various" implies many exchanges, and I think in 2018 we were limited, the Nexo Token was limited to trading on one or two exchanges.

Q.   And what were the first exchanges to list the Nexo Token?

A.   The first exchange -- this is some time ago so I'm citing from memory, but there were some Korean exchanges, maybe, if I'm not wrong.  And HitBTC was the first more prominent exchange to list the Nexo Token.

Q.   Did Nexo take any steps to prevent U.S. persons from purchasing Nexo Tokens on secondary

representative on topic 315, which is Nexo's sale of the Nexo Token on exchanges, and topic 316, which is Nexo's sale of the Nexo Token to U.S. persons.  And so --

A.    Okay.

Q.    -- I'll repeat my question, which is whether there was a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange?

A.    There was a period of time when the Nexo Token was sold to accredited investors.

Q.    On the retail exchange?

A.    I cannot confirm whether that flow was through the retail exchange or the OTC service.

Q.    Okay.  So let's set aside accreditation for a second.

A.    Okay.

Q.    Was there a period of time during which the Nexo Token was available to U.S. purchasers on Nexo's retail exchange?

A.    I don't remember.

Q.    Did you do anything to try to determine that in preparing for today?

A.    I did some preparation with regards to the Nexo Token and its sales to American, U.S. customers. However, the exact flow, whether it went through the retail exchange or the OTC desk, is something that I do

not remember and cannot confirm to you.

Q.   Would Nexo have records of its sales on the Nexo retail exchange?

A.   Going back to 2022?

Q.   Correct.

A.   We would have records.  I'm not sure they would go back to 2022.

Q.   Okay.  And would those records identify the purchasing party?

A.   They should, yes.

Q.   Okay.  And would that also include information about the residence of the purchasing party?  Would Nexo have that information?

A.   I'm not clear on the definition of residency, but it should be clear whether that is a U.S. -- it is clear whether that person is a U.S. cit -- nation -- passport holder.  American.

Q.   In order to use the Nexo retail exchange, was there any requirement to be an accredited investor?

MR. SHELTON:  Objection, vague.

A.   In order to use the Nexo retail exchange, whether -- was the requirement?  Sorry, sorry, please ask me the question again.

BY MR. TAYLOR-COPELAND:

Q.   In order to use Nexo's retail exchange was

there any requirement -- did a customer have to submit proof of accreditation?

MR. SHELTON:  I'm going to object.  It is to vague as to the asset and the nationality of the person.

A.   We were looking for accreditation status in the context of sale and purchase of the Nexo Token.

BY MR. TAYLOR-COPELAND:

Q.   And Nexo did that on its retail exchange as well?

MR. SHELTON:  Objection, assumes facts.  Vague as to the purchaser and the asset.

A.   Can you read the question one more time?

BY MR. TAYLOR-COPELAND:

Q.   Let me ask it a different way.

Can you say with 100 per cent certainty that Nexo did not sell the Nexo Token to unaccredited investors on its retail exchange in 2022?

A.   It is what -- it was the standing policy of Nexo that we would sell the Nexo Token exclusively to U.S. accredited investors.

Q.   So that wasn't exactly my question.

My question was: can you say with 100 per cent certainty that Nexo did not sell the Nexo Token to unaccredited investors on its retail exchange in 2022?

A.   I can confirm to you that the policy was for

us to not sell to accredited investors.  That we have been diligently trying to execute on that policy and I have no reason to believe that Nexo has directly sold the Nexo Token to unaccredited investors via any of its platforms and functionalities.

Q.    Okay.  And that's always been Nexo's policy?

A.    That has always been Nexo's policy.

Q.    Okay.

And you aren't personally aware of Nexo making any sales on its exchange to unaccredited U.S. investors?

A.    I am unaware of such activity, no.

Q.    Okay.  Would Mr. Kanchev be aware of any such activity?

MR. SHELTON:  Objection, calls for speculation.

A.    I could not comment on behalf of Mr. Kanchev.

BY MR. TAYLOR-COPELAND:

Q.    In preparing for today did you review any records of transactions on Nexo's retail exchange?

A.    There are a lot of documents, a lot of spreadsheets, I ... I don't know whether any of those were specifically transaction histories.

Q.    Okay.  I am just gonna put on the record that we don't believe that Mr. Trenchev has been properly

prepared to discuss subjects 315, Nexo's sale of the Nexo Token on exchange, and 316, Nexo's sale of the Nexo Token to U.S. purchasers -- persons, and we reserve our rights to raise that issue with the court.

MR. SHELTON:  And our response is that Mr. Trenchev was appropriately prepared, clearly testified what Nexo's policy was and that it did not sell to unaccredited investors in the United States.

BY MR. TAYLOR-COPELAND:

Q.  When Nexo sold -- well, for non-U.S. persons on the Nexo exchange, did Nexo sell out of its own inventory on the Nexo exchange, the retail exchange?

MR. SHELTON:  James, could you repeat that question?

BY MR. TAYLOR-COPELAND:

Q.  Yes.

So without respect to jurisdiction, at any point in time, did Nexo sell out of its own inventory the Nexo Token on the retail -- its own retail exchange?

MR. SHELTON:  Objection, vague.  I also -- I don't think that question's within the scope of his 30(b)(6) designation but if you can answer the question, you can.  Within your personal knowledge.

A.  Well, how would we define the -- you said did Nexo sell tokens of its person -- of its own inventory?

BY MR. TAYLOR-COPELAND:

Q.   Correct.

A.   Yes.

Q.   Did it do that in 2021?

A.   I don't know specifically whether that was the case in 2021.

Q.   What about 2022?

A.   Same answer.

Q.   2023?

A.   Same answer.

Q.   2024?

A.   I don't have data on the sale and purchases of the Nexo Token.  We have a corporate treasury team, they would deal with that, but what I confirm to you is correct, we have different times in the past sold out of our own inventory.

Q.   And you also sold out of your own inventory to OTC customers at times; correct?

A.   Correct.

Q.   And Nexo sold Mr. Cress the Nexo Token out of its own inventory, correct?

MR. SHELTON:  Objection, calls for speculation.

A.   I think yes.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo require customers to purchase a certain amount of Nexo Tokens in order to receive favorable borrowing rates?

A.   Nexo did not require customers to do anything. At any point.  It was -- there was an offering to customers in the form of a loyalty program that had different tiers which came with different advantages to the customers.

Q.   Was there a platinum tier?

A.   Yes.

Q.   In 2021 what percentage of a customer's portfolio had to be in Nexo Tokens to qualify for the platinum tier?

A.   Probably around 10 percent of the portfolio.

Q.   And did Nexo ever analyze whether holding the Nexo Token left its customers more susceptible to liquidation?

A.   Without being an expert on liquidity or the book depth and volatility of any particular digital assets, I have historically personally observed a close correlation between the price action of the Nexo Token and Bitcoin.  So again without being an expert on the matter, my opinion is that the Nexo Token certainly not at around 10 percent composition of a portfolio, meaning fully changes the overall volatility of that portfolio.

Q.   Did Nexo perform any analysis to that effect?

MR. SHELTON:  Objection, vague.

A.   At what time in history?

BY MR. TAYLOR-COPELAND:

Q.   Yeah, at any time in history did Nexo analyze whether, including a certain percentage of Nexo Tokens in a portfolio increased the likelihood of customer liquidation?

A.   I believe there was analysis done on the correlations between the price action of the Nexo Token in the past to Bitcoin, and the conclusion was that they're very closely correlated in terms of price action.

Q.   Who -- do you know who performed that analysis?

A.   I don't have it on top of my head, but it were -- were experts and professionals active in that field.

Q.   Was that written -- was there like a written report that you received?

A.   I remember seeing a report on that.

Q.   Do you remember how you received that?

A.   I do not remember how I received that. I think it was work done in 23/24.

Q.   So done in 2023 or 2024?

A.   That's what I believe.

Q.   Okay.

A.   Without being absolutely certain about dates.

Q.   Do you recall if it was emailed to you?

A.   I think I saw a hard copy.

Q.   Do you store hard copy documents anywhere in your office or home office?

A.   I do not.

Q.   So after you got this document in a hard copy, so in 2023 and 2024 you're working remotely; right?

A.   Correct.

Q.   Okay.

How would the hard copy have been delivered to you?  Was it mailed to you?

A.   I don't remember.

Q.   Okay.  So you receive this hard copy and then do you just throw it away?

A.   I don't --

MR. SHELTON:  Objection assumes facts, misstates testimony.

