April 24, 2026

**VIA CM-ECF**

The Honorable Thomas Hixson
United States District Court for the Northern District of California
Courtroom G – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94120

Re:    *John Cress v. Nexo Capital Inc.*, Case No. 3:23-cv-00882-TSH
       JOINT DISCOVERY LETTER REGARDING NEXO'S DEPOSITION NOTICES OF MR.
       KOSTA KANTCHEV AND MR. YASEN DAMYANOV

Dear Judge Hixson:

The parties submit this joint letter regarding Cress's request to depose two Nexo witnesses – Mr. Kosta Kantchev and Mr. Yasen Damyanov – and Nexo's request to grant a protective order barring the depositions. The parties have met and conferred in good faith prior to filing this letter, including exchange of emails.

### Attestation

Counsel for Plaintiff John Cress and Defendant Nexo Capital Inc. have met and conferred in good faith to resolve the disputes set forth below.

Dated: April 24, 2026        TAYLOR-COPELAND LAW

                      By: /s/ James Taylor-Copeland

                      Attorneys for Plaintiff


Date: April 24, 2026        BAKER & MCKENZIE LLP

                      By: /s/ Ian S. Shelton

                      Attorneys for Defendant

**NEXO'S POSITION**.

Nexo seeks protection from the noticed depositions of Kosta Kantchev ("Kantchev"), Nexo's highest-level executive chairman, and Yasen Damyanov ("Damyanov"), Nexo's Vice President of Product Development. Following five depositions of Nexo-related individuals and a corporate representative deposition (for a total 42 hours of testimony), Cress now seeks to depose these additional individuals without good cause. Kantchev is the apex executive at Nexo and neither he nor Damyanov have special or unique knowledge that has not already been covered by the other individual and 30(b)(6) depositions. Both depositions here are unduly burdensome and unreasonably duplicative, warranting a protective order to quash in their entirety. FED. R. CIV. P. 26(c).

1. **Kantchev is an apex witness who lacks unique first-hand, non-repetitive knowledge**

Kantchev is a co-founder, executive chairman, and director of Nexo, a company with a global workforce, millions of customers, and billions of dollars of cryptocurrency assets under management. Kantchev is the highest-level executive of Nexo and its affiliates, effectively making him equivalent to a CEO and the ultimate supervisor over all Nexo entities and employees. In general, "[w]hen a party seeks the deposition of a high-level executive (a so-called 'apex' deposition), the court may exercise its discretion under the federal rules to limit discovery." *Anderson v. Cnty. of Contra Costa*, 2017 U.S. Dist. LEXIS 34161, 2017 WL 930315, at *3 (N.D. Cal. March 9, 2017).

Cress's deposition notice to Kantchev is the classic case of what the apex doctrine is designed to prevent, and there is nothing to indicate that he is "going to know anything more than what many people within the company can undoubtedly testify to." *Davis v. Pinterest, Inc.*, No. 19-cv-07650-HSG (TSH), 2021 U.S. Dist. LEXIS 264788, at *1-2 (N.D. Cal. 2021). Kantchev's personal connection to Cress is non-existent. Kantchev lacks any personal involvement in this dispute, and had no personal contact with Cress. Cress's deposition testimony confirms this:

> *Q. Have you had any dealings or contact with Kosta Kantchev?*
>
> A. No, not directly.
>
> *Q. Okay. Never received an email, communication, anything else, from Kosta Kantchev?*
>
> A. Yeah, not -- not directly. Right.

*See* **Exhibit A** (April 10, 2026 Cress Depo. at 346:10-15). Importantly, the co-founder counterpart to Kantchev, Antoni Trenchev, has already provided testimony (10 hours) in his individual capacity and as Nexo's corporate representative. Trenchev confirmed that Kantchev "is the executive chairman," as distinct from Trenchev's role as "managing partner," and otherwise described Kantchev's position as "a little bit higher than mine." *See* **Exhibit B** (April 1, 2026 Trenchev Depo. at 7:7-11). "Depositions of witnesses at this level in the company who have no unique knowledge of the facts are an undue burden for the company, the witnesses, and counsel." *Davis*, 2021 U.S. Dist. LEXIS 264788, at *2-3. Cress has previously argued the relevance of Kantchev on the basis that he was a director of Nexo during the NEXO Token initial coin offering ("ICO") in 2018. However, even assuming he has knowledge of 2018 facts, that knowledge is not relevant to Cress's NEXO Token Transactions over three years later in April-June 2021, and is not unique to Kantchev, when information regarding NEXO Token sales was already obtained through Trenchev. "Courts have repeatedly denied apex depositions even on a showing that the executive made public statements on relevant issues." *Symantec Corp. v. Zscaler, Inc.*, No. 17-cv-04426-JST (TSH), 2019 U.S. Dist. LEXIS 120152, at *4 (N.D. Cal. 2019).

