# Exhibit D

# Exhibit D

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH
Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## ANTONI ANTONIEV TRENCHEV

## CONFIDENTIAL

Reported by:
GEORGIA GOULD



**CERTIFIED COPY**

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - -
IN THE MATTER OF:

JOHN CRESS,

                              Plaintiff,
NEXO CAPITAL INC.
                              Defendant.
- - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME I

Wednesday, April 1, 2026

AT:  1:04 p.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Plaintiff John Cress:

          JAMES TAYLOR-COPELAND (in person)
          MAX AMBROSE (remotely)
          TAYLOR-COPELAND LAW
          501 W. Broadway, Suite 800
          San Diego, CA 92101
          Tel: (619) 734-8770
          james@taylorcopelandlaw.com


Appearing for the Defendant Nexo Capital and the witness:

          IAN S. SHELTON (in person)
          KIRSTEN DOOLEY (in person)
          BAKER & MCKENZIE LLP
          10250 Constellation Boulevard, Suite 1850
          Los Angeles, CA 90067
          Tel: (310) 299-8535
          ianshelton@bakermckenzie.com


Appearing remotely:

JOHN CRESS (Plaintiff)

VIDEOGRAPHER:

          Simon Rutson

true.  So I would answer that in the affirmative.

Q.   So you have no reason to believe that that's not true; right?

A.   Right.

Q.   Okay.

Do you know who placed the retention policy on your emails?

A.   I do not specifically.  I understand that in the Google operating systems there is super admins.  This would normally be people at Infosec that can access the settings of the Google suite of services.  So -- but I do not have a particular name for you.

Q.   Okay.

So you didn't personally go into Google and set this retention policy; is that right?

A.   I did not.

Q.   Okay.

Did you direct somebody to implement this retention policy?

A.   I don't recall having done that.

Q.   So you can't say one way or the other?

A.   Unless I'm entirely mistaken, I have not ordered anyone to do that.

Q.   Do you know if Mr. Kanchev ordered anybody to do that?

A.    I --

MR. SHELTON:   Objection, calls for speculation.

A.    -- I cannot know that.

BY MR. TAYLOR-COPELAND:

Q.    Sorry, could you repeat that?

A.    I cannot know that.

Q.    So does Nexo know whether Mr. Kanchev ordered the implementation of this 30-day retention policy?

A.    I cannot confirm that with certainty.

Q.    You don't know one way or the other?

A.    I do not know one way or the other.

Q.    You spoke to Yassen to prepare for today?

A.    I spoke to Yassen on a particular topic.

Q.    Did you ask Yassen whether Mr. Kanchev asked him to implement a retention policy?

A.    I have not.

Q.    So is it fair to say the only people who would know whether Mr. Kanchev asked Yassen to implement the retention policy would be Mr. Kanchev and Yassen?

A.    I'm not sure that is an accurate statement. Because that presupposes that it is Yassen who made the changes.  I am not certain whether he was the only one with access to the settings of the Google services on December 2022.

Q.   Fair enough.

So then to know whether Mr. Kanchev had directed somebody to implement these retention policy changes, we would need to ask Mr. Kanchev; correct?

A.   Or -- that would be one way.  The other way would be to try to ascertain who had access to the setting switches of the Google services.  Speak to them. Or, I don't know if there is a record of -- of change of policies and then we could know who exactly it is and we could ask them who directed them.  If that makes sense.

Q.   Do you know who had super admin status in December of 2022 on Nexo's Google Workspace?

A.   I do not know who had super admin access on December 2022.

Q.   And you definitely didn't instruct anybody to implement this retention policy in December of 2022?

A.   Again, if -- unless I am entirely off, I don't think I did.

Q.   At some point did you notice that emails more than 30 days old were no longer available in your inbox?

A.   I do not recall being unable to find past emails that I needed under that or any other retention policy.

Q.   My question was a little bit different.

Did you at some point notice that emails more

Gmail.

Q.   Okay.   Do you have your phone with you?

A.   Not my working phone.   I have my personal phone.

Q.   Are you able to access -- in preparing for today did you check if you are able to access emails more than 30 days old?

