# Exhibit G

# Exhibit G

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JOHN CRESS,

        Plaintiff,

  v.                     No. 3:23-CV-00882-TSH

NEXO CAPITAL, INC.,

        Defendant.

C O N F I D E N T I A L

VIDEO DEPOSITION OF JOHN CRESS

FRIDAY, APRIL 10, 2026

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

                California CSR No. 8841

Page 1

CONFIDENTIAL

FRIDAY, APRIL 10, 2026; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:05 a.m. on April 10th, 2026.

Please note that microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time.

(Telephone interruption.)

THE VIDEOGRAPHER: Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media number 1 of the video-recorded deposition of John Cress, taken by counsel for defendant in the matter of John Cress versus Nexo Capital Incorporated, filed in the United States District Court, Northern District of California; case number 3:23-cv-00882-TSH.

The location of this deposition is 101 California Street, Suite 4100, San Francisco, California, and on Zoom videoconference.

My name is Peter Yaroschuk, representing Veritext. I am the videographer. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding,

Page 10

please state them at the time of your appearance.

Counsel and all present, including remotely, please now state your appearances and affiliations for the record, beginning with the noticing attorney.

MR. RAWLINSON: Matthew Rawlinson, Kirsten Dooley, Ian Shelton, for Baker McKenzie, representing Nexo Capital Inc.

MR. TAYLOR-COPELAND: James Taylor-Copeland and Max Ambrose, from Taylor-Copeland Law P.C., representing John Cress.

THE VIDEOGRAPHER: Counsel online.

MR. RAWLINSON: I'll enter their appearance.

I know we have Adrienne Harreveld, who's with Baker McKenzie, and Georgi Zagorski, who is in-house counsel for Nexo Capital Inc.

THE VIDEOGRAPHER: Thank you.

Would the court reporter please introduce yourself, administer the oath to the witness, and then counsel may proceed.

THE STENOGRAPHIC REPORTER: Good morning.

My name is Marilynn Hoover. I am a California certified shorthand reporter and my license number is 8841. Thank you.

Page 11

JOHN CRESS, called as a witness, being duly sworn on oath, was examined and did testify as follows:

EXAMINATION

BY MR. RAWLINSON:

Q. Good morning, Mr. Cress. Could you state your full name for the record, please.

A. John Cress.

Q. Do you have a middle name?

A. I do.

Q. What is it?

A. Thomas.

Q. Okay. What's your address?

A. 1550 Jackson Street, No. 5, San Francisco, California 94109.

Q. Okay. And you had a little trouble there at the beginning, but you understand that you're under oath today; correct?

A. Yes. I didn't have any trouble, though.

Q. Okay. Just making sure we're all on the same page.

The court reporter gave us some instructions beforehand. We'll try not to talk over each other, which she will greatly appreciate.

Can we have an agreement that I'll ask you

Page 12

questions today, and I'll assume, if you answer, you understood the question?

A. Yes.

Q. Okay. And if you need me, at any point today -- I guarantee you I will ask you a bad question or an offhand question, and if you need me to rephrase or restate, please ask me to do so.

A. (Nods head.)

Q. Good?

A. Yeah.

Q. Okay. And if at any point today you need to take a break, get some water or anything else, just let us know. We'll be happy to take as many breaks as needed, as long as there's not a question pending. The only thing I ask is, if I've asked you a question, then I will --

A. Answer it first, before the break.

Q. See, you just broke the first rule, so...

A. Ah.

Q. It's difficult. I get it.

If you could for me, could you briefly summarize your educational background.

A. Sure. I -- Starting with, say, high school?

Q. If you'd like, high school or college.

A. Sure. I graduated high school from Placer

Page 13

4 (Pages 10 - 13)

CONFIDENTIAL

High School in Auburn in 1989. And then I attended four years at UC Davis and graduated in December of 1993.

Q. Any further education, master's degrees or anything else?

A. No.

Q. Any other certifications or anything else issued by a university or an accreditation institute?

A. No. Just little like sales certifications, you know, within the industry, that aren't...

Q. And what was your undergraduate degree in?

A. It was called organizational studies.

Q. What's that mean?

A. It's -- They have -- Under sociology, there's a "law in society," which is more like a pre-law, and then organizational studies was a quasi-business degree. It was kind of interdisciplinary pulling from different majors.

Q. Okay. Where did you go to work after you graduated college?

A. Oracle.

Q. Okay. What did you do for them?

A. Sales.

Q. How long were you with Oracle?

A. Five and a half years.

Page 14

Q. Okay. Did you remain in sales the whole time at Oracle?

A. Yes.

Q. Okay. What did you do after Oracle?

A. I then worked for a company for roughly three years, called AvCom Technologies.

Q. AvCom?

A. Yeah. A-V-C-O-M.

Q. Okay. In sales again?

A. Yes.

Q. Okay. For three and a half years, and then what did you do?

A. No, for three years.

Q. I'm sorry. For three years. Then what did you do?

(Reporter request.)

Q. BY MR. RAWLINSON: Sorry about that interruption.

I think my question was what you did after AvCom.

A. After that? Then I worked for a company called Mercury Interactive.

Q. What did you do for them?

A. Also sales.

Q. Okay. And these sales jobs are in the

Page 15

software industry. Is that a fair summary?

A. Oracle is software, and Mercury was a peer-to-peer software. AvCom was a variety of supplemental -- it was like Sun Microsystems' largest reseller. We sold Cisco equipment, Oracle software.

We were a reseller, so we kind of sold more along the whole application stack. We didn't sell applications, you know, like SAP or Oracle, but we sold all the way up through the database level down to networks and hardware switches. So it was a lot of different technologies that we supplied.

Q. Okay. What did you do after Mercury?

A. After Mercury, I worked for Apple.

Q. Okay. What did you do for Apple?

A. I did sales.

Q. Software?

A. Yeah. Um-hum. I went and sold to the mega churches in Texas, like Lakewood Church and Second Baptist Church.

Q. Okay.

A. That's a nice place, if you go into Second Baptist Church. It's pretty amazing inside.

Q. Been there. You know I'm from Houston, so yeah.

A. That's why I said that.

Page 16

Q. Interesting.

A. Have you been inside that church?

Q. I have. I have, yes, sir. Very pretty.

A. Pretty -- Pretty awesome.

Q. I haven't been inside Lakewood, but definitely Second Baptist.

A. Yeah, Lakewood's just an arena, so...

Q. I've been there for the Rockets games.

A. Watch a basketball game and you don't need to go.

Q. Understood. What did you do after Apple?

A. After Apple, I worked for a company called Splunk.

Q. What is Splunk?

A. Oh, let's see if I can remember my elevator pitch. It's been a little while.

But it's the same way Oracle stores structured data, like columns, like a spreadsheet, and Google indexes and searches human-generated data, not structured data, Splunk searches machine data, which is like lock machine like log files that comes off of all those -- all the equipment I mentioned at AvCom generates log files. And you can make it structured. It searches a priori, but then it finds key value pairs like "key, first name; value, John." And then

Page 17

5 (Pages 14 - 17)

CONFIDENTIAL

-- And then it makes it searchable for many use cases, for example, troubleshooting, security investigations and forensics, web analytics; but I'd say the most was just keeping the systems.

And then it -- And then you can rerun searches to run every couple seconds for monitoring typical things that happen. So it's for troubleshooting but it's also for real-time monitoring. So that data operations is probably the biggest, but the analytics -- and of course now they're doing a lot of machine learning and AI. I haven't been there for a while, but they -- they got acquired by Cisco.

Q. Okay. That's what I was going to ask.

When did you start at Splunk?

A. I started January -- I think we had the day off -- the 2nd or 3rd, of 2008, but I don't want to be too exact. It could have been the 1st, 2nd, or 3rd, but the very beginning of January 2008.

Q. And you worked there until when?

A. Also January, roughly around the 20th was my like official, I mean, departure date, of 2020. So I was there 12 years.

Q. And, at that point, did you retire to focus on your cryptocurrency trading?

Page 18

MR. TAYLOR-COPELAND: Objection. Vague and compound.

Q. BY MR. RAWLINSON: You can answer if you can.

A. Oh, I don't think if -- at the time, if people asked me, "Are you retired or are you doing this or doing that?" I believe I -- my most common answer at the time was, "I don't know. I'm just not working. I no longer work at Splunk," so...

Q. Did you take another job in 2020?

A. No. No. I mostly stayed home, because I believe COVID was hitting the very next month.

Q. Why did you leave Splunk?

A. Similar reasons for why I left other companies, I suppose. There's very few people who worked at Splunk for 12 years, for one thing; so I guess it had kind of run its course, I guess you could say, generically, you know.

Q. Did you leave voluntarily, or were you asked to leave?

A. I left voluntarily.

Q. Okay. And you did not take another job at that time; correct?

A. That's correct.

Q. Okay. When did you next take a job?

Page 19

A. I did not.

Q. Are you -- Do you currently have a job?

A. No.

Q. So you -- I'm not -- I'm going to try to phrase this properly.

I'm not calling you unemployed. I'm just asking: You haven't had an employer since January of 2020; is that true?

A. That is true.

Q. Okay. How have you managed to live and pay your bills without a job?

A. Just through my savings.

Q. Your savings. What -- What savings do you mean?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Money. You know, you need money to live, so my money.

Q. BY MR. RAWLINSON: Okay. What's your net worth today?

A. I don't know. It'd take me a while to pencil it all out.

Q. Give me a ballpark.

A. It's somewhere between $500,000 and $2 million.

Q. And you said you obviously need money.

Page 20

What are the sources of your money that you live off today?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Prior savings.

Q. BY MR. RAWLINSON: Tell me, what does "prior savings" mean? Money you have saved up in a savings account?

A. Yeah, money saved up like that, or any type of asset that can be liquidated, you know. Like I don't live off my -- you know, my house, unless I decide to rent it out. But, yeah.

Q. Okay. When did you first start investing in crypto?

A. The very first time was April of 2014.

Q. What did you buy?

A. I bought Bitcoin.

Q. Why?

A. Because it's -- Because I wanted to.

Q. You're a fairly experienced crypto investor, would you say?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Yeah, that -- I -- you'd have to -- we'd have to put a big spectrum up on the board and put me somewhere on the spectrum.

I wouldn't say that I'm -- you know, there's

Page 21

6 (Pages 18 - 21)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

people who are very good at it, that I would read what they say. Yeah.

Q. BY MR. RAWLINSON: You were good enough at it that you quit your job in January 2020; correct?

MR. TAYLOR-COPELAND: Objection. Misstates testimony.

THE WITNESS: When I quit my job, Bitcoin, if you look at the price in January of 2020, it wasn't very good; it was pretty -- pretty bad. So I wouldn't say I was banking on my Bitcoin at that time.

Q. BY MR. RAWLINSON: Well, how much Bitcoin did you originally buy in April of 2014?

A. 300 Bitcoin.

Q. 300?

A. Um-hum.

Q. Okay. Did you buy anything else in April of 2014?

A. Excuse me. I can't recall what all -- what else I did in that month of my life. Like I probably bought groceries. Like I -- I don't -- I don't know what else I -- my total receipts are from April of 2014.

Q. Where did the -- Where did the money come from to buy your original Bitcoin?

A. It came from my savings.

Page 22

Q. Okay. Had you received some big bonus or something at work that you used to invest in Bitcoin, or how did you get started?

A. I don't recall my bonuses around then. I don't -- I don't recall what bonuses I was receiving.

Q. I'm just trying to remember if there was some big start to your Bitcoin investment, or where those original funds came from.

