# EXHIBIT A

James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN CRESS,<br><br>               Plaintiff,<br><br>        v.<br><br>NEXO CAPITAL INC.<br><br>               Defendant. | Case No. 3:23-cv-00882-TSH<br><br>**PLAINTIFF CRESS' NOTICE OF FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) DEPOSITION OF DEFENDANT NEXO CAPITAL, INC.** |

NOTICE OF RULE 30(B)(6) DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, starting March 27, 2026, counsel for Plaintiff John Cress will take the deposition(s) of the designated representative(s) of Defendant Nexo Capital Inc., able to testify fully as to the topics listed in Exhibit 1. The deposition(s) will take place at 235 Pine Street, Suite 1100, San Francisco, CA 94104, and will continue from day to day until completed. The deposition(s) will be taken before a duly qualified notary public or other officer authorized by law to administer oaths. The deposition will be recorded by video and stenographic means. The deposition may be used to preserve testimony for trial, to obtain discovery, and for any other purpose authorized by the Federal Rules of Civil Procedure.

Defendant shall provide a written designation of the name(s) and position(s) of the one or more officers, directors, or managing agents, or other person(s) who will be produced to testify on Defendant's behalf concerning the topics and matters set forth in Exhibit 1. Defendant shall, no later than seven (7) business days before the first scheduled deposition date, provide (a) the name, title, and job description of each 30(b)(6) designee; (b) the exact topics (by number) for which each designee will testify; and (c) a one-paragraph summary of the matters for which each designee is responsible.

Pursuant to Fed. R. Civ. P. 30(b)(6), the person(s) designated by Defendant to testify for each topic shall be prepared to testify fully and bind Defendant on the matters described in each topic, including subsections, on the basis of the knowledge, information, documents and ESI reasonably available to Defendant. Each designated witness shall (1) identify the data sources (including persons, custodians, and electronic repositories) used to prepare; (2) identify all custodians and data repositories searched to prepare; and (3) identify any information requested but not located, any information withheld (with the privilege asserted), and any gaps in the information reasonably available to Defendant. The witness must also identify the names and titles of the persons who prepared the witness for the deposition and the dates of such preparation.

Defendant shall produce at least seven (7) business days before the deposition the categories of documents and ESI identified in the "Advanced Delivery of Documents" section of Exhibit 1, and shall bring to the deposition (and make available in native format) all documents relied upon in preparing the designee(s). For any document withheld on grounds of privilege or work product,

NOTICE OF RULE 30(B)(6) DEPOSITION

Defendant shall provide a privilege log at least five (5) business days prior to the deposition identifying the document, author, recipients, date, and the specific privilege asserted.

If a designated witness is not prepared to testify on a topic for which they were designated, Plaintiff may suspend the deposition and seek reasonable costs, including attorneys' fees and fees for reconvening or recalling the witness. Plaintiff reserves all rights to seek sanctions if Defendant fails to produce a properly prepared designee.

Dated: January 26, 2026

Respectfully submitted,

/s/ *James Taylor-Copeland*
James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

NOTICE OF RULE 30(B)(6) DEPOSITION

**EXHIBIT 1**

The following definitions and instructions apply to the topics below:

1.      "Plaintiff" or "Cress" means Plaintiff John Cress.

2.      "Complaint" means the Second Amended Complaint (ECF No. 88), filed by the Plaintiff in this action on October 30, 2025.

3.      The terms "You," "Your," "Defendant," or "Nexo" means Defendant Nexo Capital Inc., and its subsidiaries, affiliates, divisions, successors or assignees, and their respective directors, employees, consultants, representatives and agents.

4.      "Exchange" means any website, platform, or service that allows users to buy or trade digital assets, such as NEXO. For the avoidance of doubt, EXCHANGE includes both centralized and decentralized exchanges.

5.      "Liquidation Relief Program" or "LRP" includes any program, manual, policy, or practice described in marketing materials, the VIP Brochure, or internal materials as providing partial or full relief from liquidation, collateral swaps, or any other mitigation of customer liquidation risk; it includes all internal names and synonyms used in Nexo communications.

