# EXHIBIT A

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## Antoni Antoniev Trenchev

## Confidential

Reported by:
GEORGIA GOULD



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    Confidential

before a court, the court then rules, and their ruling, in our case, was that Nexo as a group of companies and its owners, directors and officers, have not committed any crimes.

Q.   Did Nexo have any formal document retention policy in 2018?

A.   I do not believe that we had formalized that in a set of documents.  I think the default setting was that everything is pretty much kept indefinitely.

Q.   Was --

A.   Again, talking about 2018.

Q.   Okay.  Did -- and was that the same in 2019?

A.   I am not entirely sure when we issued our first formal retention policy but I would believe it was later than 2020.

Q.   So before the time that you issued a formal written policy, was the informal policy to retain emails indefinitely?

A.   It was whatever the default settings of the email provider was, which was Google.  I think that is where early days of a start-up and we had not pondered upon the retention policy and had no reason to at that time.

Q.   And before having a formal retention policy, is the same true of Slack, that you just used whatever

personal knowledge, if you know the answer, but he's not

testifying as a corporate representative on that issue.

A.    Sorry, can you rephrase the question to be?

BY MR. TAYLOR-COPELAND:

Q.    The question is what preservation measures

were actually implemented in response to government

inquiries or subpoenas?

MR. SHELTON:    I also object it's vague, but if

you can answer in your personal capacity you can answer.

A.    Well, I don't recall specifics but I think

that the vast majority of documents were kept at that

time indefinitely, so I don't -- I'm not sure whether it

called for any specific preservation at all if that was

the case.

BY MR. TAYLOR-COPELAND:

Q.    So you're unaware of any notification to

retain documents; is that correct?

A.    No, it is not correct.  I do not recall,

I might have been aware, I might not have been aware,

I just don't have a memory of that right now.

Q.    Okay.

So sitting here today you can't say whether

Nexo issued a litigation hold notice in response to any

of those government inquiries or subpoenas?

A.    I do not remember that.

in 2022, but I'm not entirely sure.

Q.   Did Nexo implement any preservation measures after learning of the filing of Mr. Cress's lawsuit?

MR. SHELTON:  Objection, asked and answered.

A.   I believe I answered that question already.

BY MR. TAYLOR-COPELAND:

Q.   Maybe I am missing something but can you -- could you repeat your answer?

A.   I will try.

I believe that when the issue -- issues around Mr. Cress were brought to my attention, I asked the same or similar question as you, what did we do to preserve relevant documentation and correspondence, rather did we send out a notice to do so and they told me that we had actually done better, we had gone about to collect relevant information as per our understanding and procedures and -- and because of that we didn't need to send out notices because the work had already been done.

Q.   So Nexo didn't send out any preservation notice in response to Mr. Cress's lawsuit; correct?

MR. SHELTON:  Objection, misstates testimony.

A.   I said that we -- the team, the legal team, had informed me they have gone beyond asking our team members and representatives to preserve, and that above and beyond is the actual collection of relevant data and

information.

BY MR. TAYLOR-COPELAND:

Q.   Okay, my question is whether Nexo sent out any preservation notice in response to Mr. Cress's lawsuit.

A.   And my answer is that we did a step that went beyond asking somebody to keep the information and that step was to actually get the information and keep it.

Q.   Were you aware that you were named as a defendant in Mr. Cress's lawsuit?

A.   I -- from the documents, exhibit 101, which is the initial letter that was sent, I did not see -- I did not see me mentioning at all.  Certainly not as a defendant -- a defendant you said?  Or counterparty or person of relevance.  So I -- I cannot be aware of something that has not --

Q.   Were you ever --

A.   -- happened.

Q.   Were you ever made aware that Mr. Cress had named you personally as a defendant?

MR. SHELTON:  Objection, vague as to the document you're referring to.

A.   Could we narrow down the question a little bit?  So that I can answer it better?

BY MR. TAYLOR-COPELAND:

Q.   Sure.  Did you ever have an understanding that

Q.   What do you mean by "the seriousness of the case"?

A.   I mean that sometimes we've had people who had lost a thousand dollars claiming that we should give them 100 million because they were so distressed over the loss of a thousand dollars.  This would be an example of a -- of a complaint that on the monetary value claims $100, but if you look a little bit closer in the facts it might not need be taken that serious.

Q.   And so is that like a reflection of whether the claim has some level of merit or not?

MR. SHELTON:  Objection, vague, asked and answered.

A.   You asked me like the initial filter of what will be brought to my attention and whether the monetary amount is a determining factor, and I'm answering a long way in saying that monetary amounts in and of itself do not -- does not constitute the grounds for this being escalated to management or not.

