# EXHIBIT H

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH
Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## ANTONI ANTONIEV TRENCHEV

## CONFIDENTIAL



Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

A.   I am.

Q.   Do you also understand that you've been designated to testify as Nexo's corporate representative on Nexo's licensing and regulatory status in California, including whether Nexo held a California finance lender's license, Nexo's relationship with Nexo Financial LLC, communications with California regulators, and Nexo's representations regarding whether it was a licensed lender?

A.   I understand that.

Q.   Okay.  And are you prepared to provide testimony on that subject today?

A.   I am.

Q.   Do you understand that you've been designated to testify on the authorship and circulation of certain documents?

A.   I am.

Q.   And are those the documents identified in this exhibit 100?

A.   Yes.

Q.   And are you prepared to testify about those matters today?

A.   I am.

Q.   Do you also understand that you've been designated to testify on Nexo's data retention policies,

document preservation, litigation holds, ESI collection and search practices and compliance with the court's discovery orders?

A.   Yes.

Q.   And are you crept to testify about that topic today?

A.   I am.

Q.   Did you talk to anybody at Nexo outside the presence of counsel to prepare to testify on that topic that we just discussed?

A.   I have not.

Q.   Do you also understand that you've been designated as Nexo's corporate representative to testify on the factual basis for Nexo's interrogatory responses?

A.   I do.

Q.   And are you prepared to provide that testimony today?

A.   I am.

Q.   So other than the conversation you had with Yassen, did you have any other conversations with anybody at Nexo outside the presence of counsel to prepare for any of those 30(b)(6) topics?

A.   Sorry which are the 30(b)(6) topics?

Q.   The topics on which you've been designated as Nexo's corporate representative.

before a court, the court then rules, and their ruling, in our case, was that Nexo as a group of companies and its owners, directors and officers, have not committed any crimes.

Q. Did Nexo have any formal document retention policy in 2018?

A. I do not believe that we had formalized that in a set of documents. I think the default setting was that everything is pretty much kept indefinitely.

Q. Was --

A. Again, talking about 2018.

Q. Okay. Did -- and was that the same in 2019?

A. I am not entirely sure when we issued our first formal retention policy but I would believe it was later than 2020.

Q. So before the time that you issued a formal written policy, was the informal policy to retain emails indefinitely?

A. It was whatever the default settings of the email provider was, which was Google. I think that is where early days of a start-up and we had not pondered upon the retention policy and had no reason to at that time.

Q. And before having a formal retention policy, is the same true of Slack, that you just used whatever

safeguard the relevant materials to the case that the complaint pertains to.

Q.   Do you know what steps, if any, were taken to preserve documents or communications in response to receiving this letter?

A.   I became aware of the complaint after the -- this letter was received.  And when it was brought to my attention, the legal team at the time had told me that they had gathered all the relevant documentation, and should this advance procedurally in -- in a direction -- or legal action would be filed against us, we would be able to produce the relevant documentation that are related to this case.

Q.   Do you know specifically what those documents and communications that were collected by the legal department were?

A.   I believe that the communications between Mr. Cress and his account manager had been duly copied and stored.  I believe from what I understand from the legal team that we were able to produce documents around the transactions and the interactions in discovery, so there is nothing that leads me to believe that the procedures around receiving demand letters and what the team should do after that have not been followed.

Q.   Was the procedures to be followed in the event

A.    Well, at the time we were three managing partners, and each of us would have their area of expertize, and departments he would oversee.  So the trading department, the OTC desk, none of that was under me, so I would not -- like the OTC desk or the -- or the trading department, they would not report to me directly.

Q.    Would they report to Kalin Metodiev?

A.    Yes.

Q.    Do you know if Mr. Metodiev received reports about the, you know, VIP clients with the most assets on the platform?

MR. SHELTON:  Objection, calls for speculation.

A.    I couldn't verify that.

BY MR. TAYLOR-COPELAND:

Q.    Did Nexo issue a litigation hold in response to this October 2021 demand letter?

A.    Can you define litigation hold for me?

Q.    Yes.  Did it send out instructions to retain relevant documents?

A.    I remember when this was brought to my attention, asking that question or something similar to it, and the answer by legal department is we did better than that, we went about, all the relevant parties and

BY MR. TAYLOR-COPELAND:

Q.   Do you know what preservation measures were implemented in response to any of those government inquiries or subpoenas?

A.   Sorry, repeat the question.

Q.   Do you know what preservation measures were implemented in response to those government inquiries or subpoenas?

A.   I mean, I know what generally our policy is, I know that a lot of documents were produced to the regulators, and I know that there have been no objections and complaints on their part that our documents and disclosures during that process have been insufficient.  And also the end result of that inquiry, I think it is there in line with my impression that there were no objections as to the quantity or quality of data and materials that we produced.

Q.   My question is a little bit different.  It's what preservation measures did Nexo actually implement in response to these government subpoenas or inquiries?

MR. SHELTON:  Okay, I'm going to object because Mr. Trenchev has not been designated on preservation issues with respect to investigations that didn't involve Mr. Cress's lawsuit.

