# Exhibit F

# Exhibit F

# Deposition Transcript

Case Number: 3:23-cv-00882-TSH

Date: June 19, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# DAVID A. GREETHAM

Reported by:
Vanese Killingbeck



CERTIFIED COPY

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

the wrong --

A.   Okay.  I can just read it.

Q.   -- page here.

A.   Okay.  I can just read it.

I do see it.  It's in the second paragraph, the third line down.

Q.   Right.

So you say:  Based on my discussions with Nexo, the targeted deletions generally fall into two categories:  One, targeted deletions of suspected spam and phishing e-mails and other potentially harmful e-mails that caused a potential security risk; and two, targeted deletion of documents in a separate UK litigation, the Morton matter, that were deleted after Nexo produced them in the Morton matter.

So when you say based on my discussions with Nexo there, you're referring to your discussions with Mr. Damyanov, correct?

A.   Yes.

Q.   Okay.  Any -- anybody else?  Is that based on your discussions with anybody else here when you say based on my discussions with Nexo on page 20?

A.   Well, he was the only person I spoke to at Nexo.

I may have used that as referring to Nexo counsel as well, perhaps.  I did ask about the Morton matter.  You know, I was unfamiliar with it.  I had some classification regarding that.  I think that was provided to me by counsel from Nexo.

Q.   Okay.  Well, I guess let's go one by one.

So the targeted deletions of suspected spam and phishing e-mails and other potentially harmful e-mails that caused a potential security risk, did Nexo's counsel tell you that?

A.   No.

Q.   So that comes from Mr. Damyanov, correct?

A.   Yes.

Q.   And -- and Mr. Damyanov only?

A.   Yes.

Q.   Okay.  And then the second part, targeted deletion of documents in a separate UK litigation, the Morton matter, that were deleted after Nexo produced them in the Morton matter.

So am I right that Nexo's counsel provided you some information about the Morton matter?

A.   This come -- this also came from Yasen, and I followed up with counsel and asked about it because I wasn't familiar with the Morton matter.  And they -- they kind of confirmed what he said,

DAVID A. GREETHAM                                                    JOB NO. 2827028
JUNE 19, 2026

BY MR. TAYLOR-COPELAND:

Q.   Did you review any document from the Morton matter?

A.   No.

Q.   Google Drive would have audit logs showing who applied the LabelRet and rom labels, correct?

A.   It would for a period of time, yes.

Q.   And would those logs also show which documents the labels were applied to?

A.   Not necessarily.

Q.   Is it possible that it could?

A.   It would have been more -- other than a file level, it would likely be more of a high level, perhaps a file share or a folder that has subfolders and content.  That would be more likely rather than the file level.

Q.   Do I have it right that a label could be applied to either a folder or specific files within a folder?

A.   You can apply them at a high level as I discussed, and you can apply them at the file level, albeit, kind of a very tedious process.  But technically you can do that.

Q.   And then so the log would show either what folder or folders were targeted or what -- and/or

what specific files were targeted, correct?

A.   If they still existed, that's possible.

Q.   Did you review any Google Drive audit logs related to those labels?

A.   No, I just reviewed the logs that Mr. Kunkel had reviewed.

Q.   Did you ask for the Google audit logs related to LabelRet and rom?

A.   No.

Q.   Why not?

A.   You know, I had -- I had received the information from Yasen.  I had no reason to -- there was nothing to show that there was anything wrong with what he was telling me.

And, you know, this was a fairly compressed time frame to be honest with you, so we -- I kind of had to be more cognizant on where I spent my time.

But, no, I didn't ask for those logs.  I don't know the they exist.

Q.   Would it be helpful to have those logs to verify Yasen's account?

A.   Well, if I doubted what he said, but I have -- I have no reason to doubt what he told me.

Q.   Did you review any retention policy

Q.    You say Kunkel -- the bullet points.

A.    Yep.

Q.    The first bullet point, sort of toward the end, you say:  Further, Kunkel asserts that e-mails titled All OTC deals part 2 and 3 were also deleted, but I have confirmed with Nexo that they still exist, were gathered as part of discovery efforts in this case, and were not produced as they did not include Cress-specific data.

That's based exclusively on your conversations with counsel, correct?

