# EXHIBIT I

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## Antoni Antoniev Trenchev

## Confidential



Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - -

IN THE MATTER OF:

JOHN CRESS,

                              Plaintiff,

NEXO CAPITAL INC.

                              Defendant.

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME I

Wednesday, April 1, 2026

AT:  1:04 p.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                              Confidential                              JOB NO. 2571483

Page 42

A.   Well, at the time we were three managing partners, and each of us would have their area of expertize, and departments he would oversee.  So the trading department, the OTC desk, none of that was under me, so I would not -- like the OTC desk or the -- or the trading department, they would not report to me directly.

Q.   Would they report to Kalin Metodiev?

A.   Yes.

Q.   Do you know if Mr. Metodiev received reports about the, you know, VIP clients with the most assets on the platform?

MR. SHELTON:  Objection, calls for speculation.

A.   I couldn't verify that.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo issue a litigation hold in response to this October 2021 demand letter?

A.   Can you define litigation hold for me?

Q.   Yes.  Did it send out instructions to retain relevant documents?

A.   I remember when this was brought to my attention, asking that question or something similar to it, and the answer by legal department is we did better than that, we went about, all the relevant parties and

Page 43

custodians around Mr. Cress as a client, and we made sure that all the relevant information is copied and would be available in the future.

Q.   Do you know did that relevant information include all emails involving Mr. Cress?

MR. SHELTON:  Objection, vague.

A.   They confirmed to me that they had gathered all relevant information regarding the case and that would include email.  Further than that, I don't know what all emails would mean.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if they collected Slack messages?

A.   I do not recall particular discussions singling out Slack.  What I understand is that during discovery we have produced Slack messages with relevance to Mr. Cress, so that leads me to deduce that we collected Slack messages that we deemed relevant to the case at this earlier stage.

Q.   And how did Nexo decide what was relevant to the case at that stage?

MR. SHELTON:  I am gonna object on privilege grounds.  Mr. Trenchev, I don't want you to disclose the substance of communications with Nexo's attorneys, but if you can give a response at a more general level as a corporate representative, you can testify on that at

Page 44

that level.

A.   Thank you.  It would be my understanding that they would use search words, search terms, to filter out what is relevant and what is not.

BY MR. TAYLOR-COPELAND:

Q.   To run that search would they have to involve IT?

A.   I do not know that.

Q.   Do you know if Google enabled Nexo to search for specific terms across all email addresses?

A.   Make sure that I understand the question, whether it can -- whether there's a functionality, you type in the search term and then it searches through all addresses of -- corporate addresses?

Q.   Correct.

A.   I am unaware of such a feature.  It might or might not exist.

Q.   And do you know if Slack had functionality to allow search through all Nexo's Slack messages regardless of user?

A.   I do not know the inner working of the Slack platform.

Q.   So do you know how Nexo ran these searches with the search terms?

A.   I don't have the details on that.

Page 45

Q.   Do you know if there are any records of that happening?

A.   I don't know whether this was a recorded activity or how it was conducted.

Q.   I am about to introduce another exhibit. do you guys want to keep going or --

A.   Should we take five to ten minutes?

MR. SHELTON:  Let's take a 10 minute break.

A.   Thank you.

THE VIDEOGRAPHER:  Going off the record at 2:15. end of media 1.

(2:15 p.m.)

(Break taken.)

(2:28 p.m.)

THE VIDEOGRAPHER:  This is the beginning of media 2 in the deposition of Antoni Trenchev.  Back on the record at 2:28.

BY MR. TAYLOR-COPELAND:

Q.   I'm going to introduce exhibit 102.

(Exhibit 102 marked for identification)

A.   Okay.  It's two so ...

MR. TAYLOR-COPELAND:  Yes.  My questions are just going to be about this at a very high level.  So it's a document entitled "Nexo Financial LLC, Complaint Policy".

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                        Confidential

Page 90

the reason why all the emails on some occasions have been still on the servers after that time constraint has elapsed.

Q.   To store things in Google, would that be something that you would personally do or -- like a button you would press or is that something that a system admin would have to do?

