# EXHIBIT J

**DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER**

**Information Governance and Rebuttal Report**

**JOHN CRESS v. NEXO CAPITAL INC.,**

**Case No. 3:23-cv-00882**
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Report Date: June 5, 2026
Report Author: David A. Greetham

**Engagement Date:**    May 4, 2026

**Client Information:**    Nexo Capital Inc.
           c/o Baker McKenzie LLP
           10250 Constellation Blvd.
           Los Angeles, CA 90067

**Computer Forensic Expert:**  David A. Greetham
           Vice President of Digital Forensics

## I.  Computer Forensic Expert Qualifications:

Formerly the Principal at PC Forensics (A Level Legal Company), I am currently the Vice President of Digital Forensics at Level Legal, a full-service digital forensics investigation and eDiscovery company based in Texas. I hold eight patents for digital forensics and eDiscovery technology. I have worked in the digital forensics, eDiscovery and Information Governance arena since the early 1990s. I am also a Certified Information Governance Officer (CIGO).

I often teach on my areas of expertise to litigation experts, attorneys and judges, and taught on the subject of Digital Forensics and Information Governance at the Executive Office of the President at the White House in Washington, D.C. in 2018. In March 2026, I received a Lifetime Achievement Award, from Legalweek Leaders in Tech Law. My *Curriculum Vitae* is attached to this Rebuttal Report as **Exhibit A**.

## II.  Requested Examination:

I have been engaged by Nexo to provide a rebuttal to the opinions offered by Michael Kunkel in his Expert Report dated April 20, 2026, and to offer opinions regarding Nexo's document retention and preservation efforts as it relates to the claims made in this case.

## III.  Assumptions:

I will not offer any opinions regarding any specific claims, although my opinions may touch on some elements of the known facts in this matter. This report reflects my analysis and opinions to date. As a result, as additional data, analysis results, information, or testimony becomes

available, I may consider this information. I may modify or update my opinions in light of additional information received after the date of this report.

**IV.    Documents Received and Examined:**

A list of documents received and relied upon can be found in **Exhibit B** attached to this Rebuttal Report. Other documents have been provided to me but may not be specifically referenced in this Rebuttal Report. I also spoke with Yasen Damyanov regarding the Google audit log and other matters referenced in this report.

**V.    Executive Summary:**

- Kunkel is neither trained nor qualified to provide an opinion on Information Governance, based on his details about his experience.

- Kunkel did not assess Nexo's overall data retention policies and practices but instead focused solely on a few discrete categories of non-retained data, or expired data, to imply that Nexo improperly deleted information relevant to this lawsuit. As reflected by Nexo's voluminous document collection and production in this matter, Nexo's default data retention policies were sufficient to retain and produce documents relevant to this lawsuit.

- Kunkel's report suggests without any analysis that certain non-retained data, or deleted data, (1) should have been preserved in connection with this litigation, (2) was relevant to this litigation, (3) was not cumulative of other evidence that Nexo produced in this matter, and (4) was not preserved in other Nexo data repositories. None of these suggestions have evidentiary support, and Kunkel is not qualified to express an opinion on those issues.

- A proper analysis of these issues from an Information Governance perspective requires knowledge of the default retention policies of the organization, the nature and scope of Nexo's notice of potential claims, the timing of any retention policy changes, any changes to the scope of potential claims over time, and Nexo's knowledge of those changes.

- I see no evidence that Nexo took steps to actively delete material potentially relevant to this dispute. To the contrary, the evidence indicates that Nexo preserved and produced relevant information in this case.

## VI.    Opinions and Observations:

### a.  Information Governance and Data Retention:

Information Governance ("IG") refers to the organizational framework of policies, procedures, controls, roles, and accountability mechanisms established to ensure that information is created, managed, stored, accessed, retained, and disposed of in a lawful, secure, consistent, and efficient manner throughout its lifecycle.[1,2,3] It is intended to safeguard the integrity, confidentiality, availability, and evidentiary reliability of information assets while ensuring compliance with legal, regulatory, and operational obligations.[1,3]

Information Governance further encompasses the strategic oversight of information as a corporate asset, including risk management, data protection, records management, information security, and regulatory compliance.[1,2,3] Authoritative frameworks describe Information Governance as a system of decision rights and accountability designed to ensure appropriate

---

[1] https://armatoronto.on.ca/about-us/ig
[2] https://cio-wiki.org/wiki/Information_Governance_%28IG%29
[3] https://www.techtarget.com/searchcio/definition/information-governance

behavior in the valuation, creation, use, archiving, and deletion of information, thereby reducing organizational risk and supporting transparency, accountability, and lawful business operations.[1,4]

There are several professional organizations offering specialized Information Governance training and certification. These certifications include:

- o Certified Information Governance Professional (IGP);

- o Certified Information Governance Officer (CIGO); and

- o Certified Information Professional (CIP).

General data retention policies are a normal and proper component of Information Governance. There are legitimate business justifications for general data retention policies, including to protect old customer data and prevent the misuse of data by threat actors. Different types of data, and different data custodians, can and do have different retention periods given the nature of the data and the different corporate interests at issue.

Targeted deletion of certain data or categories of data is common, and can have a variety of business justifications, including because the information presents security risks or relates to matters that have no continuing relevance to the company.

It is not normal for mature businesses to indefinitely retain all forms of data, or to have no retention policies at all. On the contrary, the implementation of data retention policies is a hallmark of sound Information governance and is often a sign of company maturation and development. For example, some start-up companies might not initially have data retention policies, but those companies will begin to implement such policies as their business grows, their company matures, new threats are identified, and the business, regulatory, and competitive landscape changes.

---

[4]    https://magazine.arma.org/2022/02/information-governance-vs-data-governance-whats-the-difference-and-why-does-it-matter/

The number of changes to data retention policies, and the targeted nature of some of the changes, is the prerogative of the organization. An organization is generally not required to retain data unless required by legal or regulatory requirements, or for ongoing business needs.

### b. Kunkel is not qualified:

The Kunkel report dated April 20, 2026 (Kunkel report) starts with one and a half pages detailing Kunkel's experience in the eDiscovery and Computer Forensics arena. Specifically, section 3 of the report states "*I have been involved in thousands of computer forensic investigations and electronic discovery engagements surrounding theft of intellectual property, trade secret misappropriation, financial fraud, email and Internet abuse, employee disputes, copyright infringement, industrial espionage, disputed dismissals, software code reviews, spoliation, and large data set management among other engagements.*"

Further, in section 4, Kunkel states the certifications that he holds "*I hold certifications as a Certified Information Security Systems Professional (ISC2) as well as an EnCase Certified Examiner (OpenText).*" This section ends with "*My Curriculum Vitae is hereto attached as Exhibit 1.*"

A review of Exhibit 1 further states his experience with matters relating to his professional career, which includes: Fraud, Divorce & Family Law, Theft of Intellectual Property, Asset Recovery, Trade Secret Misappropriation, Defamation, Email & Internet Abuse, Industrial Espionage, Employees Disputes, Disputed Dismissals, Patent Infringement, Software Code Review, Copyright Infringement, and Breach of Contract."

Of note, there is no mention of any Information Governance matters that he has been "involved" with over his "thousands" of cases, nor any mention of experience in the acquisition or review of any retention records policies. There is also no record of any Information Governance

training, certifications, or qualifications gained during his extensive career. However, in his report, Kunkel performs analysis and offers expert opinion in the area of retention policies, an element of records management, which is one element of the Information Governance framework. Instead, Kunkel's experience limits him to the technical analysis of the materials that he has reviewed, and not the overarching Information Governance aspect of records management, including records retention, or its legitimate use in the business world.

