# Exhibit 4

# Exhibit 4

# Deposition Transcript

Case Number: 3:23-cv-00882-TSH

Date: June 19, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# DAVID A. GREETHAM

Reported by:
Vanese Killingbeck



CERTIFIED COPY

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

DAVID A. GREETHAM                                          JOB NO. 2827028
JUNE 19, 2026

A.   Yes, I am.

Q.   -- are you aware that the log at least says that Mr. Damyanov was the one who was responsible for the vast majority of the changes in the log, right?

A.   The entries in the log, yes.

Q.   Okay.  Did you ask him whether he, in fact, made the changes that the log reflects?

A.   We talked about it, and we actually talked about that log that you're talking about, and he said, yes, he made those -- he was the one that entered those.

Q.   Okay.  Did he -- did you ask him if he was instructed to make any of those changes by anyone else at the company?

A.   I did.

Q.   And what did he say?

A.   He said he was instructed to make changes from senior management.

Q.   And did he provide the names of senior management?

A.   No.

Q.   Did he identify either Mr. Trenchev or Mr. Kantchev as having provided instructions?

A.   He did not.

BY MR. TAYLOR-COPELAND:

Q.   And we will start at paragraph 19.

So Mr. Kunkel says:  Google Vault Audit log, NEXO-0369389 shows the implementation of retention rules that took place on December 4th, 2022.

You don't dispute that, correct?

A.   No.

Q.   Okay.  And you also don't dispute that it revealed that Nexo's retention rules used the setting apply only to deleted objects false, correct?

A.   Correct.

Q.   And you don't dispute the next sentence, which is that the significance of this is that while some IT policies only clear from the trash, Nexo's configuration affirmatively scanned and purged active live e-mails from or to the following e-mail addresses if they were over 30 days old and sent after October 1, 2017.

And the addresses are:

Kosta@nexo.io;

Kosta@nexobank.com;

Antoni@nexo.io;

And antoni@nexobank.com.

Is that right?  You don't dispute that?

A.    I don't dispute that.

Q.    Then looking at paragraph 28 on Mr. Kunkel's report, he says:  The Audit Log shows that on December 6, 2022, a 30-day auto deletion rule covering all e-mails in the MNGRET organizational unit with no user specific filters was implemented.  This purged every e-mail in the organizational unit after 30 days.

Do you dispute everything in that paragraph?

A.    No.  I -- I think it states in my report that Mr. Kunkel's technical analysis, I don't dispute any of them.

Q.    I understand that.  And I know this is a little tedious, but I just want to make sure we're on the same page about what you consider is technical analysis versus what you -- you do dispute.

A.    Okay.

Q.    So looking to paragraph 26 above here, it says:  The Audit Log identifies the same December 4, 2022, changes to e-mails involving Kosta and Antoni Trenchev.  It also reveals that Nexo's retention rules regarding e-mail addresses for Kosta

DAVID A. GREETHAM
JUNE 19, 2026

JOB NO. 2827028

and Antoni were expanded on March 9, 2023.

And then it says:  They were expanded to apply a 180-day retention setting to e-mails to or from antoni@trenchev.com and kosta.kk@gmail.com. Once again, this applied to all the mailboxes in the organization.

You don't dispute that, correct?

(Simultaneous cross-talk.)

MS. DOOLEY:  Objection to form.  There are numerous facts in that single paragraph.  I just think maybe we should take them one by one.

(Simultaneous cross-talk.)

MS. DOOLEY:  But answer if you can.

A.    I'm -- I'm just looking one more time.

I don't dispute the fact that the audit log showed that the retention rules for Kosta Antoni were expanded on March 9th.

And the expansion to a 180-day rule to include antoni@trenchev.com and kosta.kk@gmail.com, I don't dispute that.

BY MR. TAYLOR-COPELAND:

Q.    Okay.  And then looking at paragraph 29: On November 6, 2023, at 180-day attention rule -- retention rule was applied to all e-mails to or from

policies targeting a number of specific RFC 822

message IDs.

