# Exhibit 9

# Exhibit 9



D. GREETHAM
06.19.2026
**Exhibit 230**
Vanese Killingbeck

Claim No.

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**KING'S BENCH DIVISION**

**COMMERCIAL COURT**

**BETWEEN**

**(1) SHANE MORTON**

**(2) OWEN MORTON**

**(3) JASON MORTON**

**Claimants**

**-and-**

**NEXO CAPITAL INC.**
**(a company incorporated in the Cayman Islands)**

**Defendant**

---

**PARTICULARS OF CLAIM**

---

**A    THE PARTIES**

1.    The Claimants are a group of family members who work in the technology industry. The Second Claimant ("**Owen Morton**") and the Third Claimant ("**Jason Morton**") are brothers. The First Claimant ("**Shane Morton**") is their cousin.

1

2.    The Defendant ("**Nexo Capital**") is a company incorporated in the Cayman Islands with its registered address at Two Artillery Court, 2nd Floor, 161 Shedden Road, PO Box 799 Grand Cayman, E9 KY1-1103.

3.    Nexo Capital provides a variety of cryptocurrency services to retail and institutional customers, primarily through the website www.nexo.io (the "**Platform**") which it operates, or which is operated on its behalf.

4.    Amongst other things, it provides cryptocurrency wallet and exchange services, and offers products such as interest-earning cryptocurrency accounts (whereby customers earn interest on cryptocurrency held with Nexo Capital) and cryptocurrency credit accounts (whereby customers borrow money from Nexo Capital using their cryptocurrency as collateral).

5.    Nexo Capital also provides services in relation to its own cryptocurrency, an ERC-20 token which was launched by Nexo Capital in 2018 and which it described on Twitter as "*the world's first dividend-paying asset backed token*" (a "**Nexo Token**"). Nexo Tokens can be purchased, held and traded (amongst other places) on the Platform.

6.    In a sworn declaration by Mr Trenchev, a director of Nexo Capital, submitted by Nexo Capital in United States case *Junhan Jeong v. Nexo Fin., 21-cv-02392-BLF (N.D. Cal. Jan. 19, 2022)*, Mr Trenchev stated "*Nexo Capital Inc. is a Cayman Islands company with its principal place of business in the United Kingdom.*"

7.    The decision of the United States Supreme Court in *Hertz Corp. v. Friend* 559 U.S. 77 (2010) is authority that the term "principal place of business", in a United States context, refers to "*where a corporation's high level officers direct, control, and coordinate the corporation's activities, i.e. its "*nerve center.""* Nexo Capital's "nerve center" is therefore in London, and its activities are directed, controlled and coordinated from there.



**B      THE FACTS**

I.      The Claimants' purchases of Nexo Tokens

8.      Over the period 2019-2020, each of the Claimants opened an account on the Platform (the "**Accounts**") and then purchased a significant quantity of Nexo Tokens.

a.      Shane Morton opened an account (the "**S Account**") on or around 29 July 2019. He subsequently made the following purchases of Nexo Tokens (which were at all material times held in the S Account):

| Date | Amount |
|------|--------|
| 05/11/2019 | 260,999.18 |
| 03/07/2020 | 605,931.21 |
| 13/07/2020 | 1,294,117.00 |
| 27/08/2020 | 5,512,195.00 |
| 02/10/2020 | 71,164.00 |
| 03/10/2020 | 2,448,332.00 |
| 27/10/2020 | 3,997,142.35 |

b.      Owen Morton opened an account on the Platform (the "**O Account**") on or around 8 July 2020. He subsequently made the following purchases of Nexo Tokens (which were at all material times held in the O Account):

| Date | Amount |
|------|--------|
| 07/09/2020 | 8,533,554.00 |
| 03/10/2020 | 3,868,294.00 |
| 27/10/2020 | 4,007,359.53 |
| 04/12/2020 | 510,362.00 |
| 08/12/2020 | 990,732.00 |

c.      Jason Morton opened an account on the Platform (the "**J Account**") on or around 14 September 2020. He subsequently made the following purchases of Nexo Tokens (which were at all material times held in the J Account):

3



| Date | Amount |
|------|--------|
| 03/10/2020 | 7,561,028.00 |
| 27/10/2020 | 3,997,142.35 |

9.    In addition to their purchases of Nexo Tokens, the Claimants used their Accounts to hold and trade various other cryptocurrencies and to enter into interest-earning cryptocurrency transactions with Nexo Capital (the "**Interest Earning-Deals**").

