# EXHIBIT 7

1

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH

Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# ANTONI ANTONIEV TRENCHEV

# CONFIDENTIAL



CERTIFIED COPY

Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - - - -
IN THE MATTER OF:

JOHN CRESS,

                              Plaintiff,
NEXO CAPITAL INC.
                              Defendant.
- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME I

Wednesday, April 1, 2026

AT:  1:04 p.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

ANTONI ANTONIEV TRENCHEV                                              JOB NO. 2571483
APRIL 01, 2026                        CONFIDENTIAL

A P P E A R A N C E S

Appearing for the Plaintiff John Cress:

       JAMES TAYLOR-COPELAND (in person)
       MAX AMBROSE (remotely)
       TAYLOR-COPELAND LAW
       501 W. Broadway, Suite 800
       San Diego, CA 92101
       Tel: (619) 734-8770
       james@taylorcopelandlaw.com


Appearing for the Defendant Nexo Capital and the witness:

       IAN S. SHELTON (in person)
       KIRSTEN DOOLEY (in person)
       BAKER & MCKENZIE LLP
       10250 Constellation Boulevard, Suite 1850
       Los Angeles, CA 90067
       Tel: (310) 299-8535
       ianshelton@bakermckenzie.com


Appearing remotely:

JOHN CRESS (Plaintiff)

VIDEOGRAPHER:

       Simon Rutson

before a court, the court then rules, and their ruling, in our case, was that Nexo as a group of companies and its owners, directors and officers, have not committed any crimes.

Q. Did Nexo have any formal document retention policy in 2018?

A. I do not believe that we had formalized that in a set of documents. I think the default setting was that everything is pretty much kept indefinitely.

Q. Was --

A. Again, talking about 2018.

Q. Okay. Did -- and was that the same in 2019?

A. I am not entirely sure when we issued our first formal retention policy but I would believe it was later than 2020.

Q. So before the time that you issued a formal written policy, was the informal policy to retain emails indefinitely?

A. It was whatever the default settings of the email provider was, which was Google. I think that is where early days of a start-up and we had not pondered upon the retention policy and had no reason to at that time.

Q. And before having a formal retention policy, is the same true of Slack, that you just used whatever

the default setting was?

A.    I think that over time we've had different subscription models to Slack.  So early on there would have been the free version which obviously keeping messages for a -- like many messages for extended periods of time is costly to them so they kept it at whatever default duration that was.  At some point we upgraded to a paid service which had more options to modify policies, but the exact nuances and what -- when -- what happened, I couldn't now on the top of my head reverse engineer.

Q.    Who was responsible for creating the first written retention policy?

A.    Well, that would have been within the purview of the legal department.

Q.    As a lawyer did you sometimes get involved in activities like that with the legal department?

A.    I am not a lawyer.  I have never been qualified as a lawyer.  I went to university studying law.  But my interests were elsewhere.

Q.    Fair enough.

Do you know in Bulgaria to be a lawyer do you have to be qualified?

MR. SHELTON:  Objection, calls for a legal opinion.

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                           CONFIDENTIAL                    JOB NO. 2571483

of receiving a demand letter, is that a written document?

A.   I do not know whether they were formalized but when this was brought to my attention they already said we have gathered the information that will be needed in the future.

Q.   Were you told not to delete any of your emails?

MR. SHELTON:  Objection, vague.

A.   I mean, any of your emails is a rather broad term.  What exactly do you mean by that?

BY MR. TAYLOR-COPELAND:

Q.   Were you told not to delete relevant emails?

A.   I don't believe that I was told to not delete relevant document -- emails because I had no relevant documents to this case.  I had not heard of Mr. Cress at that point.  I had not interacted with him and it was not part of my job description to be a customer-facing agent of the company.

Q.   So before receiving the demand letter you had never heard of Mr. Cress?

A.   I don't -- I don't believe I had, no.

Q.   As managing director would you receive reports about the clients with the most assets on the Nexo platform?

A.    Well, at the time we were three managing partners, and each of us would have their area of expertize, and departments he would oversee.  So the trading department, the OTC desk, none of that was under me, so I would not -- like the OTC desk or the -- or the trading department, they would not report to me directly.

