James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

*Counsel for Plaintiff John Cress*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN CRESS, <br><br> Plaintiff, <br><br> v. <br><br> NEXO CAPITAL INC. <br><br> Defendant. | Case No. 3:23-cv-00882-TSH <br><br> **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR TERMINATING SANCTIONS OR, IN THE ALTERNATIVE, CURATIVE SANCTIONS PURSUANT TO FED. R. CIV. P. 37(e), 37(b), AND THE COURT'S INHERENT AUTHORITY** <br><br> Date: August 13, 2026 <br> Time: 10:00 AM <br><br> Judge: Hon. Thomas S. Hixson <br><br> Courtroom: <br> San Francisco Courthouse <br> Courtroom E – 15th Floor <br> 450 Golden Gate Avenue <br> San Francisco, CA 94102 |

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

NOTICE OF MOTION AND MOTION .................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

    I.    INTRODUCTION ......................................................................................................... 1

    II.    STATEMENT OF ISSUES TO BE DECIDED ................................................................ 3

    III.    FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 3

        A.    Nexo's Duty to Preserve Arose Long Before It Implemented Its Deletion Policies ... 3

        B.    Plaintiff's Document Requests and the Court's Orders ................................................ 4

        C.    Nexo's Deficient Document Production .................................................................... 5

        D.    Plaintiff's Meet-and-Confer Efforts ......................................................................... 6

        E.    Nexo's Deletion of Email and Slack Communications .............................................. 6

        F.    Nexo's Testimony Confirms the Scope and Willfulness of Its Spoliation ................ 9

        G.    Michael Kunkel's Report Confirms the Deliberate Destruction of Evidence ........... 14

    IV.    ARGUMENT .............................................................................................................. 16

        A.    The Court Should Impose Sanctions for Nexo's Discovery Misconduct ................. 16

            1.    The Court Should Impose Terminating Sanctions Under Rule 37(e)(2) ........... 17

            2.    Sanctions Under Rule 37(b) and the Court's Inherent Authority ...................... 21

        B.    The Court Should Order Specific, Tailored Relief ................................................... 24

    V.    CONCLUSION ........................................................................................................... 25

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

## TABLE OF AUTHORITIES

**Cases**

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337 (9th Cir. 1995) ........................21, 23

*Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976 (N.D. Cal. 2012) ..........................................17

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ....................................................................21, 25

*Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444 (C.D. Cal. Feb. 27,
    2020) ........................................................................................................................19, 24

*Drips Holdings, LLC v. Teledrip, LLC*, No. 5:19-CV-2789, 2022 WL 4545233 (N.D. Ohio Sept.
    29, 2022) ...........................................................................................................................18

*Facebook, Inc. v. OnlineNIC Inc.*, No. 19-CV-07071-SI (SVK), 2022 WL 2289067 (N.D. Cal.
    Mar. 28, 2022) ..........................................................................................18, 19, 22, 23, 24

*Fast v. GoDaddy.com LLC*, 340 F.R.D. 326 (D. Ariz. 2022) ..........................................19, 20

*Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334 (9th Cir. 1985) ........................................21

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) ......................17

*Jeong v. Nexo Financial LLC*, No. 5:21-cv-2392 (N.D. Cal. filed Apr. 1, 2021) .................4

*Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730 (9th Cir. 2024) ..........................................18, 24

*Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006) ....................................19, 21, 23

*Red Wolf Energy Trading, LLC v. Bia Capital Mgmt., LLC*, 626 F. Supp. 3d 478 (D. Mass.
    2022) ..................................................................................................................................22

*WeRide Corp. v. Huang*, No. 5:18-cv-07233-EJD (NC), 2020 WL 1967209 (N.D. Cal. Apr. 24,
    2020) ......................................................................................................................17, 19, 22

**Rules**

Fed. R. Civ. P. 37(b) ................................................................................................................16

Fed. R. Civ. P. 37(b)(2) .....................................................................................................1, 3, 21

Fed. R. Civ. P. 37(b)(2)(A) ............................................................................................1, 21, 24, 25

Fed. R. Civ. P. 37(b)(2)(C) ..............................................................................................21, 24, 25

ii

Fed. R. Civ. P. 37(e) ...........................................................................................................3, 16, 17, 25

Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ...............................................25

Fed. R. Civ. P. 37(e)(1)........................................................................................1, 3, 19, 21, 24

Fed. R. Civ. P. 37(e)(2)...................................................................................1, 3, 16, 17, 18, 24

Fed. R. Civ. P. 37(e)(2)(A)–(B)..........................................................................................24

Fed. R. Civ. P. 37(e)(2)(C) ............................................................................................1, 24

Civil Local Rule 37-4(b)(3) ...............................................................................................25

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

## NOTICE OF MOTION AND MOTION

TO THE COURT, DEFENDANT, AND ITS COUNSEL OF RECORD: PLEASE TAKE NOTICE, that on August 13, 2026 at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom E in the above-entitled Court, Plaintiff John Cress will move this Court for an Order:

(1) striking Defendant Nexo Capital Inc.'s ("Nexo") Answer and entering default judgment against Nexo as a terminating sanction, pursuant to Rules 37(e)(2)(C) and 37(b)(2)(A)(iii) and (vi) and the Court's inherent authority, based on Nexo's destruction of electronically stored information ("ESI") with the intent to deprive Plaintiff of its use in this litigation;

(2) in the alternative, imposing curative sanctions pursuant to Rules 37(e)(1), 37(e)(2), and 37(b)(2) and the Court's inherent authority, including: (a) findings that Nexo destroyed ESI it was required to preserve, with the intent to deprive Plaintiff of its use, and mandatory adverse-inference instructions; (b) orders precluding Nexo from arguing that the absence of internal communications supports its defenses or undermines Plaintiff's claims; and (c) an order permitting Plaintiff to present evidence and argument to the jury regarding Nexo's destruction of ESI;

(3) awarding Plaintiff $439,267.21 to compensate his reasonable attorneys' fees, expert fees, and costs incurred as a result of Nexo's spoliation and related discovery misconduct; and

(4) granting such further relief as the Court deems just to remedy the prejudice caused by Nexo's destruction of evidence and to protect the integrity of these proceedings.

This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting declaration of Max Ambrose; and the pleadings and papers filed in this action; and such further argument and matters as may be offered at the time of the hearing of this Motion. Plaintiff's counsel requested a telephonic meet and confer regarding this Motion on July 1, 2026. Nexo declined, indicating it did "not believe a meet and confer would be productive." Ambrose Dec. ¶ 2, Ex. 40.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   **INTRODUCTION**

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

This motion arises from Nexo's deliberate campaign of evidence destruction. Nexo received Plaintiff's demand letters in late 2021, retained counsel, was under investigation by the SEC and state regulators, and was defending a class action suit in this District. Yet, rather than preserving evidence, it systematically destroyed it. By the time Plaintiff filed his Complaint in February 2023, Nexo had already begun purging the emails of its two managing partners (Antoni Trenchev and Kosta Kantchev) and had deleted every Slack direct message in its database. Shortly after Plaintiff filed his Complaint, Nexo escalated its systematic deletions to new email accounts, a new managing partner, and its Slack Channels.[1] And by the time Nexo finally admitted what it had done, after months of stonewalling, the damage was irreversible.

In April 2025 the Court ordered Nexo to search and produce documents from 14 custodians, including Trenchev and Kantchev. But its productions contained virtually no emails from Trenchev and Kantchev and almost no Slack communications. Plaintiff raised these deficiencies in a detailed letter on September 9, 2025, and pressed for months without meaningful explanation. Only on January 30, 2026—after Plaintiff sought Court intervention—did Nexo disclose the reason: it had been running automatic deletion policies that destroyed those very categories of ESI throughout the litigation.

