# Deposition Transcript

Case Number: 3:23-CV-00882-TSH
Date: April 1, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## ANTONI ANTONIEV TRENCHEV

## CONFIDENTIAL



Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

than I've sent.

BY MR. TAYLOR-COPELAND:

Q.    What subjects did you discuss via email between 2018 and 2021?

MR. SHELTON:  Objection, vague.

A.    I have a hard time recalling any particular email subjects and threads that lay more than five years ago.

BY MR. TAYLOR-COPELAND:

Q.    Would you have discussed the Nexo Token sale using email?

A.    I would not rule it out.

Q.    Did you use Slack for internal communications between 2018 and 2022?

A.    Yes.

Q.    How often did you use Slack?

A.    More or less on a daily basis.

Q.    Was Slack the primary means of internal communication at Nexo.

MR. SHELTON:  Objection as to the term primary.  And vague.

A.    Slack is an important part of the internal communication system in that period.  It might have changed since.

BY MR. TAYLOR-COPELAND:

safeguard the relevant materials to the case that the complaint pertains to.

Q.    Do you know what steps, if any, were taken to preserve documents or communications in response to receiving this letter?

A.    I became aware of the complaint after the -- this letter was received.  And when it was brought to my attention, the legal team at the time had told me that they had gathered all the relevant documentation, and should this advance procedurally in -- in a direction -- or legal action would be filed against us, we would be able to produce the relevant documentation that are related to this case.

Q.    Do you know specifically what those documents and communications that were collected by the legal department were?

A.    I believe that the communications between Mr. Cress and his account manager had been duly copied and stored.  I believe from what I understand from the legal team that we were able to produce documents around the transactions and the interactions in discovery, so there is nothing that leads me to believe that the procedures around receiving demand letters and what the team should do after that have not been followed.

Q.    Was the procedures to be followed in the event

that Mr. Cress had some complaints, what did you understand those complaints to be?

A.    I understood that, unfortunately, Mr. Cress had suffered financial loss, which is something I -- on a personal level, understand how painful it can be and I sympathize with that.  I understood that he thought that there was something around the liquidation or the functioning of the Nexo credit facility that was improper, but I do not believe that to have been the case.

Q.    Did you understand him to be threatening litigation if his demands weren't met?

A.    I mean, looking at the document I think it explicitly says that if the list of demand is not met and an amicable resolution is found he has the intention to pursue other means of achieving his goals.

Q.    Was Nexo aware that once litigation is threatened an obligation arises to preserve relevant documents?

A.    By that time I don't think this was the first time that we received a letter of demands and there was an established procedure for the legal department to follow after such a letter was received.

Q.    And what was that procedure?

A.    Well, it would be to gather, copy and

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    CONFIDENTIAL

case in my accounts.

BY MR. TAYLOR-COPELAND:

Q.    So you didn't do anything to preserve any communications after learning of the lawsuit; correct?

MR. SHELTON:   Objection, vague, misstates testimony.

A.    I -- this is a rather broad statement that I did not preserve any communication.  Certainly I preserved lot of communication.  I just did not see anything relevant to the case that I should specifically focus on keeping.

BY MR. TAYLOR-COPELAND:

Q.    Can you identify one thing you did to preserve your documents after learning of Mr. Cress's litigation?

A.    I'm not sure I understand the question.  There is proactive disposal of documents and then there is keeping documents as they are.  I did -- I did not take a specific proactive action to do anything because I had no communication or documents with relevance to the case.

Q.    So you didn't suspend any auto-deletion functions on your email?

A.    I do not have auto-deletion functions on my email in 2022 and did not go about deleting anything.

Q.    At any point did you suspend automatic

MR. SHELTON:  Objection, vague.

