# Exhibit 2

# Exhibit 2

# Deposition Transcript

Case Number: 3:23-cv-00882-TSH

Date: June 17, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# KOSTA KANTCHEV

SEALED UNDER PROTECTIVE ORDER

CERTIFIED COPY

Reported by:
DARA SANOFF



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

Q.   Did you use your personal Gmail address for Nexo business?

A.   No.  I was using my Nexo account.

Q.   So you never used your personal Gmail for Nexo business?

MR. SHELTON:  Objection.  Asked and answered.

A.   I believe I just answered this question.

Q.   In 2021, did you participate in any Nexo slack channels?

MR. SHELTON:  Objection.

A.   Yes.

Q.   Do you recall any channels that you participated in?

A.   There are so many channels.

Q.   So you've participated in a lot of different channels, slack channels?

A.   I did.

Q.   Did you ever use Word or Google Docs to communicate instead of email or chat?

MR. SHELTON:  Objection, vague.

A.   How do you communicate with the world in G Drive?

Q.   So is the answer then no?

A.   The answer is that I don't understand

A.    No.

Q.    Do you have an estimate for when you first became aware of this lawsuit?

A.    No.

Q.    On December 4th, 2022, your email was placed on a 30-day auto-deletion policy, correct?

MR. SHELTON:  Objection, vague.

And I object to the terminology used.

A.    Can you repeat please?

Q.    On December 4, 2022, your email was placed on a 30-day auto-deletion policy, correct?

A.    I vaguely remember that we changed some retention policies.

Q.    And who made that decision?

A.    It was -- we're part of the Google's highest enterprise security level, Titan Security, Enterprise Security, and I've been receiving alerts with respect to government sponsored hacking attempts for my account, and it was back then it was said to this day the North Koreans which are the major North government-sponsored hacking groups are targeting crypto executives.  And we decided that it's not prudent to keep everything and at all times available. So, I at some point we started ramping up the information, the infosec team, the information

security team, and they probably started giving us some advice what to do, change retention policies. I don't remember how the decision came to be to be honest.

Q.   Ultimately, whose decision was it?  Was it your decision?

A.   I might have agreed to it.

Q.   And did you direct Yasin Damyanov to implement it?

A.   I might have agreed to him being instructed to do that, yes.

Q.   You don't think he would have implemented a retention policy changes on your mailboxes without your approval, do you?

A.   She could have done that.

Q.   If you found out --

A.   I --

Q.   Please go ahead.

A.   I generally trust people to do their job, and if they're doing their job right, it shouldn't go through me for everything.

Q.   So, before implementing this retention policy, did you discuss whether there were any categories of data that you had a legal obligation to preserve?

Workspace?

A.    I have admin permissions, yes.  They're too complex for me to understand, but I have some admin permissions there.

Q.    Are you an administrator on Nexo's Slack system?

A.    Yes.  Same answer.

Q.    When you decided to implement these retention policy changes, exactly what category of emails were you trying to get rid of to avoid this hacking threat?

A.    Sensitive documents, sensitive communication that would -- I don't know, could be used against us and the hackers always go fishing.  They pretend to be other people so if you have a counterpart they can pretend to be counterpart, this counterparty to make you click on a link, download the file.  That's how it works.

Q.    Did you understand that these retention policies would result in the deletion of all emails to and from your Nexo email address?

MR. SHELTON:  Objection.  Calls for an expert opinion.

A.    I haven't been into these technical details because I don't understand them.  I trust

SEALED UNDER PROTECTIVE ORDER

before the time this retention policy was implemented?

A.   I remember there was an investigation by the exact days I'm not really sure about them.

Q.   And was Nexo aware of the Morton litigation at that point in time?

A.   I cannot say the timeline.  Specifically, which case happened when?  For me, it's a blur. Growing company, crazy market.  I cannot even point to which year that was.

Q.   So, in that December 2022 timeframe, did you also discuss implementing retention changes to Slack?

A.   It was probably part of the same exercise that I told you about.  It was part of the campaign for information security to make sure we are safer than before.

Q.   And are you aware that Nexo implemented a four-day retention policy on its Slack direct messages?

A.   No.

Q.   Do you know who made the decision to implement the Slack direct message retention changes?

A.   I don't remember.

Q.   Did you make the decision to implement

the Slack retention changes?

A.    I don't remember.  I might have been involved, maybe not.  I just don't remember.  It was a long time.

Q.    Are you aware that on March 9, 2023, Nexo added retention rules targeting Kosta.kk@gmail.com?

A.    What does it mean?

Q.    So, are you aware that Nexo added retention rules targeting your personal email address in March of 2023?

A.    How would they add retention policy on my personal email?  That's something that only I can do.

Q.    The policy would target all emails to and from your personal email on an NEXO domain.  Are you aware of that?

A.    I don't remember.

Q.    Did you order that?

A.    I don't remember.

Q.    Why would you want to -- Nexo to delete all emails to and from your personal email address?

A.    I could only speculate which I cannot do because I really can't think of any reason right now.