# Exhibit 37

# Exhibit 37

# Nexo Services UAB

# ANTI-MONEY LAUNDERING POLICY

| | |
|---|---|
| **Legal Entity Number** | No. 305743053 |
| **Address** | Vilnius, Gedimino ave. 44A-201, Lithuania |

Contents


| | |
|---|---|
| **Preamble** | **6** |
| **Introduction and Background** | **6** |
| **AML Program** | **6** |
| **Governance** | **7** |
| **Money Laundering and Terrorism Financing** | **7** |
| **Risk-Based Approach and Risk Assessment** | **8** |
| **Due Diligence Measures** | **12** |
| **Customer Identification** | **14** |
| **Risk-Based Approach and Vigilance Measures** | **20** |
| **Ongoing Monitoring** | **24** |
| **KYC Refresh Policy** | **27** |
| **AML Officer** | **27** |
| **Training** | **28** |
| **Duty to Report in Case of Suspicion of Money Laundering and Terrorism Financing** | **30** |
| **Recordkeeping and Data Protection** | **31** |
| **Audit Policy** | **32** |
| **Audit Policy** | **32** |

## Definitions

| | |
|---|---|
| Beneficial Owner | The Natural Person who ultimately owns or controls the Customer or on whose behalf a transaction or activity is being conducted and includes but is not restricted to:<br>(a) in the case of a Legal Person other than a company whose securities are listed on a recognised stock exchange, a Natural Person who ultimately owns or controls, whether through direct or indirect ownership or control, 25 % or more of the shares or voting rights in the Legal Person;<br>(b) in the case of any Legal Person, a Natural Person who otherwise exercises ultimate effective control over the management of the Legal Person; or<br>(c) in the case of a Legal Arrangement, the trustee or other person who exercises ultimate effective control over the Legal Arrangement |
| Business relationship | Any arrangement between two or more persons where:<br>(a) the purpose of the arrangement is to facilitate the carrying out of transactions between the persons concerned on a frequent, habitual or regular basis; and<br>(b) the total amount of any payment or payments to be made by any person to any other person in the course of that arrangement is not known or capable of being ascertained at the time the arrangement is made. |
| Close associate | A natural person who is known to be the Beneficial Owner or to have joint beneficial ownership of a legal person or a legal arrangement, or any other close business relations, with a politically exposed person or a local politically exposed person; and a natural person who has sole beneficial ownership of a legal entity or legal arrangement which is known to have been set up for the de facto benefit of a politically exposed person or local politically exposed person. |
| Company | Nexo Services UAB |
| Cryptocurrency | A digital representation of value that is not issued or guaranteed by a central bank or a public authority, is not necessarily attached to a legally established currency and does not possess a legal status of currency, but is accepted by natural or legal persons as a means of exchange and which can be transferred, stored and traded electronically. |

| | |
|---|---|
| Cryptocurrency ATM | An automated machine used to exchange fiat currency for bitcoin and/or other virtual currency, and vice versa. |
| Customer/Client | A person who is in a Business Relationship, or is carrying out a One-off Transaction, with the Company. |
| Dark wallet | A browser-based extension wallet, that seeks to ensure the anonymity of Bitcoin transactions. |
| Darknet market | Dark web sites with illicit goods for sale, such as drugs, stolen information, and weapons. The transactions in darknet markets are anonymized. |
| Family member | The spouse, or a person considered to be equivalent to a spouse, of a politically exposed person or local politically exposed person; a child and their spouse, or a person considered to be equivalent to a spouse, of a politically exposed person or local politically exposed person; a parent of a politically exposed person or local politically exposed person; |
| Financial Action Task Force (FATF) | The task force established by the Group of Seven, to develop and promote national and international policies to combat Money Laundering and Terrorist Financing. |
| Legal person | A company or other entity created by operation of law with separate legal personality. |
| Mixer/Tumbler | A type of anonymizer that obscures the chain of transactions on the blockchain by linking all transactions in the same bitcoin address and sending them together in a way that makes them look as if they were sent from another address. |
| Natural person | A human being, as distinguished from a company or other entity created by operation of law with separate legal personality. |
| OFAC | The Office of Foreign Assets Control of the United States Treasury Department which administers and enforces economic sanctions programs primarily against countries and groups of individuals, such as terrorists and narcotics traffickers. |
| Politically exposed person (PEP) | A natural person who is or who has been entrusted with prominent public functions including a head of State, head of government, minister and deputy or assistant minister; a member of parliament or of a similar legislative body, a member of a governing body of a |

| | |
|---|---|
| | political party, a member of a supreme court, a member of a court of auditors or of the board of a central bank; an ambassador, a chargé d'affaires and a high-ranking officer in the armed forces; a member of an administrative, management or supervisory body of a State-owned enterprise; a director, deputy director and member of the board or equivalent function of an international organisation, except middle-ranking or more junior officials |
| Risk-based approach | An assessment of the money laundering and terrorist financing risk to which the Company is exposed, and taking the appropriate mitigation measures in accordance with the level of risk. |
| Shell bank | Any institution that accepts currency for deposit and that:<br>(a) has no physical presence in the jurisdiction in which it is incorporated or in which it is operating, as the case may be;<br>(b) is unaffiliated with a regulated Financial Group that is subject to consolidated supervision; |

## 1. Preamble

The primary purpose of this program is to affirm the high anti-money laundering standards to which Nexo Services UAB ("Nexo") adheres and to serve as a guide and reference tool for these aforementioned standards. Nexo's success depends upon adherence to these standards and compliance with all applicable laws, rules, regulations, and company policies and procedures. Nexo, therefore, endeavors to be in compliance with all laws, rules, and regulations that are applicable to the businesses in which it engages. In doing so, the Company's aim is to manage legal, compliance, regulatory, and reputation risks actively, mitigating those risks and thereby seeking to prevent, detect and report suspicions of money laundering ("ML") and terrorist financing ("TF").

The Company's AML Program is consistent with both the Global and European legal and regulatory requirements and follows the guidelines and standards to protect its business from being used to facilitate ML, TF, or other illicit activities.

