James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

*Counsel for Plaintiff John Cress*

**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN CRESS,<br><br>                        Plaintiff,<br><br>                v.<br><br>NEXO CAPITAL INC.,<br><br>                        Defendant. | Case No. 3:23-CV-00882-TSH<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TERMINATING SANCTIONS OR, IN THE ALTERNATIVE, CURATIVE SANCTIONS PURSUANT TO FED. R. CIV. P. 37(e), 37(b), AND THE COURT'S INHERENT AUTHORITY**<br><br>Hearing Date:   August 20, 2026<br>Hearing Time:  10:00 a.m.<br><br>Courtroom:      San Francisco Courthouse<br>                        Courtroom E – 15th Floor<br>                        450 Golden Gate Avenue<br>                        San Francisco, CA 94102 |

**TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................................1

II. ARGUMENT........................................................................................................1

    A. Nexo's Preservation Duty Reached the ESI It Destroyed...................................1

    B. Nexo Did Not Take Reasonable Steps — It Took Affirmative Steps in the
        Wrong Direction ..........................................................................................4

    C. The Destroyed ESI Is Lost and Cannot Be Restored or Replaced ......................5

    D. The Record Compels a Finding of Intent to Deprive..........................................8

    E. Prejudice Is Presumed and Proven .................................................................13

    F. Rule 37(b) and Inherent Authority Independently Support Sanctions ..............13

    G. The Merits Deflection Is Irrelevant and Backwards ........................................14

    H. The Requested Relief Is Tailored and Warranted.............................................15

III. CONCLUSION.....................................................................................................15

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

## TABLE OF AUTHORITIES

**Cases**

*Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730 (N.D. Ala. 2017)..................................3

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337 (9th Cir. 1995)............................14

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009) .............................15

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132 (N.D. Cal. 2012) ................................1, 2, 4

*CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488 (S.D.N.Y. 2016) ...........................................6

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).................................................................................14

*Drips Holdings, LLC v. Teledrip, LLC*, No. 5:19-CV-2789, 2022 WL 4545233 (N.D. Ohio Sept. 29, 2022) .....................................................................................................................................................5

*Facebook, Inc. v. OnlineNIC Inc.*, No. 19-cv-07071-SI (SVK), 2022 WL 2289067 (N.D. Cal. Mar. 28, 2022) ...................................................................................................................................................15

*Fast v. GoDaddy.com LLC*, 340 F.R.D. 326 (D. Ariz. 2022)..................................................................13

*Gregory v. Montana*, 118 F.4th 1069 (9th Cir. 2024)...........................................................................13

*In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981 (N.D. Cal. 2023) ...........................4, 15

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006)..............................2, 3, 4

*Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730 (9th Cir. 2024)..................................1, 4, 8, 9, 13, 14, 15

*Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) .........................................................8, 11, 13, 15

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543 (N.D. Cal. 2018) ...........................4

*Red Wolf Energy Trading, LLC v. Bia Cap. Mgmt., LLC*, 626 F. Supp. 3d 478 (D. Mass. 2022) ......13

*WeRide Corp. v. Huang*, No. 5:18-cv-07233-EJD (NC), 2020 WL 1967209 (N.D. Cal. Apr. 24, 2020) .........................................................................................................................................5, 10, 15

**Rules**

Fed. R. Civ. P. 37(b) ...............................................................................................................................13

Fed. R. Civ. P. 37(b)(2)(C) .....................................................................................................................15

Fed. R. Civ. P. 37(e) ..........................................................................................................................13, 15

Fed. R. Civ. P. 37(e)(1).............................................................................................................................13

Fed. R. Civ. P. 37(e)(2).....................................................................................................................4, 8, 15

Nexo's Opposition concedes the key facts. Nexo does not dispute that: (1) in December 2022, it switched its two managing partners' emails from indefinite retention to 30-day auto-deletion rules that purged matching emails from every mailbox in the company, Mot. at 6-7; Kunkel Rep. at 6-7; (2) it placed every Slack direct message on a four-day deletion cycle at the same time, Damyanov Tr. 81:16-84:14; (3) two days after the Complaint was filed it placed its Slack channels on a 60-day purge, and ten days after, it extended the email rules to the founders' *personal* accounts, Kunkel Rep. at 4, 8, 11-12; (4) it never issued a litigation hold or attempted recovery, Greetham Tr. 89:11-90:12; Trenchev Tr. 108:4-9, 127:6-10; and (5) the purged data is unrecoverable, Greetham Tr. 87:22-88:12.

The Opposition never answers the two questions at the center of this Motion. Why did Nexo write its deletion rules? No document says, and no witness provides a credible explanation. Infra § II.D. And what did Nexo do to preserve? Its claim that it "gathered and preserved all Cress-related material," Opp. 3-4, rests solely on a 30(b)(6) designee who could not say who collected anything, when, how, or what it captured. Trenchev Tr. 42:17-45:4, 43:7-9; infra § II.B.

