**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

COPY

HIGH COURT

ROLLS BUILDING

OF JUSTICE

**Claim No. CL-2022-000516**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**
**BETWEEN:**

**(1) SHANE MORTON**
**(2) OWEN MORTON**
**(3) JASON MORTON**

**Claimants**

**- and -**

**(1) NEXO CAPITAL INC.**
**(a company incorporated in the Cayman Islands)**
**(2) NDS EOOD**
**(a company incorporated in Bulgaria)**

**Defendants**

_____

**RE-AMENDED DEFENCE**
_____

1.  In this statement of case:

    i.   references to paragraph numbers are to paragraphs of the Re-Amended Particulars of Claim, unless otherwise stated;

    ii.  the First Defendant ("**Nexo**") and the Second Defendant ("**NDS**") adopts the abbreviations used in the Re-Amended Particulars of Claim.  This is for the sake of convenience only, and Nexo makes no admissions thereby;

    iii. where an allegation is said to be "not admitted", Nexo and NDS is are unable to admit or deny the same, and the Claimants are required to prove that allegation.

**A.  PARTIES**

2.  Paragraph 1 is admitted.  The Claimants are all sophisticated investors who, as Nexo understands, some time before July 2020, founded their own Offshore Unlicenced Forex Technology company incorporated in Dominica, which offered or offers a trading platform for cryptoassets.  The Claimants also founded a cryptoasset related business in Estonia

1

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-E21F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

and, since January 2019, have operated a software development business in Malta called Red Acre Ltd.

3. Paragraph 2 is admitted.

4. Paragraph 3 is admitted.

5. Paragraph 4 is admitted.

6. As to paragraph 5:

   i. It is admitted that Nexo issued its own cryptocurrency, an ERC-20 token known as a 'NEXO Token'.

   ii. Nexo completed a "Form D" Notice of Exempt Offering of Securities filed with the United States Securities and Exchange Commission on 18 May 2018.

   iii. However, the statement "it provides services" is vague and not admitted. Paragraph 5 is otherwise admitted.

7. Paragraphs 6 and 7 are admitted to the extent that they are correct insofar as they refer to the proceedings referred to therein, but their relevance to these proceedings is not understood.

7A. As to Paragraph 7A:

   i. NDS is a 100% subsidiary of Nexo AG, which is an entity incorporated in Switzerland, and not a subsidiary of Nexo. NDS provides outsourcing services to Nexo through Nexo AG.

   ii. The paragraph is otherwise admitted.

**B. THE FACTS**

8. Paragraph 8 is admitted. By March 2021, the Claimants together owned around 10 times the daily trading volume of NEXO Tokens. Their wallets included the NEXO Tokens that they purchased and, in the respect of the First Claimant, NEXO Tokens received as a referral bonus from Nexo.

2

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-E21F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

9. Paragraph 9 is admitted and averred.  ~~Nexo~~ The Defendants ~~relies~~ rely on the following facts not pleaded by the Claimants:

   i.   As explained below, the First Claimant began using the Platform on 29 July 2019.  On 23 June 2020, Mr Hristiyan Hristov (Nexo's account manager) sent the First Claimant an email inviting him to take part in the pilot of an account management program, which would give participants access to 'over the counter' transactions ("**OTC**"), i.e., one to one transactions of large amounts of cryptoassets outside the regular exchange on the Platform.  Mr Hristov became the First Claimant's dedicated point of contact at Nexo.  In a phone call on 24 June 2020, the First Claimant agreed to take part in the pilot.

   ii.  On 11 July 2020, Mr Hristov informed the First Claimant that he would qualify for a premium interest rate if he increased the balance of NEXO Tokens held in the his account.  Mr Hristov offered the First Claimant a premium interest rate of 5% (instead of 4%) (the "**Premium Interest Rate Deal**").  The First Claimant accepted the Premium Interest Rate deal and deposited 1,294,117.00000000 NEXO Tokens into his account on 13 July 2020.

   iii. On 20 August 2020, Mr Hristov offered the First Claimant a further increased interest rate on BTC in his account (initially 5% and later 6%), in exchange for the First Claimant keeping his NEXO Tokens in his account for six months and for his account to comprise at least 15% of NEXO Tokens throughout that period (the "**Fixed Rate BTC Deal**").  It was a term of the Fixed Rate BTC deal that the First Claimant could not withdraw the NEXO Tokens during the six months starting from 27 August 2020 i.e, until 27 February 2021.

   iv.  On 4 September 2020, the First Claimant introduced the Second and Third Claimants to Mr Hristov via Skype.  During this conversation, the First Claimant told the Second and Third Claimants: *"now is a great time to buy Nexo"*.  As explained below, the Second Claimant opened an account on the Platform on 8 July 2020.  The Second Claimant asked Mr Hristov to give him details in relation to fixed rate deals on Nexo Tokens.  On 7 September 2020, the Second Claimant informed Mr Hristov that he wanted to opt for the Fixed Rate BTC Deal and deposited 8,533,554.00000000 NEXO

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-E21F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

Tokens into his account. It was a term of the agreement that the Second Claimant could not withdraw the NEXO Tokens in his account for six months, i.e. until 7 March 2021.

v.   The Third Claimant opened his account on the Platform on 14 September 2020. On 30 September, the Third Claimant deposited 700 BTC. On 2 October 2020, the Third Claimant also opted for the Fixed Rate BTC Deal and deposited 7,561,028.00000000 NEXO Tokens into his account on 3 October 2020. It was a term of the agreement that the Third Claimant could not withdraw the NEXO Tokens in his account for six months, i.e. until 2 April 2021.

vi.   On the basis that the First Claimant had referred the Second and Third Claimants to Nexo, the First Claimant received a referral bonus from Nexo in NEXO Tokens on 2 October 2020.

vii.   As explained below, accounts on the Platform were subject to daily withdrawal limits published on Nexo's website. This must have been known to the Claimants given that on 2 October 2020, the First Claimant asked Mr Hristov to remove the daily limit on his account because he wanted to withdraw BTC in excess of $500,000 (being the daily limit for cryptocurrency). Mr Hristov made an exception for the First Claimant and asked the payments department to increase the First Claimant's daily withdrawal limit.

viii.   Throughout October 2020, the Claimants made various additional purchases of NEXO Tokens, as set out in paragraph 8 of the Re-Amended Particulars of Claim.

