Ian S. Shelton (SBN 264863)
BAKER & MCKENZIE LLP
ian.shelton@bakermckenzie.com
10250 Constellation Boulevard, Suite 1850
Los Angeles, California 90067
Phone: (310) 299-8535
Fax: (310) 201-4721

Matthew C. Rawlinson (admitted *pro hac vice*)
BAKER & MCKENZIE LLP
matthew.rawlinson@bakermckenzie.com
800 Capitol Street, Suite 2100
Houston, Texas 77002
Phone: (713) 427-5067
Fax: (713) 427-5099

*Attorneys for Defendant Nexo Capital Inc.*

**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CRESS,<br><br>        Plaintiff,<br><br>      vs.<br><br>NEXO CAPITAL INC.,<br><br>        Defendant. | Case No. 3:23-cv-00882-TSH<br><br>The Hon. Thomas S. Hixon<br><br>**DEFENDANT NEXO CAPITAL INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  October 22, 2026<br>Hearing Time:  10:00 a.m.<br><br>Courtroom:  E – 15th Floor<br>Address:     Federal Building<br>           450 Golden Gate Avenue<br>           San Francisco, CA 94102 |

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-00882-TSH

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on October 22, 2026, at 10:00 a.m. in Courtroom E of the above-entitled court, at 450 Golden Gate Avenue, San Francisco, California, Defendant Nexo Capital Inc. ("Nexo") will and does move the Court for an order granting summary judgment against Plaintiff John Cress ("Cress") under Federal Rule of Civil Procedure 56(a) for ten causes of action in the Second Amended Complaint ("SAC") (Dkt. 88). Nexo seeks summary judgment as to Cress's claims for:

1.      Fraudulent Inducement (Count I), UCL (Count II), Civil Theft (Count VI), RICO (Count VII), RICO Conspiracy (Count VIII), Fraudulent Omission (Count IX), and Breach of Contract (Count X), to the extent such claims are based on allegedly improper fees, because Cress's fee-based claims are barred by the applicable statutes of limitations.

2.      RICO (Count VII) and RICO Conspiracy (Count VIII) because Cress's claims fail as a matter of law; in the alternative, the damages recoverable for the RICO claims are limited to the allegedly improper fees.

3.      Civil Theft (Count VI) because Cress's claim fails as a matter of law; in the alternative, the damages recoverable for the civil theft claim are limited to the allegedly improper fees.

4.      UCL (Count II) because Cress has an adequate remedy at law under *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) and *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025), and the Court does not have equitable jurisdiction over the UCL claims; the UCL "unlawful" claim based on lack of licensure is independently barred by *Lagrisola v. North American Financial Corp.*, 96 Cal. App. 5th 1178, 1195 (2023).

5.      Unregistered Offer and Sale of Securities (Count III) and Fraud in the Offer and Sale of Securities (Count IV) because Cress's purchases of the NEXO Token in 2021 for utility benefits on the Nexo platform were not "investment contract" security transactions; in the alternative, the damages recoverable for the securities claims are limited to losses on the NEXO Token.

6.      Fraud in the Offer and Sale of Securities (Count IV) and Fraud (V) because the

undisputed evidence precludes a finding of reliance or damages caused by such reliance, and whether the NEXO Token was "registered" with the SEC as a security is a question of law, not fact; in the alternative, the damages recoverable for the fraud claims are limited to losses on the NEXO Token.

7.    Breach of Contract (Count X) because there is no breach of the terms of the Cryptocurrency Purchase Agreement as to liquidations, fees, timely execution or confirmation, or the "free and clear" of liens language, and the implied covenant of good faith and fair dealing cannot be used to rewrite the CPA or the Credit Terms; in the alternative, the damages recoverable for the contract claim are limited to damages caused by the alleged contract breaches—the allegedly improper fees or inferior purchase prices.

8.    Fraudulent Omission (Count IX) and Fraudulent Inducement (Count I) based on fees, interest on collateral, the Liquidation Relief Program, "some of the best rates on the market," liquidations below the LTV threshold, or responsiveness, because the undisputed evidence precludes a finding of reliance or damages caused by such reliance, or the alleged statement is not a misrepresentation about a present or existing fact; in the alternative, the damages recoverable for the fraud claims are limited to damages caused by alleged misrepresentations, not leveraged investment losses caused by a crypto market crash.

This motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed separate Statement of Undisputed Facts, the Declaration of A. Trenchev, the Declaration of I. Shelton, the pleadings and other papers on file in this action, and any such other declarations, evidence, and argument as may be presented before or at the hearing in this matter.

DATED: August 7, 2026                    BAKER & MCKENZIE LLP

                                By: */s/ Ian S. Shelton*
                                    Ian S. Shelton

                                    *Attorneys for Defendant Nexo Capital Inc.*

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-00882-TSH
)

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................. 2

TABLE OF CONTENTS ................................................................... 5

TABLE OF AUTHORITIES ................................................................ 7

INTRODUCTION ........................................................................ 1

FACTUAL BACKGROUND ................................................................. 2

    I.    Cress Used Nexo To Execute His Investment "Playbook." ....................... 2

        A.    Cress had $13 million in crypto, but he wanted more using leverage .......... 2

        B.    Cress agreed to and understood Nexo's fees and Credit Terms ................. 4

    II.    Cress Executed His Transactions With Full Knowledge Of The Terms And The Risks. .................................................................. 5

        A.    Cress repeatedly decides to leverage up. ................................. 5

        █    ██████████████████████████████ ................................. 6

    III.    The Volatile Bitcoin Market Fell And Cress's Overleveraged Position Was Liquidated. ................................................................ 7

    IV.    Cress Admits That He Was At Fault For His Losses. ......................... 8

ARGUMENT ........................................................................... 9

    I.    The Court Should Dismiss All Fee Claims As Time-Barred. .................... 9

        A.    Cress's fee claims accrued in 2021 when he was charged fees ................ 9

        B.    Cress knew about Nexo's fees in 2021. ................................... 10

        C.    Cress cannot rely on relation back. ..................................... 12

    II.    The Court Should Dismiss The RICO Claims Or Limit Damages To Fees. ........ 13

        A.    Cress does not identify a RICO Enterprise; he merely relabels Nexo's ordinary corporate structure as a criminal enterprise .................... 13

        B.    The PSLRA bars the RICO claims. ........................................ 18

        C.    RICO causation is absent. .............................................. 19

        D.    The RICO conspiracy fails for the same reasons. ......................... 21

    III.    The Court Should Dismiss The Civil Theft Claim Or Limit Damages To Fees. ................................................................... 21

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-00882-TSH

IV.   The Court Should Dismiss The UCL Claims............................................................ 22

    A.   All UCL claims must be dismissed under *Sonner*........................................ 22

    B.   The UCL "unlawful claim" based on CFL licensure must be dismissed under *Lagrisola.* ............................................................. 23

V.   The Court Should Dismiss Cress's Securities Registration And Fraud Claims Or Limit Damages To The NEXO Token.................................................... 23

    A.   The 2021 NEXO Token sale to Cress was not a securities transaction. ......................................................................................... 24

        1.  The 2018 ICO sale to investors for fundraising purposes was different than the 2021 sale to customers for utility benefits. ............... 24

        2.  By 2021, NEXO Token purchases by customers for utility benefits did not constitute securities transactions. ............................... 25

    B.   If Cress's security claims survive, his damages are limited to the NEXO Token..................................................................................... 26

VI.   The Court Should Dismiss The Securities Fraud And Fraud Claims Based On SEC "Registration."............................................................................... 27

VII.  The Court Should Dismiss The Claim For Breach Of The CPA. ........................... 28

    A.   Nexo did not breach the CPA..................................................................... 28

    B.   The implied covenant cannot be used to rewrite the CPA or Credit Terms.......................................................................................... 31

VIII.  The Court Should Dismiss The Fraudulent Omission Claims, And Fraudulent Inducement Claims. ............................................................................ 32

CONCLUSION .......................................................................................................... 35

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-00882-TSH

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Albers v. Yarbrough World Sols., LLC*,
No. 5:19-cv-05896-EJD, 2020 U.S. Dist. LEXIS 80864, 2020 WL 2218964
(N.D. Cal. May 7, 2020)................................................................................................28

*Anza v. Ideal Supply Corp.*,
547 U.S. 451 (2006) ......................................................................................................19

*Bodam v. GTE Corp.*,
197 F. Supp. 2d 1225 (C.D. Cal. 2002)................................................... 14, 16, 17, 18

*Butler v. Nat'l Cmty. Renaissance of California*,
766 F.3d 1191 (9th Cir. 2014)......................................................................................12

*Carmeli v. Razor United States, LLC*,
No. 2:21-cv-07123-JVS-SK, 2022 U.S. Dist. LEXIS 243593, 2022 WL
20273623 (C.D. Cal. Feb. 16, 2022) ...........................................................................34

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) ......................................................................................... 14, 16, 17

*Darius Mostowfi v. I2 Telecom Int'l, Inc.*,
No. C 03-5784 VRW, 2005 U.S. Dist. LEXIS 51781, 2005 WL 8162717 (N.D.
Cal. May 23, 2005)........................................................................................................28

*Deutsch Energy Co. v. Mazur*,
813 F.2d 1567 (9th Cir. 1987).....................................................................................25

*Doe v. Vaidyaji Priyanka*,
814 F. Supp. 3d 1073 (N.D. Cal. 2026) .......................................................................21

*Dusek v. JPMorgan Chase & Co.*,
832 F.3d 1243 (11th Cir. 2016).....................................................................................19

*Echlin v. PeaceHealth*,
887 F.3d 967 (9th Cir. 2018)................................................................................... 12, 13

*Farmers Ins. Exch. v. First Choice Chiropractic & Rehab.*,
No. 3:13-cv-01883-PK, 2016 U.S. Dist. LEXIS 5149, 2016 WL 10827072 (D.
Or. Feb. 25, 2016)
........................................................................................................... 14, 16, 17, 18

*Friedman v. 24 Hour Fitness USA, Inc.*,
580 F. Supp. 2d 985 (C.D. Cal. 2008)...................................................................... 12, 13

-vii-

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ................................................................................. 34

*Grouse River Outfitters, Ltd. v. Oracle Corp.*,
    848 F. App'x 238 (9th Cir. 2021) ........................................................................... 21

*Guthrie v. Transamerica Life Ins. Co.*,
    561 F.Supp.3d 869 (N.D. Cal. 2021) ..................................................................... 23

*Harris v. Garcia*,
    734 F. Supp. 2d 973 (N.D. Cal. 2010) ................................................................... 22

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ........................................................................................... 20, 21

*Howard v. Am. Online Inc.*,
    208 F.3d 741 (9th Cir. 2000) ................................................................................. 21

*Key v. Qualcomm Inc.*,
    129 F.4th 1129 (9th Cir. 2025) ........................................................................... 2, 23

*Kumaraperu v. Feldsted*,
    237 Cal. App. 4th 60 (2015) .................................................................................. 27

*L. Barber Gems, Inc. v. Brink's Diamond & Jewelry N. Am.*,
    43 F. App'x 164 (9th Cir. 2002) ............................................................................ 31

*Lagrisola v. North American Financial Corp.*,
    96 Cal. App. 5th 1178 (2023) ............................................................................. 2, 23

*Licht v. Watson*,
    567 F. App'x 689 (11th Cir. 2014) ........................................................................ 19

