# EXHIBIT 38
## FILED UNDER SEAL

# EXHIBIT 39
## FILED UNDER SEAL

# EXHIBIT 40

## FILED UNDER SEAL

# EXHIBIT 41

## FILED UNDER SEAL

# EXHIBIT 42

**From:** John Cress <jtc88@hotmail.com>
**To:** David Lindenbaum <lindenbaumdavid@gmail.com>
**Subject:** Fw: My Crypto Investment Strategy
**Date:** Fri, 26 Feb 2021 00:14:42 +0000

---

I found the playbook.    Read all this, but especially when he starts talking about Nexo....

---

**From:** Kimberly Veley <kimberlymveley@gmail.com>
**Sent:** Thursday, February 25, 2021 2:21 PM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Fwd: My Crypto Investment Strategy

Scroll down to where he says he will never ever sell his bitcoin no matter what anyone says.

---------- Forwarded message ---------
From: **Ryan Allis - Coin Times** <cointimes@substack.com>
Date: Thu, Feb 25, 2021 at 2:06 PM
Subject: My Crypto Investment Strategy
To: <kimberlymveley@gmail.com>

# My Crypto Investment Strategy

How I Got a 161% Return in 30 Days

 Ryan Allis
Feb 25



*This week we have a special edition in which I explain my strategy for investing in promising crypto projects during the next six months of this bull market cycle. Join our Telegram group here.*

Subscribe now

## The Strategy: How I Made 161% The Last 30 Days Through Crypto Investing

One month ago on January 26, 2021 I decided to conduct a 30-day crypto investing experiment to see what I'd learn.

                CRESS-00001134

I'd been investing in only Bitcoin and Ethereum on Coinbase like a newbie and I wanted to be a little more adventurous for 30 days to see what would happen.

So after some in-depth research, I decided to take $250k of my own money and invest it in a mix of 25% Bitcoin, 25% Ethereum and 50% other high-growth projects. I took the plunge.

What happened? In the last 30 days my original $250k investment turned into $653k. As of today, I'm up $403k in thirty days for a one month return of +161%. Below is the **actual daily chart** for my portfolio value the last 30 days.



You can see my crypto portfolio reached a peak value of $800k on Feb 21 before a pullback the last five days as Bitcoin and Ethereum had a minor 15%-20% correction.

During this 30 day period (Jan 26-Feb 25), Bitcoin increased in price by 51%. So the investment strategy I used outperformed Bitcoin by 110%.

I was actually surprised by how well it performed.

In terms of Bitcoin, I turned 8.23 Bitcoin on January 26, 2021 into 13.34 Bitcoin on February 25, 2021.

So, how in the world did $250k turn into $650k in 30 days? Let's take a close look.

My strategy combined investing in Bitcoin, Ethereum, Polkadot, Nexo, and a number of promising up-and-coming blockchain projects -- using an approach I call "Crypto Venture Capitalist" -- investing in 20-25 fast-growing small cap projects each week with 25% of my total portfolio value.

I'm writing this extensive guide about what I learned because I am passionate about helping others invest in crypto--which I believe is the best overall investment sector for the 2020s.

If you read this guide in full (perhaps twice), I think you'll get a lot out of this. My hope is that in some positive way, it changes your life. I care a lot about educating the "regular person" about crypto investing.

# Passive vs. Active Crypto Investing

CRESS-00001135

Everyone reading this should know there's a tried and true path to crypto investment growth... just buy and hold for the long term. In other words, passive investing.

Buy now and hold for 10-15 years and you will likely do very well. I preach this as often as I can. This is the best strategy for most people -- who don't want to become active investors.

So at the end of this post think to yourself:

1. Do I want to become an active investor and try to beat a simple portfolio of BTC, ETH, and DOT or…
2. Do I want to take a passive approach and just invest in BTC, ETH, DOT?

Because Bitcoin is worth $50k today and is likely to be worth roughly $500k+ by 2025 as Bitcoin inevitably becomes worth more than gold ($11 Trillion), it's a no-brainer that if you just buy and hold Bitcoin, Ethereum, and Polkadot (my three favorites) for 10-15 years you'll likely do very well.

Bitcoin is at least 10x better than gold at doing what gold does (stores value over time in a money supply that can't be inflated) -- and will almost certainly become worth more than gold this decade (with some ups and downs along the way of course).

This long-term buy and hold BTC, ETH, and DOT strategy is simple, easy, and can be done on autopilot. For most people, this is the easiest path.

 Are You Living On Autopilot? Mindful Leadership Training Brings You Back To The Present

I call this the "set it and forget it" approach. Anyone can simply buy 33% BTC, 33% ETH, and 33% DOT -- automatically invest a bit more every week using dollar cost averaging, tune out all the short term noise, hold for 10 years, and do extremely well.

So if you don't want to spend 2 hours per day actively managing your own crypto investments, it's probably best to use the "buy and hold" strategy.

## Why I Decided to Be An Active Crypto Investor

For me, I'm very passionate about crypto, I see how much of a positive impact it is having on the world, and see the blockchain field as core to my career the next 25 years.

CONFIDENTIAL

So I wanted to experiment with an "active investor" approach for a month and see what would happen. I knew I'd learn a lot from doing this.

So I put in 4-5 hours per day for a month--listening to podcasts, reading research reports, watching YouTube videos, subscribing to newsletters, taking BlockGeeks courses, writing this newsletter, and learning to use many of the different exchanges.

I see this early 2021 moment as if it was October 1994 and Netscape Navigator was just released… finally making the world wide web actually usable by regular people.

 Netscape Navigator 2.01 in 1995 - YouTube

Yes, I think blockchain tech will be just as transformative to the world the next 25 years as the Internet has been the last 25 years. Some of the projects we are investing in today will become the next Amazons, Googles, and Facebooks of a new era (not to mention the new banks).

# How I Prepared to Be An Active Crypto Investor

So how did I prepare to be an active crypto investor?

I knew I needed to invest in my own education first. So in December 2020 and January 2021 I took the following steps to educate myself as deeply as I could about the field before I put a lot of money to work.

As a former tech CEO, I wanted to understand the underlying technology and which platforms had the most developers building on them. I found the answer was: 1) Ethereum 2) Polkadot 3) Bitcoin 4) Tezos 5) Cardano.

As a Harvard MBA, I wanted to understand why these blockchain-based projects had actual fundamental value and not just speculative value. What gave these tokens sustainable demand and intrinsic value? How could Neobanks offer 10% annual interest when regular banks offered 0.2%? And would these decentralized finance Dapps replace traditional financial corporations?

Here's what I did to learn...

1. I read the book The Infinite Machine by Camila Russo about the history of Ethereum.

 RCN Got Featured in The Infinite Machine! | by RCN | RCN Blog | Medium

CONFIDENTIAL

CRESS-00001137

2. I read the Messari 2021 Crypto Thesis Report

3. The read the Grayscale Report: Valuing Bitcoin so I could understand what fundamentally made Bitcoin valuable (fixed supply, store of value, medium of exchange, near instant settlement, decentralized alternative to central bank monetary debasement).

4. I read the Messari Ethereum 2.0 Report. I dove deep into understanding EIP-1559 which goes live in July 2021 and the future token supply structure of Ethereum 2.0 when it goes live in 2023 (hint: it's deflationary).

5. I read the Grayscale Valuing Ethereum Report so I could wrap my head around what fundamentally made Ether (ETH) valuable (the unstoppable foundational layer for decentralized finance, decentralized storage, and decentralized apps).

6. I subscribed to these excellent Substack Newsletters

   1. The Bitcoin Forecast by Willy Woo

   2. The Pomp Letter

   3. DeFi Times

   4. Rekt Capital

7. I studied Plan B's Stock to Flow Model in depth

8. I followed lots of people in the Bitcoin and Ethereum communities on Twitter.

9. I subscribed to these free crypto podcasts and started listening to every episode.

   1. Bankless

   2. The Breakdown

   3. DeFi Times

10. I subscribed to these free YouTube channels on crypto investing:

   1. Ivan on Tech

   2. Ellio Trades

   3. BitBoy Crypto

11. I subscribed to these crypto data and analysis tools:

   1. Messari Pro

                    CRESS-00001138

2. Glassnode Studio

12. I took video courses on BlockGeeks to better understand the underlying technology of cryptography, distributed ledgers, blockchains, smart contracts, Ethereum, and Polkadot.

13. I talked to the founders of Unit Ventures, HVN, Satoshi Pay, and Plasma Pay to get their take on the promising up-and-coming blockchains and projects (all who live here in Bali).

14. And on January 20, 2021, I started publishing this newsletter The Coin Times. Why?

    1. I am a strong believer in the potential of blockchain technology, distributed ledger technology, and smart contracts to help create a much better global financial system and make a huge positive impact in our world.

    2. I see how many brilliant developers and investors are committing themselves full-time into this industry.

    3. I want to help others understand how to invest in crypto.

    4. The process of writing helps me learn and think.

 Ethereum vs Polkadot: A Comparison | News about Nodes | The Official NOWNodes Blog

# What I Learned During My Preparation Phase

After all this preparation work, a few things were obvious to me:

1. Smart contracts are the future.

2. The potential for decentralized finance is huge.

3. The future digital currency of the world will be decentralized.

4. Ethereum is the global computing platform for decentralized banking and decentralized apps.

5. Polkadot will connect all the various blockchains together (along with Cosmos and Cardano).

6. Bitcoin, Ethereum, and Polkadot are massively undervalued versus what they will trade at in 10 years

CONFIDENTIAL

CRESS-00001139

1. I believe Bitcoin will go up to a market cap of $20 trillion by the end of this decade (making 1 BTC worth about $1M)

2. I believe Ethereum will likely go up to a market cap of $10 trillion by the end of this decade (making 1 ETH worth about $80k)

3. I believe Polkadot will likely go up to a market cap of $5 trillion by the end of this decade (making 1 DOT worth about $5k).

7. We are about halfway through our current bull cycle based on the stock to flow model and what happened in 2013 and 2017.

1. This bull cycle began in May 2020 when the most recent halving occurred (the 50% reduction in Bitcoin mining supply that happens every four years).

2. Bitcoin will likely pass $100k during 2021.

3. Bitcoin will likely pass $500k around 2025.

4. Bitcoin will likely pass $1M around 2029.

 Student Interest in A.I., Machine Learning is Accelerating

# My Six Rules

Based on what I had learned, I was almost ready to begin investing.

But first, I created some basic guidelines for myself. The rules of the experiment were:

1. I would keep about 50% of my portfolio in Bitcoin and Ethereum (the safer bets).

2. I would never sell my Bitcoin. I accumulate Bitcoin. I never sell it. I plan to hold until at least 2035. I don't care what the market says what the Bitcoin is worth today. I care about how much Bitcoin I can accumulate and what it will be worth in 10-15 years.

3. I would invest the other 50% in other promising crypto projects based on my research.

4. I wouldn't make short-term bets. I wanted to invest in things I could hold for longer than a year. I didn't want to sell and create a taxable event. As long I held and didn't sell, the positions wouldn't be taxable.

5. I didn't want to DeFi yield farm. While I plan to learn to yield farm on Harvest, PancakeSwap, and Aave this month, I didn't want to learn that in my

CRESS-00001140

first month of active crypto investing.

6. I would take long-only positions (no futures, options, or shorts).

*I was ready to go.*

On January 26, 2021 the experiment was on. I would become an active crypto investor for 30 days and see what would happen.

Would I beat Bitcoin? Or would Bitcoin beat me?

 Analyst: The 2021 Altcoin Season Only Started

# My Investment Strategy That Generated 161% in 30 Days — Let's Break it Down Into Ten Steps

Ladies and gentlemen… what you've been waiting for…

Here it is, step-by-step… the exact investment strategy I used to turn $250k into $650k in the last 30 days.

Yes, you can invest with this strategy too. It takes a couple hours per day to do it properly.

As always, please do your own research and only invest what you can afford to lose. Know that the below strategy is best utilized in a bull cycle like we are in now.

And remember if you don't want to do all this work… just buy and hold for 10-15 years. But if you are open to doing 2-3 hours per day of active investing, you too can get ~100% monthly returns for as long as this bull cycle continues (it's expected to last until around September/October).

I'm going to break down my crypto investing strategy step-by-step. Here we go...

1. **Decide How Much to Invest:** First, choose an amount of money you can afford to lose 100% of. I picked $250k because I knew that while it would be quite painful to lose that, I would still be okay from my monthly income from advising SaaS companies and blockchain projects and building Hive. I essentially took what I already had invested in crypto… and decided to use that for active trading for 30 days. With such big upside asymmetry, I was open to taking the risk of complete loss. Here's how I thought about it:

   1. Worst case scenario: I lose my investment.

 CRESS-00001141

2. Likely scenario: I make 20-40x my investment within 10-15 years

3. Best case scenario: I make 100x my investment within 10-15 years.

2. **Open Accounts on Exchanges:** I knew I would need access to more exchanges than Coinbase in order to get access to the promising high-growth blockchain projects I was going to invest in. Binance.com is the largest crypto exchange in the world by volume and the most important exchange to have an account on. I opened accounts on the following exchanges.

1. Binance (note: Use a VPN if accessing from the USA).

2. Huobi

3. KuCoin



3. **Open an Account on Nexo:** Next, I opened up an account on Nexo.io, my favorite NeoBank. Nexo is the best place to hold your Bitcoin and Ethereum (and about 16 other coins) as they will pay interest on it, insure it, and offer you loans against it that are approved instantly with no credit check.

1. They pay 6-8 % per year interest on your crypto holdings and 10-12% on cash and stablecoins like USDT and USDC.

2. They custody with BitGo and also insure deposits with Lloyd's of London up to $375 million.

3. Nexo competes with BlockFi, Celsius, and Voyager but I prefer Nexo because of their ease of use.

4. Nexo gives you loans for 6% per year, collateralized against the crypto you already have, making it easy to invest more in crypto or pay for personal expenses without selling your crypto.



4. **Get Your Crypto into Nexo:** I transferred my existing Bitcoin and Ethereum from Coinbase over to my Nexo account. I now had $250k in Bitcoin and Ethereum in Nexo.

1. You could also buy the Bitcoin/Ethereum directly on Nexo via the Nexo Exchange (or transfer it over from any exchange).

2. To get Polkadot (my other big favorite) use Binance, Voyager, Huobi, Uphold, or Changelly.

CRESS-00001142

5. **Take Out a Loan on Nexo:** Next, I took an immediate $125k loan on Nexo. This was at 6% annual interest, paid out daily. I got an immediate $125,000 loan for $20 per day in interest, without any paperwork. Pretty cool. You can get a loan on Nexo for up to 60% of the value of your Bitcoin and Ethereum. It takes about three minutes to do and ten minutes for the money to show up in your Nexo wallet.

   1. You could also do the same thing on BlockFi or Celsius, but the interest rates are better on Nexo and their token is better. And a key part of my strategy was to buy the NEXO token with the loan I was taking out on Nexo.

   2. Nexo uses an automatic liquidation model and starts liquidating (selling) your crypto to repay the loan the moment the amount owed of the loan goes above 83% of the value of your crypto. They don't liquidate the whole position, just a small amount at a time needed to make the loan go back down below 83% of the value of your crypto.

   3. Because I have confidence that a) the NEXO tokens are heavily undervalued vs. where they will be in 5-10 years and b) that we are in the middle of the current bull cycle, and not the end of it, I feel pretty good about taking out a Nexo loan to get NEXO tokens. I would *not* execute this strategy (within this four year cycle) once Bitcoin goes over $100k...as the risk of a major 70% pullback drop is too high once Bitcoin goes over $100k. A pullback that large would cause some auto-liquidations of your core crypto holdings, which we want to avoid if possible. Between now (when Bitcoin is $50k) and late Summer 2021 (when Bitcoin will likely surpass $100k) is a good time to execute this strategy.



6. **Buy a Whole Bunch of NEXO tokens:** Nexo pays 30% of its profits annually out to its token holders. They pay out every August.I love that you get real cash flow annually from holding their token, like a stock dividend. The NEXO tokens are very undervalued when you look how much their annual profits are projected at for 2021/2022. I used this $125k instant Nexo loan to buy $125k worth of NEXO tokens within the Nexo app.

   1. Currently the NEXO tokens cost $2.12 each. They were $0.76 one month ago.

CONFIDENTIAL

CRESS-00001143

2. I believe they should be worth about $4.77 today based on their projected 2021 dividends and may be worth $132 per token by 2030 assuming reasonable annual profit growth.

3. I built a detailed forecast model for what the NEXO tokens should be worth, based on the value of their annual dividends.

4. I am projecting that in August 2021 for every token you hold you will receive about $0.15 in dividends and in August 2022 about $0.30 -- so you get real cashflow from holding these tokens, which is fantastic.

5. NEXO token holders also get higher interest on their deposits (up to 12%) and lower interest on their loans (6%) based on their loyalty program. By the end of this step, you'll have about 33% in BTC, 33% in ETH, and 33% in NEXO.

7. **Use the Appreciating Value of Your BTC, ETH, and NEXO to Get More Loans:** As the value of your BTC, ETH, NEXO tokens appreciate over time, Nexo will enable you to take out additional loans (up to 60% of the value of your crypto collateral).

1. As the value grows, take out additional Nexo loans and invest them into other promising blockchain-based projects (using centralized exchanges like Binance or Decentralized Exchanges like Uniswap and PancakeSwap).

2. Take out the loans in USDT and then transfer the USDT into your Binance wallet to trade with.

3. Nexo currently allows 3 free withdrawals per month and after that they charge a small fee for a withdrawal.



8. **Find Promising Projects to Invest In:** I recommend using Messari Pro to research promising projects to invest in.

1. I found some real gems in February by sorting their token list by 24 Hour return.

2. I find tokens that have appreciated by more than 25% in the last day, and then I research each one by visiting their website.

3. Those that I like after I research them I put about 0.5% of my total capital into which for me has been around $1000 per investment.

CRESS-00001144

4. I do this mostly on Binance and sometimes on Huobi or Uniswap. I do this for about 5 tokens per day.

5. You can see where you can buy the token for each project on CoinMarketCap.

6. I also take a look at the Binance top 24 hour gainers each day and do the same process.

Above you'll see the Top Movers in the Last 24 Hours on Messari.io

Above you'll see the Top Movers in the Last 24 Hours on Binance.

9. **Next, Work to Understand Why Certain Projects Are Moving Up in Value -** Get good enough to understand why each coin's value is growing. Are they are new DeFi leader? Are they part of the solution to scaling Ethereum? Are they are super easy to use banking or trading platform? Actually become a user of the projects you are investing in and join the project's Telegram group -- and you will become infinitely wiser.

10. **Triple Down on The Projects That Keep Gaining & That You Understand -** Once you watch this list every day for a week or so, you'll start to recognize some coins that seem to grow in value by 15-30% per day consistently. Once you see a token consistently growing like that research it thoroughly, if it is an app see if you can use it yourself, and if it makes sense to you, instead of investing 0.5% of your portfolio in it, up the amount to about 1.5%.

   1. On the above list, for example, PROM is up more than 1000% in the last month. Why? Because they make it easy for people to own their own data, instead of apps like social networks owning it.

   2. And MATIC is up 700% in the last month. Why? Because it's one of the best layer 2 scaling solutions for Ethereum.

   3. If you can notice the coins that are moving AND understand why, you will do very very well.

   4. The key is to look for the lower market cap ($20M to $200M) projects that are consistently growing at 15-20%+ per day, and investing in those. Those are the ones that can 100x in value.

CRESS-00001145

5. I call this playing "Token Venture Capitalist" where you put a little bit in a lot of promising projects, and then double down on what works.

6. Throughout the experiment, I kept 75% of my portfolio in what I consider the much safer investments like BTC, ETH, and NEXO.

7. Of the 180 projects I've invested in since January 2021, I'm up on 101 of them and down on 79 of them. When I lose, I tend to lose 10-50%. When I win, I tend to gain 50-500%. With all of them, I plan to hold for the long term. Some will become worth nothing -- others will end up big winners.

8. When to sell? Personally, I think the best gains will be made if you hold quality projects for 10+ years. Since you don't need to pay taxes if you don't sell -- I recommend only selling your losers toward the end of each year.

9. My biggest wins of the last month include:

    1. PPAY - Up 526%

    2. LUNA - Up 349%

    3. BAKE - Up 326%

    4. SOL- Up 290%

    5. FTM - Up 269%

    6. RUNE - Up 221%

    7. ADA - Up 191%

    8. FRONT - Up 185%

    9. DENT - Up 158%

    10. POLY - Up 132%

    11. STX - Up 119%

    12. BNB - Up 81%

    13. NEXO - Up 64%

    14. BTC - Up 58%

And that's how I turned $250k into $653k and generated a 161% return in the last 30 days. It's been quite the ride!



While I have no idea how the next 90 days will look, I expect this strategy to continue to work well throughout this bull market cycle, which I anticipate will last

CONFIDENTIAL

until around September/October 2021.

In the short-term, it could crater or it could moon. The good news is: I'm not selling this decade. So there's plenty of time for the actual price to be found. This bet has at least 10 more years on it before I would consider selling. Never sell while an asset is finding its true value and you understand it more than most.

I recommend following Willy Woo and Rekt Capital closely to stay close to the ground on how long this cycle will last. Rekt Capital thinks we will go to about $150k Bitcoin around October before pulling back. Willy Woo expects low 200s.

The below chart from Rekt Capital suggests that based on the pattern of the four year cycles, we will reach around $150k before pulling back. The first full year after the halving (which occured in May 2020) has historically always the biggest growth year. That's this year, 2021.



As always, know the above strategy is risky, could lead to loss of most of your crypto if you take out loans and then the market crashes. This strategy requires daily management and becoming very informed in the space.

## Time to Make A Choice: Active or Passive Investor

We're now at the end of this post… it's time to consider:

1. Do you want to become an active crypto investor and go for bigger potential returns?
2. Do I want to take a passive approach and just invest in the Blue Chips of BTC, ETH, and DOT?

Think about it. It may be one of the most important decisions you make this decade.

What's next for me? I plan on spending the next thirty days perfecting this investing strategy, playing in DeFi tools, and exploring the world of NFT creation.

Got questions? Post a comment and I'll answer them.

Leave a comment

CRESS-00001147

# Why Centralized National Currencies Will Lose to Decentralized Digital Currencies

In The Coin Times Telegram group this week I wrote the following post...

The main issue with centralized national currencies is they are controlled by a few people and their supply keeps increasing dramatically, hurting the poor tremendously when the prices of assets and living goes up while the value of their savings and monthly income keeps going down.

On Twitter, the below Nigerian Bitcoiner (@SatsHodl) explains the situation to a somewhat confused American economist who doesn't seem to quite get Bitcoin yet.

With decentralized digital currencies, there is a fixed supply (ex: there are only 21 million Bitcoin and more cannot be created) so you can trust that your savings are safe and not continuously debased.

We are now in a 15 year period of moving from nation-state backed currencies for medium of exchange to moving to decentralized and programmable digital currencies as the primary medium of exchange. Decentralized currency that moves across borders in milliseconds and programmable smart contracts are the foundational layer upon which we are creating a more transparent, fair, and innovative global financial system.

It's an inevitable evolution for human society, and one that beautifully will greatly empower the poor and middle class as their savings and income won't be able to be debased continually any longer.

Nation-states will attempt to issue their own digital currencies the next five years however these will have the same issues as their non-digital currencies—their supply can be increased at will.

Only decentralized currencies where the supply is fixed (ex: Bitcoin) or deflationary (Ethereum 2.0) will be accepted by the majority of the people.

Digital currency is the people's money. ����

# What About Government Regulation?

CONFIDENTIAL

CRESS-00001148

This week someone asked in our Telegram channel, "What do you think about government regulation as it relates to the blockchain sector"

Here are my thoughts...

1. The Blockchain industry is becoming the #1 taxpayer industry this decade. Jurisdictions who embrace the industry will thrive as capital and talent and taxes flow into their borders.

   1. Countries that embrace crypto (Singapore, Switzerland, USA) will thrive economically while those who don't, won't.
   2. Municipalities like Miami, Geneva, New York, and Singapore are already competing for who will be the most blockchain innovation friendly. Why? They want to become/stay the leaders of the next 20 years and attract talent, companies, innovation, and tax dollars.
   3. Smart regulators will focus on Know-Your-Customer (KYC) rules, Anti-Money Laundering (AML) rules, fraud prevention, and tax compliance.
   4. Countries that attempt to ban blockchain-based innovation will wither economically this decade.
   5. Countries who invest part of their reserves in Bitcoin and Ethereum will thrive in the next 20 years.

2. Decentralized exchanges (Uniswap, PancakeSwap, Loopring, BakerySwap) and decentralized blockchain currencies can't technologically be stopped without blocking the entire internet. Satellites are now broadcasting the Bitcoin blockchain from space back to Earth, making it accessible even to places without internet access. It's literally impossible to stop decentralized applications without taking down the entire internet.

3. Political candidates who support the blockchain industry in the next few political cycles will receive a lot of funding and contributions. Those who don't, won't.  There's a huge incentive for forward thinking public sector leaders like Andrew Yang, Cynthia Loomis, and Francis Suarez to embrace Blockchain tech.

For those who think carefully about game theory, the game is already over—it's just playing out in front of our eyes the next 15 years.

CRESS-00001149

The macro game of the 20th century was Controlled Government Economic Planning vs. Competitive Markets. Competitive markets won.

The macro game of the next 20 years is Centralized Control vs Decentralized Innovation.

Imagine the entire international legal and financial system rewritten on smart contracts and you'll be able to imagine what is coming.

## What's coming:

1. A global economic and legal system that treats all people equally regardless of where they are from.

2. A global decentralized digital currency and medium of exchange that can't be debased or controlled by the few.

3. The entire global financial and legal system (markets, stock exchanges, contract law, etc) rewritten on efficient and transparent smart contracts. Code = Law.

It's going to be a really interesting next two decades. Here's to creating a more beautiful world for all.

# Are You Early to Crypto? Yes

Here's a basic assessment, and the answer is… yes, you're still early...

- Invested before BTC $1k: Super super early
- Invested before BTC $10k: Super early
- Invested before BTC $100k: Early
- Invested before BTC $500k: Not early, not late
- Invested after BTC $500k: What most people will do
- Invested after BTC $1M: Late, but still growth potential

There's just no way that Bitcoin doesn't eventually become worth more than gold, which would make it worth $534k per BTC.

Keep in mind today Bitcoin has about the same number of users as the internet did in 1997 (1.7% of humanity), but **adoption is increasing at a pace that is faster than**

CONFIDENTIAL

CRESS-00001150

the internet.

## Chart of the Week: Ethereum's Rapid Growth



Source: CoinMetrics

# My Long-Term Crypto Portfolio Recommendations

Here are my big picture recommendations for anyone getting started in crypto investing with a balanced mix of potential return and asset preservation. I adjust these each week based on what I learn and any changes in the marketplace.

1. Never invest an amount you can't afford to lose. Crypto is volatile and downswings of 80%+ happen. Don't invest more than 50% of your total net worth in crypto.

2. Be careful investing on borrowed money (margin). We don't recommend it until you're experienced.

3. Unless you're an experienced and professional trader with many years of training, your best bet is to buy and hold for the long term (10-15 years) and not attempt to time the market.

   - If you are going to attempt to time the market, be very familiar with the Stock to Flow model and the timing of BTC halvings and be very familiar with the research backing up the blue chips like BTC, ETH, DOT. While it will have swings along the way, we do expect the current bull market to continue until at least September 2021.

4. We recommend Coinbase for those investing small amounts (<$10K) and Binance (use a VPN if needed), Coinbase Pro, Huobi, Kucoin, Gemini, or Kraken for those investing larger amounts ($10k+). You can also use the no-fee Voyager or Nexo which give you no-commission trades and 6-8% annual interest in exchange for holding your cryptodeposits.

