# EXHIBIT 68



# VIP Relationship Program

nexo.io

CONFIDENTIAL

CRESS-00000008

# You receive access to:







**Dedicated** Relationship Manager.

**OTC services** with some of the best rates on the market.

**Priority** customer support.



CONFIDENTIAL

CRESS-00000009



# What should you
## expect?



**Dedicated Relationship Manager** – a person to help in your successful utilization of the platform.



**Email SLA** – during business hours, you can expect a reply from the Relationship manager in a matter of hours, no more than 24h, weekends excluded.



**Direct phone number availability:** 8AM – 5PM UTC. Out of business hours calls – schedule in advance.



**Quarterly meetings** – regular checkups and a channel to share feedback and requests.



Sneak peek at **new platform features.**



Access to **exclusive OTC services.**



CONFIDENTIAL

CRESS-00000011



# OTC
## Services list

CONFIDENTIAL

CRESS-00000012



**Fiat-to-stablecoin conversion** – get institutional rates for amounts larger than $100,000.





**Purchases of large quantities of crypto** – get institutional rates for amounts larger than $100,000.



CRESS-00000014



**Nexo Portfolio Booster** – grow your crypto holdings by leveraging part of your portfolio.



CRESS-00000015



**Zero Cost Loan** – get a fixed term loan with no interest and no risk of liquidation.



CONFIDENTIAL

CRESS-00000016



**Liquidation relief program** - use the service in the event of a market crash to recover your liquidated assets.



CONFIDENTIAL

CRESS-00000017



# Priority
## support

CONFIDENTIAL

CRESS-00000018



Reach out **support for any technical questions** – change credentials, lost 2FA.



**Priority support** – the support will be reviewing all emails sent to **support@nexo.io** with priority.



**Email SLA** – get a response from the support team in 2 hours, **24/7**.



CONFIDENTIAL

CRESS-00000019



CRESS-00000020

# EXHIBIT 69

**From:** John Cress <jtc88@hotmail.com>
**To:** Hristiyan Hristov <hristiyan@nexo.io>
**Subject:** Re: Please read and call me ASAP
**Date:** Tue, 22 Jun 2021 13:18:00 +0000

Hi Hristiyan, I'm awake now.   It's early but I got up and made coffee and I will wait for your call.   1-415-298-4366.

John

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Tuesday, June 22, 2021 1:25 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Please read and call me ASAP

Hello John,

Please let me know when you wake up and I will do my best to initiate a call in a timely manner.

Thank you.

On Tue, Jun 22, 2021 at 4:12 AM John Cress <jtc88@hotmail.com> wrote:
> Someone from support told me I should be using the "liquidation relief program", but I don't know know what the liquidation relief program is.   It feels very late to be discussing it, but I should know everything about it and every way it could possibly be used to help me
>
>
> On Jun 21, 2021, at 11:23 AM, John Cress <jtc88@hotmail.com> wrote:
>
>
> Hristiyan,
>
> I do actually want to talk to you today.   I have a couple questions about my future asset liquidation price and I need to think and decide whether to use the asset swap function now.   Please give me a call as soon as you can today at 415-298-4366.   Thanks,
>
> John
>
> **From:** Hristiyan Hristov <hristiyan@nexo.io>
> **Sent:** Monday, June 21, 2021 8:38 AM
> **To:** John Cress <jtc88@hotmail.com>
> **Subject:** Re: Please read and call me ASAP
>
> Hello John,
>
> Let's get on a call and discuss exactly what you want to do. My take from our last call was that you did not want to exchange your collateral to USDT.

CONFIDENTIAL                                        CRESS-00002095

Looking forward to hearing from you.

On Sun, Jun 13, 2021 at 10:59 PM John Cress <jtc88@hotmail.com> wrote:
> Yes, I did.  Unfortunately, it looks like I am not able to swap the bitcoin to USDT to avoid any possible drops in BTC price, and then swap it back to BTC.   That would have provided me a lot of safety if I could do that.  I would also be willing to pay a lot of money in fees if I could do that.     If I swap my BTC to USDT, that is basically like a final liquidation and I cannot simply swap them back.   That is very scary because I ALMOST did that when I was on the phone with you and the next morning.   I have extremely lucky the exchange was not working on Friday and I got an error the next morning too.   Support opened a ticket for me and I read the article you sent me while I was waiting for the exchange to work.   I am so, so lucky I read that and got it clarified.   I almost lost millions of dollars permanently if I did those swaps.
>  Wow
>
> Anyway, if there's any way Nexo can help me to <u>temporarily swap my BTC to USDT and then swap them back to BTC at the exact same LTV as the first swap</u>, this would be a valuable service and <u>I would pay a BIG FEE</u> if I can do this....
>
> John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Sunday, June 13, 2021 6:59 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Please read and call me ASAP

Hello John,

Did you go through the article which I have sent you?

Looking forward to hearing from you.

On Sat, Jun 12, 2021 at 2:27 AM John Cress <jtc88@hotmail.com> wrote:
> Hristiyan,
>
> Disregard this email and request.  Someone explained to me that I cannot swap the Tether back to BTC, so I do NOT want to use the collateral swap service.   This service is not at all what it sounds like. Thank you,
>
> John
>
>
> On Jun 11, 2021, at 10:57 AM, John Cress <jtc88@hotmail.com> wrote:
>
>
> Hristiyan,
>
> I got up this morning and I've been trying to use the exchange, but it's just giving me this error attached.   The live support team was unable to help me and they created case # 448695.   I selected the credit wallet, entered 2.722 BTC to swap to Tether, and there's a button at the bottom that says

CRESS-00002096

"Preview Exchange".   That button is not working and I'm seeing this error I attached.     I don't know if this case is going to get the priority it needs.   This is extremely important for me.   Can you please follow up and monitor this case for me?   Also, can you or someone please do my swap for me since I can't use the self-service exchange?

I need to swap 129.42 BTC to Tether and keep 250 BTC remaining in my credit wallet.   Please confirm.

John

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Friday, June 11, 2021 4:27 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Please read and call me ASAP

Hello John,

Please find more information regarding the Collateral Swap function in this article.

Let me know if you have any questions.

On Fri, Jun 11, 2021 at 10:58 AM John Cress <jtc88@hotmail.com> wrote:
> Ok, I will be watching my phone.   Thanks

---

**From:** Hristiyan Hristov <hristiyan@nexo.io>
**Sent:** Friday, June 11, 2021 12:50 AM
**To:** John Cress <jtc88@hotmail.com>
**Subject:** Re: Please read and call me ASAP

I will call you in 30-45 minutes, John.

On Fri, Jun 11, 2021 at 10:36 AM John Cress <jtc88@hotmail.com> wrote:
> Right now it's 12:35 AM here, but I have to stay up to make sure we talk about the order before the weekend.   Can you call me now or very soon since it will be getting very late here?     Thanks

>> On Jun 11, 2021, at 12:14 AM, John Cress <jtc88@hotmail.com> wrote:

>> Ok great - I can talk right now.  Please call me now and I will answer.  Thanks,

>> John

>>> On Jun 10, 2021, at 11:58 PM, Hristiyan Hristov <hristiyan@nexo.io> wrote:

                         CRESS-00002097

Of course, John.

When will be a good time to talk?

Thank you.

On Fri, Jun 11, 2021 at 4:04 AM John Cress <jtc88@hotmail.com> wrote:
Hristiyan,

I've been trying very hard to reach someone at Nexo for help protecting my assets. Everyone in the live chat has told me that they are working to escalate my request and have someone contact me.

Last night Vladi told me that he would have you contact me.   He promised a response by the end of Thursday, and I still haven't heard from you.

I opened case #432896 twelve days ago and nobody has contacted me.   I am extremely stressed out.   I have already been liquidated once and come dangerously close two other times and I need to take action asap.   Twelve days is a long time to have eight figures of assets at risk and not have a response.

I attempted to swap 129 bitcoins to USDC or USDT at a price of $36,500 or better on the exchange and it won't let me.   I have screenshots of the swap page not allowing me to do the swap myself and I have screenshots of my conversation with Vladi.

Here's what I'm thinking could be a solution.   If today (Friday) the OTC desk can sell 129 BTC at $36,500 or higher, and exchange it to USDC or USDT, my collateral assets will be in a more stable position.

At that point, if BTC goes lower, I will be in a good position.   We would then add to the order instructions to also swap the stablecoin back into BTC if the price goes higher than $36,500 once it gets to $39,000.  This would only be a temporary measure to get through a drop in BTC price this weekend.

I'm also open to any longer term solutions or deals that could be made to make it through to the other side.

This is a very serious situation and I am doing everything possible to think about ways to protect my assets.   I need Nexo to respond immediately today to help me carry out the moves that need to happen.

I will stay up late again eagerly waiting to hear from you.  Again, my phone number is 1-415-298-4366.

I want to talk through the plan on the phone first and get this taken care of before the weekend.

John Cress

CRESS-00002098

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

 

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

 

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

 

**Banking on Crypto**
nexo.io

&lt;Screen Shot 2021-06-11 at 10.51.45 AM.png&gt;

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

 

**Banking on Crypto**
nexo.io

--
Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

 

**Banking on Crypto**
nexo.io

--

CONFIDENTIAL

CRESS-00002099

Best regards,

**Hristiyan Hristov**
Relationship Manager

+41 43 505 18 13

   

**Banking on Crypto**
nexo.io

CRESS-00002100

# EXHIBIT 70

## Re: [Nexo Help Center] Re: Chat with John Cress

**John Cress** <jtc88@hotmail.com>

Mon 6/21/2021 6:09 PM

**To:** Nexo Help Center <support@nexo.io>

Ok, nobody has ever talked me through the liquidation relief program, so I don't fully understand that or how that can help me now. But if I sell my assets now for a loss, it's not going to reduce my future liquidation thresholds, so I don't know of any relief programs I can use now. Maybe I could've done something before, but I don't know how now. I wish someone walked through it with me more before though

On Jun 21, 2021, at 1:56 AM, Nexo Help Center <support@nexo.io> wrote:

##– Please type your reply above this line –##

Hi John Cress,

Your request (#448695) has been updated. To add additional comments, please reply to this email.

**Bozhidar** (Nexo Help Center)

Jun 21, 2021, 11:56 GMT+3

Dear John Cress,

Thank you for your response.

We can completely understand that this situation is highly unpleasant, and we can assure you that we do not wish to see our clients' assets liquidated. Additionally, as you can understand, the liquidation relief program is aimed to help our clients recover from these financial losses. However, as you can understand if the market is volatile, which in turn may cause further automatic loan repayments.

Regarding your queries, please note that the reason you can swap only to assets, which have a higher LTV is because they are more stable in USD price. For example, stablecoins have a near 1:1 exchange rate to the USD, meaning that even in a market crash, their value shall not be affected as much, like other assets. Moreover, if we allowed swapping assets with a higher LTV to assets with a smaller one, via our collateral exchange, this could lead to potential automatic repayments, if the market price decreases.

Nevertheless, we would like to inform you that your account manager has reached out to you, in order to assist you with the liquidation relief program. Therefore, please check your inbox, as he should have emailed you.

CONFIDENTIAL

CRESS-00000177

Please do not hesitate to contact us in case you have any further questions, John.

As the world's largest and most trusted lender in the digital asset industry, we thank you for choosing Nexo and becoming part of our mission to decentralize global finance!

Kind Regards,
Bozhidar



Help Center | Blog

This message was sent to jtc88@hotmail.com in reference to **Case 448695**

To review the whole communication of this request please click here.

