# EXHIBIT 11

# Expert Report of Professor Seligman

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN CRESS,                                    Case No. 23-cv-00882-TSH

    Plaintiff,

    v.

NEXO FINANCIAL LLC, et al.,

    Defendants.

EXPERT WITNESS REPORT OF PROFESSOR JOEL SELIGMAN

# I.   INTRODUCTION AND QUALIFICATIONS

1.   My name is Joel Seligman, and I submit this report on behalf of the Plaintiff, John Cress.

2.   I am Dean Emeritus and Professor at Washington University School of Law and President Emeritus at the University of Rochester. After returning to the faculty of Washington University School of Law in 2020, I annually teach Securities Regulation, Financial Regulation, and Corporations.

3.   I am the author or co-author of 25 books, including an 11-volume treatise on *Securities Regulation*, co-written by the late Harvard Law Professor Louis Loss and former SEC Commissioner Troy Paredes. I have worked each year on this treatise since 1984 and currently revise one volume each year and work with Mr. Paredes to publish an annual supplement. I also have written with Professor Loss and Troy Paredes an

1

abridged two-volume treatise on Securities Regulation entitled *Fundamentals of Securities Regulation,* two histories of Securities and Financial Regulation entitled *The Transformation of Wall Street: A History of the Securities and Exchange Commission and Modern Corporate Finance* (3d ed. 2003) and *Misalignment: The New Financial Order and the Failure of Financial Regulation* (2020), a study of the Uniform Securities Act entitled *The New Uniform Securities Act* (2002), as well as approximately 50 law review articles.

4.    I have served on the New York Stock Exchange Legal Advisory Committee, the National Association of Securities Dealers (*NASD*) Legal Advisory Board, the American Law Institute Corporate Governance Project, the Federal Reserve Board of New York Upstate Regional Advisory Board and as Director of Eastman Kodak Board, among other organizations.

5.    From 2004-2007, I was a member of the NASD Board of Governors and continued as a Governor of FINRA from 2007-2015 when NASD merged with the New York Stock Exchange disciplinary body.

6.    I was the Reporter for the National Conference on Uniform State Laws current Revision of the *Uniform Securities Act* (2002), the model state law adopted in approximately 20 states.

7.    I chaired the U.S. Securities and Exchange Commission (*SEC*) Advisory Committee on Market Information and have served as an expert witness (for both plaintiffs and defendants) in approximately 25 cases. I also presented appellate arguments in federal securities cases in Federal Courts of Appeal. Between 1995, when I first became a Dean at the Arizona College of Law, and 2018, when I retired as President of the University of Rochester, I did not serve as an expert or litigant.

8.    I have attached my Curriculum Vitae as Exhibit 1. I have attached a list of cases in which I have served as an expert beginning in 2019 as Exhibit 2. In Exhibit 3, I detail the specific documents reviewed in preparation of this Report.

2

9.    I am being compensated at an hourly rate of $1000 for my work on this matter.  My compensation is not dependent on my opinions or the outcome of this case.

10.    I offer no opinions as to what the law is for the purposes of this case.  My role is limited to describing the general structure and processes of securities registration and exemptions under the Securities Act of 1933 ("1933 Act") as historically applied, based on my academic expertise.  I do not offer opinions on whether Nexo or any party complied with or violated any provision of law or regulation.

## II.  ASSIGNMENT

11.    I have been asked to prepare this Report and offer testimony comparing (1) the registration of a security between 2018 and 2021 when it is sold to the public in accordance with the Securities Act of 1933, and (2) the process of establishing an exemption to the 1933 Act registration process under Regulation D.

12.    I have also been asked to analyze Nexo's efforts to ensure that purchasers of its NEXO Token were not underwriters.

## III.  CONCLUSION

13.    When registration of a security under the 1933 Act is compared to claiming an exemption under Regulation D, there are fundamental differences, including that registration requires:

    a. Mandatory filing of a registration statement with the SEC which has statutory power to review the statement to prevent offering of a security that includes any "untrue statements of a material fact or omission . . . necessary to make the statements not misleading."

    b. Full disclosure of detailed material, including textual and financial information, in the registration statement filed with

3

the SEC and the prospectus provided to investors which includes most of the information in the registration statement.

c. Full responsibility under §11 for any misrepresentations or omissions in registration statements for the issuing corporation and certain associated individuals, including specified corporate officers, underwriters, and experts such as accountants who certify any portion of the filing. The outside role of the underwriters and experts is intended to deter false or misleading statements by corporate insiders.

d. The requirement of due diligence by each specified potential defendant under §11 to avoid liability when they can establish that they made a reasonable investigation and had grounds for belief equal to that of a prudent person when the registration statement became effective.

14.     Regulation D offerings generally do not include equivalent procedural or disclosure requirements.

# IV.     Registration of a Security for Sale to the Public under the Securities Act of 1933.

## A.     Background

13.   The Securities Act of 1933 was enacted in the aftermath of the 1929-1933 Stock Market Crash. Between September 1, 1929 and July 1, 1932, the value of all stock listed on the New York Stock Exchange shrank from a total of nearly $90 billion to just under $16 billion, a loss of approximately 83 percent. "The annals of finance," the Senate Banking Committee would write in S. Rep. No. 1455, 73d Cong., 2d Sess. 7 (1934), "present no counterpart to this enormous decline in security prices." The House Committee on Interstate & Foreign Commerce in H.R. Rep. No. 85, 73d Cong., 1st Sess. 2 (1933) similarly would state in introducing the Securities Act: "During the post-war decade, some 50 billions of new securities were floated in the United

4

States.  Fully half or $25,000,000,000 worth of securities floated during this period have been proved to be worthless" and contributed to the Great Depression:

> Unemployment had been approximately 3 percent of the labor force during the summer of 1929.  By 1933, nearly 13 million people were out of work, approximately 25 percent of the labor force.
>
> The gross national product which had been $103.1 billion in 1929 was cut nearly in half to $55.6 billion in 1933, a decline of 46 percent.  Total national wealth similarly had declined 25 percent, from $439.4 billion in 1929 to $330.5 billion in 1933.  New private and public construction fell more precipitously, from $10.8 billion in 1929 to $2.9 billion, a shrinkage of 79 percent.  National income shrank by 52 percent between 1929 and 1932, from $87.4 billion to $41.7 billion.  New corporate offerings shrank from almost $6.8 billion in 1929 to less than $400 million in 1933.

Id. at 394.

15.    The economic collapse led to the reversal of earlier near exclusive state law regulation of securities being supplanted in substantial part by the Federal Securities laws.  See, e.g., SELIGMAN, supra, *Transformation of Wall Street*, Chs. 1-3.

16.    Roosevelt introduced the Securities Act Bill on March 29, 1933, Congressional Record, 73d Cong., 1st Sess. at 937, 954; reprinted in Federal Securities Act Hearings, House Commerce Comm., 73d Cong., 1st Sess. 1 (1933), which stated in part:

> There is, however, an obligation upon us to insist that every issue of new securities to be sold in interstate commerce shall be accompanied by full publicity and information, and that no essentially important element attending the issue shall be concealed from the buying public.

5

>This proposal adds to the ancient rule of *caveat emptor* the further doctrine: "Let the seller also beware." It puts the burden of telling the whole truth on the seller. . . .

Regarding the background of Securities Act of 1933, see generally SELIGMAN, The Transformation of Wall Street at Ch. 1; Ralph F. De Bedts, The New Deal's SEC: The Formative Years (Columbia U. Press 1964); Michael E. Parrish, Securities Regulation and The New Deal 42-72 (Yale U. Press 1970).

17.        Consistent with Roosevelt's March 29, 1933 message, the House Report No. 85, supra at 3, characterized the Securities Act as including in its objectives:

(1)    An insistence that there should be full disclosure of every essentially important element attending the issue of a new security. . . .

(3)    A demand that the persons, whether they be directors, experts, or underwriters who sponsor the investment of other people's money should be held up to high standards of trusteeship.

## B.    Registration Under the 1933 Act

18.    The Securities Act of 1933 relies on three primary techniques to protect investors in public securities offerings.

19.    First, §5 requires registration with the SEC of securities offered to the public through "any means or instruments of transportation or communication in interstate commerce" unless the security or transaction is exempted by §3 or §4. In those instances in which the full registration process is applicable, the Act creates a statutory waiting period of 20 days before the security registered with the SEC can be sold, requires underwriters and securities dealers to furnish prospective investors with a prospectus based on the information in the registration statement, and empowers the Commission to issue

6

stop orders to prevent the sale of a security that "includes any untrue statement of a material fact or omits to state any material fact required to be stated . . . or necessary to make the statements therein not misleading."

20.    Second, the Securities Act requires full disclosure of material information to be provided to the SEC in the registration statement and to investors in a prospectus derived from the registration statement. 2 Louis Loss, Joel Seligman & Troy Paredes Securities Regulation Ch. 2.D. (Wolters Kluwer 7th ed., 2024).  For historical context see SELIGMAN, supra, *Misalignment* at 328-344.  This disclosure framework superseded the inadequate, often minimal disclosure paradigms of earlier state law, the New York Stock Exchange, and then applicable accounting standards.  SELIGMAN, *The Transformation of Wall Street*, at 42-49; John C. Coffee, Jr., Market Failure and the Economic Case for a Mandatory Disclosure System, 70 Va. L. Rev. 717, 722, 739-743 (1984) ("A particular flaw in theory [of voluntary disclosure] is that it overlooks the significance of corporate control transactions and assumes much too facilely that manager and shareholder interests can be perfectly aligned.")  See generally Joel Seligman, The Historical Need for a Mandatory Corporate Disclosure System, 9 J. Corp. L. 1, 9 (1983).

