# EXHIBIT 12

# Expert Report of Bruce Mizrach

**Expert Report of Prof. Bruce Mizrach**
**Cress v. Nexo**
**April 20, 2026**

## 1.1 Background and qualifications:

I have an A.B. in economics and history from Tufts University.  I was elected to Phi Beta Kappa and graduated summa cum laude.  I received my Ph.D. in economics in 1987 from the University of Pennsylvania and have taught at Boston College, the Stern School of Business at NYU, and the Wharton School at the University of Pennsylvania.

I am a tenured full professor of economics at Rutgers University where I have taught since 1995. I teach graduate and undergraduate classes in financial economics.  My specialization is in market microstructure which studies the trading mechanisms of financial markets.  I have published analyses of the equity, U.S. Treasury, corporate bond, energy, and digital asset markets.  My curriculum vitae, which is attached, provides a complete listing of my publications.

I was the editor of *Studies in Nonlinear Dynamics and Econometrics*, a journal devoted to the impact of nonlinear models on the macroeconomy and financial markets, for over 25 years.  My most recent work is on the market microstructure of electronic limit order markets in equities, fixed income, crude oil and digital assets.

My co-author Saketh Aleti and I published the first analysis of order trail data from digital asset exchanges (Aleti and Mizrach, 2021).  We looked at Bitcoin and Ethereum trading on the spot and futures markets.  In 2023, I published a paper (Kapengut and Mizrach, 2023) on the Ethereum blockchain looking at the transition to proof-of-stake.  The same manuscript also provides a comparison to the Polygon and Solana blockchains. In 2025, I published a third paper (Mizrach, 2025) on stablecoins like Tether and USD Coin. My manuscript analyzes the collateral, survivorship, blockchain linkages, fees, and microstructure of the ten leading stablecoins. This paper was featured in an invited article published in the *Financial Times* and has been presented at both the Federal Reserve Board and the European Central Bank.

I have provided policy advice to the Federal Reserve Banks of New York and St. Louis, the U.S. Department of Treasury Office of Financial Research, and the Financial Regulatory Authority.

I have operated a consulting business since 1998, the Nonlinear Analysis Group, in which I have developed and implemented trading strategies for my own accounts, as well as buy side, sell side, and hedge fund clients.

I have been involved in 14 cases in which I was asked to serve as an expert including the 1993 and 2001 World Trade Center litigation in which Cantor-Fitzgerald was the plaintiff. In nine of the 14 cases, the damages sought exceeded $100 million.  Since 2023, I have been involved in five crypto related cases, including serving as the SEC's expert in the civil case against Do Kwon and Terraform Labs. My curriculum vitae, which is attached to this report, describes in detail my involvement in each case.

I am being compensated at a rate of $1,000 per hour, for most of my work, though will be compensated at a rate of $1,250 per hour for time spent testifying at deposition and/or at trial. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

My work on this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter. In particular, the damages figures set forth in this report are calculated using digital asset prices as of the date of submission of this report, and pre-judgment interest is calculated through the date of this report. Should this matter proceed to judgment, these figures may be recalculated using the same methodology set forth herein, substituting asset prices as of the date of judgment and extending the interest computation through that date.

## 1.2 Assignment

I was asked by attorneys for Mr. Cress to analyze damages caused by the following:

- Entering the OTC and loan transactions as a result of misrepresentations made by Nexo regarding its (1) Liquidation Relief Program, (2) prompt responsiveness, (3) interest on his posted collateral, and (4) the best rates on OTC purchases, and (5) its fees on digital asset purchases and liquidations as alleged by Cress in his First Cause of Action.
- Statutory damages under Cal. Corp. Code §25503 for Nexo's sale of the Nexo Token without registration as alleged by Cress in his Third Cause of Action.
- Statutory damages under Cal. Corp. Code § 25501 for fraud in the offer or sale of the Nexo Token as alleged by Cress in his Fourth Cause of Action.
- Mr. Cress' purchase of Nexo Tokens based on Nexo's representation that the Nexo Token is registered with the SEC as a security as alleged in the Fifth Cause of Action.
- Nexo's theft of Cress' property as alleged in Cress' Sixth Cause of Action.
- Nexo's violation of the Racketeer Influenced and Corrupt Organizations Act as alleged in Plaintiff's Seventh and Eighth Cause of Action.
- Nexo's failure to disclose its OTC and liquidation fees as alleged in Plaintiff's Ninth Cause of Action.
- Nexo's breach of the Cryptocurrency Purchase Agreement as alleged in the Tenth Cause of Action.

I have also analyzed the amount of restitution necessary to restore Mr. Cress to the status quo under Cal. Bus. & Prof. §§ 17200, *et seq* for Nexo's unlawful conduct as alleged by Cress in his Second Cause of Action.

## 2. Important facts

(1) A large portion of Mr. Cress's investment portfolio was in Bitcoin (BTC). Nexo also encouraged Cress to invest in its own NEXO token by making representations regarding its

regulatory status and conditioning lending rates on NEXO holdings.  As I show in **Figure 1**, the NEXO Token declined more than Bitcoin during the relevant period and made Cress more vulnerable to liquidation. In fact, throughout its history the NEXO Token has been substantially more volatile than BTC. The monthly realized volatility[1] of NEXO is 4.23 times that of BTC over the period from April 1 to June 30, 2021.

**Figure 1: Price Fluctuation in Bitcoin (BTC) and Nexo (NEXO)**
**April 1 – June 30, 2021**



**Source**: Coingecko

---

[1] The realized volatility is a 30-day rolling moving average of the squared returns.

(2) Nexo forcibly liquidated assets from Mr. Cress's portfolio on May 23, 2021 when he was still below the loan-to-value (LTV) ratio of 83.33% that Nexo required.

(3) Nexo has stated that they used a data feed from Coin Market Cap to determine liquidation thresholds for Cress's margin trades.[2]  They have stated that they do not have the relevant pricing data from Coin Market Cap.[3]  They do state that prices from Coinbase were part of this data feed.[4]

(4) Since Nexo has not provided price information from the source purportedly used to determine LTV and initiate liquidations, I have relied on external sources for marking Cress's portfolio to the market.  Based on my knowledge of the market, I have relied on the deepest liquidity pools. For Bitcoin and Ethereum, I am using prices from Coinbase, the exchange most often offering the best prices based on my 2021 research with Aleti.  Coinbase did not provide trading in NEXO, so I have utilized data from Huobi.  This was the most active exchange in the Kaiko database with the NEXO-Tether (USDT) pair. Huobi was the predominant exchange used by Nexo to buy and sell NEXO during the time Mr. Cress was liquidated in May and June 2021.[5]

(5) Mr. Cress was concerned about intra-daily price fluctuations impacting his collateral values. He expected that his VIP status[6] would insulate him from these variations which as I show in **Figure 2** were substantial:

---

[2] Nexo's Responses to Plaintiff's Request for Production 107, 108, 109.
[3] Nexo's First Amended Objections and Response to Plaintiff's Interrogatory NO.15(i) at 24: "Nexo does not possess the exact LTV, price feed value, or other trigger used by the Nexo Oracle to initiate Plaintiff's liquidation transactions."
[4] Nexo's Second Amended Responses to Plaintiff's Interrogatory No. 7.
[5] Nexo's Responses to Plaintiff's Interrogatory No. 12.
[6] NEXO VIP Relationship Program, NEXO 2706-2718.  Liquidation relief is mentioned at NEXO 2714.

**Figure 2: Intradaily Price Variation of BTC-USD Prices on Coinbase
May 15 to June 30, 2021**



Daily fluctuations average over $3,600 per day in the sample.

(6) Despite purportedly being a Nexo VIP customer, the company responded very slowly to Mr. Cress.  For example, on March 26, 2021 at 20:09:42 UTC, Mr. Cress deposited 5,400,000 USDT (Tether) on Nexo[7] with the intention of buying both BTC and NEXO tokens.  The BTC are only credited to his account at 2021-03-27 22:58:00 UTC[8], a delay of more than 24 hours.

---

[7] https://etherscan.io/tx/0x28fcd494274f0314758862daaa876f44244c449d674562b78d8ef6bcaab6ecff
[8] NEXO 0137019

It also took Cress nearly two weeks to receive a reply to his request for a BTC liquidation price. On April 16, 2021, Cress asks[9] for his "new bitcoin liquidation price level."  He does not receive a reply[10] from his dedicated relationship manager[11] Hristiyan Hristov until April 30 after Cress had sent a second e-mail on April 29.  Mr. Hristov told Mr. Cress on April 30, 2021 that his liquidation price was $29,859.22.[12] However, Nexo's records show it began forced liquidations of Mr. Cress' assets on May 23, 2021 at a $32,163.68 BTC price, and again on June 21, 2021 at a $31,764.60 BTC price. [13]

Nexo's communication gaps became all the more harmful as Cress' portfolio began to deteriorate. For example, on May 23, 2021, the day of Cress's first liquidation, Cress requests a call with Hristov to discuss a "Flash crash scenario."[14] It does not appear Hristov replies to this email. Cress followed up two days later on May 25, 2021 asking for a quick call with Hristov to discuss selling some assets to "lower [his] liquidation point to a little bit below $30,000." It does not appear Hristov replies to this email.[15] Cress followed up again on May 27, asking again for a call to Hristov. Hristov replied that he was "not available for calls this week."[16]

Cress opened a customer support case on May 28, 2021 requesting a discussion with Nexo because he was "dealing with $12,000,000 AND that is my whole life savings, so I really need to try to have a discussion."[17] Cress reiterated "Please also understand this has to be reviewed and discussed very fast," and Nexo support confirmed "It will be reviewed as soon as possible." Cress left his phone number with Nexo support and told them "You can also call me at any time of the day." Nobody at Nexo contacted him again until Cress reached out again on June 11.

In a June 11, 2021 email exchange with Mr. Hristov, Cress mentions his customer support case opened at the end of May, and that he has "been trying very hard to reach someone at Nexo for help protecting my assets."[18] He discusses that Nexo support promised him a response, but that nobody contacted him. Cress tells Hristov, "Twelve days is a long time to have eight figures of assets at risk and not have a response." Hristov finally agreed to a call, over two weeks after Cress had requested to speak.[19] Hristov instructed Cress to use Nexo's Collateral Swap service, which did not function, and was "not at all what it sounds like," and on June 13 notes "I almost lost millions of dollars permanently if I did those swaps." Cress once again asks Hristov if there

---

[9] NEXO 3386, e-mail from Cress to Hristov, subject: Re: Borrowing scenarios.

[10] NEXO 3386, e-mail from Hristov to Cress, subject: Re: Borrowing scenarios.

[11] The VIP Program promised replies within hours and never more than 24 hours, NEXO 2709.

[12] NEXO 3386, e-mail from Hristov to Cress, subject: Re: Borrowing scenarios.

[13] Both prices are the first BTC trade liquidations on Binance on those dates in NEXO 369411.

[14] NEXO 3469, e-mail from Cress to Hristov, subject: Flash crash scenario.

[15] NEXO 3470, e-mail from Cress to Hristov, subject: Discuss selling strategy.

[16] NEXO 3471, e-mails between Cress and Hristov, subject: Re: Daily Interest on NEXO & a Final Dividend – The NEXO Governance Vote.

