# EXHIBIT 13

# Expert Report of
# Dr. Shiman Kogan

**EXPERT REPORT OF DR. SHIMON KOGAN**

**APRIL 20, 2026**

*In the Matter of John Cress, Plaintiff, vs. Nexo Capital Inc., Defendant*

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................1

   A. Assignment ..........................................................................................................1

   B. Qualifications.......................................................................................................2

   C. Documents Relied Upon......................................................................................4

II.   SUMMARY OF OPINIONS ...................................................................................6

III.  BACKGROUND .......................................................................................................7

   A. Introduction to Nexo Products and Services ......................................................7

   B. Purpose of an OTC Desk and Typical Customers..............................................12

IV.   KEY OPINIONS........................................................................................................14

   A. Nexo's OTC desk practices were at odds with OTC desk best practices or with their stated communication ......................................................................................15

4.1.1.1 No RFQ or pre-committed prices .....................................................................16

4.1.1.2 Very slow and inconsistent execution ..............................................................18

4.1.1.3 No optimization across venues or USD pairs...................................................22

4.1.1.4 Lack of execution process transparency...........................................................23

   B. Nexo's OTC desk provided poor execution quality ..........................................25

   C. Nexo charged hidden, and double fees -- contrary to the many claims it made to the contrary .........................................................................................................29

   D. The poor execution quality and high fees heightened Cress' LTV thereby increasing his risk of liquidation......................................................................................31

   E. Nexo LTV calculation and communication were wrong and misleading ..........33

   F. Nexo liquidation practices were misleading and harmful .................................35

## I.      INTRODUCTION

### A. Assignment

1.      I have been engaged by counsel for Plaintiff John Cress in the matter of *Cress v. Nexo Capital Inc*., Case No. 3:23-cv-00882-TSH, pending in the United States District Court for the Northern District of California. I have been asked to opine on the following issues:

2.      First, whether the order handling, trade execution, and fee practices of Nexo's Over-the-Counter ("OTC") trading desk were consistent with the industry's best practices and with Nexo's own stated policies and representations, including its representations that it provided "some of the best rates on the market" and charged no hidden fees.

3.      Second, whether Nexo's communications to Plaintiff accurately represented the loan-to-value ("LTV") ratios and the price thresholds at which liquidation would be triggered.

4.      Third, whether Nexo's liquidation of Plaintiff's digital assets was conducted in a manner consistent with Nexo's own stated liquidation policies and with standard risk management practices, including with respect to the order in which assets were liquidated and the fees imposed during the liquidation process.

5.      In forming my opinions, I relied on (a) academic research, (b) my teaching in financial technology, crypto markets and derivatives, (c) my professional experience in asset management and derivatives trading, (d) analysis of documents produced in this litigation and publicly available information—including blockchain data, market data from major cryptocurrency exchanges, and Nexo's own communications—as set forth more fully in this Report.

1

## B. Qualifications

6.      I am an Adjunct Associate Professor of Finance at the Wharton School, the University of Pennsylvania, and an Associate Professor of Finance at the Arison School of Business, Reichman University (Israel). I have also served on the faculty at the MIT Sloan School of Management; McCombs School of Business, University of Texas at Austin; and the Tepper School of Business, Carnegie Mellon University. I received my B.A. in Economics from Tel Aviv University in 1993, my M.B.A. from the Haas School of Business, University of California at Berkeley in 1999, and my Ph.D. in Finance from the Haas School of Business, University of California at Berkeley in 2005. I am a current and former committee member at some of the top academic finance conferences such as the Western Finance Association, the Utah Winter Finance Conference, and the Texas Finance Festival. I am also serving as a referee for top finance journals, including the Journal of Finance, the Journal of Financial Economics, and the Review of Financial Studies. I previously served as a finance area head at Reichman University, and as the Ph.D. program coordinator at Carnegie Mellon University.

7.      Before entering academia, I worked for several years in financial services, including roles that are directly relevant to the issues in this case. From 1993 to 1995, I served as an Investment Manager at Batucha Investment Management in Tel Aviv, where I was responsible for managing client portfolios across asset classes, including fixed income and equity instruments. From 1995 to 1997, I served as Derivatives Desk Manager at Zeller Eblagon Financial Services, Tel Aviv, where I oversaw the firm's derivatives trading operations. In that role I was responsible for pricing, hedging, and executing derivative strategies — including options and forwards —as well as managing counterparty relationships and large-order execution strategy. This experience gave me direct, hands-on familiarity with the operational and risk-management practices of a

2

derivatives desk, including the techniques used to execute large positions with minimal market impact, order-splitting strategies, and the management of client relationships in an over-the-counter (OTC) trading environment.

8. My primary research interest is in financial technology or "fintech" with particular emphasis on investor behavior in capital markets. I conducted some of the very early research in machine learning applied to finance and, more recently, around crypto markets. I have published 12 papers, mostly in the top finance-economics journals (the Journal of Finance, Review of Financial Studies, and American Economic Review) and have been cited over 2,000 times according to Google Scholar. Two of my most recent papers focus on the crypto markets. In the first, my coauthors and I observe that the way in which crypto returns are typically reported (*e.g.*, measured over a 24-hour window) differs from the standard practice for stocks and bonds (*e.g.*, measured between close of previous day to close of current day) and that this difference can lead investors to behave differently in crypto markets. Specifically, we show that it gives rise to a predictable change in past returns and link it to momentum behavior. In another paper, we study a large dataset of retail traders' portfolio from around the world and develop a methodology to infer their future return beliefs from their portfolio composition. We proceed to show that even investors that hold both crypto and equity assets appear to have momentum return beliefs in cryptos but mean-reverting return beliefs in equities and gold. I also serve on the advisory boards of multiple fintech startups, including three operating in the blockchain space.

9. I am also deeply passionate about the current and future implications of technology on financial services and the nature of the skills needed. I therefore developed the course "Fintech: Business, Finance, and Technology," which was one of the first fintech courses to be offered at top universities. The course is divided into two sections: a deep dive into machine-learning tools

3

and their application to credit, and a deep dive into blockchain with its application to trading. Over the years, I taught the course to a wide range of audiences from undergraduate students, MBA students, executive MBA students, and executives. I received two teaching excellence awards at the Wharton School for teaching this course. I have also developed a master-level course on "Cryptocurrencies and Decentralized Finance" ("DeFi") and taught at a special program to business executives on this topic. I also developed and taught a course in "Derivatives and Options" at the undergraduate level at Carnegie Mellon University and at the MBA level at MIT Sloan School of Management, covering the pricing, hedging, and execution of derivative instruments including options, futures, and structured products—the very instruments that underlie the OTC trading practices at issue in this case.

10.     My curriculum vitae, attached in the Appendix to this Report, provides more details about my educational and professional background and experience, as well as a list of my publications over the last ten years. I have been compensated at a rate of $1,000 per hour for the time I spend preparing for testimony on this matter including writing this Expert Report. I have been assisted by Integra FEC, a forensic data analytics and litigation consulting firm. Integra FEC has analysts and data scientists who have assisted me in analyzing these issues.

## C. Documents Relied Upon

11.     A complete list of documents and data sources relied upon in conducting the analysis is included in the Appendix. These include, but are not limited to, publicly available blockchain data, publicly available information regarding Nexo products, and other sources relied upon include documents produced to the Plaintiff and deposition testimony of Nexo's witnesses.

4

12.    It is my understanding that Nexo's witnesses who have testified in this case include:[1]

(1) Hristiyan Hristov (Cress' VIP Relationship Manager) was also designated to testify as Nexo's corporate representative on the fees, taxes, commissions, profits, and revenues Nexo took on Plaintiff's OTC transactions;

(2) Octavian Dinca (Nexo's Head of Private Client Services) was also designated to testify as Nexo's corporate representative on topics including the structure, benefits, and operation of Nexo's VIP Relationship Program, the mechanics of the VIP relationship program, Nexo's representations in the VIP Brochure, Nexo's representations regarding OTC rates, the fees, taxes, commissions, profits, and revenues Nexo took on Plaintiff's liquidations, the mechanics of Plaintiff's digital asset purchases through the Nexo OTC Desk, the policies and technical systems governing the liquidation of customer collateral, the operation of the Oracle between March 1, 2021 and June 30, 2021;

(3) Antoni Trenchev (Nexo's Director and Managing Partner) was also designated to testify as Nexo's corporate representative on topics including Nexo's representations regarding its fees and Nexo's "#ZeroFees" marketing policy and its application to Plaintiff's account.

13.    It is possible that I may review additional new information that may later become available, as well as the reports and testimony of other experts. I reserve the right to supplement my Report and analyses based on additional evidence, including any evidence brought to my attention by the Defense, other experts, or obtained through discovery.

---

[1] DEFENDANT'S AMENDED OBJECTIONS AND RESPONSES TO PLANTIFF'S 30(b)(6) DEPOSITION OF NEXO CAPITAL, INC.

5

## II.       SUMMARY OF OPINIONS

14.      I have reached the following conclusions based on (a) academic research and my teaching pertaining in this field, (b) my work experience in the area of asset management and derivatives, (c) the analysis of documents produced to the Plaintiff and publicly available information, including blockchain data and Nexo communications:

(1) despite claiming to provide "OTC services with some of the best rates on the market"[2] and "no hidden fees."[3], Nexo's OTC desk order handling deviated from industry best practices and their own stated policies, resulting in poor order execution and excessive fees, together contributing to the Plaintiff's portfolio risk;

(2) Nexo's OTC desk misrepresented the risks entailed in borrowing by substantially understating the LTV and the price threshold below which a liquidation would be triggered, all *before* the Plaintiff borrowed funds from Nexo;

(3) initiated liquidations that were (a) at odds with their own written stated policies where "Nexo Oracle might initiate small partial loan repayments automatically (without any penalty or additional fees)",[4] (b) charge the Plaintiff substantial liquidation fees while claiming that there were no such fees, and (c) did not follow standard risk management practices that call for liquidation of risky assets first, contributing to the Plaintiff's cascading liquidation calls.

---

[2] Nexo VIP Relationship Program brochure, CRESS-00000009.
[3] CRESS-00001382 (Cress' Nexo Account representing "No Hidden Fees"); CRESS-00000476 (Nexo Whitepaper representing "No hidden fees"); CRESS-00014901 (Trenchev AMA recap representing "There is no concept of hidden fees in Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make.").
[4] This language is repeated in all the liquidation notices sent to the Plaintiff, e.g., CRESS-00001854.

### III.    BACKGROUND

#### A. Introduction to Nexo Products and Services

15.    Nexo is a centralized digital asset lending platform founded in 2018 that operates as an intermediary between users who wish to earn yield on their crypto holdings and users who wish to borrow against those holdings as collateral. Nexo has described its core business as the facilitation of collateralized credit, built around a "positive net interest spread" between the rates it charges borrowers and the rates it pays to depositors.[5] Nexo publicly tells customers, "We do not enjoy liquidating clients as this brings them great distress and there is nothing we like to see less," and that "Nexo's revenues…are generated by the interest our clients pay on their loans, therefore liquidations go against the very essence of our business and token models as they shrink the loan book and reduce revenue."[6]

16.    Nexo's Earn Interest Product (EIP), launched in June 2020, is the cornerstone of the deposit side of its business. Through the EIP, users transfer crypto assets to Nexo in exchange for Nexo's promise to pay a variable rate of interest. The product is offered on two terms: a *Flexible* arrangement under which users may withdraw their assets and earned interest at any time, and a *Fixed* arrangement under which assets are locked for a defined term in exchange for higher rates. Interest is credited daily. During 2021, yields on major crypto assets reached up to 8% annually,

---

[5] Nexo, *Nexo's Business Model in Depth and at Length*, official blog post, nexo.com/blog/nexo-s-business-model-in-depth-at-length; Nexo, *Nexo's Business Model and the Gold Standard in Digital Finance*, nexo.com/blog/nexos-business-model-and-the-gold-standard-in-digital-finance.

