James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

*Counsel for Plaintiff John Cress*

**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

JOHN CRESS,

Plaintiff,

v.

NEXO CAPITAL INC.,

Defendant.

Case No. 3:23-CV-00882-TSH

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON HIS THIRD, FOURTH, AND FIFTH CAUSES OF ACTION**

Hearing Date: October 22, 2026
Hearing Time: 10:00 a.m.

Courtroom:
San Francisco Courthouse
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

# TABLE OF CONTENTS


NOTICE OF MOTION AND MOTION ....................1

STATEMENT OF ISSUES TO BE DECIDED ....................1

INTRODUCTION ....................1

I. FACTS ....................3

A. The NEXO Token ....................3

1. Nexo's 2018 Initial Coin Offering ....................3

2. Nexo Marketed the NEXO Token as an SEC-Compliant Security ....................4

3. The SEC Asks Nexo to Stop Marketing the Token as SEC-Compliant ....................5

B. Nexo's Sale and Distribution of the NEXO Token ....................6

C. Plaintiff's Purchase of the NEXO Token ....................8

D. SEC Registration Was Important to Cress ....................9

E. Nexo's Rule 36 Admissions ....................9

LEGAL STANDARD ....................10

ARGUMENT ....................10

II. Nexo Is Liable Under Corporations Code Sections 25503 (Third Cause of Action) ....................10

A. The NEXO Token Is a Security ....................11

1. The NEXO Token is an Interest in a Profit-Sharing Agreement ....................12

2. The NEXO Token is an Investment Contract ....................12

B. Nexo Offered and Sold the NEXO Token to Plaintiff in California ....................16

C. The Sale Was an Issuer Transaction, Made in Privity with Plaintiff ....................16

D. Nexo Cannot Carry Its Burden To Prove Its "Covered Security" Defense ....................17

1. Nexo cannot prove that every purchaser was accredited ....................17

2. Nexo cannot prove the required verification steps ....................23

3. Nexo cannot prove Rule 502(d) reasonable care ....................24

4. Nexo cannot disaggregate its sales to Plaintiff from its public offering ....26

III. Nexo Is Liable Under Sections 25401 and 25501 for Its False Statement That the NEXO Token Was "Registered with the SEC as a Security" (Fourth Cause of Action) ....27

A. Nexo Falsely Represented to Cress that 'the NEXO Token is Registered with the SEC as a Security" ....27

B. The False Representation is Material ....28

C. Nexo Cannot Carry Its Burden of Proving Any Section 25501 Defenses ....30

IV. The Same Misrepresentation Establishes Nexo's Liability for Common Law Fraud ....31

V. Nexo's Remaining Pleaded Defenses Do Not Preclude Judgment ....33

VI. In the Alternative, the Court Should Specify Established Facts Under Rule 56(g) and Should Not Permit Nexo to Manufacture Disputes from the Record It Destroyed ....34

VII. CONCLUSION ....35

# TABLE OF AUTHORITIES

**Cases**

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
158 Cal. App. 4th 226 (2007) .... 10

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019).... 13

*Bily v. Arthur Young & Co.*,
3 Cal. 4th 370 (1992) .... 31

*Bowden v. Robinson*,
67 Cal. App. 3d 705 (1977) .... 11, 27, 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).... 10, 17, 34

*Coinbase, Inc. v. SEC*,
126 F.4th 175 (3d Cir. 2025) .... 13

*Conlon v. United States*,
474 F.3d 616 (9th Cir. 2007) .... 10

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997) .... 31, 32, 33

*Flaxel v. Johnson*,
541 F. Supp. 2d 1127 (S.D. Cal. 2008).... 28

*Fuller v. Bae (In re Bae)*,
645 B.R. 272 (Bankr. N.D. Cal. 2022) .... 17

*Goldberg v. Paramount Oil Co.*,
143 Cal. App. 2d 215 (1956) .... 12

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) (en banc) .... 14

*Hunichen v. Atonomi LLC*,
No. C19-0615-RAJ-SKV, 2021 WL 5858811 (W.D. Wash. Nov. 12, 2021), *report and recommendation adopted* (W.D. Wash. Aug. 8, 2022) .... 17, 21

*Johnston v. Bumba*,
764 F. Supp. 1263 (N.D. Ill. 1991) .... 23

*Landreth Timber Co. v. Landreth*,
471 U.S. 681 (1985).... 13

*Lazar v. Superior Court*,
12 Cal. 4th 631 (1996) .... 32

*Leon v. IDX Sys. Corp.*,
464 F.3d 951 (9th Cir. 2006) .......... 35

*Manderville v. PCG&S Grp., Inc.*,
146 Cal. App. 4th 1486 (2007) .......... 34

*Marine Bank v. Weaver*,
455 U.S. 551 (1982) .......... 15

*Mark v. FSC Sec. Corp.*,
870 F.2d 331 (6th Cir. 1989) .......... 20

*Moss v. Kroner*,
197 Cal. App. 4th 860 (2011) .......... 17, 30

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
210 F.3d 1099 (9th Cir. 2000) .......... 10, 17

*Parvin v. Davis Oil Co.*,
524 F.2d 112 (9th Cir. 1975) .......... 16

*People v. Black*,
8 Cal. App. 5th 889 (2017) .......... 11, 12, 16

*People v. Butler*,
212 Cal. App. 4th 404 (2012) .......... 28

*Pinter v. Dahl*,
486 U.S. 622 (1988) .......... 28

*Reves v. Ernst & Young*,
494 U.S. 56 (1990) .......... 15

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal. 4th 979 (2004) .......... 31, 34

*S. Cal. Gas Co. v. City of Santa Ana*,
336 F.3d 885 (9th Cir. 2003) .......... 10

*SEC v. Barry*,
146 F.4th 1242 (9th Cir. 2025) .......... 26

*SEC v. Blockvest, LLC*,
No. 18CV2287-GPB(BLM), 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) .......... 29

*SEC v. Edwards*,
540 U.S. 389 (2004) .......... 13, 15

*SEC v. GenAudio, Inc.*,
32 F.4th 902 (10th Cir. 2022) .......... 22, 23

*SEC v. Glenn W. Turner Enters., Inc.*,
474 F.2d 476 (9th Cir. 1973) .......... 15

*SEC v. Global Telecom Servs., L.L.C.*,
325 F. Supp. 2d 94 (D. Conn. 2004) ........ 29

*SEC v. Grybniak*,
No. 20-CV-327 (EK) (MMH), 2024 WL 4287222 (E.D.N.Y. Sept. 24, 2024) ........ 29

*SEC v. Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) ........ 12, 14, 26, 27

*SEC v. LBRY, Inc.*,
639 F. Supp. 3d 211 (D.N.H. 2022) ........ 13

*SEC v. Murphy*,
626 F.2d 633 (9th Cir. 1980) ........ 11, 17, 26

*SEC v. Nutra Pharma Corp.*,
No. 18-CV-5459 (JS) (ST), 2022 WL 3912561 (E.D.N.Y. Aug. 31, 2022) ........ 18, 21

*SEC v. Payward, Inc.*,
No. 23-cv-06003-WHO, 2024 WL 4511499 (N.D. Cal. Aug. 23, 2024) ........ 14

*SEC v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ........ 17, 24, 25, 26, 29

*SEC v. Research Automation Corp.*,
585 F.2d 31 (2d Cir. 1978) ........ 29

*SEC v. R.G. Reynolds Enters., Inc.*,
952 F.2d 1125 (9th Cir. 1991) ........ 14

*SEC v. Telegram Grp. Inc.*,
448 F. Supp. 3d 352 (S.D.N.Y. 2020) ........ 13, 14, 25

*SEC v. Terraform Labs Pte. Ltd.*,
684 F. Supp. 3d 170 (S.D.N.Y. 2023) ........ 13, 14

*SEC v. Terraform Labs Pte. Ltd.*,
708 F. Supp. 3d 450 (S.D.N.Y. 2023) ........ 12, 25

*SEC v. Torchia*,
183 F. Supp. 3d 1291 (N.D. Ga. 2016) ........ 17

*SEC v. Wayland*,
No. SACV 17-01156 AG (DFMx), 2019 WL 2620669 (C.D. Cal. Apr. 8, 2019) ........ 18, 21

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) ........ 12, 13, 14

*Silver Hills Country Club v. Sobieski*,
55 Cal. 2d 811 (1961) ........ 16

*Sostack v. Ripple Labs, Inc.*,
No. 24-7599, 2026 WL 206301 (9th Cir. Jan. 27, 2026) (mem.) ........ 27

*Steroid Hormone Product Cases*,
181 Cal. App. 4th 145 (2010) ........ 29

*Tcherepnin v. Knight*,
389 U.S. 332 (1967) ........ 12, 13, 15

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ........ 29

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975) ........ 13, 15

*United States v. Zaslavskiy*,
No. 17-CR-647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ........ 13

*Vasquez v. Superior Court*,
4 Cal. 3d 800 (1971) ........ 32

*Warfield v. Alaniz*,
569 F.3d 1015 (9th Cir. 2009) ........ 14

*Yellow Creek Logging Corp. v. Dare*,
216 Cal. App. 2d 50 (1963) ........ 31

**Statutes**

15 U.S.C. § 77r(b)(4)(F) ........ 17

Cal. Civ. Code § 1572(2) ........ 31, 32

Cal. Civ. Code § 1668 ........ 34

Cal. Civ. Proc. Code § 338(d) ........ 34

Cal. Corp. Code § 25008 ........ 16

Cal. Corp. Code § 25019 ........ 11, 12

Cal. Corp. Code § 25110 ........ 1, 2, 10, 11, 17, 35

Cal. Corp. Code § 25163 ........ 11

Cal. Corp. Code § 25401 ........ 1, 2, 10, 27, 30, 35

Cal. Corp. Code § 25501 ........ 1, 2, 10, 27, 30, 31, 35

Cal. Corp. Code § 25503 ........ 1, 2, 10, 11, 16, 35

Cal. Corp. Code § 25506(b) ........ 34

Cal. Corp. Code § 25507(a) ........ 34

Cal. Corp. Code § 25701 ........ 34

**Other Authorities**

Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A Offerings, Securities Act Release No. 33-9415, 78 Fed. Reg. 44771 (July 24, 2013) .... 23

*In re Nexo Capital Inc.*, Securities Act Release No. 11149 (Jan. 19, 2023).... 16

**Rules**

Civ. L.R. 56-1 (N.D. Cal.) .... 1

Fed. R. Civ. P. 15(c)(1)(B) .... 34

Fed. R. Civ. P. 36.... 1, 9, 10

Fed. R. Civ. P. 56.... 1, 10, 34

**Regulations**

17 C.F.R. § 230.152.... 26, 27

17 C.F.R. § 230.502(a).... 17, 26

17 C.F.R. § 230.502(d) .... 2, 3, 17, 24, 25, 26

17 C.F.R. § 230.506(c).... 2, 10, 17, 18, 20, 21, 23, 24, 25, 26, 27

## NOTICE OF MOTION AND MOTION

TO DEFENDANT NEXO CAPITAL INC. AND ITS ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on October 22, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom E, 15th Floor, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, before the Honorable Thomas S. Hixson, Plaintiff John Cress will and hereby does move the Court for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56-1.

