James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

*Counsel for Plaintiff John Cress*

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN CRESS,<br>Plaintiff,<br>v.<br>NEXO CAPITAL INC.,<br>Defendant. | Case No. 3:23-CV-00882-TSH<br><br>**PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT ON HIS THIRD, FOURTH, AND FIFTH CAUSES OF ACTION**<br><br>Hearing Date: October 22, 2026<br>Hearing Time: 10:00 a.m.<br><br>Courtroom: San Francisco Courthouse<br>Courtroom E – 15th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

Pursuant to Section C(1) of the Court's Case Management Order (ECF No. 51) and Federal Rule of Civil Procedure 56, Plaintiff John Cress ("Plaintiff" or "Cress") respectfully submits this Separate Statement of Undisputed Material Facts in support of his Motion for Partial Summary

Judgment on his Third, Fourth, and Fifth Causes of Action. Pursuant to Section C of the Case Management Order, the parties met and conferred prior to this filing and did not agree to file a joint statement of facts. Each material fact on which Plaintiff relies is set forth below in a separately numbered paragraph, and each refers to the specific admissible portion(s) of the record where the fact finds support.

The supporting evidence is cited as follows. This Separate Statement uses the following labels: "MSJ Ex. __" refers to the exhibits to the Declaration of Max Ambrose in support of the Motion (the "Ambrose MSJ Decl."); "Cress Decl. Ex. __" refers to the exhibits to the Declaration of John Cress in support of the Motion ("Cress Decl."); and "Hahn Decl." and "Mitchell Decl." refer to the concurrently filed declarations of Eric Han and Brian Mitchell. Deposition transcripts and expert reports, each attached as an exhibit to the Ambrose MSJ Declaration, are cited as follows: "Trenchev Tr." refers to the certified transcript of the deposition of Nexo Co-Founder and Managing Partner Antoni Trenchev, Volumes I and II (together, MSJ Ex. 1); "Kantchev Tr." refers to the certified transcript of the deposition of Nexo co-founder Kantchev (MSJ Ex. 2); "Hristov Tr." refers to the certified transcript of the deposition of Nexo relationship manager Hristiyan Hristov (MSJ Ex. 3); "Dinca 30(b)(6) Tr." refers to the certified transcript of the deposition of Octavian Dinca, Nexo's designee under Federal Rule of Civil Procedure 30(b)(6) (MSJ Ex. 4); "Valentine Tr." refers to the certified transcript of the deposition of Nexo's retained expert Dr. Randall Valentine (MSJ Ex. 5), and "Valentine Report" and "Valentine Supp. App. C" to his expert report and appendices (MSJ Ex. 9) and his Supplemental Appendix C (MSJ Ex. 10); "Kostadinov Tr." refers to the certified transcript of the deposition of Nexo marketing director Kostadinov (MSJ Ex. 6); "Greaves Tr." refers to the certified transcript of the deposition of Greaves, the Nexo director who verified Nexo's interrogatory responses (MSJ Ex. 7); "Cress Tr." refers to the certified transcript of the deposition of Plaintiff (MSJ Ex. 8); "Seligman Report" refers to the Rebuttal Expert Report of Professor Joel Seligman (MSJ Ex. 11); "Mizrach

Report" refers to the Expert Report of Bruce Mizrach (MSJ Ex. 12); "Kogan Report" refers to the Expert Report of Shimon Kogan (MSJ Ex. 13); "Solomon Report" refers to the Expert Report of Saul Solomon (MSJ Ex. 14); "Resp. to RFA No." refers to Nexo's responses to Plaintiff's Requests for Admission (MSJ Ex. 15); and "Resp. to Rog. No." refers to Nexo's verified responses to Plaintiff's Interrogatories (MSJ Ex. 16). Pursuant to Federal Rule of Civil Procedure 36(b), each matter admitted in Nexo's responses to Plaintiff's Requests for Admission is conclusively established.

## I. THE PARTIES AND RELEVANT INDIVIDUALS

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 1. Plaintiff John Cress was, at all times relevant to this action, including in March and April 2021, a resident of San Francisco, California. | Cress Decl. ¶¶ 2, 21 & Cress Decl. Ex. F (NEXO-0003125). |
| 2. Defendant Nexo Capital Inc. ("Nexo") created and issued the NEXO Token. | MSJ Ex. 20 (Whitepaper); Trenchev Tr. (MSJ Ex. 1). |
| 3. Antoni Trenchev is a Co-Founder, Director, and Managing Partner of Nexo. He personally signed each Form D that Nexo filed with the U.S. Securities and Exchange Commission ("SEC") concerning the NEXO Token. | MSJ Ex. 21 (Form D filings); Trenchev Tr. (MSJ Ex. 1). |
| 4. At all relevant times, Hristiyan Hristov was a Nexo account manager—the dedicated relationship manager Nexo assigned to Plaintiff under its "VIP Relationship Program"—who communicated with Nexo's customers, including Plaintiff, on Nexo's behalf. | Hristov Tr. (MSJ Ex. 3); Resp. to RFA No. 657 (MSJ Ex. 15); MSJ Ex. 39 (Hristov Ex. 75); *See* Cress Decl. |

## II. NEXO'S CREATION AND DISTRIBUTION OF THE NEXO TOKEN

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 5. Nexo created and issued the NEXO Token in early 2018 as an ERC-20 token on the Ethereum blockchain. | MSJ Ex. 20 (Whitepaper). |
| 6. Nexo publicly claimed to have raised $52.5 million in its 2018 initial coin offering ("ICO") of the NEXO Token, which it described as "an 11x oversubscribed Token Sale." | MSJ Ex. 20 (Whitepaper); Kantchev Tr. (MSJ Ex. 2) 75:1–17; Trenchev Vol. II Tr. (MSJ Ex. 1) 190:13–191:12. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
| --- | --- |
| 7. The true figure was closer to $30 million. | Kantchev Tr. (MSJ Ex. 2) 75:1–17; Trenchev Vol. II Tr. (MSJ Ex. 1) 190:13–191:12. |
| 8. The proceeds of Nexo's NEXO Token sales funded the cryptocurrency lending business that Nexo's management built and operated. | MSJ Ex. 20 at 2; MSJ Ex. 76. |
| 9. Nexo made three Form D filings with the SEC concerning the NEXO Token, each personally signed by Trenchev: the first, filed February 20, 2018, identified February 14, 2018 as the "date of first sale" and represented a one-year term; the final amendment, filed May 5, 2018, reported the offering fully sold to 129 investors. | MSJ Ex. 21. |
| 10. The 2018 ICO purchasers included a roster of institutional crypto-investment funds and venture vehicles. | MSJ Ex. 22. |
| 11. Nexo has never filed any Form D concerning the NEXO Token other than its three 2018 filings. | Trenchev Vol. II Tr. (MSJ Ex. 1) 251:22–23 ("We have not filed a Reg D form other than the one that we saw today already."); Resp. to RFA Nos. 756–763 (MSJ Ex. 15). |
| 12. Nexo did not file a Form D in connection with its 2021–2022 offering of the NEXO Token to U.S. customers, including Plaintiff. | Valentine Report (MSJ Ex. 9) at 16 ("Nexo did not file a separate Form D in connection with its 2021–2022 offering of the NEXO Token to certain U.S. customers, including Plaintiff."); Resp. to RFA Nos. 756–763 (MSJ Ex. 15). |
| 13. Nexo has never imposed any transfer restriction, resale lockup, or restrictive legend on any NEXO Token. | Trenchev Tr. (MSJ Ex. 1) 206:4–207:1 ("I don't know how we could have placed restrictions on what an owner of an asset can do with his or her asset."); Resp. to Rog. No. 10 (MSJ Ex. 16) (identifying no transfer restrictions). |

