# EXHIBIT 9

# Expert Report of Dr. Robert Valentine with Appendix C CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CRESS,<br>*Plaintiff*,<br>v.<br>NEXO CAPITAL INC.,<br>*Defendant*. | Case No. 3:23-CV-00882-TSH |

**EXPERT REPORT OF DR. RANDALL VALENTINE**
**Dated: April 20, 2026**

**DESIGNATED CONFIDENTIAL PURSUANT TO THE STIPULATED PROTECTIVE ORDER**

**PUBLIC DISSEMINATION OR FILING PROHIBITED**

Valentine Forensic Finance
Randall Valentine, B.S., M.S., Ph.D.
P.O. Box 6566
Gulfport, MS 39501
(228) 236-4133

## A. Executive Summary

1. I have been retained by Nexo Capital Inc. to provide opinions regarding (i) Nexo's policy and practice for verifying accredited investor status for United States ("U.S.") direct purchasers of the NEXO Token; (ii) whether Nexo's 2021-2022 direct NEXO Token sales to certain U.S. customers ("Direct U.S. Customer Sales"), including to Plaintiff John Cress ("Plaintiff"), was consistent with best compliance practices in the cryptocurrency industry and Nexo's policy and practice for verifying accredited investor status for U.S. direct purchasers, and also consistent with Rule 506(c) of Regulation D; (iii) whether Plaintiff's dedicated relationship manager, Hristiyan Hristov, made a misrepresentation to Plaintiff when Mr. Hristov requested that Mr. Cress provide an accredited investor certificate; and (iv) whether Nexo's 2018 initial coin offering ("ICO") was a separate offering from Nexo's 2021–2022 Direct U.S. Customer Sales.

2. The SEC has explained that whether an issuer has taken "reasonable steps to verify" accredited investor status is a principles-based, facts-and-circumstances determination that may consider (among other things) the nature of the purchaser and the accredited investor category claimed, the amount and type of information the issuer has about the purchaser, and the nature of the offering and the manner of solicitation. The SEC has also identified non-exclusive verification methods that may be reasonable depending on the circumstances, including review of income documentation, review of net worth documentation, and/or written confirmations from certain regulated professionals.[1]

3. Between 2018 and 2021, and continuing through the present day, there has been considerable regulatory uncertainty in the United States concerning whether a given cryptocurrency token might qualify as an "investment contract" security based on the unique facts and circumstances of a given transaction. Given this regulatory ambiguity and uncertainty, in my opinion, Nexo took reasonable precautionary measures by filing a Form D and confirming accredited investor status for U.S. direct purchasers in connection with the 2018 ICO. Filing a Form D and verifying accredited investor status is not an admission that the 2018 ICO was, in fact, a securities transaction, but it was a prophylactic and precautionary measure taken by Nexo in an uncertain U.S. regulatory climate. In my opinion, given the nature of the cryptocurrency industry and uncertain regulatory climate in the U.S., Nexo's cautious and compliance-oriented approach constituted best practices with respect to ICOs in 2018.

---

[1] 17 C.F.R. § 230.506(c); 17 C.F.R. § 230.501(a); *see also* https://www.sec.gov/resources-small-businesses/exempt-offerings/general-solicitation-rule-506c (General solicitations- Rule 506(c)); https://www.sec.gov/rules-regulations/no-action-interpretive-exemptive-letters/division-corporation-finance-no-action/latham-watkins-503c-031225 (Latham & Watkins No Action Letter, Dated March 12, 2025); https://www.sec.gov/resources-small-businesses/capital-raising-building-blocks/assessing-accredited-investors-under-regulation-d (Assessing Accredited Investors under Regulation D, Dated August 8, 2025).

4. As of 2021, the IRS's formal guidance treated cryptocurrency as virtual currency and, for federal tax purposes, as property. The IRS first established that rule in Notice 2014-21, then reaffirmed and expanded it in its 2019 guidance. In practical terms, this meant that by the time of the events at issue, the government's operative federal tax position was that cryptocurrency transactions were governed by the tax rules applicable to property transactions and clearly classified as virtual currency.[2] While the IRS was relatively clear about the status of cryptocurrency for purposes of federal tax law as of the time of the 2018 ICO, the same was not true with respect to SEC guidance and regulations with respect to the application of federal securities laws to cryptocurrency. Indeed, this issue was unsettled, regulatory guidance was minimal or non-existent, and there was a general view that the SEC was taking a "regulation through litigation"[3] approach during the Biden Administration that was hostile to the cryptocurrency industry generally, in that the SEC was pursuing cryptocurrency companies for alleged securities registration and other violations without providing fair, clear, and advance notice to those companies of the SEC's regulatory interpretations and positions applicable to cryptocurrency.[4] Because all businesses need regulatory clarity and certainty in order to operate in a given jurisdiction, this uncertain regulatory climate led various cryptocurrency companies, including Nexo, to exit the U.S. market during the Biden Administration. The Second Trump Administration has abandoned several SEC enforcement lawsuits initiated during the Biden Administration, has promulgated new SEC guidance,[5] and has proposed new legislation concerning cryptocurrency, in an effort to give greater regulatory certainty to market participants.

5. In my opinion, the specific steps used by Nexo prior to NEXO Token sales to U.S. purchasers—such as requesting and obtaining an accredited investor certification through VerifyInvestor.com, prompting investors to identify the accredited investor category claimed, collecting and reviewing category-appropriate supporting documentation (including income and/or asset documentation as applicable), and maintaining verification records reflected in Appendix C—are consistent with the type of

[2] https://www.irs.gov/pub/irs-drop/n-14-21.pdf (IRS, Notice 2014-21, Virtual currency guidance)

[3] https://www.sec.gov/newsroom/speeches-statements/peirce-statement-kraken-020923 (SEC, Commissioner Hester M. Peirce, Kraken down: Statement on *SEC v. Payward Ventures, Inc., et al. U.S. Securities and Exchange Commission*, Dated February 9, 2023)

[4] https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-blockress-2020-02-06 (SEC, Commissioner Hester M. Peirce, Running on empty: A proposal to fill the gap between regulation and decentralization, Dated February 6, 2020)

[5] https://www.sec.gov/newsroom/press-releases/2026-30-sec-clarifies-application-federal-securities-laws-crypto-assets (SEC Clarifies the Application of Federal Securities Laws to Crypto Assets, Press Release 2026-30, Dated March 17, 2026); https://www.sec.gov/files/33-11412-fact-sheet.pdf (Fact Sheet for Press Release 2026-30); https://www.sec.gov/files/rules/interp/2026/33-11412.pdf (Interpretive Release: SEC Issued Version, Effective March 23, 2026)

objective, documentary approach contemplated by Rule 506(c) of Regulation D and SEC guidance.

6. Accordingly, and based on the materials I reviewed, it is my opinion that Nexo established a reasonable policy and practice, and took "reasonable steps," to verify accredited investor status for U.S. purchasers of the NEXO Token, as contemplated by Rule 506(c).

7. With respect to Opinion No. 1, I reviewed Nexo's investor onboarding materials and verification records (summarized in Appendix C) relating to U.S. customers who purchased NEXO Tokens. Based on that review, it is my opinion that Nexo implemented a verification policy and process reasonably designed to establish that each purchaser was an accredited investor, and that the sequence of steps employed is consistent with commonly accepted compliance practices for Rule 506(c) offerings. Based on the materials I reviewed, Nexo had a policy to sell NEXO Tokens to U.S. persons only after receiving accredited investor documentation. This policy applied to the 2018 ICO and the 2021–2022 Direct U.S. Customer Sales. Plaintiff John Cress provided an accredited investor certificate and was, in fact, an accredited investor at the time of his NEXO Token purchases between March and July 2021.

8. Based on my review of the documents and discussions with Nexo, it is my understanding that Nexo takes the position that its 2021 direct sales of the NEXO Token to Plaintiff were **not** securities transactions.[6] This view is supported by the facts and circumstances related to Plaintiff's purchase of the NEXO Token, which he purchased to obtain the utility benefit of an approximately 50% interest rate reduction on the approximately $13 million in credit lines that he took out on the Nexo platform, in addition to obtaining other platform perks associated with Nexo's "platinum" loyalty program. This saved Cress approximately $780,000 annually in interest. While this report does not express an opinion on application of the *Howey* test and whether Nexo's 2021 direct sales of the NEXO Token to Plaintiff were, in fact, securities transactions, the temporal and substantive distinctions between ICO investor purchases in 2018 and Nexo customer purchases in 2021 are relevant to my Opinion No. 3 below regarding whether the Direct U.S. Customer Sales in 2021 were a distinct offering from Nexo's ICO sales in 2018. The distinction between offerings is also consistent with my understanding of crypto utility token utilization and maturation during the 2018 through 2021 time period, wherein a token initially used for fundraising purposes in an ICO evolves into a valuable utility token for platform participants once the platform is fully operational.

---

[6] https://www.reuters.com/legal/us-judge-says-sec-lawsuit-vs-ripple-labs-can-proceed-trial-some-claims-2023-07-13/ (Ripple Labs notches landmark win in SEC case over XRP cryptocurrency, Dated July 13, 2023) ("[Judge] Torres ruled that Ripple's XRP sales on public cryptocurrency exchanges were not offers of securities under the law, because purchasers did not have a reasonable expectation of profit tied to Ripple's efforts. Those sales were 'blind bid/ask transactions,' she said, in which buyers 'could not have known if their payments of money went to Ripple, or any other seller of XRP.'").

