James Taylor-Copeland (284743)
james@taylorcopelandlaw.com
Max Ambrose (320964)
maxambrose@taylorcopelandlaw.com
TAYLOR-COPELAND LAW
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: 619-734-8770
Facsimile: 619-566-4341

*Counsel for Plaintiff John Cress*

**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

JOHN CRESS,

Plaintiff,

v.

NEXO CAPITAL INC.,

Defendant.

Case No. 3:23-CV-00882-TSH

**PLAINTIFF JOHN CRESS'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. RANDALL VALENTINE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: October 22, 2026
Hearing Time: 10:00 a.m.

Courtroom: San Francisco Courthouse
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

# TABLE OF CONTENTS


STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3)) ......................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................2

I. INTRODUCTION ..........................................................................................2

II. BACKGROUND..........................................................................................4

A. The Claims Dr. Valentine's Report Targets..................................................4

B. Dr. Valentine's Four Opinions .....................................................................4

C. Dr. Valentine's Qualifications......................................................................5

D. Dr. Valentine's Methodology, As He Described It........................................5

III. LEGAL STANDARD....................................................................................6

IV. ARGUMENT..................................................................................................8

A. Dr. Valentine Is Not Qualified to Opine on Securities-Offering Compliance or Accredited-Investor Verification Practice ..............................................8

B. Opinion Nos. 1 and 2 Are Legal Conclusions Dr. Valentine Disclaimed Under Oath, Built on No Reliable Method ..................................................9

1. "Reasonable steps . . . consistent with Rule 506(c)" is the ultimate legal question ......................................................................................9

2. Valentine's deposition disclaimers empty the opinions of any admissible content..............................................................................11

3. The opinions rest on no reliable methodology...........................................12

4. The opinions are not reliably applied to the facts .......................................15

C. Opinion No. 3 — That Mr. Hristov "Did Not Make a Misrepresentation" — Is a Legal Conclusion on the Ultimate Issue, State-of-Mind Speculation, and a Lay Reading of an Email...........................................................................19

1. The opinion decides falsity, the ultimate issue on the fraud claims ............19

2. The opinion is state-of-mind testimony Dr. Valentine admits he cannot give..........................................................................................20

3. "Simply reading the email" is not a methodology, and requires no expert..........................................................................................21

4. The opinion contradicts Dr. Valentine's own Opinion No. 4 ......................21

D. Opinion No. 4 Is an Integration Analysis Valentine Admits Regurgitates Legal Materials ....22

E. The "Regulatory Uncertainty" Narrative and Related Assertions Are Irrelevant, Unreliable, and Unfairly Prejudicial ....23

F. In the Alternative, the Court Should Exclude Each Opinion Individually ....25

V. CONCLUSION ....25

## TABLE OF AUTHORITIES

**Cases**

*Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443 (9th Cir. 1992) .................... 9, 20
*Baker v. SeaWorld Entertainment, Inc.*, 423 F. Supp. 3d 878 (S.D. Cal. 2019) .................... 7
*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) .................... 7, 22, 23
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .................... 1, 7, 8, 24
*Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II)*, 43 F.3d 1311 (9th Cir. 1995) ...... 7, 8, 19
*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) .................... 3, 6, 9
*Flaxel v. Johnson*, 541 F. Supp. 2d 1127 (S.D. Cal. 2008) .................... 10
*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) .................... 7, 12, 14, 16, 21
*Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d 998 (9th Cir. 2004) .................... 7, 9, 23
*In re Cypress Semiconductor Securities Litigation*, 891 F. Supp. 1369 (N.D. Cal. 1995), *aff'd sub nom. Eisenstadt v. Allen*, 113 F.3d 1240 (9th Cir. 1997) .................... 13, 21
*Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025) .................... 14, 15
*Kostelecky v. NL Acme Tool/NL Industries, Inc.*, 837 F.2d 828 (8th Cir. 1988) .................... 10, 19
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................... 7, 15
*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) .................... 21
*Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223 (W.D. Wash. 2018) .................... 18
*Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051 (9th Cir. 2008) .................... passim
*Neo4j, Inc. v. PureThink, LLC*, No. 18-cv-07182-EJD, 2023 WL 7093805 (N.D. Cal. Oct. 25, 2023)9
*Ollier v. Sweetwater Union High School District*, 768 F.3d 843 (9th Cir. 2014) .................... 14
*Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, No. 16-cv-01393-JST, 2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) .................... 7, 13, 20, 21
*Powell v. Anheuser-Busch Inc.*, No. CV 09-729-JFW (VBKx), 2012 WL 12953439 (C.D. Cal. Sept. 24, 2012) .................... 18
*SEC v. Daifotis*, No. C 11-00137 WHA, 2012 WL 2051193 (N.D. Cal. June 7, 2012) .................... 7
*SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072 (9th Cir. 2010) .................... 20
*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) .................... 20
*Siqueiros v. General Motors LLC*, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022) .................... 7
*Siring v. Oregon State Board of Higher Education ex rel. Eastern Oregon University*, 927 F. Supp. 2d 1069 (D. Or. 2013) .................... 21
*Stephens v. Union Pacific Railroad Co.*, 935 F.3d 852 (9th Cir. 2019) .................... 14
*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .................... 20
*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .................... 11
*United States v. Chang*, 207 F.3d 1169 (9th Cir. 2000) .................... 8, 9
*United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017) .................... 11

**Statutes, Rules, and Regulations**

Fed. R. Evid. 403 ....................1, 2, 8, 24
Fed. R. Evid. 702 .................... passim
Fed. R. Evid. 702 advisory committee's note to 2023 amendment ....................6
Fed. R. Evid. 704 ....................1
17 C.F.R. § 230.506(c)....................4, 9
Cal. Corp. Code §§ 25110, 25401, 25503....................4, 10, 19

TO DEFENDANT NEXO CAPITAL INC. AND ITS ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on October 22, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom E, 15th Floor, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, before the Honorable Thomas S. Hixson, Plaintiff John Cress ("Cress") will and hereby does move for an order excluding the opinions and testimony of Defendant Nexo Capital Inc.'s ("Nexo") retained expert, Dr. Randall Valentine, in their entirety or, in the alternative, excluding: (1) Opinion Nos. 1 and 2 (that Nexo's accredited-investor verification was reasonable and "consistent with Rule 506(c) of Regulation D"); (2) Opinion No. 3 (that Mr. Hristov "did not make a misrepresentation"); (3) Opinion No. 4 (that the 2018 ICO and the 2021–2022 sales were separate offerings); and (4) Dr. Valentine's narrative concerning "regulatory uncertainty," the SEC's enforcement posture, and secondary-market availability of the NEXO Token, as set forth in Part IV.F below.

This Motion is made pursuant to Federal Rules of Evidence 702, 704, and 403, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on the grounds that Dr. Valentine is not qualified to render the opinions he offers, that his opinions are impermissible legal conclusions on ultimate issues reserved for the Court and the jury, that his opinions are the product of no reliable methodology and are not reliably applied to the facts, and that his testimony would not assist—but would instead mislead—the trier of fact. The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Max Ambrose ("Ambrose Dec.") and exhibits thereto, the pleadings and papers on file in this action, and any argument or evidence the Court may consider at the hearing.

**STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))**

1. Whether Dr. Valentine — a finance professor who has never worked at the SEC, FINRA, or any state securities regulator, and has never been a compliance officer "of any type," — is qualified to opine on securities-offering compliance and accredited-investor verification practice.

2. Whether his opinions that Nexo acted "consistent with Rule 506(c) of Regulation D,"

"satisfied the requirements of Rule 506(c)," made no "misrepresentation," and conducted "separate" offerings under SEC "integration principles" are inadmissible legal conclusions on ultimate issues.

3. Whether opinions assembled from a single one-hour interview with one Nexo employee, documents Nexo compiled, and no independent verification — and which count expired, post-sale, and missing accredited-investor certificates as verification successes — satisfy Rule 702(b)–(d).

4. Whether the probative value, if any, of Dr. Valentine's testimony is substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury under Rule 403.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Nexo has retained a finance professor to tell the jury that it complied with the federal securities laws and did not lie to Cress. Dr. Valentine's report offers four opinions, each framed in the operative language of the legal standards this Court will charge the jury on or decide itself: that Nexo's accredited-investor verification was "consistent with Rule 506(c) of Regulation D" (Opinion Nos. 1 and 2); that Nexo's VIP relationship manager, Hristiyan Hristov, "did not make a misrepresentation" when he told Mr. Cress that "the NEXO token is registered with the SEC as a security" (Opinion No. 3); and that Nexo's 2018 initial coin offering was "separate" from its 2021–2022 token sales under SEC "integration principles" (Opinion No. 4). Ambrose Dec. ¶ 3, Ex. 1 (Valentine Rep.) at 7–16.

At deposition, Dr. Valentine disclaimed every predicate of those opinions. He is "not a lawyer." Ex. 2 (Valentine Tr.) 16:7–9. He is "not offering a legal opinion on whether Nexo qualified for any exemption as a matter of law." *Id.* 16:13–16. He is "offering no legal opinions in the case." *Id.* 198:12–16. Whether any purchaser was in fact an accredited investor "is a legal conclusion. I am not making that under any circumstances." *Id.* 175:18–20. Whether "reasonable steps to verify" means steps taken before a sale or post-facto "would call for legal opinion. I'm not going to opine on that." *Id.* 177:17–22. And his integration opinion is "just simply regurgitating what the SEC is saying." *Id.* 198:7–11.

These disclaimers leave nothing but the forbidden conclusions themselves. What Dr. Valentine proposes to deliver from the stand is a closing argument answering the ultimate legal questions—exemption, falsity, and reasonableness—in Nexo's favor, stripped of any testable analysis. The Ninth Circuit forbids exactly this. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

The opinions are also unsupported by any methodology. Dr. Valentine's "methodology" was to read documents Nexo compiled and to speak once, for "[a] little bit over an hour," with a single Nexo employee—Octavian Dinca, with Nexo's counsel present. Valentine then accepted Dinca's assurances that Nexo's "policy was always followed" without verification. Ex. 2 9:14–11:9, 130:3–7.

Applied to the facts, that method counted as verification "successes" an accredited-investor certificate that expired more than three months before the purchase it supposedly supported, certificates collected only after the sales closed, financial information that Valentine conceded "wouldn't be sufficient to verify accreditation," and several purchasers for whom Nexo produced no evidence regarding accreditation at all. *Id.* 128:15–18, 132:13–24, 162:16–163:2, 176:23–177:1. And the data set underneath his headline "95.6%" documentation figure was so incomplete that after Cress's rebuttal expert, Professor Seligman, identified numerous U.S. sales not reflected in it at all, Dr. Valentine served a "Supplemental Appendix C" adding two dozen previously omitted U.S. purchasers **the night before his deposition**. *Id.* 71:20–25, 188:19–189:6; Ex. 4. But even this Supplemental Appendix C did not include at least a dozen additional U.S. purchasers.

Rule 702 as amended requires Nexo to establish admissibility by a preponderance, with no presumption in favor of admission. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025). Nexo cannot carry that burden for a witness who is unqualified in the field he purports to explain, who offers legal conclusions he simultaneously disavows, and whose method any juror could replicate "by simply reading the email." Ex. 2 68:25–69:5. The Court should exclude Dr. Valentine's opinions and testimony in their entirety.

## II. BACKGROUND

### A. The Claims Dr. Valentine's Report Targets

Cress's third cause of action alleges the unregistered offer and sale of the NEXO Token in violation of California Corporations Code sections 25110 and 25503; his fourth and fifth causes of action allege securities fraud under section 25401 and common-law fraud based on Mr. Hristov's March 23, 2021, statement that "the NEXO token is registered with the SEC as a security." Dkt. 88 (SAC); Dkt. 98. Nexo's defense to the registration claim depends on establishing that its 2021–2022 NEXO Token sales were exempt under Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c). Nexo bears the burden of establishing its claimed exemption. Dr. Valentine's report is Nexo's vehicle for that defense, and for negating the falsity element of the fraud claims. It would be difficult to design an assignment more at odds with the expert's proper role. Nexo offers a retained finance professor to pronounce Nexo satisfied the exemption it must prove, and to pronounce true the very statement this Court has already sustained as a basis of Cress's fraud claims. Rule 702 does not permit a party to deliver its requested verdict through the mouth of a paid expert.

### B. Dr. Valentine's Four Opinions

Opinion No. 1 states that "Nexo implemented a reasonable policy and practice of verifying accredited investor status for U.S. customers who purchased the NEXO Token, consistent with Rule 506(c) of Regulation D." Ex. 1 at 7.

Opinion No. 2 states that "Nexo complied with its policy and practice" as to Cress, that "Nexo satisfied the requirements of Rule 506(c) with respect to its 2021-2022 Direct U.S. Customer Sales," and that Cress "was, in fact, an accredited investor." *Id.* ¶¶ 7, 9, at 10.

Opinion No. 3 states that "Mr. Hristov did not make a misrepresentation when Mr. Hristov requested an accredited investor certificate from Mr. Cress," and that "[a] reasonable investor in this circumstance, particularly a sophisticated, accredited investor like Plaintiff, would understand that Mr. Hristov's reference to 'registered with the SEC' was a reference to a Form D registration for an offering under SEC Regulation D." *Id.* ¶ 12, at 10–11.

Opinion No. 4 states that the 2018 ICO was "a separate and distinct offering from the later 2021–2022 Direct U.S. Customer Sales," invoking Dr. Valentine's "understanding" that "SEC integration principles include a safe harbor where offerings separated by at least 30 days may avoid integration in certain circumstances." *Id.* ¶¶ 11, 13, at 12–16.

Surrounding the four opinions is a narrative: that between 2018 and 2021 there was "considerable regulatory uncertainty" about whether tokens were securities; that the SEC pursued "regulation through litigation" during "the Biden Administration" in a manner "hostile to the cryptocurrency industry"; and that "[t]he Second Trump Administration has abandoned several SEC enforcement lawsuits." Ex. 1 ¶¶ 3–4. The report also asserts, citing two internet articles, that the exchanges on which NEXO Tokens traded were "not accessible to U.S. persons," and, citing nothing, that Dr. Valentine has "seen no evidence" of sales to statutory underwriters. *Id.* ¶¶ 15–16, at 16–17.

