# EXHIBIT 2

# Valentine Tr.

CERTIFIED
COPY

STENO

them?

A. Yes.

Q. Is it fair to say that several of your opinions rest on conversations you had with Nexo?

MR. SHELTON: Objection, vague.

THE WITNESS: The opinions I have in this case are formulated from the documents that are cited in my report, along with conversations I did have with Nexo.

BY MR. TAYLOR-COPELAND:

Q. Okay. So I want to focus just on those conversations with Nexo for a bit.

Who at Nexo did you speak with?

A. Octavio Dinca.

Q. Okay. Did you speak with anybody else or just Mr. Dinca?

A. Mr. Dinca only.

Q. Okay. And how many times did you speak with Mr. Dinca?

A. I have spoken with him once. We have exchanged email correspondence that counsel has also been on.

MR. TAYLOR-COPELAND: I'm just going to put into the record that those emails have not been produced and that we would ask that they be produced.

BY MR. TAYLOR-COPELAND:

Q. About how many emails did you exchange with Mr. Dinca?

A. To the best of my recollection, I cannot tell you the exact number, but I don't believe it was anything more than a half dozen or so.

Q. Okay. And when you spoke with Mr. Dinca, was that by phone or by video call or in person?

A. It was on Zoom.

Q. Okay. And were you able to see Mr. Dinca?

A. Yes, I saw Mr. Dinca.

Q. About how long did that meeting last?

A. A little bit over an hour.

Q. I just want to be sure we're on the same page here.

Other than that slightly over an hour call, you haven't spoken with Mr. Dinca or anyone else at NEXO, correct?

A. Correct.

Q. Was Counsel for Nexo present during that call with Mr. Dinca?

A. Yes.

Q. Did you take notes during that call with Mr. Dinca?

A. As is my work product, I always make

contemporaneous changes to my end report.

And so all of the notes that I had are already incorporated into the end report, which you have a copy of.

Q. Okay. So apart from your report, you didn't take additional contemporaneous notes?

A. That is correct.

Q. Okay. Did you record the Zoom?

A. No.

Q. Did you rely on your discussions with Mr. Dinca in reaching the opinions in your report?

A. I'm sorry. Could you restate your question, please?

Q. Did you rely on your discussions with Mr. Dinca in reaching the conclusions in your report?

A. Not necessarily. But it confirmed many of the opinions that already were in process in the report.

Q. Did you do anything to independently verify what Mr. Dinca told you during that meeting?

MR. SHELTON: Objection as to the term independently verify and vague.

THE WITNESS: As is contained in my report, there is an ample amount of documents that were cited in my report.

Everything that Mr. Dinca had told me was

consistent with the background and research I had done into Nexo's policies and procedures.

BY MR. TAYLOR-COPELAND:

Q. Did you have questions for Mr. Dinca in this meeting?

A. Yes.

Q. What did you ask him?

MR. SHELTON: Objection, vague. Calls for a narrative.

THE WITNESS: The scope of the conversation I had with Mr. Dinca had to do specifically with the policies and procedures that Nexo had in place in order to verify the accredited investor status of the individuals that were participating in both the 2018 offering and the 2021 offering.

BY MR. TAYLOR-COPELAND:

Q. Okay. Did you discuss with Mr. Dinca the statement that the NEXO token is registered with the SEC as a security?

A. No, not specifically.

Q. Why not?

A. The questions I asked him were in clarification to email correspondents that was between the Nexo officials.

In that correspondence, they used the word

"is/could" be a security.

And, to me, I took the "could" part to mean that while they were uncertain, Octavio confirmed that, yes, it was uncertain what the regulatory status was because the landscape at the time was greatly uncertain.

Q. Did you ask Mr. Dinca whether he himself had represented to Nexo customers that the NEXO token was registered with SEC as a security?

A. No. I didn't specifically ask Mr. Dinca that question.

Q. Did you ask Mr. Dinca whether the language that the NEXO token was registered with SEC as a security was part of talking points used with U.S. VIP customers?

A. That's not a specific question I asked him.

Q. Did he tell you anything about the context in which Nexo represented that the token was registered with SEC as a security?

MR. SHELTON: Objection, asked and answered.

THE WITNESS: Beyond the scope of what I answered earlier, no.

Again, the specifics of what I asked him had to deal overall with the policies and procedures that Nexo had in place to verify the accredited investor status.

opinion.

THE WITNESS: Yeah. I'm not trying to get into a legal opinion as far as the nature of what would or would not constitute a direct sale. Any platform could be, theoretically, either.

BY MR. TAYLOR-COPELAND:

Q. Okay. So, just to be clear, you're not a lawyer, correct?

A. That is correct.

Q. And you did not perform any analysis of the NEXO token under Howey, correct?

A. Correct.

Q. And you're not offering a legal opinion on whether Nexo qualified for any exemption as a matter of law, correct?

A. Correct.

Q. You understand that Rule 506(c) is an exemption from securities registration, right?

MR. SHELTON: Objection. Calls for legal opinion.

THE WITNESS: And, again, I'm not trying to make a legal opinion here. My understanding is that the Reg D and Form D are an exemption from an S-1 filing.

BY MR. TAYLOR-COPELAND:

certain time periods.

Q. In May and June of 2021?

A. Yes. I did look at the liquidation transactions in Mr. Cress's portfolio.

Q. Did you review the deposition of Christian Hristov?

A. Yes.

Q. Did you rely on the deposition of Christian Hristov in reaching the conclusions in your report?

A. I don't have it listed in my Appendix B.

Q. Does that mean that you didn't rely on it?

A. To reiterate my answer to your previous question, yes, I have read the deposition. I do not have it in my list of documents that I consider or relied on in the case.

Q. Okay. You never interviewed Mr. Hristov, correct?

A. Correct.

Q. You're offering an opinion about whether Mr. Hristov made a misrepresentation when he told Mr. Cress that the NEXO token was registered with the SEC as a security, correct?

A. Could you please reiterate your question, if you don't mind?

Q. So if you go up to the first page of your

So Reg D is a registration with the SEC under Form D. It does not specify in any correspondence that Mr. Hristov is claiming that they had an S-1 registration with the SEC.

In fact, it's very clear in the forms that he was specifically referencing Reg D and Form D.

Q. You just said Reg D is a registration with the SEC.

What do you mean when you say registration there?

A. It is a form that you do have to file and register with the SEC if you are filing that form, which Nexo, again, out of an abundance of caution, chose to do with this.

Q. So is it your view that the filing of the Form D is what constitutes, quote-unquote, registration with the SEC here?

A. Yes. And what I'm saying is that in the accredited investor form, it very clearly references back to Reg D.

And, so, when I viewed all the documentation, there is no ambiguity about what Mr. Hristov is trying to say. It's simply put in print.

Q. Okay. So your view is that when Mr. Hristov says, additionally, please note the NEXO token is

registered with the SEC as a security, and, therefore, we are only allowed to facilitate deals for Americans who are also certified accredited investors, he is referring to the filing of Form D with the SEC?

A. Yes. And it's very clear from the accredited investor form, he is referencing Form D.

And, further, as a sophisticated and accredited investor, Mr. Cress likely was aware or easily could have looked up the fact that had Nexo done an S-1 registration, they don't require an accredited -- [Zoom pause] -- for an S-1 registration.

Q. But Nexo didn't file a Form D with the SEC in connection with its sale to Mr. Cress, correct?

MR. SHELTON: Objection. Vegas as to time.

THE WITNESS: To answer your question, yes, there was an accredited investor form that was filed for Mr. Cress in compliance with Reg D.

BY MR. TAYLOR-COPELAND:

Q. My question is a little different.

Nexo didn't file a Form D with the SEC in connection with its sale to Mr. Cress, right?

MR. SHELTON: Objection. Vegas as to time period.

THE WITNESS: Yeah. I'm not certain what you're asking, Mr. Taylor TAYLOR-COPELAND, beyond

the record.

BY MR. TAYLOR-COPELAND:

Q. Dr. Valentine, what is your Ph.D. in?

A. Finance.

Q. Have you ever worked at the SEC?

A. No.

Q. Have you worked as a state securities regulator?

A. No.

Q. Have you worked at FINRA?

A. No.

Q. Have you ever been employed as a securities compliance officer?

MR. SHELTON: Objection. Vague.

