United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN CRESS,
Plaintiff,
v.
NEXO CAPITAL INC.,
Defendant.

Case No. 23-cv-00882-TSH

**ORDER RE: PLAINTIFF'S MOTION FOR SANCTIONS**

Re: Dkt. No. 135

## I. INTRODUCTION

Plaintiff John Cress filed this action against Defendants Nexo Financial LLC, Nexo Financial Services Ltd., Nexo AG, Nexo Capital, Inc., and Antoni Trenchev, Nexo's CEO, alleging the Nexo parties fraudulently induced him to take out loans collateralized by millions of dollars in digital assets, which were ultimately sold by the Nexo parties. ECF No. 1. Nexo Capital, Inc. ("Nexo") is the only remaining defendant in the case. ECF No. 37 at 7. Pending before the Court is Cress's Motion for Sanctions. ECF No. 134-3 ("Mot.").[1] The Court finds this matter suitable for disposition without oral argument pursuant to Civil Local Rule 7-1(b) and **VACATES** the August 20, 2026, hearing. For the reasons stated below, the Court **GRANTS IN PART and DENIES IN PART** the motion.[2]

[1] Cress filed his Motion under seal. *See* ECF No. 134-3. He later filed an unredacted version of his Motion on the public docket. *See* ECF No. 148-1. Cress also filed several exhibits under seal. *See* ECF Nos. 134-4–134-28. He later filed unredacted versions of most of these exhibits on the public docket. *See* ECF Nos. 148-2–148-23.

[2] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 6, 16.

## II. BACKGROUND

### A. Factual Background

The facts of this case are well known to the parties, and the Court has previously summarized this case's background in its Order denying Nexo's Motion to Dismiss the Second Amended Complaint. ECF No. 98; *see Cress v. Nexo Cap. Inc.*, No. 23-cv-00882-TSH, 2026 WL 296728 (N.D. Cal. Feb. 4, 2026). The Court incorporates by reference the factual background set forth therein. The Court includes only the factual background that is relevant to ruling on the present Motion for Sanctions.

#### 1. The Parties' Actions Between 2021–2022

On October 26, 2021, Cress's former counsel sent Nexo a Demand Letter. Declaration of Max Ambrose ("Ambrose Decl.") (ECF No. 135-1), Ex. 20 ("Demand Letter") (ECF No. 135-22). The Demand Letter alleges Nexo made misrepresentations about Nexo's "VIP Relationship Program" and "liquidation relief program," and that Nexo falsely "purported in advertisements it sent to [Cress] that its zero-cost loan program involved 'no risk of liquidation'"; the Letter also identified "Nexo employee Hristiyan Hristov" as Cress's "dedicated relationship manager." Demand Letter at 1–3. Nexo received the Demand Letter "before December 4, 2022." Ambrose Decl., Ex. 15 at 140 ("RFA Resp.") (ECF No. 134-11). Cress's former counsel spoke with Nexo's external counsel on November 10, 2021, and sent a follow-up letter on November 30, 2021. Ambrose Decl., Exs. 21 (ECF No. 135-23), 22 (ECF No. 135-24).

On December 4, 2022, Nexo created 30-day auto-deletion rules targeting every email sent to or from the email addresses of two of Nexo's managing partners (Antoni Trenchev and Kosta Kantchev), each rule configured to destroy all matching emails organization-wide that were over 30 days old and sent after October 1, 2017. Ambrose Decl., Ex. 13 (Expert Report of Michael Kunkel ("Kunkel Rep.")) at 6–7 (ECF No. 135-15). That day, Nexo also implemented a 4-day retention setting purging all Slack Direct Messages ("DMs") more than four days old organization-wide. Kunkel Rep. at 4. On December 7, 2022, Nexo changed the retention policy for Slack DMs to thirty days. *Id.*

United States District Court
Northern District of California

**2. The Parties' Actions Between 2023–2025**

Cress filed this action on February 27, 2023, alleging claims related to Nexo's VIP Relationship Program, Liquidation Relief Program, OTC services, advertising of zero percent interest rates, NEXO Token, and Earn Account Securities. ECF No. 1 ("Compl."). Specifically, Cress alleges "Nexo's 'exclusive OTC services,'" promising "some of the best rates on the market," were "illusory" because Nexo took days to execute Cress's purchases at "prices far higher than those available at the time [Cress] placed the orders." Compl. ¶ 68. Cress's Complaint names Trenchev as a defendant and identifies Kantchev by name. *See generally id.* Nexo was aware of the filing of this case by March 1, 2023. RFA Resp. at 141.

On March 1, 2023, Nexo implemented a 60-day retention setting for its Slack Public and Private Channels purging all Channel messages over 60 days old organization wide. Kunkel Rep. at 4, 12. On March 9, 2023, Nexo expanded retention rules to apply an 180-day retention setting to emails to or from the personal email addresses of Trenchev and Kantchev. *Id.* at 8, 11–12. On November 6, 2023, Nexo implemented an 180-day retention rule for emails to or from the email addresses of Kalin Metodiev. *Id.* at 8.

On November 10, 2023, Cress filed his First Amended Complaint. ECF No. 29. On January 17, 2024, Nexo expanded the retention rules for Trenchev, Kantchev, and Metodiev to additional organizational units. Kunkel Rep. at 8–9.

On July 25, 2024, Cress served his first set of RFPs, seeking communications concerning Nexo's Token sales, VIP Program, lending and liquidation practices, and communications with customers and regulators. Ambrose Decl., Ex. 14 (ECF No. 135-16). On August 7, 2024, Nexo replicated its expanded retention rules across the "MNG" unit. Kunkel Rep. at 8–9. From August 30–31, 2024, Nexo set a one-day retention rule organization wide for items in Google Drive with the label "LabelRet." *Id.* at 9. On September 2–3, 2024, Nexo created dozens of one-day retention rules targeting specific emails referencing OTC deals, NEXO Tokens, and lawyers, and documents targeting emails of Hristov's email address. *Id.* at 10.

On December 13, 2024, after Nexo objected to the majority of Cress's RFPs, Cress moved to compel Nexo's responses. ECF No. 54. On February 17, 2025, Nexo set a one-day retention

United States District Court
Northern District of California

rule organization wide for Google Drive items with the label "rom." Kunkel Rep. at 9.

**3. Other Relevant Litigation**

On September 22, 2022, the Mortons filed suit against Nexo in the High Court of Justice of England and Wales. Ambrose Decl. ¶ 11, Ex. 9 (Particulars of Claim, *Morton v. Nexo Capital Inc.*) (the "*Morton* case") (ECF No. 135-11). On August 2, 2024, the court in the *Morton* case ordered Nexo to "re-conduct its disclosure exercise" and to pay costs of €125,000. *Id.* ¶ 13, Ex. 11 (Order) (ECF No. 135-13). Nexo filed an application on September 20, 2024, to extend the deadline for the court-ordered "Reconducted Disclosure Exercise." *Id.* ¶ 14, Ex. 12 (Order) (ECF No. 135-14). Nexo settled the *Morton* case on June 6, 2025. *Id.* ¶ 12, Ex. 10 (Tomlin Order) (ECF No. 135-12).

**4. The Alleged Spoliation**

Cress alleges that Nexo improperly deleted emails from the founders/managing partners' corporate and personal email accounts, Slack DMs, Slack Channel communications, and specific emails and documents targeted by unique message ID or label. Mot. at 1–2.

Nexo's Data Retention and Disposal Policy, dated March 27, 2023, requires that all internal and external emails be retained permanently and that all "electronic documents" be retained for "at least 5 years." Ambrose Decl., Ex. 29 at Section 4.1 (ECF No. 134-19). The Policy states:

> In the event Nexo is served with any subpoena or request for documents or any employee becomes aware of a governmental investigation or audit concerning Nexo or the commencement of any litigation against or concerning Nexo, such employee shall inform Management. Any further disposal of documents shall be suspended until Management with the advice of counsel determines otherwise. Management shall take such steps as is necessary to promptly inform all staff of any suspension in further data disposal.

*Id.* at Section 6.0.

Nexo concedes that it never issued a litigation hold for electronic data that it purged and that it never attempted recovery for the data. Opp. at 9:17–10:17, 21:17–22:7 (ECF No. 144-3).[3]

[3] Nexo filed its Opposition under seal. *See* ECF No. 144-3. Nexo filed a redacted version of its Opposition on the public docket. *See* ECF No. 145.

United States District Court
Northern District of California

**a. Relevant Discovery**

In total, Nexo produced 63,866 documents spanning 370,488 pages during discovery, including 300 Slack documents. Declaration of Ian S. Shelton ("Shelton Decl.") ¶¶ 4, 8 (ECF No. 145-1).

