# ATTACHMENT 1

## UNREDACTED VERSION PREVIOUSLY FILED UNDER SEAL AS DKT. 144-3

Ian S. Shelton (SBN 264863)
BAKER & MCKENZIE LLP
ian.shelton@bakermckenzie.com
10250 Constellation Blvd., Suite 1850
Los Angeles, California 90067
Phone: (310) 299-8535
Fax: (310) 201-4721

Matthew C. Rawlinson (admitted *pro hac vice*)
BAKER & MCKENZIE LLP
matthew.rawlinson@bakermckenzie.com
800 Capitol Street, Suite 2100
Houston, Texas 77002
Phone: (713) 427-5067
Fax: (713) 427-5099

*Attorneys for Defendant Nexo Capital, Inc.*

**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN CRESS,

Plaintiff,

vs.

NEXO CAPITAL INC.,

Defendant.

Case No. 3:23-cv-00882-TSH

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR TERMINATING SANCTIONS OR, IN THE ALTERNATIVE, CURATIVE SANCTIONS PURSUANT TO FED. R. CIV. P. 37(e), 37(b), AND THE COURT'S INHERENT AUTHORITY (DKT. 135)**

Date: August 20, 2026
Time: 10:00 a.m.

Judge: Hon. Thomas S. Hixson

Courtroom:
San Francisco Courthouse
Courtroom E – 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

# TABLE OF CONTENTS

Page No.

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

I. Cress's Demand Letter provided no notice of the claims he now asserts. ..... 3

A. Cress's 2021 Demand Letter was limited in scope. ..... 3

B. Nexo preserved all Cress-specific material consistent with the Demand Letter. ..... 3

II. Almost 1.5 years passed from the Demand Letter to filing suit. ..... 4

III. The lawsuit did not trigger deletion of relevant material. ..... 6

A. Cress added securities claims but the scope of the suit remained the same. ..... 6

B. Nexo's production efforts were overwhelming. ..... 6

1. Nexo produced substantial Googe Drive documents and email ..... 6

2. Nexo produced substantial Slack documents. ..... 8

C. Cress actually failed to produce documents. ..... 10

D. Cress's other contentions are factually inaccurate. ..... 11

E. Other lawsuits or regulatory inquiries are irrelevant. ..... 14

III. Cress asserts spoliation allegations because his case is weak. ..... 15

ARGUMENT ..... 17

I. Cress is not entitled to Rule 37(e) sanctions. ..... 17

A. Rule 37(e) governs the failure to preserve ESI and imposes a high burden. ..... 17

B. Nexo preserved all required material. ..... 19

1. The Demand Letter disclosed potential claims based only on Cress's own OTC transactions and VIP-brochure theory. ..... 19

2. The original Complaint did not broaden Nexo's preservation obligations. ..... 19

3. Cress cannot use his 2025 fee claims or RICO theories to retroactively expand the scope of Nexo's preservation obligations years earlier. .... 20

4. Other cases cannot expand Nexo's duty to preserve *in this case*. ... 20

C. Nexo's preservation efforts were reasonable. .... 21

D. Cress cannot identify any lost unique evidence needed to support sanctions. .... 22

E. The audit logs do not show intent to deprive Cress of relevant evidence. .... 22

F. The discovery record forecloses any claim of prejudice. .... 23

II. Cress cannot revive his failed spoliation theory under Rule 37(b) or inherent authority. .... 23

A. Rule 37(b) does not support Cress's claims. .... 23

B. Nexo did not violate any Court order. .... 24

III. No lesser sanction is warranted because there is nothing to cure. .... 25

CONCLUSION .... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiona v. United States*,
938 F.2d 158 (9th Cir. 1991) ........ 18

*Apple Inc. v. Samsung Elecs. Co.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) ........ 18

*CAT3, LLC v. Black Lineage, Inc.*,
164 F. Supp. 3d 488 (S.D.N.Y. 2016) ........ 18

*Herb Hallman Chevrolet, Inc. v. Gen. Motors LLC*,
No. 3:22-CV-00447-MMD-CLB, 2024 WL 3160746 (D. Nev. June 24, 2024) ........ 19, 20

*Pauly v. Stanford Health Care*,
No. 18-CV-05387-SI (TSH), 2022 WL 4137579 (N.D. Cal. Aug. 22, 2022) ........ 17

*Pauly v. Stanford Health Care*,
No. 18-CV-05387-SI (TSH), 2022 WL 774296 (N.D. Cal. Mar. 14, 2022) (Hixson, J.) ........ 24

*RG Abrams Ins. v. L. Offs. of C.R. Abrams*,
342 F.R.D. 461 (C.D. Cal. 2022) ........ 23

*Ryan v. Editions Ltd. West, Inc.*,
786 F.3d 754 (9th Cir. 2015) ........ 17

*Surowiec v. Cap. Title Agency, Inc.*,
790 F. Supp. 2d 997 (D. Ariz. 2011) ........ 22

*United States v. Kitsap Physicians Serv.*,
314 F.3d 995 (9th Cir. 2002) ........ 18

**Statutes**

California Business and Professions Code § 17200 ........ 3

California Business and Professions Code § 17500 ........ 3

California Financial Code § 22161 ........ 3

Fed. R. Civ. P. 37(b) ........ 23, 24, 25

Fed. R. Civ. P. 37(e) ........ *passim*

Fed. R. Civ. P. 37(e)(1) ........ 18, 23, 25

Fed. R. Civ. P. 37(e)(2) .......... 18, 22

**Other Authorities**

https://slack.com/help/articles/115003205446-Slack-plans-and-features .......... 10

https://tinyurl.com/msy3duch .......... 14

https://www.sec.gov/newsroom/press-releases/2023-11 .......... 14

# INTRODUCTION

Cress's terminating sanctions motion is the latest example of the overreach that has persisted from the outset of this litigation. Cress does not (and cannot) identify any specific, relevant, unique ESI that was lost. He does not show prejudice. And he does not prove that Nexo acted with intent to deprive him of evidence. What the record shows instead is that Nexo preserved and produced all Cress-specific transaction materials, communications, and Slack evidence, then conducted a massive, agreed upon search and review process that produced 63,866 documents spanning 370,488 pages. Declaration of Ian Shelton ("Shelton Dec.") ¶ 4. Nexo's prolific production includes all external emails, and all internal email and Slack messages, for all six OTC transactions that form the basis for Cress's claims, which Nexo listed in an interrogatory response, in addition to tens of thousands of other documents hitting on every keyword (selected by Cress's own counsel) with any tangential relevance to this lawsuit. *See* Ex. 1, Nexo's Omnibus Resp. to ROG 21 and Exhibit 2. This record is incompatible with the terminating sanctions and adverse-inference relief Cress seeks.

Cress filed this motion because his case is struggling on the merits. Cress claims that Nexo fraudulently concealed its fees, but Cress knew about Nexo's fees in 2021 at the time of his leveraged transactions. He did not care. Cress moved his crypto from Coinbase to Nexo because Cress intended to implement a highly leveraged investment strategy that Coinbase did not offer in 2021. Only Nexo offered Cress the multi-million dollar credit lines that would allow him to amplify his potential gains (or losses) and make millions using borrowed crypto. He told his friend, "[Nexo] can have the fee ha ha" because he was making more money than he thought was possible. Ex. 2, CRESS-00000692 at -699. He did not care about Nexo's fees because, through high leverage, he was able to make his "fastest easiest million ever" based on crypto "purchased purely off [his] credit line." Ex. 4, CRESS-000012575 at -578. Cress's leveraged investment strategy went south, not because of some undisclosed fee or alleged misrepresentation in a brochure, but because Cress maxed out his credit lines at all-time-high prices in March-April 2021 and was liquidated when the market crashed over 50% in May-June 2021, as it had done multiple times before.

Cress was perfectly happy with Nexo when the market was up. And, at least initially, when the market crashed, he admitted that he "can only blame [him]self" for his losses. Ex. 5, NEXO-

0370459. As for his claim that he was duped by Nexo's VIP brochure into thinking he could engage in multi-million-dollar leveraged crypto investing with no risk of loss, Cress's own admissions kill that implausible theory too. Cress asked about his liquidation thresholds repeatedly, showing he was keenly aware of the risk of liquidation. *See, e.g.*, Ex. 3 NEXO-0003441 at -441, -443, -444, -445, -449, and -451.