A.   I remember looking at the contents of this report.  I have no recollection as to the destiny of the hard copy.

BY MR. TAYLOR-COPELAND:

Q.   Do you recall if the report found that there

A.    I don't know if that is true.

BY MR. TAYLOR-COPELAND:

Q.    Did Nexo restrict the market-makers it engaged from reselling the token on Uniswap?

MR. SHELTON:  Objection, assumes facts, calls for speculation.

A.    Again, I'm not sure the Nexo Token was or was not available on Uniswap but Uniswap in my limited technical understanding is a decentralized exchange, so from what I understand how those exchanges operate it is not possible to place restrictions apart from the one that they had, which was to geo block U.S. IP addresses.

BY MR. TAYLOR-COPELAND:

Q.    So my question is whether Nexo placed any restrictions on market-makers that it engaged limiting the venues on which they could resell it.  So for example, including in a contract with a market-maker that they cannot resell the token on Uniswap.  Did Nexo place any restrictions on market-makers limiting the venues on which they could resell the Nexo Token?

MR. SHELTON:  Objection, vague, assumes facts, calls for a legal opinion as to --

A.    Given what I described as to how Uniswap in particular was functioning, you are asking me whether Nexo was able to do something and did something that is

This is going to be exhibit 111.

(Exhibit 111 marked for identification)

A.    Thank you.

Before we begin that, may I go to the rest room?  It doesn't need to be a long break, I just need to use the rest room.

MR. TAYLOR-COPELAND:  It is fine by me.

THE VIDEOGRAPHER:  Off the record at 11:06. (11:06 a.m.)

(Break taken.)

(11:18 a.m.)

THE VIDEOGRAPHER:  This is the beginning of media 3.  Back on the record at 11:18.

BY MR. TAYLOR-COPELAND:

Q.    Mr. Trenchev, do you recognize this exhibit 111?

A.    Yes.

Q.    Okay.

And are these form Ds that Nexo submitted to the SEC?

A.    They are.

Q.    And did you sign these form Ds on behalf of Nexo?

A.    Yes.

Q.    Did you ensure everything was accurate before

signing these?

A.    Yes.

Q.    If you could turn to Nexo 114.  I think it's page 12 of 16.

A.    114.

Q.    And that is an amendment for Nexo files; correct?

A.    Appears to be the case.

Q.    Okay, and then turning to 117, do you see it says: total offering amount, 5.25 million?  And then total amount sold -- sorry, not 5, $52,500,000.  Do you see that?

A.    I see that.

Q.    But we discussed earlier that that's actually not correct; right?

MR. SHELTON:  Objection, misstates testimony.

A.    Erm, sorry, what was the question?

BY MR. TAYLOR-COPELAND:

Q.    So Nexo didn't actually take in $52,500,000 as part of its initial token sale; correct?

A.    I do not recall the exact amount that we took in.

Q.    I believe you testified earlier that it would've been less than $52,500,000.  Right?

A.    I believe there were discounts when we sold

the Nexo Token.

Q.    And then the number of investors here is 129. Right?

A.    Yes.

Q.    And was that accurate?

A.    I believed it to be accurate.

Q.    And this included five U.S. investors; right?

A.    From what I recollect, we had five American investors.

Q.    You can set that document aside, and I will introduce exhibit 112.

       (Exhibit 112 marked for identification)

A.    Thank you.

Q.    Do you recognize this document?

A.    I have seen the document before.

Q.    And do you understand that you've been designated as Nexo's corporate representative to discuss this document?

A.    I understand that.

Q.    And it's an ICO questionnaire submitted to Coinbase.  Do you see that?

A.    I do.

Q.    Do you recall why this was submitted to Coinbase?

A.    Because there's standard procedure for listing

a token in their exchange.

Q.    So Nexo was seeking to get the Nexo Token listed on Coinbase?

A.    Correct.

Q.    And it says:

"Onboarding Entity, Nexo Services OU."

And then:

"What is the use case token of the project/token?

"Nexo Services OU provide instant loans that are secured by cryptocurrencies.

"NEXO Tokens provide utility features that allow the token holders to increase loan limits and enjoy discounted [repayment] rates."

Do you see that?

A.    I do.

Q.    Why was Nexo Services OU completing this questionnaire instead of Nexo Capital?

A.    Nexo Services OU, at the time, which is late 2018, had several licenses issued by the Estonian regulator, and Coinbase, I believe, wanted the counterparty for their provision of services to be an entity that was holding licenses such as the one that Nexo Services OU had.

Q.    Was it true at the time this was submitted

that Nexo Services OU provided instant loans secured by cryptocurrencies?

A.    Nexo Services, under the various licenses it had received from the Estonian authorities, had the right to issue loans to customers.

Q.    My question isn't whether it had the right to do it; my question is whether it was doing it, because it says here Nexo Services provides instant loans that are secured by cryptocurrencies.  Was that true on May 12 of 2018?

A.    Erm --

Q.    This is December 5.

A.    -- again, might have been December.  Different formatting of dates in the U.S. and Europe.  I believe that Nexo Services OU was extending at the time loans to some customers and I believe the information in this questionnaire to be accurate.  At least on this question I have not reviewed all of the questions just yet.

Q.    Okay.

And then it says:

"Please confirm if the ICO is already registered or is planning to register with an applicable regulatory body ..."

Then the response says:

"The Token Sale has not been conducted by

to testify on these topics and I feel like you're going

very far outside the bounds and I believe it's getting

harassing.  I just want that to be on the record, that

these questions are going way outside the bounds of this

lawsuit.

BY MR. TAYLOR-COPELAND:

Q.    We disagree.

If you turn to the last page of this document

it says:

"Please provide details on the issuance of the

token including flow of funds and settlement

arrangements."

Then it says:

"Nexo Capital has [executed] a loan to

Nexo Services OU, loan agreement is attached."

Do you recall at a high level what the terms

of the loan between Nexo Services OU and Nexo Capital

were?

A.    I do not.

Q.    Sorry, turning back to number 8, it says:

"Was the ICO conducted through a token sale

platform?  Please provide details."

And the answer says:

"The Private Token Sale was a private sale

from a limited number of non-U.S. accredited investors."

Do you see that?

A.    I do.

Q.    And that's not true; right?

MR. SHELTON:  Objection, argumentative, misstates testimony and document.

A.    What do you believe to not be true?

BY MR. TAYLOR-COPELAND:

Q.    So this says the token sale was a private sale from a limited number of non-U.S. accredited investors, right?

A.    There was a limited number of non-U.S. accredited investors.  That part is correct for sure.

Q.    And there were also U.S. accredited investors; right?

A.    There were five out of 129 investors that were from the U.S.

Q.    Okay.  And do you know why Nexo is concealing that information from Coinbase in the submission?

MR. SHELTON:  Objection, argumentative, misstates document and misstates testimony.

A.    I object to the term "concealing".  We're not concealing anything from anyone.

BY MR. TAYLOR-COPELAND:

Q.    But you are saying here that the token sale involved non-U.S. accredited investors; right?

A.   The token sale involved 124 out of 129 non-U.S. accredited investors.

Q.   Well, why doesn't Nexo say that here?

MR. SHELTON:  I'm gonna object on vagueness grounds as to this term non-U.S. accredited investors and what that means.

A.   I too am struggling with the definition of that and wish whoever wrote it used clearer language for our benefit of the discussion here.

BY MR. TAYLOR-COPELAND:

Q.   So this is signed by Mr. Kanchev, correct?

A.   Yes.

Q.   So do you think we need to talk to Mr. Kanchev to found out what non-U.S. accredited investors means here?

A.   I'm not sure that I am qualified to opine on that matter.

Q.   Okay.

But you don't understand what non-U.S. accredited investors means in this context; right?

MR. SHELTON:  Objection, misstates testimony.

A.   I said that perhaps a clearer term could have been used.  This being early days of a start-up, and some eight years ago, I cannot be entirely sure what his intention was.

BY MR. TAYLOR-COPELAND:

Q.    Why didn't Nexo file a form D in connection with its sale of Nexo Tokens to Mr. Cress?

MR. SHELTON:  Objection, vague as to time period.

A.    Without being a legal professional and expert on the matter, from my understanding and recollection, the nature of the Nexo Token, and any token for that matter, can change over time.

And we feel that at the time of purchases of Mr. Cress, which I believe were at some point in 2021, you will correct me if I'm mistaken, the Nexo Token provided a lot of utility so was therefore a utility token in our mind.  Nevertheless, we made sure that Mr. Cress, as an accredited investor, should at some point in time anyone dispute our understanding that the Nexo Token is a utility token.