Additionally, discovery limitations are appropriate when "the information sought can be obtained through less intrusive discovery methods, such as by interrogatory or depositions of lower-level

1

employees with more direct knowledge of the facts at issue." *Anderson v. Cnty. of Contra Costa*, 2017 U.S. Dist. LEXIS 34161, 2017 WL 930315, at *3 (N.D. Cal. March 9, 2017). Cress has already obtained information about topics known to Kantchev through less intrusive means, namely the percipient and 30(b)(6) depositions of Trenchev, Dinca, and Hristov, and the percipient depositions of Kostadinov and Tonkov. Courts quash in these circumstances. *See Anderson*, 2017 WL 930315, at *3 (denying request for deposition of apex deponent and requiring a Rule 30(b)(6) witness deposition first before conferring further on the necessity of the apex deposition); *Davis*, 2021 U.S. Dist. LEXIS 264788, at *1-2 (Hixson, J.) (granting motion for protective order and quashing apex deposition without prejudice to pursue the deposition again after less intrusive methods of discovery if the party can demonstrate unique, non-repetitive knowledge); *Symantec*, 2019 U.S. Dist. LEXIS 120152, at *4 (Hixson, J.) (granting motion to quash apex witness who made statements others could testify to; denied motion to quash lower level employee who did not qualify as apex and who otherwise had unique, non-repetitive knowledge).

Cress has already obtained information through the 10-hour deposition of Nexo co-founder Trenchev and an exhaustive list of 49 corporate representative topics, as well as additional depositions of four lower-level employees with unique knowledge (Dinca, Kostadinov, Tonkov, Hristov). Trenchev testified in his percipient and corporate capacity about the 2018 ICO, the NEXO Token, and securities issues. Cress's corporate representative topics already encompassed topics concerning the SEC and the NEXO Token. *See* Nexo's Amended Objections and Designations to Cress's 30(b)(6) corporate representative topics attached as **Exhibit C**, Topic Nos. 3(11) and 3(12) at 17–18. Kantchev has no unique, non-repetitive knowledge of relevant facts not otherwise testified to by Trenchev or other Nexo employees, such that deposing Kantchev will be duplicative of discovery Cress has already obtained. Cress already explored topics regarding the Nexo Token ICO in 2018 in Trenchev's deposition.

Trenchev testified Nexo conducted a token sale in 2018 (Trenchev Deposition Pt. II, **Dkt. 112-7,** Tr. 236:11–16) (highlighting testimony on sales of NEXO token) and that "five" investors in that sale were from the United States, and he testified those U.S. investors, along with all U.S. based NEXO purchasers were accredited investors (Tr. 214:25–215:12). He also testified that it was Nexo's policy to sell the token exclusively to U.S. accredited investors (*Id.*). He further testified that Nexo made direct sales to certain U.S. customers in 2021-2022 via the OTC desk (who were vetted as accredited investors) (Tr. 243:9–17). Trenchev also testified that their filing of a Form D was done because of the uncertainty of the regulatory treatment of tokens in 2018 and that they only sold to accredited investors in 2021-2022 in an abundance of caution (Tr. 239:1-240:24). Cress alleges some connections between Kantchev and the 2018 ICO, but those facts have marginal if any relevance to the 2021-2022 transactions at issue here—such as Kantchev's personal token sales, his ownership of a corporate entity that allegedly handled ICO funds, or his alleged knowledge (or lack thereof) of various facts or transactions unrelated to Cress.