A.   I have not.

Q.   Did you speak to Mr. Kanchev at all in preparing for today?

A.   No.

Q.   So you don't have any idea whether he's able to access emails more than 30 days old?

A.   I have not.

Q.   Did this retention policy impact sent emails?

MR. SHELTON:   Objection, calls for an expert opinion.

A.   I don't know.

BY MR. TAYLOR-COPELAND:

Q.   Did it include archived emails?

MR. SHELTON:   Same objection.

A.   Same answer by me, I do not know.

BY MR. TAYLOR-COPELAND:

Q.   When Nexo implemented this policy was it aware it would result in the permanent deletion of emails

around Mr. Metodiev's email.

BY MR. TAYLOR-COPELAND:

Q.   Did you or Mr. Kanchev analyze Nexo's preservation obligations with respect to any litigation or investigation before implementing the 30-day retention policy?

MR. SHELTON:  Objection, vague, and I object on privileged grounds.  So I'll instruct you not to answer any discussions you had with -- to your attorneys about preservation obligations in connection with litigation.  But you can answer if those discussions involved discussions not with counsel.

A.   Well, I think the thinking at the time was that me and Mr. Kanchev not being customer-facing, not interacting with -- with clients, would have little to no relevant documents and communication on our email servers, on our email inboxes.  So -- because we had already seen a few complaints and demands, and they tended to cluster around execution, communications with account managers, customer support, so those were the important custo -- custodians of information and documents in our mind.

And that is also the reason why exclusively our inboxes had a specific retention policy, while for the rest of the employees I think we were sticking to

the indefinite retention setting then and now.

BY MR. TAYLOR-COPELAND:

Q.   Did either you or Mr. Kanchev consult outside counsel regarding the implementation of the 30-day retention policy before implementing the policy?

MR. SHELTON:  Mr. Trenchev, I'm gonna object on privileged grounds.  I don't want you to disclose the substance of any communications you had with counsel regarding the retention policies.  If you can answer, otherwise you can.

A.   I don't think I can answer otherwise.

BY MR. TAYLOR-COPELAND:

Q.   So my question isn't what the communications were, my question is whether or not you consulted outside counsel regarding the implementation of the policy before implementing the policy, either yes or no. I don't believe that's privileged.

A.   Well, I -- I have a hard time reconciling his objection, and the instruction he just gave me with answering the question even as you just rephrased it. I think it still would go in that territory.

MR. TAYLOR-COPELAND:  Are you instructing him not to answer that question?

MR. SHELTON:  Yes.

BY MR. TAYLOR-COPELAND:

snapshots do not exist."

Nexo's response is:

"Subject to and without waiving the foregoing objections, including the General Objections, Nexo has no documents to produce in response to this Request."

My question is whether you are aware of any documents or communications regarding efforts to recover, restore or retrieve deleted emails, Slack messages or other data from yourself or Mr. Kanchev?

A.   I have not.

Q.   Okay.

You can set that to the side then.

I am going to introduce exhibit 106, which is a spreadsheet which I'll put up here, and so you can let me know how to get it to you later.

(Exhibit 106 marked for identification)

Q.   My first question is whether you have seen this spreadsheet before?

A.   I have not.

Q.   Are you familiar with Google Vault and its function within Nexo's Google Workspace environment?

A.   I am not.

Q.   What is Yassen's full name and job title?

A.   If we're talking about Yassen Damyanov, as I answered earlier today, in the early days of -- is

A.   I do not know what the organization unit name to begin with is.  So if we could clarify it like it's just --

Q.   Did you review this document at all in preparing for today?

A.   No.

Q.   No?

A.   No.

Q.   And you didn't speak with Yassen at all in preparing for today?

A.   Sorry?

Q.   You didn't speak with Yassen at all in preparing for today?

MR. SHELTON:   Objection, misstates testimony.

A.   I've told you that I've spoken to him.

BY MR. TAYLOR-COPELAND:

Q.   Did you discuss this spreadsheet with him?

A.   We did not.

Q.   Do you know what the MNGRET organizational unit name is?

A.   I mean, I know -- to answer your previous question -- I know what Buenbit is.  I'm just not sure what organization -- like what's the definition of organizational unit means.

Q.   What is Buenbit?

A.    It's an exchange in Argentina.

Q.    Does Nexo own that exchange?

A.    We acquired it this year or late last.

Q.    Okay.

And do you know what MNGRET refers to?