A. You're trying to remember?

Q. I'm trying to ask you if you remember.

A. Oh. Right, right. So it was my -- my total assets is what were used to purchase those Bitcoin.

Q. So, prior to 2021, what crypto did you own, if you recall?

A. I owned -- Prior to 2021, I owned Bitcoin -- Well, that's -- that's -- you have to tell me when. You have to be more -- I -- I -- Like I first bought Bitcoin, and I don't remember what I bought and when, after that, you know. You have to give me like a -- That's -- That's a -- That's a broad question that I don't know.

Q. Yeah. I'm trying to find out -- maybe we can tie it to when you -- when you quit your job at Splunk, what crypto assets you had.

A. I don't have a snapshot of that in my mind.

Page 23

Q. You owned Bitcoin; correct?

A. That's correct.

Q. You owned ETH, E-T-H?

A. I did.

Q. Okay. Do you recall owning any other crypto products when you -- when you left your job at Splunk?

A. I believe I did.

Q. What else?

A. I can't -- I can't recall it specifically.

Q. Okay. When you -- When you quit your job in 2020, would you spend your time tracking your crypto investments?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I spent my time traveling to a friend's house, because it was COVID, and I would mostly -- you know, or my parents' house, and just try to kind of quarantine, you know, maybe get outside a little bit.

I -- I looked at crypto, but I spent my time in many different ways, probably typical to what most people did during -- during COVID. A slightly larger percentage was at home, but I did my typical like watching the news and like watching whatever sports -- although the sports were kind of limited, at that time, because of COVID.

Page 24

So I can't recall exactly how I spent my time, you know. It was kind of a miscellaneous thing, and it was how many years ago? You said 2020. That's six years ago.

So, yeah, it's -- I hope that's a fair answer of how I spent my time.

Q. The 300 Bitcoin you said you bought in 2014, did you hold that until 2021?

A. I, at the very -- at the market peak or close to the market peak in 2017, I sold 50 Bitcoins. So, then, from December -- I want to say it was December 31st of 2017, from that day forward, I had 250 Bitcoins.

Q. Okay. Where did you hold or store that 250 Bitcoin?

A. That Bitcoin was on Coinbase.

Q. What is Coinbase --

A. What is --

Q. -- for us that don't know?

A. Coinbase is where I linked my Wells Fargo account and transferred my funds automatically -- or not automatically, but through an integration, probably Plaid, and moved my funds from Wells Fargo to Coinbase. Then, at that point, I was able to convert my money to Bitcoin and purchase Bitcoin there --

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL

excuse me -- and that's where the Bitcoin was held.

Q.   All right.  So Coinbase is a cryptocurrency trading platform?

A.   Coinbase is what allowed me to do what I just explained.

Q.   Could you also buy and sell cryptocurrencies on Coinbase?

MR. TAYLOR-COPELAND:  Objection.  Vague.  Vague as to time.

THE WITNESS:  When I first put my Bitcoin on Coinbase, I believe they only allowed you to buy Bitcoin.

Q.   BY MR. RAWLINSON:  So, if I understood, you would -- your money would move from Wells Fargo to Coinbase, and then you would slowly buy or acquire Bitcoin through Coinbase.

Is that accurate?

A.   I don't know if -- Can you define the word "slowly," please.

Q.   As your money transferred from Wells Fargo to Coinbase, you would then use that to buy Bitcoin through Coinbase.  True?

A.   Yes.

Q.   And then, when you sold your 50 Bitcoin in 2017, did you do that through Coinbase?

Page 26

A.   Yes.

Q.   Was there a fee associated with your sale of 50 Bitcoin in 2017 through Coinbase?

MR. TAYLOR-COPELAND:  Objection.  Calls for speculation.

THE WITNESS:  They -- When I sold it, they had Coinbase and something called -- I want to say it was called GDX or something like that, and then I think they later named it to Coinbase Pro.  And it had fees that they -- that they displayed on the screen:

So right before you went to do your transaction, it showed you the fee right there.  And it was a smaller fee than the Coinbase, so you just had to like -- I don't know if you had to move it over to Coinbase Pro.  I don't believe it was a separate login.  But you just sort of switched to Coinbase Pro, and I believe your assets that were on Coinbase were visible.

I don't recall exactly, but I recall that the fee was -- was better on Coinbase Pro.  I can't tell you exactly what it was, but it showed it to me right there up front on the screen.

Q.   BY MR. RAWLINSON:  So the answer to my question is:  When you sold your 50 Bitcoin through either Coinbase or Coinbase Pro, there was a fee

Page 27

associated with that sale; correct?

A.   Quoted fee before transaction, up front, displayed prominently, yes.

Q.   Yes, there was a fee?

A.   (Nods head.)

Q.   When you purchased your 250 Bitcoin, as you went on, was there a fee associated with those purchases?

MR. TAYLOR-COPELAND:  Objection.  Calls for speculation.

THE WITNESS:  There was a fee that was quoted to me prior to the transaction.

Q.   BY MR. RAWLINSON:  So each time you bought Bitcoin through -- I'll just call it Coinbase, you paid a fee.  True?

A.   I paid the fee that they displayed to me.

Q.   Each --

A.   I said "paid the fee."

Q.   Yeah.  And each time you sold Bitcoin, you paid a fee; correct?

A.   That is correct.  Yep.

Q.   Have you ever bought or sold cryptocurrency through a platform without paying a fee?

MR. TAYLOR-COPELAND:  Objection.  Calls for speculation.

Page 28

THE WITNESS:  The closest thing to that, to your question, would be Nexo.

Q.   BY MR. RAWLINSON:  Okay.  Let me leave Nexo out for right now, since you want to distinguish that.

A.   Okay.

Q.   Besides Nexo, have you ever bought or sold a cryptocurrency through a platform without paying a fee?

A.   I don't -- I don't recall.

Q.   Do you recall a time where you bought or sold cryptocurrency through a platform and did not pay a fee?

MR. TAYLOR-COPELAND:  Objection.  Asked and answered.

THE WITNESS:  I don't recall.

Q.   BY MR. RAWLINSON:  Would you agree with me that, when you use a cryptocurrency trading platform, it is common to pay a fee?

MR. TAYLOR-COPELAND:  Objection.  Calls for speculation.

THE WITNESS:  I guess that would depend.

Q.   BY MR. RAWLINSON:  Well, you don't recall not ever paying a fee.  True?

A.   That's a -- That's a nuanced question, because I believed I was not paying a fee with Nexo.

Page 29

8 (Pages 26 - 29)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

So you're -- you're wanting to talk about other platforms. I get the question.

I -- I don't recall.

Q. Do you recall ever buying or selling cryptocurrency through Coinbase and not paying a fee?

A. I don't recall.

Q. Do you believe --

A. The fees could be pretty low, so...

Q. I understand. They may be high, they may be low. I'm just asking you if you commonly pay a fee when you trade through a cryptocurrency platform.

MR. TAYLOR-COPELAND: Objection.

Q. BY MR. RAWLINSON: That's common; correct?

MR. TAYLOR-COPELAND: Objection. Vague. Calls for speculation.

THE WITNESS: It is common. I don't know -- I don't recall exactly my -- if I -- if I ever not paid a fee, if I ever did not. I don't -- I don't recall. It's possible.

Q. BY MR. RAWLINSON: I'll object to the nonresponsive portion of your answer.

What is a flash crash?

MR. TAYLOR-COPELAND: Objection. Calls for speculation.

THE WITNESS: I -- I don't have a legal

Page 30

definition of "flash crash" or whatever. It's -- It's a -- I know that it has to do with the market going down.

Q. BY MR. RAWLINSON: And I'm not asking you the legal definition. I don't even think it's a legal term. I think it's a --

A. I mean, I don't even have the Wikipedia definition for you.

Q. Okay. Do you think investing in cryptocurrency is risky?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Well, you know, that -- that is something that depends, I suppose.

Q. BY MR. RAWLINSON: Well, do you consider it a risky investment?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: That's a big, broad question that can seriously vary.

Q. BY MR. RAWLINSON: Well, you've been doing this since 2014, so I'm just wondering if you consider it to be a risky investment.

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I think it can be.

Q. BY MR. RAWLINSON: Because there can be large market fluctuations in cryptocurrency; correct?

Page 31

A. There can be.

Q. Okay. And since you've been in it since 2014, you've seen the market go up and down; correct?

A. Can you define "the market."

Q. The cryptocurrency -- Let me try again.

A. Okay.

Q. Since you've been in this since 2014, you've seen the value of various cryptocurrencies increase and decrease; correct?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Can you be more specific and name a cryptocurrency.

Q. BY MR. RAWLINSON: Okay. We'll go with Bitcoin.

Since 2014, you've seen the value of Bitcoin increase and decrease; correct?

A. That would be yes, I have seen that.

Q. And you've seen it, at times, decrease fairly quickly; correct?

A. Yes.

Q. Is that what you'd call a flash crash?

A. I -- Same answer on the flash crash. It's kind of a vague term to begin with.

Q. You've used the term "flash crash" before; right?

Page 32

A. (Nods head.)

Q. So you know what it is. So will you tell me what your definition of "flash crash" is?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: Yeah, it's -- Okay. I was just saying my understanding might not match the global definition of "flash crash."

Q. BY MR. RAWLINSON: I'm only here to ask you questions, so your understanding of flash crash.

A. Sure. I would define it as a decline in the price of an asset.

Q. A rapid decline?

A. That would include a rapid decline.

Q. So you're saying any decline in the price is a flash crash?

A. It's -- I don't have a number. I don't have a percentage number that I would be comfortable defining it.

Q. Have you seen Bitcoin, since 2014, undergo a flash crash?

A. Have I seen -- Can you repeat that question.

Q. Since 2014, have you witnessed or experienced Bitcoin undergoing a flash crash?

A. Since 2014?

Page 33

9 (Pages 30 - 33)

CONFIDENTIAL

Q.  Yes, sir.

A.  I have seen Bitcoin's price go from peaks to lows; so I've seen, you know, those -- those type of market declines.

Q.  Would you describe Bitcoin as "volatile"?

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  Can you give me a reference point for that?

Q.  BY MR. RAWLINSON:  I don't know that I can. I'm just asking if you would consider Bitcoin a volatile investment.

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  I think, in order to pin that term on Bitcoin, I would need a reference point.

Q.  BY MR. RAWLINSON:  Well, since 2014, would you describe Bitcoin as a volatile investment?

A.  I -- You have to compare it to something.

Q.  Do you think Bitcoin is more volatile than the stock market?

MR. TAYLOR-COPELAND:  Objection.  Vague as to time.

THE WITNESS:  Which stock market, please?

Q.  BY MR. RAWLINSON:  Since 2014, do you think Bitcoin is more volatile than the New York stock market exchange?

Page 34

MR. TAYLOR-COPELAND:  Objection.  Vague as to time.

THE WITNESS:  Well, since 2014, yes.

Q.  BY MR. RAWLINSON:  What is an accredited investor?

MR. TAYLOR-COPELAND:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I'm not an expert.

Q.  BY MR. RAWLINSON:  Are you an accredited investor?

MR. TAYLOR-COPELAND:  Objection.  Vague as to time.

THE WITNESS:  At certain points, I have been, yeah.

Q.  BY MR. RAWLINSON:  In 2021, were you an accredited investor?

MR. TAYLOR-COPELAND:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I believe I passed that threshold.

Q.  BY MR. RAWLINSON:  Okay.  And that meant that you had a substantial amount of assets to qualify as an accredited investor?

A.  In 2021?

Q.  Yes, sir.

Page 35

A.  Yeah, the -- I know that the accredited investor, from a high-level understanding, I believe, is that your income is over $200,000 a year or that your assets exceed $1 million.  That, again, I'm not an expert on what the process is to check or when it needs to be applied.  But in 2021, I did not have income that exceeded $200,000, but I believe I had assets that exceeded $1 million.