6.      The "Oracle" means the proprietary automated system, algorithm, or third-party data feed aggregators used by Nexo to determine asset pricing, monitor LTV, and trigger liquidations.

7.      "OTC Desk" means Nexo's over-the-counter trading desk (including any internal trading desk, market making desk, or external entity acting as counterparty on behalf of Nexo) and includes the managers, traders, operations and settlement personnel, and any aliases or alternative departmental names (for example, "Over-the-Counter Desk," "OTC Trading," or "Institutional Desk").

8.      The "SEC" means the United States Securities and Exchange Commission.

9.      The term "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

10.      "Person" means any natural person, public or private corporation, whether or not organized for profit, governmental entity, partnership, association, cooperative, joint venture, sole

1

NOTICE OF RULE 30(B)(6) DEPOSITION

proprietorship or other legal entity. With respect to a business entity, the term "person" includes any natural person acting formally or informally as a director, trustee, officer, agent, attorney or other representative.

14. The relevant time period is 2017 to the present unless otherwise specified.

NOTICE OF RULE 30(B)(6) DEPOSITION

**TOPICS**

I.    **Nexo's VIP Relationship Program and Liquidation Relief Program**

1.    The structure, benefits, and operation of the "VIP Relationship Program" referenced in the Complaint, including: (a) the drafting, content, and approval of the VIP Brochure sent to Plaintiff on or about March 17, 2021; (b) the specific benefits promised to VIP clients, including "Liquidation Relief," "24/7 support," and "dedicated relationship managers"; and (c) the training, supervision, and authority of Relationship Managers, including Hristiyan Hristov, regarding Communications with VIP clients.

2.    The existence, terms, and mechanics of the "Liquidation Relief Program" advertised to Plaintiff, including: (a) how the program was intended to function; (b) internal criteria for offering "liquidation relief" or collateral swaps to customers; and (c) why Plaintiff was not offered protection from liquidation under this program.

3.    Nexo's representations in the VIP Brochure regarding the Liquidation Relief Program, including:

    a.    The factual basis for the statement in the VIP Relationship Program brochure that the Liquidation Relief Program could be used "in the event of a market crash to recover your liquidated assets;"

    b.    Nexo's knowledge at the time the brochure was drafted and sent to Plaintiff about whether the Liquidation Relief Program would allow him to recover his liquidated assets; and

    c.    Nexo's intent in advertising the Liquidation Relief Program and whether the terminology used in its advertising was designed to induce customers to maintain higher LTV ratios by creating a false sense of security.

4.    Nexo's representations in the VIP Brochure regarding responsiveness and access, including:

    a.    The factual basis for the statements that VIP customers would receive a "response from the support team in 2 hours, 24/7", a "dedicated relationship manager," that

3

NOTICE OF RULE 30(B)(6) DEPOSITION

would reply to their emails "in a matter of hours, no more than 24h," and "direct phone number availability;"

    b.  Nexo's knowledge regarding the actual workloads of its Relationship Managers (including Hristov) and its support staffing levels, including awareness of its ability or inability to respond to customers within two hours, or no more than 24 hours; and

    c.  Nexo's intent in making these representations regarding responsiveness and access.

5.    Nexo's policies, practices, and representations regarding whether digital assets posted as collateral for loans continue to earn interest, including the factual basis for the representation made to Plaintiff on March 23, 2021, that he would "be earning 5% annually on the Bitcoin which you used as collateral."

6.    Nexo's representations regarding interest on collateral, including:

    a.  The factual basis for the statement made by Hristov to Plaintiff on or about March 23, 2021, that: "You will be earning 5% annually on the Bitcoin which you used as collateral;"

    b.  Nexo's knowledge that under its own systems and Terms, assets moved to the Credit Line Wallet ceased earning interest, and whether Relationship Managers were aware of this fact; and

    c.  Nexo's intent in making this representation.