BY MR. TAYLOR-COPELAND:

Q.   Following receipt of -- sorry, let me rephrase that.

Once Nexo became aware of Mr. Cress's lawsuit, did it suspend any disposal of documents?

MR. SHELTON:  Objection.  Asked and answered.

A.   Yes, I do feel like we discussed this, but again this point, when it was ultimately brought to my attention and I asked my colleagues at the legal department what did we do, did we send the preservation notice, they told me we had gone above and beyond on this and already collected the data that would be relevant to the case.

BY MR. TAYLOR-COPELAND:

Q.   Did you suspend the retention policy in effect for any of your email addresses upon learning of the case?

A.   Well, for the given period, I don't believe there was a retention policy on my email.  We're discussing data retention document of March, late March 2023 and I think the events of this coming to my attention precede that document.

Q.   At any point did you suspend the disposal of documents under the retention policy for your email addresses?

A.   Which time period are we talking?  This is a very general question of -- of operations of a company that stretch to over eight years.

Q.   Do you recall when you -- when Nexo implemented the 30-day retention policy with respect to some of your email addresses?

MR. SHELTON:  I'm also gonna object as beyond the scope of the 30(b)(6) designation and calls for speculation.  If you can answer in your personal knowledge, you can.

A.   I do not remember that.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if Nexo placed a litigation hold in the Morton versus Nexo litigation?

MR. SHELTON:  Same objection, and same instruction.

A.   I do remember there being a hold notification being circulated on that particular case.

BY MR. TAYLOR-COPELAND:

Q.   Do you remember if it was circulated to you?

A.   I remember seeing that, yes.

Q.   Do you recall about when that was?

A.   I do not.

Q.   But you don't recall seeing a litigation hold in Mr. Cress's case, correct?

MR. SHELTON:  Objection, asked and answered.

A.   No, I asked -- I answered that question already.

BY MR. TAYLOR-COPELAND:

Q.   And the answer was?

A.   The answer was that we had gone above and

beyond a litigation hold notice by actually the team going out as soon as they became aware of the demand letter to collect all relevant communications and informations.

Q.   But you don't know exactly which communications and documents were collected, do you?

A.   I don't have specific memory what was collected then, no.

Q.   And then looking at the -- page 6 of 6 in the exhibit we were looking at, at the bottom it says, "7.0 Enforcement and Reporting Breaches":

"Breaches of this Policy may have serious legal and reputation repercussions and could cause material damage to Nexo.  Consequently, breaches can potentially lead to disciplinary action that could include summary dismissal and to legal sanctions, including criminal penalties.

"All employees are expected to promptly and fully report any breaches of the Policy."

Do you see that?

A.   Yes.

Q.   Okay.

Did any -- has anyone ever reported a breach of this policy to you?

A.   Not to my recollection.

relevant messages were already secured by the team for future use.

Q.   So is the answer then that Nexo has not done anything in this litigation to recover deleted Slack messages?

MR. SHELTON:   Objection.   Misstates testimony.

A.   This is not what I said.   The answer to that question is that Nexo went above and beyond in securing all relevant communications, whether on Slack or elsewhere in order to be helpful to the proceedings in which we currently find ourselves.

BY MR. TAYLOR-COPELAND:

Q.   So has Nexo made any effort to recover any messages deleted as -- any deleted Slack messages, in this litigation?

A.   Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.

Q.   And what did Nexo do to secure Slack messages much earlier?

A.   Well, this is within the duties of the legal department.   They have a procedure by which they make copies of the relevant information, and to my understanding that procedure has been followed and

I believe that we have submitted some Slack messages that are relevant to the case, which is testimony of the fact that they did indeed preserve that information communication and messages.

Q.   Do you know how they selected which Slack communications to retain?

MR. SHELTON:   All right, so I'm gonna object on privileged grounds.  I think that Mr. Trenchev has gone all the way to the limit of being able to testify on this topic without invading the privilege by describing the process.  I believe now the question is getting into the mechanics which, as I previously stated, we objected to and we do believe implicate the privilege.  So the specifics of the collection process I do believe are privileged and we objected to them.

So I won't object to the questioning up until now, but that question I do object to on privilege grounds.

MR. TAYLOR-COPELAND:   So it was the legal team that was responsible for collection of relevant documents; is that correct?

A.   Yes.  That was the policy.

Q.   Was that policy followed in Mr. Cress's case?

A.   I have no reason to believe it was not.

Q.   Do you know one way or the other?