Mr. Trenchev, you can testify within your

personal knowledge, if you know the answer, but he's not testifying as a corporate representative on that issue.

A.   Sorry, can you rephrase the question to be?

BY MR. TAYLOR-COPELAND:

Q.   The question is what preservation measures were actually implemented in response to government inquiries or subpoenas?

MR. SHELTON:   I also object it's vague, but if you can answer in your personal capacity you can answer.

A.   Well, I don't recall specifics but I think that the vast majority of documents were kept at that time indefinitely, so I don't -- I'm not sure whether it called for any specific preservation at all if that was the case.

BY MR. TAYLOR-COPELAND:

Q.   So you're unaware of any notification to retain documents; is that correct?

A.   No, it is not correct.  I do not recall, I might have been aware, I might not have been aware, I just don't have a memory of that right now.

Q.   Okay.

So sitting here today you can't say whether Nexo issued a litigation hold notice in response to any of those government inquiries or subpoenas?

A.   I do not remember that.

in 2022, but I'm not entirely sure.

Q.   Did Nexo implement any preservation measures after learning of the filing of Mr. Cress's lawsuit?

MR. SHELTON:  Objection, asked and answered.

A.   I believe I answered that question already.

BY MR. TAYLOR-COPELAND:

Q.   Maybe I am missing something but can you -- could you repeat your answer?

A.   I will try.

I believe that when the issue -- issues around Mr. Cress were brought to my attention, I asked the same or similar question as you, what did we do to preserve relevant documentation and correspondence, rather did we send out a notice to do so and they told me that we had actually done better, we had gone about to collect relevant information as per our understanding and procedures and -- and because of that we didn't need to send out notices because the work had already been done.

Q.   So Nexo didn't send out any preservation notice in response to Mr. Cress's lawsuit; correct?

MR. SHELTON:  Objection, misstates testimony.

A.   I said that we -- the team, the legal team, had informed me they have gone beyond asking our team members and representatives to preserve, and that above and beyond is the actual collection of relevant data and

information.

BY MR. TAYLOR-COPELAND:

Q.   Okay, my question is whether Nexo sent out any preservation notice in response to Mr. Cress's lawsuit.

A.   And my answer is that we did a step that went beyond asking somebody to keep the information and that step was to actually get the information and keep it.

Q.   Were you aware that you were named as a defendant in Mr. Cress's lawsuit?

A.   I -- from the documents, exhibit 101, which is the initial letter that was sent, I did not see -- I did not see me mentioning at all.  Certainly not as a defendant -- a defendant you said?  Or counterparty or person of relevance.  So I -- I cannot be aware of something that has not --

Q.   Were you ever --

A.   -- happened.

Q.   Were you ever made aware that Mr. Cress had named you personally as a defendant?

MR. SHELTON:  Objection, vague as to the document you're referring to.

A.   Could we narrow down the question a little bit?  So that I can answer it better?

BY MR. TAYLOR-COPELAND:

Q.   Sure.  Did you ever have an understanding that

Q.   What do you mean by "the seriousness of the case"?

A.   I mean that sometimes we've had people who had lost a thousand dollars claiming that we should give them 100 million because they were so distressed over the loss of a thousand dollars.  This would be an example of a -- of a complaint that on the monetary value claims $100, but if you look a little bit closer in the facts it might not need be taken that serious.

Q.   And so is that like a reflection of whether the claim has some level of merit or not?

MR. SHELTON:  Objection, vague, asked and answered.

A.   You asked me like the initial filter of what will be brought to my attention and whether the monetary amount is a determining factor, and I'm answering a long way in saying that monetary amounts in and of itself do not -- does not constitute the grounds for this being escalated to management or not.

BY MR. TAYLOR-COPELAND:

Q.   Following receipt of -- sorry, let me rephrase that.

Once Nexo became aware of Mr. Cress's lawsuit, did it suspend any disposal of documents?

MR. SHELTON:  Objection.  Asked and answered.

A.   Yes, I do feel like we discussed this, but again this point, when it was ultimately brought to my attention and I asked my colleagues at the legal department what did we do, did we send the preservation notice, they told me we had gone above and beyond on this and already collected the data that would be relevant to the case.

BY MR. TAYLOR-COPELAND:

Q.   Did you suspend the retention policy in effect for any of your email addresses upon learning of the case?

A.   Well, for the given period, I don't believe there was a retention policy on my email.  We're discussing data retention document of March, late March 2023 and I think the events of this coming to my attention precede that document.

Q.   At any point did you suspend the disposal of documents under the retention policy for your email addresses?

A.   Which time period are we talking?  This is a very general question of -- of operations of a company that stretch to over eight years.

Q.   Do you recall when you -- when Nexo implemented the 30-day retention policy with respect to some of your email addresses?

MR. SHELTON:  I'm also gonna object as beyond the scope of the 30(b)(6) designation and calls for speculation.  If you can answer in your personal knowledge, you can.

A.   I do not remember that.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if Nexo placed a litigation hold in the Morton versus Nexo litigation?

MR. SHELTON:  Same objection, and same instruction.