A.    Yes.

And I have some screenshots I can...

Q.    Did you review screenshots of these All OTC deals part 2 and 3?

A.    No.

Q.    Okay.  Then looking at the last bullet point which goes from page 21 onto page 22, you say: In addition, Kunkel claims that e-mails with the subject Nexo Token liquid and Akin Gump letter -- LLC letter to Nexo were deleted.  I have confirmed, however, that e-mails with this subject were gathered by Nexo and held in NUIX.

That's coming exclusively from your communications with counsel, correct?

DAVID A. GREETHAM                                              JOB NO. 2827028
JUNE 19, 2026

period when Mr. Cress was a customer or a business partner with Nexo, and I think 2024 was way after that.  So I don't know if that was considered or not by Nexo.

Q.   Okay.  You haven't seen the contents of any of the e-mails deleted under the rules identified in the retention log, have you?

MS. DOOLEY:  Objection.  Vague.  Compound.

A.   Do you mean the rules in relation to the December 2022 retention policy, or you just mean generally overall?

BY MR. TAYLOR-COPELAND:

Q.   So all -- have you seen a single e-mail, the contents of a single e-mail that was deleted by the retention rules, any of the retention rules identified in the log?

A.   I haven't seen any e-mails deleted or otherwise.

So I guess the answer would be no.

Q.   Okay.  And so you can't testify that any specific deleted item was irrelevant to this case, correct?

MS. DOOLEY:  Objection.  Vague.  Misstates testimony.

A.   I -- I don't know the relevance of any

documents that were expired because of end of life because of the retention policies.

BY MR. TAYLOR-COPELAND:

Q.   And you also cannot testify that any specific deleted item was cumulative of material produced in this litigation, correct?

A.   You know, I -- I'm not sure that is correct, because my understanding, when you see the retention rule in relation to OCC -- excuse me -- OTC deals was subject to the retention rules, but yet it was produced on -- I think maybe held back on a privileged log.

So that indicates to me that a probable explanation for that is that the efforts to gather documents by legal after the December 21 demand letter were effective, certainly in relation to some files, at least.

So I think the answer to your question is no.

Q.   Okay.   You're not testifying that every deleted item was preserved in some other repository, are you?

A.   I mean, deleted items generally are across-the-board, no.

Q.   Okay.   Looking at page 3 and 4 of your

Okay.  I'm there.

Q.    Okay.  Is this the document you relied on to assert that Kunkel is wrong in --

(Simultaneous cross-talk.)

BY MR. TAYLOR-COPELAND:

Q.    -- paragraph 248?

A.    No.

Q.    It's not?

A.    No.  I don't think so.  This is a forward of the document.

Q.    Right.

A.    But I think this is the document.  It's a forward of the document.

Q.    Would you agree a forward of the document is not the same as the original document?

A.    No, it's not the same.  It can be more fulsome, in fact.  It can be in some ways better than the original document sometimes.

Q.    Right.

It can have different content than the original, correct?

A.    It can have additional content.

Q.    The person forwarding an e-mail could add attachments, right?

A.    They could add attachments.

When I'm talking about additional content, I mean, you learn from this, it was sent from Edward Tonkov on the date there and who he sent it to.  That's -- that's additional information.

Q.   Okay.  But the person forwarding the e-mail could delete content from the forwarded portions, correct?

A.   Yeah.  I have no reason to believe that's the case but --

(Simultaneous cross-talk.)

BY MR. TAYLOR-COPELAND:

Q.   Okay.

A.   -- I mean, technically, they could -- technically, they could, yeah.

Q.   And they could remove some of the attachments, right?

A.   Technically they could.

Q.   Or add attachments?

A.   Same answer, I think.

Q.   Or edit attachments?

A.   That would be a much more complex process. You would have to download the attachment, open it separately, make modifications, save the document, then reattach it.  And then of course the metadata in that document would reflect that it would be

modified on that date and time.

Q.   Okay.  Are you able to say whether this forwarded e-mail reflects the contents or the attachments of the original?

A.   I'm looking at a PDF.  So it -- it's very impossible to tell to be honest with you.

Q.   You can't tell, right?

A.   Not from the PDF, no.

Q.   So really Kunkel isn't wrong here, right?

A.   Yeah, I think he's wrong.  I think this e-mail is the e-mail that he claims was deleted, and somebody's located it, and they've forwarded it. And if you look at this in your review tool, yeah, I'm sure you'll see the attachments.