A.   No, no, I said "star" not "store".  It was like next to the email and the subject there was a star.  Which like you press, turns into yellow and I think it's stored beyond the retention.

Q.   Okay.

A.   All this.

Q.   So if you flag something, as I think you hit that star button, then it would be -- wouldn't be subject to the retention policy?

A.   I think so.

Q.   Okay.

So at some point you became aware there was a retention policy; right?

A.   Yes, but I do recall that there were several amendments to that retention policy.  So it might have been that -- I don't know, maybe Kosta, if this was only for me and him, it's either me or him I don't recall, but I don't remember having a problem finding my emails.

Page 91

It might have been him where he said, well, maybe that's too short and we expanded it.  I don't believe that currently the retention policy period is 30 days, I think it's much longer.  Not entirely sure.

But I -- what I do remember is several changes to the retention policy, certainly more than one.

Q.   What makes you think the current retention policy is much longer?

A.   I just have this objective feeling of having seen something to that accord.

Q.   Why did Nexo implement the 30 day retention policy?

A.   Well, I think that December 2022 was after a period of particularly challenging times for the industry as a whole and specifically, for businesses, such as ours, many of our competitors did not survive.  FTX had just imploded.  And there was a lot of hacking attacks at the time.  Various black hacking groups that were becoming even more targeted in their attempts towards crypto companies, and I think the thinking was around de-risking us with Kosta, as custodians of -- custodians of especially sensitive data which might or might not obviously in our opinion not have had to be retained going forward.

To put it shortly, it was a de-risking

Page 92

activity, an initiative.

Q.   Whose decision was that?

A.   Erm, whose decision was what?  The retention period?

Q.   To implement that retention policy.

A.   I remember like general discussions around de-risking the amount of information that we had between me and him.  But who specifically pulled the trigger, I couldn't -- I couldn't say.  I don't believe it was me.

Q.   So you and Mr. Kanchev had discussions about implementing this retention policy to reduce risk; right?

A.   Yes.

Q.   Okay.

Before you implemented that policy, did you check with legal and compliance?

A.   I don't specifically recall discussions with legal and compliance.  So I couldn't tell you other -- either way.

Q.   And you're aware that -- well, let me ask it differently.

Do you have any reason to dispute that Mr. Kanchev's email was also placed on a 30-day retention period on December 4, 2022?

Page 93

A.   I do not.

Q.   And would the rationale for placing both of your emails on that retention period have been the same?

A.   Yes.

Q.   As a practical matter, did the implementation of this retention policy mean that emails older than 30 days were automatically deleted?

MR. SHELTON:  Objection, calls for an expert opinion.

A.   I do not know.

BY MR. TAYLOR-COPELAND:

Q.   You don't know?

A.   I don't know.

Q.   Did you ask Yassen about that in preparing for today?

A.   I did not.

Q.   How do you access your email?

A.   I access my email from my computer and my mobile phone, which is a working phone.

Q.   Do you use the -- do you use an application to do that?

A.   I use the native Google app.

Q.   Okay.

And then on your desktop?

A.   I would use the browser to log in to -- to the

Page 98

Q.   So for sure, at some point, those emails would have been in your inbox; right?

MR. SHELTON:  Objection, vague.

A.   Well, an email that I have sent, there is no alternative than it being available in my sent folder at some time, yes.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  And so if it is no longer available, it would mean it's been deleted some way or another; right?

MR. SHELTON:  Objection, vague.

A.   Well, it is available right now, so -- and as we found out I don't know whether it was taken from my inbox, whether it still can be taken from my inbox, or whether we went another route of preserving of what might be a document of importance.  But I would -- it's not my job to argue but I would argue that the important thing is that we do have that document and it's preserved.

BY MR. TAYLOR-COPELAND:

Q.   So you'd agree your communications with the SEC are important documents to this litigation; right?

MR. SHELTON:  Objection, vague.  Calls for a legal conclusion.  Calls for speculation.

A.   I did not say such a thing.  So that you say you agree is not an accurate statement.  I said that

Page 99

it's important in its own right.  I did not comment whether discussions with the SEC, particularly this one, had any relevance to the case at hand.