Based on my review of the Kunkel report and his stated qualifications, it is my opinion that Kunkel is not qualified to offer expert opinions regarding Information Governance. This lack of qualifications may be why his report contains very few, if any, actual opinions regarding Nexo's alleged conduct. While Kunkel states facts regarding changes to various document retention policies, he does not explain why any of those policy changes were wrong, improper or harmed Mr. Cress. Kunkel appears to rely on implication and conjecture, rather than actual facts, and presents no evidence that Nexo destroyed (much less deliberately destroyed) any evidence related to Mr. Cress. Overall, his report can be characterized as a lay person's opinion and contains little substance or understanding of Information Governance.

### c. Nexo's Discovery Efforts:

Before addressing specific criticisms of the Kunkel report, I believe it is important to put in context Nexo's discovery efforts to date. With a few narrow exceptions discussed below, Nexo's default data retention policy is to indefinitely preserve all Google Drive documents, all emails for current employees, all transaction histories, all customer support chat logs, and all other consumer record management ("CRM") logs. Nexo's Data Retention and Disposal Policy, dated March 27, 2023, contains retention periods for certain record types, including internal financial and corporate records, ranging from five years to permanent retention. While I understand Mr. Cress's

relationship manager, Hristiyan Hristov, departed from the company during the pendency of this lawsuit and his emails would have normally been deleted, his emails were instead preserved by Nexo, and responsive information was produced in this matter.

The scope of Nexo's preservation obligation is based on the notice provided to Nexo, including the October 2021 Demand Letter and the February 2023 Complaint. It is my understanding that Nexo became aware of this potential dispute on or about October 26, 2021, when it received a demand letter from Roche Freedman. I have reviewed this letter, and I have reviewed the Second Amended Complaint in this case. While I offer no opinion on this subject, I note that the scope of the dispute from the allegations in the demand letter to the Second Amended Complaint appear to have expanded significantly. Notably, the demand letter appears to address potential claims for fraudulent inducement and violations of California consumer protection laws relating to Mr. Cress's specific transactions with Nexo, which is more limited than the Second Amended Complaint. The demand letter also omits any request to preserve documents and fails to identify what documents, if any, the potential plaintiff may claim as relevant to the dispute. To the extent that Mr. Cress expanded the scope of his claims during this litigation, those new claims do not retroactively define the scope of Nexo's preservation obligation in October 2021 or March 2023.

It is common practice for an organization, upon receiving a demand letter or notice of potential litigation to either issue a "Legal hold" notice or take other steps to preserve relevant documents. An organization could rely on default data retention policies, depending on their scope, to preserve relevant documents. An organization could also take active steps to affirmatively collect and preserve relevant data after receiving notice of a potential claim. Any obligation to preserve documents must be balanced with the specific data sources of potential relevance, the

costs of long-term data retention and the needs of the organization to manage its data in an efficient manner. Long-term data storage can be expensive and create risk for an organization. Records retention policy changes support updated systematic and organizational data retention objectives. It is records retention best practice to constantly review and update (as needed) policies that dictate how long an organization retains data, or when it defensibly disposes of expired data. Even in situations where regulatory compliance or Legal hold obligations exist, outside of the potentially responsive data in relation to the subject matter, all other data sources can have (and should have) records retention policy changes as often as is required by the organization.

Kunkel did not assess Nexo's overall data retention policies and practices but instead focused solely on a few discrete categories of non-retained data, or expired data, to imply that Nexo improperly deleted information relevant to this lawsuit. As reflected by Nexo's voluminous document collection and production in this matter, Nexo's default data retention policies were sufficient to retain and produce documents relevant to this lawsuit.

I note that Antoni Trenchev testified that upon receiving the demand letter, Nexo went about gathering and preserving relevant documents relating to Mr. Cress.[5] I am not aware of any complaint in this case that Nexo did not preserve documents relating to Mr. Cress, and the Kunkel report does not identify any Cress-specific documents that were allegedly deleted.

Quite the opposite, it is my understanding that Nexo has produced over 60,000 documents in this matter. Based on my review of information provided to me by counsel and a review of counsel's January 30, 2026, correspondence, Nexo gathered documents from the following sources: [6]

---

[5] Trenchev Depo., Vol. 1, p. 42-44.
[6] Note 2 in this chart indicates that Slack data ranged from 8/9/2018 to 3/10/2025. Note 3 indicates that due to the large amount of data at issue, the initial export of the support@nexo.io non-custodial source was limited to 2021-

| Custodian[1] | Date Range Applied to Email and Drive Export | Email | Drive | Slack[2] |
|---|---|---|---|---|
| Angelov, Rosen Anatoliev | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Atanasova, Teodora Plamenova | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| bizdev.replies@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| Dinca, Octavian | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Hristov, Hristiyan Yordanov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Hristova, Magdalena Damyanova | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| investors@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| Kantchev, Kosta | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Kostadinov, Lyubcho Georgiev | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| kyc@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| ops@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| otc@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| payments@nexo.io | 1/1/2017 - 3/1/2025 | Yes | | |
| Rakshiev, Alexander Nikolaev | 1/1/2017 - 3/1/2025 | Yes | | Yes |
| Salesforce.bcc@nexo.com | 1/1/2017 - 3/1/2025 | Yes | | |
| salesvacationresponder@nexo.com | 1/1/2017 - 3/1/2025 | Yes | | |
| Shanov, Yordan Ivaylov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Stanev, Kaloyan Mariyanov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Stanev, Tom Mariyanov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| support@nexo.io | 2021-2022[3] | Yes | | |
| Tonkov, Edward Todorov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Trenchev, Antoni | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |
| Videlov, Tsvetan Dimitrov | 1/1/2017 - 3/1/2025 | Yes | Yes | Yes |

I understand that Nexo gathered 4.9TB of raw data. This is a massive undertaking and expense. While difficult to be exact, assuming an equal mix of text files, emails, Word documents, PowerPoint files, and images, 4.9TB is equivalent to over 5 billion pages of information.[7,8]

After the processing of this massive collection into NUIX (a specialized tool for extracting text and metadata from raw data), over 100 search terms that were agreed upon by the parties were applied, in addition to date filters. This resulted in over 250,000 potentially responsive documents,

---

2022. For all other non-custodial sources, the 2021-2022 limiter adopted by the Court was applied after running search terms in NUIX and before promotion to Relativity.

[7] https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte

[8] https://num2word.com/number-to-word/

which I am advised were manually reviewed, as the parties did not agree on the use of technology to assist and expedite the review. After global deduplication and review, 63,654 documents were produced by Nexo, which contained 247,500 pages. I further understand that Nexo produced 20 native Slack files in JSON format[9] and another 15 as PNG screenshots[10] relating to Mr. Cress, in addition to other Slack files. I understand the document production began on September 9, 2024, while the vast majority of the production was made in the second half of 2025. Much smaller productions continued in 2026.

The volumes of data collected, processed, and reviewed by Nexo are significant. The production of 247,500 pages is significant and would not be expected if Kunkel's allegations of intentional deletion of relevant materials were accurate.

Further, I note that while the demand letter was sent in October 2021, the initial Complaint was not filed until February 27, 2023. During this approximately 1.5-year time period, Nexo had a business to run. It is not necessary and completely unreasonable for an organization to preserve every document in the company based on one customer complaint. If that were the case, a company could, literally, never delete a single document. The passage of this much time could have indicated that the claim was not being pursued or lacked merit. Information Governance policies and best practices are in place to prevent such a massive document hold for all members of the organization all time. To the extent that Kunkel takes the position that Nexo had an obligation to preserve every document in the company, he is incorrect in his opinion.