          Do you dispute that?

     A.    No.

     Q.    And then he says:  The audit log shows

that 476 of the 512 rows of audit log items were

input by yasen@nexo.com or yasen@nexo.io and 36 rows

input by stefan.danielov@nexo.com.

          Do you dispute that?

     A.    No.

     Q.    Okay.  I think we discussed earlier that

Mr. Damyanov told you that it was, in fact, him who

implemented -- or clicked the button to implement

these changes, correct?

     A.    That's correct.

     Q.    Is it true -- I think we've looked at that

already.

          Is it true that a one-day retention rule

functionally deletes whatever is targeted by that

rule after one day?

     A.    That's the intention.

     Q.    Is it true that data purged by a Vault

retention rule is permanently unrecoverable?

     A.    The answer's yes.

          But on timing, I mean it's recoverable for

DAVID A. GREETHAM
JUNE 19, 2026

JOB NO. 2827028

a very short time.  And after that, once it's --
it's purged, it's gone.

Q.   So certainly data purged in 2023 and 2024
would not be recoverable today?

A.   Per the Google policy, no.

I'd want to look at other backups, are
there partial backups.  I'd want to look at some of
the other things to try to recover that.

But your -- your statement's correct.

Q.   Okay.  And then recovery of deleted Slack
messages is also not possible, correct?

A.   Correct.

Q.   So for any e-mail or Slack message purged
by these rules before collection, no one can examine
its contents, correct?

MS. DOOLEY:  Objection.  Vague.

A.   I'm just trying to understand looking at
the collection date.  I'm just trying to think
through your question.

You know, if somebody -- if they had not
been collected or acquired or set aside, and
retention rules are put in place and executed, the
Google documentation will tell you that after a very
short period of time, they're gone and not
recoverable.

Likewise with Slack, it's my understanding the data's already been collected in response to the demand letter of 2021.

BY MR. TAYLOR-COPELAND:

Q.   Right.

But you -- you don't actually know what was collected in response to the demand letter of 2021, correct?

A.   I don't know the actual files by way -- you're correct.

Q.   Okay.  Google Vault includes a litigation holds feature, correct?

A.   If -- if you have the right version, yes, it does.

Q.   Okay.  And a hold once placed takes precedence over retention rules, correct?

A.   Yeah.  It's very similar to an administrative retention policy.  It has a couple of extra features.  You know, it -- it could -- it could e-mail the custodians.  It could -- that kind of thing.

But it's essentially a high-level -- a high administrative level retention policy.

Q.   Okay.  And the hold creation would be documented in a Vault audit trail, right?

A.   If a litigation hold was performed using the Google technology, that would be logged at an administrative level, and those files would last for a period of time, based on your retention policy, in fact.

So I think your question was would it log, and the answer is it would log.

Q.   Okay.  You've not seen any evidence that Nexo created a Google Vault litigation hold for this case, correct?

A.   I haven't, and I -- I don't think they did.

I think because their retention policy was save everything and then after demand letter, Mr. Trenchev's deposition said that legal gathered everything, I don't -- I don't think the legal hold would have made any difference.

Q.   So you don't know what was actually collected, right?

A.   I don't, no.

Q.   And so if you don't know what was collected, how can you opine that a litigation hold wouldn't have made any difference?

A.   Well, it's the legal department -- according to Mr. Trenchev's deposition, the legal

A.    I think it -- I think it's also asking for a legal opinion, which I'm not qualified to do.

I can say that in my experience, if a legal hold is put into place because of a -- a lawsuit, the organization, the recipient of the lawsuit, and the recipient of the obligation for the legal hold have a duty to preserve documents, file folders, custodians, what they believe is potentially relevant to the -- to the matter at hand.

BY MR. TAYLOR-COPELAND:

Q.    So I'm reading your report, right?  Your view is because Nexo was using business Slack in 2023, they didn't have the capability to have a litigation hold in Slack; is that correct?