II.    The Nexo Wallet Services General Terms and Conditions

10.    Each of the Accounts was governed by the Nexo Wallet Services General Terms and Conditions (the "**General Terms**").

11.    The General Terms provided (amongst other things):

"*I. INTRODUCTION*

*These Nexo Wallet Services General Terms and Conditions ("General Terms") govern the contractual relations between you ("Client" or "you") and any holding company, subsidiary or entity belonging to the Nexo group of companies ("Nexo" or "we"), while you and Nexo are hereinafter separately referred to as "Party" and jointly - as "Parties", in regard to your use of the services provided by Nexo, and constitute a legally binding agreement ("Agreement") between the Parties.*

*II. DEFINITIONS*

*4. Digital Assets means any digital assets…including Nexo Tokens…..*

*III. NEXO WALLET SERVICES*

*3. The access to your Nexo Account will allow you to: (i) request a Nexo Wallet Service; (ii) view your balance and Transaction History; (iii) top up, withdraw and transfer Digital Assets, for which such options are available on the Nexo Platform and in the Nexo Account, and subject to revision from time to time at our sole and absolute discretion; (iv) perform other actions in relation to the above.*

*VI. WITHDRAWAL*

4

*1. Subject to the specific terms of the Nexo Crypto Credit General Terms and Conditions or the Nexo Earn Interest Product General Terms and Conditions, if any, you may request for: (i) withdrawal of all or part of the Digital Assets other than those used as collateral of a Nexo Crypto Credit to your personal wallet, together with the Interest accrued thereon, the latter as applicable to the Nexo Earn Interest Product only, as well as those to which certain prohibitions or limitations apply, as indicated in the Nexo Account and on the Nexo Platform; (ii) withdrawal of the fiat equivalence of certain Digital Assets together with the Interest accrued thereon, as applicable to the Nexo Earn Interest Product, or the fiat equivalence of the Digital Assets, as applicable to the Nexo Crypto Credit, by instructing Nexo to sell the relevant Digital Assets and Interest, as the case may be and if applicable, and transfer the fiat proceeds of the sale transaction to a bank account designated by you.*

*3. The withdrawals within the limits specified on the Nexo Platform, which are subject to revision from time to time at our sole and absolute discretion, shall be processed by Nexo no later than 24 (twenty-four) hours as of receipt of your request. In case of withdrawals exceeding the above limits, in order to guarantee the safety of the Digital Assets and Interest, if applicable, in your Nexo Account, as well as of delays due to technical reasons, the processing may take a longer period of time. However, Nexo devotes significant efforts to ensure that any withdrawal falling within the hypotheses under the preceding sentence will be processed no later than 72 (seventy-two) hours as of your request.*

*XIII. REFUSAL TO PROVIDE NEXO WALLET SERVICES. LIMITATION, SUSPENSION OR TERMINATION OF THE NEXO WALLET SERVICES. CLOSURE OF ACCOUNTS.*

*1. Nexo reserves the right to, at its sole and absolute discretion, refuse to process or to cancel any request from you in regard to the Nexo Wallet Services, including for purposes of compliance with any Applicable Law.*

*2. The topping-up of Digital Assets into your Digital Asset Wallet may be subject to certain limits imposed by Nexo (as may be amended from time to time at Nexo sole and absolute discretion).*

*3. Nexo may, at any time and without liability, terminate, suspend, limit or reverse your use, or the functionality, of the Nexo Wallet Services, or your access to your Nexo Account (including freezing or closing your Nexo Account, refusing to process any instruction of yours, or reversing a performed action), including but not limited to: (a) in the event of any breach by you of these General Terms and any other applicable terms, or any Applicable Law; (b) for the purposes of complying with a regulator's demand, a court order, an act of any governmental authority, or any Applicable Law; (c) upon Nexo's suspicion that a transaction or your use of the Nexo Wallet Services may be erroneous or connected with any unlawful activities (such as money laundering, terrorist financing, as well as fraudulent activities), or that your*

5

*Nexo Account has been compromised; (d) your Nexo Account is subject to any legal proceedings; (e) to remedy the effects of any defect in or compromise to any information system related to the provision of the Nexo Wallet Services; (f) for compliance and monitoring reasons, including in case of a discrepancy between your spending profile and the type of consumer group you belong to; (g) for maintenance of the system; or (h) if there is a change in the eligibility criteria for opening of a Nexo Account or use of the Nexo Wallet Services. In the above cases the Digital Assets in your Nexo Account may be frozen for an indefinite period of time until the matter is resolved.*