Q.    Would they report to Kalin Metodiev?

A.    Yes.

Q.    Do you know if Mr. Metodiev received reports about the, you know, VIP clients with the most assets on the platform?

MR. SHELTON:  Objection, calls for speculation.

A.    I couldn't verify that.

BY MR. TAYLOR-COPELAND:

Q.    Did Nexo issue a litigation hold in response to this October 2021 demand letter?

A.    Can you define litigation hold for me?

Q.    Yes.  Did it send out instructions to retain relevant documents?

A.    I remember when this was brought to my attention, asking that question or something similar to it, and the answer by legal department is we did better than that, we went about, all the relevant parties and

custodians around Mr. Cress as a client, and we made sure that all the relevant information is copied and would be available in the future.

Q.    Do you know did that relevant information include all emails involving Mr. Cress?

MR. SHELTON:  Objection, vague.

A.    They confirmed to me that they had gathered all relevant information regarding the case and that would include email.  Further than that, I don't know what all emails would mean.

BY MR. TAYLOR-COPELAND:

Q.    Do you know if they collected Slack messages?

A.    I do not recall particular discussions singling out Slack.  What I understand is that during discovery we have produced Slack messages with relevance to Mr. Cress, so that leads me to deduce that we collected Slack messages that we deemed relevant to the case at this earlier stage.

Q.    And how did Nexo decide what was relevant to the case at that stage?

MR. SHELTON:  I am gonna object on privilege grounds.  Mr. Trenchev, I don't want you to disclose the substance of communications with Nexo's attorneys, but if you can give a response at a more general level as a corporate representative, you can testify on that at

that level.

A.    Thank you.  It would be my understanding that they would use search words, search terms, to filter out what is relevant and what is not.

BY MR. TAYLOR-COPELAND:

Q.    To run that search would they have to involve IT?

A.    I do not know that.

Q.    Do you know if Google enabled Nexo to search for specific terms across all email addresses?

A.    Make sure that I understand the question, whether it can -- whether there's a functionality, you type in the search term and then it searches through all addresses of -- corporate addresses?

Q.    Correct.

A.    I am unaware of such a feature.  It might or might not exist.

Q.    And do you know if Slack had functionality to allow search through all Nexo's Slack messages regardless of user?

A.    I do not know the inner working of the Slack platform.

Q.    So do you know how Nexo ran these searches with the search terms?

A.    I don't have the details on that.

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    CONFIDENTIAL

Q.    Do you know if there are any records of that happening?

A.    I don't know whether this was a recorded activity or how it was conducted.

Q.    I am about to introduce another exhibit. do you guys want to keep going or --

A.    Should we take five to ten minutes?

MR. SHELTON:  Let's take a 10 minute break.

A.    Thank you.

THE VIDEOGRAPHER:  Going off the record at 2:15. end of media 1.

(2:15 p.m.)

(Break taken.)

(2:28 p.m.)

THE VIDEOGRAPHER:  This is the beginning of media 2 in the deposition of Antoni Trenchev.  Back on the record at 2:28.

BY MR. TAYLOR-COPELAND:

Q.    I'm going to introduce exhibit 102.

(Exhibit 102 marked for identification)

A.    Okay.  It's two so ...

MR. TAYLOR-COPELAND:  Yes.  My questions are just going to be about this at a very high level.  So it's a document entitled "Nexo Financial LLC, Complaint Policy".

or the commencement of any litigation against or concerning Nexo, such employee shall inform Management. Any further disposal of documents shall be suspended until Management with the advice of counsel determines otherwise.  Management shall take such steps as is necessary to promptly inform all staff of any suspension and further data disposal."

Do you see that?

A.    I do.

Q.    Is your experience that this policy was adhered to at Nexo?

A.    I have no reason to believe it has not been adhered to.

Q.    And as management were you informed when Nexo was served with a subpoena?

MR. SHELTON:  Objection, vague.