The scope of what Nexo destroyed is staggering. Beginning December 4, 2022—a year after Cress's demand letter and while engaged in active litigation in this District—Nexo executed 30-day auto-deletion rules targeting Trenchev's and Kantchev's email addresses across every mailbox in the organization, and placed all Slack direct messages on a four-day deletion cycle. The rules escalated after Plaintiff filed suit: Slack channels two days after the Complaint was filed; the founders' *personal* email accounts ten days after; Kalin Metodiev (a third managing partner, who oversaw the VIP relationship program and OTC desk) in November 2023; and, ultimately, specific emails targeted by subject line and unique message ID, and documents targeted by label. In all, Nexo's own Google Vault Audit Log records 512 retention-rule changes, 476 executed by a single administrator, with every

---

[1] Slack Channels are topic-focused group chats where members of an organization can send messages and files. They were one of the primary means of communication at Nexo. Hristov Tr. 216:6-217:3.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

critical rule configured to purge live, active messages from every account in the organization simultaneously, permanently, and irreversibly. Nexo never issued a litigation hold.

This is not a technical discovery dispute. It is a deliberate, escalating campaign to destroy evidence at the heart of this case, carried out in direct violation of Nexo's preservation obligations and concealed for years while Plaintiff litigated without access to core communications. Because no lesser sanction can remedy that harm, Plaintiff seeks terminating sanctions or, in the alternative, adverse-inference instructions—and, in any event, the attorneys' fees and costs Nexo's misconduct has caused.

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Nexo failed to take reasonable steps to preserve electronically stored information ("ESI") that should have been preserved, and that cannot be restored or replaced through additional discovery, triggering the Court's authority to impose sanctions under Rule 37(e).

2.    Whether Nexo acted with the intent to deprive Plaintiff of the lost ESI, and/or whether Nexo failed to obey the Court's discovery orders and acted in bad faith, such that the Court should strike Nexo's Answer and enter default judgment as a terminating sanction under Rule 37(e)(2), Rule 37(b)(2), or the Court's inherent authority.

3.    Whether, if the Court declines to impose terminating sanctions, the loss of ESI prejudiced Plaintiff such that curative measures under Rule 37(e)(1)—including adverse-inference instructions, orders precluding Nexo from offering certain evidence or argument, and leave for Plaintiff to present evidence and argument regarding Nexo's spoliation to the jury—are warranted.

4.    Whether Plaintiff should be awarded the reasonable attorneys' fees, expert fees, and costs he incurred as a result of Nexo's spoliation and related discovery misconduct.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Nexo's Duty to Preserve Arose Long Before It Implemented Its Deletion Policies

Nexo was on notice of litigation and regulatory scrutiny concerning the very conduct at issue in this case years before it implemented the deletion policies described below. Its duty to preserve attached, at the latest, well before December 2022.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

In late 2019 and early 2020, Trenchev personally responded to an SEC investigation into Nexo's U.S. sale of NEXO tokens and its marketing of the Tokens as "SEC-compliant." Declaration of Max Ambrose ("Ambrose Dec.") ¶ 18 & Exhibit 16. By July 2021, Nexo faced parallel investigations by both state and federal regulators. Ambrose Dec. ¶ 19 & Exhibits 17-19.

This case arises from Nexo's liquidation of Plaintiff's cryptocurrency assets in June 2021. On October 26, 2021, Plaintiff's former counsel sent Nexo a demand letter, Ambrose Dec. ¶ 20, Ex. 20, spoke with Nexo's external counsel on November 10, and sent a follow-up letter on November 30, 2021. Ambrose Dec. ¶¶ 21-22, Exs. 21, 22. On February 28, 2022, two former customers—Scott Schaaf and Yeidy Montero—sent a demand letter directly to Nexo, Kantchev, and Trenchev asserting improper liquidations. Ambrose Dec. ¶ 23, Ex. 23. Additional demand letters asserting claims arising from loan liquidations followed throughout 2022, including on August 29 and November 21, 2022— just days before Nexo implemented the initial Trenchev, Kantchev, and Slack direct message deletions. Ambrose Dec. ¶ 24, Ex. 24; ¶ 25, Ex. 25.

Plaintiff filed this action on February 27, 2023, and counsel transmitted the Complaint to Nexo's counsel the following day. Ambrose Dec. ¶ 26, Ex. 26. Nexo admits it "was aware of the filing" of this case "by March 1, 2023." Ambrose Dec. ¶ 17, Ex. 15 (Nexo's Second Amended Responses to Plaintiff's Fifth Set of RFAs (July 3, 2026)) ("RFA Resp.") Nos. 726-727. Nearly two years earlier, a class action alleging improper liquidations was filed against Nexo in this District, *Jeong v. Nexo Financial LLC*, No. 5:21-cv-2392 (Apr. 1, 2021), and in September 2022 *Jeong* amended to add liquidation-fee claims.

By the time Nexo's administrator began creating targeted auto-deletion rules on December 4, 2022, Nexo had received at least six demand letters raising the same claims at issue here (with the latest arriving just 13 days earlier), was defending active litigation over its liquidation practices and fees, was under SEC and state regulatory investigation, and had retained counsel. Its duty to preserve had attached long before the first deletion rule was created.

**B.    Plaintiff's Document Requests and the Court's Orders**

4

On July 25, 2024, Plaintiff served his First Set of RFPs seeking communications concerning Nexo's token sales, VIP Program, lending and liquidation practices, and communications with customers and regulators. Ambrose Dec. ¶ 16, Ex. 14.

Nexo initially objected to 76 of Plaintiff's 78 RFPs, forcing Plaintiff to move to compel on December 13, 2024. *See* ECF 54. On January 10, 2025, the Court issued an Order noting that "[f]or many of the RFPs at issue, the Court does think they are relevant, but to mitigate the burden the Court likely would restrict document searches to a reasonable number of custodial and non-custodial searches." ECF 55. The Court ordered Nexo to produce an organizational chart and the parties to "have a meaningful meet and confer concerning the identification of a reasonable number of custodians." *Id.*

When the parties could not agree on the custodians' identities, the Court ordered Nexo to include its two managing partners, Trenchev and Kantchev, as custodians. ECF 65 (Feb. 19, 2025).

In April 2025, the Court ordered Nexo to search for and produce documents concerning: the NEXO Token's creation, allocation, and use of proceeds (RFPs 36, 51-52, 56-58); securities registration and regulator communications (RFPs 17, 45, 63); statements about the Token's SEC registration (RFPs 68-69); Trenchev's statements regarding the Token and the Liquidation Relief Program (RFP 70); marketing (RFPs 37, 39, 59-60); the VIP Program's benefits and representations (RFPs 4, 31); and liquidations and Plaintiff-specific financials (RFPs 7, 14, 18, 25-27).

## C.    Nexo's Deficient Document Production

Nexo represented that it would "substantially complete" its document production by August 31, 2025. ECF 71. Plaintiff, however, discovered significant deficiencies. *See* Ambrose Dec. ¶ 45. Nexo's productions contained virtually no emails from Trenchev, Kantchev, or Metodiev, no Slack direct messages, and almost no internal communications among Nexo personnel in Slack Channels—despite its daily use by all key custodians. *See* Kantchev Tr. 28:9-18 (participating in "so many" Nexo Slack channels in 2021); Trenchev Tr. Vol. I, 31:13-24 (used Slack "on a daily basis"); Hristov Tr. 285:3-8 (used Slack "daily"); Dinca Tr. 391:11-21 (account managers "frequently use[d] Slack chats . . . as part of their workflow"). Nexo employees were well aware of Nexo's Slack-message deletion

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

policies, yet Nexo hid these facts from Plaintiff for years. In a document discussing topics at the heart of this case, including OTC transactions, liquidation relief, and the statement made to Cress that "the NEXO token is registered with the SEC as a security," one commenter left a note saying "pasting this here for future reference, as Slack messages can expire and disappear." Ambrose Dec. ¶ 30, Ex. 30.