A.    I have no reason to believe it did not.

BY MR. TAYLOR-COPELAND:

Q.    Then do you see it says, right underneath that, it's "Emails - internal and external", it says "Indefinite"?

A.    I do.

Q.    Is there any difference to you between permanent and indefinite?

A.    There is.

Q.    What's the difference?

A.    They would appear to be antonyms.

Q.    So to you indefinite means there's no retention policy at all?

A.    I mean, indefinite means the retention policy is to keep them indefinitely.

Q.    Okay.  And how is that different from keeping them permanently?

A.    Oh sorry, I -- I ... I confused the words.  To me "permanent" and "indefinite" would be very similar concepts.

Q.    Then it says:

"Electronic Documents, Depending on the subject matter, at least 5 years."

Right?

deletion of the data."

Do you see that?

A.   I do.

Q.   Okay.

Does Nexo have customer data in Slack chats?

MR. SHELTON:  Objection, vague.

A.   I mean, Slack data is a very broad term so I am unsure how to answer that question.

BY MR. TAYLOR-COPELAND:

Q.   So you don't know one way or the other whether Nexo communicated customer data through Slack?

MR. SHELTON:  Same objection.  Asked and answered.

A.   I would say that customer data, there is a retention policy of that data, and that it can be kept in a number of locations and I don't see how and why that should be Slack.

BY MR. TAYLOR-COPELAND:

Q.   Do you see 6 says:

"Suspension of Disposal in the Event of Litigation or Claims."

And it says:

"In the event Nexo is served with any subpoena or request for documents or any employee becomes aware of a governmental investigation or audit concerning Nexo

or the commencement of any litigation against or concerning Nexo, such employee shall inform Management. Any further disposal of documents shall be suspended until Management with the advice of counsel determines otherwise.  Management shall take such steps as is necessary to promptly inform all staff of any suspension and further data disposal."

Do you see that?

A.    I do.

Q.    Is your experience that this policy was adhered to at Nexo?

A.    I have no reason to believe it has not been adhered to.

Q.    And as management were you informed when Nexo was served with a subpoena?

MR. SHELTON:  Objection, vague.

A.    I'm looking -- I am looking at the definition of management.  Unfortunately, in 2.1, there is no definition of management, and I am not sure whether management would include what your question implies, senior management, such as me, Mr. Kanchev, or Mr. Metodiev, at that time.  Or it would include also other managers at the company, such as if we were talking about, I don't know, a customer, a consumer, customer support agent, whether him reporting to his

MR. SHELTON:  I'm also gonna object as beyond the scope of the 30(b)(6) designation and calls for speculation.  If you can answer in your personal knowledge, you can.

A.   I do not remember that.

BY MR. TAYLOR-COPELAND:

Q.   Do you know if Nexo placed a litigation hold in the Morton versus Nexo litigation?

MR. SHELTON:  Same objection, and same instruction.

A.   I do remember there being a hold notification being circulated on that particular case.

BY MR. TAYLOR-COPELAND:

Q.   Do you remember if it was circulated to you?

A.   I remember seeing that, yes.

Q.   Do you recall about when that was?

A.   I do not.

Q.   But you don't recall seeing a litigation hold in Mr. Cress's case, correct?

MR. SHELTON:  Objection, asked and answered.

A.   No, I asked -- I answered that question already.

BY MR. TAYLOR-COPELAND:

Q.   And the answer was?

A.   The answer was that we had gone above and

beyond a litigation hold notice by actually the team going out as soon as they became aware of the demand letter to collect all relevant communications and informations.

Q.   But you don't know exactly which communications and documents were collected, do you?

A.   I don't have specific memory what was collected then, no.

Q.   And then looking at the -- page 6 of 6 in the exhibit we were looking at, at the bottom it says, "7.0 Enforcement and Reporting Breaches":

"Breaches of this Policy may have serious legal and reputation repercussions and could cause material damage to Nexo.  Consequently, breaches can potentially lead to disciplinary action that could include summary dismissal and to legal sanctions, including criminal penalties.

"All employees are expected to promptly and fully report any breaches of the Policy."

Do you see that?