## 2. Introduction and Background

**2.1.** Nexo Services UAB is registered in the Register of Legal Entities of the Republic of Lithuania under reg. No. 305743053, having its seat and registered office in Vilnius, Gedimino ave. 44A-201, Lithuania

### 2.2. Scope of Activities

The Company provides financial services as described in its terms and conditions and in accordance with its licenses and/or utilizing existing exemptions for licensing requirements. The company provides lending of virtual currencies against other virtual currencies as collateral, borrowing of virtual currencies and payment of in-kind interest thereon, exchanging virtual currencies to fiat currencies and vice versa, as well as virtual currency wallet services

## 3. AML Program

### 3.1. Overview of the Program

**3.1.1.** The Company recognizes the reputational, legal, and regulatory risks posed to its business activities, customers, and the wider financial market from possible exploits for TF and the Company, therefore, is committed to complying with all relevant laws, regulations, and global

standards in order to detect, prevent, investigate and report if needed, all forms of ML and TF.

**3.1.2.** The current AML program is designed to follow the requirements of the Republic of Lithuania Law on the Prevention of Money Laundering and Terrorist Financing, relevant EU Regulations and Directives in the field of AML/CFT, other ML legislation applicable, as the case may be, as well as the best practices outlined by the Financial Action Task Force ("FATF"), and the Association of Certified Anti-Money Laundering Specialists ("ACAMS").

### 3.2. Main Pillars of the AML Program

**3.2.1.** A system of internal policies, procedures and controls adopted by the Director which includes Customer Identification Program ("CIP") outlining the customer due diligence process of the Company ("KYC") and specifying the requirements to identify beneficial ownership;

**3.2.2.** An anti-money laundering compliance unit with a designated anti-money laundering officer ("AML Officer"); and

**3.2.3.** An ongoing employee training program.

## 4. Governance

The Management Board of the Company is in charge of the implementation of the MLTFPA and the guidelines adopted on the basis thereof within the Company and, with the assistance of the AML Compliance Officer, has reviewed, endorsed, and approved the current Policy and the internal procedures.

## 5. Money Laundering and Terrorism Financing

### 5.1. Definitions

ML involves taking criminal proceeds and disguising their illegal sources in order to use the funds to perform legal and/or illegal activities. ML often involves a complex series of transactions that are difficult to separate. However, it is common to think of ML as occurring in three stages.

**5.1.1.** Stage One: **Placement** — The physical disposal of cash or other assets derived from criminal activity.

5.1.2. Stage Two: **Layering** — The separation of illicit proceeds from their source by layers of financial transactions intended to conceal the origin of the proceeds.

5.1.3. Stage Three: **Integration** — Supplying apparent legitimacy to illicit wealth through the reentry of the funds into the economy in what appears to be normal business or personal transactions.

**5.2. Conclusion**: Both terrorists and money launderers may use the same methods to move their money in ways to avoid detection, however, whereas funds destined for ML are derived from criminal activities, such as drug trafficking and fraud, TF may include funds from perfectly legitimate sources. Concealment of funds used for terrorism is primarily designed to hide the purpose for which these funds are used, rather than their source. Terrorist funds may be used for operating expenses, as well as for the actual material support of terrorist acts. Terrorists, similar to criminal enterprises, covet the secrecy of transactions regarding their destination and purpose.

## 6. Risk-Based Approach and Risk Assessment

The Company puts into practice a risk-based approach, taking into account inherent risks, risk indicators, and residual risks that persist after clarification and increased vigilance measures have been taken. The company takes a risk-based approach in assessing its customers to ensure it appropriately identifies potential ML risks affiliated with customers. A risk-based approach provides an effective, tailored, and proportionate way to manage ML and TF risks.

### 6.1. Client Risk Assessment

**6.1.1.** The Company applies risk assessment for all clients and business relationships it enters into, taking into account the inherent normal and increased risks, the ML risk indicators, and the result after required clarifications and vigilance measures. The risk assessment is applied from the initiation and throughout the existence of the business relationship and is updated periodically. The company applies different organizational and follow-up measures depending on each risk rating category derived from the risk assessment.

### 6.2. Enterprise-wide Risk Assessment ("Risk Assessment")

**6.2.1.** The Company's AML Officer has developed a comprehensive Risk Assessment of its entire business in accordance with the relevant legislative requirements and with prevailing international best practices. specifically taking into consideration the client's domicile or residence, occupation, the products and services offered as well as subjective elements.

**6.2.2.** The Risk Assessment is approved by the Director and the AML Officer of the company and is reviewed (and updated if necessary) at least annually or every time when a significant change to the Company's business or applicable regulations occurs.

**6.2.3.** The Risk Assessment follows a clearly articulated methodology, in particular, with regard to the factors under assessment, the criteria used to score and the requisite weightings used in the scoring methodologies:

- **Inherent risk assessment**: primary risk categories (1.Client risk factors; 2.Product & Services; 3.Geographies; 4.Channels; 5.Other Qualitative risks) are rated on a 3 point scale (High; Medium; Low), whereas risk sub-factors are rated on a 5 point scale (Very High; High; Medium; Low; Very Low). The results of a risk attribution questionnaire are used to calculate the overall inherent risk.

- **Control assessment:** undertakes an evaluation of both:
  - the Design of the Controls (Fully consistent; Largely consistent; Partly consistent & Insufficiently consistent); and
  - the Operating Effectiveness of the Controls (Fully effective; Largely effective; Partly effective & Insufficiently effective.

- **Residual risk assessment**: the Residual risk scoring measures the inherent risks against the mitigating controls.

**6.2.4.** The risk assessment considers all relevant inherent ML risk factors in order to determine the Company's risk profile and in turn assess the nature of mitigating controls, both from a design and operating effectiveness standpoint, in order to arrive at the residual risk, which is assessed as being within the Company's established risk appetite.

**6.2.5.** The results of the Risk Assessment have been used by the Company's Director. As a result thereof, the Director has implemented the following improvements of several key areas of the AML/CTF Controls:

- Optimization and automation of the client risk-rating process;
- Optimization of suspicious activity reports filing;
- Undergoing an external AML/CTF Audit.

### 6.3. Enhanced due diligence ("EDD")

**6.3.1.** High-risk clients, Politically Exposed Persons ("PEPs") and high-risk transactions are identified and treated with EDD

In cases where high risk is identified, additional information is requested, including but not limited to the following:

- Source of funds and wealth;
- Identifying information on individuals with control over the account, such as signatories or guarantors;
- Occupation or type of business;
- Financial statements;
- Banking references;
- Domicile;
- Proximity of the customer's residence, place of employment or place of business;
- Description of the customer's primary trade area and whether international transactions are expected to be routine;
- Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers;
- Explanations for changes in account activity; and
- Proof of address documentation (such as utility bill).