Against that record, Nexo offers two defenses. First, it says its duty to preserve was no broader than the four corners of Cress' 2021 demand letter. But the duty to preserve runs to the *subject matter* of reasonably anticipated litigation and its key players, not to the legal labels a claimant has pleaded so far. *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1137 (N.D. Cal. 2012). In any event, the argument cannot explain most of the destruction, which occurred *after* Cress filed this case and continued through years of discovery. Second, Nexo says it produced 63,866 documents. The Ninth Circuit has already answered that argument: "production of some evidence does not excuse destruction of other relevant evidence." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). What remains is Nexo's own say-so: uncorroborated justifications that shift from witness to witness. Infra §§ II.C-II.D. On remedy, Nexo stakes everything on zero, Opp. 25, never arguing that any lesser measure could cure this record. It has thus offered nothing to weigh against terminating relief once intent is found—as this record requires.

## II. ARGUMENT

### A. Nexo's Preservation Duty Reached the ESI It Destroyed

1

**The demand letter framed the subject matter, not a ceiling.** A party must preserve what it "knows or reasonably should know is relevant" to reasonably foreseeable litigation, including as to the "key players" and subject matter of the anticipated dispute. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067-68 (N.D. Cal. 2006); *Apple*, 881 F. Supp. 2d at 1137. The October 2021 demand letter placed Nexo's unlicensed lending, its VIP Relationship Program, Plaintiff's OTC transactions, and his liquidations squarely at issue. Opp. 3. The subject matter the letter identified leads directly to the ESI Nexo destroyed. The VIP Program and OTC desk were created and overseen by managing partner Kalin Metodiev, who approved the very brochure the letter challenged. Dinca II Tr. 6:2-23, 15:1-16:22; Mot. at 19-20. Trenchev and Kantchev ran the company, set sales goals and its public "#ZeroFees" message, and received demand letters *personally*. Ambrose Dec. ¶ 23, Ex. 23.

**The post-Complaint destruction ends the scope debate.** Nexo's assertion that the filing of the "original Complaint" in February 2023 "did not broaden Nexo's preservation obligations" refutes itself. Opp. 19. The Complaint named Trenchev as a defendant, identified both founders by name, and pleaded securities and fraud claims putting the NEXO Token's sale, marketing, and regulatory status—and the VIP Program, OTC transactions, and liquidations—directly at issue. ECF 1. If that Complaint did not broaden Nexo's obligations, nothing could. Nexo admits it knew of the filing by March 1, 2023. RFA Resp. Nos. 726-727. What followed was not preservation but escalation: the Slack-channel purge, the founders' personal email accounts, the new nexo.com domain, Metodiev's accounts, additional organizational units, the one-day label purges, and nearly 100 emails targeted by subject line and unique message ID, infra § II.D (timing)—all while the rolling 30- and 60-day rules destroyed mail and messages through Nexo's January 30, 2026 disclosure. Mot. at 6-8; Kunkel Rep. at 4-12. No "hindsight" is required to know that a defendant sued for securities fraud must stop purging its named managing partners' communications. Cf. Opp. 19-20.

**Nexo's argument that Plaintiff's SAC cannot "retroactively" expand its obligations, Opp. 20, misses the point.** The RICO, fee, and theft claims arise from the same OTC transactions and liquidations identified in 2021, Mot. at 20, including what Nexo charged on them. Moreover, Cress' initial Complaint alleged that Nexo's "exclusive OTC services," promising "some of the best rates on

the market," were illusory because Nexo took days to execute his purchases at unfavorable prices. ECF 1 at ¶ 68.

**The "other cases" argument (Opp. 14-15, 20-21) attacks a straw man.** Plaintiff does not contend that *Morton*, *Jeong*, or the regulatory investigations created his rights; his own demand letters and this Complaint did. Mot. at 3-4, 17. But the other proceedings matter for three independent reasons, none of which Nexo answers.

*First*, they establish what litigation was reasonably foreseeable. Foreseeability is objective, and litigation need be only "probable." *In re Napster*, 462 F. Supp. 2d at 1068-70 (duty attached before suit was filed and persisted after dismissal because "there were several indicators that they would be sued again."). More so here. By December 4, 2022, Nexo did not face the distant possibility of litigation over someone else's conduct: it had received numerous demand letters about its own liquidation and VIP practices, was defending an active class lawsuit in this District over its liquidation practices and fees,[1] and was responding to SEC and state investigations concerning the same Token sales and marketing at issue here.[2] Mot. at 3-4; Ambrose Dec. ¶¶ 18-25, Exs. 16-25. A reasonable company in that position preserves its managing partners' communications on those subjects; it does not write new deletion rules targeting them. *See Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 741-42 (N.D. Ala. 2017).

*Second*, the other matters prove knowledge and intent: Nexo claims it issued a litigation hold in *Morton*, Trenchev Tr. 81:7-17, and its own policy required suspension of disposal upon anticipated litigation, infra § II.B. Nexo knew how to preserve when it chose to. Infra § II.D.