ix.   Between 2 October 2020 and 13 October 2020, the Claimants negotiated additional deals with Mr Hristov whereby they would obtain a higher interest rate for EURx (a Nexo native stablecoin purported to be pegged to the Euro). The Claimants each signed an 'Additional Agreement to Nexo Earn Interest Rates and Conditions' (the "**EURx Agreements**" each a "**EURx Agreement**"). It was a term of each EURx Agreements that the Claimants would receive an additional 2% interest on their EURx (to be deposited at the end of term) in exchange for not withdrawing any EURx from their respective accounts until the end of the term, i.e., 12 October 2021.

x.   On 27 October 2020, Nexo deposited into the Claimants' accounts:

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-E21F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

a.    3,997,142.35000000 NEXO Tokens into the First Claimant's account;

b.    4,007,359.53000000 NEXO Tokens into the Second Claimant's account; and

c.    3,997,142.35000000 NEXO Tokens into the Third Claimant's account.

xi.    On 28 October 2020, Nexo introduced higher interest rates as part of its Earn Up and Earn In campaign.  As a result, it increased the interest rate on the Fixed Rate BTC Deal from 5% to 6%.  This higher rate was applied to the Claimants' accounts straight away.

xii.    On 4 December 2020, Nexo deposited 510,362.00000000 NEXO Tokens into the Second Claimant's account, followed by a further 990,732.00000000 NEXO Tokens on 8 December 2020.  The Claimants did not purchase any more NEXO Tokens after 8 December 2020.

xiii.    Between December 2020 and March 2021, the Claimants made various requests to Mr Hristov to allow them to withdraw from the Platform NEXO Tokens in excess of the daily withdrawal limits, including:

a.    On 8 December 2020, the Third Claimant told Mr Hristov via Skype that he wished to withdraw 600 BTC (worth approximately $12 million at the time), but that he was *"restricted"*.  Mr Hristov reminded the Third Claimant of the daily withdrawal limit of $500,000 for cryptocurrency.  He agreed to make an exception for the Third Claimant and increased his daily withdrawal limit to $2 mil per day until the Third Claimant was able to withdraw the 600 BTC, i.e., not on a permanent basis.  The Third Claimant also asked about how he could sell NEXO Tokens.  Mr Hristov reminded the Third Claimant of the Fixed Rate BTC Deal and explained to him that he could not withdraw NEXO Tokens until the relevant expiry date.

b.    On 10 December 2020, the Second Claimant told Mr Hristov via Skype that he wanted to withdraw 200 BTC and asked Mr Hristov to remove his daily withdrawal limit to enable him to do so.  Mr Hristov made an exception for the Second Claimant. Once the Second Claimant confirmed that the withdrawal was complete, the daily withdrawal limit was reinstated.

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

c. On 10 December 2020, the First Claimant asked Mr Hristov via Skype to remove the daily withdrawal limit for him to be able to withdraw 700 BTC. This withdrawal did not materialise.

d. On 1 February 2021, the First Claimant queried as to why there was a withdrawal limit on his account. Mr Hristov reminded the First Claimant of the Fixed Rate BTC Deal and the EURx Agreements. Mr Hristov made an exception for the First Claimant to allow him to withdraw 700 BTC on 2 February 2021.

e. On 4 February 2021, the Second Claimant wanted to withdraw a further 250 BTC. Mr Hristov made a further exception and increased the Second Claimant's daily withdrawal limit (and in fact the Second Claimant went on and withdrew 272 BTC). The daily withdrawal limit was then reinstated.

f. On 27 February 2021, the First Claimant's account was no longer subject to the Fixed Rate BTC Deal. However, it was still subject to the terms of the EURx Agreements (until 12 October 2021) and the daily withdrawal limits.

g. On 7 March 2021, the Second Claimant's account was no longer subject to terms of the Fixed Term BTC Deal. However, it was still subject to the EURx Agreements (until 12 October 2021) and the daily withdrawal limits.

h. On 18 February 2021, the Second Claimant told Mr Hristov that he wanted to withdraw the initial cryptoassets deposited i.e., around $8 mil. Knowing that the Second Claimant was interested in selling NEXO Tokens, Mr Hristov informed the Claimants about an OTC deal on 8 March 2021. A buyer was interested in buying 2.5 mil NEXO Tokens at a discount of 20%. Mr Hristov proposed that the Claimants split the deal between themselves. Mr Hristov also explained that daily withdrawal limits would be in place "as regular". The First and Third Claimants agreed to split the deal between them and each sell 1,050,000 NEXO Tokens (for $1,974,000 USDT each).

i. On 9 March 2021, the Second Claimant asked Mr Hristov to allow him to withdraw 200 BTC. Mr Hristov made an exception for the Second Claimant and allowed two consecutive withdrawals outside of the daily withdrawal limits of 100 BTC on

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

9 and 10 March 2021. The daily withdrawal limit was reinstated on 23 March 2021. The Second Claimant also asked about any further OTC opportunities.

j. Between 9 March and 22 March 2021, following Mr Hristov's agreement to increase the their daily withdrawal limits, the First and Second Claimants made substantial withdrawals of NEXO Tokens.

k. On 18 March 2021, the Second Claimant accepted an OTC deal (put forward by Mr Hristov via Telegram), whereby Nexo would purchase $250,000 worth of NEXO Tokens (at 20% off the spot price) each week for six weeks. However, the deal never materialised, as explained below.

xiv. The Third Claimant's account was still subject to the Fixed Rate BTC Deal (until 2 April 2021), EURx Agreement (until 12 October 2021) and the daily withdrawal limits.

The 23 March 2021 Deal

10. On 23 March 2021, the First Claimant converted 386,448.00 NEXO Tokens and the Second Claimant converted 1,040,139 NEXO Tokens into other cryptocurrencies, and asked Mr Hristov again for an increase of the withdrawal limit. Mr Hristov and the Claimants discussed on a call how the Claimants could best withdraw all of their NEXO Tokens in excess of the daily withdrawal limits. The First Claimant proposed a deal in the following terms: *"at 65% into usdt [sic] and all accounts unlocked so we can withdraw other assets as we decide"*.

11. Mr Hristov subsequently in the same written conversation proposed the following deals:

Option 1: Nexo to offer the Claimants 50% of the market value of the NEXO Tokens as a lump sum in USDT that could only be withdrawn in accordance with the daily withdrawal limits and be released from the EURx Agreements on 12 October 2021 ("**Option 1**");

Option 2: Nexo to offer the Claimants 40% of the market value of their NEXO Tokens in USDT, which the Claimants could withdraw immediately, as well as a release from the EURx Agreements more than six months early, withdrawable immediately ("**Option 2**").