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ..................................................................... 14, 16, 17

*Marshall v. Goguen*,
    604 F. Supp. 3d 980 (D. Mont. 2022) .................................................................... 20

*Meriwether v. Viacom, Inc.*,
    No. CV 18-1998 DSF, 2019 WL 4544426, 2019 U.S. Dist. LEXIS 164899
    (C.D. Cal. July 29, 2019) ...................................................................................... 35

*Miller v. Yokohama Tire Corp*,
    358 F3d 616 (9th Cir 2004) ................................................................................... 28

*MLSMK Investment Co. v. J.P. Morgan Chase & Co.*,
    651 F.3d 268 (2d Cir. 2011) .................................................................................. 19

*OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*,
    157 Cal. App. 4th 835 (2007).................................................................................... 32

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007)................................................................................... 16

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms.*
    *Co. Ltd.*,
    943 F.3d 1243 (9th Cir. 2019).................................................................................. 19

*Pincay v. Andrews*,
    238 F.3d 1106 (9th Cir. 2001).................................................................................... 9

*Rae v. Union Bank*,
    725 F.2d 478 (9th Cir. 1984)........................................................................ 14, 16, 17

*Schwarzkopf v. IBM*,
    No. C 08-2715 JF (HRL), 2010 WL 1929625, 2010 U.S. Dist. LEXIS 46813
    (N.D. Cal. 2010) ...................................................................................................... 32

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .................................................................................. 1, 23, 25, 26

*Serv. by Medallion, Inc. v. Clorox Co.*,
    44 Cal. App. 4th 1807 (1996)................................................................................... 35

*Siry Inv., L.P. v. Farkhondehpour*,
    13 Cal. 5th 333 (2022).............................................................................................. 21

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020)................................................................... 2, 1, 22, 23

*Stella v. Asset Mgmt. Consultants, Inc.*,
    8 Cal. App. 5th 181 (2017)................................................................................. 10, 11

*WA Sw. 2, LLC v. First Am. Title Ins. Co.*,
    240 Cal. App. 4th 148 (2015)........................................................................ 10, 11, 26

*Walters v. Cal. Dep't of Corr. & Rehab.*,
    No. 2:17-cv-2393 MCE KJN P, 2018 WL 341792, 2018 U.S. Dist. LEXIS 3951
    (E.D. Cal. Jan. 9, 2018) ........................................................................................... 13

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009)............................................................................ 23, 25

*Watt v. OKCoin USA Inc.*,
    No. 25-cv-00368-JSW, 2026 WL 880154, 2026 U.S. Dist. LEXIS 70658 ...................... 20, 21

-ix-

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-00882-TSH

)

*Weizman v. Talkspace, Inc.*,
      705 F. Supp. 3d 984 (N.D. Cal. 2023) ................................................................. 23

*Westways World Travel v. AMR Corp.*,
      182 F. Supp. 2d 952 (C.D. Cal. 2001) ............................................... 14, 16, 17, 18

*Williams v. Boeing Co.*,
      517 F.3d 1120 (9th Cir. 2008) ...................................................................... 12, 13

**Statutes**

18 U.S.C. § 1961(4) ...................................................................................... *passim*

18 U.S.C. § 1962(c) ...................................................................................... *passim*

18 U.S.C. § 1964(c) ...................................................................................... *passim*

Cal. Bus. & Prof. Code § 17208 ................................................................................ 9

Cal. Civ. Proc. Code § 337(a) .................................................................................... 9

Cal. Civ. Proc. Code § 338(d) .................................................................................... 9

Cal. Corp. Code § 25019 .......................................................................................... 23

Cal. Corp. Code § 25501 .......................................................................................... 27

Cal. Corp. Code § 25503 .......................................................................................... 26

Cal. Fin. Code § 22100 ............................................................................................. 23

Cal. Pen. Code § 496 ................................................................................................ 21

**Other Authorities**

17 CFR § 230.501 ..................................................................................................... 27

*Application of the Federal Securities Laws to Certain Types of Crypto Assets and
      Certain Transactions Involving Crypto Assets*, Release Nos. 33-11412, 34-
      105020 (March 17, 2026) ................................................................................... 24

Fed. R. Civ. P. 15(c) ................................................................................................. 12

Fed. R. Civ. P. 56(a) ................................................................................................... 2

-x-
NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:23-cv-00882-TSH
)

**INTRODUCTION**

This case began in February 2023 as a fraud and securities lawsuit based on four OTC purchases allegedly made in reliance on false statements by Nexo's relationship manager and in its VIP Program brochure. Since October 2025, Cress changed it to a sprawling RICO, civil theft, and breach of contract lawsuit about a completely different issue—Nexo's fees. The Court should dismiss the fee claims as time-barred because they do not relate back to the Original Complaint. For the two statutory claims seeking treble damages—RICO and civil theft—the Court should dismiss the claims entirely because Cress cannot prove the necessary elements supporting those claims. Cress cannot prove a RICO enterprise, overcome the PSLRA bar, or establish RICO causation. Cress also cannot establish that Nexo committed the crime necessary to support a civil theft claim—neither Congress nor the California Legislature intended to transform run-of-the-mill fraud and contract claims into quasi-criminal actions with mandatory treble damages, particularly when those damages seek to recover market losses caused by leverage and poor investment decisions. At a minimum, those treble damage claims must be limited by causation principles to fees alone.

The UCL claims are barred because Cress has an adequate remedy at law and the Court does not have jurisdiction to entertain those equitable claims under *Sonner* and *Key*. The UCL "unlawful" claim related to alleged lack of California Finance Lender ("CFL") licensure independently fails because Cress has no standing to pursue this theory under published California authority rejecting the same licensure claim under the same statute. Cress received the multi-million dollar credit lines that allowed him to execute his leveraged investment "playbook;" the alleged lack of licensure is a regulatory infraction that caused him no harm.

The securities claims are barred because the NEXO Token purchases were not "investment contract" security transactions under *Howey*. Cress purchased those tokens for utility benefits on the Nexo platform, specifically the 50% interest rate reduction on crypto credit lines exceeding $13 million. If the Court allows the securities claims to proceed to trial, it should enforce the statute and limit Cress's alleged losses to the specific crypto he alleges to be a security—the NEXO Token—not his market losses on the liquidations of his non-security BTC and ETH.

The claim for breach of the Cryptocurrency Purchase Agreement (the "CPA") is barred

-1-

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

because there was no breach as to timely execution or fees. The Agreement said nothing about fees, and it did not mandate near-instantaneous execution or confirmation. Nor would such an interpretation be reasonable given the fact that the OTC transactions were market orders using Time Weighted Average Pricing ("TWAP") and executed over emails between different time zones. The statement that purchased assets would be "free and clear" of any liens only addressed the initial purchase of cryptocurrency covered by the CPA; it did not prohibit Cress from using those assets as collateral in a subsequent credit line transaction governed by the Credit Terms. As for Cress's claims of breach related to his liquidations, that procedure was governed by a separate contract—the Credit Terms—that authorized the liquidations at issue and referenced fees.

The fraud claim based on whether the NEXO Token was "registered with the SEC as a security" fails because the undisputed evidence precludes a finding of actual reliance or damages, and the fraud predicate raises a question of law, not fact.

Finally, the fraudulent omission claim must be dismissed because it is predicated on an alleged omission about fees that Cress knew about in 2021. The fraudulent inducement claim predicated on fees fails for the same reason. All alleged misrepresentations supporting Cress's fraud allegations were either known to Cress, or cannot support a fraud claim as a matter of law.

## FACTUAL BACKGROUND

I.     **Cress Used Nexo To Execute His Investment "Playbook."**

**A.  Cress had $13 million in crypto, but he wanted more using leverage.**

Cress is a sophisticated, accredited investor. Nexo's Statement of Undisputed Facts in Support of Summary Judgment ("SOF") at ¶7. ██████████████████ ██████████████████████████████ (SOF at ¶8) ██████████ ██████████████████████████ Ex. 38, Cress Depo. at 34:2-35:3; Decl. of Shelton at ¶¶3,6. In late 2020, Cress quit his job and managed his investments full time. *Id.* at 18:14-20:12.

Cress decided to use Nexo for leveraged investing weeks before he received the VIP brochure. In early 2021, ████████████████████████ ██████████████ *See, e.g.*, SOF at ¶5 ██████████████ ████████████████████████████████████

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

SOF at ¶9. ████████████████████████████████████████

████████████████████████████████████ [1] *Id.* Already, Cress was devising a plan to use leverage, *i.e.,* borrow against his existing crypto, to purchase more Bitcoin.

The next day, on February 26, 2021—before he opened any Nexo account—Cress solidified the plan. He wrote Lindenbaum again: "I found the playbook. Read all this, but especially when he starts talking about Nexo." SOF at ¶10. The "playbook" Cress finally landed on was from a Coin Times article entitled "My Crypto Investment Strategy." *Id.* It laid out a step-by-step plan: open a Nexo account, transfer crypto into Nexo, take out a loan, buy "a Whole Bunch of NEXO tokens," and use the appreciating value of Bitcoin, ETH, and Nexo to obtain further cryptocurrency and loans. *Id.* at 42-44. All this was before Cress ever contacted Nexo.

By March, Cress had decided to execute his playbook. On March 3, 2021, he opened a Nexo account and transferred 250 BTC and 250 ETH, intending to borrow against his crypto—exactly the sequence in his playbook. SOF at ¶10. He wrote himself a number of emails, with questions to ask Nexo, like:

- On March 3, 2021, "Ask Nexo about trading commissions" (SOF at ¶17).

- On March 8, 2021, "If you have half your bitcoin used as loan collateral and half earning interest and LTV goes over 83% and they start auto liquidating, does that mean they automatically move some tokens from your earning bucket over to your collateral bucket, or do they start selling your BTC? I think they would sale, hence the term 'liquidate', but also because if you started earning less, it wouldn't cover the loan payments" (SOF at ¶18).

- On March 25, 2021, still before he entered into any OTC transactions with Nexo, Cress wanted to confirm his understanding of how the OTC desk worked compared to Coinbase. He asked if he could just "sell through the Nexo OTC desk *with the same fees* [as Coinbase]." (SOF at ¶14) (emphasis added). [2]

[1] Lindenbaum was a former registered investment adviser at Charles Schwab, a registered broker, and teaches financial literacy courses with the Bay Area Financial Education Foundation. SOF at ¶13.

[2] Similarly, Cress wrote his dedicated account manager Hristov, "Will all the OTC transactions and every other purchase, sell, fee, commission, and loan interest payment be consolidated in that same CSV download file?" SOF at ¶24.

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

On March 15, 2021, Hristiyan Hristov reached out to Cress, informing Cress of the VIP Relationship Program, and identifying himself as Cress's dedicated relationship manager. Ex. 14, NEXO-0003119. Cress immediately forwarded Hristov's welcome email to Lindenbaum, and then responded to Hristov, "sent my BTC over to Nexo because ***my goal was to do borrowing and lending***." SOF at ¶20 (emphasis added).

**B.  Cress agreed to and understood Nexo's fees and Credit Terms.**

Cress entered into several contracts with Nexo, all of which expressly informed him that digital assets were more volatile than fiat currencies, and this volatility could result in substantial losses quickly; that Nexo made no representations and warranties of any data provided by Nexo; and that his decision to transact with Nexo was at his own risk.