   - Many tokens don't yet trade on Coinbase. Binance has most of them. Huobi, Kucoin, and Uniswap have anything Binance doesn't have.

CRESS-00001151

- Track market caps here.
- You can see which blockchain tech is getting the most transactions fees here.
- See the research at Simetri, Messari, Trade the Chain, and Flipside Crypto for even more due diligence.

5. For a mix of long-term capital preservation and growth, we recommend keeping 20% of your holding in BTC, 20% in ETH ("The Blue Chips"), 10% in Polkadot ("The New Ethereum"), 10% in Kusama ("Polkadot's First Blockchain"), 10% in NEXO ("The best NeoBank"), 10% in Binance's BNB, and the remaining 20% in up-and-coming projects. Here's what we like the most right now based on months of research (the ones I like the most are bolded):

- Blockchains: **ETH,DOT,KSM, ATOM**, **ADA,** SOL
- NewFi Banks: **NEXO,VGX**, CAS
- Exchanges: BNB, HT, UNI, SUSHI,FTT, 1INCH, BURGER
- Binance DeFi Protocols: **XVS, CAKE, BAKE, AUTO**
- Ethereum DeFi protocols: AAVE,COMP, SNX, CRV, BAL, **DODO**
- Oracles: **LINK**, BAND
- Layer 2 Scaling Tech: **MATIC**, LRC
- Web 3.0 Tools: THETA, GRT, FIL
- Insurance Tools: **CVR,** WNXM, ARMOR
- Polkadot Apps: **POLS, TRAC,OCEAN, ONT, RFUEL,** XFT, PHA
- Payment Platforms: EGLD,CELO, XLM
- Security Token Platform: **POLY**

# My Top 20 Right Now...

If I were creating a portfolio from scratch right now that I didn't want to touch for 5 years, I would be absolutely sure to include:

**80% of Portfolio**

1. Bitcoin (BTC) 20% of portfolio
2. Ethereum (ETH) 20% of portfolio

CRESS-00001152

3. Nexo (NEXO) 10% of portfolio

4. Polkadot (DOT) 10% of portfolio

5. Kusama (KSM) 5% of portfolio

6. Cardano (ADA) 5% of portfolio

7. Cosmos (ATOM) 5% of portfolio

**Remaining 25% of Portfolio - About 1.% Each**

8. Polygon (MATIC)

9. Voyager (VGX)

10. Uniswap (UNI)

11. PancakeSwap (CAKE)

12. Polystarter (POLS)

13. Chainlink (LINK)

14. OriginTrac (TRAC)

15. Ocean Protocol (OCEAN)

16. Ontology (ONT)

17. PolkaCover (CVR)

18. RioDeFi (RFUEL)

19. PlasmaPay (PPAY)

20. Polymarket (POLY)

# The People I'm Following Closely on Twitter

1. Gavin Wood

2. Robert Breedlove

3. Lyn Alden

4. Michael Saylor

5. Cathy Wood

6. Vitalik Buterin

7. Ryan Adams

8. Camila Russo

9. Beniamin Mincu

CONFIDENTIAL

10. Barry Silbert

11. David Hoffman

12. Anthony Pompliano

13. Dan Morehead

14. Dan Held

15. Ryan Selkis

16. Saifedean Ammous

17. Willy Woo

18. Chamath Palihapitiya

# If You're Just Getting Started With Crypto, Start Here

1. Bitcoin Common Misconceptions by Robert Breedlove (Podcast)

2. Bitcoin Will Be Worth More Than Gold by Anthony Scaramucci (Deck)

3. Hyperbitcoinization: The Path To Becoming The World's Dominant Form of Money (Article)

4. Michael Saylor - Bitcoin is Hope (Podcast)

5. Money, Bitcoin, and Time by Robert Breedlove (Essay)

6. The Infinite Machine by Camila Russo (Book)

7. The Stone Ridge 2020 Shareholder Letter by Ross Stevens (Letter)

8. Crypto Theses for 2021 by Messari (PDF)

9. Bankless - The DeFi community (Substack + Podcast + Discord)

10. Understanding Polkadot - The Next Generation Blockchain Tech (Website)

**The Coin Times:**
*Tracking the most important blockchain stories of the 2020s including a **decentralized internet** and **the creation of a new open global monetary system that works for everyone**. As always, published for informational purposes only. Just my opinions. Not intended as financial advice. At the time of publication, we are long on nearly everything we write about as we believe in it. Please do your own research. Published 2x per week. Published and written by Ryan Allis.*

*Comments and thoughts welcome:*

CONFIDENTIAL

CRESS-00001154

- *Telegram channel at* t.me/thecointimes
- *Substack at* TheCoinTimes.com

*Please share with your friends and colleagues.*

Leave a comment



---

*If you liked this post from* The Coin Times, *why not share it?*

Share



© 2021 Coin Times Unsubscribe

548 Market Street PMB 72296, San Francisco, CA 94104

Publish on Substack

CRESS-00001155

# EXHIBIT 43

**From:** John Cress <jtc88@hotmail.com>
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Ask Nexo about trading commissions
**Date:** Wed, 03 Mar 2021 22:57:43 +0000

CONFIDENTIAL

CRESS-00001224

# EXHIBIT 44

**From:** John Cress <jtc88@hotmail.com>
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Fwd: More Nexo ?'s
**Date:** Mon, 08 Mar 2021 01:14:31 +0000

---

-if you have half your bitcoin used as loan collateral and half earning interest and LTV goes over 83% and they start auto liquidating, does that mean they automatically move some tokens from your earning bucket over to your collateral bucket, or do they start selling your BTC?   I think they would sale, hence the term "liquidate", but also because if you started earning less, it wouldn't cover the loan payments

 -if tokens are fixed, can you withdrawal early for an additional fee? If so, what fee?

 - how can I get a 60% credit line on tokens I'm earning interest on?  I thought posting collateral is separate from earning interest, but this seems like I'm earning interest on my collateral.

-Is it true that I can currently borrow against the money I'm earning on if it's "FLEX", but not if it's locked in order to make 1% more?

Someone in telegram wrote:  Nexo dynamic collateral system is why I like it so much . If your BTC drops 90% Nexo Oracle will move assets from savings to your credit line.
So does savings moving to credit line just mean you have less of a credit line?   If BTC drops enough, I would have no credit line at all and would be getting liquidated.  That quote makes it sound like I would not have to worry about selling my BTC (at a short term low, but also subject to a lot of LTCG)

 - what exactly are the withdrawal fees?

 - I would like to see the exact amount of assets that are fixed at any time to evaluate risk of Nexo.

CONFIDENTIAL

CRESS-00001281

# EXHIBIT 45

## Re: Borrowing scenarios

**Octavian Dinca** <octavian@nexo.io>
Tue 5/4/2021 4:37 AM
**To:** John Cress <jtc88@hotmail.com>
**Cc:** Hristiyan Hristov <hristiyan@nexo.io>

Hi John,

The OTC purchase took place ~11.30 UTC yesterday. Details below:

- 312.1487 ETH have been bought at 3203.601361 USDT per unit.

The cost per unit above includes the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC desk charged for the transaction which is estimated around ~0.5% as well. Excluding costs, the price would come to - ~3,171.882535 USDT.

Regarding the liquidation price, that would depend on the movement of the different assets in your account. Liquidations will occur if your overall asset values drops below $16,717,399.10 currently. This number will improve after the deposit of the ETH purchase.

I hope this helps clear things up.

Best regards,

**Octavian Dinca**
Relationship Manager

+41 33 533 26 64





**Banking on Crypto**
nexo.io

On Mon, May 3, 2021 at 5:13 PM John Cress <jtc88@hotmail.com> wrote:

Can you please detail the total amount that was spent and the price per token?    Please scroll down to the email from Hristiyan to me on April 16 to see an example how he detailed the totals.

If I'm calculating correctly, I sent $1,000,000 and if that only purchased 312 ETH, that means the price was $3,205 each.    That feels wrong and disappointing since the price of ETH was very far below that since my request and right now ETH is $3,118.    Those numbers seem impossible because ETH never reached a price of $3,205.    I can't be paying more than a price where ETH ever traded.

In addition to the liquidation price, can you please spell out the exact totals purchased and the price per ETH?

John

---

**From:** Octavian Dinca <octavian@nexo.io>
**Sent:** Monday, May 3, 2021 4:58 AM
**To:** John Cress <jtc88@hotmail.com>; Hristiyan Hristov <hristiyan@nexo.io>
**Subject:** Re: Borrowing scenarios

Hi John,

Happy to confirm execution took place. Details below:

- 312.14868 ETH will be added to your account later on during the day.

Enjoy a great day ahead.

Best regards,

**Octavian Dinca**
Relationship Manager

+41 33 533 26 64





**Banking on Crypto**
nexo.io

On Mon, May 3, 2021 at 2:11 PM John Cress <jtc88@hotmail.com> wrote:

Yes, I want to proceed to buy the maximum amount of Ethereum.    It's very disappointing that the price of ETH has gone up by 15% or $400 (from $2,750 to $3,150) in the four days that have passed since my request, but yes, please execute the order.    I hope asking for and waiting for my confirmation doesn't add one more day while ETH goes up even more.

John

---

**From:** Octavian Dinca <octavian@nexo.io>
**Sent:** Monday, May 3, 2021 3:58 AM
**To:** Hristiyan Hristov <hristiyan@nexo.io>
**Cc:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Hi John,

CONFIDENTIAL            CRESS-00000034

Mail - John Cress - Outlook

It is a pleasure to meet you and assist with your ETH purchase through the OTC desk. Your 1m USDT transfer has been confirmed in the OTC wallet.

Please confirm you would like to proceed and I will register your order for execution with the OTC desk.

Best regards,

**Octavian Dinca**
Relationship Manager
+41 33 533 26 64



**Banking on Crypto**
nexo.io

On Sat, May 1, 2021 at 5:27 AM Hristiyan Hristov <hristiyan@nexo.io> wrote:

Hello John,

I completely understand.

The payments team will lift the limit at the earliest convenience tomorrow morning.

I am looping in Octavian, who be taking care of the $1M ETH OTC purchase.

Please do keep in mind that it is a bank holiday and it might take us a bit longer to complete the trade.

Wishing you a great weekend.

On Sat, May 1, 2021 at 3:48 AM John Cress <jtc88@hotmail.com> wrote:

Thank you. I took a $1 Million ($999,985) UDSC loan. I also took a $1 million USDT loan. When I tried to send the $1 million USDT to the OTC wallet, I got an error that said I can only withdraw $500,000 per day and it said to contact support. I used the support live chat and spoke to a support agent who told me he will open a case to lift the restriction so that I can send the whole $1 million. He said it will take 12-24 hours, but I remember you were able to expedite this process in the past. Anyway, the case # is here: Hi John Cress, Please note that we have received a ticket (#404647) created by our live chat agents on your behalf.

I'm waiting for the resolution of this ticket so I can send the USDT to the OTC wallet. If I can withdraw the funds and you can send the order instructions to the OTC desk before you leave for your break, then you can tell me the execution details and my ETH liquidation price after you get back

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Friday, April 30, 2021 8:58 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Hello John,

Please find below the current liquidation price:

| Liquidation Price | $29,859.22 |
|---|---|

I am suggesting you do the following in regards to the ETH:

1. Take a $1,000,000 USDT loan and send it to Nexo's OTC for ETH Purchase

Nexo OTC Vault – 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7

2. 25% of your NEXO Tokens balance = $1M. Take a $1M USDC loan and leave it in your Savings wallet (it goes automatically there)

Please let me know when you send the funds for the ETH purchase so I can let the team know.

In addition, I will be on holiday from tomorrow until 10.05. Let's get everything done before I go.

Thank you.

On Thu, Apr 29, 2021 at 10:47 PM John Cress <jtc88@hotmail.com> wrote:

Hristiyan,

I've been waiting for your reply to tell me what is my current (partial) liquidation price for Bitcoin. Can you please tell me?

Also, I've been meaning to borrow more so that I can increase my Ethereum holdings from 250 to 400 to match my Bitcoin holdings. Now that Nexo will be lowering the LTV ratios soon, I need to get this process started asap today. We only have a couple days to get this finalized.

Please send me the instructions for how much I need to withdraw from my credit line, the address to send the funds, and how much Ethereum and Nexo will be purchased. I would like to get as much Ethereum as possible, but at least to get it to the 400 level, but possibly more.

CONFIDENTIAL                 CRESS-00000035

I also want to borrow 25% LTV from my Nexo balance and put the entire proceeds into the USDC savings wallet.

Thanks!

John

---

**From:** John Cress <jtc88@hotmail.com>
**Sent:** Friday, April 16, 2021 9:09 AM
**To:** Hristiyan Hristov <hristiyan@nexo.io>
**Subject:** Re: Borrowing scenarios

Ok below you mentioned "The payments team will deposit the assets shortly. Then I will calculate the BTC price liq. levels."
It looks like the assets have been deposited.    Can you tell me my new bitcoin liquidation price level?

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Friday, April 16, 2021 8:00 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

The assets have been deposited, John.

Wishing you a great weekend.


On Fri, Apr 16, 2021 at 10:43 AM Hristiyan Hristov <hristiyan@nexo.io> wrote:
Hello John,

I have some great news. The team has finished with the execution last night.

We purchased the following assets:

28.3780 BTC @ $63,426
91,715 NEXO Tokens @ $3.816

The payments team will deposit the assets shortly. Then I will calculate the BTC price liq. levels.

Congrats you have reached your BTC goal.


On Wed, Apr 14, 2021 at 8:38 PM Hristiyan Hristov <hristiyan@nexo.io> wrote:
Hello John,

I confirm that we received the funds. We will proceed with execution as it follows:

1. Purchase $350,000 worth of NEXO Tokens immediately.
2. Start a 24-hour TWAP purchase of $1,800,000 worth of BTC.

I will calculate the BTC liquidation price level once we deposit the new assets in your account.

Will keep you updated accordingly.

Thank you.


On Wed, Apr 14, 2021 at 7:30 PM John Cress <jtc88@hotmail.com> wrote:
I just sent $2,150,000 to the OTC desk USDT wallet.  Please let me know how the order executes and also please let me know what my new "partial liquidation" price is for Bitcoin.    Thanks,

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Tuesday, April 13, 2021 10:27 PM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Hello John,

Thank you for your email.

I am really glad the strategy is working out well. Happy to help you acquire the remaining 28 BTC and to top up a bit of NEXO.

Please send $2,150,000 USDT which will be used for purchasing 28 BTC and the remaining we will top the NEXO tokens balance, to ensure the lower interest rate and higher earnings.

Nexo's OTC desk USDT address - 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7

CONFIDENTIAL

CRESS-00000036

Please let me know when you send the funds so I can let the team knows.

Thank you.

On Wed, Apr 14, 2021 at 2:13 AM John Cress <jtc88@hotmail.com> wrote:
Hristiyan,

The last time we talked we decided it would be best to wait for bitcoin to consolidate and break out to a new high and keep moving a little higher before I take out another loan.   It looks like that is the situation now and I would like to take out another loan so I can buy 28 more BTC and get my total bitcoin balance to 400 BTC.

Please reply with instructions to include the total amount of USDT I need to send for the purchase of 28 BTC and for Nexo tokens.    I don't know if I need to buy more NEXO or how much I would be required, so just let me know the total amount of USDT and re-confirm the OTC Tether wallet address again, too.

Thank you,

John

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Thursday, April 1, 2021 4:33 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Hello John,

I have great news. The OTC has executed the deal with the following parameters:

1. 530,190 NEXO Tokens @ $2.829
2. 47.3227 BTC @ $59,197

We are aiming to deposit the funds as soon as possible.

Thank you.

On Wed, Mar 31, 2021 at 10:29 PM Hristiyan Hristov <hristiyan@nexo.io> wrote:
Hello John,

Thank you for your patience.

I confirm that we have received the funds and executing the Bitcoin purchase as we agreed - Time Waited average execution - 24 hours.

I strongly believe the execution has to be done and I will update you with the stats while depositing the assets first thing in the morning.

Have a good day.

On Wed, Mar 31, 2021 at 7:54 PM John Cress <jtc88@hotmail.com> wrote:
Hristiyan,

I sent $4,300,000 to the OTC desk yesterday and sent an email confirmation.   I was expecting an email from you this morning with an update on the OTC desk order execution confirmation.   A whole day has gone by now.   Also the price of bitcoin just rose from 57,400 to 59,400 now, so I'm expecting that the order fulfilled yesterday close to $57,400.

I don't have any emails from you or any from Nexo in general.  If you look in my transactions history, I sent $4,300,000 to the address you gave me, but I haven't heard back with any confirmation or any update and it's been 24 hours and bitcoin has moved higher by $2,000.  This is not good.

John

On Mar 30, 2021, at 10:41 AM, John Cress <jtc88@hotmail.com> wrote:

Do I have to click on borrow first, to borrow the funds first?   Can you possibly call me again like last time?   I don't want to make any mistakes.   If you call me, I'm sure this call will go much faster than last time.   I'm ready now - 415-298-4366

John

CONFIDENTIAL                                    CRESS-00000037

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Tuesday, March 30, 2021 10:39 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Hello John,

Thank you for confirming with me.

Let me outline the next steps below:

1. Withdraw a loan worth $4,300,000. We will use the funds to purchase NEXO Tokens (~20 BTC worth) to cover you for the Platinum Tier and the rest will be for BTC (~50 BTC). Total will be around 70 BTC.
2. Please send the funds to Nexo's OTC desk wallet - 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7
3. As soon as we receive the funds we will acquire the NEXO Tokens and start execution of the BTC (it will be done over 24 hour period)
4. We will deposit the funds into your account.

Please let me know when you send the funds over to the OTC Desk.

Thank you.

On Tue, Mar 30, 2021 at 7:05 PM John Cress <jtc88@hotmail.com> wrote:
> Ok, this sound good.   Please let me know what are the next steps.
> Thanks,
>
> John
>
>> On Mar 30, 2021, at 2:39 AM, Hristiyan Hristov <hristiyan@nexo.io> wrote:
>>
>>
>>
>> Hello John,
>>
>> I hope you are doing well.
>>
>> You can see the liquidation limit of your total portfolio when you log in to your account. It is a sentence below your Total portfolio balance saying " If the value of your collateral assets reaches ... "
>>
>> I will be happy to help you facilitate a new deal. I am proposing you the following parameters:
>>
>> 1. Buy 50 BTC @ $58,000 = ~$2,900,000 executed again in the next 24 hours
>> 2. Buy 20 BTC = ~$1,165,000 worth of NEXO Tokens to get to the Platinum tier (10% of total Portfolio after the new purchases)
>> 3. This will result in
>>
>>    ○ ~$24,150,000 Portfolio balance ( ~415 BTC + NEXO Tokens)
>>    ○  ~$9,485,000 total credit line
>>    ○ ~41% LTV
>>    ○ BTC price when partial liquidations will start @ ~$27,500
>>
>> *Keep in mind that the BTC price might move so will some of the numbers above.
>>
>> Let me know if you agree with the above and I will outline the next steps.
>>
>> Thank you.
>>
>>
>>
>>
>>
>> On Tue, Mar 30, 2021 at 10:52 AM John Cress <jtc88@hotmail.com> wrote:
>>> Hristiyan,
>>>
>>> I would like to use the credit line to purchase 50 or 75 more bitcoins.  Let me know what I need to do next.  Also, is there somewhere where I can see my current "liquidation price" and how I can see that for this scenario?   Thank you,
>>>
>>> John
>>>
>>> ---
>>>
>>> **From:** Hristiyan Hristov <hristiyan@nexo.io>
>>> **Sent:** Saturday, March 27, 2021 12:01 PM
>>> **To:** John Cress <jtc88@hotmail.com>
>>> **Subject:** Re: Borrowing scenarios
>>>
>>> Hello John,
>>>
>>> I have some great news. The OTC team did a great job and purchased the assets as it follows:

CONFIDENTIAL                                      CRESS-00000038

1. 74.441 BTC @ $55,289.81
2. 481,878 NEXO Tokens @ $2.66

The assets will be deposited in your account at earliest convenience.

Have a great Saturday.

On Fri, Mar 26, 2021 at 9:46 PM Hristiyan Hristov <hristiyan@nexo.io> wrote:

Hello John,

Please send the $5,400,000 USDT for the purchase of 75 BTC and the rest in NEXO Tokens to Nexo's OTC desk wallet - 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7

Thank you.

On Fri, Mar 26, 2021 at 8:40 PM John Cress <jtc88@hotmail.com> wrote:

Ok

On Mar 26, 2021, at 11:34 AM, Hristiyan Hristov <hristiyan@nexo.io> wrote:

Hello John,

I am finalising some internal stuff regarding your loan and OTC deal and I will call you.

Thank you.

On Fri, Mar 26, 2021 at 6:52 PM John Cress <jtc88@hotmail.com> wrote:

Hristiyan,

I signed the purchase agreement and most of my BTC is on Nexo now. All my bitcoin will be there in less than two hours from now. Can you call me now? We can go through any final steps and start purchasing bitcoin now at prices below $54,000 and I want to buy Nexo fast before it keeps rebounding. Thanks,

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Thursday, March 25, 2021 2:19 PM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Can I call you know?

I am about to go to sleep but we can cover the topics you have raised.

On Thu, Mar 25, 2021 at 10:09 PM John Cress <jtc88@hotmail.com> wrote:

I have a question about the scenario below. If LTV is 40%, that's $5,400,000 - enough to buy 100 BTC, but there is also a need to buy 25 BTC worth of NEXO tokens, so really the loan and purchase is for a value of 125 BTC, which is 50% LTV. Either it's 50% LTV, or I will only buy 75 BTC. This is important to lay out correctly and understand, because it really changes the numbers.

If I'm really doing 50% LTV, then is the liquidation amount still $25,930 or is that actually higher? I don't think I understand these numbers because we never talked about this scenario on a phone call. I don't think I totally understand the calculation of the $25,930 liquidation number. I also don't quite understand how 168 BTC is used as collateral - is that all collateral for buying 100 BTC or for 125 of BTC? We still need to go through this on the phone, so I understand 100%

Also, I think I will want to have some reserve to purchase BTC puts for downside protection. I could possibly increase the LTV and use some of the extra loan proceeds for puts. If the price of BTC drops below $35,000 or $30,000 and I have some put options at those levels, that might be more effective and efficient than just having extra BTC as collateral. If I do that, can your OTC desk purchase puts and include the transactions in the CSV file?

CONFIDENTIAL                         CRESS-00000039

| Total BTC | BTC Earn interest and protect Collateral | BTC Collateral | Purchased BTC through Nexo Credit line | Amount of BTC for NEXO Platinum | LTV | BTC Liq price @ BTC $54,000 | Inter rat |
|---|---|---|---|---|---|---|---|
| 250 | 166 | 84 | 50 | 25 | 20.00 % | $13,000 | 5 |
| 250 | 125 | 125 | 75 | 25 | 30.00 % | $19,500 | 5 |
| 250 | 82 | 168 | 100 | 25 | 40.00 % | $25,930 | 5 |

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Wednesday, March 24, 2021 6:22 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Borrowing scenarios

Hey John,

There is no need the BTC in the Savings wallet, which will earn interest to be locked up.

You can obtain the information regarding the transactions in the transaction tab and download the CSV file. All the other transactions which will go through the OTC desk, will be added there as well.

On Tue, Mar 23, 2021 at 10:32 PM John Cress <jtc88@hotmail.com> wrote:
Yes, I would definitely need to purchase the BTC and NEXO using the OTC desk. Please send the applications I need to complete and I can work on the accredited investor certificate now. I believe my interest rate is 4% because I didn't want to lock up my savings funds. Would those extra 82 BTC in the example below which are earning interest be required to be locked up, since they are part of a backup collateral reserve?

Also, I have a very important question. I need everything to have reporting data for tax purposes. I am currently relying on the CSV download to import data into TokenTax. Will all the OTC transactions and every other purchase, sell, fee, commission, and loan interest payment be consolidated into that same CSV download file?

John

On Mar 23, 2021, at 12:15 PM, Hristiyan Hristov <hristiyan@nexo.io> wrote:

Hello John,

Of course, we can start straight away. Let me clarify a few things before that:

1. As we discussed, Would you like to purchase the Bitcoins through the OTC desk?
2. In order, to be able to do a NEXO Tokens and BTC purchase through the OTC desk, we need the following documentation which will be requested from our KYC team :

- Source of Funds Declaration + supporting Documentation.
- Purchase Agreement

Additionally, please note that the NEXO token is registered with the SEC as security therefore we are only allowed to facilitate deals for American citizens who are also certified, accredited investors. If you have a certificate, please send it over. In case you don't have an accredited investor certificate but you do satisfy the requirements, you can issue one here - verifyinvestor.com.

In regards to the loan term, there is no limit for how long you will have it and there is no requirement for any interest/loan repayments. You can pay the loan + the interest in 6 months, 1 year, 2 years time. If you decide the repay the loan in the first 30 days you took it, you

CONFIDENTIAL                   CRESS-00000040

will be charged a full month interest rate. I strongly believe this does not apply to you, according to the strategy you have outlined.

You will be earning 5% annually on the Bitcoin which is you used as collateral. Keep in mind that the interest rate will be paid out daily in BTC, so you will benefit from a potential upside on the Bitcoin price.

At the moment, without the additional collateral, you can withdraw up to $4M loan which will enable you to purchase ~ 50 BTC and 25 BTC worth of NEXO Tokens.

Looking forward to hearing from you.

On Tue, Mar 23, 2021 at 7:04 PM John Cress <jtc88@hotmail.com> wrote:

> Also, do you have loan docs and an easy to read summary (or at least a highlighted version) so I can easily scan and find things like how long is the loan term and is it ok to pay off the loan early?  Are there any sort of penalties for anything?  The faster I can understand the important parts, the better
>
> John
>
>> On Mar 23, 2021, at 9:33 AM, John Cress <jtc88@hotmail.com> wrote:
>>
>>
>>  I think the scenario for 40% LTV to purchase 100 BTC is reasonable.   How much interest would the 82 BTC be earning and if all the interest was applied to the monthly loan payment, how short would the payments be and is that ok?   I need to decide whether to use the earned interest to serve as more collateral reserves or to make loan payments etc.
>>
>> I think I would want to get started asap while the price of BTC is still low.   Can you start the process now while I am transferring over 130 BTC or do you prefer to have all the BTC there first?   It takes me a couple days to transfer the BTC because I only do 5 or 10 at a time.  I could possibly do it in one day.
>>
>> John
>>
>>> On Mar 23, 2021, at 2:23 AM, Hristiyan Hristov <hristiyan@nexo.io> wrote:
>>>
>>>
>>> Hello John,
>>>
>>> I hope you are well. As we discussed, I have prepared three scenarios of purchasing Bitcoin through Nexo's Credit line. In all of them, I have added the amount of NEXO Tokens (in BTC value) you would need for the Platinum membership.
>>>
>>> Also, I have taken as a reference price of Bitcoin - $54,000

| Total BTC | BTC Earn interest and protect Collateral | BTC Collateral | Purchased BTC through Nexo Credit line | Amount of BTC for NEXO Platinum | LTV | BTC Liq price @ BTC $54,000 | In |
|---|---|---|---|---|---|---|---|
| 250 | 166 | 84 | 50 | 25 | 20.00% | $13,000 | |
| 250 | 125 | 125 | 75 | 25 | 30.00% | $19,500 | |
| 250 | 82 | 168 | 100 | 25 | 40.00% | $25,930 | |

>>> In regards to the Zero Interest Loan, the collateral used for it cannot be moved until the period of the loan expires. I am attaching the Zero Interest Loan - one-pager for more information.
>>>
>>> Looking forward to hearing your thoughts on the above.