[938EOO-K88X]

CONFIDENTIAL         CRESS-00000178

# EXHIBIT 71

**REPORT, EXHIBITS, SCHEDULES, AND SUPPORTING FILES ARE DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| **JOHN CRESS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **Case No. 3:23-cv-00882-TSH** |
| | § | |
| **NEXO CAPITAL INC.,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

---

**EXPERT REBUTTAL REPORT OF SAUL SOLOMON**

**June 5, 2026**

---

**TABLE OF CONTENTS**

I.     **INTRODUCTION AND ASSIGNMENT** ............................................................... **3**

II.    **QUALIFICATIONS** .......................................................................................... **3**

III.   **SUMMARY OF OPINIONS** ............................................................................. **5**

IV.   **BACKGROUND** ............................................................................................... **8**

    A.   Parties...........................................................................................................8

    B.   Summary of Dispute .....................................................................................8

    C.   Overview of Margin Loans and Volatility of Bitcoin and Ether......................11

V.    **ANALYSIS OF THE MIZRACH REPORT** ..................................................... **16**

    A.   Lack of Nexus Between the Allegations and Damages Calculated in the Mizrach Report ............19

    B.   Out-Of-Pocket Damages .............................................................................23

    C.   NEXO Tokens as Proportion of Purchases .................................................25

    D.   NEXO Tokens USD Damages......................................................................25

    E.   Damages for Civil Theft .............................................................................26

    F.   Damages for Fraudulent Omission of Fees .................................................28

    G.   Prejudgment Interest ...................................................................................29

VI.   **ALTERNATIVE CALCULATIONS** ................................................................ **29**

    A.   Out-Of-Pocket Damages .............................................................................30

    B.   But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized for Asset Purchases........................................................................................33

    C.   But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized to Reduce the Loan Balance........................................................................36

    D.   But-For World in which No Liquidations Occur .........................................38

    E.   But-For World in which No NEXO Token Transactions Occur.....................40

    F.   Damages Related to OTC Fees .....................................................................43

    G.   Damages Related to All Fees.......................................................................44

    H.   Damages Related to NEXO Tokens..............................................................45

    I.   Summary of Alternative Calculations...........................................................46

VII.  **ANALYSIS OF THE KOGAN REPORT** ....................................................... **47**

VIII. **ASSUMPTIONS AND LIMITING CONDITIONS** ...................................... **49**

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

## I.   INTRODUCTION AND ASSIGNMENT

1. I have been retained by Baker & McKenzie LLP on behalf of its client, Nexo Capital Inc. ("Nexo" or "Defendant") to provide certain financial and accounting analyses in connection with the above-referenced matter. Specifically, I was asked to review and respond to the April 20, 2026 report of Prof. Bruce Mizrach (the "Mizrach Report") and certain issues raised in the April 20, 2026 report of Dr. Shimon Kogan (the "Kogan Report"). The Mizrach Report purports to have evaluated the potential economic damages incurred by Mr. John Cress ("Cress" or "Plaintiff") related to Defendant's alleged misconduct, including alleged misrepresentations of its interest, fees, and Liquidation Relief Program; fraudulent sale of Nexo Tokens; and breach of the Cryptocurrency Purchase Agreement. The Kogan Report purports to have evaluated whether Nexo's over-the-counter ("OTC") trading, fee, risk, and liquidation practices in connection with Cress's account deviated from industry standards and Nexo's own representations, and whether such practices contributed to alleged economic harm to the Plaintiff.

2. A summary description of the matter and my analysis and related opinions follow.

## II.   QUALIFICATIONS

3. I am a Managing Director with Berkeley Research Group, LLC ("BRG"), a leading global strategic advisory and expert consulting firm that provides independent advice, data analytics, authoritative studies, financial and valuation analysis, expert testimony, investigations, and regulatory and dispute consulting to public and privately held corporations, financial institutions, government agencies, law firms, and regulatory bodies around the world. I am a Certified Public Accountant ("CPA"), licensed in the state of Texas. I am also a Certified Fraud Examiner ("CFE"), certified in financial forensics ("CFF"), and hold two business valuation certifications, a Certified Valuation Analyst ("CVA") and Accredited in Business Valuation ("ABV").

4. I began working for the "Big Four" public accounting firm Ernst & Young (then Ernst & Ernst) in 1977 upon graduation from the University of Texas at Austin. After just under four

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

years, I moved to a regional public accounting firm based in Houston, Texas and remained there for 29 years, at which time I moved to my current position at BRG. For over 25 years, I worked primarily on audits of public and privately held businesses in a variety of industries. I assisted with the preparation of audit reports to ensure compliance with U.S. Generally Accepted Accounting Principles ("GAAP") and filings with the U.S. Securities and Exchange Commission ("SEC"), including the review of Forms 10-Q and 10-K for public companies. I also worked on a number of registration statements which involved verifying information presented for accuracy and consistency with the audited financial statements.

5. My work over the past 25 years has primarily focused on financial consulting related to business disputes and litigation. I have served as an expert and testified regarding financial, accounting, and economic considerations in a number of cases involving breach of contract claims, post-acquisition disputes, determination of business valuation, fraud investigations, financial impact of alleged actions and related damage analysis, wrongful termination, claims related to alleged theft of trade secrets, and forensic accounting matters among others.

6. A copy of my current curriculum vitae is attached as Exhibit A, and a listing of trial testimony and depositions during the past four years is attached as Exhibit B. BRG is being compensated at an hourly rate of $1,150 for the time I spend in connection with this matter and for the time devoted by staff who assisted me on this engagement at their standard hourly rates. Our fees are not contingent upon either the outcome of the dispute or the conclusions expressed herein.

7. This report summarizes my observations and opinions to date. These observations and opinions are subject to revision or supplementation as necessary, if additional relevant information comes to my attention subsequent to the date of this report. Therefore, I reserve the right to revise and supplement this report as necessary.

8. The analysis contained herein is based on my education, training, experience, as well as discussions with counsel and others (as noted herein) and review of the materials and documents listed in Exhibit C by myself or staff working under my direction.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

## III.    SUMMARY OF OPINIONS

9.    Based on my review and analysis of the Mizrach Report, the analyses and many key assumptions are flawed and speculative, thereby rendering the opinions in the Mizrach Report erroneous and unreliable.

10.    First, Prof. Mizrach fails to establish a reliable economic nexus between the alleged misconduct and the damages he calculates. The record indicates that the losses considered in the Mizrach Report were primarily driven by external factors, including a significant downturn in cryptocurrency markets and Plaintiff's decision to invest near peak prices using leverage, risks that Plaintiff testified that he would have accepted irrespective of the allegations. Moreover, Prof. Mizrach does not distinguish between market-driven losses and those, if any, attributable to the specific alleged misconduct, and therefore does not provide a supported or reliable basis for assessing economic damages.

11.    Second, Prof. Mizrach's out-of-pocket damages methodology materially overstates losses by valuing alleged damages using digital asset prices as of April 14, 2026, rather than as of the dates of the alleged wrongful conduct or liquidation events. This approach improperly incorporates subsequent market movements unrelated to the alleged conduct, effectively transforming a historical loss into a forward-looking investment claim. In addition, his inclusion of prejudgment interest on top of a current-value measurement results in a double recovery, overstating alleged damages by approximately $6.4 million at least.

12.    Third, Prof. Mizrach's analyses related to Nexo Tokens are not grounded in the facts of this case. His "proportion of purchases" methodology treats loan-funded transactions as if they were funded by Plaintiff's own capital, which does not reflect the reality of the transactions. Further, the Mizrach Report's NEXO Token damages calculations fail to account for material economic benefits, including reduced borrowing costs associated with Platinum-tier status, and calculate prejudgment interest on an aggregated basis rather than at the transaction level, resulting in additional overstatement of damages.

13.    Fourth, the analyses in the Mizrach Report for civil theft and alleged fraudulent omission of fees are similarly unreliable. These analyses rely on the same flawed framework as the out-

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

of-pocket calculation, including inconsistent use of measurement dates and prejudgment interest. In addition, they improperly assume that Plaintiff would have held digital assets through periods of significant market decline without liquidation, an assumption that is unsupported by market evidence, particularly given the substantial declines in cryptocurrency prices during 2022. Prof. Mizrach's omission of offsetting benefits, such as loan repayment resulting from asset liquidations, further inflates the claimed damages.

14. Fifth, Prof. Mizrach's analysis of OTC fees is not supported by a robust comparison to observable market prices. When I evaluate OTC transactions against contemporaneous market price ranges derived from independent data sources, I find that the total economic impact of OTC fees is immaterial, consisting of a net overpayment of approximately $9,562 with some transactions reflecting a net economic benefit to Plaintiff.

15. In addition, it is my understanding that prejudgment interest should be calculated as simple interest but Prof. Mizrach's calculations of prejudgment interest are based on compound interest which result in an overstatement of potential economic damages throughout his report.

16. Based on a lack of support for key assumptions and the extent of errors inherent in the analyses performed in the Mizrach Report, among other issues, it is my opinion that the Mizrach Report cannot be relied upon for purposes of establishing potential economic damages, if any, sustained by Plaintiff in connection with the claims asserted in this matter.

17. I have been asked to perform alternative damages calculations based on Cress's allegations as summarized below and described in more detail in this report:

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

| No. | Description | Damages / (Benefit) | PJI thru April 14, 2026 | Total |
|---|---|---|---|---|
| 1 | *Out-Of-Pocket Damages* | | | |
| | Measurement Date as of the Deposit Dates | $ 10,771,068 | $ 4,241,472 | $ 15,012,540 |
| | Measurement Date as of the Liquidation Dates | 5,835,137 | 2,331,579 | 8,166,716 |
| | Measurement Date as of April 14, 2026 | 16,671,768 | (542,754) | 16,129,013 |
| 2 | *But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized for Asset Purchases* | | | |
| | Measurement Date as of June 23, 2021 | 408,995 | 498,793 | 907,788 |
| | Measurement Date as of April 14, 2026 | (645,007) | - | (645,007) |
| 3 | *But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized to Reduce the Loan Balance* | | | |
| | Measurement Date as of June 23, 2021 | 419,864 | 502,452 | 922,316 |
| | Measurement Date as of April 14, 2026 | (633,042) | - | (633,042) |
| 4 | *But-For World in which No Liquidations Occur* | | | |
| | Scenario 1: No Liquidations | 10,073,501 | - | 10,073,501 |
| | Scenario 2: No Liquidations and No OTC Fees | 10,203,296 | - | 10,203,296 |
| 5 | *But-For World in which No Nexo Token Transactions Occur* | | | |
| | Measurement Date as of June 23, 2021 | 437,864 | 508,511 | 946,375 |
| | Measurement Date as of April 14, 2026 | (524,443) | - | (524,443) |
| 6 | *Damages Related to OTC Fees* | | | |
| | Based on Actual Transaction Prices | 9,562 | 3,371 | 12,932 |
| | Based on Implied Prices Excluding Fees | (3,958) | (1,375) | (5,333) |
| 7 | *Damages Related to All Fees* | 517,685 | 177,067 | 694,752 |
| 8 | *Damages Related to Nexo Tokens* | 1,197,788 | 491,995 | 1,689,783 |

18.    I was asked to review only limited aspects of the Kogan Report, specifically his conclusions regarding alleged excessive OTC fees, and I do not opine on his broader analyses. Based on my independent comparison of OTC execution prices to contemporaneous market high–low ranges, I find that the transaction prices, inclusive of fees, generally fall within observed market ranges, with only one immaterial exception of approximately $0.02 above the daily high. Moreover, in two instances, the implied prices excluding fees fall below the observed daily low, indicating that Nexo achieved pricing more favorable than generally available in the market. Accordingly, my analysis does not support Dr. Kogan's conclusion that Nexo's OTC fees were excessive.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

## IV.    BACKGROUND

### A.    Parties

#### 1.    *Nexo Capital LLC*

19.    Founded in 2018,[1] Nexo operates a digital assets platform that offers a range of services, including crypto-backed loans, interest-earning products, trading solutions, and debit and credit cards.[2]

#### 2.    *John Cress*

20.    Cress is a resident of San Francisco, California.[3] Beginning on March 3, 2021, Cress began transferring cryptocurrency assets, Bitcoin ("BTC") and Ether ("ETH"), into a Nexo wallet.[4] By April 2, 2021, Cress had transferred 250.33 BTC and 250 ETH into his Nexo account.[5] Ultimately, Cress used those cryptocurrency assets to obtain crypto-backed loans totaling $13.9 million.[6]

### B.    Summary of Dispute

21.    Cress alleges that Nexo engaged in a series of practices that induced him to deposit significant digital assets on its platform and subsequently enter into leveraged loan transactions secured by those assets. Specifically, he alleges that Nexo made materially false and misleading representations, particularly in connection with its VIP Program, concerning the level of customer support, the availability of liquidation protection, the lack of fees (the "zero fees" model), and the expected economic benefits of borrowing against cryptocurrency holdings.[7] Plaintiff asserts he relied on these representations in deciding to incur substantial leverage, thereby exposing his portfolio to liquidation risk.