21.    Third, §11 transformed the process of selling securities to the public.  The SEC, the Department of Justice, and any private person may bring a lawsuit whenever any part of a registration statement contains a material misrepresentation or omission.  Accordingly, corporate insiders, including every person who signed the registration statement, the firm's principal executive and financial officers, and every person who was or agreed in the registration to become a member of the corporate board, must exercise a high degree of care.  Section 11 has been strictly enforced.  See, e.g., Escott v. BarChris Const. Corp., 283 F. Supp. 643, 696-697 (S.D.N.Y. 1968); In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 677-696 (S.D.N.Y. 2004), and reaches both direct purchasers of

7

a registered offering and those who repurchase shares and can "trace" their shares back to a misrepresentation or omission in a registered offering. Slack Tech., LLC v. Pirani, 598 U.S. 759 (2023); Barnes v. Osofsky, 373 F.2d 269, 271 (2d Cir. 1967); Hertzberg v. Dignity Partners Inc., 191 F.3d 1076, 1080 n.4 (9th Cir. 1999).

22. Critically, §11(a) includes as potential defendants underwriters, the issuer's principal executive and financial officers, every director, and every expert, including accountants who certify "any part of the registration statement." Section 11(f)(1) requires joint and several liability for the persons specified in §11(a).

23. To maximize the deterrent effect of §11, traditional state law defenses to fraud have all but been eliminated. In sharp contrast to earlier state law, the plaintiff in a §11 claim does not have to prove reliance unless he or she bought after the issuer had made generally available to its security holders an earnings statement covering a period of at least 12 months beginning after the effective date. But even then "reliance may be established without proof of the reading of the registration statement by such person." The plaintiff is not required in a *prima facie* case to prove scienter; that is intentional or reckless conduct by the defendants, only a material representation or omission. Nor need the plaintiff prove causation, although damages are reduced to the extent that the *defendant* proves that they did not result from his or her misconduct. See 9 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 383-406 (Wolters Kluwer 5th ed. 2018).

## C.    Due Diligence

24. The most transformative element of §11 for registered securities sales to the public involves the due diligence defenses of §11(b)(3). This provision creates exemptions from §11 liability for defendants when they can establish that they used due diligence to affirmatively conduct a reasonable investigation and had grounds for belief equal to that of a prudent person when the registration statement became effective. 9 Loss, Seligman & Paredes at 382-385. Regarding

8

§11, see generally id. at Ch. 11.C.d.; John C. Coffee, Jr., Hillary A. Sale & Charles K. Whitehead, *Securities Regulation: Cases and Materials* 943-995 (15th ed. 2021). The issuer of a registered security is not entitled to a due diligence defense and instead bears full responsibility for the accuracy of the disclosures. Escott v. BarChris Const. Corp., 283 F. Supp. 643 (S.D.N.Y. 1968).

25. In imposing liability on underwriters for material misstatements or omissions in registration statements, Section 11 conceives of underwriters and experts as gatekeepers – as parties capable of deterring wrongdoing by issuers. Reinier H. Kraakman, *Corporate Liability Strategies and the Costs of Legal Controls*, 93 Yale L.J. 857, 890 (1984) ("The first requisite for gatekeeper liability is, of course, an outsider who can influence controlling managers to forgo offenses."). As to the monitoring function of gatekeepers, see, id. at 891; Reinier H. Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. Econ. & Org. 53, 62-66 (1986). The provision recognizes underwriters' "unique position" among offering participants in assuring the accuracy and completeness of the issuer's disclosures. See Ernest L. Folk, III, *Civil Liabilities Under the Federal Securities Acts: The BarChris Case*, 55 Va. L. Rev. 1, 56 (1969) ("Underwriter[s] [are] uniquely able to adopt an objective or even adverse posture towards the issuer regarding the accuracy of the registration statement." (footnote omitted)); In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) ("Underwriters['] . . . unique position . . . enabled them to discover and compel disclosure of essential facts about the offering." (quoting *The Regulation of Securities Offerings*, Securities Act Release No. 7606A, 63 Fed. Reg. 67,174, 67,230 (Dec. 4, 1988)). Gatekeepers put their reputations at stake in an offering. Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 Va. L. Rev. 549, 620 (1984) ("The investment banker represents to the market (to whom it, and not the issuer, sells the security) that it has evaluated the issuer's product and good faith and it is

9

prepared to stake its reputation on the value of the innovation.") See generally John C. Coffee, Jr., Gatekeepers: The Role of Professions and Corporate Governance 353 (2006) ("The underwriter's obligation to ensure full disclosure in this context is enforced by Section 11 of the Securities Act of 1933").

26.    Section 11 makes "underwriters . . . the first line of defense" against disclosure errors. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 662. Specifically, underwriters may be liable for defects in a registration statement's non-expertised portions, which comprise the bulk of the statement and include both textual discussion and some financial and graphical data. By contrast, auditors' Section 11 liability is largely limited to the financial statements they certify, and lawyers rarely face liability under Section 11.

27.    The risk of underwriter liability affects other secondary participants, further ensuring investor protection. Courts allow due diligence performed by auditors and lawyers to help satisfy underwriters' diligence defense. For example, in determining whether the due diligence defense is established, underwriters' "receipt of [a] comfort letter[] will be important evidence," although by itself it is insufficient to establish the defense, see *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 683-84, so underwriters in registered offerings secure assurances from the issuers' legal counsel and auditors as to the accuracy of non-expertised portions of registration statements. Underwriters require these assurances, known as 10b-5 letters and comfort letters, as conditions precedent to underwriting the proposed securities offering. See James D. Cox, Robert W. Hillman & Donald C. Langevoort, *Securities Regulation: Cases and Materials* 121-122 (9th ed. 2020). A law firm's 10b-5 letter attests that the firm, or individual lawyers, is not aware of any material misstatements or omissions in the registration statement. The auditor's comfort letter gives assurance as to a wide array of financial information in the registration statement, including information appearing in the text, charts, and graphs – information that

10

is separate from the audited financial statements, which are expertised portions of a registration statement. Though the terms of these letters are highly tailored, they expose their authors to liability for negligent or fraudulent preparation, creating incentives for their authors to perform robust due diligence. Id. at 122.

28. Underwriters are well suited for service as third-party certifiers because they are uniquely positioned among offering participants to detect disclosure errors, having had decades to hone their diligence practices and procedures. Underwriters are also cost-effective certifiers since issuers already engage them to act in transactions. KRAAKMAN, *Gatekeepers*, at 93-99.

29. Because of the threat of liability and underwriters' interest in protecting their reputations, Section 11 makes underwriters virtually full partners with the issuer in preparing, reviewing drafts, and corroborating the truthfulness of the registration statement. Underwriters became prominent, if not dominant, participants in the preparation of a registration statement and the prospectus.

30. The role of the legal or managing underwriter begins with an underwriting agreement. As Cleary Gottlieb explained in *The IPO: Overview and Guide* in October 2023:

> The underwriting agreement is the contract in which the underwriters agree to purchase the offered securities from the company. . . .
>
> The centerpiece of the agreement is the number of securities to be sold and the price at which the underwriters will buy them. The underwriters typically require extensive representations and warranties from the company (and, to a lesser degree, from any selling shareholder) to support their due diligence, ensure adequate disclosure, and facilitate closing. These provisions also allocate risk between the company and the underwriters in the event that the underwriters are sued for a material misstatement or omission,

and related representations and warranties are breached. In addition, the company, its insiders, and its significant shareholders usually commit to a "lock-up."

The agreement lists closing conditions, including receipt of legal opinions from issuers', underwriters', and, if applicable, selling shareholders' counsel; comfort letters from the auditor; and other certificates and closing documents.

Professors Coffee, Sale and Whitehead explain in their Securities Regulation casebook at 102:

A great deal of activity occurs in the pre-filing period. A team must be organized to prepare the registration statement. The players will normally include the chief executive officer and the chief financial officer of the issuer, the lead underwriter and any co-manager, counsel for the issuer and for the underwriter, and the issuer's accountants. Potentially dozens of people may be involved in preparing the registration statement, and the average waiting period may last anywhere from thirty to more than sixty days, depending both on the SEC's case load at the time and how contentious the negotiations are between the issuer and the SEC's staff. Of course, the registrant chooses the filing date, but in practice, the SEC determines the effective date of the registration statement. It is important that no offer, not even an oral offer nor any attempt to solicit an offer to buy the security, occur during the pre-filing period, unless it is exempted by a special rule.

31. It has become customary for outside public accountants to review the offering document and to meet in one or more due diligence meetings to allow directors, underwriters and others to raise questions about the securities issue. Careful notes are taken of the meetings for the purpose of demonstrating a required "reasonable investigation [and] reasonable ground to believe . . . at the time that such part of the registration statement became effective, that the statements therein were

true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 11(b)(3)(A). Counsel for the offering typically make available a letter at the time of the due diligence meeting stating they have found no grounds for fraud. The outside public accountant also will provide a "cold comfort letter" stating that there have been no material developments which would cause the accountant to withdraw their opinion that the issuance was prepared in compliance with generally accepted accounting principles.

32. Historically, commentators have observed that due diligence procedures substantially reduced reported instances of fraud in IPOs. 9 Loss, Seligman & Paredes, Securities Regulation 5th ed. at 322 n.135 ("The 30,000 registration statements filed during the first 35 years of the SEC's history resulted in two adjudicated recoveries and six reported decisions approving settlements of class actions."). The very term *due diligence* entered the popular vocabulary as a byword for careful investigation of facts whether required by the legal process or otherwise.