[17] NEXO 231341, #432896 Chat with John Cress.

[18] NEXO 3510, e-mails between Cress and Hristov, subject Re: Please read and call me ASAP.

[19] *Id*.

is "any way Nexo can help" him rebalance his loans to help avoid liquidation by swapping BTC to USDT and then swapping back to BTC.[20]

Hristov testified that the Nexo OTC Desk could have facilitated a swap like this—BTC to stablecoins and back. Hristov Deposition Tr. 81:14-21, 233:5-15 ("He would have been able to do that through the OTC desk, and we discussed it. … So he would have been able to swap his assets back from Bitcoin to USDC or from USDT to BTC using the OTC desk, right? — Right."). However, Hristov does not appear to have relayed this option to Mr. Cress at the time. Instead, it appears that Hristov cuts off contact with Cress for the next week, and does not reach back out until June 21, 2021, after Mr. Cress' assets have been substantially liquidated.[21] Hristov offers to "get on a call and discuss exactly what you want to do." Cress replies, "I think your email is a little late. Look at my account. I wrote what I would like to do in the last paragraph of my email below. I don't understand why that cannot be accommodated."[22]

### 3.  Profits on Cress' OTC Purchases

I understand that Nexo advertised that Plaintiff would have access to "exclusive OTC services" including "some of the best rates on the market."[23] As detailed below, Nexo's delivery prices for Plaintiff's transactions were marked up from the prevailing market rates.

I am not aware of any reason why it would be beneficial to Mr. Cress for his orders to have been handled by a special OTC desk, rather than directly through an exchange.  His BTC trading volumes were not large relative to the depth of the BTC market: Coinbase[24] traded 706,000 BTC in May 2021.  My own research shows average depth[25] of more than 15 BTC.  The primary justification for OTC executions is to get better prices than you can get on the open market order book.

There are two sets of executions in the records produced by Cress and Nexo shown in **Table 1**. For BTC and ETH the first ("Nexo Cost") are prices at which Nexo claims to have purchased the digital assets on third-party exchanges.  In the case of NEXO tokens which came from Nexo's own inventory, Nexo reports a daily price range from Coin Market Cap.  The second column ("Price for Cress") is the price charged to Cress.  These prices were always marked at higher prices than Nexo's acquisition cost.

---

[20] *Id.*
[21] NEXO 3510, 231332, 137019.
[22] *Id.*
[23] NEXO 2707, 2709, 2712.
[24] https://data.bitcoinity.org/markets/volume/5y?c=e&r=month&t=b
[25] Aleti and Mizrach (2021), Figure 6, p.16.

CONFIDENTIAL                           7 of 36

**Table 1:**
**Nexo Price Markups on Cress Purchases**

| Date | Currency | Nexo Cost | Price for Cress | Markup % |
|---|---|---|---|---|
| 2021-03-27 | NEXO | $2.55 | $2.66 | 4.31% |
| 2021-03-27 | BTC | $54,878 | $55,290 | 0.75% |
| 2021-04-01 | NEXO | $2.77 | $2.83 | 1.99% |
| 2021-03-31 | BTC | $58,877 | $59,168 | 0.49% |
| 2021-04-15 | BTC | $62,591 | $63,429 | 1.34% |
| 2021-04-16 | NEXO | $3.68 | $3.82 | 3.70% |
| 2021-05-03 | ETH | $3,172 | $3,204 | 1.01% |

Source: NEXO-0369424.

Nexo's VIP program advertised "OTC services with some of the best rates on the market," and "institutional rates" for purchases "for amounts larger than $100,000."[26] However, the rates Nexo charged Cress were far worse than market rates, and did not even meet retail rates, let alone institutional rates. To demonstrate this point, I examine retail exchange Coinbase. Coinbase's transaction fees were much lower than the fees Nexo charged Cress through its OTC transactions. Mr. Cress would have been eligible given his trading activity for Coinbase Pro which in 2021 charged rates[27] between 0.05% and 0.15% based on whether you were the trade initiator.

Similarly, Nexo's records reflect that it paid exchange fees when it purchased BTC and ETH on Binance and Kraken. This fee was reflected in the Nexo Cost. Mr. Cress thus paid for both this fee and Nexo's additional fee on each of his OTC BTC and ETH purchases.

I summarize the profits reported by Nexo on the OTC purchases made on Cress's behalf in **Table 2**.

---

[26] NEXO 2707, 2709, 2712.
[27] Lipscomb (2021).

CONFIDENTIAL                    8 of 36

**Table 2:**
**Nexo Profits on Cress OTC Purchases**

| Timestamp | Currency | Amount | Venue | Nexo Profit |
|---|---|---|---|---|
| 2021-03-27 | NEXO | 481,878 | Inventory | $53,006.58 |
| 2021-03-27 | BTC | 74.441 | Binance | $30,638.02 |
| 2021-04-01 | NEXO | 530,190 | Inventory | $29,319.51 |
| 2021-03-31 | BTC | 47.3227 | Binance | $14,858.48 |
| 2021-04-15 | BTC | 28.378 | Binance | $23,496.94 |
| 2021-04-16 | NEXO | 91,715 | Inventory | $10,194.13 |
| 2021-05-03 | ETH | 312.1487 | Binance | $10,382.00 |
| | | | **Totals** | $171,895.65 |

Notes: The dates, currency, amounts and venues are from NEXO-0369424. The profits are from NEXO-231850

I understand that Nexo has publicly advertised that it does not charge any fees to customers for digital asset purchases, but, in every purchase in **Table 2**, Nexo profited to Cress's detriment. E-mails from Hristov show that the firm was aware of these profits:

March 27, 2021:

> Is buying BTC and NEXO with $5,400,000 USDT sent to the FB OTC Vault-tx-id
>
> We bought 75 BTC @ $54,878.23 = $4,115,867
>
> We are crediting the client with 74.441 BTC @ $55,289.81
>
> OTC-desk profit - 0.55 BTC
>
> We are selling 481,878 NEXO tokens @ $2.55
>
> We are crediting the client with 481,878 NEXO tokens @ $2.66
>
> Profit for the OTC Desk - 1.007 BTC
>
> Hedge - 22.3875 BTC @ $54,887
>
> Total profit = 1.5657 BTC ≈ $86,000

Source: NEXO-3645 (Translated).

April 1, 2021:

> Buying NEXO and BTC with $4,300,000 USDT sent to FB OTC wallet – tx id
>
> We sell 530,190 NEXO Tokens @ 2.7737 (Inventory)

We credit the client 530,190 NEXO Tokens @ 2.829

Profit for OTC Desk – 0.5 BTC = ~$29,412

We bought 47.575 BTC @ $58,883 = $2,801,360

We credit the client 47.3227 @ $59,197

Profit for OTC desk – 0.2523 BTC = ~$14,700

@OPS BTC Hedge – 25.544 BTC @ 58,669

Source: NEXO-248369 (Translated).

April 14, 2021:

He is buying BTC and NEXO with $2,150,000 USDT received in the FB OTC wallet – tx id

We sell: 98,494 @ $3.45 = $339,805 Inventory

We credit the client: 98,494 @ $3.5535

Profit for the OTC desk - $10,194

We buy BTC for $1,800,000 – I will provide details after the deal is completed.

…

April 16, 2021:

Ignore the previous figures.

He is buying BTC and NEXO with $2,150,000 USDT received in the FB OTC wallet – tx id

We sell: 91,715 NEXO Tokens @ 3.68 = $337,512 Inventory

We credit the client: 91,715 NEXO Tokens @ $3.816

Profit for the OTC desk - $12,488

We buy BTC for $1,800,000

We bought 28.7534 BTC @ $62,598.06

We credit 28.3780 BTC @ $63,426

Profit for the OTC desk – 0.3753 BTC = $23,500

Source: NEXO-248348 (Translated).

May 3, 2021:

Total amount sent by the customer: 1m USDT

ETH price for NEXO: $3,171.57

ETH price for the customer: $3,203.60

Client receives 312.1487 ETH

Inventory: NO

Hedge: NO

Profit margin for the OTC desk – 8,000 USDT + 0.7513 ETH

Source: NEXO-3604 (Translated).

The capital losses, I will show, are large enough to rule out most of Cress's liquidations.

### 3.1 Execution Delays and Unnecessary NEXO Token Purchases

I understand that Mr. Cress and Nexo entered into a Cryptocurrency Purchase Agreement ("CPA") on March 24, 2021, to govern the purchase and sale of cryptocurrency.[28] Pursuant to CPA, Cress "may submit a purchase Order to Nexo . . . via email," and Nexo would have ten minutes to confirm the Purchase Order. *Id.* at Section 1.1. I further understand that the CPA provided that "[p]romptly following payment of the Counterparty Purchase Price . . . , then Nexo shall deliver . . . the Counterparty Purchased Cryptocurrency to Counterparty by transfer of immediately available cryptocurrencies on the applicable Cryptocurrency Network . . ." *Id.* at Section 1.2(c).

The March 26, 2021 Purchase Order. On March 26, 2021 at 16:52 UTC, Cress emailed Nexo: "I signed the purchase agreement and most of my BTC is on Nexo now. All my bitcoin will be there less than two hours from now. Can you call me now? We can go through any final steps and start purchasing bitcoin now at prices below $54,000 and I want to buy Nexo fast before it keeps rebounding."[29]

Hristov responded that he was "finalizing some internal stuff regarding [Cress's] loan and OTC deal," and would call him. At 19:46 UTC, Hristov emailed Cress: "Please send the $5,400,000 USDT for the purchase of 75 BTC and the rest in NEXO Tokens to Nexo's OTC desk wallet - 0x55e4d16f9c3041EfF17Ca32850662f3e9Dddbce7. At 20:09 UTC, Cress transferred $5,400,000 USDT to the wallet identified by Hristov.[30]

The March 30, 2021 Purchase Order. Similarly, on March 30, 2021 at 18:25 UTC, Plaintiff sent $4,300,000 USDT to Nexo's OTC desk[31] to purchase 50 Bitcoin and 20 Bitcoin worth of NEXO Tokens.

---

[28] NEXO 48001.

[29] NEXO 3345.

[30] https://intel.arkm.com/explorer/tx/0x28fcd494274f0314758862daaa876f44244c449d674562b78d8ef6bcaab6ecff

[31] https://etherscan.io/tx/0x176a0e4df9f8d7ef7e230bea0a12bcc4fe5b572768e6fa8c5defd0f43ade0c66

However, Plaintiff had not received any confirmation from Nexo by the next day. He thus followed up, writing, "I was expecting an email from you this morning with an update on the OTC desk order execution confirmation. A whole day has gone by now …."

Hristov did not respond for another 12 hours, and when he did he "confirm[ed] that we have received the funds and executing the Bitcoin purchase as we agreed – Time waited average execution – 24 hours. Approximately six hours later Hristov stated that the "OTC has executed the deal with the following parameters: 1. 530,190 NEXO Tokens @ $2.829 [and] 2. 47.3227 BTC @ $59,197."