[6] Nexo, Why Liquidations Are Needed and How They Protect Us All
*Why Liquidations Are Needed and How They Protect Us All*, official blog post,  https://nexo.com/blog/why-liquidations-are-needed-and-how-they-protect-us-all.

while stablecoin yields were offered at up to 10–12% annually, with additional bonuses available to users who elected to receive interest in Nexo's native NEXO token.[7]

17.    Nexo exercised discretionary control over the pooled assets deposited under the EIP, using them to generate the returns needed to fund interest payments. According to the U.S. Securities and Exchange Commission's 2023 consent order with Nexo Capital, these "deployment activities" included lending to retail and institutional borrowers, staking on proof-of-stake networks, arbitrage strategies (including reverse cash-and-carry arbitrage capturing funding rates), and the provision of liquidity on decentralized finance (DeFi) platforms.[8]

18.    On the lending side, Nexo offers collateralized credit lines. A user deposits eligible digital assets — including Bitcoin ("BTC"), Ether ("ETH"), and over 100 other cryptocurrencies — as collateral, and in return receives access to a credit line denominated in fiat currency or stablecoins. There are no credit checks and loan approval is effectively instantaneous upon deposit. The maximum amount a borrower can draw is governed by the Loan-to-Value (LTV) ratio assigned to each collateral asset. Borrowing rates in 2021 ranged depending on loyalty tier and LTV level, with the lowest rates available to top-tier users holding NEXO tokens.

19.    Nexo launched its Over-the-Counter Trading, Borrowing and Lending Desk in July 2019, positioning it as a dedicated institutional channel complementing the automated retail platform.[9] Its stated purpose was to serve institutional clients, corporate counterparties, family offices, and large retail investors requiring the personalized execution of transactions that the automated platform was not designed to accommodate — with a minimum transaction threshold

---

[7] U.S. Securities and Exchange Commission, *In the Matter of Nexo Capital Inc.*, Admin. Proc. File No. 3-21263, Order Instituting Proceedings, Jan. 19, 2023, sec.gov/files/litigation/admin/2023/33-11149.pdf.

[8] *Ibid.*; see also Nexo Medium, "Loyalty Comes in Silver, Gold and Platinum with Nexonomics," medium.com/nexo

[9] Nexo, *Nexo Launches OTC Trading, Borrowing and Lending Desk*, official blog post (July 2019), nexo.com/blog/nexo-launches-otc-trading-borrowing-and-lending-desk; also published on the Nexo Medium channel, medium.com/nexo.

set at $100,000. The desk offered three integrated services: spot trading, collateralized institutional OTC loans, and borrowing against crypto collateral, available across a range of fiat currencies (USD, EUR, GBP) and major crypto assets and stablecoins. Nexo described this suite in its own corporate communications as "crypto-backed loans, margin lending & institutional OTC loans made on a collateralized basis," characterizing collateralized credit as "the primary line of business."[10]

20.    Nexo described the OTC desk as "a private, more personalized service" offering "1-on-1 service" to institutional, corporate, and large retail clients, and distinguished it from automated retail products by its integration with Nexo's existing "borrowing, lending, and custody infrastructure for a seamless experience."[11] In a February 1, 2021 Business Wire press release, Nexo stated that the exchange "guarantees best-price swaps" through an in-house "Smart Routing" system that "simultaneously connects to multiple exchanges and splits orders depending on price per volume to provide a fixed quote at order submission, thus ensuring no price fluctuations occur as with most exchange services." Nexo further claimed that the exchange "guarantees immediate execution," contrasting this with competitors "where the price can change by up to 5%." A companion blog post, dated February 4, 2021, elaborated that the Smart Routing system "connects to the most trusted and well-capitalized exchanges simultaneously to provide a quote better than any manually executed one." [12] Nexo's corporate witness, Octavian Dinca, similarly testified that

---

[10] Nexo (@Nexo), post on X (formerly Twitter), Nov. 28, 2022, x.com/Nexo/status/1597268181399502849; Nexo, *Nexo's Business Model and the Gold Standard in Digital Finance*, nexo.com/blog/nexos-business-model-and-the-gold-standard-in-digital-finance.

[11] Nexo, *Nexo Introduces In-app Cryptocurrency Exchange Service*, Business Wire, Feb. 1, 2021, available at businesswire.com/news/home/20210201005587/en/Nexo-Introduces-In-app-Cryptocurrency-Exchange-Service.

[12] Nexo, *Nexo Launches OTC Trading, Borrowing and Lending Desk*, July 2019, available at nexo.com/blog/nexo-launches-otc-trading-borrowing-and-lending-desk; see also Nexo Medium channel, medium.com/nexo/nexo-launches-otc-trading-borrowing-and-lending-desk-7dcf0047e0c8.

9

Nexo used "two computer systems… Time Weighted Average Price… [and] Smart Order Routing, SOR" to ensure that Nexo's OTC customers got the best rates on the market.[13]

21.    Nexo managed credit line risk through a tiered margin-call system. As the market value of collateral declines and the LTV rises, Nexo issues automated margin calls at thresholds of approximately 71.4%, 74.1%, and 76.9% LTV, prompting borrowers to add collateral or repay. If the LTV reaches 83.33%, Nexo is contractually entitled to liquidate a portion of the borrower's collateral to restore the LTV to below 80%. This automated liquidation mechanism is claimed to be managed through Nexo's proprietary "Nexo Oracle," a real-time risk engine that monitors collateral values and triggers margin events.[14]

22.    The NEXO token is an ERC-20 token issued by Nexo that Nexo described as "the world's first US SEC-compliant dividend-paying asset-backed security token with additional utility features."[15]  ERC-20 is a technical standard implemented on the Ethereum blockchain that defines a common set of rules governing the creation and transfer of fungible tokens, enabling any ERC-20-compliant token to interact seamlessly with wallets, exchanges, and smart contracts without bespoke integration for each token. This token standard became the dominant vehicle for initial coin offerings (ICOs), with the substantial majority of the over $20 billion raised through token sales between 2017 and 2019 conducted using ERC-20-compliant tokens.[16] Token holders historically received dividends of 30% of Nexo's net profits; in June 2021, Nexo replaced this

---

[13] Dinca Tr. 164:13-20

[14] Nexo Support, *Nexo Loans – FAQ*, support.nexo.com/article/nexo-loans-faq; Nexo blog, *A Stellar LTV Policy for Crypto Loans*, nexo.com/blog/a-stellar-ltv-policy. Nexo Support, Loan-to-Value (LTV) Explained – https://support.nexo.com/article/loan-to-value-ltv-explained.

[15] Nexo Token Terms, NEXO-0021510; Nexo Whitepaper, *See also* CRESS-00000476 (describing the NEXO Token as an "SEC-compliant Asset-backed Token.")

[16] Howell, Stephanie T., Marina Niessner, and David Yermack, "Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales," *The Review of Financial Studies* 33, no. 9 (2020): 3925–3974.

10

structure with an enhanced interest-rate system under its "Nexonomics" loyalty program. [17] Under this program, users are assigned to one of four loyalty tiers — Base, Silver, Gold, and Platinum — based on the proportion of their total portfolio held in NEXO tokens (less than 1%, 1–5%, 5–10%, and 10%+, respectively). Higher-tier users receive preferential terms on both the Earn and Borrow products, including up to 2% additional APY on earned interest (when taken in NEXO tokens) and up to 50% discounts on borrowing rates.[18]

23.    The NEXO token sits at the intersection of Nexo's revenue model, its client incentive structure, and the direct financial interests of its founders and executives. Nexo issued one billion NEXO tokens in an April 2018 token sale that Nexo publicly represents it raised approximately $52.5 million. According to Nexo's own Token Terms document, the total supply was allocated as follows: 52.5% sold to public investors, 25% retained by the company as "Loan Funding Reserves," 11.25% allocated to founders and the team (subject to an 18-month vesting schedule with six-month cliffs), and the remainder distributed between advisors and community programs.[19] The founders and team allocation of 112.5 million tokens meant that the co-founders held a material direct financial stake in the token's price performance. Critically, the 25% company reserve allocation (250 million tokens) was also controlled by Nexo itself, giving the company — and through it, its management — substantial ongoing economic exposure to the token.

24.    The dual financial interest of executives in the token — as holders of the team allocation and as managers of the company reserve — features indirectly in subsequent litigation. In the 2023 English High Court proceedings between Nexo and its former co-founder Georgi

---

[17] Nexo, *NEXO Token Holders Receive $20,428,359.89 in Dividends*, Jun. 16, 2021, Nexo blog, https://nexo.com/blog/the-final-dividend-worth-20-million-has-been-distributed.

[18] Nexo Support, *Nexo Loans – FAQ*, support.nexo.com/article/nexo-loans-faq; Nexo blog, *A Stellar LTV Policy for Crypto Loans*, nexo.com/blog/a-stellar-ltv-policy

[19] NEXO Token Terms, *Why Is Nexo Issuing Tokens?*, official token terms document, archived at cryptorating.eu/whitepapers/Nexo/NEXO-Token-Terms.pdf; see also NEXO Token Terms on Scribd; NEXO-0021510.

11

Shulev (who was terminated as managing partner in September 2019), a central dispute concerned a wallet allegedly holding 45,232,012 NEXO tokens that was moved on July 1, 2021, with Nexo claiming Shulev had retained unauthorized control of those assets.[20] Separately, the Bulgarian criminal investigation launched in January 2023 — which charged co-founders Antoni Trenchev, Kosta Kantchev, Kalin Metodiev, and Trayan Nikolov with forming an organized criminal enterprise, among other allegations — was ultimately dropped in December 2023, with prosecutors citing the absence of an applicable legal regime for crypto assets.[21]

## B. Purpose of an OTC Desk and Typical Customers

25.    A cryptocurrency Over-The-Counter (OTC) desk is a private trading channel through which institutional investors, corporate treasuries, high-net-worth individuals, and other large-volume participants execute substantial digital asset transactions away from public exchange order books. The defining operational rationale for OTC desks is the management of market impact: when a large buy or sell order is routed through a public exchange, it is filled progressively across the available order book, causing the execution price to move adversely — a phenomenon known as slippage. OTC desks address this by sourcing liquidity bilaterally or through a network of counterparties, allowing a large order to be filled at a single agreed-upon price with no impact on the public market thus able to "lower execution costs by tapping into unexpressed liquidity," with actual execution costs upstairs being on average only 20% as large as they would be if block

---

[20] *Nexo in Court With a Co-Founder Over $12M in Missing Assets*, CoinDesk, July 13, 2023, coindesk.com; *Crypto Lender Nexo Battles Former Co-Founder*, Blockworks, blockworks.co/news/crypto-lender-nexo-battles-former-co-founder.

[21] *Nexo co-founders and executives charged as an organized crime group in Bulgaria*, Capital.bg / Kinsights, Jan. 20, 2023, kinsights.capital.bg; *Bulgaria ends investigation into crypto lender Nexo*, The Block, theblock.co.