Cress moves for summary judgment as to liability on his Third Cause of Action (unqualified offer and sale of securities, Cal. Corp. Code §§ 25110, 25503), Fourth Cause of Action (untrue statement of material fact in the offer and sale of securities, Cal. Corp. Code §§ 25401, 25501), and Fifth Cause of Action (common law fraud), with the amount of restitution, rescissionary relief, or damages, including punitive damages, to be determined at trial. The motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declarations of John Cress and Max Ambrose and the exhibits thereto, Nexo's discovery responses and Rule 36 admissions, the pleadings and papers on file in this action, and such other matters as the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Nexo is liable under Corporations Code section 25503 for its unqualified sales of the NEXO Token to Plaintiff, where the sales, the absence of qualification, and privity are admitted and Nexo cannot carry its burden of proving its "covered security" (exemption) defense.

2. Whether Nexo is liable under Corporations Code sections 25501 for its admitted written statement that "the NEXO token is registered with the SEC as a security," which the registration record establishes was untrue, and which was material as a matter of law.

3. Whether Nexo is liable for common law fraud based on the same admitted misrepresentation, where Nexo's own documents establish scienter, and reliance is presumed from materiality and confirmed by Plaintiff's testimony and contemporaneous messages.

## INTRODUCTION

Nexo told Cress, in writing, that "the NEXO token is registered with the SEC as a security." Nexo admits its representative sent that statement to Cress and that it sent the same scripted sentence to at least fifty other customers in 2021 and 2022. Resp. to RFA Nos. 657, 659–660, 677–678 (Ex. 15).[1] Nexo's admissions establish that the statement was false. The only filing Nexo has ever made with the SEC concerning the NEXO Token is a 2018 Form D, which is a notice of claimed exemption from registration. No registration or qualification of the Token has ever been filed with, or been effective before, the SEC, the DFPI, or any state securities regulator. Resp. to RFA Nos. 738–749, 753, 756–763, 765–766, 768 (Ex. 15). Relying on Nexo's assurance, Plaintiff purchased millions of dollars of NEXO Tokens directly from Nexo's OTC desk in March and April 2021.

Those admissions resolve the securities claims. The Third Cause of Action (Cal. Corp. Code §§ 25110, 25503) imposes strict liability. Nexo sold Plaintiff a security, in California, in an issuer transaction, without qualification. Nexo's only potential escape—its affirmative defense that the sales fell within SEC Rule 506(c), making the Token a federally "covered security"—is Nexo's to prove, and refuted by its own records. Nexo acknowledged that thousands of "accredited as well as unaccredited" U.S. citizens traded the NEXO Token on its own exchange. Its own expert concedes Nexo lacks accreditation documentation for U.S. purchasers and that he cannot say whether his list of U.S. purchasers is even complete. Nexo took no verification steps before February 2021 and it imposed none of Rule 502(d)'s resale safeguards—all while telling Plaintiff the Token was registered. Indeed, weeks before the sales to Plaintiff, Nexo's owner personally waved an OTC Token sale past an accreditation check because documentation "was not a requirement at the time." Kantchev Tr. (Ex. 2) 65:3–66:20.

The Fourth Cause of Action (Cal. Corp. Code §§ 25401, 25501) is similarly suited to summary judgment. The untrue statement is admitted, its falsity is established by the admitted registration record, and a false claim of SEC registration is material as a matter of law. Reliance and scienter are not elements, and Nexo cannot prove a reasonable-care defense because the SEC told Nexo in 2020

[1] Unless otherwise noted, "Ex." citations are to the exhibits to the concurrently filed Declaration of Max Ambrose ("Ambrose Decl.").

to stop making SEC-compliance claims, Nexo's own Token-sale Terms state the Token was never registered, and the representative who made the statement testified he had no idea whether it was true.

The same admitted misstatement resolves the Fifth Cause of Action for common law fraud. Scienter is established by Nexo's own documents, and a presumption of reliance arises from materiality—a presumption Nexo cannot rebut, and that is independently confirmed by Plaintiff's testimony and contemporaneous messages. Plaintiff respectfully requests an order granting partial summary judgment and establishing Nexo's liability on the Third, Fourth, and Fifth Causes of Action.

## I. FACTS

### A. The NEXO Token

#### 1. Nexo's 2018 Initial Coin Offering

Nexo created and issued the NEXO Token in early 2018 as an ERC-20 token on the Ethereum blockchain. Ex. 20. Nexo publicly claimed to have raised $52.5 million "in an 11x oversubscribed Token Sale," *id.*, but the true figure was closer to $30 million. Trenchev Tr. (Ex. 1) 190:13–191:12; Kantchev Tr. (Ex. 2) 75:1–17; SMF 5–7. Nexo memorialized the offering through three Form D filings, each signed by Co-Founder and Managing Partner Antoni Trenchev. Ex. 21. The first, filed February 20, 2018, identified February 14, 2018, as the "date of first sale" and represented a one-year term; the final amendment, on May 5, 2018, reported the offering fully sold to 129 investors. *Id.*; SMF 3, 9. Nexo never filed any subsequent Form D. Trenchev Tr. (Ex. 1) 251:22–23; *see also* Valentine Rep. (Ex. 9) at 16 ("Nexo did not file a separate Form D in connection with its 2021–2022 offering of the NEXO Token to certain U.S. customers, including Plaintiff."); Resp. to RFA Nos. 756–763 (Ex. 15); SMF 11–12.

The 2018 ICO purchasers included a roster of institutional crypto-investment funds and venture vehicles. Ex. 22; SMF 10. Nexo imposed no transfer restriction, resale lockup, or restrictive legend on any NEXO Token, then or ever. Trenchev Tr. (Ex. 1) 206:4-9 ("I don't know how we could have placed restrictions on what an owner of an asset can do with his or her asset."); Ex. 16 (Resp. to Rog. 10) (Identifying no transfer restrictions); SMF 13. Nor did Nexo take any of the other reasonable-care steps "explicitly enumerated in Rule 502(d)" — inquiry, written disclosure of non-registration,

or restrictive legends — to prevent resale into the public market. *See infra* § II.D.3; Seligman Report (Ex. 11) ¶¶ 147–160; Ex. 16 (Resp. to Rog. 10); SMF 137, 142.

**2. Nexo Marketed the NEXO Token as an SEC-Compliant Security**

Nexo systematically marketed the NEXO Token to investors as an SEC-compliant security paying a steady investment return tied to Nexo's company-wide performance. Nexo admits that the NEXO Token was publicly marketed as a "US SEC-compliant Dividend-paying Asset-backed Security Token with Utility features." Trenchev Tr. (Ex. 1) at 285:14–24; Ex. 23; SMF 14. Its internal documents from 2018–2021 repeatedly described NEXO as a "security token": "the Nexo token is one of the strongest security tokens already circulating" (Ex. 24); "Problems with NEXO's security classification" (Ex. 25); Ex. 26 (June 2, 2021 blog post) ("the Dividends program was what classified us as a security in the US"); SMF 17, 26. Nexo also published—and later deleted, without ever producing—an article touting that "strict regulation actually makes security tokens, like NEXO, a safe investment." Exs. 29 (draft); 30; Ex. 31 ("deleted this Medium story."); SMF 18; *see infra* § VI.

Nexo's foundational marketing document, the NEXO Whitepaper, described the NEXO Token in a section titled "Why Investors Prefer NEXO Tokens" as "the World's First US SEC-compliant Asset-backed Token . . . backed by the assets of Nexo's loan portfolio." Ex. 20 (Whitepaper) at 2. The Whitepaper told investors that NEXO Tokens would deliver "Regular Passive Income: Nexo Tokens are a safe haven as they provide passive income in the form of 30% from the company's profits, distributed monthly to NEXO Token Holders." *Id.*; SMF 15–16. Internally, Nexo recognized its SEC-compliant claim was speculative at best, with its Managing Partner Trenchev advising against making the claim in a live presentation, noting that "SEC-compliant in a live format, especially when they can counter you, is dangerous. I would tone it down." Ex. 32; SMF 23.

On December 15, 2018, Nexo paid the "First NEXO Dividend" — a pro rata payout of 30% of company profits to NEXO Token holders — and publicly compared the security favorably to traditional dividend-bearing equities: "with an annualized yield of 4.8%, the First NEXO Dividend beats all dividend bearing stocks in Warren Buffet's portfolio . . . ." Ex. 33; SMF 19, 21. Nexo paid additional dividends thereafter, with the August 2020 third dividend accompanied by Nexo's

representation that it "honored its fiduciary duty to the community, distributing 30% of its profits to Nexo Holders." Ex. 34; SMF 20. Nexo continued to advertise the dividend through the time of Cress' purchase and paid dividends to Cress in June 16, 2021. Ex. 35 (showing 5,191.74 NEXO token dividend worth $9,439.89); SMF 28.

Internally, Trenchev directed employees to emphasize the dividends: "dividends are key in the context of our token, a huge plus so they should be emphasized. In general, when you talk about the difference between security and utility, it is profit sharing—with dividends being the quintessential example." Ex. 32; SMF 22. Nexo also engaged in buybacks to support the Token's price, which it viewed as "still heavily undervalued." Ex. 27 (Dec. 8, 2020 blog post); SMF 24.

### 3. The SEC Asks Nexo to Stop Marketing the Token as SEC-Compliant

In 2020, the SEC contacted Nexo about its claims that the NEXO Token was "SEC-compliant." Ex. 36. The SEC's "investigation [was] focused on several issues: Nexo's Reg D filing, Nexo's token, Nexo's dividend, and a specific investor complaint." *Id.* Trenchev acknowledged that the "SEC brought to Nexo's attention the fact that earlier versions of materials might have included the language 'SEC-compliant.'" *Id.* Trenchev assured the SEC that "[w]e have since unified all the language across the various platforms and communications channels to ensure that no inaccurate depictions of the facts are present." *Id.*; SMF 34–36. Nexo understood that the SEC "wanted us to discontinue the use of that language." Trenchev Tr. (Ex. 1) at 204:24-205:6; SMF 37.

But not only did Nexo continue the offending language well into 2021, Exs. 37 (February 2021), 38 (March 2021); SMF 38, it sharpened it. Even as Nexo assured the SEC that inaccurate depictions had been eliminated, its relationship managers began telling U.S. customers something more categorical and more demonstrably false: that the NEXO Token "is registered with the SEC as a security." And it was not improvised. Nexo's relationship managers sent the identical sentence, word for word, from standardized scripts to Cress and to hundreds of other U.S. customers, from March 2021 through 2022. Ex. 15 (RFAs 660-64, 77-78), Hristov Tr. (Ex. 3) 154:7-156:5; Ex. 39; Ex. 40 ("OTC Desk – Template"); SMF 74, 76; *infra* § I.E.

In January 2021, a Trustpilot review was sent to Nexo's marketing director saying "While NEXO Claims they are SEC and FCA compliant, and by searching the SEC and the FCA websites, we found out that NEXO is NOT registered by either agency." Ex. 41; SMF 44. In April 2021, a Nexo customer wrote to the SEC regarding the Token and the SEC responded that "Nexo is not registered with the SEC." Ex. 42. The customer forwarded this response to Nexo's customer service and legal team under the subject "Nexo falsely stated on its website it is SEC complaint." *Id.*; SMF 45. Yet Nexo continued to represent to investors that the Token was "registered with the SEC" until at least January 2022. Resp. to RFA Nos. 678–679 (Ex. 15); Ex. 43; SMF 46.