## III. NEXO MARKETED THE NEXO TOKEN AS A DIVIDEND-PAYING, "SEC-COMPLIANT" SECURITY

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 14. Nexo publicly marketed the NEXO Token as a "US SEC-compliant Dividend-paying Asset-backed Security Token with Utility features." | Trenchev Vol. II Tr. (MSJ Ex. 1) 285:14–24; MSJ Ex. 23 (Trenchev Ex. 116). |
| 15. The NEXO Whitepaper described the NEXO Token, in a section titled "Why Investors Prefer NEXO Tokens," as "the World's First US SEC-compliant Asset-backed Token . . . backed by the assets of Nexo's loan portfolio." | MSJ Ex. 20 at 2. |
| 16. The Whitepaper told investors that NEXO Tokens would deliver "Regular Passive Income: Nexo Tokens are a safe haven as they provide passive income in the form of 30% from the company's profits, distributed monthly to NEXO Token Holders." | MSJ Ex. 20 at 2. |
| 17. Nexo's internal documents from 2018 through 2021 repeatedly described the NEXO Token as a "security token," including that "the Nexo token is one of the strongest security tokens already circulating." | MSJ Ex. 24 (NEXO-0021678) ("the Nexo token is one of the strongest security tokens already circulating"); MSJ Ex. 25 (NEXO-0034505) ("Problems with NEXO's security classification"); MSJ Ex. 26 ("the Dividends program was what classified us as a security in the US"); MSJ Ex. 29 ("strict regulation actually makes security tokens, like NEXO, a safe investment"). |
| 18. Nexo published—and later deleted, without producing in discovery—an article touting that "strict regulation actually makes security tokens, like NEXO, a safe investment." | MSJ Ex. 29 (draft); MSJ Ex. 30; MSJ Ex. 31 ("deleted this Medium story."). |
| 19. On December 15, 2018, Nexo paid the "First NEXO Dividend"—a pro rata payout of 30% of company profits to NEXO Token holders—and publicly stated that "with an annualized yield of 4.8%, the First NEXO Dividend beats all dividend bearing stocks in Warren Buffet's portfolio . . . ." | MSJ Ex. 33 at NEXO-0022087. |
| 20. Nexo paid additional dividends thereafter. Nexo announced its third dividend in August 2020, stating that it had "honored its fiduciary duty to | MSJ Ex. 34. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| the community, distributing 30% of its profits to Nexo Holders." | |
| 21. Each dividend Nexo paid was distributed pro rata to all eligible NEXO Token holders. | MSJ Ex. 33; MSJ Ex. 28 (June 16, 2021 blog post). |
| 22. Internally, Trenchev directed Nexo employees to emphasize the dividends: "dividends are key in the context of our token, a huge plus so they should be emphasized. In general, when you talk about the difference between security and utility, it is profit sharing—with dividends being the quintessential example." | MSJ Ex. 32 (Trenchev Ex. 125 (NEXO-0262183 with translation)). |
| 23. Internally, Trenchev advised Nexo employees against claiming that the NEXO Token was "SEC-compliant" in a live presentation format: "SEC-compliant in a live format, especially when they can counter you, is dangerous. I would tone it down." | MSJ Ex. 32 (Trenchev Ex. 125 (NEXO-0262183 with translation)). |
| 24. Nexo engaged in buybacks to support the NEXO Token's price, which Nexo described as "still heavily undervalued." | MSJ Ex. 27 (December 8, 2020 blog post). |
| 25. Trenchev publicly promoted the NEXO Token's price potential: "double digits," and "sky is the limit . . . I do believe we are going much much higher." | MSJ Ex. 75 (transcript of Nexo's "Monthly AMA February 2021 – #AskAntoni"). |
| 26. On June 2, 2021, Nexo published a blog post stating that "the Dividends program was what classified us as a security in the US," that "with the existing Dividends program, the NEXO Token is/could be classified in the US as a security," and that the "ultimate goal" of replacing the dividend with daily interest was "to remove the 'security' aspect of the to[ken]." | MSJ Ex. 26 (June 2, 2021 blog post). |
| 27. On June 16, 2021, Nexo distributed "the fourth and final Nexo Dividend worth $20,428,359.89 . . . to all eligible NEXO Token holders," announcing that "Nexo will continue to share its financial success with token holders through the Daily Interest program"—a "more regular, predictable and flexible" yield paid in NEXO Tokens. | MSJ Ex. 28 (June 16, 2021 blog post). |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 28. Nexo continued to advertise the dividend through the time of Plaintiff's purchases, and on June 16, 2021 Nexo paid Plaintiff a dividend of 5,191.74 NEXO Tokens, worth $9,439.89, on the NEXO Tokens Plaintiff held. | MSJ Ex. 35 (CRESS-00000270 at Row 122); MSJ Ex. 58 (NEXO-0174727) (March 31, 2021 capture of Nexo's website: "you can now buy NEXO Dividend Tokens on leading exchanges, on our OTC desk (for large orders) . . ."); MSJ Ex. 19 (June 11, 2021 blog post) ("The entire final dividend will be distributed as a Loyalty Dividend and will be paid out individually for each NEXO Token based on how long it has been in your Nexo account from one ex-dividend date to the next"); MSJ Ex. 28 (June 16, 2021 blog post) ("In just three years, the company has shared a total of close to $30 million in dividends with token holders over four distributions. Following the final dividend, Nexo will continue to share its financial success with token holders through the Daily Interest program."). |
| 29. NEXO Token holders voted on retention of the NEXO dividend. | Valentine Tr. (MSJ Ex. 5) 107:7–9. |
| 30. Until 2021, the NEXO Token provided its holders a dividend based on Nexo's profits. | Valentine Tr. (MSJ Ex. 5) 105:2–25 ("Nexo did have a dividend program" that provided "a dividend based on profits of the company."). |
| 31. The "passive income" Nexo promised NEXO Token holders was to be generated by Nexo's management's operation of Nexo's lending business, not by any efforts of the Token holders themselves. | MSJ Ex. 20 (Whitepaper) at 477 (p.2); MSJ Ex. 76 (Nexo Facebook page stating "We are confident Nexo's profitability will continue its upward trajectory and NEXO Token holders will experience growing passive income returns."). |
| 32. Nexo's executives held NEXO Tokens through the team's allocation and had a financial interest in the NEXO Token's price. | Kogan Report ¶¶ 22–24 (MSJ Ex. 13). |
| 33. Plaintiff's NEXO Tokens served as collateral for his Nexo credit line. | Cress Decl. ¶¶ 18, 22 & Cress Decl. Ex. B (NEXO-0003441). |