9. With respect to Opinion No. 2, it is my opinion that Nexo took reasonable steps to verify Plaintiff John Cress's accredited investor status by obtaining an accredited investor certificate from Mr. Cress before directly selling him NEXO Tokens between March and July 2021. It is also my opinion that Nexo satisfied the requirements of Rule 506(c) with respect to its 2021-2022 Direct U.S. Customer Sales, including with respect to those sales occurring before Plaintiff's purchases.

10. Regarding the 2021–2022 Direct U.S. Customer Sales, Nexo's stated practice was to sell to U.S. customers only after the customer provided accredited investor documentation. Given Nexo's prior filing of the Form D in connection with the 2018 ICO, it was reasonable and prudent for Nexo to verify accredited investor status as a precautionary measure in connection with the 2021-2022 Direct U.S. Customer Sales, notwithstanding the fact that Nexo believed that these customer purchases were different than ICO purchases and did not qualify as securities transactions. The production I reviewed reflects documentation supporting accredited investor status for almost all U.S. purchasers (including Plaintiff). In my opinion, based on Appendix C and the records described in the report, the relevant window for evaluating Nexo's reasonable steps as to Plaintiff's offering is the set of 2021 U.S. purchasers whose initial purchases occurred before Plaintiff's purchases between March and July 2021.

11. Further, it is my understanding (as discussed in this report) that SEC integration principles include a safe harbor where offerings separated by at least 30 days may avoid integration in certain circumstances.[7] The multi-year separation between the 2018 ICO and the 2021–2022 Direct U.S. Customer Sales is consistent with treating them as distinct offerings. In addition to the substantial temporal difference between the 2018 ICO offering and the 2021-2022 customer offering, the offerings also differed dramatically on substantive grounds, including purchasers' identities and expectations. In contrast to the 2018 ICO purchasers, the 2021-2022 customers purchased the NEXO Token to obtain substantial platform-related utility benefits. Additionally, on June 8, 2021, a NEXO Token feature changed from dividends to a daily interest program.

12. With respect to Opinion No. 3, based on my review of the correspondence between the parties, Mr. Hristov did not make a misrepresentation to Mr. Cress when he requested that Mr. Cress produce an accredited investor certificate before Nexo could sell him NEXO Tokens. Plaintiff argues that a statement in half of one sentence in an email is "fraudulent," but this argument ignores the entirety of the sentence, the context in which the statement was made, the content of the accredited investor certificate produced in response to this statement referring to Regulation D, and Mr. Cress's response showing that he understood Mr. Hristov's statement to refer to a Regulation D offering that was

[7] https://www.sec.gov/resources-small-businesses/capital-raising-building-blocks/integration (Integration - What is "integration" and why does it matter, Dated August 8, 2025); https://www.sec.gov/resources-small-businesses/small-business-compliance-guides/facilitating-capital-formation-expanding-investment-opportunities-improving-access-capital-private (Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets, Dated March 10, 2021); 17 C.F.R. § 230.152 (Integration).

registered with the SEC through Nexo's Form D. Mr. Hristov stated: "Additionally, please note that the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals for American citizens who are also certified, accredited investors. If you have a certificate, please send it over. In case you don't have an accredited investor certificate but you do satisfy the requirements, you can issue one here – verifyinvestor.com." CRESS-00000030. In response, Mr. Cress responded that he would "work on the accredited investor certificate now." *Id.* Mr. Cress emailed a copy of that accredited investor certificate to Mr. Hristov on March 25, 2021—before he purchased any NEXO Tokens from Nexo. NEXO-0017263-64. Plaintiff argues that the statement "the NEXO token is registered with the SEC as a security" is a misrepresentation. However, the accredited investor certificate produced by Mr. Cress shows that he understood that registration reference was in connection with "Rule 501 of Regulation D of the Securities Act of 1933." The certificate states that Mr. Cress "has been verified as an 'accredited investor' as defined in Rule 501 of Regulation D of the Securities Act of 1933." NEXO-0017265. A reasonable investor in this circumstance, particularly a sophisticated, accredited investor like Plaintiff, would understand that Mr. Hristov's reference to "registered with the SEC" was a reference to a Form D registration for an offering under SEC Regulation D. This understanding is corroborated by Mr. Trenchev's deposition testimony that "we have submitted the Reg D form, and that this is a form of registration with the SEC." April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 278:4-25; 304:17-21.

13. With respect to Opinion No. 4, based on my review of the timing, scope, and circumstances of the offerings, it is my opinion that Nexo's 2018 ICO was a separate and distinct offering from the later 2021–2022 Direct U.S. Customer Sales that included Plaintiff. The 2018 ICO occurred when the Nexo platform was not yet available and was associated with early-stage funding and operations. In contrast, the 2021–2022 Direct U.S. Customer Sales occurred after the platform was operating and were conducted through Nexo's OTC desk catering to large customers with the most assets on the Nexo platform, which was a segment of Nexo customers most likely to benefit from the utility benefits of holding the NEXO Token. The 2018 ICO funded early-stage operations and Nexo platform development and implementation. In contrast, the 2021–2022 Direct U.S. Customer Sales were to existing platform customers who would receive specific benefits through Nexo's loyalty program. Those customers sought to avail themselves of the Token's platform utility. Thus, offering 1 (the 2018 ICO) terminated or completed more than 30 days before offering 2 (the 2021-2022 Direct U.S. Customer Sales). Additionally, Nexo established substantive customer relationships with the 2021-2022 direct purchasers prior to offering 2.

14. Nexo filed a Form D in advance of the 2018 ICO. The five U.S. ICO sales occurred pursuant to those filings and Rule 506(c), and Nexo took reasonable steps to verify the accredited investor status of the five U.S. participants in the 2018 ICO. Filing a Form D in 2018 was a precautionary measure in light of the regulatory uncertainty surrounding cryptocurrencies at the time, and the mere filing of a Form D should not be viewed as an admission or factual finding that the NEXO Token ICO sales were, in fact, securities transactions.

15. Secondary trading on exchanges does not defeat the exemption for Nexo's direct sales. Exchange activity was conducted on foreign exchanges, not accessible to U.S. persons and/or involved sellers other than Nexo. Nexo did not sell the NEXO Token to U.S. customers through its retail exchange prior to Plaintiff's purchases of the NEXO Token.

16. I have seen no evidence that Nexo sold the NEXO Token to statutory underwriters during the relevant time period, or that any alleged statutory underwriter resold NEXO Tokens to unaccredited U.S. persons.

## B. Expert Witness Qualifications

I am qualified to express expert opinions in this matter as a result of my education, training, and experience. I hold a Ph.D. in Finance and have academic and professional experience of over 25 years, including published research, financial analysis, financial technology, investment strategy, artificial intelligence, and quantitative analysis. I have been retained as an expert witness in over 200 matters, with a significant number of these involving business valuations, credit damage, cryptocurrency, and financial damages.

I have substantial experience as a forensic financial expert in matters involving cryptocurrency and valuation, including testimony in both state and federal proceedings. My cryptocurrency-specific work has included financial damages analysis in *SBI Crypto v. Whinstone Inc.*, as well as cases involving insurance disputes, probate proceedings, and divorce matters in which cryptocurrency holdings, tracing, or valuation were central issues. I have provided both deposition and trial testimony in cases where digital assets were an important component of the dispute, and I have been retained by law firms across multiple jurisdictions to analyze cryptocurrency in the context of damages, valuation, and related financial issues. This work has given me practical, litigation-tested expertise in applying financial and economic principles to cryptocurrency-related disputes. My CV is shown at Appendix A to this report.

## C. Assumptions and Limiting Conditions

As part of my analysis in this matter, I reviewed Plaintiff's Second Amended Complaint and Nexo's Amended Answer. I also considered exhibits and materials referenced in or attached to the pleadings. I also considered certain documents referenced in Appendix B, Appendix C, and in Nexo's or Plaintiff's document productions.

As part of my analysis in this matter, I reviewed the deposition transcripts of Antoni Trenchev, Octavian Dinca, Edward Tonkov, and John Cress, in addition to the parties' interrogatory responses. I also spoke in person with Mr. Dinca.

This Initial Report is based upon facts and conditions existing as of the date of this report. I have not considered subsequent events. Unless specifically requested by the client and agreed upon by me, I have no obligation to update my report for such events and conditions. I, however, reserve the right to amend or revise my opinions as discovery continues in this case.

### D. Opinion No. 1—Nexo implemented a reasonable policy and practice of verifying accredited investor status for U.S. customers who purchased the NEXO Token, consistent with Rule 506(c) of Regulation D.

I have reviewed the steps taken by Nexo to verify the accredited investor status of U.S. customers in connection with offerings relying on Rule 506(c) of Regulation D. My review included the investor onboarding materials and verification records described in more detail in, and summarized by the chart attached as, Appendix C. Based on that review, it is my opinion that Nexo implemented a verification process and policy that was reasonably designed to establish that each purchaser was an accredited investor, and that the sequence of steps employed is consistent with commonly accepted compliance practices for Rule 506(c) offerings. Nexo maintained a reasonable policy and practice of selling NEXO Tokens to U.S. persons only after the customer provided documentation establishing accredited investor status, including during (i) the 2018 ICO sales[8] and (ii) the 2021–2022 Direct U.S. Customer Sales.[9]

With respect to Plaintiff, Nexo obtained and retained documentation reflecting that he was an accredited investor at the time of his purchases, including an accredited investor certificate that he supplied from VerifyInvestor.com, which requires documents submitted in support of his status verified by a California licensed attorney. *See* NEXO-0017263-65. Accordingly, there is no dispute that Plaintiff satisfied the accredited investor requirement and that Nexo's policy and verification process worked as intended as applied to Plaintiff. *See* NEXO-0231348; NEXO-0017265.