**C. Dr. Valentine's Qualifications**

Dr. Valentine holds a Ph.D. in finance and teaches at Millsaps College. Ex. 1, App. A. He has never worked at the SEC. Ex. 2 49:5–6. He has never worked as a state securities regulator. *Id.* 49:7–9. He has never worked at FINRA. *Id.* 49:10–11. He is not a lawyer. *Id.* 16:7–9. He has never been employed as a securities compliance officer, or as a compliance officer "of any type." *Id.* 49:12–20. Asked whether he had ever "designed, run, or audited a Rule 506(c) Accredited Investor Verification Program," he identified only "probably four, maybe five" expert reports "submitted in litigation," none of which proceeded to testimony. *Id.* 49:22–50:14. His cryptocurrency-related engagements listed on his CV are damages, valuation, and tracing matters—a data-center dispute, an insurance dispute, probate, and divorce cases. Ex. 1, App. A at 24–25. None of his publications concerns securities regulation, Regulation D, offering exemptions, or compliance practice. *Id.* at 20–23.

**D. Dr. Valentine's Methodology, As He Described It**

Dr. Valentine's contact with Nexo was limited to a single Zoom call lasting "[a] little bit over an hour" with one employee, Octavian Dinca, with Nexo's counsel present. Ex. 2 9:14–10:22. He took no notes and did not record the call. *Id.* 10:23–11:9. He never interviewed Mr. Hristov, whose

statement he opines on. *Id.* 42:16–18. He never asked Mr. Dinca about the statement that the NEXO Token was "registered with the SEC as a security," nor whether Mr. Dinca himself had made that representation to customers. *Id.* 12:17–20, 13:6–10.

Asked to state the methodology behind Opinion No. 1, Valentine answered: "I did a review, including the aforementioned interview with Mr. Dinca, where I went over explicitly what Nexo's policies and procedures were . . . ." *Id.* 66:11–16. But when Dinca was asked under oath if he had "any knowledge about the process behind ensuring US customers purchasing Nexo Tokens were verified accredited investors," Dinca testified, "I can't cover this." Ex. 5, Dinca Tr. 108:22–109:3. Dinca did not know why Nexo verified accredited investors, did not know if the requirement was specific to US purchasers, did not know if verifying accredited investor status was always a requirement for NEXO sales, did not know when Nexo implemented a requirement to verify accredited investor status, did not know if Nexo had a requirement to verify accredited investor status in 2020, and did not know who was responsible for ensuring that Nexo token purchasers from the U.S. were accredited investors. Ex. 5, Dinca Tr. 99:9–108:21.

Asked to state the methodology behind Opinion No. 3, Valentine answered that "[a]ny expert could replicate exactly what I did by simply reading the email, reading the correspondence, understanding the context of those emails, and then looking at the documents that were attached . . . ." Ex. 2 68:25–69:5.

## III. LEGAL STANDARD

Expert testimony is admissible only if the proponent demonstrates to the Court that it is more likely than not that (a) the witness's specialized knowledge will help the trier of fact, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the opinion reflects a reliable application of those principles and methods to the facts. Fed. R. Evid. 702. The 2023 amendments "clarify and emphasize" that the proponent bears this burden by a preponderance of the evidence, Fed. R. Evid. 702 advisory committee's note to 2023 amendment, and "[t]here is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th

Cir. 2025).

The Court acts as gatekeeper, ensuring that all expert testimony "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152, and the Court need not admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Relevance requires "fit": the testimony must "logically advance[] a material aspect of the proposing party's case," and opinions developed "expressly for purposes of testifying" require objective, independent validation. *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1315–17 (9th Cir. 1995).

Two categorical limits matter here. First, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law," because "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (cleaned up); *Nationwide*, 523 F.3d at 1058; *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law."). Second, experts may not opine on intent, motive, or state of mind, or vouch for witnesses because "[t]he jury is sufficiently capable of drawing its own inferences" on those questions, *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (citation omitted), and an expert "is not permitted simply to review deposition testimony and other evidence and then proffer an opinion about 'what actually happened in the case at hand.'" *Id.* at *7 (quoting *SEC v. Daifotis*, No. C 11-00137 WHA, 2012 WL 2051193, at *1 (N.D. Cal. June 7, 2012)); *Siqueiros v. General Motors LLC*, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022) (excluding expert testimony where expert's "'conclusion' is nothing more than a summary" of fact witness testimony). Nor may an expert simply "review[] data from the same body of evidence that he relied on in applying his 'empirical analysis' methodology and conclud[e] that the deposition testimony and company documents corroborated his initial findings." *Baker v. SeaWorld*

*Entertainment, Inc.*, 423 F. Supp. 3d 878, 911–12 (S.D. Cal. 2019) ("the Court finds that [expert's] methodologies are unreliable in this context").

Testimony surviving Rule 702 may still be excluded under Rule 403, because expert evidence "can be both powerful and quite misleading." *Daubert*, 509 U.S. at 595 (citation omitted).

## IV. ARGUMENT

### A. Dr. Valentine Is Not Qualified to Opine on Securities-Offering Compliance or Accredited-Investor Verification Practice

Rule 702 requires that a witness be qualified "by knowledge, skill, experience, training, or education" in the specific subject of his testimony. General credentials in an adjacent field are not enough. In *United States v. Chang*, the Ninth Circuit affirmed the exclusion of a professor of international finance offered to opine on the authenticity of a security, because his "practical experience in international finance" was not "practical experience" in the "fact at issue." 207 F.3d 1169, 1172–73 (9th Cir. 2000). The fit between credential and opinion must be real: qualification "on a given subject" is what the Rule demands. *Id.* at 1172.

Dr. Valentine is *Chang*'s professor. His opinions concern the design and implementation of a Rule 506(c) accredited-investor verification program, "best compliance practices in the cryptocurrency industry," Ex. 1 ¶ 1, and what the SEC's regulations require, permit, and excuse. Yet he has never worked at the SEC, at FINRA, or for any state securities regulator, and has never been a compliance officer of any kind. Ex. 2 49:5–20. He has never designed, run, or audited a Rule 506(c) verification program in the real world. Rather, his entire claimed experience consists of "four, maybe five" expert reports written for litigation, none of which reached testimony. *Id.* 49:22–50:14. Opinions "developed . . . expressly for purposes of testifying" demand objective validation precisely because the expert's "normal workplace" should be "the lab or the field, not the courtroom or the lawyer's office." *Daubert II*, 43 F.3d at 1317.

Dr. Valentine's purported cryptocurrency experience does not close the gap. Tracing coins in a divorce, valuing them in a probate estate, or computing damages in a data-center dispute, Ex. 1, App.

A at 24–25, says nothing about Regulation D verification practice—just as expertise in "international finance" said nothing about counterfeit securities in *Chang*. Nor do his publications, which consist of articles on COVID-19 infection rates, terrorist-attack event studies, and seasonal stock-market effects, *id.* at 20–23, with not one entry on securities regulation or offering compliance. And for Opinion No. 3—what "[a] reasonable investor . . . would understand" a statement to mean—Valentine concedes he has no training in psychology and ran no survey of how investors understood the phrase "registered with the SEC as a security." Ex. 2 83:16–18, 84:3–9. Nexo cannot carry its *Engilis* burden of establishing qualification on any of the subjects his report addresses.