THE WITNESS: No.

BY MR. TAYLOR-COPELAND:

Q. Have you been employed as a compliance officer of any type?

MR. SHELTON: Same objection.

THE WITNESS: No.

BY MR. TAYLOR-COPELAND:

Q. Have you ever designed, run -- other than this assignment, have you ever designed, run, or audited a Rule 506(c) Accredited Investor Verification Program?

A. Yes. I have been involved in other securities

cases.

Q. Did any of those cases involve designing a Rule 506(c) Accredited Investor Verification Program?

A. Yes.

Q. Okay. When was that?

A. I have submitted, to the best of my recollection, probably four, maybe five reports on cases dealing with that.

I do not believe in my direct testimony history any of those cases have gone to testimony. There are, I believe, one of them that is still ongoing.

Q. Okay. So these are all expert reports that you submitted in litigation?

A. Yes, that is correct.

Q. Okay. So apart from litigation, have you designed, run, or audited a Rule 506(c) Accredited Investor Verification Program?

A. No.

Q. Have you published any articles regarding Regulation D?

MR. SHELTON: Objection. Vague.

THE WITNESS: Yeah. I would have the same thing.

If you look at the scope of what my research is in, yes, there are a lot of elements in my research

your question, by definition, there could not be transactions in 2020 that predated the 2021 offering that would have anything to do with it.

Q. So, I guess, just let me understand.

Your view is that because any sales in 2020 predate sales in 2021, they can't have any relationship to that offering; is that correct?

MR. SHELTON: Objection. Vague as to what 2020 sales you're referring to.

THE WITNESS: To answer your question, yes. To the best of my understanding as to what you're asking.

BY MR. TAYLOR-COPELAND:

Q. Okay. Is there any other reason other than that temporal limitation, or just temporal distinction that you're drawing, that you wouldn't include 2019 or 2020 sales in analyzing the 2021 offering?

A. To the best of my understanding of your question, yes.

Q. Okay. You say one of your conclusions is that it was consistent with best compliance practices in Cryptocurrency industry. Do you see that?

A. Yes.

Q. Do you agree that in order to opine on what the best compliance practices in the Cryptocurrency industry

Q. So I want to go to Opinion 1 in your report, which begins, I think, on page 7.

And your Opinion 1 is Nexo implemented a reasonable policy and practice of verifying accredited investor status for U.S. customers who purchased the NEXO token consistent with Rule 506(c) of Regulation D.

Do I have that right?

A. Yes, that's correct.

Q. Okay. Do you stand by that opinion?

A. Yes.

Q. What methodology did you use to arrive at this opinion?

A. I did a review, including the aforementioned interview with Mr. Dinca, where I went over explicitly what Nexo's policies and procedures were for verifying the accredited investor status of US-based customers.

Q. Anything else?

A. If you look at Schedule C of my report, the particular documentation that was used to verify those accredited investors is denoted in accordance with the implementation of the policies and procedures set forth by Nexo.

Q. Is your method testable?

MR. SHELTON: Objection, vague.

THE WITNESS: Could you be more specific to

investor form clearly referenced Reg D of the SEC. There was no reference to an S-1 file.

So, in my opinion, there is no misrepresentation because it was clearly outlined in print what SEC form it was in reference to.

And, further, if it were an S-1 registration, it would not require an accredited investor form.

Q. So your opinion, then, is based just on what the email says and what the accredited investor form says?

MR. SHELTON: Objection. Misstates the report.

THE WITNESS: Just to be clear and just to clear up the question a little bit, it is based on all the email correspondence that I did review.

It's based on all the statements that were made in the email.

And, yes. It was based on the statements made in the accredited investor form, most specifically the references to Reg D in that form.

BY MR. TAYLOR-COPELAND:

Q. Okay. Is your method that you utilized in arriving at Opinion 3 testable?

A. Yes.

Q. How so?

A. Any expert could replicate exactly what I did

by simply reading the email, reading the correspondence, understanding the context of those emails, and then looking at the documents that were attached, again, most notably the accredited investor form, which very clearly referenced Reg D.

Q. Well, you understand. You've read Mr. -- Professor Seligman's report, correct?

A. Yes, that is correct.

Q. And so he read those same materials, correct?

MR. SHELTON: Objection. Calls for speculation.

THE WITNESS: I'm not sure what Mr. Seligman did or did not do in the crafting of this report. I know the end product.

BY MR. TAYLOR-COPELAND:

Q. And he reached the opposite conclusion as you, correct?

A. Yes.

Q. So if someone can apply the same methodology as you and arrive at a completely separate outcome, isn't it true that this methodology is not testable?

MR. SHELTON: Objection, vague.

THE WITNESS: Mr. Seligman, I cannot speak to what methodology he did or did not use in the crafting of his report.

While it is true that he arrived at a different opinion, how he arrived at that opinion would be a question for Mr. Seligman.

BY MR. TAYLOR-COPELAND:

Q. Okay. If you could go to the bottom of page 14, and just take your time to read that bottom paragraph that goes from page 14 onto page 15.

A. Yes. Mr. Taylor-Copeland, I've read the paragraph.

Q. Okay. Do you see, say, when looking at the 2021 to 2022 offering, Nexo has a 95.6 percent rate of documentation supporting accredited investor status?

A. Yes. As of the date of my report, that's correct.

Q. Okay. And we can -- I know you've supplemented Appendix C since then, but let's just talk about your report for now.

Is that statement about 95.6 percent documentation rate, the support for that is in your Appendix C, correct?

A. Correct.

Q. Okay. Is that part of your methodology for reaching your conclusion that Nexo took reasonable steps to verify the percentage rate of documentation?

A. Yes.

Q. Okay. At what percentage would you re-evaluate your opinion that Nexo took reasonable steps to verify accreditation?

MR. SHELTON: Objection. Calls for speculation. Incomplete hypothetical.

THE WITNESS: I'm sorry. Could you restate your question?

BY MR. TAYLOR-COPELAND:

Q. Sure. Why don't we try an example.

So if Nexo only had documents supporting accreditation for 80 percent of purchasers, would it still be your view that it took reasonable steps to verify accreditation?

A. If I'm understanding your supposition here, you're asking a hypothetical. If Nexo only had documentation for 80 percent of the customers, as opposed to 95.7, would that change my conclusion?

Q. Exactly.

A. Yeah, I understand the question.

Again, I don't deal with a hypothetical and based on all the data that I have reviewed, including what is in my initial report and what's in the supplement to Appendix C that I submitted last night, that 95.7 percent number now is closer to 98 percent. And so the needle has actually moved up, not down.

In some unforeseen hypothetical that I guess as you're asking, if there's an undiscovered number of undocumented people that have participated in the program, would that change my opinion?

Hypothetically, it could. But I've seen no documentation or no substance indicating that that's the case.

Q. Okay. I want to make sure I understand.

Part of your methodology rests on the percentage rate of documentation supporting accredited investor status.

So I want to understand at what rate would that change your view that Nexo had been reasonable, or even what percent range?

MR. SHELTON: Objection. Vague and incomplete hypothetical. Asked and answered.

THE WITNESS: So in the answer to your question, I did not in my report, nor is it part of the scope of my opinions where I established some floor that hypothetically, if Nexo had gone below that floor, that would invalidate the accredited investor status. I simply looked at the facts and the data that I was provided.

And my opinion is that a 95.7 percent number was sufficient in supporting my conclusions in this

case.

BY MR. TAYLOR-COPELAND:

Q. Would a 50 percent rate of documentation be sufficient to support your conclusions in this case?

MR. SHELTON: Same objections.

THE WITNESS: My opinions in this case never have included any kind of speculation about what kind of floor would be acceptable. I was dealing with the facts on hand and the data on hand that I was dealing with. And a 95.7 percent number, in my opinion, is acceptable.

BY MR. TAYLOR-COPELAND:

Q. Well, in order for your methodology to be testable, Dr. Valentine, we have to have some number which either supports your conclusion or doesn't, right?

MR. SHELTON: Objection, vague.