**i. Slack Activity**

Nexo produced several emails showing Nexo's Slack activity. An email on January 3, 2022, states that the NEXO Token's regulatory status should be discussed in "the USA Slack channel" with Trenchev. Ambrose Decl. ¶ 33, Ex. 33 (ECF No. 134-23). An email replying to that email on March 1, 2022, discusses Nexo's sale of the NEXO Token to U.S. clients on Nexo's Exchange. *Id.* An email on June 14, 2023, states there are 538 members in the Nexo Slack and that the "team has sent 52,957 messages recently." *Id.* ¶ 31, Ex. 31 (ECF No. 134-21). The email shows new messages in the #community-management channel discussing the NEXO Token price "since being mentioned in the SEC's complaint against Coinbase" and a message from Kantchev. *Id.* at Ex. 31. And an email on October 6, 2024, shows new messages in the #support channel discussing "Liquidation Process" and "Margin Call History." *Id.* ¶ 32, Ex. 32 (ECF No. 134-22). The file paths accompanying Nexo's Slack communications show Nexo exported its Slack data on March 10, 2025. *Id.* ¶ 47.

Nexo produced a document listing its Slack Channels. *Id.* ¶ 48, Ex. 34 (ECF No. 134-24). The Slack Channels include

> channels titled spread-mark-up, forced-liquidations, team-liquidations, regulatory-struggles, ny-interest-fuck-up, negative-reviews, sales-management-team, lending, ltv-framework-service, otc-trading, nexo-token, usa, account-usa, terms-and-conditions, executive-core, marketing-legal, sales-compliance, law-enforcement, prime-whale-watch, client-trading-alerts, structured-products, sales-operations, regulatory-strategy, and compliance-comms.

Mot. at 20 (citing Ambrose Decl., Ex. 34) (internal quotations omitted).

Nexo did not produce any Slack DMs predating August 2024 or any DMs from 1,309 of 1,347 disclosed Slack Channels. Ambrose Decl. ¶¶ 46, 48, Ex. 34.

**ii. Documents**

Nexo produced a document of a PDF file that discusses Nexo's OTC desk, liquidation

relief, and the NEXO Token; the document states, "the NEXO Token is registered with the SEC as a security." *Id.* ¶ 30, Ex. 30 (ECF No. 134-20). The document contains a note from a commenter stating, "pasting this here for future reference, as Slack messages can expire and disappear." *Id.*

Nexo produced an email chain dated December 17, 2024, between Dinca and Kantchev. *Id.* ¶ 35, Ex. 35 (ECF No. 134-25). The chain includes an email from a Nexo customer to Kantchev where the customer attaches screenshots of "old emails" showing that Kantchev offered the customer a "personal liquidation-free guarantee." *Id.* at Ex. 35. Nexo produced an email chain dated March 21, 2021, between Alexander Mrozinski (a Nexo employee) and a Nexo customer. *Id.* ¶ 36, Ex. 36 (ECF No. 134-26). The chain includes emails from the customer to Kantchev's personal email address where the customer thanks Kantchev for his help in recovering the customer's crypto assets that were liquidated. *Id.* at Ex. 36.

Cress served the SEC with a subpoena in this case; the SEC produced an email chain dated February 24, 2020, showing that Trenchev communicated with the SEC regarding the NEXO Token and Nexo's "Reg D form." *Id.* ¶ 18, Ex. 16 (ECF No. 134-12).

**iii. Responses**

Nexo has no documents showing litigation hold notices, preservation memoranda, or instructions regarding document retention. Ambrose Decl., Ex. 8 at 4 ("RFP Resp.") (ECF No. 134-10). Nexo has no documents regarding business justifications for the 30-day retention rule applied to the emails of Trenchev and Kantchev or efforts to recover deleted data. RFP Resp. at 20–21.

Nexo charged Cress a liquidation fee in connection with the forced liquidation of Cress's collateral. RFA Resp. at 33–36. Nexo took fees on each of Cress's OTC transactions with Nexo. *Id.* at 36.

**b. Nexo's Testimony**

Cress deposed Nexo personnel Yasen Damyanov, Antoni Trenchev, Kosta Kantchev, Hristiyan Hristov, and Octavian Dinca.

**i. Damyanov**

Yasen Damyanov, Nexo's employee who implemented Nexo's deletion policies, testified

to the following at his deposition. *See* Ambrose Decl., Ex. 3 ("Damyanov Dep. Tr.") (ECF No. 134-6). Damyanov implemented the changes attributed to him on the Google Vault Audit Log which includes Nexo's retention policies. Damyanov Dep. Tr. at 114:4–23. Only Damyanov and Kantchev had administrative access to change Nexo's Slack retention policies between December 2022 and present day. *Id.* at 38:3–20. Each change implemented by Damyanov was a "task" assigned to him by management or the legal department. *Id.* at 40:20–41:10, 47:10–48:2, 81:20–82:4. In March 2023, Nexo's management was Trenchev and Kantchev. *Id.* at 47:24–48:2. Nexo's InfoSec team was not involved in Nexo's retention changes. *Id.* at 77:9–78:13.

On December 4, 2022, Damyanov implemented the four-day retention rule for Slack DMs that purged all DMs more than four days old. *Id.* at 81:16–22, 83:17–84:14. Slack DM policies affect all DMs and have no way to exclude particular DMs. *Id.* at 82:5–83:5. Damyanov does not know why Nexo deleted the Slack DMs. *Id.* at 81:16–24. On March 9, 2023, Damyanov implemented the 180-day retention setting to emails to or from the personal email addresses of Trenchev and Kantchev because Kantchev told Damyanov to do so. *Id.* at 122:20–125:14. Damyanov implemented the one-day retention rule ("LabelRet") on August 30–31, 2024, because "there was a task given by the legal department so that some specific documents to be purged from the Google system." *Id.* at 115:7–17, 116:1–6. Damyanov implemented the one-day retention rule ("rom") on February 17, 2025, because the legal department told him to do so. *Id.* at 118:17–119:23. Damyanov does not know what documents were classified under the "LabelRet" and "rom" labels or who chose what documents went under the labels. *Id.* at 116:18–117:13, 118:3–16, 119:11–20. Damyanov recalls one time that he exported Slack data for this case, in 2025; only Damyanov and Kantchev can perform data exports. *Id.* at 64:13–65:11.

**ii. Trenchev**

Antoni Trenchev, Nexo's co-founder and managing partner, testified individually and as Nexo's Rule 30(b)(6) corporate representative on document retention, preservation, and deletion topics. *See* Ambrose Decl., Ex. 1 ("Trenchev Dep. Tr.") (ECF No. 134-4); Shelton Decl., Ex. 7 ("Sec. Trenchev Dep. Tr.") (ECF No. 145-8). Trenchev testified as follows at his deposition. Nexo placed a litigation hold in the *Morton* case. Trenchev Dep. Tr. at 81:7–82:8. Nexo did not

place a litigation hold in Cress's case because Nexo went "above and beyond a litigation hold notice by actually the team going out as soon as they became aware of the demand letter to collect all relevant communications and information." *Id.* Trenchev does not "have specific memory" of what was collected for Cress's case. *Id.* He believes that communications between Cress "and his account manager had been duly copied and stored." *Id.* at 40:3–24. The legal department told Trenchev that Nexo preserved "all the relevant information." Sec. Trenchev Dep. Tr. at 42:17–43:18. After learning of Cress's lawsuit, Trenchev did not take any specific actions to preserve communications because he "had no communication or documents with relevance to the case." Trenchev Dep. Tr. at 62:3–20.

Nexo's policy is to retain internal and external emails indefinitely. *Id.* at 84:1–10. Trenchev does not know who placed the 30-day retention rule on his emails and Kantchev's emails in December 2022; normally, "people at Infosec" made changes to the Google settings. *Id.* at 85:15–86:12. Trenchev does not recall directing anyone to implement the retention policy and does not recall "discussions with legal and compliance" prior to the change. *Id.* at 86:13–23, 92:16–20. Nexo implemented the December 2022 retention policy as "a de-risking activity" because "FTX had just imploded," and there were "a lot of hacking attacks at the time." *Id.* at 91:11–92:1. The retention policy only applied to emails of Trenchev and Kantchev because they were not "customer-facing, not interacting with clients" and "would have little to no relevant documents and communications" in their emails. *Id.* at 101:3–102:1.