Despite his former self-awareness, Cress later sued Nexo. But as discovery has unfolded, Cress has continually overreached, ignoring the merits while launching an escalating war of accusations, new causes of action, and endless discovery requests and letter briefs to bury this case in a discovery quagmire rather than confront the fatal defects in his claims. The Cress discovery war has included 17 joint discovery letter briefs in this matter.[1] The Court completely denied 6 of them, and awarded substantially narrowed relief in 8.[2] Undeterred, Cress's barrage continues here.

This smoke-and-mirrors sanctions motion attempts to create the appearance of impropriety by combining two things present in every civil litigation against a corporate defendant—a chronology of events in the case, and a log of retention policy changes during the same time period. If any retention policy change of any type is made near (or not near) an alleged "milestone" in the case, *voilà*, spoliation. Any deleted data must have been relevant to the case, so Nexo doesn't get a chance to defend itself and the Court must impose terminating sanctions. The Court need not consider the timing of notice, the substance of notice, the scope of the preservation obligation, the radical expansion of Cress's claims between 2021 and 2025, the relevance of the allegedly deleted information, or the substance of the documents that Nexo actually produced. Instead, the Court must accept Cress's ***false speculation*** that relevant ESI was deleted, and it must ignore the overwhelming evidence that Nexo ***actually collected and produced all documents relevant to Cress***.

---

[1] Dkt. Nos. 53, 54, 59, 64, 66, 68, 72, 74, 82, 99, 106, 112, 119, 129, 132, 133, and 136.

[2] The Court denied Dkt. Nos. 63, 107, 120, 139, and 143 and limited discovery in Dkt. Nos. 55, 62, 69, 73, 89, 101, 120, 139, and 140. The denied relief included motions to compel the privilege applicable to Nexo's entire in-house legal department (Dkt. 143) and production of "class action discovery far beyond what is needed to adjudicate his claims." Dkt. 89. The Court granted Nexo a protective order against Cress's attempt to obtain privileged information from Nexo's former trial counsel. Dkt. 128. Most recently, the Court denied a motion to compel substantially all corporate, financial, and contractual documents for every Nexo affiliate going back a decade (Dkt. 139), including an explanation for every intra-company transfer over $5,000 (Dkt. 140).

Cress's motion is designed to enflame, but without any real substance. It is predicated on the false assumption that Nexo can delete nothing because everything is relevant to Cress's claims. It is the culmination of Cress's abusive approach to discovery and litigation-through-sanctions strategy. It reflects his unbounded "class action" theory of relevance—divorced from any burden or proportionality analysis—that has tainted every discovery motion Cress has filed. It also reflects his attempt to have his new October 2025 claims and RICO allegations, which raised "undisclosed fees" for the first time, retroactively define the scope of Nexo's preservation obligations in 2021 and 2023.

## FACTUAL BACKGROUND

### I. Cress's Demand Letter provided no notice of the claims he now asserts.

#### A. Cress's 2021 Demand Letter was limited in scope.

On October 26, 2021, Cress's former counsel sent Nexo a Demand Letter. Dkt. 135-22 ("Demand Letter"). Cress's motion spends almost no time on the actual substance of the Demand Letter, but argues it created a sweeping, company-wide preservation mandate covering every document in Nexo's possession. That is not the law, and it ignores the limited scope of the letter.

The Demand Letter alleged that Cress was deceived by Nexo's VIP Brochure. *Id. First*, Cress alleged the VIP program violated California Financial Code § 22161 (*id.* at p. 3); *second*, Cress alleged the representations regarding the VIP program violated California Business and Professions Code §§ 17200 & 17500 (*id.*); and *third*, Cress alleged fraudulent inducement based on misrepresentations and omissions regarding the VIP program. *Id.* at p. 4. That's it. The Demand Letter is more noteworthy for what it did not include: there is no mention of ***securities fraud***; there is no mention of the ***Nexo Token***; there is no mention of ***Nexo's fees***; there is no mention of ***RICO, civil theft, breach of contract***, or any other claim; there is no mention of ***Kosta Kantchev, Antoni Trenchev, or Kalin Metodiev***; there is no request for the ***preservation of documents***; and the letter does not identify any ***potential custodians*** (except mentioning Hristov). This Demand Letter did not reasonably put Nexo on notice of the sweeping preservation obligations Cress now tries to impose. But, as was its practice, Nexo set about to gather and preserve all documents relating to Cress.

#### B. Nexo preserved all Cress-specific material consistent with the Demand Letter.

Based on the Demand Letter, which was specific to claims of fraud arising out of Cress's

dealings with Nexo and the VIP program, Nexo gathered and preserved ***all Cress-related material***, including emails and Slack communications for every OTC transaction. Ex. 7, Trenchev Depo., Vol. 1, 42:17-45:4; 115:19-116:19. Trenchev testified that Nexo actively gathered and preserved the relevant material after receiving notice of Cress's claims, and Nexo's default retention policies at the time dictated that all relevant documents were preserved, including Hristov's Google account. *Id.* at 34:5-35:11; 42:20-43:18; Dkt. 135-48 at p. 5. The alleged absence of a cumulative "litigation hold" notice is of no significance when Nexo preserved all relevant Cress-specific materials through active collection and reliance on its default retention policies that retained everything.

## II. Almost 1.5 years passed from the Demand Letter to filing suit.

After the Demand Letter, and follow up correspondence a couple of weeks later, Cress's claims went cold. There was no communication from Cress from November 2021 until Cress filed suit in February 2023. During this time, Nexo continued to run its business, and notwithstanding Cress's inaction, continued to preserve Cress-related material.

Cress nevertheless challenges Nexo's retention policy changes for Nexo co-founders and apex executives Kosta Kantchev and Antoni Trenchev. On December 4, 2022—***months before Cress filed suit***—Nexo changed the retention settings for these two individuals to 30 days. Dkt. 135-48. These changes were made ***over a year*** after the Demand Letter, which ***did not*** mention these two individuals. As Trenchev explained, both he and Kantchev were not "customer-facing," they "would have little to no relevant documents and communications" in relation to customer complaints, and they had no dealings with Cress or other customers. Ex. 7 at 101:13-101:25.[3]

As Trenchev testified, the change was necessitated due to the threat of cyberattacks and the need to protect Nexo. *Id.* at 91:11-93:10. Nexo's business is cryptocurrency; it participates in high-value, irreversible transactions and stores highly sensitive information, which if compromised could have a devastating business impact. *Id*. at 91:17-91:24; *see also* Ex. 8 at 19 (Greetham rprt. citing FBI guidance regarding rise in internet crime). Trenchev was consistent in emphasizing "it was a de-risking activity, an initiative"—not a reaction to a miscellaneous Demand Letter received over a

[3] Trenchev DocuSigned the Cryptocurrency Purchase Agreement with Cress on behalf of Nexo, but this was a ministerial task. Trenchev never communicated directly with Cress.

year earlier. Ex. 7 at 91:25-92:1.

The undisputed record shows a legitimate business decision, unconnected to Cress, to adjust the retention settings for two high-ranking apex executives to reduce cybersecurity risk. As Nexo's rebuttal expert, David Greetham, opined, this is "one of the pillars of Information Governance and within the authority of the organization to perform modifications to the records retention policy, to protect the organization." Ex. 8 at 19. Cress's brief (and his proffered expert, Michael Kunkel[4]) does not consider (or even discuss) the sworn testimony and business justification from Trenchev. More importantly, Cress offers no evidence tying these business-driven retention changes to any missing document relevant to his claims.[5]

The same is true of Nexo's adjustment to Slack direct message ("DM") retention before suit was filed. Again, there is nothing improper with an entity choosing to adjust its retention periods for its records. On December 4, 2022, the retention period was accidentally adjusted to 4 days for Slack DMs. Trenchev described this as a "mistake," which was quickly remedied on December 7, 2022, when the period was set to 30 days. Ex. 7 at 110:20-111:1. As Greetham opined, "a default retention period of 30 to 180 days for internal slack communications is not unusual." Ex. 8 at 25. Further, this change to the Slack retention period applied only to DMs. Because Slack DMs were an ***internal*** communication tool, Nexo had no reason to believe in December 2022 that Slack DMs were relevant to Cress's fraud claims based on the VIP brochure or his ***external*** communications with Hristov. Furthermore, because they required coordination among multiple parties, Cress's OTC