Q.    What changed between 2018 and 2021?

A.    In 2018, when the initial token sale was being conducted, we were at an idea stage.  There was no platform and no utility for the Nexo Token, which was to be closely connected to the Nexo infrastructure, again non-existent at that time.

Years later, when Mr. Cress was interacting with our products and services, the Nexo Token had many

utilities, some of which we -- we discussed already. And to that accord it was our belief at the time that the Nexo Token was clearly a utility token.

Q.   So one of the utilities of the Nexo Token in 2021 was better rates; correct?

A.   Correct.

Q.   Is there anything else?

A.   Well, it's hard for me to exactly remember in that snapshot of 2021 what all the benefits of the Nexo Token were.  But it's safe for me to confirm that there was more than just the interest rates.

Q.   Sitting here today, can you identify anything other than the rates that was available in 2021 to Nexo holders?

A.   I think there were some perks if I'm not mistaken around the Nexo card.  It was allowing the customer to be eligible for cash backs to use the debit functionality on top of just the credit functionality of the card.

Yes, these are the things, some of the things that come to mind right now to me.

Q.   Anything else?

A.   Not on top of my head.

Ah.  Something did occur to me if I may add.

Q.   Sure.

A.   There were better response times, I think, of customer support.  Might have been generation of additional network addresses for the different assets, withdrawals, things like that.

Q.   Okay.  Did Nexo make any sales of the Nexo Token to any Americans in 2019?

A.   I do not recall that.

Q.   You don't know?

A.   I don't recall that.

Q.   Do you know if Nexo made any sales of the Nexo Token to any Americans in 2020?

A.   Probably, yes.

Q.   Do you know if Nexo made any sales of the Nexo Token to any Americans in 2021?

A.   That -- yes.

Q.   And do you know if Nexo made any sales of the Nexo to Americans in 2022?

A.   I know at some point we stopped selling Nexo Tokens to Americans and I think it was at some point in 2022.  So I cannot confirm with certainty when that was discontinued.  So I don't want to be inaccurate in answering your question.

Q.   So you don't know whether Nexo made any sales to Americans in 2022; is that right?

A.   I do not know.

Q.   We'll introduce what is going to be exhibit 113.

(Exhibit 113 marked for identification)

A.   Thank you.

Q.   My first question is going to be about interrogatory number 3.

Have you seen this document before?

A.   This is the complaint from Mr. Cress against Nexo Capital Inc.?

Q.   No, these are Nexo's written responses to interrogatories from Mr. Cress.

A.   I have seen that document.

Q.   Okay.

And I just -- start at maybe the final page, where there's a verification from Augustus Greaves.  Do you see that?

A.   I do.

Q.   Who is Augustus Greaves?

A.   He is a director of Nexo Capital Inc.

Q.   Does he have any management role in the company?

A.   What is the definition of a management role in the company?

Q.   What does he do in the company?

A.   He's a director of the company.

Q.   And as a director what are his responsibilities?

A.   To review documents like that, and if he agrees with the contents, to sign them.

Q.   Okay.

Is he a paid external director?

MR. SHELTON:   Objection, vague, calls for a legal opinion.

A.   I am unfamiliar -- unfamiliar with the term "external director".

BY MR. TAYLOR-COPELAND:

Q.   Do you know if Mr. Greaves professionally serves on the boards of numerous companies?

MR. SHELTON:   Objection, calls for speculation.

A.   I do not know that.  I know he's a director of Nexo Capital Inc.

BY MR. TAYLOR-COPELAND:

Q.   How did you engage him to be a director of Nexo Capital?

A.   A friend of mine introduced me to him.

Q.   Turning back to interrogatory number 3, if you look at Nexo's response it says:

"Subject to and without waiving the foregoing objections, Nexo responds as follows: The following

chart reflects Nexo's direct sales of the NEXO Token to customers in the United States."

The close date is in the DD/MM/YY format.

Do you see that?

A.    I do.

Q.    What is a direct sale?

A.    Where are we looking for that word?

Q.    So Nexo's response it says:

"The following chart reflects Nexo's direct sales of the Nexo Token."

My question is what is a direct sale?

A.    Ah.  A direct sale would be a sale where the selling party would be Nexo.

Q.    Okay.

So would Nexo's OTC deal with Mr. Cress be a direct sale?

A.    Yes.

Q.    Would a sale by Nexo on its exchange be a direct sale?

A.    Not necessarily.

Q.    Why not?

A.    Because the exchange has an order book, and that order book could be matching a client of Nexo who has placed a buy order.

Q.    Right.  But then if -- once they're matched

with Nexo, does that become a direct sale by Nexo to whoever is matched with it in the order book?

MR. SHELTON:  Objection, vague.

A.  I guess I'm saying something differently than you.  I'm saying that we could have a sale order by a client that matches with a buying order of another client.  This would not be a direct sale.

BY MR. TAYLOR-COPELAND:

Q.  I understand that.  My question is when Nexo itself sells on its exchange, would the sale from Nexo be a direct sale by Nexo?

MR. SHELTON:  Objection, assumes facts.

A.  My understanding of a direct sale is that it comes down to who the selling party is.

BY MR. TAYLOR-COPELAND:

Q.  Okay.  So --

A.  So if it's Nexo it's a direct sale.

Q.  Do you know if Nexo included any sales on its exchange to U.S. purchasers in this response?

A.  Could you perhaps phrase it differently to make sure I understand?

Q.  Yes.  I think earlier you said you don't know if Nexo sold to U.S. purchasers directly on its exchange; correct?

MR. SHELTON:  Objection, misstates testimony.

A.   I don't remember what I particularly said. I said that I'm certain that we sold to U.S. clients via the OTC desk for sure.

BY MR. TAYLOR-COPELAND:

Q.   Right.  And you don't know if you sold to U.S. clients on the retail exchange; correct?

A.   Correct.

Q.   Okay.

So my question is whether you know if Nexo included any transact -- or any relevant transactions on the retail exchange in these interrogatory responses?

A.   I don't know whether those sales of the Nexo Token occurred on the OTC, through the OTC desk, or through the retail platform exchange.

Q.   Okay.

But to the extent Nexo have sales on its exchange where the counterparty is a U.S. purchaser, those are direct sales and should be included in this response; correct?

MR. SHELTON:  Objection, vague, misstates testimony.  Calls for a legal opinion.

Could you repeat that question again?  I had trouble.

MR. TAYLOR-COPELAND:  Yeah.  To the extent Nexo has sales on its exchange where the counterparty is

a U.S. purchaser those are direct sales to a U.S. person and should be included in this response; correct?

A.   I think in order to answer that question we have to see what the objective of interrogatory number 3 is, and I am unsure that it is what you stated.

MR. SHELTON:  For the record I'm gonna state that we obviously did object to the interrogatory which, as stated here in the response, is subject to those objections.  I want to memorialize that for the record.

BY MR. TAYLOR-COPELAND:

Q.   Okay, I'll ask my question again.

To the extent Nexo had sales on its exchange where the counterparty was a U.S. purchaser, those are direct sales to a U.S. person and should be included in the response to his interrogatory.  Correct?

MR. SHELTON:  James, are you talking about sales of the Nexo Token on the exchange?

MR. TAYLOR-COPELAND:  Correct.

MR. SHELTON:  Could you ask the question again with that clarification?

BY MR. TAYLOR-COPELAND:

Q.   To the extent Nexo had sales of the Nexo Token on its exchange where the counterparty was a U.S. purchaser, those were direct sales by Nexo to a U.S. person and should be included in the response to this

interrogatory; correct?

MR. SHELTON:  Objection.  Assumes facts as to the counterparty and the selling party.

A.   I don't see the word "U.S." in anywhere where -- in interrogatory number 3, so I don't know how that assumption which you are looking for me to affirm or deny relates to that --

Q.   Well --

A.   -- interrogatory number 3.

Q.   -- we had asked for all transactions, but Nexo agreed to respond and its response says the chart reflects Nexo's direct sales of the Nexo Token to customers in the United States.  Do you see that part?

A.   Erm, give me a second.

Okay, yes, I see that.

Q.   Okay.

And so my question is: to the extent Nexo had sales of the Nexo Token on its exchange, where the counterparty was a U.S. purchaser, those are direct sales to a customer in the United States; correct?