In straining to manufacture a connection to Kantchev, Cress confirms why this apex deposition should not proceed. He points out that Kantchev "managed and oversaw" a Bulgarian Nexo affiliate—NDS EOOD—that employed Cress's relationship manager, Hristov. The same can be said of any apex officer with supervisory authority. Cress has already deposed Hristov. Citing one example, Cress also argues that Kantchev "interacted directly" with a VIP customer in 2021. Critically, this VIP customer was **NOT** Cress. Kantchev's alleged involvment in OTC transactions **NOT** involving Cress provides no basis to depose Kantchev in this lawsuit. For example, Cress alleges that Kantchev made a "personal liquidation-free guarantee" to an unidentified VIP customer, but how would that fact be relevant to this lawsuit when Kantchev admittedly had no communication with Cress? Cress has already deposed Dinca on these matters related to the OTC desk and VIP customers. If a claim of "oversight" of the OTC desk was sufficient to justify an apex deposition, then the exception would not exist because every apex executive can be said to have "oversight" authority over company operations. Due to his lack of unique, personal knowledge of the facts underlying Cress's allegations, deposing Kantchev would be unduly burdensome,

unreasonably duplicative, and not proportional to the needs of this case. Nexo requests a protective order to quash Kantchev's deposition.

## 2. **Yasen Damyanov's deposition is unreasonably duplicative and burdensome**

Cress's deposition notice to Damyanov is unreasonably duplicative given the substantial overlap between the knowledge of the witness and Nexo's corporate representative. Damyanov is Nexo's Vice President of Product Development whose potential relevance to this action is limited to managing Nexo's data, including gathering documents and ESI potentially relevant to this action. Damyanov does not have unique knowledge regarding Cress and his claims. "A court must also limit discovery if it is unreasonably duplicative, or if it can be obtained from a source that is more convenient or less burdensome." *Kovalenko v. Kirkland & Ellis LLP*, No. 22-cv-05990-HSG (TSH), 2024 U.S. Dist. LEXIS 27632, at *5 (N.D. Cal. 2024) (citing Fed. R. Civ. P. 26(b)(2)(C).) (granting motion to quash and issuing a protective order barring discovery based on the issues not being proportional).

Cress's relevance argument as to Damyanov focuses on his knowledge of document retention and ESI issues. However, this knowledge falls directly within the scope of Cress's 30(b)(6) deposition topics which had 17 topics dedicated to "Discovery Search, Production, and Preservation." **Exhibit C**, Topic Nos. 8(33) –8(49) at 40–55, including "Nexo's business data retention policies, procedures, and practices" and "Nexo's steps to preserve documents and ESI." Cress had the opportunity to question Nexo's corporate representative on these topics. Because Damyanov's deposition would be duplicative and unduly burdensome, Nexo respectfully seeks a protective order to quash the deposition.

## PLAINTIFF'S POSITION.

Rule 30 allows a party to take up to ten depositions without leave of Court. Plaintiff has taken six. Those depositions reveal that Kosta Kantchev and Yasen Damyanov have knowledge that is critical to both Cress's substantive claims and Nexo's spoliation of documents. Cress thus noticed their depositions. However, **to reduce any burden on Nexo, Plaintiff agreed to (a) limit each deposition to four hours and (b) conduct the depositions remotely**. Nexo flatly rejected this generous proposal.

**1. Kosta Kantchev.** "In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC (TSH), 2024 U.S. Dist. LEXIS 172637, at *5 (N.D. Cal. Sep. 24, 2024) (denying protective order to bar deposition of Meta CEO). "**[W]here a corporate officer may have any first-hand knowledge of relevant facts, the deposition should be allowed**." *Id*. (emphasis added). Exhaustion is not "viewed as an absolute requirement," but rather "a consideration." *Id*. at 5-6. "[I]t is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances." *Id*. at 6.[1]

Nexo argues that the Court should bar Kantchev's deposition because (1) the same testimony was obtained through other less intrusive means, and (2) Kantchev has no first-hand knowledge of the relevant facts. Not so. Kantchev managed and oversaw NDS EOOD in 2021—the company that employed Cress's VIP manager, Hristov. Trenchev Tr. 200:17-201:2. Kantchev provided direct oversight over Nexo's VIP Program and interacted directly with VIP customers in 2021—personally guaranteeing liquidation protection to a Nexo VIP.