A.    I do not.

Q.    Do you know what MNG refers to?

A.    Isn't that the same -- ah, all right, I'm seeing -- no.

Q.    Okay.

Are you able to see these entries on 2020-07-03?

A.    I see that date.

Q.    And you see it says "Period Indefinite"?

A.    Yes.

Q.    And that corresponds with your recollection of the default retention period in Nexo's Google Workspace, right?

A.    I don't know what anything on this spreadsheet means.  I don't know that this means a retention policy of anything.  I just don't know.

Q.    You see this entry here, 2022-12-04.  It says: 30 days apply only to deleted objects type false.  And then identifying: Kosta@NexoBank, Antoni@NexoBank, Antoni@Nexo.io, Kosta@Nexo.io.

Do you have any understanding of what that means?

A.    Presumably this is somehow related to 30-day policy, but like apart from that this is a spreadsheet with prompts that looks technical to me and I don't pretend to understand it.

MR. SHELTON:  Okay.  I am just gonna put on the record that it's our view that Mr. Trenchev has not been properly prepared to testify regarding the 30(b)(6) topics around retention policies and spoliation.

MR. TAYLOR-COPELAND:  Okay, so I'll respond on the record that he has been properly prepared and has testified as to this precise retention policy already.

Can we go off the record for a minute?

THE VIDEOGRAPHER:  Going off the record at 5:37.

(5:37 p.m.)

(Break taken.)

(5:49 p.m.)

THE VIDEOGRAPHER:  This the beginning of media 5, back on the record, 5:49.

BY MR. TAYLOR-COPELAND:

Q.    Mr. Trenchev, do you see in row 40, column H, it says: terms from Kosta@NexoBank.com?

A.    I see that.

email.  I certainly have seen that email address.

BY MR. TAYLOR-COPELAND:

Q.   And above it, in row 438, column H, is Antoni@trenchev.com; do you see that?

A.   I do.

Q.   Is that your personal email address?

A.   Yes.

Q.   Do you have a similar retention policy for your personal email address?

A.   I generally do not tend to use email a lot so I do not know what my current retention policy on my personal email is.

Q.   Did you search this Antoni@trenchev.com email address as part of this case?

A.   I don't believe I did because that's my personal email.

Q.   Okay.

Do you know who implemented the changes in Nexo's retention policy to reference you and Mr. Kanchev's personal email addresses?

A.   I don't know.

Q.   Was it you?

A.   It was not me.

Q.   Was it Mr. Kanchev?

A.   I don't know.

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 2, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## ANTONI ANTONIEV TRENCHEV - VOL. II

## CONFIDENTIAL



Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - -
IN THE MATTER OF:

JOHN CRESS,

                              Plaintiff,
NEXO CAPITAL INC.
                              Defendant.
- - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME II

Thursday, April 2, 2026

AT:  9:01 a.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

A P P E A R A N C E S

Appearing for the Plaintiff John Cress:

       JAMES TAYLOR-COPELAND (in person)
       MAX AMBROSE (remotely)
       TAYLOR-COPELAND LAW
       501 W. Broadway, Suite 800
       San Diego, CA 92101
       Tel: (619) 734-8770
       james@taylorcopelandlaw.com


Appearing for the Defendant Nexo Capital and the witness:

       IAN S. SHELTON (in person)
       KIRSTEN DOOLEY (in person)
       BAKER & MCKENZIE LLP
       10250 Constellation Boulevard, Suite 1850
       Los Angeles, CA 90067
       Tel: (310) 299-8535
       ianshelton@bakermckenzie.com


Appearing remotely:

JOHN CRESS (Plaintiff)

VIDEOGRAPHER:

       Simon Rutson

ANTONI ANTONIEV TRENCHEV - VOL. II                    JOB NO. 2496606
APRIL 02, 2026                    CONFIDENTIAL

Q.   Okay.

MR. SHELTON:  James, we've been going about an hour.  When you're ready for a break.

MR. TAYLOR-COPELAND:  That's fine.  We can take one now.

THE VIDEOGRAPHER:  Going off the record at 10.02.  End of media 1.

(10:02 a.m.)

(Break taken.)

(10:16 a.m.)

THE VIDEOGRAPHER:  This the beginning of media 2.  Back on the record, 10.21.