(Exhibit 138 marked.)

Q.  BY MR. RAWLINSON:  Okay.  And I'll hand you what we've marked Exhibit 138, which is Bates number NEXO-17263.

Do you have that in front of you, sir?

A.  I do.

Q.  Okay.  Does this two pages or three pages look like the accredited investor certificate that you provided to Nexo on March 25th, 2021?

A.  Well, you said two pages and then you said three pages.  Is it three pages?

Q.  I think so.  I think there's a little --

A.  Can I see your copy, then?  Because I don't have a three-pager.

MR. RAWLINSON:  It's -- Oh, where did the --

MR. TAYLOR-COPELAND:  Mine is just two as well.

Page 36

MR. RAWLINSON:  Okay.  Well, then, we'll go with the two-pager.  Not sure where the other page went.  We'll maybe get that later.

THE WITNESS:  Can I see your second page? Can you open your sheet up to it?

MR. RAWLINSON:  Yeah, it's just -- a two-page email, it looks like.

THE WITNESS:  No yours in front of you. That one looks different.

MR. RAWLINSON:  It is different.  I'm going to have to get a different copy.

THE WITNESS:  Can we make sure we're both looking at the same copy?

MR. RAWLINSON:  We are.

THE WITNESS:  Okay.  We are now?

MR. RAWLINSON:  We are.

THE WITNESS:  Okay.  That's good.

Q.  BY MR. RAWLINSON:  Is this where you provided your accredited investor certificate to Nexo?

A.  I don't see the attachment, but this email below says it's attached and I'm forwarding it to where Hristov and it says "I attached."  So you can't really see the attachment, but that appears to probably be what you described there.

Q.  Okay.  And at least the email says that

Page 37

10 (Pages 34 - 37)

CONFIDENTIAL

something called "verify investor" has verified that John Cress is an accredited investor; correct?

A. Where -- Where does it say that?

Q. In the email at the bottom, it says that a certain reviewer number 226, who's licensed as an attorney, has verified John Cress as an accredited investor. True?

A. Yes. I -- I'm reading that here.

Q. Okay. So, at that point in time, you had over a million dollars in assets?

A. I would assume that that is correct.

Q. Did you advise other people on their cryptocurrency investments?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I told people about Bitcoin, shared my enthusiasm.

Q. BY MR. RAWLINSON: What about other cryptocurrencies?

A. I -- I don't recall.

Q. Did you --

A. I was a real --

Q. Go ahead. Sorry.

A. I was a real Bitcoin enthusiast.

Q. Did you ever get paid or receive compensation to market or promote any

Page 38

cryptocurrencies?

A. I don't recall.

Q. You don't recall one way or the other whether you received compensation to market or promote cryptocurrencies?

A. I mean, no, I did not.

Q. You never received any compensation for promoting new coins that were coming on the market?

MR. TAYLOR-COPELAND: Objection. Vague as to "compensation" and "promotion."

THE WITNESS: Yeah, no, that's not what I did.

Q. BY MR. RAWLINSON: So I'm -- it seems like there's something you did with promoting new coins.

Did you have some role or job --

A. No.

Q. -- promoting new cryptocurrencies?

A. No.

Q. Hex? Did you have a role or job promoting Hex?

A. Can you be more specific?

Q. I'm trying to find out: Did you receive any benefit from encouraging others to buy Hex?

A. Hex?

MR. TAYLOR-COPELAND: Objection. Vague as

Page 39

to "benefit."

THE WITNESS: You know, maybe some -- if someone made money, they bought me a drink or something. I don't know. No, I didn't -- I didn't --

Q. BY MR. RAWLINSON: You were -- You were not a paid promoter of any cryptocurrency?

A. That's right, yeah. And some cryptos have like referral things. It's usually not the crypto itself, but it will be like the exchange. Like I remember there was an exchange, a new one, called BuyBit, and people would say, "Go to BuyBit, and here's my referral link," and then they would like earn -- just like any -- you know, Uber used to give out free rides: If you invited a friend and they took the first ride, you each got a $20 credit.

So that's the only thing I'm familiar with, but I never -- I never received any -- anything like that.

Q. Okay. Did you advise any family members to buy cryptocurrencies?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Can you define what you mean by "advised"?

Q. BY MR. RAWLINSON: Advise, encourage.

MR. TAYLOR-COPELAND: Objection. Vague and

Page 40

compound.

THE WITNESS: I always shared my enthusiasm for Bitcoin, and so that could be -- you could put that in the category of "maybe you should too," you know; but I was nobody's adviser, you know.

Q. BY MR. RAWLINSON: Your -- Your mother had over 20 Bitcoin; correct?

A. My mother?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: Well --

MR. TAYLOR-COPELAND: And calls for speculation.

THE WITNESS: Yeah, I would have to talk to my mother.

Q. BY MR. RAWLINSON: Did you help your mother acquire Bitcoin?

A. My mother, I believe, acquired 22 Bitcoins, also in 2014, probably May or June.

Q. Okay. Beyond your crypto accounts, have you ever had an investment account, a traditional investment account, that held stocks?

A. Yes.

Q. Who with? What company?

A. Well, like brokerage company?

Page 41

11 (Pages 38 - 41)

CONFIDENTIAL

Q. Yeah.

A. When I was maybe in high school or college or just starting off at Oracle, my -- I had a little account with Dean Witter, which became Morgan Stanley Dean Witter, which is now just called Morgan Stanley.

And then when I worked at Oracle, I think we had a 401(k) program through Fidelity, and then another ESPP -- Do you know what an ESPP is? Employee stock purchase plan -- account with -- I forget what it was called at the time, but it was essentially this -- it is now also Morgan Stanley.

So the first Morgan Stanley was in the Sacramento office, and the second one that Oracle opened up is in the Sand Hill Road, Menlo Park office.

And then they would like announce that we have a new provider now. Right? And so I think that's how I originally got an eTrade account, right, like they switched. But then you just have these accounts. They don't close your account; they just move funds, and then you still have this account over here. And maybe even the assets didn't move; they just started and opened up a new one.

And then it might have been with Splunk where I started -- where they used Charles Schwab. So I forget how I started with Charles Schwab, but it

Page 42

might have been through Splunk.

And that is about all the ones, the traditional ones, that I can recall, sitting here today.

Q. So, through these various accounts that you described, you've -- you've bought and sold stocks over the years. True?

A. Yes.

Q. And when you bought and sold stocks, do you recall paying a brokerage fee or commission in doing so?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I don't recall. A lot of the platforms, like eTrade and Schwab, have really moved towards like almost no fees. So I don't know if it's totally fee-free, you know; but that's a race to the bottom, those -- those exchanges. They make money other ways, and it's just been a race to the bottom when it comes to fees. That's how they compete with each other, is like low to no fees.

Q. BY MR. RAWLINSON: They -- They charge some fee and then make it some other way; right?

A. I assume.

MR. TAYLOR-COPELAND: Objection. Misstates testimony.

Page 43

THE WITNESS: Yeah, I don't -- I don't -- I don't know. All I know is I don't recall if I always paid a fee, because, when I think of those things, those type of exchanges -- I think they even might have called them, at some point, discount brokers or discount exchanges or -- you know, where their fees just plummeted.

It's possible they had no fees. It's possible. The fee became negligible. Let's put it that way.

Q. BY MR. RAWLINSON: Have you ever bought stocks on margin?

MR. TAYLOR-COPELAND: Objection. Vague as to time. And to the extent the question relates to anything after June of 2021, I'm going to instruct you not to answer on privacy grounds, but you can answer for anything beforehand.

THE WITNESS: I don't recall if I did that.

MR. RAWLINSON: What are privacy grounds?

MR. TAYLOR-COPELAND: He has a constitutional right to privacy in California, and the judge has already ruled that none of this stuff is relevant.

So we're giving you a lot of leeway in asking these questions, but his financial transactions

Page 44

after the events in question have no relevance --

MR. RAWLINSON: I didn't ask anything specific --

MR. TAYLOR-COPELAND: -- his right to privacy.

MR. RAWLINSON: -- except has he engaged in margin transactions. I think that's fair -- fair game.

MR. TAYLOR-COPELAND: And before 2021, you can answer the question.

THE WITNESS: I just -- I don't re -- I don't recall.

Q. BY MR. RAWLINSON: You don't recall, sitting here today, whether or not you ever engaged in a margin transaction before 2021?

A. Right. I'm not -- I don't do that, in general. So now I'm trying to think, did I -- did I ever do it, you know, like unknowingly or something like that? I -- I don't -- I don't think so. I don't know.

Q. Recently, have you engaged in any margin transactions?

MR. TAYLOR-COPELAND: I'm going to object and instruct you not to answer.

THE WITNESS: Yeah, I'm going to go ahead

Page 45

12 (Pages 42 - 45)

CONFIDENTIAL

and just tell you what I said: I don't recall.

Q. BY MR. RAWLINSON: What is a margin transaction?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I think it's where, when you're on margin, you're like on leverage, borrowing from the exchange. So you're buying things, not technically with your own money, like you're in a -- borrowing something.

But I have -- I don't think I've ever done it, so I don't -- I'm not -- that's not a thing that I really know, but I think that's my general understanding of it.

Q. BY MR. RAWLINSON: Do you understand that you have to put up collateral when you do a margin transaction?

MR. TAYLOR-COPELAND: Objection. Vague and calls for speculation.

THE WITNESS: Yeah, I don't -- I'm not the person to talk to about this; but I believe, for people who do it, they have to already have assets there, you know.

Q. BY MR. RAWLINSON: And then you said you'd basically buy something with somebody else's money?

A. I don't know. I haven't done it.

Page 46

But, yeah, you're -- you're on margin, meaning it's a leveraged thing with that. But I haven't -- I haven't engaged --

Q. What do you mean -- Sorry. Go ahead.

A. I really don't know. It's better to talk to someone else on a floor below us about -- about margin trading -- margin investing, you know, with brokerage accounts. I don't think I've ever done it.

Q. What did you mean when you said a leveraged or leveraged transaction?

A. I believe that you are borrowing when you do margin trading on traditional accounts, and then you're taking the borrowed funds and buying stocks, I guess.

Q. And then, if those stocks go down, you have to repay the margin loan; correct?

A. I don't know how it works.

Q. No clue?

A. Well, I don't know if they give you a warning or if -- or how -- if they do things in a certain order. I just -- I can't speak about it firsthand.

Q. Okay. Let's -- Let's switch gears, then, and talk about Nexo.

A. Do you want this back?

Page 47

Q. No, you get to hold on to those.

A. Cool.

Q. You can set that one aside, though, if you'd like. I don't think we'll go back to that.

A. Okay.

Q. So you invested fairly heavily with Nexo. True?

MR. TAYLOR-COPELAND: Objection. Vague as to "invested."

THE WITNESS: Right. I -- I moved assets from Coinbase to Nexo. So I had already invested in those assets; I was just moving them from one platform to another. So I don't -- I don't know that that's considered investing, but...

Q. BY MR. RAWLINSON: And then you took out loans from Nexo. True?

A. Later, I did take out loans. I don't know if taking out loans is considered investing.

Q. What do you mean, you don't know if taking out loans is considered investing?

A. I -- I don't know what I mean. I took out loans, and you said, "Did you invest?" so -- and then you said, "But you took out loans." So, yes, I took out loans.

Q. You took out loans and you bought more

Page 48

cryptocurrency with those loans. True?

A. True.

Q. And by June of '21, the crypto market had moved against your interests; correct?

A. That's correct.

Q. Okay. And you'd taken out approximately $13 million in loans from Nexo?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Yes.