## II.    Nexo's Fees and its ZeroFees/No Hidden Fees Advertising

7.    Nexo's representations regarding its fees, including:

    a.  The factual basis for the following representations:

        i.  Nexo's March 2020 blog post: "No fees: Banks also tend to charge all sorts of fees for their services, whereas Nexo adheres to a #ZeroFees policy. There are no additional costs associated with our services."

        ii.  Nexo's June 2020 blog post: "No minimum contribution requirements and transactions at #ZeroFees."

NOTICE OF RULE 30(B)(6) DEPOSITION

   iii. Nexo's February 2021 blog post: "Under our #ZeroFees policy you can make unlimited free-of-charge fiat withdrawals, crypto and fiat transfers into your Nexo Wallet, and credit line withdrawals. Nexo does not charge any credit line, origination, forex, and exchange fees."

   iv. Nexo's March 2021 customer account page: "No hidden fees."

   v. Nexo's Whitepaper: ""Whereas other providers charge membership, application and/or funding fees on top of the interest rates, Nexo has no fees whatsoever, apart from a very competitive annual interest rate."; "No Hidden Fees"; no "Additional Fees"; and no "Exchange Fees"

   vi. March 2021 Ask Me Anything with Trenchev: "There is no concept of hidden fees at Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make . . . There is no hidden fee like, you know, percentage wise. If we're going to implement one we're going to do an announcement well ahead of time so that people don't see some random transactions in their transaction history which they're without an explanation."

  b. The fees charged by Nexo at these times.

  c. Nexo's intent in making these statements and omitting any reference to fees from its public advertising and terms of service.

  d. Nexo's statements regarding fees disclosed in its response to Plaintiff's Interrogatory Nos. 13 and 14.

8. Nexo's representations regarding OTC Rates, including:

  a. The factual basis for the promise that VIP clients would receive "OTC services with some of the best rates no the market" and "institutional rates for amounts larger than $100,000;"

  b. The methodology used to price Plaintiff's BTC, ETH, and NEXO purchases, including Nexo's knowledge of the variance between the prices charged to Plaintiff

NOTICE OF RULE 30(B)(6) DEPOSITION

and the prevailing spot market rates (or weighted average pricing) at the time of execution

    c. Nexo's intent in making these representations and its intent to markup assets sold to customers.

9. Nexo's "#ZeroFees" marketing policy and its application to Plaintiff's account, including: (a) the existence of any internal policies to conceal fees, spreads, or markups from customers; and (b) the factual basis for the allegations in the Complaint that Nexo charged spreads/markups on OTC trades while advertising "no hidden fees" and "no exchange fees."

10. The fees, taxes, commissions, profits, and revenues Nexo took on each of Plaintiff's transactions, including his OTC transactions, forced liquidations, and manual liquidations.

**III. SEC Registration and the NEXO Token**

11. Nexo's representations regarding the regulatory status of the NEXO Token, including the statement made to Plaintiff (and other customers) that "the NEXO token is registered with the SEC as a security."

    a. The factual basis for Nexo's statement that "the NEXO Token is registered with the SEC as a security."

    b. Nexo's knowledge of the distinction between a Form D Notice of Exempt Offering and SEC registration.

    c. Nexo's intent in representing that "the NEXO Token is registered with the SEC as a security," including the decision to instruct or allow employees to use this language in Communications with US customers.

12. The factual basis for Nexo's 2018 Form D filings and the "End Date" of that offering indicated in those filings

13. Nexo's requirement for customers to hold 10% of their portfolio in NEXO Tokens to receive "Platinum" interest rates.

14. Nexo's Communications with the SEC regarding the NEXO Token or Nexo's "SEC-compliant" marketing language.

NOTICE OF RULE 30(B)(6) DEPOSITION

15.     Nexo's sales of the NEXO Token on Exchanges.

16.     Nexo's sales of the NEXO Token to U.S. Persons, including: (a) Nexo's policies, practices, and procedures for collecting information about accredited investors from 2018-2022; (b) Nexo's sales of NEXO Tokens to non-accredited investors; (c) Nexo's sale of NEXO Tokens to U.S. residents disclosed in Plaintiff's Interrogatory No. 3 to Nexo; (d) Nexo's sale of NEXO Tokens to U.S. residents that were not disclosed in Plaintiff's Interrogatory No. 3 to Nexo; (e) Nexo's referrals of non-accredited U.S. investors to purchase NEXO Tokens on Exchanges such as Uniswap, Huobi, Changelly, HitBTC; (f) the creation of, and information in the spreadsheet NEXO-0139872; (g) how the information in Plaintiff's Interrogatory No. 3 was compiled by Nexo.