A.   I do remember there being a hold notification being circulated on that particular case.

BY MR. TAYLOR-COPELAND:

Q.   Do you remember if it was circulated to you?

A.   I remember seeing that, yes.

Q.   Do you recall about when that was?

A.   I do not.

Q.   But you don't recall seeing a litigation hold in Mr. Cress's case, correct?

MR. SHELTON:  Objection, asked and answered.

A.   No, I asked -- I answered that question already.

BY MR. TAYLOR-COPELAND:

Q.   And the answer was?

A.   The answer was that we had gone above and

beyond a litigation hold notice by actually the team going out as soon as they became aware of the demand letter to collect all relevant communications and informations.

Q.    But you don't know exactly which communications and documents were collected, do you?

A.    I don't have specific memory what was collected then, no.

Q.    And then looking at the -- page 6 of 6 in the exhibit we were looking at, at the bottom it says, "7.0 Enforcement and Reporting Breaches":

"Breaches of this Policy may have serious legal and reputation repercussions and could cause material damage to Nexo.  Consequently, breaches can potentially lead to disciplinary action that could include summary dismissal and to legal sanctions, including criminal penalties.

"All employees are expected to promptly and fully report any breaches of the Policy."

Do you see that?

A.    Yes.

Q.    Okay.

Did any -- has anyone ever reported a breach of this policy to you?

A.    Not to my recollection.

relevant messages were already secured by the team for future use.

Q.   So is the answer then that Nexo has not done anything in this litigation to recover deleted Slack messages?

MR. SHELTON:   Objection.   Misstates testimony.

A.   This is not what I said.   The answer to that question is that Nexo went above and beyond in securing all relevant communications, whether on Slack or elsewhere in order to be helpful to the proceedings in which we currently find ourselves.

BY MR. TAYLOR-COPELAND:

Q.   So has Nexo made any effort to recover any messages deleted as -- any deleted Slack messages, in this litigation?

A.   Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.

Q.   And what did Nexo do to secure Slack messages much earlier?

A.   Well, this is within the duties of the legal department.   They have a procedure by which they make copies of the relevant information, and to my understanding that procedure has been followed and

I believe that we have submitted some Slack messages that are relevant to the case, which is testimony of the fact that they did indeed preserve that information communication and messages.

Q.   Do you know how they selected which Slack communications to retain?

MR. SHELTON:   All right, so I'm gonna object on privileged grounds.   I think that Mr. Trenchev has gone all the way to the limit of being able to testify on this topic without invading the privilege by describing the process.   I believe now the question is getting into the mechanics which, as I previously stated, we objected to and we do believe implicate the privilege.   So the specifics of the collection process I do believe are privileged and we objected to them.

So I won't object to the questioning up until now, but that question I do object to on privilege grounds.

MR. TAYLOR-COPELAND:   So it was the legal team that was responsible for collection of relevant documents; is that correct?

A.   Yes.   That was the policy.

Q.   Was that policy followed in Mr. Cress's case?

A.   I have no reason to believe it was not.

Q.   Do you know one way or the other?

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                    CONFIDENTIAL                    JOB NO. 2571483

A.   I believe it has been followed.

MR. TAYLOR-COPELAND:  You are free to object to this one and maybe discuss it overnight but I am gonna ask it now.

MR. SHELTON:  Okay.

BY MR. TAYLOR-COPELAND:

Q.   Did counsel -- did Nexo consult counsel before implementing of the retention policy changes identified in this exhibit?

MR. SHELTON:  So I'm gonna object to privilege grounds on -- as to the substance of any communications. But if you can answer on a yes or no basis, you can answer.  If you know.

A.   Could you please repeat the question?

BY MR. TAYLOR-COPELAND:

Q.   Yes, did Nexo consult counsel before implementing the retention policy changes identified in this exhibit, the Slack retention policy changes?

MR. SHELTON:  So Mr. Trenchev, I'm objecting -- I'm objecting on privilege grounds, but limited to the substance of communications with counsel. If you can answer on a yes or no basis, you may answer, if you know.

A.   I do not remember.

MR. SHELTON:  James, as to your prior

CERTIFICATE OF COURT REPORTER


I, GEORGIA GOULD, an Accredited Real-time Reporter,

hereby certify that the testimony of the witness ANTONI

ANTONIEV TRENCHEV in the foregoing transcript, numbered

pages 1 through 150, taken on this 1st day of April,

2026 was recorded by me in machine shorthand and was

thereafter transcribed by me; and that the foregoing

transcript is a true and accurate verbatim record of the

said testimony.



I further certify that I am not a relative, employee,

counsel or financially involved with any of the parties

to the within cause, nor am I an employee or relative of

any counsel for the parties, nor am I in any way

interested in the outcome of the within cause.


Signed:   ........................

Name:    GEORGIA GOULD

Date:    April 1, 2026

CERTIFICATE OF REPORTER

I, Georgia Gould, Accredited Real-time Reporter, do hereby declare: that prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this first day of April, 2026.

Georgia Gould (Accredited real-time Reporter)