Q.   Okay.  So what Kunkel says is that Nexo deleted all OTC deals part 1, right?

A.   That's what he says.

Q.   And he says that they did that through a -- a retention rule targeting that particular subject line, correct?

A.   That's what he -- I'm going to refer to his report, if you don't mind.

Q.   Sure.

A.   He implies in Section 34 of his report that this e-mail was targeted for deletion, and it

criteria.

BY MR. TAYLOR-COPELAND:

Q.    What's your level of certainty that this retention rule in Row 291 targeting all OTC deals part 1 would have resulted in the deletion of Exhibit 238, NEXO-0248334?

A.    That's the one that's on the screen, right?  Yeah.

Q.    Yes.

A.    What's my level of certainty?

Well, of course I'd want to validate it. But based on experience, I've seen similar before, so unless the rule changed something or unless I'm misremembering, which I don't think I am, I'm pretty confident that's the case.

Q.    Okay.  But, again, Nexo hasn't produced this e-mail, all OTC deals part 1, correct?

MS. DOOLEY:  Objection.  Vague.  Calls for speculation.

A.    Outside of the exhibit that we're looking at right now, I honestly don't know.

But I have no reason to doubt what you're saying.

BY MR. TAYLOR-COPELAND:

Q.    Okay.  And I think we agreed that it is

that Nexo's put on their privileged log, right?

A.    Okay.

Q.    And presumably they put them on the privileged log because they're relevant, right?

A.    I couldn't -- yeah, I'm sure they think they're relevant.

Q.    Okay.  Yet, the original amending sales template document is not on the privileged log, correct?

A.    Or it is part of a response to it.

Q.    Because it has been deleted, correct?

A.    Because the original -- I don't know.

I would have -- I don't know if it's in the newly gathered data or the 4.9 terabytes or -- or the date range was specific to that very large chunk showed.  You know, I don't see an excerpt of a privileged log.  I -- I don't know if it was an original e-mail, if it wasn't replied to, it was present, deleted, or otherwise.

Q.    Okay.  So we've gone through three examples that you've provided of Mr. Kunkel being wrong because, you know, you claim the documents are still available.  And all three of them don't actually have the same subject line.  They have a slightly different subject line.

Does that lead you to consider the possibility that you may be wrong about this?

A.   No.  This is not uncommon.

If it's in delete in one place, sometimes it's available in another place.  You could take that thought process kind of globally across the whole dataset.  If some of these retention policies were effective and they delete from one of their retention or whatever they were, this data could be in another place.

And, you know, the fact that this has been produced makes me think that legal did a -- you know, collected some data as Mr. Trenchev said in his deposition.  And I can't say if it was a fulsome collection or they collected everything.  But from what you're showing me, it looks like that's probably where it came from.  And -- and it's privileged log.

Q.   And in both cases, though, the original document is missing, and there's either a forward or an Re that remains, right?

A.   I think the original document has been appended.  Maybe it -- unless you have some reason to suspect that this is not the original document as it was replied to and the attachments are not the

original attachments, which there's nothing to
support that, let's say it was not uncommon.  If
data is not available in one source, it's often
available from others.

Q.    What sources do you think that this came
from?

MS. DOOLEY:  Objection.  Vague.

A.    Yes.  In a mailbox?  I don't know.

MR. TAYLOR-COPELAND:  Okay.  Let's turn
back to Exhibit 106.

BY MR. TAYLOR-COPELAND:

Q.    Okay.  Could you look at Row 193.

A.    Update retention rule begin.

I mean, it's really hard to read your
screen, so I'm looking at it locally.

Q.    I'm sorry.

A.    It's okay.

It's dated 24-09-03 at 8:14 plus three
hours.  I just want to make sure I'm looking at the
document you want me to look at.

Q.    Yeah.  And so I'm looking at Row 193.  In
Column H there's an entry that says, all data, mail,
terms, at -- to: nikola@nexo.io, subject:NEXO token
liquid ... slash [sic] @katerina@nexo.io client
signed off t.