BY MR. TAYLOR-COPELAND:

Q.   How would it be important in its own right?

MR. SHELTON:  Objection, vague.

A.   I mean, this was the first outreach by the SEC to us, so I remember that being a lot of excitement, slight worry.  Just a natural reaction of young people running a start-up when they receive an inquiry by -- by a federal regulator.  So it was significant and important.

BY MR. TAYLOR-COPELAND:

Q.   Do you recall whether you manually deleted emails that you sent to the SEC?

A.   I am not in the habit of manually deleting emails generally, unless it's obvious spam or what would be a very obvious phishing attack.

Q.   So I take it then that you don't have a specific recollection of manually deleting any emails that you sent to the SEC?

A.   I would confirm that with a fair amount of certainty that I did not manually delete emails that I sent to the SEC.

Q.   Do you know if Nexo had any retention policy

Page 100

in effect for your emails prior to December of 2022?

A.   Unless I'm mistaken, I would presume they were at the default setting, and that would be indefinite.  There might -- the only limitation might have been actual gigabyte storage.  So a set retention policy by Nexo, I don't believe we had prior to that for my email address.

Q.   Okay.  And is the same true of Mr. Kanchev's email address?

A.   Without knowing for sure, I would assume that this would be a safe assumption.

Q.   In December of 2022 was the email account of anyone other than you or Mr. Kanchev put on a 30-day retention policy?

A.   I don't believe so.

Q.   Did you discuss including Mr. Metodiev at that point in time as one of the managing partners --

A.   I don't remember.  Sorry, did you finish?

Q.   You can go ahead.

MR. SHELTON:  I am gonna object on privileged grounds, to the extent you spoke with legal counsel about the retention policy, and I instruct you not to answer.  But if you had discussions with non-legal personnel in Nexo, you can answer.

A.   Well, I don't remember there being discussions

Page 101

around Mr. Metodiev's email.

BY MR. TAYLOR-COPELAND:

Q.   Did you or Mr. Kanchev analyze Nexo's preservation obligations with respect to any litigation or investigation before implementing the 30-day retention policy?

MR. SHELTON:  Objection, vague, and I object on privileged grounds.  So I'll instruct you not to answer any discussions you had with -- to your attorneys about preservation obligations in connection with litigation.  But you can answer if those discussions involved discussions not with counsel.

A.   Well, I think the thinking at the time was that me and Mr. Kanchev not being customer-facing, not interacting with -- with clients, would have little to no relevant documents and communication on our email servers, on our email inboxes.  So -- because we had already seen a few complaints and demands, and they tended to cluster around execution, communications with account managers, customer support, so those were the important custo -- custodians of information and documents in our mind.

And that is also the reason why exclusively our inboxes had a specific retention policy, while for the rest of the employees I think we were sticking to

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                          Confidential                          JOB NO. 2571483

Page 102

==the indefinite retention setting then and now.==
BY MR. TAYLOR-COPELAND:
Q.    Did either you or Mr. Kanchev consult outside counsel regarding the implementation of the 30-day retention policy before implementing the policy?
MR. SHELTON:  Mr. Trenchev, I'm gonna object on privileged grounds.  I don't want you to disclose the substance of any communications you had with counsel regarding the retention policies.  If you can answer, otherwise you can.
A.    I don't think I can answer otherwise.
BY MR. TAYLOR-COPELAND:
Q.    So my question isn't what the communications were, my question is whether or not you consulted outside counsel regarding the implementation of the policy before implementing the policy, either yes or no. I don't believe that's privileged.
A.    Well, I -- I have a hard time reconciling his objection, and the instruction he just gave me with answering the question even as you just rephrased it. I think it still would go in that territory.
MR. TAYLOR-COPELAND:  Are you instructing him not to answer that question?
MR. SHELTON:  Yes.
BY MR. TAYLOR-COPELAND:

Page 103

Q.    Are you gonna follow that instruction?
A.    I'm gonna follow that instruction.
Q.    Okay, we'll take that to the court as well.
Do you know if you currently have access to any of your emails from 2018?
MR. SHELTON:  Objection, vague.
A.    I do not know that.
BY MR. TAYLOR-COPELAND:
Q.    Do you know if you currently have access to any emails from 2019?
MR. SHELTON:  Same objection.
A.    Well, I mean I -- during the -- today and yesterday's preparation, for today's hearing, and deposition with you, I was presented a -- a few documents, and I believe one of them was an email from around that period.  So I'm not sure where it originated, but I'm just thinking that if we have that document how would I answer your question, do I have access?  I mean, obviously so -- if my memory's correct, and that was indeed an email from that period, I then would have some sort of access even if it's not necessarily through my inbox.
BY MR. TAYLOR-COPELAND:
Q.    So my question is really just limited to through your inbox.

Page 104

A.    Okay.
Q.    Do you have access to any emails from 2018 to 2021 in your inbox?
MR. SHELTON:  Objection, vague.
A.    I do not know how to answer that.  I do not know.
BY MR. TAYLOR-COPELAND:
Q.    Did you ever email anybody about Nexo's VIP customers?
A.    I don't believe I have.
Q.    Did you ever email anybody about OTC transactions?
A.    The only instance where I could think of it is if I was describing Nexo's business and I would have mentioned the OTC service as such but I don't think I have discussed any transactions related to the OTC service.
Q.    Did you ever email anybody about Nexo's VIP program?
A.    I don't believe I have.
Q.    Have you ever emailed anybody about Nexo's Liquidation Relief Program?
A.    I don't believe I have.
Q.    Have you ever emailed anybody about Nexo's fees?

Page 105

A.    I don't believe I have.
Q.    You don't think you ever emailed anybody about Nexo's fees?
A.    I don't have an instant in my memory where I did.
Q.    So when you did the AMA about the #ZeroFees policy how would you verify that Nexo wasn't in fact charging fees at that point in time?
MR. SHELTON:  Objection, misstates documents, vague.
A.    I think that's a bit of a loaded question here.  In my appearances before the Nexo community, which included clients of ours, whatever I have stated I have believed to be true, to be the company policy. And if we -- if I said during such an appearance something to that accord, it would have been true at the present time.
BY MR. TAYLOR-COPELAND:
Q.    So my question is, you're the public face of Nexo; right?
MR. SHELTON:  Objection, vague.
A.    I was the person who would speak to the media and do the Ask Me Anything sessions at Nexo.
BY MR. TAYLOR-COPELAND:
Q.    Right.

Page 114

policy on direct messages but didn't implement any retention policy for public and private channels until a few months later?

A. Other than that distinction I made before the break, I don't think there is more I can add, different type of information on the different type of channels.

Q. So you don't know why one retention policy was deposited for direct messages and a different one was adopted for public and private channels?

A. I do not know.

Q. Does Nexo know who authorized the change -- any of these changes in the Slack DM retention policy?

A. DM being direct messages?

Q. Correct.

A. I don't think Nexo can reverse engineer that several years later what the exact approval process for that change was.

Q. Okay.

Does Nexo know who authorized the changes to public and private channels retention policies on March 1, 2023?

A. Same -- same answer.

Q. Is Nexo aware of any way to recover any Slack messages deleted pursuant to these retention policies?

MR. SHELTON: Objection, calls for an expert

Page 115

opinion.

A. I don't think Nexo can have knowledge as to inner workings of a third party service provider such as Google -- or Slack in this case, sorry.

BY MR. TAYLOR-COPELAND:

Q. Do you know whether Nexo has any audit logs related to its -- the implementation of Slack retention policies?

MR. SHELTON: Objection, vague as to the term audit log.

A. I do not know that.

BY MR. TAYLOR-COPELAND:

Q. Has Nexo made any effort to recover deleted Slack messages?

MR. SHELTON: Objection, vague.

A. Which time period for what purposes? Narrow down the question, please.

BY MR. TAYLOR-COPELAND:

Q. As part of its response to this litigation has Nexo made any efforts to recover deleted Slack messages?

A. As discussed already, when the demand letter in exhibit 101 was handed over, as later discovered by me, the team went about securing copies of the relevant messages. So I don't see how they would go -- or would need to go about trying to recover messages if all the

Page 116

relevant messages were already secured by the team for future use.