---

[9] NEXO-0343949; NEXO-0344901; NEXO-0344093; NEXO-0247809; NEXO-0343956; NEXO-0343988; NEXO-0344037; NEXO-0344095; NEXO-0344099; NEXO-0344102; NEXO-0344105; NEXO-0344109; NEXO-0344112; NEXO-0344115; NEXO-0344132; NEXO-0344144; NEXO-0344159; NEXO-0344191; NEXO-0344240; NEXO-0344152 (Native JSON).

[10] NEXO-0248511; NEXO-0248512; NEXO-0344325; NEXO-0344326; NEXO-0344327; NEXO-0369733 – NEXO-0369742 (PNG Screenshots).

**d. Slack:**

Turning to the specifics of the Kunkel report, he first takes issues with Nexo's Slack Retention Settings. I understand Nexo used the Slack Business+ Plan until the Summer of 2025, when it upgraded to the Enterprise Plan. Kunkel takes issue in section 14 with the fact that Nexo did not place a legal hold on specific members' Slack accounts, which is a feature only available for the Enterprise Plan, not an available option on the Business+ Plan.[11] By the Summer of 2025, as noted above, responsive documents had been gathered and were in the process of production in this case. Because of this, I do not see any reason for Nexo to have placed a Legal hold on any Slack accounts after it upgraded to the Enterprise Plan, and Kunkel's criticisms on this issue ring hollow.

In section 16 of the Kunkel report, he discusses several changes with the retention policies for Slack. However, an organization is not bound by one set of record retention policies for all data sources forever and is free to change their retention periods as often as required, as the needs of the business change. The setting of records retention policies commonly varies by source and is not designed to be a one-off event.

I understand Nexo employed the following default Slack retention periods, though different retention periods could be applied to specific channels:[12]

---

[11] https://slack.com/help/articles/4401830811795-Create-and-manage-legal-holds (noting that legal holds are only available on Slack Enterprise plans); https://slack.com/help/articles/115003205446-Slack-plans-and-features (comparing features of Business+ and Enterprise plans).

[12] Counsel Ltr. dated January 30, 2026. I understand that the four-day retention period for Direct Messages was done in error and that it was promptly corrected. Trenchev Depo., Vol. 1, 113:1-113:10.

Public and Private Channels

| Retention Period | Effective Date |
|---|---|
| 60 days | 03-01-2023 |
| 180 days | 01-23-2024 |

Direct Messages

| Retention Period | Effective Date |
|---|---|
| 4 days | 12-04-2022 |
| 30 days | 12-07-2022 |
| 60 days | 02-09-2023 |
| 180 days | 01-23-2024 |

I also reviewed NEXO-0369388 that identifies different retention periods for various Slack channels, which in my opinion is typical when managing such a large volume of Slack channels. In my experience, a default retention policy of 30 to 180 days for internal Slack communications is not unusual. Several business reasons exist for Slack retention policies of these duration, including (1) the amount of data at issue, (2) the cost of preserving such data, (3) the sensitivity of such data, (4) the risk that such data could be accessed by threat actors, (5) the continuing business need for the data; and (6) the type of channel content or subject.

Information Governance obligations to preserve records for extended periods of time could exist (*i.e.*, regulatory compliance, legal hold, etc.). However, the obligation to adjust record retention policies for either regulatory compliance or legal hold purposes is rarely organization-wide. Instead, this is targeted to data sources **only potentially relevant** to regulatory compliance or the legal hold subject matter. Records outside of these criteria are subject to what the business chooses to do with their records retention policies, in line with the needs of the business.

In section 17 of the Kunkel report, Kunkel discusses Slack retention policies for public and private channels. When referring to NEXO-0369388, he states "*This document indicates different retention settings for different channels.*" My response is, why is that relevant to the matter at hand?

For most organizations, this is an entirely common practice. In this instance, it appears that Nexo thoughtfully added retention settings to identified channels to ensure that they were not over preserving by simply allowing all Slack communications to be stored forever. This would not be consistent with sound Information Governance practices and would result in escalating cost and risk if no retention policies were implemented. It is also common for different data sources (in this case different channels) to be subject to different retention periods, based on the needs of the business.

Not all data sources are the same, or of equal importance or relevance to an organization, especially in the casual environment of Slack or other corporate messaging platforms.

Kunkel draws no actual conclusions from Nexo's Slack retention settings. Instead, in paragraph 42, he *implies* an ulterior motive from Nexo's implementation of a 60-day retention policy starting March 1, 2023, shortly after the Complaint was filed. But, as explained above, Nexo was free to implement retention policies it deemed necessary, and actually took the time to implement specific policies for specific channels. This conduct does not demonstrate a desire to destroy relevant information. Quite the contrary, this conduct evidences a desire to preserve necessary documents while addressing the burdens of data preservation.

As noted above, it is my understanding that Nexo preserved data related to Mr. Cress, including Slack messages, which have been produced. Kunkel does not address the fact that Nexo produced Slack communications notwithstanding the default retention policy change.

Further, Kunkel conveniently ignores the testimony of Trenchev on this topic. When asked if Nexo tried to recover deleted Slack messages (which is not possible), Trenchev consistently testified that all Cress-related materials had been preserved.[13]

In my opinion, there is nothing improper about Nexo's conduct in setting document retention settings for its Slack accounts, and Kunkel's report fails to identify any problems with Nexo's conduct.

**e. Google Vault:**

In section 18 of the Kunkel report, Kunkel refers to Google Vault logs but fails to provide an understanding of what Google Vault is.

Google Vault is an Information Governance, retention, and electronic discovery service developed for organizations using Google Workspace. The platform enables authorized administrators and legal personnel to retain, preserve, search, place legal holds on, and export organizational data generated through supported Google services, including Gmail, Google Drive, Google Chat, Google Calendar, Google Meet, Google Groups, and Google Sites.[14] Google Vault's primary purpose is to assist organizations in meeting legal, regulatory, compliance, audit, and

---

[13] Trenchev Depo. Vol. 1, 115:19-116:19:

Q.· ·As part of its response to this litigation has Nexo made any efforts to recover deleted Slack messages?

A.· ·As discussed already, when the demand letter in exhibit 101 was handed over, as later discovered by me, the team went about securing copies of the relevant messages.· So I don't see how they would go -- or would need to go about trying to recover messages if all the relevant messages were already secured by the team for future use.

Q.· ·So is the answer then that Nexo has not done anything in this litigation to recover deleted Slack messages? . . .

A.· ·This is not what I said. The answer to that question is that Nexo went above and beyond in securing all relevant communications, whether on Slack or elsewhere in order to be helpful to the proceedings in which we currently find ourselves.

Q.· ·So has Nexo made any effort to recover any messages deleted as -- any deleted Slack messages, in this litigation?

A.· ·*Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.*

[14] https://support.google.com/vault/answer/2462365

investigative obligations by ensuring that electronically stored information ("ESI") can be preserved and retrieved in a controlled and auditable manner. [14,15]

Google Vault operates as a centralized eDiscovery and records-retention mechanism rather than a conventional backup or disaster-recovery solution. Through configurable retention rules, organizations may preserve data outside of user actions, maintain audit trails of administrative actions, and export records for legal review or evidentiary purposes. The system is commonly utilized by organizations for litigation support, internal investigations, regulatory compliance, records retention policies, defensible deletion and corporate governance processes.

A key feature of Google Vault is the management of the retention policies that the organization decides upon. These policies dictate how long a certain type of record (email, spreadsheet, document, etc.) is retained by the organization, and these rules are often tailored to members of the organization at either group of custodian level. Once these policies are implemented in Google Vault, the retention policy criteria are programmatically managed and executed.

It is rare to see an organization have no records retention policy whatsoever and simply keep everything forever, outside of startups or very small organizations. Retention policies are typically created or modified using a balance of cost, risk, privacy and current business needs. It is common for organizations to modify their retention policies in response to changing business needs.