A.    Yeah, I think from a technology perspective, I think Slack only offers the ability to use a legal hold within Slack.  A litigation hold is when you subscribe to that -- the higher tier.

Q.    Okay.  But Nexo did have the ability to set channel-specific retention rules, correct?

A.    Yes, they did.

Q.    Okay.  And, in fact, they set the legal-cs-privileged-and-confidential channel for up to 1,825 days, right?

A.    I saw that in Mr. Kunkel's report, and I validated that was accurate.

Q.    Okay.  So Nexo had the ability to preserve channels that it chose to do so for at least 1,825 days, right?

A.    They had the ability -- well, I think if you turn the question around a little bit, if they didn't have a retention policy on it, by default, it was forever.

BY MR. TAYLOR-COPELAND:

Q.    Okay.

(Simultaneous cross-talk.)

A.    And I don't want to interrupt your line of questioning, but when it is an appropriate time, I would like to take a break, because we're having an air-conditioning problem in the building that I'm in.

So whenever you feel it's appropriate, maybe we could do that.

MR. TAYLOR-COPELAND:  That's -- that's fine.  We can take a break now.  Why don't we go off the record and we can discuss.

VIDEOGRAPHER:  Going off the record.  The time is 10:17 a.m. Pacific time.

(Recess taken.)

VIDEOGRAPHER:  We are back on the record at 10:27 a.m. Pacific time.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  Mr. Greetham, let's go back to your report, which is Exhibit 228.

A.   Okay.

Q.   So on page 5 of your report, you say: Targeted deletions -- targeted deletion of certain data or categories of data is common and can have a variety of business justifications including because the information presents security risks or relates to matters that have no continuing relevance to the company.

Do I have that right?

A.   I don't actually see where it says that, but that statement is correct.

Q.   Okay.  It's on page 5 of your report, the second paragraph from the bottom.

A.   I see it now.  Thank you.

Q.   So is it fair to say that your -- your disagreement with Mr. Kunkel is not that there were no targeted deletions, but rather that there can be many legitimate reasons for deletion of certain categories of documentation?

A.   I think the latter -- you know, I don't

DAVID A. GREETHAM                                          JOB NO. 2827028
JUNE 19, 2026

think his technical analysis is incorrect.

I think he doesn't think what a business reason might be for this.  You know, target deletions are fairly common in organizations when there's certain data that they no longer need.

In this instance, I think we mentioned a previous legal matter with a knowledge to keep or maybe it's part of a settlement that they didn't keep.  I don't know.

And then of course, you know, malicious e-mails, in this matter, phishing malware, tends to compromise the environment.

Q.   Are you offering an opinion regarding Nexo's intent in implementing any specific retention policy changes?

A.   No.  I'm offering an opinion on the commonality of using Google Vault and similar tools for this purpose to -- to quickly delete organization point or communication --

(Simultaneous cross-talk.)

A.   -- files.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  Because you don't have -- you would agree you don't have any personal knowledge of what Nexo's intent was, correct?

A.   I don't have any personal knowledge of that, no.

Q.   Do you agree that before implementing a retention policy that will result in the permanent deletion of documents, one of the things a company should consider is whether they have a legal obligation to retain any of those documents?

MS. DOOLEY:  Objection.  Compound.  Calls for a legal conclusion.  Incomplete hypothetical.  Vague.

A.   Like your objection is that -- I'm trying my best to make sure I understand your question.

I think you -- I think your question was if there's a legal -- if there's an obligation to preserve documents in some kind of legal, you know, litigation, HR, internal policy, something like that, should they be considered when retention policies have been put into place, I think -- is that correct?

BY MR. TAYLOR-COPELAND:

Q.   That's -- that's right.

A.   Okay.  Thank you.

I think, you know, this is all provided by your internal retention policy.

If the data had already been preserved --

period when Mr. Cress was a customer or a business partner with Nexo, and I think 2024 was way after that. So I don't know if that was considered or not by Nexo.

Q. Okay. You haven't seen the contents of any of the e-mails deleted under the rules identified in the retention log, have you?