*9. You may suspend or terminate your access to and use of any of the Nexo Wallet Services or close your Nexo Account. In order to do so, you shall submit a request to Nexo in a form and together with the relevant supporting documents and information, as may be required by Nexo. You hereby acknowledge and agree that you will be subject to such terms and conditions as we may consider applicable to such suspension, termination or closure, in particular all your debts to Nexo shall have been settled prior thereto.*

*10. If you have a remaining balance in your Nexo Account, which has been suspended or closed, you are entitled to recover such Digital Assets unless we are prohibited by any Applicable Law or a court order to release them, or where we have reasonable grounds to suspect that such Digital Assets have been obtained through any unlawful means.*

*XIX. GOVERNING LAW AND JURISDICTION*

*1. The Agreement shall be governed exclusively by the substantive law of England and Wales.*

*2. Any dispute arising out of or in connection with the Agreement (the General Terms), unless amicably settled between the Parties, shall be referred to the competent court in London, England, determined as per the procedural law of England and Wales. You agree that any dispute resolution proceeding subject to the Applicable Law under the preceding sentence shall be conducted only on an individual basis and not as a plaintiff or class member in any purported class, consolidated or representative action or proceeding. No court or other dispute resolution authority can consolidate or join more than one claim and can otherwise preside over any form of a consolidated, representative, or class proceeding. Any relief awarded cannot affect other Clients of Nexo."*

12.    Nexo Capital has deliberately failed to identify on the Platform, or in the various terms and conditions for products and services which it offers, which entity in the corporate group to which it belongs is the relevant party to contracts with account holders, and which provides the services or offers the products which are available.

6

The Claimants first asked it for that information in December 2020, but it was only in pre-action correspondence on 21 October 2021 that Nexo Capital asserted that each of the Claimants contracted with it (and only with it). Pending disclosure, the Claimants are unable to verify the Defendant's assertion, and may add further or alternative entities as defendants in due course.

13.     Each of the Claimants was a party to a contract (together, the "**Contracts**") with Nexo Capital which incorporated the General Terms.

14.     By reason of Article VI of the General Terms, the Claimants were at all material times contractually entitled to withdraw all or part of their cryptocurrency holdings from their accounts (except in the specific circumstances set out in Article XIII(3)). Withdrawals within the limits on the Platform were to be processed within 24 hours of the request, whereas withdrawals outside those limits were to be processed as soon as possible and generally within 72 hours of the request.

15.     There were also implied terms in each of the Contracts:

a.     by reason of section 49 of the Consumer Rights Act 2015, alternatively by section 13 of the Supply of Goods and Services Act 1982, that Nexo Capital would provide its services to the Claimants with reasonable care and skill (the "**Implied Term of Reasonable Care and Skill**");

b.     in order to give effect to the obvious intentions of the parties and/or business efficacy, and/or as a matter of law, that any discretions afforded to the Defendants by the Contracts would not be exercised dishonestly, for an improper purpose, irrationally, arbitrarily or capriciously ("the **Braganza duty**").

16.     Further, each of the Contracts was between a "*trader*" (Nexo Capital) and a "*consumer*" (the relevant Claimant) within the meaning of sections 48 and 61 of the Consumer Rights Act 2015. Further or alternatively, the General Terms are Nexo

7

Capital's "*standard terms of business*" within the meaning of section 3 of the Unfair Contract Terms Act 1977.

III.    The Claimants' decision to withdraw from Nexo

17.    In late 2020, the Claimants were becoming increasingly concerned about Nexo Capital.  Amongst other things, they were concerned as to: (i) Nexo Capital's lack of transparency in relation to its group structure and precisely which Nexo entities its customers contracted with; (ii) whether Nexo Capital was in compliance with applicable financial regulations in the UK, EU and US; (iii) whether Nexo Capital was authorised by the Financial Conduct Authority; (iv) whether Nexo Capital had complied with its statements made in a blog post dated 27 August 2020 that it would obtain and release audited accounts; and (v) the total volume of Nexo Tokens issued and how many of those Nexo Tokens were held by Nexo Capital's staff.  The Claimants raised written queries in December 2020 in relation to these and other matters with Nexo Capital but received no or no satisfactory answers.

18.    Accordingly, at around the beginning of March 2021 (when the total value of the Claimants' assets on the Platform was approximately USD $126,068,923), each of the Claimants resolved to sell all of their Nexo Tokens and withdraw the entirety of their assets from the Platform.