A.    I'm looking -- I am looking at the definition of management.  Unfortunately, in 2.1, there is no definition of management, and I am not sure whether management would include what your question implies, senior management, such as me, Mr. Kanchev, or Mr. Metodiev, at that time.  Or it would include also other managers at the company, such as if we were talking about, I don't know, a customer, a consumer, customer support agent, whether him reporting to his

manager which will be, you know, the head of consumer support, would fall under the definition of management.

And I see that -- that might very well be the case because, you know, given the number of employees I don't think it's reasonable everyone to escalate everything to two or three people.  It would be overwhelming information.

Did my point get across?  I spoke a little longer than I intended.

BY MR. TAYLOR-COPELAND:

Q.   Did Nexo -- was there a monetary cut-off in terms of demands that would be escalated to you as senior management?

MR. SHELTON:  Objection, vague.

A.   If I understood the question correctly, my answer would be that rather than the monetary amount, it would be the -- the basis of the claims, because we have seen complaints, which even though they have thrown in a very large number, might not necessarily be serious claims and complaints.  They might even be outlandish.

So I think that the termination of what gets escalated to us is the seriousness of the case, how well it is argued and presented, rather than the monetary value itself as a guiding principle.

BY MR. TAYLOR-COPELAND:

It might have been him where he said, well, maybe that's too short and we expanded it.  I don't believe that currently the retention policy period is 30 days, I think it's much longer.  Not entirely sure.

But I -- what I do remember is several changes to the retention policy, certainly more than one.

Q.    What makes you think the current retention policy is much longer?

A.    I just have this objective feeling of having seen something to that accord.

Q.    Why did Nexo implement the 30 day retention policy?

A.    Well, I think that December 2022 was after a period of particularly challenging times for the industry as a whole and specifically, for businesses, such as ours, many of our competitors did not survive.  FTX had just imploded.  And there was a lot of hacking attacks at the time.  Various black hacking groups that were becoming even more targeted in their attempts towards crypto companies, and I think the thinking was around de-risking us with Kosta, as custodians of -- custodians of especially sensitive data which might or might not obviously in our opinion not have had to be retained going forward.

To put it shortly, it was a de-risking

activity, an initiative.

Q.    Whose decision was that?

A.    Erm, whose decision was what?  The retention period?

Q.    To implement that retention policy.

A.    I remember like general discussions around de-risking the amount of information that we had between me and him.  But who specifically pulled the trigger, I couldn't -- I couldn't say.  I don't believe it was me.

Q.    So you and Mr. Kanchev had discussions about implementing this retention policy to reduce risk; right?

A.    Yes.

Q.    Okay.

Before you implemented that policy, did you check with legal and compliance?

A.    I don't specifically recall discussions with legal and compliance.  So I couldn't tell you other -- either way.

Q.    And you're aware that -- well, let me ask it differently.

Do you have any reason to dispute that Mr. Kanchev's email was also placed on a 30-day retention period on December 4, 2022?

A.   I do not.

Q.   And would the rationale for placing both of your emails on that retention period have been the same?

A.   Yes.

Q.   As a practical matter, did the implementation of this retention policy mean that emails older than 30 days were automatically deleted?

MR. SHELTON:   Objection, calls for an expert opinion.

A.   I do not know.

BY MR. TAYLOR-COPELAND:

Q.   You don't know?

A.   I don't know.

Q.   Did you ask Yassen about that in preparing for today?

A.   I did not.

Q.   How do you access your email?

A.   I access my email from my computer and my mobile phone, which is a working phone.

Q.   Do you use the -- do you use an application to do that?

A.   I use the native Google app.

Q.   Okay.

And then on your desktop?

A.   I would use the browser to log in to -- to the

answer, if you know.

A.   I don't think that Nexo has the knowledge of that.  This is too technical and dependent on the functionality of its email service provider, in this case Google.