### D. Plaintiff's Meet-and-Confer Efforts

Plaintiff first raised these deficiencies in a detailed meet-and-confer letter dated September 9, 2025. Ambrose Dec. ¶ 40, Ex. 41. That letter and follow-ups on September 15 and October 23, 2025, January 14, 2026, and February 3, 2026 identified the missing categories — including regulator communications and internal communications concerning Plaintiff's transactions, the NEXO Token, and the VIP Program — and repeatedly requested an explanation for the absence of communications from key custodians and from Slack. Ambrose Dec. ¶¶ 40-41 & Exs. 41-45. Nexo failed to address the deficiencies and did not agree to a telephonic meet and confer until January 22, 2026, when it finally agreed to provide information regarding its document searches and preservation practices. Ambrose Dec. ¶ 42.

### E. Nexo's Deletion of Email and Slack Communications

On January 30, 2026, Nexo finally disclosed that it had implemented automatic deletion policies affecting critical sources of ESI—including Trenchev and Kantchev's emails and nearly all Slack communications. Ambrose Dec. ¶ 43 & Exhibit 46 (1/30/2026 Letter). However, the letter omitted that Nexo significantly expanded its deletion policies during this litigation — to the founders' personal email accounts, their nexo.com domains[2], and Metodiev's corporate accounts. Ambrose Dec. ¶ 28 & Exhibit 28 (Google Vault Audit Log Rows 409-418, 425-444).

Nexo subsequently produced a Google Vault audit log recording 512 changes to Nexo's e-mail and Google Drive data retention settings from July 2020 through February 2026. Ambrose Dec. ¶ 28

---

[2] Nexo obtained a new domain, Nexo.com, on March 14, 2023. *Nexo.com is Here*, Nexo, Mar. 14, 2023, https://nexo.com/blog/nexo-com-is-here. Nexo expanded its retention rules to purge Trenchev and Kantchev's emails on this new nexo.com domain on August 31, 2023.

6

& Exhibit 28 (Google Vault Audit Log); Expert Report of Michael Kunkel, Ambrose Dec. ¶ 15 & Exhibit 13 ("Kunkel Rep."), at 7, 10. That log reveals a deliberate, escalating campaign of targeted document destruction—not a neutral IT policy. *See id.*

Two technical features make the destruction particularly significant. Google Vault retention rules operate at the domain level, meaning a rule targeting "from:kosta@nexo.io" deleted matching emails from every mailbox across the entire Nexo organization, not just Kantchev's own account. Kunkel Rep. at 7. Every critical rule in the log was set to "*apply_only_to_deleted_objects: false,*" meaning the rules affirmatively purged live, active emails from users' inboxes and sent folders, not merely items already moved to trash. Kunkel Rep. at 5-6; Greetham Tr. 78:2-79:14.

The log and Nexo's admissions document the following sequence of destruction events:

- On December 4, 2022, Nexo created 30-day auto-deletion rules targeting every email sent to or from Trenchev's and Kantchev's Nexo email addresses, each configured to destroy all matching emails organization-wide going back to October 2017. Kunkel Rep. at 6-7.

- Also on December 4, 2022, Nexo implemented a 4-day retention setting purging all Slack Direct Messages more than four days old organization-wide. Kunkel Rep. at 4. Damyanov Tr. 81:16-22, 83:17-84:14.

- On March 1, 2023—two days after Plaintiff filed the Complaint and the day after Plaintiff's counsel relayed the Complaint to Nexo's counsel—Nexo implemented a 60-day retention setting for its Slack Public and Private Channels purging all Channel messages over 60 days old organization-wide. Kunkel Rep. at 4, 12.[3]

- On March 9, 2023—ten days after Plaintiff filed the Complaint—Nexo extended the deletion campaign to Trenchev's and Kantchev's *personal* email addresses. The extension to personal accounts shows Nexo was not applying a routine corporate retention policy but affirmatively hunting down its management's communications. Kunkel Rep. at 8, 11-12.

- On August 31, 2023—two weeks after Defendants, including Trenchev, filed their Reply in support of their Motion to Dismiss, ECF 24—Nexo expanded its deletion

---

[3] Nexo contends it is possible that individual channel retention settings may have resulted in some messages being retained for longer, but it has not established that any such settings were in effect in March 2023, and the vast majority of the undated channel settings it has produced are set to zero. The channel-level settings in fact confirm Nexo could preserve Slack data for at least 1,825 days "and chose not to for almost all channels." Kunkel Rep. at 4; Greetham Dep. 92:20-93:9.

7

campaign to Trenchev's and Kantchev's new nexo.com email addresses, adopted when Nexo switched domains on March 14, 2023.

- On November 6, 2023, shortly after the Court largely denied Nexo's Motion to Dismiss, ECF 26 (10/10/23), Nexo implemented auto-deletion rules systematically targeting all emails sent to and from Kalin Metodiev—who oversaw the VIP Relationship Program at the heart of this dispute. Kunkel Rep. at 8; Trenchev Tr. 162:13-163:1; Dinca Tr. 394:1-395:17; Ambrose Dec. ¶ 28.

- On January 17, 2024, five days after Nexo moved to dismiss Plaintiff's FAC (ECF 32), which focused on Plaintiff's securities claims, Nexo expanded the deletion campaign targeting Kantchev, Trenchev, and Metodiev to additional organizational units ("No GDrive" and "Nexo Users Special Drive Sharing Feature"), and on August 7, 2024 replicated the rules across the "MNG" unit. Kunkel Rep. at 8-9. This "systematic expansion . . . during litigation suggests Nexo discovered its earlier rules had not captured all copies of the materials it sought to destroy." *Id.* at 9.

- In August and September 2024—shortly after Plaintiff served his First RFPs and while the parties were conferring on an ESI protocol—Nexo created one-day "LabelRet" retention rules for Google Drive and Docs files, functionally an immediate purge, across individual and shared team drives. A second set of one-day rules using a different label ("rom") followed on February 17, 2025, while the custodian dispute was being briefed pursuant to earlier Court Orders, ECF 55 (1/10/25), ECF 62 (2/3/2025), and two days before the Court ordered Trenchev and Kantchev added as custodians. ECF 65 (2/19/25); Kunkel Rep. at 8-9; Greetham Tr. 87:18-21, 128:18-21.

- In September 2024, Nexo surgically targeted almost 100 specific emails by subject line, including working files, OTC deal records, communications with Nexo's relationship managers, and documents referencing the same VIP customer program and transaction practices at issue in this case. Kunkel Rep. at 9-10; Greetham Tr. 86:5-23.

Nexo's destruction of evidence was not inadvertent, not routine, and not limited to a single policy decision. It was a sustained, escalating, and technically sophisticated campaign targeting the communications of key witnesses, extending to their personal accounts, continuing through the filing of the Complaint, and persisting even after this Court began issuing discovery orders.

The deposition of Yasen Damyanov—the employee who implemented all Nexo's Slack deletion policies and the vast majority of the deletion policies reflected in the Google audit log—confirms that this destruction was deliberate and centrally directed. Ambrose Dec. ¶ 5, Ex. 3 (Damyanov Tr.). Damyanov conceded that he implemented the changes attributed to him on the log and all of Nexo's Slack retention policies. Damyanov Tr. 114:12-23. But he did not act alone. Each

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

change was "a task" assigned to him by "the management or … legal department," *id.* at 40:20-41:10; 47:10-48:2; 81:20-82:4, and he identified "[m]anagement" as "Kosta Kantchev and Antoni Trenchev" — two of the very individuals whose communications the rules destroyed. *Id.* at 47:24-48:2. He further confirmed that Nexo's legal department directed the destruction of specific documents while this litigation was ongoing in August 2024: "there was a task given by the legal department so that some specific documents [could] be purged from the Google system." *Id.* at 115:7-17; 116:1-6.