A.   Yes.

Q.   Okay.

Did any -- has anyone ever reported a breach of this policy to you?

A.   Not to my recollection.

Q.   Well, let's go to -- back to section 4.1, "Emails - internal and external, Retention Period, indefinite."

A.   Yes.

Q.   Did you follow that policy?

MR. SHELTON:  Objection, vague.

A.   Emails, internal and external, were indefinite.  I have, at certain times at my tenure at Nexo, had my email retention policy set to indefinite, yes.

BY MR. TAYLOR-COPELAND:

Q.   And at other times it has been set to 30 days; right?

A.   At other times it has been set at different settings, so it would be period-specific.

Q.   Okay, I want to introduce exhibit 104.

(Exhibit 104 marked for identification)

A.   Thank you.

Q.   My questions here, I am just showing this to you to refresh your recollection, my questions are gonna be on page 5 where there is a heading labeled "Trenchev, Kanchev, Individual Custodial Emails".  So if you want to take your time to read that section and then I'll have some questions.

A.   And the other sections will not be relevant

immediately to your questions?

Q.   I don't believe so.

A.   Okay.

Q.   Other than seeing it's a letter from your attorneys to Mr. Cress's attorneys.

A.   Sure.  Can I know what ESI stands for?

Q.   I believe it's electronically stored information.

A.   Thank you.

Okay, I skimmed through the rest of the section, I think the more important parts were in the beginning, but I reserve my right to revisit that statement.

Q.   Of course.

So you see on page 5 under "Trenchev and Kanchev" heading, it says:

"We confirmed that Trenchev and Kanchev had a 30-day retention policy period effective December 4, 2022 ..."

Do you see that?

A.   I do.

Q.   Okay, is it true that a 30-day retention policy was placed on your emails on December 4, 2022?

A.   I see no reason why anything our external legal counsel should -- is telling you should not be

true.  So I would answer that in the affirmative.

Q.   So you have no reason to believe that that's not true; right?

A.   Right.

Q.   Okay.

Do you know who placed the retention policy on your emails?

A.   I do not specifically.  I understand that in the Google operating systems there is super admins. This would normally be people at Infosec that can access the settings of the Google suite of services.  So -- but I do not have a particular name for you.

Q.   Okay.

So you didn't personally go into Google and set this retention policy; is that right?

A.   I did not.

Q.   Okay.

Did you direct somebody to implement this retention policy?

A.   I don't recall having done that.

Q.   So you can't say one way or the other?

A.   Unless I'm entirely mistaken, I have not ordered anyone to do that.

Q.   Do you know if Mr. Kanchev ordered anybody to do that?

It might have been him where he said, well, maybe that's too short and we expanded it.  I don't believe that currently the retention policy period is 30 days, I think it's much longer.  Not entirely sure.

But I -- what I do remember is several changes to the retention policy, certainly more than one.

Q.   What makes you think the current retention policy is much longer?

A.   I just have this objective feeling of having seen something to that accord.

Q.   Why did Nexo implement the 30 day retention policy?

A.   Well, I think that December 2022 was after a period of particularly challenging times for the industry as a whole and specifically, for businesses, such as ours, many of our competitors did not survive.  FTX had just imploded.  And there was a lot of hacking attacks at the time.  Various black hacking groups that were becoming even more targeted in their attempts towards crypto companies, and I think the thinking was around de-risking us with Kosta, as custodians of -- custodians of especially sensitive data which might or might not obviously in our opinion not have had to be retained going forward.

To put it shortly, it was a de-risking

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                    CONFIDENTIAL                    JOB NO. 2571483

activity, an initiative.

Q.   Whose decision was that?

A.   Erm, whose decision was what?  The retention period?

Q.   To implement that retention policy.

A.   I remember like general discussions around de-risking the amount of information that we had between me and him.  But who specifically pulled the trigger, I couldn't -- I couldn't say.  I don't believe it was me.