All high-risk relationships need to be approved by the AML officer prior to onboarding.

6.4. The Company requires the same global KYC and CIPs to be applied as an initial onboarding step for all of the Company's products. Upon successful completion of KYC obligations, Customers shall undergo eligibility tests in accordance with the Company's risk appetite statement and depending on the product selected and applied for, may undergo more extensive due diligence as necessary.

**6.5. Enquiries made in relation to the crypto-backed credit line product**

Prior to granting any crypto-backed credit line to a Customer, the Company shall ensure that the following additional information and documentation is collected from the Client:

- Occupation or type of business of the Client;
- Expected annual account turnover;
- Purpose of account;
- The economic purpose for requesting the crypto-backed credit line.

**6.6. Enquiries made in relation to the Earn Interest product**

Prior to allowing the Customer to deposit assets in order to take advantage of the Earn Interest product, the Company shall ensure that the following additional information and documentation is collected from the Client:

- Occupation or type of business of the Client;
- Expected annual account turnover;
- Purpose of account;
- The economic purpose for using the Earn Interest product.

**6.7. Money-Laundering Risk to the Company's Business**

Cryptoassets pose risks around criminal activity such as ML and TF because of their accessibility online, their global reach and their pseudo-anonymous nature. The Company is prone to be used as a vehicle for ML due to the nature of the collateral it holds in order to grant loans to its clients.

Since transactions carried out by the Company involve currencies that are not recognised as legal tenders, such as cryptographic currencies (Bitcoin and similar), the Company has secured sufficient technical and computing equipment to ascertain that such transactions are limited to an exclusively bipartite relationship with its contracting party.

Where digital assets are involved, cutting-edge technology by a leading third-party provider - Chainalysis Inc., is used to determine whether assets are associated with illicit activities, thus ensuring adherence to the highest possible standards.

The Company undertakes a risk assessment prior to the launch of new products, business practices, or the use of such products, practices, and technologies. Prior to the introduction of new products and services the Company considers their characteristics and the extent to which these are vulnerable to ML/FT abuse. The Company takes the additional appropriate measures and controls to manage and mitigate the associated risks.

## 7. Due Diligence Measures

**7.1.** The Company applies the following due diligence measures:

**7.1.1.** Identification of a customer or a person participating in an occasional transaction and verification of the submitted information based on information obtained from a reliable and independent source, including using means of electronic identification and of trust services for electronic transactions;

**7.1.2.** Identification and verification of a customer or a person participating in an occasional transaction and their right of representation;

**7.1.3.** Identification of the Beneficial Owner and, for the purpose of verifying their identity, taking measures to the extent that allows Nexo to make certain that it knows who the Beneficial Owner is, and understands the ownership and control structure of the customer or of the person participating in an occasional transaction;

**7.1.4.** Understanding of business relationships, an occasional transaction or act and, where relevant, gathering information thereon;

**7.1.5.** Gathering information on whether a person is a politically exposed person, their family member, or a person known to be a close associate;

**7.1.6.** Monitoring of a business relationship, including conducting ongoing due diligence on the business relationship and scrutiny of transactions undertaken throughout the course of the relationship to ensure that the transactions being conducted are consistent with the Company's knowledge of the customer, their business, risk profile, and, when necessary, the source of funds;

**7.1.7.** Where relevant, gathering information on the origin of the customer's wealth.

**7.2.** The simplified customer due diligence includes some of the elements as described below:

**7.2.1.** **Customer Identification** - full identification of a customer, including the source of funds and wealth when appropriate. The information is maintained and updated on an ongoing basis;

**7.2.2.** **Profiles** - development of transaction and activity profiles for each customer. Profiles contain sufficient information to allow for reviews of anticipated versus actual account activity or to otherwise enable the Company to identify suspicious activity based on comparing the activity to what it knows about the customer;

**7.2.3.** **Customer Acceptance** - definition and acceptance of the customer in the context of their use of specific products and services, which may differ among customers and geographic markets;

**7.2.4.** **Risk Assessment** - assessment and grading of risks posed by the customer's account relationship. Numerous factors are considered when determining risk (e.g., customer type, products and services, transactional activity, and geographic locations). No single factor alone is used to determine risk (except where such single factor constitutes an impermissible activity, such as violating economic sanctions or a business that is engaged in illegal activity);

**7.2.5.** **Monitoring** - account and transaction monitoring based on the risks posed;

**7.2.6.** **Investigation** - investigation and examination of an unusual customer or account activity, which shall be consistent with the anticipated activity for each customer based on their occupation or type of business.

### 7.3. Due diligence on financial intermediaries

7.3.1. Prior to establishing a business relationship with a financial intermediary, the Company conducts due diligence on the intermediary in order to verify that these intermediaries are licensed and supervised for compliance with AML/CFT requirements that are consistent with international standards, and have adequate measures to comply with those requirements.

7.3.2. The Company shall obtain a reasonable understanding of the intermediary, including its ownership structure, business model, target clientele, and reputation in the market. This can be done by obtaining and reviewing the intermediary's AML/CFT policies and procedures and internal audit reports.

7.3.3. The Company shall conduct background searches, including name and adverse media screening on all known parties connected to the intermediary, including but not limited to its owners, directors, authorised representatives, and signatories.

## 8. Customer Identification

8.1. The Company verifies the identity of the contracting party, of all its lasting business relationships which are subject to the AML procedure, that is, those which are not limited from the outset to the performance of one-off activities subject to the AML procedure, and shall do so as from the establishment of contractual links.

The Company confirms, at onboarding, the nature and purpose of the business relationship wanted by the customer. The Company has created a process to clarify the economic background and the purpose of a transaction or of a business relationship if it appears unusual. To assist in determining the level of AML/CFT due diligence to be exercised with regard to the customer, a "compliance" risk profile is calculated first of all on entry into relations /low, medium, and high/, and is then recalculated on an on-going basis.