*Third*, the deletions Nexo attributes to *Morton* destroyed ESI independently subject to a preservation duty here. The label and targeted-email purges ran mid-2024 through early 2025, during

---

[1] Cress fell within two of the *Jeong* class definitions: "[a]ll persons who reside in the United States and who maintain accounts or wallets with Nexo" and "[a]ll persons who reside in California and who, as a result of Nexo's violations of the UCL as set forth in this Amended Complaint, suffered losses from their use of Nexo's Crypto Credit service."

[2] Nexo argues that these inquiries focused on the "irrelevant Earn Interest Product." Opp. at 21. Not so. The 2020 investigation centered exclusively on the NEXO Token, *see* Section II.C, and the later investigations involved both the Earn Product and "Nexo's offers, sales, and/or distributions of digital assets." *See* Ambrose Dec. Ex. 19.

3

court-ordered discovery here. Infra § II.D; Mot. at 12-14. The duty ran to the documents, not to the caption: a defendant may not sort its executives' files into "other case" and "this case" piles and burn the first. Rule 37(e)(2) requires intent to deprive "an adverse party," not the movant by name. *Jones*, 95 F.4th at 735. Judge Donato thus found intent from Google's enterprise-wide chat-deletion regime aimed at no particular adversary. *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 993-94 (N.D. Cal. 2023) (Google "intended to subvert the discovery process"). Destroying documents to defeat one court's ordered disclosure of these same custodians' files is willful destruction to avoid discovery; the identity of the courtroom does not launder the purpose. *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543 (N.D. Cal. 2018), answers a different question — whether pre-notice loss may be sanctioned — and Nexo ignores the half of the opinion holding that related litigation triggers the duty: the disputed custodian "received a litigation hold" for the related Terix matter years before HPE sued. Id. at 551-52. Oracle extended holds to overlapping custodians; Nexo wrote deletion rules targeting them.

And Nexo's assertion that "there has been no allegation or finding in any of these other cases . . . that Nexo failed to preserve or produce documents," Opp. 15, is false. On the Mortons' "missing documents" application, the Commercial Court ordered Nexo to "re-conduct its disclosure exercise" as to management, compliance, payments, and sales-team communications and the documents of Trenchev, Metodiev, and Nikolov—and to pay £125,000 in costs. Ambrose Dec. Ex. 11.

**B. Nexo Did Not Take Reasonable Steps — It Took Affirmative Steps in the Wrong Direction**

Nexo's own description of its "standard" practice—indefinite preservation of email and Drive documents—concedes that every rule at issue was a targeted departure, adopted after the duty attached. Opp. 6. Its Data Retention and Disposal Policy required that "[a]ny further disposal of documents shall be suspended" upon anticipated litigation, but its expert conceded Nexo "didn't suspend . . . the policy" and instead "added many rules" during this case. Greetham Tr. 155:11-157:3; Ambrose Dec. Ex. 29. In case after case cited by both sides, courts imposed severe sanctions on parties that did no more than leave an existing retention setting running: *Apple*, 881 F. Supp. 2d at 1146, 1150-51 (adverse inference); *In re Google Play Store*, 664 F. Supp. 3d at 993-94 (intent to deprive); *In re Napster*, 462

4
PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

F. Supp. 2d at 1070, 1077-78 (preclusion, adverse inference, and fees). Nexo's conduct sits beyond all of them: it did not inherit a deletion policy and fail to switch it off; it authored its rules during litigation. If leaving a switch on warrants severe sanctions, installing one mid-case compels them. The defendant that, like Nexo, adopted new destruction practices mid-litigation had its Answer struck. *WeRide Corp. v. Huang*, No. 5:18-cv-07233-EJD (NC), 2020 WL 1967209, at *11-*12 (N.D. Cal. Apr. 24, 2020).

Nexo's claim that it "actively collected" everything that mattered is unsubstantiated. Its 30(b)(6) designee could not say when any collection occurred, who performed it, how it was run, or what it captured beyond Hristov's account. Trenchev Tr. 40:3-24, 42:17-45:4, 81:18-82:8. Nexo has no litigation hold notices, no preservation memoranda, and no documentation of any collection. Mot. at 14 (RFPs 269-270, 290-291); Trenchev Tr. 121:1-129:10. The only Slack export anyone could identify occurred in March 2025—two years in, after years of rolling deletions. Damyanov Tr. 64:13-65:11; Ambrose Dec. ¶ 47.[3]

The Slack "Business+" excuse fails three times over: Google Vault—where the founders' emails lived—had a litigation-hold feature that would have "take[n] precedence over retention rules," and Nexo never used it, Greetham Tr. 89:11-90:12; channel settings allowed five-year retention, and Nexo set almost all to zero, Kunkel Rep. at 4; Greetham Tr. 92:20-93:9; and exports were always available—Nexo ran one in 2025. Damyanov Tr. 64:13-65:11. The problem was never a missing feature; Nexo affirmatively shortened retention two days after this suit was filed. *See Drips Holdings, LLC v. Teledrip, LLC*, No. 5:19-CV-2789, 2022 WL 4545233, at *5 (N.D. Ohio Sept. 29, 2022) (intent inferred where a party shortened Slack retention with no credible explanation).