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

12. There were further negotiations between the Claimants and Mr Hristov.  The First Claimant proposed the following deal: "*We take 40% haircut on nexo value. All converted to usdt [sic] today and we can withdraw all usdt [sic] in one go… Leave the euros mature until October.*"  Mr Hristov confirmed that if the Claimants wanted to "*settle and withdraw everything at one go, the OTC deal* [Nexo] *can provide is at 60% discount.*"

13. The Claimants chose Option 2.  On 24 March 2021, Mr Hristov confirmed that there was agreement in accordance with Option 2 (the "**Nexo Purchase Deal**").

14. The Claimants did not protest and the discussions that followed were civilised.  The Claimants did not complain about the Nexo Purchase Deal until more than six months later when they instructed their current solicitors and commenced pre-action correspondence.

## C.  THE APPLICABLE TERMS AND CONDITIONS

The Nexo Wallet Services General Terms and Conditions

15. Paragraphs 10-11 are admitted.  Nexo relies in particular on Article III, VI and XIII.  These state as follows:

> "*"III. NEXO WALLET SERVICES*
>
> *3. The access to your Nexo Account will allow you to: (i) request a Nexo Wallet Service; (ii) view your balance and Transaction History; (iii) top up, withdraw and transfer Digital Assets, for which such options are available on the Nexo Platform and in the Nexo Account, and subject to revision from time to time at our sole and absolute discretion; (iv) perform other actions in relation to the above.*
>
> *VI. Withdrawal*
>
> *1. Subject to the specific terms of the Nexo Crypto Credit General Terms and Conditions or the Nexo Earn Interest Product General Terms and Conditions, if any, you may request for: (i) withdrawal of all or part of the Digital Assets other than those used as collateral of a Nexo Crypto Credit to your personal wallet, together with the Interest accrued thereon, the latter as applicable to the Nexo Earn Interest Product only, as well as those to which certain prohibitions or limitations apply, as indicated in the Nexo Account and on the Nexo Platform; (ii) withdrawal of the fiat equivalence of certain Digital Assets together with the Interest accrued thereon, as applicable to the Nexo Earn Interest Product, or the fiat equivalence of the Digital Assets, as applicable to the Nexo Crypto Credit, by instructing Nexo to sell the relevant Digital Assets and Interest, as the case may be and if applicable, and transfer the fiat proceeds of the sale transaction to a bank account designated by you.*

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-E21F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

*3. The withdrawals within the limits specified on the Nexo Platform, which are subject to revision from time to time at our sole and absolute discretion, shall be processed by Nexo no later than 24 (twenty-four) hours as of receipt of your request. In case of withdrawals exceeding the above limits, in order to guarantee the safety of the Digital Assets and Interest, if applicable, in your Nexo Account, as well as of delays due to technical reasons, the processing may take a longer period of time. However, Nexo devotes significant efforts to ensure that any withdrawal falling within the hypotheses under the preceding sentence will be processed no later than 72 (seventy-two) hours as of your request.*
*…*

*XIII. REFUSAL TO PROVIDE NEXO WALLET SERVICES. LIMITATION, SUSPENSION OR TERMINATION OF THE NEXO WALLET SERVICES. CLOSURE OF ACCOUNTS.*

*1. Nexo reserves the right to, at its sole and absolute discretion, refuse to process or to cancel any request from you in regard to the Nexo Wallet Services, including for purposes of compliance with any Applicable Law.*
*…*

*3. Nexo may, at any time and without liability, terminate, suspend, limit or reverse your use, or the functionality, of the Nexo Wallet Services, or your access to your Nexo Account (including freezing or closing your Nexo Account, refusing to process any instruction of yours, or reversing a performed action), including but not limited to: (a) in the event of any breach by you of these General Terms and any other applicable terms, or any Applicable Law; (b) for the purposes of complying with a regulator's demand, a court order, an act of any governmental authority, or any Applicable Law; (c) upon Nexo's suspicion that a transaction or your use of the Nexo Wallet Services may be erroneous or connected with any unlawful activities (such as money laundering, terrorist financing, as well as fraudulent activities), or that your Nexo Account has been compromised; (d) your Nexo Account is subject to any legal proceedings; (e) to remedy the effects of any defect in or compromise to any information system related to the provision of the Nexo Wallet Services; (f) for compliance and monitoring reasons, including in case of a discrepancy between your spending profile and the type of consumer group you belong to; (g) for maintenance of the system; or (h) if there is a change in the eligibility criteria for opening of a Nexo Account or use of the Nexo Wallet Services. In the above cases the Digital Assets in your Nexo Account may be frozen for an indefinite period of time until the matter is resolved. (….)"*

16. The withdrawal limits were stated on the Platform and were communicated to the Claimants by Mr Hristov on various occasions. Nexo has an absolute right to set withdrawal limits on the Platform pursuant to the General Terms, in particular Article III

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

and Article VI. Further or in the alternative, the withdrawal limits were incorporated into each agreement with the Claimants by course of conduct. Mr Hristov made it clear to the Claimants repeatedly that the Claimants' accounts were subject to the daily withdrawal limits. The Claimants did not challenge this, but instead asked Mr Hristov to make repeated exceptions so they could withdraw funds in excess of the daily withdrawal limits. Paragraph 9 above is repeated.

17. The relevance of paragraph 12 is not understood and is in any case denied, save that it is admitted that Nexo confirmed in correspondence since 21 October 2021 that it was the contracting party. In addition, it is shown by the completed Form D Notice of Exempt Offering of Securities filed with the United States Securities and Exchange Commission on 18 May 2018 ("**Form D**") that Nexo is the issuer of NEXO Tokens. Form D is in the public domain and may be obtained by the Claimants at any time. The allegations made by the Claimants are in relation to acts of Mr Hristov. NDS employed Mr Hristov at the relevant time and Mr Hristov interacted with the Claimants on behalf of Nexo. Therefore, it is denied that there are further parties that could properly be added to this claim.

18. As to paragraph 13:

   i. It is denied (to the extent alleged) that the Claimants were part of a single contract with Nexo.

   ii. It is admitted that each Claimant entered into individual contracts with Nexo, which incorporated, as follows:

      a. On 29 July 2019, the First Claimant created an account via the Platform (the "**S Account**") and began using it to deposit, withdraw, transfer and exchange cryptocurrencies, including NEXO Tokens. The General Terms applied to the S Account.

      b. On 27 August 2020, the First Claimant entered into a Cryptocurrency Purchase Agreement with Nexo. Section 4.5 of this agreement included a governing law clause, which stated: "*This Agreement shall be governed by, construed and enforced in accordance with the laws of Estonia*." As explained above, on 12 October 2020, the First Claimant entered into the EURx Agreement.