For example, Nexo's Terms and Conditions,[3] which Cress agreed to twice, first when he opened an account and again in order to receive his credit lines, disclosed the following:

- "Nexo Crypto Credit means any Digital Assets credit facility granted by Nexo and the total amount of the credit due by the Client to Nexo, at any time until its full repayment, including the principal, the Interest and ***any fees*** due to Nexo in accordance with the relevant general terms and conditions." SOF at ¶31 (emphasis added).
- "Nexo will grant you a Nexo Crypto Credit in Digital Assets, if you provide the required Digital Assets as collateral by transferring them into the Nexo Account ('Collateral')." SOF at ¶38.
- "You shall at all times maintain the necessary Collateral in accordance with the [Loan to Value]." *Id.*
- "If the LTV increases above the maximum permitted thresholds, as indicated on the Nexo Platform, Nexo shall, after notifying you, liquidate the necessary amount of Collateral to rebalance your Nexo Crypto Credit." SOF at ¶39.
- "Granting the Nexo Crypto Credit to you does not make Nexo your trustee or investment adviser and no fiduciary relationship exists between us. We have no trust or other obligations in respect to your Nexo Account other than those expressly specified hereunder." *Id.* at -730.

Nexo's Terms and Conditions also disclosed and repeatedly discussed fees:

- Nexo Crypto Credit General Terms and Conditions: "the fees you paid to Nexo for your use of the services … ". SOF at ¶32;
- Nexo Exchange Service General Terms and Conditions: "the fees you paid to Nexo for your

---

[3] Nexo's Terms and Conditions consisted of Nexo Crypto Credit General Terms and Conditions (SOF at ¶32); Nexo Exchange Service General Terms and Conditions (SOF at ¶33); Nexo Wallet Services General Terms and Conditions (SOF at ¶34); and General Terms and Conditions of Earn Interest Product (SOF at ¶37).

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

use of the Nexo Exchange Service …". SOF at ¶33;

- Nexo Wallet Services General Terms and Conditions: "All fees and charges for the bank transfer under the preceding sentence, if any, shall be at your expense… the fees you paid to Nexo for your use of the relevant Nexo Wallet Service … Your use of the Nexo Wallet Services may be subject to certain fees". SOF at ¶34; and
- General Terms and Conditions of Earn Interest Product: "the fees you paid to Nexo for your use of the Nexo Earn Interest Product …". SOF at ¶37.

Cress also signed a Cryptocurrency Purchase Agreement (the "CPA") stating that "Nexo is not providing and will not provide any fiduciary, advisory, exchange or other similar services with respect to Counterparty, any person related to or affiliated with Counterparty, or any transaction subject to this Agreement." SOF at ¶46.

## II. Cress Executed His Transactions With Full Knowledge Of The Terms And The Risks.

### A. Cress repeatedly decides to leverage up.

Cress implemented his leveraged investing playbook. Hristov explained several borrowing scenarios to Cress, including the benefits associated with Nexo's Loyalty Program and owning NEXO Tokens. SOF at ¶65. By purchasing 25 BTC worth of the NEXO Token, Cress qualified for "Platinum" status, which reduced his borrowing costs by 50%. SOF at ¶¶94, 100. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ SOF at ¶66. He then entered the following transactions:

- **Transaction 1** (March 26, 2021). Cress borrowed $5,400,000 USDT for the purchase of 75 BTC and the rest in NEXO Tokens. SOF at ¶56. After execution, Hristov confirmed "The OTC team did a great job and purchased the assets as it follows: 74.441 BTC @ $55,289.81 481,878 NEXO Tokens @ $2.66[.]" *Id.*

- **Transaction 2** (March 30, 2021). Just four days later, Cress informed Hristov that he wanted to use his credit line to purchase "50 or 75 more bitcoins." SOF at ¶58. To do so, Cress borrowed an additional $4.3M to purchase 50 BTC and 20 BTC worth of NEXO Tokens. *Id.* at -90-91. Hristov confirmed that "The OTC has executed the deal with the following parameters: 530,190 NEXO Tokens @ $2.829 [and] 47.3227 BTC @ $59,197[.]" *Id.* at -90.

- **Transaction 3** (April 14, 2021). Cress took out another credit line and directed Hristov to purchase 28 BTC to reach his "goal" of 400 BTC, and whatever amount of NEXO Tokens to maintain his Platinum tier interest rate. SOF at ¶¶61-63. Hristov instructed Cress to send "$2,150,000 USDT which will be used for purchasing 28 BTC and [with] the remaining we will top [off] the NEXO tokens balance[.]" *Id.* Cress did so, and Hristov reported back that

-5-

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

the OTC desk purchased "28.3780 BTC @ $63,426 [and] 91,715 NEXO Tokens @ $3.816[.]" *Id.* at -88.

- **Transaction 4** (April 29, 2021). Cress, having decided to increase his Ethereum holdings from 250 to 400, writes Hristov again. Cress ultimately "takes a $1,000,000 USDT loan and sen[t] it to Nexo's OTC for ETH" and Nexo Tokens, and a "$1M USDC loan" to put in his savings wallet. SOF at ¶¶50,51. Hristov, being out of office, connected Cress to his colleague, Octavian Dinca, who completed the Ethereum transaction for Cress: "312.14868 ETH will be added to your account[.]" SOF at ¶52. After Cress complained about the price of Ethereum the OTC desk executed, Dinca explained Nexo's fee mechanics: "[t]he cost per unit above includes the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC desk charged for the transaction which is estimated around —0.5% as well." SOF at ¶54.

While he now alleges that he was unaware of any Nexo fees, and that he felt tricked by Nexo, at the time, he was well aware of the fees and simply did not care. ███████████████

████████████████████████████████████████████████████

SOF at ¶68. ██████████████████████████████████████████

███████████████████████████████████████████ *Id.* █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ *Id.* at -700.

In another chat, ███████████████████████████████████

██████████████████████████████ SOF at ¶69. ██████████

████████████████████████████████████████████████████

*Id.*

On several occasions, Nexo account managers, such as Hristov and Dinca, explicitly informed Cress of the fee. SOF at ¶¶25, 26; *see, e.g.,* SOF at ¶70 (Cress explaining to Lindenbaum: "I asked if 2.7% will be the fee 'all the way around' and [Hristov] said 'yes, this will be the total cos[t] for the sell execution.' Pretty tricky. I have no choice though…5% fee for a 50% loss;") *see*

-6-

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

*also* SOF at ¶91 (Cress and Hristov negotiating fees before the transactions). Yet, Cress's transaction confirmations also showed the fees themselves. For example, on his first transaction, he borrowed money from Nexo to buy 75 BTC. SOF at ¶56. Shortly thereafter, the relationship manager confirmed that Cress had been credited with 74.441 BTC, reflecting Nexo's fee of ~.6, the difference between 75 and 74.4. SOF at ¶57. Cress did not even blink an eye, and his next email was a request to purchase more BTC.

Likewise, ██████████████████████████████████████████████████████ ███████████████████████████████████████████ SOF at ¶71. In fact, Cress was happy to pay fees when it suited him. In an email to Hristov dated June 13, 2021, Cress proposed a transaction and said "***I would also be willing to pay a lot of money in fees if I could do that*** … [T]his would be a valuable service and ***I would pay a BIG FEE*** if I can do this …." SOF at ¶67 (emphasis added).

██████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ SOF at ¶73. Cress was pleased with Nexo so long as the market was up. ████████████████████████ ████████████████████████████ SOF at ¶72. In short, Cress devised a playbook for investing, found a company that allowed him to execute it, entered into leveraged transactions with full knowledge of the risks, and bragged about his success. Everything was good until the market turned south.

**III.    The Volatile Bitcoin Market Fell And Cress's Overleveraged Position Was Liquidated.**

Cress purchased BTC using borrowed funds at an average price of approximately "$57,000" per BTC. SOF at ¶75. This was near an all-time high price for BTC at the time. Like any investment, his playbook worked so long as Bitcoin's price continued rising. When the market moved sharply in the opposite direction, the risks inherent in his strategy materialized.

In late May and June 2021, the cryptocurrency market suffered one of many large crashes. Investors who had purchased cryptocurrency with borrowed money found themselves increasingly unable to satisfy collateral requirements as asset values deteriorated. Cress was one of them. He said

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

it himself: ███████████████████████████████

███████████████████████████████████████

███████ SOF at ¶6 (emphasis added). Before and during his liquidations, Cress received nearly 40 liquidation warnings.[4] But Cress was illiquid; he candidly acknowledged that he did not have any more assets or funds to deposit or pay off his credit lines. Cress wrote Hristov, "I have more assets on Coinbase and KuCoin, but these are not coins that are supported on Nexo. I have about 40 ethereum in MyEtherWallet, but is 40 ETH even going to help lower my LTV?". SOF at ¶79. Hristov's response was blunt but honest, "It will help but not much." SOF at ¶80.

**IV.    Cress Admits That He Was At Fault For His Losses.**

Cress's post-loss communications provide the most reliable account of what actually happened because they were made in real time, before any lawsuit was contemplated. In those moments, *Cress did not blame Nexo*. He blamed himself. ███████████████████

███████████████████████████████████████

██████ SOF at ¶81. ███████████████████████████████

████████████████████ SOF at ¶82. On June 24, 2021, as his leveraged positions were collapsing and liquidations were occurring, Cress candidly admitted to Nexo personnel: "*I can only blame myself.*" SOF at ¶83 (emphasis added). ██████████████████████

███████████████████████████████████████

███████████████████████████████████ SOF at ¶84.

*At no point in time during the course of his transactions did he blame Nexo for his losses.* He did not accuse Nexo of tricking him. He did not claim Nexo concealed fees, guaranteed against liquidation, or forced him into leverage. He never once protested the forced sales. Instead, ██ ████████████████████████████████████ SOF at ¶86. These contemporaneous admissions are fatal to the narrative now advanced in this litigation. ████████████████

███████████████████████████████████████

████████████████████████ SOF at ¶87. But that self-awareness proved short-lived

---

[4] *See, e.g.,* SOF at ¶78.

as Cress decided to blame Nexo. ███████████████████████████

███████████████ Decl. of Shelton, Ex. 38, Cress Depo. at 59:14-25.

## ARGUMENT

**I.    The Court Should Dismiss All Fee Claims As Time-Barred.**

To the extent Cress's claims are based on fees, Nexo moves for partial summary judgment on Cress's fraudulent inducement, UCL, and breach of contract claims (Counts I, II, and X), and full summary judgment on Cress's civil theft, RICO, RICO conspiracy, and fraudulent omission claims (Counts VI, VII, VIII, and VIII), because those fee-based claims are time-barred.[5]

**A. Cress's fee claims accrued in 2021 when he was charged fees.**

Cress did not complain about the fees that Nexo charged on his OTC transactions and liquidations until he sought leave to file the Second Amended Complaint ("SAC") on September 30, 2025. Dkt. 75. By that point, all applicable limitations periods had expired.[6] All the transactions underlying Cress's fee allegations occurred between March and June 2021. SOF at ¶88 (citing account history). The final OTC transaction occurred on April 30; and the final liquidation occurred on June 24, 2021. SOF at ¶¶88, 89. Any allegedly improper fees were necessarily assessed—and any resulting injury necessarily occurred—at the time of those transactions. Thus, Cress had no later than April 30, 2025 to assert his claims related to his OTC purchases, and June 24, 2025 to assert claims related to his liquidations.