CONFIDENTIAL

CRESS-00000041

Thank you.

On Mon, Mar 22, 2021 at 6:06 PM John Cress <jtc88@hotmail.com> wrote:

Hristiyan,

I just thought about something. If the zero cost loan is very low risk, it might make sense to utilize that, even though the upside is limited. If I only borrow 20% LTV or 40% LTV to buy 50 or 100 BTC, maybe I can utilize the rest for the zero cost loan with limited upside. However, if I do that, I would still want to make sure I have a way to move funds automatically to increase collateral if needed. Can you let me know what is that upper limit on the bitcoin price for the zero cost loan? That could be blended in if it makes sense.....

John

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**nexo**

**Banking on Crypto**
nexo.io

<Zero Interest Loan - One Pager.pdf>

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**nexo**

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**nexo**

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**nexo**

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**nexo**

**Banking on Crypto**
nexo.io

CONFIDENTIAL CRESS-00000042

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

CONFIDENTIAL

CRESS-00000043

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13



**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

**Banking on Crypto**
nexo.io

CONFIDENTIAL

CRESS-00000044

# EXHIBIT 46

Case 3:23-cv-00882-TSH    Document 153-7    Filed 08/07/26    Page 45 of 182

  

Blog  »  Product  »  New Features

# 🏅 Loyalty Comes in Silver, Gold and Platinum with Nexonomics

Nov 09, 2020     3 min read

**New Features**

> ⓘ The earn rates provided in this article might be outdated. Please refer to our Earn page for the most up-to-date rates.

With the third installment of the Nexonomics series, we present to you the **new Nexo Loyalty program**. Designed to give you the ultimate ease-of-use and flexibility to manage your assets, it goes live on our platform on **December 9**.

We believe that simple, yet proven business models work best and are reflecting this in our tokenomics, rewarding you for your loyalty to Nexo and our native token. With this core belie

CONFIDENTIAL      CRESS-00000650

Loyalty Comes in Silver, Gold and Platinum with Nexonomics

All set. Share only with your best friends!

your benefits, while giving the NEXO Token even greater utility.

## The Loyalty Program Explained

The new Nexo Loyalty program is a four-tier system, comprising **Base, Silver, Gold, and Platinum** levels, which extends benefits depending on the amount of NEXO Tokens you hold across your Nexo Savings and Credit wallets, as combined in the **Portfolio Balance\***.

The requirements for each tier are as follows:

**Base:** No NEXO Tokens are needed

**Silver:** The ratio of NEXO Tokens in your account against the rest of your portfolio must be at least 1%

**Gold**: The ratio of NEXO Tokens in your account against the rest of your portfolio must be at least 5%

**Platinum:** The ratio of NEXO Tokens in your account against the rest of your portfolio must be at least 10%

The new Loyalty Program bases **rewards tiers on the ratio of NEXO Tokens vs. the value of the other assets in your Portfolio Balance**, which must be at least 1%, 5% or 10% respectively for each tier.

The new loyalty scheme will replace the 50% credit line interest discount and the NEXO Staking Bonus for Earn accounts, which will cease to exist independently.

## The New Loyalty Rates

The new Loyalty program's Base, Silver, Gold and Platinum tiers progressively give you greater rewards the more NEXO Tokens you hold, simultaneously reducing your borrowing rates for the Instant Crypto Credit Lines and increasing your yields with the Earn on Crypto suite.

CONFIDENTIAL
CRESS-00000651

9/20/24, 3:22 PM
Loyalty Comes in Silver, Gold and Platinum with Nexonomics
Case 3:23-cv-00882-TSH    Document 153-7    Filed 08/07/26    Page 47 of 182

All set. Share only with your best friends!

| | Base | Silver | Gold | Platinum |
| --- | --- | --- | --- | --- |
| | Up to **1%** NEXO Tokens in Portfolio | **1 – 5%** NEXO Tokens in Portfolio | **5 – 10%** NEXO Tokens in Portfolio | At least **10%** NEXO Tokens in Portfolio |
| **Instant Crypto Credit Lines™** *Borrow interest rate* | 11.9% | 10.9% | 8.9% | 5.9% |
| **Earn on Crypto** *Savings interest rate* | up to **5%** +2% | up to **5.25%** +2% | up to **5.5%** +2% | up to **6%** +2% |
| **Earn on Stablecoins** *Savings interest rate* | **8%** +2% | **8.25%** +2% | **9%** +2% | **10%** +2% |
| **Earn on Fiat** *Savings interest rate* | up to **8%** +2% | up to **8.25%** +2% | up to **9%** +2% | up to **10%** +2% |
| **Dividends** | ✅ | ✅ | ✅ | ✅ |
| **Free Monthly Crypto Withdrawals** | 1 | 2 | 3 | 5 |

# Dashboard Redesign

Our new Loyalty program comes with a redesign of your Nexo account Dashboard for a simpler, smoother and more intuitive user experience.

With the new look, your **Portfolio Balance is immediately visible**, so that you can see the combined USD value of the assets in your Credit Line and Savings wallets at a glance.

We have also integrated a feature that indicates which Loyalty tier you are currently in, with a function displaying **how much more NEXO you need to hold to access the next Loyalty tier** on hover, which makes it even easier to keep a tab on your rewards.

Check it out:

CONFIDENTIAL

CRESS-00000652

Case 3:23-cv-00882-TSH    Document 153-7    Filed 08/07/26    Page 48 of 182

All set. Share only with your best friends!



# Loyalty Program > Old Nexo Bonus Model

The Loyalty program is designed to help you grow and manage your wealth now and in the long term. Below are the ways this new system takes our services to the next level:

**Flexibility:** You can choose the amount of NEXO that gets you the bonuses that best suit your needs, goals, and investment strategy.

**Dynamics:** Like our credit line, our loyalty scheme is dynamic, meaning you will still get bonus rates if the price of your crypto fluctuates, and you miss, say, the 5% or 10% thresholds for the Gold and Platinum tiers.

**Accessibility:** With the new lower thresholds for Nexo bonuses, our services are even more inclusive and easily accessible.

**Usability:** We are introducing a clearer, cleaner user experience, making it easier to calculate and keep track of the NEXO needed for bonuses.

**Build-up:** The tiered model allows us to implement further perks for clients in the near future, to be immediately unlocked as you reach a tier or a new reward is added.

CONFIDENTIAL                                                                                 CRESS-00000653

Case 3:23-cv-00882-TSH    Document 153-7    Filed 08/07/26    Page 49 of 182

All set. Share only with your best friends!

move forward with the improvements this new system will allow us to implement for you.

Like this article? Spread the word.



# Related Posts



Sep 05

## What's New In August: Target Price Swap & More

**New Features**



Aug 01

## What's New In July: Futures on the Nexo Web Platform & More

**New Features**

CONFIDENTIAL                                                                                      CRESS-00000654

Case 3:23-cv-00882-TSH   Document 153-7   Filed 08/07/26   Page 50 of 182

All set. Share only with your best friends!



Jul 04

🎬 What's New In June: Markets Section Revamp & More

**New Features**

# Let Your Crypto Work For You

The only cryptocurrency account that lets you borrow instantly in 45+ currencies.

Get Started



home » Blog » Product » New Features » 🏅 Loyalty Comes in Silver, Gold and Platinu

CONFIDENTIAL                                                                                    CRESS-00000655

Case 3:23-cv-00882-TSH    Document 153-7    Filed 08/07/26    Page 51 of 182

All set. Share only with your best friends!



Follow us

 

**TrustScore 4.7 15,213** reviews

## Sign up for updates

Enter your email

## Products

Buy

Exchange

Borrow

Nexo Card

Nexo Pro

Referral

Nexo Wallet

## Company

About

Fundamentals

Licenses

Nexo Prime

Nexo Private

Nexo Ventures

Corporates

Affiliates

Careers

## Resources

Blog

Media Center

Help Center

Status Center

Contacts

Sitemap

Vulnerability Disclosure

## Legal

Exchange Terms

Privacy Policy

Fee Schedule

Affiliate Terms

Staking Terms

Earn Terms

Terms & Conditions

Services Terms

Credit Terms

DeFi Terms

Nexo Card Terms

## Mobile app









CONFIDENTIAL                                        CRESS-00000656

All set. Share only with your best friends!

 ISO 27001, 27017, 27018 &
SOC 2 Type 2 Certifications

A Leading Digital Assets Institution

 Valued by 7M+ people
since 2018

All or part of the Nexo Services, some features thereof, or some Digital Assets, are not available in certain jurisdictions, including where restrictions or limitations may apply, as indicated on the Nexo Platform and in the relevant general terms and conditions.

Copyright 2024 Nexo. All rights reserved.

CONFIDENTIAL                                                                                        CRESS-00000657

# EXHIBIT 47
## FILED UNDER SEAL

# EXHIBIT 48

**From:** John Cress <jtc88@hotmail.com>
**To:** David Lindenbaum <lindenbaumdavid@gmail.com>
**Subject:** Re: Nexo token sale
**Date:** Wed, 30 Jun 2021 20:05:47 +0000

---

It's a joke.   But it's for a $1,600,000 loss …. They have me by the balls.   I don't seem to have any options

On Jun 30, 2021, at 12:47 PM, David Lindenbaum <lindenbaumdavid@gmail.com> wrote:

$50,000. Fee?

David

On Jun 30, 2021, at 11:33 AM, John Cress <jtc88@hotmail.com> wrote:

Look below.   I asked if 2.7% will be the fee "all the way around" and he said "yes, this will be the total cos for the sell execution".   Pretty tricky.   I have no choice though.....5% fee for a 50% loss

**From:** hristiyan@nexo.io <hristiyan@nexo.io>
**Sent:** Wednesday, June 30, 2021 9:25 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Nexo token sale

Yes.

This will be the total cost for the sell execution.

Please proceed with the withdrawal.

Let me know once you initiate it.

Sent from my iPhone

On 30 Jun 2021, at 18:16, John Cress <jtc88@hotmail.com> wrote:

Ok, someone told me to ask if the 2.7% execution fee will be the total fee all the way around, including price slippage etc.   Can you confirm?   Thanks

John

CONFIDENTIAL    CRESS-00002192

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Wednesday, June 30, 2021 12:35 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Nexo token sale

John,

If you are awake, would you be able to send the NEXO Tokens to Nexo's OTC address - 0x741336ca065105e2ce1a66405a8ebd612f470287

Thank you.

On Wed, Jun 30, 2021 at 8:28 AM John Cress <jtc88@hotmail.com> wrote:

> I confirm
>
> John
>
>> On Jun 29, 2021, at 10:27 PM, Hristiyan Hristov <hristiyan@nexo.io> wrote:
>>
>> Hello John,
>>
>> I am waiting on your confirmation to send the order for execution.
>>
>> Thank you.
>>
>> On Wed, Jun 30, 2021 at 7:27 AM Hristiyan Hristov <hristiyan@nexo.io> wrote:
>>> Noted.
>>>
>>> In order to facilitate the OTC deal, the NEXO Tokens will be deducted from your account through a custom fee transaction.
>>>
>>> The deal will be subject to a 2.7% execution cost.
>>>
>>> Please provide me with a written confirmation that you agree with the terms.
>>>
>>> Thank you.
>>>
>>> On Wed, Jun 30, 2021 at 6:50 AM John Cress <jtc88@hotmail.com> wrote:
>>>> Hristiyan
>>>>
>>>> I would like to sell all my Nexo tokens, which are currently 1,113,292.45140883 tokens but that may change daily with interest, but I would like to sell the all the tokens using the OTC desk if sufficient liquidity can be coordinated. Thank you,
>>>>
>>>> John
>>>>
>>>>
>>>> --
>>>> Best regards,

CRESS-00002193

**Hristiyan Hristov**
Relationship Manager
+41 43 505 18 13





**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager
+41 43 505 18 13




**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager
+41 43 505 18 13








**Banking on Crypto**
nexo.io

CRESS-00002194

# EXHIBIT 49

## Re: Please read and call me ASAP

**John Cress <jtc88@hotmail.com>**

Sun 6/13/2021 12:59 PM

**To:** Hristiyan Hristov <hristiyan@nexo.io>

Yes, I did. Unfortunately, it looks like I am not able to swap the bitcoin to USDT to avoid any possible drops in BTC price, and then swap it back to BTC. That would have provided me a lot of safety if I could do that. I would also be willing to pay a lot of money in fees if I could do that. If I swap my BTC to USDT, that is basically like a final liquidation and I cannot simply swap them back. That is very scary because I ALMOST did that when I was on the phone with you and the next morning. I have extremely lucky the exchange was not working on Friday and I got an error the next morning too. Support opened a ticket for me and I read the article you sent me while I was waiting for the exchange to work. I am so, so lucky I read that and got it clarified. I almost lost millions of dollars permanently if I did those swaps. Wow

Anyway, if there's any way Nexo can help me to <u>temporarily swap my BTC to USDT and then swap them back to BTC at the exact same LTV as the first swap</u>, this would be a valuable service and <u>I would pay a BIG FEE</u> if I can do this....

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Sunday, June 13, 2021 6:59 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Please read and call me ASAP

Hello John,

Did you go through the article which I have sent you?

Looking forward to hearing from you.

On Sat, Jun 12, 2021 at 2:27 AM John Cress <jtc88@hotmail.com> wrote:
> Hristiyan,
>
> Disregard this email and request. Someone explained to me that I cannot swap the Tether back to BTC, so I do NOT want to use the collateral swap service. This service is not at all what it sounds like. Thank you,
>
> John
>
>> On Jun 11, 2021, at 10:57 AM, John Cress <jtc88@hotmail.com> wrote:
>>
>>
>> Hristiyan,
>>
>> I got up this morning and I've been trying to use the exchange, but it's just giving me this error attached. The live support team was unable to help me and they

CONFIDENTIAL        CRESS-00000134

created case # 448695.    I selected the credit wallet, entered 2.722 BTC to swap to Tether, and there's a button at the bottom that says "Preview Exchange".    That button is not working and I'm seeing this error I attached.    I don't know if this case is going to get the priority it needs.   This is extremely important for me.   Can you please follow up and monitor this case for me?   Also, can you or someone please do my swap for me since I can't use the self-service exchange?

I need to swap 129.42 BTC to Tether and keep 250 BTC remaining in my credit wallet.    Please confirm.

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Friday, June 11, 2021 4:27 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Please read and call me ASAP

Hello John,

Please find more information regarding the Collateral Swap function in this article.

Let me know if you have any questions.

On Fri, Jun 11, 2021 at 10:58 AM John Cress <jtc88@hotmail.com> wrote:
> Ok, I will be watching my phone.   Thanks

---

> **From:** Hristiyan Hristov <hristiyan@nexo.io>
> **Sent:** Friday, June 11, 2021 12:50 AM
> **To:** John Cress <jtc88@hotmail.com>
> **Subject:** Re: Please read and call me ASAP
>
> I will call you in 30-45 minutes, John.
>
> On Fri, Jun 11, 2021 at 10:36 AM John Cress <jtc88@hotmail.com> wrote:
>> Right now it's 12:35 AM here, but I have to stay up to make sure we talk about the order before the weekend.   Can you call me now or very soon since it will be getting very late here?    Thanks
>>
>>> On Jun 11, 2021, at 12:14 AM, John Cress <jtc88@hotmail.com> wrote:
>>>
>>> Ok great - I can talk right now.  Please call me now and I will answer. Thanks,

CONFIDENTIAL                                    CRESS-00000135

John

On Jun 10, 2021, at 11:58 PM, Hristiyan Hristov <hristiyan@nexo.io> wrote:

Of course, John.

When will be a good time to talk?

Thank you.

On Fri, Jun 11, 2021 at 4:04 AM John Cress <jtc88@hotmail.com> wrote:

Hristiyan,

I've been trying very hard to reach someone at Nexo for help protecting my assets. Everyone in the live chat has told me that they are working to escalate my request and have someone contact me.

Last night Vladi told me that he would have you contact me. He promised a response by the end of Thursday, and I still haven't heard from you.

I opened case #432896 twelve days ago and nobody has contacted me. I am extremely stressed out. I have already been liquidated once and come dangerously close two other times and I need to take action asap. Twelve days is a long time to have eight figures of assets at risk and not have a response.

I attempted to swap 129 bitcoins to USDC or USDT at a price of $36,500 or better on the exchange and it won't let me. I have screenshots of the swap page not allowing me to do the swap myself and I have screenshots of my conversation with Vladi.

Here's what I'm thinking could be a solution. If today (Friday) the OTC desk can sell 129 BTC at $36,500 or higher, and exchange it to USDC or USDT, my collateral assets will be in a more stable position.

At that point, if BTC goes lower, I will be in a good position. We would then add to the order instructions to also swap the stablecoin back into BTC if the price goes higher than $36,500 once it gets to $39,000. This would only be a temporary measure to get through a drop in BTC price this weekend.

CONFIDENTIAL

CRESS-00000136

I'm also open to any longer term solutions or deals that could be made to make it through to the other side.

This is a very serious situation and I am doing everything possible to think about ways to protect my assets.   I need Nexo to respond immediately today to help me carry out the moves that need to happen.

I will stay up late again eagerly waiting to hear from you.  Again, my phone number is 1-415-298-4366.

<u>I want to talk through the plan on the phone first</u> and get this taken care of before the weekend.

John Cress


--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13





**Banking on Crypto**
nexo.io


--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13





**Banking on Crypto**
nexo.io


--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13





**Banking on Crypto**
nexo.io

<Screen Shot 2021-06-11 at 10.51.45 AM.png>


--
Best regards,

CONFIDENTIAL                                          CRESS-00000137

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

   



**Banking on Crypto**
nexo.io

CONFIDENTIAL

CRESS-00000138

# EXHIBIT 50
## FILED UNDER SEAL

# EXHIBIT 51

**From:** John Cress <jtc88@hotmail.com>
**To:** Brian W <snowboardz@gmail.com>
**Subject:** Fwd: Safeguarding Your Assets Throughout the Current Market Volatility
**Date:** Thu, 13 May 2021 20:03:22 +0000

---

I got this email today.    I'm safe, but can't borrow more since they tightened up the LTV ratios recently to brace for turbulence.  My average buy price of bitcoin using borrowed funds was $57,000 and now it's at $49,000. This is a Bert good entry point with brand new assets, even though LTV now is 50% instead of 60%, but that's temporary.....   my average buy price for ethereum with borrows funds was $3,200 I think

Begin forwarded message:

**From:** Nexo Community <community@nexo.io>
**Date:** May 13, 2021 at 12:11:11 PM PDT
**To:** jtc88@hotmail.com
**Subject: Safeguarding Your Assets Throughout the Current Market Volatility**
**Reply-To:** Nexo Community <reply-fec215747d67037b-950_HTML-49499974-500009431-9002@nexo.io>



Nexo

Safeguarding Your Assets Throughout the Current Market Volatility

Dear John,

As you are probably aware, the crypto market is experiencing volatility at the moment. In times like these, Nexo is here to help you protect and leverage your crypto no matter the ups and downs.

We can guarantee that all Nexo services, our IT infrastructure, and servers are functioning without any delays and downtimes, but cannot extend this certainty to how the market will perform. While we all hope for a prompt recovery in asset prices, we ask you to please bear the following in mind in the weeks to come:

# If using the Instant Crypto Credit Lines™

- Monitor your crypto and the state of your Nexo credit line closely, and ensure you have adequate notifications for price

CRESS-00001826

fluctuations and potential margin calls to avoid liquidation of your assets.

- Maintain a healthy <u>loan-to-value ratio</u> by adding extra assets to your Credit Line Wallet or, should you wish to do so, by repaying part of your withdrawn credit.

- Enable Automatic Collateral Transfer.* This feature moves assets from your Savings Wallet to your Credit Line Wallet when needed to protect your crypto from liquidation.

## If using the Earn on Crypto & Fiat suite

- Funds earning interest on the platform are safe as our sustainable business model ensures high liquidity to meet all your needs and our financial obligations.

- Nexo's 200-500% overcollateralized credit lines and our strict <u>liquidations policy</u> safeguard your funds and our business, even during unfavorable market conditions.

- We do not provide uncollateralized loans even to trustworthy institutions, a decision that guarantees our robustness even in turbulent times.

Nexo has proved time and again that our business is designed and stress-tested to withstand black-swan-type market moves, as our success over the past year has aptly demonstrated. We will continue to provide sustainable and secure financial services as we go forward, regardless of market conditions.

As we go through this volatile period, you can, as always, rely on our Customer Support team, who are here to answer all your questions.

We wish you the best of luck in all market-related activities.

Stay ahead,
The Nexo Team

CONFIDENTIAL                                                                 CRESS-00001827

**\*Automatic Collateral Transfer:** During volatile markets, should the assets in your Credit Line Wallet not cover the required loan-to-value ratio for an existing credit line, the Automatic Collateral Transfer feature instantly moves assets from your Savings Wallet to your Credit Line Wallet, protecting your crypto. This option can be enabled and disabled via the Nexo web and mobile apps.

 Excellent Rating on Trustpilot

Download Our App and Give It Your Highest Rating

 Nexo on the App Store      Nexo on Play Store

    

## Banking on Crypto

©2021 Nexo. All rights reserved.

Made with Ne  by Nexo

Unsubscribe

# EXHIBIT 52
## FILED UNDER SEAL

# EXHIBIT 53

## Market value of your crypto assets is decreasing

**Nexo** <noreply@nexo.io>

Wed 5/19/2021 10:35 AM

**To:** jtc88@hotmail.com <jtc88@hotmail.com>



Dear Nexo Client,

We are writing to inform you that the market value of the crypto assets in your Nexo Account has been decreasing and your Loan-to-Value ratio has increased to 71.43%.

You can deposit more crypto assets or stablecoins to your Nexo Account in order to improve the Loan-to-Value ratio. Depositing stablecoins is the recommended option if you would like to avoid further crypto price risk.

**The security of the assets held in your Nexo Account is guaranteed by a $375 million custodian insurance policy** and are held in multi-signature wallets and cold storage at world renowned and audited qualified custodian BitGo, which is Cryptocurrency Security Standard Level 3 as well as SOC 2 compliant.

**Nexo is a licensed & regulated digital assets institution**

Thank you.

Best Regards,
The Nexo Team

 

© 2021 Nexo. All rights reserved.

You are receiving this email because you opted in via our website.

CONFIDENTIAL             CRESS-00000081

## IMPORTANT: Market value of your crypto assets is low – third notification

Nexo <noreply@nexo.io>
Wed 5/19/2021 10:35 AM

**To:** jtc88@hotmail.com <jtc88@hotmail.com>



Dear Nexo Client,

This is the third notification that the market value of the crypto assets in your Nexo Account has been decreasing. Your Loan-to-Value ratio has increased to 76.92%.

Please deposit more crypto assets or stablecoins to your Nexo Account in order to improve the Loan-to-Value ratio. Depositing stablecoins is the recommended option if you would like to avoid further crypto price risk.

Please be informed that if the Loan-to-Value ratio increases to 83.33%, the Nexo Oracle might initiate small partial loan repayments automatically (without any penalty or additional fees).

**The security of the assets held in your Nexo Account is guaranteed by a $375 million custodian insurance policy provided by the world's leading custodians.**

**Nexo is a licensed & regulated digital assets institution**

Thank you.

Best Regards,
The Nexo Team

 

© 2021 Nexo. All rights reserved.

You are receiving this email because you opted in via our website.

CONFIDENTIAL                                                                CRESS-00000082

## IMPORTANT: Market value of your crypto assets is low – third notification

Nexo <noreply@nexo.io>

Fri 5/21/2021 4:21 PM

**To:** jtc88@hotmail.com <jtc88@hotmail.com>



Dear Nexo Client,

This is the third notification that the market value of the crypto assets in your Nexo Account has been decreasing. Your Loan-to-Value ratio has increased to 76.92%.

Please deposit more crypto assets or stablecoins to your Nexo Account in order to improve the Loan-to-Value ratio. Depositing stablecoins is the recommended option if you would like to avoid further crypto price risk.

Please be informed that if the Loan-to-Value ratio increases to 83.33%, the Nexo Oracle might initiate small partial loan repayments automatically (without any penalty or additional fees).

**The security of the assets held in your Nexo Account is guaranteed by a $375 million custodian insurance policy provided by the world's leading custodians.**

**Nexo is a licensed & regulated digital assets institution**

Thank you.

Best Regards,
The Nexo Team

 

© 2021 Nexo. All rights reserved.

You are receiving this email because you opted in via our website.

CONFIDENTIAL           CRESS-00000087

Mail - John Cress - Outlook

# Market value of your crypto assets is decreasing

Nexo <noreply@nexo.io>
Fri 5/21/2021 9:34 AM

**To:** jtc88@hotmail.com <jtc88@hotmail.com>



Dear Nexo Client,

We are writing to inform you that the market value of the crypto assets in your Nexo Account has been decreasing and your Loan-to-Value ratio has increased to 71.43%.

You can deposit more crypto assets or stablecoins to your Nexo Account in order to improve the Loan-to-Value ratio. Depositing stablecoins is the recommended option if you would like to avoid further crypto price risk.

**The security of the assets held in your Nexo Account is guaranteed by a $375 million custodian insurance policy** and are held in multi-signature wallets and cold storage at world renowned and audited qualified custodian BitGo, which is Cryptocurrency Security Standard Level 3 as well as SOC 2 compliant.

**Nexo is a licensed & regulated digital assets institution**

Thank you.

Best Regards,
The Nexo Team

 

© 2021 Nexo. All rights reserved.

You are receiving this email because you opted in via our website.

CONFIDENTIAL

CRESS-00000088

# EXHIBIT 54
## FILED UNDER SEAL

# EXHIBIT 55
## FILED UNDER SEAL

# EXHIBIT 56
## FILED UNDER SEAL

# EXHIBIT 57
## FILED UNDER SEAL

# EXHIBIT 58
## FILED UNDER SEAL

# EXHIBIT 59

Ian S. Shelton (SBN 264863)
BAKER & MCKENZIE LLP
ian.shelton@bakermckenzie.com
10250 Constellation Boulevard, Suite 1850
Los Angeles, CA 90067
Phone: (310) 299-8535
Fax: (310) 201-4721

Matthew C. Rawlinson (admitted *pro hac vice*)
BAKER & MCKENZIE LLP
matthew.rawlinson@bakermckenzie.com
800 Capitol, Suite 2100
Houston, Texas 77002
Phone: (713) 427-5000
Fax: (713) 427-5067

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN CRESS,<br><br>Plaintiff,<br><br>vs.<br><br>NEXO CAPITAL INC.<br><br>Defendant. | CASE NO. 3:23-cv-00882-TSH<br><br>**DEFENDANT'S SECOND OMNIBUS AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES**<br><br>**DESIGNATED AS <u>CONFIDENTIAL</u> UNDER THE PROTECTIVE ORDER** |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Nexo Capital, Inc. ("Defendant" or "Nexo"), by and through its attorneys, hereby submits its second omnibus amended objections and responses to Plaintiff's Interrogatories, as set forth below.

**INTERROGATORY NO. 2:**

Describe the terms of the Liquidation Relief Program referenced in **Exhibit A**.

**Response:** The Liquidation Relief Program is a service that certain Nexo customers could use to recover his or her liquidated assets in the event of a market crash. If the customer decided to use the service, the customer would enter a written contract with Nexo, which was titled Liquidation Relief Agreements ("LRAs"). Plaintiff did not choose to use the Liquidation Relief Program service, although it was available to him, or execute a LRA with Nexo. The terms of the LRAs executed by Nexo's U.S. customers are reflected in the LRAs produced as NEXO0005044-–NEXO-0005418.