22.    Plaintiff further contends that Nexo's practices increased the likelihood of Plaintiff's losses by requiring or incentivizing the purchase and holding of Nexo Tokens as a condition of

---

[1] https://nexo.com/en-us/about.
[2] https://nexo.com/en-us/about.
[3] Second Amended Complaint dated October 30, 2025 ("Second Amended Complaint"), p. 2.
[4] NEXO-0002705.
[5] NEXO-0002705.
[6] NEXO-0002705.
[7] Second Amended Complaint, p. 18.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

obtaining favorable borrowing terms.[8] Plaintiff alleges that this requirement altered the composition and risk profile of his collateral, introducing additional volatility and contributing to the deterioration of his loan-to-value ratios during market declines. Further, Cress alleges that Nexo misrepresented key facts regarding the regulatory status and characteristics of the Nexo token, including statements concerning its registration with the SEC.[9]

23.    Cress also asserts that, notwithstanding public representations of a "zero fees" model, Nexo charged undisclosed spreads, markups, or other economic charges in connection with OTC transactions and asset liquidations.[10] He further alleges that Nexo misrepresented its Liquidation Relief Program, which "deceive[s] reasonable customers, and in fact did deceive Plaintiff, into concluding that posted collateral would be protected in the event of a liquidation," and the responsiveness of its support team for VIP customers, which took "days, even weeks, to receive responses regarding [] inquiries about Nexo's services and [Plaintiff's] account at critical periods in the market."[11] In addition, it is alleged that Nexo represented that "collateral would continue to bear interest…[but] Plaintiff did not earn interest on digital assets posted as collateral for his loans."[12]

24.    As such, Plaintiff asserts the following claims in this dispute:

   a.   Fraudulent inducement related to Nexo's Liquidation Relief Program, prompt responsiveness, interest on Cress's collateral, the best rates on OTC purchases, and no hidden fees.[13]

   b.   Unfair competition under California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, related to Nexo's alleged deceptive/misleading advertising

---

[8] Second Amended Complaint, pp. 7-10.
[9] Second Amended Complaint, pp. 8.
[10] Second Amended Complaint, pp. 11-12, 17.
[11] Second Amended Complaint, p. 19.
[12] Second Amended Complaint, p. 20.
[13] Second Amended Complaint, pp. 28-29.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

for its VIP Program, Nexo's failures "to honor its promises to Plaintiff," and Nexo's loans purportedly made to Plaintiff without a finance lending license.[14]

c. Violation of Sections 25110 and 25503 of the California Corporations Code for Nexo's offer and sale of the Nexo Token, which is alleged to be an unregistered security.[15]

d. Fraud related to Nexo's offer and sale of the Nexo Token.[16]

e. Fraud related to Nexo's representation that "The Nexo token is registered with the SEC as a security."[17]

f. Civil theft for Nexo's fees on asset purchases and liquidations.[18]

g. Violation of Title 18 United States Code section 1962(c) ("RICO") as Plaintiff asserts that Nexo and its directors, employees, agents, and related entities "conducted the affairs of an associated-in-fact enterprise…[that] affected interstate commerce through a pattern of racketeering activity."[19]

h. Violation of Title 18 United States Code section 1962(d) since it is alleged that "Nexo conspired to violate the provisions of Title 18 United States Code section 1962(c)"[20]

i. Fraudulent omission of the "substantial fees and profits (a) on [Plaintiff's] OTC transactions and (b) for any liquidations of his assets."[21]

j. Breach of the Cryptocurrency Purchase Agreement.[22]

---

[14] Second Amended Complaint, pp. 29-31.
[15] Second Amended Complaint, pp. 31-33.
[16] Second Amended Complaint, p. 33.
[17] Second Amended Complaint, pp. 34-35.
[18] Second Amended Complaint, pp. 35-36.
[19] Second Amended Complaint, pp. 36-42.
[20] Second Amended Complaint, p. 42.
[21] Second Amended Complaint, pp. 43-44.
[22] Second Amended Complaint, pp. 44-47.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

### C.  Overview of Margin Loans and Volatility of Bitcoin and Ether

#### 1.  *Margin Loans*

25.  Since the claims in this matter arise out of leveraged transactions on the Nexo platform, it is useful to summarize, at a general level, how investing using margin (or leverage) generally works, why investors may choose to use it, and the risks that are inherent in doing so.

26.  The discussion that follows is provided as general background and is not specific to any particular transaction by Cress.

27.  Margin trading (or leveraged trading) refers to the use of borrowed funds to acquire or hold an investment position. In a typical margin transaction, an investor pledges existing assets as collateral and borrows additional funds from a lender in order to acquire additional investments. The result is that the investor controls a position whose total economic exposure exceeds the amount of his or her own equity in the position. The amount borrowed by the investor is commonly referred to as a "margin loan," which is a form of secured lending.

28.  The defining economic feature of margin trading is that it amplifies both gains and losses on the investor's equity. To illustrate using a simple, generic example: assume an investor contributes $100 of his own capital and borrows an additional $100 from a lender, secured by the $200 position. If the value of the underlying asset increases by 50% (to $300), the investor's equity rises from $100 to $200, a 100% return on the investor's own capital. Conversely, if the value of the underlying asset declines by 50% (to $100), the investor's equity is reduced to zero, a 100% loss of the investor's own capital, while the lender's $100 claim related to the margin loan remains. In other words, a 50% movement in the price of the underlying asset translates into a 100% movement in the investor's equity. The same mechanic operates at any leverage ratio: the higher the leverage, the smaller the price movement required to wipe out, or to double, the investor's equity.[23]

---

[23] U.S. Securities and Exchange Commission, Office of Investor Education and Advocacy, Investor Bulletin: Leveraged Investing Strategies, available at https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/leveraged-investing-strategies-know-risks-using-these-advanced-investment-tools.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

29. Investors may choose to use leverage precisely because of this amplification effect. Borrowing magnifies the potential upside of a successful investment by allowing the investor to control a larger position than his or her own capital would permit. The same mechanic, however, necessarily amplifies the downside: losses are magnified in the same proportion as gains. An investor who chooses to use leverage inherently chooses to accept both sides of that amplification.

30. Because the investor's equity can be eliminated by a sufficiently large adverse price movement in the underlying asset, liquidation is a very common and core feature of margin lending arrangements. The lender's protection in extending a secured loan is the value of the collateral. If the collateral declines in value to the point where the loan is no longer adequately secured, the lender must be able to sell collateral, on a timely basis, in order to recover the outstanding loan balance before the collateral value falls below the amount owed. In a fast-moving market, where collateral values can change rapidly within a single day, this requires the ability to issue margin calls and, if those are not cured, to liquidate collateral promptly. Without that mechanism, the lender would bear the risk of loss from price movements in the underlying asset.

31. Since this structure mitigates credit risk because the lender holds the collateral, secured lending arrangements, including margin lending, typically carry lower interest rates than unsecured credit. It is well established in the finance and lending literature that, all else equal, borrowers who pledge collateral are able to obtain credit at a lower interest rate than borrowers who do not. This is because the existence of collateral, together with the lender's ability to liquidate that collateral on a timely basis, materially reduces the credit risk borne by the lender.[24]

32. Accordingly, the favorable interest rates that are characteristic of margin loans are generally inseparable from the corresponding risk of liquidation. A borrower who obtains the benefit of those terms necessarily accepts the risk that, if the value of the pledged collateral declines,

---

[24] See Efraim Benmelech, Nitish Kumar, and Raghuram Rajan, "Secured Credit Spreads and the Issuance of Secured Debt," NBER Working Paper No. 26799 (Feb. 2020, rev. Dec. 2020) ("firms that pledge more liquid collateral find it easier not only to obtain credit but to obtain it at a reduced interest rate").

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

the lender will exercise its right to liquidate that collateral in order to protect the outstanding loan balance.

33. I am unaware of a margin lending situation where the lender would agree either not to liquidate the collateral if the asset decreases in value or would promise to return the collateral despite the losses. Such a situation would essentially create a "risk-free investment" and does not make economic sense.

### 2.  *Volatility of Bitcoin and Ether*

34. The collateral that Cress pledged on the Nexo platform consisted of Bitcoin (BTC) and Ether (ETH). Both assets are widely understood to be highly volatile, and both have a documented history of significant drawdowns over short periods of time.[25]

35. Even in the period leading up to Cress's deposits on the Nexo platform, BTC and ETH had experienced repeated, large drawdowns. As just one example, between mid-February and mid-March 2020, in the early stages of the COVID-19 market disruption, the price of BTC declined by approximately 60.7% from a high of approximately $10,458 to a low of approximately $4,107 within roughly one month, and the price of ETH declined by approximately 66.8% over the same period.[26] These declines occurred well before any of the conduct alleged in this matter and are illustrative of the type of price volatility that has historically characterized both assets.

36. Cress began transferring digital assets onto the Nexo platform on March 3, 2021 and completed those transfers by approximately April 2, 2021.[27] During that window, BTC traded at daily closing prices ranging from approximately $48,600 to $61,200, levels at or near the then all-time high for BTC. BTC reached a then all-time high of approximately $64,863 on April 14, 2021, only days after Cress completed his transfers.[28] In other words, the period during which Cress acquired his BTC exposure coincided with then record high

---

[25] Prices are sourced from Coin Market Cap historical price data for Bitcoin and Ether.
[26] Based on Coin Market Cap daily price data, Bitcoin traded as high as approximately $10,458 on February 13, 2020 and as low as approximately $4,107 on March 13, 2020, a decline of approximately 60.7%. Ether traded as high as approximately $287 on February 15, 2020 and as low as approximately $95 on March 13, 2020, a decline of approximately 66.8%.
[27] NEXO-0002705.
[28] Based on Coin Market Cap daily price data.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

pricing for the asset, a fact that materially increased the asset's vulnerability to a subsequent decline given its historical volatility.

37.   In fact, following Cress's cryptocurrency transfers into his Nexo wallet, BTC and ETH experienced two further large, market-wide drawdowns that are relevant to the analysis in this matter. First, between mid-April 2021 and late June 2021, BTC declined by approximately 55.5% (from approximately $64,863 to approximately $28,894), and ETH declined by approximately 60.9% over substantially the same window.[29] This is the period during which the vast majority of Cress's liquidations occurred. Second, between the late 2021 cyclical peak and the late 2022 cyclical trough, BTC declined by approximately 77.3% (from approximately $68,790 in November 2021 to approximately $15,599 in November 2022), and ETH declined by approximately 81.7% over substantially the same window.[30]

---

[29] Based on Coin Market Cap daily price data, Bitcoin traded at a high of approximately $64,863 on April 14, 2021 and a low of approximately $28,894 on June 22, 2021, a decline of approximately 55.5%. Ether traded at a high of approximately $4,362 on May 12, 2021 and a low of approximately $1,708 on June 22, 2021, a decline of approximately 60.9%.

[30] Based on Coin Market Cap daily price data, Bitcoin reached a high of approximately $68,790 on November 10, 2021 and a low of approximately $15,599 on November 21, 2022, a decline of approximately 77.3%. Ether reached a high of approximately $4,892 on November 16, 2021 and a low of approximately $896 on June 18, 2022, a decline of approximately 81.7%.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER



38.   Viewed across the full historical period for which daily price data is available, large drawdowns in BTC are not isolated or anomalous events. Of the appropriate eight years from 2019 through 2026, BTC experienced an intra-year peak-to-trough drawdown of at least 30% in seven of those years, and a drawdown of at least 50% in three of those years.[31] On a historical-frequency basis, therefore, large declines in BTC are recurring features of the asset's price history rather than rare or unforeseeable events. ETH has exhibited a similar, and in many periods more pronounced, pattern of large drawdowns.

39.   Taken together, two points emerge from this historical record. First, BTC and ETH are highly volatile assets, and large drawdowns over short periods of time are a recurring feature of their historical price behavior. Second, when this underlying volatility is combined with the use of margin or leverage, as described in the preceding subsection, the resulting risk to the investor's equity is correspondingly amplified. An investor who uses leverage to acquire a position in a highly volatile asset is, by construction, exposed to a meaningful probability of

---

[31] Based on Coin Market Cap historical pricing data using daily high and daily low data.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

liquidation in the event of an adverse price movement, irrespective of the identity or conduct of the particular lender. An experienced, accredited investor should, in my opinion, have been aware of these risks.

## V.    ANALYSIS OF THE MIZRACH REPORT

40.    The Mizrach Report purports to set forth the potential economic damages incurred by Cress for each of the 10 causes of action described above under five calculations. Below is a summary of his five damages calculations, the related amounts, and the associated causes of actions:

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

*Expert Rebuttal Report of Saul Solomon*
*June 5, 2026*

**Table 1.**
**Summary of Damages by Calculation in the Mizrach Report[32]**

| No. | Mizrach Description | Damages Measurement Date | Damages | Prejudgment Interest thru 04/14/2026 | Total |
|---|---|---|---|---|---|
| 1 | Out-of-Pocket Damages | 4/14/2026 | $ 15,800,772.98 | $ 6,442,940.47 | $ 22,243,713.45 |
|  | Related Causes of Action: |  |  |  |  |
|  | Fraudulent Inducement |  |  |  |  |
|  | Unfair Competition under Cal. Bus. & Prof. Code §§ 17200, et seq., |  |  |  |  |
|  | Fraud related to Nexo's Misrepresentation of the Nexo Token |  |  |  |  |
| 2 | Nexo Tokens as Proportion of Purchases | 4/14/2026 | $ 3,851,567.34 | $ 1,570,519.31 | $ 5,422,086.64 |
| 3 | Nexo Tokens USD Damages | 4/16/2021 | $ 1,401,021.00 | $ 563,619.06 | $ 1,964,640.06 |
|  | Related Causes of Action: |  |  |  |  |
|  | Violation of Sections 25110 and 25503 of the California Corporations Code |  |  |  |  |
|  | Fraud related to Nexo's offer and sale of the Nexo Token |  |  |  |  |
| 4 | Damages for Civil Theft | 4/14/2026 | $ 14,317,152.98 | $ 5,837,977.96 | $ 20,155,130.94 |
|  | x3 |  |  |  | 3 |
|  | Total Treble Damages |  |  |  | $ 60,465,392.82 |
|  | Related Causes of Action: |  |  |  |  |
|  | Civil Theft |  |  |  |  |
|  | Violation of Title 18 United States Code section 1962(c) |  |  |  |  |
|  | Violation of Title 18 United States Code section 1962(d) |  |  |  |  |
| 5 | Damages for Omission of Fees | Unclear | $ 14,306,398.00 | $ 5,633,001.00 | $ 19,939,399.00 |
|  | Related Causes of Action: |  |  |  |  |
|  | Fraudulent Omission of Fees |  |  |  |  |
|  | Breach of the Cryptocurrency Purchase Agreement |  |  |  |  |

41.   Out-of-Pocket Damages: Prof. Mizrach begins his calculation of out-of-pocket damages with the quantity of digital assets Plaintiff deposited on the Nexo platform (250.33 BTC and 250 ETH) and he subtracts the BTC Plaintiff retained following the liquidations of his collateral, which consist of 12.31 BTC. He then converts these net asset losses into U.S. dollars using digital asset prices as of April 14, 2026, which totals to $18.2 million. Cress also retained approximately 1.1 million Nexo Tokens. Therefore, Prof. Mizrach deducts $1.7 million in proceeds from NEXO Token sales received by Cress in October 2021, as well as the related statutory 7% compound interest of $705,698 for the period from March 26, 2021 to April 14,

---

[32] Mizrach Report.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

2026, resulting in total deductions of approximately $2.4 million. The resulting difference of $15.8 million is the net economic loss. Finally, he applies the statutory 7% compound interest to the net economic loss of $15.8 million for the period from March 26, 2021 to April 14, 2026 to arrive at prejudgment interest of $6.4 million. Thus, the total out-of-pocket damages as calculated by Prof. Mizrach is $22.2 million.[33]

42. <u>NEXO Tokens as Proportion of Purchases:</u> Of the total digital assets purchased by Cress on the Nexo platform, Prof. Mizrach determined that 24.4% was attributable to NEXO Tokens.[34] Therefore, Prof. Mizrach applied the 24.4% ratio to the total out-of-pocket damages of $22.2 million, as per above, to arrive at economic losses under this methodology of $5.4 million.[35]

43. <u>NEXO Tokens USD Damages:</u> The Mizrach Report presents an alternative transaction-based calculation of losses incurred on the NEXO Token transactions by comparing the dollar value paid for NEXO Tokens totaling $3.1 million to the $1.7 million in proceeds realized upon their disposition, with statutory interest added to the difference of $1.4 million from April 16, 2021 through April 14, 2026.[36] As such, total damages under this approach totals $2.0 million.