### D. Full Disclosure of Material Information

33. The purpose of the Securities Act of 1933 is to provide in one document all required material information for investors and reduce or eliminate the possibility of misleading investors through unsubstantiated news accounts, social media, or rumors. This was recognized in House Rep. No. 85, 73rd Cong., 1st Sess. (1933), the key legislative report for the 1933 Act, which detailed the requirements of providing in the registration statement and the prospectus which provided most of the contents of the registration statement "full disclosure of every essentially important element attending the issue of a new security." Id. at 3. Notably, the Securities Act concludes with detailed disclosure requirements in Schedule A for domestic issuers. Regulations over time have created truncated registration statements such as Form S-3 which allow much of the content of the comprehensive Form S-1 to be incorporated by reference for issuers subject to continuous disclosure of

annual quarterly and when necessary monthly reports. The requirement that directly or through incorporation by reference a registration statement and the prospectus comply with mandatory disclosure requirements to ensure full disclosure of material information has consistently been recognized by the United States Supreme Court as the purpose of both the Securities Act of 1933 and the Securities Exchange Act of 1934. See, e.g., United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975) ("The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market"); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976) (the 1933 Act "was designed to provide investors with full disclosure of material information concerning public offerings"); Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund, 575 U.S. 175 (2015) ("The Securities Act of 1933 . . . protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information relevant to a public offering'").

34. Preparation of the registration statement and prospectus requires compliance with Regulation S-K for textual or non-financial disclosures, Regulation S-X for financial disclosures, and Regulation C for the preparation and filing of the registration statement. All are part of a basic disclosure package.

35. Regulation S-K includes itemized disclosures concerning the business of the registrant (Items 101-103); its securities (Items 201-202); financial information (Items 301-308); management and specified security holders (Items 401-407); when applicable, the registration statement and prospectus (Items 501-512); Exhibits (Item 601); miscellaneous disclosures concerning recent sales of unregistered securities, indemnification of directors and officers, and purchases of securities by the issuer and affiliated purchasers (Items 701-703); and Industry Guides (Items 801-802). For a detailed discussion of the Regulation S-K disclosure items, see 2 LOSS, SELIGMAN & PAREDES, supra, at 76-536.

36.    The Securities Act requires distribution of a prospectus to investors with much of the content of the registration statement that is filed with the SEC.  See Section 10 of the Securities Act.  For Form S-1 offerings, much of the information required to be filed under Regulation S-K is included in the prospectus.  Under Form S-1, there are very limited opportunities for incorporation by reference.  See 2 LOSS, SELIGMAN & PAREDES, supra, at 41.  The disclosures in the prospectus provide investors, directly or indirectly, the opportunity to make informed investment decisions and to bring private lawsuits if the prospectus includes material falsehoods.  See, e.g., Securities Act Sections 11 and 12.  These disclosures largely are delineated in Regulation S-K and in the Securities Registration Form S-1 requirements and most significantly include:

a.    **Description of Business**:  A description of the general development of the business, including key products, dominant or other reportable business segments, status of development efforts for new or enhanced products, trends in market demand, resources material to the company's development, competitive conditions, and the company's principal physical properties.

Incomplete or misleading descriptions of a business were a major concern of Congress and led to the requirement in ¶8 of Schedule A of the Securities Act to disclose "the general character of the business actually transacted or to be transacted by the issuer."

The Commission notably required businesses to disclose information about segments of a business.

b.    **Management and Ownership:**  Information about key personnel, directors, and major shareholders, including information about the compensation of specified officers and directors, and a description of significant transactions between the issuer and officers, directors, promoters, and persons who control the issuer.

15

The avoidance of undisclosed compensation to business insiders and those engaged in the securities distribution process was a major priority of the Securities Acts. In the leading case defining materiality, TSC Indus., Inc. v. Northway, Inc., 457 U.S. 438, 453-454 n.15 (1970), the Supreme Court stated that total omission of material information concerning a conflict of interest as a matter of law would have to be disclosed. See, e.g., Kramer v. Time Warner Inc., 937 F.3d 767, 771 (2d Cir. 1991): "That inside directors stand to gain from a recommended transaction is material information that must be disclosed to shareholders considering a tender offer."

In the instant case, Nexo's co-founder Trenchev testified that "a certain percentage of [the NEXO] tokens [were] reserved for members of the team." Trenchev Dep. 191:14-16. However, Trenchev claimed he did not remember the exact percentage reserved for the management team, was "not sure" how many NEXO Tokens he personally received, and did "not know" whether he received more than 100 million tokens— more than 10 percent of the total supply. Id. at 191:17-192:18.

Disclosure of this type of information about ownership and sales by insiders is a key aspect of registration under the Securities Act. For example, Regulation S-K Item 403 requires disclosure of security ownership in specified transactions by corporate directors, executive officers and beneficial owners of more than 5 percent of a company's stock. Item 404 requires disclosure by related persons including directors and officers, promoters and specified control persons in specified transactions in which the participant receives an amount more than $120,000.

c.    **Financial Statements**: Audited financials, including income statements, balance sheets, and cash flow statements, typically for the past three fiscal years. These provide an overview of the company's financial health.

To reduce management's ability to obscure internal knowledge of known trends or known uncertainties, the Commission adopted the

requirements in Regulation S-K Item 303 to require management to discuss the registrant's financial condition and results of operations, specifically describing known trends or uncertainties concerning liquidity, capital resources and income. 2 LOSS, SELIGMAN & PAREDES, supra at 318-371. The forward-looking nature of the disclosures is especially useful since a company's financial statements are backward-looking, demonstrating how the company has performed but not necessarily indicating how it *will* perform.

In 2002 after the Enron debacle involved misuse of off-balance sheet transactions, the Sarbanes-Oxley Act added §13(j) to require the Commission to adopt rules disclosing material off-balance sheet transactions, arrangements, obligations and other relationships. In 2003, the Commission adopted the required amendments to the Management Discussion and Analysis Item. See Sec. Act Rel. 8182, 79 SEC Dock. 1251 (2003) (adoption); 2 LOSS, SELIGMAN & PAREDES, supra at 351-357.

Numerous recent examples of failures in the digital asset space highlight the importance of publicly available audited financials. In 2023, crypto exchange FTX reported an $8.9 billion shortfall as a result of secret loans to Alameda Research which, in turn, had led to misappropriation by the FTX and Alameda Research CEO, Sam Bankman-Fried, of which he was convicted. 1 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 90-95 (Wolters Kluwer 7th ed. 2024); Louis Loss, Joel Seligman & Troy Paredes, 2025 Cumulative Supplement at 34-35. FTX did not have securities registered with the SEC or publish audited financial statements. FTX's token, FTT, which also was not registered with the SEC, declined precipitously on this news, losing about 95% of its value in a matter of weeks. Kaiko Research, Looking Back on FTXs Impact, https://research.kaiko.com/insights/looking-back-on-ftxs-impact.

Cryptocurrency lending platform Celsius also did not publish audited financial statements. In mid-2022 the company abruptly froze all withdrawals, swaps and transfer on its platform and filed for bankruptcy

17

shortly thereafter. Celsius' unregistered CEL token declined significantly and is now essentially worthless. Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 2026 Cum. Ann. Supp. at 35. Indeed, Nexo itself never completed an audit of its financial records. Nexo co-founder Antoni Trenchev testified that Nexo "were in the process of getting [its] financial records audited. And then in 2022, after the collapse and bankruptcy of FTX, many of the auditors ceased working with crypto companies, and [Nexo's] auditor was no different than that. So they would not finalize the job." Trenchev Dep. 70:1–71:7. Trenchev confirmed that Nexo never received a finalized audit. Id. at 71:2–5. When required, the failure to produce a finalized audit is a serious matter. I have never heard of this type of requirement being excused because "many auditors ceased working with crypto companies."

d.    **Plan of Distribution**: Information regarding how the securities will be distributed or sold, including the underwriters involved, the nature of the underwriting agreement, and the price of the securities.

Item 508(a) of Regulation S-K specifically requires disclosure of any material relationship that an underwriter had with the securities issuer. Item 508(b) requires disclosure of the underwriter's compensation. Item 511 further requires disclosure of all other expenses in connection with the distribution and issuance of securities to be registered.

e.    **Use of Proceeds**: Information about the principal purposes for which the funds raised by the company will be used.

Courts have observed that when funds raised for a stated purpose are instead used for a materially different purpose, such conduct has been characterized in past federal securities decisions as misleading to investors. See, e.g., SEC v. Scott, 565 F. Supp. 1513, 1526-1527 (S.D.N.Y. 1983), *aff'd sub. nom.* SEC v. Cayman Islands Reinsurance

Corp., 734 F.2d 118 (2d Cir. 1984); SEC v. Collector's Coffee, 697 F. Supp. 3d 138, 166-167 (S.D.N.Y. 2023).

  f. **Risk Factors**: A discussion of the material risks that make an investment in the company or its securities speculative or risky.

  As with the Management Discussion Analysis Item 303, disclosure of risk factors now required under Regulation S-K Item 105 are particularly emphasized in registration statements and must immediately follow the summary section required by Item 503. Item 105(b) Discussion of Risk Factors and are meant to communicate to potential investors "material factors that make an investment in the registrant or offering speculative or risky." Item 105(a).

  Items 201-202 of Regulation S-K highlight other risk factors which potentially could depress share prices such as whether there is an established United States trading market for the stock, see Item 201(a)(2), or the issuer has a history of not paying dividends. See Item 201(c). In 2006, the Commission added Item 201(e) to require disclosure of the registrant's yearly performance charge compared to the cumulative total return of a broad equity index of stock.

  g. **Legal Proceedings**: A description of any pending material legal proceedings other than ordinary routine litigation to which the company or any of its subsidiaries is a party or likely to be a party.