The April 14, 2021 Purchase Order. On April 14, 2021, Plaintiff contacted Nexo and asked to "buy 28 more BTC and get my total bitcoin balance to 400 BTC."[32] He added, "I don't know if I need to buy more NEXO or how much would be required, so just let me know the total amount of USDT." Hristov responded by saying "[p]lease send the $2,150,000 USDT which will be used for purchasing 28 BTC and the remaining we will top the NEXO tokens balance, to ensure the lower interest rate and higher earnings."[33]  However, on April 14, Cress' account was already well over the 10% threshold required for Platinum status, sitting at 12.84% NEXO. Even after the purchase of $1,800,000 worth of BTC, Cress' account would have remained 12.04% NEXO Token. There was thus no need for Cress to purchase additional NEXO Tokens as part of this transaction.

At 16:36 UTC, Plaintiff sent $2,150,000 USDT to Nexo's OTC desk.[34] At 18:38 UTC, Hristov confirmed receipt of the funds and stated that Nexo would proceed to purchase $350,000 worth of NEXO Tokens immediately and start a 24-hour TWAP purchase of $1,800,000 worth of BTC.

Two days later, on April 16, Hristov emailed Plaintiff stating "I have some great news. The team has finished with the execution last night. We purchased the following assets: 28.3780 BTC @ $63,426; [and] 91,715 NEXO Tokens @ $3.816.

The May 2, 2021 Purchase Order. On May 2, 2021 Plaintiff sent $1,000,000 USDT to Nexo's OTC desk to purchase ETH.[35]

On May 3, Nexo stated that the execution took place and 312.14868 ETH would be added to Plaintiff's account. Plaintiff asked Nexo to detail the total amount that was spent and the price per token because "[i]f I'm calculating correctly, I sent $1,000,000 and if that only purchased 312 ETH, that means the price was $3,205 . . . Those numbers seem impossible because ETH never reached a price of $3,205. I can't be paying more than a price where ETH ever traded."[36]

Nexo responded and informed Plaintiff that the OTC purchase took place around 11:30 UTC on May 3, and that 312.1487 ETH were bought at 3203.6 USDT per unit. Nexo stated that this cost included "the 0.5% cost of execution through the NEXO OTC desk and what the partner OTC

---

[32] NEXO-0003441.

[33] Id.

[34] https://etherscan.io/tx/0xc699cf63aefa64ede79f81d23e6f88f9a62ab14992ad1f3a31236c76b30eb6da

[35] NEXO 0137019.

[36] NEXO 3441.

desk charged for the transaction which is estimated around ~0.5% as well." Nexo's internal records reflect that it took a profit of $10,382 (or 1.03%) on this transaction.[37]

In total, as reflected in **Table 2**, Nexo made profits of over $171,896 on Cress' OTC purchases. When I turn to the liquidations that soon followed, the OTC profits would have prevented 22 of Mr. Cress's 29 liquidations.

### 4. Liquidations

Mr. Cress had initial success in his margin trades.  As I show in **Figure** 3, he first enters the Bitcoin (BTC) market with BTC prices rising.

**Figure 3: Timing of Cress Liquidations**



**Source**: BTC liquidations from Cress-270.  Daily BTC/USD prices from Coingecko.

---

[37] NEXO 0137019

The BTC market, however, turned bearish shortly thereafter. By May 19, Nexo began to forcibly liquidate his holdings.  After the third set of liquidations, Cress's portfolio had shrunk by 86%.

Prior to these liquidations, Mr. Cress's holdings in his margin account are summarized in **Table 3**.

**Table 3: Cress Portfolio Before and After Liquidations**

| Date-Time | BTC | NEXO | ETH | USDC | USDT | Market Value of Collateral |
|---|---|---|---|---|---|---|
| 2021-05-19 13:10:49 | 400.95 | 1,103,783.12 | 564.28 | 1,004,696.22 | 262.32 | $15,895,895.34 |
| 2021-06-23 22:17:39 | 19.20 | 1,111,848.82 | | | | $2,260,726.68 |
| | | | | | Change | $13,635,168.66 |

Notes: The collateral holdings are from Cress 269 and 270.  I estimate the market value of the collateral using Coinbase bid prices for BTC and ETH, trades price for the NEXO token from Huobi, and valuing the USDC and USDT at $1.00

He held more than 400 Bitcoin, 1.1 million NEXO, 564 Ether, 1.004 million USD Coin, and 262 Tether.  These are important baselines because in my view, many of Nexo's liquidations were unjustified.

### 4.1 The unjustified liquidations of May 23, 2021

I compute the value of Cress's collateral at each of the seven forced liquidations on May 23.  The text in the bars in **Figure 4** contains the currency that Nexo liquidated from his portfolio. Two of the seven liquidations occurred with Cress's portfolio value below the 83.33% threshold depicted by the red-dashed line in the Figure.

**Figure 4: Cress Liquidations and Loan-to-Value (LTV) on May 23, 2021**



Source: Liquidations are from Cress 270. Prices are from Coinbase and Huobi. Stablecoins are evaluated at par. Liquidated currencies are in the white text of each bar.

## 4.2 The unjustified liquidations of June 21-22, 2021

I compute the value of Cress's collateral at each of the 22 forced liquidations on June 21 to 22, 2021. The text in the bars in **Figure 5** contains the currency that Nexo liquidated from his

portfolio. Three of the 22 liquidations occurred with Cress's portfolio value below the 83.33% threshold depicted by the red-dashed line in the Figure.

**Figure 5: Cress Liquidations and Loan-to-Value (LTV) on June 21-22, 2021**



Source: Liquidations are from Cress 270. Prices are from Coinbase and Huobi. Stablecoins are evaluated at par. Liquidated currencies are in the white text of each bar.

It is my view that many of Cress's liquidations were inconsistent with Nexo's stated 83.33% liquidation threshold.

### 4.3 Adjusting Cress's Loan for the OTC Profits

In this section, I re-examine the margin thresholds Cress had assuming Nexo's OTC fees were instead used to reduce Mr. Cress' outstanding loan (i.e. where Mr. Cress' account would have stood if not for Nexo's OTC fees).

After making this adjustment, as I show in **Figure 6**, Cress's LTV falls below 82% for the last two liquidations of BTC on May 23, 2021.[38]

---

[38] This analysis does not include the liquidation fees retained by Nexo. By keeping significant portions of the funds generated from each liquidation for itself, rather than applying the entirety to Mr. Cress' loan balance, Nexo further increased Mr. Cress' LTV and the risk of subsequent liquidations.

**Figure 6: LTV Adjusted for OTC Fees**
**May 23, 2021**

I apply these same adjustments to the liquidations of June 21 and 22 in **Figure 7**. At this point, Cress would have had more than $170,000 additional cash on hand, and this brings all 22 of the liquidations from June 21-22 down below the 83.33% threshold.

**Figure 7: LTV Adjusted for OTC Profits**
**June 21 -22, 2021**



### 4.3(a) The Value of Mr. Cress' Account Following the Five May 23 Liquidations

As set forth above, after accounting for the OTC fees charged to Mr. Cress, two of the liquidations on May 23 take place below Nexo's 83.33% threshold. All of the liquidations in June take place below this threshold. The value of Mr. Cress' account following the first five

liquidations on May 23 (i.e. those that occurred above the 83.33% threshold when accounting for fees) is shown in **Table 4**.

**Table 4: Cress's Digital Asset Holdings After First Five Liquidations on May 23:**

| Date-Time | BTC | NEXO | ETH | USDC | USDT |
|---|---|---|---|---|---|
| 2021-05-23 17:32:11 | 380.95 | 1,103,783.12 | 564.28 | 0 | 0 |

### 4.4 Amount of Liquidation Fees

Nexo charged liquidation fees in the native asset, so I first report liquidation fees in token units. I then convert to USD in the second line of **Table 5**, using current market prices as of April 14, 2026. Nexo also appears to have charged a Repayment Fee in connection with Cress' liquidations, which is disclosed in a document Mr. Dina brought with him to his deposition, but was not disclosed by Nexo in the NEXO-0369411 spreadsheet.[39] I do not presently rely on this repayment fee to calculate Cress' damages because Nexo did not clearly disclose it in the NEXO-0369411 spreadsheet. However, if Cress' repayment fees are calculated in addition to his liquidation fees, Cress paid an additional $130,330.11 in total repayment fees in connection with his liquidations ($118,395.63 in forced repayment fees, and $11,934.48 in manual repayment fees).

**Table 5: Amount of Liquidation Fees**

| Dates | Fee Damages in BTC | Fee Damages in ETH | Fee Damages in USDC | Total USD |
|---|---|---|---|---|
| May 23-June 23, 2021 | 6.5125 | 2.8210 | 9,677.95 | |
| USD Price April 14, 2025 | $74,181 | $2,323.22 | $1.00 | |
| USD Damages | $483,101.54 | $6,553.85 | $9,677.95 | $499,333.33 |

<u>Notes</u>: Fees are from NEXO-0369411.  Current BTC and ETH prices are from CoinGecko. USDC and USDT is par valued at $1.00.

### 5. Nexo Tokens Analysis

I understand that Mr. Cress initially sought only to purchase BTC using funds borrowed through Nexo's collateralized lending. Mr. Cress and Mr. Hristov initially discussed borrowing scenarios

---

[39] NEXO 369411; Dinca Tr. Ex. 50.

where Mr. Cress would purchase either 50, 75, or 100 BTC through Nexo's Credit Line.[40]  On March 30, 2021, Mr. Cress informed Hristov that his "goal is to eventually reach 400 BTC and then stop."[41] However, Nexo recommended that Mr. Cress purchase a substantial amount of its own NEXO Token as well. I understand that Nexo informed Mr. Cress that the NEXO Token was registered with the SEC as a security.[42]

I further understand that Nexo advertised that purchasing the NEXO Token would provide Mr. Cress certain benefits from the exchange including lower interest rates. After Cress's first purchase of NEXO tokens his interest rate does fall from a daily 0.0247% to 0.0164%, saving him about $830 per day in daily interest.

These savings are minimal relative to risk that these NEXO purchases placed on his portfolio. They are also minimal relative to Nexo's profits from Mr. Cress's purchases.

I re-examine the LTV that Cress would have carried on the liquidations in May and June had he not purchased NEXO Tokens.

In **Figure 8**, I show that Cress would have had a capital surplus of more than $2.4 million in May 2021 if he had a smaller loan as a result of not purchasing NEXO.

---

[40] NEXO 3139, NEXO 3354 at 357.
[41] *Id*. at 3354.
[42] NEXO 3441 at 3453.

CONFIDENTIAL                    21 of 36

**Figure 8: Cress Capital Surplus with No Nexo Tokens**
**May 23, 2021**

Source: Liquidations are from Cress 270. Prices are from Coinbase. The LTV assumes that Cress did not purchase any NEXO Tokens (the value of the NEXO Tokens is removed from the value of Mr. Cress' assets and his loan is reduced by the amount used to purchase NEXO Tokens).

The cash that Cress allocated to NEXO tokens in his margin account would keep his LTV more than 7.75% below the 83.33% liquidation threshold for the entire period from March to June

2021.In summary, the NEXO Tokens provided a small benefit in lower interest payments but at the cost of placing Cress at greater risk of liquidation. If Cress had not purchased any NEXO tokens his account would have never reached the 83.33% liquidation threshold and none of his assets would have been liquidated.