12

trades were routed through a public exchange order book.[22] Coinbase has described the purpose of its OTC desk as enabling customers to "execute large volume trades with minimal price slippage."[23]

26.     The standard pricing mechanism employed by institutional crypto OTC desks is the Request for Quote (RFQ), in which the client specifies the asset, direction, and size, and the desk returns a firm, time-limited quote — a protocol consistent with established practice across traditional OTC markets in fixed income and foreign exchange. Coinbase Prime's official documentation describes the RFQ Order as "an Order to buy or sell a specific amount of an Asset at a confirmed all-in price" obtained by "disseminating an electronic message to Coinbase Exchange for the purpose of soliciting quotes for the specific Asset," which may then "be accepted and executed or rejected by the client."[24] Talos, one of the leading institutional digital asset trading infrastructure providers, states that "when institutions need to trade in size, manage information leakage or trade asset classes that have a large number of instruments… they often turn to a request-for-quote (RFQ) protocol."[25] [26]Kraken describes its automated RFQ system as returning a quote "within seconds."[27] Quotes are very short lived and, as stated by Kraken, clients are able to

---

[22] "Does an Electronic Stock Exchange Need an Upstairs Market?", *Journal of Financial Economics* 73, no. 1 (2004): 3–36

[23] Coinbase, *Coinbase Quietly Opened Its OTC Crypto Trading Desk*, CoinDesk, Nov. 28, 2018, coindesk.com/markets/2018/11/28/coinbase-quietly-opened-its-otc-crypto-trading-desk-this-month.

[24] Coinbase, *Coinbase Markets Trading Rules* (trading rules document), available at coinbase.com/legal/trading_rules.

[25] Talos, "Why RFQ Is Essential in Institutional Crypto Markets," *Talos Insights* (2024). Available at: https://www.talos.com/insights/why-rfq-is-essential-in-institutional-crypto-markets

[26] Bitstamp, *Place Block Trades Quickly and at Optimal Prices with Bitstamp OTC RFQ*, Bitstamp Blog, available at blog.bitstamp.net/post/place-block-trades-quickly-and-at-optimal-prices-with-bitstamp-otc-rfq.

[27] Kraken, *Introducing the Kraken OTC Desk*, Kraken Support, available at support.kraken.com/articles/360021967711-introducing-the-kraken-otc-desk; Kraken, *Automated OTC Trading Now Available on Kraken Custody*, Kraken Blog, blog.kraken.com/product/automated-otc-trading-now-available-on-kraken-custody.

"execute OTC trades in seconds" — similarly settles trades immediately to the client's custody vault upon acceptance.[28]

## IV.    KEY OPINIONS

27.    To evaluate the execution quality of Nexo's OTC desk, I reviewed the email communications between Cress and Nexo, focusing on order placement requests and order confirmations, including their time stamps. I used wallets identified for Nexo and Cress and the Ethereum and Bitcoin blockchains to track and time the transfer of crypto assets between the parties. I also evaluated the deposition testimony of Nexo's witnesses. The analysis below separates trades in which Cress requested to purchase crypto assets and later trades that were part of Cress portfolio liquidation.

28.    In March 2021, after opening an account with Nexo, Cress transferred some of his BTC to Nexo with the intent of earning yield on his crypto assets. While Cress was "less comfortable borrowing", he was encouraged by promises made to him about the "VIP Relationship Program", which was to give him access to superior support and OTC services that included "liquidation relief program", and the relatively muted risk depicted by the liquidation thresholds presented by Nexo OTC desk.[29]  He eventually decided to borrow against his crypto assets and purchase additional BTC and ETH. Cress ultimately deposited a total of 250.33 BTC and 250.00 ETH with Nexo.

---

[29] March 17-19, 2021 email chain between Cress and Hristov. NEXO-0003125; VIP Relationship Program Brochure, CRESS-00000008.

14

29.    The mechanics of purchasing assets on margin at Nexo (at least in Cress case) are as follows. Upon utilizing the loan through the platform, Nexo transferred USDT equal to the withdrawn loan amount to Cress' account.[30] To purchase crypto assets, Cress first communicated with the OTC desk the asset type and quantity to be purchased. He was then asked to transfer the USDT to the crypto wallet controlled by the OTC desk.

30.    Observing (1) the communication before and after the trades were consummated, (2) the precise time stamps for the crypto wallet transfers, and (3) intra-day market prices from major exchanges for the relevant crypto assets, allows us to evaluate the quality of execution and conduct a counterfactual analysis of how Cress would have fared if he simply placed his trades directly with a major exchange rather than route them through the OTC desk.

**A. Nexo's OTC desk practices were at odds with OTC desk best practices or with their stated communication**

31.    Cress' VIP Relationship Manager, Hristiyan Hristov, testified that "For Mr. Cress the most important thing was to get the asset at the very best price, and that is what we enabled him to do through the OTC desk."[31] Hristov understood "the very best price" meant "the very best price according to the market conditions and the size of the order."[32] Nexo similarly promised Cress "some of the best rates on the market."[33] Hristov testified that in comparing Nexo's rates to publicly available rates, "the market data is publicly available, and I had access to this data so I could make a comparison."[34] However, despite Hristov drafting the VIP Brochure that promised

---

[30] USDT is a USD pegged stablecoin, issued by Tether, that was popular at the time.
[31] Hristov Tr. 72:11-17.
[32] Hristov Tr. 72:21-73:4.
[33] VIP Relationship Program Brochure, CRESS-00000009.
[34] Hristov Tr. 101:16-22.

15

"some of the best rates on the market," Hristov does not "know what rates any other OTC desks provided to their customers in 2021."[35] Dinca did not know whether Nexo performed industry-standard analysis to ensure customers were in fact receiving some of the best rates on the market. For example, Dinca does not know what a transaction cost analysis is, does not know what trade execution quality is, and does not know whether Nexo performed a comparative analysis of the slippage on different venues.[36] I perform the comparisons that Hristov discusses using publicly available market data and conclude Nexo did not offer "some of the best rates on the market": neither in execution practices nor in the resulting prices at which it transacted with Cress.

#### 4.1.1.1 No RFQ or pre-committed prices

32.    A primary reason why customers use OTC desks rather than trading via exchanges is price quality of large orders and expedited execution. OTC desks have the ability to offer competitive rates for large orders by, among other things, sourcing liquidity from multiple sources and absorbing temporary client order imbalances via sophisticated risk management and algorithmic trading. Immediate execution with an OTC desk is facilitated through an RFQ where the client locks in the price at which the trade executes. In fact, Nexo's Cryptocurrency Purchase Agreement ("CPA") acknowledged the importance of upfront agreement and quick execution.[37] The CPA states that Cress could submit purchase orders including the amount and price, and Nexo would have 10 minutes to confirm that Purchase Order by email. Further, it states that "[p]romptly following payment of the [Purchase Price]" Nexo shall deliver the cryptocurrency to Cress "by transfer of immediately available cryptocurrencies." Despite these acknowledgements, Nexo's

---

[35] Hristov Tr. 107:10-17; 100:2-12; 106:19-25 (Q. My question is for purchases did Nexo – did you compare the rates available through Nexo's OTC desk to the rates available through any other OTC desk? A. My job was not to check rates but according to my knowledge to what I know, this was some of the best rates on the market).
[36] Dinca Tr. 169:2-170:16.
[37] NEXO-0048001.

16

OTC desk did not provide an RFQ for any of Cress' trades, including when trading the NEXO token from its own inventory.  Hristov stated that "[W]e didn't know what will be the deal which he wants to get executed. Once the deal is done, we would be able to see the actual result."[38]  Thus, Nexo failed to provide Cress with an upfront execution price or execution time. The fact that this practice is problematic is not lost on Nexo: in an internal document labeled "Retail OTC Procedures"[39] it states "we don't give out quotes to customers" and continues to discuss the problem with this (and other internal practices) "when the customer sees the result of the trade, he feels misled (…) account managers waste a lot of time post the execution to deescalate the customer. We rarely do more than one deal with the same customer." Nexo claims it did communicate OTC fees upfront to some customers but did not do so for Cress.[40]

33.    Cress did indeed ask for pre-committed prices.[41] For example, on March 26, 2021 Cress' requested Nexo purchase Bitcoin "at prices below $54,000 and I want to buy Nexo fast before it keeps rebounding."[42] Nexo failed to follow Cress' clear instructions and sold Cress at a price of $55,289.81 per BTC and $2.66 per NEXO token.[43] On March 30, 2021, Cress notes he sent the $4,300,000 to the OTC desk and sent an email confirmation, and was "expecting that the order fulfilled yesterday close to $57,400."[44] Nexo once again failed to follow Cress' instructions and on April 1, 2021, Hristov informed Cress Nexo executed the deal at a $59,197 BTC price and a $2.829 NEXO Token price. Cress specifically complained to Nexo about its slow execution time for his March 30 order.[45] In that chat, Cress told Nexo "I have specific order instructions AND the

---

[38] Hristov Tr. 44:20-25.
[39] See NEXO-0145948.
[40] Trenchev Tr. 329:12-18.
[41] NEXO-0003441 at 3450.
[42] Id.
[43] Id. at 3449.
[44] Id. at 3447.
[45] March 31, 2021 customer support chat between Cress and Nexo. NEXO-0003366.

17

price of bitcoin has gone up by $2,000 over the last 24 hours and that is not good. I need to know the status of this order AND the price the order filled. It does not take 24 hours to place an order."[46] Cress complained again after his May 3, 2021 ETH transaction took days to execute.[47] Cress told Hristov "It's very disappointing that the price of ETH has gone up by 15% or $400 (from $2,750 to $3,150) in the four days that have passed since my request."[48] When Cress' order was finally executed, he once again noted that Nexo's purchase price was much higher than his requests (initially $2,750 and later $3,150), and that Nexo's quote was "impossible because ETH never reached a price of $3,205. I can't be paying more than a price where ETH ever traded."[49] Nexo's failure to provide RFQs or pre-committed prices subjected Cress to its slow and inconsistent executions (discussed below), thus prevented Cress from achieving some of the best rates on the market, or institutional rates, as Nexo promised.

#### 4.1.1.2    Very slow and inconsistent execution

34.    Not only did Nexo's OTC desk fail to provide pre-agreed trade prices, but it also subjected Cress to a very slow and costly execution, all while boasting about its "Priority" customer access through technical support, priority support, and email support team with a turnaround time of 2 hours, 24/7.[50] Given these promises and the fact that Cress was a VIP customer, it would be reasonable to expect an expedited and professional grade execution. Indeed, as described above, Cress expected faster execution times than he received.[51] Instead, trade

---

[46] *Id*.
[47] NEXO-0003441 at 3442.
[48] *Id*.
[49] *Id*. at 3441.
[50] Nexo VIP Relationship Program, CRESS-00000019.
[51] *See* NEXO-0003441 at 3447-3450; NEXO-0003366.

18

execution details provided by Nexo show that Nexo routed Cress' BTC and ETH purchases to a single exchange per order through an inexplicably slow process.

35.    To illustrate Nexo's slow and inconsistent executions, I detailed the execution of the four purchase orders submitted by Cress in Table 1. Recall that crypto markets trade 24/7/365 and thus there is no structural limit to trading any time of the day. Using blockchain data, which provides a precise timestamp for when crypto assets are transferred between parties, I can observe the exact time Nexo's OTC desk could have executed Cress orders: the time the USDT was transferred out of his crypto wallet and into Nexo's OTC desk wallet. However, Nexo's OTC desk *started* executing orders with a delay ranging from 3.0 to 29.3 hours. To put this in perspective, the *hourly* volatility, measured over the first four months of 2021, was 1.07% for BTC and 1.28% for ETH.[52] That means that within a single 24-hour period, Bitcoin's price could reasonably — within one standard deviation — shift by roughly 5.2% ($1.07\% \times \sqrt{24}$) and Ethereum price could shift by roughly 6.3% ($1.28\% \times \sqrt{24}$).[53] Thus, execution delays can be very costly in crypto markets, but Nexo's OTC desk execution was not expedited.