Nexo was aware of the distinction between registration with the SEC and a Form D exemption. Nexo's "Terms and Conditions of Token Sale" explicitly state that "the offer and sale of this security instrument has not been registered under the U.S. Securities Act. . ." Ex. 44; SMF 39; *see also* Exs. 45–46 (2020 listing inquiry sending U.S. exchange Kraken the Terms stating "THE OFFERING OF THE NEXO TOKEN HAS NOT BEEN REGISTERED, QUALIFIED, OR APPROVED"); SMF 40. Asked why Nexo would send Kraken token terms saying the opposite of what its scripts told U.S. customers, Nexo's designee had no answer: "I do not know." Trenchev Tr. (Ex. 1) 298:14–18; SMF 40. These terms were never provided to Cress. Cress Decl. ¶ 16; SMF 41.

In late 2020, Nexo discussed converting NEXO into a utility token, noting "Problems with NEXO's security classification Prevents us from easily selling the token to US citizens. Creates potential problems with the SEC." Ex. 25. Hristov replied "lets do it!" *Id.*; SMF 42. Account managers, executives, and Nexo's Trading Operations Manager also maintained a July 2020 summary of the law surrounding Regulation D which clearly identified the distinction between registration with the SEC and an exemption. Ex. 47; SMF 43. In July 2021, Nexo told the Arkansas Securities Department that it had "been advised by [its] legal counselors that NEXO Token (the 'Token') is not a security, but a token with utilitarian value and should be qualified as a utility token, therefore, **<u>exempted from registration</u>**." Ex. 48 (emphasis added); SMF 48.

**B. Nexo's Sale and Distribution of the NEXO Token**

Nexo sold the NEXO Token through at least four intersecting channels: (i) the 2018 ICO; (ii) Nexo's retail exchange; (iii) Nexo's OTC desk; and (iv) third-party cryptocurrency exchanges and market makers. Each channel made the NEXO Token broadly available to public investors, including unaccredited U.S. investors. Nexo never imposed a transfer restriction, lockup, or resale legend on the Token. Trenchev Tr. (Ex. 1) 206:4-207:1; SMF 13; *supra* § I.A.1.

Nexo publicly advertised that "[y]ou can acquire NEXO Tokens through the Nexo Exchange inside our platform (recommended) or through a third-party exchange," Ex. 49; SMF 49, and its internal records show it offered the Token on its exchange to customers in California and throughout the United States until at least February 2, 2021 when it "stopped for retail, [but] OTC continued," and again from January 27, 2022, until March 2022. Ex. 50; SMF 50. Internally, Nexo acknowledged that the "sale and purchase of NEXO Tokens [had] been available through the Nexo interface" and that at least "5,027 US citizen[s] have traded the NEXO Token for a total amount of $9,489,065. There are accredited as well as **unaccredited clients**." Ex. 51 (emphasis added); SMF 51. Both Nexo and its U.S. customers confirmed they could buy and sell NEXO on Nexo's Exchange. Exs. 52; Ex. 43 ("I acquired all my nexo on your platform via interest payments or exchanges."); 53; 54; 55 (identifying U.S. residents); SMF 52.

Throughout 2020 and 2021, American customers could also buy NEXO Tokens through a "Changelly integration" built into Nexo's own website—and unaccredited U.S. customers did. Ex. 56 (February 1, 2021: "My purchase of NEXO tokens via nexo.io website and Changelly is pending after more than an hour."); Ex. 57 (identifying the customer as U.S.-based); SMF 57, 60. On March 31, 2021, a customer documented the integration, taking a screenshot of Nexo's site, which proclaimed: "you can now buy NEXO Dividend Tokens on leading exchanges, on our OTC desk (for large orders) or . . . by clicking the 'Buy' button below and following Changelly's automated process below which is integrated with your Nexo Account . . . you will receive your tokens automatically in your Nexo Account." Ex. 58; SMF 58. Nexo and Hristov frequently directed Americans to purchase NEXO Tokens using the Changelly integration. Exs. 59–61; SMF 59.

As a result of the SEC's 2022 investigation, Nexo finally restricted Americans from purchasing NEXO Tokens through its retail exchange and the Changelly integration. Ex. 65 (the "integration is no longer available anymore for US clients since we are currently not allowed to facilitate Nexo token purchases for US clients due to ongoing regulatory changes, that we are currently actively addressing with the SEC."); SMF 61. But even then, Nexo continued to direct unaccredited investors to purchase NEXO Tokens using other exchanges. Exs. 66; 67 ("Regarding the purchase of Nexo tokens, there are several options for US Citizens to purchase Nexo tokens for eg. – Changelly – Huobi (VPN only) – HitBTC (VPN only) – Uniswap"); 68 ("the buy of Nexo tokens without an accredited investor status for US citizens can be purchased through. Defi Platforms like Uniswap or on CEXes like Huobi"); SMF 62.

Since at least March 2019, the NEXO Token has traded on third-party exchanges accessible to ordinary investors worldwide, including in the United States. Ex. 16, Resp. to Rog. 12; SMF 63. Nexo distributed the Token on HitBTC from May 2018 to November 2020 and on Huobi from January 2020 to October 2023. *Id.*; SMF 64. Nexo concedes it did not take any steps to prevent U.S. Persons from buying NEXO Tokens on these secondary markets, Trenchev Tr. (Ex. 1) at 209:25 – 210:6; SMF 65, and its own referrals illustrate that Americans could purchase NEXO Tokens on those exchanges.

**C. Plaintiff's Purchase of the NEXO Token**

On March 22, 2021, Cress asked Hristov about purchasing Bitcoin. Hristov responded with three scenarios, each requiring Plaintiff to purchase 25 Bitcoin worth of NEXO Tokens for "the Platinum membership." Ex. 39; SMF 70–71. Hristov also represented that "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals for American citizen who are also certified, accredited investors." Hristov Tr. Ex. 75 (Ex. 39); Hristov Tr. (Ex. 3) at 154:9–13; Resp. to RFA Nos. 66, 657 (Ex. 15); SMF 72–73. The Token had not been registered with the SEC. SMF 87, 90. *Infra* § I.E.

Nexo then sent Cress the Cryptocurrency Purchase Agreement ("CPA"), which Cress executed on or about March 24, 2021, at his home in San Francisco. Resp. to RFA Nos. 690, 692 (Ex. 15); Cress Decl. ¶ 17 & Ex. E; SMF 77. At Hristov's direction, Plaintiff sent $5,400,000 USDT to "Nexo's OTC

desk wallet" on March 26 "for the purchase of 75 BTC and the rest in NEXO Tokens," Cress Decl. ¶ 18, Ex. B, and on March 27 Hristov reported that the OTC team had made the purchases. *Id.*; Resp. to RFA No. 691 (Ex. 15); SMF 78–79. Plaintiff made additional NEXO Token purchases on or about March 30 and April 14, 2021. Cress Decl. ¶¶ 18–19 & Ex. B; SMF 80. Nexo's internal documents show each sale was made from Nexo's own inventory, with Nexo marking up the price it charged Cress by between 134.4% and 184.1% above its "average price" and reaping more than $1.7 million in profit from its sales to Cress. Exs. 69–72; SMF 84. The NEXO Token collapsed within weeks of Plaintiff's purchases—from more than $3.70 in early May 2021 to $1.16 on June 22, 2021. SMF 107. When Cress ultimately sold the NEXO Token he received far less than the amounts he paid for the Token. Cress Decl. ¶¶ 22–24; Mizrach Report (Ex. 12) at 27-28; SMF 108.

**D. SEC Registration Was Important to Cress**

Cress' contemporaneous conversations confirm the importance of Nexo's misrepresentation that the Token "was registered with the SEC as a security." Before finalizing the purchase, he texted a friend, for "moral support" and asked "Does security token mean registered with the SEC or something else?" His friend replied: "Yes." Cress Decl. ¶ 11 & Ex. C; SMF 98. On April 15, 2021, just after making his final NEXO Token purchase, Cress messaged another friend: "My second largest holding is NEXO, which is an SEC approved security token, which is important." Cress Decl. ¶ 12 & Ex. D; SMF 99.

**E. Nexo's Rule 36 Admissions**

Nexo admits it sold the NEXO Token to Cress out of its own inventory, Resp. to RFA Nos. 73, 649, 689, 691 (Ex. 15); that Hristov told Cress that "the NEXO token is registered with the SEC as a security;" and that the identical sentence appears in more than fifty emails Nexo sent to customers in both 2021 and 2022. Resp. to RFA Nos. 66, 657, 659–660, 677–679 (Ex. 15); SMF 73, 75, 82–83. Nexo further admits that the only filings Nexo has ever made with the SEC or any state securities regulator concerning the NEXO Token are its three 2018 Form Ds—no registration statement and no California qualification has ever been filed or been in effect, Resp. to RFA Nos. 738–749, 753, 756–763, 765–766, 768 (Ex. 15); SMF 86–87, 89–90. Each matter admitted "is conclusively established,"

Fed. R. Civ. P. 36(b), and may support summary judgment. *Conlon v. United States*, 474 F.3d 616, 621–22 (9th Cir. 2007).

**LEGAL STANDARD**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where the moving party bears the burden of proof at trial, he must establish "beyond controversy every essential element." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). Where the nonmoving party bears the burden—as Nexo does on its affirmative defenses—Plaintiff may carry his initial burden by "pointing out . . . an absence of evidence." *Celotex*, 477 U.S. at 325; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–06 (9th Cir. 2000).

**ARGUMENT**

Plaintiff seeks partial summary judgment as to liability on three claims, each of which turns on facts Nexo has admitted. The Third Cause of Action (Cal. Corp. Code §§ 25110, 25503) imposes strict liability for Nexo's unqualified sales of the NEXO Token to Plaintiff: the sales, the absence of qualification, and privity are admitted; the Token's status as a security is a question of law; and the only escape Nexo pleads—that the 2021 sales were exempt under SEC Rule 506(c)—is an affirmative defense Nexo cannot prove. The Fourth Cause of Action (§§ 25401, 25501) rests on Nexo's admitted written misstatement that "the NEXO token is registered with the SEC as a security," whose falsity is established by the admitted record and whose materiality is established as a matter of law. And the Fifth Cause of Action (common law fraud) arises from the same misstatement, with scienter established by Nexo's own documents and reliance presumed from materiality and independently confirmed by Plaintiff's testimony and contemporaneous messages.

**II. Nexo Is Liable Under Corporations Code Sections 25503 (Third Cause of Action)**

The California Corporate Securities Law of 1968 "prohibits the sale of securities in an issuer transaction unless the sale has been 'qualified' in accordance with statutory requirements." *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 249 (2007) (citing California

Corporations Code § 25110). Corporations Code § 25503 provides that any person who violates Section 25110 "shall be liable to any person acquiring from them the security sold in violation of that section." Liability turns on four elements: (1) an offer or sale of a security, (2) in this state, (3) in an issuer transaction, (4) without qualification. Each is established by Nexo's admissions and undisputed evidence. The burden of proving any exemption—including the federal "covered security" defense addressed in Section II.D below—rests on Nexo. Cal. Corp. Code § 25163; ECF No. 26 at 26. *See SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (once unregistered sales are shown, "the defendant then has the burden of proof in showing entitlement to an exemption").

Sections 25110 and 25503 create liability in favor of the immediate purchaser without regard to fault. The statutes do not "require scienter, negligence, or plaintiff's reliance." *Bowden v. Robinson*, 67 Cal. App. 3d 705, 712–13 (1977). Nor can Nexo dispute the absence of qualification. Nexo has admitted that it never filed an application to qualify the NEXO Token as a security with the DFPI or its predecessor agency. Resp. to RFA Nos. 765–766, 768 (Ex. 15); SMF 89; *supra* § I.E.