## IV. NEXO'S KNOWLEDGE AND STATEMENTS CONCERNING THE NEXO TOKEN'S REGISTRATION STATUS

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 34. In 2020, the SEC contacted Nexo about Nexo's claims that the NEXO Token was "SEC-compliant." | MSJ Ex. 36 (CRESS-00014362 at 00014362-63). |
| 35. The SEC told Nexo that it was focused on several issues: Nexo's Reg D filing, Nexo's token, Nexo's dividend, and a specific investor complaint. | MSJ Ex. 36 (CRESS-00014362 at 14382). |
| 36. Trenchev wrote to the SEC that the "SEC brought to Nexo's attention the fact that earlier versions of materials might have included the language 'SEC-compliant,'" and that "[w]e have since unified all the language across the various platforms and communications channels to ensure that no inaccurate depictions of the facts are present." | MSJ Ex. 36 (CRESS-00014362 at 00014362-63). |
| 37. Nexo understood that the SEC wanted Nexo to discontinue the use of the "SEC-compliant" language. | Trenchev Tr. (MSJ Ex. 1) 204:24–205:6 (the SEC "wanted us to discontinue the use of that language."). |
| 38. Nexo used the "SEC-compliant" language in marketing materials in February and March 2021. | MSJ Ex. 37 (February 2021); MSJ Ex. 38 (March 2021). |
| 39. Nexo drafted "Terms and Conditions of Token Sale" stating that "the offer and sale of this security instrument has not been registered under the U.S. Securities Act . . . ." | MSJ Ex. 44 (Token Sale Terms, NEXO-0216131). |
| 40. In 2020, Nexo sent the U.S. exchange Kraken its Token-sale Terms stating: "THE OFFERING OF THE NEXO TOKEN HAS NOT BEEN REGISTERED, QUALIFIED, OR APPROVED." | MSJ Exs. 45–46 (Trenchev Exs. 117–118); Trenchev Tr. (MSJ Ex. 1) 298:14–18 ("I do not know," when asked why Nexo sent Kraken Terms differing from what its scripts told U.S. customers). |
| 41. Nexo never provided its Terms and Conditions of Token Sale to Plaintiff. | Cress Decl. ¶ 16 & Cress Decl. Ex. B (NEXO-0003441 at -3454). |
| 42. In late 2020, Nexo internally discussed converting NEXO into a utility token to remove the Tokens' security classification. | MSJ Ex. 25 ("Problems with NEXO's security classification Prevents us from easily selling the token to US citizens. Creates potential problems with the SEC." Hristov replied: "lets do it!") |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 43. Nexo account managers Hristov and Dinca, executives Kantchev and Trenchev, and Trading Operations Manager Tonkov maintained a July 2020 summary of the law surrounding Regulation D that identified the distinction between registration with the SEC and an exemption from registration. | MSJ Ex. 47. |
| 44. In January 2021, Nexo's marketing director Kostadinov was sent a Trustpilot review stating: "While NEXO Claims they are SEC and FCA compliant, and by searching the SEC and the FCA websites, we found out that NEXO is NOT registered by either agency." | MSJ Ex. 41. |
| 45. In April 2021, a Nexo customer wrote to the SEC regarding the NEXO Token. The SEC responded that "Nexo is not registered with the SEC." The customer forwarded the SEC's response to Nexo's customer service and legal team under the subject line "Nexo falsely stated on its website it is SEC complaint." | MSJ Ex. 42. |
| 46. Nexo continued to represent to investors that the NEXO Token was "registered with the SEC" through 2022. | Resp. to RFA Nos. 678–679 (MSJ Ex. 15); MSJ Ex. 43 at NEXO-0110129. |
| 47. Nexo told Grayscale Bitcoin Trust, and the exchange LMAX Global, that its financial statements were confidential because they were "material, non-public information with implications for the price of the Nexo token. The token itself is registered with the SEC as a security." | MSJ Ex. 73; MSJ Ex. 74. |
| 48. In July 2021, Nexo told the Arkansas Securities Department that it had "been advised by [its] legal counselors that NEXO Token (the 'Token') is not a security, but a token with utilitarian value and should be qualified as a utility token, therefore, exempted from registration." | MSJ Ex. 48. |