In evaluating whether an issuer has taken "reasonable steps to verify" that a purchaser is an accredited investor for purposes of Rule 506(c), the SEC has stated that the determination is principles-based and depends on the facts and circumstances of each

---

[8] The five US citizens who participated in the funding round of the NEXO token were all accredited investors. *See* Appendix C; NEXO-0215538 ("With regards to the US and as witnesses by the list of US participants that has already been shared with the SEC, Nexo has 5(five) US citizens who have chosen to participate in the funding round. All of them have shown to be accredited investors, have undergone the FAFT-style prescribed KYC/AML procedures, screenings against OFAC, PEP, and blacklists, and have submitted source of funds declarations."); *see also* NEXO-0219967 ("Being SEC compliant means that during the token sale, we accepted US investors only if they are 'accredited investors,' according to Regulation D of Section 506(c)."); NEXO-0017591 ("Continuing a prudent business conduct, the NEXO Token complies with the US SEC rules and regulations pursuant to the US Securities Act Regulation D Rule 506(c)."); NEXO-0168207 ("It was offered to investors in full and strict compliance with the Security and Exchange Commission's (SEC) Regulation D."); NEXO-0219967 ("Being SEC complaint means that during the token sale, we accepted US investors only if they are 'accredited investors,' according to Regulation D of Second 506(c).").

[9] *See, e.g.*, NEXO-0045844 ("we are only allowed to facilitate deals for American citizens who are also certified accredited investors"); NEXO-0046804 (stating same).

purchaser and transaction.[10] The SEC has explained that this non-exhaustive analysis generally considers, among other things whether an individual has over $1,000,000.00 in assets, exclusive of a personal home, or whether an individual earns over $200,000.00 per year or $300,000.00/year as household income.[11]

In assessing whether an issuer has taken "reasonable steps to verify" accredited investor status for purposes of Rule 506(c), the SEC has explained that the inquiry is principles-based and turns on the particular facts and circumstances, including (among other things) the nature of the purchaser and the type of accredited investor category claimed, the amount and type of information the issuer has about the purchaser, and the nature of the offering and the manner in which the purchaser was solicited.[12] The SEC has also identified non-exclusive methods that, depending on the circumstances, are generally considered reasonable to verify accredited status, including reviewing income documentation (e.g., IRS forms such as W-2s, Form 1099, Schedule K-1, or filed tax returns for the relevant period, together with an investor's written representation regarding expected current-year income), reviewing net worth documentation (e.g., bank statements, brokerage statements, and other statements of securities holdings or comparable evidence of assets, together with a consumer credit report or similar documentation of liabilities), and/or obtaining a written confirmation from a registered broker-dealer, SEC-registered investment adviser, licensed attorney, or certified public accountant that such person has taken reasonable steps to verify the purchaser's accredited status within the applicable time period.[13]

In a March 12, 2025 no-action letter, the SEC's Division of Corporation Finance stated that an issuer may reasonably conclude it has taken "reasonable steps" to verify accredited investor status under Rule 506(c) where the offering requires a high minimum investment amount and obtains written investor representations regarding accredited status and the absence of third-party financing, provided the issuer has no actual

[10] https://www.govinfo.gov/content/pkg/FR-2013-07-24/pdf/2013-16883.pdf (Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A Offerings, Securities Act Release No. 33-9415, 78 Fed. Reg. 44,771, 44,780–81) (July 24, 2013)

[11] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/updated-3#:~:text=According%20to%20the%20SEC,%20an%20accredited%20investor,not%20included%20in%20your%20net%20worth%20calculation (Accredited Investors – Updated Investor Bulletin) (April 14, 2021)

[12] https://www.sec.gov/resources-small-businesses/small-business-compliance-guides/eliminating-prohibition-against-general-solicitation-general-advertising-rule-506-rule-144a (SEC, Eliminating the Prohibition Against General Solicitation and General Advertising in Rule 506 and Rule 144A Offerings, Small Entity Compliance Guide) (Sept. 20, 2013)

[13] https://www.sec.gov/resources-small-businesses/exempt-offerings/general-solicitation-rule-506c (General solicitation – Rule 506(c))

knowledge of contrary facts.[14] The staff emphasized that a high minimum investment is a relevant factor supporting investor accreditation, consistent with prior SEC guidance, and reiterated that the verification analysis is an objective, facts-and-circumstances determination.[15]

Specifically, the process I reviewed included (i) completion and execution of an accredited investor certification offered by VerifyInvestor.com (the "Certification"), (ii) review of income-based documentation, including tax returns, where the investor sought to qualify under an income test, (iii) review of asset-based documentation, including bank (and/or other financial account) statements, where the investor sought to qualify under a net worth test, and (iv) review of the assets in a Nexo account that reflect a high minimum investment consistent with a net-worth over $1,000,000. The Certification required the investor to identify the specific accredited investor category or categories claimed, and to provide representations under signature as to the truth and completeness of the information provided. Then, based on the category of accredited investor, VerifyInvestor.com would prompt a user to upload a "W2, K1, or 1099 … [o]ther types of accredited investors may have to upload an officer's certificate or detail out their assets, and in the case of an individual qualifying under a net worth test."[16] VerifyInvestor.com would then provide a signed letter for a licensed attorney attesting to the individuals accredited investor status. In some instances, Nexo required documentary corroboration aligned to the claimed basis for accreditation—for example, tax documentation to corroborate income thresholds over the relevant period, and bank or comparable account statements to corroborate asset holdings when net worth was the claimed basis. The steps taken to verify the status of each accredited investor are supported by the record as evidenced in Appendix C.[17]

In my opinion, this Nexo's policy and practice reflects reasonable steps taken to verify accredited status as to the 2018 ICO and 2021-2022 Direct U.S. Customer Sales, as contemplated by Rule 506(c) and related SEC guidance.

---

[14] *See* Latham & Watkins No Action Letter, footnote 1.

[15] *See* Latham & Watkins No Action Letter, footnote 1.

[16] https://www.verifyinvestor.com/faq/documentation-for-investor-verification (What documentation is required of investors for verification?) (last accessed April 17, 2026)

[17] Nexo provided me with verification documents for all U.S. based customers who purchased the NEXO Token through the dates that Plaintiff made his NEXO Token purchases with the exception of one individual, [redacted]. Considering that Nexo could provide documentary support that they verified accredited investor status for all other relevant U.S. customers, this one exception does not alter my analysis. The fact that Nexo cannot locate accredited investor documentation for one individual for a five-year old transaction does not mean that Nexo's policy was not reasonable or that Mr. [redacted] was not, in fact, an accredited investor. Trenchev testified that "it was the standing policy of Nexo that we would sell the Nexo Token exclusively to U.S. accredited investors." April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 214:14-215:12.

Within the crypto sector, limiting token sales to accredited investors has functioned as a practical marker of investor sophistication. The SEC has explained that the accredited investor definition is designed to identify persons with indicia of financial sophistication or capacity to absorb risk and loss, including, after the 2020 amendments, certain investors who qualify through professional certifications rather than wealth alone. But the Commission has also emphasized that crypto offerings remain highly risky and that the securities law analysis turns on the facts and circumstances of the particular token and transaction. [18] That is why cautious and compliance-oriented cryptocurrency companies, including Nexo, adopted the policies and practices discussed in this report.

### E. Opinion No. 2 — Nexo complied with its policy and practice of verifying accredited investor status in connection with Nexo's sale of the NEXO Token to Plaintiff in 2021, consistent with Rule 506(c) of Regulation D.

With respect to Plaintiff, Nexo obtained and retained documentation reflecting that Plaintiff was an accredited investor at the time of his NEXO Token purchases between March and July 2021 and that he supplied an accredited investor certificate to Nexo. Furthermore, Plaintiff clearly met the standard for accredited investor status in 2021 because he deposited substantially more than $1 million in cryptocurrency assets on the Nexo platform before his NEXO Token purchases, including approximately 250 Bitcoin. Accordingly, there is no dispute that Plaintiff satisfied the accredited investor requirement and that Nexo's policy and verification process worked as intended as applied to Plaintiff. *See* NEXO-0231348; NEXO-0017265. Cress admitted this fact in his deposition. April 10, 2026 Cress Dep. Tr. at 35:15-20 ("Q. BY MR. RAWLINSON: In 2021, were you an accredited investor? MR. TAYLOR-COPELAND: Objection. Calls for a legal conclusion. THE WITNESS: I believe I passed that threshold."). Nexo's established policy and practice of verifying accredited investor status for all U.S. direct purchasers of the NEXO Token, including sales to Plaintiff, was reasonable and consistent with Rule 506(c) of Regulation D.

### F. Opinion No. 3 — Mr. Hristov did not make a misrepresentation when Mr. Hristov requested an accredited investor certificate from Mr. Cress.

With respect to Opinion No. 3, based on my review of the email correspondence between the parties, Mr. Hristov did not make a misrepresentation to Mr. Cress when he requested that Mr. Cress produce an accredited investor certificate before Nexo could sell him NEXO Tokens.