**B. Opinion Nos. 1 and 2 Are Legal Conclusions Dr. Valentine Disclaimed Under Oath, Built on No Reliable Method**

**1. "Reasonable steps . . . consistent with Rule 506(c)" is the ultimate legal question**

Whether Nexo took "reasonable steps to verify" accredited-investor status under 17 C.F.R. § 230.506(c)(2)(ii) is the legal standard for one of the requirements Nexo must satisfy. And whether Nexo "satisfied the requirements of Rule 506(c)" as a whole—which also turns on whether every purchaser was in fact an accredited investor and whether Nexo took reasonable steps to ensure purchasers were not underwriters—is the ultimate question on Nexo's exemption defense. A defense on which Nexo bears the burden. Dr. Valentine's Opinion Nos. 1 and 2 purport to answer both questions: Nexo's program was "consistent with Rule 506(c) of Regulation D," Ex. 1 at 7, 10, and "Nexo satisfied the requirements of Rule 506(c)." *Id.* ¶ 9. That is not evidence. It is advocacy delivered as a verdict. "[A]n expert witness cannot give an opinion as to her legal conclusion," *Hangarter*, 373 F.3d at 1016, may not opine that conduct was or was not "legally acceptable or permissible," *Neo4j, Inc. v. PureThink, LLC*, No. 18-cv-07182-EJD, 2023 WL 7093805, at *8 (N.D. Cal. Oct. 25, 2023) (citing *Nationwide*, 523 F.3d at 1058), and may not deliver "reasonableness" conclusions that apply a legal standard, *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (reasonableness and foreseeability of reliance "were matters of law" and "inappropriate subjects for expert testimony").

Nexo will respond that experts may describe industry practice. True. But beside the point. Dr. Valentine has no experience with industry practice and his opinions are the legal conclusions. The headings of Opinion Nos. 1 and 2 track the regulation's language, the body applies SEC releases and no-action letters to Nexo's conduct, and the bottom line declares compliance. An opinion that "merely tells the jury what result to reach is not sufficiently helpful." *Nationwide*, 523 F.3d at 1060 (quoting *Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1988)). Worse, it usurps this Court's role. The jury would hear incorrect statements of the law regarding Regulation D from Nexo's paid witness — including his testimony that filing a Form D "is a form of registration," Ex. 2 81:24–82:2 — a proposition Cress's rebuttal expert, the co-author of the leading securities-regulation treatise, describes as one he has never heard "any securities professional at the SEC, in academic literature, or in any other context utter." Ex. 3 (Seligman Rebuttal) ¶ 2.

Indeed, federal courts uniformly reject the very proposition Valentine advances. *Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1143 (S.D. Cal. 2008) ("The Form D is not a 'registration statement,' but, instead, a form that exempts a company from registering its securities."). Nor is this issue new to this case. The Court quoted that precise holding when it sustained Cress's Section 25401 claim, and it denied dismissal on the premise that the statement that the NEXO Token was "registered with the SEC as a security" was a misrepresentation. Dkt. 26 at 32–33 (quoting *Flaxel*, 541 F. Supp. 2d at 1143, and denying dismissal "as to the alleged misrepresentation that the NEXO Token was registered with the SEC as a security"). Valentine's contrary opinion is not expert testimony at all. It is a legal conclusion that contradicts the framework this Court has already applied, and it would supplant the Court rather than assist the jury. Fed. R. Evid. 702(a); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (expert may not give "an opinion as to her legal conclusion"). Indeed, when asked whether he disagreed that "the Form D is not a registration statement, but instead a form that exempts a company from registering its securities," Valentine conceded that would be a legal opinion and backtracked. Ex. 2 91:2–10 ("I'm not offering a legal opinion in the case.").

Nor may Nexo salvage these legal conclusions by dressing them as industry custom: "testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991); see *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (an expert who "tell[s] the jury what result to reach" improperly "substitute[s] the expert's judgment for the jury's").

**2. Valentine's deposition disclaimers empty the opinions of any admissible content**

Confronted at deposition, Dr. Valentine renounced each component a compliance opinion would require. Whether a given purchaser was an accredited investor: "a legal conclusion. I am not making that under any circumstances." Ex. 2 175:18–20. Whether the documentation for a specific purchaser was sufficient to verify accreditation: "the answer to the question would be a legal conclusion, and I'm just not going to go there." *Id.* 158:14–16; *see id.* 157:11–16. Whether verification must precede a sale: "that would call for legal opinion. I'm not going to opine on that." *Id.* 177:17–22. Whether Nexo qualified for the exemption: "not offering a legal opinion" on it. *Id.* 16:13–16. Even the task of matching documents to purchasers: "my job in the scope of my opinions in this case, isn't to go by and verify one-by-one-by-one, whether or not these individuals are accredited investors. That's a legal opinion, and that's not what I'm doing here." *Id.* 133:23–134:2.

Yet he opines that "Nexo implemented a reasonable policy and practice of verifying accredited investor status." Ex. 1 at 7. He further opines that "Nexo has a 95.6% rate of documentation supporting accredited investor status," Ex. 1 at 14, while disclaiming any opinion on whether such documentation must be obtained before the transaction or even whether documentation would be sufficient to show accreditation.

"Documentation rate" is thus a misnomer. Much of the "documentation" on which Valentine relied does not show the investors were accredited investors—nor would Valentine testify that it does. In fact, many of those documents show the exact opposite. The documents cited in Appendix C contain flurries of unrelated emails, source of funds declarations and account statements showing net worths

and/or incomes *far below* the threshold for accredited investors. *See generally infra* Part IV.B.4. Much of the "documentation" Valentine cites thus has nothing to do with the investors' accredited-investor status. Valentine thus presents testimony that any document—even those totally unrelated to verifying accredited investor status, or those showing the exact opposite—is evidence that "Nexo implemented a reasonable policy and practice of verifying" accreditation. But labeling whatever document happens to sit in a customer's file "evidence" of Regulation D compliance—as Valentine does—is not verification. The documents must actually be analyzed to determine whether they establish accredited-investor status, and Nexo must be able to show the Court that it did that analysis. Neither Nexo nor its expert Valentine performed any such analysis.

A witness cannot hand the jury conclusions while disclaiming, under oath, the analysis that would support them. If the disclaimers are honest, the opinions are hollow—"connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. If the opinions stand, they are legal conclusions he admits he is unqualified and unwilling to defend. Either way they are inadmissible.

**3. The opinions rest on no reliable methodology**

Dr. Valentine's stated method for Opinion No. 1 was "a review" of documents plus the single Dinca interview. Ex. 2 66:11–16. He spoke to no one else at Nexo, *id.* 9:14–10:22, took no notes, *id.* 10:23–11:9, and did nothing to independently verify what Mr. Dinca told him, accepting instead that the documents Nexo selected were "consistent with" Mr. Dinca's account. *Id.* 11:18–12:2. His report repeats the client's assurances verbatim: "Based on my conversations with Nexo, I understand that all purchasers provided accredited investor certificates or other accredited investor documentation, consistent with company policy, but some records cannot be located due to the substantial passage of time." Ex. 1 at 14–15. Where the record contradicted the assurance—[redacted], a pre-Cress purchaser with no documentation at all—Dr. Valentine deferred to Mr. Dinca again: "they told me that there was a policy in place and the policy was always followed." Ex. 2 130:3–7. Asked whether he found Mr. Dinca "credible," he reasoned in a circle: "a 98 percent documentation rate in the crypto industry is pretty remarkable." *Id.* 130:22–131:1.