THE WITNESS: I would reject the premise of the question if you're dealing with something like a peer-reviewed journal article.

For example, you could use different levels of uncertainty, if you will, error rate in statistical models. But you have to disclose your error rate. You have to state what the error rate is, and different articles based on different data sets would use different outcomes based on number of

observations and a number of other factors.

Again, what you're asking is a random hypothetical in this case based on parameter models that simply were not relevant, in my opinion, to this case.

BY MR. TAYLOR-COPELAND:

Q. But how can the Court assess your methodology if your testimony is your opinion isn't going to be changed based on the percentage rate of documentation?

MR. SHELTON: Objection. Vague, misstates the testimony, incomplete hypothetical.

THE WITNESS: In peer-reviewed academic research, a 5 percent margin of error, even in the most robust studies, including medical studies and other studies, is considered to be usually the most strenuous level that you would get in academic research.

Being that that number is at 95.7 percent and above that margin of error, I never even questioned it or thought about establishing a floor.

Based on the number of observations, if you're going from the peer statistics standpoint, that floor would be lower than 95 percent; could even be as low as 90 percent or even 80 percent.

Again, based on my understanding of this case,

and based on the data I was presented with, the premise of the question just simply isn't something that's relevant to my opinion in this case.

BY MR. TAYLOR-COPELAND:

Q. Okay. Certainly, you'd agree then that if the rate was 50 percent, that would not be sufficient to support your opinion that Nexo took reasonable steps to verify accreditation, correct?

MR. SHELTON: Objection. Calls for speculation. Incomplete hypothetical.

THE WITNESS: Again, that would be purely speculative on my part, and it would be completely inconsistent with all the data I've seen.

But in some bizarre world, if it went down to 50 percent, then, yes, that could influence my opinions.

BY MR. TAYLOR-COPELAND:

Q. This 95.6 percent number, that's a count of whether documents exist in a file, correct?

A. Yes.

Q. Okay. You didn't actually open those documents and analyze whether they establish accredited investor status, correct?

A. I'm sorry. Is the premise of your question, have I seen documentation that established the

opinion in this case.

BY MR. TAYLOR-COPELAND:

Q. But you are opining that Mr. Hristov did not make a misrepresentation to Mr. Cress, correct?

A. Yes. And it's simply based on the language that was in the accredited investor form, which clearly referenced Reg D.

Q. Okay. So are you opining on whether Mr. Hristov understood what he was saying to be true?

MR. SHELTON: Objection, vague.

THE WITNESS: Obviously, I'm not a mind reader. I don't have a crystal ball. I cannot tell you what Mr. Hristov's state of mind was at the time he wrote an email.

I have reviewed the email documentation and all the supporting documentation, and that's where I drew my conclusion from.

BY MR. TAYLOR-COPELAND:

Q. Right. So I'm just trying to make sure you're not opining on what Mr. Hristov actually meant, correct?

MR. SHELTON: Objection, vague.

THE WITNESS: I'm not opining on Mr. Hristov's state of mind when he wrote the email --

BY MR. TAYLOR-COPELAND:

Q. Because --

A. I'm sorry. Go ahead.

Q. Because you didn't speak to Mr. Hristov or rely on his deposition testimony in reaching this opinion, correct?

A. No. That's not correct.

If you look at exactly what I said, I referenced his deposition testimony as to support of the documents that I already had reviewed.

Q. Can you show me where you referenced Mr. Hristov's deposition testimony?

A. Oh, I'm sorry. It wasn't Mr. Hristov's. I was referring to Mr. Trenchev.

Q. Right.

A. I was referencing not Mr. Hristov.

Q. Right. Don't you think it would have made more sense to look at Mr. Hristov's testimony to assess the veracity of a statement made by him rather than Mr. Trenchev's?

A. No.

Q. Why not?

A. I had all of the evidence that I needed based on the correspondence that was made between Mr. Hristov and Mr. Cress, and including, and especially, the accredited investor document, which very clearly references Reg D.

Q. Are you opining on what Mr. Cress understood that statement to mean?

A. I am not in Mr. Cress's mind any more than I'm in anybody else's mind.

I can tell you as an accredited sophisticated investor, either he, A, knew what Reg D meant, was familiar with the process, or easily had the means to look it up and figure it out.

If a reasonable sophisticated investor is going to make an eight-figure investment, you would think they would do due diligence on if they didn't understand what a Form D was, an accredited investor form, to simply look it up if they didn't already understand.

Q. By that same logic, wouldn't you expect a company offering securities and $10 million transactions to do their due diligence about the statements that they're making?

A. I would reference you back to my opinion three. They clearly did, on the accredited investor form, reference Reg D of the SEC. So I don't think anything was vague or ambiguous that Nexo represented.

Q. Let's look at your opinion itself, which is that a reasonable investor in this circumstance, particularly a sophisticated accredited investor like plaintiff, would understand that Mr. Hristov's reference

to registered with the SEC was a reference to a Form D registration for an offering under SEC Regulation D.

So are you opining on whether the statement is true, whether it is true that the NEXO token was registered with the SEC as a security?

A. Okay. I apologize. Are you saying that in Mr. Hristov's mind, was his statement true?

Q. No. I'm asking if you're opining on whether that statement is literally true.

A. Simply put, what I said in the report is that it was later specified by the Form D under Reg D, what exactly was being filed with the SEC. No correspondence did it ever say an S1 had been filed.

Q. My question is a little bit different.

It's just, are you offering an opinion on whether the statement registered with the SEC as a security is literally true?

A. When presented in the whole context of all the material that was in the conversation, including the accredited investor form, yes.

Q. So you are offering the opinion that within the context, it is true that the NEXO token was registered with the SEC as a security?

A. It is a form of registration.

Q. So filing a Form D is a form of registration?

MR. SHELTON: Objection. Asked and answered.

THE WITNESS: Yes.

MR. SHELTON: James, at a certain point, I'd like to take the next break when you find it okay to do that.

MR. TAYLOR-COPELAND: We could do it now if you want. Are you guys -- I know you're a bit ahead. Are you wanting to -- I guess, let's go off the record and we can talk about it. Sure. Thank you.

VIDEOGRAPHER: The time is 10:18 a.m. We are off the record.

(Off the record.)

VIDEOGRAPHER: The time is 11:01 a.m. We are on the record.

BY MR. TAYLOR-COPELAND:

Q. Dr. Valentine, I think when we left off, we were at the bottom of page 11 in your report.

So I want to focus you on, you talk about the accredited investor certificate, which says, I am pleased to confirm that the investor has been verified as an accredited as defined in Rule 501 of Regulation D of the Securities Act.

And, then, you say, the accredited investor certificate produced by Mr. Cress shows that he understood that registration reference in Mr. Hristov's

email was made in connection with Rule 501 of Regulation D of the Securities Act.

Are you opining on what Mr. Cress actually understood?

A. No. I'm not inside Mr. Cress's head.

Again, if you look at the language I have here, I just simply say a reasonable investor in this circumstance, particularly a sophisticated accredited investor. So I made a generalized statement. Obviously, Mr. Cress, there isn't a question or dispute in this case that he is or was an accredited investor.

Q. Okay. So is it fair to say that your opinion here is about what a reasonable investor in the circumstances would understand?

A. Yes.

Q. And you don't have any training as a psychologist, correct?

A. Correct.

Q. Or in survey research on investor understanding?

A. In survey research, yes. As part of being an academic and having a PhD, I do have an extensive background in survey research.

Survey research, in particular, in regards to what Reg D versus an S-1 form is, no. I haven't done

any particular survey research as far as that goes, but I do have an extensive background in survey research.

Q. Okay. And you didn't run a survey here of how investors understood the phrase registered with the SEC as a security, correct?

A. Is your question, did I personally run a survey asking if investors understood?

Q. Correct.

A. No.

Q. Okay. Are you opining on whether -- on Mr. Cress's sophistication as an investor?

A. I'm sorry. Are you asking me if I'm opining if Mr. Cress was a accredited sophisticated investor?

Q. Well, there's two words there. So I want to focus on sophisticated.

Are you opining on whether Mr. Cress was a sophisticated investor?