Between 2018–2022, Trenchev used Slack on a daily basis for internal communications, and Slack was "an important part of the internal communication system in that period." *Id.* at 31:13–34. Trenchev used Slack to send voice messages to "many different people in departments." *Id.* at 107:10–108:9. Trenchev does not know why Nexo implemented the 4-day retention rule for Slack DMs in December 2022 or who implemented the rule. *Id.* at 110:11–111:1, 113:1–23. He thinks that "four days was a mistake . . . somebody might have wanted to type in 40 and they missed a zero because four days is clearly a very, very short time period." *Id.* Nexo did not make any efforts to recover the deleted Slack DMs. Sec. Trenchev Dep. Tr. at 115:19–116:19.

Trenchev does not know why Nexo changed retention settings for Metodiev's email in January 2024. *Id.* at 162:13–163:1. Metodiev oversaw Nexo's OTC desk and VIP Relationship Program. *Id.* Metodiev, along with Trenchev and Kantchev, is "senior management." Sec. Trenchev Dep. Tr. at 75:14–76:9. Nexo employees who worked in the trading department or OTC desk reported directly to Metodiev. *Id.* at 41:23–42:15.

Trenchev does not know what "LabelRet" or "rom" are, who created and implemented those labels, or whether they were used to delete emails related to the *Morton* case. *Id.* at 137:5–138:25.

**iii. Kantchev**

Kosta Kantchev, one of Nexo's managing partners, testified as follows at his deposition. *See* Ambrose Decl., Ex. 2 ("Kantchev Dep. Tr.") (ECF No. 134-5). In 2021, Kantchev participated in "so many" Nexo Slack Channels. Kantchev Dep. Tr. at 28:9–18. Kantchev "might" have agreed to Damyanov implementing the retention policy for Kantchev's corporate email in December 2022 and "might" have instructed Damyanov to do so. *Id.* at 115:10–116:11. Kantchev was trying to get rid of "[s]ensitive documents, sensitive communications that would . . . be used against [Nexo]." *Id.* at 118:8–18. Kantchev did not use his personal Gmail address for Nexo business; he instead used his Nexo account. *Id.* at 28:1–8. He could not "think of any reason" why rules were implemented that deleted emails from his personal email address and did not remember ordering those rules. *Id.* at 121:5–25. Kantchev does not remember anything about the retention policy changes for Slack DMs and "might have been involved" in making the changes. *Id.* at 120:17–121:4.

**iv. Hristov**

Hristiyan Hristov, Cress's dedicated VIP Program manager, testified to the following at his deposition. *See* Ambrose Decl., Ex. 5 ("Hristov Dep. Tr.") (ECF No. 134-7). In 2021, Slack was one of the methods used at Nexo for internal communications. Hristov Dep. Tr. at 216:6–217:3. Hristov used Slack groups and Slack DMs to communicate with others at Nexo; Hristov may have communicated through Slack about Cress. *Id.* While at Nexo, Hristov used Slack daily. *Id.* at 285:3–8.



United States District Court
Northern District of California

**v. Dinca**

Octavian Dinca, who testified individually and as one of Nexo's Rule 30(b)(6) corporate representatives, testified as follows across his two depositions. *See* Ambrose Decl., Exs. 6 ("Dinca Dep. Tr.") (ECF No. 134-8), 7 ("Sec. Dinca Dep. Tr.") (ECF No. 134-9). Account managers at Nexo frequently used Slack chats and Slack DMs as part of their workflow. Dinca Dep. Tr. at 391:11–21. Between March and June 2021, it is possible Dinca used Slack DMs to communicate about Cress and Nexo VIP customers, including to Hristov; there is a high chance Dinca messaged with Metodiev because Dinca's team reported directly to Metodiev. *Id.* at 394:1–395:17. Metodiev created Nexo's VIP Relationship Program, created and approved the VIP Relationship Program brochure and Program policies in effect in March 2021, and set fees for Nexo OTC transactions between 2020 and 2022. Sec. Dinca Dep. Tr. at 6:2–23; 15:1–16:22.

**c. Expert Reports And Testimony**

Each party includes evidence in the form of expert reports and deposition testimony. Cress's retained expert is Michael Kunkel, and Nexo's retained expert is David Greetham.

**i. Kunkel**

Cress's retained expert, Michael Kunkel, has extensive experience in computer forensic investigations and electronic discovery efforts. Kunkel Rep. at 1–2. Kunkel offers the following opinions in his report. The emails Nexo purged on December 4, 2022, cannot be reconstructed by collecting them from other custodians because Nexo's deletion rules purged "matching emails from every mailbox in the domain." *Id.* at 7. Prior to December 4, 2022, Nexo had no retention policy set for Slack DMs. *Id.* at 4. Prior to March 3, 2023, Nexo had no retention policy for Slack Public and Private Channels. *Id.* "Nexo had the technical ability to preserve Slack data for at least 1825 days and chose not to for almost all channels." *Id.*

Regarding the "LabelRet" and "rom" labels, the Google Workspace audit logs "would show when labels were applied to specific documents, who applied them, and which documents were affected." *Id.* at 9.

When creating the one-day retention rules in September 2024, Nexo included "[n]umerous specific RFC 822 message IDs. These are a global unique identifier assigned to each email, which



United States District Court
Northern District of California

means that when a retention setting targets a specific RFC 822 message ID, it is targeting one particular email for deletion." *Id.* at 10. For example, nine emails with specific subject line titles were targeted for deletion, including emails with the subject line "All OTC deals Part 1," and "amending templates used by the sales team." *Id.*

Overall, Nexo's Google Vault Audit Log shows 512 changes to Nexo's email and Google Drive retention settings between July 2020 and February 2026. *Id.* at 7, 10; *see* Ambrose Decl., Ex. 28 (Google Vault Audit Log) (ECF No. 134-18). Nexo's retention rules were purposefully set "in such a way as to delete targeted emails by way of email addresses, IDs, subject lines, and targeted Google Drive labels" and are "indicative of centralized control." Kunkel Rep. at 10. Nexo's "systematic expansion of retention rules to additional organizational units during litigation suggests Nexo discovered its earlier rules had not captured all copies of the materials it sought to destroy and that it expanded those rules accordingly." *Id.* at 9. "This pattern of escalation—from broad rules to increasingly targeted deletion of specific communications—continued throughout the pendency of this litigation." *Id.* at 12.

Several aspects of Nexo's retention rules are "inconsistent with routine IT administration." *Id.* at 11. The

> targeting of specific RFC 822 message IDs is particularly significant. An RFC 822 message ID is a globally unique identifier assigned to each individual email at the time it is sent. It is not visible in the ordinary course of reading or managing email; locating a specific message ID requires either searching the email headers or using administrative tools to identify the exact message. A retention rule targeting a specific RFC 822 message ID is therefore not a broad policy—it is a deliberate decision to delete one particular email, which requires someone to have identified that specific email in advance.

*Id.*

Kunkel testified to the following at his deposition. *See* Reply Declaration of Max Ambrose ("Ambrose Reply Decl.") (ECF No. 149-1), Ex. 6 ("Kunkel Dep. Tr.") (ECF No. 149-7). The email Nexo produced during discovery associated with the subject line "All OTC deals Part 1" was a forward of that email and not the original email. Kunkel Dep. Tr. at 168:6–23. A forwarded email can be changed from the original email such that the forwarded email is missing

United States District Court
Northern District of California

information present in the original email. *Id.* at 173:4–13.

**ii. Greetham**

Nexo's retained rebuttal expert, David Greetham, has extensive experience in digital forensics, eDiscovery, and information governance.[4] Shelton Decl., Ex. 8 at 2 (Expert Report of David A. Greetham ("Greetham Rep.")) (ECF No. 145-9). Greetham offers the following opinions in his report. "Kunkel is neither trained nor qualified to provide an opinion on Information Governance, based on his details about his experience." Greetham Rep. at 3.

Regarding the retention policy change in December 2022 for the corporate email accounts of Trenchev and Kantchev, Kunkel does not consider the business justification offered by Trenchev at his deposition. *Id.* at 19. Trenchev's concerns regarding hacking and de-risking "were valid" because during "the early 2020's, cybercrime and phishing attacks were on the rise." *Id.* "Minimizing risk is one of the pillars of Information Governance, and within the authority of the organization to perform modifications to the records retention policy, to protect the organization." *Id.* Nexo

> has identified reasonable business justifications for the Trenchev and Kantchev email retention policy change in December 2022, including the fact that those two apex executives possessed particularly sensitive business data, that their communications could be targeted by threat actors, and given the unique security risks that generally face the cryptocurrency industry, including the potential irreversibility of fraudulent crypto transactions, and the prevalence of attempted hacks and bad actors.