---

[4] As explained in the Greetham report, Kunkel is not an Information Governance expert and is not trained or qualified to provide an opinion in this case on Information Governance. Ex. 8 at 6-7. Kunkel's experience is in eDiscovery and computer forensics. *Id.*

[5] Beyond Kunkel's lack of qualifications, he is of little help to Cress's arguments. Kunkel limited his review to Nexo's retention logs and spreadsheets. Dkt. 135-15, Kunkel Rprt., at ¶ 10. He does not offer an opinion on whether Nexo's Information Governance policies and procedures were proper, or whether any deleted documents were relevant to this lawsuit. Ex. 9, Kunkel Depo. at 33:14-18. While he claimed to have reviewed the Demand Letter, he did not discuss anything other than the "timing" of it and did not discuss the scope of preservation obligations after the Demand Letter, the Complaint, or the Second Amended Complaint. Dkt. 135-15 at ¶ 40; *see also* Ex. 9 at 34:5-35:20. He did not perform an analysis of the sufficiency of Nexo's document production. *Id.* at 37:13-38:23. And, as discussed below, he claimed that documents were deleted when they were not. *See infra* pp. 12, 22; *see also* Dkt. 135-15 at ¶ 34. His "opinions" are unreliable.

transactions were executed through ***group*** emails and Slack ***threads*** (not DMs), all of which were preserved and produced. All of the changes implemented in December 2022, over a year after the Demand Letter and months before suit was filed, were normal retention policy updates unrelated to Cress.

**III. The lawsuit did not trigger deletion of relevant material.**

**A. Cress added securities claims but the scope of the suit remained the same.**

Cress filed suit on February 27, 2023. Dkt. 1. Like the Demand Letter, Cress alleged fraudulent inducement and violations of California's Unfair Competition Law. For the first time, Cress alleged a new legal theory for violations of securities laws. *Id.* However, the scope of the factual allegations did not change—Cress sought losses associated with the same OTC transactions and liquidations identified in his Demand Letter. There was no mention of "undisclosed fees," and no allegation of RICO, civil theft, or other claims, until Cress was granted leave to file the Second Amended Complaint on October 30, 2025 almost four years later. *Compare* Dkt. 1 *with* Dkt. 88.

**B. Nexo's production efforts were overwhelming.**

Nexo preserved and produced the documents relevant to this dispute. Cress identifies no missing transaction records, documents, or communications about his dealings with Nexo. The retention decisions he attacks were either routine, business-driven, irrelevant and unrelated to this case, or made before the claims he now relies upon even existed. Further, Cress's reliance on other matters or disputes entirely misses the point—Nexo's preservation obligations are based on its obligations ***in this case***. Based on those facts, the motion must be denied.

**1. Nexo produced substantial Googe Drive documents and email.**

Any objective assessment of Nexo's document production shows that Cress's spoliation allegations are baseless, and the only party who has demonstrably failed to produce documents relevant to this litigation is Cress himself. Nexo's standard document retention policy is to indefinitely preserve all Google Drive documents, all emails for current employees, all transaction histories, all customer support chat logs, and all other consumer record management logs. Dkt. 135-

29.[6] That was standard practice at the time this dispute arose, and was later memorialized in Nexo's Data Retention and Disposal Policy. *Id.* The Court ordered Nexo to collect documents from 23 custodians, consisting of 14 individual and 9 non-custodial sources. Dkt. 62. Nexo complied and exported 4.9 Terabytes of information to its data collection tool, NUIX. Dkt. 135-48 at 2-3; Ex. 8 at 10. After running over 100 agreed search terms, because Cress refused to agree to the use of widely adopted technology-assisted review (TAR 2.0/CAL) for the documents promoted to Relativity, Nexo manually reviewed and produced 63,866 responsive documents consisting of 370,488 pages. Shelton Dec. ¶ 4; Ex. 8 at 11.[7]

Despite the fact that this is a one-plaintiff case involving a single customer who complained about six OTC transactions and a contractually authorized collateral liquidation in a market downturn, Nexo produced 1,091 documents hitting on Cress-specific terms. Shelton Dec. ¶ 6. Nexo also produced over 8,000 documents that hit on the name of Cress's relationship manager, Hristiyan Hristov. *Id.* at ¶ 7.

But Nexo did not stop at producing only Cress-specific or Hristov-specific documents. It also produced tens of thousands more documents hitting on the 100+ search terms agreed to by the parties, which resulted in production of every document with any plausible connection to this lawsuit. For example, Nexo's production includes hundreds or thousands of hits on terms including "Dedicated Relationship Manager," "Form D," "506(c)," "liquidation relief program," "OTC desk," "OTC Services," "OTC team," "priority support," VIP Relationship Program," "Liquidation Relief Agreement," "SEC or S.E.C.," and various connectors and limiters seeking documents concerning accredited investors, liquidations, the Nexo Token, securities issues, and the VIP program brochure. *Id.* at ¶ 10.

With respect to the SEC and state attorney general inquiries—which primarily related to the

[6] Nexo's substantial discovery efforts were set forth in a meet-and-confer letter to counsel dated January 30, 2026. Dkt. 135-48.

[7] Nexo's production includes, but is not limited to, 34,877 MSG files, 9,482 DOCX files, 8,427 PDF files, 5,624 PNG files (including Slack and other screenshots), 1,975 XLSX files, 1,423 EML files, 494 PPT files, 389 JPG files, 334 TXT files, 287 RSMF files (including Slack), 231 CSV files, 145 ICS files, and many others. Shelton Dec. ¶ 5.

Earn Interest Product, ***not*** at issue in this litigation—Nexo produced 4,399 documents, spanning over 24,284 pages, including ***all correspondence*** between Nexo's external legal counsel and federal and state regulators. *See* Ex. 10, Correspondence and Production Transmittal of NEXO-0345104 - NEXO-0369387.

**2. Nexo produced substantial Slack documents.**

Nexo's document production also included 300 Slack documents, including 35 Slack documents relating specifically to Cress. Shelton Dec. ¶ 8. While Cress suggests that the March 2021 Slack retention policy change permanently deleted relevant Slacks, the following chart shows that Nexo preserved and produced Slacks for every OTC transaction and related event in Cress's account:

| Date | Bates | Slack Thread | Slack Description |
|---|---|---|---|
| 03/24/2021 | NEXO-0369737; NEXO-0343960 | payments | Cress accredited investor verification |
| 03/26/2021 | NEXO-0344327; NEXO-0344098 | limits-n-compensations | Cress OTC transaction info |
| 03/26/2021 | NEXO-0369742; NEXO-0344092 | retail-otc-deals | Cress OTC transaction info |
| 03/27/2021 | NEXO-0369742 | retail-otc-deals | Cress OTC transaction info |
| 03/30/2021 | NEXO-0344327; NEXO-0344101 | limits-n-compensations | Cress increase crypto withdrawal limits |
| 03/30/2021 | NEXO-0344326; NEXO-0344094 | retail-otc-deals | Cress OTC transaction info |
| 04/14/2021 | NEXO-0344326; NEXO-0344193 | payments | Cress increase crypto withdrawal limits |
| 04/15/2021 | NEXO-0344326; NEXO-0344039 | payments | Cress OTC transaction info |
| 05/01/2021 | NEXO-0344325; NEXO-0344104 | limits-n-compensations | Cress increase crypto withdrawal limits |
| 05/03/2021 | NEXO-0344325; NEXO-0247810 | retail-otc-deals | Cress OTC transaction info |
| 06/08/2021 | NEXO-0248511; NEXO-0344120 | cs_general | Cress related Slack communication |
| 06/10/2021 | NEXO-0248511 | cs_general | Cress related Slack communication |
| 06/11/2021 | NEXO-0248511; NEXO-0344136 | cs_general | Cress related Slack communication |
| 06/30/2021 | NEXO-0344107 | limits-n-compensations | Cress increase crypto withdrawal limits |

| | | | |
|---|---|---|---|
| 07/03/2021 | NEXO-0344111 | limits-n-compensations | Cress increase crypto withdrawal limits |
| 07/04/2021 | NEXO-0344114 | limits-n-compensations | Cress OTC transaction info |
| 09/09/2021 | NEXO-0248512; NEXO-0344148 | cs_general | Cress email change |
| 09/10/2022 | NEXO-0344158 | platform-bugs | Cress related Slack communication |