MR. SHELTON:  I'm gonna object as vague. James, are you saying that Nexo is the selling -- is the selling party on the exchange?

MR. TAYLOR-COPELAND:  Correct.

A.   Again, when a transaction occurs on the Nexo

exchange, the counterparty could be Nexo, it could be

another client that was matched with the order of

a client, presumably listed here.

BY MR. TAYLOR-COPELAND:

Q.   Right.

And so when somebody purchasing the Nexo Token

on the exchange is matched with another counterparty,

perhaps another Nexo customer, that wouldn't be a direct

sale by Nexo, correct?

A.   Correct.

Q.   But when that counterparty is matched with

Nexo --

A.   Yes.

Q.   -- that would be a direct sale by Nexo,

correct?

A.   Correct.

Q.   So my question is: to the extent there are any

such sales, those should be reflected in this

interrogatory response because Nexo is saying that the

chart reflects direct sales of the token to customers in

the United States; right?

MR. SHELTON:  Object.  Vague, calls for

a legal opinion as to the interpretation -- one

second -- calls for a legal opinion as to the

interpretation of our objections and this interrogatory.

You can state an answer, if you can.

A.   The implication of your question is that it is not included here.

BY MR. TAYLOR-COPELAND:

Q.   Correct.

A.   I do not know that this is true.

Q.   But you agree it should be included, if -- if it took place?

MR. SHELTON:   Same objection.

A.   I agree that if legal counsel via this document has confirmed that it will provide Nexo's direct sales, that it should do so.

BY MR. TAYLOR-COPELAND:

Q.   So Mr. Augustus Greaves verified this response on behalf of Nexo; right?

Do you know what he did to verify that the information provided was full and complete?

A.   I do not.

MR. SHELTON:   Were you referring to the verification document?

MR. TAYLOR-COPELAND:   Correct.

MR. SHELTON:   That's the last page, Mr. Trenchev.

A.   Yes.

MR. SHELTON:   You can read it before you

answer.

A.   Well, now I know.  He has read the defendant's amended objections and the responses to plaintiff's third, fifth and twelfth interrogatories in the Cress vs. Nexo Capital Inc. case, and he has confirmed that to the best of his knowledge this information is correct.

BY MR. TAYLOR-COPELAND:

Q.   But you didn't speak with him in preparing for today; right?

A.   I have not spoken to him in preparation of today.

Q.   When's the last time you spoke with Mr. Greaves?

A.   I do not have that on top of my head.

Q.   Has it been more than a year?

A.   No it was sooner.  Last couple of months for sure.

Q.   Does Mr. Greaves have access to Nexo's transactional records?

MR. SHELTON:  Objection, calls for speculation.

A.   I do not know what access to records he particularly has.

BY MR. TAYLOR-COPELAND:

Q.   Okay, looking at the top of page 2, there are

five U.S. customers; right?

A.   I don't think I'm on the same question, sorry.

Q.   On the top of page 2.

A.   Oh, right.  Correct.

Q.   And are these the five purchasers who participated in Nexo's initial token offering?

A.   Yes.

Q.   And did Nexo ensure that all of these purchasers were accredited investors?

A.   That was the procedure, and I believe that it has been followed.

Q.   And then there's a second set of transactions that seem to span various times in 2021 and 2022.  Does that look accurate to you?

A.   It does.

Q.   And Nexo never filed a form D related to these 2021 or 2022 sales; correct?

MR. SHELTON:  Objection, vague, calls for a legal opinion.  Calls for speculation.

A.   I do not believe that we have -- let me start over.

We have not filed a Reg D form other than the one that we saw today already.

BY MR. TAYLOR-COPELAND:

Q.   Was that because these later sales are part of

the same early offering?

MR. SHELTON:  Objection, vague, calls for a legal opinion as to the term "offering"?

A.  I'm not a legal expert, certainly not of U.S. security laws.  I think it goes back to two points that we already discussed.  The first one is our belief that the Nexo Token's nature had significantly changed from a time where it was a token to be for a platform to be everything from that standpoint in future tense, to a mature and existing, sophisticated platform, which it was in 2021, and a token that provided many utilities to our clients.  That is one point.

And the second being that despite all of that being our belief, we still were looking for accreditation status of all potential U.S. purchasers of the Nexo Token, which is a high bar and a clear testimony to Nexo's desire to do things properly and above board.

Q.  Why did Nexo tell purchasers in 2021 that the Nexo Token had been registered with the SEC as a security?

MR. SHELTON:  Objection, vague, assumes facts.

A.  How do we conclude that Nexo was telling that to customers?

BY MR. TAYLOR-COPELAND:

Q.   Are you aware that Nexo told customers that the Nexo Token had been registered as a security?

A.   I cannot be aware of all communications that Nexo team members have with anyone or everyone.

Q.   And it's not true that the Nexo Token was registered with SEC as a security; right?

MR. SHELTON:  Objection.

A.   I have not said --

MR. SHELTON:  Wait one second.  Objection, vague, calls for a legal opinion.

A.   I have never said anything like what you just said.

BY MR. TAYLOR-COPELAND:

Q.   I'm not asking whether you said that.  I'm asking, it's not true that the Nexo Token was registered with SEC as a security, right?

A.   What you're saying is not correct.

Q.   So the Nexo Token was registered with SEC as a security?

A.   The Nexo Token was offered in what we believed at the time to be a compliant manner, which was the usage of the Reg D form which was filed with the SEC.

Q.   Right.  But you'll agree it wasn't registered with the SEC; correct?

MR. SHELTON:  Objection, misstates testimony,

vague, calls for a legal opinion.

A.   Without being a legal expert, I do not agree with you because in my understanding it is about compliance and you can achieve compliance with laws by utilizing the Reg D form.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo ever file any registration paperwork with the SEC?

MR. SHELTON:   Objection, vague, calls for a legal opinion, as to the term "registration paperwork".

A.   I am unclear with the term "registration paperwork".

BY MR. TAYLOR-COPELAND:

Q.   Does Nexo acknowledge that it was a mistake to say that the token was registered with the SEC as a security?

MR. SHELTON:   Objection, assumes facts.

A.   I don't believe we've made any deliberate attempt to present something that is not true.  We went above and beyond what was expected within the industry, what individual market participants and companies were doing at the time, to proactively file paperwork with the SEC in the belief that this will ensure that our actions are in compliance with securities laws.

BY MR. TAYLOR-COPELAND:

Q.   Was it a mistake to tell Mr. Cress that the Nexo Token was registered with the SEC as a security?

A.   I have not told Mr. Cress such a thing.

Q.   But was it a mistake for Nexo to tell Mr. Cress that the Nexo Token was registered with the SEC as a security?

A.   I believe that what we have said to Mr. Cress was true at all times, that the Nexo Token was flagged to the SEC, they were aware of our activities, of our fundraising efforts, the progress thereof, and it is important for him to be aware of that so that he understands why an accreditation status was required for him to enjoy or participate in the offering of products of Nexo.

Q.   So it wasn't a mistake to tell Mr. Cress that the Nexo Token was registered with the SEC as a security then?

A.   This is the third time you are asking me the same question.  If you'd like me to repeat my previous response, I could.

Q.   Well, I don't believe I've gotten a response. I'm asking if it was a mistake or not to tell Mr. Cress that the token was registered with the SEC as a security.

A.   You are taking out half a sentence out of context and you're trying to get me to opine on that, and I will not do that.

MR. SHELTON:  All right, lunch is ready.  If we could take our next break.

MR. TAYLOR-COPELAND:  Do you want to take a break now?  Or are you --?

MR. SHELTON:  Yes.

MR. TAYLOR-COPELAND:  Okay, that's fine.

THE VIDEOGRAPHER:  Going off the record at 12:08.  This is the end of media 3.

(12:08 p.m.)

(Break taken.)

(12:52 p.m.)

THE VIDEOGRAPHER:  This the beginning of media 4, continuation in the deposition of Antoni Trenchev.  Back on the record, 12:52.

BY MR. TAYLOR-COPELAND:

Q.   Mr. Trenchev, could you turn to page 6 of the interrogatory responses you have in front of you.

A.   Page 6, you said?

Q.   Yes.

A.   Okay.

Q.   And interrogatory number 12 says:

"Identify all cryptocurrency exchanges on

which you sold the Nexo Token including approximate amount, date first sold and date last sold."

And Nexo's first amended response has a chart. Do you see that?

A.   I don't see the chart, no.  Ah, this one?

MR. SHELTON:  The next page.