Nexo's 30(b)(6) witnesses did not speak to Kantchev to prepare for their depositions, so it is impossible that they would be able to testify as to Kantchev's knowledge of any fact. Trenchev Tr. 94:9-22 (**Exhibit**

---

[1] Nexo argues that Kantchev is an apex deposition. It makes no such argument regarding Damyanov.

**D**); Dinca Tr. 381:6-16 (**Exhibit E**). Nexo's witnesses frequently deferred to Kantchev's knowledge on critical issues. Trenchev did not know whether Kantchev ordered the mass-deletion of his and Trenchev's emails, or the deletion of all emails to or from Kantchev's personal email address after this litigation began. Trenchev Tr. 86:6-87:12; 88:1-10; 136:18-25. Trenchev could not understand ambiguities about NEXO Token sales in documents signed by Kantchev. *Id.* at 236:24-237:1-17; did not know if Kantchev sold NEXO tokens *Id.* at 266:13-17; and did not know if Nexo sold NEXO Tokens on its exchange, or whether Kantchev was aware of such sales. *Id.* at 211:4-15; 212:16-19; 215:8-17. Kantchev was involved in overseeing OTC NEXO Token transactions with U.S. purchasers in 2021, but Tonkov (Nexo's Trading Operations Manager) did not know why. Tonkov Tr. 282:22-284:2 (**Exhibit F**). Tonkov also did not know why records he was sent showed sales to Nexo customers from "Kosta's Inventory." Tonkov Tr. 262:18-264:15

Nexo's witnesses also sought to conceal Kantchev's direct involvement in Nexo's VIP program and OTC transactions. Trenchev testified that he and Kantchev were not "customer-facing, not interacting with -- with clients, would have little to no relevant documents and communication on our email servers, on our email inboxes." Trenchev Tr. 101:3-102:1. However, Trenchev either lied, or was unaware of Kantchev's interactions with customers in 2021. Kantchev messaged Dinca in December 2024, forwarding a customer email containing screenshots of a September 2021 email chain between Kantchev, Hristov, and a VIP customer where Kantchev provided a **"personal liquidation-free guarantee"** offering to **"personally guarantee that [customer] will not be liquidated."** While Kantchev's emails have been deleted, the customer's screenshots of the emails reveal that Kantchev was directly involved in personally guaranteeing liquidation relief for Nexo VIPs right around the time Nexo liquidated Cress.

Dinca also made numerous misrepresentations under oath, testifying he never "work[ed] with Mr. Kantchev on any VIP related tasks." Dinca Tr. 80:15-17. But Dinca and Kantchev worked directly together with VIP customers in 2021 and 2024—including during the exact March 2021 week Cress entered his OTC transactions and loans with Nexo. Kantchev also directly oversaw large VIP accounts and OTC transactions in 2021 that involved both Dinca and Hristov.

For example, on March 25, 2021, (a day before Cress entered his first OTC transaction with Nexo), Kantchev directly questioned one of Dinca's cancelled VIP deals, asking "What happened?"[2] An April 2021 email requesting additional support for VIP clients from Nexo's Head of Sales, Rakshiev says "Kosta and Kalin keep us on the hook for sales results only so we should be focusing our effort there." Kantchev's oversight of Nexo's OTC deals continued *for years*. For example, in October 2024, Kantchev asked Dinca about a Nexo whale "taking out loans to invest in $MSTR" and "to find out what's his strategy with this play."

Kantchev also played a central role in NEXO token sales. For example, Nexo took all of the proceeds (BTC and ETH) from its 2018 Token sale and transferred them to a company owned entirely by Kantchev—Zenga Limited—which then sold the BTC and ETH into "fiat currencies" and transferred the proceeds back to Nexo. Trenchev Tr. 306:19-307:10. But Trenchev did not know whether Kantchev's Zenga company received all or just some of Nexo's ICO assets. *Id*.