BY MR. TAYLOR-COPELAND:

Q.   Mr. Trenchev could you please take a look at exhibit 110 which is the org chart in front of you.

A.   Yes.

Q.   Were you ever a manager of NDSEOOD?

A.   I was a director at the company at some time.

Q.   When did you cease being a director of NDS EOOD?

A.   At some point in 22.

Q.   And was Mr. Kosta Kanchev also a manager or director of NDSEOOD at some point in time?

A.   He was.

Q.   When did he stop being a manager or director

of NDS EOOD?

A.   Around the same time as me.

Q.   At some point in time did Nexo Inc. ever own Nexo Financial LLC?

MR. SHELTON:  Objection, vague.

A.   No.

BY MR. TAYLOR-COPELAND:

Q.   In 2018 did the Nexo Token pay dividends to holders?

MR. SHELTON:  Objection, vague.  Calls for a legal opinion.

A.   I do not recall whether that was the case in 2018.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo advertise in 2018 that the Nexo Token would pay dividends to token holders?

A.   What do we understand under "advertise"?

Q.   As part of marketing its token sale, did Nexo Token -- did Nexo state that the Nexo Token would pay dividends to token holders?

A.   Well, there was a white paper document which had many versions.  I don't exclude the possibility of mentioning that in some materials.

Q.   And at some point did Nexo in fact distribute dividends to Nexo Token holders?

services.

So to which of the two is your question?

BY MR. TAYLOR-COPELAND:

Q.   That's fair enough.  Right now I'm talking about the retail exchange.  Was there a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange?

A.   I don't know.

Q.   You don't know?

A.   I don't know.

Q.   Are you 100 percent sure about that?

A.   I don't know.

Q.   Who would know?

A.   I couldn't give you a name of a person who would know for sure right now.

Q.   So you're Nexo's corporate representative on this topic; right?

A.   I'm not sure that's a topic.  You were asking me about functionality of the Nexo retail exchange.  Am I a designated corporate representative for Nexo retail exchange?

MR. SHELTON:  So he'll give you a document if he wants to ask you a question.

BY MR. TAYLOR-COPELAND:

Q.   So you're the designated corporate

representative on topic 315, which is Nexo's sale of the Nexo Token on exchanges, and topic 316, which is Nexo's sale of the Nexo Token to U.S. persons.  And so --

A.    Okay.

Q.    -- I'll repeat my question, which is whether there was a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange?

A.    There was a period of time when the Nexo Token was sold to accredited investors.

Q.    On the retail exchange?

A.    I cannot confirm whether that flow was through the retail exchange or the OTC service.

Q.    Okay.  So let's set aside accreditation for a second.

A.    Okay.

Q.    Was there a period of time during which the Nexo Token was available to U.S. purchasers on Nexo's retail exchange?

A.    I don't remember.

Q.    Did you do anything to try to determine that in preparing for today?

A.    I did some preparation with regards to the Nexo Token and its sales to American, U.S. customers. However, the exact flow, whether it went through the retail exchange or the OTC desk, is something that I do

us to not sell to accredited investors.  That we have been diligently trying to execute on that policy and I have no reason to believe that Nexo has directly sold the Nexo Token to unaccredited investors via any of its platforms and functionalities.

Q.   Okay.  And that's always been Nexo's policy?

A.   That has always been Nexo's policy.

Q.   Okay.

And you aren't personally aware of Nexo making any sales on its exchange to unaccredited U.S. investors?

A.   I am unaware of such activity, no.

Q.   Okay.  Would Mr. Kanchev be aware of any such activity?

MR. SHELTON:  Objection, calls for speculation.

A.   I could not comment on behalf of Mr. Kanchev.

BY MR. TAYLOR-COPELAND:

Q.   In preparing for today did you review any records of transactions on Nexo's retail exchange?

A.   There are a lot of documents, a lot of spreadsheets, I ... I don't know whether any of those were specifically transaction histories.

Q.   Okay.  I am just gonna put on the record that we don't believe that Mr. Trenchev has been properly

                    Do you see that?

          A.    I do.

          Q.    And that's not true; right?

                MR. SHELTON:  Objection, argumentative,
    misstates testimony and document.

          A.    What do you believe to not be true?
    BY MR. TAYLOR-COPELAND:

          Q.    So this says the token sale was a private sale
    from a limited number of non-U.S. accredited investors,
    right?