Q. BY MR. RAWLINSON: And you were facing liquidation at that point. True?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: Liquidation came up, but I wasn't -- I was expecting to be not liquidated.

Q. BY MR. RAWLINSON: Yeah. But in June of '21, you were facing the prospect of liquidation. True?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: I was facing the prospect of Nexo's platform working the way it works, which is to automatically liquidate assets at a certain point, at any point in time.

Q. BY MR. RAWLINSON: Well, that's not what you

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL

and just tell you what I said: I don't recall.

Q. BY MR. RAWLINSON: What is a margin transaction?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I think it's where, when you're on margin, you're like on leverage, borrowing from the exchange. So you're buying things, not technically with your own money, like you're in a -- borrowing something.

But I have -- I don't think I've ever done it, so I don't -- I'm not -- that's not a thing that I really know, but I think that's my general understanding of it.

Q. BY MR. RAWLINSON: Do you understand that you have to put up collateral when you do a margin transaction?

MR. TAYLOR-COPELAND: Objection. Vague and calls for speculation.

THE WITNESS: Yeah, I don't -- I'm not the person to talk to about this; but I believe, for people who do it, they have to already have assets there, you know.

Q. BY MR. RAWLINSON: And then you said you'd basically buy something with somebody else's money?

A. I don't know. I haven't done it.

Page 46

But, yeah, you're -- you're on margin, meaning it's a leveraged thing with that. But I haven't -- I haven't engaged --

Q. What do you mean -- Sorry. Go ahead.

A. I really don't know. It's better to talk to someone else on a floor below us about -- about margin trading -- margin investing, you know, with brokerage accounts. I don't think I've ever done it.

Q. What did you mean when you said a leveraged or leveraged transaction?

A. I believe that you are borrowing when you do margin trading on traditional accounts, and then you're taking the borrowed funds and buying stocks, I guess.

Q. And then, if those stocks go down, you have to repay the margin loan; correct?

A. I don't know how it works.

Q. No clue?

A. Well, I don't know if they give you a warning or if -- or how -- if they do things in a certain order. I just -- I can't speak about it firsthand.

Q. Okay. Let's -- Let's switch gears, then, and talk about Nexo.

A. Do you want this back?

Page 47

Q. No, you get to hold on to those.

A. Cool.

Q. You can set that one aside, though, if you'd like. I don't think we'll go back to that.

A. Okay.

Q. So you invested fairly heavily with Nexo. True?

MR. TAYLOR-COPELAND: Objection. Vague as to "invested."

THE WITNESS: Right. I -- I moved assets from Coinbase to Nexo. So I had already invested in those assets; I was just moving them from one platform to another. So I don't -- I don't know that that's considered investing, but...

Q. BY MR. RAWLINSON: And then you took out loans from Nexo. True?

A. Later, I did take out loans. I don't know if taking out loans is considered investing.

Q. What do you mean, you don't know if taking out loans is considered investing?

A. I -- I don't know what I mean. I took out loans, and you said, "Did you invest?" so -- and then you said, "But you took out loans." So, yes, I took out loans.

Q. You took out loans and you bought more

Page 48

cryptocurrency with those loans. True?

A. True.

Q. And by June of '21, the crypto market had moved against your interests; correct?

A. That's correct.

Q. Okay. And you'd taken out approximately $13 million in loans from Nexo?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: Yes.

Q. BY MR. RAWLINSON: And you were facing liquidation at that point. True?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: Liquidation came up, but I wasn't -- I was expecting to be not liquidated.

Q. BY MR. RAWLINSON: Yeah. But in June of '21, you were facing the prospect of liquidation. True?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: I was facing the prospect of Nexo's platform working the way it works, which is to automatically liquidate assets at a certain point, at any point in time.

Q. BY MR. RAWLINSON: Well, that's not what you

Page 49

13 (Pages 46 - 49)

CONFIDENTIAL

told your friends, is it?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I don't know what you mean.

Q. BY MR. RAWLINSON: Well, I mean, you told your friends you'd fucked yourself.

A. Okay.

Q. True?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: No. I would say Nexo fucked me.

Q. BY MR. RAWLINSON: Well, that's not what you wrote to them. Let's take a look.

(Exhibit 142 marked.)

Q. BY MR. RAWLINSON: Hand you Exhibit 142.

A. Okay.

Q. Who's Ace?

(Sotto voce remarks.)

MR. RAWLINSON: Oh, I went -- Okay. We got them out of order. It's already marked, but we'll fix it in a little bit.

THE WITNESS: All right.

MR. TAYLOR-COPELAND: What did you mark this one as?

MR. RAWLINSON: 142. I'm sorry.

MR. TAYLOR-COPELAND: Okay. Okay.

Page 50

MR. RAWLINSON: I grabbed the wrong sticker.

MR. TAYLOR-COPELAND: No problem.

Q. BY MR. RAWLINSON: Who is Ace?

A. He is a person who I engaged with in the official Nexo Telegram chat -- chat room.

Q. Does he have -- Does he have a name?

A. He does.

Q. What is it?

A. I don't recall.

Q. You have no idea what Ace's name is?

A. I knew it at one point, but I can't recall his name.

Q. Do you know how to contact Ace today?

A. I'm not sure.

Q. When was the last time you contacted Ace?

A. I don't recall.

Q. Is John Kreese on here, you?

A. Yes.

Q. Is that a -- Why is your name different?

A. Why is it different? Thanks to Ace. He said, "Don't use your real name in Telegram. Telegram is a cesspool for hackers and fraud and" -- let's just say hackers -- "it's suspect with security."

So he told me how to go change my security settings. And then I said, "Oh, if I change my name,

Page 51

then anyone" -- "any notices I've put under my old name will just" -- "people won't know it's me," or something like that.

And he goes, "Oh, I have an idea. John Kreese is -- he's an actor -- or, no, he's a character. Do you know who it is?

Q. Um-hum.

A. Okay. I didn't.

Q. Karate Kid?

A. Karate Kid, yeah. I didn't really know that. But he said, "Yeah, people will just think you're being him." So he said, "Just change it a little bit to John Kreese, and then put up the photo of that guy."

And then, every now and then, people would text me and go -- make a comment about my dojo or my karate thing, and I'm like, "Oh, okay." So now I'm John Kreese, which makes me a little more anonymous.

Q. So look at the page that's Bates numbered 13040. That's the numbers at the bottom.

A. Um-hum.

Q. Do you see there in the -- towards the bottom of the page, you say: "Basically, there's never really been a great plan. I fucked myself a long time ago, taking this much in loans and buying

Page 52

BTC at high prices. There's never really been a great plan to unwind."

Did I read that correctly?

A. Yeah, I see that.

Q. Okay. And that was all true; right?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: You know, that's how I felt in the moment. I had -- I had a great plan.

But right now, I would say your comment that I said I fucked myself, is that I fucked myself by ever doing business with Nexo. Okay?

So here is -- this is June 20th. I'm falling apart. I'm falling apart. Okay? And so I -- I say to my friend -- I'm in complete frustration. I'm seeing red. And so, yeah, I said to him all these things.

There was never -- That -- Also, that plan to unwind has to do with my plan in conjunction with Nexo, Nexo helping me have a plan to unwind.

Q. Well, you sure don't say that here.

You say that you fucked yourself a long time ago by taking this much in loans and buying BTC at high prices.

A. That's --

Q. That's not a great plan, is it, sir?

Page 53

14 (Pages 50 - 53)

CONFIDENTIAL

**Page 114**

What was the loan-to-value threshold at which you could potentially be liquidated?

MR. TAYLOR-COPELAND: Objection. Calls for speculation.

THE WITNESS: I believe it was 83.33 or just .3 -- one or two threes -- percent.

Q. BY MR. RAWLINSON: How did you get that knowledge?

A. I don't recall exactly the time and -- time and location.

MR. RAWLINSON: Take a look at 146, please.

(Exhibit 146 marked.)

Q. BY MR. RAWLINSON: Have you seen that document before?

A. Hmm. What is -- What -- I don't -- I don't recall this exactly.

Q. You don't recall whether or not you saw this on Nexo's website?

A. Not specifically. But I just told you I somewhere learned it was 83.33, so...

Q. Yeah, and I just didn't know if you learned from looking at this --

A. Could have been this.

Q. -- or somewhere else?

A. Yeah, I don't know. Yeah, I couldn't --

**Page 115**

Q. Try again. Sorry.

A. I don't know exactly. Is that fair?

Q. Okay. So no dispute that the threshold for your LTV was 83.33 percent. True?

A. Yeah, for their platform; not for me, but for their -- for their platform, yeah.

Q. Well, did you think you had a different LTV threshold?

A. That would be where their system would automatically liquidate before we reversed it. So, yes. So, in that way, it would be the -- it would happen at 83.33.

Q. Okay. So I just want to be sure we're in agreement that the 83.33 LTV threshold applied to Mr. Cress.

A. In a certain way, and that's what would require the liquidation relief program to eventually be instituted. But, yeah, that's when liquidations would apply.

Q. That's when liquidations could happen?

A. Yeah.

MR. RAWLINSON: Okay. Okay. I'm going to show you a few other documents fairly quickly, and just --

THE WITNESS: You know, I think I need a

**Page 116**

quick bathroom run.

MR. RAWLINSON: Let's do it.

THE WITNESS: Okay.

THE STENOGRAPHIC REPORTER: Wait. Your microphone.

THE WITNESS: Oh, God.

THE VIDEOGRAPHER: I'll switch media. This marks the end of media number 2 --

THE WITNESS: Oh, shoot.

THE VIDEOGRAPHER: That's okay.

-- number 2 in the deposition of John Cress.

The time is 12:29 p.m. We're off the record.

(Recess.)

THE VIDEOGRAPHER: This marks the beginning of media number 3 in the deposition of John Cress.

The time is 12:43 p.m. We are on the record.

MR. TAYLOR-COPELAND: Matthew, before you get going, I have one thing I want to put on the record, which is: We received an email from Ian about the questioning on Cress's financial transactions.

We note the court has already noted that these have nothing to do with the case and are broadly invasive of Cress's privacy. And we are aware of many

**Page 117**

Northern District decisions sustaining objections not to answer on similar grounds.

But, in the interest of avoiding a dispute, if you want to ask some additional questions, we will allow them to proceed up to a point, noting that we have a relevance and privacy objection to all of those questions.

MR. RAWLINSON: Thank you. Excuse me. Thank you, counsel.

Q. BY MR. RAWLINSON: I think those questions, Mr. Cress, if I remember, this morning, related to whether or not you have ever engaged in margin transactions relating to stocks.

Have you?

A. I don't think so. I'm not a margin trader. I've never purposely done that. I don't recall. I -- I -- I think no.

Q. Have you ever taken out a loan and used stock as collateral?

A. No.

Q. Okay. Have you ever done any put or call stock transactions?

A. I -- I have.

Q. Okay. What -- Just tell the jury what a -- what a put and call transaction are.

30 (Pages 114 - 117)

CONFIDENTIAL

A. Explain the whole thing, kind of?

Q. Very quickly, if you could.

A. Okay. So if you own a stock and the stock price is at 100 per share, there's a thing called selling a covered call. And you pick an expiration date, which is like a month away, and you say that you're willing to sell the stock at 105. So you sell a call and you earn, for example, a premium of one dollar. So if the stock reaches 105 by your expiration date, you've essentially made five dollars plus the one dollar in premium. It's like you've sold it all at 106. But if the stock goes to 110, you missed that upside. You agreed to sell it at 106, but you made, whatever, a thousand dollars.