## IV.     Plaintiff's Transactions and Nexo Account

17.     The mechanics of Plaintiff's digital asset purchases through the Nexo OTC Desk in, including: (a) how execution prices were calculated (e.g., spot price vs. markup) for Plaintiff's trades; (b) the "Portfolio Booster" transaction on or about April 14, 2021, specifically the allegation that Nexo took a $102,125 undisclosed profit/fee; (c) the internal email referenced in Complaint ¶64 detailing "Profit for the OTC Desk" and "Hedge" profits; (d) the discrepancy between the execution prices provided to Plaintiff and the time-weighted average prices (TWAP) on the market; and (e) whether Nexo acted as a principal (selling from its own inventory) or agent in these transactions.

18.     The policies and technical systems governing the liquidation of customer collateral, including: (a) the calculation of the Loan-to-Value (LTV) ratio and the 83.33% liquidation threshold; (b) the existence, calculation, and application of a "liquidation tax" or liquidation fee and the policy regarding disclosing this fee to customers (referencing Complaint ¶92: "WE SHOULD NEVER... MENTION THERE IS A LIQUIDATION TAX"); (c) the specific liquidations of Plaintiff's assets in May and June 2021, including where those assets were sold, the time of sale, and the sale prices obtained by Nexo versus the prices credited to Plaintiff's loan balance; and (d) the logic/algorithm determining the order of assets sold (e.g., US DC/BTC vs. NEXO Token).

NOTICE OF RULE 30(B)(6) DEPOSITION

19. The operation of the Oracle between March 1, 2021 and June 30, 2021, including data sources used for pricing, the frequency of updates, and any latency between a market drop and a liquidation trigger.

20. Nexo's drafting, interpretation, and performance of the Cryptocurrency Purchase Agreement entered into with Plaintiff, including: (a) The "Review Period" clause requiring confirmation within ten minutes; (b) The "Free of Liens" clause; (c) Nexo's performance of the specific Purchase Orders submitted by Plaintiff; (d) any fees associated with the Purchase Orders.

   a. Nexo's technical capability and practice regarding the "ten minute" confirmation window mandated by the Cryptocurrency Purchase Agreement, and the reasons for the delays in executing Plaintiff's purchase orders.

**V.    Nexo's Status as a Finance Lender and Corresponding Lending Licenses**

21. Nexo Capital Inc.'s status as a licensed finance lender in the State of California during the relevant period from 2020-2022, any efforts taken to obtain such licensure or comply with the California Finance Law (e.g., Cal. Fin. Code § 22000 et seq.) and the California Consumer Financial Protection Law (Cal. Fin. Code § 90000 et seq.), and Nexo's internal analysis regarding whether its lending activities, including providing loans to Plaintiff, constituted "finance lending" requiring a license under California law.

22. Whether Nexo required borrowers to submit loan applications, and whether Plaintiff ever submitted a loan application to Nexo.

23. Whether Plaintiff ever transacted or did business with Nexo Financial LLC in connection with his loans from Nexo Capital Inc.

24. The relationship between Nexo Capital Inc. and Nexo Financial LLC from 2020-2022.

25. Nexo's communications with California regulators regarding its status as a licensed finance lender, including the California Department of Business Oversight and the California Department of Financial Protection and Innovation.

26. Nexo's efforts to determine Plaintiff's intended use of the loan proceeds and whether Nexo acquired a written statement of intended purposes signed by Plaintiff.