Q. So is the answer then that Nexo has not done anything in this litigation to recover deleted Slack messages?

MR. SHELTON: Objection. Misstates testimony.

A. This is not what I said. The answer to that question is that Nexo went above and beyond in securing all relevant communications, whether on Slack or elsewhere in order to be helpful to the proceedings in which we currently find ourselves.

BY MR. TAYLOR-COPELAND:

Q. So has Nexo made any effort to recover any messages deleted as -- any deleted Slack messages, in this litigation?

A. Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.

Q. And what did Nexo do to secure Slack messages much earlier?

A. Well, this is within the duties of the legal department. They have a procedure by which they make copies of the relevant information, and to my understanding that procedure has been followed and

Page 117

I believe that we have submitted some Slack messages that are relevant to the case, which is testimony of the fact that they did indeed preserve that information communication and messages.

Q. Do you know how they selected which Slack communications to retain?

MR. SHELTON: All right, so I'm gonna object on privileged grounds. I think that Mr. Trenchev has gone all the way to the limit of being able to testify on this topic without invading the privilege by describing the process. I believe now the question is getting into the mechanics which, as I previously stated, we objected to and we do believe implicate the privilege. So the specifics of the collection process I do believe are privileged and we objected to them.

So I won't object to the questioning up until now, but that question I do object to on privilege grounds.

MR. TAYLOR-COPELAND: So it was the legal team that was responsible for collection of relevant documents; is that correct?

A. Yes. That was the policy.

Q. Was that policy followed in Mr. Cress's case?

A. I have no reason to believe it was not.

Q. Do you know one way or the other?

Page 150

"For example, before originating a loan, Nexo Capital generally did not ask for, and generally did not evaluate, the borrowers' credit history, debt, expenses, or documents relating to the borrower's overall financial condition and ability to make timely payments on their loan."

Is that accurate?

A.    It is accurate that our product functions differently whereby we did not need to check the borrowers' credit history, as we are talking about collateralized loans, and what is described here would be more applicable to an unsecured loan.

Q.    And Nexo didn't check Mr. Cress's credit history before extending him a loan; correct?

A.    I do not know that we did.  I know that we checked his accreditation status.

Q.    And it says --

MR. SHELTON:  Mr Taylor-Copeland, I am going to ask to call it.  If you want one more question --

MR. TAYLOR-COPELAND:  That's fine.

MR. SHELTON:  We'll go off the record.

THE VIDEOGRAPHER:  Going off the record at 6.16.  This is the end of media 5 of Antoni Trenchev.

(Whereupon, the deposition adjourned at 6:16 p.m.)

Page 151

CERTIFICATE OF DEPONENT

I, ANTONI ANTONIEV TRENCHEV, hereby certify that I have read the foregoing pages, numbered 1 through 150, of my deposition of testimony taken in these proceedings on Wednesday, April 1, 2026 and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed:  ........................

Name:    ANTONI ANTONIEV TRENCHEV

Date:    ........................

Page 152

CERTIFICATE OF COURT REPORTER

I, GEORGIA GOULD, an Accredited Real-time Reporter, hereby certify that the testimony of the witness ANTONI ANTONIEV TRENCHEV in the foregoing transcript, numbered pages 1 through 150, taken on this 1st day of April, 2026 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed:  ........................

Name:    GEORGIA GOULD

Date:    April 1, 2026

Page 153

ERRATA SHEET

Case Name: JOHN CRESS v NEXO

Witness Name: ANTONI ANTONIEV TRENCHEV

Date: 04/01/2026

Page/Line              From              To

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

_____

____/_____      _____

____/_____      _____

Page 154

_____

____/_____         _____

_____

____/_____         _____

_____

____/_____         _____

_____

____/_____         _____

_____

____/_____         _____

_____

Subscribed and sworn to before

me this 1st day of April, 2026

_____

ANTONI ANTONIEV TRENCHEV.

Page 155

CERTIFICATE OF REPORTER

I, Georgia Gould, Accredited Real-time Reporter, do hereby declare: that prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this first day of April, 2026.

Georgia Gould (Accredited real-time Reporter)