For organizations subject to regulatory compliance, their record retention policies (in part at least), are governed by the regulatory compliance requirements, in terms of how long an organization must save certain types of data for.

---

[15] https://support.google.com/vault/answer/2539616

Records retention policies are commonly used to manage storage costs while balancing the need to safeguard and keep targeted data for longer periods of time, while protecting the organization from user deletion of important data that the organization may want to keep.

In section 18a, Kunkel states "*Google notes that 'Vault allows Gmail to immediately purge data that exceeds the retention period when you submit a new rule. The purged data can include data that users expect to keep.' - This documentation confirms that retention rules actively purge live data—not merely data in a user's trash—and that purged data cannot be recovered.*'" Kunkel continues through Section 25 discussing Google records retention settings and changes, yet fails to explain the implication of these changes, or how they are in any way connected to this legal action, and not simply the result of the implementation and modification of records retention goals of Nexo.

Long-term data storage can be expensive and create risk for an organization. Records retention policy changes support updated systematic and organizational data retention objectives. It is records retention best practice to constantly review and update (as needed) policies that dictate how long an organization retains data, or when it defensibly disposes of expired data. Even in situations where regulatory compliance or legal hold obligations exist, outside of the **potentially responsive data in relation to the subject matter**, all other data sources can have (and should have) records retention policy changes as often as is required by the organization.

f. **Kanchev and Trenchev Emails:**

In section 19 through 31 of the Kunkel report, Kunkel discusses changes to a record retention policy in relation to Google Vault on December 4, 2022. Of note, this modification was very targeted and almost **3 months prior to the initial Complaint being filed** in this matter on

February 27, 2023.[16] The changes that Kunkel references were specifically in relation to the retention of emails only, to and from 2 individuals, each with 2 different email addresses.[17]

I am advised that the two individuals whose email addresses were subject to the records retention modification were busy senior executives who were not involved in daily operations or transactions involving Mr. Cress. At the deposition of Antoni Trenchev, Trenchev confirms that his role within Nexo, and the role of Kanchev, were not customer facing and that they "would have little to no relevant documents and communications" in relation to complaints or demands.[18]

Nexo, and some of its affiliated businesses, operate in the cryptocurrency arena. A cryptocurrency organization typically participates in high value, irreversible transactions, and stores highly sensitive information, which if compromised could have a devastating business impact. At the same deposition, when responding to questioning regarding a records retention change in December 2022, Trenchev explained "there was a lot of hacking attacks at the time. Various black hacking groups that were becoming even more targeted in their attempts towards crypto companies, and I think the thinking was around de-risking us with [Kanchev], as custodians of --custodians of especially sensitive data which might or might not obviously in our opinion not have had to be retained going forward."[19] He continued by stating that "it was a de-risking activity, an initiative."[20]

---

[16] While these changes were made after receipt of the demand letter, I saw nothing in the demand letter that would implicate Trenchev or Kanchev, especially in light of Trenvhev's testimony that he and Kanchev were not "client facing." *Supra*. Further, as noted, Trenchev testified that all Cress-related documents were already preserved at the time of these changes. Further, it had been over 1 year since receipt of the demand letter at this point with, to my knowledge, no communication from Cress. Nexo could have assumed that Cress had decided not to pursue his claims at this point.

[17] Kunkel also observes that Nexo implemented an email retention policy change for a third apex executive, Kalin Metodiev, in November 2023. It is my understanding that Metodiev had no interactions with Cress, and also that Metodiev is not a designated custodian in this matter.

[18] Trenchev Depo., Vol. 1, 101:13-101:25.
[19] Trenchev Depo., Vol. 1, 91:17-91:24.
[20] Trenchev Depo. Vol. 1, 91:25-92:1.

Trenchev's concerns were valid. During the early 2020's, cybercrime and phishing attacks were on the rise. As reported in the publication "*Federal Bureau of Investigation Internet Crime Report 2022*" [21] in reference to Business Email Compromises (BEC), "In 2022, the IC3 received 21,832 BEC complaints with adjusted losses over $2.7 billion. BEC is a sophisticated scam targeting both businesses and individuals performing transfers of funds. The scam is frequently carried out when a subject compromises legitimate business email accounts through social engineering or computer intrusion techniques to conduct unauthorized transfers of funds."

Regardless, it appears that a business decision was made, unconnected with Mr. Cress's claims, to adjust the records retention policy for these two high-ranking individuals to minimize risk. Minimizing risk is one of the pillars of Information Governance, and within the authority of the organization to perform modifications to the records retention policy, to protect the organization. Kunkel does not consider (or even discuss) the business justification offered by Trenchev in his sworn testimony and offers no opinion as to the proprietary or impropriety of the changes. Again, Kunkel is limited to repeating facts and attempting to imply wrongful conduct rather than actually offering an opinion.

Nexo has identified reasonable business justifications for the Trenchev and Kanchev email retention policy change in December 2022, including the fact that those two apex executives possessed particularly sensitive business data, that their communications could be targeted by threat actors, and given the unique security risks that generally face the cryptocurrency industry, including the potential irreversibility of fraudulent crypto transactions, and the prevalence of attempted hacks and bad actors.

---

[21] https://www.ic3.gov/AnnualReport/Reports/2022_IC3Report.pdf

**g.  Alleged Targeted Deletion of Specific Emails and Documents:**

In section 32-36 of the Kunkel report, he criticizes Nexo because "Nexo created dozens of 1-day retention rules targeting specific emails" as if this was extraordinary and indicated some bad faith actions. Kunkel fails to recognize that there are several legitimate business reasons why targeted one-day records retention policies may be implemented. By example, through email, the organization may have received a hacking attempt, phishing email, ransomware attacks, email attachments containing a virus, or other malware. Malware is malicious software designed to harm, disrupt, or take control of devices and data.[22] One method to delete this type of email system wide, would be to apply a one-day policy to delete this email universally. In addition, the organization may have a legal obligation to delete certain emails as part of a compliance requirement, or settlement in a legal action.

The implementation of a one-day records retention policy can be used for many legitimate purposes and can be an efficient option for IT personnel, as they try to safeguard their systems.

Kunkel points to targeted deletions in the Google retention log and suggests that it is evidence of improper deletion of matters relevant to this lawsuit. He has established no factual predicate for this opinion. Based on my discussions with Nexo, the targeted deletions generally fall into two categories: (1) targeted deletions of suspected spam and phishing emails and other potentially harmful emails that caused a potential security risk; and (2) targeted deletion of documents in a separate UK litigation, the *Morton* matter, that were deleted after Nexo produced them in the *Morton* matter. I am advised Nexo subsequently settled the *Morton* matter. Kunkel has provided no explanation for why targeted deletion of these emails was improper.

---

[22]
https://www.malwarebytes.com/malware#:~:text=Malware%20is%20malicious%20software%20designed%20to%20harm%2C%20disrupt%2C,files%2C%20spy%20on%20activities%2C%20or%20hijack%20system%20functions.

Nexo confirmed that the targeted deletions of suspected spam and phishing emails, and other potentially harmful emails that caused a potential security risk, were requested by the Information Security (InfoSec) department of Nexo. Nexo confirmed that the Google Drive labels "LabelRet" and "rom" were targeted deletions from Google Drive associated with the *Morton* matter. Finally, Nexo further confirmed that the MNG and MNGRET organization units referenced in the Google retention log were a subgroup with the larger Nexo group consisting of Nexo senior management. Nexo confirmed that the Trenchev and Kanchev email retention rules (discussed above) were applied to the senior management subgroups to confirm that the same retention rules were applied at the group and subgroup levels. Again, there is nothing wrong or improper with these actions.