MS. DOOLEY: Objection. Vague. Compound.

A. Do you mean the rules in relation to the December 2022 retention policy, or you just mean generally overall?

BY MR. TAYLOR-COPELAND:

Q. So all -- have you seen a single e-mail, the contents of a single e-mail that was deleted by the retention rules, any of the retention rules identified in the log?

A. I haven't seen any e-mails deleted or otherwise.

So I guess the answer would be no.

Q. Okay. And so you can't testify that any specific deleted item was irrelevant to this case, correct?

MS. DOOLEY: Objection. Vague. Misstates testimony.

A. I -- I don't know the relevance of any

documents that were expired because of end of life because of the retention policies.

BY MR. TAYLOR-COPELAND:

Q.   And you also cannot testify that any specific deleted item was cumulative of material produced in this litigation, correct?

A.   You know, I -- I'm not sure that is correct, because my understanding, when you see the retention rule in relation to OCC -- excuse me -- OTC deals was subject to the retention rules, but yet it was produced on -- I think maybe held back on a privileged log.

So that indicates to me that a probable explanation for that is that the efforts to gather documents by legal after the December 21 demand letter were effective, certainly in relation to some files, at least.

So I think the answer to your question is no.

Q.   Okay.  You're not testifying that every deleted item was preserved in some other repository, are you?

A.   I mean, deleted items generally are across-the-board, no.

Q.   Okay.  Looking at page 3 and 4 of your

report.

A.    (Sotto voce.)

3 and 4.  I'm there.

Q.    So in the bullet point -- sort of second bullet point on page 4, you say:  I see no evidence that Nexo took steps to actively delete material potentially relevant to this dispute.

Seeing no evidence is not the same as -- you're not opining that there -- no such evidence exists, correct, you're just opining that you haven't seen any?

A.    No.  I think the context -- I think the rest of the paragraph is relevant as well.  And that statement in the first part is really because evidence -- there are documents being produced that there were subject to retention policies, yet they were produced, which leads me to believe that the preservation effort after demand letter, you know, was a successful effort, at least in part.

Q.    Are you offering any opinions on what has been lost as a result -- lost or deleted as a result of these retention policies?

A.    That's relevant to this matter or just generally?

Q.    I mean, you're not offering any opinion as

to the contents of what's been deleted, are you?

A.    No.

Q.    Are you offering any opinion quantifying the amount of data deleted by these rules?

A.    No.  That would almost be impossible to be able to do that.

Q.    Why is that?

A.    Well, you know, I think you're maybe specifically thinking about the rules in relation to one-day deletions with OTC deals and token and those things.

But, you know, some of the e-mail retention policies, we don't know that -- somebody could get ten e-mails a day.  Somebody could get thousands.  And over time, you know, those numbers grow.  I have no way of knowing what those numbers would be.

Q.    Because those e-mails are gone, right?

A.    Because they're gone, and they were subject to -- they were subject to a retention policy.

However, I go back to the fact that if the preservation legal did after the demand letter was fulsome, that they reside there.  And I believe some of those files that you would think are gone forever

actually seeing the content.

Q.    Okay.  I'm gonna stop.  We probably will come back to this, but I will stop sharing it now.

And back to your report, the second part of that sentence is:  Targeted deletion of documents in a separate UK litigation, the Morton matter.

We talked a little bit about this earlier.

And I think you told me that you didn't review any pleadings in the Morton matter, right?

A.    That's correct.

Q.    And you didn't review the productions in the Morton matter?

A.    Correct.

Q.    You didn't review a settlement document in the Morton matter?

A.    Correct.  I didn't review any documents in the Morton matter.

Q.    Okay.  Do you know if there's a settlement or court order requiring Nexo to delete any of these documents from its own system?

A.    I'm not aware that there is any specific order.  I think it's possible, but I'm not aware.

Q.    Do you know when the Morton litigation began?

A.    No.

Q.    Do you know when it resolved?

A.    I don't, other than conceptual clues about retention policies.

Q.    Would you agree that whether a document is relevant to the Morton litigation is possibly independent of whether it's -- it's relevant to this litigation?