19.    Specifically as to the Nexo Tokens, in order to minimise any negative impact on the market price the Claimants decided to sell their Tokens in tranches and/or on an OTC basis. They did so as follows:

a.    On 9 March 2021: (i) Shane Morton sold 1,050,000 Nexo Tokens to buyers on an OTC basis outside the Platform (but facilitated by the Platform); and (ii) Jason Morton sold 1,050,000 Nexo Tokens to buyers on an OTC basis outside the Platform (but again facilitated by the Platform).

b.    On 18 March 2021: (i) Shane Morton withdrew 400,000 Nexo Tokens from the Platform and exchanged them for other cryptocurrencies; and (ii) Owen

Morton withdrew 1700 Nexo Tokens from the Platform and exchanged them for other cryptocurrencies.

c.      On 22 March 2021: (i) Shane Morton withdrew 700,000 Nexo Tokens from the Platform and exchanged them for other cryptocurrencies; (ii) Owen Morton withdrew 282,600 Nexo Tokens from the Platform and exchanged them for other cryptocurrencies; and (iii) Owen Morton sold 23,286 Nexo Tokens on the Platform.

IV.     The Claimants' inability to make withdrawals

20.     At 16:22 (CET) on 22 March 2021, without any notice or explanation, Nexo Capital imposed a bespoke (i.e. not Platform-wide) daily withdrawal limit on the Accounts of USD $150,000 (albeit the limit on the O Account was increased to USD $500,000 by the end of the day on 22 March 2021).

21.     At around 11am (CET) on 23 March 2021, without any notice or explanation, Nexo Capital caused the "*withdraw*" buttons previously available on the Platform to Shane and Owen Morton to be greyed-out so that they could not be selected, and completely disabled Shane and Owen Morton's ability to withdraw Nexo Tokens or any other cryptocurrencies from the Platform, thereby freezing their Accounts.

22.     Initially, Shane and Owen Morton were still able to use their Accounts to convert Nexo Tokens to other cryptocurrencies (subject to a limit of USD $50,000 per transaction).    Accordingly, Shane Morton proceeded to convert approximately 386,448 Nexo Tokens to various other cryptocurrencies in 19 separate transactions, generating proceeds of USD $957,334.    Owen Morton proceeded to convert approximately 1,038,566 Nexo Tokens to various other cryptocurrencies in 52 separate transactions, generating proceeds of USD $2,572,803.

23.     However, by around 2pm (CET) on 23 March 2021, without any notice or explanation, Nexo Capital also caused the "*convert*" buttons previously available on

the Platform to Shane and Owen Morton to be greyed-out, and completely disabled their ability to convert Nexo Tokens to other cryptocurrencies.

24.     The result was that by around 2pm (CET) on 23 March 2021:

a.      Shane Morton's holding of 11,653,432.74 Nexo Tokens, 224.98 BTC, 307.596344 Pax Gold ("**PAXG**") and 119,1462.28 Stellar ("**XLM**") was all frozen in the S Account.

b.      Owen Morton's holding of 16,631,697 Nexo Tokens and 56.07 BTC was all frozen in the O Account.

25.     On or about 30 September 2020 Nexo Capital had completely disabled Jason Morton's ability to make any withdrawals from his Account, such that his entire holding of 10,508,194 Nexo Tokens was frozen in the J Account.

V.      The Final Dividend

26.     Prior to 2021, certain owners of Nexo Tokens were entitled to receive from Nexo Capital additional Nexo Tokens by way of "dividend".

27.     As Nexo Capital stated in a blog post, dated 23 November 2018, on the website medium.com, the total sum to be distributed by way of such dividend was to represent 30% of relevant net profits, and each holder of Nexo Tokens was to receive a sum comprising: (i) a base payment (being a sum "*paid out to all eligible token holders proportionally to their NEXO Token holdings*"); and (ii) a loyalty dividend (being a sum "*paid out individually for each NEXO Token based on how long it has been in the Nexo Wallet from one ex-divided date to the next*").

28.     As stated in a post dated 26 May 2021 on its own website, Nexo Capital proposed to pay a "*final Dividend distribution*", the entirety of which was to be "*distributed as a Loyalty Dividend*", subject to a vote by all eligible Nexo Token holders. On 8 June 2021, Nexo Capital claimed that the proposal had been approved by 89.52% of the votes cast.