BY MR. TAYLOR-COPELAND:

Q.   But you didn't ask anybody at Nexo about that; right?

A.   I personally have not asked anyone at Nexo about that.

Q.   Then looking back on page 5, "Slack Production" -- let's start with, actually, below -- there's "Public and Private Channels" and then there's "Direct Messages".  And it says the direct messages were placed on a four-day retention policy on 12/04/2022.  Do you see that?

A.   I do.

Q.   Okay.  Do you know who implemented that policy?

A.   I do not.  What I remember is that four days was a mistake, was -- I think somebody might have wanted to type in 40 and they missed a zero because four days is clearly a very, very short time period, and I think that's why it was discovered and corrected when it was discovered and maybe somebody complained about it being

too short a time.

Q.   And -- so the -- December 4 is the same day the emails retention policy was implemented; right?

A.   I mean, if these are American dates, Baker McKenzie being the U.S. law firm, we would assume that, it would be, yes, December 4 and the same date.

Q.   Okay.  Do you recall if these Slack retention -- this Slack retention policy was adopted as part of that same rationale that you discussed to reduce risk?

A.   I don't recall that, no.

Q.   So does -- does Nexo know who implemented the Slack retention policy?

A.   I don't -- I'm not entirely sure what the situation was in 2022, to be honest.

Q.   Did you -- in preparing for today did you ask anybody at Nexo who implemented these Slack retention policies?

A.   I don't think that anyone at Nexo would have been able to confirm what happened four years ago, exactly, and I think that direct messages, these are usually between several people, certainly less than a handful, because then it would make sense to create a channel rather than direct messages and they -- did not tend to include data and exchanges that are or

opinion.

A.   I don't think Nexo can have knowledge as to inner workings of a third party service provider such as Google -- or Slack in this case, sorry.

BY MR. TAYLOR-COPELAND:

Q.   Do you know whether Nexo has any audit logs related to its -- the implementation of Slack retention policies?

MR. SHELTON:  Objection, vague as to the term audit log.

A.   I do not know that.

BY MR. TAYLOR-COPELAND:

Q.   Has Nexo made any effort to recover deleted Slack messages?

MR. SHELTON:  Objection, vague.

A.   Which time period for what purposes?  Narrow down the question, please.

BY MR. TAYLOR-COPELAND:

Q.   As part of its response to this litigation has Nexo made any efforts to recover deleted Slack messages?

A.   As discussed already, when the demand letter in exhibit 101 was handed over, as later discovered by me, the team went about securing copies of the relevant messages.  So I don't see how they would go -- or would need to go about trying to recover messages if all the

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    CONFIDENTIAL

relevant messages were already secured by the team for future use.

Q.    So is the answer then that Nexo has not done anything in this litigation to recover deleted Slack messages?

MR. SHELTON:    Objection.    Misstates testimony.

A.    This is not what I said.    The answer to that question is that Nexo went above and beyond in securing all relevant communications, whether on Slack or elsewhere in order to be helpful to the proceedings in which we currently find ourselves.

BY MR. TAYLOR-COPELAND:

Q.    So has Nexo made any effort to recover any messages deleted as -- any deleted Slack messages, in this litigation?

A.    Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.

Q.    And what did Nexo do to secure Slack messages much earlier?

A.    Well, this is within the duties of the legal department.    They have a procedure by which they make copies of the relevant information, and to my understanding that procedure has been followed and

email.  I certainly have seen that email address.

BY MR. TAYLOR-COPELAND:

Q.   And above it, in row 438, column H, is Antoni@trenchev.com; do you see that?

A.   I do.

Q.   Is that your personal email address?

A.   Yes.

Q.   Do you have a similar retention policy for your personal email address?

A.   I generally do not tend to use email a lot so I do not know what my current retention policy on my personal email is.

Q.   Did you search this Antoni@trenchev.com email address as part of this case?

A.   I don't believe I did because that's my personal email.

Q.   Okay.

Do you know who implemented the changes in Nexo's retention policy to reference you and Mr. Kanchev's personal email addresses?

A.   I don't know.

Q.   Was it you?

A.   It was not me.

Q.   Was it Mr. Kanchev?

A.   I don't know.