Damyanov and Kantchev were "the only two who … were … [able] to change retention policies." *Id.* at 38:11-20. Kantchev admitted he instructed Damyanov to implement the deletion policy targeting his own corporate emails. Kantchev Tr. 118:1-7, 116:5-11. Confronted with the rule targeting his personal Gmail, Kantchev claimed not to remember whether he was aware of, or ordered, it—conceding "I really cannot think of any reason" for the deletions. Yet Damyanov confirmed Kantchev gave the order to delete the founders' personal-account emails days after this litigation was filed. *Id.* at 121:5-25; Damyanov Tr. 122:20-125:14.

### F.    Nexo's Testimony Confirms the Scope and Willfulness of Its Spoliation

Nexo's co-founder and managing partner, Trenchev, testified individually and as Nexo's Rule 30(b)(6) corporate representative on document retention, preservation, and deletion topics. Ambrose Dec. ¶ 3, Ex. 1. His testimony confirms every element of the spoliation presented in this Motion.

Trenchev confirmed Nexo received Plaintiff's demand letters in late 2021 and retained counsel in response, understanding Plaintiff intended to litigate if his demands were not met. Trenchev Tr. Vol. I, 39:11-16. Yet Nexo never issued a litigation hold for this case: Trenchev personally took no preservation steps, claiming he had "no communication or documents with relevance to the case." *Id.* at 62:3-20. The record contradicts that claim: Trenchev was personally named as a defendant, filed a declaration swearing to "personal knowledge of the facts" relating to Cress' claims (ECF 19-1), signed the Form Ds at the heart of Nexo's exemption defense, and communicated directly with the SEC regarding Nexo's "Reg D filing," "dividend," and its claim that the Token was "SEC-compliant," which he acknowledged was "inaccurate." Ambrose Dec. Ex. 16.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

Trenchev also confirmed the core facts regarding the email deletions. Before December 4, 2022, both founders' accounts were set to indefinite retention—the default under Nexo's own Data Retention and Disposal Policy. *Id.* at 84:7-9; 85:17-19; *see also* Ambrose Dec. ¶ 29, Ex. 29 (Nexo's Data Retention and Disposal Policy, dated March 27, 2023). Nexo implemented the email retention changes without consulting legal or compliance (Trenchev Tr. 92:16-20), and it was initially applied exclusively to four email addresses belonging to Nexo's two founders. Kunkel Rep. ¶ 19.

Trenchev could not identify who ordered the policy — "I do not have a particular name for you" — and did not "recall" directing anyone to implement it. *Id.* at 86:6-20. He claimed the admin setting these policies "would normally be people at Infosec," *id.* at 86:6-12, but Damyanov confirmed InfoSec had no involvement in any of Nexo's retention changes. Damyanov Tr. 77:9-78:13.

Trenchev claimed the December 2022 email purge was motivated by "de-risking" concerns about cybersecurity after the FTX collapse. Trenchev Tr. 91:11-92:1. That alleged rationale, however, has no credible support. Trenchev admitted the policy applied only to the two founders' accounts, not to any other Nexo employees who would face the same supposed hacking risk. *Id.* at 100:12-15. The policy directly violated Nexo's own Data Retention Policy, which requires emails to be retained "indefinite[ly]" and mandates that "[a]ny further disposal of documents shall be suspended" once litigation is anticipated—an obligation Trenchev confirmed he understood but which Nexo disregarded. *Id.* at 74:19-75:13, Ex. 29. And the FTX collapse involved financial fraud and bankruptcy, not a data breach.[4] Indeed, FTX's founder, Sam Bankman-Fried, was himself accused of deleting records—including Slack messages—after being told to preserve records. Ambrose Dec. Ex. 39 (Jan. 27, 2023, Government Motion to Modify bail stating SBF "directed that Slack and Signal communications … be set to autodelete after 30 days or less" resulting in auto-deletion of "relevant and incriminating conversations.").

---

[4] CNN Business, Nov. 17, 2022, https://www.cnn.com/2022/11/17/business/ftx-ceo-complete-failure (reporting that FTX's collapse resulted from the misappropriation of billions of dollars in customer funds and "a complete failure of corporate controls," not any cybersecurity breach).

10

Less than three weeks after Nexo initiated its mass-data purges, Nexo was issued a Grand Jury Subpoena from the United States District Court for the Southern District of New York to testify and give evidence regarding its business dealings and communications with FTX. Ambrose Dec. ¶ 27, Ex. 27. Yet its automatic deletions continued.

The Slack deletion policies followed the same pattern. On December 4, 2022 — the same date as the email policy — Nexo placed Slack direct messages on a four-day retention setting. *Id.* at 110:11-17. Neither Kantchev, Trenchev, nor Damyanov could explain *why* Nexo deleted its Slack direct messages. Trenchev Tr. 110:11-111:1, 113:1-23; Kantchev Tr. 120:17-121:4; Damyanov Tr. 81:16-24. *Nobody* at Nexo can. The 4-day policy deleted every message "older than four days," and the 30-day policy that replaced it on December 7 continued destroying direct messages going forward. Damyanov Tr. 83:6-84:14. Damyanov confirmed the policy "affect[ed] all direct messages," with no way to exclude any particular message. *Id. at 82:5-83:5.* Nexo thus deleted every single Slack direct message in existence in its Slack database from 2021, including any messages at the time of the critical events relating to Cress' loans, OTC transactions, and liquidations. None have been produced.

Indeed, Nexo has produced **zero** Slack Direct Messages pre-dating August 2024. Ambrose Dec. ¶ 46. Trenchev testified that Slack was his primary daily communication tool and that he communicated frequently through Slack voice messages "with many different people in departments" that are now deleted. *Id.* at 31:13-24; 107:10-108:9. Dinca testified that VIP relationship managers communicated about Cress in Slack and may have discussed VIP customers in direct messages in 2021 — including with Kantchev and Metodiev, to whom he and Hristov reported. Dinca Tr. 394:1-395:17.

A separate deletion policy targeting Slack Channels was then implemented on March 1, 2023—two days after Plaintiff filed the Complaint and one day after Plaintiff's counsel relayed the Complaint to Nexo's counsel. *Id.* at 114:19-22. Trenchev, as the 30(b)(6) representative on this topic, could not identify who authorized that change either. *Id.* Slack notification emails show that Nexo employees sent at least **hundreds of thousands of Slack messages** per year, including messages about the NEXO Token's regulatory status that were never produced in this litigation. Ambrose Dec. ¶¶ 31-

11

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

33, Exs. 31 (showing 52,957 recent messages from 538 members in June 2023, including messages in the #community-management channel discussing NEXO token price "since being mentioned in the SEC's complaint against Coinbase," the NEXO token ICO, and messages from Kosta Kantchev); 32 (a Nexo #support channel discussing Nexo's "Liquidation Process" and "Margin Call History"); 33 (showing the NEXO Token's regulatory status was discussed in the "USA Slack channel"). There may thus be **<u>hundreds of thousands</u>** of missing relevant and responsive communications from Slack that Plaintiff will never see—many of which were created and destroyed during this litigation.

Nexo also could not explain why it changed the email retention settings for Kalin Metodiev—the managing partner who oversaw Nexo's OTC desk and VIP relationship program—more than a year into the litigation. *Id.* at 162:13-163:1.