Q.   So you and Mr. Kanchev had discussions about implementing this retention policy to reduce risk; right?

A.   Yes.

Q.   Okay.

Before you implemented that policy, did you check with legal and compliance?

A.   I don't specifically recall discussions with legal and compliance.  So I couldn't tell you other -- either way.

Q.   And you're aware that -- well, let me ask it differently.

Do you have any reason to dispute that Mr. Kanchev's email was also placed on a 30-day retention period on December 4, 2022?

in effect for your emails prior to December of 2022?

A.   Unless I'm mistaken, I would presume they were at the default setting, and that would be indefinite. There might -- the only limitation might have been actual gigabyte storage.  So a set retention policy by Nexo, I don't believe we had prior to that for my email address.

Q.   Okay.  And is the same true of Mr. Kanchev's email address?

A.   Without knowing for sure, I would assume that this would be a safe assumption.

Q.   In December of 2022 was the email account of anyone other than you or Mr. Kanchev put on a 30-day retention policy?

A.   I don't believe so.

Q.   Did you discuss including Mr. Metodiev at that point in time as one of the managing partners --

A.   I don't remember.  Sorry, did you finish?

Q.   You can go ahead.

MR. SHELTON:  I am gonna object on privileged grounds, to the extent you spoke with legal counsel about the retention policy, and I instruct you not to answer.  But if you had discussions with non-legal personnel in Nexo, you can answer.

A.   Well, I don't remember there being discussions

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                    CONFIDENTIAL

around Mr. Metodiev's email.

BY MR. TAYLOR-COPELAND:

    Q.   Did you or Mr. Kanchev analyze Nexo's preservation obligations with respect to any litigation or investigation before implementing the 30-day retention policy?

       MR. SHELTON:  Objection, vague, and I object on privileged grounds.  So I'll instruct you not to answer any discussions you had with -- to your attorneys about preservation obligations in connection with litigation.  But you can answer if those discussions involved discussions not with counsel.

    A.   Well, I think the thinking at the time was that me and Mr. Kanchev not being customer-facing, not interacting with -- with clients, would have little to no relevant documents and communication on our email servers, on our email inboxes.  So -- because we had already seen a few complaints and demands, and they tended to cluster around execution, communications with account managers, customer support, so those were the important custo -- custodians of information and documents in our mind.

      And that is also the reason why exclusively our inboxes had a specific retention policy, while for the rest of the employees I think we were sticking to

the indefinite retention setting then and now.

BY MR. TAYLOR-COPELAND:

Q.   Did either you or Mr. Kanchev consult outside counsel regarding the implementation of the 30-day retention policy before implementing the policy?

MR. SHELTON:  Mr. Trenchev, I'm gonna object on privileged grounds.  I don't want you to disclose the substance of any communications you had with counsel regarding the retention policies.  If you can answer, otherwise you can.

A.   I don't think I can answer otherwise.

BY MR. TAYLOR-COPELAND:

Q.   So my question isn't what the communications were, my question is whether or not you consulted outside counsel regarding the implementation of the policy before implementing the policy, either yes or no. I don't believe that's privileged.

A.   Well, I -- I have a hard time reconciling his objection, and the instruction he just gave me with answering the question even as you just rephrased it. I think it still would go in that territory.

MR. TAYLOR-COPELAND:  Are you instructing him not to answer that question?

MR. SHELTON:  Yes.

BY MR. TAYLOR-COPELAND:

ANTONI ANTONIEV TRENCHEV
APRIL 01, 2026                    CONFIDENTIAL                    JOB NO. 2571483

might be.

So that would be the usual preparation.

Q.   How would the talking points be delivered to you?

A.   Well, I think that varied over time and over the different instances.  I did bullet points somewhere, or just the teams there, we would talk.

Q.   Were they ever delivered by email?

A.   I don't believe that, no.

Q.   What app did you use to send voice messages to your colleagues?

A.   The Slack functionality.

Q.   How long would they have to listen to a voice message?

A.   Oh, I would try to keep it concise.  So I tend to record voice messages under two minutes.  I find people get distracted if it's longer.