8.2. The Company has delegated the identification of natural persons and Beneficial Owners of legal entities to Jumio Inc.. Jumio Inc. is incorporated and registered in the United States of America with company number 4786355 whose registered office is at 1971 Landings Drive, Mountain View, California 94043,

U.S.A. and is certified by the Payment Card Industry (PCI) Data Security Standard under certificate number 773536986180627. It uses highly reliable technical means for the identification of a person and verification of the person's identity, including facial checks, that guarantee truthful identification of a person and make it possible to prevent the alteration or misuse of the forwarded data.

**8.3. The Company Shall Obtain the Following Information for Natural Persons:**

**8.3.1.** Legal name (first and last) and any other names used (such as maiden name, former legal name, or alias);

**8.3.2.** Complete residential address and, on the basis of risk, also the business address or post office number;

**8.3.3.** Landline or mobile telephone numbers and email address;

**8.3.4.** Date and place of birth, and gender;

**8.3.5.** Nationality and residency status;

**8.3.6.** Occupation, position held, and name of employer;

**8.3.7.** An official personal identification number or another unique identifier;

All of the above information is verified using reliable, independently sourced documents and data.

Documentary verification procedure includes:

- Confirming the identity from an unexpired official document that bears a photograph of the customer;
- Confirming the date and place of birth from an official document;
- Confirming the validity of the official documentation through certification by an authorized person; and
- Confirming the residential address.
- Non-documentary verification procedure includes:
- Contacting the customer by telephone or by letter to confirm the information supplied;
- Checking references provided by third parties; and
- Using an independent information verification process, such as by accessing public registers, private databases, or other reliable

independent sources.

**8.3.8.** The Company has published information about the technical conditions for the identification of a person and verification of a person's identity with information technology means on its platform. A natural person or the legal representative of a legal entity identifies themselves when entering the platform and confirms upon the establishment of a business relationship and the conclusion of a transaction on an occasional basis that they have read the information about the use of information technology means on the Company's website and agree to the conditions of identification of a person and verification of person's identity with information technology means.

**8.3.9.** Where the original document is not available, the identity can be verified on the basis of one of the above documents which have been authenticated by a notary or certified by a notary or officially, or on the basis of other information originating from a credible and independent source, including means of electronic identification and trust services for electronic transactions, thereby using at least two different sources for verification of data in such an event.

**8.3.10.** If the identification of a person and verification of a person's identity with the help of information technology means upon the establishment of a business relationship is considered unsuccessful the Company rejects the application of the natural person or the legal representative of a legal entity for the conclusion of a transaction.

**8.4. The Company Shall Obtain the Following Information for Legal Persons**

**8.4.1.** The name or business name of the legal person, legal form status, and proof of incorporation;

**8.4.2.** The registry code or registration number and the date of registration;

**8.4.3.** The unique identification number for tax purposes (TIN);

**8.4.4.** The names of the director, members of the management board or other body replacing the management board, and their authorisation in representing the legal person;

**8.4.5.** Permanent address of the principal place of the legal person's business activities registered address;

**8.4.6.** The details of the telecommunications of the legal person, including mailing address, contact e-mails, and telephone numbers;

**8.4.7.** The identity of legal entities and partnerships, which are entered in an official Register of the State in which they are legally organized, shall be verified upon the basis of an up-to-date extract from this Register;

**8.4.8.** The identity of legal entities and partnerships which are not entered in an official Register shall be verified upon the basis of other probating documents, e.g. articles of association, deed or contract of foundation, official authorisation to exercise an activity, attestation issued by the firm's bodies, or an extract from a database kept by a trustworthy private company;

**8.4.9.** When a business relationship is established with a simple partnership, the contracting party is identified by verifying the identity of at least one partner;

**8.4.10.** A representative of a legal person of a foreign country must submit a document certifying his or her powers, which has been authenticated by a notary or in accordance with an equal procedure and legalised or certified by a certificate replacing legalisation (apostille), unless otherwise provided for in an international agreement;

**8.4.11.** When the contracting party is a legal entity or a partnership engaged in an operational activity or a subsidiary majority controlled by such a partnership, the Company shall obtain from the contracting party a written declaration indicating the surname, the first name, and the address of permanent residence of the natural persons that control at least 25% of the voting rights or the capital of the partnership;

**8.4.12.** If the partnership is not controlled by these persons, The Company shall obtain from the contracting party a written declaration indicating who the natural persons are who control the partnership in any other manner whatsoever, for example, due to a predominant position, preferential voting rights, a shareholders' agreement, or a contract;

**8.4.13.** If it is not possible to identify such controlling owners, The Company shall obtain from the contracting party a supporting document or a written declaration indicating the surname, the first name, and the address of permanent residence of the person or persons responsible for operational general management of the legal entity or the partnership. Identification of the controlling owner shall always apply in the case of lasting business relationships;

**8.4.14.** The financial situation of the legal person;

**8.4.15.** Nature and purpose of activities of the legal person and its legitimacy.

**8.4.16.** Trusts (or equivalent, such as foundation entities) are required to provide:

**8.4.17.** Certified copy of trust deed or agreement (or equivalent constitutional document);

**8.4.18.** Certified copies of any applicable resolutions, powers of attorney or authorisation letters authorising the purchase;

**8.4.19.** A list of the identities of each of the settlor(s) (the person(s) whose property was settled on trust); the protector (if any - not all trusts make such an appointment); the enforcer (if any - not all trusts make such an appointment); the beneficiaries (if any - where trusts are for a broad charitable purpose, for example, they may not have natural person beneficiaries), and any other natural person exercising ultimate effective control over the trust (including through a chain of control/ownership);

All of the above information is verified using reliable, independently sourced documents and data.

Documentary verification procedure includes:

- Obtaining the documents as indicated hereinabove regarding the status of the legal person; and
- Reviewing a copy of financial statements (audited, if available).

Non-documentary verification procedure includes:

- Undertaking a company search and/or other commercial inquiries to ascertain that the legal person has not been, or is not in the process of being, dissolved or terminated;

- Using an independent information verification process, such as by accessing public corporate registers, private databases, or other reliable independent sources (e.g., lawyers, accountants);
- Validating the legal entity identifier and associated data in the public access service;
- Obtaining prior references;
- Visiting the legal person, where practical; and
- Contacting the legal person by telephone, mail, or email.

**8.5.** The Company shall obtain the presentation of originals or certified true copies of the documents used for the verification. The documents presented shall be valid or, if their validity is not defined, be dated within the past twelve months, unless they are documents that are not subject to renewal.