**C. The Destroyed ESI Is Lost and Cannot Be Restored or Replaced**

Nexo's production statistics do not put one founder email from 2021 back in the record. Its composition tells the real story: Slack—Nexo's primary means of communication—accounts for just 300 of the 63,866 documents (0.47%), only 42 of which date from 2018 through 2021. Shelton Dec.

---

[3] Indeed, only after Plaintiff identified gaps did Nexo "double check[]" its legacy support system and produce seven more Cress-specific documents on June 26, 2026 — four days before the cutoff, including the chat the Opposition leads with (NEXO-0370459). Opp. Ex. 17 at 2-3.

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

¶¶ 4, 8; Supp. Ambrose Dec. ¶ 4. The zeros are undisputed: *zero* Slack direct messages predating August 2024, Ambrose Dec. ¶ 46; *zero* messages from 1,309 of 1,347 disclosed Slack channels (98.9%) — including "spread-mark-up" and "forced-liquidations," Ambrose Dec. ¶ 48, Ex. 34; virtually no emails from Trenchev, Kantchev, or Metodiev, Mot. at 5; and no backups or recovery efforts, Trenchev Tr. 108:4-9, 127:6-10. Nexo's expert agrees quantifying the purged data "would almost be impossible" — "[b]ecause they're gone." Greetham Tr. 87:22-88:12, 104:25-105:19.

Nexo's assertion that Plaintiff "makes no allegation that relevant material was lost," Opp. 9, ignores the Motion's category-by-category showing: Trenchev's internal SEC-investigation communications; Metodiev's emails concerning the VIP Program and OTC desk he ran; every Slack direct message predating August 2024; the named fee and liquidation channels; and the founders' customer communications. Mot. at 5, 11-12, 19-20 (Slack notification emails showing tens of thousands of messages per month, including discussions of the Token's regulatory status, never produced). The Opposition answers none of it. Nexo's refrain that it "produced all Cress-related Slacks," Opp. 10, 22, is unsupported and, by Nexo's own doing, untestable. No declaration describes who searched Slack, when, with what terms, or against what corpus. And completeness is unverifiable in principle: the denominator—the messages that existed before Nexo's four-, 30-, and 60-day cycles ran—is gone.

Nexo's "nine emails" narrative proves Plaintiff's point. Nexo targeted those nine communications for deletion by subject lines, including "All OTC deals Part 1" and "amending templates used by the sales team." Opp. 12 n.10; Kunkel Rep. at 9-10. Copies survived only where the rules could not reach. And *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016), on which Nexo relies, imposed sanctions despite surviving near-duplicates. Here there are no substitutes at all. Nexo's productions and privilege log confirm the rules executed as written: what survives are forwards and replies, not the originals. Nexo's expert conceded the produced "All OTC deals Part 1" document "is a forward" that "is not the same" as "the original document" and "can have additional content"; of the "amending templates" emails, only a "response" appears on the privilege log. Greetham Tr. (Reply) 207:2-209:8, 215:3-23, 220:7-222:8; ECF 133 at 2 n.1. A forward can add,

6

alter, or strip content and attachments. Supp. Ambrose Dec., Ex. 6 (Kunkel Tr. 168:6-23, 173:4-13). So even as to the nine documents Nexo could partially reconstruct, its own record shows deletion, plus differences no one can now measure.

**The destroyed documents bear on Nexo's own conduct and defenses.** Cress' securities claims turn on Nexo's sale of the NEXO Token to U.S. purchasers, on what Nexo understood about the Token's registration status when it told Cress the Token was "registered with the SEC as a security," and on the Rule 506(c) exemption—an affirmative defense it bears the burden of establishing. ECF 100; ECF 37 at 13. So too his fraud claims: internal VIP Program and fee communications bear on falsity, knowledge, intent, and reliance. None of these subjects is confined to "Cress"; they lived in the three managing partners' emails and the Slack channels Nexo purged. The Court acknowledged as much in ordering production of documents concerning the Token's creation and marketing, regulator communications, the VIP Program, OTC pricing, and liquidation practices— categories whose most probative documents would never mention "Cress." Mot. at 5 (ECF 69). A channel named "spread-mark-up" did not need to say "Cress" to bear on whether management directed and concealed the markups.