10

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

c. On 8 July 2020, the Second Claimant created an account via the Platform (the "**O Account**").  The General Terms applied to the O Account.  There was no activity on the O Account until 7 September 2020, when the Second Claimant began using the account to deposit, withdraw, transfer and exchange cryptocurrencies, including NEXO Tokens.  On 7 September 2020, the Second Claimant entered into the Cryptocurrency Purchase Agreement with Nexo.  Section 4.5 of this agreement included a governing law clause, which stated: "*This Agreement shall be governed by, construed and enforced in accordance with the laws of Estonia*."  As explained above, on 12 October 2020, the Second Claimant entered into the EURx Agreement.

d. On 14 September 2020, the Third Claimant created an account via the Platform (the "**J Account**").  The General Terms applied to the J Account.  There was no activity on the J Account until 30 September 2020 when the Third Claimant began using the account to deposit, withdraw, transfer and exchange cryptocurrencies, including NEXO Tokens.  As explained above, on 12 October 2020, the Third Claimant entered into the EURx Agreement.

e. On 23 March 2021, the Claimants entered into an agreement with Nexo for the sale of their NEXO Tokens back to Nexo.  The price obtained by the Claimants was as follows:

*"38,727,307.64 NEXO Tokens @ $1.004 = $38,882,216.87 USDT*

*12,680,107.77 EURO @ 1.1714 = $ 14,853,478.24 USDT"*

19. As to paragraph 14:

i. The first sentence is denied. The Claimants did not have an absolut<u>e</u> and unfettered right to withdraw assets. Article VI(1) (by itself and/or read in conjunction with Article III) only gives the Claimants the right to "*request*" withdrawals. In addition, the Claimants' right to request withdrawals of NEXO Tokens was subject to the applicable daily withdrawal limits.  Paragraphs 15 and 16 above are repeated.

11

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

   ii.   The second sentence is admitted, but its relevance is not understood. The Claimants do not allege that Nexo has failed to process any requests in a timely manner.

20. Paragraph 15 is denied. In particular,

   i.    It is denied that the Consumer Rights Act 2015 ("**CRA**") applies to cryptoassets. The CRA only applies to the supply of goods, digital content or services to a consumer. Cryptoassets do not fall under either of those categories. For the reasons outlined below, it is in any event denied that the Claimants were consumers under the meaning of the CRA. Subparagraph 21.i below is repeated.

   ii.   In addition, the Supply of Goods and Services Act 1982 ("**SGSA**") does not apply to contracts involving the sale of cryptoassets. Cryptoassets are neither "goods", nor "services" and, therefore, are outside the scope of the SGSA.

   iii.  The Claimants have provided inadequate particulars to why the Braganza duty should be implied into each agreement. It is, in any event, denied that the Braganza duty is an implied term of any of the agreements for the following reasons:

         a.   The Braganza duty only applies in the absence of clear language to the contrary. Here, Articles III, VI and XIII state that Nexo's discretion is "absolute".

         b.   Further or in the alternative, there is no imbalance of power. The Claimants are sophisticated investors, who owned cryptoassets businesses. As Nexo understands, the Claimants had been trading cryptoassets for at least six years before entering into the Nexo Purchase Deal. Paragraph 2 above and Paragraph 21 below are repeated.

21. As to paragraph 16:

   i.    The first sentence is denied. The Claimants were not consumers within the definition in Section 2 of the CRA. The Claimants were not acting for purposes that were wholly or mainly outside their trade, business, craft or profession. The Claimants are sophisticated individuals who own and operate their own software development business and Forex Technology company incorporated to trade cryptoassets. In

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

addition, the Second Claimant stated in his source of funds declaration that he was in receipt of "Dividends paid in Cryptos" from Forex Ltd. Paragraph 2 above is repeated.

    ii.    As to the second sentence:

        a.    Is is denied that the Unfair Contract Terms Act 1977 ("**UCTA**") applies. Pursuant to Section 27 of UCTA, where English law applies to a contract only by choice of the parties (and apart from that choice would be the law of some country outside the United Kingdom), sections 2 to 7 do not apply to the contract. In this case, English law applies to each one of the contracts only by virtue of the choice of law provision in Article XIX of the General Terms. Nexo is incorporated in the Cayman Islands and the Claimants reside in Ireland/Malta.

        b.    Further or in the alternative, if (which is denied) the Claimants were consumers, it is denied that UCTA applies. Section 3 of UCTA does not apply to terms in consumer contracts.

        c.    In yet a further alternative, if (which is also denied) the cryptoassets purchased by the Claimants constitute "goods", it is denied that UCTA applies. Pursuant to section 26, UCTA does not apply to international supply contracts, irrespective of the governing law or jurisdiction clause. Each contract would classify as an international sales contract because the Claimants were Irish citizens (two residing in Malta) when the cryptoassets were purchased.

## The Claimants' decision to withdraw from Nexo

22. As to paragraph 17:

    i.    Nexo can neither admit nor deny the Claimants' state of mind. It is denied, if alleged, that there were grounds for the Claimants to be concerned about Nexo.

    ii.    In any event, the paragraph is embarrassing for lack of particularity. The Claimants do not set out any justification for their alleged concerns about the five items set out in in the paragraph.

    iii.    The Claimants are put to proof as to their alleged "concerns". In particular:

13

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

    a.   The Claimants are put to proof that they were interested in any of the five items set out in paragraph 17 and/or that their decision to invest in Nexo Tokens between 2020 and 2021 was influenced by the alleged "concerns",  and/or that their decision to sell and withdraw their Nexo Tokens was influenced by the alleged "concerns".

    b.   The Claimants are put to proof as to the relevance of these alleged concerns to their present claims.

    iv.   For the avoidance of doubt, it is averred that Nexo has at all time been in compliance with the applicable laws and regulations.

23. Paragraph 18 is noted.  The value of the Claimants' combined portfolio on the Platform as of March 2021 was significantly higher than when they signed up to the Platform.  The difference was approximately $40 million (across the three accounts combined). By March 2021, the Claimants had made a substantial profit by trading on the Platform, purchasing NEXO Tokens and benefitting from preferential interest rates.

24. As to paragraph 19:

    i.   The first sentence is not admitted.  The Claimants are put to proof as to the rationale behind their decision to sell.

    ii.   The fact of the transactions in subparagraphs 19(a)-(c) are admitted.