In the SAC, Cress alleges that Nexo represented it did not charge fees and had a #ZeroFees or "no hidden fees" policy (Dkt. 88, ¶¶53, 111), but, contrary to this policy, "secretly" took profits from his OTC transactions and liquidations. Dkt. 88, ¶¶196, 213. Because these claims were filed after the limitations period, he invokes the discovery rule and specifically pleads that he did not discover, nor could he have reasonably discovered, the facts giving rise to the fee-based claims until

---

[5] *See* Dkt. 88, ¶¶140, 153 (showing Cress's claims solely relying on fee allegations); Dkt. 88, ¶¶195, 215, 235, 241, and 254 (showing Cress's claims partially relying on fee allegations).

[6] Fraud and civil theft claims are subject to a three-year limitations period. Cal. Civ. Proc. Code §§ 338(c), (d). RICO, breach of contract, and UCL claims are subject to a four-year limitations period. *Id.* § 337(a); Cal. Bus. & Prof. Code § 17208; *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001).

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

at least August 31, 2025, through Nexo's document productions. Dkt. 88, ¶¶148, 192, 202, 205, 236, 249, and 264. In fact, he goes ever further, claiming that "he was *genuinely ignorant* of the material facts underlying th[ese] claim[s] and, despite exercising reasonable diligence, was unable to uncover those facts any sooner." Dkt. 88, ¶¶148, 192, 202, 205, 236, 249, and 264 (emphasis added). The law, as well as the record, shows that his claims are barred.

**B. Cress knew about Nexo's fees in 2021.**

The discovery rule "which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action," mandates that "[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Stella v. Asset Mgmt. Consultants, Inc.*, 8 Cal. App. 5th 181, 192 (2017). Here, Cress cannot plausibly maintain that he was "genuinely ignorant" of the fees at the time of his transactions.

*First*, Cress agreed to fees through his agreements with Nexo. Cress specifically agreed to the Terms and Conditions referencing Nexo's fees when he opened an account with Nexo: Nexo Crypto Credit General Terms and Conditions "the fees you paid to Nexo for your use of the services … " (SOF at ¶32); Nexo Exchange Service General Terms and Conditions: "the fees you paid to Nexo for your use of the Nexo Exchange Service …" (SOF at ¶33); Nexo Wallet Services General Terms and Conditions: "All fees and charges for the bank transfer under the preceding sentence, if any, shall be at your expense… the fees you paid to Nexo for your use of the relevant Nexo Wallet Service … Your use of the Nexo Wallet Services may be subject to certain fees" (SOF at ¶36); General Terms and Conditions of Earn Interest Product: "the fees you paid to Nexo for your use of the Nexo Earn Interest Product …" (SOF at ¶37). At a minimum, he had actual or constructive knowledge that Nexo charged fees.

*Second*, his own contemporaneous communications establish that he was well aware of fees as of April 2021. ████████████████ ████████████████████████████████ SOF at ¶68. ██ ████████████████████████

████████ *Id.* Cress was therefore aware not only of the fees themselves but of the very conduct he now contends was unlawful. Indeed, the premise of the fee allegations is Nexo charged either excessive or undisclosed fees. Cress's statements show that at a minimum, he had already formed that belief in April 2021.

*Third*, at the very least, Cress was suspicious of fees in April 2021, and was required to "go find the facts." Indeed, that is *precisely* what Cress did. In May and June 2021, Cress began to ask about the pricing details of his OTC transactions and went on to directly negotiate fees. SOF at ¶26. On May 3, 2021, Cress expressly asked Nexo about fees on his ETH purchase, to which Nexo responded: "[t]he cost per unit above includes the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC desk charged for the transaction which is estimated around —0.5% as well." SOF at ¶54.

*Fourth*, Cress thought Nexo was doing him wrong. ████████

████████

████████ SOF at ¶69. ████████

████████ *Id.* ████████

████████

████████ *Id.*

"Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Stella v. Asset Mgmt. Consultants, Inc.*, 8 Cal. App. 5th 181, 192 (2017). Here, Cress, rather than filing suit on his fee-based claims, sat on them. *WA Sw. 2, LLC v. First Am. Title Ins. Co.*, 240 Cal. App. 4th 148, 158 (2015) (holding that plaintiffs' claims about hidden transactions costs were time-barred because the private placement memorandum put accredited investors on notice about commissions). Accordingly, Cress's claims accrued no later than June 2021, *i.e.*, the time of his last transaction and/or liquidation and after he had already admittedly discovered the alleged injury or at the very least been put on notice. At that point, Cress had three years to bring his fraud-based claims and civil theft (until June 2024), and four years to bring his contract, UCL, and RICO claims (until June 2025). Yet Cress did not assert any fee-based claim until September

30, 2025, when he moved for leave to file the SAC. Dkt. 75.

### C.  Cress cannot rely on relation back.

Likely, Cress will pivot and, instead of claiming the discovery rule, he will suddenly argue his claims relate back to his original filing date. Fed. R. Civ. P. 15(c). Here, Cress's Original Complaint identified a discrete set of alleged wrongs. It asserted alleged misrepresentations in Nexo's VIP Relationship Program Brochure concerning the OTC desk's customer service and responsiveness (Dkt. 1, ¶¶68-76, 89-93) and the Liquidation Relief Program (¶¶85-88). It alleged securities-law violations arising from a purported "requirement" that Cress purchase NEXO Tokens to obtain enhanced benefits (¶¶50-67). It further alleged that Nexo provided untimely liquidation notices, over-liquidated collateral (¶¶81-82), and failed to pay interest on collateral (¶¶94-95). Notably absent from the Complaint was any allegation that Nexo improperly charged fees. ***The Complaint never used the word "fee," never alleged that OTC transactions or liquidations involved improper fees, never claimed that any fee was excessive or undisclosed, and never sought damages based on fee-related conduct***. Nothing in Cress's pleadings would have alerted Nexo that it would later be required to defend claims concerning the assessment, disclosure, or calculation of OTC or liquidation fees.

For relation back to apply, the claims must "share a common core of operative facts such that the plaintiff ***will rely on the same evidence to prove each claim***." *Echlin v. PeaceHealth*, 887 F.3d 967, 978 (9th Cir. 2018) (emphasis added) (quoting *Williams v. Boeing Co*., 517 F.3d 1120, 1133 (9th Cir. 2008)). Thus, an amendment will not relate back where the amended complaint "had to include additional facts to support the [new] claim." *Id.* (brackets in original). Rule 15 incorporates the relation back rules of the law of a state only when that state's law provides the applicable statute of limitations and is more lenient. *Butler v. Nat'l Cmty. Renaissance of California*, 766 F.3d 1191, 1200 (9th Cir. 2014). Where federal law applies the applicable statute of limitations, Rule 15 governs. *Id.*; *see also Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 997 (C.D. Cal. 2008) (applying Rule 15 to RICO claims).

In *Echlin*, even though the new claim arose "from the same general transaction" as her old claim, the Ninth Circuit concluded that was insufficient for relation back because the new claim

-12-

"would not rely on all the same facts and evidence," so the new claim "would therefore be time-barred." *Id.* at 978-79. Consistent with *Echlin*, courts have found no relation back when the same evidence will not be used to prove the old and new claims. *See Williams*, 517 F.3d at 1133 (finding "no common core of operative facts between the compensation discrimination claim and the promotion discrimination, hostile work environment, and retaliation claims"). The addition of new facts supporting claims "different in character" from old claims that substantially "escalate[] Defendant's potential liability"—such as treble damages under RICO—"weighs against permitting relation back." *Friedman*, 580 F. Supp. 2d at 997 (RICO and EFTA claims did not relate back to fraud and contract claims). California state law is consistent, finding no relation back when the new claim relies on new facts that did not give the defendant "adequate notice of the claim based on the original pleading." *Walters v. Cal. Dep't of Corr. & Rehab.*, No. 2:17-cv-2393 MCE KJN P, 2018 U.S. Dist. LEXIS 3951, at *15 (E.D. Cal. Jan. 9, 2018).

That is exactly the circumstance here. The newly asserted fee allegations do not elaborate on, clarify, or amplify facts already pled. Cress admits as much by affirmatively pleading that the fee claims were separate and, allegedly, undiscoverable from the facts he knew before August 2025. Instead, the fee claims target an entirely different category of conduct. Whereas the original pleadings focused on brochure representations, token-purchase requirements, liquidation notices, collateral liquidations, and interest payments, the new allegations focus on whether Nexo charged OTC and liquidation fees, whether those charges were disclosed, and whether the amounts assessed were proper. Those issues were never mentioned, let alone placed in controversy, in either prior pleading. Cress cannot have it both ways—he cannot claim "genuine ignorance" of the fee claims *and* that the fee claims relate back to the original transactions. Nexo is entitled to summary judgment on all claims predicated on allegedly improper fees.

## II.     The Court Should Dismiss The RICO Claims Or Limit Damages To Fees.

If the RICO claim (Count VII) is not time-barred, it should be dismissed on the merits.

### A.     Cress does not identify a RICO Enterprise; he merely relabels Nexo's ordinary corporate structure as a criminal enterprise.

The alleged RICO Enterprise is not separate from Nexo. It is Nexo. Cress's own discovery

responses describe a collection of Nexo affiliates, executives, employees, and service entities that collectively operated the Nexo platform. The shared ownership, branding, management, policies, and personnel on which he relies demonstrate the existence of a single integrated business organization, not an enterprise distinct from the alleged RICO person. Because the alleged enterprise has no purpose, structure, personnel, or activities apart from conducting Nexo's ordinary business, the distinctiveness requirement is not satisfied.

Section 1962(c) requires proof of two distinct entities: "(1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see also Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984). RICO defines "enterprise" to include a legal entity or an association-in-fact, 18 U.S.C. § 1961(4), but that definition does not eliminate the distinctiveness requirement. *Cedric Kushner*, 533 U.S. at 161; *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). A corporation cannot become a RICO enterprise merely by acting through the employees, contractors, service providers, or affiliates that perform the corporation's ordinary business functions. *Living Designs*, 431 F.3d at 361; *Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 960-61 (C.D. Cal. 2001); *Bodam v. GTE Corp.*, 197 F. Supp. 2d 1225, 1232-33 (C.D. Cal. 2002); *Farmers Ins. Exch. v. First Choice Chiropractic & Rehab.*, No. 3:13-cv-01883-PK, 2016 U.S. Dist. LEXIS 5149, at *24 (D. Or. Feb. 25, 2016).

Nexo Capital is not a distinct "person" from the "Nexo Enterprise." Rather, the operation of a "digital asset savings and loan platform" constitutes the affairs of the Nexo Group, which lacks any distinctiveness from the corporate entities that make up the group. Dkt. 88, ¶214. Kosta Kantchev is the sole ultimate beneficial owner of Nexo Inc., which is the parent of most Nexo entities including Nexo Capital, and he is the sole direct owner of all other Nexo affiliates comprising the alleged Nexo Enterprise, with the exception of a 30% stake in one Nexo affiliate held by Trenchev. SOF at ¶127. NDS EOOD ("NDS") is a downstream wholly-owned subsidiary of Nexo Inc., which is 100% beneficially owned by Kosta Kantchev. SOF at ¶¶116, 117. NDS employs all Nexo employees according to intra-corporate contractual relationships, including an agreement in which it provides services to Nexo Capital. SOF at ¶117. NDS did not provide services

to any other company outside the Nexo Group. SOF at ¶119.