**INTERROGATORY NO. 3:**

In the table below or in a similar table, please identify the following information regarding each sale of NEXO made by You:

  a.  The date and time of the sale;
  b.  The quantity of NEXO sold;
  c.  The sale price;
  d.  The place where the transaction was authorized;
  e.  The order number of the sale (if any);
  f.  The exchange on which the sale occurred (if any);
  g.  The counterparty (if known); and
  h.  (By Bates number) the contract pursuant to which the NEXO was sold (if any)

| Date & Time of Sale | Quantity of NEXO | Sale Price (USD) | Place where Transaction Authorized | Order Number | Exchange | Counterparty | Bates No. of Relevant Contract |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Response:** Nexo objects to this Interrogatory as compound and consisting of at least eight subparts for an undefined number of transactions. Nexo further objects to the term "place where transaction was authorized" as vague and ambiguous. Nexo further objects to this Interrogatory because it seeks information regarding non-U.S. sales of the NEXO Token, which are irrelevant, overbroad, unduly burdensome, and not proportional to the needs of the case. The Court has ruled

## **VERIFICATION**

On behalf of Nexo Capital Inc., I declare under penalty of perjury under the laws of the United States, that I have read the Defendant's Second Omnibus Amended Objections and Responses to Plaintiff's Interrogatories, in *Cress v. Nexo Capital Inc*., Case No. 3:23-cv-00882-TSH, and state that the answers are true and correct to the best of my knowledge, information and belief, based upon my personal knowledge of such matters, upon my discussions with persons known or believe by me to have personal knowledge of such matters, or upon my review of documents and records relating to such matters.

On behalf of Nexo Capital Inc.:

Signed by:

*Augustus Greaves*

CF546A9791D8427...

Signature

Augustus Greaves

Name

Director

Title

# EXHIBIT 60
## FILED UNDER SEAL

# EXHIBIT 61

## FILED UNDER SEAL

# EXHIBIT 62

**Expert Report of Prof. Bruce Mizrach**
**Cress v. Nexo**
**April 20, 2026**

## 1.1 Background and qualifications:

I have an A.B. in economics and history from Tufts University.  I was elected to Phi Beta Kappa and graduated summa cum laude.  I received my Ph.D. in economics in 1987 from the University of Pennsylvania and have taught at Boston College, the Stern School of Business at NYU, and the Wharton School at the University of Pennsylvania.

I am a tenured full professor of economics at Rutgers University where I have taught since 1995. I teach graduate and undergraduate classes in financial economics.  My specialization is in market microstructure which studies the trading mechanisms of financial markets.  I have published analyses of the equity, U.S. Treasury, corporate bond, energy, and digital asset markets.  My curriculum vitae, which is attached, provides a complete listing of my publications.

I was the editor of *Studies in Nonlinear Dynamics and Econometrics*, a journal devoted to the impact of nonlinear models on the macroeconomy and financial markets, for over 25 years.  My most recent work is on the market microstructure of electronic limit order markets in equities, fixed income, crude oil and digital assets.

My co-author Saketh Aleti and I published the first analysis of order trail data from digital asset exchanges (Aleti and Mizrach, 2021).  We looked at Bitcoin and Ethereum trading on the spot and futures markets.  In 2023, I published a paper (Kapengut and Mizrach, 2023) on the Ethereum blockchain looking at the transition to proof-of-stake.  The same manuscript also provides a comparison to the Polygon and Solana blockchains. In 2025, I published a third paper (Mizrach, 2025) on stablecoins like Tether and USD Coin. My manuscript analyzes the collateral, survivorship, blockchain linkages, fees, and microstructure of the ten leading stablecoins. This paper was featured in an invited article published in the *Financial Times* and has been presented at both the Federal Reserve Board and the European Central Bank.

I have provided policy advice to the Federal Reserve Banks of New York and St. Louis, the U.S. Department of Treasury Office of Financial Research, and the Financial Regulatory Authority.

I have operated a consulting business since 1998, the Nonlinear Analysis Group, in which I have developed and implemented trading strategies for my own accounts, as well as buy side, sell side, and hedge fund clients.

I have been involved in 14 cases in which I was asked to serve as an expert including the 1993 and 2001 World Trade Center litigation in which Cantor-Fitzgerald was the plaintiff. In nine of the 14 cases, the damages sought exceeded $100 million.  Since 2023, I have been involved in five crypto related cases, including serving as the SEC's expert in the civil case against Do Kwon and Terraform Labs. My curriculum vitae, which is attached to this report, describes in detail my involvement in each case.

I am being compensated at a rate of $1,000 per hour, for most of my work, though will be compensated at a rate of $1,250 per hour for time spent testifying at deposition and/or at trial. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

My work on this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter. In particular, the damages figures set forth in this report are calculated using digital asset prices as of the date of submission of this report, and pre-judgment interest is calculated through the date of this report. Should this matter proceed to judgment, these figures may be recalculated using the same methodology set forth herein, substituting asset prices as of the date of judgment and extending the interest computation through that date.

## 1.2 Assignment

I was asked by attorneys for Mr. Cress to analyze damages caused by the following:

- Entering the OTC and loan transactions as a result of misrepresentations made by Nexo regarding its (1) Liquidation Relief Program, (2) prompt responsiveness, (3) interest on his posted collateral, and (4) the best rates on OTC purchases, and (5) its fees on digital asset purchases and liquidations as alleged by Cress in his First Cause of Action.
- Statutory damages under Cal. Corp. Code §25503 for Nexo's sale of the Nexo Token without registration as alleged by Cress in his Third Cause of Action.
- Statutory damages under Cal. Corp. Code § 25501 for fraud in the offer or sale of the Nexo Token as alleged by Cress in his Fourth Cause of Action.
- Mr. Cress' purchase of Nexo Tokens based on Nexo's representation that the Nexo Token is registered with the SEC as a security as alleged in the Fifth Cause of Action.
- Nexo's theft of Cress' property as alleged in Cress' Sixth Cause of Action.
- Nexo's violation of the Racketeer Influenced and Corrupt Organizations Act as alleged in Plaintiff's Seventh and Eighth Cause of Action.
- Nexo's failure to disclose its OTC and liquidation fees as alleged in Plaintiff's Ninth Cause of Action.
- Nexo's breach of the Cryptocurrency Purchase Agreement as alleged in the Tenth Cause of Action.

I have also analyzed the amount of restitution necessary to restore Mr. Cress to the status quo under Cal. Bus. & Prof. §§ 17200, *et seq* for Nexo's unlawful conduct as alleged by Cress in his Second Cause of Action.

## 2. Important facts

(1) A large portion of Mr. Cress's investment portfolio was in Bitcoin (BTC). Nexo also encouraged Cress to invest in its own NEXO token by making representations regarding its

regulatory status and conditioning lending rates on NEXO holdings. As I show in **Figure 1**, the NEXO Token declined more than Bitcoin during the relevant period and made Cress more vulnerable to liquidation. In fact, throughout its history the NEXO Token has been substantially more volatile than BTC. The monthly realized volatility[1] of NEXO is 4.23 times that of BTC over the period from April 1 to June 30, 2021.

**Figure 1: Price Fluctuation in Bitcoin (BTC) and Nexo (NEXO)**
**April 1 – June 30, 2021**



**Source**: Coingecko

---

[1] The realized volatility is a 30-day rolling moving average of the squared returns.

(2) Nexo forcibly liquidated assets from Mr. Cress's portfolio on May 23, 2021 when he was still below the loan-to-value (LTV) ratio of 83.33% that Nexo required.

(3) Nexo has stated that they used a data feed from Coin Market Cap to determine liquidation thresholds for Cress's margin trades.[2] They have stated that they do not have the relevant pricing data from Coin Market Cap.[3] They do state that prices from Coinbase were part of this data feed.[4]

(4) Since Nexo has not provided price information from the source purportedly used to determine LTV and initiate liquidations, I have relied on external sources for marking Cress's portfolio to the market. Based on my knowledge of the market, I have relied on the deepest liquidity pools. For Bitcoin and Ethereum, I am using prices from Coinbase, the exchange most often offering the best prices based on my 2021 research with Aleti. Coinbase did not provide trading in NEXO, so I have utilized data from Huobi. This was the most active exchange in the Kaiko database with the NEXO-Tether (USDT) pair. Huobi was the predominant exchange used by Nexo to buy and sell NEXO during the time Mr. Cress was liquidated in May and June 2021.[5]

(5) Mr. Cress was concerned about intra-daily price fluctuations impacting his collateral values. He expected that his VIP status[6] would insulate him from these variations which as I show in **Figure 2** were substantial:

---

[2] Nexo's Responses to Plaintiff's Request for Production 107, 108, 109.

[3] Nexo's First Amended Objections and Response to Plaintiff's Interrogatory NO.15(i) at 24: "Nexo does not possess the exact LTV, price feed value, or other trigger used by the Nexo Oracle to initiate Plaintiff's liquidation transactions."

[4] Nexo's Second Amended Responses to Plaintiff's Interrogatory No. 7.

[5] Nexo's Responses to Plaintiff's Interrogatory No. 12.

[6] NEXO VIP Relationship Program, NEXO 2706-2718. Liquidation relief is mentioned at NEXO 2714.

CONFIDENTIAL                4 of 36

**Figure 2: Intradaily Price Variation of BTC-USD Prices on Coinbase**
**May 15 to June 30, 2021**



Daily fluctuations average over $3,600 per day in the sample.

(6) Despite purportedly being a Nexo VIP customer, the company responded very slowly to Mr. Cress.  For example, on March 26, 2021 at 20:09:42 UTC, Mr. Cress deposited 5,400,000 USDT (Tether) on Nexo[7] with the intention of buying both BTC and NEXO tokens.  The BTC are only credited to his account at 2021-03-27 22:58:00 UTC[8], a delay of more than 24 hours.

---

[7] https://etherscan.io/tx/0x28fcd494274f0314758862daaa876f44244c449d674562b78d8ef6bcaab6ecff
[8] NEXO 0137019

It also took Cress nearly two weeks to receive a reply to his request for a BTC liquidation price. On April 16, 2021, Cress asks[9] for his "new bitcoin liquidation price level."   He does not receive a reply[10] from his dedicated relationship manager[11] Hristiyan Hristov until April 30 after Cress had sent a second e-mail on April 29.  Mr. Hristov told Mr. Cress on April 30, 2021 that his liquidation price was $29,859.22.[12] However, Nexo's records show it began forced liquidations of Mr. Cress' assets on May 23, 2021 at a $32,163.68 BTC price, and again on June 21, 2021 at a $31,764.60 BTC price. [13]

Nexo's communication gaps became all the more harmful as Cress' portfolio began to deteriorate. For example, on May 23, 2021, the day of Cress's first liquidation, Cress requests a call with Hristov to discuss a "Flash crash scenario."[14] It does not appear Hristov replies to this email. Cress followed up two days later on May 25, 2021 asking for a quick call with Hristov to discuss selling some assets to "lower [his] liquidation point to a little bit below $30,000." It does not appear Hristov replies to this email.[15] Cress followed up again on May 27, asking again for a call to Hristov. Hristov replied that he was "not available for calls this week."[16]

Cress opened a customer support case on May 28, 2021 requesting a discussion with Nexo because he was "dealing with $12,000,000 AND that is my whole life savings, so I really need to try to have a discussion."[17] Cress reiterated "Please also understand this has to be reviewed and discussed very fast," and Nexo support confirmed "It will be reviewed as soon as possible." Cress left his phone number with Nexo support and told them "You can also call me at any time of the day." Nobody at Nexo contacted him again until Cress reached out again on June 11.

In a June 11, 2021 email exchange with Mr. Hristov, Cress mentions his customer support case opened at the end of May, and that he has "been trying very hard to reach someone at Nexo for help protecting my assets."[18] He discusses that Nexo support promised him a response, but that nobody contacted him. Cress tells Hristov, "Twelve days is a long time to have eight figures of assets at risk and not have a response." Hristov finally agreed to a call, over two weeks after Cress had requested to speak.[19] Hristov instructed Cress to use Nexo's Collateral Swap service, which did not function, and was "not at all what it sounds like," and on June 13 notes "I almost lost millions of dollars permanently if I did those swaps." Cress once again asks Hristov if there

[9] NEXO 3386, e-mail from Cress to Hristov, subject: Re: Borrowing scenarios.
[10] NEXO 3386, e-mail from Hristov to Cress, subject: Re: Borrowing scenarios.
[11] The VIP Program promised replies within hours and never more than 24 hours, NEXO 2709.
[12] NEXO 3386, e-mail from Hristov to Cress, subject: Re: Borrowing scenarios.
[13] Both prices are the first BTC trade liquidations on Binance on those dates in NEXO 369411.
[14] NEXO 3469, e-mail from Cress to Hristov, subject: Flash crash scenario.
[15] NEXO 3470, e-mail from Cress to Hristov, subject: Discuss selling strategy.
[16] NEXO 3471, e-mails between Cress and Hristov, subject: Re: Daily Interest on NEXO & a Final Dividend – The NEXO Governance Vote.
[17] NEXO 231341, #432896 Chat with John Cress.
[18] NEXO 3510, e-mails between Cress and Hristov, subject Re: Please read and call me ASAP.
[19] Id.

is "any way Nexo can help" him rebalance his loans to help avoid liquidation by swapping BTC to USDT and then swapping back to BTC.[20]

Hristov testified that the Nexo OTC Desk could have facilitated a swap like this—BTC to stablecoins and back. Hristov Deposition Tr. 81:14-21, 233:5-15 ("He would have been able to do that through the OTC desk, and we discussed it. … So he would have been able to swap his assets back from Bitcoin to USDC or from USDT to BTC using the OTC desk, right? — Right."). However, Hristov does not appear to have relayed this option to Mr. Cress at the time. Instead, it appears that Hristov cuts off contact with Cress for the next week, and does not reach back out until June 21, 2021, after Mr. Cress' assets have been substantially liquidated.[21] Hristov offers to "get on a call and discuss exactly what you want to do." Cress replies, "I think your email is a little late. Look at my account. I wrote what I would like to do in the last paragraph of my email below. I don't understand why that cannot be accommodated."[22]

### 3.  Profits on Cress' OTC Purchases

I understand that Nexo advertised that Plaintiff would have access to "exclusive OTC services" including "some of the best rates on the market."[23] As detailed below, Nexo's delivery prices for Plaintiff's transactions were marked up from the prevailing market rates.

I am not aware of any reason why it would be beneficial to Mr. Cress for his orders to have been handled by a special OTC desk, rather than directly through an exchange.  His BTC trading volumes were not large relative to the depth of the BTC market: Coinbase[24] traded 706,000 BTC in May 2021.  My own research shows average depth[25] of more than 15 BTC.  The primary justification for OTC executions is to get better prices than you can get on the open market order book.

There are two sets of executions in the records produced by Cress and Nexo shown in **Table 1**. For BTC and ETH the first ("Nexo Cost") are prices at which Nexo claims to have purchased the digital assets on third-party exchanges.  In the case of NEXO tokens which came from Nexo's own inventory, Nexo reports a daily price range from Coin Market Cap.  The second column ("Price for Cress") is the price charged to Cress.  These prices were always marked at higher prices than Nexo's acquisition cost.

---

[20] *Id.*
[21] NEXO 3510, 231332, 137019.
[22] *Id.*
[23] NEXO 2707, 2709, 2712.
[24] https://data.bitcoinity.org/markets/volume/5y?c=e&r=month&t=b
[25] Aleti and Mizrach (2021), Figure 6, p.16.

**Table 1:**
**Nexo Price Markups on Cress Purchases**

| Date | Currency | Nexo Cost | Price for Cress | Markup % |
|---|---|---|---|---|
| 2021-03-27 | NEXO | $2.55 | $2.66 | 4.31% |
| 2021-03-27 | BTC | $54,878 | $55,290 | 0.75% |
| 2021-04-01 | NEXO | $2.77 | $2.83 | 1.99% |
| 2021-03-31 | BTC | $58,877 | $59,168 | 0.49% |
| 2021-04-15 | BTC | $62,591 | $63,429 | 1.34% |
| 2021-04-16 | NEXO | $3.68 | $3.82 | 3.70% |
| 2021-05-03 | ETH | $3,172 | $3,204 | 1.01% |

Source: NEXO-0369424.

Nexo's VIP program advertised "OTC services with some of the best rates on the market," and "institutional rates" for purchases "for amounts larger than $100,000."[26] However, the rates Nexo charged Cress were far worse than market rates, and did not even meet retail rates, let alone institutional rates. To demonstrate this point, I examine retail exchange Coinbase. Coinbase's transaction fees were much lower than the fees Nexo charged Cress through its OTC transactions. Mr. Cress would have been eligible given his trading activity for Coinbase Pro which in 2021 charged rates[27] between 0.05% and 0.15% based on whether you were the trade initiator.

Similarly, Nexo's records reflect that it paid exchange fees when it purchased BTC and ETH on Binance and Kraken. This fee was reflected in the Nexo Cost. Mr. Cress thus paid for both this fee and Nexo's additional fee on each of his OTC BTC and ETH purchases.

I summarize the profits reported by Nexo on the OTC purchases made on Cress's behalf in **Table 2**.

---

[26] NEXO 2707, 2709, 2712.
[27] Lipscomb (2021).

**Table 2:**
**Nexo Profits on Cress OTC Purchases**

| Timestamp | Currency | Amount | Venue | Nexo Profit |
|---|---|---|---|---|
| 2021-03-27 | NEXO | 481,878 | Inventory | $53,006.58 |
| 2021-03-27 | BTC | 74.441 | Binance | $30,638.02 |
| 2021-04-01 | NEXO | 530,190 | Inventory | $29,319.51 |
| 2021-03-31 | BTC | 47.3227 | Binance | $14,858.48 |
| 2021-04-15 | BTC | 28.378 | Binance | $23,496.94 |
| 2021-04-16 | NEXO | 91,715 | Inventory | $10,194.13 |
| 2021-05-03 | ETH | 312.1487 | Binance | $10,382.00 |
| | | | **Totals** | $171,895.65 |

Notes: The dates, currency, amounts and venues are from NEXO-0369424. The profits are from NEXO-231850

I understand that Nexo has publicly advertised that it does not charge any fees to customers for digital asset purchases, but, in every purchase in **Table 2**, Nexo profited to Cress's detriment.  E-mails from Hristov show that the firm was aware of these profits:

March 27, 2021:

> Is buying BTC and NEXO with $5,400,000 USDT sent to the FB OTC Vault-tx-id
>
> We bought 75 BTC @ $54,878.23 = $4,115,867
>
> We are crediting the client with 74.441 BTC @ $55,289.81
>
> OTC-desk profit - 0.55 BTC
>
> We are selling 481,878 NEXO tokens @ $2.55
>
> We are crediting the client with 481,878 NEXO tokens @ $2.66
>
> Profit for the OTC Desk - 1.007 BTC
>
> Hedge - 22.3875 BTC @ $54,887
>
> Total profit = 1.5657 BTC ≈ $86,000

Source: NEXO-3645 (Translated).

April 1, 2021:

> Buying NEXO and BTC with $4,300,000 USDT sent to FB OTC wallet – tx id
>
> We sell 530,190 NEXO Tokens @ 2.7737 (Inventory)

We credit the client 530,190 NEXO Tokens @ 2.829

Profit for OTC Desk – 0.5 BTC = ~$29,412

We bought 47.575 BTC @ $58,883 = $2,801,360

We credit the client 47.3227 @ $59,197

Profit for OTC desk – 0.2523 BTC = ~$14,700

@OPS BTC Hedge – 25.544 BTC @ 58,669

Source: NEXO-248369 (Translated).

April 14, 2021:

He is buying BTC and NEXO with $2,150,000 USDT received in the FB OTC wallet – tx id

We sell: 98,494 @ $3.45 = $339,805 Inventory

We credit the client: 98,494 @ $3.5535

Profit for the OTC desk - $10,194

We buy BTC for $1,800,000 – I will provide details after the deal is completed.

…

April 16, 2021:

Ignore the previous figures.

He is buying BTC and NEXO with $2,150,000 USDT received in the FB OTC wallet – tx id

We sell: 91,715 NEXO Tokens @ 3.68 = $337,512 Inventory

We credit the client: 91,715 NEXO Tokens @ $3.816

Profit for the OTC desk - $12,488

We buy BTC for $1,800,000

We bought 28.7534 BTC @ $62,598.06

We credit 28.3780 BTC @ $63,426

Profit for the OTC desk – 0.3753 BTC = $23,500

Source: NEXO-248348 (Translated).

May 3, 2021:

Total amount sent by the customer: 1m USDT

ETH price for NEXO: $3,171.57

ETH price for the customer: $3,203.60

Client receives 312.1487 ETH

Inventory: NO

Hedge: NO

Profit margin for the OTC desk – 8,000 USDT + 0.7513 ETH

Source: NEXO-3604 (Translated).

The capital losses, I will show, are large enough to rule out most of Cress's liquidations.

### 3.1 Execution Delays and Unnecessary NEXO Token Purchases

I understand that Mr. Cress and Nexo entered into a Cryptocurrency Purchase Agreement ("CPA") on March 24, 2021, to govern the purchase and sale of cryptocurrency.[28] Pursuant to CPA, Cress "may submit a purchase Order to Nexo . . . via email," and Nexo would have ten minutes to confirm the Purchase Order. *Id.* at Section 1.1. I further understand that the CPA provided that "[p]romptly following payment of the Counterparty Purchase Price . . . , then Nexo shall deliver . . . the Counterparty Purchased Cryptocurrency to Counterparty by transfer of immediately available cryptocurrencies on the applicable Cryptocurrency Network . . ." *Id.* at Section 1.2(c).

The March 26, 2021 Purchase Order. On March 26, 2021 at 16:52 UTC, Cress emailed Nexo: "I signed the purchase agreement and most of my BTC is on Nexo now. All my bitcoin will be there less than two hours from now. Can you call me now? We can go through any final steps and start purchasing bitcoin now at prices below $54,000 and I want to buy Nexo fast before it keeps rebounding."[29]

Hristov responded that he was "finalizing some internal stuff regarding [Cress's] loan and OTC deal," and would call him. At 19:46 UTC, Hristov emailed Cress: "Please send the $5,400,000 USDT for the purchase of 75 BTC and the rest in NEXO Tokens to Nexo's OTC desk wallet - 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7. At 20:09 UTC, Cress transferred $5,400,000 USDT to the wallet identified by Hristov.[30]

The March 30, 2021 Purchase Order. Similarly, on March 30, 2021 at 18:25 UTC, Plaintiff sent $4,300,000 USDT to Nexo's OTC desk[31] to purchase 50 Bitcoin and 20 Bitcoin worth of NEXO Tokens.

---

[28] NEXO 48001.

[29] NEXO 3345.

[30] https://intel.arkm.com/explorer/tx/0x28fcd494274f0314758862daaa876f44244c449d674562b78d8ef6bcaab6ecff

[31] https://etherscan.io/tx/0x176a0e4df9f8d7ef7e230bea0a12bcc4fe5b572768e6fa8c5defd0f43ade0c66

However, Plaintiff had not received any confirmation from Nexo by the next day. He thus followed up, writing, "I was expecting an email from you this morning with an update on the OTC desk order execution confirmation. A whole day has gone by now …."

Hristov did not respond for another 12 hours, and when he did he "confirm[ed] that we have received the funds and executing the Bitcoin purchase as we agreed – Time waited average execution – 24 hours. Approximately six hours later Hristov stated that the "OTC has executed the deal with the following parameters: 1. 530,190 NEXO Tokens @ $2.829 [and] 2. 47.3227 BTC @ $59,197."

The April 14, 2021 Purchase Order. On April 14, 2021, Plaintiff contacted Nexo and asked to "buy 28 more BTC and get my total bitcoin balance to 400 BTC."[32] He added, "I don't know if I need to buy more NEXO or how much would be required, so just let me know the total amount of USDT." Hristov responded by saying "[p]lease send the $2,150,000 USDT which will be used for purchasing 28 BTC and the remaining we will top the NEXO tokens balance, to ensure the lower interest rate and higher earnings."[33]  However, on April 14, Cress' account was already well over the 10% threshold required for Platinum status, sitting at 12.84% NEXO. Even after the purchase of $1,800,000 worth of BTC, Cress' account would have remained 12.04% NEXO Token. There was thus no need for Cress to purchase additional NEXO Tokens as part of this transaction.

At 16:36 UTC, Plaintiff sent $2,150,000 USDT to Nexo's OTC desk.[34] At 18:38 UTC, Hristov confirmed receipt of the funds and stated that Nexo would proceed to purchase $350,000 worth of NEXO Tokens immediately and start a 24-hour TWAP purchase of $1,800,000 worth of BTC.

Two days later, on April 16, Hristov emailed Plaintiff stating "I have some great news. The team has finished with the execution last night. We purchased the following assets: 28.3780 BTC @ $63,426; [and] 91,715 NEXO Tokens @ $3.816.

The May 2, 2021 Purchase Order. On May 2, 2021 Plaintiff sent $1,000,000 USDT to Nexo's OTC desk to purchase ETH.[35]

On May 3, Nexo stated that the execution took place and 312.14868 ETH would be added to Plaintiff's account. Plaintiff asked Nexo to detail the total amount that was spent and the price per token because "[i]f I'm calculating correctly, I sent $1,000,000 and if that only purchased 312 ETH, that means the price was $3,205 . . . Those numbers seem impossible because ETH never reached a price of $3,205. I can't be paying more than a price where ETH ever traded."[36]

Nexo responded and informed Plaintiff that the OTC purchase took place around 11:30 UTC on May 3, and that 312.1487 ETH were bought at 3203.6 USDT per unit. Nexo stated that this cost included "the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC

---

[32] NEXO-0003441.

[33] *Id.*

[34] https://etherscan.io/tx/0xc699cf63aefa64ede79f81d23e6f88f9a62ab14992ad1f3a31236c76b30eb6da

[35] NEXO 0137019.

[36] NEXO 3441.

desk charged for the transaction which is estimated around ~0.5% as well." Nexo's internal records reflect that it took a profit of $10,382 (or 1.03%) on this transaction.[37]

In total, as reflected in **Table 2**, Nexo made profits of over $171,896 on Cress' OTC purchases. When I turn to the liquidations that soon followed, the OTC profits would have prevented 22 of Mr. Cress's 29 liquidations.

### 4. Liquidations

Mr. Cress had initial success in his margin trades. As I show in **Figure** 3, he first enters the Bitcoin (BTC) market with BTC prices rising.

**Figure 3: Timing of Cress Liquidations**



**Source**: BTC liquidations from Cress-270. Daily BTC/USD prices from Coingecko.

---

[37] NEXO 0137019

The BTC market, however, turned bearish shortly thereafter. By May 19, Nexo began to forcibly liquidate his holdings.  After the third set of liquidations, Cress's portfolio had shrunk by 86%.

Prior to these liquidations, Mr. Cress's holdings in his margin account are summarized in **Table 3**.

### Table 3: Cress Portfolio Before and After Liquidations

| Date-Time | BTC | NEXO | ETH | USDC | USDT | Market Value of Collateral |
|---|---|---|---|---|---|---|
| 2021-05-19 13:10:49 | 400.95 | 1,103,783.12 | 564.28 | 1,004,696.22 | 262.32 | $15,895,895.34 |
| 2021-06-23 22:17:39 | 19.20 | 1,111,848.82 | | | | $2,260,726.68 |
| | | | | | Change | $13,635,168.66 |

Notes: The collateral holdings are from Cress 269 and 270.  I estimate the market value of the collateral using Coinbase bid prices for BTC and ETH, trades price for the NEXO token from Huobi, and valuing the USDC and USDT at $1.00

He held more than 400 Bitcoin, 1.1 million NEXO, 564 Ether, 1.004 million USD Coin, and 262 Tether.  These are important baselines because in my view, many of Nexo's liquidations were unjustified.