44. <u>Damages for Civil Theft:</u> Prof. Mizrach modifies the methodology used in his out-of-pocket calculation for damages related to civil theft by incorporating additional assumptions regarding the propriety of certain liquidation events. Specifically, he adjusts the underlying asset losses to exclude 20 BTC that he concludes would have been liquidated under the applicable loan-to-value threshold ("LTV"). The Mizrach Report then recalculates damages using the same framework described above in the out-of-pocket calculation (conversion to current prices, exclusion of the NEXO Token proceeds, and application of prejudgment interest), yielding adjusted damages of approximately $20.2 million. Prof. Mizrach subsequently applies statutory trebling to these amounts, resulting in total damages of approximately $60.5 million.[37]

---

[33] Mizrach Report, pp. 24-25; table06_out_of_pocket_damages_tables.xlsx.
[34] Calculated as $3,131,686.48/$12,847,514.48 = 24.4%. Mizrach Report, pp. 27-28, Table 7.
[35] Mizrach Report, p. 28.
[36] Mizrach Report, Table 8.
[37] Mizrach Report, pp. 28-29, Table 9.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

45.  Damages for Fraudulent Omission of Fees: For the damages related to the alleged omission of fees, the Mizrach Report first aggregates (i) OTC transaction fees of $171,896, (ii) liquidation fees of $0.5 million, and (iii) the overall decline in Plaintiff's portfolio value between May 19, 2021 and June 23, 2021 of $13.6 million. This summation results in net losses of $14.3 million. Prof. Mizrach then applies prejudgment interest to this combined figure, which yields total damages of approximately $19.9 million.[38] It is unclear why Prof. Mizrach includes the decline in Plaintiff's portfolio value as a component of damages related to the alleged fraudulent omission of fees. Although the Mizrach Report notes that, "for fraud claims, 'plaintiffs may recover out-of-pocket damages in addition to benefit-of-the-bargain damages,'"[39] Prof. Mizrach does not provide any narrative or rationale to explain the inclusion of this damages component and if it is an out-of-pocket or benefit-of-the-bargain damages.

46.  Both the Mizrach Report and my analyses in this report assume that Nexo's liability is established by the trier of fact. I understand that liability is disputed, and I do not offer any opinions on liability or any other legal issue in this matter.

47.  Based upon my review and analysis of the Mizrach Report, and my review and analysis of other relevant documents and information as noted herein, the calculations he has presented of the various economic damages contain a number of errors and are otherwise flawed and speculative. My specific opinions are discussed in detail below.

### A.    Lack of Nexus Between the Allegations and Damages Calculated in the Mizrach Report

48.  Generally, "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event," and "[i]n most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position."[40] One important consideration in a damages analysis is causation, that is, did the defendant's claimed

---

[38] Mizrach Report, p. 30, Table 10.
[39] Mizrach Report, p. 30.
[40] National Research Council. 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press, p. 432.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

wrongful conduct cause the damages allegedly suffered by the plaintiff.[41] Per the AICPA, a plaintiff must prove causation.[42] Other damages treaties also support the principle that "damages must be proximately caused by the wrongful conduct of the defendant."[43] As stated in the *Litigation Services Handbook*, "[t]he damages claim must consider all other material factors that could have affected the plaintiff's financial results, and must develop sufficient evidential support for the nexus between the claimed damages and the defendant's wrongdoings."[44] In other words, any damages analysis should include only the loss caused by the harmful act.[45]

49.    In addition to damages treatises in general, there are also professional organizations that discuss causation. As an example, the AICPA's practice aid *Calculating Lost Profits* states:

> the practitioner should consider whether losses could be associated with unrelated external events or events subsequent to the wrongful act. Practitioners need to attempt to identify the nonviolative facts affecting losses and ensure that the damage analysis identifies and calculates as damages only those losses that are violative within the asserted causes of action.[46]

50.    Despite these well-established principles, Prof. Mizrach does not connect his damages analysis to the specific allegations at issue. Instead, his approach effectively assumes that the liquidation of Plaintiff's positions and the resulting losses should be attributed wholesale to the alleged misconduct, without demonstrating a clear economic link between the two.

51.    First, it is my understanding that Cress himself testified that he intended to invest in cryptocurrency using leverage and that he would have done so irrespective of the misconduct

---

[41] Weil, Roman, et al., *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Chapter 4, p. 3.

[42] Per the AICPA, a plaintiff must prove three elements in a lost profits damages claim: i.) liability; ii.) causation; and iii.) that the lost profits were estimated to a reasonable degree of certainty. AICPA Forensic & Valuation Services Practice Aid: *Calculating Lost Profits*, 2020, pp. 11-16. AICPA Forensic & Valuation Services Practice Aid: *Attaining Reasonable Certainty in Economic Damages Calculations*, 2020, pp. 9-12.

[43] Robert L. Dunn; "Recovery of Damages for Lost Profits;" 6th Edition; Volume 1 §1.1.

[44] Weil, Roman, et al., *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Chapter 4, p. 25.

[45] National Research Council. 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press, p. 432.

[46] AICPA Forensic & Valuation Services Practice Aid: *Calculating Lost Profits*, 2020, p. 17.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

that is now alleged against Nexo.[47] To the extent that is established, it further supports the conclusion that the liquidation losses contained in the Mizrach Report were not caused by the alleged conduct of Nexo. Rather, such market-driven losses were the materialization of the leverage and market risk that Cress had independently chosen to accept. As noted above, leverage inherently introduces sensitivity to price movements and increases the likelihood of liquidation during market downturns. Prof. Mizrach does not evaluate how this independent decision, separate from any alleged claims, contributed to the observed losses, nor does he isolate its effects from the damages calculation.

52.  Second, the claimed damages center largely on losses from the liquidation of Plaintiff's leveraged positions. However, there is no demonstrated nexus showing that the alleged actions of Nexo directly caused those liquidations. For example, transaction-level fees do not, in and of themselves, mechanically trigger liquidation events. Liquidations occur when account equity falls below required thresholds, typically driven by asset price declines in leveraged accounts. As shown in Tables 6 through 9 and discussed in more detail below, even in but-for scenarios in which Nexo charged no fees at all (and either the avoided fees were redeployed into additional asset purchases or applied to reduce the outstanding loan balance), Cress would still have experienced substantial liquidations driven by the May-June 2021 decline in BTC and ETH prices. Similarly, as shown in Tables 12 and 13 below, even in a but-for scenario in which Cress did not purchase any NEXO Tokens at all and instead used the same funds to acquire BTC or ETH, Cress would still have experienced substantial liquidations driven by the market-wide decline during that period. In each of these scenarios, the principal driver of Cress's liquidations is the market decline, not Nexo's fees or the existence of Nexo Tokens. As such, Prof. Mizrach has provided no economic analysis establishing that the fees at issue were the driver of the liquidation outcomes.

53.  Third, the evidence indicates that the liquidation losses are more directly explained by external factors, including the downturn in the cryptocurrency market and the timing of Plaintiff's investments. As discussed above, Plaintiff entered positions near peak market levels (i.e., at or near all-time highs) while using leverage. In such circumstances, subsequent

---

[47] Cress Depo., Pp. 168-170.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

market declines significantly increase the likelihood of liquidation independent of any alleged misconduct. Prof. Mizrach does not disentangle these market-driven effects from the alleged sources of harm.

54. Finally, Prof. Mizrach does not provide a narrative or any analysis that aligns specific categories of alleged misconduct with the purported losses calculated in his report. For instance, it is my understanding that the RICO allegations are related to the fees charged by Nexo. Plaintiff alleges that

> The Nexo Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of maximizing profits by fraudulently concealing commissions, fees, and profits that it takes from its customers in digital asset trades and transactions and the "liquidation" of its customers' digital assets. While the Nexo Enterprise contends that it does not want its customers to be liquidated, it is in fact a hyper-predatory scheme to artificially increase its customers' likelihood of liquidation by taking secret profits on customer transactions, leaving its customers with less digital assets and a higher LTV (and consequentially, higher risk) than they would otherwise have. When its customers are inevitably liquidated it takes additional profits on those transactions.[48]

As such, for these claims, the relevant economic impact would be the amount of fees charged, but the Mizrach Report relies on a modified out-of-pocket analysis as discussed above that is based on Cress's digital assets deposited on the Nexo platform and not the specific fees at issue in the allegations. Similarly, it is also my understanding the Plaintiff's claims of civil theft are also related to the fees charged by Nexo.[49] Again, Prof. Mizrach's damages analysis is based on the lost value of Cress's digital assets deposited on the Nexo platform and not the specific fees alleged to be improper.

---

[48] Second Amended Complaint, p. 38.
[49] Second Amended Complaint, p. 35 ("Nexo induced Plaintiff to deposit his BTC and ETH into Nexo's Credit Line, and subsequently transfer millions of dollars' worth of digital assets to its 'OTC Desk' based on its representations that it did not charge any fees…. Nexo also concealed from Plaintiff that it was taking a fee or 'tax' on liquidations. Once again, it was Nexo's official policy to conceal these secret fees from its customers, including Plaintiff.").

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

55. In sum, Prof. Mizrach's analysis does not establish a coherent connection between the specific allegations and the claimed damages. By failing to isolate the drivers of liquidation, account for market-based factors, and map how specific allegations connect to specific losses, Prof. Mizrach's damages framework does not provide a supported economic nexus between the underlying claims and the losses presented and, thus, cannot be relied upon for the determination of economic losses sustained by Cress.

## B.    Out-Of-Pocket Damages

56. Prof. Mizrach's out-of-pocket damages methodology deviates from accepted financial damages principles in several respects, thereby overstating claimed losses. While the analysis in the Mizrach Report purports to measure the value necessary to restore Plaintiff to his "but-for" position, instead of measuring damages at the loss date, Prof. Mizrach revalues Cress's purported lost digital assets using spot prices as of April 2026, well after the alleged injury period. Damages should ordinarily be measured as of the date of the alleged improper acts. The approach used by Prof. Mizrach effectively transforms a historical loss into a forward-looking investment position and captures subsequent market appreciation unrelated to the alleged conduct. [50] The American Institute of Certified Public Accountants ("AICPA")

---

[50] According to the *Litigation Services Handbook: The Role of the Financial Expert*, in both an ex ante or ex post analysis, the damages should be calculated as of the date of loss and taken forwards or back to the measurement date as appropriate ("*(ii) Measurement Date* The measurement date is the date as of which the expert calculates damages. In the case of an unlawful act that occurs on a single date – the breach of a contract, for instance – the measurement date would be the date of the breach. Some cases have multiple unlawful acts occurring on different dates. For example, one could argue that every time a patent infringer makes, or uses, or offers to sell, or sells an infringing product, the infringer commits a new unlawful act. In this example, an expert applying an ex ante analysis should measure the damages associated with each separate unlawful act on the date that each occurred." (Weil, Roman, et al., *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Chapter 5, p. 5) and "*(iv) Prejudgment Interest* Even though ex post analyses do not discount past lost cash flows, the cash flows should accrue prejudgment interest from the date the plaintiff lost them to the date of recovery (or a proxy for such a date)." (Weil, Roman, et al., *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Chapter 5, p. 9)). It also states the following for Rule 10b-5 cases related to federal securities claims:

> Following a strict interpretation of the term *actual damages* in § 28(a) of the 1934 act and the lead of the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, many courts have adopted the out-of-pocket rule as the traditional measure of damages in Rule l0b-5 cases.