  Disclosure of material pending legal proceedings is a particularized form of risk factor that may be included in the Management Discussion & Analysis description of Risk Factors. See Sec. Act Rel. 10,825 (2020). If a pending litigation involves a sufficiently substantial estimable amount of loss and a sufficiently high probability of occurrence, disclosure is required even though it is contingent and may never occur. A risk of loss alone can drive stock prices down. See, e.g., Gulf & W. Indus., Inc. v. Great A. & P. Tea Co., Inc., 476 F.2d 687, 697 (2d Cir. 1973), where the court affirmed a preliminary injunction enjoining a consummation of a tender offer in part because the bidder

19

omitted to state certain material facts indicating that there were substantial antitrust obstacles to a substantial stock acquisition. The court noted, "The fact that, at the time it announced its tender offer, an antitrust action had not been commenced against G&W, and that the liability was uncertain, does not excuse G&W's failure to disclose all these relevant circumstances so that A. & P. shareholders could weigh them in reaching their decision whether or not to tender their shares." See also Greenstone v. Cambex Corp., 975 F.2d 22, 24 (1st Cir. 1992); Indiana Pub. Retirement Sys. v. SAIC, Inc., 818 F.3d 85 (2d Cir. 2016).

h.    **Description of Securities Being Offered**: This includes the number of shares being sold, the type of security (e.g., common stock, preferred stock, bonds), and a brief outline of specified securities rights including dividend rights and rights to vote.

i.    **Material Contracts and Agreements**: These are significant contracts that can have a substantial impact on the company's business, such as licensing agreements, leases, or supply contracts.

37.    In addition to compliance with Regulation S-K, Regulation S-X requires each covered registrant and its subsidiaries to file with the SEC two years of audited consolidated balance sheets and three years of audited income statements and cash flow. Regulation S-X Items 3-01 - 3-03. Financial statements in Regulation S-X include all notes to the statements and all related schedules. Regulation S-X Rule 1-01(b). Since 1973, it has been the policy of the Commission as stated in Accounting Series Release No. 150 that only financial statements prepared in compliance with the principles, standards, and practices promulgated by the FASB [Financial Accounting Standards Board] would be acceptable to the SEC; "those contrary to such FASB pronouncements would be deemed lacking substantial authoritative support." This policy was reaffirmed in 1980 when the Commission revised Regulation S-X Item 4-01(a). As the court in Slater v. A.G. Edwards & Son, Inc., 719 F.3d 1190, 1197 (10th Cir. 2013) stated: "Regulation S-X requires documents filed with the SEC to be in

20

compliance with Generally Accepted Accounting Principles (*GAAP*).  17 C.F.R. §4-01(a)(1).  Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  Rule 4-01(a)(1) in full repeats the text quoted in the *Slater* case but concludes: "unless the Commission has otherwise provided.  This article and other articles of Regulation S-X provide clarification of certain disclosures which must be included in any event, in financial statements filed with the Commission."

38.    To ensure the integrity of financial statements, Congress in the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§78dd-1, et seq., which added §13(b)(2) of the Securities Exchange Act, requires each reporting corporation to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles.  . . ."  A primary purpose of §13(b)(2) was to prevent corporate officers or directors from making materially false or misleading statements or omitting to state material facts "as an accountant in connection with (i) [a]ny audit, review or examination of the financial statements of the issuer . . . or (ii) [t]he preparation or filing of any document or report required to be filed with the Commission. . . ."  Quoting Rule 13b2-2, as amended.  See also Rule 13b2-1.

39.    In 2002 after a major financial scandal involving Enron, see 2 LOSS, SELIGMAN & PAREDES, supra at 730-760, Congress enacted the Sarbanes Oxley Act, Pub. L. 107–204, 116 Stat. 745, to provide for a Public Company Accounting Oversight Board (*PCAOB*) "to create a stronger, more diligent and independent system" of outside auditors.  Sec. Ex. Act Rel. 46,120, 77 SEC Dock. 2832, 2852 (2002).  The PCAOB provides a private-sector non-profit corporation charged with overseeing the auditors of public companies.  Sarbanes-Oxley Act Title I.

21

40. The Senate Report accompanying the Sarbanes Bill notably explained: "The bill requires the Board to establish or adopt auditing, quality control, and ethics standards for the audit of public companies. The Committee has concluded that the Board's plenary authority in this area is essential for the Board's effective operation. . . ." S. Rep. No. 107-205, 107th Cong., 2d Sess., at 8 (2002).

41. The Sarbanes-Oxley Act also added §10(m) to the Securities Exchange Act to require each covered corporation to have an audit committee composed entirely of outside or independent directors, who were not corporate executives or accepting any consulting, advising or other compensatory fee from the issuer and have at least one audit committee financial expert. See 2 LOSS, SELIGMAN & PAREDES, supra at 650-665.

42. Senior executives are required to certify internal control requirements. The principal executive officer or officers and principal financial officer or officers at the time of filing each annual report and each quarterly report are required to sign a certification that includes a statement as required by the Securities Exchange Act Rules 13a-14(a), 15d-14(a) and is now codified in Regulation S-K Item 601(b)(31):

I, certify that:

. . .

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

43.    Several studies suggest that investors interpret SEC registration and oversight as a signal that an investment carries lower risk or is "safer" as a signal of third-party certification. In an experimental study based on a large sample of Dutch investors and their regulators, Cox and de Goeij found that when regulatory oversight was explicitly mentioned in investment materials (such as noting that a securities offering had regulatory approval), investors' willingness to invest increased and their perceived risk decreased. Ruben Cox & Peter C. de Goeij, Regulatory Certification, Risk Factor Disclosure, and Investor Behavior, 24 *Rev. Fin.* 1079-1106 (2020). In other words, by analogy, SEC involvement may be viewed as a form of certification in the eyes of investors. This implies many investors take comfort in the fact that a security has been through the SEC registration process.

44.    Historical evidence also indicates that markets view SEC-mandated disclosure as reducing investment risk. A study by Greenstone, Oyer, and Vissing-Jorgensen examined stock returns around the 1964 Securities Acts Amendments, which for the first time required many previously unregulated over-the-counter companies to register with the SEC and disclose financial reports. Michael Greenstone, Paul Oyer & Annette Vissing-Jorgensen, *Mandated Disclosure, Stock Returns, and the 1964 Securities Acts Amendments*, 121 Q.J. Econ. 399 (2006). They found that investors placed positive value on these new disclosure requirements. In a firm-level event study, the companies most affected by the new registration rules experienced abnormal stock returns of about +3.5% in the weeks when they announced their compliance, signaling increased investor optimism. *Id.* Cumulatively, from the proposal of the law to its implementation, the affected firms saw 11%–22% higher returns relative to firms already subject to SEC regulation. *Id.* The authors interpret these gains as evidence that investors felt better protected and anticipated improved performance once firms were forced to be more transparent and accountable to the SEC. In other words,

mandatory SEC registration/disclosure made investors feel more secure, bidding up stock prices.

45. Additional support comes from studies of restricted stock (shares that are unregistered and cannot be freely traded). Investors generally demand a steep discount for unregistered, illiquid shares compared to identical registered shares, a phenomenon reflecting higher perceived risk or inconvenience. An SEC-sponsored study from the 1970s, for example, the SEC Study found that "restricted securities are issued at substantial discount from the market value of freely tradeable securities – the average discount for 278 private placements examined by the Study was about 23 percent, although variation in practice was considerable. "Institutional Investor Study Report of the Securities and Exchange Commission, H.R. Doc. No. 92-64 at xxvi (92d Cong., 1st Sess. 1971)."

46. Firms from jurisdictions with weaker investor protections can signal their commitment to higher standards by subjecting themselves to U.S. SEC regulation. John C. Coffee, Jr., The Future as History: The Prospects for Global Convergence in Corporate Governance and its Implications, 93 Nw. U. L. Rev. 641 (1999). When foreign companies list on U.S. exchanges (thereby registering with the SEC and complying with U.S. disclosure and governance rules), they often experience an increase in liquidity and increases in a firm's share value. Id. at 673-674. This is partly due to improved liquidity and visibility, but also due to investor perceptions of stronger protections. By "bonding" themselves to U.S. laws, firms signal a desire to respect shareholder rights under tougher scrutiny and enforcement. Investors become more willing to buy these companies' shares because they believe management is constrained from unethical behavior – the firm has effectively tied its hands to be more honest and transparent. In June 2025, there were 530 non-U.S. issuers from 48 countries listed on the New York Stock Exchange alone. Insights, Recent Trends in Foreign Companies Listing in the U.S. Exemplify Structural Advantages for Issuers (June 19, 2025).

24

## V.    Exempted Securities Offerings Under Regulation D

47.    In Sections 3 and 4 of the Securities Act are a number of exemptions from the public offering requirements of the Securities Act. What is now Section 4(a)(2), the private offering exemption, originally was intended to be a narrow exemption for "the sale of an issue of securities to insurance companies or to a limited group of experienced investors," explained James Landis, a drafter of the Securities Act of 1933 and the second Chair of the SEC.  James M. Landis, The Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev. 29, 37 (1959).  The House Report, H. Rep. No. 85, 73d Cong., 1st Sess. (1933) added to Landis's characterization.  Exempt securities and exempt transactions were intended to address instances "where there is no practical need for [the Act's] application or where the public benefits are too remote."  Id. at 5.  Exempted transactions in Section 4 permitted an issuer "to make a specific or an isolated sale of its securities to a particular person, but insisting that if a sale of the issuer's securities should be made generally to the public that that transaction shall come within the purview of the Act."  Id. at 15-16.  The Commission was given in the initial version of the Securities Act "a further discretionary power carefully limited to exempt additional transactions and securities where the aggregate amount of the offering does not exceed $100,000. This power is deemed necessary for the effective administration of the bill but is expected to be used only in a sparing manner."  Id. at 6.