## 6. Mr. Cress' attempts to stabilize his account

Mr. Cress's communications with Nexo continued to be poor as prices began to fall in May 2021.

### 6.1 Mr. Cress' Late May Attempts to Sell Assets to Stabilize his LTV

On May 23, 2021, the day of Cress's first liquidation, Cress requests a call with Hristov to discuss a "Flash crash scenario."[43] It does not appear Hristov replies to this email. Cress followed up two days later on May 25, 2021 asking for a quick call with Hristov to discuss selling some assets to "lower [his] liquidation point to a little bit below $30,000." It does not appear Hristov replies to this email.[44] In my analysis of Cress's liquidations in **Section 4**, I find that Cress exited his BTC positions at average prices over $30,640 in June 2021. If Cress' BTC liquidation price had been slightly below $30,000, he would not have suffered any subsequent liquidations.

### 6.2 Mr. Cress' Attempts to Swap Assets to Stabilize his LTV in June

Cress opened a customer support case on May 28, 2021 requesting a discussion with Nexo because he was "dealing with $12,000,000 AND that is my whole life savings, so I really need to try to have a discussion." Cress reiterated "Please also understand this has to be reviewed and discussed very fast," and Nexo support confirmed "It will be reviewed as soon as possible." Cress left his phone number with Nexo support and told them "You can also call me at any time of the day." Cress' VIP Relationship Manager did not contact him again until June 11.[45]

In a June 11, 2021 email exchange with Mr. Hristov, Cress mentions his customer support case opened at the end of May, and that he has "been trying very hard to reach someone at Nexo for help protecting my assets." He discusses that Nexo support promised him a response, but that nobody contacted him. Cress tells Hristov, "Twelve days is a long time to have eight figures of assets at risk and not have a response." Hristov finally agreed to a call, over two weeks after Cress had requested to speak. Cress expressed interest in swapping some of his assets to stablecoins to stabilize his account and reduce the likelihood of liquidation. Specifically, Mr. Cress asks if the "OTC desk can sell 129 BTC at $36,500 or higher, and exchange it to USDC or USDT, my collateral assets will be in a more stable position." On June 11, 2021 22:00 UTC, the ask price of BTC was $36,919.99 and his LTV was under 71%.

Hristov testified that the Nexo OTC Desk could have facilitated a swap like this—BTC to stablecoins and back. Hristov Deposition Tr. 81:14-21, 233:5-15 ("He would have been able to

---

[43] NEXO 3469, e-mail from Cress to Hristov, subject: Flash crash scenario.
[44] NEXO 3470, e-mail from Cress to Hristov, subject: Discuss selling strategy.
[45] NEXO 231341, customer support chat between Cress and Daniel on May 28, 2021, showing Hristov reaching out to Cress around midnight on June 11, 2021.

do that through the OTC desk, and we discussed it. … So he would have been able to swap his assets back from Bitcoin to USDC or from USDT to BTC using the OTC desk, right? — Right."). However, Hristov does not appear to have relayed this option to Mr. Cress at the time. Instead, it appears that Hristov cuts off contact with Cress for the next week, and does not reach back out until June 21, 2021[46], after Mr. Cress' assets have been substantially liquidated.

Had Hristov and the OTC Desk allowed Mr. Cress to swap 129 BTC for stablecoins at the market price on or around the time of Mr. Cress' June 11 email, Mr. Cress would have avoided any subsequent liquidations.

### 7. Damages owed to Cress From Nexo's Actions

I understand that Nexo advertised that as a VIP, Cress would be able to utilize its "Liquidation Relief Program", which was a "service" Plaintiff could use "in the event of a market crash to recover your liquidated assets.[47] I further understand that Plaintiff's VIP Relationship Manager ignored him for days on end as Cress was trying to communicate with him regarding how to ensure his assets were not liquidated. *Id.* This section analyzes the damages Plaintiff sustained as a result of these misrepresentations. I understand that Plaintiff is entitled to return of the assets lost on the Nexo platform. Plaintiff is also entitled to recover out-of-pocket damages, benefit-of-the-bargain damages, consequential damages, punitive damages, treble damages, pre-judgment interest, post-judgment interest, costs of suit, and attorney's fees. As a general matter, the damages calculations presented in this section and the tables referenced below are based on digital asset prices as of the date of submission of this report, and pre-judgment interest is calculated through the date of this report. Because the prices of Bitcoin, Ether, and NEXO Tokens, as well as accrued interest, will continue to change between the date of this report and any entry of judgment, the figures set forth herein may be recalculated at the time of judgment using the same methodology described in this report—that is, by substituting the applicable asset prices as of the date of judgment and extending the interest calculation through that date.

### 7.1 Out of Pocket Damages

Counsel for Mr. Cress has advised me that: "Under the out-of-pocket measure, a plaintiff may receive damages sufficient to make him whole, or in other words, to restore him to the financial position he held prior to the fraudulent transaction."[48] By April 2, 2021, the Plaintiff deposited 250.33 BTC and 250 ETH with NEXO.[49]

After Nexo's OTC trades and liquidations of Plaintiff's BTC and ETH, Plaintiff was ultimately left with approximately 12.31 BTC, 0 ETH, and 1,103,783 NEXO Tokens.[50] After a series of transactions, Plaintiff ultimately received $1,730,665.59 for these NEXO Tokens.[51]

---

[46] NEXO-0003510
[47] Plaintiff's Supplemental Response to Interrogatory No. 4
[48] *Molina v. Ford Motor Co.*, No. 2:23-cv-06323-RGK-KS, 2023 U.S. Dist. LEXIS 167710 (C.D. Cal. Sep. 19, 2023).
[49] CRESS-269.
[50] CRESS 270 and NEXO 0002705.
[51] CRESS 000659

Plaintiff's out-of-pocket damages are thus: 238.0169 BTC + 250 ETH - $1,730,666. As shown in **Table 6** below, the current value of those assets is $15,800,773.[52]

**Table 6: Out of Pocket Damages**

|  | BTC | ETH | USD | Totals | As of Date |
|---|---|---|---|---|---|
| Assets | 238.0169 | 250 | -$1,730,665.59 |  | 2021-03-26 |
| Current Price | $74,181 | $2,323.22 |  |  | 2026-04-14 |
| Value in USD | $17,656,331.66 | $580,805.00 | -$2,436,363.68 | $15,800,772.98 | 2026-04-14 |
|  |  |  |  |  |  |
| 7% Statutory pre-judgement interest 5.05 years |  |  |  | $6,442,940.47 | 2026-04-14 |
|  |  |  |  |  |  |
| **Total Damages** |  |  |  | $22,243,713.44 |  |

I apply the same statutory 7% per year on his cash holdings, which reduces the damages owed by $2.436 million, but applying the same rate to the cash value of his assets raises his total damages to $22,243,713.

**Section 8.  Claim by Claim Damages**

   A.  Fraudulent Inducement (First Cause of Action)

Counsel for Mr. Cress has advised me that: fraud "plaintiffs may recover out-of-pocket damages in addition to benefit-of-the-bargain damages.[53] Here, Plaintiff alleges that Nexo fraudulently induced him into entering the OTC and loan transactions through misrepresentations regarding its (1) Liquidation Relief Program, (2) prompt responsiveness, (3) interest on his posted collateral, and (4) the best rates on OTC purchases, and (5) its fees on digital asset purchases and liquidations as alleged by Cress in his First Cause of Action.

As set forth in **Table 6** above, my opinion is that Cress' out-of-pocket damages are $22,243,713. This is the amount necessary to put Mr. Cress in the position he would have been in had he not entered into any OTC or loan transactions with Nexo. This figure includes applicable interest, but does not include any punitive damages.

   B.  Restitution Pursuant to Cal. Bus & Prof. §§ 17200 (Second Cause of Action)

---

[52] Cress was receiving yields for his deposits of BTC and ETH at the Nexo platform.  I estimate these at 0.0129 BTC per day and 0.0334 ETH per day, based on his yields prior to his first margin purchases.  As of April 14, 2026 this would have given him an additional 23.82 BTC and 61.66 ETH, with combined current value of $1,910,848. This additional yield is not included in Table 6.
[53] Dkt. 98 at 21-22 (*quoting Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996)).

I have also analyzed the amount of restitution necessary to restore Mr. Cress to the status quo. Counsel for Mr. Cress has advised me that: under Cal. Bus. & Prof. §§ 17200, *et seq* the measure of restitution is the money or property defendant wrongfully acquired from plaintiff.

The assets Nexo obtained from Plaintiff includes all assets Mr. Cress deposited on Nexo's platform, minus the assets Plaintiff was left with after Nexo's OTC trades and liquidations of Plaintiff's assets.

Plaintiff deposited 250.33 BTC and 250 ETH with NEXO, and after Nexo's OTC trades and liquidations of Plaintiff's BTC and ETH, Plaintiff was ultimately left with approximately 12.31 BTC, 0 ETH, and 1,103,783 NEXO Tokens. After a series of transactions, Plaintiff ultimately received $1,730,666 for these NEXO Tokens.

The restitution owed to Plaintiff to restore him to the status quo by returning the funds which he has an ownership interest in is: 238.0169 BTC + 250 ETH - $1,730,666. Should the Court determine that equitable interest on this restitution is warranted, I could calculate that amount using the same methodology outlined in **Table 6**.

C. Unregistered Offer and Sale of NEXO Token security Cal. Corp. Code § 25503 (Third Cause of Action) and Fraud in the Offer and Sale of NEXO Token security Cal. Corp. Code § 25501 (Fourth Cause of Action)

Plaintiff also brings claims under California Corporations Code §25401 and 25503. Counsel for Mr. Cress has informed me that: damages for a 25503 claim are:

> Any person who violates Section 25110, 25130, or 25133, or a condition of qualification under Chapter 2 (commencing with Section 25110) of this part, imposed pursuant to Section 25141, or an order suspending trading issued pursuant to Section 25219, shall be liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff.

Similarly, counsel for Cress has advised me that: damages for 25401 are described in Section 25501:

Any person who violates Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if the defendant had exercised reasonable care, would not have known) of the untruth or omission. Upon rescission, a purchaser may recover the consideration paid for the security, plus interest at the legal rate, less the amount of any income received on the security, upon tender of the security. Upon rescission, a seller may recover the security, upon tender of the consideration paid for the security plus interest at the legal rate, less the amount of any income received by the defendant on the security. Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff. Damages recoverable under this section by a seller shall be an amount equal to the difference between (1) the value of the security at the time of the filing of the complaint plus the amount of any income received by the defendant on the security and (2) the price at which the security was sold plus interest at the legal rate from the date of sale. Any tender specified in this section may be made at any time before entry of judgment. In addition to the relief described above, the court shall award reasonable attorney's fees and costs to a prevailing purchaser or seller who succeeds in establishing a right to the relief provided by this section.

Damages for Plaintiff's §25401 and 25503 claims are thus the same.

As discussed, in **Claim B** above, Plaintiff deposited 250.33 BTC and 250 ETH with Nexo. Plaintiff used this BTC and ETH as collateral to obtain NEXO using Nexo's collateralized loans. Nexo's Crypto Credit General Terms provide that "Nexo acquires the ownership of the Collateral while the Nexo Crypto Credit is outstanding.[54]" After Nexo's liquidations of Plaintiff's BTC and ETH, Plaintiff was ultimately left with approximately 12.31 BTC, 0 ETH, and 1,103,783 NEXO Tokens.[55] After a series of transactions, Plaintiff ultimately received $1,730,666 for these NEXO Tokens.