36.    To visually depict the execution pattern of the Plaintiff's orders by the OTC desk, I created plots – one for each of the BTC/ETH trades – that shows the timeline, starting when the USDT arrives at the OTC desk and continues for 24 hours, or when execution had been completed. Figures 1 to 4 show the prices of the traded crypto asset during that time window, when trades were executed, and the accumulation of the order over time. Observing the Figures, it is evident that the OTC desk execution practices were not consistent with 24-hour TWAP (or 24-hour VWAP), or else there would be a gradual and continuous execution until desired amount reached.

---

[52] CryptoCompare CCCAGG (Crypto Compare Aggregate) index, hourly OHLCV via the histohour endpoint (https://min-api.cryptocompare.com).
[53] Return volatility scales by the squared root of time, see Merton, Robert C. "On Estimating the Expected Return on the Market: An Exploratory Investigation." *Journal of Financial Economics* 8, no. 4 (1980): 323–361.

19

Instead, they show inconsistent patterns across the trades in a way that is hard to explain by order size: some trades start with a 3-hour delay (Trade 1) while others *start* with over 24-hour delay (Trade 2); some orders are executed continuously (Trades 1&2) while others have inexplicable pauses (Trades 3&4).

**Figure 1 – Trade 1 Execution Timeline**



20

**Figure 2 – Trade 2 Execution Timeline**



**Figure 3 – Trade 3 Execution Timeline**



21

**Figure 4 – Trade 4 Execution Timeline**



### 4.1.1.3    No optimization across venues or USD pairs

37.    Not only did the OTC desk not provide immediate execution of trades but the way it did fill these orders was one that provided little value add beyond what a retail client could have done on their own, all while claiming that its VIP customers would "get institutional rates for amounts larger than $100,000".[54] Despite the fact that Nexo claims it was connected to multiple exchanges it did not split Cress' orders across multiple venues to expedite execution and lower price impact. Dinca indeed testified that Nexo had the capacity to execute a single TWAP on multiple exchanges for Cress' transactions at the same time.[55] Instead, it routed each order to a

---

[54] Nexo VIP Relationship Program Brochure, CRESS-000000008.
[55] Dinca Tr. 172:12-173:12.

22

single exchange while breaking it into a number of smaller orders. Despite Dinca testifying that regular retail clients did not have TWAP technology available to them, the process of breaking orders into small ones is a standard feature that was offered to retail clients of Binance around that time.[56]

38.    When executing large transactions in cryptocurrency markets, liquidity is fragmented not only across exchanges but also across quote-currency pairs — BTC/USD, BTC/USDT, BTC/USDC, and BTC/DAI represent distinct order books with independent depth profiles. Routing a large order across multiple such pairs and thus taking advantage of a large liquidity pool reduces effective price impact relative to executing against a single pool.[57] However, Nexo's OTC routed all the trades to the USDT pair only.

### 4.1.1.4    Lack of execution process transparency

39.    Not only did Nexo's OTC desk fail to commit to an execution price but it did not follow a transparent and consistent execution policy. First, Nexo sought to justify its poor executions and mask its fees, by telling Cress that the OTC desk was executing his orders using a "24-hour TWAP", confirmed in writing for at least the second and third BTC trade.[58] This standard trade execution policy splits a large order into many, equal size orders, spread over the course of 24 hours in an attempt to minimize price impact. However, this was simply false. As Table 1 shows, some trades were executed over a course of 12 minutes while other trades took 19.1 hours to consummate. In fact, none of the orders followed the stated 24 TWAP policy. Furthermore, order size does not appear to explain the speed of execution with the first order – being the largest

---

[56] See discussion of "Iceberg Order" on Binance FAQ page (dating July 26, 2021): https://www.binance.com/en/support/faq/detail/5d3fa5e5709f47e0b5f186b350da1655.
[57] Foucault, Thierry, and Albert J. Menkveld. "Competition for Order Flow and Smart Order Routing Systems." *Journal of Finance* 63, no. 1 (2008): 119–158. https://doi.org/10.1111/j.1540-6261.2008.01312.x.
[58] CRESS-00001760, NEXO-0003386 at 3388, 3390; NEXO-0003441 at 3445-3447.

executing over the course of 1.1 hours and the second order, being 20% smaller taking 19.1 hours to complete. In addition, while Nexo's OTC desk claimed it was using a 24 TWAP to acquire BTC, implying an execution through an exchange, it in fact sold NEXO tokens out of its own inventory without disclosing it to Cress. This was not an innocent omission, but a policy designed to mislead customers: in an internal document labeled "OTC Services" it states in the context of NEXO token selling "How we present it: 'We connect buyers and sellers, we do not sell from our inventory'". Nexo's VIP Relationship managers represented that Nexo "is not participating in the trade, we act as a middle man of the deal"[59]. Separate internal communication around trade confirmation makes it clear that the NEXO tokens were sold from inventory.  In a September 20, 2021, in an email from Hristov to Cress, Nexo misrepresented its sales practices to Cress, telling him "Since we are not a market maker for NEXO, the Nexo OTC does not directly participate in trades. When getting an inquiry from a client who wants to sell NEXO tokens, we will look for a buyer."[60] Hristov's statements directly contradict Nexo's OTC practices with respect to Cress's NEXO token trades. Nexo was a direct participant in all of Cress' OTC NEXO token trades, selling NEXO tokens to Cress from its own inventory.

**Table 1 – Trade Logistics and Timeline**

| Trade | Trade Request | USDT Arrives at OTC Wallet | Trade Execution Start End | OTC Desk Confirms Transaction | OTC Desk Transfers of Assets | Delay to Start of Execution (hours) | Delay to End of Execution (hours) |
|---|---|---|---|---|---|---|---|
| 1 | Use 5.4M USDT Buy 75 BTC Use remainder to buy NEXO | 03-26 20:09 | 03-26 23:11 03-27 00:18 | 03-27 10:01 | 03-27  22:54 | 3.0 | 4.1 |
| 2 | Use 4.3M USDT Buy 50 BTC Use remainder to buy NEXO | 03-30 18:25 | 03-30 22:49 03-31 17:54 | 04-01 11:30 | 04-02  17:41 | 4.4 | 23.5 |

---

[59] NEXO-0003588
[60] September 20, 2021, email chain between Cress and Hristov. NEXO-0003639.

24

| Trade | Trade Request | USDT Arrives at OTC Wallet | Trade Execution Start End | OTC Desk Confirms Transaction | OTC Desk Transfers of Assets | Delay to Start of Execution (hours) | Delay to End of Execution (hours) |
|---|---|---|---|---|---|---|---|
| 3 | Use 2.15M USDT Buy 28 BTC Use remainder to buy NEXO | 04-14 16:36 | 04-15 14:37 04-15 17:58 | 04-16 07:54 | 04-16 10:35 | 22.0 | 25.4 |
| 4 | Purchase ~$1M ETH | 05-02 05:57 | 05-03 11:15 05-03 11:26 | 05-0311:58 | 05-04 13:49 | 29.3 | 29.5 |

**Notes:**

1. All times are UTC.
2. All trades take place in 2021, thus year is omitted for brevity.

## B. Nexo's OTC desk provided poor execution quality

40.    Nexo made explicit promises about providing some of the "some of the best rates on the market"[61] but the data shows that the prices at which Cress orders were executed are inconsistent with this claim. To quantify the difference between the price at which the OTC desk executed Cress orders and the price at which he could have executed these very same orders if he simply routed them to an exchange, I obtained intraday data for BTC and ETH from multiple exchanges, including Binance and Kraken. The analysis focuses on Binance and Kraken since Nexo's OTC desk routed orders to Binance and Kraken. Using these two exchanges only provides a *lower* bound on the quality of execution since I did not consider the price available through other OTC desks or on other exchanges.

41.    For the analysis below, I use data from high-volume exchanges[62] that reports historical minute-level open, high, low and close prices as well as trading volume across a number

---

[61] Nexo VIP Relationship Program brochure, CRESS-00000009.
[62] Data is sourced directly from public APIs provided by Binance, Bitfinex, Huobi, and Kraken. See Appendix.

25

of dominant exchanges. I focus on Binance and Kraken where Nexo OTC routed Cress' orders. Given that cryptocurrencies are often traded against different dollar-denominated pairs such as USD, USDT, USDC, etc., I include all major pairs, weighted by trading volume. By far the largest exchange was Binance with a volume market share during the period where the purchase orders were placed (March 26, 2021 to May 2, 2021), of 74% in BTC and 54% in ETH. Within Binance and Kraken, the dominant USD pair was USDT with 75% for BTC and 60% for ETH. Thus, the results presented below remain robust if I include all exchanges or focus only on USDT.

42.    Using this data, I construct three counterfactual execution prices. The first follows Nexo stated "24 TWAP" execution policy[63] and computes executed price as the average 1-minute close price on Binance and Kraken for the 24-hour window starting when USDT was transferred to the OTC desk crypto wallet. The second, "24 VWAP" computes a volume-weighted price using 1-minute volume and price data, as "it is common to evaluate the performance of traders by their ability to execute orders at prices better than the volume-weighted average price (VWAP) over the trading horizon."[64] To test for the robustness of the first two methods, I created a third counterfactual execution price that takes into account order size explicitly. The total price impact of a large trade is estimated using the square-root impact law, confirmed empirically for Bitcoin by Donier and Bonart (2015)[65], who analyze over one million Bitcoin metaorders and find $I(Q) = Y \times \sigma \times \sqrt{(Q/V)}$, where $\sigma$ is return volatility over the execution window, V is market volume over that same window, $Q/V$ is the trade's participation rate, $Y \approx 1$ for Bitcoin. The intuition of this formula is that a deep market is one with high volume and low volatility, other

[63] CRESS-00001760, NEXO-0003386 at 3388, 3390; NEXO-0003441 at 3445-3447.
[64] Madhavan, Ananth. "VWAP Strategies." *Transaction Performance* (Investment Technology Group), Spring 2002, 32–39.
[65] Donier, Jonathan, and Julius Bonart. "A Million Metaorder Analysis of Market Impact on the Bitcoin." *Market Microstructure and Liquidity* 1, no. 2 (2015). https://arxiv.org/abs/1412.4503

things equal. Applying this framework, the counterfactual execution price for a purchase of Q coins is $P_t \times \left(1 + \sigma \times \sqrt{(Q/V)}\right)$, where $P_t$ is the price at the time of execution, and σ and V are computed over the actual execution interval of 24 hours using minute-level price and volume data. Details of the parameter estimates for each of the trades is provided in the Appendix.

43.     Table 2 provides a comprehensive comparison between Nexo's OTC desk execution of BTC and ETH purchases and the price of these cryptocurrencies when the funds were available, using these three methods. The comparisons show clearly that Cress did not receive "some of the best rates on the market". In fact, Cress would have likely paid between 65bp and 847bp lower prices on these BTC and ETH purchases if he simply routed his trade to a retail exchange and followed one of these two standard execution strategies (TWAP or VWAP). The price impact estimations are largely in line with the TWAP and VWAP price execution estimates, providing support for these estimates while taking into account Cress' order sizes.  In short, Nexo OTC desk did not perform its stated function as a provider of faster or cheaper execution in Cress' case.