### A. The NEXO Token Is a Security

Despite telling Cress that the NEXO Token had been "registered with the SEC as a security" and publicly advertising it as a "US SEC-compliant Dividend-paying Asset-backed Security Token," entitling holders to a share of Nexo's profits, *supra* §§ I.A.2, I.E; Ex. 23; SMF 14, 72, Nexo now contends that its Token sales were not securities transactions. That argument is without merit.

An instrument that promises its holder a participation in the issuer's profits is not a borderline application of the securities laws. Section 25019 defines a "security" to include both a "certificate of interest or participation in any profit-sharing agreement" and an "investment contract." Cal. Corp. Code § 25019.[2] Because the material facts about what Nexo promised Token purchasers are undisputed, the Token's status as a security is a question of law suited to summary adjudication. *See,*

[2] The federal definition is materially identical, served as the model for the definition in section 25019, and federal "decisions interpreting the federal definition are helpful" in applying the state definition. *People v. Black*, 8 Cal. App. 5th 889, 905 (2017) (citation omitted).

*e.g.*, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177–83 (S.D.N.Y. 2020) (summary judgment); *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450 (S.D.N.Y. 2023) (same).

**1. The NEXO Token is an Interest in a Profit-Sharing Agreement**

The NEXO Token answers to the statutory description twice over. Where an instrument "on [its] face" "answer[s] to the name or description" in the statutory definition, it "may be included within any of [the] definitions, as matter of law." *Tcherepnin v. Knight*, 389 U.S. 332, 339 (1967). Nexo's own offering documents promised purchasers a participation in Nexo's profits—a 30% profit share paid as "dividends"—and Nexo marketed the Token as a dividend-paying "security token." *Supra* §§ I.A.2, I.E; Valentine Tr. (Ex. 5) at 105:2–3, 105:20–25 ("Nexo did have a dividend program" that provided "a dividend based on profits of the company."); SMF 14–17, 30.

Indeed, Nexo stated that its financial statements were confidential precisely because they were "material, non-public information with implications for the price of the Nexo token. The token itself is registered with the SEC as a security." Ex. 73; Ex. 74; SMF 47. The section 25019 list is "expansive," and the "'critical question' . . . is whether a transaction falls within the regulatory purpose of the law." *Black*, 8 Cal. App. 5th at 900. Instruments granting "a right to share in the profits or proceeds of a business enterprise to be conducted by others" have always been securities. *Goldberg v. Paramount Oil Co.*, 143 Cal. App. 2d 215, 218–19 (1956). A digital instrument sold to the public at large on the promise of passive distributions from the issuer's profits sits at the center—not the periphery—of that regulatory purpose. While the Court's analysis need proceed no further, the NEXO Token is also an investment contract.

**2. The NEXO Token is an Investment Contract**

California courts evaluate whether an instrument is an "investment contract" under the federal test of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and, independently, under the state risk-capital test; a transaction is a security if it satisfies either. *Black*, 8 Cal. App. 5th at 900–01. Ultimately, the distinction is of little import because Nexo's offer and sale of the NEXO Token satisfies both.

*Howey* asks, "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301. The Supreme Court has already

decided what a promised profit-share means: "The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts." *Howey,* 328 U.S. at 300. Profits include "dividends, other periodic payments, or the increased value of the investment." *SEC v. Edwards*, 540 U.S. 389, 394 (2004). So in *Tcherepnin*, shares that paid dividends out of the issuer's profits had "the essential attributes of investment contracts." 389 U.S. at 338. And "the right to receive dividends contingent upon an apportionment of profits" heads the Supreme Court's list of the characteristics that mark the prototypical security. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985).[3] Each *Howey* element is satisfied by the profit-share.

The digital-asset cases treat a promised distribution of enterprise profits as the clearest case in the field. From the SEC's foundational guidance forward, tokens whose holders "stood to share in potential profits" of the enterprise have been securities. *United States v. Zaslavskiy*, No. 17-CR-647, 2018 WL 4346339, at *6–7 (E.D.N.Y. Sept. 11, 2018); *Coinbase, Inc. v. SEC*, 126 F.4th 175, 208 (3d Cir. 2025) (Bibas, J., concurring) ("Crypto assets that "entitle[] holders to voting rights and dividends" are "nothing but creative schemes to evade securities regulations); *see also SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 195 (S.D.N.Y. 2023). The *a fortiori* point is unavoidable: courts hold tokens are securities even where the issuer "did not promise investors any dividend or other periodic payment," because "a formalized profit-sharing mechanism is not required." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019); *accord SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. 2022); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020). If tokens promising no distributions at all are securities because their value flows from the issuer's efforts, an instrument that expressly promises holders a share of the issuer's profits cannot be anything else.

---

[3] The NEXO Token bears every characteristic the Court has identified as "usually associated with common stock": "(i) the right to receive dividends contingent upon an apportionment of profits" — the Token's dividend of 30% of Nexo's profits, *supra* § I.A.2; "(ii) negotiability" — the Token traded freely on Nexo's own and third-party exchanges, with no transfer restriction or legend, *supra* §§ I.A.1, I.D; "(iii) the ability to be pledged or hypothecated" — Plaintiff's Tokens served as collateral for his Nexo credit line, *supra* §§ I.B–I.C; "(iv) the conferring of voting rights" — Token holders voted on retention of the dividend, *supra* § I.D; Valentine Tr. (Ex. 5) at 107:7–9; and "(v) the capacity to appreciate in value," *supra* §§ I.A.2, I.D. *Landreth*, 471 U.S. at 686 (citing *Forman*, 421 U.S. at 851).

**Investment of money.** The "investment of money" analysis is "an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). Plaintiff sent Nexo millions of dollars in USDT, drawn on loans secured by substantially all of his Bitcoin and Ethereum, to purchase NEXO Tokens, and lost the value of that investment when the Token collapsed. *Supra* § I.C; Cress Decl. ¶¶ 17–20 & Exs. B & E; SMF 78, 80–81, 107. That is tangible and definable consideration given in return for the Tokens. *Kik*, 492 F. Supp. 3d at 177–78; *Telegram*, 448 F. Supp. 3d at 368–69.

**Common enterprise.** The Ninth Circuit requires either horizontal commonality—the pooling of investor funds with fortunes tied to those of other investors—or strict vertical commonality. *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc). Both are present.

Horizontally, Nexo pooled the proceeds of its Token sales to build and operate the single lending enterprise on whose profits every holder's return depended, *supra* § I.A.1; SMF 8, 145, and every Token holder's fortunes rose and fell together: each holder received the same pro rata dividend of 30% of Nexo's net profits, *supra* § I.A.2; SMF 21, and each held the same fungible token whose market price was common to all. SMF 144. *See Terraform*, 684 F. Supp. 3d at 196; *Kik*, 492 F. Supp. 3d at 178–79.

Strict vertical commonality follows as well. "One indicator of vertical commonality, though by no means the only indicator, is an arrangement to share profits on a percentage basis between the investor and the seller or promoter." *SEC v. Payward, Inc.*, No. 23-cv-06003-WHO, 2024 WL 4511499, at *15 (N.D. Cal. Aug. 23, 2024) (quoting *SEC v. R.G. Reynolds Enters., Inc.,* 952 F.2d 1125, 1130 (9th Cir. 1991) (holding profit sharing was "sufficient to show vertical commonality and satisfy the second prong of *Howey*," and affirming summary judgment for the SEC)). Nexo pitched the Token as exactly that—"backed by the underlying assets of Nexo's loan portfolio" and paying holders "30% from the company's profits." Ex. 45; SMF 15–16; *see also* Ex. 13 (Kogan Report ¶¶ 22–24) (executives' "dual financial interest" as team-allocation holders incentivized promoting the Token's price); SMF 32.

**Expectation of profits from the efforts of others.** Investors in NEXO expected profits from Nexo's efforts because Nexo promised exactly that: the Token paid holders a dividend equal to 30 percent of Nexo's profits. SMF 16, 30. *See SEC v. Edwards*, 540 U.S. 389, 394 (2004) ("profits" include "dividends, other periodic payments, or the increased value of the investment"); *Tcherepnin*, 389 U.S. at 338-39 (payments based on issuer's earnings); *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) (prong met where the promoter's efforts are "the undeniably significant ones"). Nexo paid the dividend from December 2018 through June 2021, *supra* § I.A.2; SMF 19–21, 27; advertised that it beat "all dividend bearing stocks in Warren Buffet's portfolio," Ex. 33; SMF 19; and promoted the Token's price: "double digits," "sky is the limit . . . I do believe we are going much much higher." Ex. 75; SMF 25.

Internally, Trenchev and Kantchev directed Nexo employees to emphasize the dividend: "dividends are key in the context of our token, a huge plus, so they should be emphasized. In general, when you talk about the difference between security and utility, it is profit sharing—with dividends being the quintessential example." *Supra* § I.A.2; Ex. 32; SMF 22.

On June 16, 2021, Nexo distributed "the fourth and final Nexo Dividend worth $20,428,359.89 . . . to all eligible NEXO Token holders," announcing that "Nexo will continue to share its financial success with token holders through the Daily Interest program"—a "more regular, predictable and flexible" yield paid in NEXO Tokens. Ex. 28; SMF 27. The label changes nothing: "profits" include "other periodic payments," fixed or variable. *Edwards*, 540 U.S. at 394–97.

Nexo's expert, Dr. Randall Valentine, admits the Token "did provide a dividend based on profits of the company" until 2021, but opines that the payment "functioned more like interest on a savings account rather than a dividend." Valentine Tr. (Ex. 5) at 105:2–25; SMF 30. The analogy fails twice over. A return paid only if, and to the extent, the issuer earns profits is "a participation in earnings resulting from the use of investors' funds," *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)—the very feature that separates securities from savings deposits. *Marine Bank v. Weaver*, 455 U.S. 551, 557 (1982). And a "savings account" offered by an uninsured non-bank is itself a security, *id.* at 558–59; *Reves v. Ernst & Young*, 494 U.S. 56, 69 (1990), which is why Nexo consented to an

SEC order finding that its own interest-bearing Earn product was an unregistered security. Ex. 17, *In re Nexo Capital Inc.*, Securities Act Release No. 11149 (Jan. 19, 2023); SMF 147.

Token purchasers had no role in generating the promised distributions; Nexo's management ran the lending business that produced them. *Supra* § I.A.2; Ex. 76; SMF 31.

**The risk capital test.** The result is the same under California's risk-capital test. *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815 (1961); *Black*, 8 Cal. App. 5th at 900–01. Nexo raised millions from an indiscriminate public offering to build and operate its lending venture, *supra* §§ I.A.1, I.B; SMF 6–8, 31, 145; Token holders were powerless over the enterprise; and their unsecured investment was fully at risk, as the Token's collapse proved. SMF 107. *Supra* § I.C. *Silver Hills* held that country-club memberships were securities even though members had no right to any return—the statute applies "as clearly . . . as it would . . . had the purchasers expected their return in some such familiar form as dividends." 55 Cal. 2d at 815–16. Token purchasers here expected precisely that familiar form—dividends.

### B. Nexo Offered and Sold the NEXO Token to Plaintiff in California

An offer or sale is made "in this state" when it is directed to and received in California. Cal. Corp. Code § 25008(a)–(b). Hristov's March 23, 2021, email proposing the Token-purchase "scenarios," the CPA Nexo drafted and sent, and Nexo's OTC payment instructions were each directed to and received by Plaintiff—a San Francisco resident—in California, where he executed the CPA and submitted each purchase order. *Supra* §§ I.C–I.D; Cress Decl. ¶¶ 17–19, 21 & Ex. F; SMF 1, 85. That is a California sale. *Parvin v. Davis Oil Co.*, 524 F.2d 112, 117 (9th Cir. 1975).