## V. NEXO DISTRIBUTED THE NEXO TOKEN TO U.S. INVESTORS THROUGH MULTIPLE CHANNELS

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 49. Nexo publicly advertised that "[y]ou can acquire NEXO Tokens through the Nexo Exchange inside our platform (recommended) or through a third-party exchange." | MSJ Ex. 49 at NEXO-0163801. |
| 50. Nexo's internal records state that Nexo offered the NEXO Token to retail customers, including customers in California and throughout the United States, until February 2, 2021—when it "stopped for retail, [but] OTC continued"—and again from January 27, 2022 until March 2022. | MSJ Ex. 50; Trenchev Tr. (MSJ Ex. 1) 211:4-21 (Nexo's corporate representative could not rule out that there was "a period of time during which the Nexo Token was available to U.S. purchasers on the retail exchange."). |
| 51. Nexo acknowledged internally that the sale and purchase of NEXO Tokens had been available through the Nexo interface and that at least 5,027 US citizens traded the NEXO Token for over $9 million. "There are accredited as well as unaccredited clients." | MSJ Ex. 51. |
| 52. U.S. customers bought and sold the NEXO Token on Nexo's own exchange. | MSJ Ex. 43 at -110124 ("I acquired all my nexo on your platform via interest payments or exchanges."), at -110125 ("There was a period when it was possible for US citizens to purchase Nexo tokens . . . using our Nexo Exchange"); MSJ Exs. 52–55 (identifying U.S. residents); MSJ Ex. 91, Hahn Decl. ¶¶ 1-4; MSJ Ex. 102 Mitchell Decl. ¶ 2. |
| 53. Unaccredited U.S. investors traded the NEXO Token through Nexo's own platform. | MSJ Ex. 51 ("There are accredited as well as unaccredited clients."); Trenchev Tr. (MSJ Ex. 1) 212:16–217:8. |
| 54. Nexo acknowledged in mid-2020 that roughly 30 percent of all NEXO Tokens were held by U.S. residents. | MSJ Ex. 77. |
| 55. At least 70,698 unique wallets hold the NEXO Token. | Ambrose MSJ Decl. ¶ 20 & MSJ Ex. 18 (CRESS-00019317). |
| 56. Nexo paid dividends to both unaccredited and accredited holders of the NEXO Token, including U.S. citizens. | MSJ Ex. 19 ("Dividend Details," June 11, 2021 blog post) ("All token holders including US citizens will receive their dividend payouts in NEXO Tokens."). |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 57. Throughout 2020 and 2021, customers, including U.S. customers, could buy NEXO Tokens through a "Changelly integration" built directly into Nexo's own website. | MSJ Ex. 58; MSJ Ex. 37; MSJ Ex. 56; MSJ Ex. 57. |
| 58. On March 31, 2021, Nexo's website advertised: "you can now buy NEXO Dividend Tokens on leading exchanges, on our OTC desk (for large orders) or . . . by clicking the 'Buy' button below and following Changelly's automated process below which is integrated with your Nexo Account . . . you will receive your tokens automatically in your Nexo Account." | MSJ Ex. 58. |
| 59. Nexo directed American customers to purchase NEXO Tokens using the Changelly integration through its support desk, its official Telegram channel, and Plaintiff's relationship manager, Hristov. | MSJ Ex. 60 ("You can purchase NEXO tokens using the 'Buy NEXO Tokens' button on the dashboard of your account. This is a shortcut to Changelly's services."); MSJ Ex. 59; MSJ Ex. 61; MSJ Exs. 62–64 (Telegram). |
| 60. On February 1, 2021, a Nexo customer whom Nexo identifies as a Virginia resident purchased NEXO Tokens through the Changelly integration on Nexo's website. | MSJ Ex. 56 ("My purchase of NEXO tokens via nexo.io website and Changelly is pending after more than an hour."); MSJ Ex. 37; MSJ Ex. 57 (identifying the customer as a Virginia resident). |
| 61. In June 2022, Nexo stated that the Changelly "integration is no longer available anymore for US clients since we are currently not allowed to facilitate Nexo token purchases for US clients due to ongoing regulatory changes, that we are currently actively addressing with the SEC." | MSJ Ex. 65. |
| 62. Nexo directed U.S. investors, including investors it knew were not accredited, to purchase NEXO Tokens through other venues, including Huobi, HitBTC, Uniswap, and the Changelly integration. | MSJ Ex. 66 ("American citizens have two options to get [NEXO tokens] – either register an account with Huobi and purchase it themselves or through our OTC desk."); MSJ Ex. 67 ("there are several options for US Citizens to purchase Nexo tokens for eg. – Changelly – Huobi (VPN only) – HitBTC (VPN only) – Uniswap"); MSJ Ex. 68 ("the buy of Nexo tokens without an accredited investor status for US citizens can be purchased through. Defi Platforms like Uniswap or on CEXes like Huobi"). |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 63. Since at least March 2019, the NEXO Token has traded on third-party exchanges. | Resp. to Rog. No. 12 (MSJ Ex. 16). |
| 64. Nexo distributed the NEXO Token on the HitBTC exchange from May 2018 to November 2020 and on the Huobi exchange from January 2020 to October 2023. | Resp. to Rog. No. 12 (MSJ Ex. 16); Valentine Report (MSJ Ex. 9) ¶ 13 (pp. 794–824). |
| 65. Nexo took no steps to prevent U.S. persons from buying NEXO Tokens on secondary markets. | Trenchev Vol. II Tr. (MSJ Ex. 1) 209:25–210:6 ("I don't believe we could reasonably be expected to regulate activity on other venues and third party providers."). |
| 66. Nexo engaged market makers to sell NEXO Tokens, but could not identify any limitation in its agreements on where those market makers could resell the Token. | Trenchev Tr. (MSJ Ex. 1) 225:15–24 (Nexo could not say whether its agreements limited "where those market-makers could resell the token"). |
| 67. Nexo did not begin verifying accredited-investor status for purchases through its OTC desk until at least February 2021. | MSJ Ex. 78 ("[t]he last time we discussed your purchasing of NEXO Tokens the accredited investor status was not mandatory."). |
| 68. Even then, Nexo had no written policies or procedures for verifying accredited-investor status. | Valentine Tr. (MSJ Ex. 5) 150:24–151:11, 180:23–25 (no written verification policies or procedures: "Not that I can recall at this time."). |
| 69. In February 2021, Nexo co-founder Kantchev directed that an OTC NEXO Token sale proceed while it was paused awaiting accreditation documents. Nexo's compliance officer warned in the same thread that skipping verification "exposes us to unnecessary risk with the SEC." | Kantchev Tr. (MSJ Ex. 2) 65:3–66:20; MSJ Ex. 80 (Kantchev Ex. 224 (NEXO-0248439)) ("There's no point in pausing them. This is [redacted]."); Kantchev Tr. (MSJ Ex. 2) 67:13–22, 73:9–13 (accreditation documentation "was not a requirement at the time"; verification was an "optionality"); 72:19–73:1. |

## VI. NEXO'S WRITTEN REPRESENTATION TO PLAINTIFF THAT THE NEXO TOKEN WAS "REGISTERED WITH THE SEC," AND PLAINTIFF'S PURCHASES IN CALIFORNIA