Hristiyan Hristov was Plaintiff's dedicated relationship manager, and Mr. Cress had extensive correspondence with Mr. Hristov. It is my understanding that Mr. Cress claims

[18] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-16 (SEC, Investor bulletin: Initial coin offerings, Dated July 25, 2017)

that Mr. Hristov told him via email on March 23, 2021 that "the NEXO token is registered with the SEC as a security," and that this statement was "fraudulent."

This argument ignores the entirety of the sentence, the context in which the statement was made, the content of the accredited investor certificate produced in response to this statement referring to SEC Regulation D, and Mr. Cress's response showing that he understood Mr. Hristov's statement to refer to a Regulation D offering that was registered with the SEC through Nexo's Form D.

To evaluate the challenged statement, it is necessary to have a complete understanding of the full correspondence related to Mr. Hristov's request for the accredited investor certificate.

On March 23, 2021, Mr. Hristov stated: "Additionally, please note that the NEXO token is registered with the SEC as a security therefore we are only allowed to facilitate deals for American citizens who are also certified, accredited investors. If you have a certificate, please send it over. In case you don't have an accredited investor certificate but you do satisfy the requirements, you can issue one here – verifyinvestor.com." CRESS-00000030.

On March 23, 2021, Mr. Cress responded: "I can work on the accredited investor certificate now." CRESS-00000030.

On March 25, 2021, Mr. Cress emailed a copy of that accredited investor certificate, dated March 24, 2021, before he purchased any NEXO Tokens from Nexo. NEXO-0017263-64. The accredited investor certificate stated that the verification was in connection with a Regulation D offering. It stated, in relevant part:

"I have been engaged by Verify Investor, LLC to analyze whether John Cress (the 'Investor') is an 'accredited investor,' as defined by Rule 501 of Regulation D of the Securities Act of 1933." NEXO-0017265.

The certificate further states: "I am pleased to confirm that the Investor has been verified as an 'accredited investor' as defined in Rule 501 of Regulation D of the Securities Act of 1933." NEXO-0017265.

The accredited investor certificate produced by Mr. Cress shows that he understood that registration reference in Mr. Hristov's email was made in connection with "Rule 501 of Regulation D of the Securities Act of 1933."

A reasonable investor in this circumstance, particularly a sophisticated, accredited investor like Plaintiff, would understand that Mr. Hristov's reference to "registered with the SEC" was a reference to a Form D registration for an offering under SEC Regulation D. This understanding is corroborated by Mr. Trenchev's deposition testimony and documentary evidence stating that filing the form D with the SEC "constitutes a form of registration." April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 304:17-21 (referring to Deposition Exhibit 119). Mr. Trenchev, when discussing Deposition Exhibit 119, stated

that "If we look at the next sentence, we clearly continued to state our understanding, which is that the fact that we have filed the form D with the SEC, constitutes a form of registration and—with the SEC and compliance with the applicable securities laws." Mr. Trenchev further testified that "I reviewed filing the form as a form of registration with the SEC." *Id.* at 278:4-9. Because the phrase containing the challenged language a coupled with a request for an accredited investor certificate, the reference to "registered with the SEC" refers to the Form D that Nexo filed with the SEC in connection with the 2018 ICO. My opinion is based on my understanding of the cryptocurrency markets in 2018 and 2021, the role of Regulation D in cryptocurrency offerings, and the evolving U.S. regulatory landscape as applied to cryptocurrency.

### G. Opinion No. 4 — Nexo's initial coin offering (ICO) in 2018 was temporally and substantively separate from Nexo's offering to Plaintiff in 2021, and the profiles of the respective purchasers in each offering were different.

I have reviewed information related to Nexo's initial coin offering (ICO) in 2018 and Nexo's Direct U.S. Customer Sales in 2021-2022. My review included evaluating the timing and scope of each offering and representations made in connection with each. Based on that review, it is my opinion that each of these offerings were separate and distinct. For clarity, nothing in this report should be understood as an admission by Nexo that the NEXO Token was in fact a security for any particular transaction, including Plaintiff's NEXO Token purchases. In periods of regulatory uncertainty, which was the case as it relates to cryptocurrency ICOs in 2018, it is common and prudent for market participants to take protective steps that assume, *arguendo*, that an instrument could be alleged to be a security by regulators or private litigants.[19] Based on my experience and as reflected in my understanding of cryptocurrency markets in 2018, filing a Form D in 2018 was a precautionary compliance measure, not a concession as to the ultimate securities status of the NEXO Token at that time and in connection with those transactions.[20] Nexo's actions in 2018, including filing the Form D and verifying accredited investor status for U.S. participants in the ICO, reflect a conservative and cautious approach to compliance, which would allow Nexo to avail itself of the Rule 506(c) safe harbor in the event that the SEC or a private litigant later took the position that the 2018 ICO transactions were securities transactions because the NEXO Token was allegedly an investment contract.

In 2018, Nexo was starting operations and the Nexo platform was not yet available. The 2018 ICO token was a limited, private pre-sale used towards funding client loan requests in connection with getting the Nexo platform running.[21] Five U.S. customers made 2018 ICO purchases, each of whom Nexo took steps to verify their accredited investor status

---

[19] "Nexo took the decision to file a Reg D form in order to be as transparent as possible and to comply with the US Securities regulations as understood and interpreted by what was available at that time." NEXO-0215538.

[20] Treatment of a token as a security is in flux and recent SEC/CFTC guidance suggest that many cryptocurrencies do not meet the definition of a security. *See* footnote 5.

[21] NEXO-0219970.

and each of whom had to make the purchase outside of the Nexo platform.[22] Nexo has provided documentation to support the accredited investor status for each of the 2018 ICO purchasers. Plaintiff was not a 2018 ICO purchaser.

Nexo filed a Form D in connection with the 2018 ICO offering dated February 14, 2018, followed by two amendments also filed with the SEC on March 13, 2018 and May 18, 2018, respectively.[23] The five U.S. ICO sales referenced above occurred pursuant to those Form D filings and the associated Rule 506 exemption. *See* Appendix C.

By 2021, when Plaintiff purchased NEXO Tokens, the Nexo platform was operational and accessible to customers. Through the use of the OTC desk, the 2021-2022 NEXO Token sales occurred on Nexo's platform to preexisting U.S. customers. Plaintiff and other U.S. customers could obtain perks or utility benefits on the Nexo platform, including significantly lower interest rates on their credit lines.[24] On June 8, 2021, NEXO Token holders voted to switch from a dividend to a daily interest program.[25] As a result, prior to Plaintiff's June 21-23, 2021 liquidations, Plaintiff's expectation was limited to a benefit of daily interest.

The utility benefits of the NEXO Token to U.S. customers are substantial, as reflected in the chart below. For example, Plaintiff took out approximately $13 million in credit lines from Nexo, and he obtained a reduction in the interest rate paid on those credit lines from 11.9% to 5.9%.[26] Thus, particularly as to substantial customers like Plaintiff, the potential utility benefits of the NEXO Token greatly outweighed any other purported investment benefit of holding the NEXO Token, including dividends or daily interest, as reflected in the attached chart of loyalty program benefits during the time period Plaintiff purchased his NEXO Tokens in March-April 2021:

---

[22] NEXO 0017620; NEXO-0217591; NEXO-0217592; NEXO-0217564; NEXO-0369425; NEXO-0217610; NEXO-213297; NEXO-0217597; NEXO-0369426; NEXO-0217596.

[23] https://www.sec.gov/Archives/edgar/data/1732097/000173209718000002/xslFormDX01/primary_doc.xml (Nexo Capital Inc., Form D) (February 20, 2018); https://www.sec.gov/Archives/edgar/data/1732097/000173209718000003/xslFormDX01/primary_doc.xml (Nexo Capital Inc., Form D Amendment 1) (March 13, 2018); https://www.sec.gov/Archives/edgar/data/1732097/000173209718000004/xslFormDX01/primary_doc.xml (Nexo Capital Inc., Form D Amendment 2 (May 18, 2018).

[24] John Cress received an annualized savings of 6% on $13 million dollars that equates to approximately $780,000 annually. CRESS-00000322; CRESS-00000650 (noting benefits of holding NEXO Tokens, including a 6% interest rate reduction).

[25] https://nexo.com/en-us/blog/nexo-community-accepts-governance-proposal-to-give-users-daily-interest-on-nexo-tokens (Nexo Community Approves Governance for Daily Interest on NEXO Tokens) (June 8, 2021)

[26] CRESS-00000650.

| | Base<br>Up to 1% NEXO Tokens in Portfolio | Silver<br>1 - 5% NEXO Tokens in Portfolio | Gold<br>5 - 10% NEXO Tokens in Portfolio | Platinum<br>At least 10% NEXO Tokens in Portfolio |
|---|---|---|---|---|
| Instant Crypto Credit Lines™<br>Borrow interest rate | 11.9% | 10.9% | 8.9% | 5.9% |
| Earn on Crypto<br>Savings interest rate | up to 5% +2% | up to 5.25% +2% | up to 5.5% +2% | up to 6% +2% |
| Earn on Stablecoins<br>Savings interest rate | 8% +2% | 8.25% +2% | 9% +2% | 10% +2% |
| Earn on Fiat<br>Savings interest rate | up to 8% +2% | up to 8.25% +2% | up to 9% +2% | up to 10% +2% |
| Dividends | ✓ | ✓ | ✓ | ✓ |
| Free Monthly Crypto Withdrawals | 1 | 2 | 3 | 5 |

CRESS-00000652.