Valentine did not review a single written policy or procedure, because Nexo has none. Instead, his methodology was to confirm Dinca's promise that "all US-based investors were required to have documentation of accredited investor status," but conceded that for some investors, "the documentation as we sit here today is not available." Ex. 2 150:24–151:11.

That is not expertise; it is cherry-picked evidence transmitted as argument. Dr. Valentine conceded as much, stating that the Dinca interview merely "confirmed many of the opinions that already were in process in the report." The conclusions came first, and the client's confirmation came after. Ex. 2 11:16–17. An expert may not "simply . . . review deposition testimony and other evidence and then proffer an opinion about 'what actually happened,'" *Oracle*, 2018 WL 6511146, at *7, and may not vouch for the credibility of the client's witnesses, which is "solely [a] jury function[]." *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1373 (N.D. Cal. 1995), *aff'd sub nom. Eisenstadt v. Allen*, 113 F.3d 1240 (9th Cir. 1997). Yet that is exactly what Dr. Valentine claims he did. His methodology was "simply reading the email, reading the correspondence, understanding the context of those emails, and then looking at the documents that were attached . . . ." Ex. 2 68:25–69:5.

But when Nexo had no accredited investor documentation, Valentine waved away those lapses, asserting without any evidence "simply the documents were misplaced or lost." Ex. 2 128:19–129:23. Or for others, he speculated "we don't know if this was the only thing that was used to verify the accredited investor status" of the U.S. investor. Ex. 2 153:15–154:4. And when asked if Nexo had sufficient information for others, Valentine backed down on his methodology, claiming "I would not go so far as to say a legal conclusion that this indeed made [the customer] an accredited investor." Ex. 2 157:7–16.

Where his own documentary support could not establish that a purchaser was accredited, Valentine simply assumed that Nexo had additional information. When accredited-investor certificates were expired or post-dated the transactions they purported to support, he speculated that such investors could have had "over a million dollars deposited on the Nexo platform." Ex. 2 140:8–141:10; *see also id.* 135:22–137:5; 160:5–21; Ex. 6 ([redacted]); Ex. 7 ([redacted]). But Valentine conceded this was pure

conjecture, admitting "As we sit here today, I did not identify the Nexo account balances." Ex. 2 146:7–15. Valentine advanced these assumptions only at his deposition, after Nexo's post-dated accredited-investor certificates eviscerated his opinion that "Nexo maintained a reasonable policy and practice of selling NEXO Tokens to U.S. persons **only after the customer provided documentation establishing accredited investor status**." Ex. 1 at 7 (emphasis added).

Nexo's own customer communications—supplied by Dinca himself—run directly contrary to Valentine's speculation. When verifying accredited-investor status, Dinca told customers that Nexo would not treat their account values as proof: "[t]he crypto assets in your account cannot be used for this purpose [to verify accredited investor status] by our Compliance team." Ex. 8 at NEXO-0055890; *see also* Ex. 9 ("We are sorry, but we cannot accept your crypto deposit as net worth proof. By definition, net worth equals assets minus liabilities and we do not have proof of all liabilities and practically can not obtain one"). Dr. Valentine ultimately agreed that Nexo would not have documentation of customers' liabilities—without which a "net worth" calculation cannot suffice to verify accredited-investor status. Ex. 2 149:19–150:7. Valentine thus not only speculated about what Nexo knew of customer account balances; his own testimony establishes that even if Nexo had relied on those balances, it would itself be speculating about accreditation, counting assets while ignoring liabilities.

"A party's own speculation is insufficient to create a genuine issue of material fact . . . and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) (citation omitted); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014). The "Court may evaluate whether the expert proffered sufficient facts or data to 'support . . . every necessary link' in her theory . . . If the evidence does not so suffice, the Court may 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 961 (N.D. Cal. 2025) (quoting *Joiner*, 522 U.S. at 146). Valentine simply assumes that the documents presented corroborated accredited investor status—without providing any opinion on

whether they actually do, or whether Nexo did anything to analyze them. Moreover, Valentine omitted dozens of NEXO Token purchasers from his report, and even after supplementation, omitted dozens more. There is no clear explanation why other than that he did not know about them. But lack of critical knowledge is a failure to proffer sufficient facts to support Dr. Valentine's conclusions. His opinions should thus be excluded on that basis. *Klein*, 766 F. Supp. 3d at 961.

Moreover, while Valentine asserts that the documentation rate provides the basis for his opinion, he concedes his report "established [no] floor" at which Nexo's documentation rate would become unreasonable. Ex. 2 70:15–25; 72:8–23. When pressed about the testability of his methodology given his failure to establish a floor, Valentine improvised an analogy between a compliance-documentation rate and "a 5 percent margin of error" in "peer-reviewed academic research." *Id.* 73:17–74:24. No SEC release, no treatise, no industry survey, and nothing in his report supports importing statistical-significance conventions into Rule 506(c). That is the antithesis of "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Dr. Valentine eventually conceded that if the documentation rate were significantly lower, it could "influence [his] opinions." Ex. 2 75:5–16. As explained in Part IV.B.4 below, the documentation rate is in fact much lower—and indeed under fifty percent for the period Valentine dubs "relevant." Yet Valentine has not revised his opinion at all.

**4. The opinions are not reliably applied to the facts**

Rule 702(d) independently requires exclusion. Dr. Valentine defined the "only window of time relevant to Plaintiff" as the eight U.S. purchasers who bought before Mr. Cress. Ex. 1 at 15; Ex. 2 112:3–113:8. Within that self-selected window, his own Appendix C and testimony establish that at least six of the eight were not properly verified. The sole "documentary support" provided by [redacted] was a certificate that expired September 21, 2020, "more than three months" before his January 5, 2021, purchase. Ex. 2 132:13–24, 134:20–23. Two more purchasers had certificates collected only "after the transaction," meaning Nexo had no evidence of their accreditation status at

the time of the sale. *Id.* 176:23–177:1. Another two purchasers provided only limited information regarding their assets, which Valentine conceded was insufficient to establish the necessary income or net worth required to verify accreditation. Ex. 2 162:12–20; 155:6–21; 176:17–22. [redacted] had "[n]one." Ex. 1, App. C; Ex. 2 128:15–18. Dr. Valentine conceded he has "no way of knowing" [redacted] income, net worth, or occupation. Ex. 2 129:13–23. Valentine misidentified other purchasers as purchasing after Cress's purchases. [redacted] made his purchase on October 21, 2020 (not 2021 as Valentine claims). Ex. 10. Nor did [redacted] provide any accredited investor certificate or any accredited investor documentation, as his investment statement showed a $253,000 account value with a Source of Funds declaration stating expected account turnover of $50,000.[1] Ex. 11; Ex. 12.

Professor Seligman identified the same pattern across the full 2021–2022 population: purchasers verified after purchase, purchasers with lapsed certificates, and purchasers with no valid documentation. Ex. 3 ¶¶ 34, 38.