A. In my view, Mr. Cress was an accredited sophisticated investor.

Q. Okay. So is your view that Mr. Cress is a sophisticated investor based on his accreditation status?

A. Yes.

Q. Okay. Is it based on anything else?

A. No.

can proceed with your questions, please.

Q. Okay. Do you see where it says the Form D is not a registration statement, but instead a form that exempts a company from registering its securities?

A. Yes.

Q. Do you disagree with that statement?

MR. SHELTON: Objection. Calls for a legal opinion about the meaning of the court order.

THE WITNESS: Yeah. I'm not offering a legal opinion in the case.

BY MR. TAYLOR-COPELAND:

Q. But you are offering an opinion that Mr. Hristov's statement that the token was registered with SEC as a security was not a misrepresentation, correct?

A. And the reason it's not a misrepresentation is on the accredited investor form. It clearly denotes Reg D and Form D, so there was no ambiguity.

At no point in time did Mr. Cress claim that they had filed an S-1 form.

Q. Okay. So your view is that Mr. Hristov told Mr. Cress that they had filed a Form D?

A. No, that's not correct.

My opinion is on the accredited investor form that it explicitly references Reg D and Form D.

just take a moment to read the paragraph beginning with Appendix C.

You write, those purchasers who made purchases in 2018 or after plaintiff are not relevant to the offering at the time plaintiff made his purchases. The only window of time relevant to plaintiff and in which the reasonable steps taken by Nexo are relevant as to that offering are the 2021 purchases that occurred before plaintiff's purchases between March and July 2021.

Do you see that?

A. Yes.

Q. Do you stand by that?

MR. SHELTON: Objection, vague.

THE WITNESS: As you're well aware, I updated Supplemental Appendix C last night, which does include potential customers of either the 2018 or 2021 offering.

BY MR. TAYLOR-COPELAND:

Q. Right. My question is whether you stand by the statement that purchases made after plaintiff are not relevant to the offering at the time plaintiff made his purchases?

A. Yes, that is correct.

Q. Okay. And that the only window of time

relevant to plaintiff and in which the reasonable steps taken by Nexo are relevant as to the offering are -- let's leave out 2021 -- but we can say the purchases that occurred before plaintiff's purchases, correct?

A. Yes. I believe that's correct.

Your wording of that was a little confusing, but basically what it's saying is that the purchases prior to Mr. Cress are what was considered.

Q. Why is that?

A. My job here was to evaluate the constructs and implementation of Nexo's policy of verifying credit investors.

So what I did was I took a step-by-step approach, first of all, evaluating what Nexo's policy was, then evaluating the implementation of the policy, and then ensuring that all customers adhered to that policy and were indeed accredited investors. It was not to establish legally whether or not someone was a credit investor. That is a legal conclusion. What I was doing was evaluating Nexo's policies.

So specifically what I looked at were all the investors of the 2021 offering that came before Mr. Cress. Did Nexo effectively follow their policy of establishing accredited investor certification for all US-based investors prior to Mr. Cress during that time

third-party platforms were not considered.

BY MR. TAYLOR-COPELAND:

Q. Well, did you consider Nexo's sales on its own retail exchange?

A. Yes.

Q. Okay. What information did you do to assess those sales?

A. I looked at the entirety of all of Nexo's sales during the said months. And what I was specifically looking for were, did Nexo, in the policy of selling to only accredited investors in the US that they had clearly established, did they follow the policies and take reasonable steps to follow those policies.

And that is why I have denoted in my report the 95.7 percent rate of documentation that's now with the new 24 up to close to 98 percent.

Q. Okay. So how do you know that those purchasers listed on your Appendix C are the complete universe of US-based individuals who purchased Nexo on the Nexo platform?

A. We are still in the process of going through documentation. I can't say with 100 percent certainty that this is the list and there could not be further amendments.

What I have seen is everything that has been

THE WITNESS: No. If you look at the updates, it does include some of those years.

BY MR. TAYLOR-COPELAND:

Q. Okay. Why does it include some of those years, but sitting here today, you can't tell me whether you asked for all of that data from 2019 or 2020?

MR. SHELTON: Objection. Misstates the testimony.

THE WITNESS: Yeah. To be totally clear, what I said in my earlier testimony was the Supplemental Appendix C, it's still an ongoing process. I wanted to submit it in order to be transparent.

ROG 3 will be updated at some point, and we are still working towards that right now.

This updated Supplemental Appendix C that includes 24 new customers were customers that could have been part of either the 2018 or 2021 offering.

BY MR. TAYLOR-COPELAND:

Q. So in putting together the supplemental responses, how are you treating 2019 and 2020 transactions? Are you including them? Are you not including them? And what is informing your decision to either include them or exclude them?

MR. SHELTON: Objection. Vague and compound.

THE WITNESS: As I have previously testified, I

reaching your determination that Nexo was reasonable in verifying accredited investor status?

A. As we sit here today, I know I believe this is the list.

Q. And then it appears that there are eight customers in 2021 who predate John Cress, correct?

A. Yes, that is correct.

Q. And those are the customers that are highlighted in yellow, right?

A. Yes, that is correct.

Q. Okay. So it's [redacted], and [redacted], correct?

A. Yes, that's correct.

Q. And you concede Nexo could not produce documentation for one of those eight, Mr. [redacted], correct?

A. Yes, that's correct.

Q. So we have no way of knowing whether Mr. [redacted] was accredited or not, correct?

A. Not necessarily. My understanding is Nexo did have a policy in place, and that policy was followed.

What I saw, based on the instance of Mr. [redacted], and I have this denoted in my report, that over the seven years since this process started, that

simply the documents were misplaced or lost, that does not mean that they never existed in the first place or that Mr. [redacted] was not verified as an accredited investor.

Q. But you don't know one way or another whether Mr. [redacted] was verified as an accredited investor, with certainty, correct?

A. Not necessarily. Based on my interview with Nexo personnel, Nexo did have a policy in place, and all investors were verified as accredited investors.

The documentation for that, as you correctly stated, is not available as we sit here today.

Q. So you have no way of knowing what Mr. [redacted]'s income was, do you?

A. That is correct. As I previously stated, the documentation as we sit here today is not available.

Q. And you have no way of knowing what his net worth was, correct?

A. Correct.

Q. And you have no way of knowing whether his occupation may have qualified him as an accredited investor, correct?

A. Correct.

Q. So I understand that Nexo told you that at a high level they had a policy of verifying accreditation.

Did they tell you specifically that they had verified the accreditation of Mr. [redacted]?

A. Yes. When I specifically interviewed Nexo, they told me that there was a policy in place and the policy was always followed.

However, the documents do not exist for Mr. [redacted].

Q. Okay. Did they tell you who was in charge of collecting the documents for Mr. [redacted]?

A. To the best of my recollection, I believe it was Octavio.

Q. Okay. And you spoke with him, right?

A. Correct.

Q. And was he able to tell you about what Mr. [redacted]'s income or net worth was?

A. No. He simply said that the policy was in place and that Nexo did follow the policy.

And what I'm looking at from my end, at the time of my report, is that Nexo did have a 95.7 implementation rate that's now, with this new 24, closer to 98 percent.

Q. Okay. And you believe Mr. Dinca to be credible in telling you this?

A. Based on my examination of all the documents, a 98 percent documentation rate in the crypto industry is

pretty remarkable.

Q. I agree. It is pretty remarkable.

Why don't we look at -- [redacted] is the first one listed here. January 5, 2021, right, initial close date?

A. Yes, that's correct.

Q. What's your understanding of what this initial close date -- well, you put together Appendix C, right?

A. Yes, that is correct.

Q. What does initial close date mean?

A. The initial close date of his original settled NEXO tokens.

Q. Okay. So we will introduce Exhibit 251.

(Plaintiff's No. 251, document, was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q. Do you have that in front of you?

A. Yes. If you don't mind, could you blow it up just a little bit?

Q. Yeah. But just before we look at the details, do you see the Bates number here matches the Bates number provided as the documentary support for Mr. [redacted]

A. I'm sorry. Which data are you referencing?

Q. Do you see the Bates number here in the bottom

right-hand corner of this document, Nexo 0026699.