*Id.*

Regarding Slack, "a default retention policy of 30 to 180 days for internal Slack communications is not unusual." *Id.* at 25.

Regarding the one-day retention rules Nexo created, the targeted deletions concern either (1) "suspected spam and phishing emails and other potentially harmful emails that caused a potential security risk"; or (2) "documents in a separate UK litigation, the *Morton* matter, that

---

[4] "Information Governance ('IG') refers to the organizational framework of policies, procedures, controls, roles, and accountability mechanisms established to ensure that information is created, managed, stored, accessed, retained, and disposed of in a lawful, secure, consistent, and efficient manner throughout its lifecycle." Greetham Rep. at 4.

United States District Court
Northern District of California

were deleted after Nexo produced them in the *Morton* matter" and "subsequently settled the *Morton* matter." *Id.* at 20. "Nexo confirmed that the Google Drive labels 'LabelRet' and 'rom' were targeted deletions from Google Drive associated with the *Morton* matter." *Id.* at 21.

An RFC 822 message ID "is a useful feature for IT to have at their disposal if the organization has received an email that they think may compromise the integrity of the organization and protect them from malicious attacks." *Id.* at 24. Kunkel is "simply wrong" that retention rules targeting specific RFC 822 message IDs resulted in the deletion of nine emails. *Id.* at 21. The email, "All OTC deals Part 1," "was produced in this litigation." *Id.* And "emails with the subject 'amending templates used by the sales team' were deleted," but "two of these emails appear on Nexo's privilege log." *Id.*

Greetham testified to the following at his deposition. *See* Ambrose Decl., Ex. 4 ("Greetham Dep. Tr.") (ECF No. 135-6); Ambrose Reply Decl., Ex. 8 ("Sec. Greetham Dep. Tr.") (ECF No. 149-9). He does not dispute any of Kunkel's technical analysis. Greetham Dep. Tr. at 79:12–14. Damyanov told Greetham that Damyanov made the changes reflected on the Google Vault Audit Log because "he was instructed to make changes from senior management." *Id.* at 23:2–19.

The default retention policy for Slack Channels is "forever"; Nexo can set channel-specific retention rules for up to 1,825 days. *Id.* at 92:20–93:9. Data purged by a Google Vault retention rule are permanently unrecoverable, and it is not possible to recover Slack messages. *Id.* at 87:22–88:12. Once deleted, it is "almost" impossible to quantify the amount of data deleted or identify the contents of the data deleted. *Id.* at 102:13–103:2, 104:25–105:21. Google Vault has a litigation hold feature that takes precedence over retention rules; there is no evidence Nexo created such a hold. *Id.* at 89:11–90:12.

For his report, Greetham relied on Nexo's representation to him that the "LabelRet" and "rom" targeted deletions took place after Nexo resolved the *Morton* matter. *Id.* at 126:10–15, 128:2–3. Greetham did not review any *Morton* pleadings, productions, or settlement documents and did not know when *Morton* began or resolved. *Id.* at 121:4–122:3. Greetham was not aware that the *Morton* case settled on June 6, 2025, after Nexo implemented the "LabelRet" and "rom"

rules. *Id.* at 127:9–129:8. He could not "possibly answer" whether documents related to *Morton* are also related to this matter. *Id.* at 142:5–144:23.

For his report, Greetham did not rely on the forwarded email with the subject line "All OTC deals Part 1" that Nexo produced in discovery in disputing Kunkel's conclusions regarding the nine targeted email deletions. Sec. Greetham Dep. Tr. at 207:2–209:8. This is because a forwarded email is "not the same" as the original email—a forwarded email may contain additional content, be missing content, or contain different attachments as compared to the original email. *Id.* Greetham did not know whether Nexo produced the original email, "All OTC deals Part 1." *Id.* at 215:3–23. Regarding the email, "amending templates used by the sales team," Nexo did not put the original email on its privilege log; instead, Nexo put "part of a response" to the email on the privilege log. *Id.* at 220:7–222:8.

There can be business reasons for targeted deletions—these deletions "are fairly common in organizations when there's certain data that they no longer need." Greetham Dep. Tr. at 94:20–95:12.

**B. Procedural Background**

Cress filed this case on February 27, 2023, alleging five causes of action: (1) Fraudulent Inducement of Contract (against all Nexo Defendants); (2) California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")) (against all Nexo Defendants); (3) Unregistered Offer and Sale of Securities (Cal. Corp. Code §§ 25110, 25503) (against all Defendants); (4) Unregistered Offer and Sale of Securities (Cal. Corp. Code §§ 25110, 25504) (against Trenchev); and (5) Fraud in the Offer and Sale of Securities (Cal. Corp. Code §§ 25401, 25504.1) (against all Defendants). ECF No. 1.

On May 15, 2023, Defendants moved to dismiss the original Complaint pursuant to Rule 12(b)(2) and Rule 12(b)(6). ECF No. 19. Trenchev filed a declaration in support of the motion based on his "personal knowledge" of "Nexo's services and products as well as the named defendants in this lawsuit, including their corporate structure." ECF No. 19-1.

On October 10, 2023, the Court granted in part and denied in part Defendants' motion. ECF No. 26. The Court dismissed all claims against all Defendants, except Nexo, for lack of

personal jurisdiction. *Id.* at 7–15. The Court denied Defendants' motion as to Cress's first claim for fraudulent inducement of contract, finding his allegations plausible at the motion to dismiss stage. *Id.* at 15–21. As to the UCL claim, the Court granted Defendants' motion to the extent it was based on Nexo's alleged deceptive conduct in the sale of the NEXO Token and Cress's Nexo Earn Account, and also to the extent it is based on Nexo's advertised interest rates being available only to customers who maintain 10% of their portfolio balance in the NEXO Token or on Nexo's alleged failure to provide Cress notice before liquidating his assets. *Id.* at 24–25. As to Cress's third claim under California Corporations Code sections 25110 and 25503, the Court granted Defendants' motion, finding Cress had not plausibly alleged the existence of a non-exempt, unregistered security. *Id.* at 31. The Court also dismissed Cress's state law securities fraud claim, except as to the single alleged misrepresentation that the NEXO Token was registered with the Securities and Exchange Commission ("SEC") as a security. *Id.* at 33. The Court granted Cress leave to amend. *Id.*

On November 10, 2023, Cress filed his First Amended Complaint ("FAC"), re-pleading the same five causes of action. ECF No. 29. Defendants again moved to dismiss pursuant to Rule 12(b)(2) and Rule 12(b)(6). ECF No. 32. On June 25, 2024, the Court granted in part and denied in part Defendants' motion. ECF No. 37. The Court granted Defendants' request to dismiss all Defendants, except Nexo, without leave to amend. *Id.* at 7. The Court granted Defendants' motion as to the UCL claim for the same reasons articulated in the Court's first dismissal order. *Id.* at 8. As to Cress's claims under California Corporations Code sections 25110 and 25503, the Court granted Defendants' motion to the extent it was based on the Earn Account and Leveraged Investment Instrument but denied Defendants' motion to the extent the claim was based on the NEXO Token. *Id.* at 8–13. The Court also dismissed Cress's state law securities fraud claim, except as to the single alleged misrepresentation that the NEXO Token was registered with the SEC as a security. *Id.* at 13. The Court denied Cress leave to amend his dismissed claims. *Id.* at 8, 10, 13.

On July 23, 2024, Nexo filed an answer to the FAC. ECF No. 45. Nexo filed an amended answer to the FAC on August 13, 2024. ECF No. 50. On September 30, 2025, Cress sought leave

United States District Court
Northern District of California

to amend the FAC "to add additional misrepresentations as the basis for his fraudulent inducement claim, and add causes of action for fraudulent omission, common law fraud, civil theft, civil RICO, and breach of contract." ECF No. 76. The Court granted Cress leave to amend the FAC on October 30, 2025. ECF No. 86.

On October 30, 2025, Cress filed the operative Second Amended Complaint ("SAC"). ECF No. 88. Cress alleges ten causes of action in the SAC under federal law and California state law: (1) Fraudulent Inducement; (2) California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")); (3) Unregistered Offer and Sale of Securities (Cal. Corp. Code §§ 25110, 25503); (4) Fraud in the Offer and Sale of Securities (Cal. Corp. Code § 25401); (5) Fraud; (6) Civil Theft (Cal. Penal Code § 496(C)); (7) Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(C)); (8) Violations of RICO, Conspiracy to Violate 1962(C)) (18 U.S.C. § 1962(D)); (9) Fraudulent Omission; and (10) Breach of Cryptocurrency Purchase Agreement. SAC ¶¶ 139–264. Cress seeks, *inter alia*, damages including treble and punitive damages. *Id.* at 47.