*Id.* ¶ 9. But Nexo did not stop at producing Cress-related Slacks. Nexo produced an interrogatory response listing Slacks ***and internal Nexo emails*** for all of Cress's OTC transactions:

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Transaction | Type | Input Currency | Input Amount | Output Currency | Output Amount | USD Equivalent | Details | Date / Time | Bates |
| 2 | OTC 1 | OTC | USDT | 4115828 | BTC | 74.441 | $4,115,828.00 | OTC USDT to BTC | 3/27/2021 | NEXO-0002705, CRESS-00000034, NEXO-000364, NEXO-0003449, NEXO-0248377, NEXO-0344327 (Slack), NEXO-0369736 (Slack), NEXO-0369737 (Slack), NEXO-0369741 (Slack), NEXO-0369742 (Slack), NEXO-0344092 (Slack) |
| 3 | OTC 1 | OTC | USDT | 1281795 | NEXO | 481878 | $1,281,795.00 | OTC USDT to NEXO | 3/27/2021 | NEXO-0002705, CRESS-0000002; NEXO-0003449, NEXO-0248377, NEXO-0344327 (Slack), NEXO-0369736 (Slack), NEXO-0369737 (Slack), NEXO-0369741 (Slack), NEXO-0369742 (Slack), NEXO-0344092 (Slack) |
| 4 | OTC 2 | OTC | USDT | 2801361 | BTC | 47.3227 | $2,801,361.00 | OTC USDT to BTC | 4/1/2021 | NEXO-0002705, CRESS-00000027, NEXO-0003446, NEXO-0344327, NEXO-0248370, NEXO-0344326 (Slack), NEXO-0344327 (Slack), NEXO-0369735 (Slack), NEXO-0369736 (Slack), NEXO-0369737 (Slack), NEXO-0369741 (Slack), NEXO-0344094 (Slack) |
| 5 | OTC 2 | OTC | USDT | 1499907 | NEXO | 530190 | $1,499,907.00 | OTC USDT to NEXO | 4/1/2021 | NEXO-0002705, CRESS-00000027, CRESS-00000034, NEXO-0003447, NEXO-0344327, NEXO-0248370, NEXO-0344326 (Slack), NEXO-0344327 (Slack), NEXO-0369735 (Slack), NEXO-0369736 (Slack), NEXO-0369737 (Slack), NEXO-0369741 (Slack), NEXO-0344094 (Slack) |
| 6 | OTC 3 | OTC | USDT | 1799903 | BTC | 28.378 | $1,799,903.00 | OTC USDT to BTC | 4/16/2021 | NEXO-0002705, CRESS-00000034, NEXO-0003447, NEXO-0248348, NEXO-0344326 (Slack), NEXO-0369734 (Slack), NEXO-0369735 (Slack), NEXO-0369736 (Slack), NEXO-0369740 (Slack), NEXO-0344242 (Slack) |
| 7 | OTC 3 | OTC | USDT | 349984 | NEXO | 91715 | $349,984.00 | OTC USDT to NEXO | 4/16/2021 | NEXO-0002705, CRESS-00000034, NEXO-0003445, NEXO-0248348, NEXO-0344326 (Slack), NEXO-0369734 (Slack), NEXO-0369735 (Slack), NEXO-0369736 (Slack), NEXO-0369740 (Slack), NEXO-0344242 (Slack) |
| 8 | OTC 4 | OTC | USDT | 999999 | ETH | 312.1487 | $999,999.00 | OTC USDT to ETH | 5/3/2021 | NEXO-0002705, CRESS-00000034, NEXO-0003604, NEXO-0003442, NEXO-0247810, NEXO-0248326, NEXO-0344325 (Slack), NEXO-0344326 (Slack), NEXO-0369734 (Slack), NEXO-0369735 (Slack), NEXO-0369740 (Slack) |
| 93 | OTC 5 | OTC | NEXO | 1113498 | USDT | 1597712 | $1,597,712.00 | OTC NEXO to USDT | 6/30/2021 | NEXO-002705, NEXO-0003588, NEXO-0344308, NEXO-0003551, NEXO-0248511 (Slack), NEXO-0248512 (Slack), NEXO-0369738 (Slack), NEXO-0369739 (Slack) |
| 94 | OTC 6 | OTC | USDT | 1598386 | NEXO | 1041157 | $1,598,386.00 | OTC USDT to NEXO | 7/4/2021 | NEXO-002705, NEXO-0003588, NEXO-0248278, NEXO-0248511 (Slack), NEXO-0248512 (Slack), NEXO-0369733 (Slack), NEXO-0369738 (Slack), NEXO-0369739 (Slack), NEXO--0344114 (Slack) |

*See* Ex. 1, Nexo's Omnibus Resp. to ROG 21 and Exhibit 2. In other words, ***all relevant emails and Slacks*** related to Cress and his transactions were preserved and produced.

Cress complains that Nexo changed its Slack retention policy for public and private channels days after the filing of the lawsuit, but makes no allegation that ***relevant*** material was lost. He has not identified evidence that Nexo deleted material relevant to his claims, much less that Nexo personnel ***used Slack DMs*** (as opposed to Slack threads) to discuss Cress, other customers, or customer transactions, and he ignores the fact that Nexo actually produced Slack channel communications from this case. Trenchev, the corporate representative, was clear in his testimony that all material relevant to Cress was maintained. When asked whether Nexo had tried to restore Slack messages (which is not possible), Trenchev responded: "***Again, I don't see how and why one would need to do that if it had already taken the larger step of securing the messages and communications of relevance much earlier.***" Ex. 7 at 115:19-116:19 (emphasis added). With respect to the default Slack retention policy changes in March 2021, that was a new default retention policy that only kicked in when there was no channel-specific policy in place. *Id.* at 34:7-35-11;

Ex. 11, Damyanov Depo. at 35:11-37:24; 49:19-51:25; 55:15-57:12. In other words, Nexo had no concerns with making routine changes to its default retention settings because such changes did not impact already preserved material, or material subject to longer channel-specific retention periods.

Cress also makes much of Slack DMs, but the deposition testimony he cites does not show that Nexo personnel used Slack DMs to communicate about customers or customer transactions. *See* Dkt. 135, at 5 (all deponents referring to Slack generally, not Slack DMs). The record shows that Nexo personnel used Slack "threads," a group communication tool, which Nexo produced and which span Cress's transactions in 2021. *See, e.g.*, Ex. 12, NEXO-0344325; Ex. 13, NEXO-0344326; Ex. 14, NEXO-0369733 (Nexo Slack threads referring to Cress in 2021).

Cress also faults Nexo for not using a "litigation hold" feature within Slack. But Cress fails to inform the Court that Nexo used the Slack "Business+ Plan" until the summer of 2025, when it upgraded to the "Enterprise Plan." Dkt. 135-48; Ex. 11 at 60:4-62:14. The Business+ Plan ***does not have*** a litigation hold feature.[8] Ex. 11 at 60:4-62:14. It simply has channel-specific and default retention policy features, which Nexo used in 2021. Nexo cannot be criticized for not using a "litigation hold" feature that was unavailable in Slack, particularly when the evidence shows that Nexo produced all Cress-related Slacks by relying on active collection and channel-level retention policies.

**C. Cress actually failed to produce documents.**

Cress has been unable to identify any Cress-specific document that was not produced by Nexo. Desperate to manufacture the appearance that Nexo had not produced Cress-specific documents, Cress scoured Nexo's production and sent a letter on June 24, at the end of fact discovery, claiming that Nexo's production suffered "serious deficiencies" because Cress could not find ***three*** Cress-specific documents in Nexo's production ***where Cress already had copies***. Ex. 16, June 24, 2026 Cress Correspondence. In response, Nexo immediately produced two of the three documents and explained that the third document (that Cress already had) was likely caught in a spam filter because Cress forwarded an auto-generated email to Hristov. *Id*. In an abundance of

[8] https://slack.com/help/articles/115003205446-Slack-plans-and-features (comparing features of Business+ and Enterprise plans).

caution, Nexo also re-examined its legacy chat systems and confirmed that it had produced all Cress-related chats with customer support. Ex. 17, June 26, 2026 Nexo Correspondence and Production Transmittal. During the course of this exercise, Nexo discovered that Cress had failed to produce (or only partially produced) nine Cress-specific documents that appeared in Nexo's production. *Id.* Nexo immediately raised that issue and requested that Cress supplement his production. *Id.* Cress never responded nor produced the missing documents. Thus, only Cress has failed to produce documents relevant to this litigation. Additionally, in stark contrast to Nexo's voluminous production, Cress has produced a mere 1,708 documents consisting of 19,562 pages. Shelton Dec. ¶ 11. Yet Cress, the party who hasn't produced all his Nexo communications, it seeking terminating sanctions based on speculation Nexo didn't produce imaginary relevant documents he can't identify.