A.   Oh, yes.  Of course.

BY MR. TAYLOR-COPELAND:

Q.   And it lists Bitfinex, HITBTC, Huobi, FTX, ByBit, Binance and Bitstamp.  Do you see that?

A.   I see that.

Q.   Is that the complete list of exchanges on which Nexo has sold the Nexo Token?

A.   These are all the exchanges where the Nexo Token is listed.  What you said, that Nexo has sold Nexo Tokens, might -- might not be true for all exchanges. I cannot attest to that.  It implies that we were the seller.  In many exchanges, buyers and sellers are matched so that part is not necessarily true.

Q.   So if you look at the spreadsheet or the chart, there's a date first sold and then there's a date last sold, and then a buy column, a sell column, and a net column.  Do you see that?

A.   I do.

Q.   Okay.  Does this indicate, the fact that there

Q.   are both buys and sells on these exchanges, that Nexo is both buying and selling on the exchanges that are listed in this chart?

MR. SHELTON:  Mr. Trenchev, before you answer, you can read the entire interrogatory.  There's a -- the page before the chart explains what the chart is.

A.   Thank you.

Okay, my understanding of the chart is that there were buys and sells and then which one ^outweighted which we find out in the last column, net, whether more was sold than purchased or vice versa.

BY MR. TAYLOR-COPELAND:

Q.   And my question is whether this is the complete list of exchanges on which Nexo has sold the Nexo Token?

A.   I believe this is the complete list of exchanges where we have sold tokens.

Q.   But earlier today didn't you tell me that Nexo has sold Nexo Token on its own retail exchange?

A.   I don't believe I told you that.  I told something different.  I said that I am certain that we have sold the Nexo Token via the OTC desk to American accredited investors.  I don't think we had any more discussion on the topic than that.

Q.   So here my question isn't limited to

Americans.  My question is --

A.    Right.

Q.    -- well, I'd understood earlier that your testimony was Nexo had sold the Nexo Token on its retail exchange.  Is that not correct?

A.    Well, the way the Nexo exchange works is it has a software mechanism that would be integrated with other exchanges.  So it passes on the orders of other exchanges so that they ultimately get filled at other venues, and that's why I believe that this chart has been presented to you in the way that it has been presented.

Q.    So Nexo does not sell directly on its own exchange?

MR. SHELTON:  Objection, vague as to the word "directly".

BY MR. TAYLOR-COPELAND:

Q.    Nexo Tokens.

A.    I don't know whether we, in the relevant time period, sold directly via our exchange or were a matching engine.

Q.    So you don't know one way or the other?

A.    I do not know whether at the given time period we have been selling as Nexo or were -- we were a matching engine for buyers or sellers.

Q.  Do you know -- my question is at any time period, if Nexo was selling the Nexo Token directly on its own exchange?

A.  It certainly has been selling the Nexo Token directly over the OTC service and I am unsure, expanding my previous answer, to include all periods, whether the retail exchange we were selling directly or matching orders.

Q.  So do you know one way or another whether this chart is accurate in the response to interrogatory number 12?

A.  There's no reason why I would believe that this is an inaccurate chart.

Q.  So Nexo has been a net buyer of the Nexo Token.  Is that correct?

MR. SHELTON:  Objection, vague.

A.  I'm sorry, net buyer on the particular exchange overall?  What is that you're --?

Q.  So overall, right?

A.  Well, without having the benefit of the spreadsheet functionalities and adding up it, it would like that we have bought more than sold on the venues that are listed in the chart.

Q.  Well, did Nexo buy and sell on any venues that are not listed in the chart?

A.   I don't think so.

Q.   Where did Nexo get the funds to purchase Nexo Tokens?

MR. SHELTON:  Objection, vague.  I mean I'm having trouble understanding that question, James.  If you could --

BY MR. TAYLOR-COPELAND:

Q.   What is the purpose of Nexo's purchase of Nexo Tokens?

A.   There is more than one purpose for Nexo to purchase its Nexo Tokens.

Q.   What are they?

A.   Well, a non-exhaustive list would be we had buy-back programs.  So that's one line.  A second is that we were paying interest, via the earn interest product.  And some of the payouts were in Nexo Tokens, so we would have to acquire those tokens, or some of the purchases are related to that.  And these are the two examples that come to mind right now.

Q.   Did Nexo purchase Nexo Tokens to artificially increase the price -- the market price of Nexo?

A.   No.

Q.   Did Nexo ever provide liquidity for Nexo on a decentralized exchange?

MR. SHELTON:  Objection, vague -- vague as to

ANTONI ANTONIEV TRENCHEV                                          JOB NO. 2496606
APRIL 02, 2026                    Confidential - VOL. II

MR. SHELTON:  Objection, vague.

A.  I think I understand the question.  And my response would be that there was very different terms under which clients did business on the Nexo retail platform and the Nexo OTC service.

BY MR. TAYLOR-COPELAND:

MR. TAYLOR-COPELAND:  So would somebody who used the Nexo OTC service, would they not have been subject to the same crypto credit terms that other borrowers were subject to?

MR. SHELTON:  Objection, vague, calls for a legal opinion.  Misstates the document.  Calls for speculation.

A.  The two sets of products, the Nexo retail platform, and the Nexo OTC desk and services, they are guided by different terms and conditions.

BY MR. TAYLOR-COPELAND:

Q.  Do you know what the differences were?

MR. SHELTON:  Same objection.

A.  Well, I don't have the details readily available in my memory but my understanding is that the OTC desk is designed for larger clients, institutions, high and ultrahigh net worth individuals who are looking for bespoke, often more complex product and services that are available through the Nexo retail platform.

And that accordingly, with that provision of services in a bespoke manner, certainly came with a different price tag.

Q.   Are you aware of whether liquidation fees were disclosed to Nexo's OTC customers?

MR. SHELTON:   Objection, vague.

A.   As a -- as -- in terms of company policy, it is and has always been to disclose fees associated with the provision of the relevant services.

BY MR. TAYLOR-COPELAND:

Q.   Okay.   So how were those fees disclosed?

MR. SHELTON:   Same objection.

A.   I believe we talked about this yesterday. That they could have been disclosed in a number of different ways.

BY MR. TAYLOR-COPELAND:

Q.   So my question isn't how they could have been disclosed, my question is how were they disclosed.

A.   And my answer is in various different ways, given that this is a bespoke and customer-specific product that caters to the specific needs of the clients.   This would have varied from client to client.

Q.   Okay, can you identify any specific document -- or let's focus on Mr. Cress.   Are you aware of how liquidation fees were disclosed to Mr. Cress?

MR. SHELTON:  Objection, calls for speculation.

A.   Am I the designated person who is a corporate representative on this topic?

MR. SHELTON:  No, I don't believe so on the communications with Mr. Cress, no.

A.   If you could please repeat the question?

BY MR. TAYLOR-COPELAND:

Q.   Yes.  Are you aware of whether liquidation fees were disclosed to Mr. Cress at all?

A.   I can confirm that the policy of the company was to disclose the fees and cost of services of the provision of the OTC desk of which I understand he was a client.  I'm not privy to the exact details.

Q.   So you don't know whether liquidation fees were disclosed to Mr. Cress at all; right?

MR. SHELTON:  I'm gonna object.  Mr. Trenchev, this is outside the scope of your 30(b)(6) designation. You're designated to testify on liquidations generally or communications --

MR. TAYLOR-COPELAND:  I'm not asking him any of that.  I'm asking if he knows.

MR. SHELTON:  So you can answer, if you know personally.

A.   I know what the policy is and it is to

disclose what would be expected from the client to pay. I do not know the details and particulars of Mr. Cress's case.

BY MR. TAYLOR-COPELAND:

Q.   You don't personally know whether liquidation fees were disclosed to Mr. Cress at all; right?

A.   I know what the policy is.  I do not know how particularly Mr. Cress's case has been handled.

Q.   Okay.

You asked your counsel just now if you had been designated as the corporate representative on this topic; right?

A.   I did.

Q.   Would you have given me a different answer, if he had told you yes?

MR. SHELTON:  Objection, argumentative.

A.   No.

BY MR. TAYLOR-COPELAND:

Q.   Are you intentionally withholding information right now?

A.   I am not.

MR. SHELTON:  Objection, argumentative. I mean, James, I mean that's a harassing question.  You can answer the question Mr. Trenchev, if you can.