Kantchev had direct oversight over large VIP accounts and OTC purchases at the exact time Cress made his purchases and took out his loans—**even personally guaranteed liquidation protection for a Nexo VIP customer in 2021**. Nexo's attempts to misrepresent Kantchev's direct involvement and critical

---

[2] It appears this email is available only because Tonkov saved it and included it as an attachment to a separate email, thus preserving a copy of an email that was otherwise deleted by Nexo's Kantchev-focused retention/deletion policies. Indeed, the email does not appear in Kantchev's custodial file.

relevant knowledge should not insulate him from a 4-hour remote deposition. Just because Kantchev did not directly communicate with Cress does not mean he has no first-hand knowledge of facts relevant to this case, including regarding Kantchev's direct knowledge and involvement in Nexo's OTC transactions, liquidation relief program, VIP relationship program, NEXO token sales, sales of assets to Nexo customers directly from his own inventory, and Nexo's document deletions.

**2. Yasen Damyanov.** As this Court knows, Nexo concedes that it destroyed essentially all emails belonging to its Managing Partners Antoni Trenchev and Kosta Kantchev and nearly all Slack Direct Messages, through auto-deletion policies implemented on December 4, 2022. *See* Dkt. 99 at 2–3. Nexo also admitted that it began deleting Slack communications in its Public and Private Channels on March 1, 2023—including those used to specifically discuss Cress's transactions—days after Cress filed this lawsuit.

Nexo has produced communications between Damyanov and Slack regarding these deletions. Nexo has also produced a Google audit log (the "Audit Log") showing its destruction of documents is even more extreme than Nexo previously conceded. Nexo implemented company-wide deletion policies for court-ordered custodians during this litigation and implemented dozens of targeted deletions of Hristiyan Hristov's (Cress's VIP Relationship Manager) emails during this litigation. That Audit Log shows that the vast majority of the changes to Nexo's retention/deletion settings (476 of 512) were implemented by Damyanov—including (i) the retention period placed on Trenchev and Kantchev's emails on December 4, 2022, (ii) the expansion of those rules to their personal email addresses on March 9, 2023, (iii) the retention period placed on Managing Partner Kalin Metodiev's emails on November 6, 2023, (iv) the 1-day retention rules placed on specific emails by RFC 822 message IDs[3] and subject lines in November 2021 and September 2024, and (v) the 1-day retention rules placed on specific Google Drive documents tagged with certain labels. Damyanov thus has critical and unique knowledge regarding why and how these changes were implemented, and the technical impact of these retention policies.

Nexo argues that "Cress already had the opportunity to question Nexo's corporate representative on these topics." Not so. Nexo designated Trenchev as its corporate representative to testify on these topics. But Trenchev was unable to answer basic questions about the Audit Log, which he described as "a spreadsheet with prompts that looks technical to me and I don't pretend to understand." Trenchev Tr. at 134:1-5. Trenchev conceded that he had not "seen this spreadsheet before," was not familiar with "Google Vault," did not discuss the Audit Log with Damyanov to prepare, and "do[esn't] know what anything on this spreadsheet means." *Id.* 129:12-19; 132:12-18; 133:16-21. Given Nexo's failure to properly prepare Trenchev, testimony from Damyanov is critical. *See* Dkt. 112 at 2-3; 112-2 at Ex. B.

Finally, Trenchev testified that he did not direct anyone to implement the retention policy changes (Tr. 86:18-23), that he could not say whether it was Kantchev who ordered their implementation (Tr. 87:8-14), and that the only way to know would be "**to ask Mr. Kantchev**" or "**ascertain who had access to the setting switches of the Google services. Speak to them. Or I don't know if there is a record of - - of change of policies and then we could know who exactly it is and we could ask them who directed them**." Tr. 88:1-10. Here the Audit Log shows the changes were implemented by Damyanov. Nexo's own testimony is thus that the only way to get this information is from Kantchev or Damyanov. Yet Nexo refuses to produce either.

---

[3]An RFC 822 message ID is a globally unique identifier assigned to each individual email at the time it is sent. It is not visible in the ordinary course of reading or managing email; locating a specific message ID requires either searching the email headers or using administrative tools to identify the exact message. A retention rule targeting a specific RFC 822 message ID is therefore not a broad policy—it is a deliberate decision to delete one particular email, which requires someone to have identified that specific email in advance.