          A.    There was a limited number of non-U.S.
    accredited investors.  That part is correct for sure.

          Q.    And there were also U.S. accredited investors;
    right?

          A.    There were five out of 129 investors that were
    from the U.S.

          Q.    Okay.  And do you know why Nexo is concealing
    that information from Coinbase in the submission?

                MR. SHELTON:  Objection, argumentative,
    misstates document and misstates testimony.

          A.    I object to the term "concealing".  We're not
    concealing anything from anyone.
    BY MR. TAYLOR-COPELAND:

          Q.    But you are saying here that the token sale
    involved non-U.S. accredited investors; right?

A.    The token sale involved 124 out of 129 non-U.S. accredited investors.

Q.    Well, why doesn't Nexo say that here?

MR. SHELTON:  I'm gonna object on vagueness grounds as to this term non-U.S. accredited investors and what that means.

A.    I too am struggling with the definition of that and wish whoever wrote it used clearer language for our benefit of the discussion here.

BY MR. TAYLOR-COPELAND:

Q.    So this is signed by Mr. Kanchev, correct?

A.    Yes.

Q.    So do you think we need to talk to Mr. Kanchev to found out what non-U.S. accredited investors means here?

A.    I'm not sure that I am qualified to opine on that matter.

Q.    Okay.

But you don't understand what non-U.S. accredited investors means in this context; right?

MR. SHELTON:  Objection, misstates testimony.

A.    I said that perhaps a clearer term could have been used.  This being early days of a start-up, and some eight years ago, I cannot be entirely sure what his intention was.

Nexo Tokens on any decentralized exchange?

A.   I don't know.

Q.   Do you know if Nexo has sold Nexo Tokens on any decentralized exchange?

A.   I do not.

Q.   About how many Nexo Tokens have you sold personally?

A.   I have not sold Nexo Tokens personally.

Q.   You've never sold any Nexo Tokens?

A.   I have never sold Nexo Tokens personally.

Q.   Not a single one?

A.   No.

Q.   Do you know if Mr. Kanchev has sold any Nexo Tokens?

MR. SHELTON:  Objection, calls for speculation.

A.   I can't answer that.  I don't know.

BY MR. TAYLOR-COPELAND:

Q.   Do you own any holding companies which hold own Nexo Tokens on your behalf?

MR. SHELTON:  Objection, vague.

A.   Sorry, please repeat the question.

Q.   Yes.  Has anyone, either person or company, sold Nexo Tokens on your behalf?

MR. SHELTON:  Objection, vague.

So again, there were some U.S. investors in the sale; correct?

A.   Correct.

Q.   Otherwise, is that statement accurate.

A.   Well, given where the comma is, 130 accredited, I think that could encompass U.S. investors and then it lists on non-U.S. investors, which is another subset, I'm comfortable that it's an accurate sentence.

Q.   Okay.

And then there's another paragraph that starts with "For the avoidance of price risk".  Is that paragraph accurate?

MR. SHELTON:  Objection, that's a very long paragraph.  That's compound and vague.  I mean, if you could break it up, James.

BY MR. TAYLOR-COPELAND:

Q.   Okay.

So is it true that after the pre-sale Nexo transferred all the Bitcoin and Ethereum proceeds to Zenga Limited?

A.   If not all then a very -- a very large portion of them.

Q.   Okay, and Zenga Limited is owned by Mr. Kanchev?

A.   Correct.

Q.   And then Zenga sold the Bitcoin and Ethereum that had been transferred to it by Nexo?

A.   It sold it for fiat currencies.

Q.   Then did Zenga transfer the proceeds back to Nexo?

A.   It did.

Q.   Did it transfer all of the proceeds back to Nexo?

A.   Yes.

Q.   You can set that document aside.

(Exhibit 121 marked for identification)

A.   Thank you.

Q.   Okay, this is a Slack chat titled "Support"; right?

A.   That is -- sorry, where are we reading?

Q.   At the very top left do you see it says "Support"?

A.   Correct.

Q.   And if you turn to page 247645.

A.   Okay.

Q.   There is some messages from Nikola, and then a response from you, correct?  You are antoni@nexo.io?

A.   I am.

Q.   And who is Nikola?