Q. Okay. And you've engaged in some of those transactions?

A. Yeah. When I worked -- I'm -- I'm not like a trader or have, like you said -- you know, with crypto or traditional stuff; but, as I mentioned before, I worked for many years at Oracle, 12 years at Splunk. They have stock plans. You end up with a lot of stock.

So I had a friend, a long time ago, say, "Hey, you know, you've got a lot of that" -- "just that one stock. You could sell covered calls," and he

explained it to me, so...

Q. Okay.

A. So I did that like back in like 2000, but I -- it's not like something I did -- you know, I did it in 2000, then I've done it again; but it's not like my, you know, thing I do all the time.

Q. Gotcha.

A. I understand it. And I have done it.

Q. Okay. But no margin transactions where you actually have to post --

A. Right.

Q. -- your stock as collateral?

A. Yeah. The reason it's called a covered call is because like you have -- you own the stock. So if you have to sell it, you just sell it and you have that premium as income.

Q. Okay.

A. Yeah.

MR. RAWLINSON: Before the break, we were talking about terms and conditions.

I'm going to show you some other ones, and we'll talk through these.

Let me show you 147.

(Exhibit 147 marked.)

Q. BY MR. RAWLINSON: Do you have Exhibit 147

in front of you, sir?

A. Yes.

Q. Do you recognize these as the Nexo Exchange Service general terms and conditions?

A. I don't know if I would use the word "recognize," but I see that in the header.

Q. Did you read these before you opened your account at Nexo?

A. No.

Q. How did these get into your file?

A. I would say the same way that the -- that the credit line terms and conditions got into my file; that I was looking around and downloading things and such, what I believe would have been July of 2021.

Q. Okay. So you believe you downloaded this off the Nexo website?

A. Most likely that's where this came from.

Q. And, similarly, when we were talking about Exhibit 145 a minute ago, do you believe you downloaded that off the Nexo website?

A. I mean, with both of these, I don't recall; but I think it's likely that somebody may have downloaded them from -- I mean, I very well -- that's very possible.

Q. Okay.

A. Yeah.

Q. Do you have any reason to believe that Exhibits 145 and 147 are not available on the Nexo website?

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: I don't know, but I don't -- I have no reason to believe that they would not.

Q. BY MR. RAWLINSON: You found them somewhere; right?

A. Um-hum.

MR. TAYLOR-COPELAND: Objection. Vague as to time.

THE WITNESS: Sorry about the --

Q. BY MR. RAWLINSON: Is that a yes?

A. -- the water. Yes.

Q. Great. But you said you did not read Exhibit 147 before you opened your account; correct?

A. Correct.

(Exhibit 148 marked.)

MR. RAWLINSON: Okay. Let's look at 148 --

THE WITNESS: Okay.

MR. RAWLINSON: -- if you could, please.

MR. TAYLOR-COPELAND: Thank you.

MR. RAWLINSON: Sure.

31 (Pages 118 - 121)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

with?

A. My sister.

Q. Is she a lawyer?

A. No.

Q. Okay. Who is Eric Fournier, F-O-U-R-N-I-E-R? I might be saying it wrong.

A. Yeah, Fournier.

Q. Fournier. There we go.

A. He's a friend.

Q. Is he a lawyer?

A. No.

Q. Who is Abid Azam, A-B-I-D, A-Z-A-M?

A. I -- I think I -- I'm going to say that I'm not a hundred percent sure, but I think that's a guy, and the context in there is that he refers me to a lawyer or something. I met him at a sort of a business networking house party on the Peninsula, and then met him one other time. Like really don't know him very well.

Q. Do you know -- He's not your lawyer; right?

A. No, yeah.

Q. All right. Who is Tomo, T-O-M-O?

A. Tomo is a friend's ex-boyfriend.

Q. Is he or she a lawyer?

A. No.

Page 134

Q. Okay. Who is the GC at Lyft?

A. That is a friend.

Q. Does that friend have a name?

A. That should be privileged, James. That's Michael.

MR. TAYLOR-COPELAND: So you can say his name, but...

THE WITNESS: Okay. That's Michael Blum.

Q. BY MR. RAWLINSON: I didn't catch the last name.

A. Michael Blum, B-L-U-M.

Q. Okay. Mr. Blum's obviously an attorney?

A. Okay. Yeah.

Q. Yes?

A. Yeah.

Q. Is he your attorney?

MR. TAYLOR-COPELAND: Objection. Vague as to time, but you can answer.

Q. BY MR. RAWLINSON: At any point in time, has he been your attorney?

A. Yes.

Q. You retained him formally?

A. Yes.

Q. With an engagement agreement?

A. Yes.

Page 135

Q. When was that?

A. I don't recall exactly when, when there was an engagement agreement.

Q. What year?

A. I'm going to guess 2021, possibly 2022.

Q. Was it while he was still employed with Lyft?

A. No.

Q. He had left Lyft and was on his own?

MR. TAYLOR-COPELAND: Objection. Calls for speculation, but you can answer.

THE WITNESS: Yeah, he was on his own.

Q. BY MR. RAWLINSON: Was he with a law firm?

A. No.

Q. Solo practitioner?

A. Yes.

Q. And you had an engagement agreement with him related to this matter?

MR. TAYLOR-COPELAND: I'm going to object that it calls for attorney-client communications and instruct you not to answer that question.

THE WITNESS: Okay.

Q. BY MR. RAWLINSON: Did you retain him in connection with this dispute with Nexo?

A. I'm going to not answer that.

Page 136

MR. TAYLOR-COPELAND: Same -- Same objection.

THE WITNESS: Yeah.

MR. RAWLINSON: I get to know who his lawyers are in this case.

MR. TAYLOR-COPELAND: He just told you.

THE WITNESS: He's my lawyer, and Max over there.

Q. BY MR. RAWLINSON: I understand. At one point, was Mr. Blum your attorney in this matter?

MR. TAYLOR-COPELAND: So I'm going to object, and that calls for a legal conclusion.

I think you can answer yes or no, whether Mr. Blum has provided you legal advice related to this matter.

THE WITNESS: Mr. Blum never worked on this matter, but he -- you know, he -- he knew about it and like helped me, but he -- he never -- he never worked on this matter.

MR. TAYLOR-COPELAND: So --

THE WITNESS: Huh? Yes or no, you said?

MR. TAYLOR-COPELAND: Yes or no.

THE WITNESS: I don't want to say the wrong -- I don't want -- I don't know which one's a lie or the truth.

Page 137

35 (Pages 134 - 137)

CONFIDENTIAL

Yes or no?  He didn't -- He has never worked on this case, like it's not -- he didn't file anything, so...

MR. TAYLOR-COPELAND:  Well -- Okay.  So can we take a one-minute break here?

MR. RAWLINSON:  Yes, sir.

MR. TAYLOR-COPELAND:  Okay.

THE WITNESS:  Sorry.

THE VIDEOGRAPHER:  This marks the end of media number 3 in the deposition of John Cress.

THE WITNESS:  Trying to do my best here.

THE VIDEOGRAPHER:  The time is 1:09 p.m.  We're off the record.

(Recess.)

THE VIDEOGRAPHER:  This marks the beginning of media number 4 in the deposition of John Cress.

The time is 1:13 p.m.  We are on the record.

Q.  BY MR. RAWLINSON:  Okay.  Mr. Cress, we had a short break so you could talk to your counsel.

I think my question was whether Mr. Blum was retained as your counsel in this matter.

A.  Yes.

MR. TAYLOR-COPELAND:  I'm just going to object and say that "in this matter" is vague, but you can answer yes or no.

Page 138

THE WITNESS:  Yes.

Q.  BY MR. RAWLINSON:  Okay.  I'll try it again.

Was he retained in connection with your dispute with Nexo?

A.  Yes.

Q.  Okay.  And you told me, I believe, that you have a written engagement agreement with Mr. Blum?

A.  Yes.

Q.  Okay.  Who is "Deanna Menold, Matt Stepka's party"?

A.  Sorry.  Deanna Menold, a friend.

Q.  Is she an attorney?

A.  No.

MR. RAWLINSON:  Where's the --

(Sotto voce remarks.)

MR. RAWLINSON:  Okay.  Mr. Cress, while we're on this...

MR. TAYLOR-COPELAND:  Thank you.

MR. RAWLINSON:  Sure.  Hand you Exhibit -- Well, sorry.  I've marked them out of order again.  My bad.  But this is Exhibit 155.

(Exhibit 155 marked.)

Q.  BY MR. RAWLINSON:  Do you have that in front of you?

A.  Yes.

Page 139

Q.  Okay.  And this is a letter from the law firm -- I don't know if it's pronounced Roche.

A.  Roche.

Q.  Roche?

A.  Um-hum.

Q.  -- Roche Freedman; is that correct?

A.  Yes.

Q.  And it's dated October 26, 2021?

A.  Yes.

Q.  Okay.  And this is correspondence that your counsel sent out in this matter?

A.  Yes.

Q.  Did you have an engagement agreement with Roche Freedman?

MR. TAYLOR-COPELAND:  You can answer yes or no.

THE WITNESS:  Yes.

Q.  BY MR. RAWLINSON:  Okay.  Did you retain them in connection with this dispute?

MR. TAYLOR-COPELAND:  Same instruction.

THE WITNESS:  Yes.  Sorry.

Q.  BY MR. RAWLINSON:  At some point, did you end that attorney-client relationship?

MR. TAYLOR-COPELAND:  Same instruction.

You can answer yes or no.

Page 140

THE WITNESS:  Yeah.  I'm going to say yes.

Q.  BY MR. RAWLINSON:  Okay.  Do you know when?

A.  I believe it was roughly December of 2022 or January of 2023.

Q.  Okay.  Did you approve this letter before it went out?

A.  I don't recall.

Q.  You don't recall whether or not you read this before it went out?

A.  I assume I must have; but I don't recall doing it, so...

Q.  Do you think this was a fair summary of your potential claims against Nexo at the time?

MR. TAYLOR-COPELAND:  Objection.  Vague, and calls for a legal conclusion.

THE WITNESS:  I'm not sure.

Q.  BY MR. RAWLINSON:  On page 2, they have some paragraphs numbered first, second, third.

Do you see that?

A.  This says page 2 of 6 right here.

Q.  And I'm looking at Bates number 344295.

A.  Okay.  Go ahead.

Q.  Okay.  It looks like first there's complaints about Nexo's representations about responsiveness; correct?

Page 141

36 (Pages 138 - 141)

CONFIDENTIAL

question.

Q. BY MR. RAWLINSON: And do you remember reading and understanding this document when you signed it on March 24th, 2021?

A. I don't recall.

Q. You understand this governs your cryptocurrency purchases between you and Nexo; correct?

MR. TAYLOR-COPELAND: Objection. Calls for a legal conclusion.

You can answer.

THE WITNESS: I believe so, yes.

Q. BY MR. RAWLINSON: Okay. And there's nothing in this document about your loan transactions with Nexo. True?

A. I'd like to read the document. Okay?

MR. RAWLINSON: Then let's go off the record, and you can read the document.

MR. TAYLOR-COPELAND: No, that's not how it works.

MR. RAWLINSON: Yeah, it is. If he's going to waste time --

THE WITNESS: No. Well, then, here. You can have the document back.

MR. TAYLOR-COPELAND: If you want him to

Page 146

read the document --

MR. RAWLINSON: Sir --

MR. TAYLOR-COPELAND: -- he'll take time on the record to read it. The same thing your witnesses did. John --

THE WITNESS: I'm just saying.

MR. TAYLOR-COPELAND: John, please.