NOTICE OF RULE 30(B)(6) DEPOSITION

27.   Nexo's use of any California finance lending license in connection with its https://nexo.io website.

28.   Nexo's representations from 2020-2022 that Nexo Capital Inc. was a licensed finance lender in the State of California.

## VI.   Nexo's Related Persons and Entities

29.   The relationship, shared management, flow of funds, commingling of funds, and shared employees between Nexo Capital Inc. and the Related Persons and entities listed in the Complaint (e.g., Nexo Services, NDS EOOD, Credissimo), specifically regarding the operation of the lending platform, the employment of Hristiyan Hristov, and the operation of the OTC Desk.

30.   The policies and practices regarding the commingling of customer assets with Nexo's proprietary trading funds or the assets of other Nexo Related Persons and entities as described in paragraph 37 of Plaintiff's Second Amended Complaint.

## VII.   Creation and Circulation of Nexo's Business Records

31.   The authorship and circulation of the following documents, including all iterations:

   a.   NEXO-0145948 (Retail OTC Procedures)

   b.   NEXO-0140611, NEXO-0142440 (information held in the Liquidation transaction)

   c.   NEXO-0214393, NEXO-0219069 (OTC Services)

   d.   NEXO-0139872 (Spreadsheet listing US NEXO Token investors)

   e.   NEXO-0137019 (Spreadsheet displaying Plaintiff's account information)

   f.   NEXO-0017589 (Spreadsheet displaying otc_deal_id)

   g.   NEXO-0216477 (List of questions the SEC wants Nexo to answer)

   h.   NEXO-0211778 (US market overview of Nexo token holders)

   i.   NEXO-0150967 (text file showing hidden conversation between Stanev and Kantechv regarding liquidation fees)

   j.   NEXO-0211144 (Letter to Arkansas Securities Department re Nexo Financial LLC)

   k.   NEXO-0017325 (Hris OTC deals January – June 2021)

9

NOTICE OF RULE 30(B)(6) DEPOSITION

l.  NEXO-0136995 (Litigation document in Hristov's custodial files)

m.  NEXO-0137255 (document discussing OTC, Portfolio Booster, NEXO Token)

n.  NEXO-0137893 (Nexo VIP program flow)

o.  NEXO-0137920 (Onboarding guide – Account Managers)

p.  NEXO-0138007, NEXO-0219321 (Goal of the program)

q.  NEXO-0138207 (Answers to questions regarding Nexo's lending)

r.  NEXO-0138672, NEXO-0139111 (Hristiyan's OKRs for Q4, 2020)

s.  NEXO-0138743, NEXO-0140906 (Internal FAQs)

t.  NEXO-0139009 (Document discussing Yoshiyuki Kubota)

u.  NEXO-0141048, NEXO-0141050, NEXO-0219682 (Nexo .csv transaction types)

v.  NEXO-0141364 (Email purportedly attaching Nexo legal opinions regarding NEXO token regulatory status)

w.  NEXO-0142401 (Retail OTC Deal Flows)

x.  NEXO-0144183 (Nexo Information & Messaging Points Grand Document)

y.  NEXO-0145425 (AM Workflow Optimization Proposition (AM Trainee):)

z.  NEXO-0146247 (OTC deals – performed on Telegram chats)

aa.  NEXO-0147325 (Nexo PR partner search draft emails)

bb.  NEXO-0149277 (Nexo FAQ)

cc.  NEXO-0149410 (Transparency promises)

dd.  NEXO-0149714 (Basic Facts About Nexo)

ee.  NEXO-0149792 (Questions for Project Nexo)

ff.  NEXO-0158081 (Nexo Investor Presentation Appendix – Detailed Financials)

gg.  NEXO-0163173 (NEXO Buyback Program: Strategy & Communication)

hh.  NEXO-0168656 (Why is Nexo Issuing Tokens?)

ii.  NEXO-0172850 (Lending Desk Deal Flows)

jj.  NEXO-0183586 (Data Retention and Disposal)

kk.  NEXO-0184400 ($NEXO & $BTC Correlation)