Beyond these legitimate reasons for the 1-day retention rules, it appears Kunkel is simply wrong on many of the statements he makes. For example:

- In section 34h, Kunkel claims that Nexo deleted "All OTC deals part 1 (22.04.2021-19.01.2021)." This is incorrect as that document was produced in this litigation at NEXO-0248334. This clear error calls into question Kunkel's other claims. Further, Kunkel asserts that emails titled All OTC deals part 2 and part 3 (section 34i and 34j) were also deleted, but I have confirmed with Nexo that they still exist, were gathered as part of the discovery efforts in this case but were not produced as they did not include Cress-specific data. Part 1 was produced because it included Mr. Cress transactions.

- Similarly, Kunkel claims that emails with the subject "amending templates used by the sales team" were deleted (section 34g), but two of these emails appear on Nexo's privilege log at PRIV-0000045 and -49 that I reviewed.

- In addition, Kunkel claims that emails with the subject "Nexo token liquid" and "Akin Gump LLC-Letter to Nexo" were deleted. I have confirmed, however, that emails with

this subject were gathered by Nexo and are held in NUIX. I understand these documents were not promoted for review because they did not hit on any search terms. While Kunkel could not have known this, it is still evidence that his specious claims of deletion are simply untrue.

These errors call into question Kunkel's claims of targeted deletion but also raise another significant issue. Kunkel is alleging deletion of emails that do not appear relevant to the case as they were not marked for production. As discussed, Kunkel appears to cast aspersions on Nexo without demonstrating that there has been any actual harm to Mr. Cress.

This weak analysis is further demonstrated by Kunkel's claims that NEXO-0369409 shows evidence of numerous, relevant deletions. That is not the case. Even a cursory review of Column H in the spreadsheet reveals that almost all of these alleged deletions relate to either random emails and/or time periods unrelated to Mr. Cress. And, as noted above, the ones Kunkel tried to cherry-pick in section 34 missed completely. Kunkel's argument that there were targeted deletions related to this dispute is simply incorrect.

## VII.    Kunkel Report Conclusion:

In short, while Kunkel has identified changes to Nexo's retention periods (which are not in dispute), he has done nothing to show that there was a malicious intent behind these changes or that they affected the gathering and production of relevant documents in this case. I respond to Kunkel's alleged conclusions:

**Section 37** – Kunkel expresses an opinion regarding the intentional setting of retention rules in Google Vault. These facts are not in dispute; however, Kunkel again fails to recognize that changes to retention rules can effectively target emails through various criteria to assist in safeguarding the organization from outside attacks and for other legitimate business purposes. He

states that the retention rules were "purposefully set at Nexo in such a way to delete targeted emails." As stated above, retention policies are common. I understand the targeted deletions addressed documents associated with spam, phishing, malware attempts, ransomware, other harmful content, and the *Morton* matter. He also states that Nexo had the ability to implement a litigation hold but did not. As stated above, Nexo's default retention policy, with few exceptions, was to retain all relevant data.

**Section 38** – Kunkel states "*Several aspects of the retention rules documented above are, in my opinion, inconsistent with routine IT administration. Routine data retention policies are typically applied uniformly across an organization or service—for example, a blanket policy retaining all email for a set period.*"

Kunkel is not qualified to offer this opinion, and he is incorrect. Retention rules are designed to apply policies against many data sources (such as email) at a granular level. Further, differing policies for the same data source category are common, and are often targeted by custodians, departments, etc. Even more granular, it is possible to set a retention policy by custodian and by attachment size or type. This is the very essence of records management. Not all custodians have the same type of data that is important to the organization. It is possible for organizations to have thousands of differing retention policies, if the needs of the business require it. He also states the deletion of emails by subject line, message, IDs, or Google Drive labels is "not characteristic of ordinary IT retention policy." On the contrary, a business could have legitimate reasons to delete information that is no longer relevant to the organization or that presents potential security risks.

**Section 39** – Kunkel discusses targeting specific emails by their message ID. For clarification, a message ID is added to an email by the mail server once sent (in this instance

Gmail). The receiver has the Message ID hidden in the headers of an email. It is a trivial process to identify the Message ID at the receiver's end, but not possible at the sender's end.

Record retention policies can use the Message ID as criteria for a certain action (by example, it can be used to delete an email) and can be used in a one-day records retention policy. This is a useful feature for IT to have at their disposal if the organization has received an email that they think may compromise the integrity of the organization and protect them from malicious attacks. As reflected above, the RFC 822 message IDs provided an efficient manner to eliminate potentially harmful materials, such as spam and phishing emails, from Nexo's systems, which is an effective method to protect the organization.

**Section 40** – Kunkel states "*The timing of these retention rules correlates with key events in this litigation.*" He fails to mention, however, the hundreds of other retention rules that do not correspond with any significant dates in this litigation. Kunkel has full access to the logs provided by Google that detail retention rules change, yet fails to explain why any of the rules that he identifies impact this litigation. As explained above, any analysis of Nexo's retention obligation must go beyond dates and consider issues like the default retention settings, the scope of notice to Nexo, and the potential expanding scope of claims over time.

The timing of Nexo's retention policy changes has a reasonable explanation that is unrelated to the *Cress* litigation. Nexo's initial December 2022 retention policy changes have no correlation with events in the *Cress* litigation – the Demand Letter was sent in October 2021, and no further demand had been issued since that time when the retention policy changes were implemented over a year later. According to Nexo, there was a roll-out of retention policy changes that began in December 2022 and was implemented in stages within the company. According to Nexo, the March 2023 retention policy changes were a continuation of the retention policy

implementation that began in December 2022 and had no connection to the *Cress* litigation. In my experience, it is common for new retention policy strategies to be implemented over a period of time. Thus, Kunkel's suggestion of a link between events in the *Cress* litigation and changes in retention policies is based on pure speculation and conjecture without any evidence. Nexo's explanation of a phased rollout of retention policy changes is much more plausible than Kunkel's suggestion that an individual claim triggered company-wide retention policy changes. Nexo's explanation is also supported by its contemporaneous roll out of a written Data Retention and Disposal policy on March 23, 2023, which contains an "approved date" of January 11, 2023.

Further, Kunkel mentions "*the pattern of escalation – from broad rules to increasingly targeted deletion of specific communications.*" As an organization matures and understands their business needs better, it is common (and best practice) to become granular where possible, in relation to setting records retention policies. The "broad to targeted" escalation that Kunkel mentions is expected behavior for a maturing company who are subject to compliance or legal hold obligations. Again, legal hold does not mean that all data sources in an organization must be unilaterally retained.

**Section 41** – Kunkel explains that email(s) that have expired based on records retention rules being executed, cannot be recovered. If Kunkel is implying that emails between Mr. Cress and Nexo are lost forever, he fails to address the fact that Mr. Cress (as a party to the email) would have a copy of the email(s), which would have been produced in discovery. And he fails to address the unrebutted testimony that Nexo gathered, preserved, and produced all Cress transaction emails.

**Section 42** - Kunkel states that "*Nexo is unable to provide any business justification for implementation of its Slack retention policies.*" In my experience, a default retention policy of 30 to 180 days for internal Slack communications is not unusual. As explained above, certain channels

can have longer retention periods than the default setting, and Nexo produced Slack messages in this matter. Several business reasons exist for Slack retention policies of these duration, including (1) the amount of data at issue, (2) the cost of preserving such data, (3) the sensitivity of such data, (4) the risk that such data could be accessed by threat actors, (5) the continuing business need for the data; and (6) the type of channel content or subject.