MS. DOOLEY:  Vague.  Objection.

A.    Are you saying, perhaps, one of the Morton matter items that was leaked could have been relevant to this Cress litigation?

BY MR. TAYLOR-COPELAND:

Q.    Correct.

A.    I don't know.  And from timing, I don't know.

I was certainly under the impression that the Morton matter was completely resolved, or however we term it, in advance of the lawsuit that was filed by Mr. Cress.

MS. DOOLEY:  I just want to add an objection for vague and calls for a legal conclusion.

BY MR. TAYLOR-COPELAND:

Q.    I'm going to introduce what will be Exhibit 230.

DAVID A. GREETHAM                                          JOB NO. 2827028
JUNE 19, 2026

(Exhibit Number 230 was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q.   So it says Particulars of Claim in Morton versus Nexo.

A.   I see that.

Q.   And going down to page -- paragraph 34.

Do you see where it says:  When the Claimants realized that Nexo Capital had frozen Shane and Owen's accounts, they demanded an explanation from their main point of contact at Nexo Capital, a Mr. Hristiyan Hristov.

Mr. Hristov purported to be the Claimants' relationship manager and acted at all times on behalf of Nexo Capital.

Mr. Hristov proposed a telephone call to discuss the matter, which was attended on the afternoon of 23 March 2021 by Claimants.

Do you see that?

A.   I see that on the screen.  Yes.

Q.   Were you aware of these allegations when you opined that there was nothing improper behind Nexo's deletion of Morton-related documents while this Cress case was pending?

MS. DOOLEY:  Objection.  Misstates the record, testimony, facts.

DAVID A. GREETHAM                                          JOB NO. 2827028
JUNE 19, 2026

A.   I have no knowledge of the Morton litigation.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  The allegations here concern Mr. Hristov.

And you're aware that the allegations in this case concern Mr. Hristov, correct?

A.   I believe he was the relationship manager for Mr. Cress, and they preserved his e-mail when normally it would have been deleted after -- after he left the company, so I assume he's relevant to this.

Q.   Right.

And you see that he was also the Mortons' relationship manager, correct?

A.   It seems that way from what you're showing me, yes.

Q.   And you didn't know that at the time you submitted your report?

A.   I've never seen any documents in relation to the Morton matter, so I couldn't possibly know that.

Q.   This next exhibit will be Exhibit 231.

(Exhibit Number 231 was marked for identification.)

THE WITNESS:  I've appeared to have lost

DAVID A. GREETHAM                                           JOB NO. 2827028
JUNE 19, 2026

reflected in the Retail OTC Deal Flows document?

A.   I see that.

Q.   Do you have an understanding that Mr. Cress' case against Nexo also involves OTC transactions?

A.   Not really.  No.  I read the, you know, OTC transactions, cybersecurity trading, Nexo Token, io, all these are relevant, but I don't fully understand the relevance.

Q.   Okay.  And I think earlier you told me that your understanding was that these deletions, the LabelRet and LabelRom targeted deletions, took place after Nexo resolved the Morton matter; is that right?

A.   That's what I was told, yes.

Q.   Okay.  So...

MS. DOOLEY:  Not to interrupt, James.

But, David, do you need to take a second to get your Steno app to show exhibits?

THE WITNESS:  I can do if somebody tells me how to do it.

I think it was -- I just have to rejoin. I really don't want to do that.  Maybe that's something we do during a break.

But if Mr. Taylor-Copeland is okay with

sharing and the documents are not tiny and highly complex, I -- we can try to carry on.  I can try to fix it --

MS. DOOLEY:  Okay.

THE WITNESS:  -- on a break maybe.

MR. TAYLOR-COPELAND:  That's fine.

If -- if it's not working for you, let me know, and we can change it.

But I'll introduce Exhibit 232 here.