10

29.    Accordingly, on 16 June 2021, the board of Nexo Capital announced a final divided in the sum of USD $20,428,359.89 with an ex-dividend date of 8 June 2021 (the "**Final Dividend**"). In a post on its website on the same date, Nexo Capital stated that the Final Divided "*comprises 30% of Nexo's net profit for the financial period 30 June 2020 – 30 May 2021*".

30.    In pre-action correspondence, Nexo Capital has accepted that each of the Claimants was entitled to receive part of the Final Dividend.

## C.    BREACH OF CONTRACT

31.    By imposing those withdrawal limits, disabling the ability to withdraw, and prohibiting conversion of cryptocurrencies, Nexo Capital was in breach of the Contracts with each of Shane and Owen Morton:

32.    In particular:

a.    The specific circumstances identified in Article XIII(3) did not apply;

b.    Nexo Capital was in breach of Articles VI(1) and (3) of the General Terms;

c.    alternatively, Nexo Capital was in breach of the Implied Term of Reasonable Care and Skill, because no reasonable provider of cryptocurrency wallet or exchange services would have frozen Shane and Owen's Accounts in the circumstances set out above.

33.    To the extent that Nexo Capital in its Defence seeks to rely upon any contractual discretion to impose bespoke withdrawal limits on, freeze or prohibit conversions in the S or O Accounts (whether by virtue of Article III, Article XIII or otherwise), the Claimants will contend in Reply, amongst other things, that:

a.    any such term is unfair and not binding on the Claimants pursuant to s.62 of the Consumer Rights Act 2015;

11

b.    alternatively, since that discretion would permit Nexo Capital to render no performance under the Contracts, or a substantially different performance from that which was reasonably expected of it, any such term cannot be relied on by virtue of section 3 of the Unfair Contract Terms Act 1977 because Nexo Capital cannot plead and prove that any such term is reasonable;

c.    further or alternatively, the exercise by Nexo Capital of any such discretion was a breach of the *Braganza* duty, in that by exercising its discretion in the circumstances above, Nexo Capital acted irrationally, arbitrarily, and capriciously.

## D.    TORT OF INTIMIDATION

34.    When the Claimants realised that Nexo Capital had frozen Shane and Owen's Accounts, they demanded an explanation from their main point of contact at Nexo Captial, a Mr Hristiyan Hristov ("**Mr Hristov**").

35.    Mr Hritsov purported to be the Claimants' relationship manager, and acted at all times on behalf of Nexo Capital.

36.    Mr Hristov proposed a telephone call to discuss the matter, which was attended on the afternoon of 23 March 2021 by the Claimants.

37.    During that telephone call:

a.    Mr Hristov stated that Nexo Capital had been closely monitoring Shane and Owen Morton's sales of Nexo Tokens and repeatedly queried why the Claimants wished to dispose of their Nexo Tokens.

b.    Mr Hristov explained that Nexo Capital had frozen the S Account and the O Account to prevent further sales, so as to support the market price of the Nexo Tokens.

12

c.     Shane and Owen Morton explained that their sales of Nexo Tokens had not impacted the market price of the Nexo Tokens, but that even if they had, Nexo Capital had no right to freeze their Nexo Tokens.

d.     Mr Hristov stated (the **"Proposal"**) that if the Claimants wished to withdraw their cryptocurrencies from the Platform they could either: (i) all sell their Nexo Tokens to Nexo Capital at a 60% discount on their market price without any subsequent withdrawal limits (i.e. allowing them to fully withdraw everything in their Accounts immediately); or (ii) all sell their Nexo Tokens to Nexo Capital at a 50% discount on their market price with low subsequent withdrawal limits.  Mr Hristov stated that, in either case, the Claimants would be able to immediately withdraw any other cryptocurrencies which they held in their Accounts, including those subject to an Interest-Earning Deal.

38.    Against the background set out in paragraph 17 above, Nexo Capital's words (by Mr Hritsov) and conduct amounted to an illegitimate threat that if the Claimants did not accept the Proposal, Nexo Capital would breach the Contracts (or in the case of Shane and Owen continue to breach the Contracts) by obstructing withdrawals from the Accounts (whether by a freeze on the Accounts, the imposition of low withdrawal limits or otherwise).

39.    Nexo Capital, by Mr Hritsov, intended that each of the Claimants should act upon the threat, in particular by accepting the Proposal, and intended that each of the Claimants should suffer loss thereby, in particular because that loss was an inevitable and obvious consequence of offering the Proposal which would result in the Claimants being paid less than market value for their Nexo Tokens.