Nexo issued no litigation hold for this case—despite Trenchev claiming he personally received one in the *Morton v. Nexo* matter. *Id.* at 81:7-17. Nexo claims it instead went "above and beyond a litigation hold" by "collect[ing] all relevant communications," but, it could not say when that collection occurred or identify what it preserved beyond Hristov's communications and some transactional documents. *Id.* at 40:3-24; 81:18-82:8. And that "justification" is undermined by the simultaneous auto-deletion policies destroying the very communications Nexo claimed to be securing. Indeed, Damyanov could only remember a single Slack data export performed in this case from 2025—years after its deletions began. Damyanov Tr. 64:13-65:11. This aligns with Nexo's document production, describing its Slack chats from a File Path indicating a March 10, 2025 export. Ambrose Dec. ¶ 47. Nexo's rolling Slack deletions were continuous during that time. Kunkel Rep. at 4, 12.

With respect to the targeted deletions of emails in September 2024 and the targeted deletions of documents labeled "LabelRet" and "rom", Nexo concedes that it intentionally deleted documents relevant to litigation, but contends these documents related to the *Morton* litigation rather than this case. That post-hoc justification fails on the documents and on Nexo's own admissions.

Damyanov—the administrator who executed the rules—testified that the August 30-31, 2024 "LabelRet" rules and the February 17, 2025 "rom" rules were created because "there was a task given

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

by the legal department so that some specific documents [could] be purged from the Google system." Damyanov Tr. 116:1-120:9. Yet Damyanov did not know what those documents were: he did not know "what documents were under LabelRet," who "classified" them or "chose what documents go under that label," who at Nexo "would know the contents," or whether they "related to Mr. John Cress' case." *Id.* at 116:18-117:13, 118:3-16, 119:11-20. Nexo's corporate representative also disclaimed knowledge of what "LabelRet" and "rom" targeted.[5] Trenchev Tr. 137:5-18. Neither could exclude that Nexo destroyed documents responsive to this litigation.

Nexo's contrary "Morton, not Cress" justification rests entirely on its own unverified say-so. Nexo's retained ESI expert, David Greetham, opined that the LabelRet and "rom" deletions "took place after Nexo resolved the Morton matter"—but admitted that premise was simply "what I was told" by Nexo. Greetham Tr. 126:10-15, 128:2-3. He reviewed no Morton pleadings, productions, or settlement documents; knew of no order requiring deletion; and did not know when Morton began or resolved. *Id.* at 121:4-122:3. Nor has any Nexo witness tied the deletions to Morton.

The documentary record also refutes Nexo's timing: the deletions occurred not at the "conclusion" of *Morton* but in the middle of court-ordered discovery in that very case. On August 2, 2024, the English High Court ordered Nexo to "re-conduct its disclosure exercise," expressly reaching "Documents held/generated by Mr. Antoni Trenchev [and] Mr. Kalin Metodiev," including all communications between Nexo employees and Trenchev as well as "discussions and approvals of transactions and agreements." Greetham Tr. 129:15-131:12, Ambrose Dec. ¶ 13, Ex. 11 (Ex. 233 to Greetham Depo). The court also ordered Nexo to pay £125,000 in costs — pointed notice of the seriousness of its discovery obligations. *Id.* at 130:15-16.

Nexo executed the "LabelRet" purge weeks later, on August 30-31, 2024; carried out its targeted email deletions in September 2024; and on September 20, 2024, asked the English court to extend the deadline for that same "Reconducted Disclosure Exercise." *Id.* at 128:18-22, 132:25-

---

[5] Plaintiff served discovery asking for information about these labels. Nexo refused to provide it. That dispute was submitted to the Court at ECF 133.

13

133:15; Ambrose Dec. ¶ 14, Ex. 12; Damyanov Tr. 115:14-16. The "rom" purge followed on February 17, 2025. Greetham Tr. 128:18-20. The Morton matter did not settle until June 6, 2025. *Id.* at 127:15-23 & Ex. 232. Confronted with these orders—which he conceded he was seeing for "the first time"— Greetham could not defend his opinion that the deletions occurred "after the Morton matter concluded." *Id.* at 131:7-12, 132:2-9, 133:6-134:19.

Finally, even crediting Nexo's premise, the two matters substantially overlap: the Mortons' "relationship manager" was Hristov—the same relationship manager at the center of Plaintiff's claims — and the court-ordered Morton redisclosure targeted the documents of Trenchev and Metodiev, individuals central to this case. Greetham Tr. 123:6-124:22, 130:19-131:6; Ambrose Dec. ¶¶ 11, 13, Exs. 9 (¶ 34), 11. Asked whether Morton-related documents "would also be related to this matter," Greetham answered, "I can't possibly answer that question." *Id.* at 142:5-144:23.

Nexo has made no effort to recover any of the destroyed data. There are no backups, archives, Vault exports, or forensic recovery efforts. Trenchev Tr. 108:4-9; 127:6-10. Nexo concedes it has no litigation hold notices (RFP 269), preservation memoranda (RFP 270), business justifications for initially applying the 30-day policy exclusively to Trenchev and Kantchev (RFP 290), or any efforts to recover deleted data (RFP 291). *Id.* at 121:1-129:10; Ambrose Dec. ¶ 10, Ex. 8 (Trenchev Exhibit 105). For a company with a legal department, outside counsel at Baker McKenzie, and an Infosec team, the complete absence of documentation relating to preservation decisions is itself evidence of further spoliation or willful failure to create a paper trail.

**G.    Michael Kunkel's Report Confirms the Deliberate Destruction of Evidence**

The deliberate and systematic nature of Nexo's evidence destruction is confirmed by the expert report of Michael Kunkel. Ambrose Dec. ¶ 15 & Exhibit 13 ("Kunkel Rep.").

Mr. Kunkel's analysis of the Google Vault Audit Log reveals conduct that is, in his professional opinion, "inconsistent with routine IT administration." *Id.* at 11. Unlike a standard enterprise retention policy applied uniformly across an organization, Nexo's rules selectively targeted the email addresses of Kantchev, Trenchev, and Metodiev, including their personal email accounts

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

that "would have no connection to routine domain administration," as well as specific emails by subject line, Google Drive labels, and individual RFC 822 message IDs. *Id.* at 11.

Mr. Kunkel explains that an RFC 822 message ID is a globally unique identifier not visible in ordinary email use; targeting one "is a deliberate decision to delete one particular email, which requires someone to have identified that specific email in advance." *Id.* at 11. "The destruction cannot be remedied by searching other custodians' accounts, because the rules operated across all accounts simultaneously." *Id.* at 12. Mr. Kunkel further documents how the timing of the deletions tracked key litigation milestones, characterizing the pattern as an "escalation — from broad rules to increasingly targeted deletion of specific communications" that "continued throughout the pendency of this litigation." *Id.* at 11-12; see supra § III.E.

Kunkel also confirms that Nexo never activated the litigation hold features in either Google Vault or Slack, which would have preserved data indefinitely and taken precedence over any retention rules. *Id.* at 3, 6, 10; Greetham Tr. 89:6-90:12. Kunkel concludes that the retention rules "were purposefully set at Nexo in such a way as to delete targeted emails by way of email addresses, IDs, subject lines, and targeted Google Drive labels," with 476 of 512 audit-log entries executed by a single actor, yasen@nexo.com —"indicative of centralized control." Kunkel Rep. at 10; Greetham Tr. 87:5-10 (not disputing).

Nexo's own expert does "not dispute … any of" Mr. Kunkel's "technical analysis." Ambrose Dec. ¶ 6, Ex. 4 (Greetham Tr.) at 79:12-14. He agreed that "Nexo's configuration affirmatively scanned and purged active live e-mails" organization-wide — including, after March 9, 2023, email to and from the founders' personal accounts. *Id.* at 78:9-80:21. And he confirmed that Damyanov told him he "was instructed to make [the] changes from senior management." *Id.* at 23:13-19.