Q.   Would those be embedded in the chat or would they disappear after a certain amount of time?

A.   I think it -- the retention policy of Slack does not discriminate between written word and voice messages.

Q.   So you used that functionality with the comms team.  Did you use that with other people that you were communicating with at Nexo?

A.   I have used it with many different people in departments.

Q.   Okay.

Do you know if there is a backup copy of any emails that may have been deleted as part of this retention policy?

MR. SHELTON:  Objection, calls for speculation, calls for an expert opinion.

A.   I -- I don't know that, no.

BY MR. TAYLOR-COPELAND:

Q.   Does Nexo know?

MR. SHELTON:  Same objections.

A.   Erm, I -- on my email address?

BY MR. TAYLOR-COPELAND:

Q.   Correct.

A.   I don't believe there are copies on my email address unless somebody went rogue and copied it without my knowledge.

Q.   Okay.

So before the retention policy was implemented you didn't download or try to save your existing messages anywhere?

A.   No.

Q.   Do you know if Mr. Kanchev did that?

MR. SHELTON:  Objection, calls for

answer, if you know.

A.   I don't think that Nexo has the knowledge of that.  This is too technical and dependent on the functionality of its email service provider, in this case Google.

BY MR. TAYLOR-COPELAND:

Q.   But you didn't ask anybody at Nexo about that; right?

A.   I personally have not asked anyone at Nexo about that.

Q.   Then looking back on page 5, "Slack Production" -- let's start with, actually, below -- there's "Public and Private Channels" and then there's "Direct Messages".  And it says the direct messages were placed on a four-day retention policy on 12/04/2022.  Do you see that?

A.   I do.

Q.   Okay.  Do you know who implemented that policy?

A.   I do not.  What I remember is that four days was a mistake, was -- I think somebody might have wanted to type in 40 and they missed a zero because four days is clearly a very, very short time period, and I think that's why it was discovered and corrected when it was discovered and maybe somebody complained about it being

too short a time.

Q. And -- so the -- December 4 is the same day the emails retention policy was implemented; right?

A. I mean, if these are American dates, Baker McKenzie being the U.S. law firm, we would assume that, it would be, yes, December 4 and the same date.

Q. Okay. Do you recall if these Slack retention -- this Slack retention policy was adopted as part of that same rationale that you discussed to reduce risk?

A. I don't recall that, no.

Q. So does -- does Nexo know who implemented the Slack retention policy?

A. I don't -- I'm not entirely sure what the situation was in 2022, to be honest.

Q. Did you -- in preparing for today did you ask anybody at Nexo who implemented these Slack retention policies?

A. I don't think that anyone at Nexo would have been able to confirm what happened four years ago, exactly, and I think that direct messages, these are usually between several people, certainly less than a handful, because then it would make sense to create a channel rather than direct messages and they -- did not tend to include data and exchanges that are or

Does Nexo have a business reason that it implemented a four-day retention policy on Slack direct messages on December 4, 2022?

A.   As stated before, I think the four-day policy was a mistake by whoever put that into the system, and hence that's why it was promptly changed after the discovery two days later.

Q.   Okay, so on December 7 it was changed to 30 days; right?

A.   This is what the document says, yes.

Q.   Okay.  And was there a business reason for having a 30-day retention policy for Slack direct messages?

A.   What would the definition of a business reason be?

Q.   Do you know why Nexo implemented a 30-day retention policy for its Slack direct messages on December 7, 2022?

A.   Well, there must have been a reason why we thought that is a good idea.  I just cannot reverse engineer that four years later.

Q.   So you don't know?

A.   I do not know.

Q.   Okay.

Do you know why Nexo implemented a retention

Q.   Do you see that that request asks for:

"All Documents showing litigation hold notices, preservation memoranda, or instructions regarding document retention issued to any of Your employees, agents, or contractors, including without limitation the Nexo Source Accounts between January 1, 2017 to the present."