**8.6.** In the case of legal entities and partnerships: If the official Register subject to the supervision of a state authority, in which they are entered, is accessible by computer and continuously updated, the Company shall also verify the identity by means of acceding itself to this official Register, and downloading and printing itself the extract from this Register.

**8.7.** The Company shall keep in the file of the business relationship photocopies of the documents presented to it or prints of those downloaded by it; these documents shall be dated and countersigned by it on the day of their receipt or download.

**8.8.** It is the policy of the Company to request certified copies of documentation that allows the identification of Beneficial Owners and cross-checks such information with openly available public information.

**8.9.** Once the Beneficial Owner has been identified, his personal identification document is screened via Jumio Inc. which verifies the person's identity information against PEP, Sanctions, and material adverse media watchlist provided by using the database of ComplyAdvantage.

**8.10.** The Company will not carry out any transaction before the documents and information required to identify the Beneficial Owner of the assets that are the subject of the business relationship are obtained in full. If the contracting party is unwilling to provide the required documentation, as to the identity of the Beneficial Owner, the company will refuse to establish the business relationship or, if necessary, immediately break it off.

**8.11.** The Company will immediately put an end to the business relationship if it becomes evident or a justified suspicion exists that the Company has been deceived in respect to the identity of the client, the controlling owner, or the Beneficial Owner.

## 9. Risk-Based Approach and Vigilance Measures

### 9.1. Prohibited Assets

The Company will not accept assets where the Company knows or could assume that assets originate from crime or qualified tax evasion, even if this crime or offense was committed abroad.

### 9.2. Prohibited Relationships

The Company will not enter into business relationships:

**9.2.1.** With persons or companies who finance terrorism (or are suspected to) or are criminal organizations, or part of or support such organizations;

**9.2.2.** With an unidentified or anonymous person until their identity is satisfactorily verified;

**9.2.3.** With persons or companies subject to sanctions or other restrictive measures listed in the official watch lists of sanctioned persons and entities including, but not limited to the OFAC, EU, and UN lists;

**9.2.4.** With persons or companies domiciled in prohibited jurisdictions[1];

**9.2.5.** With banks that are not physically present at the place of incorporation (fictive banks/ shell banks) unless they are part of a supervised and adequately consolidated financial group;

**9.2.6.** With a person whose capital consists of bearer shares or other bearer securities.

### 9.3. High-risk Business Relationships

[1] The Company does not enter into business relationships with persons or companies with domicile or residence or registered office in the following jurisdictions: Afghanistan, Burma (Myanmar), Côte d'Ivoire, Cuba, Eritrea, Iran, Iraq, Lebanon, Sierra Leone, Central African Republic, Democratic Republic of Congo
Democratic People's Republic of Korea, The Crimea region of Ukraine, Libya, Republic of the Congo, Somalia, Sudan, South Sudan, Syria, Venezuela, Yemen, Zimbabwe.

The Company has developed criteria to flag high-risk business relationships based on:

**9.3.1.** Domicile or residence of the contractual party, the controlling person or the Beneficial Owner of assets as well as the nationality of the contractual party or the Beneficial Owner of assets;

**9.3.2.** Type of business activities and place of business of the contractual party and/or the Beneficial Owner of the assets;

**9.3.3.** Material negative news about a client or its connected person. The scope of the adverse media is not limited to allegations or convictions related to criminal activity, a client's bad reputation is enough to raise the risk level attributed to the client;

**9.3.4.** Client's ownership structure that is unnecessarily complex, difficult to understand, and/or containing entities that can be used to conceal the beneficial ownership.

**9.4. The Company deems the following business relationships high risk:**

**9.4.1.** Business relationships with foreign politically exposed persons (PEPs);

**9.4.2.** Business relationships with family members and close associates of politically exposed persons;

**9.4.3.** Business relationships with foreign banks where the Company acts as a respondent.

**9.5. A business relationship is deemed to be high risk if it displays any of the risk criteria above in combination with one or more criteria below:**

**9.5.1.** Business relationships with local politically exposed persons (PEPs)

**9.5.2.** Business relationships with politically exposed persons who hold leading functions in intergovernmental organizations

**9.5.3.** Business relationships with persons who are close to persons described in the two paragraphs above

**9.5.4.** Business relationships with politically exposed persons who hold leading functions in sports organizations

Onboarding a high-risk business relationship requires the approval of the Director as well as additional documents proving the source of wealth and source of funds.

**9.6. High-risk Transactions**

**9.6.1.** The Company has developed criteria to recognize high-risk transactions based on:

**9.6.1.1.** The amount of assets used as a collateral

**9.6.1.2.** Significant deviations from normal transaction types, volumes, and/or frequencies for the business relationship in question

**9.6.1.3.** Significant deviations compared to transaction types, volumes, and/or frequencies customary for loan transactions.

**9.6.2.** Once a business relationship exhibits high-risk traits, the Company will request clarifications which include but are not limited to obtaining written or verbal information from the customer and consulting publicly accessible sources and databases. The Company shall conclude on and document these as quickly as possible.

## 10. Procedure for Entering into a Business Relationship

The procedure for acceptance or refusal of a business relationship is applied to each business relationship which is subject to the AML procedure. Regarding new business relationships, the procedure must be completed before any transaction is carried out.

**10.1. First Level: Customer Officer**

**10.1.1.** As from the first contact, the Company shall endeavor to acquire a good knowledge of its client. Preparation of the file for entering into a business relationship shall be the responsibility of the person in direct contact with the client (first level of control), who must make sure that all the documents and information required by the AML laws as well as the Company's internal directives are gathered. The person in direct contact with the client must, in particular, identify the contracting party or the natural person or persons who control the contracting party where it is a legal entity or a partnership and obtain the required identity documents concerning them; obtain an in-depth description of the activity of the contracting party and the Beneficial Owner and of the origin of the

assets which are the subject of the business relationship; complete the form for entering into a business relationship and attach to the file any exchange of correspondence with the client (letters, faxes, e-mails, special instructions, etc.); detect business relationships and transactions which require clarification or increased vigilance, or show indicators of ML.

**10.1.2.** If a lasting business relationship or if clarification or increased vigilance are required, or if there are indicators of ML or TF, the file opened when entering into the business relationship, duly completed, shall be forwarded to the AML Officer.