The fragments that survived measure the loss. Nexo's internal records track the on-and-off switch for U.S. retail sales of the NEXO Token—"stopped for retail, [but] OTC continued," then "started again for retail." Supp. Ambrose Dec. Ex. 1. The founders set those policies, Trenchev Tr. 162:13-163:1; Dinca Tr. 394:1-395:17, and the places they discussed them are named in Nexo's own channel list: "nexo-token," "usa," "otc-trading," "sales-compliance," and "regulatory-struggles." Ambrose Dec. ¶ 48, Ex. 34. Nexo has not produced one message from any of them.[4] Nexo's contention that Cress cannot identify "specific, relevant, unique ESI that was lost," Opp. 1, is simply wrong. For example, a March 2022 email shows that Nexo and Trenchev used the "USA slack channel" to discuss how to announce that they were "putting on hold the buy, sell and swap features of our Exchange for

---

[4] The pattern holds across the production: the substantive internal documents Nexo did produce are largely spreadsheets and standalone document files — formats its email and Slack deletion rules did not reach — not the mailbox and message data the rules destroyed.

the NEXO Token . . . for U.S. clients" following a settlement with the SEC. *Id.* at Ex. 33. Those messages bear on whether Nexo sold the NEXO Token to U.S. retail clients on its Exchange—and thus on its Rule 506(c) exemption. Those exemption questions are answered by Nexo's internal practice, not Cress' transaction file. Nexo's own expert cannot say whether his list of U.S. purchasers is even complete. Supp. Ambrose Dec. Ex. 2 (Valentine Tr. 184:5-186:15). The records that would have completed it are gone. A party that bears the burden of proving its own compliance cannot carry it by eliminating the evidence of what it did. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). Similarly, Trenchev's 2020 exchanges with the SEC about its investigation into "Nexo's Reg D filing, Nexo's token, Nexo's dividend" survive only because the SEC produced them on Plaintiff's subpoena. Nexo's internal side of that conversation is gone: not one email or message about the SEC's inquiry, Nexo's response, or the work to "ensure that no inaccurate depictions of fact are present" that Trenchev promised the SEC. Ambrose Dec. Ex. 16; Mot. at 19.

## D. The Record Compels a Finding of Intent to Deprive

Intent under Rule 37(e)(2) means "willful destruction of evidence with the purpose of avoiding its discovery by an adverse party," and may be inferred from circumstantial evidence, including "the timing of destruction, affirmative steps taken to delete evidence, and selective preservation." *Jones*, 95 F.4th at 735. Here the evidence is direct as well as circumstantial.

**Direct evidence.** Kantchev admits he instructed Damyanov to implement the deletion policy targeting his emails. Kantchev Tr. 115:14-116:11, 118:1-7; Damyanov Tr. 38:11-20. Damyanov testified that Kantchev directed the purge of the founders' *personal* accounts days after this case was filed, Damyanov Tr. 122:20-125:14, and that the August 2024 and February 2025 label purges were "a task given by the legal department so that some specific documents [could] be purged from the Google system" during this litigation. Damyanov Tr. 115:7-17, 116:1-6. No one ever instructed him to preserve anything or suspend a single rule. Damyanov Tr. 40:20-22, 41:1-4, 123:22-125:14.

**Timing and targeting.** Slack channels two days after the Complaint; the founders' personal emails ten days after; Metodiev weeks after the Court sustained the core claims; label and message-ID purges during discovery—including the "rom" rules while the parties briefed the custodian dispute

under Court order. Mot. at 6-8; Kunkel Rep. at 8-12. And targeting unique RFC 822 message IDs demonstrates "a deliberate decision to delete one particular email, which requires someone to have identified that specific email in advance." Kunkel Rep. at 11.

**Selective preservation.** Nexo's own chart of surviving Slack threads, Opp. 8-9, demonstrates the third *Jones* factor: Nexo *chose* what to keep. It screenshotted select threads involving Hristov that contained Cress' account number or email address—apparently not even searching his name—while extinguishing the channels where the fees on those transactions were discussed. Supp. Ambrose Dec. ¶ 7. Consider what the chart says the surviving threads contain—accreditation checks, "OTC transaction info," withdrawal-limit changes, Opp. 8-9—and what they do not: nothing about the liquidation of Plaintiff's eight-figure portfolio, the Liquidation Relief Program he was promised, or why relief never came—though Nexo maintained channels named "forced-liquidations" and "team-liquidations." Ambrose Dec. ¶ 48, Ex. 34. There are zero Slack messages from May 4-June 7 and June 12-29—when all of Cress' liquidations took place and most of his unheeded pleas were sent. On Nexo's account, its employees executed the defining events of this case without exchanging one surviving internal message about them. The deletion rules supply the likelier explanation: those messages existed, and the rules Nexo implemented two days after this case was filed destroyed them.