<u>The Claimants' withdrawals</u>

25. As to paragraph 20:

    i.   As explained above, Mr Hristov made repeated exceptions for the Claimants in order to allow them to withdraw cryptoassets in excess of the daily withdrawal limit between September 2020 and March 2021.  It is admitted that on 22 March the limits on the S and O accounts was reduced to USD $150,000. However, the limit on the O Account was increased to $800,000 (substantially above the normal daily withdrawal limit on the Platform) within 20 minutes and then returned to the standard daily limits.

    ii.   However, the Claimants did not seek to make any withdrawals from the accounts. Therefore, they were not prejudiced.

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-E21F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

iii.   In any event, all of the assets in the J Account were still subject to the Fixed Rate BTC Deal and the EURx Agreement and were, therefore, not withdrawable.

26. As to paragraph 21:

i.   It is admitted that the "withdraw" ~~button~~ menu option on the O and S Accounts was unavailable for a period of time on 23 March 2021.

ii.   It is denied, if alleged, that the Claimants asked for an explanation in relation to the "withdraw" ~~button~~ menu option. On 23 March 2021, at around 12:38 pm (CET), the First Claimant asked for his limits to be put up to a "*decent amount*" and that "*2m will do*", and made no mention of the "withdraw" button (which is in fact a "withdraw" menu option). The same applies to the Second Claimant. Subparagraph 41(iii) below is repeated.

27. As to paragraph 22:

i.   The term "initially" is vague and not admitted. It is admitted and averred that The First Claiman~~dt~~ and the Second Claimant were able to use their accounts to convert Nexo Tokens to other Cryptoassets. As explained above, they have done so on numerous occasions. Paragraph 9 above is repeated.

ii.   The transactions described in the rest of paragraph 22 are admitted~~, save that the Second Claimants transactions amounted to 1,040,139 NEXO Tokens.~~.

28. As to paragraph 23:

i.   The Nexo Platform includes a "swap" menu option, not a "convert" button. Nexo has not so far been able to verify whether the ~~"convert" button~~ "swap" option was unavailable for a period of time on 23 March 2021. Therefore, the paragraph is not admitted.

ii.   In any event, the Claimants do not plead that they intended to make any conversions at or around 2pm (CET) on 23 March 2021, while they were negotiating the Nexo Purchase Deal. It is denied, if alleged, that they made any requests to convert their cryptoassets while negotiating the Nexo Purchase Deal.

15

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

29. As to paragraph 24:

    i.    The fact that the First and Second Claimants held the mentioned cryptoassets in their respective accounts is admitted.

    ii.    Paragraphs 25 and 26 above are repeated.

30. Paragraph 25 is denied.  In particular:

    i.    The Third Claimant started using his account on 30 September 2020. On 2 October 2020, the Third Claimant opted for the Fixed Rate BTC Deal. This meant that he could not withdraw his NEXO Tokens until 2 April 2021. On 12 October 2020, he entered into the EURx Agreement. The Third Claimant agreed not to withdraw any EURx from the J Account until 12 October 2021. As explained below, the Third Claimant ended up benefitting from the ability to withdraw the EURx early, on or around 24 March 2021.

    ii.    The allegations that Nexo "completely disabled" or "caused to be completely disabled" the Third Claimant's ability to make withdrawals is in any event too vague to plead to. For the avoidance of doubt, Nexo did not "disable" the Third Claimant's ability to withdraw NEXO Tokens. The Third Claimant agreed to keep his NEXO Tokens on the Platform in order to benefit from the Fixed Rate BTC Deal. As at 23 March 2021, the Third Claimant's NEXO Tokens were still staked as part of the Fixed Rate BTC Deal and the EURx Agreement.  Therefore, the J Account had no withdrawable cryptoassets as at 23 March 2021.

30A. As to paragraph 25A:

i.    The description of the relationship between NDS and Nexo in the second sentence is factually incorrect and is denied.  Paragraph 7A above is repeated.

ii. The allegation in the second sentence as to Nexo's refusal to identify the names of any NDS employees is denied.  Nexo has provided the Claimants with answers to their questions in correspondence and by way of Part 18 Response.  In any event, the allegations made by the Claimants are in relation to acts of Mr Hristov.  NDS employed Mr Hristov at the relevant time and Mr Hristov interacted with the Claimants on behalf of Nexo.

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

iii. The rest of the paragraph is not admitted.

The Loyalty Payment

31. Paragraphs 26-30 are not relevant to the present claim. On 16 June 2021, Nexo deposited the following NEXO Tokens into the Claimants' accounts by way of final loyalty payment (the "**June NEXO Tokens**"):

    i.    183,636.15642727 into the S Account;

    ii.    212,497.93511216 into the O Account; and

    iii.    128,482.30359102 into the J Account.

32. Nexo has already, therefore, paid each one of the Claimants the "*Final Dividend*" with interest. None of the Claimants are claiming for the "*Final Dividend*". No cause of action is pleaded in relation to the "*Final Dividend*". As explained below, the Claimants each made a significant profit as a result of the June NEXO Tokens.

33. Paragraph 27 is admitted, save that it is denied, if alleged, that "*relevant net profits*" meant each individual NEXO Token holder's profits. This is a reference to Nexo's profits. Between February 2018 and June 2021, Nexo rewarded holders of NEXO Tokens by annually depositing a proportion of NEXO Tokens into their accounts.

34. Subsequently, various NEXO Token holders voted instead to be rewarded by way of daily interest on their NEXO Token holdings. Nexo listened to them. This led to the announcement referred to in paragraph 28. The first sentence in paragraph 28 is, therefore, admitted. As to the second sentence:

    i.    The proposal was in fact approved (by 89.52% of the votes cast) and not merely claimed to be approved.

    ii.    Paragraph 28 is otherwise admitted.

35. As to paragraph 29:

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

i.    The reference to Nexo Capital's board is not understood and not admitted. The 16 June 2021 announcement was made on Nexo's website i.e., "nexo.io". Nexo confirmed that *"the dividend distribution is a result of Nexo's first Governance Vote – the new functionality that empowers NEXO Token holders to participate in important decisions and changes to the Nexo platform."* There is no reference to Nexo's board.

ii.   The rest of the paragraph is otherwise admitted.

36.  As explained above, each one of the Claimants benefitted from the June NEXO Tokens. The June NEXO Tokens were deposited into each of their respective accounts on 16 June 2021. Due to an internal misunderstanding, the June NEXO Tokens were unavailable for a period of time. However, the Claimants have had full access to the June NEXO Tokens since 23 September 2021. Between 16 June 2021 and 23 September 2021, the June NEXO Tokens went up in value from c.\$1.35 to c.\$3.25. The Claimants sold all of their June NEXO Tokens received at a substantial profit. In addition, they benefitted from interest on their June NEXO Tokens.