While only Nexo Capital and NDS are relevant to the services that Nexo provided to U.S. customers in 2021, all worldwide Nexo affiliates in the Nexo Group exist for the purpose of providing Nexo's cryptocurrency services to Nexo's global customer base (Trenchev Decl., ¶¶ 24, 27, 33) as established by Nexo's own admissions: the Nexo Group's Consolidated Anti-Money Laundering Policy describes the group as several companies performing different lines of a single integrated suite of services — "lending of virtual currencies against other virtual currencies as collateral, borrowing of virtual currencies and payment of in-kind interest thereon, exchanging virtual currencies to fiat currencies and vice versa, as well as virtual currency wallet services" (SOF at ¶120); Nexo confirmed to the Massachusetts Securities Division that Nexo Capital is the Nexo Group company "conducting business" via Nexo's public website and mobile application and offering the Crypto Credit Product, the Exchange Service, and the Earn Interest Product (SOF at ¶121); and the Nexo Group maintains legal entities worldwide "in order to service 200+ jurisdictions in the most efficient manner" (SOF at ¶122). Nexo's Terms and Conditions similarly treat the affiliates collectively as one "Nexo" by defining the relationship between the client and "the Nexo group of companies." SOF at ¶32; Ex. 4, CRESS-00000721 at § 1. The CPA on which Cress sues likewise defines Nexo as "Nexo (any holding companies, subsidiaries or related entities...)" — so Cress's own contract equates the affiliates with Nexo. Ex. 16, CPA at -97. These are the vehicles through which one Nexo business reaches its customers, performing the corporation's ordinary functions — not a separate association-in-fact enterprise.[7] *See* also Decl. of Trenchev at ¶38.

Cress does not identify an enterprise separate from Nexo's platform business. Rather, he simply relabels Nexo's ordinary lending, OTC trading, compliance, support, marketing, and liquidation operations as an "enterprise." Under that theory, however, every company operating through subsidiaries, service companies, executives, and employees would automatically become a RICO Enterprise. Cress's discovery response confirms that the alleged "Nexo Enterprise" is nothing more than Nexo, the broader Nexo Group, and the personnel and affiliated entities through which

---

[7] Nexo Financial has confirmed that it does not provide "any services through the website https://nexo.io, which is used by other companies from the Nexo Group." SOF at ¶123.

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

Nexo operated its platform. ███████████████████████████████ ███████████████████████████████████████████ Decl. of Shelton, Ex. 60, Pl.'s Supp. Resp. to ROG No. 22 at 111-14. But Cress's theory of enterprise is circular: ███████████████████████████████████ ███████████████████████████████████████████ ████████████████████████ Id. at 114-21. Those allegations do not prove a RICO enterprise distinct from Nexo; they prove only that Nexo and related companies operated as an integrated corporate group, which is insufficient where the alleged enterprise merely conducts the normal affairs of the defendant corporation. *Cedric Kushner*, 533 U.S. at 161; *Rae*, 725 F.2d at 481; *Westways*, 182 F. Supp. 2d at 960-61; *Bodam*, 197 F. Supp. 2d at 1232-33. That is ordinary corporate conduct, not a separate association-in-fact enterprise. *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007); *Farmers*, 2016 WL 10827072, at *23-24. Every fact Cress identifies demonstrates integration, not distinctiveness.

Nor does Cress's reliance on NDS cure the distinctiveness defect. ████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████ Ex. 60, Pl.'s Supp. Resp. to ROG No. 22 at 121–23. Cress further █████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ Id. Those admissions show that NDS was a wholly-owned subsidiary that employed Nexo's Bulgarian workforce. But, Cress has not identified an objective pursued by the alleged enterprise that was separate from operating Nexo's cryptocurrency business. Every act he identifies—customer service, compliance, OTC execution, marketing, loan administration, and liquidation—was performed in furtherance of Nexo's ordinary commercial operations.

The Ninth Circuit has made clear that an enterprise consisting only of the defendant and its employees would fail for lack of distinctiveness, *Living Designs*, 431 F.3d at 361, and district courts in this Circuit apply the same rule to employees, agents, and affiliated entities conducting the

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

defendant's ordinary affairs. *Westways*, 182 F. Supp. 2d at 960–61; *Bodam*, 197 F. Supp. 2d at 1232-33; *Farmers*, 2016 WL 10827072, at *24.[8] Cress's theory ultimately collapses into the proposition that Nexo became a RICO enterprise because its customer support personnel, compliance personnel, OTC desk personnel, engineers, and account managers were employed through NDS rather than directly by Nexo Capital. But a corporation does not become distinct from itself merely because its workforce is organized through a service subsidiary.

Cress's reliance on Nexo Group organizational charts, common ownership, and intercompany arrangements suffers the same fate. ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 60, Pl.'s Supp. Resp. to ROG No. 22 at 111-14, 119-21, 123-29. But common ownership, shared management, intercompany payments, consolidated policies, group-wide contracts, and ordinary allocation of costs and revenue are hallmarks of an affiliated corporate group. They do not establish a RICO enterprise with an existence distinct from the alleged RICO person. *Cedric Kushner*, 533 U.S. at 161; *Rae*, 725 F.2d at 481; *Westways*, 182 F. Supp. 2d at 960–61; *Bodam*, 197 F. Supp. 2d at 1232–33. To the contrary, ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. *Id.* at 114–21. That is the same "person" by another name, not a distinct enterprise. *Cedric Kushner*, 533 U.S. at 161; *Farmers*, 2016 WL 10827072, at *24.

Courts in this Circuit routinely reject RICO enterprises that merely restate a corporation plus its employees, agents, affiliates, or entities acting on its behalf. In *Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952 (C.D. Cal. 2001), the court explained that a § 1962(c) enterprise must

---

[8] While the Court relied on *Living Designs* when denying Nexo's motion to dismiss, the case is factually distinguishable. There, the Ninth Circuit held that DuPont and outside law firms could constitute an associated-in-fact enterprise because the law firms were legally distinct professional entities, required to conform to independent ethical duties, and not "merely at the beck and call" of DuPont. *Living Designs,* 431 F.3d at 361–62. The court emphasized that if the alleged enterprise had consisted only of DuPont and its employees, the pleading would fail for lack of distinctiveness. *Id.* at 361. That is precisely the circumstance with respect to Nexo Capital and NDS.

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

be more than an association conducting the normal affairs of a defendant corporation, because corporations necessarily act through employees and agents. *Id.* at 960-61. Likewise, in *Bodam v. GTE Corp.*, 197 F. Supp. 2d 1225 (C.D. Cal. 2002), the court dismissed a RICO claim where the plaintiff failed to plead an enterprise separate and distinct from the defendant. *Id.* at 1232-33. And in *Farmers*, the court held that, where the RICO person and enterprise were composed of the defendant and its employees, the claim failed for lack of distinctiveness. 2016 WL 10827072, at *24. Those cases fit Cress's interrogatory response ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████ Ex. 60, Pl.'s Supp. Resp. to ROG No. 22 at 111-29.

Under Cress's approach, any multinational business operating through subsidiaries, shared-service entities, centralized compliance groups, centralized technology teams, and common branding would automatically satisfy the enterprise requirement. That cannot be the law because it would eliminate the distinctiveness requirement altogether. Summary judgment for Nexo is proper.

### B. The PSLRA bars the RICO claims.

Alternatively, the Private Securities Litigation Reform Act ("PSLRA") provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish" a civil RICO violation. 18 U.S.C. § 1964(c). The RICO claim is barred by that statute because, notwithstanding Cress's disclaimer that the claim is "not based upon any of Nexo's securities law violations," Dkt. 88, ¶204, the alleged predicate acts necessarily rely on conduct that would be actionable as fraud in the purchase or sale of securities.

Cress identifies as predicate conduct Nexo's alleged representations that the OTC desk had "purchased" NEXO Tokens for him when, according to Cress, Nexo was selling NEXO Tokens from its own inventory at undisclosed markups. That theory tracks the actual OTC transactions described above.[9] Cress's securities theory likewise turns on those same NEXO Token purchases:

---

[9] *See* § II.A *supra* (showing Transaction 1 used $5.4 million USDT to buy BTC and NEXO Tokens, resulting in 481,878 NEXO Tokens at $2.66, Ex. 18, NEXO-0003386 at -93; Transaction

-18-

the SAC pleads that the NEXO Token was an unregistered security, Dkt. 88, ¶¶170, 178, and Cress's own interrogatory response calculates securities damages by reference to the consideration used to obtain the NEXO Tokens. SOF at ¶16.

The same overlap appears in his fee predicates. Cress contends that Nexo's #ZeroFees campaign and OTC confirmations concealed markups on NEXO Token purchases, but the record evidence he relies on is the same pricing and confirmation evidence for transactions involving the alleged security. SOF at ¶¶56-65. And even the liquidation predicate is inseparable from the NEXO Token theory because ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████ Ex. 38, Cress Depo. at 208:24-209:3; SOF at ¶¶96, 76. Because the NEXO Token purchases were central to, not incidental to, the alleged fraud— the PSLRA bars Counts VII and VIII as a matter of law. *See Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1249-50 (11th Cir. 2016); *Licht v. Watson*, 567 F. App'x 689, 693 (11th Cir. 2014); *MLSMK Investment Co. v. J.P. Morgan Chase & Co.*, 651 F.3d 268, 277-80 (2d Cir. 2011).

### C. RICO causation is absent.

The "by reason of requirement under § 1964(c) requires both proximate and but-for causation." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Supply Corp.*, 547 U.S. 451, 461 (2006). Because "the proximate cause requirement generally bars suits for alleged harm that is too remote from the defendant's unlawful conduct, ... it demands some direct relation between the injury asserted and the injurious conduct alleged." *Painters*, 943 F.3d at 1248-49 (quotation marks and alterations omitted).

Here, the alleged pattern of racketeering activity relates solely to Nexo's alleged undisclosed fees. Cress's own damages expert, Mizrach, claims that the "fee," markup, or spread on Cress's OTC transactions was only $171,895, and the liquidation fees were $499,333. Decl. of Shelton, Ex. 62,

---

2 used borrowed funds to buy 530,190 NEXO Tokens at $2.829, *id.* at -90-92; and Transaction 3 purchased another 91,715 NEXO Tokens at $3.816, *id.* at -88-89).

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

Mizrach Rep. at 9 and 20. Nexo's OTC fees were low-single-digits, and in some cases less than 1%.[10] *See, e.g.,* SOF at ¶¶52-53. Yet Mizrach calculates Cress's RICO damages as $20.1 million or $60.4 million trebled, which includes a $13.6 million "Portfolio Value Change" caused by Cress's use of high leverage and a 50%+ market crash. Ex. 62, Mizrach Rep. at 29-30. Cress's attenuated causation theory—which seeks market losses that are $19 million (or $59 million) more than the fees allegedly charged—cannot meet RICO's direct relationship requirement. *See Marshall v. Goguen*, 604 F. Supp. 3d 980, 1007 (D. Mont. 2022) (finding direct relationship test not satisfied because "any scrutiny would need to determine the extent to which Plaintiffs' losses were the result of the Scheme's alleged criminal conduct as opposed to say, ***poor business practices, the independent actions of others, or market fluctuation***") (emphasis added).