### 4.1 The unjustified liquidations of May 23, 2021

I compute the value of Cress's collateral at each of the seven forced liquidations on May 23.  The text in the bars in **Figure 4** contains the currency that Nexo liquidated from his portfolio. Two of the seven liquidations occurred with Cress's portfolio value below the 83.33% threshold depicted by the red-dashed line in the Figure.

**Figure 4: Cress Liquidations and Loan-to-Value (LTV) on May 23, 2021**



<u>Source</u>: Liquidations are from Cress 270. Prices are from Coinbase and Huobi. Stablecoins are evaluated at par. Liquidated currencies are in the white text of each bar.

## 4.2 The unjustified liquidations of June 21-22, 2021

I compute the value of Cress's collateral at each of the 22 forced liquidations on June 21 to 22, 2021. The text in the bars in **Figure 5** contains the currency that Nexo liquidated from his

portfolio. Three of the 22 liquidations occurred with Cress's portfolio value below the 83.33% threshold depicted by the red-dashed line in the Figure.

**Figure 5: Cress Liquidations and Loan-to-Value (LTV) on June 21-22, 2021**



Source: Liquidations are from Cress 270. Prices are from Coinbase and Huobi. Stablecoins are evaluated at par. Liquidated currencies are in the white text of each bar.

It is my view that many of Cress's liquidations were inconsistent with Nexo's stated 83.33% liquidation threshold.

### 4.3 Adjusting Cress's Loan for the OTC Profits

In this section, I re-examine the margin thresholds Cress had assuming Nexo's OTC fees were instead used to reduce Mr. Cress' outstanding loan (i.e. where Mr. Cress' account would have stood if not for Nexo's OTC fees).

After making this adjustment, as I show in **Figure 6**, Cress's LTV falls below 82% for the last two liquidations of BTC on May 23, 2021.[38]

---

[38] This analysis does not include the liquidation fees retained by Nexo. By keeping significant portions of the funds generated from each liquidation for itself, rather than applying the entirety to Mr. Cress' loan balance, Nexo further increased Mr. Cress' LTV and the risk of subsequent liquidations.

**Figure 6: LTV Adjusted for OTC Fees**
**May 23, 2021**



I apply these same adjustments to the liquidations of June 21 and 22 in **Figure 7**.  At this point, Cress would have had more than $170,000 additional cash on hand, and this brings all 22 of the liquidations from June 21-22 down below the 83.33% threshold.

**Figure 7: LTV Adjusted for OTC Profits**
**June 21 -22, 2021**



### 4.3(a) The Value of Mr. Cress' Account Following the Five May 23 Liquidations

As set forth above, after accounting for the OTC fees charged to Mr. Cress, two of the liquidations on May 23 take place below Nexo's 83.33% threshold. All of the liquidations in June take place below this threshold. The value of Mr. Cress' account following the first five

liquidations on May 23 (i.e. those that occurred above the 83.33% threshold when accounting for fees) is shown in **Table 4**.

**Table 4: Cress's Digital Asset Holdings After First Five Liquidations on May 23:**

| Date-Time | BTC | NEXO | ETH | USDC | USDT |
|---|---|---|---|---|---|
| 2021-05-23 17:32:11 | 380.95 | 1,103,783.12 | 564.28 | 0 | 0 |

### 4.4 Amount of Liquidation Fees

Nexo charged liquidation fees in the native asset, so I first report liquidation fees in token units. I then convert to USD in the second line of **Table 5**, using current market prices as of April 14, 2026. Nexo also appears to have charged a Repayment Fee in connection with Cress' liquidations, which is disclosed in a document Mr. Dina brought with him to his deposition, but was not disclosed by Nexo in the NEXO-0369411 spreadsheet.[39] I do not presently rely on this repayment fee to calculate Cress' damages because Nexo did not clearly disclose it in the NEXO-0369411 spreadsheet. However, if Cress' repayment fees are calculated in addition to his liquidation fees, Cress paid an additional $130,330.11 in total repayment fees in connection with his liquidations ($118,395.63 in forced repayment fees, and $11,934.48 in manual repayment fees).

**Table 5: Amount of Liquidation Fees**

| Dates | Fee Damages in BTC | Fee Damages in ETH | Fee Damages in USDC | Total USD |
|---|---|---|---|---|
| May 23-June 23, 2021 | 6.5125 | 2.8210 | 9,677.95 | |
| USD Price April 14, 2025 | $74,181 | $2,323.22 | $1.00 | |
| USD Damages | $483,101.54 | $6,553.85 | $9,677.95 | $499,333.33 |

Notes: Fees are from NEXO-0369411.  Current BTC and ETH prices are from CoinGecko. USDC and USDT is par valued at $1.00.

### 5. Nexo Tokens Analysis

I understand that Mr. Cress initially sought only to purchase BTC using funds borrowed through Nexo's collateralized lending. Mr. Cress and Mr. Hristov initially discussed borrowing scenarios

---

[39] NEXO 369411; Dinca Tr. Ex. 50.

where Mr. Cress would purchase either 50, 75, or 100 BTC through Nexo's Credit Line.[40]  On March 30, 2021, Mr. Cress informed Hristov that his "goal is to eventually reach 400 BTC and then stop."[41] However, Nexo recommended that Mr. Cress purchase a substantial amount of its own NEXO Token as well. I understand that Nexo informed Mr. Cress that the NEXO Token was registered with the SEC as a security.[42]

I further understand that Nexo advertised that purchasing the NEXO Token would provide Mr. Cress certain benefits from the exchange including lower interest rates. After Cress's first purchase of NEXO tokens his interest rate does fall from a daily 0.0247% to 0.0164%, saving him about $830 per day in daily interest.

These savings are minimal relative to risk that these NEXO purchases placed on his portfolio. They are also minimal relative to Nexo's profits from Mr. Cress's purchases.

I re-examine the LTV that Cress would have carried on the liquidations in May and June had he not purchased NEXO Tokens.

In **Figure 8**, I show that Cress would have had a capital surplus of more than $2.4 million in May 2021 if he had a smaller loan as a result of not purchasing NEXO.

---

[40] NEXO 3139, NEXO 3354 at 357.
[41] *Id*. at 3354.
[42] NEXO 3441 at 3453.

CONFIDENTIAL                          21 of 36

**Figure 8: Cress Capital Surplus with No Nexo Tokens**
**May 23, 2021**

Source: Liquidations are from Cress 270. Prices are from Coinbase. The LTV assumes that Cress did not purchase any NEXO Tokens (the value of the NEXO Tokens is removed from the value of Mr. Cress' assets and his loan is reduced by the amount used to purchase NEXO Tokens).

The cash that Cress allocated to NEXO tokens in his margin account would keep his LTV more than 7.75% below the 83.33% liquidation threshold for the entire period from March to June

CONFIDENTIAL                    22 of 36

2021.In summary, the NEXO Tokens provided a small benefit in lower interest payments but at the cost of placing Cress at greater risk of liquidation. If Cress had not purchased any NEXO tokens his account would have never reached the 83.33% liquidation threshold and none of his assets would have been liquidated.

## 6. Mr. Cress' attempts to stabilize his account

Mr. Cress's communications with Nexo continued to be poor as prices began to fall in May 2021.

### 6.1 Mr. Cress' Late May Attempts to Sell Assets to Stabilize his LTV

On May 23, 2021, the day of Cress's first liquidation, Cress requests a call with Hristov to discuss a "Flash crash scenario."[43] It does not appear Hristov replies to this email. Cress followed up two days later on May 25, 2021 asking for a quick call with Hristov to discuss selling some assets to "lower [his] liquidation point to a little bit below $30,000." It does not appear Hristov replies to this email.[44] In my analysis of Cress's liquidations in **Section 4**, I find that Cress exited his BTC positions at average prices over $30,640 in June 2021. If Cress' BTC liquidation price had been slightly below $30,000, he would not have suffered any subsequent liquidations.

### 6.2 Mr. Cress' Attempts to Swap Assets to Stabilize his LTV in June

Cress opened a customer support case on May 28, 2021 requesting a discussion with Nexo because he was "dealing with $12,000,000 AND that is my whole life savings, so I really need to try to have a discussion." Cress reiterated "Please also understand this has to be reviewed and discussed very fast," and Nexo support confirmed "It will be reviewed as soon as possible." Cress left his phone number with Nexo support and told them "You can also call me at any time of the day." Cress' VIP Relationship Manager did not contact him again until June 11.[45]

In a June 11, 2021 email exchange with Mr. Hristov, Cress mentions his customer support case opened at the end of May, and that he has "been trying very hard to reach someone at Nexo for help protecting my assets." He discusses that Nexo support promised him a response, but that nobody contacted him. Cress tells Hristov, "Twelve days is a long time to have eight figures of assets at risk and not have a response." Hristov finally agreed to a call, over two weeks after Cress had requested to speak. Cress expressed interest in swapping some of his assets to stablecoins to stabilize his account and reduce the likelihood of liquidation. Specifically, Mr. Cress asks if the "OTC desk can sell 129 BTC at $36,500 or higher, and exchange it to USDC or USDT, my collateral assets will be in a more stable position." On June 11, 2021 22:00 UTC, the ask price of BTC was $36,919.99 and his LTV was under 71%.

Hristov testified that the Nexo OTC Desk could have facilitated a swap like this—BTC to stablecoins and back. Hristov Deposition Tr. 81:14-21, 233:5-15 ("He would have been able to

---

[43] NEXO 3469, e-mail from Cress to Hristov, subject: Flash crash scenario.
[44] NEXO 3470, e-mail from Cress to Hristov, subject: Discuss selling strategy.
[45] NEXO 231341, customer support chat between Cress and Daniel on May 28, 2021, showing Hristov reaching out to Cress around midnight on June 11, 2021.

do that through the OTC desk, and we discussed it. … So he would have been able to swap his assets back from Bitcoin to USDC or from USDT to BTC using the OTC desk, right? — Right."). However, Hristov does not appear to have relayed this option to Mr. Cress at the time. Instead, it appears that Hristov cuts off contact with Cress for the next week, and does not reach back out until June 21, 2021[46], after Mr. Cress' assets have been substantially liquidated.

Had Hristov and the OTC Desk allowed Mr. Cress to swap 129 BTC for stablecoins at the market price on or around the time of Mr. Cress' June 11 email, Mr. Cress would have avoided any subsequent liquidations.

**7. Damages owed to Cress From Nexo's Actions**

I understand that Nexo advertised that as a VIP, Cress would be able to utilize its "Liquidation Relief Program", which was a "service" Plaintiff could use "in the event of a market crash to recover your liquidated assets.[47] I further understand that Plaintiff's VIP Relationship Manager ignored him for days on end as Cress was trying to communicate with him regarding how to ensure his assets were not liquidated. *Id.* This section analyzes the damages Plaintiff sustained as a result of these misrepresentations. I understand that Plaintiff is entitled to return of the assets lost on the Nexo platform. Plaintiff is also entitled to recover out-of-pocket damages, benefit-of-the-bargain damages, consequential damages, punitive damages, treble damages, pre-judgment interest, post-judgment interest, costs of suit, and attorney's fees. As a general matter, the damages calculations presented in this section and the tables referenced below are based on digital asset prices as of the date of submission of this report, and pre-judgment interest is calculated through the date of this report. Because the prices of Bitcoin, Ether, and NEXO Tokens, as well as accrued interest, will continue to change between the date of this report and any entry of judgment, the figures set forth herein may be recalculated at the time of judgment using the same methodology described in this report—that is, by substituting the applicable asset prices as of the date of judgment and extending the interest calculation through that date.

**7.1 Out of Pocket Damages**

Counsel for Mr. Cress has advised me that: "Under the out-of-pocket measure, a plaintiff may receive damages sufficient to make him whole, or in other words, to restore him to the financial position he held prior to the fraudulent transaction."[48] By April 2, 2021, the Plaintiff deposited 250.33 BTC and 250 ETH with NEXO.[49]

After Nexo's OTC trades and liquidations of Plaintiff's BTC and ETH, Plaintiff was ultimately left with approximately 12.31 BTC, 0 ETH, and 1,103,783 NEXO Tokens.[50] After a series of transactions, Plaintiff ultimately received $1,730,665.59 for these NEXO Tokens.[51]

---

[46] NEXO-0003510
[47] Plaintiff's Supplemental Response to Interrogatory No. 4
[48] *Molina v. Ford Motor Co.*, No. 2:23-cv-06323-RGK-KS, 2023 U.S. Dist. LEXIS 167710 (C.D. Cal. Sep. 19, 2023).
[49] CRESS-269.
[50] CRESS 270 and NEXO 0002705.
[51] CRESS 000659

Plaintiff's out-of-pocket damages are thus: 238.0169 BTC + 250 ETH - $1,730,666. As shown in **Table 6** below, the current value of those assets is $15,800,773.[52]

**Table 6: Out of Pocket Damages**

|  | BTC | ETH | USD | Totals | As of Date |
|---|---|---|---|---|---|
| Assets | 238.0169 | 250 | -$1,730,665.59 |  | 2021-03-26 |
| Current Price | $74,181 | $2,323.22 |  |  | 2026-04-14 |
| Value in USD | $17,656,331.66 | $580,805.00 | -$2,436,363.68 | $15,800,772.98 | 2026-04-14 |
|  |  |  |  |  |  |
| 7% Statutory pre-judgement interest 5.05 years |  |  |  | $6,442,940.47 | 2026-04-14 |
|  |  |  |  |  |  |
| **Total Damages** |  |  |  | $22,243,713.44 |  |

I apply the same statutory 7% per year on his cash holdings, which reduces the damages owed by $2.436 million, but applying the same rate to the cash value of his assets raises his total damages to $22,243,713.

## Section 8.  Claim by Claim Damages

### A.  Fraudulent Inducement (First Cause of Action)

Counsel for Mr. Cress has advised me that: fraud "plaintiffs may recover out-of-pocket damages in addition to benefit-of-the-bargain damages.[53] Here, Plaintiff alleges that Nexo fraudulently induced him into entering the OTC and loan transactions through misrepresentations regarding its (1) Liquidation Relief Program, (2) prompt responsiveness, (3) interest on his posted collateral, and (4) the best rates on OTC purchases, and (5) its fees on digital asset purchases and liquidations as alleged by Cress in his First Cause of Action.

As set forth in **Table 6** above, my opinion is that Cress' out-of-pocket damages are $22,243,713. This is the amount necessary to put Mr. Cress in the position he would have been in had he not entered into any OTC or loan transactions with Nexo. This figure includes applicable interest, but does not include any punitive damages.

### B.  Restitution Pursuant to Cal. Bus & Prof. §§ 17200 (Second Cause of Action)

---

[52] Cress was receiving yields for his deposits of BTC and ETH at the Nexo platform.  I estimate these at 0.0129 BTC per day and 0.0334 ETH per day, based on his yields prior to his first margin purchases.  As of April 14, 2026 this would have given him an additional 23.82 BTC and 61.66 ETH, with combined current value of $1,910,848. This additional yield is not included in Table 6.
[53] Dkt. 98 at 21-22 (*quoting Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996)).

I have also analyzed the amount of restitution necessary to restore Mr. Cress to the status quo. Counsel for Mr. Cress has advised me that: under Cal. Bus. & Prof. §§ 17200, *et seq* the measure of restitution is the money or property defendant wrongfully acquired from plaintiff.

The assets Nexo obtained from Plaintiff includes all assets Mr. Cress deposited on Nexo's platform, minus the assets Plaintiff was left with after Nexo's OTC trades and liquidations of Plaintiff's assets.

Plaintiff deposited 250.33 BTC and 250 ETH with NEXO, and after Nexo's OTC trades and liquidations of Plaintiff's BTC and ETH, Plaintiff was ultimately left with approximately 12.31 BTC, 0 ETH, and 1,103,783 NEXO Tokens. After a series of transactions, Plaintiff ultimately received $1,730,666 for these NEXO Tokens.

The restitution owed to Plaintiff to restore him to the status quo by returning the funds which he has an ownership interest in is: 238.0169 BTC + 250 ETH - $1,730,666. Should the Court determine that equitable interest on this restitution is warranted, I could calculate that amount using the same methodology outlined in **Table 6**.

C. Unregistered Offer and Sale of NEXO Token security Cal. Corp. Code § 25503 (Third Cause of Action) and Fraud in the Offer and Sale of NEXO Token security Cal. Corp. Code § 25501 (Fourth Cause of Action)

Plaintiff also brings claims under California Corporations Code §25401 and 25503. Counsel for Mr. Cress has informed me that: damages for a 25503 claim are:

> Any person who violates Section 25110, 25130, or 25133, or a condition of qualification under Chapter 2 (commencing with Section 25110) of this part, imposed pursuant to Section 25141, or an order suspending trading issued pursuant to Section 25219, shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.

Similarly, counsel for Cress has advised me that: damages for 25401 are described in Section 25501:

Any person who violates Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if the defendant had exercised reasonable care, would not have known) of the untruth or omission. Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security. Upon rescission, a seller may recover the security, upon tender of the consideration paid for the security plus interest at the legal rate, less the amount of any income received by the defendant on the security. Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff. Damages recoverable under this section by a seller shall be an amount equal to the difference between (1) the value of the security at the time of the filing of the complaint plus the amount of any income received by the defendant on the security and (2) the price at which the security was sold plus interest at the legal rate from the date of sale. Any tender specified in this section may be made at any time before entry of judgment. In addition to the relief described above, the court shall award reasonable attorney's fees and costs to a prevailing purchaser or seller who succeeds in establishing a right to the relief provided by this section.

Damages for Plaintiff's §25401 and 25503 claims are thus the same.

As discussed, in **Claim B** above, Plaintiff deposited 250.33 BTC and 250 ETH with Nexo. Plaintiff used this BTC and ETH as collateral to obtain NEXO using Nexo's collateralized loans. Nexo's Crypto Credit General Terms provide that "Nexo acquires the ownership of the Collateral while the Nexo Crypto Credit is outstanding.[54]" After Nexo's liquidations of Plaintiff's BTC and ETH, Plaintiff was ultimately left with approximately 12.31 BTC, 0 ETH, and 1,103,783 NEXO Tokens.[55] After a series of transactions, Plaintiff ultimately received $1,730,666 for these NEXO Tokens.

Because Nexo claimed ownership of all of Plaintiff's digital assets as part of his purchase of NEXO, I treat those digital assets as the consideration paid for NEXO Token. **In Table 7**, I show NEXO tokens represented 24.4% of his digital asset purchases.

---

[54] NEXO-0000157.
[55] CRESS-00000269; CRESS-00000270; NEXO-0002705

**Table 7: NEXO Tokens as Proportion of Purchases**

| Date | Token | USD Cost |
|------|-------|----------|
| 2021-03-27 | NEXO | $1,281,795.48 |
| 2021-03-27 | NEXO | $1,499,907.00 |
| 2021-04-01 | BTC | $4,115,828.00 |
| 2021-03-31 | BTC | $2,800,000.00 |
| 2021-04-15 | BTC | $1,800,000.00 |
| 2021-04-16 | NEXO | $349,984.00 |
| 2021-05-03 | ETH | $1,000,000.00 |
| | **Total** | $12,847,514.48 |

I apply this percentage to the out of pocket damages in **Table 6**. Damages from the unregistered sale would then total 24.4% of $22,243,713 or $5,422,086.64.

Alternatively, Mr. Cress' damages using the USD prices at the times of the transactions is set forth as follows:

**Table 8: NEXO Token USD Damages**

| | |
|---|---|
| USD paid for Nexo Tokens | $3,131,686 |
| USD received for Nexo Tokens (GSR proceeds) | $1,730,666 |
| Difference between amount USD paid and USD received | $1,401,021 |
| Plus 7% interest (April 16, 2021 - April 14, 2026) | $1,964,640.06 |

D.  Common Law Fraud (Fifth Cause of Action)

I understand that Cress alleges that he relied to his detriment on Nexo's representation that the NEXO Token is registered with the SEC as a security in purchasing the NEXO Token with loans from Nexo secured by his BTC. Because I conclude that Cress would not have ever breached the 83.33% LTV level had he not purchased NEXO Tokens, *see* Section 5 above, my opinion is that his out of pocket damages are, as shown in **Table 6**, $22,243,713—this is the amount necessary to put Mr. Cress in the position he would have been in, but for his purchase of NEXO Tokens, including applicable interest. It does not include punitive damages.

E.  Civil Theft Cal. Penal Code § 496(C) (Sixth Cause of Action)

I understand from counsel for Cress that: Cal Penal Code §496(C) provides that the remedy for violations is "three times the amount of actual damages . . . costs of suit, and reasonable attorney's fees." Plaintiff alleges that Nexo violated §496(C) by inducing him to deposit his BTC and ETH

into Nexo's Credit Line, and subsequently transfer millions of dollars' worth of digital assets to its OTC Desk based on representations that it did not charge any fees. As shown in **Table 2** , Nexo took $171,896 in fees on Plaintiff's OTC purchases and as shown in **Table 5**, $499,333 in fees on Plaintiff's liquidations.

As set forth in Section 4, the loss of these digital assets contributed substantially to Cress' liquidation. If he had retained the assets taken by Nexo as transaction and liquidation fees, he would have avoided the vast majority of liquidations as shown in **Figure 6** and **7**.  **In Table 9**, I adjust Mr. Cress's out of pocket damages for the 20 BTC that were liquidated on May 23 when his LTV was above 83.33%.

**Table 9: Damages for Civil Theft**

|  | BTC | ETH | USD | Totals | As of Date |
|---|---|---|---|---|---|
| Assets | 238.0169 | 250 | -$1,730,665.59 | | 2021-03-26 |
| BTC from Liquidations 4 and 5 | -20 | | | | |
| Current Price | $74,181 | $2,323.22 | | | 2026-04-14 |
| Value in USD | $16,172,711.66 | $580,805.00 | -$2,436,363.68 | $14,317,152.98 | 2026-04-14 |
| | | | | | |
| 7% Statutory pre-judgement interest 5.05 years | | | | $5,837,977.96 | 2026-04-14 |
| | | | | | |
| **Total Damages** | | | | $20,155,130.93 | |

Treble damages bring this total to $60,465,393.

  F.  Violation of Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c)-(d) (Seventh and Eighth Causes of Action)

I understand from counsel for Cress that: 18 U.S.C. § 1964(c) provides that any "person injured in his business or property by reason of a violation of section 1962 . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

Plaintiff alleges that the Nexo Enterprise engaged in a systematic scheme of mail and wire fraud by fraudulently inducing him to take out millions of dollars in collateralized loans while charging substantial hidden fees on OTC purchases, loan transactions, and liquidations—all while affirmatively representing a "#ZeroFees" policy and providing fabricated trade confirmations to conceal the true costs. As a direct and proximate result of these RICO violations, Plaintiff alleges he suffered the loss of substantially all of the digital assets he deposited on Nexo's platform, as Nexo's hidden fees, inflated execution prices, and undisclosed liquidation charges compounded to erode his collateral and trigger liquidations.

As set forth in **Table 2**, Nexo took $171,896 in fees on Plaintiff's OTC purchases, and as shown in **Table 5**, $499,333 in fees on Plaintiff's liquidations.

As set forth in Section 4, the loss of these digital assets contributed substantially to Cress' liquidation. If he had retained the assets taken by Nexo as transaction and liquidation fees, he would have avoided the vast majority of liquidations as shown in **Figure 6** and **7**. As shown in **Table 9**, his net worth adjusted for the liquidations above the 83.33% threshold is $20,155,131, and treble damages would raise this to $60,465,393.

G. Fraudulent Omission in Failing to Disclose Fees (Ninth Cause of Action)

I understand from counsel for Cress that: for fraud claims, "plaintiffs may recover out-of-pocket damages in addition to benefit-of-the-bargain damages.[56]". Here, Plaintiff alleges that Nexo fraudulently omitted material information regarding its fees on digital asset purchases and liquidations, thereby inducing Cress to enter into the OTC and loan transactions. Specifically, Nexo failed to disclose the fees it charged on digital asset purchases and liquidations—information that, had it been disclosed, would have been material to Cress's decision to transact with Nexo. This omission operated alongside, and is consistent with, the affirmative misrepresentations alleged in the First Cause of Action, including those concerning Nexo's (1) Liquidation Relief Program, (2) prompt responsiveness, (3) interest on posted collateral, and (4) the best rates on OTC purchases. I summarize and total the amounts in **Table 10**.

**Table 10: Damages Under the Ninth Cause of Action**

| Fees on OTC Purchases | $171,896 | Table 2 |
|---|---|---|
| Liquidation Fees | $499,333 | Table 5 |
| Portfolio Value Change | $13,635,169 | Table 3 |
| Sub-Total | $14,306,398 | |
| Statutory interest | $5,633,001 | |
| Total Damages | $19,939,399 | |

H. Breach of Cryptocurrency Purchase Agreement (Tenth Cause of Action)

I understand from counsel for Mr. Cress that: Under California law, the standard measure of damages for breach of contract is the amount that will put the injured party "in as good a position as he or she would have occupied if the defendant had not breached the contract. (24 Williston on Contracts (4th ed. 2002) § 64:1, p. 7.) In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain."[57] The measure of damages "is

---

[56] Dkt. 98 at 21-22 (quoting *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996))
[57] *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967-68 (2004).

the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."[58]

Here, Plaintiff alleges that Nexo breached the Cryptocurrency Purchase Agreement ("CPA") by charging undisclosed fees on digital asset purchases and by failing to execute transactions at the agreed-upon or represented terms. The CPA governed the terms under which Cress purchased digital assets through Nexo's OTC desk, and Nexo's imposition of undisclosed fees and/or its failure to deliver digital assets at the rates represented constituted a material breach of that agreement.

My understanding from counsel for Mr. Cress is that Nexo's actions may, under California law, have constituted a breach of contract. As discussed in Sections 3 and 4, my opinion is that Nexo's untimely executions, failure to deliver digital assets at the represented rates, and Nexo's undisclosed fees resulted in the liquidations of Cress's assets. Cress's damages are thus set forth in **Table 10** above: $19,939,399.

## 9. Conclusion

Nexo profited from Mr. Cress at every stage of their relationship.  When he first purchased digital assets, Nexo marked up those prices substantially despite their promises never to profit from trades executed on a customer's behalf.  Damages from these markups totaled over $171,000 back in 2021.

Nexo's OTC profits diminished Cress's capital cushion which exposed Cress to additional liquidations.  If we reasonably credit Cress's portfolio with Nexo's ill-gained profits, only five of the 29 forced liquidations from Cress's account were justifiable, and none from the second set of liquidations in June 2021.  Nexo charged heavy fees for the liquidations, and Cress's losses from those fees in current dollars are over $499,333.

Cress was encouraged to hold NEXO tokens, but these were harmful to his portfolio.  NEXO tokens declined even more than BTC and ETH, and they eroded his capital cushion and pushed him closer to liquidation.

Because of the fraudulent actions on the part of Nexo, I further estimate out-of-pocket damages of $22,243,713.

---

[58] Cal. Civ. Code § 3300.

Dated: April 20, 2026

_Bruce Mizrach_

Prof. Bruce Mizrach

# EXHIBIT 63

Mail John Cress - Outlook

**And the Results of the Governance Vote Are...**

Nexo Community <community@nexo.io>

Tue 6/8/2021 6:01 AM

**To:** jtc88@hotmail.com <jtc88@hotmail.com>



Dear JOHN THOMAS,

The first NEXO Governance Vote is now closed.

The people have spoken, the ballots are in and we're thrilled to

CONFIDENTIAL                  CRESS-00000251

announce that **the Daily Interest on NEXO Tokens proposal was accepted** and has already been activated.