> The out-of-pocket measure rule defines damages as "the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or, in

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Practice Aid on *Attaining Reasonable Certainty in Economic Damages Calculations* emphasizes that damages must be "anchored in facts, make use of sound methodologies, and yield reasonable results," and that the objective is to avoid analyses driven by speculation or hindsight.[51] By selecting a current valuation date, Prof. Mizrach attributes later market movements, including broad cryptocurrency price increases, to Nexo's misconduct, rather than isolating damages caused by the alleged wrongdoing.

57.    There is also a fundamental disconnect between Prof. Mizrach's use of a current measurement date (April 14, 2026) and his application of prejudgment interest ("PJI"), which results in a double recovery. It is my understanding that prejudgment interest is intended to compensate a claimant for the time value of money between the date of the alleged wrongful conduct that causes the loss and the date of judgment. However, where damages are already measured at a current valuation date (i.e., where the award reflects the present-value or present-market pricing), there is no timing gap to bridge, and the application of additional interest inflates the award. In this case, Prof. Mizrach effectively applies both: (i) a current-value measurement that already incorporates the passage of time through updated crypto prices, and (ii) a separate 7% prejudgment interest calculation over the same period. This combination violates basic damages principles and results in an overstatement of potential economic losses of at least $6.4 million.[52]

---

other words, the difference between the amount parted with and the value of the thing received." Typically, courts measure this as the plaintiff's purchase price less the true value at the time of the transaction. The true value is the price of the security in the absence of fraud or misrepresentation (see Section 27.4(b) of this chapter). Strictly applied, the out-of-pocket rule does not permit damages that depend on increases or decreases in the security's price during the plaintiff's class period (i.e., from the date of the fraud to its disclosure) because the plaintiff agrees to bear market risk by undertaking the transaction (Weil, Roman, et al., *Litigation Services Handbook: The Role of the Financial Expert*, Sixth Edition, Chapter 27, p. 6).

[51] AICPA Forensic & Valuation Services Practice Aid: *Attaining Reasonable Certainty in Economic Damages Calculations*, 2020, pp. 12-15.
[52] Mizrach Report, Table 6.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

### C.    NEXO Tokens as Proportion of Purchases

58.    This damages analysis in the Mizrach Report is also fundamentally flawed because it relies on an inappropriate out-of-pocket framework that is inconsistent with the economic reality of the transactions. The record indicates that NEXO Tokens were acquired using loan proceeds, not Cress's own capital or the digital assets he transferred into his Nexo wallet. By treating loan-funded acquisitions as if they were funded by the cryptocurrency Cress transferred into his Nexo wallet, Prof. Mizrach's approach is contrary to the facts of the case and produces a measure of loss that does not correspond to Cress's true economic exposure for the NEXO Tokens.

59.    Prof. Mizrach's methodology also relies on his out-of-pocket calculations and therefore inherits all of its shortcomings. As discussed above, that model improperly relies on current market prices (hindsight), fails to measure losses as of the date of the alleged improper acts, ignores causation by attributing broader market movements to Nexo, and produces an overstatement of potential economic damages when combined with prejudgment interest. In short, the proportional NEXO Token damages are not a standalone, reliable methodology and should not be relied upon for the determination of Cress's losses, if any, related to the NEXO Tokens.

### D.    NEXO Tokens USD Damages

60.    Prof. Mizrach's NEXO token USD damages calculation is methodologically unreliable because it applies a single aggregate approach to calculate PJI rather than calculating interest at the transaction level, which is required to properly reflect the time value of money. A transaction-level approach is necessary because each alleged purchase occurred at a different point in time, and therefore each cash flow would accrue (or not accrue) interest over a distinct period. By applying PJI to an aggregated damages figure, the Mizrach Report ignores the timing of individual transactions and implicitly assumes all losses were incurred simultaneously. This creates a mismatch between the actual economic timing of events and the damages calculation, overstating the purported losses.

61.    In addition, Prof. Mizrach's calculation fails to account for the economic benefits received by Cress through the use of loan proceeds, specifically the effective benefit from reduced or

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

avoided interest costs associated with the Nexo platform. As Prof. Mizrach states in his report:[53]

> I further understand that Nexo advertised that purchasing the NEXO Token would provide Mr. Cress certain benefits from the exchange including lower interest rates. After Cress's first purchase of NEXO tokens his interest rate does fall from a daily 0.0247% to 0.0164%, saving him about $830 per day in daily interest.

Any proper damages framework must consider both alleged losses and offsetting benefits to determine the net harm. By omitting the benefit of financing derived directly from the NEXO Tokens, such as interest savings or preferential borrowing terms tied to holding NEXO tokens, Prof. Mizrach presents a one-sided analysis that captures only the alleged downside while ignoring the corresponding upside, which results in an overstatement of the economic damages.

### E.     Damages for Civil Theft

62. Similar to his out-of-pocket calculations, Prof. Mizrach's civil theft damages calculation is unreliable because it reflects a fundamental disconnect between his measurement date and his application of PJI, resulting in an internally inconsistent and overstated damages figure. In his analysis, Prof. Mizrach values the allegedly lost cryptocurrency amounts using a current point-in-time price (as opposed to as of the date of the alleged wrongful conduct), while also applying PJI from an earlier alleged loss date. This approach measures the potential loss as of the wrong date and improperly compensates the same passage of time twice - once through the use of updated asset values and again through the addition of interest.

63. In addition, Prof. Mizrach's calculation improperly assumes, without evidentiary support, that Cress would have held the cryptocurrencies continuously through the alleged damages period and into the current valuation date. There is no analysis demonstrating that the claimant would have maintained those positions despite significant market volatility and declines in 2021 and 2022, particularly in digital asset markets, that would likely necessitate

---

[53] Mizrach Report, p. 21.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

further liquidations. Below is a summary of the daily price of BTC from March 2021 through April 2026:

**Table 2.**
**Daily Price of Bitcoin, March 2021 through April 2026[54]**



As shown above, the price of BTC experienced deterioration that was even more severe in 2022 than in 2021 when Prof. Mizrach's approach indicated that Cress would have had some liquidations. Thus, the assumption of continuous holding functions as a "but-for" scenario that is neither tested nor corroborated by historical market conditions. By failing to consider alternative, economically plausible scenarios, such as liquidation during a declining market,

---

[54] Closing prices per Coin Market Cap.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

Prof. Mizrach's model effectively builds damages on hindsight rather than contemporaneous reality and is therefore speculative and unreliable.

### F.    Damages for Fraudulent Omission of Fees

64.    As with the NEXO token USD damages calculation, the Mizrach Report's calculation related to the alleged omission of fees by Nexo is unreliable due to its treatment of PJI, which again is applied at an aggregate level rather than on a transaction-by-transaction basis. Because each transaction occurs at a different point in time, each associated fee would accrue (or not accrue) PJI differently. A reliable methodology requires PJI to be calculated at the individual transaction level to accurately reflect timing.

65.    In addition, similar to his out-of-pocket and other damages calculations, Prof. Mizrach again relies on current digital asset prices as of April 14, 2026, rather than measuring losses as of the dates on which the alleged harm occurred. Specifically, in calculating the amount of liquidation fees, Prof. Mizrach uses the pricing as of April 14, 2026. This approach is inconsistent with accepted damages principles, which require that losses be measured at a point in time that reflects the economic impact of the alleged wrongdoing. As noted above, by using current values, Prof. Mizrach effectively attributes later market-wide fluctuations to Nexo's alleged conduct.

66.    More fundamentally, the largest component of the damages for omission of fees ($13.6 million out of $14.3 million before PJI) is related to the change in Plaintiff's portfolio value between May 19, 2021 and June 23, 2021. The inclusion of Prof. Mizrach's portfolio change calculation as damages is unsound because it fails to account for the impact of declining market prices during that period, which is not a result of any alleged misconduct of Nexo. For example, in an Excel file of the data relied upon by Prof. Mizrach that reflects BTC prices,[55] the May 19, 2021 price of BTC was $43,091.04 while the June 23, 2021 price was $32,507.74, a decline of approximately 25%.[56]

---

[55] Btc-usd.xlsx.
[56] ($32,507.74 minus $43,091.04) / $43,091.04 = 25%.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

67. Furthermore, Prof. Mizrach's analysis also fails to consider that Cress used loan proceeds to acquire many of the assets he had in his portfolio as of May 19, 2021. As such, the liquidation of those assets resulted in the benefit received through loan repayment. Any damages framework must assess net economic impact, including both alleged losses and offsetting benefits. Here, repayment of loan balances (whether through liquidation or collateral application) reduces liabilities and therefore confers a financial benefit to Plaintiff that the Mizrach Report completely disregards. By focusing solely on changes in portfolio value without recognizing the corresponding reduction in debt, Prof. Mizrach has improperly overstated Cress's potential economic losses.

68. Taken together, Prof. Mizrach's damages calculation is erroneous, internally inconsistent, and biased toward overstating damages. A reliable analysis must incorporate all relevant cash flows, measure potential damages as of the date of the alleged improper acts, isolate and remove the impact of changed market factors unrelated to the claims asserted by Cress, and apply consistent time-value principles, none of which Prof. Mizrach's model considers.

### G.    Prejudgment Interest

69. The Mizrach Report calculates PJI using a 7% compound interest rate; however, it is my understanding that the applicable standard calls for the application of 7% simple interest. If PJI is properly calculated on a simple (rather than compound) basis, the amounts reported in the Mizrach Report would be overstated. Because the use of compound interest results in the application of "interest on interest" over time, it materially inflates the measure of damages relative to a simple interest framework. Accordingly, Prof. Mizrach's PJI calculations and, by extension, his total damages figures are overstated and unreliable.

## VI.    ALTERNATIVE CALCULATIONS

70. I have been asked to perform alternative damages calculations assuming liability on the part of Nexo, which I understand Nexo disputes. If liability is not found against Nexo for the claims asserted by Cress in this matter, there are no damages. Below is a description of each calculation.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

### A.    Out-Of-Pocket Damages

71.    According to the Mizrach Report, Prof. Mizrach understood that "Plaintiff is entitled to return of the assets lost on the Nexo platform."[57] He goes on to further note that, "Under the out-of-pocket measure, a plaintiff may receive damages sufficient to make him whole, or in other words, to restore him to the financial position he held prior to the fraudulent transaction."[58] Prof. Mizrach fails to explain or identify the specific acts that he considered to be the "fraudulent transaction." As noted above, he does not measure the losses sustained by Cress as of the date of any alleged improper acts but rather improperly uses a current date to do so. As such, I have calculated potential out-of-pocket damages as of three measurement dates: (i) the dates Cress's collateral assets (250.33 BTC and 250 ETH) were deposited into his Nexo wallet; (ii) the dates on which those collateral assets were liquidated; and (iii) as of April 14, 2026.

### 1.    *Measurement Date as of the Deposit Date*

72.    To the extent that it is asserted that Cress would not have transferred any assets to Nexo, the dates Cress's digital assets were deposited into his Nexo wallet (March 3, 2021 through April 2, 2021) are the proper dates of potential loss measurement. Using the average price from Coin Market Cap for each deposit date, I determined that the total amount contributed by Cress is $13.5 million. The related prejudgment interest from the deposit dates to April 14, 2026 is calculated using a 7% simple interest, resulting in PJI of $4.8 million. Thus, the subtotal of the total amount contributed by Cress and PJI is $18.2 million as of April 14, 2026.[59]

73.    Then, I reduced the $18.2 million by the $1.7 million received by Cress from the sale of his NEXO Tokens in October 2021.[60] Since Cress received this amount in October 2021, I also calculated the PJI related to this amount using the same approach because Cress would have use of these funds prior to April 14, 2026, resulting in total deductions of $2.3 million related to the October 2021 sale of NEXO Tokens.

---

[57] Mizrach Report, p. 24.
[58] Mizrach Report, p. 24.
[59] Slight difference due to rounding.
[60] CRESS-00000659.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

74.    Lastly, I further reduce the loss amount by the April 14, 2026 value of the 12.73 BTC that Cress currently holds,[61] which totals $1.0 million.

75.    As such, Cress's out-of-pocket damages based on the deposit dates are $10.8 million with PJI totaling $4.2 million, which equals to total potential damages amount of $15.0 million as of April 14, 2026, as summarized below.