48.    The SEC's administrative construction was early established in a 1935 Opinion of the SEC's General Counsel that the determination whether a particular transaction involves a private or public offering depends not on any one factor but on all the surrounding circumstances. Apart from the number of offerees, important factors were the offeree's relationship to each other and to the issuer, the number of units offered, and the manner of offering.  Sec. Act Rel. 285 (1935).  The SEC long viewed an offering to approximately 25 persons not to involve a public offering, Sec. Act Rel. 285 (1935), in some instances permitting

offerings up to 100 institutional investors also to be considered private offerings. This remained the Commission's approach until the Supreme Court decided SEC v. Ralston Purina Co., 346 U.S. 119 (1953). See 2 LOSS, SELIGMAN & PAREDES, supra, at 328-332. See also Orrick, Non-Public Offerings of Corporate Securities – Limitations on the Exemption under the Federal Securities Act, 21 U. Pitt. L. Rev. 1, 10-13 (1959).

49. In its 1953 *Ralston Purina* decision, the Supreme Court explained that the private placement exemption was limited to investors who "could fend for themselves," meaning either they were able to evaluate the merits and risks of a nonpublic offering or had access to information comparable to the information which would be contained in a Securities Act registration statement. SEC Commissioner Orrick in 1958 would state of the exemption: "As a rule of thumb, the Commission has considered that an offering made to no more than 25 or 30 persons, who take the securities for investment and not for distribution, is generally a private transaction not requiring registration." Orrick, Some Observations on the Administration of the Securities Laws, 42 Minn. L. Rev. 25, 33 (1957).

50. In the initial decades of the Section 4(a)(2) exemption primarily was made for debt, and the proportion taken by life insurance companies was estimated to be as high as 90 percent or greater. See 3 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation at 357-362 (Wolters Kluwer 7th ed. 2025). In 1962, for example, 97 percent of private placements involved debt; in 1970, 83 percent of corporate public and private offerings were registered offerings, only 17 percent were private. Id. at 359.

51. The burden was on the defendant to show a right to the exemption. In 1973, the court in G. Eugene Found. v. First Fed. Corp., 663 F.2d 988 (10th Cir. 1973) denied the exemption when the sale by a single individual of a large block of stock to a single buyer was denied the Section 4(a)(2) exemption because there "was not evidence . . . of

what knowledge the [buyer] possessed concerning either the stock or the company, nor was he shown to be in a position to know such information could have been disclosed by registration." Several other cases limited the private offering exemption. See, e.g., Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680 (5th Cir. 1971) (the level of sophistication of the investor was not dispositive if he did not have "access to the kind of information which registration would provide"); Henderson v. Hayden Stone Inc., 461 F.2d 1069 (5th Cir. 1972) (the private placement exemption was not available when defendants could not prove how many offerings had been made and when); SEC v. Continental Tobacco Co., 463 F.2d 137 (5th Cir. 1972) (even when plaintiffs had received a brochure concerning the corporation and unaudited financial statements, the private plaintiff exemption was unavailable because: "The record does not show that each offeree had a relationship with Continental giving access to the kind of information that registration would have provided or an opportunity to inspect Continental's records or to verify for themselves statements made to them"); Doran v. Petroleum Management Corp., 545 F.2d 893 (5th Cir. 1977) (employed a disjunctive test which the private placement exemption either would be available if the offerees occupied a privileged or insider status relative to the issuer that afforded them access to information registration would otherwise provide, or by making actual disclosure without proving that the offerees occupied a privileged position). See generally other cases discussed in 3 LOSS,SELIGMAN & PAREDES, supra at 346-353.

52.    In 1982, the Commission sought to bring order to an area of law called by Ray Garrett Jr., a future SEC Chair, as "a kind of mishmash," see id. at 353, by adopting Regulation D. Regulation D was adopted after the Commission in 1972 earlier had adopted a more restrictive Rule 146 than the subsequently adopted Regulation D, see Sec. Act Rel. 5336 (1972), and subsequently Rule 240 for offerings up to $100,000 in a 12 month period, and Rule 242 for offerings up to $2

27

million made to up to 35 investors in addition to accredited investors. See generally 2 LOSS, SELIGMAN & PAREDES 375-387. Regulation D was adopted as an amalgamation of Rules 146, 240 and 242 with significant changes. See generally id. at 387-454.

53. The emphasis of Regulation D is an objective test to define accredited investors, aggregate offering price, information requirements, limitations on manner of offering, limitations of resale and notice of sale. Regulation D historically has proven most consequential for permitting issuers to proceed under Rule 506 which has no dollar limit on the amount that can be offered.

54. For many decades, Regulation D Rule 506 offerings could not be sold employing general advertising or general solicitation. Then in the JOBS (Jumpstart Our Business Startups) Act of 2012, Congress directed the Commission to revise its Rule 502(c) prohibition on general advertisings and solicitation so that it did not apply to Rule 506 offerings when "all purchasers of the securities are accredited investors."

55. The Commission's adoption on November 2, 2020, the day before the National election, by a 3-2 partisan vote, enacted further far reaching amendments to exempt offering rules "to facilitate capital formation and increase opportunities for investors by expanding access to capital for small and medium-sized businesses and entrepreneurs across the United States." Sec. Act Rels. 10,763 (2020) (proposal), 2020 Fed. Sec. L. Rep. (CCH) ¶82,416; 10,884 (2020) (adoption), 2020 Fed. Sec. L. Rep. (CCH) ¶82,737.

56. The proposal Release viewed exempt offerings systematically:

> In 2019, registered offerings accounted for $1.2 trillion (30.8 percent) of new capital, compared to approximately $2.7 trillion (69.2 percent) that we estimate was raised through exempt offerings. Of the approximately $2.7 trillion estimated as raised in exempt offerings in 2019, Table 1 shows the amounts that we estimate were raised under each of the identified exemptions:

29

**Table 1:  Overview of amounts raised in the exempt market in 2019**

| Exemption | Amounts Reported or Estimated as Raised in 2019 |
|---|---|
| Rule 506(b) of Regulation D | $1,492.0 billion |
| Rule 506(c) of Regulation D | 66.0 billion |
| Regulation A:  Tier 1 | 0.044 billion |
| Regulation A:  Tier 2 | 0.998 billion |
| Rule 504 of Regulation D | 0.228 billion |
| Regulation Crowdfunding | 0.062 billion |
| Other exempt offerings | 1,167.0 billion |

Id. at nn. 12-14.

The adoption Release summarized Securities Act exemptions including those adopted in its November 2, 2020 Release in a separate Table:

**Overview of Capital-Raising Exemptions**

| Type of Offering | Offering Limit within 12-month Period | General Solicitation | Issuer Requirements | Investor Requirements | SEC Filing Requirements | Restrictions on Resale | Preemption of State Registration and Qualification |
|---|---|---|---|---|---|---|---|
| Section 4(a)(2) | None | No | None | Transactions by an issuer not involving any public offering. *See SEC v. Ralston Purina Co.* | None | Yes. Restricted securities | No |
| Rule 506(b) | None | No | "Bad actor" disqualifications apply | Unlimited accredited investors<br><br>Up to 35 sophisticated but non-accredited investors in a 90-day period | Form D | Yes. Restricted securities | Yes |
| Rule 506(c) | None | Yes | "Bad actor" disqualifications apply | Unlimited accredited investors<br><br>Issuers must take reasonable steps to verify that all purchasers are accredited investors | Form D | Yes. Restricted securities | Yes |
| Rule 504 of Regulation D | $10 million | Permitted in limited circumstances | Excludes blank check companies, Exchange Act reporting companies, and investment companies<br><br>"Bad actor" disqualifications apply | None | Form D | Yes. Restricted securities except in limited circumstances | No |

30

57.    Regulation D during the 2018-2021 period was an exemption from the registration requirements of the 1933 Act only available to the issuer of the security. See 2 LOSS, SELIGMAN & PAREDES, supra at 427.

58.    There are two basic types of exemptions. Rule 504 applies to relatively small offerings made under the 1934 Act that occur exclusively within one or more states requiring state registration and the public filing and delivery of a substantive disclosure document. Because of the low aggregate offering limit ($5 million before the November 2020 amendments, increased to $10 million afterward) and the complexity of meeting varying state registration and disclosure requirements, Rule 504 has been used infrequently. As shown in Table 1 above, only about $0.228 billion was raised through Rule 504 offerings in 2019, compared with more than $1.5 trillion raised under Rules 506(b) and 506(c).

59.    By contrast, Rule 506 provides the most commonly-used exemptions and accounts for the vast majority of Regulation D offerings.

60.    Rule 506(b) has no dollar limit but after November 2020 limits the number of purchasers of securities from the issuer to no more than 35 nonaccredited investors in any 90 day-calendar period. Rule 506(b) also will permit an unlimited number of sales to accredited investors, as defined in Rule 501(a).

61.    Each nonaccredited investor may be advised by a purchaser's representative who has "such knowledge and experience in financial and business matters that he is capable of evaluating, alone, or . . . together with the purchaser, the merits and risks of the prospective investment." Rules 501(i); Rule 502(b)(2)(ii).

62.    When sales are made to nonaccredited investors under Rule 506(b)(2)(v), issuers are also required to give each purchaser, at a reasonable time before purchase, "the opportunity to ask questions and receive answers concerning the terms and conditions of the offering and to obtain any additional information which the issuer possesses or can

31

acquire without unreasonable effort or expense that is necessary to verify the accuracy of information furnished under [Rule 502(b)(2)(i) or (ii)]."