Because Nexo claimed ownership of all of Plaintiff's digital assets as part of his purchase of NEXO, I treat those digital assets as the consideration paid for NEXO Token. **In Table 7**, I show NEXO tokens represented 24.4% of his digital asset purchases.

---

[54] NEXO-0000157.

[55] CRESS-00000269; CRESS-00000270; NEXO-0002705

**Table 7: NEXO Tokens as Proportion of Purchases**

| Date | Token | USD Cost |
|------|-------|----------|
| 2021-03-27 | NEXO | $1,281,795.48 |
| 2021-03-27 | NEXO | $1,499,907.00 |
| 2021-04-01 | BTC | $4,115,828.00 |
| 2021-03-31 | BTC | $2,800,000.00 |
| 2021-04-15 | BTC | $1,800,000.00 |
| 2021-04-16 | NEXO | $349,984.00 |
| 2021-05-03 | ETH | $1,000,000.00 |
| | **Total** | $12,847,514.48 |

I apply this percentage to the out of pocket damages in **Table 6**. Damages from the unregistered sale would then total 24.4% of $22,243,713 or $5,422,086.64.

Alternatively, Mr. Cress' damages using the USD prices at the times of the transactions is set forth as follows:

**Table 8:  NEXO Token USD Damages**

| | |
|---|---|
| USD paid for Nexo Tokens | $3,131,686 |
| USD received for Nexo Tokens (GSR proceeds) | $1,730,666 |
| Difference between amount USD paid and USD received | $1,401,021 |
| Plus 7% interest (April 16, 2021 - April 14, 2026) | $1,964,640.06 |

D.  Common Law Fraud (Fifth Cause of Action)

I understand that Cress alleges that he relied to his detriment on Nexo's representation that the NEXO Token is registered with the SEC as a security in purchasing the NEXO Token with loans from Nexo secured by his BTC. Because I conclude that Cress would not have ever breached the 83.33% LTV level had he not purchased NEXO Tokens, *see* Section 5 above, my opinion is that his out of pocket damages are, as shown in **Table 6**, $22,243,713—this is the amount necessary to put Mr. Cress in the position he would have been in, but for his purchase of NEXO Tokens, including applicable interest. It does not include punitive damages.

E.  Civil Theft Cal. Penal Code § 496(C) (Sixth Cause of Action)

I understand from counsel for Cress that: Cal Penal Code §496(C) provides that the remedy for violations is "three times the amount of actual damages . . . costs of suit, and reasonable attorney's fees." Plaintiff alleges that Nexo violated §496(C) by inducing him to deposit his BTC and ETH

into Nexo's Credit Line, and subsequently transfer millions of dollars' worth of digital assets to its OTC Desk based on representations that it did not charge any fees. As shown in **Table 2** , Nexo took $171,896 in fees on Plaintiff's OTC purchases and as shown in **Table 5**, $499,333 in fees on Plaintiff's liquidations.

As set forth in Section 4, the loss of these digital assets contributed substantially to Cress' liquidation. If he had retained the assets taken by Nexo as transaction and liquidation fees, he would have avoided the vast majority of liquidations as shown in **Figure 6** and **7**. **In Table 9**, I adjust Mr. Cress's out of pocket damages for the 20 BTC that were liquidated on May 23 when his LTV was above 83.33%.

**Table 9: Damages for Civil Theft**

|  | BTC | ETH | USD | Totals | As of Date |
|---|---|---|---|---|---|
| Assets | 238.0169 | 250 | -$1,730,665.59 |  | 2021-03-26 |
| BTC from Liquidations 4 and 5 | -20 |  |  |  |  |
| Current Price | $74,181 | $2,323.22 |  |  | 2026-04-14 |
| Value in USD | $16,172,711.66 | $580,805.00 | -$2,436,363.68 | $14,317,152.98 | 2026-04-14 |
|  |  |  |  |  |  |
| 7% Statutory pre-judgement interest 5.05 years |  |  |  | $5,837,977.96 | 2026-04-14 |
|  |  |  |  |  |  |
| **Total Damages** |  |  |  | $20,155,130.93 |  |

Treble damages bring this total to $60,465,393.

F.  Violation of Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c)-(d) (Seventh and Eighth Causes of Action)

I understand from counsel for Cress that: 18 U.S.C. § 1964(c) provides that any "person injured in his business or property by reason of a violation of section 1962 . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

Plaintiff alleges that the Nexo Enterprise engaged in a systematic scheme of mail and wire fraud by fraudulently inducing him to take out millions of dollars in collateralized loans while charging substantial hidden fees on OTC purchases, loan transactions, and liquidations—all while affirmatively representing a "#ZeroFees" policy and providing fabricated trade confirmations to conceal the true costs. As a direct and proximate result of these RICO violations, Plaintiff alleges he suffered the loss of substantially all of the digital assets he deposited on Nexo's platform, as Nexo's hidden fees, inflated execution prices, and undisclosed liquidation charges compounded to erode his collateral and trigger liquidations.

As set forth in **Table 2**, Nexo took $171,896 in fees on Plaintiff's OTC purchases, and as shown in **Table 5**, $499,333 in fees on Plaintiff's liquidations.

As set forth in Section 4, the loss of these digital assets contributed substantially to Cress' liquidation. If he had retained the assets taken by Nexo as transaction and liquidation fees, he would have avoided the vast majority of liquidations as shown in **Figure 6** and **7**. As shown in **Table 9**, his net worth adjusted for the liquidations above the 83.33% threshold is $20,155,131, and treble damages would raise this to $60,465,393.

G.  Fraudulent Omission in Failing to Disclose Fees (Ninth Cause of Action)

I understand from counsel for Cress that: for fraud claims, "plaintiffs may recover out-of-pocket damages in addition to benefit-of-the-bargain damages.[56]". Here, Plaintiff alleges that Nexo fraudulently omitted material information regarding its fees on digital asset purchases and liquidations, thereby inducing Cress to enter into the OTC and loan transactions. Specifically, Nexo failed to disclose the fees it charged on digital asset purchases and liquidations—information that, had it been disclosed, would have been material to Cress's decision to transact with Nexo. This omission operated alongside, and is consistent with, the affirmative misrepresentations alleged in the First Cause of Action, including those concerning Nexo's (1) Liquidation Relief Program, (2) prompt responsiveness, (3) interest on posted collateral, and (4) the best rates on OTC purchases. I summarize and total the amounts in **Table 10**.

**Table 10: Damages Under the Ninth Cause of Action**

| | | |
|---|---|---|
| Fees on OTC Purchases | $171,896 | Table 2 |
| Liquidation Fees | $499,333 | Table 5 |
| Portfolio Value Change | $13,635,169 | Table 3 |
| Sub-Total | $14,306,398 | |
| Statutory interest | $5,633,001 | |
| Total Damages | $19,939,399 | |

H.  Breach of Cryptocurrency Purchase Agreement (Tenth Cause of Action)

I understand from counsel for Mr. Cress that: Under California law, the standard measure of damages for breach of contract is the amount that will put the injured party "in as good a position as he or she would have occupied if the defendant had not breached the contract. (24 Williston on Contracts (4th ed. 2002) § 64:1, p. 7.) In other words, the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain."[57] The measure of damages "is

---

[56] Dkt. 98 at 21-22 (quoting *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996))
[57] *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 967-68 (2004).

the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."[58]

Here, Plaintiff alleges that Nexo breached the Cryptocurrency Purchase Agreement ("CPA") by charging undisclosed fees on digital asset purchases and by failing to execute transactions at the agreed-upon or represented terms. The CPA governed the terms under which Cress purchased digital assets through Nexo's OTC desk, and Nexo's imposition of undisclosed fees and/or its failure to deliver digital assets at the rates represented constituted a material breach of that agreement.

My understanding from counsel for Mr. Cress is that Nexo's actions may, under California law, have constituted a breach of contract. As discussed in Sections 3 and 4, my opinion is that Nexo's untimely executions, failure to deliver digital assets at the represented rates, and Nexo's undisclosed fees resulted in the liquidations of Cress's assets. Cress's damages are thus set forth in **Table 10** above: $19,939,399.

## 9. Conclusion

Nexo profited from Mr. Cress at every stage of their relationship.  When he first purchased digital assets, Nexo marked up those prices substantially despite their promises never to profit from trades executed on a customer's behalf.  Damages from these markups totaled over $171,000 back in 2021.

Nexo's OTC profits diminished Cress's capital cushion which exposed Cress to additional liquidations.  If we reasonably credit Cress's portfolio with Nexo's ill-gained profits, only five of the 29 forced liquidations from Cress's account were justifiable, and none from the second set of liquidations in June 2021.  Nexo charged heavy fees for the liquidations, and Cress's losses from those fees in current dollars are over $499,333.

Cress was encouraged to hold NEXO tokens, but these were harmful to his portfolio.  NEXO tokens declined even more than BTC and ETH, and they eroded his capital cushion and pushed him closer to liquidation.

Because of the fraudulent actions on the part of Nexo, I further estimate out-of-pocket damages of $22,243,713.

---

[58] Cal. Civ. Code § 3300.

Dated: April 20, 2026

_Bruce Mizrach_

Prof. Bruce Mizrach

**Appendix 1: Curriculum Vitae of Professor Bruce Mizrach**

# BRUCE MIZRACH
Curriculum Vitae
May 2025

Department of Economics
Rutgers University
75 Hamilton Street
New Brunswick, NJ 08901

Voice: (908) 913-0253
Fax: (425) 795-9942
e-mail: mizrach@econ.rutgers.edu
http://snde.rutgers.edu

Education:

| | |
|---|---|
| 1987 | University of Pennsylvania<br>Ph.D. in Economics |
| 1981 | Tufts University<br>A.B. in History and Economics<br>Phi Beta Kappa, Summa cum Laude |

research areas:

Market microstructure
Financial crises
Nonlinear time series

current positions:

| | |
|---|---|
| 1995-present | Rutgers University<br>Assistant, Associate and Full Professor<br>Department of Economics |
| 2015-present | Financial industry regulatory authority<br>Contractor<br>Office of the Chief Economist, |

previous positions:

| | |
|---|---|
| 2017-2020 | Office of Financial Research. U.S. Treasury Dept.<br>Consultant |
| Spring 2005 | Stern School new York University<br>Visiting Associate Professor, Department of Finance |
| Sep 1992-Dec 1994 | Federal Reserve Bank of New York<br>Economist and Senior Economist |
| Jan 1990-Aug 1992 | Wharton School University of Pennsylvania<br>Visiting Assistant Professor, Department of Finance |
| Sep 1987-Aug 1991 | Boston College<br>Assistant Professor. Department of Economics |