**Table 2 – Trade Execution Prices and Benchmarks**

| Trade | Trade Instructions | Trade Date | Price Provided to Cress | Price at Time USDT Arrives | 24h Time-Weighted Avg (TWAP) | 24h Volume-Weighted Avg (VWAP) | Daily Price Impact (Sq. Root Method) | Execution Gap Range Relative to TWAP and VWAP (in bp) |
|---|---|---|---|---|---|---|---|---|
| 1 | Purchase 75 BTC | 03-26 20:09 | $55,289.81 | $53,929.78 | $54,903.53 | $54,932.55 | $53,982.05 | 65-70 |
| 2 | Purchase 50 BTC | 03-30 18:25 | $59,197.00 | $59,028.75 | $58,639.95 | $58,593.76 | $59,082.56 | 95-103 |
| 3 | Purchase 28 BTC | 04-14 16:36 | $63,426.00 | $63,372.26 | $62,739.49 | $62,657.63 | $63,410.22 | 109-123 |
| 4 | $1M USD worth of ETH | 05-02 05:57 | $3,203.60 | $2,919.09 | $2,953.31 | $2,965.99 | $2,920.87 | 801-847 |

**Notes:**
1. All time are UTC.
2. All trades take place in 2021, thus year is omitted for brevity.

3.  Market data obtained from CITE.
4.  For price impact methodology, see Donier, Jonathan, and Julius Bonart. "A Million Metaorder Analysis of Market Impact on the Bitcoin." *Market Microstructure and Liquidity* 1, no. 2 (2015). https://arxiv.org/abs/1412.4503.

44.      The quality of price execution appears much worse when analyzing NEXO token purchases. First, the purchases of NEXO tokens were not discretionary buys made by Cress. Instead, Cress' Relationship Manager suggested the quantity of these purchases made to comply with Nexo requirements that customers hold 10% of their asset value to obtain lower borrowing fees. It should be noted that NEXO tokens had no functionality for Cress outside of the artificial requirement set by Nexo to receive discounts on loan interest. Second, internal documents from Nexo show that NEXO token purchases were not executed on external exchanges. Instead, Nexo sold Cress NEXO tokens from "inventory" at, what appear to be highly inflated and arbitrary prices, without prior disclosure. To understand why such disclosure would be important, note that these orders were filled by Nexo creating an internal transfer price at which NEXO tokens were "sold" to the OTC desk and then the OTC desk added a markup when selling the tokens to Cress. Given that Nexo controlled the float of NEXO tokens, the internal transfer pricing appears to have no objective grounding compared to the price at which Nexo obtained these tokens.

45.      To see this, Table 3 computes for all NEXO token purchases the markup charged by Nexo to Cress. These markups are exorbitant and range from 246% to 295% relative to its own acquisition price. Not only that, but there appears to be very little relation between the internal prices set by Nexo and the price at which the token traded at the time. To further see that the execution prices charged to Cress had little apparent economic grounding, notice that the markups charged by the OTC desk are unrelated to quantity traded. For example, while the 3rd NEXO purchase was 1/6 the size of the 2nd purchase, the markup relative to prevailing market prices was

7-fold larger in percentage terms. This is particularly concerning because it shows that the markups are likely capricious and do not reflect the true economic cost of trading on behalf of Cress.

**Figure 5 – NEXO Token Trade Details**

| Trade | Trade Amount (NEXO Tokens) | Trade Date | Price Provided to Cress | Internal Transfer Price | Internal Acquisition Cost | Market Price at the Time | Markup vs. Internal Cost | OTC Spread | Markup vs. Market Price |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 481,878 | 03-26 20:09 | $2.66 | $2.55 | $1.05 | $2.54 | 242% | 4.3% | 4.7% |
| 2 | 530,190 | 03-30 18:25 | $2.829 | $2.7737 | $1.06 | $2.78 | 262% | 2.0% | 1.8% |
| 3 | 91,715 | 04-14 16:36 | $3.816 | $3.68 | $1.26 | $3.39 | 292% | 3.7% | 12.6% |

**Notes:**
1. All times are in UTC.
2. All trades take place in 2021, thus year is omitted for brevity.
3. Market data obtained from CryptoCompare.com. See Appendix.

## C. Nexo charged hidden and double fees contrary to the many claims it made to the contrary

46.    Nexo repeatedly made public statements on how it did not charge fees – both explicitly and "no hidden fees."[66] Contrary to these numerous claims, Cress was charged both hidden and duplicate fees. In fact, mispresenting the fees Nexo charges was not an omission but instead an internal policy: in internal document labeled "Retail OTC Procedures",[67] it states at the top "we tell customers Nexo does not charge commission on the transactions, while in fact we do". In a separate document, labeled "OTC Services"[68] it states that "All trades are executed in accordance with the institutional terms (…) whereby we will not charge you a separate trading

---

[66] CRESS-00001382 (Cress' Nexo Account representing "No Hidden Fees"); CRESS-00000476 (Nexo Whitepaper representing "No hidden fees"); CRESS-00014901 (Trenchev AMA recap representing "There is no concept of hidden fees in Nexo. We pioneered #ZeroFees and we are proud to be transparent about all charges we make.").
[67] NEXO-0145948.
[68] NEXO-0214393.

commission for the exchange transactions." However, it continues to state that "for non-NEXO token deals (…) average effective commissions is 1.7%", "for NEXO tokens our average effective commission is 3.61%".

47.    The fees that Cress was charged on his OTC purchases are detailed in internal Nexo communications,[69] and have been summarized in Table 4. Trenchev testified that "It has been and always has been Nexo's policy that there are no hidden fees."[70] Trenchev also testified that a customer viewing Cress' account page representing "no hidden fees" "could reasonably expect the Nexo retail platform to come with no hidden fees."[71]

**Table 4 — Transaction Fees**

| Trade | Trade Date | BTC / ETH Fees (in bp) | NEXO Token Fees (in bp) |
|-------|------------|------------------------|-------------------------|
| 1 | 03-26  20:09 | 75 | 431 |
| 2 | 03-30  18:25 | 49 | 199 |
| 3 | 04-14  16:36 | 134 | 370 |
| 4 | 05-02  05:57 | 101 | N/A |

**Notes:**
1. "bp" denotes 1/100 of 1% (i.e., 100bp are equal to 1%).
2. Transaction fees as calculated internally by Nexo, see NEXO-0369424.

48.    Consistent with the prior evidence, Nexo OTC desk appeared to have charged very high, hidden fees on these trades, that appeared capricious as they varied (in rate) over time and across assets. It should be noted that both in the case of cryptocurrency trading and its own Nexo token trading, the OTC provided no actual trading service, instead routing cryptocurrencies to exchanges and moving Nexo tokens from treasury, as discussed earlier in this report. Despite that,

---

[69] NEXO-0248369–70; NEXO-0248348–49.
[70] Trenchev Tr. 346:1-11; 348:7-14
[71] Trenchev Tr. 338:5-12.

the OTC charged Cress, who was part of Nexo's VIP Relationship Program, described as an "elite club of Nexo customers" with "access to a number of exclusive services and offerings,"[72] very high fees.

49.    To benchmark the fees charged by Nexo OTC desk, I obtained the contemporaneous fee schedule for Binance[73] for different tier clients. Based on Cress trading pattern, if he traded directly on Binance, he would have qualified for a "VIP 1" status (or higher), and paid a fee ranging between 6.75-10bp, depending on the nature of order and his holdings. First, it should be noted that Nexo OTC desk fees were applied *in addition* to whatever fees they were charged by the exchanges (Binance and Kraken). Hristov understood that Nexo charged a fee "in addition to the fees charged by the exchanges on which Nexo acquired the assets."[74] Second, Nexo OTC desk fees are around *ten times* higher than the fees he would have paid on Binance – where many of his trades were executed – ranging from 49 to 101 bp. Third, Binance applied a *constant* percentage fee to trades based on customer status. In contrast, Nexo OTC desk fees appeared to vary greatly in another sign of their opaqueness. Finally, for Nexo to lock in profits from its OTC customers, the fees Nexo's OTC desk charged on NEXO token trades was around twenty to forty *times* higher than Binance's fees.

### D. The poor execution quality and high fees heightened Cress' LTV thereby increasing his risk of liquidation

50.    Taken together, the extremely poor quality of trade execution across all crypto assets purchased for Cress, coupled with the exorbitant fees, contributed to his eventual forced

---

[72] NEXO-0003119.
[73] https://web.archive.org/web/20210513094037/https://www.binance.com/en/fee/trading.
[74] Hristov Tr. 108:1-6.

31

liquation. While quantifying whether Cress would have been forced to liquidate, if not for the poor execution quality and fees, is beyond the scope of this report, I do want to highlight the economic impact of excess fees on induced leverage.

51.    This can be most easily illustrated via an example. Imagine a customer who transferred 10 BTC to Nexo when the price was $50,000 BTC/USD. If this customer obtained a loan of $500,000 to purchase additional BTC, then, without fees his LTV would be 0.50: loan amount is $500,000 and the value includes 10 BTC he transferred and an additional 10 BTC that he was able to purchase with the loan. If fees are set at 5%, that same customer is able to purchase only 9.52 BTC and his LTV starts at 0.51. That is, the effect of the 5% fee on initial margin is only 1%. If BTC price was to fall to 30,000 USD/BTC, without fees, the LTV would rise to 0.83: his loan value is still $500,000 but his portfolio value is now only $600,000 (10 BTC transferred, 10 BTC purchased). With fees, his LTV would rise to 0.85: loan of $500,000 and value of $585,714 (10 BTC transferred, 9.52 BTC purchased). This example illustrates that excessive fees cause portfolio LTV to become more sensitive to decline in prices and, thus, make them more likely to liquidate. In other words, there is a direct amplification effect that goes from fees and execution quality to the likelihood of portfolio liquidation.

52.    Dinca acknowledged this, agreeing that "without the fee, Mr. Cress' loan would be reduced by more [Correct]… Because the entirety of the liquidation would then go to reducing the loan [Correct]… But instead some goes to Nexo's fee, right? [Correct]… So, as a result, Mr. Cress' LTV is going to be higher than it would be without the fee after liquidation. Right? [Correct]"[75] and as Hristov acknowledged, "The higher the LTV, the higher the risk of liquidation."[76]

---

[75] Dinca Tr. 324:19-325:7; 330:4-16.
[76] Hristov Tr. 115:4-7.

**E. Nexo LTV calculation and communication were wrong and misleading**

53.      LTV is a central concept in the working of an OTC desk as it measures client's risk, defines the limits of exposure and triggers both client alerts and asset liquidations. Thus, the definition and calculation of said LTV should be clear and consistent. However, Nexo communication of how it computes a client's LTV was misleading, underplayed the risk undertaken, and presumably was different from the LTV used to trigger account alerts and/or liquidations.

54.      When initially considering a loan, Cress received an email communication that provided him with different scenarios, in terms of loan amounts, and the resulting LTV,[77] repeated in the table below.

*Liquidation scenarios at varying Loan-to-Value ratios*

| Total BTC | Purchased BTC through Nexo credit line | Amount of Nexo purchased (in BTC) | LTV | BTC liquidation price @ BTC $54,000 |
|---|---|---|---|---|
| 250 | 50 | 25 | 20.00% | $13,000 |
| 250 | 75 | 25 | 30.00% | $19,500 |
| 250 | 100 | 25 | 40.00% | $25,930 |

55.      While Nexo did not provide an explicit explanation for the LTV calculation, it is clear that it is based on taking the additional number of BTC purchased through the credit line and dividing them by the number of BTC deposited by Cress. For example, 20.0% is equal to 50 divided by 250, 30.0% is equal to 75 divided by 250, etc. However, this table is misleading and understating portfolio risk in a significant way since Cress would be required to purchase 25 BTC

---

[77] CRESS-00001774; NEXO-0003386.

worth of NEXO tokens under each of these scenarios. Thus, if Cress was to carry out the first scenario, his *actual* LTV would be 1.5 times higher than what Nexo presented (30% instead of 20%). Likewise, Cress' true LTV would be 1.33 times higher under the second scenario (40% instead of 30%) and 1.25 higher under the third scenario (50% instead of 40%), assuming the assets purchased with the loan are not pledged as collateral. Hristov testified that he agreed LTV calculations "should include the NEXO Token," and agreed that "otherwise it would be inaccurate…And understate LTV."[78] Hristov further testified that "the loan-to-value ratio depends on all the assets which are held as collateral and the amount of loan which has in account."[79]

56.     Second, the scenario table sent by Nexo before Cress decided on taking a loan claims to show the threshold for liquidation. That is, it shows how much the price of BTC/USD can drop before the portfolio begins to get liquidated. For example, the first scenario shows that the price of BTC could drop by over 75% before a liquidation is necessary (going from $54,000 to $13,000). Even the more aggressive leverage scenario shows that BTC can drop by over 50% before liquidation is triggered, suggesting that even very significant drops in the price of BTC would not trigger liquidation.