### C. The Sale Was an Issuer Transaction, Made in Privity with Plaintiff

The same undisputed fact satisfies both transactional predicates for liability under section 25503 — that Nexo's sale was an "issuer transaction," and that it was in privity with Plaintiff: Nexo sold the NEXO Token directly to Plaintiff, out of its own inventory, for its own financial benefit. Nexo admits it "sold the NEXO token to Plaintiff," Resp. to RFA No. 73 (Ex. 15); SMF 82, and that it "owned the Nexo Tokens in its own inventory that it sold Plaintiff." Resp. to RFA Nos. 649, 689 (Ex. 15); Exs. 69–72 (internal OTC pricing records reflecting Nexo's markups and profits on the sales to

Plaintiff); SMF 83–84. That sale was an issuer transaction. *Fuller v. Bae (In re Bae)*, 645 B.R. 272, 291 (Bankr. N.D. Cal. 2022) (a transaction "directly or indirectly for the benefit of the issuer" is an "issuer transaction."). It also establishes that Cress acquired the NEXO Token from Nexo and is thus in privity. *See Moss v. Kroner*, 197 Cal. App. 4th 860, 870–75 (2011).

**D. Nexo Cannot Carry Its Burden To Prove Its "Covered Security" Defense**

Nexo contends that the NEXO Token was a "covered security" — and section 25110 therefore preempted — because its sales were exempt under SEC Rule 506(c). 15 U.S.C. § 77r(b)(4)(F); 17 C.F.R. § 230.506(c). "Federal preemption is a defense, and Defendants must plead and prove it." ECF No. 37 at 13 (citing *SEC v. Torchia*, 183 F. Supp. 3d 1291, 1310 (N.D. Ga. 2016)).[4] "Exemptions from registration provisions are construed narrowly 'in order to further the purpose of the Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof.'" *SEC v. Platforms Wireless Int'l Corp*., 617 F.3d 1072, 1086 (9th Cir. 2010) (quoting *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980).

To establish the exemption, Nexo must prove that (1) every purchaser of NEXO securities was an accredited investor, 17 C.F.R. § 230.506(c)(2)(i); (2) it took "reasonable steps to verify" accredited-investor status, § 230.506(c)(2)(ii); (3) it satisfied Rule 502(d) by exercising reasonable care to assure that purchasers were not underwriters, §§ 230.506(c)(1), 230.502(d); and (4) its sales to Plaintiff were not integrated with a non-exempt offering. § 230.502(a). Because Nexo bears the burden of proof, Plaintiff may prevail merely by pointing out the absence of evidence. *Celotex*, 477 U.S. at 325; *Nissan Fire*, 210 F.3d at 1102–06. While a single failure is fatal to Nexo's preemption defense, Nexo cannot prove it met a single requirement of Rule 506.

**1. Nexo cannot prove that every purchaser was accredited**

Rule 506(c) is unavailable if even a single purchaser in the offering was unaccredited. 17 C.F.R. § 230.506(c)(2)(i) ("[a]ll purchasers"); *Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-SKV,

---

[4] The defense matters only to the Third Cause of Action: NSMIA preempts state registration and qualification requirements for covered securities, but expressly preserves state antifraud authority, so the Fourth Cause of Action stands regardless. See ECF No. 26 at 28 ("a cause of action for securities fraud would not be preempted.").

2021 WL 5858811, at *12 (W.D. Wash. Nov. 12, 2021), *report and recommendation adopted* (W.D. Wash. Aug. 8, 2022) ("Because all investors must be accredited, a showing that even one SAFT signatory was not accredited would preclude exemption under Rule 506(c)"); *SEC v. Wayland*, No. SACV 17-01156 AG (DFMx), 2019 WL 2620669, at *4 (C.D. Cal. Apr. 8, 2019) (exemption "inapplicable" where "Defendants allowed unaccredited investors to invest"); *SEC v. Nutra Pharma Corp.*, No. 18-CV-5459 (JS) (ST), 2022 WL 3912561, at *10 n.6 (E.D.N.Y. Aug. 31, 2022) (exemption unavailable where two purchasers were unaccredited); ECF 37 at 12 (506(c) exemption available only "when all purchasers are 'accredited investors'"). The undisputed record shows unaccredited purchasers in every pipeline: Nexo's own retail exchange, the Changelly integration, third-party exchanges, and the OTC Desk itself.

**Nexo's Sales on its Own Retail Exchange.** The NEXO Token was available to U.S. retail purchasers on Nexo's own exchange—which Nexo advertised as the "recommended" way to "acquire NEXO Tokens"—until at least February 2, 2021, just weeks before its sales to Plaintiff, and again from January 27 to March 1, 2022. *Supra* § I.B; Ex. 50; SMF 49–50. Internally, Nexo acknowledged that "a total of 5,027 US citizen[s] have traded the NEXO Token for a total amount of $9,489,065. There are accredited **as well as unaccredited clients**." Ex. 51 (emphasis added); SMF 51. Nexo's corporate representative could not deny that it sold Tokens to unaccredited U.S. investors on its retail exchange. Trenchev Tr. (Ex. 1) 212:16–217:8; SMF 53; *see also* Valentine Tr. (Ex. 5) at 125:5–126:15; SMF 134. Nexo's communications with customers verify it sold to U.S. customers on its retail exchange. Ex. 43 ("I acquired all my nexo on your platform via interest payments or exchanges;" "There was a period when it was possible for US citizens to purchase Nexo tokens…using our Nexo Exchange"); SMF 52.[5] A sworn purchaser declaration now confirms it: on February 28, 2022—inside the reopened window—Erik Hahn, a New Mexico resident and U.S. citizen, bought 2,910.92 NEXO Tokens on Nexo's Exchange, and Nexo never informed him of any accredited-investor requirement. Hahn Decl. (Ex. 91) ¶¶ 2–4; SMF 52.

[5] This purchaser is not disclosed in Nexo's Interrogatory Response or its Expert's Appendix C.

At least 70,698 unique wallets hold the Token, Ambrose Decl. ¶ 20 & Ex. 18; SMF 55, and Nexo acknowledged in mid-2020 that roughly 30 percent of all NEXO Tokens were held by U.S. residents. Ex. 77; SMF 54. In addition, Nexo paid dividends to both unaccredited and accredited U.S. citizens holding the NEXO Token. Ex. 19 (Dividend Details, June 11, 2021 Blog post) ("All token holders including US citizens will receive their dividend payouts in NEXO Tokens."); SMF 56.

**The Changelly Integration and Third-Party Exchanges.** Throughout 2020 and 2021, Nexo also sold the NEXO Token to U.S. investors—accredited and unaccredited alike—through a "Changelly integration" built directly into its own website. SMF 57. *Supra* § I.B. Nexo advertised that a customer could "now buy NEXO Dividend Tokens . . . by clicking the 'Buy' button" on his Nexo dashboard and would "receive [his] tokens automatically in [his] Nexo Account." Ex. 58; SMF 58; *supra* § I.B. Nexo steered Americans to the integration through its support desk, Ex. 60; its official Telegram channel, Exs. 62–64; and Cress's own Relationship Manager. Ex. 61; SMF 59. And unaccredited U.S. customers used it. On February 1, 2021 — weeks before Nexo's sales to Plaintiff — an unaccredited U.S. customer emailed Nexo support that his "purchase of NEXO tokens via nexo.io website and Changelly is pending after more than an hour." Exs. 56; 57 (identifying customer as U.S.-based); SMF 60.

Nexo also told American purchasers they could buy the Token on third-party exchanges on which Nexo itself was selling—HitBTC (May 2018 to November 2020) and Huobi (January 2020 to October 2023). *Supra* § I.B; Valentine Report ¶ 13; Ex. 67 (referring a non-accredited U.S. customer to "Changelly – Huobi (VPN only) – HitBTC (VPN only) – Uniswap"); Ex. 66 ("American citizens have two options to get [NEXO tokens] – either register an account with Huobi and purchase it themselves or through our OTC desk."); SMF 62, 64.

Nexo's expert didn't consider purchases made through the Changelly integration or on third-party exchanges Valentine Tr. (Ex. 5) at 127:5–8, 204:25–205:6, and conceded that whether exchange purchasers were U.S. persons is unknowable to him: "It's anonymous. We don't know." *Id* at 31:17–24; 203:2–6. Indeed, Valentine "never ha[s] stated that there were no transactions to U.S. customers" on these exchanges. *Id.* at 202:14–203:1; SMF 135–136. An issuer that must prove every purchaser in

the offering was accredited cannot do so through an expert who cannot say who—or even how many—the purchasers were. "In order to come within the Rule 506 safe harbor, [Nexo] is required to offer evidence of the issuer's reasonable belief as to the nature of *each* purchaser. Thus, for purposes of Rule 506, what [Nexo] knew and reasonably believed about each purchaser is critical." *Mark v. FSC Sec. Corp.*, 870 F.2d 331, 335, 337 (6th Cir. 1989) (burden cannot be met where documents were not sufficient to establish "the issuer reasonably believed ***each*** purchaser was suitable so as to warrant a Rule 506 exemption") (emphasis added).

**Nexo's OTC Sales**. Even at the OTC Desk, Nexo did not begin verifying accreditation until February 2021. Ex. 78 ("[t]he last time we discussed your purchasing of NEXO Tokens the accredited investor status was not mandatory."); SMF 67. Nexo's designee on U.S. sales admitted that Nexo "[p]robably, yes" sold NEXO Tokens to Americans in 2020—when no verification existed at all—and was "certain that we sold to U.S. clients via the OTC desk for sure." Trenchev Tr. (Ex. 1) 240:10–12; 245:1–7. Any such sale is absent from Nexo's verified U.S.-sales chart, which spans only 2021 and 2022. *Id.* 251:12–15; SMF 131. Brian Mitchell's sworn declaration confirms it: on November 12, 2020, Hristov himself facilitated Mitchell's OTC Desk purchase of approximately 106,100 NEXO Tokens—worth roughly $20,500—when Mitchell's annual income was approximately $60,000, far below the accreditation thresholds. Mitchell Decl. (Ex. 102) ¶¶ 3–5. Nexo never asked Mitchell for any financial information or accredited-investor certificate and never told him—for that purchase or his July 2020 purchase on Nexo's in-app exchange—that accreditation was required. *Id.* ¶¶ 2, 6; SMF 132.

Nexo seeks to prove its OTC sales were limited to accredited investors through the testimony of its expert Valentine. While his opinions should be excluded (see Plaintiff's Daubert Motion), his own report confirms that Nexo cannot establish accredited-investor status for every purchaser. According to Valentine, in the 2021–2022 NEXO Token offering, "Nexo has provided documentation in support of accredited investor status for 7 of the 8 purchasers preceding Plaintiff and 44 of the 46 purchasers after Plaintiff." Valentine Report ¶ 13 (p. 708–724); SMF 113. On Nexo's own data, then, at least three of the fifty-five U.S. OTC purchasers in the 2021–2022 offering have no accredited-

investor documentation. That alone defeats Rule 506(c). *Supra* (*Hunichen*, *Nutra Pharma*, *Wayland*). Valentine's explanation that "some records cannot be located due to the substantial passage of time," Valentine Rep. at 14–15; SMF 116, is not a Rule 506(c) defense. The issuer carries the burden of proof, and the absence of records means Nexo cannot meet it. That is doubly true where Nexo itself destroyed the files of the custodians who ran the very sales at issue. *See infra* § VI.