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 70. On March 22, 2021, Plaintiff approached Hristov about purchasing Bitcoin using a loan | MSJ Ex. 39. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| from Nexo secured by Plaintiff's digital assets, and initially sought to move forward with a purchase of between 50 and 100 Bitcoin at a 20–40% loan-to-value ratio. | |
| 71. Hristov responded with "three scenarios of purchasing Bitcoin through Nexo's Credit line," each requiring Plaintiff to purchase 25 Bitcoin worth of NEXO Tokens for "the Platinum membership." | MSJ Ex. 39. |
| 72. On March 23, 2021, Hristov represented to Plaintiff in writing: "the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals for American citizen who are also certified, accredited investors." | MSJ Ex. 39 (Hristov Ex. 75); Hristov Tr. (MSJ Ex. 3) 154:9–13; Resp. to RFA Nos. 66, 657 (MSJ Ex. 15). |
| 73. Nexo admits that its representative sent Plaintiff the statement that "the NEXO token is registered with the SEC as a security." | Resp. to RFA Nos. 66, 657 (MSJ Ex. 15). |
| 74. The identical sentence appears verbatim in Nexo's standardized "OTC Desk – Template," a script used with Nexo's U.S.-based clients. | MSJ Ex. 40 (Hristov Ex. 76); Hristov Tr. (MSJ Ex. 3) 157:9–10 (the template was a script "used to discuss this with Nexo clients or U.S. based clients"); 154:7–156:5. |
| 75. Nexo admits that the identical sentence appears in more than fifty emails Nexo sent to customers. | Resp. to RFA Nos. 659–660, 677–678 (MSJ Ex. 15). |
| 76. Nexo's relationship managers sent the identical sentence to Plaintiff and to hundreds of other U.S. customers from March 2021 through at least 2022. | Resp. to RFA Nos. 660–664 (MSJ Ex. 15); Hristov Tr. (MSJ Ex. 3) 154:7–156:5; MSJ Ex. 39; MSJ Ex. 40. |
| 77. Nexo drafted and sent Plaintiff the Cryptocurrency Purchase Agreement ("CPA"), which Plaintiff executed on or about March 24, 2021 at his home in San Francisco, California. | Resp. to RFA Nos. 690, 692 (MSJ Ex. 15); Cress Decl. ¶ 17 & Cress Decl. Ex. E (CRESS-00000060). |
| 78. On March 26, 2021, Plaintiff took out a $5.4 million loan from Nexo, collateralized by his digital assets, and at Hristov's direction sent $5,400,000 in USDT to "Nexo's OTC desk wallet" "for the purchase of 75 BTC and the rest in NEXO Tokens." | Cress Decl. ¶ 18 & Cress Decl. Ex. B (NEXO-0003441). |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 79. On March 27, 2021, Hristov reported that Nexo's OTC team had made the purchases. | Cress Decl. ¶ 18 & Cress Decl. Ex. B; MSJ Ex. 70 (Hristov Ex. 78); Resp. to RFA No. 691 (MSJ Ex. 15). |
| 80. Plaintiff made additional NEXO Token purchases from Nexo on or about March 30, 2021 (sending $4.3 million) and April 14, 2021 (sending $2.15 million), each time sending funds from his home in San Francisco to a Nexo-controlled wallet at Hristov's direction. | Cress Decl. ¶ 19 & Cress Decl. Ex. B. |
| 81. Plaintiff paid more than $3,131,686 for NEXO Tokens through Nexo's OTC Desk, all of it funded with loans collateralized by the Bitcoin and Ethereum Plaintiff had deposited with Nexo. | Cress Decl. ¶ 20; Mizrach Report (MSJ Ex. 12) at 27–28. |
| 82. Nexo admits that it sold the NEXO token to Plaintiff. | Resp. to RFA No. 73 (MSJ Ex. 15). |
| 83. Nexo admits that it owned the NEXO Tokens that it sold to Plaintiff in its own inventory. | Resp. to RFA Nos. 649, 689, 691 (MSJ Ex. 15). |
| 84. Nexo made each of its NEXO Token sales to Plaintiff from Nexo's own inventory, marking up the price it charged Plaintiff by between 134.4% and 184.1% above Nexo's "average price" and making more than $1.7 million in profit on its sales to Plaintiff. | MSJ Exs. 69–72 (internal OTC pricing records). |
| 85. Hristov's March 23, 2021 email proposing the Token-purchase "scenarios," the CPA that Nexo drafted and sent, and Nexo's OTC payment instructions were each directed to and received by Plaintiff in California, where Plaintiff executed the CPA and submitted each purchase order. | Cress Decl. ¶¶ 17–19, 21 & Cress Decl. Ex. F (NEXO-0003125) (telling Hristov on March 18, 2021 that he could be reached in San Francisco); Cress Decl. Ex. E. |

## VII. THE NEXO TOKEN WAS NEVER REGISTERED WITH THE SEC OR QUALIFIED IN CALIFORNIA

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 86. The only filings Nexo has ever made with the SEC concerning the NEXO Token are its three 2018 Form D filings. | Resp. to RFA Nos. 738–749, 753, 756–763, 765–766, 768 (MSJ Ex. 15). |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 87. No registration statement concerning the NEXO Token has ever been filed with, or been declared effective by, the SEC. | Resp. to RFA Nos. 738–749, 753 (MSJ Ex. 15). |
| 88. A Form D is titled "Notice of Exempt Offering of Securities"; nowhere does a Form D indicate that it is a mechanism for registering a security with the SEC, and filing a Form D is not the filing by which a security is registered with the SEC. | MSJ Ex. 21; Seligman Report (MSJ Ex. 11) ¶ 5; Valentine Tr. (MSJ Ex. 5) 88:18–20 (a Form D "is an exemption from filing an S-1 form, just factually speaking"); 16:22–17:3, 88:25–89:2 (the S-1 is "the filing . . . with the SEC" by which "you are registering a security"). |
| 89. Nexo never filed an application to qualify the offer or sale of the NEXO Token with the California Department of Financial Protection and Innovation or its predecessor agency, and no qualification of the NEXO Token has ever been in effect in California. | Resp. to RFA Nos. 765–766, 768 (MSJ Ex. 15). |
| 90. No registration or qualification of the NEXO Token has ever been filed with, or been in effect before, the SEC, the DFPI, or any other state securities regulator. | Resp. to RFA Nos. 738–749, 753, 756–763, 765–766, 768 (MSJ Ex. 15). |

## VIII. NEXO'S KNOWLEDGE REGARDING THE TRUTH OF THE REPRESENTATION

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 91. Hristov had no understanding that the NEXO Token had been registered with the SEC. | Hristov Tr. (MSJ Ex. 3) 38:1–9; 155:1–11 (no knowledge of the difference between "claiming an exemption from registration and registering a security"). |
| 92. Nexo could not identify any basis its relationship managers had to believe that the scripted statement that the "the NEXO token is registered with the SEC as a security" was true. | Dinca 30(b)(6) Tr. (MSJ Ex. 4) 49:13–19 ("I don't know what basis they would have."). |
| 93. Nexo claims that in 2021 it did not know whether the NEXO Token was a security. | Valentine Tr. (MSJ Ex. 5) 108:9–11 (in 2021 Nexo "did not know whether the token was a security or not"); 24:19–21, 48:11–16 (Nexo's internal correspondence showed "they thought it could be a security, meaning they didn't know"). |