A key difference between the 2018 ICO and the 2021-2022 Direct U.S. Token Sales was the purchase context and purpose. The 2018 ICO was structured as an early-stage funding round to develop the Nexo platform and fund initial credit lines. By contrast, the 2021–2022 sales were made to existing Nexo platform customers. Those customers, including Plaintiff, used the token for platform utility benefits. Plaintiff admitted in his deposition that he purchased the NEXO Token for its utility benefits, specifically the 50% interest rate reduction on his $13 million credit lines. Cress Dep. 209:1–6; 211:9–13. (Apr. 10, 2026). This conclusion is consistent with Trenchev's testimony, who stated: "In 2018, when the initial token sale was being conducted, we were at an idea stage. There was no platform and no utility for the Nexo Token, which was to be closely connected to the Nexo infrastructure, again non-existent at that time. Years later, when Mr. Cress was interacting with our products and services, the Nexo Token had many utilities, some of which we -- we discussed already. And to that accord it was our belief at the time that the Nexo Token was clearly a utility token." April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 238:2-239:3.

55 U.S. customers made 2021-2022 NEXO Token purchases, 8 of whom made initial purchases prior to Plaintiff's purchases and 46 of whom occurred after. Based on its policy, Nexo sold only to customers who provided accredited investor documentation. Nexo has provided documentation in support of accredited investor status for 7 of the 8 purchasers preceding Plaintiff and 44 of the 46 purchasers after Plaintiff. Plaintiff also provided documentation to Nexo to support his accredited investor status. When looking at the 2021-2022 offering, Nexo has a 95.6% rate of documentation supporting accredited investor status. Looking at this documentation and Nexo's policy of selling NEXO Tokens to only those with accredited investor documentation, the limited absence of documentation does not change the fact that Nexo consistently followed a policy of requesting and reviewing accredited investor documentation before allowing U.S.

customers to make purchases of the 2021-2022 NEXO Token. Based on my conversations with Nexo, I understand that all purchasers provided accredited investor certificates or other accredited investor documentation, consistent with company policy,[27] but some records cannot be located due to the substantial passage of time.

It is also important for my analysis to distinguish between Nexo's platform-level policies, systems, and compliance procedures (including its accredited-investor gatekeeping and verification process) and any alleged discrepancy in implementation of this policy by a single employee in a discrete instance. Nexo Capital Inc. is the Defendant, and the reasonableness of its practices should be evaluated at the policy/system level consistent with the principles-based standards reflected in SEC guidance.[28] Trenchev testified that "it was the standing policy of Nexo that we would sell the Nexo Token exclusively to U.S. accredited investors." April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 214:14-215:12. A single implementation error (assuming one even occurred)—especially if applied retroactively based on alleged unaccredited sales *after* Plaintiff's purchases—would not be consistent with how the applicable regulatory framework evaluates an issuer's reasonable steps and procedures. Any argument that a policy implementation error, or an inability to locate old documents, results in loss of the exemption as to sales to indisputably accredited investors (such as Plaintiff) would lead to a retroactive, strict liability interpretation of the Rule 506(c) safe harbor, which is inconsistent with the SEC's regulatory focus on "reasonable" compliance measures. This position would also be illogical because the Plaintiff bringing the claim—John Cress—was indisputably an accredited investor in 2021.

Appendix C notes the 2018 ICO purchasers, the 2021 purchasers who made initial purchases before Plaintiff, and the 2021-2022 purchasers who made initial purchases after Plaintiff. Those purchasers who made purchases in 2018 or after Plaintiff are not relevant to the offering at the time Plaintiff made his purchases. The only window of time relevant to Plaintiff, and in which the reasonable steps taken by Nexo are relevant as to that offering, are the 2021 purchases that occurred before Plaintiff's purchases between March and July 2021.

Additionally, it is my understanding that the SEC has a "safe harbor" provision that prevents two offerings from being integrated into one in certain circumstances, including when the initial offering is completed 30 days or more before a subsequent offering.[29] Nexo's 2018 ICO occurred years before the 2021-2022 offering. The 2018 ICO purchasers had a different expectation regarding their purchases than later customers, like Plaintiff,

---

[27] April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 51:16–52:2 (noting that it was Nexo's policy to only sell NEXO Tokens to accredited investors).

[28] The IRS has defined virtual currency as "a digital representation of value" and expressly states that "Bitcoin and other cryptocurrencies are examples of virtual currency," while further providing that such virtual currency is treated as property for federal tax purposes. *See* footnote 2.

[29] https://www.sec.gov/resources-small-businesses/capital-raising-building-blocks/integration (SEC, Integration – What is "integration" and why does it matter?) (August 8, 2025)

who used the Nexo platform and availed themselves of the Token's substantial utility benefits.

In my opinion, Nexo's 2018 ICO was a separate offering from the 2021-2022 offering to Plaintiff.

While Nexo did not file a separate Form D in connection with its 2021-2022 offering of the NEXO Token to certain U.S. customers, including Plaintiff, it is my understanding that filing a Form D is not a condition to obtaining an exemption under Rule 506(c) and does not bar reliance on the safe harbor. Furthermore, given Nexo's position that those 2021-2022 purchases were **not** securities transactions, as set forth above, the fact that Nexo did not file a Form D is reasonable and appropriate under the circumstances and reflects Nexo's cautious, compliance-oriented approach to NEXO Token sales in the U.S.[30] Because Nexo filed a Form D in connection with the 2018 ICO, Nexo acted conservatively and cautiously by continuing to request accredited investor certifications from 2021-2022 U.S. purchasers despite believing that such transactions were not securities transactions that would require invocation of the safe harbor.

I did not review Nexo's direct sales to non-U.S. purchasers because they are not relevant to Section 506(c), which only regulates the sale of the alleged securities to U.S. purchasers.

I did not review the sale of NEXO Tokens on third-party exchanges not owned or operated by Nexo because they are not relevant to Section 506(c). Those third-party exchanges did not sell to U.S. customers during the relevant time period. Nexo sold the NEXO Token on Huobi from January 2020 to October 2023, but Huobi suspended access for all U.S. users effective November 13, 2019.[31] Nexo also sold the NEXO Token on HitBTC from May 2018 through November 2020, but that exchange is also not available to U.S. customers.[32] *See* Nexo's First Amended Response to Interrogatory No. 12, dated December 9, 2025. Nexo also did not allow U.S. retail customers to purchase the NEXO Token on the Nexo

---

[30] Trenchev's testimony supports this conclusion. He explained that Nexo did not file a Form D before the 2021-2022 sales for the following reasons: "I think it goes back to two points that we already discussed.·The first one is our belief that the Nexo Token's nature had significantly changed from a time where it was a token to be for a platform to be everything from that standpoint in future tense, to a mature and existing, sophisticated platform, which it was in 2021, and a token that provided many utilities to our clients.· That is one point. And the second being that despite all of that being our belief, we still were looking for accreditation status of all potential U.S. purchasers of the Nexo Token, which is a high bar and a clear testimony to Nexo's desire to do things properly and above board."). April 2, 2026 Trenchev Dep. Tr. (Vol. 2) at 251:15-252:18.

[31] https://www.theblock.co/linked/45733/huobi-to-freeze-all-us-user-accounts-on-nov-13 (Huobi to freeze all US user accounts on Nov. 13) (November 4, 2019)

[32] https://ifed-inc.ca/2021/12/06/hitbtc-exchange-review-2021-withdrawal-fees/ (HitBTC Exchange Review 2021: Withdrawal Fees & Trading View) (noting in December 2021 that HitBTC is not available to U.S. customers) (December 6, 2021)

exchange through July 2021 when Cress made his final NEXO Token purchase through the Nexo OTC desk.

To the extent Plaintiff contends that secondary-market trading of NEXO Tokens on exchanges undermines the availability of an exemption for Nexo's direct sales, that contention is misplaced. Nexo's direct sales at issue were limited to accredited U.S. customers, while exchange trading involved secondary transactions on foreign exchanges that were not accessible to U.S. persons and/or transactions in which Nexo was not the seller. Such secondary-market transactions do not defeat the exemption applicable to Nexo's direct sales. While I have seen no evidence that any U.S. purchasers bought the NEXO Token from Nexo on an exchange prior to Mr. Cress's purchases between March and June 2021, to the extent Plaintiff makes such an allegation, any such alleged sale would not impact the Rule 506(c) safe harbor because the blind purchase of a cryptocurrency utility token from an anonymous and unknown counterparty on an exchange would not qualify as a securities transaction. *See* footnote 6 (describing XRP/Ripple Labs decision). Such a transaction would stand in stark contrast to Plaintiff's OTC transactions, where he knew that he was purchasing the NEXO Token directly from Nexo. There is also no reason to believe that such hypothetical, anonymous transactions at unknown times would be considered part of the same offering as Nexo's Direct U.S. Customer Sales.

Finally, I am not aware of any evidence that Nexo sold the NEXO Token to statutory underwriters, or that any alleged statutory underwriter resold NEXO Tokens to unaccredited U.S. persons.

**Certification of Expert**

I certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

3. I have no present or prospective appreciation in the property that is the subject of this report, and I have no personal appreciation or bias with respect to the parties.