Dr. Valentine counted every one of these toward Nexo's "95.6% rate of documentation supporting accredited investor status." Ex. 1 at 14; Ex. 2 134:24–135:2 ([redacted] "counted . . . toward Nexo's 95.6 percent success rate"). His justification — an expired certificate "pass[es] a reasonableness test" because "[d]oes your W-2 change . . . No, it doesn't," *id.* 177:7–15 — appears nowhere in his report, in the regulation, or in any source he identified. It is a rationalization invented at deposition, applied to reach a predetermined result, which contradicts his report's own reasoning that "Nexo maintained a reasonable policy and practice of selling NEXO Tokens to U.S. persons only after the customer provided documentation establishing accredited investor status." Ex. 1 at 7; *see Joiner*, 522 U.S. at 146.

The underlying data set was equally unreliable. Appendix C—which Dr. Valentine confirmed he "put together," Ex. 2 131:7–9—omitted every U.S. purchaser from 2019 and 2020, omitted

[1] Nexo and Valentine frequently attempt to rely on "Source of Funds" declarations required by Nexo's Anti-Money-Laundering policies to argue that all U.S. investors were verified accredited investors. However, these Source of Funds declarations generally do not provide information regarding wealth or income, and in fact often suggest that the investors were nowhere near the monetary threshold to be accredited investors. *See, e.g.,* Ex. 12; Ex. 20 (identifying customer as a firefighter).

purchasers who bought through the Changelly integration on Nexo's own website, and omitted purchases on third-party exchanges. *Id.* 188:2–189:6, 204:25–205:6; Ex. 3 ¶¶ 33, 36, 56. After Professor Seligman's rebuttal identified undisclosed U.S. sales, Dr. Valentine served a "Supplemental Appendix C" the night before his deposition adding roughly two dozen purchasers from 2019 to 2022. Ex. 2 71:20–25, 212:25–213:8; Ex. 4. Valentine limited his opinion "to the reasonable steps Nexo took with respect to its 2018 and 2021 OTC sales" but later discovered for the first time, *after* he filed his report, that Nexo had been selling NEXO tokens to U.S. investors in 2019 and 2020. Ex. 2 188:1–189:6; 193:2–5. Valentine could provide no credible explanation why he excluded 2020 U.S. investors from his report. Ex. 2 59:4–19 (excluding 2020 sales solely because they "predate sales in 2021"); 184:5–186:9 (learning of 2019-2020 sales after he submitted his report, and unable to say whether there were any 2020 sales at the time of his deposition).

The new purchasers identified on Supplemental Appendix C further highlight the complete absence of any methodology. Indeed, at least seven of the eleven additional pre-Cress purchasers—who fall within what Valentine calls the "only window of time relevant to Plaintiff"—were not properly verified. Ex. 4. For example, Valentine's Supplemental Appendix C identified [redacted] as purchasing Nexo Tokens in March 2020, but the documentation purportedly supporting his accreditation was a January 2022 email chain—nearly two years later—which Valentine conceded "obviously does not have any per[tinent] information as far as accredited investor forms." Ex. 2 213:15–214:19; Ex. 13. Similarly, the only documentation supporting Nexo's sale to [redacted] in August 2020 is an email chain from March 2021. Ex. 14. The documentation purportedly supporting the accreditation of [redacted] in July 2020 is an email chain in which Mr. [redacted] refuses to provide an accredited investor certificate. Ex. 15. [redacted] documents post-date his November 2020 purchases by four months. Exs. 16–18. [redacted] documents post-date its August 2019 purchase by nearly two years. Ex. 19 (June 2021 email). Several other purchasers—including one who identifies himself as a firefighter—are supported only by Source of Funds declarations that say nothing about their incomes or net worth. Exs. 20 and 21. In all, Valentine's Supplemental Appendix C shows that

for at least 13 of the 19 pre-Cress purchasers, Nexo did not have documentation sufficient to verify accreditation at the time of sale. Ex. 4; Ambrose Dec. ¶ 29.

At Dr. Valentine's deposition, he acknowledged that the full universe of U.S. NEXO Token purchasers remains unknown: "We are still in the process of going through documentation. I can't say with 100 percent certainty that this is the list and there could not be further amendments." Ex. 2 116:21–24. An opinion whose data set is conceded to be incomplete, whose inclusion criteria shifts day by day, whose limitations are based on blatantly incorrect facts, and whose headline percentage moved between report and deposition is not "based on sufficient facts or data," Fed. R. Evid. 702(b), and does not reflect the reliable application Rule 702(d) demands. *Powell v. Anheuser-Busch Inc.*, No. CV 09-729-JFW (VBKX), 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012) ("Reliance on incomplete facts and data will make an expert's opinion unreliable"); *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1240 (W.D. Wash. 2018) ("Opinions that are derived from erroneous or incomplete data are appropriately excluded.").

Indeed, Cress has identified dozens of additional NEXO Token purchasers not identified or considered by Valentine even in his Supplemental Appendix C, including:

1. [redacted] purchased 30,000 NEXO on December 15, 2020. Ex. 22; Ex. 23 (No certificate or financial info).
2. [redacted] purchased $40,000 of NEXO Tokens on November 11, 2020 and November 18, 2020. Ex. 24 (Residence); Ex. 25 (Email); Ex. 22 (spreadsheet). (No certificate, financial info, or communications).
3. [redacted] purchased 32,256.05 NEXO on December 4, 2020. Ex. 22 (spreadsheet); Ex. 26 (residence); Ex. 27 (email) (No certificate or financial info).
4. Brian Mitchell purchased approximately 10,000 NEXO Tokens using Nexo's in-app exchange. Ex. 33 ¶ 2 (Mitchell Declaration). Around November 12, 2020, Brian Mitchell purchased 106,100 NEXO Tokens on November 12, 2020. Ex. 33 ¶ 4; Ex. 22; Ex. 24. (No certificate or financial info). Prior to his NEXO Token purchase, Nexo did not ask him for financial information, an accredited investor certificate or inform him of an accredited investor requirement. Ex. 33 ¶¶ 5-6.
5. [redacted] purchased 105,000 NEXO on December 16, 2020. Ex. 22; Ex. 24. (No certificate or independent financial info).
6. [redacted] purchased $100,000 of NEXO on December 17, 2020. Ex. 22; Ex. 28. (No certificate or financial info).
7. [redacted] purchased $100,000 of NEXO on February 4, 2021. Ex. 22; Ex. 24. (No certificate, financial info, or communications).

8. [redacted] purchased $60,000 of NEXO on April 2, 2021. Ex. 22; Ex. 29; Ex. 28. (No certificate or financial info).
9. [redacted] bought $168,210 of NEXO Tokens on December 21, 2020. Ex. 22; Ex. 24. (No certificate or financial info).
10. Erik Hahn, a U.S. citizen who purchased 2,910.92 NEXO Tokens on Nexo's Exchange through Nexo's website on February 28, 2022. Ex. 32 (declaration of Erik Hahn).
11. Nexo also sold NEXO Tokens to U.S. investors during this litigation. Ex. 30; Ex. 24; Ex. 28.