A. Hold on. No, I don't.

Q. The bottom right corner of the screen. Can you see the --

A. Oh, I do see it on the big screen for whatever reason it's not showing up on my laptop. But, yes, I do see it on the big screen. I can't make out exactly what the numbers are, but that does look correct.

Q. Okay. And that's the same number as is listed for the documentary support in your Appendix C for Mr. [redacted], right?

A. Yes. That appears to be correct.

Q. Okay. And do you see that this certificate was issued on June 23rd, 2020?

A. Yes, that is correct.

Q. And do you see that it expires on September 21st, 2020?

A. Yes, that is correct.

Q. But Mr. Reynolds's purchase was not completed until January 5, 2021, right?

A. Yes, that is correct.

Q. And that's more than three months after his certificate had expired, correct?

A. Yes, that is correct.

Q. Okay. And there's no income information

provided to support the accreditation determination, right?

A. Not on this letter, no.

Q. Okay. No other documentary support at all, right?

A. Not that's listed under my Appendix C, no.

Q. Okay. So the only documentary support is an expired accredited investor certificate, correct?

A. No. That's not necessarily true.

Q. Why not?

A. If, in this case, Mr. [redacted] -- and, again, I'm not trying to make a legal conclusion. My understanding is courts have ruled various ways on whether or not you can self-identify. And so I'm not trying to make a legal argument or conclusion.

But if Mr. [redacted] had substantial assets that would indicate over a million dollars of net worth in his Nexo portfolio, there would be no reason to believe that he fell out of accredited investor status and that he was not an accredited investor at the time of the sale.

Q. Do you know whether he did?

A. I don't have those documents in front of me. And my job in the scope of my opinions in this case, isn't to go by and verify one-by-one-by-one, whether or

not these individuals are accredited investors. That's a legal opinion, and that's not what I'm doing here.

What I did was I identified very clearly the policies and procedures that Nexo had in place. And their policy was to make sure that all US-based investors were documented, accredited investors and that they take reasonable steps to accomplish this.

And that was what the scope of my opinions were, not whether or not Mr. [redacted] was an accredited investor.

Q. Okay. Do you think accepting an expired accredited investor certificate is a reasonable policy and practice for verifying accredited investor status?

A. It depends. If it's in conjunction with other documentation or information, such as the individual had $8 million, $10 million deposited into a Nexo account, then, yes, you would know by definition, by just factual definition, this individual is still an accredited investor.

Q. Well, looking at your Appendix C, this is the only document that you have cited as your documentary support for Mr. [redacted], correct?

A. Yes, that's correct.

Q. Okay. So you've made your opinion here. You've counted this toward Nexo's 95.6 percent success

rate in verifying accredited investors, right?

A. Yes, that is correct.

Q. Okay. So my question then is, is your opinion that accepting an expired investor certificate as the sole basis for verifying accreditation is a reasonable policy and practice for verifying accredited investor status?

MR. SHELTON: Objection. Asked and answered.

THE WITNESS: Yeah. I would refer you back to my previous answer, Mr. Taylor-Copeland.

What I said was in conjunction with other information that Nexo did have access to, especially what the net asset value in Mr. [redacted] or any of the aforementioned people in their account would have been, that they would still be in accredited investor status.

So even though this document did, as you pointed out, expire by a few months, Mr. [redacted] would still be, by definition, by factual definition, an accredited investor.

BY MR. TAYLOR-COPELAND:

Q. With all due respect, you wrote this report, right?

A. Yes.

Q. You wrote Appendix C to the report?

A. Yes.

Q. And you cite this document as the sole documentary support for verifying accredited investor status, right?

A. Yes.

Q. So rather than speculate about what additional information Nexo may or may not have had, I'm asking you based on what's in your report, is it a reasonable policy and practice for Nexo to verify accredited investor status based on an expired accredited investor certificate?

MR. SHELTON: Same objection. Asked and answered. I think this question has been asked like three times now.

THE WITNESS: Yes. Mr. Taylor-Copeland, I'm happy to reiterate my answer if you would like.

BY MR. TAYLOR-COPELAND:

Q. Please do.

A. Certainly. What I'm simply saying is that this documentation documents that Mr. [redacted] was an accredited investor at the time of the certificate all the way through September 21st.

If Nexo had knowledge based on Mr. [redacted]' net account value that he still had over a million dollars in assets, then by factual definition, he was

still an accredited investor. And, yes, that would be consistent with Nexo's policies of documenting and making sure that every US-based customer in the 2021 offering -- or sorry, in this offering, the 2021 offering was an accredited investor.

Q. Would it be sufficient if -- to think accepting something scrawled on a napkin that says I'm an accredited investor would be a reasonable basis for verifying accreditation?

MR. SHELTON: Objection. Vague, argumentative, and incomplete hypothetical.

THE WITNESS: I'm not making a legal opinion on the legality or permissibility of something put on a napkin.

BY MR. TAYLOR-COPELAND:

Q. You are offering an opinion about -- let's turn to page 9 of your report.

Do you have that in front of you?

A. Yes, I'm on page 9.

Q. Okay. So you say specifically the process I reviewed included completion and execution of an accredited investor certification offered by VerifyInvestor.com, review of income-based documentation, including tax returns where the investor sought to qualify under an income test, review of

Appendix C.

Q. Okay. Why don't we look at -- well, let's turn back to your Appendix C. [redacted]. Initial close date, January 25, 2021. Do you see that?

A. Yes.

MR. TAYLOR-COPELAND: I'll introduce this as Exhibit 252.

(Plaintiff's No. 252, document, was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q. Do you see here that the accredited investor certificate is dated February 9, 2021?

A. Yes.

Q. And that's two full weeks after the close date of Mr. Almeida's transaction, correct?

A. Approximately, yes.

Q. Okay. So, again, the only documentary support identified in your report is a certificate that post-dates the transaction, correct?

A. Yes.

Q. Do you think it's a reasonable policy and practice to verify accredited investor status after completion of a transaction?

A. Again, I would refer back to my previous answer.

If Mr. [redacted] had over a million dollars deposited on the Nexo platform, by factual definition they knew he was an accredited investor. If they knew this certificate was in progress, yes, I do think it's permissible.

Q. If they knew that, shouldn't that be listed in the documentary support in your Appendix C?

A. Again, I would reference you back to my previous answer. I'm not trying to give an abstract legal argument.

Q. I'm not asking for an abstract legal argument.

You're saying that with this hypothetical abstract information about whether they may or may not have had assets on the platform, maybe it would be one way, maybe it would be the other, shouldn't you have provided that as the basis and the documentary support if that is, in fact, the basis for their policy and practice being reasonable?

A. Again, I would reference you back to my previous answer.

The reason that's not included is I'm not trying to make an abstract legal argument about what is or is not permissible.

Q. I'm extremely confused. You're providing an opinion that Nexo engaged in a reasonable policy and

MR. SHELTON: Objection, vague. Incomplete hypothetical.

THE WITNESS: Yeah. And, again, that's a hypothetical. I've not seen any evidence in this case that that would be applicable at all.

BY MR. TAYLOR-COPELAND:

Q. Well, I think the issue here is, you're the one who's creating the hypothetical. So let's just make sure we agree on something.

Nowhere in your report do you identify the account balances of any of the individuals on Appendix C, do you?

A. As we sit here today, I did not identify the Nexo account balances. As I previously stated, ROG 3 will be updated.

But as we sit here today, no.

Q. And none of the documents considered, none of the documents on your documents considered list identified the account balances of those individuals, correct?

A. It is my understanding that based on my conversations with Nexo, it was part of the policy, and it is documented in my report, that they can use the account balance of the individuals as documentation that they do meet the factual definition of an accredited

correct?

MR. SHELTON: Objection. Vague. Incomplete hypothetical.

THE WITNESS: Could you be more specific in what you're asking, please?

BY MR. TAYLOR-COPELAND:

Q. Sure. Net worth is your assets minus your liabilities, right?

A. Yes.

Q. And so if Nexo had a million dollars of Mr. Almeida's money, but Mr. [redacted] owed the IRS $800,000, what's Mr. Almeida's net worth?

MR. SHELTON: Objection. Vague. Incomplete hypothetical.

THE WITNESS: Yeah. You're asking a hypothetical thing. But, I'm sorry. What's your specific question?