On December 5, 2025, Nexo filed a motion to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 94. On February 4, 2026, the Court denied Nexo's motion. ECF No. 98. On February 18, 2026, Nexo filed its operative Answer to the SAC. ECF No. 100 ("Answer"). In its Answer, Nexo's Sixth Affirmative Defense states:

> If Plaintiff establishes that the NEXO Token is a security, Plaintiff's claims are barred, in whole or in part, because the alleged transactions are exempt from the registration requirements of the Securities Act, other federal or state securities laws, and/or the regulations promulgated thereunder, including the safe harbor of Rule 506 of Regulation D.

Answer at 25.

On July 6, 2026, Cress filed the instant Motion for Sanctions. ECF No. 134-3 ("Mot."). On July 27, 2026, Nexo filed an Opposition. ECF No. 144-3 ("Opp."). On August 3, 2026, Cress filed a Reply. ECF No. 149 ("Reply").

United States District Court
Northern District of California

## III. LEGAL STANDARD

"Rule 37(e) governs the remedies available for the failure to preserve electronically stored information." *Fourth Dimension Software v. DER Tourisktik Deutschland GmbH,* No. 19-cv-5561-CRB, 2021 WL 5919821, at *3 (N.D. Cal. Dec. 15, 2021). Rule 37(e) states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Rule 37(e) "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures." 2015 Adv. Comm. Notes, Fed. R. Civ. P. 37(e). Accordingly, the detailed language of Rule 37(e) forecloses reliance on the Court's inherent authority to fashion sanctions for the failure to preserve ESI. *Gregory v. State of Montana*, 118 F.4th 1069, 1072, 1079 (9th Cir. 2024)

## IV. DISCUSSION

Cress moves for sanctions under Rule 37(b), Rule 37(e), and the Court's inherent power for Nexo's alleged spoliation of electronically stored information ("ESI") and failure to obey Court orders. Mot. at 1. Overall, Cress requests terminating sanctions and attorneys' fees and expenses; alternatively, Cress requests curative sanctions and fees. *Id.*

In sum, the Court finds that Nexo spoliated ESI with the intent to deprive Cress of its use in this case and that the spoliation prejudices Cress. The Court concludes that under Rule 37(e), terminating sanctions are not warranted; however, sanctions in the form of curative instructions

United States District Court
Northern District of California

and attorneys' fees are warranted.[5]

### A. Spoliation Under Rule 37(e)

Cress argues that Nexo spoliated ESI with intent to deprive Cress of its use in this case, and that the spoliation prejudiced Cress. Mot. at 16:19–21:2.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Herson v. City of Richmond*, No. C-09-02516-PJH(LB), 2011 WL 3516162, at *2 (N.D. Cal. Aug. 11, 2011) (citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)). "Rule 37(e) sets forth three criteria to determine whether spoliation of ESI has occurred: (1) the ESI 'should have been preserved in the anticipation or conduct of litigation'; (2) the ESI 'is lost because a party failed to take reasonable steps to preserve it'; and (3) '[the ESI] cannot be restored or replaced through additional discovery.'" *Porter v. City & Cnty. of San Francisco*, No. 16-cv-03771-CW(DMR), 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018) (citing Fed. R. Civ. P. 37(e)) (alteration in original).

Rule 37(e) provides that when a covered loss of ESI occurs, a court must make specified findings before imposing a sanction. *Gregory*, 118 F.4th at 1078. If a court finds prejudice, it may "impose remedial sanctions that are 'no greater than necessary to cure the prejudice' resulting from the loss." *Id.* (citing Fed. R. Civ. P. 37(e)(1)). The court may impose certain types of severe sanctions "*only* upon finding that the party [who caused the loss] acted with the *intent* to deprive another party of the information's use in the litigation." *Id.* (citing Fed. R. Civ. P. 37(e)(2)) (emphasis and alteration in original).

Here, the Court finds that Cress establishes Nexo's spoliation of ESI. The Court further finds that Nexo's spoliation prejudices Cress and that the purpose of the spoliation was to deprive Cress of discovery in this case.

[5] Because the Court concludes that it would not award different sanctions under Rule 37(b) or the Court's inherent authority, the Court does not determine whether sanctions would be appropriate under these other authorities.

United States District Court
Northern District of California

**1. Lost ESI**

Cress argues that the loss of ESI is "irremediable" because there are no backups, the purged data are permanently unrecoverable, and nothing can be reconstructed from other custodians. Mot. at 17:20–23. Nexo contends that Cress cannot "show that Nexo lost unique information that is unavailable from any other source, including the files of other custodians." Opp. at 22:8–26.

ESI is "lost" where it "cannot be restored or replaced." *WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 WL 1967209, at *12 (N.D. Cal. Apr. 24, 2020). Because ESI "often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." 2015 Adv. Comm. Notes, Fed. R. Civ. P. 37(e).

Here, everyone agrees that the emails, Slack DMs, Slack Channel threads, and Google Drive documents purged by Nexo are gone forever. Greetham Dep. Tr. at 87:22–88:12. Nexo argues that Cress possesses some documents from other sources, so they are not lost. Opp. at 22:9–17. Yet Nexo does not say what these documents are. Next, Nexo argues that documents identified by Kunkel as deleted were not deleted. *Id.* at 22:18–26. But even assuming that is true (which as discussed below, it is not), Nexo does not dispute that the remaining deleted ESI cannot be restored. Therefore, Cress establishes that Nexo lost ESI. *Cf. hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 975 (N.D. Cal. 2022) ("Nor does hiQ dispute that it has permanently lost the evidence at issue.").

**2. Duty To Preserve**

Cress argues that Nexo's duty to preserve "attached no later than [Cress's] October 26, 2021 demand and indisputably upon the February 2023 Complaint." Mot. at 17:6–12. Nexo contends that the "earliest date that any duty to preserve documents related to Cress's claims arose in October 2021" and extended to "documents related to Cress's OTC transactions and his correspondence with Hristov." Opp. at 19:1–21:16. Nexo further contends that the "original Complaint did not broaden Nexo's preservation obligations." *Id.*

A party's obligation to preserve evidence for use in litigation arises when litigation is pending or becomes "reasonably foreseeable." *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645

United States District Court
Northern District of California

F.3d 1336, 1345–46 (Fed. Cir. 2011) (applying Ninth Circuit law). Whether "litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 549 (N.D. Cal. 2018) (citation omitted). Moreover, parties "engage in spoliation of documents as a matter of law only if they had some notice that the documents were potentially relevant to the litigation before they were destroyed." *Kitsap*, 314 F.3d at 1001 (cleaned up).

Here, Nexo does not dispute that Cress's Demand Letter and Complaint triggered a duty to preserve relevant ESI; instead, Nexo quarrels over the scope of its preservation obligation. Opp. at 19:1–21:16. Regarding the Demand Letter, Nexo asserts that it was "specific to claims of fraud arising out of Cress's dealings with Nexo and the VIP Program." *Id.* at 3:9–4:8; *see id.* at 19:1–21:16 ("The Demand Letter disclosed potential claims based only on Cress's own OTC transactions and VIP-brochure theory."). According to Nexo, Cress should have requested evidence preservation and named all relevant custodians in his Demand Letter. *Id.* at 3:19–26. That is not the law. "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *Doe LS 340 v. Uber Techs., Inc.*, 710 F. Supp. 3d 794, 801 (N.D. Cal. 2024) (citation omitted). And it is Nexo—not Cress—who would know what individuals possessed information relevant to Cress's claims.