**D. Cress's other contentions are factually inaccurate.**

**Personal Emails.** Cress claims wrongdoing because Nexo extended Trenchev's and Kantchev's retention settings to their personal emails after the lawsuit was filed. But there is no showing that Trenchev or Kantchev used their *personal* email for business purposes, much less for anything having to do with Cress. Ex. 15, Kantchev Depo., 28:1-8 ("Q. Did you use your personal Gmail address for Nexo business? A. No. I was using my Nexo account."); Ex. 7 at 136:10-16 (Trenchev testifying he did not search his personal email because it was not used for business).

**Metodiev Changes.** Cress argues Nexo improperly changed the retention settings for Kalin Metodiev on November 6, 2023. Metodiev is also a co-founder of Nexo, similar to Trenchev and Kantchev. He also was not customer-facing. Ex. 7 at 41:23-42:15; 75:14-76:9 (describing Metodiev as senior management). While Cress now tries to play up Metodiev's importance, the record does not support his claims. Cress did not identify Metodiev in his Demand Letter or original Complaint. Dkt. 135-22; Dkt. 1. He also did not identify him as a person with knowledge of relevant facts in his Initial Disclosures (dated September 9, 2024); or in his First Amended Initial Disclosures (dated June 17, 2025); or in his Second Amended Initial Disclosures (dated April 3, 2026). Shelton Dec. ¶ 12. It was not until ***June 29, 2026*** (the eve of filing his Joint Letter Brief on spoliation discovery dated July 1, 2026) in his Third Amended Initial Disclosures, that Cress suddenly decided to emphasize the importance of Metodiev. *Id.* Similarly, Metodiev was ***never*** identified as a custodian

throughout the parties' meet-and-confer process. And Cress did not take his deposition. Cress never singled out Metodiev as a potential critical custodian like he represents in his motion. Dkt. 135, at p. 22. Dkt. 135-49 was a request to add ***24 additional custodians*** to this case, in addition to the 18 already agreed or ordered, one of which included Metodiev.[9] Nexo responded "Nexo declines to include the 24 additional custodians proposed in your January 21 letter, as they are not relevant to Mr. Cress or his claims, and review of their documents would not be proportional." Dkt. 135-49. That was the end of the inquiry by Cress. Cress went on to pursue Trenchev and Kantchev as custodians, but abandoned any requests as to Metodiev.

**Kunkel's Alleged Deletions.** Cress, through his "expert" Kunkel, created a list of allegedly relevant documents he claimed were "deleted." Kunkel testified under oath that he was not offering an opinion that any deleted information was relevant to this lawsuit (Ex. 9 at 33:14-18) so his opinion here is of questionable value. However, his report is further called into question by his incorrect allegations. Kunkel's report identifies nine emails by subject line as targeted by one-day retention rules, even though each of these communications were ***not*** permanently deleted. Dkt. 135-15 at 10. And Cress followed up this report with a set of RFPs asking for production of the allegedly deleted documents. Ex. 18. Nexo responded by producing copies of the documents,[10] yet Cress continues to advance the argument that targeted deletion of emails occurred in September 2024. Nexo has produced or logged communications for each of these emails—not because they are relevant, but to disprove Cress's false spoliation allegations.

---

[9] Cress claims that Dkt. 135-49 shows "plaintiff requesting Metodiev as a custodian," but Dkt. 135-49 is actually a letter from Baker McKenzie.

[10] Nexo produced or logged the following documents that Kunkel falsely claimed were destroyed: (1) NEXO-0370097: subject: Deposit to Exchange alert for; to: hristiyan@nexo.io; (2) PRIV-0000045 and PRIV-0000049: subject: amending templates used by the sales team; (3) NEXO-0248334: subject: All OTC deals part 1 (22.04.2021-19.01.2021) (previously produced as it contained Cress's OTC transactions, proving Nexo's retention efforts worked); (4) NEXO-0370211: subject: All OTC deals part 2 (21.01.2021- 30.10.2020); (5) NEXO-0370325: subject: All OTC deals Part 3 (30.10. 2020-07.06.2020) - Last part from Edward's Inbox; (6) PRIV-0000291 – PRIV-0000297: subject: Lawyers' Email, 05112021; (7) NEXO-0370451: subject: NEXO token liquid... - @katerina@nexo.io client signed off t...; (8) NEXO-0370429: subject: Akin Gump LLP – Letter to Nexo – 22 Sept 2021.docx; and (9) NEXO-0370479 and NEXO-0370481: To: kiril@nexo.io OR from: kiril@nexo.io AND Urgently contacts.

**LabelRet and ROM Targeted Deletions.** Another red herring put forth by Cress regarding "targeted deletions" relates to items marked "LabelRet" and "rom" deletions. Nexo's discovery responses, and Greetham's report, explain that Nexo's one-day retention rules were implemented to delete two categories of documents: (1) spam and phishing messages that presented security risks, and (2) documents related to the settled *Morton* litigation in the UK. Ex. 29, Nexo's Response to ROG 24; Ex. 8 at 20-21. There is no evidence that these targeted deletions related in any way to Cress or his claims. Cress sent Nexo discovery requests regarding these alleged targeted deletions, which Nexo opposed, and the Court denied Cress's motion to compel. Dkt. 133; Dkt. 139. Further, the audit logs show only that retention rules existed and were administered. They do not identify the underlying documents, do not establish that any Cress-relevant information was destroyed, do not show that responsive material was not collected before disposition, and do not support an inference that Nexo acted with the intent to deprive Cress of evidence. Damyanov's testimony was consistent throughout: he implemented legal-directed retention rules but had no knowledge of the contents of LabelRet or rom, the selection of documents for those labels, or whether any affected document related to the Cress action. *See, e.g.*, Ex. 11 at 116:1-117:13.

**Other Changes.** Finally, Cress cherry-picks certain retention changes in the log and tries to tie them to events in this case. Cress tries to create the impression that the ***only*** changes in the log were temporally connected with this case, but he ignores numerous other changes that do not fit his narrative. For example, the Trenchev, Kantchev, and Slack DM retention changes in December 2022 were ***more than a year after*** Cress's October 2021 Demand Letter and ***months before*** he filed suit in February 2023. Cress does not allege that Nexo knew a complaint was imminent, or that the December 2022 activity had anything to do with Cress or the narrow dispute as it then existed. In addition, the audit logs show the same type of retention-rule activity that Cress complains of occurring in clustered bursts, across many unrelated dates—both before and after the alleged "milestones." As Greetham explained in his report, one-day retention rules targeting specific emails are not extraordinary and were used to target (1) spam and phishing emails that presented security threats, or (2) documents related to the settled *Morton* litigation. Ex. 8 at 20. All other default retention policies in the log had legitimate explanations unconnected to Cress, and they were

consistent with normal Information Governance principles. *Id.* at 17-20.

**E. Other lawsuits or regulatory inquiries are irrelevant.**

Cress spends an inordinate amount of time on other Nexo disputes apparently to establish what is not otherwise demonstrated—an obligation ***in this case*** to have preserved even more documents. First, *Morton* was a case pending in the UK and has no connection to this matter. *Morton* involved a claim by a group of investors who alleged that Nexo blocked them from withdrawing $126 million in cryptocurrency and froze their accounts.[11] That has nothing to do with Cress's claims that he was defrauded by the VIP program brochure or paid undisclosed fees.

Similarly, Cress relies on SEC and state agency inquiries to create some obligation to maintain records in this matter. Again, there is no connection. The SEC and state agencies investigated Nexo regarding its offering of the Earn Interest product.[12] Cress does not allege any claims regarding the Earn Interest product. To the extent any inquiry tangentially touched the NEXO Token or credit lines, Cress subpoenaed records from the SEC and CDFPI. All of this is moot because Nexo produced 4,399 documents, spanning 24,284 pages, consisting of all correspondence between its outside counsel and federal and state regulators, including SEC and CDFPI. Ex. 10.