A.   I am not.

BY MR. TAYLOR-COPELAND:

Q.    Did Nexo consider proceeds from the 2018 ICO as revenue?

A.    No.

Q.    Why not?

A.    So within the Nexo Group I told you that at the time, the relevant time, there were three managing partners of Nexo.  Finance and accounting was not an area where I am particularly well versed and it was not under my responsibility so I do not possess sufficient knowledge to answer your question.

Q.    Do you know if Nexo classified the token sale as a sale of equity?

MR. SHELTON:  Objection, calls for legal opinion.  Calls for an expert opinion.

A.    The tokens do not constitute equity to the best of my understanding.

BY MR. TAYLOR-COPELAND:

Q.    I'll introduce exhibit 114.

(Exhibit 114 marked for identification)

A.    Thank you.

Q.    Have you seen this document before, Mr. Trenchev?

A.    Yes.

Q.    What is it?

A.   It is a document that describes the terms and condition of token sale.

Q.   Is it the terms and conditions of Nexo Token sale?

A.   I don't think so.

Q.   So you are the corporate representative regarding this document.  What token sale terms and conditions does this relate to?

A.   Can you repeat the latter part of your question?

Q.   Yes.  What token sale terms and conditions does this relate to?

A.   I believe there is a file on the Google Drive, which I am listed as author.

Q.   Mm-hmm.

A.   My recollection is that we were gathering information, how other token issuers were going about and thinking about token sales.  So this, in my recollection, is a brainstorming exercise of what potentially the terms of a token sale might look like.  But I don't believe that in this format this ever made it to the final cut, and it was not presented to any potential investors in this form.

Q.   Okay.

So you see prior to -- the first sentence:

"Prior to and during the pre-sale and token sale, parties interested in purchasing Nexo Tokens will be asked to provide personally identifiable information in order to be permitted to participate in the sale."

Do you see that?

A.   I do.

Q.   So was this a draft of Nexo's terms of token sale then?

MR. SHELTON:  Objection, misstates testimony.

A.   I said that the entirety of the document is a brainstorming session, not a final document, and it was not in this form distributed to potential investors.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  But you saw this document; right?

A.   Yes.

Q.   Okay.

Do you see "Notice to Residents of the United States"?

A.   Yes.

Q.   It says:

"The offer and sale of this security instrument has not been registered under the U.S. Securities Act of 1933, as amended (the 'Securities Act'), or under the securities laws of certain states."

Do you see that?

A.   I do.

Q.   Okay.

Did Nexo ultimately include similar language in its terms of token sale?

A.   So this document is dated, at the time, before the token sale took place.  So it can be accurate at the time and then following the submission of the Reg D form that we talked about, coming after, replacing the facts which were true at the time.

Q.   Okay.  Do you see the next sentence says:

"This security may not be offered, sold or otherwise transferred, pledged or hypothecated as permitted under the Act and applicable state securities laws pursuant to an effective registration statement or an exemption therefrom."

Then it says:

"Nexo will offer Nexo Tokens to accredited U.S. investors following rule 506 of regulation D, section 4A of the US Securities Act, under which securities can be distributed to 'accredited investors' with a net worth of $1M USD or a certain level of income."

Do you see that?

A.   I do.

Q.   Does that refresh your recollection about

whether you had an understanding at the time you drafted this that there was a difference between registration and a rule 506 exemption?

A.   No.   To me filing the 506 rule is a form of registration.

Q.   Okay.   So you viewed filing the rule 506 as registering a token with the SEC as a security?

A.   I viewed filing the form as a form of registration with the SEC.

Q.   Then why would you tell purchasers of the token that it had not been registered with the SEC as a security?

MR. SHELTON:   Objection, assumes facts, misstates the document, misstates his testimony.

A.   Again, this is a brainstorming session that I don't believe in this form made it to the official documents of offering.   So what you are saying is inaccurate.

BY MR. TAYLOR-COPELAND:

Q.   So you don't believe Nexo ultimately told purchasers that the security instrument had not been registered under the Securities Act?

A.   I believe that we have submitted the Reg D form, and that this is a form of registration with the SEC.

Q.   Right, but that wasn't my question at all.  My question was you don't believe Nexo ultimately told purchasers that the security instrument had not been registered under the Securities Act?

A.   If there is a specific communications you would like to draw my attention to, I would be happy to look at that.  Apart from that we are talking very generally about communications stemming from many employees and representatives of the company so I cannot be sure how I am expected to answer the question.

Q.   Okay.

So you said you viewed filing a form D as registering with SEC; right?

A.   Yes.

Q.   So then presumably you would've taken out this language from the final version that says the security instrument has not been registered under the Securities Act; right?

MR. SHELTON:  Objection, argumentative.

A.   A lot of assumptions about what I might or might not have done during the early days of a start-up dating to eight years ago, and I think the -- what is more important than any half a sentence taken out of context, is the intention, and the intention was clear, that despite the lack of clarity on many questions

surrounding digital assets at the time, we went above and beyond in our attempt to comply, be a good actor, and deliver value for our customers.

BY MR. TAYLOR-COPELAND:

Q.   What is the half a sentence taken out of context?

A.   What you are taking around the -- what you are citing as, to me, language around registration and filing a form, whether that constitutes registration or is it an exemption, it gets very technical for me and obscures to a certain extent the intention.  Which I previously stated was to be in compliance with laws, should they be applicable to the products and services.

Q.   Was this document drafted by you?

A.   Exhibit 114?

Q.   Yes.

A.   It is my memory that this was standard language used across many token sales and that I, as part of my brainstorming exercise, found and replaced whatever the company or token names was with a Nexo Token for me to see how it would read after that.

Q.   Did Nexo retain Pepper Hamilton to help it in its token sale?

MR. SHELTON:  I want to object on privilege grounds.  If you can answer yes or no you can, but

I instruct you not to disclose the substance of any communications you had with Nexo's counsel.

A.   I remember Pepper Hamilton being retained by Nexo to advise on legal matters.  However, I'm not certain when that occurred.

BY MR. TAYLOR-COPELAND:

Q.   Okay.

I'd like to introduce exhibit 115.

(Exhibit 115 marked for identification)

A.   Thank you.

Q.   Do you recall doing a talk with Scott Melker?

A.   I do.

Q.   Do you recall whether Nexo published anything about that on its blog?

A.   I do not.

Q.   If you could turn to the page 149118.

A.   118?

Q.   Correct.

A.   Okay.

Q.   Do you see it says:

"If you went public, would the NEXO Tokens be converted to equity?"

And then the answer is:

"If we were to go public, we are very aware that we have responsibilities to the NEXO Token holders

document?

A.   Many people took part in the drafting of the token terms.

Q.   Were you involved?

A.   I was.

Q.   Who provided final approval for publication of the Nexo Token terms?

A.   This being very early start-up days, and a few people in the room, I don't think there was a designated authority who said "I approve this for release."

Q.   Do you see at the bottom of the first paragraph it says:

"The Token Sale is an invigorating and efficient way to raise funds, as it prompts the community members to reinvest into the sustainable growth of useful products.  To further reward NEXO Token holders, each NEXO Token bears dividend-paying features."

Was that all correct?

A.   I was on the wrong page.  Let me quickly skim through it.

Okay, I saw what you just read out loud.

Q.   Was that accurate?

A.   Well, the first sentence, mm, could have benefited from clearer language, for instance I'm not sure what an invigorating way to raise funds means, or

who the author of that sentence is.  But I don't see anything in substance objectionable.

Q.    Okay.

And then there is a chart that appears to be comparing the Nexo dividend token to a typical ICO token; do you see that?

A.    Yes.

Q.    Do you think that's a fair categorization of the purpose of that chart?

A.    Let me read it, please.

Again, I think this could've benefited less loaded phrases and be clearer in terms of language.

Q.    At a high level was the purpose of this chart to compare the Nexo Token to a typical ICO token?

A.    It was.

Q.    Okay.  And then under "Category" under -- so it's described as the "NEXO Dividend Token, "right?

A.    It is.

Q.    And "Category" says:

"US SEC-compliant Dividend-paying Asset-backed Security Token with Utility features."

Do you see that?

A.    I do.

Q.    Okay, so was the Nexo Token U.S. SEC-compliant?

Q.   Is your understanding that that is what happened until the governance vote removed the dividend feature?

A.   It is.

Q.   At some point did Nexo remove this language calling its Nexo -- the token U.S. SEC-compliant?

A.   Yes.

Q.   When was that?

A.   I don't know.

Q.   Was that in response to inquiry received from the SEC?

A.   I don't remember.

Q.   Okay, turning to page 2 it says:

"The NEXO Token is the world's first SEC-compliant dividend-paying asset-backed security token with additional utility features, that will be offered as a security to qualified investors in accordance with US and other laws."