Q. BY MR. RAWLINSON: We're not going to throw documents at each other. I've handed you --

A. Well, you threw it at me.

Q. No, sir. I handed you Exhibit 152.

A. Okay.

Q. It's on the record it's in front of you.

A. Okay.

Q. And we're going to ask you questions about it.

A. Okay.

Q. Are you going to throw anything else at me?

A. Only what you throw at me. Are you going to throw anything at me?

Q. I have handed you documents, sir.

A. Okay.

Q. And I've treated you with nothing but respect today, and I would request the same from you.

Am I going to get that?

Page 147

A. Yes.

Q. Look at paragraph section 1.1, "purchase orders."

A. Okay.

Q. There's a reference in section 1.1 to the timing of purchase orders.

What does that mean to you?

MR. TAYLOR-COPELAND: Objection. Calls for a legal conclusion.

THE WITNESS: They call it the review period.

MR. RAWLINSON: Right.

THE WITNESS: Yeah. That sounds like that's the time of which a quote is valid for and would need to be refreshed.

Q. BY MR. RAWLINSON: Okay. That's not the time in which a transaction or a purchase has to be executed. True?

MR. TAYLOR-COPELAND: Okay. Calls for a legal conclusion.

THE WITNESS: Yeah. So I -- I can't -- I'm not -- I'm not really a lawyer, so I may not be totally correct on this, but maybe it's the time that the quote needs to be refreshed, the quote. Right? So -- but I could be wrong.

Page 148

Q. BY MR. RAWLINSON: I'm asking you your understanding as the person that signed this agreement.

So that's not the time in which a purchase has to be executed; correct?

A. Let me -- Let me read it. Right? Let me read it, because -- to try to recollect what I understood then. Let me just read it.

(Reviewing document.)

THE WITNESS: This isn't talking about executing an order. This is saying a purchase order to Nexo from me. So I'm still not -- I'm still not sure. I'm not --

Q. BY MR. RAWLINSON: Well, you said it has to do with refreshing the quote. It doesn't have to do with executing within 10 minutes. Correct?

MR. TAYLOR-COPELAND: Objection. Same objection.

THE WITNESS: It could.

MR. TAYLOR-COPELAND: Calls for a legal conclusion.

THE WITNESS: It could, because you can't -- you can't execute an order if the quote is expired. So it very well -- I think it very well does have to do with that.

Page 149

38 (Pages 146 - 149)

CONFIDENTIAL

A. That's exactly the one.

Q. And that's the one you couldn't use, because you didn't have sufficient collateral; correct?

MR. TAYLOR-COPELAND: Objection. Misstates testimony.

THE WITNESS: Where does it say additional collateral here? I'm pointing to this one.

MR. RAWLINSON: Right.

THE WITNESS: What are you pointing to?

Q. BY MR. RAWLINSON: Well, there's a service; correct?

A. Yeah. Yeah.

Q. Okay. Service requires a fee; right?

MR. TAYLOR-COPELAND: Objection.

THE WITNESS: Nope, no fees. No fees. Can you point to the fee?

Q. BY MR. RAWLINSON: So Nexo is just supposed to give back your money in the event of a market crash?

A. Can you point -- Can you show me the fee? Can you --

MR. TAYLOR-COPELAND: Objection. Misstates testimony.

THE WITNESS: Sorry.

Q. BY MR. RAWLINSON: I'm not going to argue

Page 198

with you, sir. I'm going to have you answer questions.

A. No, I'm asking can you provide a document that shows the fee that you're referring to.

Q. I'm asking you if you ever availed yourself of this service.

MR. TAYLOR-COPELAND: I'm going to object. Asked and answered.

It's becoming harassing. You've asked the same question 20 times.

THE WITNESS: Have I answered?

Q. BY MR. RAWLINSON: Isn't it true you didn't have what the liquidation relief program was?

A. No, but that was funny.

(Exhibit 156 marked.)

MR. TAYLOR-COPELAND: What exhibit number are we on?

MR. RAWLINSON: I think we're on 156, if I'm doing things right.

Q. BY MR. RAWLINSON: Okay. I've handed you Exhibit 156.

This is an email string between you and Mr. Hristov; correct?

A. Yes.

Q. Okay. And in the middle there, you wrote to

Page 199

Mr. Hristov on June 22nd, 2021; correct?

A. Um-hum.

Q. And you say: "Somebody says I should be using the liquidation relief program, but I don't know what the liquidation relief program is."

Do you see that?

A. Um-hum.

Q. Did I read that correctly?

A. You did.

Q. Okay. So how can you say, when you got this in March, but by June you don't know what the liquidation relief program is?

A. It's because this has to be put into context.

They have completely ignored me. I know what the liquidation relief program is. They went dark on me for 19 days when I was asking for help. Okay? And so, at this point, I know they're not helping me. I know these guys are stealing from me, they're not helping me at all. And, yeah, so I'm just trying to get their attention and make sure that I at least ask for it before -- even though I know it's not -- I mean, this is June 22nd. This is after they've been complete criminals. Right? So I already know, but -- yeah, you know, I'm being liquidated. So now

Page 200

I've been liquidated. What's the program? What are the -- What are the details, you know, the actual steps, the actual like what do we do now? Let's use the -- Let's -- What's step 1, 2, and 3? I already knew what the answer was going to be, so... Yeah.

Q. I'll object to the nonresponsive portion.

A. Okay.

Q. How -- How can you say you knew in March of 2021 what the liquidation relief program was, but you write in June, to the same gentleman you allegedly talked to, "I don't know what the liquidation relief program is"?

MR. TAYLOR-COPELAND: Objection. Asked and answered.

THE WITNESS: Do you want me to go through that all again?

Q. BY MR. RAWLINSON: I want you to answer my question --

A. Oh.

Q. -- because last time you didn't.

MR. TAYLOR-COPELAND: He did answer your question.

THE WITNESS: I did.

MR. TAYLOR-COPELAND: You didn't like the answer. You can answer again if you want.

Page 201

51 (Pages 198 - 201)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

THE WITNESS: I don't want to. But, I mean, we can use up some time on this. That's fine.

So they completely ignored me from about -- When I first started to ask how I can protect my assets, I think that was like May 20 -- around between May 26 and May 29th. I'm going to go with May 29th, but I'm just guessing now. I want to -- I want to answer your question.

MR. RAWLINSON: That'd be great.

THE WITNESS: And so from May 29th to June 11th, that's 19 days, and I'm begging for help. I'm begging for help for their -- I mean, can you imagine this? Can you imagine: You got millions of dollars on the line, and you have a VIP relationship manager and the whole company just ignores you? That's sickening.

Okay? So my understanding of the liquidation relief program started to change. It started to change in my head, that, you know, I don't -- I don't think it's real. Okay?

And so on June 22nd, I'm just -- I'm just -- I'm just making a formality here. That's the day, that's the exact day I got liquidated. So I'm just saying, "Hey, by the way, what about this liquidation relief program?" I mean, that sentence, I don't even

Page 202

take myself seriously there. I knew they weren't ever going to help me. Right?

MR. RAWLINSON: I'll object to the nonresponsive portion.

THE WITNESS: Do you want me to answer it a third time, or do you just want to just --

Q. BY MR. RAWLINSON: No. It'd be great if you could directly answer my questions, though.

A. Okay.

Q. What you don't write to Mr. Hristov here is, "I know exactly what the liquidation relief program is, and this is how it's supposed to work."

Right?

MR. TAYLOR-COPELAND: Objection. The document speaks for itself.

THE WITNESS: No. Support told me how it works. I already knew. I didn't need to repeat it back to the guy who's completely ignoring me.

Q. BY MR. RAWLINSON: Well, you don't say --

A. He knows --

Q. I'm sorry. Finish.

A. I'm very defeated right here. Okay? It's over. They've scammed me. It's game over.

Q. Well, to be fair, you fucked yourself: You took out $13 million in loans and spent it all on

Page 203

cryptocurrency, and the market crashed.

MR. TAYLOR-COPELAND: Objection. Argumentative.

THE WITNESS: No.

MR. TAYLOR-COPELAND: I don't think there's a question in there.

Q. BY MR. RAWLINSON: Is anything in my statement untrue?

A. Nexo fucked me. So you're close about the being fucked.

Q. Yeah. Never seen you write that.

How come you didn't write to Mr. Hristov here, "I'm not supposed to be liquidated, you promised"?

A. Because I -- I'd rather focus my time with lawyers, going forward, than -- than this A-hole. I'm not going to keep doing business with a criminal. It's over.

Q. Okay.

A. Okay.

Q. Didn't you speak to Mr. Hristov on June 22nd?

A. I think so, or right around then.

Q. Okay. And you may have spoken with him on June 11th; correct?

Page 204

A. Correct.

Q. When you spoke with him on June 11th, did you raise the liquidation relief program and this whole argument "I'm never supposed to be liquidated"?

A. I think I just answered your question, but do you want me to answer it again?

Q. I want to know if, when you spoke to Mr. Hristov on June 11th, did you discuss with him the fact that you were never supposed to be liquidated?

A. I'll go through the whole thing. Sure, let's do it again.

Q. It's yes/no. Did you talk to Mr. Hristov on June 11th and say, "I'm never supposed to be liquidated"?

A. So on June 11th, I wasn't liquidated yet, so I'm not sure what you're referring to.

Q. You'd suffered some partial liquidations at that point; correct?

A. Yes.

Q. Yeah. Did you say, "I'm not supposed to be liquidated. I'm a big VIP"?

A. No. The liquidation relief program is like after -- after you've suffered like full liquidations, and then on -- on that call, we were -- I asked him about -- I did ask him about the liquidation relief

Page 205

52 (Pages 202 - 205)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

Q.   Sitting here today, you can't tell me any fees you paid in the Earn on Crypto product; correct?

A.   Yeah.  Yeah.  But once you've been taken for so many hidden fees, it's hard to -- hard for me to know.

Q.   Mr. Cress, I'm going to object as nonresponsive.

A.   Okay.

Q.   We're getting low on time, and I know you're trying to run out the clock; but if it's yes/no, let's just go with that.

Good enough?

A.   Not that I know of, yeah.

MR. TAYLOR-COPELAND:  Objection. Argumentative.

THE WITNESS:  So I cannot say yes or no.  I do not know.

(Exhibit 172 marked.)

Q.   BY MR. RAWLINSON:  All right.  I'm going to hand you 172.

It's a document entitled "One company, two years, endless success stories."

Do you have that in front of you?

A.   I do, yeah.

Q.   Okay.  And if you look on page 527, it says:

Page 310

"We implemented zero fees, removing all withdraw fees for Nexo platform transactions and covering blockchain network fees."

Do you see that?

A.   I do.

Q.   Were you ever charged any withdraw fees for Nexo platform transactions?

A.   I believe they had a thing where you got a certain amount of withdrawals for free, and I don't know if I was within that or if I went over it and maybe once I got a small withdrawal fee.  But, apparently, those withdraw fees were very small and not something I was worried about.  So I -- I'm not going to run out the time for you.  I don't know if I was charged one or not.

Q.   Sitting here right now, you don't know whether you were charged withdraw fees; correct?

A.   Yeah.

Q.   Okay.  And this certainly doesn't relate to any OTC transactions; correct?

MR. TAYLOR-COPELAND:  Objection.  Vague as to "this."

THE WITNESS:  I don't know, because if I'm withdrawing and my assets are on the OTC desk, then maybe it does involve.  Maybe I'm withdrawing from the

Page 311

OTC desk.  So I don't know.

MR. RAWLINSON:  Okay.

THE WITNESS:  It may or may not.

Q.   BY MR. RAWLINSON:  You didn't rely on this document in entering into any transactions with Nexo; correct?

A.   Let me -- Let me see.  Did I rely?  I may have, just because the more times -- in marketing, they go on impressions; and the more times you see "no hidden fees" -- Is this the one that I forwarded to a friend, or was that the last one?