NOTICE OF RULE 30(B)(6) DEPOSITION

ll.  NEXO-0191899 (Institutional onboarding process)

mm.    NEXO-0198751 (AML & Compliance on NEXO Token ICO)

nn.  NEXO-0199060 (Information sent to Kentucky regulators)

oo.  NEXO-0199737 (Buyback Program Announcement)

pp.  NEXO-0201588 (Gap Analysis)

qq.  NEXO-0205251 (Salesforce export)

rr.  NEXO-0205396 (Nexo Consolidated and Combined Financial Statements 2019 and 2020)

ss.  NEXO-0209784 (Nexo VIP Relationship Program nexo.10)

tt.  NEXO-0211579 (Licenses and registrations of companies from Nexo Group – active or under regulatory review)

uu.  NEXO-0213465 (Nexo Business Plan)

vv.  NEXO-0214359 (Nexo's Earn/Credit Integration – features and security)

ww.    NEXO-0214701 (Balance Sheet & PnL)

xx.  NEXO-0214765 (How to Buy the Nexo Token and Earn Dividends)

yy.  NEXO-0215538 (Dear Emily, Dear Michael)

zz.  NEXO-0216078 (Dear Bitmex Team)

aaa.    NEXO-0216131 (TERMS AND CONDITIONS OF TOKEN SALE)

bbb.    NEXO-0217044 (ICO Questionnaire Coinbase)

ccc.    NEXO-0217096 (NEXO Token Terms)

ddd.    NEXO-0217190 (NEXO Token FAQ)

eee.    NEXO-0217236 (Onboarding guide – Sales Ops)

fff.  NEXO-0217316 (Debunking 5 Security Token Myths)

ggg.    NEXO-0217704 (FAQ)

hhh.    NEXO-0219825 (Dear Ben, Dear All)

iii.  NEXO-0219967 (HELP CENTER ARTICLES)

jjj.  NEXO-0221024 (Nexo Group Organizational Chart)

11

NOTICE OF RULE 30(B)(6) DEPOSITION

kkk.   NEXO-0225417 (Nexo Financial LLC US MSB Business Plan March 14, 2022)

lll.   NEXO-0225988 (Salesforce Case 000099111)

mmm.   NEXO-0231222 (Hristov Employment Agreement)

nnn.   NEXO-0231227 (Hristov Head of Institutional Employment Agreement)

32.   Nexo's use-of-language policies and procedures from 2018 to present.

## VIII.   Discovery Search, Production, and Preservation

33.   Nexo's business data retention policies, procedures, and practices.

34.   Nexo's steps to preserve documents and ESI potentially relevant to this action, including when litigation was first anticipated, when litigation holds were issued or modified, and the custodians, data sources, and categories of information subject to preservation.

35.   The manner in which Nexo implemented and enforced preservation obligations, including instructions provided to custodians, monitoring or follow-up to ensure compliance, and any adjustments to auto-deletion or auto archiving.

36.   Any deletion, loss, overwriting, or unavailability of potentially responsive documents or ESI, including timing and circumstances.

37.   The collection and search of documents and ESI from senior executives and other custodians involved in the matters at issue.

38.   The data sources and systems identified as reasonably likely to contain responsive information, including email systems, messaging platforms (e.g. Slack, Telegram, Signal, WhatsApp), CRM and operational systems, cloud repositories, and company-issued devices.

39.   The data sources and systems actually searched for responsive documents and ESI, and any sources not searched or only partially searched, including reasons why.

40.   The methods and tools used to search for, export, and produce responsive documents and ESI, including search terms, filters, date ranges, custodial versus non-custodial searches, and the role of counsel or vendors.

12

NOTICE OF RULE 30(B)(6) DEPOSITION

41.    Any limitations placed on searches, including by time period, platform, file type, or language.

42.    The procedures and tools used to collect documents and ESI from custodians and systems, including whether collections were full, targeted, or incremental.

43.    The processing steps applied to collected data prior to production, including de-duplication, filtering, and other culling methods.