**VIII.    Compensation for Work Performed:**

Level Legal charges $500 per hour for my analysis, associated review of documents and systems in this matter, and any written reports or testimony. Level Legal's fees are not contingent on the outcome of these proceedings.

**IX.    Reservations:**

I reserve the right to perform additional analysis as directed. In the event of additional analysis, a supplemental report may be written that will serve to supplement this report. The results included in this report relate only to the work performed. None of the conclusions or opinions stated herein may be used in relation to materials not reviewed. The work performed on the materials in this case complied with client requirements and specifications, unless specifically identified as a deviation in this report. The analysis and conclusions contained in this report are expressed within a reasonable degree of probability within the field of computer forensics.

David A. Greetham

Vice President of Digital Forensics

Level Legal

EXHIBIT A

# David Greetham

Digital Forensics, Information Governance and eDiscovery Expert

903.303.2719 | dgreetham@levellegal.com | linkedin.com/in/davidgreetham



## Overview

David Greetham is a tenured digital forensics expert and is the vice president of digital forensics at Level Legal. He has testified as an expert on numerous occasions both nationally and internationally. He has acted as a joint neutral expert on many occasions, specifically in the areas of digital forensics analysis, information governance and eDiscovery methodologies. His accolades include:

- Tenured digital forensics expert and successful entrepreneur.
- Testified as an expert on numerous occasions both nationally and internationally, including the landmark case Coleman Holdings v. Morgan Stanley.
- Developed and patented the first-in-the-world remote forensics collection system.
- Provided specific training for the Executive Office of the President at the White House, Harvard University, and New Scotland Yard.
- Member of the Association of Certified Fraud Examiners.
- Certified Forensic Litigation Consultant.
- Lifetime Achievement Award, Winner – 2026 Legalweek Leaders in Tech Law.
- Legal Innovator of the Year, Winner – 2024 Texas Legal Awards.
- International Legal Technology Association Innovator of the Year, Finalist – 2023.
- Ricoh's International Star Patent Award, Winner – 2016.

He holds multiple certifications and association memberships seats and is a frequent speaker for Bar Association meetings and continuing legal education events.

David completed his Master of Science in Forensic Computing from Cranfield University, considered as one of the top five technical universities in the world, which is based at the Defense Academy of the United Kingdom. In addition, David is the inventor and developer of Remlox™, a patented, forensically sound "remote collection" tool which has already been used in 39 countries throughout the world. He also holds multiple other eDiscovery and digital forensics patents.

# Professional Experience

**VP of Digital Forensics**
Level Legal
2023 – Present

Leads digital forensics and eDiscovery service lines. Handles all aspects of process, including digital data collection, forensics analysis, and expert testimony. Manages projects ranging from 10 to 1,300 custodians.

**Principal**
PC Forensics
2021 – 2023

Owned and operated full-service digital forensics organization, including training and teaching, forensic collections and analysis, information governance consulting, and expert witness testimony. PC Forensics was acquired by Level Legal in 2023.

**VP of eDiscovery (Sales & Operations)**
Ricoh Americas Corporation
2007 – 2021

Led eDiscovery sales and operations for a multi-billion global services organization, overseeing computer forensics, information governance, electronic data discovery, fraud investigations, and consulting on complex technical matters. This included forensics analysis, electronic processing, and production of electronically stored information (ESI) in client internal investigations and external litigious matters. Served as Director of an accredited forensic lab and managed a team of forensic experts in data collection and investigation across domestic and international cases. Former President of HSSK Forensics, acquired by Ricoh in 2012.

**VP Electronic Evidence**
First Advantage Litigation Consulting
2004 – 2007

Conducted investigations and provided consultation on electronic evidence for large-scale litigations involving up to 12,000 custodians. Managed the entire data lifecycle, including pre-litigation consulting, data collection, culling, analysis, attorney review preparation, and expert testimony. Performed forensic examinations on systems involved in data theft, internet misuse, and spoliation, alongside network security risk assessments. Authored and standardized operating procedures for the Forensics Department, ensuring consistent, high-quality processes and rigorous testing of new tools and techniques.

| **CEO and President** | Trained new investigators in computer forensics and forensic analysis |
| --- | --- |
| Pc Forensics (UK) | of mobile devices (cell phones, Psion organizers, PDAs, etc.); designed |
| 1998 - 2004 | and installed procedures for competent forensic investigations; planned hardware specifications to effectively facilitate thorough investigations; represented both plaintiffs and defendants in civil and criminal matters; performed computer forensic analysis on more than 400 hard drives; provided evidence as expert witness on more than 20 occasions in five different countries; consulted with corporate clients and assisted with staff selection in positions of IT security. |

## Education

| **Completed Master of Science in Forensic Computing** | Computer Forensics Foundation I & II |
| --- | --- |
| Cranfield University, | Computer Forensics Advanced |
| Shrivenham, England | Internet Investigations |
| Defence Academy of the UK | Forensic Networks and Forensic Internet |
| | Legal Issues and Courtroom Skills |
| | System Programming |

## Patents and Inventions

- Remlox Cloud™: Patent No. US 10,609,120 enabling cloud- based targeted collections (filed 2017, issued 2020).
- Legal Discovery Tool Implemented in A Mobile Device: Patent No. 10,191,907 (issued 2019).
- DART™ (Data Analysis and Reporting Tool): Patent No. US 9,633,030 (issued 2017).
- Electronic Document Retrieval Tool: Patent No. US 9,286,410 (issued 2016).
- Electronic Document Retrieval and Reporting Using Intelligent Advanced Searching: Patent No. US 9,348,917 (issued 2015).
- Remlox™: Patent No. US 9,087,207 (issued 2015).
- Secure cloud-based data collection tool: Patent No. US 10,686,780 (issued June 2020).
- Legal Discovery Tool Implemented in A Mobile Device: Patent No. 11,100,045 (issued 2021).

## Certifications & Associations

- Member of the Association of Certified Fraud Examiners

- Certified Forensic Litigation Consultant by the Forensic Expert Witness Association

- Certified eDiscovery Specialist by the Association of Certified E-Discovery Specialists

- Certified Computer Crime Investigator by the High Tech Crime Network

- Certified Computer Forensic Technician by the High Tech Crime Network

- Certified Information Governance Officer (CIGO)

- Certified Fraud Examiner

- Former Member of the Association of British Investigators and Digital Forensic Research Workshops (DFRWS) Licensed private investigator in Texas and Florida, USA

- PG Certificate Forensic Computing

- PG Diploma Forensic Computing

## Publications

- "A Point of Inflection: Remote eDiscovery" – Document Strategy, October 2020

- "Securing Each Link in the e-Discovery Chain" – Law Journal Newsletters, September 2018

- "The Role of Encryption in Law Firm Data Security" – Cybersecurity Law & Strategy, August 2017

## Notable Speaking and Training Engagements

- Digital Forensics and eDiscovery Training. Executive Office of the President at the White House, February 2019.

- "Forensics Collections and Changes to the Computer Forensics World." Digital Government Institute, E-Discovery, Records & Information Management Conference, March 2021.

- "Computer Forensics – Beyond the Basics." Harvard Law School, Cambridge, Massachusetts, February 2014 (CLE Credit).

## Awards

- Lifetime Achievement Award, Winner – 2026 Legalweek Leaders in Tech Law.
- Legal Innovator of the Year, Winner – 2024 Texas Legal Awards.
- International Legal Technology Association Innovator of the Year, Finalist – 2023.
- Ricoh's International Star Patent Award, Winner – 2016.