(Exhibit Number 232 was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q.   Do you see this is another document filed in -- in court in England?

A.   I do.  Yes.

Q.   And you see it's dated June 6, 2025?

A.   I see that.

Q.   And it says that:  Upon the Parties having agreed to terms of settlement set out in a confidential settlement agreement, it's so ordered that the trial commencing on 14 July 2025 is vacated.

Do you see that?

A.   I see that.  Yes.

Q.   Okay.  So it appears that your understanding of the timing of this case is -- is

not quite right, correct?

A.    I am going based on what I was advised by Nexo and...

Q.    Okay.

A.    I don't know if this is the same case, a different case.  I don't -- I've never seen any documents in relation to -- ones becoming knowledge of the Morton matter.

Q.    Okay.  And the -- we can agree at least that the LabelRet and LabelRom retention settings were implemented before June of 2025, correct?

A.    I'll -- I'll just check that.  I think you're right.  But I think the dates on that are fairly clear in the retention records.

Q.    Yeah, and --

(Simultaneous cross-talk.)

BY MR. TAYLOR-COPELAND:

Q.    And if it helps, my understanding is the LabelRet rules ran August 30 to 31, 2024, and rom February 17, 2025.

A.    I have no reason to doubt that.  Thank you.

Q.    Okay.  And the targeted e-mail deletions in September of 2023 also would have occurred significantly before this settlement date, correct?

MS. DOOLEY:  Objection.  Vague.

BY MR. TAYLOR-COPELAND:

Q.   I'm sorry.  I think I misstated that.  I believe it's September of 2024.

MS. DOOLEY:  Same objection.

A.   I mean the -- the retention rules applied in the date that was, you know, associated.  So I don't think there's any dispute about that.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  This will be Exhibit 233.

(Exhibit Number 233 was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q.   Do you see that this is another document filed in English court, and that this has a date of August 2, 2024?

A.   That's right.  I see that.  Yes.

Q.   And you see it's the claimants are listed as the Mortons, and then the defendants are Nexo Capital and NDS EOOD?

A.   I see that.

Q.   Okay.  And then it appears that it's an order.

Do you see that?

A.   I do.

Q.   And it says that:  The First Defendant,

which would be Nexo Capital, shall re-conduct its disclosure exercise limited to issues for Disclosure 4 and 6, only as set out in the Agreed [sic] Review Document dated September 29, 2023, and limited to the sources, search terms, and date ranges set out in the First Defendant's DRD Section 2 questionnaire, in respect to the documents identified in Categories 1 and 2 in the Annex of this order as follows.

And then it provides a date, 09 August 2024, for defendants to provide claimants with confirmation and certain information, and then it provides defendants with a date to file a witness statement.

And then it orders the defendants to pay 125,000 pounds of costs.

And then these are the categories.  I'll just focus mostly on the second category, which is: Documents held/generated by Mr. Antoni Trenchev, Mr. Kalin Metodiev, Mr. Trayan Nikolov, to the extent responsive to.

And then it lists the issues below, which would be:  Communications involving anyone within Nexo that stem from communication with Mr. Trenchev; discussions and approvals of transactions and

agreements; discussions and approvals of the exit sale and disabling; communications relating to the terms agreements and cryptocurrency purchase agreements between defendant 1 and the claimants signed by Mr. Trenchev.

Mr. Metodiev has his own categories there.

So you weren't aware of this disclosure order at the time you issued your report, correct?

MS. DOOLEY:  Objection.  Vague. Ambiguous.  Misstates the document.

A.   I think this is the first time I've seen this document to answer your question.

BY MR. TAYLOR-COPELAND:

Q.   Okay.  Does the existence of this order in August of 2024 change your assessment of the implementation of the LabelRet purge on August 31st?

MS. DOOLEY:  Objection. Vague.

A.   Did it change my understanding of the label you mean?

BY MR. TAYLOR-COPELAND:

Q.   No.

Does it -- does it change your understanding of whether Nexo was deleting those documents after having produced them in litigation?