40.    As a consequence, the Claimants agreed to sell their Nexo Tokens to Nexo Capital at a 60% discount on their market price without any subsequent withdrawal limits. The agreed mechanism for this sale was the conversion of Nexo Tokens and EURx to Tether (**"USDT"**).

41.    Accordingly, on 24 March 2021:

13

a.    Nexo Capital converted Shane Morton's holding of 11,653,432.74 Nexo Tokens to 11,700,046 USDT (using a rate of 1.004 as compared to a market rate of 2.53) and his holding of 5,975,114.28 EURx to 6,998,131 USDT. Shane Morton then emptied the S Account of its contents (namely 18,698,177 USDT, 224.98 BTC, 307.596344 PAXG and 119,146.28 XLM).

b.    Nexo Capital converted Owen Morton's holding of 16,631,967 Nexo Tokens to 16,698,495 USDT (using a rate of 1.004 as compared to a market rate of 2.53) and his holding of 3,608,323.10 EURx to 4,245,086 USDT. Owen Morton then emptied the O Account of its contents (namely 20,877,053 USDT and 56.07 BTC).

c.    Nexo Capital converted Jason Morton's holding of 10,508,194.17 Nexo Tokens to 10,550,203 USDT (using a rate of 1.004 as compared to a market rate of 2.53) and his holding of 3,082,496.27 EURx to 3,610,259 USDT. Jason Morton then emptied the J Account of its contents (namely 14,160,462 USDT).

42.    In the circumstances, the Defendant committed the tort of intimidation against each of the Claimants.

**E.    CAUSATION AND LOSS**

I.    Tort of intimidation

43.    By reason of Nexo Capital's commission of the tort of intimidation, each of the Claimants has suffered loss and damage. Such loss and damage will be the subject of expert evidence in due course but includes without limitation:

a.    The difference between:

    i.    The best price which the Claimants could have obtained for their Nexo Tokens on the market had they adopted their intended (and reasonable) strategy of selling their Nexo Tokens in March 2021

14

which balanced: (i) their desire to dispose of their entire holdings swiftly with (ii) the need to minimise the effect of their disposals on the market price. Such strategy would from April 2021 at the latest have involved the use of software to automate sales.

ii. The price which the Claimants were paid for their Nexo Tokens as a result of the Post-Freeze Sale (being 11,700,046 USDT in the case of Shane Morton, 16,698,494 USDT in the case of Owen Morton and 10,550,203 USDT in the case of Jason Morton).

b. Further, the difference between the value of the Nexo Tokens:

i. which each of the Claimants received by way of Final Dividend having disposed of all their Nexo Tokens on 23 March 2021 (being 183,636.15642727 Nexo Tokens in the case of Shane Morton, 212,497.9531 Nexo Tokens in the case of Owen Morton and 128,482.30359102 Nexo Tokens in the case of Jason Morton); and

ii. which each of the Claimants would have received by way of Final Dividend had they been able to execute the strategy identified at paragraph 43a(i) above. Such strategy would have resulted in each of the Claimants holding Nexo Tokens for longer, and beyond 23 March 2021, thereby resulting in a larger transfer to them by way of Final Dividend. The amount of that Final Dividend also depends in part on the amount of relevant net profits, upon which the Claimants may comment further following disclosure.

## II.    Breach of contract

44. Alternatively, Shane and Owen Morton agreed to the Proposal and sold their assets to Nexo Capital in reasonable mitigation of the loss which they would otherwise have suffered by reason of Nexo Capital's breaches of contract.

15



45. Accordingly, Nexo Capital's breaches of contract have caused loss and damage to Shane and Owen Morton. Such loss and damage will be the subject of expert evidence in due course but includes without limitation the loss and damage identified in paragraph 43 above.

## G.    INTEREST

46. Each of the Claimants claims interest pursuant to the Court's equitable jurisdiction and/or under s.35A of the Senior Courts Act 1981 on the sums found to be due to them at such rate and for such period and on such basis as the Court considers appropriate.

## THE CLAIMANTS CLAIM

(1) Damages.

(2) Interest.

(3) Such further or other relief as the Court thinks fit.

(4) Costs.

**LAWRENCE AKKA KC**

**SAM GOODMAN**

Statement of truth

The Claimants believe that the facts stated in this Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Name: Justin Williams
Date: 29 September 2022
Position: Partner, Akin Gump LLP

16