Greetham also agreed that "data purged by a Vault retention rule is permanently unrecoverable" and that deleted Slack messages are likewise gone. *Id.* at 87:22-88:12. He confirmed that Google Vault has a "litigation holds feature" that, once placed, "takes precedence over retention rules" and would have been "logged" in the audit trail, yet he had "not seen any evidence that Nexo

15

created a Google Vault litigation hold for this case" and did not "think they did." *Id.* at 89:11-90:12. Shown Section 6 of Nexo's own written policy — "Suspension of Disposal in the Event of Litigation or Claims," which requires that "[a]ny further disposal of documents … be suspended" — Greetham conceded that Nexo "didn't suspend … the policy" but instead "added many rules" while the litigation was pending. *Id.* at 155:11-157:3. He admitted he had never seen "the contents of a single e-mail that was deleted," could not "testify that any specific deleted item was irrelevant to this case," offers no opinion on Nexo's intent, and conceded quantifying the destroyed data "would almost be impossible" — "[b]ecause they're gone." *Id.* at 102:13-103:2, 95:13-96:2, 104:25-105:19. Greetham concedes his disagreement with Mr. Kunkel "is not that there were no targeted deletions," but only that targeted deletions "can" have legitimate business justifications — a justification he does not supply for any deletion at issue here. *Id.* at 94:20-95:12. Nexo's own expert thus confirms every operative element of the spoliation — the purging of live data organization-wide, its permanent loss, the absence of any litigation hold, and the violation of Nexo's own preservation policy — while conceding he cannot show the loss was harmless.

As described below, Nexo's admitted deletion of critical communications and its failure to adequately preserve, search, and produce relevant ESI has severely prejudiced Plaintiff's ability to obtain discovery concerning the events at issue in this case.

## IV.    ARGUMENT

### A.    The Court Should Impose Sanctions for Nexo's Discovery Misconduct

Nexo's extreme discovery conduct requires the imposition of harsh sanctions to maintain the fairness and integrity of this proceeding. Nexo destroyed broad categories of relevant ESI that it was obligated to preserve, and Rule 37(e) authorizes the most severe sanctions, including terminating sanctions, where a party acted with the intent to deprive its opponent of that evidence. Fed. R. Civ. P. 37(e)(2). Nexo's conduct also independently violated the Court's discovery order, supporting sanctions under Rule 37(b), and constituted bad-faith litigation misconduct sanctionable under the Court's inherent authority.

#### 1.    The Court Should Impose Terminating Sanctions Under Rule 37(e)(2)

Rule 37(e) applies where ESI (1) "that should have been preserved in the anticipation or conduct of litigation [2] is lost because a party failed to take reasonable steps to preserve it," and (3) that information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e); *WeRide Corp. v. Huang*, No. 5:18-cv-07233-EJD (NC), 2020 WL 1967209, at *11-*12 (N.D. Cal. Apr. 24, 2020). All three predicates are satisfied. *First*, Nexo's duty to preserve arose long before the deletions: it received six demand letters over eighteen months, faced SEC and state investigations, was engaged in active litigation in this district, and retained U.S. counsel, so the duty attached no later than Plaintiff's October 26, 2021 demand and indisputably upon the February 2023 Complaint. See *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067-68 (N.D. Cal. 2006). Nexo has admitted both trigger dates: it received the October 26, 2021 demand letter "before December 4, 2022," and it was "aware of the [Complaint] filing by March 1, 2023." RFA Resp. Nos. 726-727. *Second*, Nexo failed to take reasonable steps: it issued no litigation hold and, rather than suspending its deletion policies, expanded them to the founders' personal accounts and new email domains, a third managing partner, additional organizational units, Slack channels, and specific emails targeted by subject line and message ID. A sophisticated company with in-house counsel, outside counsel, and an information-security team was "required to suspend any existing policies related to deleting or destroying files" even "as to key custodians." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. 2012). Yet Nexo left unused the litigation-hold features its own expert admitted would have preserved the data and "take[n] precedence over [the] retention rules." Greetham Tr. 89:11-90:12. *Third*, the loss is irremediable: there are no backups, archives, or Vault exports; the purged data is permanently unrecoverable; and because the rules operated across all accounts simultaneously, nothing can be reconstructed from another custodian. Greetham Tr. 87:22-88:12; Kunkel Rep. at 5, 12.

**Nexo destroyed this evidence with the intent to deprive Plaintiff of its use (Rule 37(e)(2)).** Where the three predicates are met and the party "acted with the intent to deprive another party of the information's use in the litigation," the Court may presume the lost information unfavorable and

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

impose an adverse-inference instruction or terminating sanctions — and "there is no requirement that the court find prejudice." Fed. R. Civ. P. 37(e)(2); *Facebook, Inc. v. OnlineNIC Inc.*, No. 19-CV-07071-SI (SVK), 2022 WL 2289067, at *6 (N.D. Cal. Mar. 28, 2022). Intent may be shown by direct or circumstantial evidence — including where "it is reasonable to infer[] that a party purposefully destroyed evidence to avoid its litigation obligations." *Id.*; *see Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735-36 (9th Cir. 2024) (intent may be inferred from circumstantial evidence, including the timing and selectivity of deletions). Here the evidence is direct. Kantchev, Nexo's control person, admitted he "agreed to" the deletion policy on his own mailbox and "agreed to [Damyanov] being instructed" to carry it out. Kantchev Tr. 115:14-116:11, 118:1-7. Damyanov confirmed it was "not possible" he acted without direction, that every rule was "a task" from "management or … legal," and that Kantchev personally directed the purge of the founders' personal Gmail accounts — while no one ever instructed him to preserve anything or suspend a single rule. Damyanov Tr. 40:20-22, 41:1-4, 123:22-125:14.

Other evidence confirms the same intent: the timing of each escalation (demand letter, Complaint filing, active litigation), the selective targeting of the executives' personal accounts, the surgical deletion of specific emails by subject line and unique message ID, and the complete absence of any litigation hold, backup, or recovery effort despite claiming to have implemented holds in other cases. *Jones*, 95 F.4th at 735 (intent inferred where a party "selectively deleted" relevant messages); *see also Drips Holdings, LLC v. Teledrip, LLC*, No. 5:19-CV-2789, 2022 WL 4545233, at *5 (N.D. Ohio Sept. 29, 2022) (inferring intent to deprive, and imposing a mandatory adverse-inference instruction, where a party shortened its Slack message-retention setting to a matter of days and deleted existing messages after anticipating litigation, and offered no credible explanation for the timing or the change in retention policy).

That intent warrants terminating sanctions, and lesser measures cannot cure the harm. "[T]o dismiss a case under Rule 37(e)(2), a district court need only find that the Rule 37(e) prerequisites are met, the spoliating party acted with the intent required …, and lesser sanctions are insufficient to address the loss of the ESI." *Jones,* 95 F.4th at 736. Each finding is compelled here. As in *Facebook*

18

and *WeRide* — where the courts struck the answer and entered default because intentional, organization-wide destruction occurred "on such a massive scale" that no jury instruction could substitute for the lost evidence — the destruction here was intentional, directed from the top, and irreversible. Excluding the spoliator's evidence or instructing the jury "would not substitute for the spoliated evidence that could have built [Plaintiff's] affirmative case." *WeRide*, 2020 WL 1967209, at *11-*12 (quoting *Leon v. IDX Systems Corp.*, 464 F.3d 951, 960 (9th Cir. 2006)); *Facebook*, 2022 WL 2289067, at *7-*8. The Court should enter default judgment. Should it decline to terminate, it should at minimum impose a mandatory adverse-inference instruction that the destroyed communications were unfavorable to Nexo, preclude Nexo from disputing the matters the lost ESI would have addressed, and award Plaintiff's fees. *See Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 339-40 (D. Ariz. Feb. 3, 2022); *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, at *9-10 (C.D. Cal. Feb. 27, 2020).