And Nexo's amended response is that subject to the general objections, Nexo has no documents to produce in response to this request.

My question is whether that is correct, that Nexo has no documents available that are responsive to that request?

A.   Give me a minute, please, to make sure I understand the request and the answer correctly.

Okay, so the question was again?

Q.   Does not -- does Nexo have any documents that are responsive to that request?

MR. SHELTON:  I -- I am going to object on privilege grounds to the way you've phrased that question.  I do think you could ask it in a way though that would be non-objectionable.

MR. TAYLOR-COPELAND:  How is it non-objectionable to ask whether Nexo has any documents? How is it seeking privileged information to ask whether

Nexo has any documents responsive to that request?

MR. SHELTON:  Could the Court Reporter read back the question?

(Record Read.)

MR. SHELTON:  Okay, I'm not gonna object to that.

A.   Okay, well, as I said, earlier today, I do remember seeing a hold notice with regards to the Morton case.  I don't remember when it was, and perhaps it was -- is now no longer available.  Some time having passed.  Other than that, I do not know how to answer your question.

BY MR. TAYLOR-COPELAND:

Q.   Let me ask it a little bit differently.

Do you have any reason to believe that Nexo does have any documents responsive to request 269 other than the one you just mentioned?

A.   I do not.

Q.   Then request number 270, which is right below, asks for:

"Communications sufficient to show all litigation hold notices to any of Your employees, agents, or contractors, including without limitation the Nexo Source Accounts, between January 1, 2017 to the present."

ANTONI ANTONIEV TRENCHEV                                    JOB NO. 2571483
APRIL 01, 2026                         CONFIDENTIAL

And the response -- the amended response says:

"Subject to ... the foregoing objections ... Nexo has no documents to produce in response to this request."

So my question is whether you have any reason to believe that that is in any way inaccurate?

MR. SHELTON:  So -- I'm gonna object just as -- as misstating the request, because Nexo filed objections to this request.  One of those objections on page 4 was: this request seeks all litigation hold notices that are not limited to the relevant time period or the -- this lawsuit, referring to the Cress lawsuit. So we did object to producing litigation hold notices unrelated to Cress.

It's unclear to me whether your question was referring to all litigation hold notices or the Cress -- Cress-related notices.  If you could -- if you could please clarify.

BY MR. TAYLOR-COPELAND:

Q.   Yeah.  So you're aware of Mortons being -- a litigation hold; correct?

A.   I have seen such at the time that it was issued.  I believe it was later than the John Cress case.

Q.   Are you aware of any other litigation holds?

A.   Not on top of my head.

Q.   Okay.

And request 272, rather than asking a question about this, have you sent any communication acknowledging receipt of a litigation hold notice at any point in time?

A.   "You" being me personally?

Q.   Yes.

A.   I'm not sure I understand the word "my acknowledgement of the receipt of the hold notice of the Mortons" -- how is it called?  -- "hold notice qualify as such".

Q.   Yes.  If you responded and acknowledged receipt of it.

A.   I think I did.

Q.   Okay.

And request 273 says:

"Communications sufficient to show Your employees, agents, or contractors, including without limitation, the Nexo Source Accounts, acknowledged any document retention policies [between] January 1, 2017 [and] the present."

And the amended response says:

"Subject to ... the foregoing objections ... Nexo has no documents to produce in response to this

Request."

Do you see that?

A.   I do.

Q.   Okay.

Are you aware of any documents that would be responsive to this request 273?

MR. SHELTON:  I just want to object to state that this request was subject to Nexo's objections, including requesting documents beyond the scope of the Cress lawsuit.  You can answer the question, if you can.

A.   I do not.

BY MR. TAYLOR-COPELAND:

Q.   So Nexo's unaware of any employees, agents or contractors acknowledging a document retention policy between January 1, 2017, and the present?