**10.2. Second Level: the AML Officer**

**10.2.1.** The AML Officer shall examine the form for entering into the business relationship and the documents gathered by the customs officer upon the basis of which he shall issue a recommendation to the Director to accept or refuse the business relationship, with an indication of the reasons. He shall in particular verify that the extent of the information collected is adequate in accordance with the risk of the business relationship.

**10.3. Third Level: Company Director**

**10.3.1.** The acceptance or refusal to enter into a business relationship shall be the responsibility of the Company Director. If the refusal to enter into a business relationship is the result of reasons or circumstances relating to the use of criminal proceeds or TF or to the commission of related offenses or an attempt thereof or with regard to which the Company suspects or knows that it constitutes ML or TF or the commission of related offenses, the Director and the AML Officer shall conduct an investigation and report the suspicion of ML and TF to the relevant competent authority.

**10.4.** Potential clients are screened through police records or equivalent, sanctions lists and lists containing information about financial crimes, ML, TF, fraud, and other offenses before onboarding.

The Company considers all the sanctions falling into one of the following categories:

- **Targeted sanctions:** aimed at specifically named individuals, such as key leaders in a country or territory, named terrorists, significant narcotics traffickers, and proliferators of weapons of mass destruction. These sanctions often include the freezing of assets and travel bans where possible;

- **Sectoral sanctions:** aimed at key sectors of an economy to prohibit a very specific subset of financial dealings within those sectors to impede future growth;

- **Comprehensive sanctions:** generally prohibit all direct or indirect import/export, trade brokering, financing, or facilitating against most goods, technology, and services. These are often aimed at regimes responsible for gross human rights violations and nuclear proliferation.

The sanctions list screened by the Company includes, but is not limited to the OFAC, EU, and UN lists.

### 10.5. Form for Entering into a Business Relationship

The Company Director approves of a form for entering into a business relationship which comprises the information to be collected by the customer relations officer prior to acceptance of a business relationship by the Director. This information shall subsequently be completed and updated throughout the entire business relationship.

## 11. Ongoing Monitoring

### 11.1. Ongoing Customer Due Diligence

The Company shall conduct ongoing monitoring to identify and report suspicious transactions and, on a risk basis, maintain and update customer information, including information regarding the beneficial ownership of legal entity customers, using the customer risk profile as a baseline against which customer activity is assessed for suspicious transactions.

The Company performs ongoing real-time PEP and sanctions lists screening of all clients. The Company is instantly notified of any change in the PEP or sanctions status of the client allowing it to ensure immediate reaction which could suggest emerging risk for the business, reassessment of the risk level attributed to the client, or a reason to discontinue the business relationship.

The Company performs real-time adverse media screening for negative news related to all its clients. Negative news deemed material by the Company result in increased vigilance regarding the client.

**11.2. Ongoing Monitoring Consists of:**

- Checking of transactions made in a business relationship in order to ensure that the transactions are in concert with the Company's entity's knowledge of the customer, its activities, and risk profile;
- Regular updating of relevant documents, data, or information gathered in the course of application of due diligence measures;
- Identifying the source and origin of the funds used in a transaction.

**11.3.** In economic or professional activities, paying more attention to transactions made in the business relationship, the activities of the customer and circumstances that refer to criminal activity, ML or TF or, that are likely to be linked with ML or TF, including to complex, high-value and unusual transactions and transaction patterns that do not have a reasonable or visible economic or lawful purpose or that are not characteristic of the given business specifics;

**11.4.** In economic or professional activities, paying more attention to the business relationship or transaction whereby the customer is from a high-risk third country or, whereby the customer is a citizen of such country or whereby the customer's place of residence or seat or, the seat of the payment service provider of the payee is in such country or territory.

**11.5. The Ongoing Transaction Monitoring is Conducted on Two Levels:**

**11.5.1.** Any loan request is subject to a due diligence procedure performed by the customer relations officer. Determination of the unusual nature of one or more transactions essentially depends on a subjective assessment, in relation to the knowledge of the customer and his/her behaviour on the Company's platform. Any officer must inform immediately the AML officer of any atypical transactions that they observe and cannot attribute to a lawful activity or source of income known of the customer;

**11.5.2.** The first line of control is supplemented by a risk-based automated second line of control, including increased monitoring of transactions of clients considered as high risk.

**11.5.2.1.** The monitoring is conducted using a high-performance standard market tool known as Know Your Transaction (KYT), supported by the Company's IT department. The KYT tool is a real-time anti-ML compliance solution for monitoring cryptocurrency transactions.

KYT provides real-time transaction monitoring of cryptocurrency activity to identify high-risk behavior. Alerts are generated whenever a transfer involves a risky counterparty and crosses a value threshold and are based on factors such as category, service, direct versus indirect exposure, the direction of funds, and amount. The KYT software continuously collects data on high-risk cryptocurrency addresses associated with darknet markets, dark market wallets, sanctioned cryptocurrency addresses, stolen funds, scams, ransomware, gambling services, mixers/tumblers, cryptocurrency ATMs, high-risk exchanges, and fundraising for illicit or violent activity.

**11.5.2.2.** After an alert is generated by the system, it automatically uncovers the digital trail associated with the address and the chain of interconnected cryptocurrency addresses allowing for the identification of potential suspects in investigations.

**11.6.** To accompany these due diligence measures, other more structural measures are progressively put in place.

## 12. KYC Refresh Policy

**12.1.** KYC Refresh represents the process of updating Client data so as to ensure compliance with the applicable AML/CTF legislative framework and guidelines and mitigation of the risks for the Company associated with ML, TF, and other forms of financial crime.

**12.2.** The Company has implemented a formal scheduled KYC Refresh process which follows a Risk-Based Approach - relevant information is updated as per the Customer's risk profile (Low, Medium, High) and in accordance with the following timescale:

- **High risk clients:** once a year
- **Medium Risk**: every 2 years
- **Low Risk**: Every 3 years

**12.3.** Relevant documentation for the purposes of KYC Refresh is identified by the AML Officer who conducts identification of outdated data pertaining to each Client, in accordance with the Client's risk profile.

## 13. AML Officer

### 13.1. The Role

**13.1.1.** The AML Officer has the necessary powers to act effectively for the purposes of establishing the Company's AML Program. The AML Officer has good knowledge of all applicable ML regulations and matters and maintains it by regular attendance of training programs, conferences, and webinars.