**The justifications are pretext, which is itself evidence of intent.**

*The FTX "de-risking" story.* Nexo's assertion that the Motion "does not consider" Trenchev's justification, Opp. 5, is false. Mot. at 10-11. Trenchev claims the December 2022 email rules were cybersecurity "de-risking" after FTX's collapse. But the rules applied to precisely two people, Trenchev Tr. 100:12-15; violated Nexo's own written policy, Ambrose Dec. Ex. 29; were adopted without consulting legal or compliance, Trenchev Tr. 92:16-20; and are uncorroborated by any document (RFP 290). Ambrose Dec. ¶ 27, Ex. 27. FTX collapsed under its own fraud, not a data breach—and its founder was accused of the same auto-deletion tactic. Ambrose Dec. Ex. 39. Trenchev could not even say who ordered the policy. Trenchev Tr. 92:6-10 ("who specifically pulled the trigger . . . I couldn't say"). The Opposition treats the story as a liability: it confines the rationale to the two founders' corporate mailboxes and ventures none for anything that followed—not their personal

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

accounts, not Metodiev, not Slack. Compare Opp. 4-5 with Opp. 5, 11-12. A rationale whose own sponsor hedges it, whose author no witness can name, and whose scope shrinks with every rule it needs to excuse is not a fact; it is a litigation construct. *See WeRide,* 2020 WL 1967209, at *9 (terminating sanctions for "willful[]" and "bad faith" spoliation where a company kept auto-deletion running and adopted ephemeral messaging as "more secure").

*The four-day "mistake."* Nexo tells the Court the Slack DM setting was "accidentally adjusted." Opp. 5. Its support is Trenchev's guess: "four days was a mistake . . . I think somebody might have wanted to type in 40 and they missed a zero." Trenchev Tr. 110:20-22. Nexo's 30(b)(6) witness did not know who implemented the rule, did not ask, and testified that no one "would have been able to confirm what happened four years ago." Trenchev Tr. 110:18-20, 111:16-21. And the "correction" was a 30-day rolling purge that kept destroying every DM in the company throughout this litigation; none predating August 2024 has ever been produced. Damyanov Tr. 83:6-84:14; Ambrose Dec. ¶ 46. An unexplained rule that destroyed every DM in the database, "remedied" by a rule that continued the destruction, is not a typo. Nexo downplays these mass DM deletions because "the deposition testimony . . . does not show that Nexo personnel used Slack DMs to communicate about customers or customer transactions." Opp. 10. Not so: Dinca testified that DMs were part of the account-manager workflow and that he believed he discussed "VIP customers" and related issues with Hristov and Metodiev by DM. Dinca Tr. 391:11-21, 394:1-395:17.

*The unexplained channel purge.* Nexo has no explanation at all for the Slack-channel rule it adopted two days after the Complaint was filed. Mot. at 7, 11. Nexo cannot say who authorized it. Trenchev Tr. (Reply) 114:11-22. The Opposition offers no business rationale and no account of the timing; it says only that "channel-specific" settings *might* have preserved something. Opp. 9-10. But Nexo never established that any such setting was in effect in March 2023. Supra § II.B. Worse for Nexo, its defense of the direct-message purge—that Plaintiff's transactions "were executed through group emails and Slack threads (not DMs)," Opp. 5-6—is an admission that the channels are where the relevant communications lived. Those are the channels Nexo put on a 60-day cycle for the rest of this litigation, and from 98.9% of which it has produced **zero messages**. Ambrose Dec. ¶ 48, Ex. 34.

10

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

*"Morton, not Cress."* Nexo's only sworn-adjacent support is an objection—to an interrogatory it refused to answer—asserting that the labeled documents "were produced in the Morton action and thereafter deleted following entry of a confidential settlement agreement." Opp. Ex. 29 (Resp. to ROG 24). The objection is demonstrably false. The LabelRet purge ran August 30-31, 2024 and the "rom" purge February 17, 2025—months before Morton settled on June 6, 2025, and in the middle of the English court's order to "re-conduct its disclosure exercise" as to Trenchev's and Metodiev's documents. Greetham Tr. 126:10-134:19; Ambrose Dec. ¶¶ 13-14, Exs. 11-12. Greetham admitted his contrary opinion was "what I was told," and could not defend it when shown the orders. Greetham Tr. 126:10-15, 128:2-3, 131:7-134:19. Even on its own terms, the story is damning: deleting a UK court's ordered disclosure materials mid-case—the same executives, the same relationship manager—is not a defense to spoliation; it is more of it.

Nexo's appeal to "a different discovery regime," Opp. 21, fares no better. English law imposed the same duty, expressly including suspension of deletion processes. CPR Practice Direction 57AD ¶¶ 3.1(1), 4.1-4.3 (party that "knows that it is or may become a party to proceedings" has "an obligation to suspend relevant document deletion or destruction processes").[5] All of Nexo's deletions post-date the September 2022 Morton filing; whatever the regime, purging the same executives' files mid-case violated it. The difference is not a defense; it is a second set of obligations Nexo disregarded.

Nexo's refrain that "[t]here is no evidence that these targeted deletions related in any way to Cress or his claims," Opp. 13, deserves particular scrutiny: Nexo is the reason no more evidence exists. When Plaintiff sought discovery to test the label explanations, Nexo refused, telling this Court that an interrogatory identifying the deleted emails "is impossible to comply with because any deleted documents no longer exist." ECF 133 at 6. Having called that identification "impossible," Nexo cannot defeat sanctions because Plaintiff has not identified what the labels destroyed. A spoliator "can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon*, 464 F.3d at 959.