37.  Paragraph 30 is admitted. For the reasons above, its relevance is not understood. There is no claim in relation to the *"Final Dividend"*. The Claimants have not pleaded any (i) cause of action and (ii) loss in relation to the *"Final Dividend"*.

## D.  ALLEGED BREACH OF CONTRACT

38.  As to paragraph 31:

i.    It is admitted and averred that each account made on the Platform is subject to withdrawal limits. It is however, denied that these limits are "imposed". Paragraph 16 above is repeated.

ii.   It is denied that Nexo disabled the Claimants' ability to withdraw. Each Claimant was only entitled to request to withdraw cryptoassets subject to the: (i) daily withdrawal limits; (ii) Fixed Rate BTC Deals; and (iii) EURx Agreements. Paragraph 19.1 above and 39.ii are repeated. The only period when the First and Second Claimants were unable to withdraw assets is addressed in paragraphs 25 and 26 above.

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

iii. It is denied that Nexo prohibited the conversion of cryptocurrencies. The First and Second Claimants were at all relevant times able to convert their cryptocurrencies, save as described at paragraph 28 above.

iv. It is denied that Nexo was in breach of each of the contracts with the First and Second Claimants for the reasons set out in paragraph 39 below.

v. It is noted that no breach of contract is pleaded in relation to the Third Claimant. It is in any event denied that Nexo breached its contract with the Third Claimant for the reasons set out in paragraph 39 below.

39. As to paragraph 32:

i. As to subparagraph 32(a)

a. It is denied, if alleged, that Article XIII(3) did not apply. Pursuant to Article XIII(3) Nexo was contractually entitled *"at any time and without liability [to] terminate, suspend, limit or reverse your use, or the functionality, of the Nexo Wallet Services, or your access to your Nexo Account (including freezing or closing your Nexo Account, refusing to process any instruction of yours, or reversing a performed action), including but not limited to: (…)"*. While it is admitted that the circumstances set out in the examples (a)-(h) do not apply here, it is denied that Nexo's contractual entitlement is limited to those circumstances. Article XIII(3) contains a clear reference to the fact that Nexo's rights apply in circumstances *"including but not limited to"* the ones envisaged in examples (a)-(h). In any event, Article XIII(2) further entitles Nexo *"at its sole and absolute discretion,* [to] *refuse to process or to cancel any request from you in regard to the Nexo Wallet Services"*.

ii. As to subparagraph 32(b):

a. The Claimants are put to proof that they made requests that fell within Article VI(1).

b. It is denied that Nexo was in breach of Article VI (1). In particular:

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

    (i)    Article VI(1) only gives the Claimants the right to *"request"* withdrawals. There is no absolute and unfettered right to withdraw.

    (ii)    Further or in the alternative, Article VI(3) (by itself and read in conjunction with Article IIII) clearly sets out that the withdrawal limits *"are subject to revision from time to time at our sole and absolute discretion"*.

    c.    It is denied that Nexo was in breach of Article VI (3). In particular:

    (i)    This clause specifically refers to the daily withdrawal limits. The obligation to execute withdrawal within 24 hours only applies to withdrawals within the daily withdrawal limits. Article VI(3) does not confer the Claimants a right to make withdrawals in excess of the daily withdrawal limits.

    (ii)    Nexo simply undertakes to "devote significant efforts to ensure that" withdrawals above the daily withdrawal limits which <u>are approved by Nexo</u> (as was the case with multiple requests from the Claimants prior to 23 March 2021) are executed within 72 hours. It is denied, to the extent alleged, that Nexo failed to comply with any request from the Claimants in a timely manner. In any event, The Claimants were able to withdraw their entire holding on the Nexo Platform within 72 hours of 22 March 2021, as admitted at paragraph 41 of the <u>Re-</u>Amended Particulars of Claim.

    <u>iii.</u> As to subparagraph 32(c):

    d.    It is denied that the Implied Term of Reasonable Care and Skill falls to be implied into any of the agreements with the Claimants. Subparagraphs 20.i-ii above are repeated.

    e.    Further or in the alternative, it is denied that Nexo was in breach of this term. Paragraphs 25 and 26 above are repeated.

40. As to paragraph 33:

    i.    As to subparagraph 33(a), the CRA does not apply to this claim. Paragraphs 20.i and 21.i above are repeated. The Claimants have provided inadequate particulars to why

20

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

Article III, Article XIII (or other Articles of the General Terms) are unfair. If such particulars are provided ~~in the Reply~~, ~~Nexo~~ the Defendants reserve~~s its~~ their right to apply to amend ~~its Defence~~ their case accordingly. For the avoidance of doubt, it is denied that Article III, Article XIII (or any other part of the General Terms) are unfair.

ii.    As to subparagraph 33(b):

a.    For the reasons set out at paragraph 21 above, it is denied that UCTA applies.

iii.    If UCTA applies, the Claimants have, in any event, provided inadequate particulars to why Article III or Article XIII (or other Articles of the General Terms) are unfair. If such particulars are provided ~~in the Reply~~, ~~Nexo~~ the Defendants reserve~~s its~~ their right to apply to amend ~~its Defence~~ their case accordingly. For the avoidance of doubt, it is denied that Article III, Article XIII (or any other part of the General Terms) are unfair.

iv.    As to subparagraph 33(c):

~~c.~~ a.    It ~~it~~ is denied that a Braganza duty should be implied in any of the agreements between the Claimants and Nexo. Subparagraph 20.iii above is repeated. Further or in the alternative, it is denied that such duty was breached. The Claimants have provided inadequate particulars as to why Nexo acted "irrationally, arbitrarily, and capriciously". If such particulars are provided ~~in the Reply~~, Nexo reserves its right to apply to amend its ~~Defence~~ case accordingly. In any event, it is denied that Nexo acted "irrationally, arbitrarily and capriciously". Nexo had an absolute contractual right to permit a withdrawal, reject a request and set withdrawal limits (including pursuant to Article III, Article VI and article XIII). Not permitting withdrawals for a period of time during 23 March 2021 was within the scope of that discretion.