Cress's RICO causation theory fails because it asks this Court to do what the Supreme Court in *Hemi* forbids: move past the first step in the causal chain. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10-12 (2010). RICO does not permit a plaintiff to trace his way through a sequence of intervening decisions, market forces, contract terms, and later consequences until he arrives at a loss he would like to recover. The statute requires a direct, proximate, relationship between the alleged predicate acts and the asserted injury. *Hemi Grp., LLC*, 559 U.S. at 10-12. Thus, if the plaintiff must go beyond the immediate cause of his injury—if the theory depends on what he would have done differently, how third parties or markets would have behaved, or how later intervening events might have unfolded—RICO proximate cause is absent as a matter of law.

Cress's losses materialized only after an intervening market crash caused the value of his collateral to fall and triggered contractually authorized liquidations. There is no RICO causation based on at least five independent, intervening causes: (1) Cress's leverage; (2) crypto market decline; (3) insufficient collateral; (4) contractual liquidation thresholds, and (5) Cress's failure to close his positions before liquidation, including when the market was up. Recent crypto cases rigorously enforce the RICO causation requirement. In *Watt v. OKCoin USA Inc.*, the court dismissed RICO claims brought by crypto-theft victims against an exchange that allegedly failed to

---

[10] The fees for the BTC and ETH purchases ranged from 0.49% to 1.34% The fees for the NEXO Token purchases, which were a less liquid asset, ranged from 1.99% to 4.31%.

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

maintain adequate AML and KYC controls, holding that the proximate cause of the plaintiffs' injury was not crypto laundering but theft. No. 25-cv-00368-JSW, 2026 U.S. Dist. LEXIS 70658, at *14-20 (N.D. Cal. Mar. 31, 2026). Cress's RICO claims seek to recover investment losses caused by a crypto market downturn and his use of leverage. Allowing such a theory would require the Court to "move well beyond the first step" in the causal chain, *Hemi*, 559 U.S. at 10, and to speculate about counterfactual scenarios in which Cress would not have borrowed, would have borrowed less, would have bought different assets, would have added more collateral, would have exited earlier, or would somehow have avoided the same market collapse. RICO proximate cause does not permit that exercise. At a minimum, in the unlikely event the RICO claim moves forward, the Court should limit Cress's potential RICO recovery to fees only.

### D.  The RICO conspiracy fails for the same reasons.

As set forth above, Nexo is entitled to summary judgment on RICO conspiracy (Count VIII) because the underlying substantive RICO claim fails. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (RICO conspiracy claim fails with the substantive RICO claim).

### III.   The Court Should Dismiss The Civil Theft Claim Or Limit Damages To Fees.

Cress's civil theft claim fails because Penal Code section 496 is not a treble-damages substitute for ordinary fraud, breach of contract, or a commercial dispute over fees. To invoke section 496, Cress must prove that property was "stolen or obtained in a manner constituting theft," that Nexo knew the property was so obtained, and that Nexo received or possessed it. *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 361–62 (2022); *Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 F. App'x 238, 242-43 (9th Cir. 2021). Theft by false pretenses further requires proof that Nexo knowingly made a false representation with criminal intent to defraud and that Cress transferred property in reliance on that representation. *Doe v. Vaidyaji Priyanka*, 814 F. Supp. 3d 1073, 1086-87 (N.D. Cal. 2026).

That criminal-intent requirement is dispositive. As the California Supreme Court emphasized in *Siry*, "not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft." 13 Cal. 5th at 362. That is this case. At most, Cress alleges ordinary fraud or a commercial

-21-

dispute about OTC pricing, fees, disclosures, and liquidation mechanics. Those theories may support ordinary civil claims if the elements are met; they do not establish that Nexo committed theft. The record contains no evidence that Nexo intended to steal Cress's collateral when Cress transferred assets to Nexo, borrowed against them, purchased cryptocurrency, and subjected collateral to the Credit Terms governing LTV, margin warnings, and liquidation. Indeed, Cress obtained the benefit of his bargain—a credit line exceeding $13 million that he used to execute his leveraged investment "playbook"—and he was happy about it until the market moved against him. The Crypto Credit terms defined Nexo Crypto Credit to include "the principal, the Interest and **any fees** due to Nexo," required Cress to "at all times maintain the necessary Collateral" in accordance with the applicable LTV, and provided that "[i]f the LTV increases above the maximum permitted thresholds, as indicated on the Nexo Platform, Nexo shall, after notifying you, liquidate the necessary amount of Collateral to rebalance your Nexo Crypto Credit." SOF at ¶¶39, 31; *see also* Decl. of Shelton, Ex. 9, NEXO-0009125 (Nexo article reiterating the 83.3% LTV threshold before liquidation). Those provisions defeat the premise that Nexo committed theft.

The timing also defeats Cress's theory. A civil theft claim fails where "there is no causal connection shown between the [representation] alleged to be false" and the transfer of property. *Harris v. Garcia*, 734 F. Supp. 2d 973, 1000 (N.D. Cal. 2010). Here, the alleged misrepresentation concerns fees or fee advertising, while the challenged liquidations were triggered by market decline and the Credit Terms. Cress's knowledge of the fees likewise defeats his theft claims. Cress ███ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████ SOF at ¶68. A customer who knew about fees cannot use his alleged lack of knowledge as a predicate for criminal theft. To the extent that the predicates for the civil theft claim extend beyond fees and is duplicative of Cress's fraud theory, it fails for the same reason as the fraudulent omission and inducement claims discussed in § VIII below. If the Court concludes that a triable issue exists on the alleged fee theory, any civil theft recovery must be limited to the fees.

## IV.    The Court Should Dismiss The UCL Claims.

### A.    All UCL claims must be dismissed under *Sonner*.

-22-

The Court must dismiss the equitable UCL claims because Cress has an adequate remedy at law through his legal claims. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *Weizman v. Talkspace, Inc.*, 705 F. Supp. 3d 984, 990 (N.D. Cal. 2023) (dismissing UCL claim where plaintiff failed to allege an inadequate remedy at law); *Guthrie v. Transamerica Life Ins. Co.*, 561 F.Supp.3d 869, 875 (N.D. Cal. 2021) ("I and many other district judges applying *Sonner* have understood it to require that a plaintiff must, at a minimum, plead that she lacks adequate remedies at law if she seeks equitable relief."). The Ninth Circuit recently reaffirmed this principle. *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025) (affirming dismissal of UCL claim because of the existence of a legal remedy). The equitable claim must be dismissed.

**B.    The UCL "unlawful claim" based on CFL licensure must be dismissed under *Lagrisola*.**

Cress's unlawful-prong UCL claim based on lack of CFL licensure must be dismissed. In *Lagrisola v. North American Financial Corp.*, 96 Cal. App. 5th 1178 (2023), borrowers alleged that the defendant violated Financial Code section 22100 by engaging in unlicensed lending. The court held that those allegations were insufficient because the borrowers did not allege that they paid more than they would have paid a licensed lender, suffered any particular harm from the defendant's unlicensed status, or relied on any representation or omission about licensure when entering the loan. *Id.* The court emphasized that the borrowers "received the benefit of their bargain," having obtained the loan they sought at the agreed price. *Id*. The same reasoning controls here.

**V.    The Court Should Dismiss Cress's Securities Registration And Fraud Claims Or Limit Damages To The NEXO Token.**

Nexo is entitled to summary judgment on Cress's Unregistered Offer and Sale of Securities (Count III) and Fraud in the Offer and Sale of Securities (Count IV) claims (collectively, the "security claims") because the 2021 NEXO Token sale to Cress was not a securities transaction under California or federal law. Cal. Corp. Code § 25019 defines a security broadly to include an "investment contract." Similarly, under the seminal *Howey* test, a security is "[1] a contract, transaction or scheme whereby a person invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (numbers added) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293,

-23-

298-99 (1946)). According to SEC interpretation applying federal securities law to certain crypto assets, "[d]igital commodities…are not themselves securities. However, as with any asset that is not a security, a nonsecurity crypto asset can be offered and sold subject to an investment contract, which is a security."[11]

### A.    The 2021 NEXO Token sale to Cress was not a securities transaction.

The relevant transaction at issue is not the 2018 fundraising ICO. The relevant transaction is a 2021 purchase by an existing Nexo customer inside an already-operational ecosystem for immediate platform benefits. Cress purchased the NEXO Token to obtain the *utility benefit* of an interest rate reduction on the approximately $13 million in credit lines that he took out on the Nexo platform, in addition to obtaining other platform perks associated with Nexo's "Platinum" loyalty program. *See* SOF at ¶¶96, 102 (describing Nexo loyalty program and the 5.9% borrow interest rate for platinum members); *see also* Ex. 61, Pl.'s Supp. Resp. to ROG No. 1 at 8 ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ SOF at ¶98. ████████████████████████

████████████████████████████████████████████

████████████████████████ SOF at ¶¶100, 101.

### 1.    The 2018 ICO sale to investors for fundraising purposes was different than the 2021 sale to customers for utility benefits.

The NEXO Token ICO in 2018 was a separate offering from the one to Cress in 2021. During the 2018 ICO, Nexo was just starting operations and the OTC trading, borrowing, and lending desk (launched in 2019) did not exist. SOF at ¶104. Almost all of the funds from the 2018 Token sale were used to fundraise and fund clients' crypto-backed loan requests in connection with getting the Nexo platform running. SOF at ¶105. SEC Interpretation provides as follows that the status of an asset may change through time:

---

[11] *Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets*, Release Nos. 33-11412, 34-105020 (March 17, 2026) at 13, *available at* https://www.sec.gov/files/rules/interp/2026/33-11412.pdf referred to herein as "SEC Interpretation."

-24-

> A non-security crypto asset that was offered and sold subject to an investment contract does not necessarily remain subject to the associated investment contract in perpetuity … When a purchaser of a non-security crypto asset that has been subject to an investment contract could no longer reasonably expect the issuer's representations or promises to engage in essential managerial efforts to remain connected to the non-security crypto asset, the non-security crypto asset separates from such representations or promises, and thereafter the non-security crypto asset is not subject to Federal securities law.

*See* SEC Interpretation at 28-29. On February 1, 2021, the NEXO exchange launched globally, whereby a token initially used for fundraising purposes morphed into a utility token tied to specific benefits with an operational platform. SOF at ¶104.

### 2. By 2021, NEXO Token purchases by customers for utility benefits did not constitute securities transactions.

By the time Cress made his NEXO Token purchases in 2021, customers (including Cress) could obtain perks or utility benefits on the NEXO platform, including significantly lower interest rates on their own credit lines. Nexo's Loyalty Program granted different tier benefits to consumers based on the ratio of NEXO Tokens in a customer's account against the rest of their portfolio—a higher ratio yielded a lower borrower interest rate. SOF at ¶102. These 2021 advertising materials emphasized functionality of the asset.

Because *Howey* requires three distinct elements, the lack of evidence as to any one element is fatal to Cress's claim. *Deutsch Energy Co. v. Mazur*, 813 F.2d 1567, 1569 (9th Cir. 1987). The focus here is on the third factor of *Howey* requiring "an expectation of profits produced by the efforts of others," which in turn, involves two distinct concepts: "whether a transaction involves any expectation of profit and whether expected profits are the product of the efforts of a person other than the investor." *See Warfield*, 569 F.3d at 1020.