# Vote Results

## 362M          89.52%          10.48%

Participating tokens          Voted "For"          Voted "Against"

# What Happens Now?

Here's what's happening now that our community chose Daily Interest on NEXO Tokens:

- NEXO Token holders will receive **up to 12% interest** per annum, paid out daily, on NEXO Tokens held in both the Savings and Credit Line wallets, meaning that NEXO Tokens used as collateral will also earn interest.

- Daily Interest on NEXO Tokens starts with 7% interest for FLEX Terms across all Loyalty tiers, while those benefiting from **Nexo's Fixed Terms for 3 or 12 months will receive 9% and 12% interest**, respectively.

- **All Nexo clients are now eligible for Daily Interest on NEXO Tokens[1].**

- A final <u>Loyalty Dividend</u> worth **$20,428,359.89** will be paid out to all eligible NEXO Token holders on **June 16, 2021**. Expect more details about the dividend in the next few days.

    **Note:** The official Record Date for this final Dividend took place at 12:01 UTC on June 8, 2021, immediately after voting closed.

CONFIDENTIAL          CRESS-00000252

We are incredibly excited to embark on this new chapter in Nexo's story both with the new Daily Interest program and future Governance proposals.

Stay ahead,
The Nexo Team

[1]Currently excluded from this product are citizens or residents of the State of New York, and users subject to other limitations as may be applicable at times, who place their NEXO Tokens in their Nexo accounts. The Daily Interest on NEXO Tokens is subject to the Nexo Earn Interest Product General Terms and Conditions, as amended on occasion.



Download Our App and Give It Your Highest Rating

 

    

Unlock the Power of Your Crypto

©2021 Nexo. All rights reserved.

Made with 🔷 by Nexo

Unsubscribe

CONFIDENTIAL        CRESS-00000253

# EXHIBIT 64

# Deposition Transcript

Case Number: 3:23-CV-00882-TSH
Date: April 2, 2026

In the matter of:

# JOHN CRESS v NEXO CAPITAL INC.

# Antoni Antoniev Trenchev

# Confidential - VOL. II

Reported by:
GEORGIA GOULD

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

CONFIDENTIAL
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

CASE NO: 3:23-CV-00882-TSH

- - - - - - - - - - - - - - - - - -
IN THE MATTER OF:

JOHN CRESS,

                    Plaintiff,
NEXO CAPITAL INC.
                    Defendant.
- - - - - - - - - - - - - - - - - -

DEPOSITION OF: ANTONI ANTONIEV TRENCHEV

VOLUME II

Thursday, April 2, 2026

AT:  9:01 a.m.

Taken at:

Baker & McKenzie LLP
280 Bishopsgate
London
EC2M 4AG
United Kingdom

Court Reporter:

GEORGIA GOULD
Accredited Real-time Reporter

Page 201

of NDS EOOD?

A. Around the same time as me.

Q. At some point in time did Nexo Inc. ever own Nexo Financial LLC?

MR. SHELTON: Objection, vague.

A. No.

BY MR. TAYLOR-COPELAND:

Q. In 2018 did the Nexo Token pay dividends to holders?

MR. SHELTON: Objection, vague. Calls for a legal opinion.

A. I do not recall whether that was the case in 2018.

BY MR. TAYLOR-COPELAND:

Q. Did Nexo advertise in 2018 that the Nexo Token would pay dividends to token holders?

A. What do we understand under "advertise"?

Q. As part of marketing its token sale, did Nexo Token – did Nexo state that the Nexo Token would pay dividends to token holders?

A. Well, there was a white paper document which had many versions. I don't exclude the possibility of mentioning that in some materials.

Q. And at some point did Nexo in fact distribute dividends to Nexo Token holders?

Page 202

A. Yes.

MR. SHELTON: Objection, vague. Calls for a legal opinion.

BY MR. TAYLOR-COPELAND:

Q. And what percentage of Nexo's profits were distributed as dividends during the time period when Nexo was distributing dividends to token holders?

MR. SHELTON: Objection, vague.

A. I do not recall that.

BY MR. TAYLOR-COPELAND:

Q. Do you recall if it was approximately 30 percent?

A. I do not recall that.

Q. Did Nexo pay dividends to U.S. holders of the Nexo Token?

MR. SHELTON: Objection, vague as to time period.

A. Can we narrow down the time period? Because I think there is a difference in time.

BY MR. TAYLOR-COPELAND:

Q. Was there a time that Nexo did pay dividends to U.S. holders of the Nexo Token?

A. Yes.

Q. And what was that time period?

A. I do not remember.

Page 203

Q. Do you have an estimate?

A. I remember that at some point there was a governance vote to – to discontinue the dividend component of the Nexo Token. To answer your question about time period, I think that would have been the discontinuation 22 or 3. I'm not entirely sure.

Q. Okay.

So prior to the governance vote to discontinue the dividend, Nexo distributed dividends to both U.S. and non-U.S. holders of the token, right?

A. Oh I don't think I can answer that question in that way. Could we narrow it down a little bit? Because I feel like it's a bit general.

Q. What part of the question is unclear?

A. There have been several inter– instances of distribution. I believe that at the time we called it air drops, so I'm not sure all of them underwent – under the same rules and principles.

Q. Do you know if any if them excluded U.S. holders in particular?

A. I have some memory of that but it's a little bit vague in my memory.

Q. Did Nexo ever describe the Nexo Token as SEC-compliant?

A. We might have.

Page 204

Q. What did that mean to Nexo?

A. I'm the corporate representative on that topic, correct?

MR. SHELTON: Correct.

A. Yes.

Well, the understanding of Nexo at the time was that the regulatory framework lacked clarity, this being digital assets being a new innovative type of assets. There were various school of thought that were debating to what extent the existing regulatory framework would encapsulate that asset class.

So our aim at Nexo has always been to be compliant, and even going above arguing existing rules do not apply, in an effort to – as a precautionary measure, take steps to be on the safe side if it was then retroactively determined that those laws would have applied to our activity and the asset class as such.

BY MR. TAYLOR-COPELAND:

Q. Did Nexo ever check with the SEC to ask whether it could describe its token as SEC-compliant?

MR. SHELTON: Objection, vague.

A. I don't recall.

BY MR. TAYLOR-COPELAND:

Q. Did the SEC ever tell Nexo to stop using SEC compliant language?

Page 365

CERTIFICATE OF COURT REPORTER

I, GEORGIA GOULD, an Accredited Real-time Reporter, hereby certify that the testimony of the witness ANTONI ANTONIEV TRENCHEV in the foregoing transcript, numbered pages 156 through 363, taken on this 2nd day of April, 2026 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed:  ........................

Name:    GEORGIA GOULD

Date:    April 06, 2026

Page 366

ERRATA SHEET

Case Name: JOHN CRESS v NEXO

Witness Name: ANTONI ANTONIEV TRENCHEV

Date: 04/02/2026

Page/Line          From                To

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

Page 367

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

____/_____        _____

_____

Subscribed and sworn to before me this 2nd day of April, 2026

_____

ANTONI ANTONIEV TRENCHEV

Page 368

CERTIFICATE OF REPORTER

I, Georgia Gould, Accredited Real-time Reporter, do hereby declare: that prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event or the action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Witness my hand this second day of April, 2026.

Georgia Gould (Accredited real-time Reporter)

# EXHIBIT 65

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN CRESS,                                              Case No. 23-cv-00882-TSH

    Plaintiff,


    v.


NEXO FINANCIAL LLC, et al.,

    Defendants.


EXPERT WITNESS REPORT OF PROFESSOR JOEL SELIGMAN

# I.   INTRODUCTION AND QUALIFICATIONS

1.    My name is Joel Seligman, and I submit this report on behalf of the Plaintiff, John Cress.

2.    I am Dean Emeritus and Professor at Washington University School of Law and President Emeritus at the University of Rochester. After returning to the faculty of Washington University School of Law in 2020, I annually teach Securities Regulation, Financial Regulation, and Corporations.

3.    I am the author or co-author of 25 books, including an 11-volume treatise on *Securities Regulation*, co-written by the late Harvard Law Professor Louis Loss and former SEC Commissioner Troy Paredes. I have worked each year on this treatise since 1984 and currently revise one volume each year and work with Mr. Paredes to publish an annual supplement.  I also have written with Professor Loss and Troy Paredes an

1

abridged two-volume treatise on Securities Regulation entitled *Fundamentals of Securities Regulation,* two histories of Securities and Financial Regulation entitled *The Transformation of Wall Street: A History of the Securities and Exchange Commission and Modern Corporate Finance* (3d ed. 2003) and *Misalignment: The New Financial Order and the Failure of Financial Regulation* (2020), a study of the Uniform Securities Act entitled *The New Uniform Securities Act* (2002), as well as approximately 50 law review articles.

4. I have served on the New York Stock Exchange Legal Advisory Committee, the National Association of Securities Dealers (*NASD*) Legal Advisory Board, the American Law Institute Corporate Governance Project, the Federal Reserve Board of New York Upstate Regional Advisory Board and as Director of Eastman Kodak Board, among other organizations.

5. From 2004-2007, I was a member of the NASD Board of Governors and continued as a Governor of FINRA from 2007-2015 when NASD merged with the New York Stock Exchange disciplinary body.

6. I was the Reporter for the National Conference on Uniform State Laws current Revision of the *Uniform Securities Act* (2002), the model state law adopted in approximately 20 states.

7. I chaired the U.S. Securities and Exchange Commission (*SEC*) Advisory Committee on Market Information and have served as an expert witness (for both plaintiffs and defendants) in approximately 25 cases. I also presented appellate arguments in federal securities cases in Federal Courts of Appeal. Between 1995, when I first became a Dean at the Arizona College of Law, and 2018, when I retired as President of the University of Rochester, I did not serve as an expert or litigant.

8. I have attached my Curriculum Vitae as Exhibit 1. I have attached a list of cases in which I have served as an expert beginning in 2019 as Exhibit 2. In Exhibit 3, I detail the specific documents reviewed in preparation of this Report.

9.    I am being compensated at an hourly rate of $1000 for my work on this matter.  My compensation is not dependent on my opinions or the outcome of this case.

10.    I offer no opinions as to what the law is for the purposes of this case.  My role is limited to describing the general structure and processes of securities registration and exemptions under the Securities Act of 1933 ("1933 Act") as historically applied, based on my academic expertise.  I do not offer opinions on whether Nexo or any party complied with or violated any provision of law or regulation.

## II.    ASSIGNMENT

11.    I have been asked to prepare this Report and offer testimony comparing (1) the registration of a security between 2018 and 2021 when it is sold to the public in accordance with the Securities Act of 1933, and (2) the process of establishing an exemption to the 1933 Act registration process under Regulation D.

12.    I have also been asked to analyze Nexo's efforts to ensure that purchasers of its NEXO Token were not underwriters.

## III.    CONCLUSION

13.    When registration of a security under the 1933 Act is compared to claiming an exemption under Regulation D, there are fundamental differences, including that registration requires:

    a. Mandatory filing of a registration statement with the SEC which has statutory power to review the statement to prevent offering of a security that includes any "untrue statements of a material fact or omission . . . necessary to make the statements not misleading."

    b. Full disclosure of detailed material, including textual and financial information, in the registration statement filed with

3

the SEC and the prospectus provided to investors which includes most of the information in the registration statement.

c. Full responsibility under §11 for any misrepresentations or omissions in registration statements for the issuing corporation and certain associated individuals, including specified corporate officers, underwriters, and experts such as accountants who certify any portion of the filing. The outside role of the underwriters and experts is intended to deter false or misleading statements by corporate insiders.

d. The requirement of due diligence by each specified potential defendant under §11 to avoid liability when they can establish that they made a reasonable investigation and had grounds for belief equal to that of a prudent person when the registration statement became effective.

14. Regulation D offerings generally do not include equivalent procedural or disclosure requirements.

## IV. Registration of a Security for Sale to the Public under the Securities Act of 1933.

### A. Background

13. The Securities Act of 1933 was enacted in the aftermath of the 1929-1933 Stock Market Crash. Between September 1, 1929 and July 1, 1932, the value of all stock listed on the New York Stock Exchange shrank from a total of nearly $90 billion to just under $16 billion, a loss of approximately 83 percent. "The annals of finance," the Senate Banking Committee would write in S. Rep. No. 1455, 73d Cong., 2d Sess. 7 (1934), "present no counterpart to this enormous decline in security prices." The House Committee on Interstate & Foreign Commerce in H.R. Rep. No. 85, 73d Cong., 1st Sess. 2 (1933) similarly would state in introducing the Securities Act: "During the post-war decade, some 50 billions of new securities were floated in the United

4

States. Fully half or $25,000,000,000 worth of securities floated during this period have been proved to be worthless" and contributed to the Great Depression:

> Unemployment had been approximately 3 percent of the labor force during the summer of 1929. By 1933, nearly 13 million people were out of work, approximately 25 percent of the labor force.
>
> The gross national product which had been $103.1 billion in 1929 was cut nearly in half to $55.6 billion in 1933, a decline of 46 percent. Total national wealth similarly had declined 25 percent, from $439.4 billion in 1929 to $330.5 billion in 1933. New private and public construction fell more precipitously, from $10.8 billion in 1929 to $2.9 billion, a shrinkage of 79 percent. National income shrank by 52 percent between 1929 and 1932, from $87.4 billion to $41.7 billion. New corporate offerings shrank from almost $6.8 billion in 1929 to less than $400 million in 1933.

Id. at 394.

15.    The economic collapse led to the reversal of earlier near exclusive state law regulation of securities being supplanted in substantial part by the Federal Securities laws. See, e.g., SELIGMAN, supra, *Transformation of Wall Street*, Chs. 1-3.

16.    Roosevelt introduced the Securities Act Bill on March 29, 1933, Congressional Record, 73d Cong., 1st Sess. at 937, 954; reprinted in Federal Securities Act Hearings, House Commerce Comm., 73d Cong., 1st Sess. 1 (1933), which stated in part:

> There is, however, an obligation upon us to insist that every issue of new securities to be sold in interstate commerce shall be accompanied by full publicity and information, and that no essentially important element attending the issue shall be concealed from the buying public.

5

> This proposal adds to the ancient rule of *caveat emptor* the further doctrine: "Let the seller also beware." It puts the burden of telling the whole truth on the seller. . . .

Regarding the background of Securities Act of 1933, see generally SELIGMAN, The Transformation of Wall Street at Ch. 1; Ralph F. De Bedts, The New Deal's SEC: The Formative Years (Columbia U. Press 1964); Michael E. Parrish, Securities Regulation and The New Deal 42-72 (Yale U. Press 1970).

17.    Consistent with Roosevelt's March 29, 1933 message, the House Report No. 85, supra at 3, characterized the Securities Act as including in its objectives:

(1)    An insistence that there should be full disclosure of every essentially important element attending the issue of a new security. . . .

(3)    A demand that the persons, whether they be directors, experts, or underwriters who sponsor the investment of other people's money should be held up to high standards of trusteeship.

## B.    Registration Under the 1933 Act

18.    The Securities Act of 1933 relies on three primary techniques to protect investors in public securities offerings.

19.    First, §5 requires registration with the SEC of securities offered to the public through "any means or instruments of transportation or communication in interstate commerce" unless the security or transaction is exempted by §3 or §4. In those instances in which the full registration process is applicable, the Act creates a statutory waiting period of 20 days before the security registered with the SEC can be sold, requires underwriters and securities dealers to furnish prospective investors with a prospectus based on the information in the registration statement, and empowers the Commission to issue

6

stop orders to prevent the sale of a security that "includes any untrue statement of a material fact or omits to state any material fact required to be stated . . . or necessary to make the statements therein not misleading."

20.    Second, the Securities Act requires full disclosure of material information to be provided to the SEC in the registration statement and to investors in a prospectus derived from the registration statement. 2 Louis Loss, Joel Seligman & Troy Paredes Securities Regulation Ch. 2.D. (Wolters Kluwer 7th ed., 2024). For historical context see SELIGMAN, supra, *Misalignment* at 328-344. This disclosure framework superseded the inadequate, often minimal disclosure paradigms of earlier state law, the New York Stock Exchange, and then applicable accounting standards. SELIGMAN, *The Transformation of Wall Street*, at 42-49; John C. Coffee, Jr., Market Failure and the Economic Case for a Mandatory Disclosure System, 70 Va. L. Rev. 717, 722, 739-743 (1984) ("A particular flaw in theory [of voluntary disclosure] is that it overlooks the significance of corporate control transactions and assumes much too facilely that manager and shareholder interests can be perfectly aligned.") See generally Joel Seligman, The Historical Need for a Mandatory Corporate Disclosure System, 9 J. Corp. L. 1, 9 (1983).

21.    Third, §11 transformed the process of selling securities to the public. The SEC, the Department of Justice, and any private person may bring a lawsuit whenever any part of a registration statement contains a material misrepresentation or omission. Accordingly, corporate insiders, including every person who signed the registration statement, the firm's principal executive and financial officers, and every person who was or agreed in the registration to become a member of the corporate board, must exercise a high degree of care. Section 11 has been strictly enforced. See, e.g., Escott v. BarChris Const. Corp., 283 F. Supp. 643, 696-697 (S.D.N.Y. 1968); In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 677-696 (S.D.N.Y. 2004), and reaches both direct purchasers of

7

a registered offering and those who repurchase shares and can "trace" their shares back to a misrepresentation or omission in a registered offering. Slack Tech., LLC v. Pirani, 598 U.S. 759 (2023); Barnes v. Osofsky, 373 F.2d 269, 271 (2d Cir. 1967); Hertzberg v. Dignity Partners Inc., 191 F.3d 1076, 1080 n.4 (9th Cir. 1999).

22.    Critically, §11(a) includes as potential defendants underwriters, the issuer's principal executive and financial officers, every director, and every expert, including accountants who certify "any part of the registration statement." Section 11(f)(1) requires joint and several liability for the persons specified in §11(a).

23.    To maximize the deterrent effect of §11, traditional state law defenses to fraud have all but been eliminated. In sharp contrast to earlier state law, the plaintiff in a §11 claim does not have to prove reliance unless he or she bought after the issuer had made generally available to its security holders an earnings statement covering a period of at least 12 months beginning after the effective date. But even then "reliance may be established without proof of the reading of the registration statement by such person." The plaintiff is not required in a *prima facie* case to prove scienter; that is intentional or reckless conduct by the defendants, only a material representation or omission. Nor need the plaintiff prove causation, although damages are reduced to the extent that the *defendant* proves that they did not result from his or her misconduct. See 9 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 383-406 (Wolters Kluwer 5th ed. 2018).

### C.    Due Diligence

24.    The most transformative element of §11 for registered securities sales to the public involves the due diligence defenses of §11(b)(3). This provision creates exemptions from §11 liability for defendants when they can establish that they used due diligence to affirmatively conduct a reasonable investigation and had grounds for belief equal to that of a prudent person when the registration statement became effective. 9 Loss, Seligman & Paredes at 382-385. Regarding

8

§11, see generally id. at Ch. 11.C.d.; John C. Coffee, Jr., Hillary A. Sale & Charles K. Whitehead, *Securities Regulation: Cases and Materials* 943-995 (15th ed. 2021). The issuer of a registered security is not entitled to a due diligence defense and instead bears full responsibility for the accuracy of the disclosures. Escott v. BarChris Const. Corp., 283 F. Supp. 643 (S.D.N.Y. 1968).

25.    In imposing liability on underwriters for material misstatements or omissions in registration statements, Section 11 conceives of underwriters and experts as gatekeepers – as parties capable of deterring wrongdoing by issuers. Reinier H. Kraakman, *Corporate Liability Strategies and the Costs of Legal Controls*, 93 Yale L.J. 857, 890 (1984) ("The first requisite for gatekeeper liability is, of course, an outsider who can influence controlling managers to forgo offenses."). As to the monitoring function of gatekeepers, see, id. at 891; Reinier H. Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. Econ. & Org. 53, 62-66 (1986). The provision recognizes underwriters' "unique position" among offering participants in assuring the accuracy and completeness of the issuer's disclosures. See Ernest L. Folk, III, *Civil Liabilities Under the Federal Securities Acts: The BarChris Case*, 55 Va. L. Rev. 1, 56 (1969) ("Underwriter[s] [are] uniquely able to adopt an objective or even adverse posture towards the issuer regarding the accuracy of the registration statement." (footnote omitted)); In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) ("Underwriters['] . . . unique position . . . enabled them to discover and compel disclosure of essential facts about the offering." (quoting *The Regulation of Securities Offerings*, Securities Act Release No. 7606A, 63 Fed. Reg. 67,174, 67,230 (Dec. 4, 1988)). Gatekeepers put their reputations at stake in an offering. Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 Va. L. Rev. 549, 620 (1984) ("The investment banker represents to the market (to whom it, and not the issuer, sells the security) that it has evaluated the issuer's product and good faith and it is

prepared to stake its reputation on the value of the innovation.") See generally John C. Coffee, Jr., Gatekeepers: The Role of Professions and Corporate Governance 353 (2006) ("The underwriter's obligation to ensure full disclosure in this context is enforced by Section 11 of the Securities Act of 1933").

26.     Section 11 makes "underwriters . . . the first line of defense" against disclosure errors. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 662. Specifically, underwriters may be liable for defects in a registration statement's non-expertised portions, which comprise the bulk of the statement and include both textual discussion and some financial and graphical data. By contrast, auditors' Section 11 liability is largely limited to the financial statements they certify, and lawyers rarely face liability under Section 11.

27.     The risk of underwriter liability affects other secondary participants, further ensuring investor protection. Courts allow due diligence performed by auditors and lawyers to help satisfy underwriters' diligence defense. For example, in determining whether the due diligence defense is established, underwriters' "receipt of [a] comfort letter[] will be important evidence," although by itself it is insufficient to establish the defense, see *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 683-84, so underwriters in registered offerings secure assurances from the issuers' legal counsel and auditors as to the accuracy of non-expertised portions of registration statements. Underwriters require these assurances, known as 10b-5 letters and comfort letters, as conditions precedent to underwriting the proposed securities offering. See James D. Cox, Robert W. Hillman & Donald C. Langevoort, *Securities Regulation: Cases and Materials* 121-122 (9th ed. 2020). A law firm's 10b-5 letter attests that the firm, or individual lawyers, is not aware of any material misstatements or omissions in the registration statement. The auditor's comfort letter gives assurance as to a wide array of financial information in the registration statement, including information appearing in the text, charts, and graphs – information that

10

is separate from the audited financial statements, which are expertised portions of a registration statement. Though the terms of these letters are highly tailored, they expose their authors to liability for negligent or fraudulent preparation, creating incentives for their authors to perform robust due diligence. Id. at 122.

28. Underwriters are well suited for service as third-party certifiers because they are uniquely positioned among offering participants to detect disclosure errors, having had decades to hone their diligence practices and procedures. Underwriters are also cost-effective certifiers since issuers already engage them to act in transactions. KRAAKMAN, *Gatekeepers*, at 93-99.

29. Because of the threat of liability and underwriters' interest in protecting their reputations, Section 11 makes underwriters virtually full partners with the issuer in preparing, reviewing drafts, and corroborating the truthfulness of the registration statement. Underwriters became prominent, if not dominant, participants in the preparation of a registration statement and the prospectus.

30. The role of the legal or managing underwriter begins with an underwriting agreement. As Cleary Gottlieb explained in *The IPO: Overview and Guide* in October 2023:

> The underwriting agreement is the contract in which the underwriters agree to purchase the offered securities from the company. . . .
>
> The centerpiece of the agreement is the number of securities to be sold and the price at which the underwriters will buy them. The underwriters typically require extensive representations and warranties from the company (and, to a lesser degree, from any selling shareholder) to support their due diligence, ensure adequate disclosure, and facilitate closing. These provisions also allocate risk between the company and the underwriters in the event that the underwriters are sued for a material misstatement or omission,

11

and related representations and warranties are breached. In addition, the company, its insiders, and its significant shareholders usually commit to a "lock-up."

The agreement lists closing conditions, including receipt of legal opinions from issuers', underwriters', and, if applicable, selling shareholders' counsel; comfort letters from the auditor; and other certificates and closing documents.

Professors Coffee, Sale and Whitehead explain in their Securities Regulation casebook at 102:

A great deal of activity occurs in the pre-filing period. A team must be organized to prepare the registration statement. The players will normally include the chief executive officer and the chief financial officer of the issuer, the lead underwriter and any co-manager, counsel for the issuer and for the underwriter, and the issuer's accountants. Potentially dozens of people may be involved in preparing the registration statement, and the average waiting period may last anywhere from thirty to more than sixty days, depending both on the SEC's case load at the time and how contentious the negotiations are between the issuer and the SEC's staff. Of course, the registrant chooses the filing date, but in practice, the SEC determines the effective date of the registration statement. It is important that no offer, not even an oral offer nor any attempt to solicit an offer to buy the security, occur during the pre-filing period, unless it is exempted by a special rule.

31. It has become customary for outside public accountants to review the offering document and to meet in one or more due diligence meetings to allow directors, underwriters and others to raise questions about the securities issue. Careful notes are taken of the meetings for the purpose of demonstrating a required "reasonable investigation [and] reasonable ground to believe . . . at the time that such part of the registration statement became effective, that the statements therein were

12

true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 11(b)(3)(A). Counsel for the offering typically make available a letter at the time of the due diligence meeting stating they have found no grounds for fraud. The outside public accountant also will provide a "cold comfort letter" stating that there have been no material developments which would cause the accountant to withdraw their opinion that the issuance was prepared in compliance with generally accepted accounting principles.

32.    Historically, commentators have observed that due diligence procedures substantially reduced reported instances of fraud in IPOs. 9 Loss, Seligman & Paredes, Securities Regulation 5th ed. at 322 n.135 ("The 30,000 registration statements filed during the first 35 years of the SEC's history resulted in two adjudicated recoveries and six reported decisions approving settlements of class actions."). The very term *due diligence* entered the popular vocabulary as a byword for careful investigation of facts whether required by the legal process or otherwise.

### D.    Full Disclosure of Material Information

33.    The purpose of the Securities Act of 1933 is to provide in one document all required material information for investors and reduce or eliminate the possibility of misleading investors through unsubstantiated news accounts, social media, or rumors. This was recognized in House Rep. No. 85, 73rd Cong., 1st Sess. (1933), the key legislative report for the 1933 Act, which detailed the requirements of providing in the registration statement and the prospectus which provided most of the contents of the registration statement "full disclosure of every essentially important element attending the issue of a new security." Id. at 3. Notably, the Securities Act concludes with detailed disclosure requirements in Schedule A for domestic issuers. Regulations over time have created truncated registration statements such as Form S-3 which allow much of the content of the comprehensive Form S-1 to be incorporated by reference for issuers subject to continuous disclosure of

13

annual quarterly and when necessary monthly reports. The requirement that directly or through incorporation by reference a registration statement and the prospectus comply with mandatory disclosure requirements to ensure full disclosure of material information has consistently been recognized by the United States Supreme Court as the purpose of both the Securities Act of 1933 and the Securities Exchange Act of 1934. See, e.g., United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975) ("The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market"); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976) (the 1933 Act "was designed to provide investors with full disclosure of material information concerning public offerings"); Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund, 575 U.S. 175 (2015) ("The Securities Act of 1933 . . . protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information relevant to a public offering'").

34. Preparation of the registration statement and prospectus requires compliance with Regulation S-K for textual or non-financial disclosures, Regulation S-X for financial disclosures, and Regulation C for the preparation and filing of the registration statement. All are part of a basic disclosure package.

35. Regulation S-K includes itemized disclosures concerning the business of the registrant (Items 101-103); its securities (Items 201-202); financial information (Items 301-308); management and specified security holders (Items 401-407); when applicable, the registration statement and prospectus (Items 501-512); Exhibits (Item 601); miscellaneous disclosures concerning recent sales of unregistered securities, indemnification of directors and officers, and purchases of securities by the issuer and affiliated purchasers (Items 701-703); and Industry Guides (Items 801-802). For a detailed discussion of the Regulation S-K disclosure items, see 2 LOSS, SELIGMAN & PAREDES, supra, at 76-536.