**Table 3.**
**Alternative Calculation: Out-of-Pocket Damages based on the Deposit Dates[62]**

| Description | Damages | | PJI thru April 14, 2026 | | Total | |
|---|---|---|---|---|---|---|
| Assets Deposited | $ | 13,456,170 | $ | 4,784,227 | $ | 18,240,397 |
| Nexo Token Proceeds | | (1,730,666) | | (542,754) | | (2,273,420) |
| 12.73 BTC Holdings | | (954,437) | | - | | (954,437) |
| **Total** | $ | **10,771,068** | $ | **4,241,472** | $ | **15,012,540** |

76.    I note that this amount is $7.2 million less than the $22.2 million asserted in the Mizrach Report.

### 2.    *Measurement Date as of the Liquidation Date*

77.    From a financial and accounting perspective, the act of depositing digital assets into a Nexo wallet did not preclude Cress from accessing those assets. As such, it can be argued that he did not "lose" those collateral assets until they were liquidated from the Nexo wallet. I also note that Cress alleges that the liquidations that did occur were improper. Accordingly, as an alternative, I have calculated Cress's out-of-pocket damages based on the liquidation dates. For purposes of this analysis, I have relied on a first-in-first-out ("FIFO") approach, which assumes that the first assets contributed/obtained in the Nexo wallet are the first assets sold. As such, Cress's contributed 250.33 BTC and 250 ETH are the first assets sold in Cress's

---

[61] As of September 5, 2024, Cress's Nexo wallet has 10.13 BTC after he withdrew 2.60 BTC on January 6, 2022 (NEXO-0002705). As such, I have assumed that Cress has at least 12.73 BTC as of April 14, 2026. To the extent that Cress earned additional interest on the 10.13 BTC remaining in his Nexo wallet as of September 5, 2024, the incremental interest would further decrease any asserted economic damages. I note that Prof. Mizrach assumes that Cress currently holds 12.31 BTC based on Cress's holdings as of January 5, 2022 (Mizrach Report, p. 24; NEXO-0002705).
[62] Schedule 1.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

historical liquidation transactions of BTC and ETH. This approach is conservative since the first assets sold in a market of declining prices will generally realize higher prices.

78. The methodology remains exactly the same as my calculation for out-of-pocket damages based on the deposit dates. The only thing that has changed is the dates of loss, which are based on the actual liquidation dates between May 2021 and June 2021. Based on the foregoing, Cress's out-of-pocket damages based on the liquidation dates are $5.8 million with PJI totaling $2.3 million, which equals to total damages of $8.1 million as of April 14, 2026, as summarized below.

**Table 4.**
**Alternative Calculation: Out-of-Pocket Damages based on the Liquidation Dates[63]**

| Description | Damages | PJI thru April 14, 2026 | Total |
|---|---|---|---|
| Assets Liquidated | $ 8,520,240 | $ 2,874,333 | $ 11,394,573 |
| Nexo Token Proceeds | (1,730,666) | (542,754) | (2,273,420) |
| 12.73 BTC Holdings | (954,437) | - | (954,437) |
| **Total** | **$ 5,835,137** | **$ 2,331,579** | **$ 8,166,716** |

79. I note that this amount is $14.1 million less than the $22.2 million asserted in the Mizrach Report.

### 3.    *Measurement Date as of April 14, 2026*

80. Alternatively, I have measured Cress's losses and his potential out-of-pocket damages as of the current date, consistent with Prof. Mizrach's analysis. As noted, I do not believe this measurement date is appropriate for the reasons noted above, however I am presenting this analysis as a means to correct for other errors noted in Mizrach's analysis. I have relied on the April 14, 2026 values. However, the $1.7 million in proceeds received by Cress from the sale of his NEXO Tokens in October 2021 would still have related PJI since Cress would have access to those funds prior to April 14, 2026. Thus, Cress's out-of-pocket damages based on a measurement date of April 14, 2026 are $16.1 million, which is $6.1 million less than the $22.2 million asserted in the Mizrach Report, as summarized below.

---

[63] Schedule 2.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

**Table 5.**
**Alternative Calculation: Out-of-Pocket Damages as of April 14, 2026[64]**

| Description | Damages | PJI thru April 14, 2026 | Total |
|---|---|---|---|
| Assets Deposited | $ 19,356,870 | $ - | $ 19,356,870 |
| Nexo Token Proceeds | (1,730,666) | (542,754) | (2,273,420) |
| 12.73 BTC Holdings | (954,437) | - | (954,437) |
| **Total** | **$ 16,671,768** | **$ (542,754)** | **$ 16,129,013** |

**B.     But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized for Asset Purchases**

81.  As noted above, a damages analysis requires translating the alleged harmful event into its economic impact by generally comparing the plaintiff's actual financial position to the position that would have existed absent the event. Central to this analysis is determining whether, and to what extent, the alleged conduct is responsible for the claimed losses. Authoritative guidance emphasizes that damages must be limited to those caused by the conduct at issue and must account for other material factors that could have affected outcomes. Accordingly, a sound analysis must identify and exclude losses attributable to external or unrelated factors, and must clearly establish a supported nexus between the alleged conduct and the specific damages claimed, rather than attributing all observed losses to the conduct without such differentiation. Therefore, a damages analysis commonly involves the evaluation of the financial position of the plaintiff in the "but-for" world (i.e., a hypothetical scenario where the alleged wrongful act(s) did not occur, also referred to as the counterfactual world) and the actual world.[65] A properly constructed but-for scenario and accurate evaluation of the plaintiff's financial position in this hypothetical situation can isolate the damages caused by the alleged harmful act (as opposed to other factors).[66]

82.  In this matter, it is asserted that Nexo improperly charged OTC fees and that, but for those fees, Plaintiff would have avoided certain liquidations or experienced fewer losses. To

---

[64] Schedule 3.

[65] National Research Council. 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press, p. 429.

[66] National Research Council. 2011. Reference Manual on Scientific Evidence: Third Edition. Washington, DC: The National Academies Press, p. 432.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

evaluate this assertion, I constructed a but-for scenario titled "But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized for Asset Purchases." In this scenario, I removed all OTC fees from Plaintiff's transactions and assumed that the amount that was paid as fees were instead available to purchase additional digital assets on the same dates as the original transactions. These incremental asset purchases were added to Plaintiff's portfolio and included in subsequent calculations.

83.    I then recalculated Plaintiff's loan-to-value ("LTV") ratio over time using contemporaneous pricing data sourced from Coin Market Cap. Specifically, I valued the collateral portfolio using the daily low price for each digital asset. I understand that LTV levels are monitored continuously and automatically on the Nexo platform. As a result, using the daily low price is a reasonable proxy for the intraday price dynamics, as it reflects that, at some point during the trading day, the collateral would have been valued at or near that level for purposes of evaluating LTV thresholds. In this manner, the but-for analysis captures the economic effect of intra-day market volatility on collateral values and liquidation risk.

84.    Where the recalculated LTV exceeded the assumed liquidation threshold of 83.3%, I simulated liquidation events consistent with Nexo's general practices, but only to the extent necessary to restore the LTV to the threshold. This establishes a minimal liquidation framework, in which only the amount of assets required to cure the LTV breach is liquidated, rather than assuming full or excessive liquidation. In these simulated liquidations, I applied average daily prices (based on Coin Market Cap data)[67] as the execution price for asset sales and corresponding loan repayments. No fees or additional charges were included in the but-for liquidation process, consistent with the premise that such fees would not have been imposed in the counterfactual scenario.

85.    This approach isolates the effect of the alleged wrongful conduct (i.e., the existence of Nexo's fees) by comparing (i) a but-for world in which those fees did not exist and incremental capital was deployed into additional assets to (ii) the actual world in which fees reduced available collateral and allegedly increased the likelihood of liquidation. By

---

[67] The average daily prices are calculated as the average of the high and low prices for that day.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

recalculating LTV under historical market conditions while modifying only the treatment of fees, this methodology provides a direct assessment of whether, and to what extent, those fees caused additional liquidations or economic loss.

86.   Under this scenario, as of the end of June 23, 2021, the date on which Prof. Mizrach calculates the diminution in Plaintiff's portfolio value between May 19, 2021 and June 23, 2021 for his damages calculation related to the alleged fraudulent omission of fees by Nexo, Cress would have had $10.6 million in total assets but also $7.5 million in outstanding loan principal and accrued interest, resulting in a net economic position of $3.1 million. In other words, as of June 23, 2021, Cress's potential economic damages would be only $3.1 million at most. However, once the October 2021 NEXO Token sales proceeds and Cress's 12.73 BTC holdings are considered, as well as PJI based on a 7% simple interest rate, Plaintiff's total damages using a measurement date of June 23, 2021 is $0.9 million, consisting of $0.4 million in net economic losses and $0.5 million in PJI, as summarized below.

**Table 6.**
**Alternative Calculation: But-For World in which Nexo did not Charge Fees and Excess Amounts are Utilized for Asset Purchases (as of June 23, 2021)[68]**

| Description | Damages | PJI thru April 14, 2026 | Total |
|---|---|---|---|
| Loan Balance | $ 7,496,642 | | |
| Asset Balance (USD) | 10,590,740 | | |
| Value of Net Holdings as of June 23, 2021 | 3,094,097 | | |
| PJI (June 23, 2021 - Oct. 21, 2021) | | $ 71,207 | $ 71,207 |
| Nexo Token Proceeds | (1,730,666) | | |
| Subtotal | 1,363,432 | 427,586 | 1,791,018 |
| 12.73 BTC Holdings | (954,437) | - | (954,437) |
| **Total** | **$ 408,995** | **$ 498,793** | **$ 907,788** |

87.   However, as noted above, digital assets continued to experience significant volatility and experienced a precipitous decline in its market prices in 2022. Therefore, when I consider the counterfactual scenario through 2022, Cress would have to essentially liquidate nearly all remaining assets by June 2022 due to the severe decline in the market. Therefore, when I

---

[68] Schedule 4.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

evaluate damages based on this scenario through April 14, 2026, Cress actually received a net benefit of $0.7 million after consideration of his current holdings of 12.73 BTC, as summarized below.[69]

**Table 7.**
**Alternative Calculation: But-For World in which Nexo did not Charge Fees and Excess Amounts are Utilized for Asset Purchases (as of April 14, 2026)[70]**

| Description | Damages / (Net Benefit) |
|---|---|
| Loan Balance | $        96,199 |
| Asset Balance (USD) | 405,628 |
| Value of Net Holdings as of April 14, 2026 | 309,429 |
| 12.73 BTC Holdings | (954,437) |
| **Total Damages / (Net Benefit)** | **$       (645,007)** |

### C.    But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized to Reduce the Loan Balance

88.    I evaluated an alternative but-for scenario in which OTC fees are removed, consistent with the methodology described above, but instead of reinvesting those avoided fees into additional asset purchases, I assume that those amounts would have been used to pay down Plaintiff's outstanding loan balance. All other aspects of the analysis, including the use of Coin Market Cap data, the application of daily low prices for collateral valuation, the continuous monitoring of LTV, and the simulation of liquidation events only when the LTV exceeds the 83.3% threshold, remain unchanged from the previously described framework.

89.    Under this scenario, as of June 23, 2021, Plaintiff would have held approximately $10.6 million in total assets and $7.5 million in outstanding loan principal and accrued interest, resulting in a net economic position of approximately $3.1 million. Accordingly, the potential damages attributable to the alleged imposition of fees would be limited to approximately $3.1 million at most. However, once the October 2021 Nexo Token sales proceeds and Cress's 12.73 BTC holdings are considered, as well as PJI, Plaintiff's total

---

[69] This scenario does not consider the October 2021 Nexo Token sales proceeds because it is assumed to have occurred in the counterfactual world as well.
[70] Schedule 4.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

damages using a measurement date of June 23, 2021 is $0.9 million, consisting of $0.4 million in net economic losses and $0.5 million in PJI, as summarized below.

**Table 8.**
**Alternative Calculation: But-For World in which Nexo did not Charge Fees and Excess Amounts are Utilized to Reduce the Loan Balance (as of June 23, 2021)[71]**

| Description | Damages | PJI thru April 14, 2026 | Total |
|---|---|---|---|
| Loan Balance | $ 7,543,265 | | |
| Asset Balance (USD) | 10,648,232 | | |
| Value of Net Holdings as of June 23, 2021 | 3,104,967 | | |
| PJI (June 23, 2021 - Oct. 21, 2021) | | $ 71,457 | $ 71,457 |
| Nexo Token Proceeds | (1,730,666) | | |
| Subtotal | 1,374,301 | 430,995 | 1,805,296 |
| 12.73 BTC Holdings | (954,437) | | (954,437) |
| **Total** | **$ 419,864** | **$ 502,452** | **$ 922,316** |

90. Extending this analysis through the subsequent period of market volatility in 2022, the decline in digital asset prices would again have materially impaired the collateral value of the portfolio. Even under the but-for condition of reduced loan balances, I find that Plaintiff would ultimately be required to liquidate substantially all remaining assets by mid-2022 due to the severity of market-wide declines. As a result, when the analysis is extended through April 14, 2026, Plaintiff would realize a net economic benefit of approximately $0.7 million, after accounting for remaining holdings of approximately 12.73 BTC, as summarized below.[72]

---

[71] Schedule 5.