63. Information requirements are specified in Rule 502(b). For issuers not subject to the continuous reporting requirements of §§13 or 15(d) of the 1934 Act, the issuer is required to provide the same type of information required in Part II of Form 1-A if the issuer is eligible to claim an exemption under Regulation A or the information required in Part 1 of a registration statement that the issuer would be entitled to use such as Form S-1. Information requirements under Rule 502(b) are scaled for size with different standards for offerings up to $20 million than those over $20 million. Financial information must be prepared in accordance with Generally Accepted Accounting Standards if an offering involves more than $20 million. Exhibits required to be filed with Form S-1 need not be furnished to nonaccredited investors under Rule 502(b).

64. Issuers under Rule 502(b) must file a notice of sale with the SEC providing the information specified in Form D and update the form annually. Form D is a simplified, often check the box, notice that is often completed by a non-securities professional and requires disclosure of issuer's identity, principal place of business, contact information, related persons, industry group, issuer size, type of offering, duration of offering, types of securities, minimum investment, sales commission, offering and sales amount, number of nonaccredited investors, number of earlier investors, sales commissions, and use of proceeds.

65. Rule 506(b) issuers are prevented from engaging in general advertising and solicitations of a securities sale. See Rule 502(c); id. at 470-491.

66. As discussed further in Section VI, Rule 506(b) issuers also must comply with Rule 502(d) limits on resale which means exercising "reasonable care to assure that the purchasers are not underwriters."

67. Rule 506(c) goes further than Rule 506(b) and allows an unlimited number of sales to be made in an offering solely to accredited

investors. Rule 506(c) has no information requirements and since 2013 has permitted general advertising and soliciting. See Rule 502(c).

68.    Rule 501(a) after November 2020 lists 13 different types of accredited investors and before the 2020 amendments just listed the first eight of these types of accredited investors. See id. at 441-462.

69.    The first eight types of accredited investors available throughout the entire 2018-2021 period include several types of institutional investors such as specified banks, broker-dealer firms, investment advising firms, and insurance companies, any director, executive officer or general partner of the issuer; and natural persons whose individual net worth or joint net worth with a spouse exceeds $1 million or who added individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of the two most recent years and had a reasonable expectation of reaching the same income level in the current year.

70.    In November 2020, the SEC broadened the *accredited investor* definition to add any natural person who was certified as a registered securities broker, estimated then to be 691,041 individuals, and other types of securities professionals, clients of exempt specified family officers. See id. at 441-462.

71.    Under Rule 506(c)(2), the issuer must take reasonable steps to verify that the purchasers of the securities are accredited investors such as reviewing IRS filings of the purchaser's income, bank statements, a consumer report from at least one nationwide consumer reporting agency or receiving written confirmation that a registered broker-dealer, investment adviser, licensed attorney or certified public accountant had taken reasonable steps to verify that the purchaser is an accredited investor within the prior three months. See id. at 482-487.

72.    Rule 507(a) disqualifies persons from using either Rule 504 or 506 when they have been subject to any order, judgment or decree of any court of competent jurisdiction or temporarily, preliminarily or

permanently enjoined for failure to comply with Regulation D's Rule 503. There are exceptions for good faith, see Rule 507(b), or insignificant deviations under Rule 508. See id. at 493-496.

73.    The marketing of a Rule 506 offering either under Rule 506(b) or 506(c) usually results in the preparation of an offering circular. This provides written detail concerning the issuance to investors and can be the basis of a fraud claim if material misstatements or omissions are made, typically for private litigants under §10(b) of the Securities Exchange Act and Rule 10b-5, which – unlike strict liability under §11 of the Securities Act – requires showing that the defendants acted wrongfully, and that investors relied on the material misstatement or omission. See 8 Louis Loss, Joel Seligman & Troy Paredes, Securities Regulation 168-240 (Wolters Kluwer 6th ed. 2022); 9 Louis Loss, Joel Seligman & Troy Paredes 524-622 (Wolters Kluwer 6th ed. 2023).

74.    Regulation D does not require several investor protection mechanisms that are required in a registered Securities Act offering, such as a requirement to hire an underwriter, imposing full responsibility on each signer of a registered offering including specified corporate insiders, underwriters and specified experts, or a requirement of due diligence to ensure that each material fact was made after a reasonable investigation, and there were reasonable grounds to believe that each part of the registration statement, when it became effective was true.

## VI.  Reasonable Care to Assure that Purchasers ARE Not Underwriters

75.    Rule 506(b) issuers also must comply with Rule 502(d) limits on resale which means exercising "reasonable care to assure that the purchasers are not underwriters." Under Section 2(a)(11) of the Securities Act, an "underwriter" is broadly defined as any person who purchases securities from the issuer "with a view to…distribution" (or who participates in or facilitates such a distribution). Even an individual

34

investor can be deemed a statutory underwriter if they serve as a link in an unregistered distribution from the issuer to the public. SEC v. Chinese Consol. Benevolent Ass'n, Inc., 120 F.2d 738, 740 (2d Cir. 1941), *cert. denied*, 314 U.S. 618; Harden v. Raffensperger, Hughes & Co., Inc., 65 F.3d 1392 (7th Cir. 1995); SEC v. Softpoint, Inc., 958 F. Supp. 846, 860 (S.D.N.Y. 1997) ("The prohibitions of Section 5 are not limited to control persons; the language sweeps broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security.") To preserve the exemption and avoid an improper public distribution, the issuer must exercise reasonable care to ensure that the purchasers of the securities are not Section 2(a)(11) underwriters. Under Rule 502(d), reasonable care can be demonstrated by:

(a)    Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;

(b)    Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available; and

(c)    Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities.

76.    The issuer should conduct a reasonable inquiry with respect to each purchaser to determine whether the purchaser is a Section 2(a)(11) underwriter purchasing for resale or is acquiring for investment. This means asking prospective investors whether they are purchasing for their own account or on behalf of others and confirming that they have no pre-arranged plans to resell the securities. For example, the issuer might require investors to complete questionnaires or attest to their investment purpose. If an investor is unwilling to commit to a purchase

35

for long-term investment, or if other "red flags" emerge (such as the investor indicating an intent to quickly flip or distribute the securities to others), the issuer should treat that as a warning sign. Indicia that a purchaser may be acting as an underwriter include any expressed intent to resell immediately, forwarding of offering securities to multiple parties, unusual commissions or arrangements suggestive of a finder's fee, or other involvement in the distribution process (e.g. the investor is a broker-dealer or has lined up downstream buyers). An investor exhibiting such behavior could be viewed as taking the securities "with a view to distribution," inconsistent with the Regulation D exemption. The courts and the SEC have provided limited additional interpretation of Rule 502(d)  See, e.g., SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072 (9th Cir. 2010) (denying that defendant had established reasonable care under Rule 502(d): "Registration exemptions are to be construed narrowly in favor of disclosure." Citing SEC v. Murphy, 626 F.2d 633, 641 (9th Cir. 1980). See also SEC v. Telegram Grp., 448 F. Supp. 3d 352, 380-381 (S.D.N.Y. 2020) (finding Telegram failed to use reasonable care to ensure that the Initial Purchasers were not Underwriters when the initial purchasers bought Grams from Telegram, the issuer, with an intent to resell them for profit in the secondary market soon after launch of the TON blockchain).

77.    Under Rule 502(d), the issuer must provide written representations to each purchaser prior to sale affirming that the investor is purchasing for investment purposes only and not with any intention to resell or distribute the securities unless an exemption from registration is available. Often, the subscription agreement or stock purchase agreement will contain an investor warranty that the purchaser is acquiring the securities for their own account, not as an agent or nominee for someone else, and "not with a view to distribution." This warning is typically highlighted in the offering materials or private placement memorandum and reiterated in the purchase documents. By securing these representations and delivering explicit resale disclaimers

in writing, the issuer creates a record that each investor was informed of, and agreed to, resale restrictions, supporting the issuer's reasonable care defense. During 2018–2021, as in other periods, issuers routinely provided these investment-intent representations and resale acknowledgments as a matter of best practice, reflecting industry standards of Rule 502(d) compliance.

78.    In addition to these disclosures, issuers must enforce resale restrictions in practice. Rule 502(d) specifically notes that placing a restrictive legend on the securities is an accepted method of demonstrating reasonable care. Accordingly, stock certificates or electronic book-entry notations for Regulation D shares are legended to state that the securities have not been registered under the Securities Act and cannot be sold or transferred without registration or a valid exemption. A typical legend used in private offerings throughout 2018–2021 recites that the security "has not been registered under the 1933 Act" and that the holder agrees it may only be offered or sold pursuant to an effective registration statement or an applicable exemption such as Rule 144, with any prospective transferee often required to furnish a legal opinion to the issuer's transfer agent to confirm an exemption. In practice, issuers instruct their transfer agents to reject any transfer of the securities that is not accompanied by either proof of registration or an attorney's opinion letter verifying an exemption, for instance, an opinion that the resale meets Rule 144's conditions after the requisite holding period. Additionally, many private placement agreements impose a contractual lock-up period or require investors to agree not to resell for a specified time period, further ensuring that no immediate distribution to the public can occur. These measures – legends, stop-transfer instructions, and contractual resale prohibitions – are all concrete steps that manifest the issuer's continuing diligence in preventing any unregistered "downstream" sales. They help ensure that each purchaser truly holds the securities for investment and will not circumvent Securities Act registration requirements.

37

79.    In tokenized offerings, these transfer restrictions can be expressed directly in the smart contract so that every attempted transfer is vetted for compliance before it settles.  For example, on the Ethereum blockchain, the ERC-1404 smart contract standard for issuing tokens with transfer restrictions provides a mechanism for "issuers to enforce investor limit, control flowback between US and non-US investors, or other similar restrictions." https://github.com/simple-restricted-token/simple-restricted-token. This smart contract adds compliance hooks so that token transfers proceed only when issuer defined rules are satisfied—commonly customer whitelisting based on know your customer information, jurisdictional blocks, and lock-up periods. This is not just a theoretical possibility. Several issuers have utilized this technology and issued security tokens with built in transfer restrictions. For example, Arca U.S. Treasury Fund ("ArCoin") issued fund shares on Ethereum as "ArCoin," with AML/KYC requirements built into the token's smart contracts so that only eligible wallets can hold/transfer the security.  https://www.arcalabs.com/about-arcoin.