1

# Academic Activities

SHORT TERM ACADEMIC APPOINTMENTS (2000-):

| | | |
|---|---|---|
| Oct 2017 | FEDERAL RESERVE BANK OF NEW YORK | Visiting Scholar |
| Oct 2009 | UNIVERSITY OF TECHNOLOGY - SYDNEY | Honorary Fellow |
| May 2008 | NATIONAL CHIAO TUNG UNIVERSITY | Visiting Scholar |
| Jun 2005-Aug 2007 | FEDERAL RESERVE BANK OF SAINT LOUIS | Consultant |
| Spring 2006 | FEDERAL RESERVE BANK OF NEW YORK | Visiting Scholar |
| Apr. 2002 | BILKENT UNIVERSITY | Visiting Scholar |
| Feb 2002 | SANTA FE INSTITUTE | Visiting Scholar |

PROFESSIONAL ACTIVITIES:

| | | |
|---|---|---|
| 1996-2023 | STUDIES IN NONLINEAR DYNAMICS AND ECONOMETRICS | |
| | Editor-in-Chief | |
| 2011-2016 | JOURNAL OF STOCK AND FOREX TRADING | |
| | Associate Editor | |
| 2007- | RUTGERS CLIMATE AND ENERGY INSTITUTE | |
| | Affiliate | |
| 1993-2008, 2011-13 | SOCIETY FOR NONLINEAR DYNAMICS | |
| | Board Member, Program Committee | |
| 2007-10, 2013 | SOCIETY FOR COMPUTATIONAL ECONOMICS | |
| | Program Committee | |

GRANTS:

U.S. Department of Treasury, Office of Financial Research, Jan. 2020-Sep. 2020, $40,973.
Europlace Institute of Finance (co-PI with P. Mazza and M. Petitjean), Feb. 2019, 10,000.
U.S. Department of Treasury, Office of Financial Research, Jul. 2017-Dec. 2019, $154,700.
U.S. Department of Treasury, Office of Financial Research, Jan. 2017-Jun. 2017, $55,435.
Intelligence Advanced Research Projects Activity (IARPA) Grant N66001-13-C-2008, "Strategy and Network Econometrics," (co-PI with G. Cybenko, G. Elliott, E. Santos and A. Timmermann), 2013-14, $985,484.
Paul Woolley Center Research Fellow, 2009.
Taiwan National Science Council, Visiting Scholar, 2008.
Rutgers University, Sidney Simon Grant: 2002; 2003; 2004; 2006; 2008; 2010, 2012;
Rutgers University, Faculty Research Council Grant: 13 awards since 2002.

HONORS AND AWARDS:

Market Microstructure and Nonlinear Dynamics, Keynote Speaker, 2013.
RWE Best Paper Award, Conference on Energy Finance, 2012.
2nd Intl. Symposium in Computational Economics and Finance, Invited Speaker, 2012.
5th NCTU International Finance Conference, Invited Speaker, 2012.
European Climate Exchange, New Thinking in Carbon Research Prize, 2010.
Institute for Quantitative Investment, First Prize, 2009.
JFS-Carli Foundation, Bank of Italy Conference, Invited Speaker, 2004.

## Consulting: Financial Services

| | | |
|---|---|---|
| Feb 2022- | Capvision | Consultant |
| June 2020 | GDA Fund | Consultant |
| May 2020 | T. Rowe Price | Consultant |
| Jan 2015- | Financial Industry Regulatory Authority | Contractor |
| April 2014 | Alliance Bernstein | Consultant |
| June 2013 | World Gold Council | Consultant |
| May 2013 | Goldman Sachs Asset Management | Consultant |
| Mar 2012-Sep 2013 | Scout Capital | Consultant |
| July 2011 | Cipher Capital | Consultant |
| Aug 2010- | Gerson Lehman Group | Consultant |
| July-Dec 2010 | Algorithmic Execution | Director of Research |
| Sep 2007-May 2010 | Investment Analytics | Consultant |
| Jun 1998- | Nonlinear Analysis Group | Principal |

# Litigation Consulting

John Cress v. Nexo Capital Inc., U.S. District for the Northern District Of California Plaintiffs expert retained by Taylor-Copeland Law April 2, 2025.

CMT Asset Management et. al. v. Brevan Howard Capital Management et. al., JAMS Arbitration, Respondents expert retained by Akin Gump, February 20, 2025.

United States v. Aleksei Andriunin (GotBit LLC), U.S. District Court for the District of Massachusetts, Defense expert retained by Dechert LLP, January 28, 2025.

United States v. Braden John Karony (Safemoon LLC), U.S. District Court for the Eastern District of New York, Defense expert retained by David B. Smith, PLLC, July 26, 2024, Report: October 7, 2024; Testimony May 19, 2025.

United States v. Douglas Jae Woo Kim, U.S. District Court for the Northern District of California, Prosecution expert retained by DOJ March 30, 2024.; Expert Disclosure: April 2, 2024; Testimony: February 13, 2025.

Securities AND Exchange Commission v. Terraform Labs, PTE. LTD. and Do Hyeong Kwon, U.S. District Court for the Southern District of New York, Plaintiffs expert retained by SEC on September 1, 2022, Report: September 7, 2023, Deposition: September 22, 2023, Rebuttal Report: October 13, 2023, Testimony: April 2, 2024.

Matthew J. Platkin, Attorney General of New Jersey et al. v. MV Realty LLC et al., Superior Court of New Jersey Chancery Division, Essex County, Plaintiffs expert retained by Department of Law, June 7, 2023.

Harold Lehr v. Brevan Howard US Investment Management LP, American Arbitration Association, Defense expert retained by Morgan Lewis, March 16, 2022, Report: April 1, 2022.

In RE: Treasuries Securities Auction Antitrust Litigation, The U.S. District Court, Southern District of New York, Defense expert retained by Cleary Gotlieb, October 10, 2017.

Shan Yuan Huang v. Serenity Capital Management., American Arbitration Association, Respondents expert retained by Morgan Lewis, Report: October 13, 2017, Testimony: June 24, 2018.

September 11, 2001 Property Damage and Business Loss Litigation, Cantor Fitzgerald et al v. American Airlines et al, The U.S. District Court, Southern District of New York, Defense expert retained by Condon & Forsyth, Deposition: May 15, 2013.

The PNC Financial Services Group, Inc., LP v. Lynette Pedensky, et al, Cuyahoga County's Court of Common Pleas, Defense expert retained by Porter Wright, Report: April 25, 2012.

BG Cantor Market Data, LP v. Tullett Prebon Information, Ltd., American Arbitration Association, Defense expert retained by Schulte, Roth and Zabel, Report: June 24, 2011, Testimony: September 7, 2011.

State of New Jersey by the Commissioner of Transportation v. 200 Route 17 LLC, Superior Court of New Jersey Law Division: Bergen County, Plaintiff's expert retained by New Jersey Department of Transportation, Report: June 30, 2009 and March 16, 2015, Deposition: April 15, 2015, Testimony: July 2, 2009, April 27-29, 2015.

Cantor Fitzgerald et al. v. The Port Authority of New York and New Jersey, Supreme Court of the State of New York, County of New York, Defense expert retained by Weil, Gotshal and Manges, August 2008-September 2011.

4

# Publications

BOOKS:

*The Encyclopedia of Complexity and System Science*, Section Editor for Finance and Econometrics, 2009, New York: Springer-Verlag.

PAPERS:

"Stablecoins: Survivorship, Transactions Costs and Exchange Microstructure," *Journal of Alternative Investments* 27, 2025, 82–109.

"An Event Study of the Ethereum Transition to Proof-of-Stake" (with E. Kapengut), *Commodities* 2, 2023, 96-110.

"Bitcoin Spot and Futures Market Microstructure," (with S. Aleti), *Journal of Futures Markets*, 41, 2021, 194-225.

"Federal Reserve System International Facilities, " (with C. Neely) Federal Reserve Bank of St. Louis *Economic Synopses*, No. 29, May 8, 2020.

"Supporting Small Borrowers: ABS Markets and the TALF," (with C. Neely), Federal Reserve Bank of St. Louis *Economic Synopses*, No. 20, April 16, 2020.

"Fed Intervention in the To-Be-Announced Market for Mortgage-Backed Securities," (with C. Neely), Federal Reserve Bank of St. Louis *Economic Synopses*, No. 19, April 15, 2020.

"Secondary Market Corporate Credit Facility Supports Main Street," (with C. Neely), Federal Reserve Bank of St. Louis *Economic Synopses*, No. 17, April 13, 2020.

"The Stock Market's Wild Ride," (with C. Neely), Federal Reserve Bank of St. Louis *Economic Synopses*, No. 15, April 10, 2020.

"New Evidence of the Marginal Predictive Content of Small and Large Jumps," (with B. Yu and N. Swanson), *Econometrics*, 18, 2020, 1-52.

"Location Basis Differentials in Oil Prices," (with P. Luong and Y. Otsubo), *Energy Journal* 40, 2019, Article 3.

"High Frequency Trading in the Equity Market During U.S. Treasury POMO," (with C. Gao), *Uncertainty, Expectations and Asset Price Dynamics*, New York: Springer-Verlag, 2018, 81-103.

"The Microstructure of a U.S. Treasury ECN: The BrokerTec Platform," (with M. Fleming and G. Nguyen), *Journal of Financial Markets* 40, 2018, 2-22.

"Analysis of Securitized Asset Liquidity, (with An He), *Research Note*, FINRA Office of the Chief Economist, 2017.

"Market Quality Breakdowns in Equities," (with C. Gao), *Journal of Financial Markets*, 28, 2016, 1-23.

"Analysis of Corporate Bond Liquidity," *Research Note*, FINRA Office of the Chief Economist, 2015.

"A Video Interview of James Stock," *Studies in Nonlinear Dynamics and Econometrics* 19:4, 2015, 393-96.

PUBLICATIONS (CONT.)

"Econometric Analysis of Currency Carry Trade," (with H. Chung and Y-J Wang) in C.F. Lee (ed.), *Handbook of Financial Econometrics and Statistics*, New York: Springer Verlag, 2015, 1877-90.

"Skyscraper Height and the Business Cycle: Separating Myth from Reality," (with J. Barr and K. Mundra), *Applied Economics* 47, 2015, 148-60.

"Testing the CAPM Theory Based on a New Model for Fama-French 25 Portfolio Returns," (with L. Li and Z. Zhou), *Theoretical Economics Letters* 4, 2014, 666-80.

"The Market Microstructure of the European Climate Exchange," (with Y. Otsubo), *Journal of Banking and Finance* 39, 2014, 107-116.

"An Empirical Analysis of the Shanghai and Shenzhen Limit Order Books," (with H. Chung, C. Gao and J. Lu), *Economic Modelling* 34, 2013, 37-41.

"Leverage and VaR as Measures of Bank Distress: Comment," in Joseph Haubrich and Andrew Lo (eds.), *Quantifying Systemic Risk*, Chicago: U. Chicago Press for NBER, 2013, 94-105.

"Jumps and Cojumps in Subprime Home Equity Derivatives," *Journal of Portfolio Management* 38, 2012, 136-46.

"Integration of the Global Carbon Markets," *Energy Economics* 34, 2012, 335-49.

"Learning and Conditional Heteroscedasticity in Asset Returns," in C. Kyrtsou and C. Vorlow (eds.), *Progress in Financial Markets Research*, 2011, New York: Nova, 1-14.

"Tail Return Analysis of Bear Stearns Credit Default Swaps," *Economic Modelling* 27, 2010, 1529-36.