57.     The presentation of these liquidation thresholds is wrong and misleading, understating the risk taken and the magnitude of price fluctuation that the portfolio can tolerate. If the liquidation threshold is indeed 83.33%, as implied from the table provided by Hristov, and stated by Nexo liquidation warning emails[80], then the true thresholds are much higher under all scenarios. The reason is simple: accounting for the necessary Nexo purchases results in a larger loan, higher risk, and therefore more sensitivity to price drops. The true price thresholds for

---

[78] Hristov Tr. 144:9-145:2.
[79] Hristov Tr. 145:11-16.
[80] E.g., CRESS-00001854.

34

liquidation are in fact \$19,518, \$26,024, and \$32,530, under scenarios 1, 2, and 3, respectively. These prices are between 25% and 50% *higher* than what the table reports. Thus, the portfolios presented by Nexo are significantly more sensitive to BTC price drops than what it let Cress believe. In conclusion, Nexo significantly underrepresented the risks implied by taking leverage through its programs *before* Cress borrowed any funds. This, presumably, was designed to encourage Cress to take on higher leverage as higher leverage implied higher fees through trading fees and trading markups, and loan interest payments. Hristov indeed conceded that "this is not an accurate representation of the liquidation price."[81]

### F. Nexo liquidation practices were misleading and harmful

58.     Nexo promoted its OTC services to Cress by describing its "liquidation relief program", which is to be used "in the event of a market crash to recover your liquidated assets".[82] However, despite Nexo's promises, Hristov testified that the Liquidation Relief Program did not in fact work "to recover his [Cress'] assets in the event of a market crash" and that Cress could not recover his assets through the liquidation relief program.[83]

59.     Not only did Nexo fail to provide any "liquidation relief", but it also profited substantially from liquidating Cress' portfolio as detailed below. An internal document discussing liquidation practices states (capitalization in original document): "IMPORTANT: WE SHOULD NEVER, UNDER ANY CIRCUMSTANCES MENTION THERE IS A LIQUIDATION TAX".[84] These systematic practices of customer deception are not incidental. The document continues to

---

[81] Hristov Tr. 145:22-146:7
[82] Nexo VIP Relationship Program, CRESS-00000017.
[83] Hristov Tr. 67:14-24.
[84] NEXO-0140611.

explain, "Most of you have probably worked on cases, in which the customer is disputing the amount received as part of the liquidation, claiming that it is smaller than it should be. In order to convince them there is no mistake, we should divide the amount that was received from 'Exchange Sell Cost' by the amount shows as 'Amount'". Basically, Nexo makes up the execution prices to conceal the liquidation fees and commissions that they charge "(…) this difference is caused by the tax, which we SHOULD NEVER mention. That's why we should never mention the actual sell price."

60.     Beginning May 19, 2021, Nexo started sending Cress automated warning emails reporting current LTV and urging him to "deposit more crypto assets or stablecoins to your Nexo Account in order to improve the Loan-to-Value ratio." It continues to warn "Please be informed that if the Loan-to-Value ratio increases to 83.33%, the Nexo Oracle might initiate small partial loan repayments automatically (without any penalty or additional fees)."

61.     These messages imply that an automated system would trigger small partial liquidations once the 83.33% threshold is crossed at no additional fees or penalties to Cress. Without addressing the question of whether this stated LTV was crossed prior to liquidations, the pattern of liquidation shows that they were neither small nor without fees. The liquidation record shows that the liquidation practices of Nexo substantially differ from what their repeated written notices claimed. In practice, these liquidations were (1) unlikely to have been automated and were not small or incremental, (2) entailed substantial fees, (3) did not liquidate the most volatile asset first. Nexo's corporate representative on the operation of Nexo's Oracle did not do anything to understand whether Nexo's Oracle properly liquidated Mr. Cress' assets at the 83.33% threshold.[85]

---

[85] Dinca Tr. 309:9-310:6.

62.    Cress' portfolio was liquidated over a course of four waves – on May 23, 2021, on the morning of June 21, 2021, on the evening of June 21, 2021, and on June 22, 2021. In the first wave, Nexo sold, over the course of less than two hours, around $1M USDC, 10.000 BTC, 10.000 BTC, 1.515 BTC, 0.012 BTC. The goal of an automated liquidation process is indeed to avoid large discrete liquidations and instead submit small incremental orders that bring the portfolio below the maximal allowed LTV. However, this wave of liquidation is not a sequence of small liquidations. Instead, it is mostly composed of large, discrete orders. Indeed, each of the 10 BTC liquidation orders was worth around $300,000. Furthermore, an automated system was unlikely to have issued a liquidation order for exactly 10.00 BTC – a round number that is extremely unlikely to have arisen out of a machine-based calculation. In the second wave of liquidations, lasting less than 30 minutes, Nexo sent four sell orders, each for 12 BTC. Again, a pattern that is inconsistent with an automated system making small partial sales. The same pattern repeats during the third wave of liquidations (five sale orders for 12 BTC each), and fourth wave of liquidation (13 sale orders for 12 BTC each). Recall that an automated system would be triggered to meet a certain *dollar value*, since the loan is fixed in dollars, and *not* to meet a certain crypto amount. In fact, Nexo could not provide an explanation for why it submitted multiple 12 BTC sale orders when force liquidating Cress' account.[86]

63.    The trading records provided by Nexo[87] show that the forced liquidations entailed substantial penalty fees – contrary to what it stated in written communication. These liquidation fees ranged from 2.08% to 2.50% and came on top of the fees Nexo was charged by the exchange and then passed on to Cress. Dinca agreed that Nexo's 2% liquidation fees were at least 20 times

---

[86] Dinca Tr. 354:11-25
[87] NEXO-0369411. Nexo also appears to have charged a Repayment fee in connection with Cress' liquidations. However, Nexo did not clearly disclose this Repayment fee in its records, e.g., NEXO-0369411.

37

larger than Kraken's 0.1% exchange fee.[88] These fees are very high and unjustified as they were charged for routing BTC sale orders to known exchanges (Binance and Kraken). As discussed earlier in the report, Cress would have paid no more than 0.1% if he routed the orders to Binance directly. Thus, at a time of duress, Nexo charged Cress over 20 times the fee he would have paid to route his orders. Of course, by charging him these exorbitant fees on each of the sales, Nexo contributed to a decline in his collateral value and thus brought his account closer to the next forced liquidation.

64.     Finally, the OTC desk did not consult with the Plaintiff when deciding on the assets to liquidate.[89] Risk management best practice prescribes liquidating the position that contributes most to portfolio risk before reducing lower-risk holdings, assuming comparable liquidity.[90] [91] Nexo understood that more stable assets were better for reducing liquidation risk.[92] But Nexo's logic for liquidating assets was to act "in the best interests of the user, by liquidating assets that are stable and protecting the assets that the users want to have in their account."[93] Thus, Nexo's liquidation practices increased customer's risks of further liquidations by liquidating risky assets last.

65.     Specifically, heading into the first liquidation on May 23, 2021, Cress held stablecoins, BTC, and ETH. While all three assets were highly traded and liquid at the time, ETH was substantially more volatile than the rest, relative to the USD denominated loan, as discussed earlier in the report: ETH was around 20% more volatile than BTC. Given that the goal of partial liquidation is to reduce the portfolio's risk exposure to a safe level as efficiently as possible, a more

[88] Dinca Tr. 358:1-18.
[89] Dinca Tr. 343:6-344:6.
[90] Jorion, Philippe. *Value at Risk: The New Benchmark for Managing Financial Risk*, 3rd ed. McGraw-Hill, 2007.
[91] Litterman, Robert B. "Hot Spots and Hedges." *Journal of Portfolio Management* 23, no. 5 (1996): 52–75.
[92] Dinca Tr. 324:9-15.
[93] Dinca Tr. 342:21-343:9.

volatile asset contributes disproportionately to the portfolio's risk. Thus, selling the volatile asset first removes more risk per dollar liquidated, which is exactly what the liquidating party needs. By that rationale, Nexo should have liquidated Cress' ETH holdings *first*, and only then, if needed, his BTC holdings, and, only last, his USDT holdings. In contrast to that, Nexo decided to liquidate first the Plaintiff's stablecoin holdings and then his BTC holdings, without liquidating a single unit of Cress' ETH holdings. Indeed, between the first and second wave of liquidation, BTC declined by 8.83% while ETH declined by 10.04%. If Nexo liquidated ETH assets before BTC, the second wave of liquidation could have been postponed, reduced in value, or avoided altogether.

Dated: April 20, 2026



_____

Shimon Kogan

39

# APPENDIX

## Price Impact Calculations

*Source: Donier, J. & Bonart, J. (2015). A Million Metaorder Analysis of Market Impact on the Bitcoin. Market Microstructure and Liquidity 1(2). https://arxiv.org/abs/1412.4503 | Y = 0.9 (mean Y-ratio, paper Fig. 8) | σ_D = σ_1min × √1440 | V_D = sum of 1-min volumes over 24h window | Trade window: [t, t + 24h)*

| Trade Details | | | Model Inputs (Donier & Bonart 2015, Eq. 1: I = Y · σ_D · √(Q / V_D)) | | | | | | | Impact Estimate | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trade Date / Time | Asset | Order Size Q (asset units) | Arrival Price ($) | N 1-min Returns | σ per Minute (log-ret) | σ_D 24h Realized Vol | V_D 24h Volume (asset) | Part. Rate Q / V_D | Y (Donier-Bonart) | Impact (% of price) | Price Impact ($) | Post-Impact Price ($) |
| 2021-03-26 20:09:00 | BTC | 75 | 53,916.76 | 1,440 | 0.0730% | 2.77% | 89,010.1 | 0.0843% | 0.90 | 0.0724% | 39.03 | 53,955.80 |
| 2021-03-30 18:25:00 | BTC | 50 | 59,023.28 | 1,440 | 0.0990% | 3.76% | 99,617.3 | 0.0502% | 0.90 | 0.0758% | 44.72 | 59,068.00 |
| 2021-04-14 16:36:00 | BTC | 28 | 63,331.25 | 1,440 | 0.0824% | 3.13% | 95,727.0 | 0.0292% | 0.90 | 0.0481% | 30.48 | 63,361.73 |
| 2021-05-02 05:57:00 | ETH | 310 | 2,915.69 | 1,440 | 0.0808% | 3.07% | 1,198,145.3 | 0.0259% | 0.90 | 0.0444% | 1.29 | 2,916.99 |

40

# Documents Relied Upon

1. Ananth Madhavan, *VWAP Strategies*, Transaction Performance 32 (Spring 2002).

2. Binance, *Iceberg Order FAQ* (July 26, 2021), https://www.binance.com/en/support/faq/detail/5d3fa5e5709f47e0b5f186b350da1655.

3. Binance, *Spot Kline/Candlestick Data*, Binance Public Data Archive (accessed Mar. 26, 2026), https://data.binance.vision/?prefix=data/spot/daily/klines/.

4. Binance, *Trading Fees* (archived May 13, 2021), https://web.archive.org/web/20210513094037/https://www.binance.com/en/fee/trading.

5. Bitfinex, *REST Public Candles Reference*, Bitfinex Documentation (accessed Mar. 26, 2026), https://docs.bitfinex.com/reference/rest-public-candles.