Valentine's deposition only widened these gaps. Of the eight U.S. purchasers in the 2021 offering who preceded Plaintiff, Valentine conceded that for one, "the documents do not exist" — "[n]o documentation exists as we sit here today" — and that he has no way of knowing whether his income, net worth, or occupation qualified him. Valentine Tr. (Ex. 5) at 130:6–7; 169:22–170:1; 128:15–18, 129:13–23. Two more have no accredited-investor certificate at all, *id.* at 170:13–18 ("There is no accredited investor certificate."), and insufficient financial information to verify accreditation. *Id.* at 176:17–22. For two others, Nexo "did not collect an accredited investor certificate until after the transaction." *Id.* at 176:23–177:1. And the sole documentary support for another is a certificate that expired months before his purchase. *Id.* at 132:13–133:8, 134:20–23. Valentine nonetheless counted all but one of these individuals as proof of successful verification. *Id.* at 134:24–135:2; SMF 118–122. In short, for at least six of the eight U.S. purchasers immediately preceding Plaintiff in Valentine's own window—the pre-Cress period his report singles out as "the only window of time relevant to Plaintiff," Valentine Rep. at 15; Valentine Tr. (Ex. 5) at 112:3–113:8; SMF 117—Nexo had no current accreditation documentation in hand at the time of sale. On Valentine's own account, then, the phase before Plaintiff's purchases is what matters most—and it is exactly there that Nexo's verification record collapses.

Valentine's eleventh-hour supplementation only deepened the failure within that window. His "Supplemental Appendix C"—served the night before his deposition—added eleven more pre-Cress U.S. purchasers, and for at least 8 of the 11, the supporting "documentation" is facially inadequate: a March 2020 sale supported only by a January 2022 email chain that Valentine conceded "obviously does not have any per[tinent] information as far as accredited investor forms," Valentine Tr. (Ex. 5) at 213:15–19; Ex. 81; an August 2020 sale supported only by a July 2021 email chain, Ex. 82; a March

2020 sale "supported" by an email chain in which the investor refuses to provide an accredited-investor certificate, Ex. 83; and purchasers whose only "documentation" are Source of Funds declarations insufficient to verify income or net worth Exs. 84–87; SMF 125–126. Still another pre-Cress purchaser appears in Valentine's data misdated as an October 2021 purchaser: Nexo's records show he bought on October 21, 2020, provided no accredited-investor certificate, and did not provide sufficient financial information to establish accreditation. Exs. 88–90; SMF 128. In all, on Valentine's own final data, Nexo lacked documentation sufficient to verify accreditation at the time of sale for at least 13 of the 19 U.S. OTC purchasers preceding Plaintiff—the very "window of time" Valentine deems relevant. Valentine Supp. App. C (Ex. 10); SMF 129; *see* Plaintiff's Daubert Motion at 17-18.

Nor can Valentine supply the offering's boundaries: he "can't say with 100 percent certainty" that his purchaser list is complete, Valentine Tr. (Ex. 5) at 116:21–24; he served a "Supplemental Appendix C" adding 24 U.S. purchasers the night before his deposition, *id.* at 117:7–11, 184:11–14, 213:3–8; he first learned that Nexo sold NEXO Tokens to U.S. purchasers in 2019 and 2020 from Professor Seligman's rebuttal report, *id.* at 184:15–19; and his Appendix C is limited to the customers Nexo itself identified. *Id.* at 195:16–21; SMF 125, 130–131. Even the supplemented list remains incomplete. Plaintiff has identified more than a dozen additional U.S. purchasers which do not appear in either version—including nine who bought between November 2020 and April 2021, squarely within the pre-Cress window, and sales to U.S. investors made during this litigation. Exs. 57, 92, 54, 93–98; Hahn Decl. (Ex. 91) ¶¶ 2–4; Mitchell Decl. (Ex. 102) ¶¶ 2–7; SMF 132. Neither Hahn nor Mitchell appears anywhere in Nexo's interrogatory responses or Valentine's report. SMF 132. *Infra* § VI. Nexo has offered no evidence to verify that any of these purchasers was accredited. Nexo's sworn purchaser universe was still moving in June 2026: the director who verified Nexo's interrogatory answers could not explain why a $1.5 million June 2021 U.S. Token purchaser was missing from every earlier version of the list, and he "can't speculate to the completeness" of the current one. Greaves Tr. (Ex. 7) 104:6–105:5, 106:14–107:1; SMF 133.

Nexo's proof fails just as the issuer's failed in *SEC v. GenAudio, Inc.*, 32 F.4th 902, 943 (10th Cir. 2022), which affirmed summary judgment because the issuer's failure "to provide information

regarding the number or sophistication of [its] investors" precluded any "reasonable belief that all of the solicited investors were accredited." *Accord Johnston v. Bumba*, 764 F. Supp. 1263, 1276-77 (N.D. Ill. 1991) (generalized process testimony "did not provide a complete picture as to the status of all of the investors"). So too here. Its expert concedes Nexo lacks documentation covering all purchasers; his report identified 60 U.S. purchasers, his revised list 82, and Plaintiff has since identified at least 14 more—at least 96 in all—with retail-exchange and third-party-exchange purchasers still unaccounted for; and Valentine admitted he was "not completed with the investigation" of whether Nexo sold Tokens to unaccredited investors. Valentine Tr. (Ex. 5) at 120:13–122:17; SMF 125, 132, 134; *supra* § I.B. Where the defendant cannot clearly define the contours of their offerings, its "attempt to find safe harbor under Rule 506 is unavailing." *GenAudio*, 32 F.4th at 943.

Nor can the 2018 Form Ds bridge these gaps: Nexo admits it filed no Form D for the 2021 offering it now defends. Trenchev Tr. (Ex. 1) at 251:22–23 ("We have not filed a Reg D form other than the one that we saw today already."); Resp. to RFA Nos. 756–763 (Ex. 15); SMF 11–12; *supra* § I.E.

**2. Nexo cannot prove the required verification steps**

Rule 506(c) independently conditions the exemption on the issuer having taken "reasonable steps to verify" that each purchaser was an accredited investor. 17 C.F.R. § 230.506(c)(2)(ii). Because Rule 506(c) permits issuers to solicit the public at large, the SEC conditioned the exemption on verification directed at each purchaser—a requirement "separate from and independent of" actual accreditation, which "must be satisfied even if all purchasers happen to be accredited investors." *Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A Offerings*, Securities Act Release No. 33-9415, 78 Fed. Reg. 44771, 44776–77 (July 24, 2013). Nexo took none for substantial portions of its distribution: no verification at all until approximately February 2021, Ex. 78; SMF 67; none at all for Mitchell's November 2020 OTC purchase, Mitchell Decl. (Ex. 102) ¶¶ 4, 6; purchasers its own records show were never properly verified, Ex. 79; and it cannot even say that no unaccredited investor purchased on its exchange. Trenchev Tr. (Ex. 1) 212:16–217:8; SMF 53. On its own witnesses' account, what verification Nexo

did claim was optional and unwritten. In February 2021—weeks before the sales to Plaintiff—Nexo's owner personally overrode a pause on an OTC Token sale awaiting accreditation documents ("There's no point in pausing them. This is [redacted]."), testifying that accreditation documentation "was not a requirement at the time" and that verification was an "optionality," even though Nexo's compliance officer warned that skipping verification "exposes us to unnecessary risk with the SEC." Kantchev Tr. (Ex. 2) 65:3–66:20, 67:13–22, 72:19–73:13; Ex. 80; SMF 69. And Nexo's own Rule 506(c) expert concedes the verification "policies and procedures" he defends were never written down. Valentine Tr. (Ex. 5) at 180:23–25 ("Q. So we've established, I think, there's no written policies and procedures about this, correct? A. Not that I can recall at this time."); SMF 68. Nor can Nexo supply the missing proof through its expert: as outlined above and in the Valentine Daubert Motion, for at least 13 of the 19 U.S. OTC purchasers preceding Cress, Nexo did not collect documentation sufficient to verify accreditation at the time of sale. *Supra* § II.D.1; Valentine Supp. App. C; SMF 129; *see* Plaintiff's Daubert Motion.

**3. Nexo cannot prove Rule 502(d) reasonable care**

In addition to selling only to verified accredited investors, the issuer must comply with Rule 502(d) and "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(11) of the Act." *Platforms Wireless*, 617 F.3d at 1091 (quoting 17 C.F.R. § 230.502(d)); *see also* 17 C.F.R. § 230.506(c). Reasonable care is demonstrated by "[r]easonable inquiry" into whether the purchaser buys for others, "[w]ritten disclosure to each purchaser prior to sale that the securities have not been registered . . . and, therefore, cannot be resold" absent registration or an exemption, and a restrictive "legend." 17 C.F.R. § 230.502(d)(1)–(3). Nexo identifies no inquiry into whether purchasers were acquiring the Token for others, no written disclosure that the Token was unregistered, and no legend or transfer restriction of any kind. Ex. 16, Resp. to Rog. 10; Seligman Report ¶¶ 147–160; Trenchev Tr. (Ex. 1) 206:4-207:1; SMF 137. It thus cannot prove "reasonable care" under Rule 502(d).

Rule 502(d)(2) required written disclosure "to each purchaser prior to sale" that the Token had not been registered and could not be resold. Nexo told Cress and dozens of other OTC purchasers the

opposite, falsely representing that "the NEXO token is registered with the SEC as a security." SMF 138. *Supra* § I.C. Nexo thus did not merely omit the purchaser-directed disclosure Rule 502(d) required; it affirmatively inverted it.

Plaintiff's expert, Professor Joel Seligman, opines that during the 2018–2021 period, "issuers routinely provided . . . investment-intent representations and resale acknowledgments as a matter of best practice, reflecting industry standards of Rule 502(d) compliance," including investment-intent inquiries and representations and restrictive legends or transfer restrictions. Seligman Report ¶¶ 147–160; Trenchev Tr. (Ex. 1) 206:4-207:1 (Nexo may have been able to "code lock-up periods into the token" but did not); SMF 141–142. Nexo has identified no step it took to comply. Ex. 16, Resp. to Rog. 10; Seligman Report ¶ 157; SMF 137, 142; *Platforms Wireless*, 617 F.3d at 1091–92 (affirming summary judgment where "the defendants cannot establish that they exercised reasonable care" because they "took none of the three actions explicitly enumerated in Rule 502(d)").

Nexo has retained no expert to dispute Seligman's conclusions on Rule 502(d), and Nexo's Managing Partner confirmed that the NEXO Token sold to Plaintiff bore no transfer restriction or legend whatsoever. Trenchev Tr. (Ex. 1) 206:4-207:1; 223:12-21; SMF 13, 141, 143. Valentine's deposition confirms each failure: Nexo imposed no lockup on the Token in the 2021 offering, Valentine Tr. (Ex. 5) at 209:8–10; placed no restrictions on the transfer of the Token, *id*. at 210:12–15; and never required any purchaser to state he was not buying to resell, *id.* at 208:14–209:1; SMF 139. There is no triable issue: Nexo did not exercise reasonable care under Rule 502(d).

Nexo likewise engaged market-makers to sell NEXO Tokens, but could not say whether its agreements limited "where those market-makers could resell the token." Trenchev Tr. (Ex. 1) 225:15–24; SMF 66. And it conceded it took no steps to prevent U.S. persons from buying the Token on secondary markets. Trenchev Tr. (Ex. 1) at 209:25–210:6; SMF 65.