## IX. SEC REGISTRATION WAS IMPORTANT TO PLAINTIFF

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 94. Nexo's representation that the NEXO Token was registered with the SEC as a security was significant to Plaintiff. | Cress Tr. (MSJ Ex. 8) 277:5–16 ("That was very, very significant."); 278:4–13 ("I think it means a lot. I think it means that you are – that Nexo is a regulated financial product, and that Nexo is a legitimate company in compliance with the U.S. securities laws."); Cress Decl. ¶¶ 8–9. |
| 95. Plaintiff is not a lawyer, a broker, or a securities professional. | Cress Decl. ¶ 3. |
| 96. Plaintiff has never worked in the securities industry. | Cress Decl. ¶ 3. |
| 97. Plaintiff had never heard of a Form D before the events giving rise to this case. | Cress Decl. ¶ 3. |
| 98. Before finalizing his purchase, Plaintiff texted a friend for "moral support" and asked, "Does security token mean registered with the SEC or something else?"; his friend replied, "Yes." | Cress Decl. ¶ 11 & Cress Decl. Ex. C (CRESS-00012511 at -12518 to -12519). |
| 99. On April 15, 2021, shortly after making his final NEXO Token purchase, Plaintiff messaged another friend: "My second largest holding is NEXO, which is an SEC approved security token, which is important." | Cress Decl. ¶ 12 & Cress Decl. Ex. D (CRESS-00001680 at -1683). |
| 100. Nexo's representation that the NEXO Token was registered with the SEC played a substantial part in Plaintiff's decision to purchase the NEXO Tokens. Plaintiff would not have purchased the Tokens, or transacted with Nexo at all, had he known the Token was not registered with the SEC. | Cress Decl. ¶¶ 13–14. |
| 101. Nexo never provided Plaintiff any disclaimer or correction of the representation that the NEXO Token was registered with the SEC; at the time of his purchases, Plaintiff did not know that the NEXO Token was not registered with the SEC, and did not review or look up any Nexo filing with the SEC in 2021. | Cress Decl. ¶¶ 15–16. |
| 102. SEC registration carries investor protections that are absent from a Regulation D exempt offering, | Seligman Report (MSJ Ex. 11) ¶¶ 27–32. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| including statutory SEC review, mandatory disclosure, Section 11 liability, and a due-diligence framework. | |
| 103. Many investors "take comfort in the fact that a security has been through the SEC registration process," while a Form D "is a simplified, often check the box, notice." | Seligman Report (MSJ Ex. 11) ¶¶ 107, 130. |
| 104. On February 8, 2021, a customer-survey response delivered to Nexo's head of marketing stated that "the Nexo Token is SEC compliant is a huge plus in recommending Nexo to friends and family." | Kostadinov Tr. (MSJ Ex. 6) 299:3–8, 300:9–16; MSJ Ex. 99 (Kostadinov Ex. 27). |
| 105. Nexo's retained expert offers no opinion on materiality. | Valentine Tr. (MSJ Ex. 5) 19:23–20:3, 20:23–22:25, 103:9–104:4. |
| 106. Nexo's retained expert offers no rebuttal to Professor Seligman's analysis of the difference between SEC registration and a Regulation D exemption. | Valentine Tr. (MSJ Ex. 5) 19:23–20:3, 20:23–22:25, 103:9–104:4. |

## X. THE NEXO TOKEN'S COLLAPSE AND PLAINTIFF'S LOSSES

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 107. The NEXO Token's price collapsed within weeks of Plaintiff's purchases—from more than $3.70 in early May 2021 to $1.16 on June 22, 2021. | Cress Decl. ¶ 22; Mizrach Report (MSJ Ex. 12) at 27–28. |
| 108. When Plaintiff ultimately sold his remaining NEXO Tokens, the proceeds of that sale were $1,730,665.59—far less than the amounts he had paid for the Tokens. | Cress Decl. ¶ 24 & Cress Decl. Ex. G (CRESS-00000659); Mizrach Report (MSJ Ex. 12) at 27–28. |
| 109. Plaintiff suffered losses on his NEXO Tokens; Nexo's retained damages expert does not dispute that Plaintiff suffered losses on the NEXO Tokens themselves. | Cress Decl. ¶¶ 22–24 & Cress Decl. Ex. G (CRESS-00000659); Mizrach Report (MSJ Ex. 12) at 24–31; Solomon Report (MSJ Ex. 14) ¶ 17 (acknowledging at least $1,689,783 in losses). |