*Randall Valentine, B.S., M.S., Ph.D.*

## H. Compensation

1. I am being compensated for my work on this Initial Report at the rate of $500.00 per hour.

Appendix A



# RANDALL VALENTINE, PH.D

ACADEMIC

*Associate Professor Finance Millsaps College• Aug 2024 To Present*

*Associate Professor of Practice Finance• Texas Tech University Aug 2021 To Aug 2024*

*Professor of Finance• William Carey University • Aug 2014 To Aug 2021*

*Asst/Associate Professor of Finance•Georgia Southwestern State University 2005 To Aug 2014*

PROFESSIONAL

*Conference chair • academy of business research • www.aobronline.com*

Co-Chair of the Academy of Business Research since 2004. Currently, ABR has over 1,000 individuals attend its 4 conferences annually with representatives from over 30 countries. ABR publishes 5 journals. ABR has media mentions in several international publications and in the Wall Street Journal.

*Quant Analyst • Handsboro Capital • 2015-2021*
Chief quant analyst for a $50-100 million portfolio consisting of distressed debt/equity investments. This is done in coordination with a group of hedge funds and investment banks.

Graduate Certificate in AI
Wharton College of Business, University of Pennsylvania 2025

Graduate Certificate in FinTech
Wharton College of Business, University of Pennsylvania 2024

Ph.D. in Finance
Mississippi State University

2006

MS in Finance/Statistics
Mississippi State University
2001

BS in Finance
Arkansas State University
1997

## RESEARCH

Current research appreciations include

recent "A" rated journals in FINTECH and COVID-19

## AWARDS

Finalist for Outstanding Teacher, Rawls College of Business Texas Tech University
2022,2023

Distinguished Research Awards
2008,2013, 2020,2022

## Service highlights

Faculty Advisor Rawls Finance Association (initiated connections and internships with Goldman Sachs, J.P. Morgan, and many others)
2021-Present

Faculty Advisor Business Valuation
2021-Present

Online Instruction Coordinator
2014-2021

Chair IRB
2012-2014

Head of AACSB Committee
2007-2010

Research list—A and A* rated journals (abdc list)

"An Inquiry into FinTech Research: Analysis of Methodologies and Investigative Foci" Journal of Banking and Finance Law and Practice 2025 (Z. Jourdan, K. Corley, A. Tran)

"FINTECH: A Content Analysis of Finance and Information Systems Literature" Electronic Markets, (Volume 33, 2023). (Z. Jourdan, K. Corley, A. Tran)

"Investigating the Relationship of School Reopening to Increases in COVID-19; The Case of the Delta Variant", *Journal of Public Health*, fdaa373, https://doi.org/10.1093/pubmed/fdab373 (Volume 45 Issue 1, 2023).

"Irrational Exuberance or the Money-Trust Power Grab: Was the Panic of 1907 Truly a Speculative Bubble or a Financial Coup D'état? ," Journal of Behavioral Finance, (Volume 24, 2022). (R. Larocca, T. Cunningham)

"Behavioral Predictors of Fraud Motivation within Common and Uncommon Demographic Groups," Journal of Banking Finance Law and Practice, (Vol 31, 2020). (E. Heneke)

"Relationship of 2020 Protests to Increases in COVID-19 Cases Using Event Study Methodology, *Journal of Public Health*, , fdaa127, https://doi.org/10.1093/pubmed/fdaa127 **(Was in Top 5 Most Read/Downloaded Articles in all of PubMed and highest AltMetric of any finance author with 579)**

Research list

"Examining COVID-19 Infection Rates Using Data Analytics: The Case of Lifting Mask Mandates," Journal of Data Analytics, Forthcoming (R. LaRocca)

"Examining the Relationship Between Earnings and Patent Filings Among Pharmaceutical Companies in Asia," International Journal of Economic and Financial Issues, Vol 3 2020 (A. Okun)

"Does Health Locust of Control and Self Efficacy Impact Attitudes Towards Direct to Consumer Advertising in the US," e-Journal of Social and Behavioral Research in Business, Vol 11 Issue 1, 2020 (C. Maldanado)

"Online Vs. On Ground: Academic Honesty in Online Classes," Presented at International Organization of Social Sciences and Behavioral Research Conference 2018 (R. Reich, D. Valentine)

"International Currency Exchange Rate and Gasoline Price," Southern Journal of Business and Economics, Spring 2016 (F. Xu and D. Wang).

"The Virtual Professor," Administrative Issues Journal, Fall 2014 (R. Bennett).

"An Examination of Risk Adjusted Returns Caused by Terrorist Attacks," Journal of Insurance Research, Spring 2012 (C. Bishop).

Real Estate Analysis, Spring 2011 (Co-editors Diaz and Hansz).
Personal Finance 1st Edition, Spring 2011 (Co-editors Kapoor, Dahlby, and Hughes).

"Forecasting Economic Data Based on Terrorist Attacks," Journal of the Academy of Financial Management, 2010 (J. Kooti and M. Fahti).

"Management Forecasting and Measuring Accuracy of Forecasting Techniques," International Journal of Business, Marketing, and Decision Sciences, 2010 (M. Fahti and J. Kooti).

The Next Great Depression, Fall 2009. Was on Best Seller List in Economics/Inflation.

"The Implications of Gramm-Leach-Bliley on the 2008 Economic Downturn," Franklin Business and Law Review, Volume 4, 2008.

"The Bad Neighbor: A Case Study of State Farm in Hurricane Katrina," Conflict Negotiation and Resolution Journal, Volume 1, 2008 (A.J. Kooti and J. Kooti).

"Using the Buffet Model: The K-Mart Recovery," Journal of Global Education, Volume 1, 2008 (S. Murrie, A.J. Kooti and D. Valentine).

"Identifying Marketing Strategies for a new product; A Case Study," Business Journal for Entrepreneurs, Volume 1, 2008 (D. Valentine).

"Distribution Channels of Online Commodities," Conflict Resolution and Negotiation Journal, Summer, 2007 (B. Kinard).

"The Theory of Efficient Capital Markets…A Review of Literature," Journal of Business for Entrepreneurs, Spring 2007.

"Accreditation and Assessment: A Provocative Approach," Journal of College Teaching and Learning, Fall 2007 (J. Kooti and D. Valentine).

"Minority Marketing in the Finance Industry," Global Journal for International Financial Analysts, Volume 8, Spring 2007 (J. Kooti and D. Valentine).

"Explaining January Returns: The Santa Clause Hypothesis," Journal of Applied Financial Research, Volume 1, Issue 1 2007 (J. Kooti).

"Workforce Capacity and Employer Satisfaction in Southwest Georgia: A Case Study in Rural Economic Development Needs," Journal of Business for Entrepreneurs, Volume 2006, Issue 1 (J. Kooti).

"E-Pricing: Cruising in the South," Bottom Line, Fall 2006 (D. Valentine, B. Heshizer, and C. Howell).

"November Effect and Tax Loss Selling: An Empirical Investigation," The Journal of International Business Research, Fall 2006 (J. Kooti).

"Perceptions of a Family-Based Community: Predictors from a Rural Community," Insights to a Changing World, Volume 2005, Issue 4 (J. Kooti and D. Valentine).

"The Performance Measure of U.S. and International Mutual Funds Versus the Standard and Poors 500 Index Fund," Journal of International Financial Management, Summer 2005 (B. Hayes).

"Retail vs. Etail, a Look at Expedia.com," Coastal Business Journal, Summer 2005 (D. Valentine and B. Kinard).

"How Groupthink Influenced the Ford/Firestone Fiasco," Ethics and Critical Thinking, Volume 2005, Issue 1 (D. Valentine and N. McMinn).

"The World Series Stock Market Predictor," Journal of Business, Industry, and Economics, Spring 2005 (M. Foster and C. Hopkins).

"Student Attributes and Successful Performance, An Empirical Examination," Insights for a Changing World, Fall 2004 (F. David).

"K Mart: A Roadmap to Bankruptcy," Ethics and Critical Thinking Quarterly Journal, Fall 2004 (R. Schifer).

"Efficient Markets and E-Commerce: The Hotel Industry," World Sports and Entertainment Journal, Summer 2004 (B. Kinard and R. Schifer).

"The Use of the IRAs in the Teaching of Finance," The American Academy of Financial Management Journal, Volume 5, Summer 2004.

"E-Pricing: The Transportation Market in the South," Business Journal for Entrepreneurs, Volume 2004, Issue 2 (D. Bendall, B. Kinard, and B. Barnes).

"Cheaters Never Win....Or Do They Just Graduate With Honors?" Ethics and Critical Thinking Quarterly Journal, Spring 2004 (F. David and B. Kinard).

"The Internet in the Instruction of Finance," Insights to a Changing World Journal, Volume 2004, Issue 2 (G. de Haas).

"Travel in Arkansas: The Airline Industry," Arkansas Review of Business and Economics, 2005 (D. Bendall, B. Kinard, and B. Barnes).