Cress has been unable to locate information sufficient to verify that *any* of these additional purchasers were accredited investors. Valentine's data set is fatally flawed because neither he nor Nexo can say with any certainty who purchased NEXO tokens from Nexo, and when, much less whether those purchasers were accredited investors. Yet Valentine seeks to tell the jury that Nexo had a "95.6% rate of documentation supporting accredited investor status." That opinion is untethered from reality, much less any sound methodology.

Finally, Valentine's verification-practice benchmarks are anachronisms: a March 2025 no-action letter, August 2025 SEC staff pages, and a March 2026 interpretive release, offered to bless conduct from 2018 through 2021. Ex. 1 nn.1, 5, 14–15, 29; Ex. 3 ¶ 57. The timing is not a technicality: the March 2025 no-action letter is the centerpiece of his opinion that Nexo's minimal verification sufficed, so the opinion measures Nexo's 2021 conduct against a standard that did not exist until four years later. *Daubert II*, 43 F.3d at 1315–16.

**C. Opinion No. 3 — That Mr. Hristov "Did Not Make a Misrepresentation" — Is a Legal Conclusion on the Ultimate Issue, State-of-Mind Speculation, and a Lay Reading of an Email**

**1. The opinion decides falsity, the ultimate issue on the fraud claims**

This Court has already sustained Cress's section 25401 and common-law fraud claims based on the March 23, 2021, statement that "the NEXO token is registered with the SEC as a security." Dkt. 98. Whether that statement was false or misleading is the ultimate issue those claims present. Opinion No. 3 purports to answer it: "Mr. Hristov did not make a misrepresentation." Ex. 1 at 10. At deposition, Dr. Valentine went further, testifying that "[w]hen presented in the whole context of all the material that was in the conversation," he is offering the opinion that the statement is true. Ex. 2 81:15–82:2.

Telling the jury that the centerpiece statement of a fraud case was not a misrepresentation is not specialized knowledge "help[ing] the trier of fact," Fed. R. Evid. 702(a); it "merely tells the jury what result to reach." *Nationwide*, 523 F.3d at 1060 (quoting *Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1988)).

Dr. Valentine's companion formulation—what "[a] reasonable investor in this circumstance . . . would understand," Ex. 1 ¶ 12—simply applies a legal reasonableness standard, which the Ninth Circuit holds is an "inappropriate subject[] for expert testimony." *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (reasonableness of reliance was a matter "of law" and an "inappropriate subject[] for expert testimony"). The reasonable-investor formulation independently invades the Court's province, because a "reasonable investor" is not a fact for a finance professor to find—it is the legal test for materiality. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (fact is material if a "reasonable shareholder would consider it important"); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010) (fact is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."). An expert therefore "cannot testify as to whether the specific information at issue in a case is or is not 'material,'" and may not tell the jury what a reasonable investor would understand. *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (adding "economically" to "material" "does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion"). Dr. Valentine's relabeling of the same forbidden conclusion—as what a reasonable investor "would understand," or as the statement being "true in context"—fares no better.

**2. The opinion is state-of-mind testimony Dr. Valentine admits he cannot give**

The report asserts that the accredited-investor certificate "shows that [Mr. Cress] understood" Mr. Hristov's registration reference to concern Regulation D. Ex. 1 ¶ 12, at 11. But at his deposition Valentine testified he was not "opining on what Mr. Cress actually understood," admitting "I am not in Mr. Cress's mind any more than I'm in anybody else's mind." Ex. 2 80:3–4; 83:5 ("I'm not inside

Mr. Cress's head"). On Mr. Hristov, Valentine concedes: "Obviously, I'm not a mind reader. I don't have a crystal ball. I cannot tell you what Mr. Hristov's state of mind was at the time he wrote an email." Ex. 2 78:11–14. Valentine's own testimony illustrates why "Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind." *Oracle*, 2018 WL 6511146, at *3 (quoting *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013)). What remains, Valentine says, is "a generalized statement" about a hypothetical reasonable investor, Ex. 2 83:5–15 — the legal standard again, offered by a witness with no training in psychology and no survey of how investors understood the phrase "registered with the SEC as a security." *Id.* 83:16–18, 84:3–9.

**3. "Simply reading the email" is not a methodology, and requires no expert**

Dr. Valentine's method for Opinion No. 3, in his own words: "Any expert could replicate exactly what I did by simply reading the email, reading the correspondence, understanding the context of those emails, and then looking at the documents that were attached . . . ." Ex. 2 68:25–69:5. The finder of fact is more than capable of reading emails. Expert interpretation of ordinary correspondence "offers no more than the drawing of an inference from the facts of the case" — inferences "[t]he jury is sufficiently capable of drawing" for itself — and "would be merely substituting the expert's judgment for the jury's." *Oracle*, 2018 WL 6511146, at *3 (citation omitted); *cf. Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977). Valentine never interviewed Mr. Hristov — the declarant — and did not rely on Mr. Hristov's deposition. Ex. 2 42:16–18, 79:2–14. The only extrinsic support he cites is the deposition testimony of Antoni Trenchev, Nexo's own co-founder, that filing a Form D "constitutes a form of registration." Ex. 1 ¶ 12, at 11–12. That is not a methodology for ascertaining what a hypothetical reasonable investor would understand. It is the issuer's litigation position restated by its own founder. *See* Ex. 3 ¶ 7. Repeating a party witness and pronouncing him corroborated is credibility-vouching, "solely [a] jury function[]." *In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1373 (N.D. Cal. 1995), *aff'd sub nom. Eisenstadt v. Allen*, 113 F.3d 1240 (9th Cir. 1997) (table).

**4. The opinion contradicts Dr. Valentine's own Opinion No. 4**

Finally, *Joiner*'s analytical gap is unbridgeable here because Valentine's contention in support of Opinion 3 that "[a] reasonable investor in this circumstance, particularly a sophisticated, accredited investor like Plaintiff, would understand that Mr. Hristov's reference to 'registered with the SEC' was a reference to a Form D registration for an offering under SEC Regulation D" is internally inconsistent.

Form D is titled a "Notice of Exempt Offering of Securities"; and as Professor Seligman explains, "Nowhere, does Form D indicate it is a mechanism for registering a security with the SEC." Ex. 3 ¶ 5. Valentine nevertheless contends that when Hristov says that "the NEXO token is registered with the SEC as a security . . . he is referring to the filing of Form D with the SEC." Ex. 2 44:24–45:13. But Dr. Valentine's own Opinion No. 4 states that Nexo's 2021–2022 offering was separate from its 2018 offering and that Nexo "did not file a separate Form D in connection with its 2021-2022 offering," which was the offering in which Mr. Hristov was soliciting Mr. Cress. Since Nexo did not file any Form D in connection with that offering, the March 2021 statement "could not have been a reference to the filing of a Form D" covering that offering. Ex. 1 at 15; Ex. 3 ¶ 6.

Dr. Valentine's response — that a Form D "is a form of registration," Ex. 2 81:24–82:2 — is not finance expertise. It is an incorrect assertion about securities law from a witness who is "not a lawyer." *Id.* 16:7–9. An expert may not repackage the defendant's legal position as "context" and deliver it with the imprimatur of expertise. *Crow Tribe*, 87 F.3d at 1045.