BY MR. TAYLOR-COPELAND:

Q. My specific question is do you take into account both assets and liabilities in determining net worth?

A. Yes.

Q. Okay. And even where individuals have assets on the Nexo platform, Nexo does not necessarily have insight into the liabilities of those individuals,

correct?

A. Depending on the documentation.

Q. Right. So, I mean, specifically focusing on Mr. [redacted], Nexo doesn't have any documentation regarding any of his assets or liabilities off the platform, correct?

A. That is not something I'm aware of.

Q. Okay. Did you ask Nexo whether [redacted] had over a million dollars on his Nexo account at the time of this transaction?

A. We never mentioned Mr. [redacted] specifically. But, again -- and, of course, my report, what Nexo did was either verify through an accredited investor certificate, through income documentation, through other documentation, or through the deposit amount that they had in the Nexo account.

Q. So, again, you're just taking Mr. Dinca's word on this, right?

A. No. I have evaluated Nexo's policies and procedures and looked at their actions they did in order to adhere to those policy and procedures. I've seen nothing to indicate that Nexo did not adhere to policies and procedures.

Q. These policies and procedures you're referring to, are they written down anywhere?

A. Not that I'm aware of specifically. But they were in effect. They were in force, and they were being implemented in that all US-based investors were required to have documentation of accredited investor status.

Q. We just established that Mr. [redacted] didn't, right?

MR. SHELTON: Objection. Misstates the testimony.

THE WITNESS: No. I never said he didn't. I just simply said that the documentation as we sit here today is not available.

My understanding is that all investors, including Mr. [redacted], did go through a verification process.

BY MR. TAYLOR-COPELAND:

Q. Okay. Let's look at the next individual on this list, [redacted], initial close date, 3 January 2021. Do you see that?

A. Yes.

Q. And if you'll -- we'll take a look at the document itself.

But, first, I just want to direct you to the Bates numbers. The, you know, the documentary support on Appendix C is 6324 through 6326. I just want to make sure we can agree that these have the same Bates

Q. So, again, on the close date, Nexo didn't have any documentary support for Mr. [redacted]'s accreditation, correct?

A. Are all three of these documents that are mentioned in documentary support on the screen? Was that what your first question was about?

Q. Yeah. So the -- the audit trail is 6324. The letter is 6325. And then the source of funds declaration is 6326.

A. And I apologize. I was looking at forms.

Would you restate your question, please?

Q. Yeah. My question is, again, at the time of this transaction, Nexo did not have documentary support. So let's -- let's take a step back.

There's no accredited investor certificate for Mr. [redacted], right?

A. Yes. That appears to be the case.

Q. And on June or January 3rd, the date of the transaction, Nexo did not yet have any information, documented information regarding Mr. [redacted]'s net worth or income, correct?

A. Not necessarily.

MR. SHELTON: Objection. Misstates the document.

THE WITNESS: Not necessarily. That was -- we

know when this document was turned in, but we don't know if this was the only thing that was used to verify the accredited investor status of Mr. [redacted] in this case.

BY MR. TAYLOR-COPELAND:

Q. Well, this is what you relied on in opining that Nexo is reasonable in verifying accredited investor status, correct?

MR. SHELTON: Objection. Vague as to which document in this set you're referring to.

BY MR. TAYLOR-COPELAND:

Q. Okay. So I'm talking about the letter. We can look at -- I think this is submitted before 16-12-2020.

Do you see anything on this document regarding his income?

A. Go back down if you don't mind to the 16-12-2020 document.

MR. SHELTON: You can read the entire document.

THE WITNESS: Yeah. I would like to read the entire document.

BY MR. TAYLOR-COPELAND:

Q. Should I start at the top of it here?

A. Yeah. The source of funds declaration because that's the date that -- this one is dated from January, correct?

Q. December of 2020.

A. December of 2020. Okay. Thank you.

There is a number in there, expected annual account turnover of $250,000. And then there's also a denoted source of funds are from employment income.

Q. Right. So from this document, do you know what Mr. [redacted]'s income is?

A. Just to be specific, are we talking about the document in the top or the two documents in the bottom?

Q. So just the source of funds declaration right now.

Is there any information in the source of funds declaration which allows you to understand what Mr. [redacted]'s salary is?

A. No. It does state that it's clearly from employment income and the expected annual account turnover, but it does not mention specifically what his salary is.

Q. And it also doesn't mention his net worth, right?

A. That is correct.

Q. Okay. So just focusing on the source of funds declaration for a minute, standing alone, would it be reasonable for Nexo to rely just on this document to verify Mr. [redacted]'s accredited investor status?

A. You're talking about the income of $200,000 for two years in a row?

Q. Correct.

A. Again, Nexo did have the account balance of Mr. [redacted]. There may have been other information in there too that is not in this exhibit.

Q. So I understand that, but I just want to focus on this exhibit for now.

Standing on its own, does this exhibit provide sufficient information to verify accreditation?

A. And, again, the scope of my opinions isn't to answer a question as to whether or not Mr. [redacted] was an accredited investor. I do believe this constitutes a reasonable step by Nexo in verifying the status. I would not go so far as to say a legal conclusion that this indeed made Mr. [redacted] an accredited investor.

Q. Well, isn't whether a document is sufficient to establish that someone is an accredited investor a key part of whether Nexo was reasonable in what it implemented in order to verify accredited investor status?

A. Yes. Documentation certainly is part of the process.

Q. Okay. And this document standing by itself is not sufficient to verify accredited investor status,

correct, this February 10 letter?

MR. SHELTON: Objection. Misstates prior testimony.

THE WITNESS: Again, whether or not Mr. [redacted] was an accredited investor is a legal conclusion that I'm not making in this case.

I do believe, as I previously stated, that this was a reasonable step for Nexo to verify this.

BY MR. TAYLOR-COPELAND:

Q. So you're not quite answering my question, which is whether the information in this document is sufficient to verify Mr. [redacted]'s accreditation status?

MR. SHELTON: Objection. Asked and answered.

THE WITNESS: Again, I feel the answer to the question would be a legal conclusion, and I'm just not going to go there.

But what I would say is I do believe this is a reasonable step that Nexo took.

BY MR. TAYLOR-COPELAND:

Q. How can you opine on whether it's a reasonable step that Nexo took while refusing to answer whether the information is sufficient to verify accreditation?

A. Again, the scope of my opinions are did Nexo take reasonable steps to implement its policy of only selling to accredited investors in the U.S., and I do

(Off the record.)

VIDEOGRAPHER: We are on the record. The time is 1:30 p.m.

BY MR. TAYLOR-COPELAND:

Q. Okay. Dr. Valentine, [redacted] is listed on your Appendix C with an initial close date of January 21, 2021, right?

A. Yes. That's correct.

Q. And the supporting documentation is listed as Nexo-0017350, right?

A. Yes, that's correct.

MR. TAYLOR-COPELAND: I'm going to introduce that as Exhibit 254.

(Plaintiff's No. 254, document, was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q. Let me know if you have that in front of you.

A. Yes, I see it.

Q. And, again, the date here is February 12, 2021. So sometime after the transaction itself, correct?

A. Yes, that's correct.

Q. Okay. And then [redacted] is listed with an initial close date of January 5, 2021, correct?

A. Just as a point of clarification, I have the 6th, not the 5th.

this page that you believe would allow Nexo to reasonably verify Mr. [redacted] accreditation?

A. I don't see anything on that page, so, no.

Q. Okay.

A. Well, can you scroll back up? There was something you just scrolled through. What is this here? Can you please -- okay. I see it here.

It's referencing aforementioned crypto assets, but I don't see the aforementioned crypto assets anywhere above that.

Q. Mm-hmm.

A. Okay. So expected annual account turnover looks like 700 -- is that 78,000 or 780,000?

Q. I believe it's 78,000.

A. Okay. Sure.

Q. Is there anything on this page that you believe Nexo could reasonably rely on in verifying Mr. [redacted] accreditation?

A. It's possible in combination with other things below. But as a standalone, not yet.

Please scroll up.

Q. Okay. And this one just says your outstanding loan is $34,735.54, right?

A. Yes, correct.

Q. Okay. And that information standing alone

wouldn't be sufficient to verify accreditation, correct?