Cress responds that the Demand Letter created a duty to preserve communications from Metodiev, Kantchev, and Trenchev, along with Slack DMs and Slack Channel threads regarding Cress's transactions, the OTC desk, liquidations, and the VIP Program. Mot. at 5:18–6:4, 9:18–26, 11:5–12:10; Reply at 2:1–10. The Court agrees. The duty to preserve evidence extends to information "relevant to the subject matter involved in the action" and the "key players" in the case. *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1137 (N.D. Cal. 2012) (citation omitted). First, Metodiev oversaw Nexo's OTC desk and VIP Relationship Program and set fees for the OTC desk; Nexo employees who worked in the trading department or OTC desk reported directly to Metodiev. Sec. Trenchev Dep. Tr. at 41:23–42:15, 162:13–163:1; Sec. Dinca Dep. Tr.

at 6:2–23; 15:1–16:22. As Cress's Demand Letter put Nexo on notice of claims regarding the OTC desk and VIP Program, it created a duty to preserve Metodiev's communications. Second, Cress also proffers evidence that Kantchev interacted with customers regarding the Liquidation Relief Program which Cress put squarely in dispute in the Demand Letter. Ambrose Decl., Exs. 35–36; Demand Letter at 1–3. Nexo therefore had a duty to at least preserve Kantchev's emails regarding liquidation relief. Further, Nexo's argument that its retention policy change for Trenchev in December 2022 is immaterial because the Demand Letter "did not mention" Trenchev falls flat. Opp. at 4:14–20. Trenchev is a key individual in the case—he avers as much in his declaration for Nexo's motion to dismiss, stating that he has "personal knowledge" of "Nexo's services and products as well as the named defendants in this lawsuit, including their corporate structure." ECF No. 19-1; *see* Mot. at 9:18–26. Thus, Nexo had a duty to preserve Trenchev's communications relating to Cress's claims. Finally, the Court is not sure what to make of Nexo's assertion that it "preserved all Cress-specific material consistent with the Demand Letter." Opp. at 3:27–4:8. Seemingly, Nexo focused on items that discussed Cress by name; however, the subject matter of the Demand Letter is not confined to such documents. Reply at 7:4–15. Nexo had a duty to preserve emails, Slack DMs, and Slack Channels related to Cress's transactions, the OTC desk, liquidations, and the VIP Program. *Id.*

Nexo argues that its Slack DMs are not relevant because the deposition testimony "does not show that Nexo personnel used Slack DMs to communicate about customers or customer transactions." Opp. at 10:4–9. Not so. Hristov and Dinca testified that because Slack DMs were routinely used in workflow, it is possible they communicated about Cress through Slack DMs. Hristov Dep. Tr. at 216:6–217:3; Dinca Dep. Tr. at 391:11–21, 394:1–395:17. And Trenchev, Kantchev, Hristov, and Dinca all testified that Slack is an integral part of internal communication at Nexo. Trenchev Dep. Tr. at 31:13–34; Kantchev Dep. Tr. at 28:9–18; Hristov Dep. Tr. at 285:3–8; Dinca Dep. Tr. at 391:11–21. Therefore, contrary to Nexo's assertion, it *did* have "reason to believe in December 2022 that Slack DMs were relevant to Cress's fraud claims." Opp. at 5:10–6:4.

Regarding Cress's Complaint, Nexo's position is inconsistent. Reply at 2:11–23. Nexo

argues that the Complaint did not change the "scope of the factual allegations" because it "sought losses associated with the same OTC transactions and liquidations identified in the Demand Letter." Opp. at 6:5–13. Nexo also states that because the Complaint added securities claims related to the NEXO Token, Nexo preserved and produced all documents relating to NEXO Token sales to Cress. *Id.* at 19:22–20:5. It is clear that the Complaint triggered a duty to preserve materials related to the NEXO Token. Again, Nexo seemingly asserts it preserved items that discussed Cress by name. However, the Complaint triggered a duty to preserve ESI relating to "the NEXO Token's sale, marketing, and regulatory status." Reply at 2:11–23. Thus, after Cress filed his Complaint, Nexo had a duty to preserve emails, documents, Slack DMs, and Slack Channels related to the NEXO Token. And Nexo's obligations triggered by the Demand Letter remained in effect after the Complaint's filing. In addition, contrary to Nexo's assertion, the Complaint implicates Nexo's "undisclosed fees" as it alleges Nexo's promised rates for OTC services are "illusory" because the rates were higher than promised. Opp. at 6:6–13; Reply at 2:24–3:2 (citing Compl. ¶ 68).

Therefore, Cress establishes that the Demand Letter and Complaint triggered Nexo's duty to preserve ESI in the form of emails, documents, Slack DMs, and Slack Channels that related to Cress's specific transactions, OTC services, liquidation relief, the VIP Program, the NEXO Token, and Nexo's fees.

**3. Failure To Take Reasonable Measures**

Cress argues that Nexo failed to take reasonable steps to preserve the lost ESI because "it issued no litigation hold and, rather than suspending its deletion policies, expanded them." Mot. at 17:12–20. Nexo contends that its "preservation efforts were reasonable" because it "produced all Cress-related documents in this action, and Cress cannot identify one" that it did not. Opp. at 21:17–22:7.

Rule 37(e) "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection." 2015 Adv. Comm. Notes, Fed. R. Civ. P. 37(e). Courts should consider the following factors in analyzing whether a party took reasonable steps to preserve ESI: (1) the party's "good-faith operation of an electronic information system" and whether the prospect of

litigation necessitates "intervening in that routine operation"; (2) "the party's sophistication with regard to litigation"; (3) whether ESI was lost "despite the party's reasonable steps to preserve" and "the extent to which a party knew of and protected against such risks"; and (4) the "proportionality" of preservation efforts considering the party's resources. *Id.*

Here, it is undisputed that Nexo did not place a litigation hold in this case and that it took affirmative steps to destroy ESI. Nexo argues that a litigation hold was unnecessary because "all evidence shows that relevant materials were collected and produced by other methods." Opp. at 21:17–22:7. But "once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Doe LS 340*, 710 F. Supp. 3d at 801 (citation omitted). Nexo did the opposite—despite its standard policy to preserve emails indefinitely and other ESI for at least five years, Nexo took affirmative steps to purge relevant ESI. First, following the Demand Letter, Nexo destroyed virtually all Slack DMs (those older than four days) and emails of Trenchev and Kantchev. Kunkel Rep. at 6–7. As discussed, Nexo knew that these emails and Slack DMs were relevant to Cress's claims. Second, following the Complaint, Nexo destroyed Metodiev's emails, emails associated with the personal email addresses of Kantchev and Trenchev, all Slack Channel threads, and specific emails referencing OTC deals, NEXO Tokens, and Hristov. *Id.* at 4, 8–12. As discussed, Nexo knew that Metodiev was a key player in Nexo's OTC desk and VIP Program. In addition, Cress's evidence shows that Kantchev used his personal email address to communicate with customers, and that Nexo had thousands of messages on Slack Channels which were used to discuss OTC transactions, liquidation relief, forced liquidations, that "the NEXO Token is registered with the SEC as a security," sales of the NEXO Token to U.S. clients, and spread mark-up. Ambrose Decl., Exs. 30–34, 36. Moreover, Nexo retained the retention rules throughout this case, continuously purging ESI. Kunkel Rep. at 12. And despite Slack's importance in Nexo communications, Nexo performed but a single Slack data export, years after the Complaint was filed. Mot. at 12:11–20. Overall, Nexo's claim that it took steps to preserve relevant ESI strains credulity.

In fact, Nexo's only "evidence" that it produced all relevant documents is Trenchev's

testimony that Nexo collected "all relevant communications and information." Trenchev Dep. Tr. at 81:7–82:8. However, Trenchev "could not say when any collection occurred, who performed it, how it was run, or what it captured beyond Hristov's account." Reply at 5:6–12; Trenchev Dep. Tr. at 40:3–24, 81:7–82:8. As such, his testimony holds no value regarding Nexo's collection efforts. *See Doe LS 340*, 710 F. Supp. 3d at 803 ("Courts routinely hold that parties are entitled to know what kinds and categories of ESI a party has collected and preserved and what specific actions were undertaken to that end.") (cleaned up). Moreover, Nexo does not argue that it did not have the resources to properly preserve ESI. Nor could it. Nexo does not dispute that it is a "sophisticated company with in-house counsel, outside counsel, and an information-security team." Mot. at 17:16–20. Therefore, Cress establishes that Nexo failed to take reasonable steps to preserve the lost ESI.

Accordingly, because the Court finds that Cress establishes the threshold requirements for Rule 37(e) are met, the Court next analyzes prejudice to Cress and Nexo's intent.

**4. Prejudice**

Cress argues that at a minimum, the loss of ESI prejudiced him because "the record shows that specific, plainly relevant materials are gone." Mot. at 19:13–21:2, 23:13–20. Nexo contends that Cress does not show prejudice because he cannot "identify any specific, relevant, unique ESI that was lost." Opp. at 1:3–4.

A finding of prejudice is necessary to impose sanctions against a party under Rule 37(e)(1). *In re Vaxart, Inc. Sec. Litig.*, No. 20-cv-05949-VC, 2025 WL 1865848, at *6 n.9 (N.D. Cal. July 7, 2025). "For Rule 37(e) purposes, prejudice exists where the spoliation impairs the other party's 'ability to go to trial' or threatens 'to interfere with the rightful decision of the case.'" *Id.* at *6 (quoting *RG Abrams Insurance v. Law Offices of C.R. Abrams*, 342 F.R.D. 461, 507 (C.D. Cal. 2022)). "The Court has discretion to determine whether the loss of the information is prejudicial; neither party carries a burden of proving or disproving prejudice." *Chinitz v. Intero Real Est. Servs.*, No. 18-cv-05623-BLF, 2020 WL 7389417, at *2 (N.D. Cal. May 13, 2020) (cleaned up). "Whether the loss of the information was prejudicial depends in part on the importance of the information to the case." *Id.* (cleaned up).