The same is true of the other Demand Letters Cress attaches to his Motion at Exhibits 23, 24, and 25. By his own admission, these Demand Letters were about alleged "improper liquidations" specific to other customers. Dkt. 135 at 4. Nexo already preserved all documents related to Cress's liquidations, so how could demand letters related to other customer liquidations expand the scope of Nexo's preservation obligation with respect to Cress?

Cress also notes the *Jeong v. Nexo* matter previously pending in this district. That case started as a class action but, in March 2023, the court struck the class allegations, meaning it was a one-party case involving a single plaintiff. Ex. 19, 5:21-cv-02392-BLF, Dkt. 84 (Order Granting Mtn. to Strike Class Allegations). *Jeong* involved allegations that Nexo improperly suspended XRP as a credit line repayment option after the SEC filed an enforcement action in December 2020 claiming that XRP was an unregistered security. Ex. 20, Dkt. 71 (Third Amended Complaint), at ¶¶ 6-10.

---

[11] A summary of the claims can be found here: https://tinyurl.com/msy3duch.
[12] https://www.sec.gov/newsroom/press-releases/2023-11.

Jeong's liquidation losses were allegedly caused by his inability to use XRP. The allegations in *Jeong* have nothing to do with the allegations in *Cress*, which happened over a year after the XRP suspension and did not involve XRP.

Finally, there has been no allegation or finding in any of these other cases or regulatory inquiries that Nexo failed to preserve or produce documents. The only evidence before the Court is that Nexo has complied with its document preservation obligations in all matters, including this one. None of these unrelated matters created additional preservation obligations in this matter.

**III. Cress asserts spoliation allegations because his case is weak.**

Cress filed the present motion because his case is struggling on the merits. Cress claims to be a naïve investor that was "duped" by Nexo, but Cress was, in fact, an experienced and "accredited" investor (Ex. 21, NEXO-0017263) who had accumulated over $12 million in cryptocurrency before joining the Nexo platform. Ex. 22, Cress's Resp. to Interrogatory No. 12. He joined the Nexo platform because his "goal was to do borrowing and lending" against his crypto assets from the very beginning. Ex. 23, NEXO-0003125. Cress had been researching crypto lenders for weeks and sought out Nexo so he could achieve his leveraged investing "playbook." *Id.*; *see also* Ex. 24, CRESS-00001134 (Cress writing a friend, saying "I found the playbook"). As Cress explained, he was following other crypto investors (including Michael Saylor) to guide his investments. Ex. 2 at -699.

> He's also the reason I moved all my bitcoin and ethereum from Coinbase to NEXO, borrowed 60% of my value using my coins as collateral and magically increased my holdings by 60%!! Unbelievable
> 06:39:46 pm

Cress was not duped. Consistent with his playbook, Cress took out the multi-million dollar credit lines, collateralized by his digital assets, to buy more crypto. Ex. 25, CRESS-00001707 ("I also have an entirely new bitcoin strategy that's much better and tax efficient, courtesy of Michael Saylor and Nexo which is working great.").

Cress's Second Amended Complaint (Dkt. 88) relies heavily on the allegation that Nexo did not disclose its fees to Cress, but that is false. Cress admitted that every crypto exchange he has ever used, including while he amassed over $12 million in crypto, charged him fees on his transactions.

Ex. 26, Cress Depo., 27:2-30:19. Nexo was no different. On March 25, 2021, before he entered into any transactions with Nexo, Cress wanted to confirm his understanding of how the OTC desk worked compared to Coinbase. He asked if he could just "sell through the Nexo OTC desk ***with the same fees***." Ex. 27, NEXO-0003341 (emphasis added). On April 6, 2021, in the midst of borrowing from Nexo, Cress's friend asked "Wow-you can get margin from Nexo? Are the fees better than [Coinbase]?" Ex. 2 at -699. In response, Cress wrote:

> The fees are not better, but they allowed me to make more money in a short amount of time than I ever thought I could .... they can have the fee ha ha
> 06:41:40 pm

In fact, he went further and explained exactly how Nexo calculated its fee and said he was "ok with it." *Id*. at -700.

> I go through their OTC desk, so it's not even fees really - they execute my order over a 24 hour period and use a weighted average for my price and Avery time the execution price is magically at the very high end of the 24 hour price, so they basically front run my order and take a big slippage as their profit
> 06:44:49 pm

> I'm ok with it though
> 06:45:24 pm

Cress knew and did not care Nexo was charging him fees. So long as Cress was making money, he was overjoyed with Nexo, describing his gains as the "fastest easiest million ever":

> I own over 1 million Nexo tokens which were purchased purely off my credit line and Nexo is up over $1 since I got it. It's the fastest and easiest million ever
> 07:37:22 pm

Ex. 4 at -12578. When a friend noted in a chat that another platform would charge transaction fees on the sale of cryptocurrency, Cress replied:

> It doesn't matter - Nexo rips me off worse than that every time, but it doesn't matter
> 05:13:01 pm

Confirming his knowledge of fees, Cress ***actively discussed*** the 1% transaction fee on one of his OTC purchases weeks before his first liquidation. Ex. 3 at -453. Because Cress knew about the fees, and knew the serious risks associated with his leveraged investment "playbook," when the market turned against him, he knew he only had himself to blame. In a moment of candor, Cress admitted

to a friend it was all his own fault. Ex. 28, CRESS-00013030 at -13040.

> Basically there has never really been a great plan. I fucked myself a long time ago taking this much in loans and buying BTC at high prices..... there's never really been a great plan to unwind
> 07:25:53 pm

As for Cress's unbelievable claim that he was duped by Nexo's VIP brochure into thinking he could engage in multi-million-dollar leveraged crypto investing ***with no risk of loss***, Cress asked about his liquidation thresholds repeatedly, showing he was keenly aware of the risk of liquidation. *See, e.g.*, Ex. 3 at -441, -443, -444, -445, -449, and -451. If Cress truly believed he had a special "no liquidation guarantee" from Nexo, he would not have cared about liquidation thresholds. Immediately after his liquidations, Cress told Hristov "I don't know what the liquidation relief program is," showing he did not subjectively interpret any VIP brochure statement as promising a risk-free investment: Cress could keep his leveraged gains while Nexo would cover his losses. Ex. 6, CRESS-00002095. Nor would such a ridiculous interpretation be reasonable because Cress knew it was the opposite of how collateralized credit lines actually work, as disclosed in the Credit Terms to which Cress agreed. These highly detrimental admissions are why Cress is relying on a terminating sanctions motion to smear Nexo in advance of summary judgment while simultaneously attempting to avoid the need to produce evidence to support his meritless claims.

## ARGUMENT

### I. Cress is not entitled to Rule 37(e) sanctions.

#### A. Rule 37(e) governs the failure to preserve ESI and imposes a high burden.

Sanctions are only available under Rule 37(e) where electronically stored information ("ESI") (1) "should have been preserved in the anticipation or conduct of litigation;" (2) the party "failed to take reasonable steps to preserve it;" and (3) the ESI is therefore "lost" and "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Cress bears the burden of proof for these threshold requirements. *See Ryan v. Editions Ltd. West, Inc.*, 786 F.3d 754, 766 (9th Cir. 2015). Where the evidence in question "consists of ESI, Rule 37(e), not inherent authority, supplies the controlling legal standard." *Pauly v. Stanford Health Care*, No. 18-CV-05387-SI (TSH), 2022 WL 4137579, at *2 (N.D. Cal. Aug. 22, 2022), *report and recommendation adopted*,

No. 18-CV-05387-SI, 2022 WL 4133298 (N.D. Cal. Sept. 12, 2022) (Hixson, J.). To show spoliation, Cress must show that Nexo had "some notice that the documents were potentially relevant" to the litigation *before* they were destroyed. *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). Rule 37(e) requires that the moving party show that the opposing party failed to take "reasonable steps" to preserve the ESI at issue. As the Advisory Committee Notes explain, the "reasonable steps" standard does not "call for perfection." Advisory Comm. N. A party moving for sanctions under Rule 37(e) must also show that the ESI at issue "is lost . . . and it cannot be restored or replaced through additional discovery." ESI is not "lost" where it is available from another source. *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016).