Was that accurate at the time?

A.   That was a forward-looking statement when issued -- whenever that document is issued.

Q.   Did Nexo do anything to verify that it was going to be the first SEC-compliant dividend-paying token?

A.   I don't remember.

Q.    Then under "Security Features, Dividend-paying & Asset-backed Token", it says:

"In return for their initial backing and ongoing support, NEXO Token holders will receive 30% dividends from Nexo's profits."

And Nexo fulfilled that promise; correct?

A.    Correct.

Q.    Then it says:

"NEXO tokens are backed by the underlying assets of Nexo's loan portfolio."

Do you see that?

A.    Let me find it please.

I see that's last sentence, yes.

Q.    Okay.  And was that accurate?

A.    That was a forward-looking statement of things to happen in the future.

Q.    Okay.

And at any point were Nexo Tokens actually backed by the underlying assets of Nexo's loan portfolio?

MR. SHELTON:  Objection, vague.

A.    I don't know.

BY MR. TAYLOR-COPELAND:

Q.    When Nexo liquidated Mr. Cress did it send the funds it received or his assets to Nexo Token holders?

MR. SHELTON:  Objection, calls for speculation, vague.

A.   No.

BY MR. TAYLOR-COPELAND:

Q.   Then the last sentence under "Compliant and Regulated", it says:

"Continuing a prudent business conduct, the NEXO Token complies with the US SEC rules and regulations pursuant to the US Securities Act Regulation D Rule 506(c)."

Do you see that?

A.   I do.

Q.   What was Nexo's understanding at the time of what rule 506(c) allowed?

A.   I find it difficult to pinpoint exactly what we knew in 2017 or 18 when this document was compiled, but the understanding was that going through the forms, and their submission under rule 506 was a way of being in compliance with the SEC rules and regulations.

Q.   Okay.

Turning to page 3, there's some information on the distribution of the token in the first chart.  Do you see that?

A.   I do.

Q.   And it says that 52.5 percent goes to

investors.  Are those the purchasers in the rule 506(c)

offering?

      MR. SHELTON:  Objection, vague as to the

terminology "506(c) offering".  Calls for a legal

opinion.

    A.  If you could ask me again the question.

BY MR. TAYLOR-COPELAND:

    Q.  So, yeah, this 525 million tokens that are

supposed to go to investors, are those the investors in

the initial token sale?

    A.  These 525 million tokens were the ones that we

designated then intended to sell to investors in a token

sale.

    Q.  Okay.

    And then there's 250 million identified as

"overdraft reserves".  Do you see that?

    A.  I do.

    Q.  Okay, what is overdraft funding reserves?

    A.  The idea was that the -- the very vast

majority of the funds raised during the token sale would

go towards the financing of loans.  In other words, this

would be the money that we would extend to borrowers

against that collateral.

    And since the business as such is very

capital-intensive, we provided for a way to secure

ANTONI ANTONIEV TRENCHEV                                      JOB NO. 2496606
APRIL 02, 2026                  Confidential - VOL. II

MR. SHELTON:  James, when you are at a good place can we take our next break?

MR. TAYLOR-COPELAND:  I have three or four more questions on this document.

MR. SHELTON:  Sure.

BY MR. TAYLOR-COPELAND:

Q.    So if you could turn to the last page of this document, please.  It says:

"General and Utilities Disclaimers".

And then it says -- I think the second or third sentence says:

"The offering of the Nexo Token has not been registered, qualified, or approved under any securities, futures, financial instruments, capital markets, or exchange control legislation, regulation, or ordnance of any jurisdiction.  In all jurisdictions, the offer to sell and solicitation to buy a Nexo Token is directed solely to qualified institutional investors, qualified professional investors, and those other sophisticated persons to whom offers and solicitation may be made without any licensing, registration, qualification, or approval under applicable law[s] ..."

Do you see that?

A.    I do.

Q.    So Nexo was informing purchasers that the

A.   I do not know who drafted this document, and I don't know what and why they did when they drafted it or what they intended.

BY MR. TAYLOR-COPELAND:

Q.   Okay.

Well, was it true that as of December 6, 2018, the Nexo Token had not been registered?

MR. SHELTON:   Objection, asked and answered. Misstates the document.

A.   Well, Nexo's understanding and the prevailing understanding at the time was that the filing of the Reg D form with the SEC constitutes a registration with the SEC.

Q.   Then why would it send token terms saying the opposite to Kraken in August of 2020?

MR. SHELTON:   Objection, argumentative. Misstates the document.

A.   I do not know.

BY MR. TAYLOR-COPELAND:

Q.   You can set that aside.

This will be exhibit 119.

(Exhibit 119 marked for identification)

A.   Thank you.

Q.   Have you seen this document before?

A.   Yes.

Q.   And do you understand that you've been designated as Nexo's corporate representative to address this document?

A.   Yes.

Q.   And what is it?

A.   It is a letter to the Arkansas Security Department.

Q.   Okay.

Could you turn to the page bates-stamped 211149.

A.   Yes.

Q.   Do you see it says "Nexo Token"?

A.   Yes.

Q.   And it says:

"We have been advised by our legal counselors that [the] NEXO Token ... is not a security, but a token with utilitarian value and should be qualified as a utility token, therefore, exempted from registration."

Do you see that?

A.   I do.

Q.   What do you mean that it should be "exempted from registration"?

A.   Erm --

MR. SHELTON:   Objection to the extent it calls for a legal opinion.

A.   Could I have the question again?

BY MR. TAYLOR-COPELAND:

Q.   Yes.   What did Nexo mean when it said that the token should be "exempted from registration"?

MR. SHELTON:   Same objection.   Calls for a legal opinion.

A.   I probably have to get a little bit more context by reviewing the previous pages, if you could give me ...

So these appear to be answers to questions that Arkansas had posed to Nexo but we're missing the questions so without them for me it's difficult to work out the exact context and the subsequent meaning of the answer.

BY MR. TAYLOR-COPELAND:

Q.   Do you know why Nexo would tell the Arkansas Securities Department in July 22, 2021, that the token was exempted from registration when it told Mr. Cress in March of 2021 that the token had been registered with the SEC as a security?

MR. SHELTON:   Objection, assumes facts as to the document that has not been shown to the witness regarding Mr. Cress.   Also, misstates the text of this paragraph.

A.   I think I would benefit from viewing any correspondence to Mr. Cress that you're reading from in

order to better answer your questions.

BY MR. TAYLOR-COPELAND:

Q.    Okay.

So Nexo has admitted in response to RFAs in this case that it represented to Mr. Cress that the Nexo Token was registered with the SEC as a security.

My question is if that's true, why did Nexo tell the Arkansas Securities Department in July 2021 that the token was exempted from registration?

MR. SHELTON:  Objection, misstates the document.

A.    Without being an expert on the inner workings of the various --

MR. SHELTON:  I'm sorry Mr. Trenchev, I'm also gonna object.  This calls for a legal opinion as to the meaning of the term "registration".  You can go ahead.

A.    Thank you.

So I don't know exactly how state and federal regulators work, and the dynamics between those two levels of regulators, but what you read out that was communicated to Mr. Cress, appears to be my understanding with reference to the federal authority, which is the SEC, and here the discussion appears to be about -- around the state securities department.  So again, without having the benefit of seeing the question

that was posed to Nexo, I would say that these are

different topics around registrations with different

authorities.  So I could see how both statements could

be true at the same time.

BY MR. TAYLOR-COPELAND:

Q.   So let me ask you this.  So if you turn to the

last page, it says:

"Sincerely, Antoni Trenchev, Manager ...

Financial LLC."

And then --

A.   Mm-hmm.

Q.   -- so that's you; right?

A.   Correct.

Q.   Presumably you would've reviewed information

to make sure it was accurate before providing it to the

Arkansas Securities Department; right?

A.   Right.

Q.   Do you recall doing that?

A.    I think we begin with saying that we have been

advised by our legal counsels --

MR. SHELTON:  Mr. Trenchev, I advise you don't

disclose the substance of any communication Nexo had

with its external legal counsel regarding this issue.

You can testify as to the substance of Nexo's

communications directly with the regulator.

A.    Thank you.

I was making the point that we clearly had been advised by external legal counsel.  So this answers your question whether I took steps to ensure that what I'm saying is correct.