Q.   It was a couple ago.

A.   It shows that I downloaded it.  Right?  So I wouldn't say that I didn't rely on it.

Q.   Do you even know if you saw this?

A.   I mean, this is just another example of -- Yeah, I mean, I probably did.

Q.   Do you know whether or not you saw this document before right now?

A.   This one doesn't look super familiar, but...

Q.   As your attorney pointed out, some of these Cress documents, they downloaded, not you; so you may not have seen this.  Right?

A.   (Reviewing document.)

Q.   True?

Page 312

A.   You know, the information -- a lot of the information sounds familiar.  There's so many documents.  But I relied on a lot of the statements that are in this document, because I might have seen them, like in every document, like "zero hidden fees," so...

Q.   You're -- You're speculating a lot.

Yes or no:  Have you seen Exhibit 172 before right now?

MR. TAYLOR-COPELAND:  Objection.  Asked and answered.

THE WITNESS:  I don't recall.

MR. RAWLINSON:  Okay.  I'm going to hand you another document that was previously marked as Exhibit 4 in this case.

(Exhibit 4 previously marked.)

Q.   BY MR. RAWLINSON:  Do you have that in front of you?

A.   Exhibit 4.  Exhibit 4.  Whatever.  I have what you just handed me.

Q.   Okay.  Who is Stella Zlatareva, Z-L-A-T-A-R-E-V-A?

A.   I don't recall.

Q.   You don't know that person?

A.   I may.  I don't recall.

Page 313

79 (Pages 310 - 313)

CONFIDENTIAL

Q. Okay. Were you a member of the Nexo Community in December 2020?

A. What do you mean, "the Nexo Community"?

Q. Well, this email went to whoever Stella is from Nexo Community.

Would you have received emails from Nexo Community in --

A. In December of 2020?

Q. Um-hum.

A. I don't think so.

Q. So you've never seen this document before, Exhibit 4?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I just don't -- I don't know if I have or not.

Q. BY MR. RAWLINSON: Did you rely on this document, Exhibit 4?

A. It's possible. I mean, these documents --

Q. How would you have seen an email between Stella and Rosen Angelov?

A. Oh, yeah. I wouldn't have seen that, but that doesn't mean I didn't see this document somewhere.

Well, this one says "Dear Stella," so this is an email.

Q. Right.

A. I mean, is this an email or a document?

Q. It's an email to someone named Stella.

A. Got it.

Q. You've never seen that before; right?

MR. TAYLOR-COPELAND: Objection. It's vague and confusing.

So are you asking him if he's seen the email or if he's seen the article that appears to accompany the email?

THE WITNESS: Also, I don't know if my -- if this has come up in discovery, like -- like I don't -- I didn't see it at the time it was sent from Stella. I'm not copied on it.

MR. RAWLINSON: Right.

THE WITNESS: Right. I'm not copied on it.

Q. BY MR. RAWLINSON: Okay. You didn't see it in January of 2021 when it was sent to Stella, or Stella to Rosen; correct?

MR. TAYLOR-COPELAND: Same objection. Vague.

THE WITNESS: Unless it was forwarded. But it would have probably not been forwarded on that day.

Q. BY MR. RAWLINSON: Okay. So there's no way you relied on that document in entering into any

transactions with Nexo; correct?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I may have relied on information that's in this document. I would need to really read the document.

Q. BY MR. RAWLINSON: I'm asking about that document.

There's no way you relied on an email between Stella and Rosen; correct?

MR. TAYLOR-COPELAND: Okay. I'm going to make the same objection.

And, counsel, you really need to ask whether he relied on this email or...

THE WITNESS: The information.

MR. RAWLINSON: That's exactly what I asked him: "Have you ever seen" --

THE WITNESS: Let me read the email.

(Reporter request.)

THE WITNESS: Okay. Let me read the email, please.

Q. BY MR. RAWLINSON: No. I don't have time for that.

My question is: Have you ever seen Exhibit 4 before, which is an email between Stella and Rosen, that document?

A. I mean, my lawyers tell me not to respond, so I --

MR. TAYLOR-COPELAND: No, I'm --

THE WITNESS: You're not?

MR. TAYLOR-COPELAND: Just to be clear: I'm not telling you --

THE WITNESS: Oh, you're not?

MR. RAWLINSON: Your lawyer --

MR. TAYLOR-COPELAND: He's clarified --

THE WITNESS: Oh, I'm sorry.

MR. TAYLOR-COPELAND: -- that he's referring to the email. So you can answer the question.

THE WITNESS: Okay. I don't believe I would have had possession of this email, but I may have relied on information that's contained here.

Q. BY MR. RAWLINSON: You've never seen Exhibit 4 before; correct?

A. I've never seen this email from this person to this person.

Q. Correct. That's all you've got to say.

A. Okay. All right. Sorry. Sorry. I didn't mean to be argumentative.

Q. Oh, maybe you did.

A. Oh, maybe I did.

MR. RAWLINSON: Ah, James, come on.

80 (Pages 314 - 317)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

Here you go. I got another one.

MR. TAYLOR-COPELAND: Thank you.

MR. RAWLINSON: Give you another shot.

For the record, we're just having a little fun. It's late in the day.

(Exhibit 5 previously marked.)

Q. BY MR. RAWLINSON: This is -- I'm handing you plaintiff's exhibit -- I'm sorry, "plaintiff's"?

I'm handing you Exhibit 5, that's been previously marked. This is an email from Nexo Community to someone named Yordan Shanov?

Do you see that?

A. Yeah.

Q. Okay. Real quickly, have you ever seen this document before?

A. It looks familiar.

Q. Have you ever seen this document, which is an email from Nexo Community to Yordan Shanov, before?

A. I may have seen the document that they're -- that they're sending.

Q. And that's not what I asked you. It's a real simple questions.

Have you ever seen Exhibit 5 before?

A. Let me read it. Let me look at it.

"Dear Yordan." These look like drafts,

Page 318

because there's "Dear Yordan." So I didn't -- I don't think I saw materials from Nexo that had like this "dear" first name; so, no.

Q. You know who Yordan is?

A. Yordan Shanov? I don't recall.

Q. So you've never seen Exhibit 5 before; correct?

A. Sure. Yeah.

MR. RAWLINSON: All right.

(Exhibit 6 previously marked.)

Q. BY MR. RAWLINSON: I've handed you what's been previously marked as Exhibit 6, which is NEXO-7981.

Have you ever seen that document before?

A. I'm not sure. I can't -- It's too small.

Q. You can't read it?

A. Hum-um.

Q. So you can't tell me whether or not you've seen this document before?

A. Correct.

Q. It's titled "how do I withdraw crypto assets I have stored at Nexo?"

Is that something you would have looked at and reviewed?

A. Possibly.

Page 319

Q. Well, yes or no?

A. I don't know.

Q. Don't know. So you can't testify as to whether or not you've seen this Exhibit 6 before; correct?

A. I -- I might, if I could read it. I can't currently.

Q. I've got one shot with you. You should have brought readers or something else. But --

MR. TAYLOR-COPELAND: Why don't we go off the record, and maybe I can pull it up on my computer and make it bigger for him.

MR. RAWLINSON: If you want to take a quick pause, we can.

MR. SHELTON: Let's go off the record.

THE VIDEOGRAPHER: I've got like 2.5's, if he wants to borrow them.

MR. SHELTON: Are we on the record?

MR. RAWLINSON: No. We'll just keep rolling.

Q. BY MR. RAWLINSON: You can't provide any testimony today on Exhibit 6; correct?

A. Yeah. Maybe later.

MR. RAWLINSON: Okay. I'm afraid we're going to get the same deal here on Exhibit 7, which is

Page 320

another printout from Nexo's website.

(Exhibit 7 previously marked.)

Q. BY MR. RAWLINSON: Can you read it?

A. No.

Q. Have you ever seen it before?

A. Can't read it.

Q. Okay. You've seen the chart, though, before; right?

A. I see that has the tiers.

Q. Okay.

A. But I can't read the -- I can barely see.

Q. Do you have glasses?

A. I got Lasik surgery like in the 2011, I want to say. I haven't used glasses since then. The doctor gave me some readers that I've been in denial that I need, because I don't usually need them; but I also don't usually read things this small. So I don't know, I might end up getting glasses.

Q. All right. Let me ask you this: If this says: "Under our zero fees policy, you can make unlimited free-of-charge fiat withdraws, crypto and fiat transfers into your Nexo Wallet and credit line withdraw. Nexo does not charge any credit line, origination, Forex, and exchange fees."

Is that true or untrue?

Page 321

81 (Pages 318 - 321)

Veritext Legal Solutions
346-293-7000

CONFIDENTIAL

A. That's untrue. Untrue.

Q. "For transfers into the Nexo Wallet."

Is that true or untrue?

A. Well, I don't know about the last part of your statement, but the -- there were parts of that sentence that were untrue.

Q. Okay. Do you know of any fees Nexo charges for its Nexo Wallet?

A. No. But Nexo takes hidden fees, so I wouldn't know, and I don't think I used their wallet.

MR. RAWLINSON: I'll object to the nonresponsive portion.

Let's look at what's been previously marked as Exhibit 8, which is Nexo 147920.

(Exhibit 8 previously marked.)

Q. BY MR. RAWLINSON: Have you ever seen this document before?

A. Don't recall. I've seen a lot -- I've seen a lot of the information. I recognize a lot of the information.

Q. I need to know whether or not you've seen this document before, sir.

A. Not exactly, but I -- Nexo adheres to a zero fees policy. There's no additional costs. There's a lot of stuff I recognize, you know, but...

Page 322

Q. All right. And this talks about the crypto credit lines; correct?

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: It says at the top "crypto credit lines."

Q. BY MR. RAWLINSON: And you told me earlier you couldn't remember any fees associated with your crypto credit line; correct?

MR. TAYLOR-COPELAND: Objection. Misstates testimony. Vague.

THE WITNESS: Do you mean -- Do you mean what I -- what I expected or what I later found out?

Q. BY MR. RAWLINSON: You told me earlier, sir, that there were no fees associated with your use of the crypto credit line.

MR. TAYLOR-COPELAND: Objection. Vague and misstates testimony.

Q. BY MR. RAWLINSON: Correct?

THE WITNESS: I don't think that's true. They took major fees.

Q. BY MR. RAWLINSON: From your loans? You told me earlier you never paid a fee associated with your loans.

MR. TAYLOR-COPELAND: Same objections.

THE WITNESS: That I know of.

Page 323

Q. BY MR. RAWLINSON: Okay. You can't tell me today that you paid any fee associated with your loans; correct?

A. Yeah. I don't know what the hell Nexo's done at this point.

MR. RAWLINSON: Oh, God.

(Exhibit 10 previously marked.)

Q. BY MR. RAWLINSON: Okay. I've handed you what's been previously marked as Exhibit 10, which is NEXO-168966.

Do you see that?

A. I see 96. Maybe -- Maybe --

Q. Did I say it wrong?

A. Maybe you need the readers now.

Q. 168966?

A. 996.

Q. Thank you for correcting me.

A. No problem.

Q. 168996. Have you seen that document before, Exhibit 10?

A. Three crypto -- This looks like a blown-up version of the other one, so I think I just saw it.

Q. Okay. Do you have a recollection of seeing it in February 12th, 2021?

A. February 12th? Oh, 02/12 right there. I

Page 324

couldn't tell you if I saw it on that day.

Q. Okay. Do you know if you were a part of the email group investors@nexo.io on February 12th, 2021?

A. I really don't think so at that point.

Q. Okay. Do you see that Nexo says they're incorporating free cryptocurrency withdraws into their loyalty program?

A. I do.

Q. Okay. And anything about that untrue?

MR. TAYLOR-COPELAND: Objection. Calls for speculation.