44.    The criteria used to determine whether documents and ESI were produced, withheld, or deemed non-responsive.

45.    The handling of documents referenced in produced materials but not themselves produced, including missing attachments, exhibits, or linked files.

46.    The preservation and production of metadata and native files, including whether metadata was altered during collection or processing and the reasons for any such alteration.

47.    Nexo's steps to comply with the Court's discovery orders, including supplemental searches or productions and any remedial actions taken in response to identified gaps or deficiencies.

48.    The authenticity, creation, and interpretation of the trade confirmations, transaction history logs, and internal emails (including those quoted in the Complaint) concerning Plaintiff's account.

49.    Nexo's responses and objections to Plaintiff's Interrogatories, including but not limited to:

    a.    the factual bases for each response and objection;

    b.    the identity of all persons who provided information, input, or approval for each response;

    c.    the documents, data sources, information systems, and custodians relied upon in preparing each response;

    d.    the steps taken by Nexo to investigate, verify, and ensure the completeness and accuracy of its responses;

    e.    any limitations, assumptions, qualifications, or reservations underlying the responses;

13
NOTICE OF RULE 30(B)(6) DEPOSITION

f.   any information known to Nexo that was not included in its responses and the reasons for any such omission; and

g.   the process by which Nexo collected, reviewed, and synthesized information for purposes of responding to Plaintiff's Interrogatories.

14
NOTICE OF RULE 30(B)(6) DEPOSITION

## ADVANCED DELIVERY OF DOCUMENTS

Defendant shall produce at least seven (7) business days before the deposition the categories of documents and ESI identified here, and shall bring to the deposition (and make available in native format) all documents relied upon in preparing the designee(s). For any document withheld on grounds of privilege or work product, Defendant shall provide a privilege log at least five (5) business days prior to the deposition identifying the document, author, recipients, date, and the specific privilege asserted.

## REQUEST 1:

All documents reviewed, referred to or relied on by Nexo's 30b6 designees to prepare for the noticed deposition.

NOTICE OF RULE 30(B)(6) DEPOSITION

James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimilie: 619-566-4341

*Counsel for Plaintiff John Cress*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN CRESS,<br><br>        Plaintiff,<br><br>        v.<br><br>NEXO CAPITAL INC.<br><br>        Defendant. | Case No. 3:23-cv-00882-TSH<br><br>**PROOF OF SERVICE** |

1

NOTICE OF RULE 30(B)(6) DEPOSITION

**PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California. I am over the age of eighteen years and not a party to the within action.

On January 26, 2026, I served the following document in the manner described below:

**PLAINTIFF CRESS' NOTICE OF FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) DEPOSITION OF DEFENDANT NEXO CAPITAL, INC**

☐    BY UNITED STATES MAIL: By mailing a true and correct copy of the documents listed above in the United States mail, first class, postage prepaid, addressed to the addresses set forth below.

☑    BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy from my email address, maxambrose@taylorcopelandlaw.com to the email addresses set forth below.

On the following parties in this action:

**SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 26, 2026, at San Diego, California.

DATED:  January 26, 2026                    By,

_/s/Max Ambrose_
Max Ambrose
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4944
Facsimile: (619) 566-4341


_Counsel for Plaintiff John Cress_

1
PROOF OF SERVICE

## SERVICE LIST

Attorneys for Defendant by mail:

- Attn: Ian Shelton
  Baker Mckenzie
  10250 Constellation Blvd.
  Los Angeles, CA 90067

Attorneys for Defendant by electronic service:

- Ian Shelton - Ian.Shelton@bakermckenzie.com
- Matthew Rawlinson - Matthew.Rawlinson@bakermckenzie.com
- Kirsten Dooley - Kirsten.Dooley@bakermckenzie.com

Co-counsel by electronic service:

Plaintiff's counsel by electronic service:
- James Taylor-Copeland – james@taylorcopelandlaw.com
- Max Ambrose – maxambrose@taylorcopelandlaw.com

2
PROOF OF SERVICE