## Selection of Recent Speaking and Training Engagements

- "Unmasking Synthetic Media and Deepfakes." ILATCON 2025, Speaker.
- "Digital Evidence: Mapping the Landscape/Case Insights." ACFE Dallas Chapter, January 2025.
- "From Scratch to Scale: Shaping a Dynamic Litigation Support Operation." – ILTACON 2024, Speaker.
- "Forensic challenges with Mobile devices, social media and the Internet of Things." Women in eDiscovery Iowa Chapter, 2022.
- "Disruption in eDiscovery." ILTACON 2020, Speaker with Jeff Shapiro (CLE Credit).
- "Cybersecurity, Attorneys, and Data Breaches: Your Legal and Ethical Duties." The Bar Association of Metropolitan St. Louis, St. Louis, Missouri, July 2020 (CLE Credit).
- "Defensible Collection – What Every Litigator Needs to Know." Nationwide Online Presentation, September 2018 (CLE Credit).
- "School's Out – Let's Stay Connected: The IoT." Association of Certified eDiscovery Specialists, Nationwide Online Presentation, August 2018.
- "Digital Evidence Challenges: Connected Devices and the Internet of Things (IoT)." Digital Government Institute, Records Management Conference, Washington, D.C., September 2017.
- "IoT Collection Challenges/Self-Authentication of ESI Under FRE 902(14)." Women in E-Discovery, Minnesota Chapter, September 2017 (CLE Credit).
- "Internet of Things (IoT), How the Internet of Things (IoT) Impacts Forensics and Data Collection: the developing scope of data collection and intersection of technology." Women in E-Discovery, Houston Chapter, July 2017 (Panel Discussion).
- "Computer Forensics – Beyond the Basics." Maryland State Bar Annual Meeting, Baltimore, Maryland, June 2017 (CLE Credit).
- "Managing eDiscovery needs in a Big Data World." National CLE Conference, Aspen, Colorado, January 2017.
- "Cloud Collections as the New Norm." Technology in Practice, Toronto, Canada, November 2016.

- "Sharpening Our Most-Used Tools: Protective Orders, Production Protocols & Requests-for-Production." Electronic Discovery Institute Leadership Summit, Fort Lauderdale, Florida, October 2016 (Panel Discussion).
- "Harnessing the Cloud for eDiscovery." E-Discovery Records & Information Management Conference & Expo, Washington, D.C., March 2016
- "The Future of Computer Forensics." National Space and Technology Association, Houston, Texas, April 2009.

A complete list of publications and speaking engagements is available upon request.

## Recent U.S. Expert Witness Testimony

| | |
|---|---|
| **V&E Capital v Legacy Contractors, LLC**<br>November 2025 - Arbitration proceeding before the American Arbitration Association | Testified at an arbitration proceeding on behalf of plaintiff in relation to a dispute regarding tracing an intercepted transfer of funds. The testimony included an analysis of email headers and tracking email sources to a specific organization. |
| **C-B Gear And Machine, Inc. v Jacob Flores, Juan Rick Flores, and Machinery Maintenance Rebuilders, Inc.**<br>May 2025 - CAUSE NO. 2024-8679 in the District Of 190th District Court of Harris County, Texas | Testified at deposition on behalf of Plaintiffs. Testimony included details about the detection of USB devices being used to illicitly copy data, in a departed employee related litigation, and how technical information can demonstrate potential theft of trade secrets. |
| **The State of Texas v Salomon Campos Jr.**<br>October 2024 - CAUSE NO. 24-01-01322 in the 445th Judicial District Court, Cameron County, Texas | Provided live televised testimony in a capital murder trial concerning information governance standards and expectations. The testimony highlighted observed deficiencies in information governance practices and supported the court's understanding of proper evidence-handling procedures. |

| | |
|---|---|
| **Intrepid Directional Drilling Specialists, Ltd v Total Directional Services, LLC & Aliarcid Rodriguez** <br> April 2024 - CAUSE NO. 24-01-01322 in the 457th District Court, Montgomery County, Texas | Provided live testimony as a jointly engaged neutral expert in relation to forensic imaging and analysis of electronic devices in an alleged theft of trade secrets matter. Testimony encompassed the Microsoft Windows operating system, and how analysis of system generated artefacts can reveal evidence of the actions of a user on a Microsoft Windows system. |
| **Bureau Veritas Commodities and Trade Inc. v Renisha Nanoo and Cotecna Inspection Inc.** <br> December 2022 - Case No. 2:20-Cv-03374 (United States District Court Of Eastern District of Louisiana) | Testified at deposition on behalf of plaintiffs in relation to Microsoft Windows system artifacts, including information in relation to connected USB devices, Internet history, shellbags analysis, email deletion and Volume Shadow Copy recovery. Testimony also encompassed information in relation to data recover techniques specific to deleted or uninstalled applications. |
| **Securities and Exchange Commission (SEC) v Bradley C. Davis** <br> July 2022 <br> Case No. 2:20-Cv-03271-Ab (KSx) | Testified at trial on behalf of plaintiffs in relation to mass deletion of electronic records. Testimony encompassed analysis of Recycle Bin records, the methodology of restoring data from Volume Shadow Copies, timestamp information in relation to deletions, and "last accessed" registry settings. |
| **Securities and Exchange Commission (SEC) v Bradley C. Davis** <br> September 2021 <br> Case No. 2:20-Cv-03271-Ab (KSx) | Testified at deposition remotely on behalf of plaintiffs in relation to mass deletion of electronic records. Testimony encompassed analysis of Recycle Bin records and the recovery of deleted electronic records using Volume Shadow Copies. |

| | |
|---|---|
| **Texas Direct Insurance Agency LP v Richard E. Chester.**<br>August 2021<br>Cause 2020-18467, 190th Judicial District Court of Harris County, Texas | Provided live testimony on email deletion and recovery of deleted emails from OST files. Demonstrated to the court how previously "deleted" emails may be recoverable from a cached OST file. |
| **Texas Direct Insurance Agency LP v Richard E. Chester.**<br>June 2021<br>Cause 2020-18467, 190th Judicial District Court of Harris County, Texas | Remotely provided live testimony and provided a technical interpretation at the request of plaintiffs, for the Court in relation to cellphone imaging, data extraction and potential recovery of deleted contents. Advised on digital forensics and eDiscovery protocols in an alleged theft of trade secrets matter. |
| **National Prescription Opiate Litigation, Mdl No. 2804**<br>September 2020 - Case No. 17-Md-2804<br>In the Northern District of Ohio | Remote video oral declaration in relation to the National Prescription Opiate Litigation MDL. The testimony incorporated methodology of data collections from Office 365 (now M365) and feasibility of search terms. |
| **Travelers Company, Inc. et al. v Gabriel Carrilo, et al**<br>May 2014 - No. 3:13-Cv-00267-Hla-Pdb, United States District Court, Middle District of Florida | Testified at deposition in relation to the results of analysis in relation to computer use and the results of comparisons of files by hash values and keyword/key phrase searching. |
| **John R.W. Yates v Johanna M. Seddon and Mark J. Daly**<br>June 2013 - Patent Interference No. 105,897 (SGL) | In the United States Patent and Trademark Office before The Board of Patent Appeals and Interferences in Charlotte, North Carolina. Engaged to testify as an expert in relation to authentication of archived emails. |