(Simultaneous cross-talk.)

MS. DOOLEY:  Objection.  Vague.

A.  I couldn't opine on that.  It's the first time I'm seeing these documents -- it's the first time I'm seeing any documents in relation to the Morton matter, and I would want to review them a little bit more extensively and pad the decks and what have you.

So as we sit here today, I couldn't give you an opinion on that.

BY MR. TAYLOR-COPELAND:

Q.  Okay.  So it may or may not change your analysis sitting here today?

A.  Well, it --

(Simultaneous cross-talk.)

MS. DOOLEY:  Objection.  Misstates testimony.

A.  It depends what you mean by my analysis.

So what I've -- what I've put in my report is, you know, facts I have learned.  And I don't know what's gonna be different about this.  And I don't know if I have access to this document going forward and I -- so, no, at this stage, it wouldn't change anything.

BY MR. TAYLOR-COPELAND:

Q.  This is Exhibit 234.

(Exhibit Number 234 was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q.    This is another order in the Morton case. Do you see that?

A.    I do.  Yes.

Q.    And do you see where it says:  Upon the Court having ordered First Defendant to reconduct part of its extended disclosure exercise as set out in the Order of Mrs. Justice Cockerill dated 02 August 2024.  And upon the First Defendant having made an application on notice dated 20 September '24 to extend the deadline for complying with that Order in respect to the Reconducted Disclosure Exercise, and then granting additional time to comply with the Order?

MS. DOOLEY:  Objection.  Vague.  Misstates the document.

A.    I -- I can see what you just read out.

BY MR. TAYLOR-COPELAND:

Q.    Okay.  So the August 30 to September 3, 2024, deletion rules were executed in the middle of court-ordered redisclosure in the very case you say justified implementation of those rules, correct?

(Simultaneous cross-talk.)

MS. DOOLEY:  Objection.  Vague.  Misstates the document, testimony.

A.    That's not what I said.

BY MR. TAYLOR-COPELAND:

Q.    Well, what's -- what's incorrect about that statement?

A.    What my -- my statement in my report said that there appeared to be no -- nothing wrong with retention rules.  And the execution of those in relation to the spam in the case that was advised was previously settled prior to this.  I don't know if it was the Morton matter.

I don't know if this is the same.  I see three Mortons on this list.  I -- I don't know if it's the same matter.

Like I said a few moments ago, I'd really want to review these documents, you know, after this deposition, and -- and I'll be able to answer better then.

Q.    Okay.  But do you -- do you think that you should have asked to review these pleadings before providing the opinion that the targeted deletions were done after the Morton matter concluded and after documents had been produced in the Morton matter?

contents of those -- anything that's got a LabelRet label has been deleted, that was the intention of the policy with the conditions that are in there.

BY MR. TAYLOR-COPELAND:

Q.   Okay.   Let's just for a second assume that Nexo is being forthright when they say that these labels were associated -- were targeted deletions associated with the Morton matter.

You still can't exclude the documents deleted because they were related to the Morton matter wouldn't also be responsive to discovery in this case, can you?

MS. DOOLEY:  Objection.  Vague. Argumentative.  Compound.

A.   Well, from looking at these in year 2024, my understanding is that Nexo had already gathered documents in the demand letter, so sometime between December '21 and March of '23, so this -- assuming -- if we make the assumption that these documents are relevant, we can also make the assumption they were collected through a legal gathering in that '21 -- December '21 to March '23 time frame.

BY MR. TAYLOR-COPELAND:

Q.   Well, again, you have --

DAVID A. GREETHAM                                            JOB NO. 2827028
JUNE 19, 2026

(Simultaneous cross-talk.)

A.    We got away from the facts a little bit here.  It feels like we're making a lot of hypotheticals, but...

BY MR. TAYLOR-COPELAND:

Q.    Yeah, I think we are.

Because you -- you have no idea what was actually collected by Nexo, correct?

MS. DOOLEY:  Objection.  Argumentative.  Asked and answered.