**At a minimum, the loss prejudiced Plaintiff and warrants curative sanctions (Rule 37(e)(1)).** Even if the Court declines to find intent, Rule 37(e)(1) authorizes curative measures "upon finding prejudice," and a movant need only offer "plausible, concrete suggestions as to what [the destroyed] evidence might have been." Fed. R. Civ. P. 37(e)(1); *Fast*, 340 F.R.D. at 339. Plaintiff readily meets that standard. Although the full scope of what Nexo destroyed is unknowable, the record shows that specific, plainly relevant materials are gone, including:

- *All* of Trenchev's communications with the SEC in 2020 regarding Nexo's false marketing of its token as "SEC-compliant" as well as his internal communications regarding that investigation. The SEC communications survive only because the SEC produced them in response to Plaintiff's subpoena; the internal communications are gone. Ambrose Dec. Ex. 16.
- Nearly all of Metodiev's emails and communications about Nexo's OTC Desk and VIP relationship program. Metodiev was Nexo's managing partner overseeing the OTC Desk and VIP relationship program at the heart of this case. Trenchev Tr. 162:13-163:1. Metodiev "directly engaged" with Nexo's VIP relationship management team. Dinca Tr. 394:1-395:17. Metodiev created Nexo's VIP relationship program, created the policies and practices for the VIP program, set fees for Nexo OTC transactions, and drafted and approved Nexo's VIP relationship brochure that was sent to Cress and forms the basis for his fraud claims. Dinca II Tr. 6:2-23; 15:1-16:22.
- Every Slack direct message between 2018 and August 2024. Kunkel Rep. at 4; Greetham Tr. 88:10-12. Ambrose Dec. ¶ 46.

19

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

- Potentially hundreds of thousands of messages in Slack Channels, including messages discussing the NEXO Token's regulatory status both before and during this litigation. Ambrose Dec. ¶¶ 31, 33, Exs. 31 (showing 52,957 recent messages from 538 members in June 2023, including messages in the #community-management channel discussing NEXO token price "since being mentioned in the SEC's complaint against Coinbase," the NEXO token ICO, and messages from Kosta Kantchev); 33 (showing NEXO Token's US regulatory status was discussed in the "USA Slack channel"). Nexo has not produced a single document from the vast majority of their Slack channels, despite email notifications revealing they contain critically relevant communications. Nexo has produced **zero** Slack messages from 1,309 of the 1,347 (98.9%) Slack channels disclosed. Ambrose Dec. ¶ 48, Ex. 34. Including **zero** messages from channels titled "spread-mark-up", "forced-liquidations", "team-liquidations", "regulatory-struggles", "ny-interest-fuck-up", "negative-reviews", "sales-management-team", "lending", "ltv-framework-service", "otc-trading", "nexo-token", "usa", "account-usa", "terms-and-conditions", "executive-core", "marketing-legal", "sales-compliance", "law-enforcement", "prime-whale-watch", "client-trading-alerts", "structured-products", "sales-operations", "regulatory-strategy", and "compliance-comms."
- Emails showing Kantchev's oversight of the VIP relationship program and OTC services — e.g., his written promise to a VIP customer of a "personal liquidation-free guarantee," which survives only in a customer's screenshot, and his use of his personal address (kosta.kk@gmail.com) to "help recover" a customer's "crypto assets" liquidated in a 2021 flash crash, revealed only by a forwarded email. Ambrose Dec. Exs. 35, 36.
- Trenchev and Kantchev's receipt of customer complaints and legal demands, some of which are available only because the customers provided them to Plaintiff's counsel. Ambrose Dec. Ex. 23.
- Any email discussions among Nexo's managing partners Trenchev, Kantchev, and Metodiev on the topics of this case: the NEXO Token, the OTC desk, the VIP relationship program, and the Nexo Enterprise entities.

These concrete examples far exceed the "plausible, concrete suggestions" the rule requires, *Fast*, 340 F.R.D. at 339, and several survive only because a third party kept a copy — confirming both that the originals existed and that Nexo's copies are irretrievably gone. Nexo's own admissions confirm the materiality of the destroyed categories: it now admits that it "took fees on each of Plaintiff's OTC transactions" and charged liquidation fees on his forced liquidations — the very fees discussed in the destroyed communications and Slack channels (e.g., "spread-mark-up"). Ambrose Dec. ¶ 17, Ex. 15 (Nexo's July 3, 2026 Second Amended Responses to Plaintiff's Fifth Set of RFAs, Nos. 405, 408-413). The prejudice is concrete: Trenchev denied ever emailing about the very subjects on which he was co-founder and public spokesperson; Kantchev's 2021 emails are likewise gone; and Nexo's own expert cannot identify a single deleted item as irrelevant, quantify what was destroyed, or

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

describe it. Greetham Tr. 102:13-103:2, 104:25-105:21. At a minimum, then, the Court should order the curative measures under Rule 37(e)(1) specified below.

### 2.    Sanctions Under Rule 37(b) and the Court's Inherent Authority

Rule 37(b)(2) authorizes "just orders" when a party "fails to obey an order to provide or permit discovery" — from deeming facts established and precluding evidence through default judgment. Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi). Willfulness is not required for sanctions short of dismissal or default, *see Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1341 (9th Cir. 1985), and it is present here in any event. "Instead of or in addition to" those orders, the Court "must" order the disobedient party, its counsel, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless it was substantially justified. Fed. R. Civ. P. 37(b)(2)(C). The Court also possesses inherent authority to sanction "conduct which abuses the judicial process," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991), including by terminating a case where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings," *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995); *Leon*, 464 F.3d at 958, and by shifting fees for conduct taken in bad faith, *Chambers*, 501 U.S. at 45-46.

Nexo failed to obey this Court's discovery orders in at least three respects. *First*, Nexo continued destroying responsive ESI after the Court ordered that ESI searched and produced. In August 2024 Nexo represented in the parties' Joint Case Management Statement that they had conferred "regarding reasonable and proportionate steps to preserve evidence relevant to the issues reasonably evident in this action." ECF 48. In January 2025 the Court found many of the disputed RFPs relevant and called for custodian briefing. ECF 55. The Court ordered Nexo to include Trenchev and Kantchev as custodians on February 19, 2025, ECF 65, and in April 2025 ordered Nexo to search for and produce documents across the categories described above. *Supra* § III.B. Yet Nexo's rolling 30-, 60-, and 180-day deletion rules remained in force throughout the court-ordered search-and-production period, destroying responsive documents during the compliance window itself—a fact Nexo concealed until January 30, 2026. *Supra* §§ III.C-III.E. A party does not "obey" a production

order while operating rules that destroy the very documents the order reaches. *See Facebook*, 2022 WL 2289067, at *7-*8 (defendants "continued deleting data even during discovery"); *WeRide*, 2020 WL 1967209, at *11-*12 (auto-delete settings left in place during litigation); *Red Wolf Energy Trading, LLC v. Bia Capital Mgmt., LLC*, 626 F.Supp.3d 478, 510 (D. Mass. Sept. 8, 2022) (entering default judgment under Rule 37(b) where a party repeatedly failed to produce Slack messages).

*Second*, Nexo destroyed evidence in anticipation of the Court's rulings. On February 17, 2025 — while the parties' custodian dispute was pending and actively being briefed, and two days before the Court ordered Trenchev and Kantchev added as custodians, ECF 65 — Nexo created the one-day "rom" deletion rules, working functionally immediate destruction of labeled Google Drive documents. *Supra* § III.E. Nexo was thus purging documents at the very moment it was briefing this Court on which custodians' documents it should have to search. And its earlier purges made its eventual "compliance" illusory: by the time the Court ordered the founders added as custodians, their mailboxes had been purging on 30-day cycles for more than two years, so Nexo tendered custodians whose files it had already emptied.