A.   I'm a little perplexed by the whole set of questions and I don't want to get anything wrong.  Can I get some clarifications?  So what exactly is being said and what I'm being asked?  Because I am unclear.

Q.   So my question is whether Nexo is aware of any employees acknowledging receipt of a document retention policy at any point between January 1, 2017, and the present.

A.   I do not know how to answer that question.

Q.   Why is that?

A.   Because I don't understand it.  Are you asking whether anyone ever acknowledged receipt of a hold notice?

Q.   Of a -- of document retention policy?

A.   Yes, I --

MR. SHELTON:  Look, I'm gonna -- I'm gonna object just to the extent Mr. Trenchev has not been designated to testify on Nexo's RFP responses as to these issues.  I agree that some of these requests might touch on designated topics, but I think the question is very confusing in referring to this document.

And so I think your question is unrelated to request number 273.  If you could just restate it without reference to the RFP, I think it would be helpful for Mr. Trenchev.

BY MR. TAYLOR-COPELAND:

Q.   Fair enough.

So just aside from that request, is Nexo aware of any employees acknowledging receipt of a document retention policy at any point between January 1, 2017, and the present?

A.   Well, if I, like previously told you, acknowledged that receipt, the answer to that question would be yes.

Q.   So then looking at request 274, this asks for:

"All Documents and Communications, including internal emails, IT tickets, or change logs, regarding the decision to authorize or implement the Retention Policy Changes."

Now this one -- sorry, not that one.

Does Nexo have any disaster recovery backup tape or cold storage inventories that may contain either email or Slack data deleted pursuant to the retention policies?

A.    I don't believe that to be the case.

Q.    Then looking at request 283 on page 15.

A.    I'm looking at it.

Q.    Okay.

This one asks for:

"Documents sufficient to show that auto-deletion jobs were suspended, modified, or otherwise managed for Nexo Source Accounts and the date those steps occurred."

And the amended response says:

"Subject to and without waiving the foregoing objections, including the General Objections, Nexo has no documents to produce in response to this Request."

Are you aware of whether Nexo has any documents regarding whether auto-deletion jobs were suspended, modified -- just suspended or modified?

A.   I have no reason to believe that the amended response that we provided is inaccurate.

Q.   And then if you could look at request 290 which is on page 20.  And this one asks for:

"All Documents and Communications regarding the business justification for applying a 30-day email deletion policy exclusively to Antoni Trenchev and Kosta Kanchev."

And the amended response says:

"Subject to and without waiving the foregoing objections ... Nexo has no documents to produce in response to this Request."

And my question is whether you're aware of any documents and communications regarding the business justification for implementing the email retention policy changes on December 4, 2022?

A.   I am not.

Q.   Then RFP 291 asks for:

"All Documents and Communications regarding any efforts to recover, restore, or retrieve deleted emails, Slack messages, or other data for Antoni Trenchev, Kosta Kanchev, or any other Nexo Source Accounts, including without limitation, admin logs showing attempted restores, back-up/snapshot searches, and any certifications or determinations that backups or

snapshots do not exist."

Nexo's response is:

"Subject to and without waiving the foregoing objections, including the General Objections, Nexo has no documents to produce in response to this Request."

My question is whether you are aware of any documents or communications regarding efforts to recover, restore or retrieve deleted emails, Slack messages or other data from yourself or Mr. Kanchev?

A.   I have not.

Q.   Okay.

You can set that to the side then.

I am going to introduce exhibit 106, which is a spreadsheet which I'll put up here, and so you can let me know how to get it to you later.

(Exhibit 106 marked for identification)

My first question is whether you have seen this spreadsheet before?

A.   I have not.

Q.   Are you familiar with Google Vault and its function within Nexo's Google Workspace environment?

A.   I am not.

Q.   What is Yassen's full name and job title?

A.   If we're talking about Yassen Damyanov, as I answered earlier today, in the early days of -- is

Q.   So directing your attention to rows 305 through 308, they say: period 1 days after modification. Then: apply only to deleted objects, false type docs. And then: label conditions, label Ret is present.