**13.1.2.** The AML Officer consults specialists outside of the Company when he is faced with complex situations beyond his level of competence.

### 13.2. Duties

**13.2.1.** The AML Officer is the main point of contact for ML matters for the Company's staff and competent regulatory and supervisory authorities.

**13.2.2.** The AML Officer reviews the Company's internal directives in ML matters and advises staff on this subject. The AML officer ensures the internal directives and regulations are followed and the Company is compliant on ML matters.

**13.2.3.** The AML Officer ensures that the Company's duty to report is followed and the appropriate measures are executed in case of doubt or founded suspicion of ML or TF, particularly as far as the notification of the relevant competent authority is concerned.

**13.2.4.** The AML Officer defines the parameters of the transaction monitoring system and ensures that the notifications generated by this system are processed.

**13.2.5.** The AML Officer ensures the Company is compliant with the record-keeping obligations.

**13.2.6.** The AML Officer ensures the ML training requirement for the Company's staff is met.

**13.2.7.** The AML Officer reports to the Director any breach of the ML rules by staff members.

**13.2.8.** The AML Officer should not monitor the risks of the business relationships of which he is operationally in charge.

**13.2.9.** The AML Officer promotes the culture of compliance within the Company.

## 14. Training

### 14.1. Persons Subject to ML Training Obligation

The Director, the AML Officer and all staff responsible for ML matters are subject to ML training obligations.

The scope of training also includes the following Company's staff: legal staff; financial staff; payments staff; treasury staff; operations staff; independent testing staff; customer support staff, etc.

### 14.2. ML Training Knowledge Areas for the Above Individuals

**14.2.1.** General background and history pertaining to ML controls, including the definitions of ML and TF;

**14.2.2.** The legal framework of ML and TF;

**14.2.3.** Penalties for AML/CFT violations, including criminal and civil penalties, fines, jail terms, as well as internal sanctions, such as disciplinary action up to and including termination of employment;

**14.2.4.** Internal policies, such as customer identification and verification procedures and policies, including customer due diligence, enhanced due diligence, and ongoing due diligence;

**14.2.5.** Review of the internal AML/CFT and sanctions risk assessments;

**14.2.6.** Legal record-keeping requirements;

**14.2.7.** Suspicious transaction monitoring and reporting requirements;

**14.2.8.** Currency transaction reporting requirements;

**14.2.9.** Methods of reaction when faced with a suspicious customer or transaction;

**14.2.10.** Methods of response to customers who want to circumvent reporting requirements;

**14.2.11.** Duties and accountability of employees;

**14.2.12.** Maintaining confidentiality with AML-related matters;

**14.2.13.** AML trends and emerging issues related to criminal activity, TF, and regulatory requirements;

**14.2.14.** Real-life ML schemes (preferably cases that have occurred at the Company or companies having similar scope of activity), including how the pattern of activity was first detected, its impact on the Company, and its ultimate resolution.

**14.2.15.** Duty to report and freezing of assets.

The AML Officer ensures training content is reviewed and updated in line with the regulations and best practices. The training is ongoing and on a regular schedule. Existing employees falling within the above-indicated groups attend an annual training session. New employees receive appropriate training with respect to their job function and within a reasonable period after joining or transferring to a new job. Situations may arise that demand an immediate session, such as an examination or audit that uncovers serious ML control deficiencies, changes in software, systems, procedures, or regulations, etc.

The AML Officer maintains a copy of the completion of the annual training for each employee.

The AML Officer takes additional steps to promote the Anti-money laundering policy via team meetings and periodic updates on the intranet and via email. He maintains a record of the steps that have been taken to raise awareness.

## 15. Duty to Report in Case of Suspicion of Money Laundering and Terrorism Financing

Where The Company identifies in economic or professional activities, a professional act or provision of professional service activity or facts whose characteristics refer to the use of criminal proceeds or TF or to the commission of related offenses or an attempt

thereof or with regard to which the Company suspects or knows that it constitutes ML or TF or the commission of related offenses, it must report it to the relevant competent authority immediately, but no later than within two working days after identifying the activity or facts or after getting the suspicion.

**15.1.** The AML Officer shall immediately inform the Director in those cases.

**15.2.** The AML Officer shall draft without delay a report intended for the relevant competent authority, enclose his report and the available documents making the report explicit. Failure to report is an offense that is subject to sanctions.

**15.3.** If the Company does not exercise its right to report even though it has doubts about the business relationship involving substantial assets, it shall duly document its reasons not to report. If the Company decides to continue the business relationship while under investigation, it will keep it under strict surveillance in order to examine and record the ML and/or TF indicators.

**15.4.** The AML Officer shall remind the Director and every employee involved in the investigation of the ML suspicion case, as well as all staff members likely to be in contact with the client under investigation, of the obligation of secrecy towards the client and any third parties, excluding competent supervisory authorities and law enforcement agencies, as to the existence of the founded suspicion, their reporting and the precept made by the relevant competent authority or about the commencement of criminal proceedings.

**15.5.** Informing the client that there is an ongoing investigation or disclosing any details of it known as "tipping off" could impede the investigation and is subject to sanctions.

## 16. Recordkeeping and Data Protection

**16.1.** In order to comply with ML regulations the company keeps all documents related to its business relationships with clients during the entire period of the contractual relationship, and thereafter for 5 /five/ years from its termination. The Company also keeps documents relating to transactions in which it has participated within the framework of a business relationship and for 5 /five/ years after their completion. When several transactions form a whole, the period of 5 /five/ years shall run from completion of the last one.

**16.2.** The documents are kept on a reliable computer storage device, organised, and kept available in a safe place that is rapidly accessible, so that they can be easily

consulted by the authorities responsible for criminal prosecution and ML supervision.

**16.3.** The complete list of all business relationships is subject to the AML procedure from the AML Register. The records in the register are updated annually by the AML Officer by keeping the history of the modifications made.

**16.4.** The AML Register includes a section updated by the AML Officer which contains the following data:

**16.4.1.** The status of the verifications of the identity of the contracting party and the identification of the Beneficial Owner;

**16.4.2.** The clarifications carried out concerning specific transactions, with an indication of the dates, conclusions, recommendations, and deadlines for regularising matters;

**16.4.3.** Any possible judicial or administrative proceedings which have concerned the business relationship in AML matters (reports to the authorities, requests for information or freeze by the authorities, etc.);

**16.4.4.** The business relationships requiring increased vigilance; the degree of consistent risk applicable to the business relationship;

**16.4.5.** The periodic checks that the register is kept correctly, carried out by the AML Officer at least annually.

**16.5.** The Company has adopted a comprehensive data protection policy in order to comply with the applicable data protection regulations.