Nexo told this Court it "was entitled to change its retention policies or delete documents,

---

[5]    https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part-57a-business-and-property-courts/practice-direction-57ad-disclosure-in-the-business-and-property-courts.

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

provided they were not relevant to *this* lawsuit," ECF 133 at 5, and that Morton's connection to this case is "that both claimants used the OTC desk and had the same relationship manager." *Id.* at 6. By Nexo's own test, everything turns on the contents of what it deleted—contents its 30(b)(6) designee, administrator, and expert each disclaim knowing. Trenchev Tr. 137:5-18; Damyanov Tr. 116:18-117:13, 119:11-20; Greetham Tr. 102:13-103:2. And when Nexo believes evidence helps it, it produces it. Google Drive "would have audit logs showing who applied the LabelRet and rom labels" and to which files. Greetham Tr. 65:5-66:24. If those logs showed only spam and irrelevant documents, Nexo would have printed them and narrowed this Motion. Its silence is a choice, and the ordinary inference from that choice applies.

Moreover, Nexo's assertion that *Morton* has nothing in common with this case is refuted by the record. Opp. 21. The Mortons were pilot members of the same program Nexo later marketed to Cress as the VIP Relationship Program: Hristov recruited them in June 2020 into "the pilot of an account management program" with access to "over the counter" transactions. Supp. Ambrose Dec. Ex. 3 (*Morton* Defence ¶ 9(i) (Trenchev-verified)). Their claims arose from OTC NEXO purchases executed the same week as Plaintiff's first, under the same OTC procedures "established by the Defendant's management team." Supp. Ambrose Dec. Ex. 4 (*Morton* Updated Part 18 Response 1, 2(b), 2(e) (Trenchev-verified)). Nexo's contrary description of *Morton* cites none of this; it rests on a one-minute November 2022 news item. Opp. 14 & n.11.

*"Not customer-facing."* The claim that the founders "would have little to no relevant documents," Opp. 4, is refuted by fragments third parties kept: Kantchev's written "personal liquidation-free guarantee" to a VIP; his use of kosta.kk@gmail.com to assist a customer liquidated in a 2021 flash crash; and Trenchev's SEC correspondence. Supra § II.C; Ambrose Dec. Exs. 35, 36. They also impeach Kantchev's denial that he used his "personal Gmail address for Nexo business,"

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

Opp. Ex. 15 (Kantchev Tr. 28:1-3), and beg the question: if the personal accounts held nothing, why purge them days after this case was filed? Damyanov Tr. 122:20-125:14.[6]

## E. Prejudice Is Presumed and Proven

Because the record establishes intent, no separate showing of prejudice is required under Rule 37(e)(2). *Jones*, 95 F.4th at 736. And under Rule 37(e)(1), Plaintiff need only make "plausible, concrete suggestions" about what was destroyed. *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 339 (D. Ariz. 2022). Those categories are catalogued above. Supra § II.C; Mot. at 19-20. Nexo's contrary demand that Plaintiff name the destroyed documents inverts the law. Supra § II.D. Nor does "extensive discovery" cure the loss, Opp. 23; Nexo's witnesses often professed no recollection on the very subjects the destroyed records would have answered. *Leon*, 464 F.3d at 959; Mot. at 23.

## F. Rule 37(b) and Inherent Authority Independently Support Sanctions

Plaintiff agrees Rule 37(e) supplies the standard for sanctions based on lost ESI. But it does not immunize the rest of Nexo's conduct. First, Rule 37(b) reaches Nexo's failure to obey this Court's orders. The Court ordered Trenchev and Kantchev added as custodians, ECF 65, and ordered production across defined categories — orders Nexo "complied" with by tendering custodians whose mailboxes it had been emptying on 30-day cycles for two years, its label purges running mid-briefing. Mot. at 5, 21-22.[7] Producing the husk of a court-ordered custodial file is not obedience. *See Red Wolf Energy Trading, LLC v. Bia Cap. Mgmt., LLC*, 626 F. Supp. 3d 478, 510 (D. Mass. 2022).

Second, inherent authority reaches Nexo's litigation misconduct beyond the loss of ESI. *See Gregory v. Montana*, 118 F.4th 1069, 1077-80 (9th Cir. 2024). Nexo represented to Plaintiff and this Court that Metodiev was "not relevant to Mr. Cress or his claims," while concealing that it had purged emails to or from him organization-wide and was continuing to do so. Ambrose Dec. ¶ 44, Exs. 47-

---

[6] Nexo's attacks on Mr. Kunkel, Opp. 5 n.5, 12, miss the mark: relevance and the scope of Nexo's duties are questions for the Court, not a forensic examiner. And Nexo's own expert disputes none of Kunkel's analysis, offers no opinion on intent, and cannot say any deletion was harmless. Greetham Tr. 79:12-14, 94:20-96:2, 102:13-103:2, 104:25-105:19.