## E.    ALLEGED COMMISSION OF THE TORT OF INTIMIDATION

41. As to paragraph 34:

i.    It is admitted that Mr Hristov was the Claimants' main point of contact at Nexo and that on 23 March 2021 the First Claimant asked once again for an increase in the daily withdrawal limit. As explained above, the First Claimant wrote to Mr Hristov on 23

21

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

March stating "*whats [sic] going on i [sic] was able to take 2m yesterday and now it says 150k?*".

ii. It is denied, if alleged, that the Claimants claimed at the time that their accounts were frozen. It is admitted that the First and Second Claimants asked on 23 March 2021 for an explanation as to why they were no longer able to withdraw up to $2 million daily from their accounts. The First Claimant asked for his limits to be put up to a "*decent amount*" and that "*2m will do*".

iii. Paragraphs 25 and 26 above are repeated.

iv. In eny event, NDS could not have frozen Shane and Owen's Accounts as it is not the operator of the Nexo Platform.

42. As to paragraph 35:

i. Mr Hristov was in fact the Claimants' account manager, and did not merely purport to be so.

ii. It is admitted that Mr Hristov acted on behalf of Nexo.

iii. As to the second sentence, it is denied that Mr Hristov acted on behalf of NDS when dealing with the Claimants. Mr Hrsitov, although employed by NDS, was acting on behalf of Nexo when dealing with the Claimants and his work was performed as part of Nexo's business.

43. Paragraph 36 is admitted. The background to this call is set out at paragraph 10 above.

44. As to paragraph 37:

i. Subparagraph 37(a) is admitted, save that the Mr Hristov referred to Nexo not Nexo and NDS. NDS does not have a contractual relationship with the Claimants and does not operate the Platform. As explained above at paragraph 9, the Claimants made repeated requests to withdraw NEXO Tokens over and above their daily limits in a short period of time. It is Mr Hristov's recollection that during the call the Claimants expressed their desire to withdraw all their assets in one go and to liquidate their NEXO Tokens to realise their large profits on their NEXO Tokens.

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

ii.     Subparagraphs 37B, 37C and 37D are admitted.

iii.    Subparagraph 37E is noted. However, the two sale options presented to the Claimants were communicated by Mr Hristov to the Claimants in writing at 3:16 PM CET on 23 March 2021 via Telegram and subsequently by email. The references to "the Proposal" in this Re-Amended Defence are references to the Option 1 and Option 2 set out at paragraph 11 above.

iv.     The rest of the paragraph is not admitted.

45. Paragraph 38 is denied. In particular:

i.      The relevant background to the Nexo Purchase Deal is set out at paragraph 9 above.

ii.     Nexo and NDS (through Mr Hristov) did not make a coercive threat, but put forward two OTC proposals for negotiations, by way of response to the first deal which was proposed by the First Claimant. In addition:

a.  The Claimants have failed to particularise the alleged coercive threat.

b.  It is denied that Mr Hristov threatened a breach of contract if the Claimants did not accept the Proposal. The Claimants were free to reject the Proposal, sell their NEXO Tokens on the market and withdraw them in accordance with the daily withdrawal limits. The First Claimant acknowledged this in the Telegram conversation which formed part of the negotiations on 23 March 2021 *"on the platform we could technically withdraw 500k nexo daily and sell them on the market so you have to meet us somewhere"*. In any event, Nexo was contractually entitled to impose withdrawal limits. Paragraph 16 above is repeated.

d. c. The allegation that there was a threatened breach of contract in relation to the Third Claimant is not understood and is denied. Nexo notes that the The Claimants do not explicitly plead that Nexo was in breach of the agreement with the Third Claimant. As explained above, as at 23 March 2021, the Third Claimant's tokens were still staked as part of the Fixed Rate BTC Deal and the EURx Agreement.

ii.     Paragraphs 25 and 26 above are repeated.

Docusign Envelope ID: 4253D538-A6B8-430B-BDBE-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

46. Paragraph 39 is denied. In particular:

    i.    Mr Hristov did not make a threat. Paragraph 45 above is repeated.

    ii.    In the alternative, the alleged threat was not intended to coerce the Claimants into taking a particular course of action. As to this:

        a.    The Claimants do not allege to have been coerced.

        b.    Further or in the alternative, it is denied that Nexo or NDS coerced the Claimants to accept the Proposal. The Claimants made a commercial decision. The Nexo Purchase Deal was subject to back and fourth negotiations between sophisticated parties and was accepted by the Claimants. The first proposal came from the First Claimant, which suggested a deal whereby the Claimants would sell their NEXO tokens at 40% discount. The Claimants were alive to the fact that they had alternatives to accepting the Proposal. Subparagraph 45.ii above is repeated.

    iii.    Mr Hristov did not intend that the Claimants would act upon the alleged threat or that they would suffer loss. To the contrary, Mr Hristov made efforts to provide the Claimants with favourable deals, including finding them an OTC buyer, on 18 March 2021, interested in buying a large amount of NEXO Tokens at 20% discount on the market value.

    iv.    The Claimants did not suffer any losses. As a result of the Nexo Purchase Deal they made significant profits. In addition, the Nexo Purchase Deal was advantageous.

    v.    The contemporaneous correspondence is inconsistent with ~~Nexo's~~ the Claimants' new theory that they have been coerced in accepting the Nexo Purchase deal. In particular:

        a.    The Claimants quickly accepted the Nexo Purchase deal and did not complain about it for six months.

        b.    They also expressed the interest to continue using the Platform, including the credit card provided to them.

        c.    In addition, in or around June 2021, the First Claimant took out a loan against his June NEXO Tokens.

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

    d.  It is denied that *"loss was an inevitable and obvious consequence of offering the Proposal which would result in the Claimants being paid less than market value for their Nexo Tokens."* This statement ignores the obvious benefits of the Nexo Purchase Deal. Subparagraph 47.ii below is repeated.

47. As to paragraph 40:

    i.  The words *"as a consequence"* are too vague to plead to. ~~Nexo notes that the~~ The Claimants (rightly) do not plead that they entered into the Nexo Purchase Deal as a result of coercion. It is averred that the Claimants made a commercial decision, following negotiations, to accept "Option 2" set out at paragraph 11 above and conclude the Nexo Purchase Deal. The reference to "Post-Freeze Sale" is not admitted.

    ii.  In any event, it is denied to the extent alleged, that the deal was entered into as a consequence of the alleged threat. It is averred that the Claimants made a commercial decision to enter into the Nexo Purchase Deal. This benefitted them in various ways including by (i) being able to withdraw the value of the NEXO Tokens without being subject to the daily withdrawal limits; (ii) ending the EURx Agreements early (and for the Third Claimant to also exit the Fixed Rate BTC Deal); and (iii) avoid taking the risk of price fluctuation in a volatile market.