Cress acquired NEXO Tokens because ownership of the token directly reduced borrowing costs on more than $13 million in credit facilities and enabled participation in Nexo's loyalty tiers. *See* § V.A *supra*. The transaction therefore resembled a customer purchasing a product that unlocked economic benefits within an existing platform, rather than an investor providing capital in expectation that future managerial efforts would generate returns. Cress's anticipated gains depended on his own borrowing decisions, leverage levels, timing decisions, Bitcoin and Ethereum

-25-

price movements, and execution of his self-directed leveraged investment playbook. The NEXO Token was a cost reduction tool necessary to achieve Cress's own investment goals through his own efforts. Those expected gains did not arise from managerial efforts performed by Nexo.

*First*, Cress testified that Platinum membership "is what you need to get any kind of interest rate that would make any of this feasible, which is that 5.9 percent." SOF at ¶¶98, 99 ███████

███████████████████████

███ *Id.* ███████████████

*Id.* at ¶100. Thus, Cress purchased the NEXO Token to receive a lower interest rate–a feature of the NEXO Token that is distinct from the 2018 ICO and which was not tied to an expectation of profits solely from the efforts of Nexo.

*Second*, the dividend available to 2021 NEXO Token holders did not give an expectation of profits because it was discretionary, and in any event was a miniscule benefit compared to the 50% interest rate reduction. *See* SOF at ¶102 (showing a 50% reduced rate for Platinum members). Further, on June 8, 2021, NEXO Token holders voted to switch from a dividend to a daily interest program. SOF at ¶106. As a result, prior to Cress's June 21-23, 2021 liquidations, Cress's expectation was limited to a benefit of daily interest. Even with the dividend, the *Howey* factors weigh against the NEXO Token not being classified as an "investment contract" security for the class of purchasers who, like Cress, were active Nexo customers buying for the utility benefit of a 50% interest rate reduction and other platform perks.

**B.    If Cress's security claims survive, his damages are limited to the NEXO Token.**

Despite the fact that he is only alleging the NEXO Token is a security, ███████████

████████████████████████ Ex. 61, Pl.'s Supp. Resp. to ROG Nos. 7-8 at 24-25. If the Court does not dismiss the securities claims, it should limit damages to losses on the NEXO Token only. Under both statutes controlling Cress's security claims, a plaintiff's recovery is limited to the loss on the asset alleged to be a security—here the NEXO Token—not separate investment losses on non-securities. The damages formulas are in the statute. Cal. Corp. Code § 25503, governing Cress's securities registration claim, limits damages to "the difference between (a) the purchase price plus interest at the legal rate from the date of purchase,

plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." Cal. Corp. Code § 25501, governing his securities fraud claim, defines recoverable damages as "an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff." However, Cress seeks losses associated with his BTC and ETH liquidations through his securities claim. If the Court allows the claim to proceed, the Court should limit damages to losses on the NEXO Token.

## VI.    The Court Should Dismiss The Securities Fraud And Fraud Claims Based On SEC "Registration."

Cress's fourth cause of action for securities fraud, and fifth cause of action for fraud, is predicated on the statement that "[t]he NEXO token is registered with the SEC as a security." Dkt. 88, ¶¶177, 183. This statement was made by Hristov—a Bulgarian non-lawyer—to Cress when Hristov requested that Cress provide an accredited investor certificate stating that Cress "has been verified as an accredited investor as defined in Rule 501 of the Regulation D of the Securities Act of 1933." SOF at ¶7. The evidence is undisputed that Nexo filed a Form D with the SEC in 2018, that Nexo viewed the filing of the Form D as a form of registration with the SEC, that Nexo made this representation to Cress in the course of requesting an accredited investor certificate that is only relevant to a Regulation D offering, and that the certificate referred to Regulation D on its face. *Id.* Nexo continued to request these certificates in the years after the 2018 ICO, not because Nexo believed that the Token was still a security in 2021 after fundraising was done and the platform was fully operational, but to play it safe from a compliance perspective in an abundance of caution. Decl. of Shelton, Ex. 64, Trenchev Depo., Vol. II, at 204:6-17. Given the full content of Hristov's statement to Cress and his explanation that Nexo needed the accredited investor certificate to directly sell NEXO Tokens, Cress had knowledge that Hristov's "registered" statement was a reference to a Form D / Regulation D offering, rather than some other offering that did ***not*** require an accredited investor certificate. Cress's knowledge of the alleged falsity precludes "actual reliance." *Kumaraperu v. Feldsted*, 237 Cal. App. 4th 60, 70 (2015). Cress also cannot show

-27-

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

"damages proximately caused by the reliance" because ██████████████ ████████████████████████████████████████ ██████████████ SOF at ¶98.

The claim is also barred because it is based on a question of law, not fact. To establish falsity, Cress does not rely on evidence, but instead on an "expert report" from law professor Joel Seligman, which makes legal arguments about types of registrations under federal securities laws. Ex. 65, Seligman Rep. at II.11. The Court need not resolve any dispute about the legal meaning of the term "registration" to dismiss this claim. A fraud claim "cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law." *Miller v. Yokohama Tire Corp*, 358 F3d 616 (9th Cir 2004); *Darius Mostowfi v. I2 Telecom Int'l, Inc.*, No. C 03-5784 VRW, 2005 U.S. Dist. LEXIS 51781, at *17-18 (N.D. Cal. May 23, 2005). Whether a Form D qualifies as a form of registration with the SEC implicates the securities laws, and certainly is an alleged misrepresentation "as to matters of law." As reflected in Professor Seligman's report, the Court would need to look to *legal authority* to address that issue, not *facts*. Decl. of Shelton, Ex. 65, Seligman Rep. at 4-9. Consequently, the fraud claim must be dismissed. *See Albers v. Yarbrough World Sols., LLC*, No. 5:19-cv-05896-EJD, 2020 U.S. Dist. LEXIS 80864, at *13-14 (N.D. Cal. May 7, 2020) (dismissing fraud claim based on "misrepresenting the status of YWS construction workers" because a "statement that an individual is a contractor, vendor, or an employee of a contractor, is a statement of law.").

If the Court allows fraud claims based on the registration status of the NEXO Token to proceed to trial, the Court should limit damages to losses incurred in connection with that asset.

## VII.    The Court Should Dismiss The Claim For Breach Of The CPA.

### A.    Nexo did not breach the CPA.

Nexo is entitled to summary judgment on Cress's breach of the CPA claim (Count X) because the plain language of the CPA and the undisputed evidence demonstrate no breach. This is not a breach of contract case—it is an attempt to retroactively rewrite a negotiated OTC trading relationship into a guaranteed execution, no-fee, agency relationship that the CPA does not support. Cress argues that Nexo breached the CPA by, amongst other things, liquidating his digital assets,

charging "undisclosed fees," and "failing to timely execute" purchase orders. Dkt. 88 ¶¶257-260. But the CPA has a narrow scope and provides for the submission of "Purchase Orders for the purchase and sale of cryptocurrency." SOF at ¶41. The CPA does not govern Cress's credit lines and liquidations at all – events which were controlled separately by Cress's Credit Terms. *Compare* Ex.16, CPA at -97 with Nexo Crypto Credit General Terms and Conditions, Ex. 4, CRESS-00000721 at -28.

**Liquidations are not a breach.** As set forth in its preamble, the CPA relates to "periodic Purchase Orders for the purchase and sale of cryptocurrency." Ex. 16 at -97. The CPA further provides that "Upon consummation of such purchase, Counterparty will be vested with good and valid title to such Counterparty Purchased Cryptocurrency free and clear of any and all Liens." *Id.* at § 3.1(e). Cress argues that Nexo breached this provision when liquidating assets—assets he used as collateral in exchange for a Nexo credit line. But the CPA makes no mention of credit lines, loans, collateral, or liquidations, because it is not the relevant agreement that controlled Cress's loans or liquidations. While Nexo users could enter into a CPA without also using such assets as collateral, that is not what Cress did. Cress's proffered interpretation is anything but reasonable, as he seeks to absolve himself of overleveraging his collateral by redirecting focus to the CPA, which is not the controlling agreement.

Instead, the Nexo Crypto Credit General Terms and Conditions provides that "Nexo will grant you a Nexo Crypto Credit in Digital Assets, if you provide the required Digital Assets as collateral by transferring them into the Nexo Account ('Collateral')." SOF at ¶38. Cress procured digital assets through the CPA and then chose to provide those assets as collateral in exchange for a Nexo credit line. Two separate agreements. Cress consented to Nexo's Terms & Conditions, including the Nexo Crypto Credit General Terms and Conditions, when he opened his account. *See* Decl. of Shelton, Ex. 3, NEXO-0369726 at -28 ("By signing up, you agree with our T&C and Privacy Policy"). Cress again consented to the Nexo Crypto Credit General Terms and Conditions when he submitted his credit line withdrawal requests on the Nexo platform, which resulted in the deposit of the stablecoin credit line into his Nexo account. *See* SOF at ¶30. In circumstances where the loan-to-value ratio exceeded certain thresholds, as occurred with Cress, the Nexo Crypto Credit

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

General Terms and Conditions provided that Nexo may "liquidate the necessary amount of Collateral to rebalance your Nexo Crypto Credit." SOF at ¶39. This is what happened to Cress according to the Terms and Conditions, not the CPA. Cress cannot support a claim for breach of the CPA due to liquidations controlled by this separate agreement.

**Fees are not a breach.** Cress argues that Nexo breached the CPA by charging "undisclosed fees … above the prevailing market price" that were "not authorized by, nor apparent from, the terms of the CPA." Dkt. 88, ¶¶258-259. But Cress admits "the CPA does not explicitly say 'Nexo will charge no fees'" and cannot point to any contractual language in the CPA barring fees or otherwise requiring Nexo to disclose the fee included in every cryptocurrency price. Dkt. 95 at 31. Under the CPA, the definition of a "Purchase Order" refers to email confirmations "setting forth, among other things ... the price per applicable cryptocurrency ...." SOF at ¶43. Cress complains that Nexo's prices included "hidden mark-ups or spreads above the prevailing market price." Dkt. 88, ¶¶258. But the CPA does *not* guarantee "market price" or sales without "mark-ups." Cress cannot support a breach of contract cause of action in the absence of a breach of the plain terms of the CPA.

**Executions are not a breach**. Cress next argues that Nexo breached the CPA by "failing to timely *execute* Plaintiff's cryptocurrency purchase orders as required" and "[b]y allowing the Review Period to lapse without timely *execution* or *confirmation*, Nexo effectively rejected or delayed Plaintiff's orders in violation of the CPA's express requirements …" Dkt. 88, ¶257 (emphasis added). Nexo is entitled to summary judgment on this issue because Nexo did not breach the Review Period or any other timing obligation under the plain language of the CPA. The Review Period is relevant to the timing of the parties' *confirmation* of a Purchase Order – it is completely silent as to the timing of *execution* of a transaction. *See* Ex. 16, CPA § 1.1. This distinction is material and fatal to Cress's claim alleging breach based on a failure to "timely execute." The Review Period is relevant only to confirmation:

> Purchase Orders. During the term of this Agreement and at such times as mutually agreed by the Parties, the Counterparty or Nexo may submit a Purchase Order to Nexo or the Counterparty via email and the party receiving the Purchase Order shall have ten minutes (the "Review Period") to ***confirm*** such Purchase Order via email after which Review Period such Purchase Order shall be deemed to be rejected and expired.