14

36.   The Securities Act requires distribution of a prospectus to investors with much of the content of the registration statement that is filed with the SEC.  See Section 10 of the Securities Act.  For Form S-1 offerings, much of the information required to be filed under Regulation S-K is included in the prospectus.  Under Form S-1, there are very limited opportunities for incorporation by reference.  See 2 LOSS, SELIGMAN & PAREDES, supra, at 41.  The disclosures in the prospectus provide investors, directly or indirectly, the opportunity to make informed investment decisions and to bring private lawsuits if the prospectus includes material falsehoods.  See, e.g., Securities Act Sections 11 and 12.  These disclosures largely are delineated in Regulation S-K and in the Securities Registration Form S-1 requirements and most significantly include:

a.   **Description of Business**:  A description of the general development of the business, including key products, dominant or other reportable business segments, status of development efforts for new or enhanced products, trends in market demand, resources material to the company's development, competitive conditions, and the company's principal physical properties.

Incomplete or misleading descriptions of a business were a major concern of Congress and led to the requirement in ¶8 of Schedule A of the Securities Act to disclose "the general character of the business actually transacted or to be transacted by the issuer."

The Commission notably required businesses to disclose information about segments of a business.

b.   **Management and Ownership:**  Information about key personnel, directors, and major shareholders, including information about the compensation of specified officers and directors, and a description of significant transactions between the issuer and officers, directors, promoters, and persons who control the issuer.

15

The avoidance of undisclosed compensation to business insiders and those engaged in the securities distribution process was a major priority of the Securities Acts. In the leading case defining materiality, TSC Indus., Inc. v. Northway, Inc., 457 U.S. 438, 453-454 n.15 (1970), the Supreme Court stated that total omission of material information concerning a conflict of interest as a matter of law would have to be disclosed. See, e.g., Kramer v. Time Warner Inc., 937 F.3d 767, 771 (2d Cir. 1991): "That inside directors stand to gain from a recommended transaction is material information that must be disclosed to shareholders considering a tender offer."

In the instant case, Nexo's co-founder Trenchev testified that "a certain percentage of [the NEXO] tokens [were] reserved for members of the team." Trenchev Dep. 191:14-16. However, Trenchev claimed he did not remember the exact percentage reserved for the management team, was "not sure" how many NEXO Tokens he personally received, and did "not know" whether he received more than 100 million tokens— more than 10 percent of the total supply. Id. at 191:17-192:18.

Disclosure of this type of information about ownership and sales by insiders is a key aspect of registration under the Securities Act. For example, Regulation S-K Item 403 requires disclosure of security ownership in specified transactions by corporate directors, executive officers and beneficial owners of more than 5 percent of a company's stock. Item 404 requires disclosure by related persons including directors and officers, promoters and specified control persons in specified transactions in which the participant receives an amount more than $120,000.

c.    **Financial Statements**: Audited financials, including income statements, balance sheets, and cash flow statements, typically for the past three fiscal years. These provide an overview of the company's financial health.

To reduce management's ability to obscure internal knowledge of known trends or known uncertainties, the Commission adopted the

16

requirements in Regulation S-K Item 303 to require management to discuss the registrant's financial condition and results of operations, specifically describing known trends or uncertainties concerning liquidity, capital resources and income.  2 LOSS, SELIGMAN & PAREDES, supra at 318-371.  The forward-looking nature of the disclosures is especially useful since a company's financial statements are backward-looking, demonstrating how the company has performed but not necessarily indicating how it *will* perform.

In 2002 after the Enron debacle involved misuse of off-balance sheet transactions, the Sarbanes-Oxley Act added §13(j) to require the Commission to adopt rules disclosing material off-balance sheet transactions, arrangements, obligations and other relationships.  In 2003, the Commission adopted the required amendments to the Management Discussion and Analysis Item.  See Sec. Act Rel. 8182, 79 SEC Dock. 1251 (2003) (adoption); 2 LOSS, SELIGMAN & PAREDES, supra at 351-357.

Numerous recent examples of failures in the digital asset space highlight the importance of publicly available audited financials. In 2023, crypto exchange FTX reported an $8.9 billion shortfall as a result of secret loans to Alameda Research which, in turn, had led to misappropriation by the FTX and Alameda Research CEO, Sam Bankman-Fried, of which he was convicted.  1 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 90-95 (Wolters Kluwer 7th ed. 2024); Louis Loss, Joel Seligman & Troy Paredes, 2025 Cumulative Supplement at 34-35. FTX did not have securities registered with the SEC or publish audited financial statements. FTX's token, FTT, which also was not registered with the SEC, declined precipitously on this news, losing about 95% of its value in a matter of weeks. Kaiko Research, Looking Back on FTXs Impact, https://research.kaiko.com/insights/looking-back-on-ftxs-impact.

Cryptocurrency lending platform Celsius also did not publish audited financial statements. In mid-2022 the company abruptly froze all withdrawals, swaps and transfer on its platform and filed for bankruptcy

17

shortly thereafter. Celsius' unregistered CEL token declined significantly and is now essentially worthless. Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 2026 Cum. Ann. Supp. at 35. Indeed, Nexo itself never completed an audit of its financial records. Nexo co-founder Antoni Trenchev testified that Nexo "were in the process of getting [its] financial records audited. And then in 2022, after the collapse and bankruptcy of FTX, many of the auditors ceased working with crypto companies, and [Nexo's] auditor was no different than that. So they would not finalize the job." Trenchev Dep. 70:1–71:7. Trenchev confirmed that Nexo never received a finalized audit. Id. at 71:2–5. When required, the failure to produce a finalized audit is a serious matter. I have never heard of this type of requirement being excused because "many auditors ceased working with crypto companies."

d.    **Plan of Distribution**: Information regarding how the securities will be distributed or sold, including the underwriters involved, the nature of the underwriting agreement, and the price of the securities.

Item 508(a) of Regulation S-K specifically requires disclosure of any material relationship that an underwriter had with the securities issuer. Item 508(b) requires disclosure of the underwriter's compensation. Item 511 further requires disclosure of all other expenses in connection with the distribution and issuance of securities to be registered.

e.    **Use of Proceeds**: Information about the principal purposes for which the funds raised by the company will be used.

Courts have observed that when funds raised for a stated purpose are instead used for a materially different purpose, such conduct has been characterized in past federal securities decisions as misleading to investors. See, e.g., SEC v. Scott, 565 F. Supp. 1513, 1526-1527 (S.D.N.Y. 1983), *aff'd sub. nom.* SEC v. Cayman Islands Reinsurance

18

Corp., 734 F.2d 118 (2d Cir. 1984); SEC v. Collector's Coffee, 697 F. Supp. 3d 138, 166-167 (S.D.N.Y. 2023).

       f.    **Risk Factors**: A discussion of the material risks that make an investment in the company or its securities speculative or risky.

As with the Management Discussion Analysis Item 303, disclosure of risk factors now required under Regulation S-K Item 105 are particularly emphasized in registration statements and must immediately follow the summary section required by Item 503. Item 105(b) Discussion of Risk Factors and are meant to communicate to potential investors "material factors that make an investment in the registrant or offering speculative or risky." Item 105(a).

Items 201-202 of Regulation S-K highlight other risk factors which potentially could depress share prices such as whether there is an established United States trading market for the stock, see Item 201(a)(2), or the issuer has a history of not paying dividends. See Item 201(c). In 2006, the Commission added Item 201(e) to require disclosure of the registrant's yearly performance charge compared to the cumulative total return of a broad equity index of stock.

       g.    **Legal Proceedings**: A description of any pending material legal proceedings other than ordinary routine litigation to which the company or any of its subsidiaries is a party or likely to be a party.

Disclosure of material pending legal proceedings is a particularized form of risk factor that may be included in the Management Discussion & Analysis description of Risk Factors. See Sec. Act Rel. 10,825 (2020). If a pending litigation involves a sufficiently substantial estimable amount of loss and a sufficiently high probability of occurrence, disclosure is required even though it is contingent and may never occur. A risk of loss alone can drive stock prices down. See, e.g., Gulf & W. Indus., Inc. v. Great A. & P. Tea Co., Inc., 476 F.2d 687, 697 (2d Cir. 1973), where the court affirmed a preliminary injunction enjoining a consummation of a tender offer in part because the bidder

19

omitted to state certain material facts indicating that there were substantial antitrust obstacles to a substantial stock acquisition. The court noted, "The fact that, at the time it announced its tender offer, an antitrust action had not been commenced against G&W, and that the liability was uncertain, does not excuse G&W's failure to disclose all these relevant circumstances so that A. & P. shareholders could weigh them in reaching their decision whether or not to tender their shares." See also Greenstone v. Cambex Corp., 975 F.2d 22, 24 (1st Cir. 1992); Indiana Pub. Retirement Sys. v. SAIC, Inc., 818 F.3d 85 (2d Cir. 2016).

h. **Description of Securities Being Offered**: This includes the number of shares being sold, the type of security (e.g., common stock, preferred stock, bonds), and a brief outline of specified securities rights including dividend rights and rights to vote.

i. **Material Contracts and Agreements**: These are significant contracts that can have a substantial impact on the company's business, such as licensing agreements, leases, or supply contracts.

37. In addition to compliance with Regulation S-K, Regulation S-X requires each covered registrant and its subsidiaries to file with the SEC two years of audited consolidated balance sheets and three years of audited income statements and cash flow. Regulation S-X Items 3-01 - 3-03. Financial statements in Regulation S-X include all notes to the statements and all related schedules. Regulation S-X Rule 1-01(b). Since 1973, it has been the policy of the Commission as stated in Accounting Series Release No. 150 that only financial statements prepared in compliance with the principles, standards, and practices promulgated by the FASB [Financial Accounting Standards Board] would be acceptable to the SEC; "those contrary to such FASB pronouncements would be deemed lacking substantial authoritative support." This policy was reaffirmed in 1980 when the Commission revised Regulation S-X Item 4-01(a). As the court in Slater v. A.G. Edwards & Son, Inc., 719 F.3d 1190, 1197 (10th Cir. 2013) stated: "Regulation S-X requires documents filed with the SEC to be in

20

compliance with Generally Accepted Accounting Principles (*GAAP*). 17 C.F.R. §4-01(a)(1). Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." Rule 4-01(a)(1) in full repeats the text quoted in the *Slater* case but concludes: "unless the Commission has otherwise provided. This article and other articles of Regulation S-X provide clarification of certain disclosures which must be included in any event, in financial statements filed with the Commission."

38.    To ensure the integrity of financial statements, Congress in the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§78dd-1, et seq., which added §13(b)(2) of the Securities Exchange Act, requires each reporting corporation to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles. . . ." A primary purpose of §13(b)(2) was to prevent corporate officers or directors from making materially false or misleading statements or omitting to state material facts "as an accountant in connection with (i) [a]ny audit, review or examination of the financial statements of the issuer . . . or (ii) [t]he preparation or filing of any document or report required to be filed with the Commission. . . ." Quoting Rule 13b2-2, as amended. See also Rule 13b2-1.

39.    In 2002 after a major financial scandal involving Enron, see 2 LOSS, SELIGMAN & PAREDES, supra at 730-760, Congress enacted the Sarbanes Oxley Act, Pub. L. 107–204, 116 Stat. 745, to provide for a Public Company Accounting Oversight Board (*PCAOB*) "to create a stronger, more diligent and independent system" of outside auditors. Sec. Ex. Act Rel. 46,120, 77 SEC Dock. 2832, 2852 (2002). The PCAOB provides a private-sector non-profit corporation charged with overseeing the auditors of public companies. Sarbanes-Oxley Act Title I.

21

40. The Senate Report accompanying the Sarbanes Bill notably explained: "The bill requires the Board to establish or adopt auditing, quality control, and ethics standards for the audit of public companies. The Committee has concluded that the Board's plenary authority in this area is essential for the Board's effective operation. . . ." S. Rep. No. 107-205, 107th Cong., 2d Sess., at 8 (2002).

41. The Sarbanes-Oxley Act also added §10(m) to the Securities Exchange Act to require each covered corporation to have an audit committee composed entirely of outside or independent directors, who were not corporate executives or accepting any consulting, advising or other compensatory fee from the issuer and have at least one audit committee financial expert. See 2 LOSS, SELIGMAN & PAREDES, supra at 650-665.

42. Senior executives are required to certify internal control requirements. The principal executive officer or officers and principal financial officer or officers at the time of filing each annual report and each quarterly report are required to sign a certification that includes a statement as required by the Securities Exchange Act Rules 13a-14(a), 15d-14(a) and is now codified in Regulation S-K Item 601(b)(31):

I, certify that:

. . .

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

22

43.    Several studies suggest that investors interpret SEC registration and oversight as a signal that an investment carries lower risk or is "safer" as a signal of third-party certification. In an experimental study based on a large sample of Dutch investors and their regulators, Cox and de Goeij found that when regulatory oversight was explicitly mentioned in investment materials (such as noting that a securities offering had regulatory approval), investors' willingness to invest increased and their perceived risk decreased. Ruben Cox & Peter C. de Goeij, Regulatory Certification, Risk Factor Disclosure, and Investor Behavior, 24 *Rev. Fin.* 1079-1106 (2020). In other words, by analogy, SEC involvement may be viewed as a form of certification in the eyes of investors.  This implies many investors take comfort in the fact that a security has been through the SEC registration process.

44.    Historical evidence also indicates that markets view SEC-mandated disclosure as reducing investment risk. A study by Greenstone, Oyer, and Vissing-Jorgensen examined stock returns around the 1964 Securities Acts Amendments, which for the first time required many previously unregulated over-the-counter companies to register with the SEC and disclose financial reports. Michael Greenstone, Paul Oyer & Annette Vissing-Jorgensen, *Mandated Disclosure, Stock Returns, and the 1964 Securities Acts Amendments*, 121 Q.J. Econ. 399 (2006). They found that investors placed positive value on these new disclosure requirements. In a firm-level event study, the companies most affected by the new registration rules experienced abnormal stock returns of about +3.5% in the weeks when they announced their compliance, signaling increased investor optimism. *Id.* Cumulatively, from the proposal of the law to its implementation, the affected firms saw 11%–22% higher returns relative to firms already subject to SEC regulation. *Id.* The authors interpret these gains as evidence that investors felt better protected and anticipated improved performance once firms were forced to be more transparent and accountable to the SEC. In other words,

mandatory SEC registration/disclosure made investors feel more secure, bidding up stock prices.

45.    Additional support comes from studies of restricted stock (shares that are unregistered and cannot be freely traded). Investors generally demand a steep discount for unregistered, illiquid shares compared to identical registered shares, a phenomenon reflecting higher perceived risk or inconvenience. An SEC-sponsored study from the 1970s, for example, the SEC Study found that "restricted securities are issued at substantial discount from the market value of freely tradeable securities – the average discount for 278 private placements examined by the Study was about 23 percent, although variation in practice was considerable. "Institutional Investor Study Report of the Securities and Exchange Commission, H.R. Doc. No. 92-64 at xxvi (92d Cong., 1st Sess. 1971)."

46.    Firms from jurisdictions with weaker investor protections can signal their commitment to higher standards by subjecting themselves to U.S. SEC regulation. John C. Coffee, Jr., The Future as History: The Prospects for Global Convergence in Corporate Governance and its Implications, 93 Nw. U. L. Rev. 641 (1999). When foreign companies list on U.S. exchanges (thereby registering with the SEC and complying with U.S. disclosure and governance rules), they often experience an increase in liquidity and increases in a firm's share value. Id. at 673-674. This is partly due to improved liquidity and visibility, but also due to investor perceptions of stronger protections. By "bonding" themselves to U.S. laws, firms signal a desire to respect shareholder rights under tougher scrutiny and enforcement. Investors become more willing to buy these companies' shares because they believe management is constrained from unethical behavior – the firm has effectively tied its hands to be more honest and transparent. In June 2025, there were 530 non-U.S. issuers from 48 countries listed on the New York Stock Exchange alone. Insights, Recent Trends in Foreign Companies Listing in the U.S. Exemplify Structural Advantages for Issuers (June 19, 2025).

24

# V.    Exempted Securities Offerings Under Regulation D

47.    In Sections 3 and 4 of the Securities Act are a number of exemptions from the public offering requirements of the Securities Act. What is now Section 4(a)(2), the private offering exemption, originally was intended to be a narrow exemption for "the sale of an issue of securities to insurance companies or to a limited group of experienced investors," explained James Landis, a drafter of the Securities Act of 1933 and the second Chair of the SEC.  James M. Landis, The Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev. 29, 37 (1959).  The House Report, H. Rep. No. 85, 73d Cong., 1st Sess. (1933) added to Landis's characterization.  Exempt securities and exempt transactions were intended to address instances "where there is no practical need for [the Act's] application or where the public benefits are too remote."  Id. at 5.  Exempted transactions in Section 4 permitted an issuer "to make a specific or an isolated sale of its securities to a particular person, but insisting that if a sale of the issuer's securities should be made generally to the public that that transaction shall come within the purview of the Act."  Id. at 15-16.  The Commission was given in the initial version of the Securities Act "a further discretionary power carefully limited to exempt additional transactions and securities where the aggregate amount of the offering does not exceed $100,000. This power is deemed necessary for the effective administration of the bill but is expected to be used only in a sparing manner."  Id. at 6.

48.    The SEC's administrative construction was early established in a 1935 Opinion of the SEC's General Counsel that the determination whether a particular transaction involves a private or public offering depends not on any one factor but on all the surrounding circumstances. Apart from the number of offerees, important factors were the offeree's relationship to each other and to the issuer, the number of units offered, and the manner of offering.  Sec. Act Rel. 285 (1935).  The SEC long viewed an offering to approximately 25 persons not to involve a public offering, Sec. Act Rel. 285 (1935), in some instances permitting

25

offerings up to 100 institutional investors also to be considered private offerings. This remained the Commission's approach until the Supreme Court decided SEC v. Ralston Purina Co., 346 U.S. 119 (1953). See 2 LOSS, SELIGMAN & PAREDES, supra, at 328-332. See also Orrick, Non-Public Offerings of Corporate Securities – Limitations on the Exemption under the Federal Securities Act, 21 U. Pitt. L. Rev. 1, 10-13 (1959).

49.    In its 1953 *Ralston Purina* decision, the Supreme Court explained that the private placement exemption was limited to investors who "could fend for themselves," meaning either they were able to evaluate the merits and risks of a nonpublic offering or had access to information comparable to the information which would be contained in a Securities Act registration statement. SEC Commissioner Orrick in 1958 would state of the exemption: "As a rule of thumb, the Commission has considered that an offering made to no more than 25 or 30 persons, who take the securities for investment and not for distribution, is generally a private transaction not requiring registration." Orrick, Some Observations on the Administration of the Securities Laws, 42 Minn. L. Rev. 25, 33 (1957).

50.    In the initial decades of the Section 4(a)(2) exemption primarily was made for debt, and the proportion taken by life insurance companies was estimated to be as high as 90 percent or greater. See 3 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation at 357-362 (Wolters Kluwer 7th ed. 2025). In 1962, for example, 97 percent of private placements involved debt; in 1970, 83 percent of corporate public and private offerings were registered offerings, only 17 percent were private. Id. at 359.

51.    The burden was on the defendant to show a right to the exemption. In 1973, the court in G. Eugene Found. v. First Fed. Corp., 663 F.2d 988 (10th Cir. 1973) denied the exemption when the sale by a single individual of a large block of stock to a single buyer was denied the Section 4(a)(2) exemption because there "was not evidence . . . of

what knowledge the [buyer] possessed concerning either the stock or the company, nor was he shown to be in a position to know such information could have been disclosed by registration." Several other cases limited the private offering exemption. See, e.g., Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680 (5th Cir. 1971) (the level of sophistication of the investor was not dispositive if he did not have "access to the kind of information which registration would provide"); Henderson v. Hayden Stone Inc., 461 F.2d 1069 (5th Cir. 1972) (the private placement exemption was not available when defendants could not prove how many offerings had been made and when); SEC v. Continental Tobacco Co., 463 F.2d 137 (5th Cir. 1972) (even when plaintiffs had received a brochure concerning the corporation and unaudited financial statements, the private plaintiff exemption was unavailable because: "The record does not show that each offeree had a relationship with Continental giving access to the kind of information that registration would have provided or an opportunity to inspect Continental's records or to verify for themselves statements made to them"); Doran v. Petroleum Management Corp., 545 F.2d 893 (5th Cir. 1977) (employed a disjunctive test which the private placement exemption either would be available if the offerees occupied a privileged or insider status relative to the issuer that afforded them access to information registration would otherwise provide, or by making actual disclosure without proving that the offerees occupied a privileged position). See generally other cases discussed in 3 LOSS, SELIGMAN & PAREDES, supra at 346-353.

52.    In 1982, the Commission sought to bring order to an area of law called by Ray Garrett Jr., a future SEC Chair, as "a kind of mishmash," see id. at 353, by adopting Regulation D. Regulation D was adopted after the Commission in 1972 earlier had adopted a more restrictive Rule 146 than the subsequently adopted Regulation D, see Sec. Act Rel. 5336 (1972), and subsequently Rule 240 for offerings up to $100,000 in a 12 month period, and Rule 242 for offerings up to $2

27

million made to up to 35 investors in addition to accredited investors. See generally 2 LOSS, SELIGMAN & PAREDES 375-387. Regulation D was adopted as an amalgamation of Rules 146, 240 and 242 with significant changes. See generally id. at 387-454.

53. The emphasis of Regulation D is an objective test to define accredited investors, aggregate offering price, information requirements, limitations on manner of offering, limitations of resale and notice of sale. Regulation D historically has proven most consequential for permitting issuers to proceed under Rule 506 which has no dollar limit on the amount that can be offered.

54. For many decades, Regulation D Rule 506 offerings could not be sold employing general advertising or general solicitation. Then in the JOBS (Jumpstart Our Business Startups) Act of 2012, Congress directed the Commission to revise its Rule 502(c) prohibition on general advertisings and solicitation so that it did not apply to Rule 506 offerings when "all purchasers of the securities are accredited investors."

55. The Commission's adoption on November 2, 2020, the day before the National election, by a 3-2 partisan vote, enacted further far reaching amendments to exempt offering rules "to facilitate capital formation and increase opportunities for investors by expanding access to capital for small and medium-sized businesses and entrepreneurs across the United States." Sec. Act Rels. 10,763 (2020) (proposal), 2020 Fed. Sec. L. Rep. (CCH) ¶82,416; 10,884 (2020) (adoption), 2020 Fed. Sec. L. Rep. (CCH) ¶82,737.

56. The proposal Release viewed exempt offerings systematically:

> In 2019, registered offerings accounted for $1.2 trillion (30.8 percent) of new capital, compared to approximately $2.7 trillion (69.2 percent) that we estimate was raised through exempt offerings. Of the approximately $2.7 trillion estimated as raised in exempt offerings in 2019, Table 1 shows the amounts that we estimate were raised under each of the identified exemptions:

28

**Table 1:  Overview of amounts raised in the exempt market in 2019**

| Exemption | Amounts Reported or Estimated as Raised in 2019 |
|---|---|
| Rule 506(b) of Regulation D | $1,492.0 billion |
| Rule 506(c) of Regulation D | 66.0 billion |
| Regulation A:  Tier 1 | 0.044 billion |
| Regulation A:  Tier 2 | 0.998 billion |
| Rule 504 of Regulation D | 0.228 billion |
| Regulation Crowdfunding | 0.062 billion |
| Other exempt offerings | 1,167.0 billion |

Id. at nn. 12-14.

The adoption Release summarized Securities Act exemptions including those adopted in its November 2, 2020 Release in a separate Table:

**Overview of Capital-Raising Exemptions**

| Type of Offering | Offering Limit within 12-month Period | General Solicitation | Issuer Requirements | Investor Requirements | SEC Filing Requirements | Restrictions on Resale | Preemption of State Registration and Qualification |
|---|---|---|---|---|---|---|---|
| Section 4(a)(2) | None | No | None | Transactions by an issuer not involving any public offering. *See SEC v. Ralston Purina Co.* | None | Yes. Restricted securities | No |
| Rule 506(b) | None | No | "Bad actor" disqualifications apply | Unlimited accredited investors<br><br>Up to 35 sophisticated but non-accredited investors in a 90-day period | Form D | Yes. Restricted securities | Yes |
| Rule 506(c) | None | Yes | "Bad actor" disqualifications apply | Unlimited accredited investors<br><br>Issuers must take reasonable steps to verify that all purchasers are accredited investors | Form D | Yes. Restricted securities | Yes |
| Rule 504 of Regulation D | $10 million | Permitted in limited circumstances | Excludes blank check companies, Exchange Act reporting companies, and investment companies<br><br>"Bad actor" disqualifications apply | None | Form D | Yes. Restricted securities except in limited circumstances | No |

30

57.    Regulation D during the 2018-2021 period was an exemption from the registration requirements of the 1933 Act only available to the issuer of the security.  See 2 LOSS, SELIGMAN & PAREDES, supra at 427.

58.    There are two basic types of exemptions.  Rule 504 applies to relatively small offerings made under the 1934 Act that occur exclusively within one or more states requiring state registration and the public filing and delivery of a substantive disclosure document. Because of the low aggregate offering limit ($5 million before the November 2020 amendments, increased to $10 million afterward) and the complexity of meeting varying state registration and disclosure requirements, Rule 504 has been used infrequently. As shown in Table 1 above, only about $0.228 billion was raised through Rule 504 offerings in 2019, compared with more than $1.5 trillion raised under Rules 506(b) and 506(c).

59.    By contrast, Rule 506 provides the most commonly-used exemptions and accounts for the vast majority of Regulation D offerings.

60.    Rule 506(b) has no dollar limit but after November 2020 limits the number of purchasers of securities from the issuer to no more than 35 nonaccredited investors in any 90 day-calendar period.  Rule 506(b) also will permit an unlimited number of sales to accredited investors, as defined in Rule 501(a).

61.    Each nonaccredited investor may be advised by a purchaser's representative who has "such knowledge and experience in financial and business matters that he is capable of evaluating, alone, or . . . together with the purchaser, the merits and risks of the prospective investment." Rules 501(i); Rule 502(b)(2)(ii).

62.    When sales are made to nonaccredited investors under Rule 506(b)(2)(v), issuers are also required to give each purchaser, at a reasonable time before purchase, "the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information which the issuer possesses or can

acquire without unreasonable effort or expense that is necessary to verify the accuracy of information furnished under [Rule 502(b)(2)(i) or (ii)]."

63. Information requirements are specified in Rule 502(b). For issuers not subject to the continuous reporting requirements of §§13 or 15(d) of the 1934 Act, the issuer is required to provide the same type of information required in Part II of Form 1-A if the issuer is eligible to claim an exemption under Regulation A or the information required in Part 1 of a registration statement that the issuer would be entitled to use such as Form S-1. Information requirements under Rule 502(b) are scaled for size with different standards for offerings up to $20 million than those over $20 million. Financial information must be prepared in accordance with Generally Accepted Accounting Standards if an offering involves more than $20 million. Exhibits required to be filed with Form S-1 need not be furnished to nonaccredited investors under Rule 502(b).

64. Issuers under Rule 502(b) must file a notice of sale with the SEC providing the information specified in Form D and update the form annually. Form D is a simplified, often check the box, notice that is often completed by a non-securities professional and requires disclosure of issuer's identity, principal place of business, contact information, related persons, industry group, issuer size, type of offering, duration of offering, types of securities, minimum investment, sales commission, offering and sales amount, number of nonaccredited investors, number of earlier investors, sales commissions, and use of proceeds.