[72] This scenario does not consider the October 2021 Nexo Token sales proceeds because it is assumed to have occurred in the counterfactual world as well.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

**Table 9.**
**Alternative Calculation: But-For World in which Nexo did not Charge Fees and Excess Amounts are Utilized to Reduce the Loan Balance (as of April 14, 2026)[73]**

| Description | Damages / (Net Benefit) |
|---|---|
| Loan Balance | $ 99,919 |
| Asset Balance (USD) | 421,314 |
| Value of Net Holdings as of April 14, 2026 | 321,395 |
| 12.73 BTC Holdings | (954,437) |
| **Total Damages / (Net Benefit)** | **$ (633,042)** |

### D.    But-For World in which No Liquidations Occur

91.    As noted above, a core issue of Nexo's alleged misconduct is the liquidation of Cress's assets to cure defaults to the LTV threshold. Therefore, to further evaluate the impact of these alleged improper liquidations, I constructed an alternative but-for scenario in which no liquidations occur, and instead Plaintiff's outstanding loan balance is permitted to remain in place and accrue interest through April 14, 2026. This scenario isolates the economic effect of liquidation events by comparing outcomes where collateral is preserved, but debt obligations increase over time. However, as discussed above, borrowers who benefit from secured margin loans inherently accept the risk that a decline in the value of pledged collateral may trigger the lender's right to liquidate such collateral to protect the outstanding loan balance, a key feature of these arrangements. Absent this mechanism, the investor would effectively obtain a risk-free investment, rendering the counterfactual economically unrealistic.

92.    I perform this analysis under two scenarios. In Scenario 1, the only difference between this scenario and the actual transaction history is that I do not simulate any liquidation events, regardless of whether the LTV ratio exceeds the assumed threshold of 83.3%. Instead, the collateral portfolio is held constant (subject only to market price fluctuations and interest earned), and the loan balance is allowed to grow based on accrued interest over time, reflecting the contractual borrowing structure.

---

[73] Schedule 5.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

93. Interest on the outstanding loan is calculated continuously from the relevant borrowing dates through April 14, 2026, using the applicable borrowing rates. This approach reflects the economic tradeoff between liquidation and leverage, specifically, that avoiding liquidation preserves asset exposure but increases debt obligations through compounding interest.

94. Under this scenario, Plaintiff retains full exposure to the volatility of the digital asset market, including both upward and downward price movements. However, the absence of liquidation events eliminates any forced asset sales at potentially unfavorable prices, while simultaneously allowing the loan balance to increase over time. As a result, Plaintiff's net economic position at any point in time reflects the combined effect of portfolio market value and accumulated loan obligations, rather than the realized outcomes associated with forced liquidation.

95. As of April 14, 2026, Plaintiff's net economic position under this scenario is approximately $11.0 million, reflecting total asset values of $32.3 million offset by an outstanding loan balance (inclusive of accrued interest) of $21.2 million.[74] After consideration of Cress's 12.73 in BTC holdings, the total damages are $10.1 million, as summarized below.[75]

**Table 10.**
**Alternative Calculation: But-For World in which there is No Liquidation of Cress' Assets to Reduce the Loan Balance (Scenario 1)[76]**

| Description | Damages / (Net Benefit) |
|---|---|
| Loan Balance | $    21,223,085 |
| Asset Balance (USD) | 32,251,022 |
| Value of Net Holdings as of April 14, 2026 | 11,027,937 |
| 12.73 BTC Holdings | (954,437) |
| **Total Damages / (Net Benefit)** | **$    10,073,501** |

96. In Scenario 2, the only difference between this scenario and the actual transaction history is that I do not simulate any liquidation events, regardless of whether the LTV ratio exceeds

---

[74] Slight difference due to rounding.

[75] This scenario does not consider the October 2021 Nexo Token sales proceeds because it is assumed to have occurred in the counterfactual world as well.

[76] Schedule 6.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

the assumed threshold of 83.3%, and I removed all OTC fees from Plaintiff's transactions and assumed that the amount that was paid as fees were instead available to purchase additional digital assets on the same dates as the original transactions. All other assumptions remain the same as Scenario 1.

97.    As of April 14, 2026, Plaintiff's net economic position under this scenario is approximately $11.2 million, reflecting total asset values of $32.4 million offset by an outstanding loan balance (inclusive of accrued interest) of $21.2 million. After consideration of Cress's 12.73 in BTC holdings, the total damages are $10.2 million, as summarized below.[77]

**Table 11.**
**Alternative Calculation: But-For World in which there is No Liquidation of Cress' Assets to Reduce the Loan Balance and No OTC Fees (Scenario 2)[78]**

| Description | Damages / (Net Benefit) |
|---|---|
| Loan Balance | $    21,223,085 |
| Asset Balance (USD) | 32,380,817 |
| Value of Net Holdings as of April 14, 2026 | 11,157,733 |
| 12.73 BTC Holdings | (954,437) |
| **Total Damages / (Net Benefit)** | **$    10,203,296** |

### E.    But-For World in which No NEXO Token Transactions Occur

98.    Cress alleges that "Nexo also lied to Plaintiff to induce him to purchase its own NEXO Token…. by representing that 'the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals with American citizens who are also certified, accredited investors,'" although Cress asserts that the Nexo Token was not registered with the SEC.[79] To evaluate the economic impact of this allegation, I constructed

---

[77] This scenario does not consider the October 2021 Nexo Token sales proceeds because it is assumed to have occurred in the counterfactual world as well.
[78] Schedule 7.
[79] Second Amended Complaint, p. 21.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

a but-for scenario in which Plaintiff did not purchase NEXO Tokens, and instead used the same funds to acquire alternative digital assets.

99. This scenario relies on the same framework and methodology described above, including the use of Coin Market Cap pricing data, the application of daily low prices for collateral valuation, continuous monitoring of LTV, and the modeling of liquidation events only where LTV exceeds the 83.3% threshold. The only modification to the framework is that, in place of NEXO Token purchases, I assume the funds were used to acquire other digital assets (e.g., BTC or ETH) on the same dates as the original transactions. These substitute assets are then incorporated into Plaintiff's portfolio and tracked through time in the same manner as the rest of the analysis. In addition, the interest rate related to the loan balance will accrue at the non-preferred rate.

100. Under this scenario, as of June 23, 2021, Plaintiff would have held approximately $11.3 million in total assets and $8.2 million in outstanding loan principal and accrued interest, resulting in a net economic position of approximately $3.1 million. Accordingly, the potential damages attributable to the alleged purchase of NEXO Tokens would be approximately $3.1 million at most. However, once the October 2021 NEXO Token sales proceeds and Cress's 12.73 BTC holdings are considered, as well as PJI, Plaintiff's total damages using a measurement date of June 23, 2021 is $0.9 million, consisting of $0.4 million in net economic losses and $0.5 million in PJI, as summarized below.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

**Table 12.**
**Alternative Calculation: But-For World in which there are no Nexo Token Transactions**
**(as of June 23, 2021)[80]**

| Description | | Damages | PJI thru April 14, 2026 | | Total |
|---|---|---|---|---|---|
| Loan Balance | $ | 8,186,282 | | | |
| Asset Balance (USD) | | 11,309,249 | | | |
| Value of Net Holdings as of June 23, 2021 | | 3,122,967 | | | |
| PJI (June 23, 2021 - Oct. 21, 2021) | | | $ | 71,871 | $ | 71,871 |
| Nexo Token Proceeds | | (1,730,666) | | | |
| Subtotal | | 1,392,301 | | 436,640 | 1,828,941 |
| 12.73 BTC Holdings | | (954,437) | | | (954,437) |
| **Total** | $ | **437,864** | $ | **508,511** | $ | **946,375** |

101. Extending the analysis through the broader market decline in 2022, I find that while substituting alternative digital assets may affect the timing and severity of liquidations, Plaintiff would nevertheless have been exposed to significant market-wide declines in digital asset prices. As a result, even under this but-for scenario, Plaintiff would have experienced substantial reductions in collateral value and would ultimately be required to liquidate a significant portion of his holdings. When evaluated through April 14, 2026, the resulting net damages (or benefits) are approximately $0.5 million, as summarized below.

**Table 13.**
**Alternative Calculation: But-For World in which there are no Nexo Token Transactions**
**(as of April 14, 2026)[81]**

| Description | | Damages / (Net Benefit) |
|---|---|---|
| Loan Balance | $ | 193,741 |
| Asset Balance (USD) | | 623,735 |
| Value of Net Holdings as of April 14, 2026 | | 429,994 |
| 12.73 BTC Holdings | | (954,437) |
| **Total Damages / (Net Benefit)** | $ | **(524,443)** |

---

[80] Schedule 8.
[81] Schedule 8.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

### F.    Damages Related to OTC Fees

102. Cress asserts that Nexo's OTC fees caused his OTC transactions to be "at a significantly higher price than Plaintiff could have acquired them himself using a retail exchange and [Nexo] took substantial undisclosed profits on these transactions at Plaintiff's expense."[82] One method to evaluate this claim is to compare the execution prices of Plaintiff's OTC transactions to observable market price ranges on the same trading dates.

103. To perform this analysis, I obtained daily low and high market prices for the relevant digital assets from Coin Market Cap. For each OTC transaction, I compared the actual transaction price, inclusive of fees, and the implied price excluding fees, to the corresponding daily low-high range. This comparison provides a benchmark for determining whether the executed transaction prices fall within a reasonable range of contemporaneous market activity.

104. Where the transaction price falls within the daily low–high range, I have not identified any economic harm attributable to execution pricing or embedded fees, as the trade occurred within the observable market bounds for that day. However, for transactions where the actual price or the implied price excluding fees falls outside the daily range, I quantify the economic impact by measuring the extent to which the price exceeds (or falls below) the daily high (or low). Specifically, for such transactions, I calculate net damages (or net benefits) as the product of (i) the difference between the actual or implied transaction price and the nearest bound of the daily price range, and (ii) the quantity of units transacted on that date. This framework captures both instances of alleged overpayment and situations where Plaintiff obtained a price more favorable than the daily observed range.

105. This methodology also enables a direct evaluation of the impact of OTC fees by comparing transaction prices with and without fees relative to the market range. In doing so, it isolates whether fees materially caused transactions to occur outside reasonable market pricing.

---

[82] Second Amended Complaint, p. 14.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

106. Finally, I calculate PJI on any identified net damages using the corrected methodology (i.e., 7% simple interest). As with the underlying damages calculation, interest is applied at the transaction level consistent with the timing of each trade.

107. Based on this approach, the total damages related to OTC fees are $12,932, consisting of $9,562 related to net overpayment of fees and $3,371 in PJI from the transaction date to April 14, 2026 based on actual transaction prices and a net benefit of $5,333, consisting of $3,958 related to an underpayment when excluding fees and $1,375 in PJI from the transaction date to April 14, 2026 based on implied prices excluding fees, as summarized below.

**Table 14.**
**Alternative Calculation: Out-of-Pocket Damages related to OTC Fees[83]**

| Description | Damages | PJI thru April 14, 2026 | Total |
|---|---|---|---|
| Actual Prices | $ 9,562 | $ 3,371 | $ 12,932 |
| Implied Prices | (3,958) | (1,375) | (5,333) |

### G.    Damages Related to All Fees

108. It is my understanding from the allegations that Nexo charged fees for three activities: (i) OTC transactions; (ii) liquidations; and (iii) repayment of the loan balances. Below is a summary of the total fees charged by Nexo related to Cress's loan and wallet activities.

**Table 15.**
**Alternative Calculation: Out-of-Pocket Damages related to Nexo Fees[84]**

| Description | Damages | PJI thru April 14, 2026 | Total |
|---|---|---|---|
| OTC Transaction Fees | $ 171,896 | $ 60,515 | $ 232,411 |
| Liquidation Fees | 215,916 | 72,754 | $ 288,669 |
| Repayment Fees | 129,873 | 43,799 | 173,672 |
| **Total** | **$ 517,685** | **$ 177,067** | **$ 694,752** |

---

[83] Schedule 9.
[84] Schedule 10.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

### H.    Damages Related to NEXO Tokens

109.  To evaluate alleged damages associated with Plaintiff's NEXO Token transactions, I applied a methodology that is conceptually similar to that used by Prof. Mizrach, while incorporating important corrections to ensure that the resulting measure reflects Plaintiff's net economic position and properly accounts for the timing of cash flows.

110.  Consistent with Prof. Mizrach's general framework, I began by identifying the transactions involving the purchase of NEXO Tokens and calculating the amounts he paid in those transactions. However, I modified the calculation of PJI to more accurately reflect the timing of these transactions. Specifically, rather than applying PJI to an aggregated damages figure, I calculated PJI on a transaction-by-transaction basis, such that each transaction accrues interest from its respective date to April 14, 2026. This approach aligns the time value of money calculation with the actual timing of cash flows and avoids distortions that arise when all transactions are assumed to occur at a single point in time. In addition, I calculate the PJI based on the 7% simple interest rate rather than compounding it as Prof. Mizrach does in his report.

111.  Next, I account for the sales proceeds from NEXO Tokens sold in October 2021, along with the associated PJI on those proceeds, as an offset to damages. These realized proceeds represent a direct economic benefit received by Plaintiff and are therefore deducted in determining net damages.

112.  In addition, my approach accounts for the economic benefits received by Plaintiff through participation in Nexo's platform via Cress's NEXO Token holdings, which Prof. Mizrach's analysis does not incorporate. In particular, Plaintiff's holding of NEXO tokens provided access to a preferred (Platinum-tier) borrowing rate, which is lower than the non-preferred rate available to other users. I quantify this benefit as the difference between the non-preferred borrowing rate and the preferred rate applicable to Platinum members, applied to the relevant loan balances over time. This differential represents an economic benefit in the form of interest savings, which must be considered in any assessment of net damages.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

113. I offset any calculated losses associated with NEXO Token transactions by these interest savings, as well as related PJI, thereby reflecting the net financial impact of Plaintiff's participation in the platform.