80.    Even prior to the implementation of the ERC-1404 smart contract standard, token issuers were able to implement transfer restrictions when issuing ERC-20 tokens, the standardized fungible token of the Ethereum blockchain utilized by Nexo. For example, iCap Equity issued real estate security tokens as ERC-20 tokens with transfer restrictions to comply with Rule 144 of the Securities Act of 1933, which requires a one-year mandatory lockup period for securities sold. https://www.coindesk.com/markets/2019/09/16/harbor-tokenizes-real-estate-funds-worth-100-million-on-ethereum.

81.    Stablecoin issuers also demonstrate large-scale, real-world use of code-based transfer controls. Circle's USDC stablecoin has an explicit network blacklisting policy: when an address is blacklisted, it cannot send or receive USDC and the balance is blocked on-chain. This policy is publicly documented and used, including a June/July 2020 freeze of $100,000 USDC at law-enforcement request and freezes of

38

Tornado Cash-linked addresses following OFAC designations in August 2022. *See* Centre Consortium USDC Network Blacklisting Policy.

82. I have reviewed Nexo's response to Plaintiff's Interrogatory No. 10, which asked Nexo to "state all evidence" it intended to rely upon to support its contention that its "sale of the NEXO Token to Plaintiff was exempt from the registration requirements of the Securities Act." As part of its response, Nexo states that it "took reasonable care to assure that the purchasers of the NEXO Token in the U.S. were not statutory underwriters." However, Nexo does not identify any steps it took to ensure that "purchasers of the NEXO Token in the U.S. were not statutory underwriters." Nexo does not identify any (a) inquiry to determine if U.S. purchasers were acquiring the securities for themselves or for other persons or (b) any restrictions it placed on the transferability and sale of the NEXO Token. In fact, Nexo's co-founder Antoni Trenchev did not identify any steps Nexo took to ensure that purchasers were not statutory underwriters and confirmed that no transfer restrictions were imposed on Tokens. Trenchev Dep. 206:4-9 ("Q: Did Nexo place restrictions on the resale of tokens sold to accredited investors? A: Well, I don't know how we could have placed restrictions on what an owner of an asset can do with his or her asset.").

83. Mr. Trenchev was also unable to say whether the NEXO Token was available to U.S. purchasers on Nexo's own exchange. Trenchev Dep. 211:4-12.

84. I also understand that Nexo did not place any restrictions on the transferability of the NEXO Token into the Token's smart contract, even though it was aware that it was technologically possible to do so. Trenchev Dep. 206:12-207:1 ("Q: Did Nexo include any transfer restrictions in its Nexo Token smart contract? A. I don't think that we did that.").

85. Nexo also does not state that it took reasonable care to assure that purchasers of the NEXO Token outside the United States were not

statutory underwriters. But an issuer must take reasonable steps to ensure that even its offshore investors are not purchasing with a view to distribute into the U.S. This means in practice that foreign purchasers in a Reg D deal should be subjected to the same investigation and resale restrictions as U.S. purchasers: they should provide written representations of their investment intent (no intent to resell quickly), agree to receive securities bearing U.S. transfer restrictions, and be notified of the prohibition on unregistered resales into any market (including U.S. markets). These precautions are part of the issuer's reasonable care obligation. The failure to apply such measures to non-U.S. buyers would create a dangerous gap in compliance, effectively inviting regulatory violation. Indeed, U.S. regulators have cautioned that issuers cannot use offshore transactions as a mere conduit to avoid registration.

86.    The SEC's guidance confirms that foreign issuers too can utilize Regulation D, but the resulting securities will be restricted and subject to Rule 502(d)'s resale limits.  WCRS Group, Inc., 987 SEC No-Act. LEXIS 1488 (Jan. 8, 1987) (resale of securities by U.S. investors would be satisfied when (1) each seller received an opinion of counsel acceptable to WCRS that registration is not required or become effective; (2) no transfers for at least one year; . . . (4) each certificate representing the Seller's Common Stock will bear a legend stating that such shares cannot be transferred without exemption from registration or an exemption); Parkway Group PLC, 1988 SEC No-Act. LEXIS 550 (May 3, 1988) (similar).

87.    The policy rationale for this is straightforward: a foreign purchaser is just as capable of acting as a conduit for an unregistered distribution into the United States as a domestic purchaser. For example, without resale restrictions, an issuer could sell securities to an offshore investor and that investor could soon resell those securities into the U.S. markets or to U.S. persons.

\* \* \*

40

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: _April 17_____, 2026

_____

Professor Joel Seligman

Dean Emeritus and Professor

Washington University School of Law

41

**Exhibit 1**

**JOEL SELIGMAN**
*Curriculum vitae*

Washington University School of Law
joelseligman@wustl.edu

April 2026

**EDUCATION**

Harvard University Law School, J.D. 1974
Cum Laude
University of California at Los Angeles,
A.B. 1971, Magna Cum Laude
Member, Phi Beta Kappa Society

**EMPLOYMENT EXPERIENCE**

2020-present          Dean Emeritus and Professor
                      Washington University School of Law

2018-2021             President Emeritus and University Professor
                      University of Rochester

2005-2018             President, CEO and G. Robert Witmer, Jr. University
                      Professor
                      University of Rochester

1999-2005             Dean and Ethan A.H. Shepley University Professor
                      Washington University School of Law

1995-1999             Dean and Samuel M. Fegtly Professor of Law
                      The University of Arizona College of Law

1987-1995             Professor of Law
                      The University of Michigan Law School

1

| | |
|---|---|
| 1986-1987 | Visiting Professor of Law<br>The University of Michigan Law School |
| 1983-1986 | Professor of Law<br>George Washington University Law School |
| 1977-1983 | Professor<br>Northeastern University Law School |
| 1974-1977 | Corporate Accountability Research Group |

## CONSULTANT

| | |
|---|---|
| 1988-1989 | Consultant, Office of Technology Assessment |
| 1983 | Consultant, Department of Transportation |
| 1979-1982 | Consultant, Federal Trade Commission |

## REPORTER

| | |
|---|---|
| 1998-2002 | National Conference of Commissioners on Uniform State Laws, Revision of Uniform Securities Act |

## CHAIR

| | |
|---|---|
| 2000-2001 | Securities and Exchange Commission Advisory Committee on Market Information |

## PUBLICATIONS

### *BOOKS*

With Mary Schwab Seligman, **The Good Society and Tyrants:  The Intractable Struggle** (Cognella Press 2025)

2

**Twelve Great Years** (Gatekeeper Press 2022).

**Misalignment:  The New Financial Order and the Failure of Regulation** (Wolters Kluwer 2020).

With Louis Loss and Troy Paredes,  **Securities Regulation & Annual Supplement** (4th & 5th eds. Wolters Kluwer Law & Business).

With Louis Loss and Troy Paredes, 1-10 **Securities Regulation** (6th ed. Wolters Kluwer Law & Business).

With Louis Loss and Troy Paredes, 1-5 **Securities Regulation** (7th ed. Wolters Kluwer Law & Business).

With Louis Loss and Troy Paredes, 1-2 **Fundamentals of Securities Regulation & Annual Supplement** (8th ed. 2024) (earlier **Fundamentals** co-written with Louis Loss and Troy Paredes, 3d ed. Aspen Law & Business, 1994; 4th ed. Aspen Law & Business, 2000; 5th ed. Aspen Publishers, 2004; 6th ed. 2011; 7th ed. 2018).

With John Coffee and Hillary Sale, **Securities Regulation** (9th ed. Foundation Press, 2007).

**The New Uniform Securities Act** (Aspen Law & Business, 2003).

With John Coffee, **Securities Regulation** (8th ed. Foundation Press, 1998 and 9th ed. 2002).

**Corporations:  Cases and Materials** (Aspen Law & Business, 1995).

**The SEC and the Future of Finance** (Praeger, 1985).

**The Transformation of Wall Street:  A History of the Securities and Exchange Commission and Modern Corporate Finance** (Houghton Mifflin, 1982; rev. ed. Northeastern University Press, 1995; and 3d ed Aspen Publishing, 2003).

**The High Citadel:  The Influence of Harvard Law School** (Houghton Mifflin, 1987).

3

With Ralph Nader and Mark Green, **Constitutionalizing the Corporation:  The Case for the Federal Chartering of Giant Corporations** (Report issued January 1976; a revised hardcover version was published in September 1976 by W.W. Norton under the title:  **Taming the Giant Corporation**).


### *ARTICLES*

**The War on the SEC is Different**, 53 Sec. Reg. L. J. 188 (2025).

**Is Restructuring the Answer?**, A Book Review of Stephen H. Legomensky's *Reimagining the American Union:  The Case for Abolishing State Government* (Los Angeles Review of Books 2025).

With John Coffee, **About Face:  How Much of Current SEC Policy Will the Trump Administration Reverse?**, Columbia Law School's Blog on Corporations and the Capital Markets (Dec. 3, 2024).

**The Keys to the Kingdom:  The Unexpectedly Unsettled Definitions of *Security* and *Sale* and the Overruling of *Chevron***, 22 Berkeley Bus. L.J. 405 (2025).

**On the Value of History:  A Review of A.C. Pritchard & Robert B. Thompson, A History of Securities Law in the Supreme Court**, 47 Seattle U. L. Rev. 987 (2024).