"Does a Common Trend Exist Between EUA and CER prices?" *Trading Carbon* 4, 2010, 11.

"Nonlinear Mean Reversion in EMS Exchange Rates," *Brussels Economic Review* 53, 2010, 187-98.

"Estimating Implied Probabilities From Option Prices and the Underlying," in. C.F. Lee and A.C. Lee (eds), *The Handbook of Quantitative Finance and Risk Management*, 2010, New York: Springer-Verlag, 515-29.

"Experts Online: An Analysis of Trading Activity in a Public Internet Chat Room," (with S. Weerts), *Journal of Economic Behavior and Organization* 70, 2009, 266-81

"Highs and Lows: A Behavioural and Technical Analysis," (with S. Weerts), *Applied Financial Economics* 19, 2009, 767-77.

"The Microstructure of the U.S. Treasury Market," (with C. Neely), *The Encyclopedia of Complexity and System Science*, 2009, New York: Springer-Verlag, 9565-77.

"Introduction to Finance and Econometrics in Complex Systems," *The Encyclopedia of Complexity and System Science*, 2009, New York: Springer-Verlag, 3388-91.

"A Note On Demand and Supply Factors In Manufacturing Output Asymmetries," (with O. Korenok and S. Radchenko), *Macroeconomic Dynamics* 13, 2009, 263–77.

PUBLICATIONS (CONT.)

"Comment on Modelling Nonlinear Comovements Between Time Series," *Journal of Macroeconomics* 31, 2009, 212-15

"Estimating the Intensity of Choice in a Dynamic Mutual Fund Allocation Decision," (with D. Goldbaum), *Journal of Economic Dynamics and Control* 32, 2008, 3866-76.

"The Impact of Monetary Policy on Bond Returns Volatility: A Segmented Markets Approach," (with F. Occhino), *Journal of Economics and Business* 60, 2008, 485-501.

"A Video Interview with James Hamilton," *Studies in Nonlinear Dynamics and Econometrics* 12, Issue 2, Article 1, 2008.

"Information Shares in the U.S. Treasury Market," (with C. Neely) *Journal of Banking and Finance* 32, 2008, 1221-33;

"Nonlinear Time Series Analysis," in L. Blume and S. Durlauf (eds.) *The New Palgrave Dictionary of Economics*, 2nd ed., 2008, London: Palgrave Macmillan, 4611-16.

"The Next Tick on Nasdaq," *Quantitative Finance* 8, 2008, 19-40.

"Does SIZE Matter: Liquidity Provision by the Nasdaq Anonymous Trading Facility," *Competition and Regulation in Network Industries* 1, 2006, 471-85.

"The Enron Bankruptcy: When Did The Options Market Lose Its Smirk?," *Review of Quantitative Finance and Accounting* 27, 2006, 365-82.

"The Transition to Electronic Communications Networks in the Secondary Treasury Market," (with C. Neely), Federal Reserve Bank of St. Louis *Review* 88, 2006, 527-41.

"Assessing Central Bank Credibility during the EMS Crises: Comparing Option and Spot Market-Based Forecasts" (with M. Haas and S. Mittnik), *Journal of Financial Stability* 2, 2006, 28-54.

"Does The Stock Market Punish Corporate Malfeasance? A Case Study Of Citigroup," (with S. Z. Weerts), *Corporate Ownership and Control* 4, 2006, 154-8.

"A Video Interview with Buz Brock, " *Studies in Nonlinear Dynamics and Econometrics* 9, Issue 1, Article 1, 2005.

"A Markov Switching Cookbook," (with J. Watkins), in Philip Rothman (ed.), *Nonlinear Time Series Analysis of Economics and Financial Data*, Dordrecht: Kluwer, 1999, 33-43.

"Real Versus Pseudo International Systemic Risk: Some Lessons from History," (with M. Bordo and A. Schwartz), *Review of Pacific Basin Financial Markets and Policies* 1, 1998, 31-58.

"Determining Delay Times for Phase Space Reconstruction with Application To The FF/DM Exchange Rate," *Journal of Economic Behavior and Organization* 30, 1996, 301-25.

"Forecasting Realignments: The Case of the French Franc in the Exchange Rate Mechanism," in W.A. Barnett, A. Kirman and M. Salmon (eds.), *Nonlinear Dynamics and Economics*, Cambridge: Cambridge U. Press, 1996, 359-66.

7

PUBLICATIONS (CONT.)

"The Information in the Term Structure: A Non-parametric Investigation," *Journal of Forecasting* 15, 1996, 137-153.

Review of *Complex Economic Dynamics*: *Exchange Rate Theory: Chaotic Models of Foreign Exchange Markets*, in *Journal of Economic Literature* 33, 1995, 1976-77.

"Target Zone Models with Stochastic Realignments: An Econometric Evaluation," *Journal of International Money and Finance* 14, 1995, 641-57.

"New Evidence on the Effectiveness of Foreign Exchange Market Intervention," (with C. DeVries, K. Koedijk, and P. Stork), *European Economic Review* 39, 1995, 501-8.

"Nonlinear Exchange Rate Modeling," American Statistical Association, *1993 Proceedings of the Business and Economic Statistics Section*, 1994, 383-7.

Review of  *Exchange Rate Theory: Chaotic Models of Foreign Exchange Markets*, in *Journal of Economic Behavior and Organization* 25, 1994, 473-75.

"Using U-statistics to Detect Business Cycle Nonlinearities," in Willi Semmler (ed.), *Business Cycles: Theory and Empirical Investigation*, Boston: Kluwer Press, 1994, 369-88.

"Multivariate Nearest-neighbour Forecasts of EMS Exchange Rates," *Journal of Applied Econometrics* 7 Supplement, 1992, S151-63, reprinted in M. H. Pesaran and S. Potter (eds.) *Nonlinear Dynamics Chaos and Econometrics*, West Sussex: John Wiley , 1993, 143-156.

"Parametric and Seminonparametric Analysis of Nonlinear Time Series," (with S. Mittnik), in *Advances in GLIM and Statistical Modeling*, L. Fahrmeir, B. Francis, R. Gilchrist and G. Tutz (eds.), New York: Springer-Verlag, 1992, 207-12.

"On Determining the Dimension of Real-Time Stock-Price Data," (with E.S. Mayfield), *Journal of Business Economics and Statistics* 10, 1992, 367-74, reprinted in W. D. Dechert (ed.), *Chaos Theory in Economics: Methods, Models and Evidence*, Cheltenham: Edward Elgar, 1995.

"The Distribution of the Theil-U Statistic in Bivariate Normal Populations," *Economics Letters* 38, 1992, 163-67.

"The State of Economic Dynamics: A Review Essay," *Journal of Economic Dynamics and Control* 16, 1992, 175-90.

"Managing the Dollar: Has the Plaza Agreement Mattered?" (with M. Klein and R.G. Murphy), *Journal of Money, Credit and Banking* 23, 1991, 742-51.

"Nonparametric Estimation of the Correlation Exponent," (with E.S . Mayfield), *Physical Review* A 88 #4, 1991, 5298-5301.

"Non-Convexities in a Stochastic Control Problem with Learning," *Journal of Economic Dynamics and Control* 15, 1991, 515-38.

8

PUBLICATIONS (CONT.)

"A Liquidity-in-Advance Model of the Demand for Money Under Price Uncertainty," (with A.M. Santomero), *Journal of Monetary Economics* 26, 1990, 143-59.

"Non-Convergence to Rational Expectations and Optimal Monetary Policy in Models with Learning," in Dynamic Modeling and Control of National Economies 1989. *Selected Papers from the 6th IFAC Symposium*, Edinburgh, UK, 27-29 June 1989, N. Christodoulakis (ed.), Oxford: Pergamon Press, 1990, 293-98.

"Aggregation, Information, and the Instability of Asset Demands," (with A.M. Santomero), *Studies in Banking and Finance* 5, Amsterdam: North Holland, 1988, 369-85.

"The Stability of Money Demand and Forecasting Through Changes in Regime," (with A.M. Santomero), *Review of Economics and Statistics* 68, 1986, 324-28.

# Public Service

PROFESSIONAL:

New Jersey Environmental Federation, 2012.
Union of Concerned Scientists, 2009-
Environment New Jersey, 2012.
North Jersey Public Policy Network, 2011-
Financial Executives International, Princeton Chapter, 2011.
San Diego Financial Executives International, 2012.
New Jersey Department of Transportation, 2009.


PERSONAL:

Intercounty Soccer Coach, Westfield, NJ, 2005-12.
Travel Soccer Coach, Westfield, NJ, 2013-2015.

# University Service

UNIVERSITY ACTIVITIES:

Debate, Confronting Climate Change: What Should RU Do?, 2013.
Rutgers University, Sigma Phi Epsilon Outstanding Faculty Finalist, 2001.

UNIVERSITY COMMITTEES:

Graduate Curriculum Committee 2000-01;
Advisory Committee for Appointments and Promotions of Nontenured Faculty 1997-98;
Rutgers Initiative on Climate Change, Social Policy and Politics, 2007-;
Library Advisory Committee, 2009-11,2013-;
Faculty Research Grant Program, 2011-12;
Advisory Committee for Appointments and Promotions to Professor I 2014-16;
Advisory Committee for Appointments and Promotions, 2024-25.;

DEPARTMENT COMMITTEES:

Undergraduate Honors and Awards Committee: 2003, 2011-12, 2024-25;
Graduate Admissions Committee, 2011-12, 2013-16, 2017-18 (chair);
Graduate Honors and Awards Committee: 2003, 2004, 2013-24.
Promotion Committees: Ireland (1997); Chang (1999); Schmitt-Grohe (2000); Sbordone (2001); Occhino (2003);
Faculty Recruiting: 1995-2005; 2007-2010; 2013-14; 2014-15; 2015-16;2019-20; 2022-23;
Financial Economics Qualifying Examination Committee: 2006-7;
Macroeconomic Theory Qualifying Examination Committee: 1995-2000.
Monetary Theory Field Examination Committee: June 1996;
Undergraduate Education and Curriculum Committee: 1996-97.
Working Paper Coordinator: 1996-2015;
Workshop in Money, History and Finance: 1995-96 (co-organizer).
Workshop on Macroeconomics: 1998-99, 2000-01; 2006-12.

# Research Supervision

PHD THESIS:

Yang Zhang "Essays on Generating Alpha through Deep Learning-Based Portfolio Construction," 2024.

Susan Weerts (chair), "Information Processing, Social Influence, and Learning Among Investors, 2023, Placement: Budget Office of Minnesota.

Jesse Neumann (chair), "Big Data and the Cross Section of Equity Returns," 2022, Placement: Wolf Capital.

Hyungil Kye (chair), "A Study On Off-Exchange Trading Activities," 2021, Placement: Aalto University.

Jaeheon Jung, "Time-Varying Covariance Matrix Estimations of Factor Models," 2021.

Bo Yu, "New Evidence of the Marginal Predictive Content of Small and Large Jumps," 2020.

Phat Luong, "Three Essays in Commodity Risk Management," 2019, Placement: SUNY Polytechnic

Freddy Rojas (chair), "The Impact of Collateralization on Swaps Rates Under Clearing," 2018, Placement: BAU International University

Roque Montero, "Forecasting and Monetary Policy Analysis. New Empirical Evidence," 2016: Placement: UBS

Wukuang Cun, "Essays on Information, Liquidity and Financial Frictions," 2015, Placement: USC.