6. Bitstamp, *Place Block Trades Quickly and at Optimal Prices with Bitstamp OTC RFQ*, Bitstamp Blog, https://blog.bitstamp.net/post/place-block-trades-quickly-and-at-optimal-prices-with-bitstamp-otc-rfq.

7. *Bulgaria Ends Investigation into Crypto Lender Nexo*, The Block, https://www.theblock.co.

8. Coinbase, *Coinbase Markets Trading Rules*, https://www.coinbase.com/legal/trading_rules.

9. *Coinbase Quietly Opened Its OTC Crypto Trading Desk*, CoinDesk (Nov. 28, 2018), https://www.coindesk.com/markets/2018/11/28/coinbase-quietly-opened-its-otc-crypto-trading-desk-this-month.

10. Cress' Nexo account overview, CRESS-00001382.

11. *Crypto Lender Nexo Battles Former Co-Founder*, Blockworks, https://blockworks.co/news/crypto-lender-nexo-battles-former-co-founder.

12. CryptoCompare, *CCCAGG (Crypto Compare Aggregate) Index BTC/USD Daily Closing Prices*, https://min-api.cryptocompare.com.

13. CryptoCompare, *Public API Histoday Endpoint Data*, https://min-api.cryptocompare.com.

14. Email correspondence on OTC trades, CRESS-00001760.

15. Email correspondence on OTC trades, CRESS-00001774.

16. Email correspondence on OTC trades, NEXO-0003386.

17. Email correspondence on OTC trades, NEXO-0003588.

18. Hendrik Bessembinder & Kumar Venkataraman, *Does an Electronic Stock Exchange Need an Upstairs Market?*, 73 J. FIN. ECON. 3 (2004).

19. HTX, *BTCUSDT Spot Kline Data*, HTX Vision Archive (accessed Mar. 26, 2026), https://www.htx.com/vision/?prefix=data/klines/spot/daily/.

20. Jonathan Donier & Julius Bonart, *A Million Metaorder Analysis of Market Impact on the Bitcoin*, 1 MKT. MICROSTRUCTURE & LIQUIDITY (2015), https://arxiv.org/abs/1412.4503.

21. Kraken, *Automated OTC Trading Now Available on Kraken Custody*, Kraken Blog, https://blog.kraken.com/product/automated-otc-trading-now-available-on-kraken-custody.

22. Kraken, *Downloadable Historical OHLCV & Trades Data*, Kraken Support Center (accessed Mar. 26, 2026), https://support.kraken.com/articles/360047124832-downloadable-historical-ohlcvt-open-high-low-close-volume-trades-data.

23. Kraken, *Introducing the Kraken OTC Desk*, Kraken Support, https://support.kraken.com/articles/360021967711-introducing-the-kraken-otc-desk.

24. LTV Warning Notifications, CRESS-00001854, 00001855, 00001861, 00001871, 00001928, 00001939, 00001941, 00001943, 00001960, 00001977, 00001992, 00001993, 00002031, 00002035, 00002058, 00002069, 00002072, 00002073, 00002075, 00002082, 00002083, 00002103, 00002105.

25. Merton, Robert C. "On Estimating the Expected Return on the Market: An Exploratory Investigation." *Journal of Financial Economics 8, no. 4* (1980): 323–361.

26. Nexo, *A Stellar LTV Policy for Crypto Loans*, Nexo Blog, https://nexo.com/blog/a-stellar-ltv-policy.

27. *Nexo Co-founders and Executives Charged as an Organized Crime Group in Bulgaria*, Capital.bg (Jan. 20, 2023), https://kinsights.capital.bg.

28. *Nexo in Court With a Co-Founder Over $12M in Missing Assets*, CoinDesk (July 13, 2023), https://www.coindesk.com/consensus-magazine/2023/07/13/nexo-in-court-with-a-co-founder-over-12m-in-missing-assets.

29. Nexo, Internal Memo on Liquidation Practices, NEXO-0140611.

30. Nexo, Liquidation Records for Cress' Account, NEXO-0369411.

31. Nexo, *Loan-to-Value (LTV) Explained*, Nexo Support, https://support.nexo.com/article/loan-to-value-ltv-explained.

32. Nexo, *Loyalty Comes in Silver, Gold and Platinum with Nexonomics*, Medium, https://medium.com/nexo.

42

33. Nexo, Medium, https://medium.com/nexo/nexo-launches-otc-trading-borrowing-and-lending-desk-7dcf0047e0c8.

34. Nexo, *Nexo Introduces In-app Cryptocurrency Exchange Service*, Bus. Wire (Feb. 1, 2021), https://www.businesswire.com/news/home/20210201005587/en/Nexo-Introduces-In-app-Cryptocurrency-Exchange-Service.

35. Nexo, *Nexo Launches OTC Trading, Borrowing and Lending Desk*, Nexo Blog (July 2019), https://nexo.com/blog/nexo-launches-otc-trading-borrowing-and-lending-desk.

36. Nexo, *Nexo Loans – FAQ*, Nexo Support, https://support.nexo.com/article/nexo-loans-faq.

37. Nexo, *NEXO Token Terms: Why Is Nexo Issuing Tokens?*, https://cryptorating.eu/whitepapers/Nexo/NEXO-Token-Terms.pdf.

38. Nexo, *Nexo VIP Relationship Program* (Brochure), CRESS-00000008 – CRESS-00000019.

39. Nexo, *Nexo's Business Model and the Gold Standard in Digital Finance*, Nexo Blog, https://nexo.com/blog/nexos-business-model-and-the-gold-standard-in-digital-finance.

40. Nexo, *Nexo's Business Model in Depth and at Length*, Nexo Blog, https://nexo.com/blog/nexo-s-business-model-in-depth-at-length.

41. Nexo (@Nexo), X (Nov. 28, 2022), https://x.com/Nexo/status/1597268181399502849.

42. Nexo, *OTC Services*, NEXO-0214393.

43. Nexo, *Retail OTC Procedures*, NEXO-0145948.

44. Nexo CPA, NEXO-0048001.

45. Nexo, March 15, 2021 email from Hristov to Cress, NEXO-0003119.

46. Nexo, Summary of Cress' OTC Transactions, NEXO-0369424.

47. Order Instituting Proceedings, *In the Matter of Nexo Capital Inc.*, Admin. Proc. File No. 3-21263 (U.S. Sec. & Exch. Comm'n Jan. 19, 2023), https://www.sec.gov/files/litigation/admin/2023/33-11149.pdf.

48. Philippe Jorion, *Value at Risk: The New Benchmark for Managing Financial Risk* (3d ed. 2007) (McGraw-Hill).

49. Robert B. Litterman, *Hot Spots and Hedges*, 23 J. PORTFOLIO MGMT. 52 (1996).

50. Robert C. Merton, *On Estimating the Expected Return on the Market: An Exploratory Investigation*, 8 J. FIN. ECON. 323 (1980).

51. Stephanie T. Howell, Marina Niessner & David Yermack, *Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales*, 33 REV. FIN. STUD. 3925 (2020).

43

52. Talos, *Why RFQ Is Essential in Institutional Crypto Markets*, Talos Insights (2024), https://www.talos.com/insights/why-rfq-is-essential-in-institutional-crypto-markets.

53. Transcript of Dinca Deposition conducted Mar. 27, 2026.

54. Transcript of Hristov Deposition conducted Mar. 30, 2026.

55. Transcript of Trenchev Deposition, Vol. I-II, conducted Apr. 1–2, 2026.

**Shimon Kogan**

Reichman University and the Wharton School
skogan@runi.ac.il
skogan@upenn.edu

shimonkogan.com

*April 2026*

## Education

*2005*         **Ph.D. in Finance**
              Haas School of Business
              University of California at Berkeley

*1999*         **M.B.A**
              Haas School of Business
              University of California at Berkeley

*1994*         **B.A.**
              The Eitan Berglas School of Economics
              Tel Aviv University, Tel Aviv

## Academic Positions Held

The Wharton School, University of Pennsylvania
*2016-current*  Adjunct Associate Professor of Finance

Arison School of Business, Reichman University
*2013-current*  Associate Professor of Finance (with Tenure)

MIT Sloan School of Management
*2017-2020*    Visiting Associate Professor of Finance

McCombs School of Business, University of Texas at Austin
*2008-2014*    Assistant Professor of Finance

Tepper School of Business, Carnegie Mellon University
*2005-2008*    Assistant Professor of Finance

## Non-academic Employment

*2023-current*  **Testifying Expert**
*IntegraFEC*

*2019-varying*  **Advisor**
*Forest Park*
*Archimedes*
*ExpanseBTC*
*Altius*
*Forkast*
*Sages.io*

*2014*  **Co-Founder**
*GoodBasket, Tel Aviv*

*2000-2001*  **Director**
*marchFIRST, San Francisco*

*1999*  **Associate**
*Mitchell Madisson Group, San Francisco*

*1998*  **Corporate Finance Associate**
*Levi Strauss and Company, San Francisco*

*1995-1997*  **Derivatives Desk Manager**
*Zeller Eblagon Financial Services, Tel Aviv*

*1993-1995*  **Investment Manager**
*Batucha Investment Management, Tel Aviv*

## Awards
***Research Excellence award***
Arison School of Business, Reichman University, 2024-25
***Teaching Excellence award***
Wharton School of Business, 2022-23
***Teaching Excellence award***

Wharton School of Business, 2020-21

## Teaching

*FinTech: Business, Finance, and Technology*
    Undergraduate and MBA, Wharton School of Business
    MFE, Reichman University
    MSF and MBA, University of Texas at Austin

*Data Science for Finance*
    MBA, Wharton School of Business
    MFE, Reichman University

*Crypto Currencies and Decentralized Finance*
    MFE, Reichman University

*Behavioral Finance*
    MBA, European School of Management and Technology
    MBA, Reichman University
    Executive MBA, European School of Management and Technology
    MBA, Carnegie Mellon University

*Investment Theory and Practice*
    Undergraduate, University of California at Berkeley
    MBA, University of Texas at Austin
    Undergraduate, IDC Herzliya
    MAFE, Reichman University

*Portfolio Management*
    MSF, University of Texas at Austin

*Derivatives and Options*
    Undergraduate, Carnegie Mellon University
    MBA, MIT Sloan

*Introduction to Finance*
    MBA, Carnegie Mellon University

## Published Papers

« Distinguishing the Effect of Overconfidence from Rational Best-Response on Information Aggregation », *Review of Financial Studies, 2009, 22(5), pp. 1889-1914.*

« Predicting Risk from Financial Reports with Regression », with Dimitry Levin, Bryan Routledge, Jacob Sagi, and Noah Smith, *Proceedings of the North American Association for Computational Linguistics Human Language Technologies Conference, Boulder, CO, May/June 2009.*

« Securities Auctions under Moral Hazard: Theory and Experiments », with John Morgan, *Review of Finance, 2010, 14 (3), pp. 477-520.*

« Coordination in the Presence of Asset Markets », with Anthony Kwasnica and Roberto Weber, *American Economic Review, 2011, 101(2) , pp. 927-947.*

 « Investor Inattention and the Market Impact of Summary Statistics », with Thomas Gilbert, Lars Lochstoer, and Ataman Ozyildirim, *Management Science, Special Issue on Behavioral Economics and Finance, 2012, 58(2), pp. 336-350.*

« Trading Complex Assets », with Bruce Carlin and Richard Lowery, *Journal of Finance, 2013, 68(5), 1937-1960.*

« Business Microloans for U.S. Subprime Borrowers », with Cesare Fracassi, Mark J. Garmaise, and Gabriel Natividad, *Journal of Financial and Quantitative Analysis, 2016, 51 (1), pp. 55-83.*

« Is Investor Rationality Time Varying? Evidence from the Mutual Fund Industry », with Vincent Glode, Burton Hollifield, and Marcin Kacperczyk, *Behavioral Finance: Where do Investors Biases Come From?, Itzhak Venezia [ed.], World Scientific Publishing Co., 2016, pp. 67-113.*

« Information, Trading, and Volatility: Evidence from Firm-Specific News», with Jacob Boudoukh, Ronen Feldman, and Matthew Richardson, *AQR Research Excellence Award Finalist. The Review of Financial Studies*, Volume 32, Issue 3, 1 *2019*, Pages 992–1033, https://doi.org/10.1093/rfs/hhy083

« Social Media and Financial News Manipulation »*,* with Toby Moskowitz and Marina Niessner. *Review of Finance, Oct* 2022*,* https://doi.org/10.1093/rof/rfac058.