Courts reject token issuers' Rule 506(c) defenses on this very ground. The *Telegram* court held that the issuer "failed to use reasonable care . . . and therefore may not avail itself of a Rule 506(c) exemption" because it "did not intend for Grams to come to rest with the 175 Initial Purchasers but to reach the public at large via post-launch resales." 448 F. Supp. 3d at 380–81; *Terraform*, 708 F. Supp.

3d at 475–76 (same, given Terraform's "repeated statements about developing a liquid secondary market"). So too here: Nexo listed the Token on public exchanges, celebrated the listings as answers to "the Nexo community's repeated requests," and advertised that anyone could "acquire NEXO Tokens through the Nexo Exchange inside our platform (recommended) or through a third-party exchange." SMF 49, 63–64. *Supra* § I.B. On this record, no reasonable factfinder could conclude that Nexo exercised the reasonable care Rule 502(d) requires. *Platforms Wireless*, 617 F.3d at 1091–92.

**4. Nexo cannot disaggregate its sales to Plaintiff from its public offering**

Even if Nexo could otherwise satisfy Rule 506(c) as to its 2021 OTC sales, and it cannot, the exemption would still fail because those sales were integrated with Nexo's contemporaneous public distribution of the same Token. The burden of proving non-integration, like the rest of the exemption, is Nexo's. *SEC v. Barry*, 146 F.4th 1242, 1262 (9th Cir. 2025) ("[n]on-integration is an element of Defendants' affirmative defense"; affirming summary judgment integrating offerings under the *Murphy* factors).

Since March 15, 2021, integration has been governed by amended Rule 152. *See* 17 C.F.R. § 230.502(a). Offers and sales "will not be integrated" only if "the issuer can establish that each offering either complies with the registration requirements of the Act, or that an exemption from registration is available for the particular offering." 17 C.F.R. § 230.152(a). Nexo therefore must establish an exemption for each of its concurrent 2021 offerings—its OTC sales and its retail-exchange, Changelly, and public-exchange distribution to U.S. purchasers—and no exemption is available for the latter. Integration also forecloses any attempt to confine the compliance inquiry to the OTC purchasers Nexo says it papered because the OTC sales and the concurrent public distribution were a single offering, the offering whose every purchaser Nexo must prove accredited and verified includes the exchange and Changelly purchasers it cannot even identify. The five-factor analysis of former Rule 502(a) points the same way and may be resolved on summary judgment. *See Murphy*, 626 F.2d at 645–46; *Kik*, 492 F. Supp. 3d at 181–82 (integrating concurrent token offerings at summary judgment).

The record permits only one conclusion: every channel sold the same fungible NEXO Token, funding the same lending business, and Nexo sold to Plaintiff through its OTC desk while the

Changelly integration remained live for U.S. customers and the Token traded on public exchanges to which Nexo referred unaccredited investors. Ex. 50; SMF 144–146; *supra* § I.B; *Sostack v. Ripple Labs, Inc.*, No. 24-7599, 2026 WL 206301, at *2 (9th Cir. Jan. 27, 2026) (mem.) (offerings of a token that "remained fungible and interchangeable" were not "separate offerings").

Nexo's own expert offers no opinion on integration—"I'm offering no legal opinions in the case"—nor on offering purpose, or use of proceeds. Valentine Tr. (Ex. 5) at 198:12–16, 16:13–16, 101:11–102:2; SMF 143. Because Nexo cannot establish that an exemption "is available for the particular offering" it simultaneously conducted to the public, 17 C.F.R. § 230.152(a), integration defeats Rule 506(c) as a matter of law. *Kik*, 492 F. Supp. 3d at 181–82.

This was not a compliant offering that fell short at the margins. Each failure independently defeats the exemption; together, they show Nexo disregarded every condition of the exemption it now invokes—as to the offering as a whole and as to Plaintiff himself. The "covered security" defense therefore fails as a matter of law.

## III. Nexo Is Liable Under Sections 25401 and 25501 for Its False Statement That the NEXO Token Was "Registered with the SEC as a Security" (Fourth Cause of Action)

Section 25401 prohibits the offer or sale of a security by means of any "communication that includes an untrue statement of a material fact . . ." Section 25501 provides that: "Any person who violates Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person . . ." "Sections 25401 and 25501 differ from common law negligent misrepresentation in that: (1) proof of reliance is not required, (2) although the fact misrepresented or omitted must be 'material,' no proof of causation is required, and (3) plaintiff need not plead defendant's negligence." *Bowden v. Robinson*, 67 Cal. App. 3d 705, 715 (1977).

### A. Nexo Falsely Represented to Cress that 'the NEXO Token is Registered with the SEC as a Security"

Here Nexo represented to Plaintiff that "the NEXO token is registered with the SEC as a security." Hristov Tr. Ex. 75 (Ex. 39); Hristov Tr. (Ex. 3) at 154:9–13; SMF 72. The misrepresentation was not a one-off mistake by Hristov. The same false sentence appears verbatim in Nexo's

standardized "OTC Desk – Template" (Ex. 40), which Hristov confirmed was a "script used to discuss this with Nexo clients or U.S. based clients." Hristov Tr. Ex. 76 (Ex. 40); *id.* at 157:9–10; SMF 74. Nexo admits it sent the same language to more than fifty customers in 2021 and 2022. SMF 75. *Supra* § I.E. The Token was never registered with the SEC as a security and the statement is thus literally false. Resp. to RFA Nos. 738–749 (Ex. 15); SMF 86–87, 90; *Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1143 (S.D. Cal. 2008) ("The Form D is not a 'registration statement,' but, instead, a form that exempts a company from registering its securities."). Nexo's own retained expert does not dispute the premise: Valentine acknowledged that the Form D Nexo filed is titled "Notice of Exempt Offering of Securities" and "is an exemption from filing an S-1 form, just factually speaking"—the S-1 being "the filing . . . with the SEC" by which "you are registering a security." Valentine Tr. (Ex. 5) at 88:18–89:2, 16:22–17:3; SMF 88. Falsity is thus established by the admitted registration record. SMF 86–90. *Supra* § I.E.

**B. The False Representation is Material**

A false claim of SEC registration is material under any standard. A "reasonable investor would consider it important in reaching an investment decision," *People v. Butler*, 212 Cal. App. 4th 404, 421 (2012), because registration confers the investor protections at the heart of the securities laws' command of "full and fair disclosure." *See Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of **material information** thought necessary to allow them to make informed investment decisions . . . .") (emphasis added).

Materiality is also confirmed by the unrebutted expert opinion of Plaintiff's expert, Professor Joel Seligman — Dean Emeritus of Washington University School of Law and co-author of the eleven-volume Loss, Seligman, & Paredes treatise on Securities Regulation. Professor Seligman explains that SEC registration carries investor protections wholly absent from a Regulation D exemption—statutory SEC review, mandatory disclosure, Section 11 liability, and a due-diligence framework. Seligman Report ¶¶ 27–32; SMF 102. Many investors "take comfort in the fact that a security has been through the SEC registration process," *id.* ¶ 107, while Form D "is a simplified, often check the box, notice." *Id.* ¶ 130; SMF 103. Nexo's own customers told it the same thing: on February 8, 2021—six weeks

before Hristov's email to Plaintiff—a customer-survey response delivered to Nexo's head of marketing stated that "the Nexo Token is SEC compliant is a huge plus in recommending Nexo to friends and family." Kostadinov Tr. (Ex. 6) 300:9–16, 299:3–8; Ex. 99; SMF 104. Nexo's expert declines to opine on materiality and offers no rebuttal to Professor Seligman. Valentine Tr. (Ex. 5) at 103:9–104:4, 20:23–22:25, 19:23–20:3; SMF 105–106.

Consistent with these principles, courts treat a false statement that an investment is "registered" or "approved" by a regulator as a material misrepresentation. *See SEC v. Grybniak*, No. 20-CV-327 (EK) (MMH), 2024 WL 4287222, at *21 (E.D.N.Y. Sept. 24, 2024) (rejecting argument that statements that tokens were "SEC registered" and the offering was "100% SEC compliant" were not material); *SEC v. Global Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 112 (D. Conn. 2004) (granting summary judgment to SEC and holding false representation of regulatory approval was material because "a reasonable investor would consider these representations as important factors in determining whether to invest"); *SEC v. Blockvest, LLC*, No. 18CV2287-GPB(BLM), 2019 WL 625163, at *10 (S.D. Cal. Feb. 14, 2019) (prima facie § 17(a) showing where promoter was "falsely claiming their ICO has been 'registered' and 'approved' by the SEC"); *SEC v. Research Automation Corp.*, 585 F.2d 31, 34–36 (2d Cir. 1978) (affirming summary judgment and holding false representation regarding patent rights was material).

This Court has already held that Nexo's representation "that the NEXO Token was registered with the SEC" is "sufficient to allege materiality." ECF No. 26 at 33. Because a false assurance of SEC registration misrepresents the most basic category of investor-protective information the securities laws exist to compel, it is "so obviously important to an investor[] that reasonable minds cannot differ on the question of materiality," and materiality is established as a matter of law. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 157 (2010) (materiality of unlawfulness "requires no stretch" to resolve); *accord SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094–96 (9th Cir. 2010) (affirming summary judgment where misrepresentation was material as a matter of law).

Moreover, while reliance is not an element of a Section 25501 claim, Cress did in fact attach importance to Nexo's representation that the Token was "registered with the SEC as a security." *Supra* § I.D; Cress Tr. (Ex. 8) 277:5–16 ("That was very, very significant."); Cress Decl. ¶¶ 8–9, 12 & Ex. D; SMF 94, 99.

**C. Nexo Cannot Carry Its Burden of Proving Any Section 25501 Defenses**

Section 25501 makes a violator of Section 25401 liable to the purchaser "unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if the defendant had exercised reasonable care, would not have known) of the untruth or omission." Cal. Corp. Code § 25501. Reasonable care and the plaintiff's knowledge are affirmative defenses on which Nexo bears the burden of proof. *See Bowden*, 67 Cal. App. 3d at 715; *Moss*, 197 Cal. App. 4th at 873. Nexo cannot carry that burden on either one.

Nexo cannot prove reasonable care. The absence of any factual basis for Hristov's representation precludes any "reasonable care" defense. Hristov testified he had no understanding that the Token had been registered and did not know the difference between "claiming an exemption from registration and registering a security." Hristov Tr. (Ex. 3) at 38:1–9; 155:1–11; SMF 91. Indeed, the very Terms and Conditions of Token Sale that Nexo drafted, but never provided to Plaintiff, expressly state "the offer and sale of this security instrument has not been registered under the U.S. Securities Act of 1933." Ex. 44; SMF 39, 41. The SEC informed Nexo in 2020 that its "SEC-compliant" marketing was inaccurate, and Nexo agreed to "discontinue the use of that language." Trenchev Tr. (Ex. 1) at 204:24-205:6; Ex. 36; SMF 34, 36–37. Nexo nevertheless continued to disseminate the same false "registered with the SEC" representation through standardized scripts to U.S. investors, including Plaintiff, throughout 2021. Hristov Tr. Ex. 76 (Ex. 40); SMF 74, 76. Nexo's own retained expert forecloses the defense from yet another direction: he confirmed that in 2021 Nexo itself "did not know whether the token was a security or not," Valentine Tr. (Ex. 5) at 108:9–11, and that its internal correspondence showed "they thought it could be a security, meaning they didn't know." *Id.* at 24:19–21, 48:11–16; SMF 93. A seller that did not know whether its token was a security could not, in the exercise of reasonable care, flatly assure a purchaser in writing that the token "is registered with the

SEC as a security." Nexo thus cannot carry its burden of proving that it exercised reasonable care and neither knew nor, in the exercise of reasonable care, could have known of the untruth.