## XI. NEXO'S ACCREDITATION, VERIFICATION, AND RESALE-SAFEGUARD RECORD

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 110. Nexo's retained expert, Dr. Randall Valentine, has never worked at the SEC, at FINRA, or for any state securities regulator; has never been employed as a compliance officer "of any type"; is not a lawyer; and identified as his experience with Rule 506(c) accredited-investor verification programs "probably four, maybe five" expert reports prepared for litigation, none of which proceeded to testimony. | Valentine Tr. (MSJ Ex. 5) 49:5–20 (SEC, state regulators, FINRA, compliance roles); 16:7–9; 49:22–50:14. |
| 111. Valentine's contact with Nexo in forming his opinions consisted of a single Zoom call, lasting "[a] little bit over an hour," with one Nexo employee—Octavian Dinca—with Nexo's counsel present; Valentine took no notes and did not record the call, never interviewed Hristov, did not ask Dinca about the statement that the NEXO Token was "registered with the SEC as a security," and did not independently verify what Dinca told him. | Valentine Tr. (MSJ Ex. 5) 9:14–10:22; 10:23–11:9; 42:16–18; 12:17–20, 13:6–10; 11:18–12:2; 130:3–7 ("they told me that there was a policy in place and the policy was always followed"). |
| 112. Dinca, Nexo's Rule 30(b)(6) designee, testified—when asked whether he had "any knowledge about the process behind ensuring US customers purchasing Nexo Tokens were verified accredited investors"—"I can't cover this"; Dinca did not know why Nexo verified accredited-investor status, whether the requirement was specific to U.S. purchasers, whether it was always a requirement for NEXO Token sales, when Nexo implemented it, whether it existed in 2020, or who was responsible for ensuring that U.S. purchasers of the NEXO Token were accredited investors. | Dinca 30(b)(6) Tr. (MSJ Ex. 4) 108:22–109:3; 99:9–108:21. |
| 113. Nexo's expert Valentine asserts that in the 2021–2022 NEXO Token offering, Nexo provided documentation in support of accredited-investor status for 7 of the 8 U.S. purchasers preceding Plaintiff and 44 of the 46 U.S. purchasers after Plaintiff. | Valentine Report (MSJ Ex. 9) ¶ 13 (pp. 708–724) ("Nexo has provided documentation in support of accredited investor status for 7 of the 8 purchasers preceding Plaintiff and 44 of the 46 purchasers after Plaintiff."). |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 114. Valentine's report states that Nexo has a "95.6% rate of documentation supporting accredited investor status.". | Valentine Report (MSJ Ex. 9) at 14; Valentine Tr. (MSJ Ex. 5) 70:15–25, 72:8–23, 75:5–16. |
| 115. Valentine identified no minimum documentation rate below which Nexo's verification would be unreasonable, and acknowledged that a significantly lower documentation rate could influence his opinions. | Valentine Report (MSJ Ex. 9) at 14; Valentine Tr. (MSJ Ex. 5) 70:15–25, 72:8–23, 75:5–16. |
| 116. Some of Nexo's records concerning purchaser accreditation cannot be located. | Valentine Report (MSJ Ex. 9) at 14–15 ("some records cannot be located due to the substantial passage of time"). |
| 117. Nexo's retained expert treats the period preceding Plaintiff's purchases as the only window of time relevant to Plaintiff. | Valentine Report (MSJ Ex. 9) at 15 ("the only window of time relevant to Plaintiff"); Valentine Tr. (MSJ Ex. 5) 112:3–113:8. |
| 118. No accreditation documentation exists for [redacted], one of the eight U.S. purchasers who preceded Plaintiff in the 2021 offering. [redacted]'s income, net worth, and any accreditation-qualifying occupation are unknown. | MSJ Ex. 9 (Valentine Report App. C); Valentine Tr. (MSJ Ex. 5) 130:6–7 ("the documents do not exist"); 169:22–170:1 ("[n]o documentation exists as we sit here today"); 128:15–18, 129:13–23. |
| 119. For two more of the U.S. purchasers preceding Plaintiff, there is no accredited-investor certificate, and the available financial information is insufficient to verify accreditation. | Valentine Tr. (MSJ Ex. 5) 170:13–18 ("There is no accredited investor certificate."); 176:17–177:1 (no net worth information or accredited investor certificates for two customers); 155:6–21 (documentation does not show salary or net worth), 162:12–20 (asset information Valentine conceded was insufficient to establish the income or net worth required to verify accreditation). |
| 120. For two other U.S. purchasers preceding Plaintiff, Nexo did not collect an accredited-investor certificate until after the transaction. | Valentine Tr. (MSJ Ex. 5) 140:8-141:10 (accredited investor certificate provided "two full weeks after the close date" of the NEXO purchase; 176:23–177:1 (Nexo "did not collect an accredited investor certificate until after the transaction," meaning it had no evidence of accreditation status at the time of sale); MSJ Ex. 9 (Valentine Report App. C). |
| 121. For another U.S. purchaser preceding Plaintiff, [redacted], the sole documentary support | Valentine Tr. (MSJ Ex. 5) 132:13–24, 134:20–23. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| is an accredited-investor certificate that expired on September 21, 2020—more than three months before his January 5, 2021 purchase. | |
| 122. Valentine counted [redacted] toward Nexo's "95.6 percent success rate." | Valentine Tr. (MSJ Ex. 5) 134:24–135:2 ([redacted] "counted . . . toward Nexo's 95.6 percent success rate"). |
| 123. At times, Nexo told customers seeking accredited-investor verification that it would not accept crypto assets in an account to be used for purposes of verifying accreditation. | MSJ Ex. 100 (NEXO-0055884 at -55890) ("[t]he crypto assets in your account cannot be used for this purpose [to verify accredited investor status] by our Compliance team."); MSJ Ex. 101 (NEXO-0048730) ("We are sorry, but we cannot accept your crypto deposit as net worth proof."). |
| 124. Valentine did not identify any purchaser's Nexo account balance. | Valentine Tr. (MSJ Ex. 5) 140:8–141:10, 146:7–15 ("As we sit here today, I did not identify the Nexo account balances."); 149:19–150:7. |
| 125. Valentine served a "Supplemental Appendix C" the night before his deposition, adding twenty-four U.S. purchasers to his list, including eleven additional U.S. purchasers who preceded Plaintiff. Valentine does not know whether the added purchasers bought in Nexo's 2018 offering or its 2021 offering. | Valentine Tr. (MSJ Ex. 5) 117:7–11, 184:11–14, 213:3–8; 124:4–17; 186:2–9 ("I don't know whether they bought the token from Nexo in the specific 2018 offering. That is still under investigation"); MSJ Ex. 10 (Supp. App. C). |
| 126. For at least eight of the eleven added U.S. purchasers who preceded Plaintiff, the supporting documentation is insufficient to verify accreditation. It consists of a January 2022 email chain for [redacted]'s March 2020 purchase; a July 2021 email chain for [redacted]'s August 2020 purchase; an email chain in which the investor, [redacted], declines to provide an accredited-investor certificate for his March 2020 purchase; and Source of Funds declarations that do not verify income or net worth. | Valentine Tr. (MSJ Ex. 5) 213:15–214:19 (the January 2022 email chain "obviously does not have any per[tinent] information as far as accredited investor forms"); MSJ Ex. 81; MSJ Ex. 82; MSJ Ex. 83; MSJ Exs. 84–87. |
| 127. Documentation for other purchasers added in Supplemental Appendix C also post-dates the purchases it purportedly supports: [redacted]'s documents post-date his November 2020 purchases by four months, and [redacted]'s | MSJ Exs. 9, 10, 103, 104. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| documents post-date its August 2019 purchase by nearly two years. | |
| 128. Another U.S. purchaser who preceded Plaintiff, [redacted], appears in Valentine's data as an October 2021 purchaser; Nexo's records show that he bought on October 21, 2020, provided no accredited-investor certificate, and submitted an investment statement showing a $253,000 account value and a Source of Funds declaration stating a $50,000 income. | MSJ Exs. 88–90. |