**Four Year Testimony List**

Deposition testimony in a credit fraud case: Feng Lin v. Synchrony Bank and Experian;, April 3, 2026, for Daniel Zuniga of Petroff Amshen, Staten Island, NY

Deposition testimony in a credit fraud case: Tyler Totaram v. Wells Fargo, Transunion, Equifax;, March 23, 2026, for Serge Petroff of Petroff Amshen, Brooklyn, NY

Deposition testimony in a financial damages and cryptocurrency case: SBI Crypto Inc. v. Whinstone Inc;, Feb 7, 2026, for Cory Johnson of Winstead PA, Dallas, TX

Binding Arbitration testimony in a credit damage case: Weisser v. Citigroup Inc;, December 22, 2025, for Michael Sayre of Armstrong Teasdale P.C., Miami, FL

Deposition testimony in a financial damages and cryptocurrency case: SBI Crypto Inc. v. Whinstone Inc;, August 22, 2025, for Cory Johnson of Winstead PA, Dallas, TX

Deposition testimony in an insurance and cryptocurrency case: Cory and Jennifer Chimento v. Citizens of Louisiana;, October 17, 2025, for Carter Marshall of Christovich and Kearney, New Orleans, LA

Trial testimony in a divorce case involving cryptocurrency: Jake Lynd v. Brittany Lynd; Case No. CI 23-103, In the District Court, Buffalo County, Nebraska, June 26, 2025, for Michele Romero, Esq. of Stamm-Romero, LLC, Kearny, Nebraska.

Trial testimony in probate case involving cryptocurrency: The Matter of the Estate of George James Buffington., Cause No. PR24-00323, In the Second Judicial District Court of the State of Nevada in and for the County of Washoe, April 17, 2025, for Cassandra Walsh of Woodburn and Wedge, Reno NV

Deposition testimony in a wrongful termination and credit damage case: Aloke Chaudhurri v. Rekor Systems Inc; OALJ No. 2024-SOX-00015, In the United States Department of Labor, Washington D.C., June 17, 2025, for Eric Siegel of Eric Siegel Law, Washington D.C.

Deposition testimony in a wrongful termination and credit damage case: Hessam Mjab v. Rekor Systems Inc; OALJ No. 2024-SOX-00012, In the United States Department of Labor, Washington D.C., October 24, 2024, for Eric Siegel of Eric Siegel Law, Washington D.C.

Deposition testimony in a divorce case involving cryptocurrency: Jake Lynd v. Brittany Lynd; Case No. CI 23-103, In the District Court, Buffalo County, Nebraska, November 18, 2024, for Michele Romero, Esq. of Stamm-Romero, LLC, Kearny, Nebraska.

Deposition testimony in a bank fraud and credit damage case: William Oliver v. Independent Bank Inc;, September 23, 2024, for Richard Bourland of Griffith, Jay, and Mitchell, Ft. Worth, TX

Trial testimony in probate case involving cryptocurrency: The Matter of the Estate of Mitchell Kent Fox., Cause No. 00320, In the Probate Court of the State of Michigan in and for the County of Oakland, May 8, 2024, for Rob Cleary of Thav, Ryke and Associates, Southfield, MI

Deposition testimony in a personal injury case: Charles J. Squeri v. William G. Schultz, Case No. 2101994, In Common Pleas Court Hamilton County, OH, October 31, 2022 for Cole Millchap Law Firm, Cincinnati, OH

Appendix B

## LIST OF DOCUMENTS CONSIDERED

1. Plaintiff's Second Amended Complaint
2. Defendant's Answer to Second Amended Complaint
3. Deposition of Antoni Trenchev
4. Deposition of Edward Tonkov
5. Deposition of Octavian Dinca
6. Deposition of John Cress
7. Plaintiff's interrogatory responses
8. Defendant's interrogatory responses
9. All documents cited in the body or footnotes of this report
10. All documents cited in the chart attached as Appendix C:

| |
|---|
| CRESS-00000027 |
| CRESS-00000322 |
| CRESS-00000650 |
| NEXO-0005419 |
| NEXO-0005420 |
| NEXO-0005421 |
| NEXO-0005422 |
| NEXO-0005424 |
| NEXO-0005426 |
| NEXO-0005466 |
| NEXO-0005467 |
| NEXO-0005468 |
| NEXO-0005476 |
| NEXO-0005480 |
| NEXO-0005538 |

| |
|---|
| NEXO-0005592 |
| NEXO-0005651 |
| NEXO-0005652 |
| NEXO-0005653 |
| NEXO-0005660 |
| NEXO-0005693 |
| NEXO-0005694 |
| NEXO-0005771 |
| NEXO-0005828 |
| NEXO-0005662 |
| NEXO-0005663 |
| NEXO-0005664 |
| NEXO-0005665 |
| NEXO-0005671 |
| NEXO-0005673 |
| NEXO-0005675 |
| NEXO-0005681 |
| NEXO-0005687 |
| NEXO-0005775 |
| NEXO-0005814 |
| NEXO-0005817 |
| NEXO-0005818 |
| NEXO-0005820 |
| NEXO-0005822 |
| NEXO-0005823 |
| NEXO-0005824 |
| NEXO-0005825 |
| NEXO-0005827 |
| NEXO-0005833 |

| |
|---|
| NEXO-0005834 |
| NEXO-0005836 |
| NEXO-0005839 |
| NEXO-0005832 |
| NEXO-0005841 |
| NEXO-0005849 |
| NEXO-0005894 |
| NEXO-0005993 |
| NEXO-0005994 |
| NEXO-0005995 |
| NEXO-0005996 |
| NEXO-0005997 |
| NEXO-0005999 |
| NEXO-0006000 |
| NEXO-0006004 |
| NEXO-0006005 |
| NEXO-0006013 |
| NEXO-0006017 |
| NEXO-0006019 |
| NEXO-0006112 |
| NEXO-0006120 |
| NEXO-0006121 |
| NEXO-0006122 |
| NEXO-0006123 |
| NEXO-0006126 |
| NEXO-0006131 |
| NEXO-0006132 |
| NEXO-0006133 |
| NEXO-0006135 |

| |
|---|
| NEXO-0006136 |
| NEXO-0006137 |
| NEXO-0006139 |
| NEXO-0006212 |
| NEXO-0006213 |
| NEXO-0006219 |
| NEXO-0006225 |
| NEXO-0006231 |
| NEXO-0006239 |
| NEXO-0006247 |
| NEXO-0006253 |
| NEXO-0006257 |
| NEXO-0006261 |
| NEXO-0006267 |
| NEXO-0006269 |
| NEXO-0006313 |
| NEXO-0006314 |
| NEXO-0006315 |
| NEXO-0006316 |
| NEXO-0006317 |
| NEXO-0006318 |
| NEXO-0006319 |
| NEXO-0006320 |
| NEXO-0006321 |
| NEXO-0006324 |
| NEXO-0006325 |
| NEXO-0006326 |
| NEXO-0006363 |
| NEXO-0006364 |

| |
|---|
| NEXO-0006417 |
| NEXO-0006418 |
| NEXO-0006419 |
| NEXO-0006421 |
| NEXO-0006424 |
| NEXO-0006425 |
| NEXO-0006429 |
| NEXO-0006434 |
| NEXO-0006440 |
| NEXO-0006442 |
| NEXO-0006443 |
| NEXO-0006445 |
| NEXO-0006446 |
| NEXO-0006447 |
| NEXO-0006470 |
| NEXO-0006471 |
| NEXO-0006478 |
| NEXO-0006485 |
| NEXO-0006486 |
| NEXO-0006496 |
| NEXO-0006497 |
| NEXO-0006499 |
| NEXO-0006501 |
| NEXO-0006503 |
| NEXO-0006505 |
| NEXO-0006507 |
| NEXO-0006509 |
| NEXO-0006510 |
| NEXO-0006522 |

| |
|---|
| NEXO-0006540 |
| NEXO-0006542 |
| NEXO-0006553 |
| NEXO-0006557 |
| NEXO-0006565 |
| NEXO-0006567 |
| NEXO-0006569 |
| NEXO-0006571 |
| NEXO-0006579 |
| NEXO-0006581 |
| NEXO-0006586 |
| NEXO-0006587 |
| NEXO-0006588 |
| NEXO-0006589 |
| NEXO-0006590 |
| NEXO-0006592 |
| NEXO-0006593 |
| NEXO-0006594 |
| NEXO-0006595 |
| NEXO-0006596 |
| NEXO-0006597 |
| NEXO-0006605 |
| NEXO-0006617 |
| NEXO-0006619 |
| NEXO-0006631 |
| NEXO-0006643 |
| NEXO-0006648 |
| NEXO-0006649 |
| NEXO-0006650 |

| |
|---|
| NEXO-0006651 |
| NEXO-0006652 |
| NEXO-0006664 |
| NEXO-0006666 |
| NEXO-0006668 |
| NEXO-0006670 |
| NEXO-0006677 |
| NEXO-0006685 |
| NEXO-0006687 |
| NEXO-0006692 |
| NEXO-0006693 |
| NEXO-0006695 |
| NEXO-0006711 |
| NEXO-0006718 |
| NEXO-0006719 |
| NEXO-0006727 |
| NEXO-0006728 |
| NEXO-0006730 |
| NEXO-0006735 |
| NEXO-0006738 |
| NEXO-0006739 |
| NEXO-0006745 |
| NEXO-0006752 |
| NEXO-0006760 |
| NEXO-0006762 |
| NEXO-0006791 |
| NEXO-0006792 |
| NEXO-0006793 |
| NEXO-0006794 |