**D. Opinion No. 4 Is an Integration Analysis Valentine Admits Regurgitates Legal Materials**

*First*, at the time Dr. Valentine wrote his report, he did not know Nexo had made any sales to U.S. investors in 2019 and 2020. Ex. 2 184:5–185:1. His report makes absolutely no mention of any of those sales. For example, Dr. Valentine writes in his report that Nexo's policy to implement a verification process to identify accredited investors "applied to the 2018 ICO and the 2021-2022 Direct U.S. Customer Sales" but says nothing about Nexo's 2019 and 2020 sales. Ex. 1 at 3. Yet Dr. Valentine testified that the 2019 and 2020 sales identified on Supplemental Appendix C "includes 24 new customers . . . that could have been part of either the 2018 or 2021 offering." Ex. 2 124:4–17. However,

Valentine does not know which offering those investors purchased in. Ex. 2 186:2–9 ("I don't know whether they bought the token from Nexo in the specific 2018 offering. That is still under investigation"). And he limited his opinions to "the reasonable steps Nexo took with respect to its 2018 and 2021 OTC sales." Ex. 2 193:2–5. Valentine thus offered no opinion on Nexo's 2019 and 2020 sales, and cannot factually say whether Nexo's sales *between* the 2018 ICO and 2021 "offering" had any relevance to the integration analysis.

Valentine's inability to correctly identify *years* of sales to U.S. investors shows that Valentine performed *zero* credible analysis of whether Nexo made separate or continuous offerings. Valentine analyzed only the limited set of NEXO token sales that Nexo spoon-fed him.

*Second*, whether Nexo's 2018 ICO and its 2021–2022 sales are one offering or two is a question of integration under the securities laws—a legal doctrine. Opinion No. 4 resolves it, invoking Dr. Valentine's "understanding" of "SEC integration principles," a "safe harbor where offerings separated by at least 30 days may avoid integration," and the legal significance of Form D filings. Ex. 1 ¶¶ 11, 13, at 12–16. Asked whether he understood integration to be a legal doctrine, he answered: "That is why I have the citation directly from the SEC. I'm just simply regurgitating what the SEC is saying." Ex. 2 198:7–11. "Experts 'interpret and analyze factual evidence. They do not testify about the law.'" *Crow Tribe*, 87 F.3d at 1045 (citation omitted). A witness who recites agency guidance and applies it to his client's conduct is instructing the jury on the law — "the distinct and exclusive province of the court." *Hangarter*, 373 F.3d at 1016 (citation omitted).

The factual residue of Opinion No. 4—that 2018 precedes 2021 and that the platform launched in the interim—requires no expert and is not specialized knowledge. Fed. R. Evid. 702(a). The legal packaging, meanwhile, rests on the same anachronism as his verification opinions: the integration "safe harbor" he describes is drawn from an SEC staff page dated August 8, 2025, offered to characterize offerings conducted in 2018 and 2021. Ex. 1 at 15 n.29; Ex. 3 ¶ 57. And Dr. Valentine confirmed he will offer no opinion "about whether these offerings should or should not be integrated," Ex. 2 198:12–16, leaving, once again, nothing but a conclusion he disclaims the ability to defend.

**E. The "Regulatory Uncertainty" Narrative and Related Assertions Are Irrelevant, Unreliable, and Unfairly Prejudicial**

The report's framing narrative — that the SEC engaged in "regulation through litigation . . . during the Biden Administration" in a manner "hostile to the cryptocurrency industry," that companies fled the U.S. market, and that "[t]he Second Trump Administration has abandoned several SEC enforcement lawsuits," Ex. 1 ¶¶ 3–4 — is not tied to any element of any claim or defense. It is historical and political storytelling, calculated to suggest that Nexo was the victim of shifting regulation rather than the author of a false statement.[2] Expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful," *Daubert*, 509 U.S. at 591 (citation omitted), and a district court "may exclude evidence relating to erroneous or inapplicable legal theories" precisely because it confuses and misleads. *Nationwide*, 523 F.3d at 1059–60. The narrative is also wrong: the *Howey* framework has governed since 1946, and Nexo's own internal documents show it understood the NEXO Token's "security classification" created "potential problems with the SEC." Ex. 3 ¶¶ 8–24; Ex. 31.

The same is true of the report's stray factual assertions. Dr. Valentine claims exchange trading was "not accessible to U.S. persons," Ex. 1 ¶ 15, but admitted he did nothing to "independently test" U.S. access and that "[t]here is no way that I can go back and independently test this." Ex. 2 198:17–23, 203:2–6. He acknowledged reviewing a March 2021 email in which a Nexo relationship manager directed U.S. citizens to buy NEXO Tokens on "Huobi, VPN-only; HitBTC, VPN-only," and confirmed he was "aware that Nexo staff were directing U.S. purchasers to Huobi and HitBTC in March of 2021." *Id.* 202:1–13; *see* Ex. 3 ¶¶ 48–52. His underwriter opinion — "I have seen no evidence," Ex. 1 ¶ 16 — identifies no inquiry that could have produced evidence, *see* Ex. 3 ¶¶ 41–46, and testimony premised on the absence of evidence the witness never looked for fails Rule 702(b).

[2] This storytelling is also untethered from the facts of the case, where Nexo was first contacted by the SEC during the first Trump administration in 2020, and the statement in question was made in March 2021, just two months into the Biden administration and before any of the examples of "regulation through litigation" cited by Dr. Valentine.

Whatever marginal relevance these assertions carry, the risk that a jury will defer to a Ph.D.'s unexamined say-so "substantially outweigh[s]" it. Fed. R. Evid. 403; *Daubert*, 509 U.S. at 595.

**F. In the Alternative, the Court Should Exclude Each Opinion Individually**

Complete exclusion is warranted because no opinion in the report survives Rule 702 once the legal conclusions, state-of-mind speculation, client-sourced narration, and unreliable data work are removed. If the Court nonetheless permits Dr. Valentine to testify in any capacity, Cress respectfully requests that the Court exclude, at minimum: (1) any opinion that Nexo's verification policy or practice was "reasonable," took "reasonable steps," or was "consistent with" or "satisfied" Rule 506(c) (Opinion Nos. 1–2); (2) any opinion that any purchaser was "in fact" an accredited investor (Opinion No. 2); (3) any opinion that Mr. Hristov's statement was not a misrepresentation or would have been understood by a reasonable investor or by Mr. Cress to refer to a Form D filing (Opinion No. 3); (4) any opinion that the 2018 and 2021–2022 offerings are separate or non-integrated (Opinion No. 4); (5) any testimony concerning "regulatory uncertainty" or the SEC's enforcement posture under any administration; and (6) any testimony that exchanges were inaccessible to U.S. persons or that no sales to statutory underwriters occurred.

## V. CONCLUSION

Dr. Valentine is unqualified in the field his report occupies, and his opinions are legal conclusions he has disclaimed, delivered on data he concedes are incomplete, through a method he describes as reading documents any juror can read. The Court should exclude his opinions and testimony in their entirety; in the alternative, it should exclude Opinion Nos. 1 through 4 and the accompanying narrative described above.

Dated: August 7, 2026

Respectfully submitted,

TAYLOR-COPELAND LAW

*/s/ James Taylor-Copeland*
James Taylor-Copeland
Counsel for Plaintiff John Cress