A. Not in combination with something else.

Q. And then here we have a bank statement continuation.

A. Could you please scroll up? You went really fast with some numbers there.

Q. Okay.

A. Thank you.

Q. Okay. Was there anything in that document that you believe Nexo could reasonably rely upon in verifying Mr. [redacted] accreditation?

A. Could you please scroll to the top of the document again, please? Okay. Could you go down just a little bit, please?

Q. Next page or --

A. Yes, please. Next page. Okay. Right there.

First of all, again, the standard here is reasonableness, not perfection. And I would certainly agree with you this is not perfect, but I think it could be construed as reasonable based on partial information you're piecing together here.

So one of the safe harbors they're talking about is does the individual have a net worth of over a million dollars? Well, while we don't necessarily know that, we do know that 50 percent of it is coming from

THE WITNESS: No. To be totally clear, my testimony is that what Nexo did was in accordance with their policies. They did take reasonable steps to verify these investors. That is my testimony.

BY MR. TAYLOR-COPELAND:

Q. Okay. Let's go one-by-one.

[redacted]. Do you believe that the documentary support provided for [redacted] is sufficient to allow Nexo to determine that he was an accredited investor on January 5th, 2021?

A. I believe it is a reasonable step, and it does pass a reason --

Q. Again, that's not my question.

Dr. Valentine, I'm asking you if the documentation is sufficient to allow Nexo to make that determination that he's an accredited investor.

A. And, again, I can't be more clear about this.

The ultimate determination of whether or not someone is an accredited investor is a legal conclusion. I am not making that under any circumstances.

What I am saying is that what Nexo did is reasonable. With Mr. [redacted], you had a certificate that was expired by a matter of days. Does that mean that the underlying information where he got the accredited investor certificate had changed? His W-2

had changed? His income had changed? His net worth had changed? No. It's only a matter of days. It is reasonable to believe that Mr. [redacted] was an accredited investor.

Q. You're opining in this case that Mr. Cress was a sophisticated accredited investor, correct?

A. By definition, Mr. Cress had over eight figures deposited in crypto, so, yes.

Q. So you feel comfortable telling me that Mr. Cress was an accredited investor, right?

A. The ultimate definition of an accredited investor is up to the courts.

What I'm saying is that in Mr. Cress's case, there was significant documentation to pass the reasonableness test and that he was an accredited investor.

Q. Right. Because with Mr. Cress, we have information about his net worth, correct?

A. Correct.

Q. Okay. We don't have that same information for Mr. [redacted] or Mr. [redacted], do we?

A. That is correct.

Q. Okay. And then for two additional purchasers, Nexo did not collect an accredited investor certificate until after the transaction, right?

A. Yes, that is correct.

Q. So of the eight purchasers in your only relevant window, six were sold NEXO tokens with no valid pre-sale accredited investor verification, correct?

MR. SHELTON: Objection. Misstates testimony in the documents.

THE WITNESS: No. My testimony in the documents is even though they were expired by a few days or even a couple of months in one case, it does pass a reasonableness test.

Again, does the underlying information used to get their accredited investor certificate change in a matter of days? Does your W-2 change? Does anything change? No, it doesn't.

So, therefore, it passes a reasonableness test.

BY MR. TAYLOR-COPELAND:

Q. Would you agree that reasonable steps to verify means steps taken before the sale?

MR. SHELTON: Objection. Calls for legal opinion.

THE WITNESS: And, again, that would call for legal opinion. I'm not going to opine on that.

BY MR. TAYLOR-COPELAND:

Q. Well, your testimony is that you focused on the reasonableness of Nexo's process, right?

MR. SHELTON: We disagree. And we think he's been trying to answer your questions, which have been vague and repetitive and objectionable.

BY MR. TAYLOR-COPELAND:

Q. Okay. Your initial report didn't identify any NEXO token sales from 2019 or 2020, right?

A. Are you referring to the Supplement C?

Q. Well, I'm talking your initial report, Appendix C, didn't identify any sales from 2019 or 2020, right?

A. I believe that's correct.

Q. Okay. But last night you submitted a Supplemental Appendix C, which did identify some sales in 2019 or 2020, correct?

A. Correct.

Q. When did you first learn Nexo sold NEXO tokens to US purchasers in 2019?

A. When I read Mr. Seligman's rebuttal report where he identified the five, that is where everything started.

Obviously, I wanted to do my own due diligence and figure out exactly in coordination with Nexo, with counsel, do we have a complete list, and are there anymore names other than what Mr. Seligman identified.

But I guess the origin of your question will be Mr. Seligman's rebuttal report was the genesis of the

discovery of these 24.

Q. Okay. So until seeing Mr. Seligman's rebuttal report, you weren't aware that Nexo had sold any tokens to U.S. purchasers in 2019 or 2020?

A. Well, I want to be very clear. We don't know for sure at this point that the individuals identified in 2019 and 2020 were indeed purchasers of the 2018 offering. We do not know that for sure yet. That's still under investigation and the ROG will be updated when it's completed.

Q. You're aware that that interrogatory asks for all sales of NEXO tokens to U.S. purchasers, correct?

A. Off the top of my head, I cannot call for specifics of what the ROG requested.

Q. Okay. Did you withhold information regarding 2019 and 2020 purchasers from your initial report?

A. No.

Q. How is it possible you entirely missed these 2019 and 2020 sales in your initial report?

A. Well, first of all, I don't know that I did.

Again, what I'm saying is these are people that could be people that participated in the 2018 offering. What I don't know for sure yet is that they were.

In the interest of being fully transparent and forthcoming, I wanted to make sure you got this document

prior to the deposition.

Q. So just so we're clear here, the individuals you added last night, are you saying you don't know whether they bought the NEXO token from Nexo, or you don't know whether they bought the NEXO token from Nexo in a specific offering?

A. I don't know whether they bought the token from Nexo in the specific 2018 offering. That is still under investigation.

Q. Okay. But you know that they bought the NEXO token from Nexo, correct?

A. And, again, the details are all still being confirmed. I just wanted to be fully transparent and make you aware these are individuals that could have participated in the 2018 program.

Q. So let's forget about 2018, 2019. I'm just asking you, do you know if these individuals who you added last night purchased NEXO tokens from Nexo?

A. Again, I will reference you to my previous answer. I don't want to say with 100 percent certainty the answer is yes when I'm not 100 percent certain.

We will supplement this and the ROG will be updated, but I obviously want to fact-check everything before I make a definitive statement like that.

Q. Well, shouldn't you have fact-checked

Q. Well, okay. Why don't you tell me?

What is the universe of Appendix C? What were you trying to set forth in Appendix C?

A. First of all, Appendix C were the individuals that we knew of at the date of my report that had participated either in the 2018 or the 2021 offering.

Q. So for purposes of your initial report, you intentionally excluded purchasers in 2019 and 2020; is that right?

MR. SHELTON: Objection. Misstates testimony.

THE WITNESS: No, that is not correct.

BY MR. TAYLOR-COPELAND:

Q. Okay. I'm just trying to understand why these individuals that were identified last night weren't in your initial report.

Was this an intentional exclusion or did you just miss them?

MR. SHELTON: Objection. Asked and answered.

THE WITNESS: Yeah. I would reference you back to my previous answer.

The origin of all this was Mr. Seligman's rebuttal report, which I got approximately a couple of weeks ago.

If I got it maybe a week or two sooner, you probably would have had this document sooner. There

were no intentional misrepresentations or omissions in any report.

And as you're well aware, in my report, I reserved the right to supplement the report or amend the report as additional facts may be disclosed. And that is what this is.

BY MR. TAYLOR-COPELAND:

Q. Okay. So looking at page 15 of your report, you say Appendix C notes the 2018 ICO purchasers, the 2021 purchasers who made initial purchases before plaintiff, and the 2021 to 2022 purchasers who made initial purchases after plaintiff, right?

A. Yes, that's correct.

Q. Why didn't it include the 2020 purchasers who made their initial purchase before plaintiff?

A. Again, I would reference you back to my previous answer.

It was something that was brought up during Mr. Seligman's rebuttal report that I received a couple of weeks ago.