Here, the Court finds that Nexo's targeted deletion of ESI prejudices Cress. Nexo insists that Cress's claim that deleted ESI "might be relevant to his claims is utterly speculative." Opp. at 22:8–26. Importantly, "[w]here emails and documents are missing entirely due to a party's failure to preserve and their relevance cannot be directly ascertained, a party can hardly assert any presumption of irrelevance to the destroyed documents." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2024 WL 4823938, at *21 (N.D. Cal. Nov. 15, 2024) (citation omitted). But the relevance of some materials *is* known. *See supra*, Part IV.A.2,3. And Cress demonstrates that relevant evidence is gone. Despite their relevance and evidence of existence, Nexo produced no Slack DMs pre-dating August 2024, virtually no emails from Trenchev, Kantchev, or Metodiev, and no Slack Channel threads relating to spread mark-up, forced liquidations, the NEXO Token's regulatory status, or sale of the NEXO Token to U.S. clients. Mot. at 5:18–6:4, 11:5–12:10; Reply at 5:21–6:17. As such, Nexo incorrectly asserts that Cress has not identified relevant material that was lost from Slack Channels. Opp. at 9:17–21. Further, Nexo is incorrect that Cress has not identified "one document relevant to this case that was actually deleted and is unavailable." *Id.* at 22:8–26. Kunkel identified the "All OTC deals Part 1" and "amending templates" emails as deleted by Nexo; in turn, Nexo produced a forwarded email and a partial response—Nexo did not produce original documents. Reply at 6:18–9:3.

Cress demonstrates that Nexo's spoliation impairs his ability to present his claims at trial because it deprives him of relevant information. *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 339 (D. Ariz. 2022). First, Cress is prejudiced by not having access to the deleted Slack DMs and Slack Channel threads, given their extensive use by Nexo. Mot. at 19:25–20:9; *see In re Vaxart*, 2025 WL 1865848, at *5 ("It's almost certain that Boyd and Maher discussed Vaxart matters in the deleted texts—given their timing and given the extent to which they texted about work-related matters generally—which means the plaintiffs are prejudiced by not having access to those texts."). Indeed, two days after Cress added claims regarding the NEXO Token, Nexo deleted Slack Channel threads which were used to discuss the NEXO Token's regulatory status and its sale to U.S. clients. These items bear on Cress's securities claims and Nexo's affirmative defense to those claims. Reply at 7:4–8:12. Slack Channels were also used to discuss spread mark-up and

forced liquidations.

Second, given Metodiev's role in overseeing the OTC desk and VIP Program and setting fees for OTC transactions, Cress is prejudiced by not having access to Metodiev's emails. Mot. at 19:21–25. These items bear on Cress's fraud claims regarding the VIP Program and OTC fees. Cress is likewise prejudice by not having the deleted emails of Trenchev and Kantchev given that Kantchev communicated with customers regarding liquidation relief and Trenchev used Slack Channels to discuss the NEXO Token and communicated directly with the SEC. Reply at 7:4–8:12.

Finally, Nexo's internal memoranda show that Nexo knowingly concealed OTC and liquidation fees from customers. Reply at 14:17–25. Cress is surely prejudiced by not having access to communications regarding these policies (which likely existed at some point) as they go to scienter. *Id.* at 15:4.

**5. Culpable State Of Mind**

Cress argues that the evidence—both direct and circumstantial—confirms that Nexo destroyed ESI with the intent to deprive Cress of its use. Mot. at 17:24–19:12. Nexo contends that there "is no evidence of intent—only Cress cherry-picking routine retention activity and trying to align it with litigation events after the fact." Opp. at 22:27–23:7.

To award sanctions under Rule 37(e)(2), a court must find that an offending party "acted with the intent to deprive another party of the information's use in the litigation." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). In context, the word "intent" is "most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Id.* "Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions." *Id.* "Relevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation." *Id.*

"In *Lee v. County of Los Angeles*, a sister district court synthesized *Jones* and other authorities to set out six factors relevant to determining intent: (1) the context of the deletion, including whether the deletion was driven by the deleting party's financial considerations; (2) the

United States District Court
Northern District of California

timing of the evidence's loss, which is the most decisive factor in the assessment; (3) whether there was selective preservation of any data; (4) whether the deleting party attempted to recover the data; (5) the method of deletion (e.g., automatic deletion vs. affirmative steps of erasure), and (6) the existence of institutional policies on preservation." *Praecipio Consulting, LLC v. Howser*, No. 25-cv-02927-JST, 2026 WL 2280769, at *7 (N.D. Cal. July 30, 2026) (citing No. 2:23-cv-06875-GW-MAA, 2025 WL 2505484, at *10 (C.D. Cal. Aug. 29, 2025)) (cleaned up).

Here, the Court finds that Nexo destroyed ESI with the intent to deprive Cress of its use in this case. To start, Cress proffers direct evidence of Nexo's intent. Damyanov—Nexo's employee who deleted all the ESI at issue—testified that management (Trenchev or Kantchev) ordered the deletions, Kantchev directed the purge of the personal email accounts, and the legal department ordered the "LabelRet" rule to purge specific documents. Mot. at 18:7–12; Reply at 8:18–24. And Kantchev ordered Damyanov to purge his corporate emails to get rid of documents that could be used against Nexo. Kantchev Dep. Tr. at 118:8–18.

Cress also proffers extensive circumstantial evidence of Nexo's intent. Mot. at 18:13–22; Reply at 8:25–13:2. Indeed, Cress's evidence shows that every factor weighs against Nexo. *See Praecipio*, 2026 WL 2280769, at *7 (discussing the six factors relevant to determining intent). First, the context of Nexo's deletion is dubious at best. Indeed, the falsities surrounding Nexo's purported justifications for deleting ESI are shocking. Nexo asserts that in December 2022, the retention period for Slack DMs was "accidentally adjusted to 4 days." Opp. at 5:10–14. But this is belied by the very person who performed the deletion (Damyanov). *See* Damyanov Dep. Tr. at 81:16–22, 83:17–84:14 (testifying he deleted Slack DMs because it was a "task" assigned to him). Even more concerning is Nexo's assertion that the "LabelRet" and "rom" labels targeted for deletion "documents related to the settled *Morton* litigation." Opp. at 13:1–15. This is demonstrably false—while the labels were implemented in August 2024 and February 2025, the *Morton* case did not settle until June 2025. Mot. at 13:14–14:5; Ambrose Decl., Ex. 10; *see* Greetham Dep. Tr. at 127:9–129:8 (walking back opinion that the labels targeted documents after *Morton* settled). Nexo's assertion that it extended the retention settings to the personal emails of Trenchev and Kantchev because "there is no showing that Trenchev or Kantchev used their

*personal* email for business purposes" fares no better. Opp. at 11:12–17 (emphasis in original). Nexo itself produced documents showing that Kantchev used his personal email to communicate with Nexo customers. Ambrose Decl., Ex. 36. To that end, Trenchev's claim that the December 2022 rules were a "de-risking" action that only applied to emails of Trenchev and Kantchev because they were not "customer-facing" falls apart under scrutiny. Reply at 9:18–10:5; Trenchev Dep. Tr. at 101:3–102:1. Finally, Nexo's assertion that it produced "copies of the documents" identified by Kunkel as deleted is refuted by the evidence. Opp. at 12:9–19; *see* Reply at 6:18–7:3.

Second, the timing of key retention rules parallels important case events. For example, two days after Cress filed his Complaint, Nexo deleted Slack Channel threads; ten days after this filing, Nexo deleted the founders' personal emails; and during discovery, Nexo implemented label and message-ID purges. Reply at 8:25–9:3. Third, Nexo selectively preserved some emails and Slack communications using targeted deletions and rules aimed at certain email addresses. *Id.* at 9:4–16. Fourth, everyone agrees that Nexo did not attempt to recover deleted ESI. Opp. at 21:17–22:7, Sec. Trenchev Dep. Tr. at 115:19–116:19; Reply at 6:4–6. This is especially salient for the purported "accidental" deletion of Slack DMs—why would there be no recovery efforts for such a large "mistake?" *See In re Vaxart*, 2025 WL 1865848, at *8 ("Recovery efforts, even if unsuccessful, can indicate a lack of intent.") (cleaned up). Fifth, it is undisputed that Nexo affirmatively implemented the rules that destroyed ESI by changing its default settings that preserved the information for at least five years. Ambrose Decl., Ex. 29. Finally, there is no dispute that Nexo's own policies mandate a litigation hold; yet Nexo chose to ignore these policies by not placing a litigation hold in this case even though it placed one in the *Morton* case. *Id.*; Opp. at 6:24–7:22; Reply at 3:18–20. Therefore, the Court has no trouble finding that Nexo destroyed ESI with a culpable state of mind.