The remedies available under Rule 37(e) vary based on whether the moving party establishes specific intent. An adverse instruction and terminating sanctions require the moving party to establish that its opponent "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Simply pointing to documents missing from a custodian's production is not enough; both the Federal Rules and the law of this Circuit require far more. *See id.*; *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (declining to draw an adverse inference where nothing in the record indicated that the litigant destroyed records "in response to [that] litigation" or "with the intent of covering up information"); *see also Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1147 (N.D. Cal. 2012) (holding that a sanctioning court must find that the party acted in "conscious disregard" of its preservation obligations).

If intentional destruction is not established, and thus neither an adverse instruction nor terminating sanctions is permitted, the Court is authorized to award lesser sanctions only if it determines that the moving party was prejudiced by the loss of ESI that cannot be obtained from other sources. Fed. R. Civ. P. 37(e)(1). "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Advisory Comm. N. The Court may only "order measures no greater than necessary to cure the prejudice" caused by the unavailability of the information that was lost. Fed. R. Civ. P. 37(e)(1).

### B. Nexo preserved all required material.

#### 1. The Demand Letter disclosed potential claims based only on Cress's own OTC transactions and VIP-brochure theory.

The October 2021 Demand Letter was narrow. It only identified alleged misrepresentations made to Cress in the VIP brochure. There is no complaint that Nexo did not preserve and produce (1) all correspondence and chats between Nexo and Cress; (2) all transaction records, both internal and external, relating to Cress; and (3) all internal communications regarding Cress's transactions.

From the Demand Letter, there is no way Nexo could have known that Cress might one day claim that Trenchev or Kantchev had relevant documents, or that he would assert a RICO claim in October 2025 based on "undisclosed fee" allegations that are nowhere in his 2021 Demand Letter. If that were the standard, every CEO email at every company could someday be deemed relevant to a customer dispute—and, by extension, so could every company email.

Courts define the scope of a litigant's document preservation obligation based on the scope of notice and the description of potential claims in pre-suit correspondence. *See Herb Hallman Chevrolet, Inc. v. Gen. Motors LLC*, No. 3:22-CV-00447-MMD-CLB, 2024 WL 3160746, at *7 (D. Nev. June 24, 2024) ("Based on the letters from Champion it is reasonable for GM to have assumed allocation information would not be the basis of potential claims but rather the claims would arise out of GM's discretionary distribution of STMI inventory."). The earliest date that any duty to preserve documents related to Cress's claims arose in October 2021, and originally only extended to documents and custodians Nexo could reasonably have anticipated from the Demand Letter—namely, documents related to Cress's OTC transactions and his correspondence with Hristov.

#### 2. The original Complaint did not broaden Nexo's preservation obligations.

When Cress finally got around to filing his actual lawsuit in February 2023—a year and a half after the Demand Letter—it was very similar to the claims outlined in his letter, with the addition of new legal theories. His new securities claims did not meaningfully change the scope of Nexo's preservation obligations, and the Court promptly narrowed Cress's securities claims to relate only to the sale of the Nexo Token and, specifically, the representation ***to him*** that the Nexo Token

was registered with the SEC as a security.[13] Again, Nexo preserved and produced all documents relating to statements made to Cress and the sales of the Nexo Token to him. Not only that, Nexo also produced a verified response to Cress's Interrogatory No. 3 ("ROG 3") identifying Nexo's direct sales of the NEXO Token to all US customers, in addition to accredited investor documentation for each of those customers listed in ROG 3.[14]

**3. Cress cannot use his 2025 fee claims or RICO theories to retroactively expand the scope of Nexo's preservation obligations years earlier.**

Cress's claims did not change dramatically until October 2025 when he added RICO and a slew of other new claims related to Nexo's fees. That was the first mention of undisclosed fees by Cress in this litigation whatsoever. That timing matters. Rule 37(e) does not permit a party to manufacture a preservation breach by expanding the case years later and then faulting its opponent for not having preserved every category of information that might become relevant only under the newly pleaded theory. *See Herb Hallman Chevrolet, Inc.*, 2024 WL 3160746, at *7.

**4. Other cases cannot expand Nexo's duty to preserve *in this case*.**

Cress wants to focus on other cases (*Morton*, *Jeong*, federal and state regulatory inquiries, etc.) and not this case. He dedicates much of his motion to arguing that Nexo's document preservation obligations for this case were triggered by other cases and regulatory inquiries that began years ***before*** Cress was even a Nexo customer and involving issues ***wholly absent*** from his Demand Letter. For the reasons explained above, Nexo complied with its preservation obligations when it received notice of Cress's claims, and other litigation or regulatory inquiries did not expand the scope of Nexo's preservation obligation beyond what Nexo already did. See *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, considered this issue. 328 F.R.D. 543, 551 (N.D. Cal. 2018) ("When questioned at oral argument, HPE could not provide any authority to support its argument that Oracle's obligation to preserve evidence in connection with *Itanium* carries over to this litigation or that this Court could enforce a preservation obligation in a different case conducted before a

---

[13] The Court dismissed Cress's UCL claim and narrowed his securities registration claim and securities fraud claim to only apply to sales of the Nexo Token. Dkt. 26.

[14] Those records are identified by Bates number for each individual customer in a schedule (Appendix C) to Nexo's expert, Randall Valentine's, report.

different judge in a different jurisdiction, which is now on appeal. Accordingly, Oracle did not have a duty to preserve evidence for this litigation based solely on *Itanium*.").

While the SEC inquiry focused on and resulted in an order concerning the irrelevant Earn Interest Product, Cress argues a portion of the SEC inquiry in 2019-2020 touched upon "Nexo's U.S. sale of NEXO tokens and its marketing of the Tokens as 'SEC-compliant.'" Dkt. 135 at 8. But Cress's 2021 Demand Letter ***did not mention*** the NEXO Token or whether it was SEC-compliant, and his 2023 Complaint was the first time Nexo had notice that the NEXO Token was relevant to Cress's claims. The 2023 Complaint was filed three years ***after*** Trenchev's interactions with the SEC in 2019-2020 and months ***after*** his retention policy change in December 2022. In any event, Nexo produced all correspondence between its outside counsel and federal and state regulators, and Cress ***has a copy*** of the 2020 Trenchev-SEC correspondence. Ambrose Decl., Ex. 16. Similarly, unlike the *Morton* matter—a lawsuit in a foreign country involving different parties, different facts, different claims, and a different discovery regime—Cress has no allegation that Nexo "froze" his account or "coerced" an OTC sale. The *Jeong* matter involved unrelated claims concerning Nexo's suspension of XRP as a credit line repayment option in response to an SEC enforcement action in December 2020. Ex. 21 at ¶¶ 6-10.

**C. Nexo's preservation efforts were reasonable.**

To obtain any sanctions under Rule 37(e), Cress must also show that Nexo "failed to take reasonable steps to preserve" the ESI at issue. He cannot. The uncontradicted testimony is that Nexo reasonably relied on active collection and default retention policies to collect evidence for this matter. The proof of the effectiveness of this collection method is in the pudding—Nexo actually produced all Cress-related documents in this action, and Cress cannot identify one that he did not.

It was not necessary for Nexo to implement a redundant "legal hold" within Google because, with the exception of the three apex executive retention policies discussed above, the default policy was to indefinitely preserve the Google accounts of all current employees, and Nexo took steps to preserve Hristov's account after he departed. *Supra* p. 4. Furthermore, as to Slack, Nexo did not have the Enterprise Plan allowing "legal hold" functionality until Summer 2025. Before that, similar to Google, Nexo relied on active collection, and custom retention periods for certain channels. As

shown above, Nexo collected and produced all Slacks relevant to Cress. This collection was all that was required by law. Cress's suggestion that sanctions are proper based on the mere absence of a legal hold—when all evidence shows that relevant materials were collected and produced by other methods—is inconsistent with law. *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1007 (D. Ariz. 2011) ("Per se rules are too inflexible for this factually complex area of the law where a wide variety of circumstances may lead to spoliation accusations. An allegedly spoliating party's culpability must be determined case-by-case.").

**D. Cress cannot identify any lost unique evidence needed to support sanctions.**

To obtain relief under Rule 37(e), Cress must show that Nexo lost unique information that is unavailable from any other source, including the files of other custodians. *See Oracle Am., Inc.*, 328 F.R.D. 543, 552 (finding that Apex custodian's deleted documents were not unique as to support a spoliation claim as they were produced in various forms by other custodians). Cress cannot satisfy this requirement by pointing to documents in its possession from other sources, which are not "lost" within the meaning of Rule 37(e). As for Cress's reference to "[p]otentially hundreds of thousands of messages in Slack Channels," (Dkt. 135, at 20), Nexo has already produced all Cress-related Slack threads. His claim that other Slack messages deleted pursuant to default retention policies might be relevant to his claims is utterly speculative and cannot support a spoliation finding.