BY MR. TAYLOR-COPELAND:

Q.    Okay.

So after being advised by your external legal counsel that the Nexo Token had utilitarian value and should be qualified as a utility token and therefore exempted from registration, did Nexo go about amending or changing the representations it made to its OTC customers to remove the language stating that the Nexo Token had been registered with SEC as a security?

MR. SHELTON:  Object.  It assumes facts as to the substance of privileged communications with counsel which Mr. Trenchev did not testify to, and it misstates the document.

A.    Well, these are two separate time periods. One is 2018, and there are statements around facts of that time.  Here we are three and a half years later, in mid to late 2021.  So if the fabric and nature of the Nexo Token has changed, this might have resulted in the need of different actions around how we would go about our continued desire and policy to be in compliance with

applicable laws and regulations.

BY MR. TAYLOR-COPELAND:

Q.    So this document says:

"We have been advised by our legal counselors that NEXO Token ... is not a security, but a token with utilitarian value and should be qualified as a utility token, therefore, exempted from registration."

Is that true?

A.    That is the sentence written on that piece of paper, yes.

Q.    Okay.

In response to that did Nexo stop representing to OTC customers that the Nexo Token had been registered with SEC as a security?

MR. SHELTON:  Objection, misstates the next sentence of that document.  Misstates the document.

A.    If we look at the next sentence, we clearly continued to state our understanding, which is that the fact that we have filed the form D with the SEC, constitutes a form of registration and -- with the SEC and compliance of the applicable securities laws.

BY MR. TAYLOR-COPELAND:

Q.    You can set that aside.

This will be exhibit 120.

(Exhibit 120 marked for identification)

A. Thank you.

Q. Have you had a chance to read the document, Mr. Trenchev?

A. I'm halfway through it.

Yes.

Q. Okay, have you seen this before?

A. I have not.

Q. Do you have any reason to doubt that Mr. Kanchev sent this to Kraken?

MR. SHELTON: Objection, calls for speculation.

A. I do not.

BY MR. TAYLOR-COPELAND:

Q. Okay. And it's asking Kraken to transfer the trading history from one account for all trades generated from February 1, 2018 onward to a separate account under the name Nexo Capital Inc.; right?

A. Correct.

Q. And it says:

"... immediately after its incorporation in February 2018, Nexo Capital Inc., a Cayman Islands company, registration No. 332370, completed a SEC-registered Reg D 506(c) private sale of NEXO Tokens to around 130 accredited, non-US investors (all being subject to full KYC/AML checks)."

A.   Correct.

Q.   And then Zenga sold the Bitcoin and Ethereum that had been transferred to it by Nexo?

A.   It sold it for fiat currencies.

Q.   Then did Zenga transfer the proceeds back to Nexo?

A.   It did.

Q.   Did it transfer all of the proceeds back to Nexo?

A.   Yes.

Q.   You can set that document aside.

(Exhibit 121 marked for identification)

A.   Thank you.

Q.   Okay, this is a Slack chat titled "Support"; right?

A.   That is -- sorry, where are we reading?

Q.   At the very top left do you see it says "Support"?

A.   Correct.

Q.   And if you turn to page 247645.

A.   Okay.

Q.   There is some messages from Nikola, and then a response from you, correct?  You are antoni@nexo.io?

A.   I am.

Q.   And who is Nikola?

A.   He is one of the earlier employees at Nexo, and I believe at the time he was in customer support.

Q.   Okay.

And he posts an article from Crypto Briefing; correct?  What is the Nexo token?  Introduction to crypto loan token.  Do you see that?

A.   I do.

Q.   He asks:

"Can I get someone at NEXO to please tell me if the statements in this article is correct?"

A.   Okay, we are further down the page.

Q.   And then he says:

"This article has also been commented on in the Telegram, now we also have emails on this topic, this is what worries me the most."

Do you see that?

A.   Give me a second, please.  How did you translate that later bit?  About the worry?

Q.   Sure.  Why don't you tell me what you understood Mr. Nikola to be saying in these three Bulgarian sentences?

A.   He says I -- involuntarily pasted without the question in Telegram and there are discussions around it.  We have a few emails on the topic.  They are worried about this part the most.

So they're worried, I think you said that he, Nikola, is worried.

Q.   So is your understanding that Nikola is saying people in the Telegram are worried about this article?

A.   About a specific part which is presumably the one on top.

Q.   Okay.

I'll introduce exhibit 122.

(Exhibit 122 marked for identification)

A.   Thank you.

MR. SHELTON:  James, just for the record, Max had also admitted in an exhibit that hasn't been produced to us and we ask that it be produced with the bates-stamp after the deposition.

MR. TAYLOR-COPELAND:  Okay, it will be.

MR. SHELTON:  Okay.  Sorry, what was the exhibit number?

MR. TAYLOR-COPELAND:  122, I believe.

BY MR. TAYLOR-COPELAND:

Q.   My question is whether you recall reviewing this article at the time?

A.   I do not.

Q.   Okay.

You can set it aside then.

(Exhibit 123 marked for identification)

ANTONI ANTONIEV TRENCHEV                                          JOB NO. 2496606
APRIL 02, 2026              Confidential - VOL. II

Q.   This will be exhibit 123.

Would you receive -- do you have access to the legal@Nexo.io address?

A.   I do not.

Q.   Was there a time when you did?

A.   I don't remember such a time.

Q.   Okay.

Do you recall if this chain was ever forwarded to you?

A.   I don't.

Q.   Okay.

You can set that aside.

This will be exhibit 124.

(Exhibit 124 marked for identification)

A.   Thank you.

Q.   Do you see where this says "We have decided" about midway down the first page:

"To issue the world's first SEC compliant asset-backed security token even prior to SEC Chairman Jay Clayton stating that all ICOs are seen as security offerings."?

A.   Give me a second to find that.  Are we on the first page?

Q.   Yes.

MR. SHELTON:  Where are you reading from

James?  I can't find it either.

A.   Yes, I think we're --

BY MR. TAYLOR-COPELAND:

Q.   Sorry, my apologies.  You can set that aside. Sorry, no, no, keep it in front of you.

A.   Right.

Q.   So my question here is just about the first page.  Do you see on March 1, 2022, Troy Gravitt says:

"Let's change paragraph #2, sentence #1, to:

"Due to the rapidly developing U.S. regulatory framework, we are ..."

Then he crosses out:

"... for the time being, putting on hold ...

"[add: halting] the buy, sell and swap features of our Exchange for the NEXO Token, as well as the Earn in NEXO option, for U.S. clients ..."

Do you see that?

A.   I do.

Q.   Okay.

Does that refresh your recollection about whether there was a time when there was a buy -- there was the ability for U.S. customers to buy, sell or swap the Nexo Token on the Nexo exchange?

MR. SHELTON:  Objection, calls for speculation.

A.   Again, as we previously discussed, an exchange functionality was available both on the Nexo retail platform and on the OTC desk, I'm not sure that we can definitively conclude from the sentence as is which exchange, with a capital E, refers to in this instance here.

BY MR. TAYLOR-COPELAND:

Q.   Okay.

So to you "exchange" could refer to either the retail exchange or the OTC exchange; right?

A.   Correct.

Q.   Okay.

Then the responses from Magdalena Hristova, and she says:

"Just so you know, I would run this by Antoni in the USA Slack channel as he was the one who insisted on changing the official language I'd used, "suspended" to "put on hold".  He [just] wants very soft in language here and while I definitely agree with you and prefer using halted or suspended, let's just run this by Antoni.  Deal?"

Do you see that?

A.   I do.

Q.   Was it true that you wanted softer language in this press release?

A.   I wanted to use put on hold, which I don't believe it's necessarily based softer language than what Troy is suggesting, which is halting.

Q.   Okay.  Did Troy ultimately run this by you in the USA Slack channel?

A.   I do not recall that.

Q.   What was the USA Slack channel?

A.   It was a Slack channel where topics with relevance to the U.S. market were discussed.

Q.   Okay, and were you a participant in that channel?

A.   Yes.

Q.   Okay.

You can set that document aside.

(Exhibit 125 marked for identification)

Q.   This will be exhibit 125.

A.   Thank you.

Q.   My questions here are just gonna be about the first two paragraphs.

A.   Should I go ahead and read those?

Q.   My questions are just gonna be about the first two paragraphs so if you -- maybe I'll ask my question and if you feel you need more context feel free to read on.  But if you see -- well first of all, have you seen this document before?