THE WITNESS: I have real trouble saying what's true and not true when it comes to Nexo, so I don't know.

Q. BY MR. RAWLINSON: Well, to your knowledge, is that untrue?

A. I have no knowledge of the truth of that. I don't know yet.

Q. Do you have any basis today to see that -- say that Nexo charged for cryptocurrency withdrawals?

A. I don't have a specific evidence, but I have a lot of experience with them lying, so I'll go with that.

MR. RAWLINSON: I'll object to the nonresponsive portion.

Page 325

82 (Pages 322 - 325)

CONFIDENTIAL

THE WITNESS: Okay.

MR. TAYLOR-COPELAND: Thank you.

(Exhibit 11 previously marked.)

Q. BY MR. RAWLINSON: I've handed you what's been previously marked as Exhibit 11 in this case, which is NEXO-179538.

Have you seen this email from Nexo Community to Lyubcho@nexo.io before?

A. No, but I wish I did, because I'd love to buy Bitcoin at 8900; but I don't -- I don't recall seeing this.

Q. You've never seen this before; correct?

A. Yeah, not the email itself between the two people, right, or Bitcoin at 8900.

MR. RAWLINSON: Okay.

THE WITNESS: All right.

MR. RAWLINSON: Where are we?

(Sotto voce remarks.)

THE WITNESS: Okay. The node.

(Exhibit 12 previously marked.)

Q. BY MR. RAWLINSON: I've handed you what's been previously marked as Exhibit 12.

This is an email from Daniel Kuhn at CoinDesk to Magdalena@nexo.io.

Do you see that?

Page 326

A. I do.

Q. And this is dated 07/19/21. "Yellen about stablecoins" is the subject.

Have you ever seen this document before?

A. I think that you're very specifically talking about an email from this person to this person, right, a private email?

Q. I'm very specifically talking about Exhibit 12.

Have you seen Exhibit 12 before?

A. I may have seen some -- a lot of this content, but I never had -- my eyes never had access to an email from CoinDesk to Magdalena@nexo.io.

MR. RAWLINSON: Right. Okay.

(Exhibit 15 previously marked.)

Q. BY MR. RAWLINSON: I've handed you a document that's previously been marked as Exhibit 15, which is NEXO-22733.

Do you have that in front of you?

A. Yes.

Q. Okay. This is an email again from Nexo Community to someone named at Lyubcho@nexo.io.

Do you see that?

A. Um-hum.

Q. Have you ever seen Exhibit 15 before?

Page 327

A. I've seen the promises there of all those "no fees," but I haven't seen the private email from Nexo to Lyubcho@nexo.

Q. And this is dated July 11th of 2019.

Do you think you've seen this document before?

A. I never had access to that email account, so I would think that it's impossible that I've seen this email.

Q. Okay. And do you see the "re" line of this email is "zero fees on all your Nexo Wallet transactions"?

A. Where is that?

Q. It's the "re" line of the email.

A. Oh. Yeah, I see that.

Q. Okay. Do you know if Nexo charges any fees on its Nexo Wallet transactions?

A. I don't know.

MR. TAYLOR-COPELAND: Objection. Vague.

THE WITNESS: I don't know.

MR. TAYLOR-COPELAND: Calls for speculation.

Q. BY MR. RAWLINSON: Sitting here today, you can't tell me whether or not Nexo charges fees on its Nexo Wallet transactions; correct?

A. Correct.

Page 328

MR. RAWLINSON: All right. I'm going to throw my back out reaching over.

(Exhibit 16 previously marked.)

Q. BY MR. RAWLINSON: I've handed you what's been previously marked as Exhibit 16, which is NEXO-149521, titled "introductory information about Nexo."

Have you ever seen this document before?

A. I might have seen it like with graphics, not -- this one is pretty plain looking, but I recognize a lot of stuff in here.

Q. Okay. My question is whether or not you can testify that you've ever seen Exhibit 16 before.

A. I don't recall.

Q. Okay. Do you know if you saw Exhibit 16 before February of 2021?

A. Don't recall.

Q. You can't testify one way or the other?

A. Yeah, I don't -- I don't recall, but I see a lot of the information I recognize.

Q. I gotcha.

A. Okay.

Q. Your counsel may fix that later.

I'm asking you about Exhibit 16, whether or not you've ever seen that document before.

Page 329

83 (Pages 326 - 329)

CONFIDENTIAL

A.   Without any graphics, you know, I don't recall.  Could have been.

Q.   Can you tell me one way or another, sitting here right now, whether or not you've seen Exhibit 16?  Yes or no.

A.   I don't recall.

Q.   Okay.  If you don't recall seeing it, then you can't testify today that you relied on any of the information in Exhibit 16; correct?

A.   Oh, I relied on a lot of information.

MR. TAYLOR-COPELAND:  Objection.  Vague.  Compound.

THE WITNESS:  That was --

Q.   BY MR. RAWLINSON:  Did you rely on Exhibit 16 if you've never seen it before?

A.   I relied on -- Do you want me to tell you what I relied on and read it?

Q.   No.

A.   Okay.

Q.   I want to know whether or not you can testify that you've seen Exhibit 16.

MR. TAYLOR-COPELAND:  Asked and answered.

THE WITNESS:  I would have to sit here and read this; because you just said, if I didn't rely on this, I didn't rely on any of the information in it.

Page 330

That's very tricky.

Q.   BY MR. RAWLINSON:  I did not ask you -- I'm not trying to trick you.

A.   Okay.  Okay.

Q.   I'm saying:  Exhibit 16, if you can't testify that you've seen this document before, then you can't testify that you relied on this document.  Correct?

A.   Okay.  Well, you said that I relied on "any information."

Q.   Let's not quibble.

A.   No, I --

Q.   I will rephrase the question --

A.   Okay.

Q.   -- and we'll move forward.

A.   Yeah, I don't --

Q.   Did you rely on Exhibit 16?

A.   I don't recall.

(Exhibit 28 previously marked.)

MR. TAYLOR-COPELAND:  Thank you.

Q.   BY MR. RAWLINSON:  I've handed you what's been marked previously as Exhibit 28, which is NEXO-162576.

Do you have that in front of you?

A.   Yes.

Page 331

Q.   Okay.  And this is a -- looks to be a transcript of "Ask Antoni Anything."

MR. TAYLOR-COPELAND:  Objection.  Misstates the document.

Q.   BY MR. RAWLINSON:  Did you watch this YouTube video?

A.   What -- What date?

Q.   At any time, have you watched the YouTube video that this is recapping?

A.   Okay.

MR. TAYLOR-COPELAND:  Objection as to what's attached.

THE WITNESS:  He did multiple "ask me anything's," so I'm going to -- Give me a second.

(Reviewing document.)

THE WITNESS:  Talking about the governance vote, fixed terms.

This looks like a familiar AMA that I watched.

Q.   BY MR. RAWLINSON:  Have you seen Exhibit 28 before, this document?

A.   This document?

Q.   Yes.

A.   I -- I don't recall.

Q.   Okay.  Do you recall watching the March 2021

Page 332

AMA?

A.   Yes.  I recognize these topics.

Q.   When did you watch it?

A.   That's -- you know, you're asking me to come out -- I don't want to be quoted exactly on the date.  I think it was late March.

Q.   Do you have a recollection of watching it in late March?

A.   That's right.

Q.   Okay.  Would that have been before or after you transferred your crypto to Nexo?

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  It was -- You mean after I transferred, just -- just simply put the money on Nexo?  I -- you know, that's hard to remember, but I -- I'm going to guess after.

Q.   BY MR. RAWLINSON:  Okay.  Would you have watched it after you started doing OTC desk transactions?

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  Before that, before the transactions.

Q.   BY MR. RAWLINSON:  You think you watched it before the transactions?

A.   Yes.

Page 333

84 (Pages 330 - 333)

CONFIDENTIAL

So like, at that point in time, I didn't think that like their liquidation bot completely malfunctioned and they were, you know, totally liquidating me way out of the ballpark. That -- You know, and that's just based on my crude check, sanity check, or whatever check.

Q. BY MR. RAWLINSON: Right. So you don't have any basis, sitting here today, to say that Nexo didn't properly calculate your loan-to-value ratio at 83.33 percent and execute liquidations; correct?

MR. TAYLOR-COPELAND: Objection. Compound.

THE WITNESS: I might.

MR. TAYLOR-COPELAND: Calls for speculation, and calls for expert testimony.

THE WITNESS: Sitting back here, sitting on July 20th, I would say that. I wouldn't say that sitting here today.

Q. BY MR. RAWLINSON: Sitting here today, can you tell me that Nexo violated the 83.33 threshold?

MR. TAYLOR-COPELAND: I'm going to object and instruct you not to answer based on any conversations you've had with counsel.

THE WITNESS: I don't know yet.

Q. BY MR. RAWLINSON: Do you have any facts to offer me today?

Page 358

A. Oh, today? No.

Q. Today, that Nexo did not properly liquidate you according to the numbers, as you told Miguel?

A. No --

MR. TAYLOR-COPELAND: Objection. Calls for speculation. Calls for expert testimony.

THE WITNESS: I can tell you that you will know soon.

Q. BY MR. RAWLINSON: Okay. But today I don't get to know?

A. That's right.

Q. All right.

A. You're going to have to wait just a little bit.

MR. RAWLINSON: What a fun surprise that will be.

THE WITNESS: Yeah.

MR. RAWLINSON: Last one, if Max will let me do it.

(Exhibit 174 marked.)

Q. BY MR. RAWLINSON: 174 I've handed you, which is yet another chat with the mysterious Ace.

Do you have that in front of you?

A. Yeah.

Q. Okay. And I'm going to direct your

Page 359

attention to page 13081.

A. Okay. Um-hum.

Q. Okay. Was it true what you told Ace that the problem is you got yourself in a huge fucking bind and then it became damage control and deer in the headlights?

A. Yeah. That's what I -- That's how I felt.

Q. I mean, that's a fair summary of how you went through this whole transaction: You fucked yourself by taking out too many loans, and got yourself in a huge fucking bind, as you say. Correct?

MR. TAYLOR-COPELAND: Objection. Argumentative and compound.

THE WITNESS: I mean, we'll just agree to disagree. You're -- You want to say everything's my fault. I -- I think it's Nexo's fault.

MR. RAWLINSON: Okay.

THE WITNESS: But I was definitely -- A couple things that are right here is like the word "fucking," and "damage," and "deer in the headlights."

So some of this is true, but Nexo completely are frauds, so...

Q. BY MR. RAWLINSON: You certainly don't write that here. You say you got yourself in a huge fucking bind, then you tried damage control --

Page 360

A. Well -- Sure.

Q. -- and then you were just paralyzed, deer in the headlights. Right?

A. Yeah. Well --

MR. TAYLOR-COPELAND: Objection. Argumentative and compound.

THE WITNESS: I wish I never did business with Nexo. I wish I never did that.

Q. BY MR. RAWLINSON: Because you fucked yourself?

MR. TAYLOR-COPELAND: Objection. Argumentative.

THE WITNESS: Because Nexo fucked me, you know. Because Nexo fucked me.

Q. BY MR. RAWLINSON: "Deer in the headlights" is a reference to you had -- you were not taking any action during April, May, and June as the market was crashing; correct?

A. Well, it's more like the 19 days they refused to respond to me, you know, and then what situation that -- that put me into.

Q. Well, you were paralyzed. What does "deer in the headlights" mean?

A. It means I need their help, they're completely ignoring me, and I'm realizing how screwed

Page 361

91 (Pages 358 - 361)