| | |
|---|---|
| **Adrian Arrington, Derek Owens, Mark Turner, and Angela Palacios Individually and on Behalf of all Others Similarly Situated, v National Collegiate Athletic Association**<br>May 2012 - Case No. 11-cv-06356 in the United States District Court of Northern Illinois (Eastern Division) | Engaged to testify at an ESI protocol hearing on behalf of defendants, detailing forensically sound and efficient methodologies that can be used to collect, review and produce large quantities of ESI. Testimony included the difficulties reviewing hundreds of thousands of non-text searchable PDF files. |
| **William R. and Susan M. Knoderer v State Farm Lloyds, Penny Perkins and Tom Roberts**<br>August 2011 - Case No. 74-037 in the District Court of Hunt County, Texas. | Engaged to testify in relation to the effective management and segregation of responsive and privileged documents, in an eDiscovery document review and production process. |
| **Norit Americas Inc., v ADA-ES, Inc., et. al.**<br>September 2010, October 2010 – Case No. 30-192-Y-00718-09 in the American Arbitration Association of Atlanta, Georgia. | Engaged to testify regarding the analysis of application (embedded) metadata of Microsoft office documents, and its use in assisting with ascertaining original document authorship. |
| **Ashland, Inc. v James A. Cecere**<br>March 2010 - Case No. 10CV-3039 in the Court of Common Pleas of Franklin County, Ohio (Civil Division). | Testified at TRO hearing, demonstrating that a USB device had been used to copy proprietary and confidential company documents by a departing employee. |
| **United States of America v Faraj Salim Said**<br>November 2009 - Case No. H-09-660 in the United States District Court of Texas (Houston Division). | Testified in relation to the effective forensic analysis of electronic evidence, specifically in relation to tracking the source of downloads from the Internet. Testimony encompassed a detailed explanation of how Internet activity is recovered. |

| | |
|---|---|
| **Appling Farms, Et. Al. V John Turner, et. al.** September 2008 - Cause No. 2008-0914 in the District Court of Harris County, Texas 234th Judicial District. | Testimony detailed the use of MD5 Hash algorithms and how this can be used to compare different datasets for identical files. In addition, "near duplication" technologies were explained and the potential effectiveness was discussed. |
| **United States of America v Barry Gitarts** September 2008 - Case No. 1:07cr00464 in the United States District Court Eastern District of Virginia (Alexandria Division). | Testimony detailed the use of peer-to-peer networks, and how they could be used to download and distribute copyrighted material. |
| **Lewis Equipment Company, et. al. v General Crane (USA) Including Shawn Cluff and Randy Harris** September 2008 - Cause No. 2008-0914 in the District Court of Harris County, Texas 234th Judicial District. | Testimony detailed the use of MD5 Hash algorithms and how this can be used to compare different datasets for identical files. |
| **Richard Mulholland v William H. Winters and Marc E. Yonker** June 2008 - Case Nos. 01-5452, 01-5545, 03-2502, 05-5054 in the Circuit Court of the Thirteenth Judicial Circuit of the State of Florida, in and for Hillsborough County, Complex Business Litigation Division. | Testimony detailed efficient practices in relation to computer forensics preservation standards and electronic discovery productions. |

| | |
|---|---|
| **MARK ALBER, et. al. v MCCALL-T. et. al.** April 2008 - Cause No. 2006-08098 in the 133 Judicial District Court, Harris County, Texas. | Presented testimony in relation to validated methodologies used for the safe collection of electronic evidence. In addition, provided a detailed protocol to facilitate a secure and effective data collection, ensuring the integrity of the clients' data. |
| **Eagle Domestic Drilling Operations, LLC v Hallwood Energy, LP And Hallwood Petroleum, LLC** March 2008 - Case No. 07-30426-H4-11 in the United States Bankruptcy Court, Southern District of Texas; Houston. | Testified at sanctions hearing regarding an ineffective electronic evidence collection. |
| **Oscher (Trustee) v The Solomon Tropp Law Group** February 2006 - Cause No. 8:00bk-18057-ALP in the United States Bankruptcy Court for the Middle District of Florida. | Engaged to testify as expert in Motion for Summary Judgment regarding allegation of misappropriation of funds. Testimony encompassed standards in relation to electronic discovery and failings in the discovery obligations by plaintiffs in this matter. |
| **Oscher (Trustee) v The Solomon Tropp Law Group** November 2005 - Cause No. 8:00bk-18057-ALP in the United States Bankruptcy Court for the Middle District of Florida. | Engaged to testify as expert at deposition in Chapter 11 bankruptcy hearing. Testimony detailed expected standards in electronic discovery and highlighted the failings in this discovery matter. |

| | |
|---|---|
| **FJQC V Judge Gregory P. Holder**<br>June 2005 - Cause No. Sc03-1171, No. 02-487, in the Florida Judicial Qualifications Commission Supreme Court. | Provided live televised testimony as expert in high profile, televised case in the Supreme Court of Florida. Testimony detailed technical structure of backup tapes, and the procedures required to make "fake" backups. Testimony also encompassed how the Windows Operating System functions, and how it provides date and time stamps. |
| **Coleman (Parent) Holdings, Inc. v Morgan Stanley & Co., Inc.**<br>April 2005 - Cause No: 03 CA-005045 AI in the 15th Judicial District Court of Palm Beach County, Florida. | Engaged to provide written testimony as computer forensic expert in billion-dollar civil litigation, specifically in relation to metadata. In particular, testimony detailed the differences between metadata and in-house document management systems; explaining what makes the two technologies fundamentally distinct and clarifying the differences between the expected results during analysis. |
| **Morgan Stanley Dean Witter v Menaged MDL NO. 2804**<br>December 2004 | Engaged by counsel for Defendant to testify as expert in securities mismanagement arbitration. Testimony encompassed the recovery of relevant deleted Web pages from the claimant's computer and included the reconstruction of Internet history activity for a specific time period in September 2000. |
| **FJQC v Judge Gregory P. Holder**<br>September 2004 - June 2005, Cause No. Sc03-1171, No. 02-487, in the Florida Judicial Qualifications Commission Supreme Court. | Engaged by counsel for Defendant to testify as expert in high profile alleged plagiarism case. Testimony encompassed authenticating backup tapes and the documents contained within. Also demonstrated procedures required to create "fake" backup tapes. |

EXHIBIT B

**Exhibit B – Documents Received and Relied Upon**

NEXO-0248488: Plaintiff's October 26, 2021 demand letter.

Plaintiff's February 27, 2023 Complaint, Dkt. 1.

Deposition Transcript of Antoni Trenchev, Vols. I (April 1, 2026), II (April 2, 2026), including pp. 42-44; 91:17-91:24; 91:25-92:1; 101:13-101:25; 113:1-113:10; and 115:19-116:19.

Plaintiff's October 30, 2025 Second Amended Complaint, Dkt. 88.

Legal Correspondence: The January 30, 2026, letter from Nexo's counsel to Plaintiff's counsel.

NEXO-0369388: A spreadsheet of Slack Channel-level retention settings.

NEXO-0369409: A Google Vault Audit Log.

NEXO-0369389: A Google Vault Audit Log showing 12/4/22.

NEXO-0248334: "All OTC deals part 1 (22.04.2021-19.01.2021)."

NEXO-0183586: Data Retention and Disposal Policy, dated March 27, 2023.

Excerpt of Privilege Log: Entries for PRIV-0000045 and PRIV-0000049.

Native Slack JSON Files (20): NEXO-0343949, NEXO-0344091, NEXO-0344093, NEXO-0247809, NEXO-0343956, NEXO-0343988, NEXO-0344037, NEXO-0344095, NEXO-0344099, NEXO-0344102, NEXO-0344105, NEXO-0344109, NEXO-0344112, NEXO-0344115, NEXO-0344132, NEXO-0344144, NEXO-0344159, NEXO-0344191, NEXO-0344240, and NEXO-0344152

Slack PNG Files (15): NEXO-0369733, NEXO-0248511, NEXO-0344325, NEXO-0369734, NEXO-0344326, NEXO-0369735, NEXO-0369736, NEXO-0369737, NEXO-0248512, NEXO-0369738, NEXO-0369739, NEXO-0369740, NEXO-0344327, NEXO-0369741, and NEXO-0369742.

All documents or websites cited in the body or footnotes of my report.