A.    What I do know is that content that was targeted for deletion has a retention rule.  Content of that was produced -- collected, gathered, indexed in UX, searched as it was produced and went on the privilege log or didn't get produced because it wasn't responsive to agreed-upon search criteria.

BY MR. TAYLOR-COPELAND:

Q.    Again, that really wasn't my question.

My question was whether you have any independent knowledge of what Nexo collected in this case?

(Simultaneous cross-talk.)

MS. DOOLEY:  Objection.  Vague.

A.    I think I've already stated that I don't know what they collected.

BY MR. TAYLOR-COPELAND:

Q.   Okay.   And then my -- my question is:   You can't rule out that documents that related to the Morton matter would also be related to this matter, can you?

MS. DOOLEY:   Objection.   Vague.   Calls for speculation.   Calls for a legal conclusion.

A.   Yeah, I can't possibly answer that question.

BY MR. TAYLOR-COPELAND:

Q.   Right.

Because -- because you don't -- you don't know.   You can't rule that out, correct?

MS. DOOLEY:   Objection.   Argumentative. Asked and answered.

A.   I would have to understand the entirety of the Morton litigation.   I would have to know what files were deleted.   I would have to know if they were already produced in the Morton litigation before this.

There's so many things that I would have to know to be able to provide you with an honest answer.

BY MR. TAYLOR-COPELAND:

Q.   And you just don't know those things,

Mr. Cress, and apparently for Mr. Morton as well, his was preserved, which was really outside of the retention policy.

The retention policies change.  They get modified as the business needs change, as data sizes get bigger, as risk increases.  You know, there's a lot of reasons why it would change.

You know, so this -- this looks like a fairly rudimentary first attempt at a retention policy, more a starting point.

Q.   Okay.  And then do you see Section 6, Suspension of Disposal in the Event of Litigation or Claims?

A.   I see that.  Yes.

Q.   And it says:  In the event Nexo is served with any subpoena or request for documents or any employee becomes aware of a governmental investigation or audit concerning Nexo or the commencement of any litigation against or concerning Nexo, such employees shall inform management.  Any further disposal of documents should be suspended until management with the advice of counsel determines otherwise.  Management shall take such necessary -- such steps as is necessary to promptly inform all staff of any suspension in further data

disposal.

Do you see that?

A.    I do see that.  Yes.

Q.    Do you have any reason to believe that was done here?

A.    In relation to --

Q.    Let's start with Mr. Cress.

MS. DOOLEY:  Objection.  Vague as to time.

A.    I -- I go back to what Mr. Trenchev said in his deposition, that they -- his legal team gathered the relevant documents or potential relevant documents, which I think ultimately were produced in this matter.

So they -- they didn't suspend -- from my knowledge, they didn't suspend the policy as it were.  They collected the data -- they preserved it separately and collected it and -- and processed and produced it in discovery --

(Simultaneous cross-talk.)

A.    -- is my understanding.

BY MR. TAYLOR-COPELAND:

Q.    In fact, they did the opposite, right? They -- they added additional retention rules while the litigation was pending, correct?

MS. DOOLEY:  Objection.  Misstates

testimony.

A.   They -- as they were maturing, they added many rules to achieve many goals, I'm sure.

But, again, Mr. Trenchev's deposition said that his legal team advised him that they, you know, gathered -- I can't remember the exact words -- but basically put aside a copy of the potentially relevant documents in relation to Mr. Cress and his claim.  And that was after the demand letter.

And then there was -- as I understand it, there was no more communications until the lawsuit was filed some time later.

So I think by then, they'd already gathered the documents so there wasn't a suspension of disposal, I guess, because they'd already gathered the documents.

BY MR. TAYLOR-COPELAND:

Q.   Right.

But your sole basis for that knowledge is what Mr. Trenchev says that Nexo's legal team said to him, correct?

MS. DOOLEY:  Objection.  Vague.  Misstates testimony.

A.   Yeah, I don't think that is correct.  I want to make sure I understood your question.