*Third*, Nexo litigated the scope of court-ordered discovery on false pretenses and concealed its non-compliance. During the court-ordered custodian negotiations, Nexo represented to Plaintiff and to the Court that Metodiev was not a relevant custodian — even though he created and oversaw Nexo's VIP program and OTC desk and appears on surviving documents discussing Plaintiff's OTC transactions, and even though Nexo had already purged his emails organization-wide, a fact it disclosed to no one. Ambrose Dec. ¶ 44; ECF 59 at 3 (Nexo arguing in January 2025 it "worked diligently to identify relevant custodians for discovery" and that Metodiev was not "likely to have relevant information regarding Cress"), Ex. 47 (Plaintiff requesting Metodiev as a custodian), Ex. 48 (Nexo falsely representing he "is not relevant to Mr. Cress or his claims"). After representing that its production would be "substantially complete" by August 31, 2025, Nexo then spent nearly five months deflecting Plaintiff's specific written inquiries about the absence of founder emails and Slack messages, *supra* § III.D, disclosing its deletion policies only on January 30, 2026 — in a letter that

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

itself omitted the expansion of those policies to the founders' personal accounts and to Metodiev. *Supra* § III.E. That is the conduct of a party managing the revelation of its own spoliation, not complying with court-ordered discovery.

The same record establishes bad faith for purposes of the Court's inherent authority. Nexo knew its obligations: its own Data Retention Policy required that disposal "be suspended" upon anticipated litigation; it issued a litigation hold in *Morton*; and Kantchev acknowledged being informed of Nexo's retention obligations for litigation. *Supra* §§ III.A, III.F. Rather than suspend, Nexo escalated — expanding its deletion rules while this case, the *Morton* case, and regulatory proceedings were all pending — and then offered justifications (a post-FTX "de-risking" measure applied to the two founders alone; "Morton, not Cress") that collapse on examination. *Supra* §§ III.E-III.G. Deliberate destruction, concealment, and pretext are the textbook showing for inherent-authority sanctions. *Anheuser-Busch*, 69 F.3d at 348; *Leon*, 464 F.3d at 958-59.

The prejudice from these violations is concrete. Trenchev denied under oath that Kantchev ever played a customer-facing role at Nexo. Trenchev Tr. 101:3-102:1. Records that survive only because customers preserved them — Kantchev's written "personal liquidation-free guarantee" and his personal-email exchanges with customers, *supra* § IV.A.1 — show that denial to be false. Ambrose Dec. ¶¶ 35-36, Exs. 35, 36. Because Nexo purged Kantchev's emails organization-wide, Plaintiff will never know the full extent of that involvement and can never fully test Trenchev's denials. Discovery misconduct that leaves an opponent unable to test sworn denials "threaten[s] to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959; *Facebook*, 2022 WL 2289067, at *8.

Each of the five factors governing terminating sanctions supports severe relief: Nexo's concealment alone has consumed months of meet-and-confer efforts and motion practice that should never have been necessary (factors one and two); the prejudice is set forth above and in Section IV.A.1 (factor three); the policy favoring merits dispositions carries little weight where the spoliating party has itself made a fully informed merits adjudication impossible (factor four); and no lesser sanction can restore what Nexo destroyed (factor five). *Leon*, 464 F.3d at 958; *Facebook*, 2022 WL 2289067,

23

at *8-*9. At minimum, the Court "must" award Plaintiff the reasonable expenses, including attorneys' fees, "caused by the failure" — a failure that was not substantially justified — and should impose the evidentiary and remedial measures specified below. Fed. R. Civ. P. 37(b)(2)(C).

### B.    The Court Should Order Specific, Tailored Relief

For the reasons set forth above, the Court should strike Nexo's Answer and enter default judgment. Fed. R. Civ. P. 37(e)(2)(C), 37(b)(2)(A)(iii), (vi); *Jones*, 95 F.4th at 736. If the Court declines to enter terminating sanctions, Plaintiff respectfully requests the following specific relief. Each measure is tied to a category of destroyed ESI or established misconduct, and collectively they are no greater than necessary to cure the prejudice. Fed. R. Civ. P. 37(e)(1)-(2). A Proposed Order specifying this relief accompanies this Motion.

**(1) Adverse-inference findings and instructions.** Findings under Rule 37(e)(2) that Nexo destroyed ESI it was required to preserve, with the intent to deprive Plaintiff of its use in this litigation, and a mandatory instruction that the jury must presume the destroyed ESI was unfavorable to Nexo. Fed. R. Civ. P. 37(e)(2)(A)-(B). Because the destroyed ESI corresponds to identifiable categories, the presumption should be given content tied to those categories—specifically, that the destroyed emails and Slack communications of Trenchev, Kantchev, and Metodiev, and Nexo's destroyed Slack channels and direct messages, would have shown: (a) that Nexo's managing partners knew of, directed, and concealed the markups Nexo charged on OTC transactions and the fees it charged on liquidations, while Nexo publicly advertised #ZeroFees and no hidden fees; (b) that Nexo knew the NEXO Token was not registered with the SEC when it represented otherwise to Plaintiff and other customers and did so with the intent of inducing them to purchase the Token; (c) that Nexo made sales of the NEXO Token to unaccredited U.S. investors in 2020 and 2021, and (d) that Nexo made the representations in the VIP Brochure—including the Liquidation Relief Program and its customer-responsiveness and pricing promises—without the intention or ability to honor them. Plaintiff further requests that these presumptions apply in adjudicating any motion for summary judgment. *See Colonies*, 2020 WL 1496444, at *9-*10. Proposed instructions are included in the Proposed Order.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

**(2) Preclusion.** Orders pursuant to Rules 37(b)(2)(A)(ii) and 37(e) that: (a) Nexo may not argue or suggest to the Court or the jury that the absence of internal emails, Slack messages, or other internal communications is evidence that events did not occur or that Plaintiff's claims lack support; (b) Nexo may not contest the authenticity or completeness of copies of destroyed communications preserved by third parties, including customer screenshots, forwarded emails, and third-party productions; and (c) Nexo's witnesses may not offer testimony concerning the contents of destroyed communications or contradicting the presumed facts described above.

**(3) Evidence of spoliation at trial.** An order permitting Plaintiff to present evidence and argument to the jury regarding Nexo's destruction of ESI and the circumstances surrounding it. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

**(4) Fees and costs.** An award of $439,267.21 to compensate Plaintiff for the reasonable attorneys' fees, expert fees, and costs incurred as a result of Nexo's spoliation and related misconduct, including investigating the deficient productions, the September 2025–February 2026 meet-and-confer efforts, the spoliation portions of the Damyanov, Kantchev, Trenchev, Greaves, and Greetham depositions, retaining Mr. Kunkel, and preparing this Motion. Fees are mandatory under Rule 37(b)(2)(C) unless Nexo's failure was "substantially justified" — it was not — and are independently warranted under Rule 37(e) and the Court's inherent authority. *Chambers*, 501 U.S. at 45-46. An itemized declaration accompanies this Motion pursuant to Civil Local Rule 37-4(b)(3).

**V.    CONCLUSION**

Nexo's discovery conduct has left Plaintiff—and the Court — without a complete record of evidence that should exist in this case. Without the relief requested, Plaintiff will continue to litigate at a structural disadvantage, and be unable to access the very communications that bear on Nexo's knowledge and intent. Plaintiff respectfully requests that the Court strike Nexo's Answer and enter default judgment or, in the alternative, order the specific relief set forth in Section IV.B above, and in any event award Plaintiff his reasonable attorneys' fees and costs.

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH

Dated:  July 6, 2026

Respectfully submitted,


/s/ *Max Ambrose*
James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

*Counsel for Plaintiff John Cress*

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
Case No. 3:23-cv-00882-TSH