My question is if you know what "label Ret" is?

A.   I don't know.

Q.   Do you know who created it?

A.   I do not.

Q.   Do you know who would have been able to tag documents with label Ret?

A.   Since I don't know what label Ret is I don't feel like I'm able to answer your question.

Q.   Okay.

And then here it's the -- essentially in rows 76 through 79, a similar type of entry, but it says the label Rom, R-O-M, is present.  Do you know what Rom is?

A.   I don't know.

Q.   Do you see here there's some emails that reference Shane Morton, Jason Morton, and Owen Morton?

A.   I see Shane and Jason, a third name I did not hear correctly perhaps -- a-ha, yes.

Q.   245 and 246.

A.   I can see that.

Q.   Do you know who they are?

A.   Yes.

Q.   Who are they?

A.   Former clients of Nexo.

Q.   And did they sue Nexo at some point in time?

A.   They brought the claim against Nexo which was settled and resolved in full.

Q.   Was it settled before November 2, 2024?

A.   I don't have the exact date of settlement with them.

Q.   Do you know why Nexo would delete emails regarding the Mortons?

MR. SHELTON:  Objection, assumes facts.  I'm also gonna object because this is beyond the scope of the 30(b)(6) designation and has nothing to do with the current lawsuit.  You can answer, if you can.

A.   The cell that you have highlighted on the spreadsheet appears to be in some sort of commands and code language that are foreign to me, so I cannot even comment whether what you have said is correct, that this suggests deletion of anything.

BY MR. TAYLOR-COPELAND:

Q.   So you're not personally aware of Nexo's deletion of any emails related to the Mortons during litigation with them?

A.   I am not.

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH
Date: April 2, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

## ANTONI ANTONIEV TRENCHEV - VOL. II

## CONFIDENTIAL

**CERTIFIED COPY**

Reported by:
GEORGIA GOULD



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q.   What inquiries or subpoenas did Nexo preserve documents in response to?

A.   Well, there have been many inquiries, and requests, so I couldn't pinpoint specific instances. But this is standing policy at Nexo.

Q.   Do you know for sure that Nexo did anything to preserve documents or communications in response to any inquiries or subpoenas from regulators?

A.   I believe I have memories of us doing that.

Q.   Just briefly we're going to go back to exhibit 106 which I'll put up on the screen here.

A.   Ah, right.

Q.   So in row 354, column H, do you see it says, "terms from Kalin@Nexo.io," and then above it it says "terms to Kalin@Nexo.io," is Kalin@Nexo.io Kalin Metodiev?

A.   Yes.

Q.   Do you know why Nexo would change retention settings for Mr. Metodiev's email in January of 2024?

A.   I do not know that, no.

Q.   Mr. Metodiev was the one who oversaw Nexo's OTC desk.  Correct?

A.   Correct.

Q.   Did he also oversee Nexo's VIP relationship program?

A.   I think so.

Q.   So I'd like to direct your attention to row 177, column H, and there is an entry that says "subject Shane-Nexo tokens proposition".  Do you know what that was, Shane-Nexo tokens proposition?

A.   Not specifically.  I presume Shane refers to a client of ours.  I don't -- I don't have the context of that, no.

Q.   Okay.  Thank you.  We'll put that aside.

And if I could direct your attention back to exhibit 108 which we were looking at toward the end of the day yesterday.  It's the consent order.

A.   Yes.

Q.   And if you could please turn to page 3.

A.   Yes.

Q.   And the last sentence of paragraph 10 says:

"Nexo Capital did not generally evaluate the borrower's debt-to-income ratio."

Is that true?

A.   I believe so.

Q.   Did Nexo evaluate Mr. Cress's debt to income ratio before extending him a loan?

MR. SHELTON:  Objection, calls for speculation.

A.   While I'm not entirely sure, it is the nature