**16.6.** Upon expiry of the retention periods referred to in section 15.1, the Company shall delete the personal data, unless the legislation regulating the relevant field establishes a different procedure. On the basis of a precept of the competent supervisory authority, data of importance for prevention, detection, or investigation of ML or TF may be retained for a longer period, but not for more than five years after the expiry of the first time limit.

## 17. Audit Policy

**17.1.** It is the policy of the Company to conduct independent testing (an audit) administered by internal and/or external auditors, consultants, or other independent, qualified independent parties to assess the Company's

compliance with AML/CTF regulatory requirements, relative to its risk profile, and assess the overall adequacy of the Company's AML Compliance Program.

**17.2.** The Company shall conduct independent testing every 12 months. In case of significant changes in the Company's risk profile, systems, compliance staff, or processes, or when errors or deficiencies in some aspect of the AML Compliance Program have been identified more frequent independent testing may be appropriate.

**17.3.** Independent testing of specific AML/CTF requirements is to be risk-based and evaluate the quality of risk management related to ML, TF, and other illicit financial activity risks for significant operations across the organization. Risk-based independent testing focuses on the Company's risk assessment to tailor independent testing to the areas identified as being of greatest risk and concern and is based on the Company's size or complexity, organizational structure, the scope of activities, risk profile, quality of control functions, geographic diversity, and use of technology. Risk-based independent testing is to include evaluating pertinent internal controls and information technology sources, systems, and processes used to support the AML Compliance Program. In addition, consideration is to be given to the expansion into new product lines, services, Customer types, and geographic locations through organic growth or merger activity. The independent testing is to evaluate the overall adequacy of the Company's AML Compliance Program and the Company's compliance with AML.CTF regulatory requirements. This evaluation helps inform the Director and Senior Management of weaknesses, or areas in need of enhancements or stronger controls. Typically, this evaluation includes an explicit statement in the report(s) about the Company's overall compliance with BSA regulatory requirements. At a minimum, the independent testing is to contain sufficient information for the reviewer (e.g., Director, Senior Management, AML Officer, review auditor, or an examiner) to reach a conclusion about the overall adequacy of the AML Compliance Program.

**17.4.** To contain sufficient information to reach this conclusion, independent testing of the Company's AML Compliance Program and AML/CTF regulatory requirements are to include, at a minimum, a risk-based review of whether:

1. The Company's AML risk assessment aligns with the Company's risk profile (products, services, customers, and geographic locations).

2. Relevant changes in Company activities since the last independent test.

3. The Company's policies, procedures, and processes for AML compliance align with the Company's risk profile.

4. The Company adheres to its policies, procedures, and processes for AML compliance.

5. The Company complies with AML/CTF recordkeeping and reporting requirements.

6. The Company's overall process for identifying and reporting suspicious activity is adequate. This review may include evaluating filed or prepared SARs to determine their accuracy, timeliness, completeness, and conformance to the Company's policies, procedures, and processes.

7. The Company's information technology sources, systems, and processes used to support the AML Compliance Program are complete and accurate. These may include reports or automated programs used to:

   A. Identify large currency transactions, aggregate daily currency transactions, record monetary instrument sales and funds transfer transactions, and provide analytical and trend reports.

   B. Training is provided for appropriate personnel, tailored to specific functions and positions, and includes supporting documentation.

   C. The Director took appropriate and timely action to address any violations and other deficiencies noted in previous independent testing and regulatory examinations, including progress in addressing outstanding supervisory enforcement actions, if applicable.

8. Suspicious activity monitoring systems and the system's ability to identify potentially suspicious activity are sufficient. Although there are no specific regulatory requirements for the development of an independent test, the independent testing is to include, as applicable, an evaluation of:

A. The system's methodology for monitoring transactions and accounts for potentially suspicious activity.

B. The system's ability to generate monitoring reports.

C. Filtering criteria, as appropriate, to determine whether they are reasonable, tailored to the Company's risk profile, and include higher-risk products, services, Customers, and geographic locations.

D. Policies, procedures, and processes for suspicious activity monitoring systems.

9. Overall suspicious activity monitoring and reporting processes are sufficient. Although there are no specific regulatory requirements for the development of an independent test, the independent testing is to include, as applicable, an evaluation of:

   A. The identification or alert process.

   B. The management of alerts, research, SAR decision making, SAR completion and filing, and monitoring of continuous activity.

   C. Policies, procedures, and processes for referring potentially suspicious activity from all operational areas and business lines to the personnel or department responsible for evaluating potential suspicious activity.

10. The independent testing performed was adequate, relative to the Company's risk profile.

Auditors are to document the independent testing scope, procedures performed, transaction testing completed, and any findings. All independent testing documentation and supporting work papers are to be available for examiner review. Violations, exceptions to Company policies, procedures, or processes, or other deficiencies noted during the independent testing are to be documented and reported to the Director and the AML Officer in a timely manner. The Director and the AML Officer are to track deficiencies and document progress implementing corrective actions.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Antoni Trenchev

Director          Antoni Trenchev

HELLOSIGN

# Audit trail

| | |
|---|---|
| **TITLE** | Please sign AML policy for Mano.Bank |
| **FILE NAME** | Nexo Services UAB AML Policy.pdf |
| **DOCUMENT ID** | 414a2ce7a38433bfa6609030f4757af6299101e2 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document history

| | | |
|---|---|---|
| SENT | **09 / 13 / 2021**<br>07:44:14 UTC | Sent for signature to Antoni Trenchev (antoni@trenchev.com) from george.i.manolov@gmail.com<br>IP: 94.155.136.135 |
| VIEWED | **09 / 13 / 2021**<br>07:51:20 UTC | Viewed by Antoni Trenchev (antoni@trenchev.com)<br>IP: 78.83.69.195 |
| SIGNED | **09 / 13 / 2021**<br>07:51:32 UTC | Signed by Antoni Trenchev (antoni@trenchev.com)<br>IP: 78.83.69.195 |
| COMPLETED | **09 / 13 / 2021**<br>07:51:32 UTC | The document has been completed. |