[7] Nexo implemented the one-day "rom" deletion rules while the custodian dispute was briefed under earlier Court Orders, ECF 55 (1/10/25), ECF 62 (2/3/25), and two days before the Court ordered Trenchev and Kantchev added as custodians. ECF 65 (2/19/25); Kunkel Rep. at 8-9; Greetham Tr. 87:18-21, 128:18-21.

48; ECF 59 at 3. It then deflected Plaintiff's inquiries for five months before a January 30, 2026 disclosure that omitted the personal-account and Metodiev expansions. Mot. at 22-23. Deception of court and counsel to conceal spoliation is sanctionable bad faith. Chambers *v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991); *Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir. 1995).* Nexo's suggestion that Plaintiff abandoned Metodiev, Opp. 11-12, is backwards: Plaintiff requested him as a custodian in January 2025; Nexo refused with the misrepresentation above; and because all emails to or from him were deleted his centrality emerged only from Nexo's 2026 disclosures and depositions; and when Plaintiff then sought his deposition, Nexo refused to produce him as no longer party-affiliated. Mot. at 22; Supp. Ambrose Dec. Ex. 5.

## G. The Merits Deflection Is Irrelevant and Backwards

A sanctions motion is not a referendum on the merits. In any event, Nexo's exhibits show the opposite of what it claims: in the very excerpt Nexo filed, Cress testified he "believed [he] was not paying a fee with Nexo." Opp. Ex. 26 (Cress Tr.) 29:24-25. That is the deception working, not knowledge of the fraud. Whether Plaintiff was sophisticated or blamed himself in June 2021—before discovery revealed the extent of Nexo's misconduct—is a jury argument about claims already sustained, ECF 98, not a defense to destroying the internal communications about that misconduct.

The two surviving fee documents make the point. Nexo's internal OTC memorandum admits: "We tell customers Nexo does not charge commission on the [OTC] transaction[s], while in fact we do." ECF 75-5; ECF 76-6 (Ex. 2). Its internal liquidation script commands: "WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX," and coaches agents to "convince" customers "there is no mistake." ECF 75-11, ECF; 76-12 (Ex. 9). Documents like these do not materialize out of the ether: policies are proposed, drafted, circulated, and enforced. Yet Nexo has produced no communications about the drafting, implementation, or enforcement of either one. If these are the admissions that survived Nexo's rules, the Court may fairly infer what the destroyed discussion around them contained. *Jones*, 95 F.4th at 735.

## H. The Requested Relief Is Tailored and Warranted

*Jones* requires three findings: the Rule 37(e) prerequisites, intent, and the insufficiency of

lesser sanctions. 95 F.4th at 736. The first two are established above; the third follows from what was destroyed and how. An adverse-inference instruction does "not substitute for the spoliated evidence that could have built [Plaintiff's] affirmative case." *WeRide,* 2020 WL 1967209, at *11-*12 (quoting *Leon,* 464 F.3d at 960). The destroyed ESI goes to scienter—which lived in the communications Nexo purged—and to Nexo's own exemption defense, which Nexo would remain free to prove with the curated record it left standing. An instruction reaches the trial; it does not reach the two years of discovery Plaintiff conducted against a record that had been emptied. *Facebook, Inc. v. OnlineNIC Inc.,* No. 19-cv-07071-SI (SVK), 2022 WL 2289067, at *7-*8 (N.D. Cal. Mar. 28, 2022) (default where concealment and deletions continued during discovery). And it does not reach the future: Nexo never says the deletion rules have stopped—only that no order "compell[ed]" it "to suspend any retention setting." Opp. 25. For a defendant facing this exposure, an instruction is a price worth paying. Only terminating relief removes the profit from the strategy. Nexo proposes no middle ground. *Id.*

Should the Court conclude that striking the entire Answer goes too far, the Rule 37(e)(2)(A) presumption should at minimum be applied where it is dispositive: to Nexo's claimed Rule 506(c) exemption—an affirmative defense on which Nexo bears the burden, and whose proof (the executives' emails and the "usa" Slack channel) is what Nexo destroyed. Presuming the destroyed evidence unfavorable on a defense Nexo must prove defeats the defense. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 142 (S.D.N.Y. 2009) (precluding affirmative defense). Nexo nowhere contests the reasonableness or itemization of the $439,267.21 in fees and costs, mandatory under Rule 37(b)(2)(C) absent substantial justification—a showing Nexo has not attempted—and independently awardable under Rule 37(e). *See In re Google Play Store*, 664 F. Supp. 3d at 994.

### III. CONCLUSION

Nexo destroyed the communications of the three executives who ran the programs at issue, every direct message in its Slack database, and nearly all Slack channel messages—after six demand letters, during this lawsuit, and through this Court's discovery orders—and then concealed it. The Court should strike Nexo's Answer and enter default judgment.

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH

Dated: August 3, 2026

Respectfully submitted,

*/s/Max Ambrose*

James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

Counsel for Plaintiff John Cress

PLAINTIFF'S REPLY ISO MOTION FOR SANCTIONS - 3:23-CV-00882-TSH