48. Paragraph 41 is admitted insofar as it describes the transactions which formed part of the Nexo Purchase Deal. It is denied, if alleged, that NDS effected these conversions. Nexo not NDS is the operator of the Nexo Platform. As to the footnote in paragraph 41(b) it is admitted and averred that Owen Morton held 16,565,585.53 in his account (as pleaded in paragraph 41(b) of the Re-Amended Particulars of Claim and shown in the transaction logs), but that he was in fact overpaid by 119.02 NEXO Tokens, in that he received the USDT equivalent of 16,565,704.55 NEXO Tokens following the Nexo Purchase Deal. The reference to an "unexplained discrepancy" is not admitted.

49. Paragraph 42 is denied for the reasons set out in the rest of this section. It is averred that the Claimants made a commercial decision to enter into the Nexo Purchase Deal.

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

49A. Paragraph 42A is denied. Mr Hrsitov, although employed by NDS, was acting on behalf of Nexo when dealing with the Claimants and his work was performed as part of Nexo's business. It is denied that NDS is vicariously liable for Mr Hristov.

## DA. ALLEGED UNLAWFUL MEANS CONSPIRACY

49B. Paragraph 42B is denied. The pleading of the alleged unlawful means conspiracy is embarrassing for lack of particularity. In addition:

    a.  It is denied that Nexo and NDS agreed or combined to injure the Claimants by unlawful means.

    b.  It is denied that Nexo and NDS intended to injure the Claimants. Paragraphs 41-49 above are repeated.

    c.  It is denied that Nexo and NDS took concerted action. Paragraphs 25-49 above are repeated.

    d.  It is denied that Nexo was in breach of contract to the Claimants and that Nexo or NDS committed the tort of intimidation against the Claimants. Paragraphs 38-49 above are repeated.

    e.  It is denied that the claimants suffered loss and damage. Paragraphs 50-51 below are repeated.

49C. Paragraph 42C is denied. Nexo and the employees of NDS did not combine or conspire to injure the Claimants, for the reasons set out at paragraph 38-49B above.

## F.  CAUSATION AND LOSS

50. As to paragraph 43:

    i.  The first sentence is denied. The Claimants did not suffer loss as a result of the alleged commission of the tort of intimidation (and/or the alleged vicarious liability of NDS). As explained above, (i) the Claimants did not incur any losses and (ii) in fact obtained substantial benefits as a result of the Nexo Purchase deal, including but not limited to

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**
**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

being able to withdraw the assets subject to the EURx Agreements early (as well as the Fixed Rate BTC deal in the Third Claimant's case).

ii.  ~~In any event, their alleged losses are vague and unparticularised and it is not possible for Nexo~~ ~~and NDS~~ ~~to properly plead to them. Nexo~~ ~~and NDS~~ ~~reserves its~~ ~~their~~ ~~right to amend its~~ ~~their~~ ~~Defence~~ ~~case~~ ~~and plead to the alleged losses if these are adequately particularised in the Reply.~~ Furthermore, the alleged losses, as well as the impact on the market of any hypothetical sales of Nexo Tokens by the Claimants are a matter for expert evidence. It is denied that subparagraph 43(a) and (b) constitute the proper basis to calculate the Claimants' alleged losses.

   a.  At so subparagraph 43(a), the alleged "strategy" is unparticularised. The Claimants are put to proof as to the alleged strategy, the fact that they would have applied it and the likely effects on the volatile market. Nexo notes that the Claimants' owned a significant proportion of the total NEXO Tokens, close to 10 times the daily trading volume.  In addition, the Claimants are put to proof as to how their "strategy" would have worked given that the hypothetical sales would have coincided with the dip in the crypto market during July and September 2021. As to subparagraph 43(a)(A), the references to the figures set out in the Claimants' expert reports are noted. For the reasons set out in this Re-Amended Defence, it is denied that the Claimants suffered any losses or that they are entitled to any damages. Furthermore, the Defendants' case is that the Claimants' expert reports are flawed. The Defendants will rely at trial on the figures set out in the Defendants' expert report.

   b.  As to subparagraph 43(b):

      (i)   First, the Claimants fail to account for the benefit of all of them having been released from the EURx Agreements early and of the Third Claimant having been released from the Fixed Rate BTC Deal early.

      (ii)  Second, the relevance of the "*Final Dividend*" is not understood. As explained above, these tokens have been available to the Claimants since September 2021 and have been sold at a profit.

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

    c.   Subparagraph 43(b)(A) is noted. For the reasons set out in this Re-Amended Defence, it is denied that the Claimants suffered any losses or that they are entitled to any damages. Furthermore, the Defendants' case is that the Claimants' expert reports are flawed. The Defendants will rely at trial on the figures set out in the Defendants' expert report.

51. As to paragraph 44:

    i.   For the reasons set out above, it is denied that Nexo was in breach of any of the contracts with the Claimants.

    ii.   In any event, the Claimants have not suffered any losses. In fact they have made a significant profit.

    iii.   Further or alternatively, there is no causal link between the alleged breaches and the alleged losses. The Claimants freely agreed to the Nexo Purchase Deal, which broke the chain of causation.

    iii.   The Claimants are put to proof as to the steps taken to mitigate their alleged losses.

51A. Paragraph 44A is denied. The Claimants have not suffered any alloses as a result of the alleged commission of the tort of unlawful means conspiracy (and/or NDS' alleged vicarious liability for conspiracy by its employees). Paragraphs 50-51 above are repeated.

**G. INTEREST**

52. It is denied that the Claimants are entitled to any interest. The Claimants have not suffered any losses from the alleged breach of contract and the alleged intimidation.

53. In the premises, for the reasons set out in this Re-Amended Defence, it is denied that the Claimants are entitled to the relief sought in the Prayers, or to any relief at all.

                                                  DAVID QUEST KC

                                                  ANCA BUNDA

Docusign Envelope ID: 4253D538-A6B8-430B-BDBF-521F4D47051A

**Amended by Order of Simon Colton KC sitting as a Deputy High Court Judge, dated 26 January 2024**

**Re-Amended by Order of Mr Justice Butcher, dated 14 November 2024**

DAVID QUEST KC

ANCA BUNDA

DAVID QUEST KC

ANCA BUNDA

**Statement of truth**

I believe that the facts stated in this Re-Amended Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised to sign this statement on behalf of the Defendant.

Signed: ......*Antoni Trenchev*......

DocuSigned by:
B27A6532EB714D6...

Name:       Antoni Trenchev

Position:    Director

Dated:      22 November 2024