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

*Id.* at § 1.1. As was the commercial reality, following confirmation, execution of a purchase order occurred later—not instantaneously, as no such timing obligation exists in the CPA. Further, the CPA specifically states the effect of non-confirmation—the order "shall be deemed to be rejected"— not a breach. *Id.* There can be no breach from an occurrence specifically contemplated by the parties' agreement. CPA section 3.1(g) provides that "Nexo is solely responsible for any decision to enter into a transaction subject to this Agreement." SOF at ¶49. Nexo had no obligation under the CPA to confirm or accept every purchase order, such that Nexo allowing a purchase order to lapse automatically upon expiration of the ten minute review period cannot support a claim for breach.

**Liens are not a breach**. Cress also argues that Nexo breached the CPA because it provides that assets will be delivered "free and clear" of liens. Dkt. 88, ¶260. This statement simply means that assets purchased under the CPA are not encumbered in connection with the purchase transaction. It does not prevent the customer from using those purchased assets as collateral ***in a separate credit line transaction under a separate contract***—the Credit Terms.

**Damages must be limited.** Finally, Cress seeks all of his liquidation losses for breach of the CPA, not just damages flowing from the purported breach. Cress argues that Nexo's delayed execution resulted in inferior pricing, and that Nexo charged undisclosed fees. If the Court allows the CPA claim to proceed to trial, damages must be limited to losses caused by the alleged breach— pricing and fees. Cress's effort to recover his liquidation losses for alleged violation of the CPA is barred by the risk waiver in the CPA and proximate causation principles; the liquidations were governed by a separate contract—the Credit Terms—which contained a consequential damages waiver. SOF at ¶¶32; 46 ("Counterparty is solely responsible for any decision to enter into a transaction subject to this Agreement, including the evaluation of any and all risks related to any such transaction."); *L. Barber Gems, Inc. v. Brink's Diamond & Jewelry N. Am.*, 43 F. App'x 164, 166 (9th Cir. 2002) (affirming summary judgment on contract claim based on "intervening force").

### B.     The implied covenant cannot be used to rewrite the CPA or Credit Terms.

Cress alleges a breach of the implied covenant of good faith and fair dealing on numerous bases, each of which relates to Nexo's pricing and fees. Dkt. 88, ¶263. But as discussed *supra*, "the CPA does not explicitly say 'Nexo will charge no fees.'" Dkt. 95 at 31. The CPA contemplates

submission of "price per applicable cryptocurrency," but does not explicitly or implicitly require Nexo to offer goods without the inclusion of its own fees. SOF at ¶43 (various "Purchase Price" definitions). "[T]he scope of the implied covenant is dictated by the 'purposes and express terms of the contract.'" *Schwarzkopf v. IBM*, No. C 08-2715 JF (HRL), 2010 U.S. Dist. LEXIS 46813, at *36 (N.D. Cal. 2010) (granting summary judgment in defendant's favor on claim for breach of implied covenant when the defendant acted within the bounds of reasonable discretion under the contract). Nexo therefore had discretion to include fees in the prices it conveyed. To the extent Nexo's pricing included its fees, this could not frustrate Cress's right to choose whether he wanted to transact with Nexo at that value.

Assuming *arguendo* the implied covenant pled by Cress does exist, the undisputed evidence is that Cress contemptuously knew of the fees charged by Nexo: ███████████ SOF at ¶68. Because the evidence only allows for one inference—that Cress knew Nexo charged fees and chose to transact with Nexo anyway—Nexo could not have breached the CPA by charging those known fees.

## VIII. The Court Should Dismiss The Fraudulent Omission And Fraudulent Inducement Claims.

**Fees.** To the extent Cress's fraudulent omission claim (Count IX) and part of his fraudulent inducement claim (Count I) are predicated on a failure to disclose fees, those must be dismissed because he knew. Dkt. 88, ¶¶241-243, 142. To prevail on his fraud claim, Cress must establish, amongst other things, a justifiable reliance causing damages. *OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 157 Cal. App. 4th 835, 864 (2007). Because he knew about the fees, he cannot have relied on any statements by Nexo to the contrary.

**Interest on Collateral.** The Court should dismiss the fraudulent inducement claim about interest on collateral. Dkt. 88, ¶¶140-146. Nexo's website disclosed that interest accrued on assets in the savings wallet, not the credit line wallet, and Cress himself acknowledged this fact in multiple written communications. Ex. 35, NEXO-0011384; Ex. 38, Cress Depo. at 216:20-217:8. Cress knew his collateral was not earning interest. ███████████████████████ ███████████████████████████████████████ Dkt. 88, ¶¶104-05) ████

████████████████████████████████████████████████████████

██████████████████████ Ex. 38, Cress Depo. at 216:20-217:8. On March 8, 2021, Cress wrote to himself "If you have half your bitcoin used as loan collateral and half earning interest and LTV goes over 83% and they start auto liquidating, does that mean they automatically move some tokens from your earning bucket over to your collateral bucket" — indicating he knew his crypto could either be used for collateral or earn interest. Ex. 44, CRESS-00001281. ██████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Ex. 66, CRESS-00012772 at -783. ████████████████

████████████████████████████████████████████████████████

██████████████████████ Ex. 67, CRESS-00012850 at -853. And on June 11, 2021, Nexo's chat support again confirmed that collateral in the Credit Line Wallet would not earn interest. He was expressly told: "if they are on the Credit Line wallet, they will not earn interest." Ex. 36, NEXO-0003532 at -542. This was consistent with Nexo's help desk article "Why did I not receive interest on my savings?" which confirmed "we do not pay interest on the funds, which are locked as collateral." Ex. 35, NEXO-0011384. Because he knew that interest did not accrue on collateral, he cannot have relied on any statements by Nexo to the contrary.

**Liquidation Relief Program.** The statement in the VIP brochure about the liquidation relief program cannot serve as a predicate for the fraudulent inducement claim because the undisputed evidence shows (1) the LRP was a real program, (2) Nexo offered it to many U.S. customers who signed up for it, and (3) Cress declined to execute a Liquidation Relief Agreement because Cress did not like the terms. *See* Ex. 59, Nexo's Omnibus ROG, ROG No. 2. The brochure stated: "Liquidation Relief Program—use the service in the event of a market crash to recover your liquidated assets." Ex. 68, CRESS-00000008 (hereafter, "LRP"). █████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 38, Cress Depo. at 110:25-112:25. ████████████████████████████████████████████████████

████████ Ex. 38, Cress Depo. at 112:1-8. But Cress's own actions and admissions preclude this position.

Cress asked about his liquidation thresholds repeatedly: he was keenly aware of the risk of liquidation. *See, e.g.*, Ex. 19, NEXO-0003441 at -441, -443, -444, -445, -449, and -451 (asking for his "liquidation price" on March 25, March 30, April 14, April 16, April 29, May 1, and May 3). There would be no reason to ask about liquidation thresholds or a liquidation price if, as Cress now asserts, he was protected from liquidation. After his final liquidation, Cress wrote: "Someone from support told me I should be using the 'liquidation relief program', but ***I don't know what the liquidation relief program is***." Ex. 69, CRESS-00002095 (emphasis added). He also admitted that "nobody has ever talked me through the liquidation relief program, so I don't fully understand that or how that can help me now." Ex. 70, CRESS-00000177.

Nothing on the VIP brochure stated that Nexo was offering Cress a risk-free investment, that Cress could keep all the gains and Nexo would insure his losses, or that Nexo would restore Cress's collateral after a liquidation without any cost. Cress's admission precludes a finding of reliance on the LRP statement in the brochure, and his retrospective interpretation of that statement as providing a risk-free, cost-free, leveraged crypto investment that contradicts the black letter text of the Credit Terms (providing for liquidation) is unreasonable as a matter of law. *Carmeli v. Razor United States, LLC*, No. 2:21-cv-07123-JVS-SK, 2022 U.S. Dist. LEXIS 243593, at *26-27 (C.D. Cal. Feb. 16, 2022) (dismissing fraud claim based on "an unreasonable interpretation of the statements").

**"Some of the Best Rates."** Cress's fraudulent inducement claim is also predicated on the statement in the VIP Brochure regarding "OTC services with some of the best rates on the market." Nexo continues to maintain that the qualifier "***some of*** the best rates" in an undefined "market" is unactionable puffery not capable of objective verification—it does not define the "best rate," it does not define the "market," and it does not provide a temporal measurement window within that market (emphasis added). *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc*., 63 F.4th 747, 782 (9th Cir. 2023). Similarly, Cress's claims relating to "institutional rates" suffer from the same issues. However, assuming the Court disagrees, the prices that Cress paid were within or below the crypto daily market range without fees, and within the daily market range with fees with the exception of one NEXO Token transaction that was $0.02 above the observed daily high. Ex. 71, Solomon Rep. at ¶¶18, 118 & Schedule 9. Consequently, this statement cannot be the predicate for a fraud claim.

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT

**Responsiveness.** Lack of prompt responsiveness cannot serve as a predicate for the fraudulent inducement claim because the statements in the brochure about customer response times were "promises of future performance, and at most, were negligently made. California does not recognize the tort of negligent false promise." *Meriwether v. Viacom, Inc.,* No. CV 18-1998 DSF (MRWx), 2019 U.S. Dist. LEXIS 164899, at \*7 (C.D. Cal. July 29, 2019). Whether a VIP relationship manager or a customer support agent would respond to a future phone call or email in a specific amount of time is fundamentally different than an alleged misrepresentation of present or existing fact. Cress's allegation that Hristov did not promptly respond to his communications in May and June 2021—even if accepted as true—does not establish that Nexo did not have a present intent to be responsive when it sent Cress the VIP brochure months earlier in March 2021.

**Liquidations Below LTV Threshold.** Cress cannot predicate a fraudulent inducement claim based on alleged liquidations below the 83.3% LTV threshold because there was no fraud— the LTV threshold has always been 83.3%. Ex. 9, NEXO-0009125. Cress does not allege that Nexo falsely represented the threshold was different. The false contention that Nexo *executed* Cress's liquidations below the 83.3% LTV threshold is a theoretical breach of contract claim; however, Cress does not plead a breach claim under the Credit Terms addressing LTV and liquidations.

**Causation.** If the Court allows the fraud claims to proceed to trial, it should limit damages to those caused by the alleged misrepresentations, as opposed to liquidation losses. *See Serv. by Medallion, Inc. v. Clorox Co*., 44 Cal. App. 4th 1807, 1819 (1996) (finding lack of proximate cause to support fraud claim because "[i]t was the termination [of a contract], not the misrepresentation, that resulted in the alleged harm"). Cress's investment losses were caused by a string of voluntary decisions and market forces *after* the alleged fraud as described in the RICO causation section.

**CONCLUSION**

For the reasons discussed above, Nexo respectfully requests that the Court grant Nexo's motion for summary judgment.

DATED: August 7, 2026                BAKER & MCKENZIE LLP

                                     By: */s/ Ian S. Shelton*
                                          Ian S. Shelton

                                          *Attorneys for Defendant Nexo Capital Inc.*

NEXO CAPITAL INC.'S MOTION FOR SUMMARY JUDGMENT