65. Rule 506(b) issuers are prevented from engaging in general advertising and solicitations of a securities sale. See Rule 502(c); id. at 470-491.

66. As discussed further in Section VI, Rule 506(b) issuers also must comply with Rule 502(d) limits on resale which means exercising "reasonable care to assure that the purchasers are not underwriters."

67. Rule 506(c) goes further than Rule 506(b) and allows an unlimited number of sales to be made in an offering solely to accredited

investors. Rule 506(c) has no information requirements and since 2013 has permitted general advertising and soliciting. See Rule 502(c).

68. Rule 501(a) after November 2020 lists 13 different types of accredited investors and before the 2020 amendments just listed the first eight of these types of accredited investors. See id. at 441-462.

69. The first eight types of accredited investors available throughout the entire 2018-2021 period include several types of institutional investors such as specified banks, broker-dealer firms, investment advising firms, and insurance companies, any director, executive officer or general partner of the issuer; and natural persons whose individual net worth or joint net worth with a spouse exceeds $1 million or who added individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of the two most recent years and had a reasonable expectation of reaching the same income level in the current year.

70. In November 2020, the SEC broadened the *accredited investor* definition to add any natural person who was certified as a registered securities broker, estimated then to be 691,041 individuals, and other types of securities professionals, clients of exempt specified family officers. See id. at 441-462.

71. Under Rule 506(c)(2), the issuer must take reasonable steps to verify that the purchasers of the securities are accredited investors such as reviewing IRS filings of the purchaser's income, bank statements, a consumer report from at least one nationwide consumer reporting agency or receiving written confirmation that a registered broker-dealer, investment adviser, licensed attorney or certified public accountant had taken reasonable steps to verify that the purchaser is an accredited investor within the prior three months. See id. at 482-487.

72. Rule 507(a) disqualifies persons from using either Rule 504 or 506 when they have been subject to any order, judgment or decree of any court of competent jurisdiction or temporarily, preliminarily or

33

permanently enjoined for failure to comply with Regulation D's Rule 503. There are exceptions for good faith, see Rule 507(b), or insignificant deviations under Rule 508. See id. at 493-496.

73. The marketing of a Rule 506 offering either under Rule 506(b) or 506(c) usually results in the preparation of an offering circular. This provides written detail concerning the issuance to investors and can be the basis of a fraud claim if material misstatements or omissions are made, typically for private litigants under §10(b) of the Securities Exchange Act and Rule 10b-5, which – unlike strict liability under §11 of the Securities Act – requires showing that the defendants acted wrongfully, and that investors relied on the material misstatement or omission. See 8 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 168-240 (Wolters Kluwer 6th ed. 2022); 9 Louis Loss, Joel Seligman & Troy Paredes 524-622 (Wolters Kluwer 6th ed. 2023).

74. Regulation D does not require several investor protection mechanisms that are required in a registered Securities Act offering, such as a requirement to hire an underwriter, imposing full responsibility on each signer of a registered offering including specified corporate insiders, underwriters and specified experts, or a requirement of due diligence to ensure that each material fact was made after a reasonable investigation, and there were reasonable grounds to believe that each part of the registration statement, when it became effective was true.

## VI. Reasonable Care to Assure that Purchasers ARE Not Underwriters

75. Rule 506(b) issuers also must comply with Rule 502(d) limits on resale which means exercising "reasonable care to assure that the purchasers are not underwriters." Under Section 2(a)(11) of the Securities Act, an "underwriter" is broadly defined as any person who purchases securities from the issuer "with a view to…distribution" (or who participates in or facilitates such a distribution). Even an individual

34

investor can be deemed a statutory underwriter if they serve as a link in an unregistered distribution from the issuer to the public. SEC v. Chinese Consol. Benevolent Ass'n, Inc., 120 F.2d 738, 740 (2d Cir. 1941), *cert. denied*, 314 U.S. 618; Harden v. Raffensperger, Hughes & Co., Inc., 65 F.3d 1392 (7th Cir. 1995); SEC v. Softpoint, Inc., 958 F. Supp. 846, 860 (S.D.N.Y. 1997) ("The prohibitions of Section 5 are not limited to control persons; the language sweeps broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security.") To preserve the exemption and avoid an improper public distribution, the issuer must exercise reasonable care to ensure that the purchasers of the securities are not Section 2(a)(11) underwriters. Under Rule 502(d), reasonable care can be demonstrated by:

(a)    Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;

(b)    Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available; and

(c)    Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities.

76.    The issuer should conduct a reasonable inquiry with respect to each purchaser to determine whether the purchaser is a Section 2(a)(11) underwriter purchasing for resale or is acquiring for investment. This means asking prospective investors whether they are purchasing for their own account or on behalf of others and confirming that they have no pre-arranged plans to resell the securities. For example, the issuer might require investors to complete questionnaires or attest to their investment purpose. If an investor is unwilling to commit to a purchase

35

for long-term investment, or if other "red flags" emerge (such as the investor indicating an intent to quickly flip or distribute the securities to others), the issuer should treat that as a warning sign. Indicia that a purchaser may be acting as an underwriter include any expressed intent to resell immediately, forwarding of offering securities to multiple parties, unusual commissions or arrangements suggestive of a finder's fee, or other involvement in the distribution process (e.g. the investor is a broker-dealer or has lined up downstream buyers). An investor exhibiting such behavior could be viewed as taking the securities "with a view to distribution," inconsistent with the Regulation D exemption. The courts and the SEC have provided limited additional interpretation of Rule 502(d)  See, e.g., SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072 (9th Cir. 2010) (denying that defendant had established reasonable care under Rule 502(d): "Registration exemptions are to be construed narrowly in favor of disclosure." Citing SEC v. Murphy, 626 F.2d 633, 641 (9th Cir. 1980). See also SEC v. Telegram Grp., 448 F. Supp. 3d 352, 380-381 (S.D.N.Y. 2020) (finding Telegram failed to use reasonable care to ensure that the Initial Purchasers were not Underwriters when the initial purchasers bought Grams from Telegram, the issuer, with an intent to resell them for profit in the secondary market soon after launch of the TON blockchain).

77.    Under Rule 502(d), the issuer must provide written representations to each purchaser prior to sale affirming that the investor is purchasing for investment purposes only and not with any intention to resell or distribute the securities unless an exemption from registration is available. Often, the subscription agreement or stock purchase agreement will contain an investor warranty that the purchaser is acquiring the securities for their own account, not as an agent or nominee for someone else, and "not with a view to distribution." This warning is typically highlighted in the offering materials or private placement memorandum and reiterated in the purchase documents. By securing these representations and delivering explicit resale disclaimers

36

in writing, the issuer creates a record that each investor was informed of, and agreed to, resale restrictions, supporting the issuer's reasonable care defense. During 2018–2021, as in other periods, issuers routinely provided these investment-intent representations and resale acknowledgments as a matter of best practice, reflecting industry standards of Rule 502(d) compliance.

78. In addition to these disclosures, issuers must enforce resale restrictions in practice. Rule 502(d) specifically notes that placing a restrictive legend on the securities is an accepted method of demonstrating reasonable care. Accordingly, stock certificates or electronic book-entry notations for Regulation D shares are legended to state that the securities have not been registered under the Securities Act and cannot be sold or transferred without registration or a valid exemption. A typical legend used in private offerings throughout 2018–2021 recites that the security "has not been registered under the 1933 Act" and that the holder agrees it may only be offered or sold pursuant to an effective registration statement or an applicable exemption such as Rule 144, with any prospective transferee often required to furnish a legal opinion to the issuer's transfer agent to confirm an exemption. In practice, issuers instruct their transfer agents to reject any transfer of the securities that is not accompanied by either proof of registration or an attorney's opinion letter verifying an exemption, for instance, an opinion that the resale meets Rule 144's conditions after the requisite holding period. Additionally, many private placement agreements impose a contractual lock-up period or require investors to agree not to resell for a specified time period, further ensuring that no immediate distribution to the public can occur. These measures – legends, stop-transfer instructions, and contractual resale prohibitions – are all concrete steps that manifest the issuer's continuing diligence in preventing any unregistered "downstream" sales. They help ensure that each purchaser truly holds the securities for investment and will not circumvent Securities Act registration requirements.

37

79.    In tokenized offerings, these transfer restrictions can be expressed directly in the smart contract so that every attempted transfer is vetted for compliance before it settles.  For example, on the Ethereum blockchain, the ERC-1404 smart contract standard for issuing tokens with transfer restrictions provides a mechanism for "issuers to enforce investor limit, control flowback between US and non-US investors, or other similar restrictions." https://github.com/simple-restricted-token/simple-restricted-token. This smart contract adds compliance hooks so that token transfers proceed only when issuer defined rules are satisfied—commonly customer whitelisting based on know your customer information, jurisdictional blocks, and lock-up periods. This is not just a theoretical possibility. Several issuers have utilized this technology and issued security tokens with built in transfer restrictions. For example, Arca U.S. Treasury Fund ("ArCoin") issued fund shares on Ethereum as "ArCoin," with AML/KYC requirements built into the token's smart contracts so that only eligible wallets can hold/transfer the security.  https://www.arcalabs.com/about-arcoin.

80.    Even prior to the implementation of the ERC-1404 smart contract standard, token issuers were able to implement transfer restrictions when issuing ERC-20 tokens, the standardized fungible token of the Ethereum blockchain utilized by Nexo. For example, iCap Equity issued real estate security tokens as ERC-20 tokens with transfer restrictions to comply with Rule 144 of the Securities Act of 1933, which requires a one-year mandatory lockup period for securities sold. https://www.coindesk.com/markets/2019/09/16/harbor-tokenizes-real-estate-funds-worth-100-million-on-ethereum.

81.    Stablecoin issuers also demonstrate large-scale, real-world use of code-based transfer controls. Circle's USDC stablecoin has an explicit network blacklisting policy: when an address is blacklisted, it cannot send or receive USDC and the balance is blocked on-chain. This policy is publicly documented and used, including a June/July 2020 freeze of $100,000 USDC at law-enforcement request and freezes of

38

Tornado Cash-linked addresses following OFAC designations in August 2022. *See* Centre Consortium USDC Network Blacklisting Policy.

82. I have reviewed Nexo's response to Plaintiff's Interrogatory No. 10, which asked Nexo to "state all evidence" it intended to rely upon to support its contention that its "sale of the NEXO Token to Plaintiff was exempt from the registration requirements of the Securities Act." As part of its response, Nexo states that it "took reasonable care to assure that the purchasers of the NEXO Token in the U.S. were not statutory underwriters." However, Nexo does not identify any steps it took to ensure that "purchasers of the NEXO Token in the U.S. were not statutory underwriters." Nexo does not identify any (a) inquiry to determine if U.S. purchasers were acquiring the securities for themselves or for other persons or (b) any restrictions it placed on the transferability and sale of the NEXO Token. In fact, Nexo's co-founder Antoni Trenchev did not identify any steps Nexo took to ensure that purchasers were not statutory underwriters and confirmed that no transfer restrictions were imposed on Tokens. Trenchev Dep. 206:4-9 ("Q: Did Nexo place restrictions on the resale of tokens sold to accredited investors? A: Well, I don't know how we could have placed restrictions on what an owner of an asset can do with his or her asset.").

83. Mr. Trenchev was also unable to say whether the NEXO Token was available to U.S. purchasers on Nexo's own exchange. Trenchev Dep. 211:4-12.

84. I also understand that Nexo did not place any restrictions on the transferability of the NEXO Token into the Token's smart contract, even though it was aware that it was technologically possible to do so. Trenchev Dep. 206:12-207:1 ("Q: Did Nexo include any transfer restrictions in its Nexo Token smart contract? A. I don't think that we did that.").

85. Nexo also does not state that it took reasonable care to assure that purchasers of the NEXO Token outside the United States were not

39

statutory underwriters. But an issuer must take reasonable steps to ensure that even its offshore investors are not purchasing with a view to distribute into the U.S. This means in practice that foreign purchasers in a Reg D deal should be subjected to the same investigation and resale restrictions as U.S. purchasers: they should provide written representations of their investment intent (no intent to resell quickly), agree to receive securities bearing U.S. transfer restrictions, and be notified of the prohibition on unregistered resales into any market (including U.S. markets). These precautions are part of the issuer's reasonable care obligation. The failure to apply such measures to non-U.S. buyers would create a dangerous gap in compliance, effectively inviting regulatory violation. Indeed, U.S. regulators have cautioned that issuers cannot use offshore transactions as a mere conduit to avoid registration.

86.    The SEC's guidance confirms that foreign issuers too can utilize Regulation D, but the resulting securities will be restricted and subject to Rule 502(d)'s resale limits.  WCRS Group, Inc., 987 SEC No-Act. LEXIS 1488 (Jan. 8, 1987) (resale of securities by U.S. investors would be satisfied when (1) each seller received an opinion of counsel acceptable to WCRS that registration is not required or become effective; (2) no transfers for at least one year; . . . (4) each certificate representing the Seller's Common Stock will bear a legend stating that such shares cannot be transferred without exemption from registration or an exemption); Parkway Group PLC, 1988 SEC No-Act. LEXIS 550 (May 3, 1988) (similar).

87.    The policy rationale for this is straightforward: a foreign purchaser is just as capable of acting as a conduit for an unregistered distribution into the United States as a domestic purchaser. For example, without resale restrictions, an issuer could sell securities to an offshore investor and that investor could soon resell those securities into the U.S. markets or to U.S. persons.

* * *

40

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

April 17

Dated: _____, 2026


_____

Professor Joel Seligman

Dean Emeritus and Professor

Washington University School of Law

41

**Exhibit 1**

**JOEL SELIGMAN**
*Curriculum vitae*

Washington University School of Law
joelseligman@wustl.edu

April 2026

**EDUCATION**

Harvard University Law School, J.D. 1974
Cum Laude
University of California at Los Angeles,
A.B. 1971, Magna Cum Laude
Member, Phi Beta Kappa Society

**EMPLOYMENT EXPERIENCE**

2020-present          Dean Emeritus and Professor
                      Washington University School of Law

2018-2021             President Emeritus and University Professor
                      University of Rochester

2005-2018             President, CEO and G. Robert Witmer, Jr. University
                      Professor
                      University of Rochester

1999-2005             Dean and Ethan A.H. Shepley University Professor
                      Washington University School of Law

1995-1999             Dean and Samuel M. Fegtly Professor of Law
                      The University of Arizona College of Law

1987-1995             Professor of Law
                      The University of Michigan Law School

1

| | |
|---|---|
| 1986-1987 | Visiting Professor of Law<br>The University of Michigan Law School |
| 1983-1986 | Professor of Law<br>George Washington University Law School |
| 1977-1983 | Professor<br>Northeastern University Law School |
| 1974-1977 | Corporate Accountability Research Group |

## CONSULTANT

| | |
|---|---|
| 1988-1989 | Consultant, Office of Technology Assessment |
| 1983 | Consultant, Department of Transportation |
| 1979-1982 | Consultant, Federal Trade Commission |

## REPORTER

| | |
|---|---|
| 1998-2002 | National Conference of Commissioners on Uniform State Laws, Revision of Uniform Securities Act |

## CHAIR

| | |
|---|---|
| 2000-2001 | Securities and Exchange Commission Advisory Committee on Market Information |

## PUBLICATIONS

### *BOOKS*

With Mary Schwab Seligman, **The Good Society and Tyrants:  The Intractable Struggle** (Cognella Press 2025)

2

**Twelve Great Years** (Gatekeeper Press 2022).

**Misalignment:  The New Financial Order and the Failure of Regulation** (Wolters Kluwer 2020).

With Louis Loss and Troy Paredes,  **Securities Regulation & Annual Supplement** (4th & 5th eds. Wolters Kluwer Law & Business).

With Louis Loss and Troy Paredes, 1-10 **Securities Regulation** (6th ed. Wolters Kluwer Law & Business).

With Louis Loss and Troy Paredes, 1-5 **Securities Regulation** (7th ed. Wolters Kluwer Law & Business).

With Louis Loss and Troy Paredes, 1-2 **Fundamentals of Securities Regulation & Annual Supplement** (8th ed. 2024) (earlier **Fundamentals** co-written with Louis Loss and Troy Paredes, 3d ed. Aspen Law & Business, 1994; 4th ed. Aspen Law & Business, 2000; 5th ed. Aspen Publishers, 2004; 6th ed. 2011; 7th ed. 2018).

With John Coffee and Hillary Sale, **Securities Regulation** (9th ed. Foundation Press, 2007).

**The New Uniform Securities Act** (Aspen Law & Business, 2003).

With John Coffee, **Securities Regulation** (8th ed. Foundation Press, 1998 and 9th ed. 2002).

**Corporations:  Cases and Materials** (Aspen Law & Business, 1995).

**The SEC and the Future of Finance** (Praeger, 1985).

**The Transformation of Wall Street:  A History of the Securities and Exchange Commission and Modern Corporate Finance** (Houghton Mifflin, 1982; rev. ed. Northeastern University Press, 1995; and 3d ed Aspen Publishing, 2003).

**The High Citadel:  The Influence of Harvard Law School** (Houghton Mifflin, 1987).

3

With Ralph Nader and Mark Green, **Constitutionalizing the Corporation: The Case for the Federal Chartering of Giant Corporations** (Report issued January 1976; a revised hardcover version was published in September 1976 by W.W. Norton under the title: **Taming the Giant Corporation**).

### *ARTICLES*

**The War on the SEC is Different**, 53 Sec. Reg. L. J. 188 (2025).

**Is Restructuring the Answer?**, A Book Review of Stephen H. Legomensky's *Reimagining the American Union: The Case for Abolishing State Government* (Los Angeles Review of Books 2025).

With John Coffee, **About Face: How Much of Current SEC Policy Will the Trump Administration Reverse?**, Columbia Law School's Blog on Corporations and the Capital Markets (Dec. 3, 2024).

**The Keys to the Kingdom: The Unexpectedly Unsettled Definitions of *Security* and *Sale* and the Overruling of *Chevron***, 22 Berkeley Bus. L.J. 405 (2025).

**On the Value of History: A Review of A.C. Pritchard & Robert B. Thompson, A History of Securities Law in the Supreme Court**, 47 Seattle U. L. Rev. 987 (2024).

**The Judicial Assault on the Administrative State**, 100 Wash. U. L. Rev. 1687 (2023).

**The Rise and Fall of Cryptocurrency: The Three Paths Forward**, 19 NYU J. L. & Bus. 93 (Fall 2022)

**Framing the Issues: Board Diversity and Corporate Purpose**, 12 Harvard Bus. L. Rev. 249 (Summer 2022).

With Andrew Tuch, **The Further Erosion of Shareholder Protection: Expanded Exemptions, SPAC Mergers, and Direct Listings**, 108 Iowa L. Rev. 303 (2022).

**Payment for Order Flow**, 18 Hastings Bus. L.J. 3 (2021).

**In Memory of Harvey J. Goldschmid,** 92 Wash. U. L. Rev. 249 (2016).

4

**The New Financial Order:  An Essay for Alan Bromberg**, 68 SMU L. Rev. 877 (2015).

**Memories of Bill Cary**, 2 Colum. Bus. L. Rev. 318 (2013).

**Key Implications of the Dodd-Frank Act for the Independent Regulatory Agencies**, 89 Wash. U. L. Rev. 1 (2011).

**The SEC in a Time of Discontinuity**, 95 Va. L. Rev. 667 (2009).

**In Honor of Harvey Goldschmid**, 106 Colum. L. Rev. 1479 (2006).

**Should Investment Companies Be Subject to a New Statutory Self-Regulatory Organization?**, 83 Wash. U. L. Q. 1115 (2005); 2 ICFAI J. Corp. & Sec. L. 43 (2005).

**A Modest Revolution in Corporate Governance**, 80 Notre Dame L. Rev. 1159 (2005).

**Rethinking Private Securities Litigation**, 73 U. Cin. L. Rev. 95 (2004).

**Cautious Evolution or Perennial Irresolution:  Stock Market Self-Regulation During the First 70 Years of the Securities and Exchange Commission**, 59 Bus. Law. 1347 (2004).

**Self-Funding for the Securities and Exchange Commission**, 28 Nova. L. Rev. 233 (2004).

**A Comment on Accounting and Auditing**, 47 St. Louis U. L. J. 967 (2003).

**The New Uniform Securities Act**, 81 Wash. U. L. Q. 243 (2003).

**No One Can Serve Two Masters:  Corporate and Securities Law after Enron**, 80 Wash. U. L. Q. 449 (2002).

**Rethinking Securities Markets:  The SEC Advisory Committee on Market Information and the Future of the National Market System**, 57 Bus. Law. 637 (2002).

**The Nontrial Adversarial Model**, 64 Law & Contemp. Probs. 97 (Spring/Summer 2001).

**The Changing Nature of Federal Regulation**, 6 Wash. U. J. L. & Pol'y 205 (2001).

**In Memoriam:  Louis Loss**, 111 Harv. L. Rev. 2141 (1998).

**A Mature Synthesis:  *O'Hagan* Resolves "Insider" Trading's Most Vexing Problems**, 23 Del. J. Corp. L. 1 (1998).

**Götterdämmerung for the Securities Act?**, 75 Wash. U. L. Q. 887 (1997).

**The Private Securities Reform Act of 1995**, 38 Ariz. L. Rev. 717 (1996).

**The Quiet Revolution:  Securities Arbitration Confront the Hard Questions**, 33 Hous. L. Rev. 327 (1996).

**The Mandatory Disclosure System and Foreign Firms**, 4 Pacific Rim L. & Policy J. 807 (1995).

**The SEC's Soft Information Revolution**, 63 Fordham L. Rev. 1953 (1995).

**Another *Un*special Study:  The SEC's Market 2000 Report and Competitive Developments in the United States Capital Markets**, 50 Bus. Law. 485 (1995).

**The Obsolescence of Wall Street:  A Contextual Approach to the Evolving Structure of Federal Securities Regulation**, 93 Mich. L. Rev. 649 (1995).

**The Merits Do Matter**, 108 Harv. L. Rev. 438 (1994).

**The Merits Still Matter**, 108 Harv. L. Rev. 749 (1995).

**The Implications of *Central Bank***, 49 Bus. Law. 1429 (1994).

**The New Corporate Law**, 59 Brook. L. Rev. 1 (1993).

**Accounting and the New Corporate Law**, 50 Wash. & Lee L. Rev. 943 (1993).

**The Disinterested Person:  An Alternative Approach to Shareholder Derivative Litigation**, 55 Law & Contemp. Prob. 357 (Autumn 1992).

6

**The Historical Need for a Mandatory Corporate Disclosure System**, 9 J. Corp. L. 1 (1983), *reprinted in* 16 Sec. L. Rev. 3 (1984); *reprinted in* 1 ABA Sec. of Bus. L., Selected Articles on Federal Securities Law 329 (1991).

**The Case for Federal Minimum Corporate Law Standards**, 49 Md. L. Rev. 947 (1990).

**The Washington Public Power Supply System Debacle**, 14 J. Corp. L. 889 (1989).

**Introduction:  Symposium:  Issues in Corporate Governance**, 22 Mich. J. L. Ref. 1 (1988).

**The Internationalization of the Securities Markets:  Preface to a Symposium**, 9 Mich. Y.B. Int'l Legal Stud. 1 (1988).

**A Sheep in Wolf's Clothing:  The American Law Institute's Corporate Governance Project**, 55 Geo. Wash. L. Rev. 325 (1987).

**Equal Protection in Shareholder Voting Rights:  The One Common Share, One Vote Controversy**, 54 Geo. Wash. L. Rev. 687 (1986) (also published as a report of the Investor Responsibility Research Center, and in Knights, Raiders & Targets, ch. 31) (J. Coffee, L. Lowenstein & S. Rose-Ackerman eds. 1988).

**The SEC and Accounting:  A Historical Perspective**, 7 J. Comp. & Cap. Market L. 241 (1985).

**The Reformulation of Federal Securities Law Concerning Nonpublic Information**, 73 Geo. L. J. 1083 (1985), *reprinted in* 18 Sec. L. Rev. 119 (1986).

**The Municipal Disclosure Debate**, 9 Del. J. Corp. L. 647 (1984).

**Reappraising the Appraisal Remedy**, 52 Geo. Wash. L. Rev. 829 (1984), *reprinted in* 28 Corp. Prac. Commentator 1 (1986).

**The Application of the Federal Antitrust Laws to Municipal Taxicab Regulation**, 26 J. Urb. & Contemp. L. 25 (1984) (initially published as a Department of Transportation study).

**The Future of the National Market System**, 10 J. Corp. L. 79 (1984).

7

**The Structure of the Options Market**, 10 J. Corp. L. 141 (1984).

**Federal Depository Institutions Life Insurance**, 31 Drake L. Rev. 591 (1984).

**The Securities and Exchange Commission and Corporate Democracy**, 3 U. Dayton L. Rev. 1 (1978).

**A Brief History of the Delaware General Corporation Law of 1899**, 1 Del. J. Corp. L. 249 (1976).

## ORGANIZATIONS

Member, The State Bar of California.

Member, ABA Task Force on Corporate Responsibility (2002).

Member, Professional Ethics Executive Committee of the American Institute of Certified Public Accountants (2000-2002).

Member, New York Stock Exchange Legal Advisory Committee (1998-1999).

Member, The University of Arizona Foundation Board of Directors (1998-1999).

Member, Arizona State Bar Board of Governors, *ex officio* member (1995-1999).

Member, NASAA Task Force on the Future of State and Federal Securities Regulation (1995-1996).

Member, NASD Legal Advisory Board (1994-1997).

Member, Advisory Committee, American Law Institute Corporate Governance Project (1980-1992).

Member, Federal Reserve Bank of New York Upstate New York Regional Advisory Board (2009-2012).

Governor, NASD Board of Governors (2004-2007).

Governor, FINRA Board of Governors (2007-2015).

8

Member, Eastman Kodak Company Board of Directors (2009-2013).

Member, COFHE Board (2009-2012).

Economic Security Solutions Group, AARP (2004-2005).

Co-chair, Finger Lakes Regional Economic Development Council (2011-2016).

Member, University Research Association Board of Trustees (2013-2016).

Member, National Security Higher Education Advisory Board (2010-2012).

Member, American Academy of Arts and Sciences.

**Exhibit 2**

**EXPERT WITNESS CASE LIST**

Cambridge Retirement System v. Amneal Pharmaceuticals, Inc., et al., Superior Court of New Jersey, Somerset County:  Law Division, Docket No. SOM-L-1701-19

Robison v. Marver, et al., Superior Court of the State of Washington, County of King, Docket No. 20-2-01777-9

Strober, et al. v. Browd, et al., Superior Court of the State of Washington, County of King, Docket No. 20-02-07762-3 SEA

In re Grupo Televisa Litig., No. 18 Civ. 1979 (LLS) (S.D.N.Y. 2021) on behalf of Robbins Geller.

In re Ripple Labs Inc. Litig., Case No. 4:18-cv-06753-PJH (N.D. Cal. 2023).

In re Qualcomm Inc. Sec. Litig., Case No. 3:17-cv-00121-JO-MSB (S. D. Cal.)

**Exhibit 3**

**RECORD MATERIALS REFERENCED**

The following is a list of portions of the record referenced in my report. Citations to statutes, cases, treatises, articles, or other authorities are included in the body of the report.

*Deposition of Antoni Trenchev*, taken in *Cress v. Nexo Capital Inc.*, Case No. 23-cv-00882-TSH (N.D. Cal.), including cited portions at 70:1–71:7; 191:14–192:18; 206:4–9; 206:12–207:1; and 211:4–12.

Defendant Nexo Capital Inc.'s April 18, 2025 Response to Plaintiff's Interrogatory No. 10.

# EXHIBIT 66
## FILED UNDER SEAL

# EXHIBIT 67
## FILED UNDER SEAL

1