114. As a result of the calculations described above, the total damages related to Nexo Token transactions consists of $1.2 million related to the net amount expended for Nexo Tokens and $0.5 million in PJI from the transaction date to April 14, 2026, resulting in total damages of $1.7 million, as summarized below.

**Table 16.**
**Alternative Calculation: Damages Related to Nexo Tokens[85]**

| Description | Damages | | PJI thru April 14, 2026 | | Total |
|---|---|---|---|---|---|
| Nexo Token Purchased | $ | 3,131,686 | $ | 1,104,217 | $ 4,235,903 |
| Nexo Token Proceeds | | (1,730,666) | | (542,754) | (2,273,420) |
| Saved Interest Expense | | (203,233) | | (69,467) | (272,700) |
| **Total** | **$** | **1,197,788** | **$** | **491,995** | **$ 1,689,783** |

## I.    Summary of Alternative Calculations

115. Below is a table summarizing the alternative calculations I have performed in this matter, reflecting damages as of April 14, 2026:

---

[85] Schedule 11.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

**Table 17.**
**Summary of Alternative Calculations[86]**

| No. | Description | Damages / (Benefit) | PJI thru April 14, 2026 | Total |
|---|---|---|---|---|
| 1 | *Out-Of-Pocket Damages* | | | |
| | Measurement Date as of the Deposit Dates | $   10,771,068 | $   4,241,472 | $   15,012,540 |
| | Measurement Date as of the Liquidation Dates | 5,835,137 | 2,331,579 | 8,166,716 |
| | Measurement Date as of April 14, 2026 | 16,671,768 | (542,754) | 16,129,013 |
| 2 | *But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized for Asset Purchases* | | | |
| | Measurement Date as of June 23, 2021 | 408,995 | 498,793 | 907,788 |
| | Measurement Date as of April 14, 2026 | (645,007) | - | (645,007) |
| 3 | *But-For World in which Nexo did not Charge Any Fees and Excess Amounts are Utilized to Reduce the Loan Balance* | | | |
| | Measurement Date as of June 23, 2021 | 419,864 | 502,452 | 922,316 |
| | Measurement Date as of April 14, 2026 | (633,042) | - | (633,042) |
| 4 | *But-For World in which No Liquidations Occur* | | | |
| | Scenario 1: No Liquidations | 10,073,501 | - | 10,073,501 |
| | Scenario 2: No Liquidations and No OTC Fees | 10,203,296 | - | 10,203,296 |
| 5 | *But-For World in which No Nexo Token Transactions Occur* | | | |
| | Measurement Date as of June 23, 2021 | 437,864 | 508,511 | 946,375 |
| | Measurement Date as of April 14, 2026 | (524,443) | - | (524,443) |
| 6 | *Damages Related to OTC Fees* | | | |
| | Based on Actual Transaction Prices | 9,562 | 3,371 | 12,932 |
| | Based on Implied Prices Excluding Fees | (3,958) | (1,375) | (5,333) |
| 7 | *Damages Related to All Fees* | 517,685 | 177,067 | 694,752 |
| 8 | *Damages Related to Nexo Tokens* | 1,197,788 | 491,995 | 1,689,783 |

## VII.    ANALYSIS OF THE KOGAN REPORT

116. The Kogan Report purports to analyze the conduct of Nexo in its dealings with Cress, focusing on the firm's OTC trading desk, fee practices, risk disclosures, and liquidation processes. I have been asked to review only certain limited aspects of the Kogan Report, specifically Dr. Kogan's discussion of alleged excessive fees associated with OTC transactions. I have not been asked to evaluate, and do not opine on, the full set of analyses

---

[86] Schedules 1 - 11.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

or opinions contained in the Kogan Report. The lack of discussion in this report about any issues, analyses, or opinions contained in the Kogan Report should not be construed as my agreement with those items.

117. With respect to the allegation of excessive fees, I performed an independent analysis of Plaintiff's OTC transaction prices relative to contemporaneous market data. Specifically, I compared the execution prices of the relevant transactions to the observable daily high–low price ranges using Coin Market Cap data for the same digital assets on the same dates. As noted above, based on this analysis, I find that the transaction prices, inclusive of fees, generally fall within the observed daily market ranges. Only one transaction exceeded the high end of the daily range, and that variance was minimal, approximately $0.02 (or 0.6%) above the observed daily high of $2.81,[87] indicating no meaningful economic deviation from prevailing market pricing.

118. Further, when evaluating the implied transaction prices excluding fees, I identified two instances in which those implied prices fall below the observed daily low range. This indicates that, after accounting for fees, the effective execution prices achieved by Nexo were more favorable than the prices generally available in the market on those dates.[88] Taken together, these findings do not support the conclusion that Nexo's OTC fees were excessive. Rather, they suggest that the transaction outcomes were generally consistent with, and in some cases more favorable than, prevailing market prices.

---

[87] $0.02 / $2.81 = 0.7% (see Schedule 9).
[88] Schedule 9.

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

## VIII.    ASSUMPTIONS AND LIMITING CONDITIONS

119.  This report is based solely upon the information that has been provided to me and is described in this report. This report was prepared solely for use in this matter and should not be used for any other purpose. Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any other purpose (other than stated above) without the previous written consent of BRG, and in any event only with proper authorization. This report reflects the facts and conditions existing at the report date. Subsequent events have not been considered, and I have no obligation to update my report for such events and conditions.

120.  I reserve the right to supplement this report at a later date if new information becomes available.

*    *    *    *    *

Respectfully submitted,

Saul Solomon

DESIGNATED CONFIDENTIAL UNDER THE PROTECTIVE ORDER

# EXHIBIT 72

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

)

JOHN CRESS,                     )

                                )

          Plaintiff,            )

                                )

     vs.                        )Case No.

                                )3:23-cv-00882-TSH

NEXO CAPITAL, INC.,             )

                                )

          Defendants.           )

_____)


REMOTE VIDEOTAPED DEPOSITION OF

DAVID LINDENBAUM

Wednesday, May 13, 2026

Volume I


Reported by:

MELISSA MCCANN

CSR No. 14960

Job No.  8038394

PAGES 1 - 106

Page 1

from a W-2 employer?

A November 2020.

Q And who did you work for then?

A Charles Schwab.

Q And what was your job title in this role?

A Vice President of Managed Accounts, Alternative Investments, and Structured Products.

Q Is it fair to say that you retired from that role?

A Sure.

Q When you were at Charles Schwab, did you have any involvement with investing in cryptocurrency?

A No.

Q It was more traditional type securities?

A Yes.

Q Okay, thank you. I'm going to turn back to the Bay Area Financial Education Foundation. So what is your role with this foundation?

A I serve on the board and I also am a volunteer. I teach.

Q What classes do you teach?

A Budgeting, investments, taxes, college planning, investments, credit.

Q How long have you been volunteering there?

A I guess three or four years.

Page 14

Q How long have you been on the board?

A Two.

Q How often do you teach classes?

A Probably every other month.

Q So you teach the basics about investing; correct?

A Yeah, investing, credit, budgeting.

Q Do you teach about debts and loans?

A Yeah, that's in the credit module.

Q Do you teach debt management?

A We touch on it. Try not to get into debt.

Q Why do you try not to get into debt?

MR. COMMINS: Objection. Vague.

THE WITNESS: So the kids understand what it means to have debt.

Q BY MS. DOOLEY: I I'm sorry. Maybe I misheard you. I thought you said that you try not to get into debt when you're teaching these courses. Is that what you said or did I mishear you?

A I said that, I said that in the regards to the students who generally have a aversion to credits. And I char talk to them about credit a.k.a. debts. And there is good debt and there's bad debt.

Q Would you consider that debt management?

A Yeah, I guess so.

Page 15

Q Okay. So is it fair to say that you do teach debt management?

A It's fair to say I explain what debt is, but I don't counsel on their particular debts.

Q Do you teach about interest rates?

A Yes.

Q Do you teach about understanding or calculating transaction costs?

A No.

Q Do you teach about being responsible or prudent about debt?

A Yes.

Q Did touch on transaction costs at all?

A No.

Q So you don't discuss fees?

A No.

Q You wouldn't discuss the fee to take out a loan?

A I would discuss that credit cards have high interest rates and home loans typically have lower rates. So there's rates that are higher and rates that are lower.

But so if you say that's a fee, but I don't think of that as a fee. I think of a fee as being like a late payment.

Page 16

Q These are students who are preparing for college, correct?

A Yes, generally. Well, I shouldn't say that. I think a lot of these kids would love to go to college. We can't afford it.

So, and again, I teach high school, college kids. I've taught at homes for foster kids who are in their 20s, and I've taught 65-year-olds who are just trying to get by.

Q Do you teach about cryptocurrency?

A No.

Q Do you teach about trading?

A No.

Q Margin or leverage investing?

A No.

Q Do you teach risk management?

A No.

Q What about over-collateralizing?

A No.

Q If a student in one of your courses had questions about these topics, would you discuss these issues with them?

A If it pertained to the whole class, yes.

Q Have you ever spoken about any of these issues with any of your students?

Page 17

5 (Pages 14 - 17)

acquired by Gemini?

A  Yes.

Q  What was your role?  What was the exact job title, if you recall?

A  Strategic advisor.

Q  Strategic advisor, you said?

A  Mm-hmm.

Q  And this role, did you work with leverage?

A  No.

Q  Margin?

A  No.

Q  Did you advise or touch on risk management?

A  No.

Q  Diversification?

A  No.

Q  What about volatility?

A  No.

Q  Interest rates?

A  No.

Q  In your consulting roles, have you touched on leverage?

A  No. Margin?

Q  Margin?

A  No.

Q  Interest rates?

Page 30

A  No.

Q  Risk management?

A  No.

Q  Diversification?

A  No.

Q  Volatility?

A  No.

Q  But in these consulting worlds, you do touch on cryptocurrency; correct?

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  Let's say I've done 25 consulting gigs over the last four years.  Two, maybe, were on crypto.

Q  BY MS. DOOLEY:  What exactly were they about in the crypto universe?

A  Honestly, I don't remember.

Q  Are all of your consulting roles for companies?

A  No.

Q  Outside of companies, who else do you provide consulting for?

A  Consulting firms, asset management firms.  So I think of companies as C-Corps, but they're all investment firms, I guess.

Q  Do you provide consulting services for high

Page 31

net worth individuals?

A  Not for a fee.

Q  What you mean by that?

A  Friends ask me questions, or if they have questions.

Q  Okay.  We've been on the record for about 45 minutes.  Do you mind if we go ahead and take a 10-minute break?

A  Okay.

THE VIDEOGRAPHER:  Going off the video record.  Time on the monitor is 10:49 a.m.

(Recess.)

THE VIDEOGRAPHER:  We're now back on the video recorded.  Time on the monitor is 10:59 a.m.

Q  BY MS. DOOLEY:  So Mr. L, you were a registered investment advisor; correct?

A  No.  I mean, I was -- not a practicing one, no.

Q  But were you ever registered?

A  Um, securities registered.  Series 7, Series 24, 63, 65.

Q  Were you --

A  Right.

Q  I'm sorry.  Go ahead.

A  No.  Go ahead.

Page 32

Q  You can finish your thought.

A  But I was not a -- I was under Schwab's registered investment advisor.

Q  Were you a registered broker?

A  I was a registered broker but never acted as a broker.  I was registered as an advisor but never acted as one.

Q  Thank you and apologies for cutting you off.  I didn't mean to.  What does a broker do?

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  Stockbroker?

Q  A registered broker.

A  Sells investment products to clients.

Q  And what about a financial advisor?

A  Sells investment products to clients.

Q  So as part of the role of an advisor, to help client's understand the cost and risk of investing?

A  I hope.

Q  How does a broker make money?

MR. TAYLOR-COPELAND:  Objection.  Vague.

THE WITNESS:  A few ways.  One, commissions, and one through charging advisory fees.  I guess three ways.  One third way can be an hourly rate or a flat fee.

Q  BY MS. DOOLEY:  And how do brokerage firms

Page 33

9 (Pages 30 - 33)

MR. TAYLOR-COPELAND: If we could take a five-minute break, I don't anticipate that I will have any questions, but I'd just like to think about it.

THE VIDEOGRAPHER: Going off the video record. Time on the monitor is 1:42 p.m.

(Recess.)

THE VIDEOGRAPHER: Going off the video record. This concludes today's video deposition. The time on the monitor is 1:47 p.m. We're now off the video record.

(TIME NOTED: 1:47 p.m.)

Page 106

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June ___ ____

_M. McCann_

MELISSA MCCANN
CSR NO. 14960

Page 108

I, DAVID LINDENBAUM, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _____, 20____, at _____, _____.
          (City)           (State)

_____
DAVID LINDENBAUM
Volume I

Page 107

Cress, John v. Nexo Capital, Inc.

David Lindenbaum Job No. 8038394

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

David Lindenbaum                Date

Page 109

28 (Pages 106 - 109)