**The Judicial Assault on the Administrative State**, 100 Wash. U. L. Rev. 1687 (2023).

**The Rise and Fall of Cryptocurrency:  The Three Paths Forward**, 19 NYU J. L. & Bus. 93 (Fall 2022)

**Framing the Issues:  Board Diversity and Corporate Purpose**, 12 Harvard Bus. L. Rev. 249 (Summer 2022).

With Andrew Tuch, **The Further Erosion of Shareholder Protection:  Expanded Exemptions, SPAC Mergers, and Direct Listings**, 108 Iowa L. Rev. 303 (2022).

**Payment for Order Flow**, 18 Hastings Bus. L.J. 3 (2021).

**In Memory of Harvey J. Goldschmid,** 92 Wash. U. L. Rev. 249 (2016).

4

**The New Financial Order:  An Essay for Alan Bromberg**, 68 SMU L. Rev. 877 (2015).

**Memories of Bill Cary**, 2 Colum. Bus. L. Rev. 318 (2013).

**Key Implications of the Dodd-Frank Act for the Independent Regulatory Agencies**, 89 Wash. U. L. Rev. 1 (2011).

**The SEC in a Time of Discontinuity**, 95 Va. L. Rev. 667 (2009).

**In Honor of Harvey Goldschmid**, 106 Colum. L. Rev. 1479 (2006).

**Should Investment Companies Be Subject to a New Statutory Self-Regulatory Organization?**, 83 Wash. U. L. Q. 1115 (2005); 2 ICFAI J. Corp. & Sec. L. 43 (2005).

**A Modest Revolution in Corporate Governance**, 80 Notre Dame L. Rev. 1159 (2005).

**Rethinking Private Securities Litigation**, 73 U. Cin. L. Rev. 95 (2004).

**Cautious Evolution or Perennial Irresolution:  Stock Market Self-Regulation During the First 70 Years of the Securities and Exchange Commission**, 59 Bus. Law. 1347 (2004).

**Self-Funding for the Securities and Exchange Commission**, 28 Nova. L. Rev. 233 (2004).

**A Comment on Accounting and Auditing**, 47 St. Louis U. L. J. 967 (2003).

**The New Uniform Securities Act**, 81 Wash. U. L. Q. 243 (2003).

**No One Can Serve Two Masters:  Corporate and Securities Law after Enron**, 80 Wash. U. L. Q. 449 (2002).

**Rethinking Securities Markets:  The SEC Advisory Committee on Market Information and the Future of the National Market System**, 57 Bus. Law. 637 (2002).

**The Nontrial Adversarial Model**, 64 Law & Contemp. Probs. 97 (Spring/Summer 2001).

5

**The Changing Nature of Federal Regulation**, 6 Wash. U. J. L. & Pol'y 205 (2001).

**In Memoriam:  Louis Loss**, 111 Harv. L. Rev. 2141 (1998).

**A Mature Synthesis:  *O'Hagan* Resolves "Insider" Trading's Most Vexing Problems**, 23 Del. J. Corp. L. 1 (1998).

**Götterdämmerung for the Securities Act?**, 75 Wash. U. L. Q. 887 (1997).

**The Private Securities Reform Act of 1995**, 38 Ariz. L. Rev. 717 (1996).

**The Quiet Revolution:  Securities Arbitration Confront the Hard Questions**, 33 Hous. L. Rev. 327 (1996).

**The Mandatory Disclosure System and Foreign Firms**, 4 Pacific Rim L. & Policy J. 807 (1995).

**The SEC's Soft Information Revolution**, 63 Fordham L. Rev. 1953 (1995).

**Another *Un*special Study:  The SEC's Market 2000 Report and Competitive Developments in the United States Capital Markets**, 50 Bus. Law. 485 (1995).

**The Obsolescence of Wall Street:  A Contextual Approach to the Evolving Structure of Federal Securities Regulation**, 93 Mich. L. Rev. 649 (1995).

**The Merits Do Matter**, 108 Harv. L. Rev. 438 (1994).

**The Merits Still Matter**, 108 Harv. L. Rev. 749 (1995).

**The Implications of *Central Bank***, 49 Bus. Law. 1429 (1994).

**The New Corporate Law**, 59 Brook. L. Rev. 1 (1993).

**Accounting and the New Corporate Law**, 50 Wash. & Lee L. Rev. 943 (1993).

**The Disinterested Person:  An Alternative Approach to Shareholder Derivative Litigation**, 55 Law & Contemp. Prob. 357 (Autumn 1992).

6

**The Historical Need for a Mandatory Corporate Disclosure System**, 9 J. Corp. L. 1 (1983), *reprinted in* 16 Sec. L. Rev. 3 (1984); *reprinted in* 1 ABA Sec. of Bus. L., Selected Articles on Federal Securities Law 329 (1991).

**The Case for Federal Minimum Corporate Law Standards**, 49 Md. L. Rev. 947 (1990).

**The Washington Public Power Supply System Debacle**, 14 J. Corp. L. 889 (1989).

**Introduction:  Symposium:  Issues in Corporate Governance**, 22 Mich. J. L. Ref. 1 (1988).

**The Internationalization of the Securities Markets:  Preface to a Symposium**, 9 Mich. Y.B. Int'l Legal Stud. 1 (1988).

**A Sheep in Wolf's Clothing:  The American Law Institute's Corporate Governance Project**, 55 Geo. Wash. L. Rev. 325 (1987).

**Equal Protection in Shareholder Voting Rights:  The One Common Share, One Vote Controversy**, 54 Geo. Wash. L. Rev. 687 (1986) (also published as a report of the Investor Responsibility Research Center, and in Knights, Raiders & Targets, ch. 31) (J. Coffee, L. Lowenstein & S. Rose-Ackerman eds. 1988).

**The SEC and Accounting:  A Historical Perspective**, 7 J. Comp. & Cap. Market L. 241 (1985).

**The Reformulation of Federal Securities Law Concerning Nonpublic Information**, 73 Geo. L. J. 1083 (1985), *reprinted in* 18 Sec. L. Rev. 119 (1986).

**The Municipal Disclosure Debate**, 9 Del. J. Corp. L. 647 (1984).

**Reappraising the Appraisal Remedy**, 52 Geo. Wash. L. Rev. 829 (1984), *reprinted in* 28 Corp. Prac. Commentator 1 (1986).

**The Application of the Federal Antitrust Laws to Municipal Taxicab Regulation**, 26 J. Urb. & Contemp. L. 25 (1984) (initially published as a Department of Transportation study).

**The Future of the National Market System**, 10 J. Corp. L. 79 (1984).

7

**The Structure of the Options Market**, 10 J. Corp. L. 141 (1984).

**Federal Depository Institutions Life Insurance**, 31 Drake L. Rev. 591 (1984).

**The Securities and Exchange Commission and Corporate Democracy**, 3 U. Dayton L. Rev. 1 (1978).

**A Brief History of the Delaware General Corporation Law of 1899**, 1 Del. J. Corp. L. 249 (1976).

### ORGANIZATIONS

Member, The State Bar of California.

Member, ABA Task Force on Corporate Responsibility (2002).

Member, Professional Ethics Executive Committee of the American Institute of Certified Public Accountants (2000-2002).

Member, New York Stock Exchange Legal Advisory Committee (1998-1999).

Member, The University of Arizona Foundation Board of Directors (1998-1999).

Member, Arizona State Bar Board of Governors, *ex officio* member (1995-1999).

Member, NASAA Task Force on the Future of State and Federal Securities Regulation (1995-1996).

Member, NASD Legal Advisory Board (1994-1997).

Member, Advisory Committee, American Law Institute Corporate Governance Project (1980-1992).

Member, Federal Reserve Bank of New York Upstate New York Regional Advisory Board (2009-2012).

Governor, NASD Board of Governors (2004-2007).

Governor, FINRA Board of Governors (2007-2015).

8

Member, Eastman Kodak Company Board of Directors (2009-2013).

Member, COFHE Board (2009-2012).

Economic Security Solutions Group, AARP (2004-2005).

Co-chair, Finger Lakes Regional Economic Development Council (2011-2016).

Member, University Research Association Board of Trustees (2013-2016).

Member, National Security Higher Education Advisory Board (2010-2012).

Member, American Academy of Arts and Sciences.

**Exhibit 2**

**EXPERT WITNESS CASE LIST**

Cambridge Retirement System v. Amneal Pharmaceuticals, Inc., et al., Superior Court of New Jersey, Somerset County:  Law Division, Docket No. SOM-L-1701-19

Robison v. Marver, et al., Superior Court of the State of Washington, County of King, Docket No. 20-2-01777-9

Strober, et al. v. Browd, et al., Superior Court of the State of Washington, County of King, Docket No. 20-02-07762-3 SEA

In re Grupo Televisa Litig., No. 18 Civ. 1979 (LLS) (S.D.N.Y. 2021) on behalf of Robbins Geller.

In re Ripple Labs Inc. Litig., Case No. 4:18-cv-06753-PJH (N.D. Cal. 2023).

In re Qualcomm Inc. Sec. Litig., Case No. 3:17-cv-00121-JO-MSB (S. D. Cal.)

**Exhibit 3**

**RECORD MATERIALS REFERENCED**

The following is a list of portions of the record referenced in my report. Citations to statutes, cases, treatises, articles, or other authorities are included in the body of the report.

*Deposition of Antoni Trenchev*, taken in *Cress v. Nexo Capital Inc.*, Case No. 23-cv-00882-TSH (N.D. Cal.), including cited portions at 70:1–71:7; 191:14–192:18; 206:4–9; 206:12–207:1; and 211:4–12.

Defendant Nexo Capital Inc.'s April 18, 2025 Response to Plaintiff's Interrogatory No. 10.