Cheng Gao (chair), "High Frequency Trading, Hidden Orders, and Market Quality in Equities," 2014, Placement: J.P. Morgan.

Yoichi Otsubo (chair), "Essays on Market Microstructure of Natural Resource and Environmental Markets," 2011, Placement: Manchester Business School.

Adam Gulan, "Essays in International Macroeconomics," 2011, Placement: Bank of Finland.

Jessica Mai, "Alternative Approaches to Business Failure Prediction Models," 2010, Placement: NCTU.

Jie Lu (chair), "Three Essays on Market Microstructure and Behavioral Finance," 2009, Placement: Cal State Long Beach.

Xianghua Liu, "Financial Econometrics," 2009, Placement: USAA Federal Savings Bank.

Liuling Li, "Bayesian Analysis of Interest Rate Models," 2009, Placement: Nankai University.

Geetesh Bhardwaj, "Essays in Prediction and Specification Analysis," 2006, Placement: Bates-White.

Saubhik Deb, "Essays on Crises and Recoveries," 2005. Placement: World Bank.

Oleg Korenok (chair), "Bayesian Analysis of Macroeconomic Models," 2005, Placement: VCU.

Stanislav Radchenko, "Essays in Bayesian Econometrics," 2002, Placement: UNC Charlotte.

Padmasini Raman, "The Housing Market," 2000, Placement: Fannie Mae.

Amarnath Ananthanarayanan, "Essays in Environmental Policy," 1998, Placement: GE Capital.

Jongwoo Kim, "The Path and Volatility of Output Across Monetary Regimes: The Japanese Experience, 1880-1996," 1998, Placement: J.P. Morgan.

Fred Engst, "Asymmetry as a Source of Specification Error in the Macro Time Series," 1997, Placement: AT&T.

Zhongjian Xia, "What Causes Closed End Fund Discounts?", 1996, Placement: American Express.

Julia Fernald, "Comovement of Foreign Exchange and Term Premia with Overlapping and Non-Overlapping Returns," Wharton School, 1992, Placement: Federal Reserve Bank of New York.

Murat Ucer, "Essays on the Monetary Origins of Price Fluctuations in the Unofficial Market for Foreign Exchange in Turkey," Boston College, 1991, Placement: IMF.

Serhan Ciftcioglu, "The Macroeconomic Stability of a Small Open Economy under Fixed and Flexible Rates," Boston College, 1988, Placement: Eastern Mediterranean University.

RESEARCH SUPERVISION (CONT.)

MASTERS THESIS:

Philip Roth, "Investors Make Bottoms, Traders Make Tops," 2015.

Gwen C De Baca, "The Evolution of Sovereign Credit Spread Dynamics," 2014.

Lei Hou (chair), "Credit Expansions, Diversification and Financial Instability: Regulating China's Shadow Banking System," 2012.

Myung-Joo Song (chair), "Hidden Orders in a Dynamic Limit Order Book," 2011.

Lan Xu, "Money and the Stock Market Reconsidered," 1998.

James Watkins (chair), "Nonlinear Time Series," 1997.

Ti-fen Liang, "Evidence of Bank Managers' Risk Preferences," 1996.

Madhu Kalimipalli, "Application of the Markov Regime Switching Model to Stock Market Volatilities," 1995.

UNDERGRADUATE HONORS:

Eli Kapengut, "Ethereum Transition to Proof-of-Stake," 2022-23, Honors Capstone Project.

Saketh Alexi, "Does Payment for Order Flow Impact Execution Quality," 2017-18, Henry Rutgers Award Winner.

Yosef Baruh, "Recent Trends in FCPA Enforcement," 2016-17, Honors.

Charles Bruno, "High Frequency Trading," 2015-16, Henry Rutgers Award Winner.

Brandon Li, "Bank Lending," 2011-12, High honors.

Sean Vidolin, "Implied Correlations in CDOs," 2010-11, Honors.

Matthew Karmel, "Predicting Financial Crises," 2008-9, Honors.

Chris Maroldo, "Common Information in Technical Indicators: Implications for Stock Returns," Henry Rutgers, 2004-05, High honors.

Gretchen Barrick, "Accounting for Options on the Balance Sheet," 2004-05, High honors.

Rikin Pandya, "Analyst Conflicts and Nasdaq Market Making Activities," 2002-03, Highest honors.

William Eng, "Decimalization," 2000-01, High honors.

Mark Telymonde, "Effects of an Econometric Filter on Short-term Technical Trading Systems," 1999-2000, High honors.

Vadim Mezrin, "Options Pricing with Stochastic Interest Rates," Senior Honors, 1997-98, High honors.

Michael DaCosta, "Politics and the Federal Budget Deficit: An Empirical Analysis," Senior Honors, 1995-96. High honors;

# Presentations:

<u>2023</u>:
NYU Stern Fintech Conference.

<u>2022</u>:
Society for Nonlinear Dynamics and Econometrics; European Central Bank.

<u>2021</u>:
UWA Blockchain and Cryptocurrency;

<u>2020</u>:
FINRA Economic Advisory Council;

<u>2019</u>:
Society for Nonlinear Dynamics and Econometrics; Cubist Systematic Strategies; Office of Financial Research; Securities and Exchange Commission;

<u>2018</u>:
FINRA Economic Advisory Council;

<u>2017</u>:
FINRA Economic Advisory Council; Office of Financial Research; Federal Reserve Bank of New York;

<u>2016</u>:
Society for Nonlinear Dynamics and Econometrics; Federal Reserve Board; Office of
Financial Research; Fixed Income Trading and Investment;

**Appendix 2: List of Items Considered**

**A.1 Case Documents**

Second Amended Complaint, Dkt. 88, JOHN CRESS, vs. NEXO CAPITAL INC, U.S. District Court for the Northern District of California, CASE NO. 3:23-cv-00882-TSH

NEXO 2706-2718, NEXO VIP Relationship Program.

NEXO 3386, March 22-May 1, 2021 e-mail chain between Cress, Hristov, and Dinca.

CRESS 269, record of trades, interest payments.

CRESS 270, record of trades, interest payments.

CRESS 659, GSR purchase of NEXO tokens.

CRESS 1760, e-mails between Cress and Hristov.

NEXO 369424, documenting OTC purchases.

NEXO 137019, documenting NEXO token trades.

NEXO 231850, document reporting profits on OTC trades.

NEXO-3645 (Translated), March 27, 2021 Hristov e-mail regarding BTC and NEXO purchase with $5,400,000 USDT.

NEXO-248369 (Translated), April 1, 2021 Hristov e-mail regarding NEXO and BTC purchase with $4,300,000 USDT.

NEXO-248348 (Translated), April 16, 2021 Hristov e-mail regarding BTC and NEXO purchase with $2,150,000 USDT.

NEXO-3604 (Translated), May 3, 2021 Hristov e-mail regarding ETH purchase with $1,000,000 USDT.

NEXO 3139, e-mails regarding borrowing scenarios.

NEXO 3345, March 26, 2021 e-mail from Cress to Nexo.

NEXO 3354, e-mails regarding borrowing scenarios.

NEXO 3441, e-mails between Cress and Hristov regarding April 14, 2021 purchase order and May 3, 2021 ETH pricing.

NEXO 3469, e-mail from Cress to Hristov, subject: Flash crash scenario.

NEXO 3470, e-mail from Cress to Hristov, subject: Discuss selling strategy.

NEXO 3471, e-mails between Cress and Hristov, subject: Re: Daily Interest on NEXO & a Final Dividend – The NEXO Governance Vote.

NEXO 3510, e-mails between Cress and Hristov, subject: Re: Please read and call me ASAP.

NEXO 231332, document cited regarding Hristov communications.

NEXO 231341, #432896 Chat with John Cress (customer support case opened May 28, 2021).

NEXO 369411, records of first BTC trade liquidations on Binance.

NEXO 48001, Cryptocurrency Purchase Agreement ("CPA") between Cress and Nexo, dated March 24, 2021.

NEXO 157, Nexo's Crypto Credit General Terms.

NEXO 2705, record of post-liquidation balances.

Deposition of Hristiyan Hristov, including transcript pages 81:14-21 and 233:5-15.

Deposition of Octavian Dinca, including Exhibit 50.

Nexo's Responses to Plaintiff's Requests for Production Nos. 107, 108, and 109.

Nexo's First Amended Objections and Responses to Plaintiff's Interrogatory No. 15(i).

Nexo's Second Amended Responses to Plaintiff's Interrogatory No. 7.

Nexo's Responses to Plaintiff's Interrogatory No. 12.

Plaintiff's Second Supplemental Response to Interrogatory No. 4.

Order Denying Defendant's Motion to Dismiss. Dkt. 98 in Cress v. Nexo Capital Inc., No. 3:23-cv-00882-TSH (N.D. Cal.).

## A.2 Articles and Monographs:

Aleti, Saketh and Bruce Mizrach "Bitcoin Spot and Futures Market Microstructure," *Journal of Futures Markets*, 41, 2021, 194-225.

Kapengut, Elie and Bruce Mizrach, "An Event Study of the Ethereum Transition to Proof-of-Stake," *Commodities* 2, 2023, 96-110.

Lipscomb, Sam, "Coinbase Review 2021: Fees, Services & More," https://www.aol.com/coinbase-review-2021-fees-services-221937631.html, Retrieved on June 5, 2025.

Mizrach, Bruce "Stablecoins: Survivorship, Transaction Costs and Exchange Microstructure," *Journal of Alternative Investments* 27, 2025, 82–109.

Mizrach, Bruce "Stablecoin risks spur case for central bank digital currency," *Financial Times,* December 6, 2021.

## A.3 Publicly available data and code

Coingecko, https://www.coingecko.com/, Data on BTC-USD, NEXO-USD and ETH-USD.

Kaiko, NEXO-USDT trades from the Huobi exchange.

Etherscan, transaction record at https://etherscan.io/tx/0x28fcd494274f0314758862daaa876f44244c449d674562b78d8ef6bcaab6ecff.

Etherscan, transaction record at https://etherscan.io/tx/0x176a0e4df9f8d7ef7e230bea0a12bcc4fe5b572768e6fa8c5defd0f43ade0c66.

Etherscan, transaction record at https://etherscan.io/tx/0xc699cf63aefa64ede79f81d23e6f88f9a62ab14992ad1f3a31236c76b30eb6da.

Arkham Intelligence, transaction record at https://intel.arkm.com/explorer/tx/0x28fcd494274f0314758862daaa876f44244c449d674562b78d8ef6bcaab6ecff.

Bitcoinity, BTC exchange volume data at https://data.bitcoinity.org/markets/volume/5y?c=e&r=month&t=b.

## A.4 Expert data collection

Coinbase, Top of the order book data, captured in real-time directly from Coinbase API. BTC-USD, and ETH-USD.

Expert's data feeds from Coinbase for BTC/USD and from Huobi for NEXO/USD.

## A.5 Programming Code

Sandbox.zip: I have provided the defendant a complete set of programs and data used to produce all of the results in the report.