« Are Cryptos Different? Evidence from Retail Trading »*,* with Igor Makarov, Marina Niessner, and Antoinette Schoar. *Journal of Financial Economics,* 2024, 159.

« Self-serving biases in beliefs about collective outcomes », with Florian Schneider and Roberto Weber. *Games and Economic Behavior*, forthcoming.

« *Avoiding Idiosyncratic Volatility: Flow Sensitivity to Individual Stock Returns* », with Marco Di Maggio, Francesco A. Franzoni, and Ran Xing, *Journal of Finance*, forthcoming.

## Working Papers

« The Asymmetry in Responsible Investing Preferences », with Jacquelyn Humphrey, Jacob Sagi, and Laura Starks. R&R.

« AI Personality Extraction from Faces: Labor Market Implications », with Marius Guenzel, Marina Niessner, and Kelly Shue.

« Facing Default? », with Pranav Garg, Marius Guenzel, Marina Niessner, and Kelly Shue.

« Fee the People: Retail Investor Behavior and Trading Commission Fees », with Omri Even-Tov, Kimberlyn George, and Eric C. So. R&R.

« Pure Momentum in Cryptocurrency Markets », with Cesare Fracassi.

« Corporate Disclosure: Facts or Opinions? », with Vitaly Meursault and Toby Moskowitz.

« Aggregate Sentiment and Investment: An Experimental Study », with Donja Darai, Anthony Kwasnica, and Roberto Weber.

## General Media

« AI Personality Extraction from Faces: Labor Market Implications »
*The Economist* — November, 2025
https://www.economist.com/business/2025/11/06/should-facial-analysis-help-determine-whom-companies-hire
*Financial Times*, November, 2025
https://www.ft.com/content/4340e9a8-783f-46f3-86c8-78fa36f3dd36

« Investor Inattention and the Market Impact of Summary Statistics »
*Smart Money -- WSJ*, February 02, 2012
(http://blogs.smartmoney.com/advice/2012/02/02/facebooks-bizarre-friend-rally/)

*Financial Times*, August 31, 2012
(http://www.ft.com/intl/cms/s/d2e3c6ea-f1ea-11e1-8973-00144feabdc0,Authorised=false.html?
_i_location=http://www.ft.com/cms/s/0/d2e3c6ea-f1ea-11e1-8973-00144feabdc0.html&_i_refer-
er=http://faculty.washington.edu/gilbertt/research.shtml#axzz26TcNbY8z)

« Coordination in the Presence of Asset Markets »
*Forbes Magazine*, November 10, 2008 (http://www.forbes.com/intelligentinvesting/forbes/
2008/1110/046.html)
*Pittsburgh Post Gazette*, October 26, 2008
(http://www.post-gazette.com/pg/08300/922712-28.stm)

FinTech Relate
http://www.thedp.com/article/2018/01/fintech-rising-popularity-at-penn-upenn-wharton-bitcoin-
course-philadelphia
http://knowledge.wharton.upenn.edu/article/bitcoin-sound-investment
https://cryptovest.com/news/wharton-mba-blockchain-course-set-for-spring-2018/
http://observador.pt/2017/06/13/bitcoins-podem-ser-um-substituto-moderno-do-ouro/

## Grants

« Israeli Science Foundation (ISF) Grant »
2025-2029 ($120,000)

« Inquire Europe »
with Rawley Heimer and Nancy Xu, 2020-2021 ($10,000)

« Interdisciplinary Grant for "Improving Financial Decision Making »
with Moran Ofir, Tali Regev, Shahar Ayal and Orit Tykocinski, 2015-2016 ($10,000)

« Israeli Science Foundation (ISF) Grant »
with Jacob Boudoukh and Ronen Feldman, 2013-2015 ($100,000)

« McCombs Research Excellence Grant »
with Tony Kwasnica and Roberto Weber, 2010-2011 ($14,904)

« The Q Group: Text Based Portfolio Choice »

with Bryan Routledge, Jacob Sagi and Noah Smith, 2008-9 ($10,000)

« The Difference between Data and Information »
Center for Analytical Research and Technology
with Bryan Routledge and Jacob Sagi, 2007-8 ($90,000)

« Active Portfolio Management and Behavioral Finance »
Teaching Innovation Award
with Bryan Routledge, 2006-7 ($20,000)

« How Can Internal Markets Help Firms Make Better Decisions? »
Center for Analytical Research and Technology
with Don Moore and Roberto Weber, 2006-7 ($100,000)

« Distinguishing overconfidence from rational best-response in markets »
The Experimental Social Science Laboratory (XLab)
2004-2005 ($5,000)

« Studying overconfidence in financial markets »
The Center for Responsible Business, Haas School of Business
2003 ($20,000)

« Testing principle-agent models in asset markets »
Institute of Business and Economic Research (IBER)
2002 ($2,000)

## Conference Talks and Discussions

*2026*   The Adam Smith Workshop

*2025*   Journal of Corporate Finance Special Issue Conference

*2024*   Fintech and Financial Institutions Conference
ESADE Spring Workshop
Colorado Finance Summit

*2023*   Big Data NBER
Behavioral Finance NBER
Web3 Financing and Inclusivity
HKU-TLV Finance Forum

*2022*   Program for Financial Studies at Columbia Business School

*2021*   Saint Louis University Law Journal Symposium

*2020*   American Finance Association Meetings

PRI Academic Week

*2019*  Kentucky Finance Conference

*2018*  AFA
Kentucky Finance Conference
SYSU Finance Conference
Texas Finance Festival
The 9th Summer Finance Conference at IDC Herzliya
CICF 2018
INSEAD Finance Symposium
NBER Behavioral

*2017*  AEA
RFS FinTech Workshop

*2016*  FIRS

*2015*  American Finance Association (AFA) Meetings
First Israel Behavioral Finance Conference
Western Finance Association Meetings
Asian Bureau of Finance and Economic Research (ABFER)
Northern Finance Association Meetings
Household and Economics Decision-Making Conference
Workshop for Promotion of Experimental Validation of the Theory of Asset Pricing
Sixth Miami Behavioral Finance Conference

*2014*  FIRS 9th Annual Conference
Jerusalem Finance Conference

*2013*  Western Finance Association (WFA) Meetings
European Finance Association (EFA) Meetings
UK Inquire
9th Annual Asset Pricing Retreat
Napa Conference

*2012*  American Finance Association (AFA) Meetings
Western Finance Association (WFA) Meetings
The Rothschild Caesarea Center 9th Annual Conference

*2011*  Western Finance Association (WFA) Meetings
Society for Financial Studies Finance Cavalcade
European Finance Association (EFA) Meetings

*2010*   American Finance Association (AFA) Meetings
Western Finance Association (WFA) Meetings
Texas Finance Festival
University of British Columbia Winter Finance Conference
Lone Star Conference
Miami Behavioral Finance Conference

*2009*   Utah Winter Finance Conference
NBER meeting in Behavioral Finance
European Finance Association (EFA) Meetings

*2008*   Financial Management Association
NBER meeting in Behavioral Finance

*2007*   Western Finance Association (WFA) meetings
Caesarea Center 4th annual convention

*2006*   European Finance Association Meetings

*2005*   Tel-Aviv University
Western Finance Association (WFA) meetings
NBER Market Microstructure Session

*2004*   Student Conference, London Business School

## Presentations

*2025*   SKEMA, Paris

*2024*   University of Texas at Austin

*2021*   The Wharton School

*2020*   University of Texas Austin
FIRN
University of Geneva

*2019*   UNC
Boston College
Villanova University

*2018*   University of Miami

MIT Sloan
Yale
FEB
Catolica Lisbon
Rochester University
Boston University

2017    HEC Paris
Tel Aviv University
Banco Invest Conference

2016    York University

2015    Case Western Reserve University

2014    Wharton School of Business

2013    NYU

2011    University of Miami
Michigan State University
Interdisciplinary Center Herzliya (IDC)
Tel Aviv University
Hebrew University
University of South Wales
University of Sydney
University of Melbourne
Australian National University
University of Queensland

2010    PennState, Smeal College of Business

2008    Rotman School of Management, University of Toronto
Sloan School of Management, MIT
Mays Business School, Texas A&M

2007    The Leo Recanati Graduate School of Business, Tel Aviv University
Arison School of Business, Interdisciplinary Center Herzliya (IDC)
Boston College

2006    Center for Behavioral Decision Research, Carnegie Mellon University
Economic Department, Pittsburgh University
Tepper Finance Seminar, Carnegie Mellon University
PennState, Smeal College of Business

- 10 -

*2005*    David Eccles School of Business, The University of Utah
Federal Reserve Bank of Boston
Harvard Business School
McCombs School of Business, The University of Texas at Austin
Sauder School of Business, University of British Columbia
Sloan School of Management, MIT
Tepper School of Business, Carnegie Mellon University
Yale School of Management

*2004*    Economic Department, University of California at Berkeley

## Referee

*American Economic Review; Journal of Finance; Review of Financial Studies; Review of Finance; Journal of Financial Economics; Management Science; National Science Foundation; Journal of Financial Markets;  Journal of Banking and Finance; Journal of Business Finance and Accounting; Journal of the European Economic Association; Journal of Marketing Research; Journal of Portfolio Management; Journal of Economic Analysis and Policy; Journal of Economic Behavior and Organization; Experimental Economics; Organizational Behavior and Human Decision Processes; Economic Inquiry; Accounting and Business Research; Journal of the European Economic Association; Israeli Science Foundation.*

## Conference Committee Member

*Western Finance Association*
*Utah Winter Finance Conference*
*European Finance Association*
*Texas Finance Festival*
*Financial Management Association*
*Midwest Finance Association*
*China International Conference in Finance*
*The Financial Intermediation Research Society (FIRS) Conference*
*Georgia State University FinTech Conference*

## Conference Organizer

*Annual Conference in Financial Economics Research*
*Annual Quantitative Trading Symposium*
*Israel Conference in Behavioral Finance*

## Dissertation Committee Member

*2009*    Vincent Glode, Carnegie Mellon University (now at Wharton with Tenure)

*2014*    Denys Maslov, University of Texas at Austin (now at Moody's Analytics)

*2022*    Sajad Ghorbani, the University of Pennsylvania (now at Cornerstone Research)

*2024*    Pawel Bednarek, the University of Pennsylvania (now at Cornerstone Research)

## University Service

*2015-current*  Program Committee Co-Chair, Annual Conference in Financial Economics Research

*2013-2015*    Finance Area Head, Reichman University

*2006-2008*    Coordinator, Finance doctoral program, Carnegie Mellon University

*2006-2008*    Member, Behavioral Laboratory Advisory Committee, Carnegie Mellon University

## Other Information

*Affiliations*    American Finance Association, Western Finance Association

*Languages*    English, Hebrew

*Software*    Matlab, Stata, Visual Basic, R., Python

*Citizenship*    Israeli, US