Nexo also cannot show that Plaintiff "knew the facts concerning the untruth," Cal. Corp. Code § 25501, as his contemporaneous messages show the opposite. SMF 98–99, 101. *Supra* § I.D.

## IV. The Same Misrepresentation Establishes Nexo's Liability for Common Law Fraud

The elements of fraud are "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004); ECF No. 98 at 21 (applying this formulation to this claim). The first element is admitted, and its falsity and materiality are established as a matter of law by both the registration record and Nexo's non-rebuttal of Professor Seligman. SMF 73, 86–90, 105–106. *Supra* §§ I.E, III.A–B. The remaining elements are equally beyond genuine dispute.

**Scienter.** California does not require proof that the speaker knew the statement was false. Actual fraud includes "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true," Cal. Civ. Code § 1572(2), and "false representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (quoting *Yellow Creek Logging Corp. v. Dare*, 216 Cal. App. 2d 50, 55 (1963)); *accord* ECF No. 98 at 23 (quoting *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 415 (1992)). Nothing warranted Nexo's assertion, and Nexo's own documents prove it. Its own Token-sale Terms state that "the offer and sale of this security instrument has not been registered." Ex. 44; SMF 39; *supra* § I.A.3. The SEC told Nexo in 2020 that its "SEC-compliant" marketing was inaccurate, and Nexo agreed to "discontinue the use of that language." Trenchev Tr. (Ex. 1) at 204:24-205:6; SMF 34, 37. Customers told Nexo the same thing: a January 2021 Trustpilot review sent to its marketing director, and an April 2021 customer email forwarding the SEC's own response that "Nexo is not registered with the SEC." Exs. 41–42; SMF 44–45; *supra* § I.A.3. And the employee who made the assertion admitted he had no idea whether it was true. Hristov Tr. (Ex. 3) at

38:1–9; SMF 91. Nexo's corporate designee, asked what basis its relationship managers had to believe the scripted statement was true, answered: "I don't know what basis they would have." Dinca 30(b)(6) Tr. (Ex. 4) 49:13–19; SMF 92. And even as its scripts told U.S. customers the Token was "registered," Nexo told U.S. exchanges the opposite—and its designee could not explain the contradiction: "I do not know." Trenchev Tr. (Ex. 1) 298:14–18; SMF 40; *supra* § I.A.3. An unqualified written assertion of registration, made by a seller that admittedly did not know whether the Token was registered—against its own contrary Terms and a standing SEC directive—is actual fraud under section 1572(2). No credibility finding is needed; the conclusion follows from Nexo's documents and its witnesses' own words.

**Intent to induce reliance.** The statement was a sales tool. It appears verbatim in Nexo's standardized "OTC Desk – Template" script, Hristov Tr. (Ex. 3) at 157:9–10; SMF 74, and Hristov deployed it in the email soliciting Token purchases from Plaintiff and other Americans. Hristov Tr. Ex. 75 (Ex. 39); SMF 72. A scripted assurance delivered to close a sale permits only one inference about its purpose. *See Engalla*, 15 Cal. 4th at 976–77 (intent to induce reliance may be inferred from statements made to encourage participation); *see also Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996); *Vasquez v. Superior Court*, 4 Cal. 3d 800, 811–12, 814 (1971) (standardized pitch "recited by rote" creates an inference or presumption of reliance where "material misrepresentations were made").

**Justifiable Reliance.** California law presumes what Nexo's script was written to accomplish: "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Engalla*, 15 Cal. 4th at 976–77. At summary judgment, the party asserting fraud "need only make a showing that the misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance from such misrepresentations . . . absent evidence conclusively rebutting reliance." *Id.* at 977. Materiality is established as a matter of law, *supra* § III.B, so the presumption arises, and it is Nexo's burden to come forward with evidence rebutting reliance. Nexo has nothing of the kind: no disclaimer was given to Plaintiff, no contrary account of the transaction exists, and there is no admission of non-reliance. Cress Decl. ¶¶ 15–16; SMF 101. Rather, the direct evidence runs the other way, and reliance need not be "the sole or even

the predominant" factor in Plaintiff's decision; it is enough that the representation "played a substantial part." *Engalla*, 15 Cal. 4th at 976–77. Plaintiff testified the representation was "very, very significant," Cress Tr. (Ex. 8) 277:5–16; SMF 94; before buying, he asked a friend whether "security token mean[s] registered with the SEC or something else," Cress Decl. ¶ 11 & Ex. C; SMF 98; and shortly after his final purchase he wrote that NEXO "is an SEC approved security token, which is important." Cress Decl. ¶ 12 & Ex. D; SMF 99. Contemporaneous messages written with no litigation in view leave no room for genuine dispute. Plaintiff's declaration confirms what his contemporaneous messages show: the representation played a substantial part in his decision, and he would not have purchased the Tokens—or transacted with Nexo at all—had he known the truth. Cress Decl. ¶¶ 13–14; SMF 100.

**Resulting damage.** Liability requires resulting damage, not its computation. It is undisputed that Plaintiff was damaged by his NEXO Token purchases: the Token collapsed from more than $3.70 in early May 2021 to $1.16 on June 22, 2021, *supra* § I.C; Cress Decl. ¶¶ 22–24; SMF 107, and even Nexo's own expert does not dispute that Plaintiff suffered losses on the NEXO Tokens themselves. Solomon Report (Ex. 14) ¶ 17; Mizrach Report (Ex. 12) at 24-31; SMF 109. The parties dispute only the measure and extent of recoverable damages—including whether Plaintiff may recover the further losses from the liquidations that the Token's collapse set in motion. That dispute is for trial. Plaintiff asks the Court to establish liability on the Fifth Cause of Action and reserve the measure of compensatory damages and the punitive-damages determination for trial.

## V. Nexo's Remaining Pleaded Defenses Do Not Preclude Judgment

Nexo's Answer to the SAC pleads thirty-seven affirmative defenses. ECF No. 100. Those directed at the Third, Fourth, and Fifth Causes of Action are addressed above: that the Token is not a security (Fifth Defense), *supra* §§ II.A–B; that Nexo was not the seller and that sales occurred on third-party exchanges (Seventh)—refuted by Nexo's admission that it sold Plaintiff the Token out of its own inventory, *supra* §§ I.E, II.C; that the sales were exempt or federally preempted (Sixth, Fourteenth), *supra* § II.D; that the misrepresentation was immaterial in the "total mix" of information (Eighth), *supra* § III.B; and that Plaintiff cannot establish justifiable reliance (Thirty-Sixth), *supra* § IV. The economic loss doctrine (Thirty-Fifth) does not reach this fraud claim: the misrepresentation

preceded and induced the purchases themselves, and tort damages are permitted "where the contract was fraudulently induced." *Robinson Helicopter*, 34 Cal. 4th at 989–90. Nor can the boilerplate integration, non-reliance, disclaimer, and limitation provisions Nexo invokes from its terms and conditions (Twenty-Third through Thirty-Second) manufacture a triable issue: a party "cannot absolve himself or herself from the effects of his or her fraud by any stipulation in the contract," *Manderville v. PCG&S Grp., Inc.*, 146 Cal. App. 4th 1486, 1500–01 (2007); Cal. Civ. Code § 1668, and any "condition, stipulation or provision purporting to bind any person acquiring any security to waive compliance" with the Corporate Securities Law "is void." Cal. Corp. Code § 25701. None of the rest creates a triable issue, and Nexo bears the burden of proof on each. *Celotex*, 477 U.S. at 325.

The limitations defense (Twenty-First) fails on the face of the record: this action was filed on February 27, 2023, ECF No. 1—within section 25507(a)'s period for the Third Cause of Action and section 25506(b)'s period for the Fourth *a fortiori*—and the Fifth arises from the same conduct and relates back to the original Complaint. Fed. R. Civ. P. 15(c)(1)(B); *see* Cal. Civ. Proc. Code § 338(d). Nexo, which bears the burden on its own defense, has produced no evidence supporting any earlier accrual or discovery date. *Celotex*, 477 U.S. at 325. The boilerplate equitable defenses fail for want of any supporting evidence, which is Nexo's to produce. *Id.*

## VI. In the Alternative, the Court Should Specify Established Facts Under Rule 56(g) and Should Not Permit Nexo to Manufacture Disputes from the Record It Destroyed

If the Court concludes that any discrete element or defense presents a triable issue, Plaintiff requests that the Court enter an order under Rule 56(g) specifying the material facts that are not genuinely in dispute and treating them as established in this case. Fed. R. Civ. P. 56(g).

In deciding what is genuinely disputed, the Court should also account for Nexo's destruction of evidence, which is the subject of Plaintiff's motion for sanctions. ECF Nos. 135, 149. As set forth there, beginning December 4, 2022 Nexo implemented 30-day auto-deletion rules that purged Trenchev's and Kantchev's emails from every mailbox in the organization, and placed all Slack direct messages on a four-day deletion cycle. ECF No. 135 at 6–7. When Cress filed his Complaint, including the securities claims, Nexo escalated. It placed its Slack channels on a 60-day purge two days after the

Complaint was filed, extended the email rules to the founders' personal accounts ten days after, and in November 2023 began deleting the emails of Kalin Metodiev, the managing partner who directly oversaw the OTC Desk that sold Plaintiff his NEXO Tokens and the VIP program through which Hristov solicited him. ECF No. 135 at 7–8; ECF No. 112 at 2–3. Nexo never issued a litigation hold, and the loss is permanent. Nexo has produced zero Slack direct messages predating August 2024 and zero messages from 98.9% of its Slack channels, including "nexo-token," "usa," and "sales-compliance"—channels where its executives discussed U.S. sales of the Token. ECF No. 149 at 5–7. All of Trenchev's internal communications concerning the SEC's 2020 investigation of Nexo's "SEC-compliant" marketing are likewise gone. *Id.* at 7–8.

Those destroyed communications are among the very records that would document Nexo's Token sales, verification, and compliance practices. The Hahn and Mitchell Declarations illustrate what the destruction conceals: two U.S. Token purchasers that Nexo's sworn interrogatory responses never identified, and whom Plaintiff found only through his own investigation. Exs. 91, 102; SMF 132; *supra* § II.D.1. If Plaintiff's limited means surfaced two undisclosed purchasers, the records Nexo destroyed can only be presumed to conceal significantly more. Having destroyed the records, Nexo cannot oppose this motion by speculating about what they might have shown, or by faulting the evidentiary record for gaps of Nexo's own making—as with its expert's assertion that accreditation records "cannot be located due to the substantial passage of time." *Supra* § II.D.1. A spoliator "can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). If the sanctions motion is granted, the requested findings and presumptions—including that Nexo knew the Token was not registered with the SEC and that it sold the Token to unaccredited U.S. investors in 2020 and 2021—would apply on summary judgment and independently resolve any residual dispute in Plaintiff's favor. ECF No. 135 at 24.

## VII. CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment establishing Nexo's liability on the Third Cause of Action (Cal. Corp. Code §§ 25110, 25503), the Fourth Cause of Action (Cal. Corp. Code §§ 25401, 25501), and the Fifth Cause of Action (common law fraud).

Dated: August 7, 2026

Respectfully submitted,
TAYLOR-COPELAND LAW
*/s/ James Taylor-Copeland*
James Taylor-Copeland
Counsel for Plaintiff John Cress