| 129. Nexo lacked documentation sufficient to verify accreditation at the time of sale for at least 13 of the 19 U.S. OTC purchasers preceding Plaintiff. | MSJ Ex. 10 (Valentine Supp. App. C); Valentine Tr. (MSJ Ex. 5) 128:15–18, 129:13–23, 130:6–7, 132:13–24, 134:20–23, 169:22–170:1, 170:13–18, 176:17–22, 176:23–177:1, 213:15–214:19; Seligman Report (MSJ Ex. 11) ¶¶ 34, 38; Ambrose MSJ Decl. ¶ 76. |
| 130. Nexo's retained expert cannot say with certainty that his list of U.S. purchasers of the NEXO Token is complete. | Valentine Tr. (MSJ Ex. 5) 116:21–24 ("We are still in the process of going through documentation. I can't say with 100 percent certainty that this is the list and there could not be further amendments."). |
| 131. Nexo sold NEXO Tokens to U.S. purchasers in 2019 and 2020, including through its OTC desk. Valentine first learned of Nexo's 2019 and 2020 U.S. sales from Professor Seligman's rebuttal report, and his Appendix C is limited to the customers Nexo itself identified. | Trenchev Vol. II Tr. (MSJ Ex. 1) 240:10–12 (Nexo "[p]robably, yes" sold NEXO Tokens to Americans in 2020), 245:1–7 ("certain that we sold to U.S. clients via the OTC desk for sure"), 251:12–15; Valentine Tr. (MSJ Ex. 5) 184:15–19, 188:2–189:6, 195:16–21; Seligman Report (MSJ Ex. 11) ¶¶ 33, 36, 56. |
| 132. Nexo's own records identify additional U.S. purchasers of the NEXO Token who appear on neither version of Valentine's purchaser list—including nine who bought between November 2020 and April 2021: [redacted] (30,000 NEXO Tokens, December 15, 2020); [redacted] ($40,000, November 11 and 18, 2020); [redacted] (32,256.05 NEXO Tokens, December 4, 2020); [redacted] (20,000 NEXO Tokens, November 12, 2020); [redacted] (105,000 NEXO Tokens, December 16, 2020); [redacted] ($100,000, December 17, | MSJ Exs. 57, 54, 92–98 (records of the nine purchasers); MSJ Exs. 57, 96, 98 (sales during this litigation); Ambrose MSJ Decl. ¶ 76. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 2020); [redacted] ($168,210, December 21, 2020); [redacted] ($100,000, April 2, 2021); and [redacted] ($60,000, April 2, 2021). Nexo also sold NEXO Tokens to U.S. investors during this litigation. Nexo has offered no evidence that any of these purchasers was accredited. | |
| 133. The Nexo director who verified Nexo's interrogatory answers could not explain why a $1.5 million June 2021 U.S. NEXO Token purchaser was missing from every earlier version of Nexo's purchaser list, and could not speak to the completeness of the current list. | Greaves Tr. (MSJ Ex. 7) 104:6–105:5; 106:14–107:1 ("can't speculate to the completeness"). |
| 134. Valentine cannot say whether Nexo sold the NEXO Token to U.S. customers on Nexo's own exchange before February 2021, and has not completed an investigation of whether Nexo sold NEXO Tokens to unaccredited investors. | Valentine Tr. (MSJ Ex. 5) 125:5–126:15 ("I cannot say with 100 percent certainty . . . because I'm not completed with my investigation yet."); 120:13–122:17. |
| 135. Valentine did not consider purchases made through the Changelly integration or on third-party exchanges. | Valentine Tr. (MSJ Ex. 5) 127:5–8, 204:25–205:6. |
| 136. Valentine does not opine that there were no transactions with U.S. customers on third party exchanges. | Valentine Tr. (MSJ Ex. 5) 31:17–24 ("It's anonymous. We don't know."); 203:2–6 ("There is no way that I can go back and independently test this."); 202:14–203:1 (Valentine has "never ha[s] stated that there were no transactions to U.S. customers"). |
| 137. Nexo did not make any inquiry into whether purchasers were acquiring the NEXO Token for themselves or for other persons, no written disclosure to purchasers that the Token was unregistered and could not be resold without registration or an exemption, and no restrictive legend or transfer restriction of any kind. | Resp. to Rog. No. 10 (MSJ Ex. 16); Seligman Report (MSJ Ex. 11) ¶¶ 147–160; Trenchev Tr. (MSJ Ex. 1) 206:4–207:1. |
| 138. Nexo told Plaintiff and dozens of other OTC purchasers that the NEXO Token was "registered with the SEC as a security"; Nexo did not disclose to them in writing that the Token was unregistered. | Resp. to RFA Nos. 66, 657, 659–660, 677–678 (MSJ Ex. 15); MSJ Ex. 40 (Hristov Ex. 76); Resp. to Rog. No. 10 (MSJ Ex. 16); Cress Decl. ¶ 16. |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 139. Nexo imposed no lockup on the NEXO Token in the 2021 offering, placed no restrictions on transfer of the Token, and did not require any purchaser to state that he was not buying the Token to resell it. | Valentine Tr. (MSJ Ex. 5) 208:14–209:1, 209:8–10, 210:12–15. |
| 140. Valentine's opinion that he has seen no evidence of sales to statutory underwriters is based on Nexo's accreditation paperwork. He did not examine any purchaser's post-sale transactions. | Valentine Tr. (MSJ Ex. 5) 206:13–23 (has "seen no evidence" of sales to statutory underwriters based on the accreditation paperwork); 208:2–8; Valentine Report (MSJ Ex. 9) ¶ 16. |
| 141. Nexo could have coded a lock-up period into the NEXO Token smart contract but did not do so. | Trenchev Tr. (MSJ Ex. 1) 206:4–207:1 (Nexo may have been able to "code lock-up periods into the token" but did not); 223:12–21 ("we do not have control" over "restrictions as to who can trade" on third-party venues). |
| 142. During the 2018–2021 period, token issuers conducting exempt offerings routinely provided investment-intent representations and resale acknowledgments as a matter of best practice, reflecting industry standards of Rule 502(d) compliance, including investment-intent inquiries and representations and restrictive legends or transfer restrictions, and that Nexo has not identified a single step it took to assure that U.S. purchasers of the NEXO Token were not statutory underwriters. | Seligman Report (MSJ Ex. 11) ¶¶ 147–160. |
| 143. Nexo has retained no expert to rebut Professor Seligman's opinions; Valentine prepared no rebuttal report and offers no opinion on integration, offering purpose, or use of proceeds. | Valentine Tr. (MSJ Ex. 5) 16:13–16, 19:23–20:3, 101:11–102:2, 198:12–16. |
| 144. Each channel through which Nexo distributed the NEXO Token sold the same fungible NEXO Token. | MSJ Ex. 50; MSJ Ex. 58; MSJ Ex. 66; Resp. to Rog. No. 12 (MSJ Ex. 16). |
| 145. The proceeds of all NEXO Token sales funded Nexo's lending business. | MSJ Ex. 20 (Whitepaper) at 2; MSJ Ex. 76. |
| 146. Nexo's OTC sales to Plaintiff occurred while the Changelly integration remained available on Nexo's website and while Nexo was selling the Token on third-party exchanges to which it referred U.S. retail customers. | MSJ Ex. 50; MSJ Ex. 56 (February 1, 2021 email: "My purchase of NEXO tokens via nexo.io website and Changelly is pending…"); MSJ Ex. 58 (March 31, 2021 website capture: "you can now buy |

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| | NEXO Dividend Tokens… by clicking the "Buy" button below and following Changelly's automated process below which is integrated with your Nexo Account."); MSJ Exs. 67 ("Regarding the purchase of Nexo tokens, there are several options for US Citizens to purchase Nexo tokens for eg. – Changelly – Huobi (VPN only) – HitBTC (VPN only) – Uniswap"); Resp. to Rog. No. 12 (MSJ Ex. 16). |
| 147. In January 2023, Nexo consented to entry of an SEC cease-and-desist order finding that Nexo offered and sold its interest-bearing Earn Interest Product as an unregistered security. | MSJ Ex. 17 (In re Nexo Capital Inc., Securities Act Release No. 11149 (Jan. 19, 2023)). |

Dated: August 7, 2026

Respectfully submitted,

TAYLOR-COPELAND LAW

/s/ James Taylor-Copeland
James Taylor-Copeland
*Counsel for Plaintiff John Cress*