| |
|---|
| NEXO-0006795 |
| NEXO-0006796 |
| NEXO-0006797 |
| NEXO-0006798 |
| NEXO-0006799 |
| NEXO-0006800 |
| NEXO-0006801 |
| NEXO-0006802 |
| NEXO-0006803 |
| NEXO-0017263-65 |
| NEXO-0017350 |
| NEXO-0017351 |
| NEXO-0017361 |
| NEXO-0017365 |
| NEXO-0017368 |
| NEXO-0017373 |
| NEXO-0017381 |
| NEXO-0017591 |
| NEXO 0017620 |
| NEXO-0021759 |
| NEXO-0026699 |
| NEXO-0041805 |
| NEXO-0045844 |
| NEXO-0046804 |
| NEXO-0079183 |
| NEXO-0168207 |
| NEXO-0175107 |
| NEXO-0211219 |
| NEXO-0211144 |

| |
|---|
| NEXO-0213297 |
| NEXO-0215538 |
| NEXO-0217564 |
| NEXO-0217591 |
| NEXO-0217592 |
| NEXO-0217596 |
| NEXO-0217597 |
| NEXO-0217610 |
| NEXO-0217610 |
| NEXO-0219967 |
| NEXO-0219970 |
| NEXO-0231348 |
| NEXO-0369425 |
| NEXO-0369426 |
| NEXO-0369427 |
| NEXO-0369429 |
| NEXO-0369430 |
| NEXO-0369432 |
| NEXO-0369434 |
| NEXO-0369458 |
| NEXO-0369459 |
| NEXO-0369460 |
| NEXO-0369461 |
| NEXO-0369462 |
| NEXO-0369463 |
| NEXO-0369464 |
| NEXO-0369465 |
| NEXO-0369466 |

Appendix C

*See* attached chart of NEXO Token purchasers with corresponding accredited investor documentation.

APPENDIX C

| Account Name | Initial Close Date | Documentary Support |
|---|---|---|
| [redacted] | 14-Feb-18 | NEXO-0017620 |
| | 27-Feb-18 | NEXO-0217591, NEXO-0217564 |
| | 1-Mar-18 | NEXO-0217592, NEXO-0369425 |
| | 1-Mar-18 | NEXO-0217610, NEXO-0213297, NEXO-0217597 |
| | 2-Mar-18 | NEXO-0369426, NEXO-0217596 |
| | 5-Jan-21 | NEXO-0026699 |
| | 25-Jan-21 | NEXO-0041805 |
| | 5-Jan-21 | *None* |
| | 3-Jan-21 | NEXO-0006324, NEXO-0006325, NEXO-0006326 |
| | 10-Mar-21 | NEXO-0006648, NEXO-0006650, NEXO-0006651, NEXO-0006652, NEXO-0006664, NEXO-0006666 |
| | 21-Jan-21 | NEXO-0017350 |
| | 28-Jan-21 | NEXO-0369434, NEXO-0369427, NEXO-0369429, NEXO-0369430, NEXO-0369432 |
| | 6-Jan-21 | NEXO-0006791, NEXO-0006792, NEXO-0006793, NEXO-0006794, NEXO-0006795, NEXO-0006796, NEXO-0006797, NEXO-0006798, NEXO-0006799, NEXO-0006800, NEXO-0006801, NEXO-0006802, NEXO-0006803, NEXO-0369461 |
| | **1-Apr-21** | **NEXO-0017265** |
| | 2-Dec-21 | NEXO-0017351 |
| | 19-May-21 | NEXO-0005419, NEXO-0005420, NEXO-0005421, NEXO-0005422 |
| | 21-Oct-21 | NEXO-0005424, NEXO-0005426, NEXO-0005466 |
| | 29-Apr-21 | NEXO-0006738, NEXO-0006739, NEXO-0006745, NEXO-0006752, NEXO-0006760, NEXO-0006762 |
| | 14-Apr-21 | NEXO-0175107 |
| | 13-Jan-22 | NEXO-0005467, NEXO-0005468, NEXO-0005476 |
| | 13-Apr-21 | NEXO-0005480, NEXO-0005538, NEXO-0005592, NEXO-0005651, NEXO-0005652, NEXO-0005653, NEXO-0005660 |
| | 14-Feb-22 | NEXO-0005662, NEXO-0005663, NEXO-0005664, NEXO-0005665, NEXO-0005671, NEXO-0005673, NEXO-0005675, NEXO-0005681, NEXO-0005687 |

| | | | |
|---|---|---|---|
| [redacted] | | 13-Jun-21 | NEXO-0005693, NEXO-0005694, NEXO-0005771 |
| [redacted] | | 25-May-21 | NEXO-0005775, NEXO-0005814, NEXO-0005817, NEXO-0005818, NEXO-0005820, NEXO-0005822, NEXO-0005823, NEXO-0005824, NEXO-0005825, NEXO-0005827 |
| [redacted] | | 3-Feb-22 | NEXO-0005828, NEXO-0369466 |
| [redacted] | | 13-Jun-21 | NEXO-0017365 |
| [redacted] | | 26-Aug-21 | NEXO-0005832 |
| [redacted] | | 9-Dec-21 | NEXO-0005833, NEXO-0005834, NEXO-0005836, NEXO-0005839, NEXO-0369459 |
| [redacted] | | 14-Jan-22 | NEXO-0005841, NEXO-0005849, NEXO-0005894 |
| [redacted] | | 3-Jun-21 | NEXO-0017368 |
| [redacted] | | 10-Aug-21 | NEXO-0005993, NEXO-0005994, NEXO-0005995, NEXO-0005996, NEXO-0005997 |
| [redacted] | | 27-Feb-22 | *None* |
| [redacted] | | 9-Feb-22 | NEXO-0005999 |
| [redacted] | | 3-Feb-22 | NEXO-0006000, NEXO-0006004, NEXO-0006005, NEXO-0006013, NEXO-0006017, NEXO-0006019 |
| [redacted] | | 14-Nov-21 | NEXO-0006112, NEXO-0006120, NEXO-0006121, NEXO-0006122, NEXO-0006123, NEXO-0006126 |
| [redacted] | | 12-Jul-21 | NEXO-0006131 |
| [redacted] | | 18-Oct-21 | NEXO-0079183 |
| [redacted] | | 28-Feb-22 | *None* |
| [redacted] | | 20-Oct-21 | NEXO-0006132 |
| [redacted] | | 5-Sep-21 | NEXO-0017373 |
| [redacted] | | 26-Jul-21 | NEXO-0006133, NEXO-0006135, NEXO-0006136, NEXO-0006137 |
| [redacted] | | 18-Oct-21 | NEXO-0017361 |
| [redacted] | | 23-Feb-22 | NEXO-0006139, NEXO-0006212, NEXO-0006213, NEXO-0006219, NEXO-0006225, NEXO-0006231, NEXO-0006239, NEXO-0006247, NEXO-0006253, NEXO-0006257, NEXO-0006261, NEXO-0006267, NEXO-0006269 |
| [redacted] | | 30-Jan-22 | NEXO-0006313, NEXO-0006314, NEXO-0006315, NEXO-0006316, NEXO-0006317, NEXO-0006318, NEXO-0006319, NEXO-0006320, NEXO-0006321, NEXO-0369460 |

| | | | |
|---|---|---|---|
| [redacted] | | 30-Nov-21 | NEXO-0006328, NEXO-0006342, NEXO-0006363, NEXO-0006364, NEXO-0006417, NEXO-0006418, NEXO-0006419, NEXO-0006421 |
| | | 2-Dec-21 | NEXO-0006424, NEXO-0006425, NEXO-0006429, NEXO-0006434 |
| | | 17-Aug-21 | NEXO-0006440, NEXO-0006442, NEXO-0006443, NEXO-0006445, NEXO-0006446 |
| | | 22-Feb-22 | NEXO-0006447, NEXO-0006470, NEXO-0006471, NEXO-0006478, NEXO-0006485, NEXO-0006486, NEXO-0006496, NEXO-0006497, NEXO-0006542, NEXO-0006553, NEXO-0006557 |
| | | 12-Oct-21 | NEXO-0006565, NEXO-0006567, NEXO-0006569, NEXO-0006571, NEXO-0006579, NEXO-0006581, NEXO-0369465 |
| | | 8-Dec-21 | NEXO-0006586 |
| | | 24-Aug-21 | NEXO-0006499, NEXO-0006501, NEXO-0006503, NEXO-0006505, NEXO-0006507 |
| | | 6-Feb-22 | NEXO-0006587, NEXO-0006588, NEXO-0006589, NEXO-0006590, NEXO-0006592, NEXO-0006593, NEXO-0006594, NEXO-0006595, NEXO-0369462 |
| | | 22-Aug-21 | NEXO-0006596, NEXO-0006597, NEXO-0006605, NEXO-0006617, NEXO-0006619, NEXO-0006631, NEXO-0006643 |
| | | 13-Apr-21 | NEXO-0006509, NEXO-0006510, NEXO-0006522, NEXO-0006540 |
| | | 24-Nov-21 | NEXO-0006649 |
| | | 5-May-21 | NEXO-0006668, NEXO-0006670, NEXO-0006677, NEXO-0006685, NEXO-0006687, NEXO-0369463 |
| | | 6-Sep-21 | NEXO-0017381 |
| | | 28-Sep-21 | NEXO-0006692, NEXO-0006693, NEXO-0006695, NEXO-0006711, NEXO-0369464 |
| | | 30-Jul-21 | NEXO-0211219, NEXO-0369458 |
| | | 26-Oct-21 | NEXO-0006718, NEXO-0006719, NEXO-0006727, NEXO-0006728, NEXO-0006730, NEXO-0006735 |