And, since then, I've been doing subsequent investigation into it. I am not certain that there were any 2019 or 2020 purchasers that did this under the 2018 offering. That's something that is still trying to be determined. The ROG will be updated when appropriate.

opinion.

Are you -- your opinion, then, is limited to the reasonable steps Nexo took with respect to its 2018 and 2021 OTC sales; is that correct?

A. Yes.

Q. Okay. So you're not opining then on whether Nexo sold the token to unaccredited investors in 2020?

MR. SHELTON: Objection. Misstates the document.

THE WITNESS: Anything under the 2019 offering, Nexo did see reasonable steps to verify accredited investor information on everybody they sold the token to. There is no evidence that Nexo sold the token to any unaccredited investors or underwriters or anything like that.

BY MR. TAYLOR-COPELAND:

Q. Okay. So, I mean, are you offering that opinion that there's no evidence Nexo sold the token to unaccredited investors or underwriters?

A. I have seen no evidence in anything that I've reviewed to indicate that Nexo sold tokens to any unaccredited investors or underwriters from the 2019 offering.

Q. Okay. What about 2022? Sorry. 2020?

A. So could you specify what your question is

understanding, as discussed in this report, that SEC integration principles include a safe harbor where offerings separated by at least 30 days may avoid integration in certain circumstances."

Do you see that?

A. Yes.

Q. Do you understand that integration is a legal doctrine?

A. That is why I have the citation directly from the SEC. I'm just simply regurgitating what the SEC is saying.

Q. Okay. Are you going to provide a legal opinion about whether these offerings should or should not be integrated?

A. No. I'm offering no legal opinions in the case.

Q. With respect to the exchanges on which the Nexo token was available for trading between 2018 and 2021, did you do anything to independently test whether U.S. persons could, in fact, trade on those exchanges?

MR. SHELTON: Objection. Asked and answered.

THE WITNESS: Could you be more specific in the exchanges you're referencing?

BY MR. TAYLOR-COPELAND:

Q. Well, do you know what exchanges the Nexo token

Q. And do you see this email at the top where Nexo's representative, Mr. Marinsky says regarding the purchase of NEXO tokens, there are several options for U.S. citizens to purchase tokens for, e.g., Changelly; Huobi, VPN-only; HitBTC, VPN-only; Uniswap; or alternatively, I can from help with purchasing NEXO tokens OTC. For this reason, you would have to have as a U.S. citizen an accredited investor status.

Do you see that?

A. Yes.

Q. Were you aware that Nexo staff were directing U.S. purchasers to Huobi and HitBTC in March of 2021?

A. Yes. I have seen this email.

Q. Okay. Does this change your view that third-party exchanges did not sell to U.S. customers during the relevant time period?

A. No. I don't recall making that definitive statement.

What I simply said was I cited two articles saying that these two outfits, Huobi and HitBTC, made policy announcements that they were going to cease selling to US-based customers. That was what I said. I never have stated that there were no transactions to U.S. customers. I have stated that there is no way for me to bootstrap and validate that information

one way or the other.

Q. Okay. So there's no way for us to know whether there were transactions to U.S. customers or not on Huobi and HitBTC; is that right?

A. Yes. There is no way that I can go back and independently test this.

MR. TAYLOR-COPELAND: I'll mark Exhibit 258.

(Plaintiff's No. 258, document, was marked for identification.)

BY MR. TAYLOR-COPELAND:

Q. Let's start at the bottom and then we can scroll up again.

Do you see this email from Mr. Dinca?

A. Yes. I do see the email.

Q. And it appears to be regarding the purchase of NEXO tokens, correct?

A. Yes.

Q. Okay. And Mr. Dinca discusses the possibility of facilitating a transaction through the OTC desk, right?

A. Yes, that's correct.

Q. Okay. But there's no reference here to any need for accredited investor certification, is there?

A. Not on the email you're referencing, no.

Q. Okay. And then he says the alternative here

would be to either go through Changelly integration on our platform or to go directly to an exchange.
Do you see that?
A. Yes.
Q. Were you aware that Nexo offered a Changelly integration on its platform through which U.S. customers could buy NEXO tokens in 2020?
A. I am aware there was a link to Changelly that was on Nexo's website at one time.
Q. Okay. Doesn't that contradict the premise that U.S. users didn't have access to the NEXO token on third-party exchanges?
A. Well, first of all, I've never said that U.S. users could not access. I just simply said there's not a way for me to backtest and validate this one way or the other.
Q. Okay. When you spoke with Mr. Dinca, did he tell you about the Changelly integration?
A. My conversations with Mr. Dinca were specifically about the policies and procedures that Nexo had implemented and was following to attempt to make efforts to verify the accreditation -- accredited investor status of the individuals that are on Schedule C.
Q. Okay. But that Schedule C does not include

individuals who purchased using the Changelly integration, correct?

A. To the best of my knowledge, no.

Q. And it doesn't include individuals who purchased on a third-party exchange, correct?

A. To the best of my knowledge, no.

Q. Okay. Does it include individuals who purchased on Nexo's retail exchange?

A. Yes. I asked Nexo for all transactions, regardless of what Nexo exchange they were on. So, yes. It would cover that.

Q. Okay. Turning to paragraph 16 of your report, you say, I've seen no evidence that Nexo sold the NEXO token to statutory underwriters, correct?

A. Yes, that is correct. But could you reference me where you're at again?

Q. It's paragraph 16. Is this -- oh, sorry. I'm not presenting this. I thought I was.

Paragraph 16, top of page 6.

A. I apologize. I thought you were referencing page 16. But, yes. That is what I said.

Q. Okay. What did you do to assess whether any of the individuals or entities that purchased NEXO token from Nexo were statutory underwriters?

A. First of all, all five of the individuals that

Q. Okay. Is there any opinion in your report you wish to correct or withdraw today?
A. No.
Q. Other than the Supplemental Appendix C, is there anything else you intend to amend or supplement in your report?
A. As we sit here today, no.
Q. Has any court ever excluded or limited your testimony?
A. Never.
MR. TAYLOR-COPELAND: I'd like to look at the Supplemental Appendix C. I'm going to introduce this as Exhibit 259.
(Plaintiff's No. 259, document, was marked for identification.)
BY MR. TAYLOR-COPELAND:
Q. So is this a copy of Supplemental Appendix C?
A. It's not showing on the screen, sir.
Q. Sorry about that. How about now?
A. Yes. That appears to be Appendix C.
Q. Okay. And I think we discussed earlier, yellow is the purchasers, the 2021 purchases made before Mr. Cress, right?
A. Correct.
Q. And then what does blue mean? Is this the

supplemental one or is this the original one, just for clarification?

A. This is the Supplemental Appendix C.

Q. Okay.

A. The blue are the 20 -- and basically everything from blue on down are the 24 individuals that I've identified that may have taken part in either the 2018 or 2021 program.

Q. Okay. Did your Appendix C make any modifications regarding the documentary support to individuals who were already on it? So other than from this Kevin Wexler on down?

A. Not that I can recall.

Q. Okay. So let's take a look.

We have [redacted] and the transaction date is March 2. I assume that's 2020, right?

A. I'm sorry. Where is Eric? Okay. I see [redacted]. Yes.

Q. So what I'd like to do then is take a look at his supporting documentation. We can start at the bottom and then go up.

A. Okay. You can go up. Okay. Okay. You can go up. Okay. You can go up.

Q. This is the top.

A. Okay.
Q. So the Appendix C shows a purchase in March of 2020, right?
A. Yes.
Q. And this supporting documentation is an email chain from, looks like January of 2022, right?
A. Yes.
Q. So nearly two years later, correct?
A. Yes.
Q. And does this email chain have any information that would allow you to ascertain whether Mr. [redacted] is an accredited investor or not?
A. Just to answer your question, as I previously stated, ROG 3 is something that I relied on my report. That information came from Nexo. That information is going to be updated.
This email chain obviously does not have any permanent information as far as accredited investor forms.
So I am not sure if just the wrong file was uploaded for this. But as I stated before, ROG 3 will be amended.
Q. Okay. So sitting here today, are you aware of what information Nexo used to verify Mr. [redacted] accreditation in March of 2020?