Nexo's remaining argument to the contrary is unavailing. Nexo repeatedly emphasizes its "prolific production" during discovery. Opp. at 1:5–13, 6:14–9:16. "But production of some evidence does not excuse destruction of other relevant evidence." *Jones*, 95 F.4th at 736.

**B. Sanctions**

Cress argues that terminating sanctions and mandatory adverse-inference instructions are warranted under Rule 37(e)(2), and that curative sanctions and attorneys' fees and expenses are warranted under Rule 37(e)(1). Mot. at 17:1–21:2, 24:4–25:18. Nexo contends that terminating sanctions are not warranted and that "no lesser sanction is warranted because there is nothing to cure." Opp. at 17:19–23:23, 25:18–25.

Under Rule 37(e)(1), if a court finds prejudice to another party from loss of ESI, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). "The range of such measures is quite broad if they are necessary for this purpose," and "is entrusted to the court's discretion." 2015 Adv. Comm. Notes, Fed. R. Civ. P. 37(e). A court may impose sanctions under Rule 37(e)(2) upon finding that the spoliating party acted with the intent to deprive another party of the information's use in the litigation. Fed. R. Civ. P. 37(e)(2). "In the Ninth Circuit, an adverse inference, dismissal, or default judgment sanction for ESI may be granted *only* through 37(e)(2), not 37(e)(1)." *Praecipio*, 2026 WL 2280769, at *3 (citing *Gregory*, 118 F.4th at 1078) (emphasis in original).

Here, because the Court finds both that Nexo's spoliation prejudices Cress and that Nexo acted with a culpable state of mind, the Court considers sanctions under both Rule 37(e)(1) and Rule 37(e)(2).

**1. Terminating Sanctions**

Cress argues that terminating sanctions are warranted because lesser measures cannot cure the harm from Nexo's spoliation. Mot. at 18:23–19:12.

To issue terminating sanctions under Rule 37(e)(2), a district court must "find that the Rule 37(e) prerequisites are met, the spoliating party acted with the intent required under Rule 37(e)(2), and lesser sanctions are insufficient to address the loss of the ESI." *Jones*, 95 F.4th at 735.

Here, the Court concludes that terminating sanctions are not warranted because lesser sanctions sufficiently address the loss of ESI. Cress argues that "no jury instruction could substitute for the lost evidence" that could have built Cress's affirmative case. Mot. at 18:23–19:12. The Court disagrees. Dismissal "constitutes the ultimate sanction for spoliation." *Fast*,

United States District Court
Northern District of California

340 F.R.D. at 353 (citation omitted). "It should be used only when the resulting prejudice is extraordinary, denying a party the ability to adequately" present its case. *Id.* (cleaned up). While Nexo's spoliation deprives Cress of evidence that would be favorable to his case, it does not foreclose a meaningful prosecution of his case. *See id.* at 353–54 (explaining dismissal appropriate where "defendant was denied access to the only evidence from which it could develop its defenses adequately") (cleaned up).

Accordingly, the Court **DENIES** Cress's Motion for terminating sanctions.

**2. Curative Sanctions**

Cress argues that should the Court decline to enter default judgment, it should (1) "impose a mandatory adverse-inference instruction that the destroyed communications were unfavorable to Nexo"; (2) "preclude Nexo from disputing the matters the lost ESI would have addressed"; and (3) permit Cress "to present evidence and argument to the jury regarding Nexo's destruction of the ESI and the circumstances surrounding it."[6] Mot. at 19:7–12, 24:4–25:10. Specifically, Cress requests the Court instruct the jury that Nexo's destroyed ESI would have shown:

> (a) that Nexo's managing partners knew of, directed, and concealed the markups Nexo charged on OTC transactions and the fees it charged on liquidations, while Nexo publicly advertised #ZeroFees and no hidden fees;
>
> (b) that Nexo knew the NEXO Token was not registered with the SEC when it represented otherwise to Plaintiff and other customers and did so with the intent of inducing them to purchase the Token;
>
> (c) that Nexo made sales of the NEXO Token to unaccredited U.S. investors in 2020 and 2021, and
>
> (d) that Nexo made the representations in the VIP Brochure—including the Liquidation Relief Program and its customer-responsiveness and pricing promises—without the intention or ability to honor them.

*Id.* at 24:14–24. Further, Cress "requests that these presumptions apply in adjudicating any motion for summary judgment." *Id.* at 24:24–26. Other than opposing "lesser sanctions" in

[6] In his Reply, Cress argues that if the Court does not strike Nexo's Answer, the Court should strike Nexo's affirmative defense based on Rule 506(c). Reply at 15:13–18. Because Cress did not include this request in his Motion, Nexo had no opportunity to respond. The Court therefore declines to reach this request.

United States District Court
Northern District of California

general, Nexo does not respond to Cress's specific requests. Opp. at 25:18–25.

Appropriate sanctions under Rule 37(e)(1) may include "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies." 2015 Adv. Comm. Notes, Fed. R. Civ. P. 37(e). Under Rule 37(e)(2), a court may issue adverse-inference instructions—"jury instructions that permit or require the jury to presume or infer that lost information was unfavorable to the party that lost it." *Id.* The Court may also infer "that the opposing party was prejudiced by the loss of information that would have favored its position." *Id.* In addition, a court may "presume or infer that the lost information was unfavorable to the party who lost it when ruling on a pretrial motion." *Id.*

Here, the Court concludes that Cress's requested curative sanctions are appropriate and permitted under Rule 37(e). Notably, Nexo's intentional conduct and the prejudice it caused Cress warrant a mandatory adverse inference instruction instructing the jury that the information intentionally deleted by Nexo was unfavorable to its case. *Cf. Fast*, 340 F.R.D. at 354. As discussed, the evidence shows that Nexo's deletions prejudice Cress's ability to establish the four facts he requests specific jury instructions for. Mot. at 24:14–26. The Court thus finds these instructions are warranted. Finally, the Court will apply these presumptions in adjudicating the parties' motions for summary judgment. *Id.*

Accordingly, the Court **GRANTS** Cress's Motion for curative sanctions.

**3. Attorneys' Fees**

Cress argues that the Court should award him "$439,267.21 to compensate [him] for the reasonable attorneys' fees, expert fees, and costs incurred as a result of Nexo's spoliation and related misconduct." Mot. at 25:11–18. Cress includes an itemized declaration pursuant to Civil Local Rule 37-4(b)(3) with his Motion. Ambrose Decl. ¶¶ 49–53.

"The Court may award monetary sanctions under Rule 37(e)(1) in the form of fees and costs associated with spoliation." *Saucedo v. Trans Union LLC*, No. 22-cv-04891-EKL, 2025 WL 5089312, at *4 (N.D. Cal. Mar. 7, 2025); *see In re Vaxart*, 2025 WL 1865848, at *8 (awarding

reasonable fees and cost as sanction under Rule 37(e)). The party seeking the award of fees must submit evidence to support the request. *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000). Specifically, the party must support the request with evidence regarding the "number of hours worked and the rates claimed." *Id*. The party opposing the fee request bears the "burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in submitted affidavits." *Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002).

Here, the Court concludes that monetary sanctions in the form of Cress's reasonable attorneys' fees and expenses are appropriate. Nexo does not contest the reasonableness or itemization of the requested fees and costs. Reply at 15:18–21; *see generally* Opp. Nexo thus concedes that the requested fees are reasonable. *See Ardente, Inc. v. Shanley*, No. C-07-4479-MHP, 2010 WL 546485, at *6 (N.D. Cal. Feb. 10, 2010) ("Plaintiff fails to respond to this argument and therefore concedes it through silence.").

Accordingly, the Court **GRANTS** Cress's Motion for attorneys' fees. Because the spoliation of ESI is attributable to Nexo, not its counsel, the Court **ORDERS** Nexo to pay $439,267.21 in attorneys' fees and expenses to Cress within 21 days of the date of this order.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART and DENIES IN PART** Cress's Motion for Sanctions.

**IT IS SO ORDERED.**

Dated: August 17, 2026

THOMAS S. HIXSON
United States Magistrate Judge