Cress's expert, Kunkel, identified a list of specific documents in his report that he contends Nexo deleted—emails with the subject "All OTC deals part 1 (22.04.2021-19.01.2021)," "All OTC deals part 2" and "part 3," "Nexo token liquid," "Akin Gump LLC-Letter to Nexo," and "amending templates used by the sales team." Dkt. 135-15, Kunkel Rprt., at ¶ 34. Nexo's rebuttal expert addressed each of those documents individually in his report, and the record shows that not one of them supports a deletion narrative: each was either produced in this litigation, still exists and was gathered into Nexo's NUIX collection but not produced because it did not hit on any Cress-specific terms, or was logged as privileged. Ex. 8 at 21-22. Cress's demand for terminating sanctions does not identify one document relevant to this case that was actually deleted and is unavailable.

**E. The audit logs do not show intent to deprive Cress of relevant evidence.**

A court may impose an adverse inference or terminating sanctions only if the moving party

proves that relevant ESI was destroyed with the intent to deprive the opposing party of its use in the litigation. Fed. R. Civ. P. 37(e)(2). Cress has not made that showing. Cress's theory rests entirely on the assertion that certain retention activity occurred near supposed litigation "milestones." This opposition has methodically explained that every retention policy change in the log had a legitimate explanation unrelated to Cress, including one-day retention rules targeting spam and phishing emails, or documents related to the *Morton* litigation. There is no evidence of intent—only Cress cherry-picking routine retention activity and trying to align it with litigation events after the fact.

**F. The discovery record forecloses any claim of prejudice.**

Absent proof of intentional destruction, adverse instructions and terminating sanctions are unavailable. Lesser sanctions under Rule 37(e)(1) require prejudice from missing ESI that cannot be obtained from other sources. Given the breadth of the witnesses examined, the scope of testimony obtained, and Nexo's production of tens of thousands of documents, Cress cannot plausibly demonstrate that unidentified allegedly missing or deleted documents have prejudiced his ability to discover relevant facts or present his claims. To the contrary, the extensive discovery already taken provided Cress with ample opportunity to explore the underlying facts, test Nexo's explanations, and develop whatever arguments he wishes to make regarding the merits.

Cress is not entitled to any "alternative" or "lesser" relief under Rule 37(e)(1) because he identifies no specific evidence that is "lost." Without lost evidence, the Court cannot assess whether Cress has been prejudiced, as Rule 37(e)(1) requires. If the rule was otherwise, a plaintiff could rely on rank speculation that a corporate defendant spoliated evidence because unknown documents were deleted by normal retention policies. The documents Cress identified in Kunkel's expert report do not suggest that Cress was deprived of unique information of such material importance that Cress would be prejudiced.

**II. Cress cannot revive his failed spoliation theory under Rule 37(b) or inherent authority.**

**A. Rule 37(b) does not support Cress's claims.**

Cress's requests for sanctions under Rule 37(b) and the Court's inherent authority are little more than an effort to repackage his Rule 37(e) spoliation theory under less demanding standards. The Court should reject that attempt. In situations concerning whether ESI was lost, a court may

only issue sanctions under Rule 37(e). Rule 37(b) applies only where "a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery . . . ." Fed. R. Civ. P. 37(b*); see also RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 342 F.R.D. 461, 490 (C.D. Cal. 2022) (delineating between a court's authority to issue sanctions under Rule 37(b), Rule 37(e), and its inherent authority). Terminating sanctions are also unavailable under Rule 37(b) or inherent authority absent key factors, chiefly "prejudice and availability of lesser sanctions." *Pauly v. Stanford Health Care*, No. 18-CV-05387-SI (TSH), 2022 WL 774296, at *4 (N.D. Cal. Mar. 14, 2022) (Hixson, J.).

**B. Nexo did not violate any Court order.**

Cress loosely alleges three instances of disobedience. *First*, he claims Nexo violated Dkt. No. 65 by maintaining "rolling . . . deletion rules . . . throughout the court-ordered search-and-production period." But Dkt. No. 65 required Nexo to include Trenchev and Kantchev as custodians and investors@nexo.io and investors@nexo.com as non-custodial sources, and it is dated February 19, 2025. At that time, Cress's claims had not expanded, and any changes to retention rules happened years earlier. Nevertheless, Nexo complied with the Court's order and produced documents from those sources as it existed when ordered. What Cress actually alleges is spoliation, which Rule 37(e)—not Rule 37(b)—governs. And, as discussed above, that claim fails.

The cases Cress cites confirm the distinction. In *Facebook, Inc. v. OnlineNIC Inc.*, the court applied Rule 37(e) to the spoliation allegations and Rule 37(b) only to the defendant's failure to comply with a ***specific*** order requiring that a special master have unencumbered access to databases, passwords, and backups. No. 19-cv-07071-SI (SVK), 2022 WL 2289067 (N.D. Cal. Mar. 28, 2022). Likewise, in *WeRide Corp. v. Kun Huang*, the court applied Rule 37(e) to spoliation and Rule 37(b) to a preliminary injunction that expressly prohibited destroying, deleting, removing, or altering documents and ESI. No. 5:18-cv-07233-EJD, 2020 WL 1967209 (N.D. Cal. Apr. 24, 2020). In *Red Wolf Energy Trading*, the court imposed sanctions under Rule 37(b) only after granting a motion to compel that ordered the defendant to review a custodian's production, supplement that production and other discovery responses, and file an affidavit certifying compliance. The defendant "filed a sworn affidavit on behalf of all defendants claiming to have done so," but that certification "proved

to be untrue." 626 F. Supp. 3d 478, 482 (D. Mass. Sept. 8, 2022). Here, there was no order compelling Nexo to suspend any retention setting, preserve any specific category of ESI beyond what Rule 37(e) already requires, or take any action that Nexo disobeyed. Where the alleged misconduct is loss of ESI, Rule 37(e) provides the rule. Cress argues that Nexo deleted documents on February 17, 2025, "in anticipation of the Court's ruling," again pointing to Dkt. No. 65. But Nexo has already explained that the "rom" label related to the *Morton* matter, not Cress. The deletion was part of ordinary information governance for unrelated material, not an attempt to evade a Court order in this case. Coincidental timing does not establish disobedience.

Cress claims Nexo litigated the scope of discovery while concealing non-compliance, focusing on Nexo's position that Metodiev was not a relevant custodian. That argument fails for the reasons already explained: Metodiev was not customer-facing, had no connection to Cress, was not identified by Cress in his Demand Letter, pleadings, disclosures, or custodian proposals until the eve of this spoliation dispute, and has not been deposed. Similarly, Nexo did not delay, conceal, or misrepresent its collection efforts. Nor can Cress avoid Rule 37(e) by invoking inherent authority. The 2015 amendments to Rule 37(e) foreclose reliance on inherent authority to sanction alleged loss of ESI where the rule applies. Because Cress's theory is entirely about allegedly missing electronic information, his request rises or falls under Rule 37(e), not Rule 37(b) or inherent authority.

**III. No lesser sanction is warranted because there is nothing to cure.**

For the same reasons, no lesser sanction is appropriate either. Rule 37(e)(1) permits only measures no greater than necessary to cure actual prejudice from lost ESI. Cress identifies no lost relevant information, much less prejudice requiring a cure. And the sanctions he seeks—terminating sanctions, adverse inferences, evidentiary exclusions, fee-shifting, and other curative measures—would punish Nexo for ordinary retention policies, not remedy any demonstrated harm. Because there was no violation of a court order, no bad faith, no lost unique evidence, and no prejudice, the Court should deny all requested sanctions.

## CONCLUSION

The Court should deny Plaintiff's Motion for Terminating Sanctions or, in the Alternative, Curative Sanctions Pursuant to Fed. R. Civ. P. 37(e), 37(b), and the Court's Inherent Authority.

DATED: July 27, 2026

BAKER & MCKENZIE LLP

By *\/s/ Ian S. Shelton*

Ian S. Shelton

*Attorneys for Defendant Nexo Capital Inc.*